**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------x
IN RE: AMERICAN EXPRESS ANTI-STEERING
RULES ANTITRUST LITIGATION

This Document Relates To:                       11-MD-02221 (NGG) (RER)
CONSOLIDATED CLASS ACTION
-----------------------------------------------------------------x
THE MARCUS CORPORATION,
on behalf of itself and all similarly situated persons,

                                                13-CV-07355 (NGG) (RER)

                        Plaintiff,

                - against -

AMERICAN EXPRESS COMPANY et al.,

                        Defendants.
-----------------------------------------------------------------x


**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF**
**MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT**


FRIEDMAN LAW GROUP, LLP              PATTON BOGGS LLP
    Gary B. Friedman                     Read K. McCaffrey
    Tracey Kitzman                       2550 M Street, NW
    Scott Levy                           Washington, DC 20037
    Rebecca Quinn                        (202) 457-6000
    270 Lafayette Street
    New York, New York 10012
    (212) 680-5150

REINHARDT WENDORF & BLANCHFIELD
    Mark Reinhardt
    Mark A. Wendorf
    1250 East First National Bank Building
    332 Minnesota Street
    St. Paul, MN 55101
    (651) 287-2100

                                                January 7, 2014

<u>Table of Contents</u>

Table of Authorities…………………………………………………………………… ii

Preliminary Statement……………………………………………………………… 2

Factual Background………………………………………………………… 7

    A.    *Procedural History*…………………………………………………… 7

    B.    *Anti-Steering Rules Challenges*……………...…………………… 9

    C.    *The Amex ASR Litigation*……………………...………………………… 11

    D.    *Settlement Process* ……………………...…………………………….. 12

    E.    *Settlement Terms*……………………...…………………………….. 14

    F.    *Relation to DOJ Action* ……………………...………………………… 16

**ARGUMENT**

I.    PRELIMINARY APPROVAL IS WARRANTED…………………...…….. 17

II.   THE PROPOSED NOTICE PLAN AND NOTICE
      SHOULD BE APPROVED……………………...…………………………..… 20

III.  PROPOSED SCHEDULE……………………...……………………………… 22

CONCLUSION ……………….....…………………...………………………… 24

i

Table of Authorities

Cases

*Amchem Prods., Inc. v. Windsor,*
   521 U.S. 591 (1997)……………………………………………………………18, 19

*American Express Co. v. Italian Colors Restaurant.,*
   130 S. Ct. 2401 (May 3, 2010)……………………………………………………….9

*American Express Co. v. Italian Colors Restaurant,*
   133 S. Ct. 2304 (2013)……………………………………………………………….9

*AT&T Mobility v. Concepcion,*
   131 S. Ct. 1740 (2011)……………………………………………………………….9

*Blessing v. Sirius XM Radio Inc.,*
   No. 09-cv-1035 (HB)(RLF) (S.D.N.Y.) [DE-108]……………………………………21

*Bourlas v. Davis Law Assocs.,*
   237 F.R.D. 345 (E.D.N.Y. 2006)…………………………………………………...18

*Expressions Hair Design v. Schneiderman,*
   2013 WL 5477607 (S.D.N.Y. Oct. 3, 2013)…………………………………………5

*In re Initial Pub. Offering Sec. Litig.,*
   243 F.R.D. 79 (S.D.N.Y. 2007)……………………………………………………17

*In re NASDAQ Market-Makers Antitrust Litig.,*
   176 F.R.D. 99 (S.D.N.Y. 1997)……………………………………………………17

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.,*
   05-MD-1720 (EDNY) (JG) (JO) [DE-6124],
   2013 U.S. Dist. LEXIS 179340 (E.D.N.Y. Dec. 13, 2013)…………….......3, 5, 6, 18, 20

*In re Prudential Sec. Inc. Ltd. P'ships Litig.,*
   163 F.R.D. 200 (S.D.N.Y. 1995)…………………………………………………...17

*Italian Colors Restaurant v. American Express Co.,*
   2003 WL 22682482 (N.D. Cal. Nov. 7, 2003)…………………………………………7

*Marcus Corp. v. American Express Co.,*
  2005 U.S. Dist. LEXIS 13170 (S.D.N.Y. July 1, 2005)…………………………………..8

*In re American Express Merchants Litig.,*
  554 F.3d 300 (2d Cir. 2009)………………………………………………………………9

*In re American Express Merchants Litig.,*
  634 F.3d 187 (March 8, 2011)……………………………………………………………9

*In re American Express Merchants Litig,*
  667 F.3d 204 (February 1, 2012)…………………………………………………………9

*In re Baldwin-United Corp.,*
  105 F.R.D. 475 (S.D.N.Y. 1984)……………………………………………………...22

*In re Marsh & McLennan Cos. Sec. Litig,*
  2009 WL 5178546 (S.D.N.Y. Dec. 23, 2009)…………………………………………...18

*Padro v. Astrue,*
  2013 U.S. Dist. LEXIS 150494 (E.D.N.Y., Oct. 18, 2013)……………………………21

*Precision Assocs. v. Panalpina World Transp., Ltd.,*
  2013 U.S. Dist. LEXIS 121795 (E.D.N.Y. Aug. 27, 2013)……………………………...21

*Reade-Alvarez v. Eltman, Eltman & Cooper, P.C.,*
  237 F.R.D. 26 (E.D.N.Y. 2006)………………………………..………………………17, 18

*Wal-Mart Stores, Inc. v. Dukes,*
  131 S. Ct. 2541(2011)……………………………………………………………………19

*Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.,*
  396 F.3d 96 (2d Cir. 2005)………………….…..………………………………...…17, 18, 21

Treatises

Manual For Complex Litigation (Fourth)
  §§21.311-312 (2004 Ed.) …………………………………………………………..…  22

Manual For Complex Litig. (Third)
  § 30.42 (1995)……………………………………………………………………………18

iii

3 Newberg On Class Actions
§ 8:40 (4th ed.)…………………………………………………………………………………22

Class Plaintiffs[1] respectfully submit this memorandum of law in support of their motion seeking Orders from this Court:

(1)     Granting preliminary approval of the settlement of the consolidated class action proceedings in *In re American Express Anti-Steering Rules Antitrust Litig.* ("*Amex ASR*")*,* 11-MD-2221, in accordance with the Class Settlement Agreement annexed hereto as Exhibit A (the "Settlement Agreement" or "SA"), including (i) approval of the class notice plan set forth in SA Appendix E (plan of distribution of notice) and SA Appendix F (contents of notice) (together, the "Notice Plan"),  (ii) certification of a class for settlement purposes and appointment of class counsel; and (iii) issuance of an injunction against collateral litigation by class members outside of this forum;

(2)     Adopting the December 23, 2013 preliminary approval order issued by Judge Daniels in *Marcus Corp. v. American Express* ("*Marcus*"), which was since transferred to this Court, and directing Notice Plan be followed with respect to *Marcus* as well as *Amex ASR;* and

(3)     Establishing a schedule, consistent with the terms of the Settlement Agreement, for the provision of notice to members of the class, the filing of papers in support of and opposition to the proposed settlement, and for a final fairness hearing.

For the convenience of the Court, proposed Orders granting preliminary approval with respect to the *Amex ASR* and *Marcus* actions, respectively, are annexed hereto as Exhibit B and Exhibit C, and the proposed schedule is set forth below at Section III and further contained in the proposed preliminary approval orders.

---

[1]  The term "Class Plaintiffs" as used in this memorandum refers to the putative class plaintiffs in MDL 2221 – namely, Animal Land, Inc., Firefly Air Solutions, LLC, Il Forno, Inc., Italian Colors Restaurant, Jasa Inc., Lopez-Dejonge, Inc., and Plymouth Oil Corp. As applied to matters subsequent to the transfer to this Court of *Marcus Corp. v. American Express*, 04 Civ. 0532 (GBD) (S.D.N.Y.), the term is meant to include plaintiff The Marcus Corporation as well.

## PRELIMINARY STATEMENT

The injunction that lies at the heart of this proposed settlement represents some of the most consequential relief ever obtained in a private enforcement action under the U.S. antitrust laws.  The injunction builds on the equitable relief obtained recently in merchant class cases against Visa and MasterCard, and provides merchants – for the first time ever – readily usable market-based tools for reversing the ever-escalating costs of payment card acceptance.  Coming as it does on the heels of more than ten years of hard-fought litigation in numerous courts – including the *Amex ASR* litigation before this Court, the *Marcus* class action recently transferred to this Court by Judge Daniels and the *Italian Colors* case that was decided by the United States Supreme Court – and following protracted negotiations facilitated by one of the nation's most respected mediators, the settlement easily satisfies the standards governing preliminary approval.

The core relief is strikingly simple: American Express's rules will be altered to permit merchants to impose a separate fee, or "surcharge," on all credit and charge card transactions (which are expensive to merchants) and thus to steer transactions to debit cards (which are generally inexpensive to merchants, and which are not subject to any surcharge).  And the agreement prohibits Amex from undermining that core relief in various ways, including through tying arrangements that might otherwise compel merchants to accept high-fee, non-surchargeable Amex-branded debit cards as a condition of accepting Amex's personal and corporate charge and credit cards.

But while the relief is simple, the implications for merchants and their customers are sweeping.  U.S. credit card transactions alone pump more than two trillion dollars each year through the pipes of Visa, MasterCard and American Express.  For decades, these networks have used their extraordinary market power to levy massive tolls upon all that traffic, in the form of

2

merchant fees that are by most measures the highest in the industrialized world.   And merchants

have been largely powerless to resist, incurring fees of roughly $55 billion per year on credit

card transactions alone to the networks and their agents.

      Now, following approval of this settlement, merchants will have at their disposal a tool of

unprecedented potency to constrain those costs: surcharges in favor of debit.  The signature

feature of the U.S. payment market today is the enormous spread between the low cost of debit

acceptance – where rates are largely regulated by the Federal Reserve, under the Durbin

Amendment to the Dodd-Frank financial reforms– and the high cost of credit and charge card

acceptance.  On a $100 ticket, the typical U.S. retailer in many industries might pay $3.00 in

merchant fees for a credit card transaction as opposed to 50 cents or so for a debit card.

Merchants will now have the option of imposing a simple, single surcharge – say, 2% of the

ticket amount – on all credit card transactions, while advertising that debit (and cash and checks)

are accepted free of charge.  By availing themselves of this new market-based tool, merchants

can effectively steer consumers to use debit or any other payment form that they prefer. As Judge

Gleeson recognized recently in approving the merchant class settlement with Visa and

MasterCard, the "ability to surcharge allows merchants … to steer customers to less costly cards

or to other payment mechanisms, decreasing their card-acceptance costs." MDL 1720 Approval

Order at 33.[2]

      The following chart (which is submitted as a proffer of what plaintiffs intend to show at a

final approval hearing, and is subject to minor modifications) illustrates the approximate

---

[2]   *In re Payment Card Interchange And Merchant Discount Fee Antitrust Litig.*, 05-MD-1720
(EDNY) (JG) (JO) ("MDL 1720").  References to the "MDL 1720 Approval Order" refer to the
December 13, 2013 order granting final approval of that settlement, available on ECF at 1:05-
md-01720-JG-JO, DE–6124.

3

magnitude of the spreads between the cost of credit card acceptance on all major brands, on the

one hand, and debit card acceptance on the other:[3]



As this chart suggests, it is specifically the ability to surcharge in favor of *debit* that

creates the potential for truly dramatic benefits for merchants and their customers. Currently,

debit accounts for less than half of plastic payment volume in the United States.  By contrast, in

much of Europe, debit accounts for well over 70% of plastic spend.  So debit presumably has a

---

[3]  The data sources and assumptions underlying this analysis will be set forth in detail in the
economic expert report that Class Plaintiffs will submit with their papers in support of final
approval. The presentation here is designed to reflect the "rate premium" of American Express
over competitor brands across the US market.  This measurement avoids the so-called "mix
premium" fallacy, under which American Express's average premium over other brands would
otherwise appear exaggerated because relatively more Amex volume happens to be transacted at
high-fee merchants (e.g., airlines and restaurants) whereas relatively more Discover or Visa
volume is transacted at low-fee merchants (e.g., mass retailers like Wal-Mart).

lot of room to grow in the U.S. market.  As merchants use their new competitive tool to shift payments over to debit, their overall payment acceptance costs will plummet, given the large spreads in acceptance costs.  Further, as consumers modify habits and move debit cards to the front of their wallets, displacing credit and charge cards, even merchants who do not impose surcharges will benefit from their customers' shift to the lower-cost payment mechanism.

And all of this benefits consumers. As both Judge Gleeson and Judge Rakoff have recently observed, rules against surcharging are plainly "anti-consumer." MDL 1720 Approval Order at 34; see *Expressions Hair Design v. Schneiderman*, 2013 WL 5477607 (S.D.N.Y. Oct. 3, 2013) (JSR).  Without the ability to surcharge, merchants seeking to cover their high acceptance costs -- which fund the card issuers' extravagant rewards programs -- must raise prices to all consumers, including users of cash, debit and even food stamps.  Rules against surcharging thus create "a regime in which the poorest consumers subsidize the awards conferred upon premium cardholders."  MDL 1720 Approval Order at 36.  The removal of these rules means that, "[f]or the first time, merchants will be empowered to expose hidden bank fees to their customers, educate them about those fees, and use that information to influence their customers' choices of payment methods."  *Id.* at 10.  Likewise, in *Expressions*, Judge Rakoff struck down a state ban on surcharges, observing that such bans "were enacted in the name of consumer protection at the behest of the credit-card industry over the objection of consumer advocates."  2013 WL 5477607 at *14. Indeed, in that case, the nation's leading consumer advocacy groups went on record sharply attacking the anti-surcharging restraints.[4]

---

[4]   See Brief of Consumer Action, National Association Of Consumer Advocates, The National Consumers League, and U.S. Public Interest Research Group as *Amici Curiae* in Support of Plaintiffs' Motion for a Preliminary Injunction.  Available on ECF at 1:13-cv-3775-JSR, DE-25.

While the *Amex ASR* and *Marcus* cases were directed at American Express, the relief contained in this settlement will empower merchants, for the first time, to surcharge Visa, MasterCard and Discover credit card transactions.  This settlement unlocks the value of the rules changes that merchants have wrung from all of those networks in recent years.  Under the MDL 1720 settlement, merchants surcharging Visa or MasterCard must also surcharge American Express.  Discover rules are generally similar.[5]  So while all three of the other networks now *allow* for surcharging, merchants who accept American Express – a group that accounts for over 90% of U.S. payment card transaction volume – are realistically constrained by Amex's refusal to allow the practice.  Put simply, until and unless American Express allows merchants to surcharge Amex transactions, the vast majority of U.S. merchants cannot surcharge *any* transactions.

Thus, in the MDL 1720 approval process, many merchants complained that they cannot avail themselves of the historic injunctive relief obtained in that case because they cannot surcharge Amex transactions.  MDL 1720 Approval Order at 12 (noting objections that "the merchant restraints imposed by American Express" serve to "undermine" the relief).  In response, Judge Gleeson wrote, "even if the objectors are right in contending that additional dominoes must fall before the alleged anticompetitive behavior of Visa and MasterCard is eradicated, those dominoes will have to fall in other forums."  *Id.* at 13.

With the Settlement Agreement filed today, the dominoes are falling.

---

[5]   Indeed, Discover's rules are materially identical to the rules that Amex is adopting under the Settlement Agreement.  Since rescinding its no-surcharge rules at the behest of merchants and class counsel in 2006, Discover rules have provided that a merchant may surcharge Discover transactions, so long as the merchant also surcharges all other credit and charge card transactions, in at least the same amount.

## FACTUAL BACKGROUND

A.    *Procedural History*

In August 2003, a group of small merchants including Italian Colors Restaurant filed suit

in the Northern District of California challenging certain applications of American Express's

Honor All Cards rule under the antitrust laws.  Those actions were then transferred to the

Southern District of New York, *Italian Colors Rest. v. Am. Express Co.*, 2003 WL 22682482

(N.D. Cal. Nov. 7, 2003), where other similar cases were filed and consolidated by Judge

Daniels under the caption *In re American Express Merchants Litig.*, Master File No. 03-cv-9592

(the "*Italian Colors* cases"), with the undersigned counsel appointed as interim class counsel

under Fed. R. Civ. P. 23(g). (DE-29).

The plaintiffs in the *Italian Colors* cases – like all small merchants subject to the standard

form American Express card acceptance agreement during that time frame – were bound by

arbitration clauses banning collective action and mandating one-on-one arbitral proceedings.  On

April 30, 2004, American Express moved to compel arbitration in the *Italian Colors* cases, and

Judge Daniels granted that motion on March 16, 2006. (DE-20 and DE-34).

On July 13, 2004, The Marcus Corporation filed suit.  *Marcus Corp. v. American Express*

*Co. et al.*, 04-cv-05432 (GBD) (SDNY).  Unlike the smaller merchant plaintiffs in the *Italian*

*Colors* cases*,* Marcus Corp. was not at that time subject to any arbitration provision.

Accordingly, *Marcus* proceeded with discovery as the *Italian Colors* plaintiffs commenced their

lengthy appellate journey challenging American Express's arbitration policy.

The point behind the *Marcus* case, and the parallel *Italian Colors* cases, was to give

merchants a competitive tool for combating card acceptance costs.  Specifically, plaintiffs argued

that certain applications of American Express's Honor All Cards rule harmed competition by

7

allowing Amex to offer inflated fees to prospective bank-issuers of Amex-branded revolving credit cards, thus causing Visa and MasterCard to increase the merchant fees from which they compensate banks, and generally inciting an ever-escalating upward spiral in merchant interchange fees.  As Judge Daniels recognized in denying Amex's motion to dismiss, plaintiff contended that American Express's tying arrangement worked a "radical realignment" of the market by "forcing MasterCard and Visa to either price their own services to merchants at inefficiently high levels, or risk losing all of the banks, and the U.S. credit card market, to American Express."  2005 U.S. Dist. Lexis 13170, at 7-8, 11.

Over the course of the ensuing five years, the parties in *Marcus* engaged in exceedingly hard-fought litigation.  The litigation record included millions of pages produced by American Express and millions more produced by third-parties, including the complete record from *In re VisaCheck/MasterMoney Antitrust Litig.*, 96-cv-5238 (JG) (E.D.N.Y.).  There was substantial deposition discovery of American Express, Marcus Corp. and third parties, in addition to which plaintiff requisitioned and reviewed depositions of approximately seventy witnesses from *American Express Travel Related Services, Inc. v. Visa USA Inc. et al.*, 04-cv-08967 (BSJ) (S.D.N.Y.), which was proceeding contemporaneously with discovery in *Marcus*, and which obviated scores of additional fact depositions in that case.  In addition to discovery motions, the parties fully briefed and argued multiple substantive motions, including motions to dismiss on statute of limitations grounds, and a class certification motion following multiple expert depositions and reports.  Further, after an exchange of extensive expert reports on merits and damages issues, and multiple *Daubert* motions by the defendants (all of which were denied), both sides moved for summary judgment, and both of those motions were fully briefed and argued in January 2009.

Also in January 2009, the Second Circuit issued the first of a series of decisions finding that the class action waiver contained in the American Express arbitration clause was unenforceable against the *Italian Colors* plaintiffs. *In re American Express Merchants Litig*., 554 F.3d 300 (2d Cir. 2009). Some 15 months later, the Supreme Court then granted certiorari, vacated the Second Circuit's decision and remanded for reconsideration of in light of certain intervening authority. 130 S. Ct. 2401 (May 3, 2010). After another round of briefing, the Second Circuit in March 2011 then reaffirmed its original ruling in *In re American Express Merchants Litig*., 634 F.3d 187 (March 8, 2011). Shortly after that, the Supreme Court decided *AT&T Mobility v. Concepcion*, 131 S. Ct. 1740 (2011), broadly upholding an arbitration clause and class action waiver. Following *Concepcion*, the Second Circuit then called for yet another round of briefing, after which it yet again reaffirmed its earlier decisions. *In re American Express Merchants Litig*, 667 F.3d 204 (February 1, 2012). American Express successfully petitioned the Supreme Court for certiorari, and, on June 20, 2013, the Court reversed the Second Circuit's decision. *American Express Co. v. Italian Colors Restaurant*, 133 S. Ct. 2304 (2013).

B.      *Anti-Steering Rules Challenges*

During the course of discovery in the *Marcus* case, it became apparent to Class Counsel and their economic experts that the rules circumscribing the ability of merchants to steer transactions to lower-cost payment forms were at the root of the competitive ills plaguing the payments industry. Based on the evidence uncovered, plaintiff's merits experts in the *Marcus* action opined that American Express's rules against steering operated to largely insulate it from competitive pricing pressures, and warranted a finding of substantial market power.

In May 2005, Animal Land Inc., a pet transportation business based in Atlanta, represented by the same counsel as in the instant cases, filed an action against Visa entitled

*Animal Land, Inc. v. Visa USA, Inc.*, 05-CV-01210 (JOF) (N.D. Ga.) challenging Visa's rules against surcharging. That action -- which was followed in short order by cases challenging MasterCard's similar rule and cases that challenged the so-called "default interchange rules" of both networks -- was the first case filed in what later became MDL 1720.

But as litigation challenging anti-steering and anti-surcharging rules broke out in 2005-06, Marcus Corp. was not at liberty to amend its complaint to challenge American Express's similar rule.[6] So instead, Class Counsel filed cases challenging American Express's rules restraining merchant surcharges in the MDL 1720 court, on behalf of other small merchant clients. After conferring with American Express, the parties in MDL 1720 and Magistrate Judge Orenstein, Class Counsel then withdrew those actions and re-filed them in the Southern District of New York, where they were ultimately reassigned to Judge Pauley under the master file name *Performance Labs, Inc. et al. v. American Express Co., et al.,* 06-CV-2974 (WHP) (SDNY) and then consolidated with additional filings as *In re American Express Anti-Steering Rules Antitrust Litig.*, 06-CV-2974 (WHP) (S.D.N.Y.) ("*Amex ASR*").

Because the merchants challenging Amex's anti-steering rules were all subject to the arbitration clause, the *Amex ASR* case was stayed from its inception in 2006 until the Second Circuit ruled in *Italian Colors* in January 2009. At that point, the parties commenced discovery before Judge Pauley. Also, in that time frame, a number of larger merchants (who were either not bound by Amex's arbitration clause or as to whom Amex did not invoke that clause) filed claims that were substantially identical to the *Amex ASR* complaint in the Eastern District of New

---

[6] By early 2006, subsequent to a significant asset divestiture, Marcus Corp. had become subject to the standard form American Express card acceptance agreement applicable to smaller merchants, thus obligating it to arbitrate any new claims. By informal agreement of the parties, defendants did not seek to enforce the arbitration agreement as to the tying claims in *Marcus*, and Marcus Corp. did not seek to amend its complaint to add the anti-steering rules claims in this action.

York, where they were assigned to this Court. *Rite Aid Corp., et al. v. American Express Travel Related Services, et al.*, Master File No. 08-CV-2315 (NGG) (E.D.N.Y.).  Collectively, these plaintiffs are referred to below as the "Individual Merchant Plaintiffs".

In October 2009, relying on evidence adduced in *Marcus* and this action, counsel for Marcus Corp. and the *Amex ASR* plaintiffs submitted to the Justice Department – whom it understood was investigating Visa and MasterCard's rules relating to merchant steering – a white paper entitled "Why The Antitrust Division Should Challenge American Express's Anti-Steering Rules."  Following extensive investigation of all three networks, the Justice Department announced on October 4, 2010 that it and seventeen plaintiff states had entered into consent decrees with Visa and MasterCard and filed an enforcement action against American Express challenging certain of its rules relating to merchant steering.  *United States v. American Express Co.,* 10-CV-4496 (NGG) (E.D.N.Y.).  Because both the DOJ's case and the Individual Merchant Plaintiffs' cases were pending in this Court, the *Amex ASR* plaintiffs initiated proceedings before the Judicial Panel on Multi-District Litigation, which then transferred the *Amex ASR* case to this Court.

C.      *The Amex ASR Litigation*

Discovery in the *Amex ASR* case was extensive, to say the least.  Pursuant to laboriously negotiated discovery coordination protocols with defendants, the Individual Merchant Plaintiffs and the Department of Justice, the Class Plaintiffs participated in 150 depositions and marshaled a record that included more than 20 million pages of new documents.  Among other areas, Class Plaintiffs took a laboring oar in investigating the real-world experience of American Express with surcharging in Australia, where surcharges have been permitted since 2003.  Through depositions taken in Hawaii and elsewhere of executives running Amex's Australia business,

along with several million pages of Amex-Australia documents, the plaintiffs assembled a detailed record of the Australia surcharge experience that is unavailable anywhere else in the world – a record that uniquely evidences the pro-competitive power of merchant surcharging. This extensive record – to which the parties in MDL 1720 did not have access[7] – also flatly undercuts numerous arguments offered up by objectors in MDL 1720, including the myth that merchants imposing surcharges have experienced any appreciable lost sales volume. In fact, they have not, as Class Plaintiffs' evidence-based submissions at final approval will show.

In the view of Class Counsel, Amex's merits defenses were especially compromised by the 2012 litigation surrounding Amex's assertion of attorney-client privilege as to documents relating to the cancelation of surcharging merchants in Australia. (DE-192, 194, 196, 203, 213). In that joint motion, the Class Plaintiffs and Individual Merchants Plaintiffs sought documents which, plaintiffs believe, indicate that the power of merchant surcharging to influence network behavior is vastly beyond what other available data would suggest. Magistrate Judge Reyes ultimately resolved that hotly contested motion in plaintiffs' favor, after extensive briefing, argument and submissions that included reports on both sides from experts on the Australian law of attorney-client privilege (DE-213).

D. *Settlement Process*

Back in the fall of 2006, after Judge Daniels granted the motion to compel arbitration in *Italian Colors* and before the initial Second Circuit decision, with discovery in *Marcus* in full swing and the first *ASR* case just then filed, the parties engaged in a series of meetings designed

---

[7] Class Plaintiffs in the MDL 1720 proceedings filed a motion to compel third party American Express to produce specified Amex-Australia documents in connection with the settlement process. Amex objected, DE-1760, and Magistrate Judge Orenstein denied plaintiffs request on February 1, 2013 (entry following DE-1785).

to explore potential resolution.  The meetings did not bear fruit, and the parties agreed to resume the conversation after the arbitration issue was finally resolved.  That juncture would not arrive for seven more years.

The Supreme Court's June 2013 ruling in *Italian Colors* precipitated the instant settlement.  First of all, the Court's broad ruling upholding Amex's collective action ban made it clear to Class Counsel that no damages class action was realistically feasible in *Amex ASR* or in *Marcus*.  By 2013, class plaintiffs had discovered that virtually every Amex-accepting merchant in the U.S. was subject to a binding arbitration clause with American Express.  So even if a non-arbitration-bound named plaintiff were free to proceed in court,[8] it is likely Amex's arbitration clause would be upheld as against substantially all of the members of a putative class, such that even the numerosity requirement of Rule 23(a)(1) would likely not be satisfied.

However, it was also Class Counsel's judgment that a class action seeking market-wide injunctive relief remained viable, under *Italian Colors*, to the extent such an injunction was necessary to provide plaintiffs meaningful relief under the antitrust laws.  On that basis, Class Plaintiffs vigorously resisted Amex's motion to compel arbitration in the *Amex ASR* case.  Among other things, plaintiffs argued that if the arbitration agreements were interpreted to bar them from seeking market-wide changes to Amex's anti-competitive policies, those agreements would violate the vindication-of-rights doctrine that the *Italian Colors* Court expressly reaffirmed.  The motion – which presents difficult and complex issues, and carries the potential for yet another trip to the Supreme Court – was fully briefed in August 2013, and is currently *sub judice* before this Court.  (DEs 262-269).

---

[8] As discussed above at fn 6, the parties previously agreed that with respect to the claims filed in 2004 (including as amended), Marcus Corp. remained free to proceed in court, but that it was bound by an arbitration agreement with respect to any new claim filed from 2005 onwards.

It is against this backdrop that the parties have agreed to settle the instant litigation.  If plaintiffs were to lose the current arbitration motion pending before this Court, then it is quite likely that no private actor could obtain any relief – including the right to impose surcharges – for the 99% of U.S. merchants that are unable or unlikely to press their claim in one-on-one arbitrations. Accordingly, the parties engaged in intensive negotiations throughout the summer and fall of 2013, with the assistance of mediator Kenneth R. Feinberg.  Mr. Feinberg presided over numerous in-person and telephonic conferences, commencing even before the Supreme Court released its *Italian Colors* ruling, and continuing to the present.  At the final approval hearing on this application, Class Counsel expects to submit a declaration from Mr. Feinberg attesting to the hard-fought and decidedly arms-length nature of these negotiations.

E.      *Settlement Terms*

The Settlement Agreement allows merchants to impose a surcharge upon Amex credit and charge card transactions so long as: (i) the amount of the surcharge does not exceed the discount rate applicable to that transaction and the amount of the surcharge the merchant is permitted to impose on any other credit card brand; (ii) the surcharge is fully disclosed, on the same terms that the merchant is required to disclose Visa and MasterCard surcharges; and (iii) the merchant provides 30 days notice to American Express that it intends to surcharge.  SA ¶ 8. Debit cards, including pre-paid or gift cards, may not be surcharged unless or until similar cards on competitors' brands are subject to surcharging.  SA ¶ 8.  Meanwhile, American Express is prohibited from offering a traditional debit card subject to its Honor All Cards policy, lest such an offering undermine the surcharging relief provided in the agreement. SA ¶ 8.

The agreement also provides that American Express and a merchant may agree to waive the right to surcharge, provided that the contract is individually negotiated, for a set term of years

and supported by actual consideration, *e.g.*, a discount rate reduction.  SA ¶ 10. An obligation of good faith and fair dealing is expressly made applicable to any such contracts, SA ¶ 90, to ensure (as just one example) that Amex cannot threaten merchants with rate increases to induce them to enter agreements not to surcharge.

The release is a broad one, "specifically intended . . . to preclude all members of the Settlement Class from seeking . . . equitable relief prior to the Release Termination Date (which date shall be a minimum of ten years following the Provisions Change Date) with respect to any rule or provision that was or could have been challenged in these Actions" subject to the "identical factual predicate doctrine as applied to the [*Amex ASR* case] and the Marcus Action." SA ¶ 26.  The release duration may also extend beyond ten years if Visa and MasterCard's rules remain unchanged, as well as Amex's rules, and so long as the equitable release in the MDL 1720 agreement remains in effect and has not been abrogated.  SA ¶ 26.

There is no release whatsoever of any right that any class member presently has to sue for money damages. SA ¶ 40.  On the contrary, the Agreement specifically contemplates that a merchant may pursue damages claims against American Express based on the anti-steering rules and Honor All Cards rules (as those rules exist before the rules changes take effect) under whatever dispute resolution terms are applicable to that merchant.  SA ¶ 40.  In fact, because most merchants' agreements call for binding arbitration, the agreement provides that arbitral claimants shall be entitled to receive the extensive evidentiary and litigation record that Class Counsel has amassed in these cases. SA ¶ 68.  Only claims for damages based on the relevant rules as they exist *after* approval of the settlement agreement by this Court are released (and even then, only to the extent Amex has not engaged in any new conduct). SA ¶ 27.

In addition, American Express has agreed to pay the attorneys' fees and costs incurred by Class Counsel and the dozens of law firms whose efforts over the past decade have made this settlement possible, as well as any service awards the Court may grant, up to a cap of $75 million. SA ¶ 55.  It will also pay $2 million in costs associated with the provision of notice to the members of the settlement class, SA ¶ 17, and an additional $2 million as a fund to be used to educate merchants about their new-found surcharging rights. SA ¶ 18.

F.    *Relation to DOJ Action*

Critically, the Settlement Agreement recognizes that the Department of Justice is pursuing the elimination of American Express's "non-discrimination rules" and it ensures that class members will receive the full benefit of whatever relief DOJ is able to obtain from American Express after trial or via a consent decree. SA ¶ 35.  The relief sought by the Department of Justice – which would permit merchants to treat American Express transactions differentially vis-à-vis other credit card transactions, in various respects – has always been centrally important to the Class Plaintiffs.  The proposed settlement does not reflect any change of heart on the part of Class Plaintiffs or Class Counsel with respect to the importance of obtaining the differential treatment rights that DOJ is seeking.  Rather, it reflects the reality that Class Plaintiffs have struck a compromise, under which their ability to obtain these differential treatment rights is contingent upon the outcome of the DOJ action.  In fact, given plaintiffs' newly won rights to surcharge Amex transactions, the differential treatment rights that DOJ is seeking will be more valuable than ever.  Far from abandoning their quest for differential treatment rights, the Class Plaintiffs have entered a settlement that reflects their confidence in the ability of the Government to prevail in its action.

**ARGUMENT**

**I.      PRELIMINARY APPROVAL IS WARRANTED**

The settlement of complex litigation is strongly favored.  The Second Circuit is "mindful of the strong judicial policy in favor of settlements, particularly in the class action context. The compromise of complex litigation is encouraged by the courts and favored by public policy." *Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*, 396 F.3d 96, 116-17 (2d Cir. 2005) (internal quotation marks and citation omitted); *In re Prudential Sec. Inc. Ltd. P'ships Litig.*, 163 F.R.D. 200, 209 (S.D.N.Y. 1995) ("It is well established that there is an overriding public interest in settling and quieting litigation, and this is particularly true in class actions.").

Accordingly, at the preliminary approval stage, courts ask only whether the proposed settlement was the product of collusion and whether it is within the range of possible reasonableness: "Where the proposed settlement appears to be the product of serious, informed, noncollusive negotiations, has no obvious deficiencies, does not improperly grant preferential treatment to class representatives or segments of the class and falls within the range of possible approval, preliminary approval is granted." *In re Initial Pub. Offering Sec. Litig.*, 243 F.R.D. 79, 87 (S.D.N.Y. 2007) (quoting *In re NASDAQ Market-Makers Antitrust Litig.*, 176 F.R.D. 99, 102 (S.D.N.Y. 1997).  As Judge Sifton has explained, "a full fairness analysis is unnecessary at this stage; preliminary approval is appropriate where a proposed settlement is merely within the range of possible approval."  *Reade-Alvarez v. Eltman, Eltman & Cooper, P.C.*, 237 F.R.D. 26, 34 (E.D.N.Y. 2006).

Measured against these standards, the proposed settlement easily warrants preliminary approval.  At the final approval hearing, Class Counsel will present detailed economic evidence to demonstrate that the relief here represents "an indisputably procompetitive development that

17

has the potential to alter the very core of the problem this lawsuit was brought to challenge."
MDL 1720 Approval Order at 31. For now, though, it is enough to say that this settlement is
within the "range of possible approval," with respect to the fairness of the settlement and
adequacy of consideration.

The procedural fairness of the settlement is likewise plain.  The Second Circuit in *Wal-
Mart* held that a "presumption of fairness, adequacy, and reasonableness may attach to a class
settlement reached in arm's-length negotiations between experienced, capable counsel after
meaningful discovery."  396 F.3d at 116 (quoting Manual For Complex Litig. (Third) at § 30.42
(1995)); *In re Marsh & McLennan Cos. Sec. Litig.*, No. 04-cv-8144 (CM), 2009 WL 5178546, at
*4 (S.D.N.Y. Dec. 23, 2009) (same).  Here, after nearly eleven years of hard-fought litigation,
190 depositions across the combined cases, the review of tens of millions of pages of produced
documents, and many months of intensive negotiations facilitated by a leading mediator, the
presumption of fairness is surely warranted.

It is also clearly appropriate here to certify an injunctive class for settlement purposes, as
the proposed Preliminary Approval Order would do.  "Certification of a class for settlement
purposes only is permissible and appropriate provided the standards under Rule 23(a) and (b) are
met."  *Reade-Alvarez,* 237 F.R.D. at  31 (citing *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591,
619-21 (1997); *see Bourlas v. Davis Law Assocs*., 237 F.R.D. 345, 350 (E.D.N.Y. 2006)
("[b]efore reaching the merits of the proposed settlement. . . the court must first ensure that the
settlement class, as defined by the parties, is certifiable under the standards of Rule 23(a) and
(b)").  As summarized in *Amchem, "*Rule 23(a) states four threshold requirements applicable to
all class actions: (1) numerosity (a class so large that joinder of all members is impracticable);
(2) commonality (questions of law or fact common to the class); (3) typicality (named parties'

claims or defenses are typical of the class); and (4) adequacy of representation (representatives will fairly and adequately protect the interests of the class)." 521 U.S. at 613 (internal quotations, ellipses and brackets omitted).

In this case, the injunctive class consists of all merchants that accept American Express cards in the United States. Because this class numbers in the millions, the numerosity requirement of Rule 23(a)(1) is clearly met. And the remaining Rule 23(a) requirements are all met because the American Express rules that will be rewritten by this settlement apply equally to each and every member of the class, all of whom have a shared interest in expanding the options available to card-accepting merchants at the point of sale. For this reason, the commonality and typicality requirements are plainly satisfied, as is the adequacy requirement of Rule 23(a)(4), which "serves to uncover conflicts of interest between named parties and the class they seek to represent." *Amchem*, 521 U.S. at 625.

Rule 23(b)(2), moreover, is satisfied when the defendant "has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief . . . is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2); *see Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2557 (2011) ("[t]he key to the (b)(2) class is the indivisible nature of the injunctive or declaratory remedy warranted — the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them") (internal quotations and citations omitted). Applying this standard, Judge Gleeson found Rule 23(b)(2) was satisfied in MDL 1720, holding that "[t]he network rules regimes that gave rise to this case applied generally to every merchant accepting Visa or MasterCard credit cards, and the injunctive relief in the proposed settlement does as well. Specifically, all merchants have the same interest in being able to inform cardholders at the point of sale of the acceptance costs of

their credit cards and to either steer them to lower-cost alternatives or recoup the cost of

acceptance." MDL 1720 Approval Order at 46.  The same is true here: the interests of all class

members are aligned and cohesive, and the proposed Rule 23(b)(2) class warrants certification.

Similarly warranted is the appointment as Class Counsel of the law firms Friedman Law

Group LLP, Patton Boggs LLP and Reinhardt, Wendorf & Blanchfield, under Rule 23(g), as set

forth in the proposed Preliminary Approval Order, Ex. D at ¶ 8.  Judge Daniels has already made

such an appointment in *Marcus* (*see* Dec. 23, 2013 Preliminary Approval Order at ¶ 8), and

Judge Pauley and Magistrate Judge Reyes both issued orders appointing these same three firms

as interim class counsel under Rule 23(g)(3) in *Amex ASR*.  (*See* 06-CV-2974 (S.D.N.Y.) at DE-

26 and 11-MD-2221 at DE-14).  Class Counsel respectfully submit that, over the course of this

litigation, they have demonstrated that the requisites of Rule 23(g)(1) are met.

Finally, the proposed Preliminary Approval Order enjoins class members from initiating

new claims with respect to the subject matter of the instant case.  The purpose of this proposed

injunction, which mirrors a similar injunction that was entered in MDL 1720 (DE-1656-1 at D-

1), is simply to ensure that challenges to the settlement will be heard by the district court

presiding over the settlement process, and not subject to collateral attack in far-flung

jurisdictions by persons seeking to hold up the settling parties. By its terms, this injunction

would have no application to the continuing litigation by the Individual Merchant Plaintiffs or

the Department of Justice.  Nor would it preclude any person from initiating a legal challenge to

the Settlement Agreement before this Court.

## II.     THE PROPOSED NOTICE PLAN AND NOTICE SHOULD BE APPROVED

When a class has been certified under Rule 23(b)(2), "the court may direct appropriate

notice to the class."  Fed. R. Civ. P. 23(c)(2)(A).  Notice of a pending class action settlement, in

turn, may be directed by the court in a "reasonable manner to all class members who would be bound by the proposal." Fed. R. Civ. P. 23(e)(1).  The standard for adequacy of a settlement notice ultimately is one of reasonableness.  As the Second Circuit has held, "[t]here are no rigid rules to determine whether a settlement notice to the class satisfies constitutional or Rule 23(e) requirements; the settlement notice must fairly apprise the prospective members of the class of the terms of the proposed settlement and of the options that are open to them in connection with the proceedings." *Wal-Mart Stores, Inc. v. Visa USA, Inc.,* 396 F.3d 96, 113-14 (2d Cir 2005) (internal quotations and citations omitted).

Here, in consultation with leading legal notice provider Hillsoft Communications, the parties have crafted a notice plan and notice form that amply satisfies the requirements of Rule 23 and due process.  The notice dissemination plan, attached as Appendix E to the Settlement Agreement (along with a *curriculum vitae* of Hillsoft, attached as Ex. 1 thereto), provides for: (1) postcards to be sent via First Class Mail to all Class Members, providing basic information on the settlement and directing them to the case website and a toll-free phone number for complete information; (2) publication notice in a combination of national and regional business publications and retailer trade journals; (3) a case website, containing a long-form notice and other case documents; and (4) information provided by telephone to those who call a toll-free number as indicated on the postcard and publication notices.  The contents of the post-card notice, publication notice and the long form notice are set forth in Appendix F.

Notice plans following similar procedures for reaching members of a settlement class have been approved by numerous district courts in this Circuit and elsewhere.  *See, e.g., Padro v. Astrue*, 2013 U.S. Dist. LEXIS 150494, at *3-6, 7-9 (E.D.N.Y., Oct. 18, 2013); *Blessing v. Sirius XM Radio Inc.*, No. 09-cv-1035 (HB)(RLF) (S.D.N.Y.) (DE-108); *Precision Assocs. v.*

*Panalpina World Transp., Ltd.*, 2013 U.S. Dist. LEXIS 121795, 30-31 (E.D.N.Y. Aug. 27, 2013); *see also* 3 Newberg On Class Actions § 8:40 (4th ed.) (collecting cases).

The long-form notice, attached at Appendix F to the Settlement Agreement, contains all of the information required by Rule 23, including a description of the nature, history, and status of the litigation; the definition of the Class and the injunctive relief that will result from the settlement; the right of Class Members to object to the settlement, as well as the deadline and procedure for doing so; the binding effect of an approval of the settlement and the terms of the releases; and the contact information for Class Counsel. The long-form notice uses clear, concise, and plain language and follows the guidelines in the Manual For Complex Litigation (Fourth) at §§21.311-312 (2004 Ed.). The long-form notice therefore satisfies all applicable requirements. *See, In re Bayer Corp. Combination Aspirin Prods. Marketing And Sales Practices Litig.*, 1:09-md-02023-BMC (E.D.N.Y. May 16, 2012) (DE-175-1); *In re Baldwin-United Corp.*, 105 F.R.D. 475, 485 (S.D.N.Y. 1984).

## III.   <u>PROPOSED SCHEDULE</u>

Subject to the Court's approval, the parties propose the schedule set forth below for dissemination of notice, class member objections, and the briefing and hearing on the motions for final approval and for attorneys fees. With the exception of the final approval hearing date, this schedule is contained in the proposed preliminary approval orders that are attached as Exhibits B and C hereto.

| 24 days after Preliminary Approval Order | Postcard mailing |
|---|---|
| 40 days after Preliminary Approval Order | Class Administrator's report |
| March 7, 2014 | Class to file Motions for Final Approval and for Attorneys' Fees |

| April 11, 2014 | Last day for Class Members to object to approval of the Settlement |
|---|---|
| May 5, 2014 | Last day for parties to file responses to objections, if any |
| May 19, 2014, or at such later date as may be convenient for the Court | Final approval hearing |

## CONCLUSION

For all the foregoing reasons, Class Plaintiffs respectfully request that the Court enter the

Orders requested on the instant motions.

Dated: January 7, 2014

**FRIEDMAN LAW GROUP, LLP**

/s/Gary B. Friedman_____
Gary B. Friedman
Tracey Kitzman
Scott Levy
Rebecca Quinn
270 Lafayette Street
New York, New York 10012
(212) 680-5150
gfriedman@flgllp.com

Mark Reinhardt, Esq.
Mark Wendorf, Esq.
**REINHARDT WENDORF &
BLANCHFIELD**
332 Minnesota Street
St. Paul, Minnesota 55101
(651) 297-2100

Read K. McCaffrey, Esq.
**PATTON BOGGS LLP**
2550 M Street, NW
Washington, DC 20037
(202) 457-6000

24