**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------x
IN RE: AMERICAN EXPRESS ANTI-STEERING
RULES ANTITRUST LITIGATION

This Document Relates To:                                    11-MD-02221 (NGG) (RER)
CONSOLIDATED CLASS ACTION
-------------------------------------------------------------------x
THE MARCUS CORPORATION,
on behalf of itself and all similarly situated persons,

                                         13-CV-07355 (NGG) (RER)
                            Plaintiff,

          - against -

AMERICAN EXPRESS COMPANY, et al.,            **REDACTED - PUBLIC VERSION**

                            Defendants.
-------------------------------------------------------------------x


**CLASS PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF**
**MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT**


                                                                April 15, 2014

# TABLE OF CONTENTS

Table of Authorities ......................................................................... iii

I.      Introduction .......................................................................... 1

II.     Procedural History .................................................................. 8

        A.      *Italian Colors* and *Marcus* Cases ................................... 8

        B.      Anti-Steering Rules Challenges ...................................... 10

        C.      Settlement Process ..................................................... 13

III.    Settlement Terms .................................................................. 14

IV.     The Standards for Assessing Whether a Class Action
        Settlement is Fair, Reasonable, and Adequate ........................... 17

V.      The "Presumption Of Fairness" Is Warranted Because The Settlement
        Was Negotiated At Arms' Length By Experienced Counsel After Meaningful
        Proceedings Before An Experienced And Respected Mediator .......... 19

VI.     Evaluation Of The Applicable *Grinnell* Factors Confirms That
        The Settlement Satisfies The "Fair, Adequate and Reasonable" Standard ......... 20

        A.      Scope Of Litigation Factors (*Grinnell* Factors 1 and 3)................. 21

        B.      Litigation Risk Factors (*Grinnell* Factors 4-6) ....................... 23

                1.      Liability Risk ............................................. 23
                2.      Damages/ Relief Risk................................... 24
                3.      Class Certification Risks............................... 25
                4.      *Marcus* Action-Specific Risks......................... 26

VII.    Discussion Of Anticipated Objections........................................ 27

        A.      Value Of Surcharging Rights In General (MDL 1720 Redux)............... 27

        B.      Lack Of Differential Surcharge Rights................................ 30

                1.      The Credit-Debit Rate Differential Swamps Interbrand
                        Rate Differentials........................................... 30
                2.      Differential Surcharging Is Illegal In Ten States,
                        And No Constitutional Challenge Applies.................... 31
                3.      Alternative Sources For Differential Treatment Rights........... 33

i

C.    Due Process/Adequacy Of Representation Considerations ................... 33

VIII.    Class Notice Was Adequate By Any Measure ............................................ 35

Conclusion ............................................................................................................ 36

# TABLE OF AUTHORITIES

**Page(s)**

**C**ASES

*American Express Co. v. Italian Colors Restaurant,*
130 S. Ct. 2401 (May 3, 2010) .......................................................... *passim*

*American Express Co. v. Italian Colors Restaurant,*
133 S. Ct. 2304 (2013) ................................................................... 10

*AT&T Mobility v. Concepcion,*
131 S. Ct. 1740 (2011) ................................................................... 10

*City of Detroit v. Grinnell Corp.,*
495 F.2d 448 (2d Cir. 1974) .......................................................... *passim*

*Expressions Hair Design et al. v. Schneiderman,*
2013 U.S. Dist. LEXIS 143415 (S.D.N.Y. Oct. 3, 2013) ...................... 2, 27, 31, 32

*In re American Express Merchants Litig.,*
554 F.3d 300 (2d Cir. 2009) .......................................................... 10

*In re American Express Merchants Litig.,*
634 F.3d 187 (2d Cir. 2011) .......................................................... 10

*In re American Express Merchants Litig,*
667 F.3d 204 (2d Cir. 2012) .......................................................... 10

*In re American Express Merchants Litig,*
681 F.3d 139 (2d Cir. 2012) .......................................................... 10, 25

*In re Global Crossing Sec. & ERISA Litig.,*
225 F.R.D. 436 (S.D.N.Y. 2004) ...................................................... 18

*In re Luxottica Grp. S.p.A. Sec. Litig.,*
233 F.R.D. 306 (E.D.N.Y. 2006) ...................................................... 17

*In re McDonnell Douglas Equip. Leasing Sec. Litig.,*
838 F. Supp. 729 (S.D.N.Y. 1993) .................................................... 18

*In re PaineWebber Ltd. P'ships Litig.,*
171 F.R.D. 104 (S.D.N.Y), aff'd, 117 F.3d 721 (2d Cir. 1997) ............ 17-18

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.,*
2013 U.S. Dist. LEXIS 179340 (E.D.N.Y. Dec. 13, 2013) ("MDL 1720") ............ *passim*

*In re Prudential Sec. Inc. Ltd. P'ships Litig.,*
163 F.R.D. 200 (S.D.N.Y. 1995) ...................................................... 17

iii

*In re Telik, Inc. Sec. Litig.*,
    576 F. Supp. 2d 570 (S.D.N.Y. 2008)................................................................20

*In re Visa Check-MasterMoney Antitr. Litig.*,
    280 F.3d 124 (2d Cir. 2001)........................................................................23

*Italian Colors Rest. v. Am. Express Co.*,
    2003 WL 22682482 (N.D. Cal. Nov. 7, 2003) ....................................................8

*Joel A. v. Giuliani*,
    218 F.3d 132 (2d Cir. 2000)................................................................ *passim*

*Marcus Corp. v. American Express Co.*,
    2005 U.S. Dist. LEXIS 13170 (S.D.N.Y. July 5, 2005) ...........................................9

*Marisol A. v. Giuliani*,
    185 F.R.D. 152 (S.D.N.Y. 1999) ..................................................................24

*McReynolds v. Richards-Cantave*,
    588 F.3d 790 (2d Cir. 2009)..................................................................17, 20

*Robertson v. National Basketball Ass'n*,
    556 F.2d 682 (2d Cir. 1977)..................................................................19, 33

*Strougo v. Bassini*,
    258 F. Supp. 2d 254 (S.D.N.Y. 2003)..............................................................18

*Thompson v. Metropolitan Life Ins. Co.*,
    216 F.R.D. 55 (S.D.N.Y. 2003) ...................................................................19

*Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*,
    396 F.3d 96 (2d Cir. 2005)..............................................................17, 34, 35

*Weinberger v. Kendrick*,
    698 F.2d 61 (2d Cir. 1982)....................................................................... 18

**STATUTES**

Clayton Act § 16 ......................................................................................21

**OTHER AUTHORITIES**

Fed. R. Civ. P. 23 ........................................................................... *passim*

U.S. Const. amend. I ........................................................................27, 31, 32

U.S. Const. amend. XIV ...................................................................................27

Plaintiffs The Marcus Corporation, Animal Land, Inc., Firefly Air Solutions, LLC, Il Forno, Inc., Italian Colors Restaurant, Jasa Inc., Lopez-Dejonge, Inc., and Plymouth Oil Corp. ("Class Plaintiffs") respectfully submit this memorandum of law in support of their motion seeking an Order from this Court granting final approval of the settlement of the consolidated class action proceedings in *In re American Express Anti-Steering Rules Antitrust Litig.*, 11-MD-2221 (NGG) (RER) (the "*Amex ASR*" case) and *Marcus Corp. v. American Express Co.*, 13-CV-07355 (NGG) (RER) ("*Marcus*").

## I.    Introduction

The instant settlement caps a forty-year effort by U.S. merchants to obtain the right to assess "surcharges" on credit card transactions – *i.e.*, to use transparent price signals at the point of sale to recoup the cost of credit card acceptance and incent consumers to use cheaper payment products, such as debit or cash.

The long road to this settlement began in the mid-1970s, as lobbyists for Master Charge, BankAmericard and American Express convinced Congress to enact legislation that banned merchant surcharges. Senator William Proxmire of Wisconsin, one of the surcharge ban's chief opponents and a noted consumer advocate, explained why: "The nation's giant credit card companies want to perpetuate the myth that credit is free." Irvin Molotsky, *Extension of Credit Surcharge Ban*, N.Y. Times, Feb. 29, 1984, at D12. Merchants were soon joined by consumer rights advocates and others in opposition to the federal surcharge ban, which took effect in 1976. By the early 1980s, Senator Proxmire remarked that "[n]ot one single consumer group supports the proposal to continue the ban on surcharges," which effectively forced cash payers and debit users to subsidize the cost of credit cards by preventing merchants from imposing those costs directly on credit card users. *Id.* Ultimately, the FTC, Federal Reserve and White House

1

economists, as well as lawmakers from both parties, joined merchants in attacking the surcharge ban, and Congress affirmatively allowed the ban to lapse in 1984. See accompanying Declaration of Gary B. Friedman, at ¶ 7; *see generally, Expressions Hair Design et al. v. Schneiderman*, 2013 U.S. Dist. LEXIS 143415, at *11 (S.D.N.Y. Oct. 3, 2013).

But no sooner had the federal surcharge ban expired than the major credit card companies – by this time, Visa, MasterCard and American Express – all enacted or strengthened their own regulations, by-laws and contractual clauses effectively banning merchants from imposing surcharges on credit card transactions. The networks also employed fake-grass-roots "astroturf" organizations, with names like "Consumers Against Penalty Surcharges," to convince some 10 states during the mid-1980s to enact statutes banning merchant surcharges. Friedman Decl., ¶ 7. Accordingly, by the time Class Plaintiff Animal Land Inc. fired the first shot across the bow in an Atlanta federal court in May 2005 seeking to invalidate Visa's no-surcharge rule, the quest of U.S. merchants to obtain the right to surcharge credit card transactions appeared downright quixotic. By all appearances, merchant surcharging lay well out of legal reach -- buried underneath multiple layers of long-standing network rules and state laws.

And yet, as this Settlement Agreement comes before this Court for final approval, the entire edifice of anticompetitive private and public anti-surcharging restrictions in the United States is poised to collapse. *Animal Land* long ago blossomed into MDL 1720, a sprawling mass of litigation that finally settled this past year with Visa and MasterCard both agreeing to rescind their longstanding rules against merchant surcharging. The state statutes, meanwhile, have run into the U.S. Constitution, with District Judge Jed Rakoff declaring the New York statute unconstitutional in 2013, and Judge Gleeson finding "reason to believe" that the other state statutes will likewise "bit[e] the dust." *In re Payment Card Interchange Fee & Merch. Disc.*

2

*Antitrust Litig.*, 2013 U.S. Dist. LEXIS 179340, at *60 (E.D.N.Y. Dec. 13, 2013). And while literally thousands of merchants complained in the MDL 1720 fairness proceedings that surcharge relief is meaningless until they are free to surcharge Amex – because of the way the new Visa/MasterCard surcharging rules are drawn – the instant settlement eliminates that impediment.

This settlement provides U.S. merchants for the first time ever with readily usable market-based tools for reversing the ever-escalating costs of payment card acceptance. Under the settlement here, merchants will be free to impose a separate charge to account for the costs of credit card acceptance, thus offering consumers a powerful and direct economic incentive to use debit cards – the cost of which is regulated by the Federal Reserve and far cheaper than credit card transactions. In fact, as shown by Class Plaintiffs' expert economist Dr. Alan Frankel, the average cost difference to a U.S. merchant between a credit and debit card transaction is a whopping 1.57% of the total purchase price. See Declaration of Alan S. Frankel, Ph.D., dated April 10, 2014, at ¶ 35. By driving consumers to debit, U.S. merchants stand to gain 1.57% of literally trillions of dollars over time.

The settlement is not perfect. In a perfect world, merchants would have the additional right to assess different surcharge amounts on different credit card brands, which the instant settlement does not allow. But the real price differences to merchants between and among credit card brands are, on average, very minor – especially when compared with the vast price differential between all credit cards, on the one hand, and debit cards on the other. So the settlement allows merchants to engage in the steering that most matters: moving customers away from credit cards to low-priced, and largely price-regulated, debit cards. And it allows merchants to engage in the type of surcharging they will *actually do:* applying a single, simple

3

surcharge amount to all credit card transactions. Moreover, as discussed below, the more

nuanced surcharging strategies that are not permitted under this settlement – often referred to as

"differential surcharging"[1] – have the disadvantage of remaining illegal in the states with anti-

surcharging statutes, whereas those statutes cannot constitutionally ban the simple surcharging

that is authorized by the settlement here. See below at 31-32.

The proposed settlement also does not obtain for merchants relief against the various

non-surcharge-related anti-steering rules that Amex maintains, including rules against asking

customers to use non-Amex products instead of Amex cards, or offering discounts for the use of

competing credit card brands instead of Amex cards. These rules are at the heart of the

Government's case against American Express, and the members of the class here will obtain full

injunctive relief as to these rules from a DOJ trial victory or consent decree. Class Counsel has

always recognized that these rules are anticompetitive, and important. Far from abandoning the

challenge to these rules, Class Counsel has issued a vote of confidence in our colleagues at the

Department of Justice. And if DOJ is *not* able to prevail on these claims, Class Counsel has no

reason to believe that we would have prevailed. Accordingly, the value to merchants of the

instant settlement is in no way undercut by the absence of relief as against the non-surcharge-

related anti-steering rules.

By all indications, U.S. merchants are poised to make broad use of their newly won rights

to impose surcharges upon credit card transactions. A recent market study performed by Olinger

Group, a well respected market research firm, exhibited a 2-minute informational video to

---

[1] The term "differential surcharging" is misleading. What the settlement does not allow is *intra-credit-card* differential surcharging; *i.e.*, surcharging credit card brands differentially. What the settlement *does* allow is differential surcharging as between debit and credit. Nonetheless, we will generally use the phrase "differential surcharging" to mean intra-credit-card differential surcharging.

roughly 800 U.S. merchants from selected industries and then asked if they would surcharge. The video presented surcharging as automated and hassle-free, which is how vendors in the marketplace will present the option. The survey was directed at merchant sectors including dry cleaners, beauty salons, home improvement, auto repair, law firms and several others. *More than half* of those surveyed responded with an unequivocal yes – that they would surcharge. Of the remainder, most stated they would surcharge if some number of their competitors did. See The Olinger Group, Credit Card Merchant Surcharge Study, March 2014, annexed to the accompanying Declaration of Jude A. Olinger.

The easy-to-use surcharging solutions depicted in the Olinger video are almost at hand. As chronicled in the accompanying Declaration of Scott Levy, vendors in the marketplace are developing automated systems that can apply compliant surcharges, and the large Visa and MasterCard processing firms are just now beginning to roll out programs that allow for widespread carriage of surcharged transactions in compliance with Visa and MasterCard regulations. Levy Decl., ¶¶ 4-5. Once the instant settlement is finally approved, it is reasonable to expect that entrepreneurial service providers in the marketplace will be distributing marketing materials that look a lot like the Olinger video, to induce merchants to use their new tools broadly. And at the same time, Class Counsel will deploy a $2 million advertising fund, provided under the Settlement Agreement, to inform merchants of their new-found surcharging rights.

To be sure, it is impossible to predict with precision just how widespread surcharging will become, and just how much credit card volume will shift to debit as a consequence. But we do know that in Australia, within four years after the onset of the reforms there, some 10% of merchants (measured by volume) were already imposing surcharges, and that today – a decade

5

out – some 40% of merchants (measured by volume) are surcharging. See Frankel Decl., ¶ 41 and Fig. 4 (citing East & Partners 2013 Report). We also know that, when U.S. merchants institute a policy of surcharging credit card transactions, they will save 1.57% of the total sales amount on those transactions where the consumer switches to debit, and they will recover even more than that on those transactions where the consumer pays the surcharge. Frankel Decl., ¶¶ 35, 57.[2]

Finally, we know that U.S. credit card transaction volume is $2.4 trillion per year. See Frankel Decl., ¶ 17, n. 36 (citing Nilson Report # 1034 at 1, Friedman Decl. Ex. H). As a result, we know that merchants will save at least the following amounts, depending upon what percentage of U.S. merchants (by volume) come to engage in credit card surcharging: [3]

---

[2]  The evidence shows that merchants simply *do not lose sales* from surcharging – just as one would expect, given that 40% of Australian merchants overall and 60% of large sophisticated merchants are surcharging. ██████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
██████████████

[3]  The formula here is (i) the percentage of merchants surcharging (by volume), times (ii) 1.57% times (iii) $2.4 trillion, over a 10-year period that holds constant the percentage of merchants surcharging. These values do not include the spill-over benefits that non-surcharging merchants stand to realize as consumers modify their habits to use debit cards more broadly. Nor do they presuppose any gains from reduced rates on credit card fees.

| % of US Merchants Surcharging | Savings Per Year | Savings Over Ten-Year Period |
|---|---|---|
| 1% | $ 376.8 million | $3.76 billion |
| 10% | $3.76 billion | $37.68 billion |
| 20% | $7.53 billion | $75.36 billion |
| 30% | $11.30 billion | $113.04 billion |
| 40% (as in AU today) | $15.07 billion | $150.72 billion |

Finally, the consideration of any class action settlement must take stock of the alternatives. The alternative to this settlement is not a better settlement; it is no settlement. And if there is no settlement, then Class Plaintiffs will be compelled to pursue litigation that is fraught with risks. At the outset, of course, are all of the risks that attend proving liability in the face of the defenses that American Express has so aggressively asserted, including its arguments regarding market power, market definition, the implications of "two-sided markets," and the competitive effects of its practices. And beyond those merits risks, continued litigation in this case would require Class Plaintiffs to overcome Amex's position that any given merchant may only seek to change the relevant contractual anti-steering provisions *as to itself*, and not as to the marketplace more broadly. While Class Plaintiffs have strongly contested the point – and we do believe we have the better of the argument – it would be reckless in the wake of *Italian Colors* to write off Amex's chances of winning that particular battle, which is presently *sub judice* on this Court's docket. See Amex Reply Mem., 8/5/2013, DE 265. Moreover, any resolution of that issue is immediately appealable in either direction and, if recent history is any guide, could well delay resolution of the case for years to come.

## II.     Procedural History

### A.     *Italian Colors and Marcus Corp. Cases*

In August 2003, a group of small merchants including Italian Colors Restaurant filed suit in the Northern District of California challenging certain applications of American Express's Honor All Cards rule under the antitrust laws.  Those actions were then transferred to the Southern District of New York, *Italian Colors Rest. v. Am. Express Co.*, 2003 WL 22682482 (N.D. Cal. Nov. 7, 2003), where other similar cases were filed and consolidated by Judge Daniels under the caption *In re American Express Merchants Litig.*, Master File No. 03-CV-9592 (the "*Italian Colors* cases").

The plaintiffs in the *Italian Colors* cases – like all small merchants subject to the standard form American Express card acceptance agreement during that time frame – were bound by arbitration clauses banning collective action and mandating one-on-one arbitral proceedings.  On April 30, 2004, American Express moved to compel arbitration in the *Italian Colors* cases, and Judge Daniels granted that motion on March 16, 2006.  *In re American Express Merchants Litig.*, 03-CV-9592, DE 20 and DE 34.

On July 13, 2004, The Marcus Corporation filed suit.  *Marcus Corp. v. American Express Co. et al.*, 04-CV-05432 (GBD) (S.D.N.Y.).  Unlike the smaller merchant plaintiffs in the *Italian Colors* cases, Marcus Corp. was not at that time subject to any arbitration provision.  Accordingly, *Marcus* proceeded with discovery as the *Italian Colors* plaintiffs commenced their lengthy appellate journey challenging American Express's arbitration policy.

The point behind the *Marcus* case, and the parallel *Italian Colors* cases, was to give merchants a competitive tool for combating card acceptance costs.  Specifically, plaintiffs argued that certain applications of American Express's Honor All Cards rule harmed competition by

allowing Amex to offer inflated fees to prospective bank-issuers of Amex-branded revolving

credit cards, thus causing Visa and MasterCard to increase the merchant fees from which they

compensate banks, and generally inciting an ever-escalating upward spiral in merchant

interchange fees.[4] As Judge Daniels recognized in denying Amex's motion to dismiss, plaintiff

contended that American Express's tying arrangement worked a "radical realignment" of the

market by "forcing MasterCard and Visa to either price their own services to merchants at

inefficiently high levels, or risk losing all of the banks, and the U.S. credit card market, to

American Express." *Marcus Corp. v. American Express Co.*, 2005 U.S. Dist. LEXIS 13170, at

*7-8, 11 (S.D.N.Y. July 5, 2005).

Over the course of the ensuing five years, the parties in *Marcus* engaged in exceedingly

hard-fought litigation. The litigation record included millions of pages produced by American

Express and millions more produced by third-parties, including the complete record from *In re

VisaCheck/MasterMoney Antitrust Litig.*, 96-CV-5238 (JG) (E.D.N.Y.). There was substantial

deposition discovery of American Express, Marcus Corp. and third parties, in addition to which

plaintiff requisitioned some seventy high-relevance depositions from *American Express Travel

Related Services, Inc. v. Visa USA Inc. et al.*, 04-CV-08967 (BSJ) (S.D.N.Y.), which was

proceeding contemporaneously, thus obviating scores of additional fact depositions in *Marcus*.

In addition to discovery motions, the parties fully briefed and argued multiple substantive

motions, including motions to dismiss on statute of limitations grounds, and a full-blown class

certification motion following multiple expert depositions and reports. Further, after an

---

[4] As part of this same course of conduct, and to blaze a trail for the bank-issued Amex cards,
Amex launched proprietary mass-market revolving credit card brands subject to the HAC tie,
including its Blue and Costco cards. Class Plaintiffs based damages claims upon those tied
products, arguing that they could not have been launched at prices exceeding Visa "plain vanilla"
credit card prices absent the illegal tie.

exchange of extensive expert reports on merits and damages issues, and multiple *Daubert*

motions by the defendants (all of which were denied), both sides moved for summary judgment,

and both of those motions were fully briefed and argued in January 2009.

Also in January 2009, the Second Circuit issued the first of a series of decisions finding

that the class action waiver contained in the American Express arbitration clause was

unenforceable against the *Italian Colors* plaintiffs. *In re American Express Merchants Litig.*,

554 F.3d 300 (2d Cir. 2009). Some 15 months later, the Supreme Court then granted certiorari,

vacated the Second Circuit's decision and remanded for reconsideration of in light of certain

intervening authority. *American Express Co. v. Italian Colors Restaurant*, 130 S. Ct. 2401 (May

3, 2010). After another round of briefing, the Second Circuit in March 2011 then reaffirmed its

original ruling in *In re American Express Merchants Litig.*, 634 F.3d 187 (March 8, 2011)

(*"Amex II"*). Shortly after that, the Supreme Court decided *AT&T Mobility v. Concepcion*, 131

S. Ct. 1740 (2011), broadly upholding an arbitration clause and class action waiver. Following

*Concepcion*, the Second Circuit then called for yet another round of briefing, after which it yet

again reaffirmed its earlier decisions. *In re American Express Merchants Litig*, 667 F.3d 204

(Feb. 1, 2012) (*"Amex III"*). After a motion for en banc reconsideration was narrowly defeated

by a deeply divided Court of Appeals, *In re American Express Merchants Litig*, 681 F.3d 139

(2d Cir. 2012) (*"Amex IV"*), American Express successfully petitioned the Supreme Court for

certiorari, and, on June 20, 2013, the Court reversed the Second Circuit's decision. *American*

*Express Co. v. Italian Colors Restaurant*, 133 S. Ct. 2304 (2013).

### B. *Anti-Steering Rules Challenges*

During the course of discovery in the *Marcus* case, it became apparent to Class Counsel

and their economic experts that the rules circumscribing the ability of merchants to steer

transactions to lower-cost payment forms were at the root of the competitive ills plaguing the payments industry. Based on the evidence uncovered in *Marcus*, plaintiffs' merits experts in that case opined that American Express's rules against steering operated to largely insulate it from competitive pricing pressures, and warranted a finding of substantial market power – economic arguments that would be echoed years later in the summary judgment arguments proffered to this Court by the Individual Merchant Plaintiffs.

In May 2005, Animal Land Inc., a pet transportation business based in Atlanta (and a Class Plaintiff here as well), filed an action against Visa entitled *Animal Land, Inc. v. Visa USA, Inc.*, 05-CV-01210 (JOF) (N.D. Ga.) challenging Visa's rules against surcharging. That action – which was followed in short order by cases challenging MasterCard's similar rule and cases that challenged the so-called "default interchange rules" of both networks – was the first case filed in what later became MDL 1720.

But as litigation challenging anti-steering and anti-surcharging rules broke out in 2005-06, Marcus Corp. was not at liberty to amend its complaint to challenge American Express's similar rule.[5] So instead, Class Counsel filed cases in late 2005 challenging American Express's rules restraining merchant surcharges in the MDL 1720 court, on behalf of other small merchant clients. After conferring with the parties in MDL 1720 and Magistrate Judge Orenstein, and American Express, Class Counsel then withdrew those actions and re-filed them in the Southern District of New York. Although the filings were marked related to *Marcus*, they were ultimately reassigned to Judge Pauley under the master file name *Performance Labs, Inc. et al. v. American*

---

[5] By early 2006, subsequent to a significant asset divestiture, Marcus Corp. had become subject to the standard form American Express card acceptance agreement applicable to smaller merchants, thus obligating it to arbitrate any new claims. By informal agreement of the parties, defendants did not seek to enforce the arbitration agreement as to the tying claims in *Marcus*, and Marcus Corp. did not seek to amend its complaint to add the anti-steering rules claims in the *Marcus* action.

*Express Co., et al.*, 06-CV-2974 (WHP) (S.D.N.Y.) and then consolidated with additional filings

as *In re American Express Anti-Steering Rules Antitrust Litig.*, 06-CV-2974 (WHP) (S.D.N.Y.)

("*Amex ASR*").

Because the merchants challenging Amex's anti-steering rules were all subject to the

arbitration clause, the *Amex ASR* case was largely stayed from its inception in 2006 until the

Second Circuit ruled in *Italian Colors* in January 2009. At that point, the parties commenced

discovery in earnest before Judge Pauley. Also, in that time frame, a handful of larger merchants

(who were either not bound by Amex's arbitration clause or as to whom Amex did not invoke

that clause) filed claims that were substantially identical to the *Amex ASR* complaint in the

Eastern District of New York, where they were assigned to this Court. *Rite Aid Corp., et al. v.

American Express Travel Related Services, et al.*, Master File No. 08-CV-2315 (NGG)

(E.D.N.Y.). Collectively, these plaintiffs are referred to below as the "Individual Merchant

Plaintiffs."

In October 2009, relying on evidence adduced in *Marcus* and this action, Class Counsel

submitted to the Justice Department – whom it understood was investigating Visa and

MasterCard's rules relating to merchant steering – a white paper entitled "Why The Antitrust

Division Should Challenge American Express's Anti-Steering Rules." Following extensive

investigation of all three networks, the Justice Department announced on October 4, 2010 that it

and seventeen plaintiff states had entered into consent decrees with Visa and MasterCard and

filed an enforcement action against American Express challenging certain of its rules relating to

merchant steering. *United States v. American Express Co.*, 10-CV-4496 (NGG) (E.D.N.Y.).

Because both the DOJ's case and the Individual Merchant Plaintiffs' cases were pending in this

Court, the *Amex ASR* plaintiffs initiated proceedings before the Judicial Panel on Multi-District Litigation, which then transferred the *Amex ASR* case to this Court.

Fact discovery in the *Amex ASR* case has been extensive, to say the least. Pursuant to laboriously negotiated discovery coordination protocols with defendants, the Individual Merchant Plaintiffs and the Department of Justice, the Class Plaintiffs participated in 120 depositions and marshaled a record that included more than 20 million pages of new documents.

## C.     *Settlement Process*

Back in the fall of 2006, after Judge Daniels granted the motion to compel arbitration in *Italian Colors* and before the initial Second Circuit decision, with discovery in *Marcus* in full swing and the first *ASR* case just then filed, the parties engaged in a series of face-to-face meetings designed to explore potential resolution. The meetings did not bear fruit, and the parties agreed to resume the conversation after the arbitration issue was finally resolved. That juncture would arrive seven years later.

The Supreme Court's June 2013 ruling in *Italian Colors* precipitated the instant settlement. First of all, the Court's broad ruling upholding Amex's collective action ban made it clear to Class Counsel that no damages class action was realistically feasible in *Amex ASR* or in *Marcus*. By 2013, class plaintiffs had discovered that virtually every Amex-accepting merchant in the U.S. was subject to a binding arbitration clause with American Express. So even if a non-arbitration-bound named plaintiff were free to proceed in court, it is likely Amex's arbitration clause would be upheld as against substantially all of the members of a putative class, such that a putative damages class could not even meet the numerosity requirement of Rule 23(a)(1).

However, it was also Class Counsel's judgment that a class action seeking market-wide injunctive relief remained viable, under *Italian Colors*. Thus, Class Plaintiffs vigorously resisted

Amex's motion to compel arbitration in the *Amex ASR* case, arguing that the *Italian Colors* decision and the language of the Card Acceptance Agreement do not in fact foreclose an action seeking broad injunctive relief. The motion – which presents difficult and complex issues, carries the potential for yet another trip to the Supreme Court, and threatens the ability of 99% of U.S. merchants to ever obtain any relief against Amex's surcharging rules – was fully briefed in August 2013, and is currently *sub judice* before this Court. (DEs 262-269).

It is against this backdrop that the parties have agreed to settle the instant litigation. The parties thus engaged in intensive negotiations throughout the summer and fall of 2013, with the assistance of mediator Kenneth R. Feinberg. Mr. Feinberg presided over numerous in-person and telephonic conferences, commencing before the Supreme Court released its *Italian Colors* ruling, and continuing to the present. A declaration from Mr. Feinberg is submitted together with the parallel Motion For Attorneys' Fees And Costs.

## III.    Settlement Terms

The Settlement Agreement, Friedman Decl., Ex. A, allows merchants to impose a surcharge upon Amex credit and charge card transactions so long as: (i) the amount of the surcharge does not exceed the discount rate applicable to that transaction and the amount of the surcharge the merchant imposes on any other credit card brand; (ii) the surcharge is fully disclosed, on the same terms that the merchant is required to disclose Visa and MasterCard surcharges; and (iii) the merchant provides 30 days notice to Amex that it intends to surcharge. SA ¶ 8. Debit cards, including pre-paid or gift cards, may not be surcharged unless or until similar cards on competitors' brands are subject to surcharging. See SA ¶ 8 and Amex Merchant Regulations, Friedman Decl., Ex. B at §3.2.

Meanwhile, Amex is prohibited from offering a traditional debit card subject to its Honor All Cards policy, lest such an offering undermine the surcharging relief provided in the agreement. SA ¶ 8. Specifically, Class Counsel was concerned that Amex might launch a rewards-bearing, high-fee, non-Durbin-regulated traditional debit card product and advertise that that product is "surcharge free." The appeal is obvious. And while Class Plaintiffs would take the position that such a campaign would constitute new conduct, outside the scope of the Release, the Settlement Agreement makes clear that merchants would be free to refuse to accept any such new product, irrespective of Amex's Honor All Cards policy.

The agreement also provides that Amex and a merchant may agree to waive the right to surcharge, provided that the contract is individually negotiated, for a set term of years and supported by actual consideration, *e.g.*, a discount rate reduction. SA ¶ 10. An obligation of good faith and fair dealing is expressly made applicable to any such contracts, SA ¶ 90, to ensure (as just one example) that Amex cannot threaten merchants with rate increases to induce them to enter agreements not to surcharge. And in fact, Class Counsel has received binding written acknowledgement from Amex counsel that any such threat would violate the contractual covenant of good faith and fair dealing. Letter from Philip C. Korologos dated December 16, 2013, Friedman Decl., Ex. W.

The release is a broad one, "specifically intended . . . to preclude all members of the Settlement Class from seeking . . . equitable relief prior to the Release Termination Date (which date shall be a minimum of ten years following the Provisions Change Date) with respect to any rule or provision that was or could have been challenged in these Actions" subject to the "identical factual predicate doctrine as applied to the [*Amex ASR* case] and the Marcus Action." SA ¶ 26. The release duration may also extend beyond ten years if Visa or MasterCard's rules

remain unchanged, as well as Amex's rules, and so long as the equitable release in the MDL 1720 agreement remains in effect and has not been abrogated. SA ¶¶ 26, 1(vv). Conduct that is undertaken subsequent to final approval that is consistent with the rules as they exist subsequent to final approval, is released, and cannot form the predicate of an injunctive or damages claim. SA ¶¶ 26, 27.

There is no release whatsoever of any right that any class member presently has to sue for money damages. SA ¶ 40. On the contrary, the Agreement specifically contemplates that a merchant may pursue damages claims against American Express based on the anti-steering rules and Honor All Cards rules (as those rules exist before the rules changes take effect) under whatever dispute resolution terms are applicable to that merchant. SA ¶ 40. Recognizing that most merchants' agreements call for binding arbitration, the Agreement provides that arbitral claimants shall be entitled to receive the extensive evidentiary and litigation record that Class Counsel has amassed in these cases, subject only to the claimant's agreement to be bound by the applicable Protective Order (and the Court's agreement to amend that Order to reflect this arrangement). SA ¶ 68.

The Settlement Agreement also recognizes that the Department of Justice is pursuing the elimination of certain American Express "non-discrimination provisions," or anti-steering rules, and it ensures that class members will receive the full benefit of whatever injunctive relief DOJ is able to obtain from American Express after trial or via a consent decree. SA ¶ 35.

In addition, American Express has agreed to pay the attorneys' fees and costs incurred by Class Counsel and the dozens of law firms whose efforts over the past 10 ½ years have made this settlement possible, up to a cap of $75 million. SA ¶ 55. It will also pay (and in fact has paid) $2 million in costs associated with the provision of notice to the members of the class, SA ¶ 17, and

will pay an additional $2 million as a fund "to be used solely by Class Counsel for the purpose of educating members of the Settlement Class about" their new-found surcharging rights. SA ¶ 18.

## IV.    The Standards for Assessing Whether a Class Action Settlement is Fair, Reasonable, and Adequate

The Second Circuit is "mindful of the strong judicial policy in favor of settlements, particularly in the class action context. The compromise of complex litigation is encouraged by the courts and favored by public policy." *Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*, 396 F.3d 96, 116-17 (2d Cir. 2005); *In re Prudential Sec. Inc. Ltd. P'ships Litig.*, 163 F.R.D. 200, 209 (S.D.N.Y. 1995) ("It is well established that there is an overriding public interest in settling and quieting litigation, and this is particularly true in class actions.")  "Class action suits readily lend themselves to compromise because of the difficulties of proof, the uncertainties of the outcome, and the typical length of the litigation." *In re Luxottica Grp. S.p.A. Sec. Litig.*, 233 F.R.D. 306, 310 (E.D.N.Y. 2006).

The standard employed in the Second Circuit for the evaluation of a proposed settlement is clear: "Before such a settlement may be approved, the district court must determine that a class action settlement is fair, adequate, and reasonable, and not a product of collusion." *Joel A. v. Giuliani*, 218 F.3d 132, 138 (2d Cir. 2000), citing Fed. R. Civ. P. 23(e)(2).  "We have recognized a presumption of fairness, reasonableness, and adequacy as to the settlement where a class settlement is reached in arm's-length negotiations between experienced, capable counsel after meaningful discovery. Such a presumption is consistent with the strong judicial policy in favor of settlements, particularly in the class action context." *McReynolds v. Richards-Cantave*, 588 F.3d 790, 803 (2d Cir. 2009) (internal quotations and citations omitted); *Wal-Mart* 396 F.3d at 116 (same). "So long as the integrity of the arm's length negotiation process is preserved . . . a

strong initial presumption of fairness attaches to the proposed settlement." *In re PaineWebber Ltd. P'ships Litig.*, 171 F.R.D. 104, 125 (S.D.N.Y), *aff'd*, 117 F.3d 721 (2d Cir. 1997).

Recognizing that a settlement represents an exercise of judgment by the negotiating parties, the Second Circuit has cautioned that while a court should not give "rubber stamp approval" to a proposed settlement, it must "stop short of the detailed and thorough investigation that it would undertake if it were actually trying the case." *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 462 (2d Cir. 1974). In assessing a settlement, then, the court should neither substitute its judgment for that of the parties who negotiated the settlement, nor conduct a mini-trial on the action's merits. *Weinberger v. Kendrick*, 698 F.2d 61, 73 (2d Cir. 1982); *see also In re Global Crossing Sec. & ERISA Litig.*, 225 F.R.D. 436, 455 (S.D.N.Y. 2004) (court should not substitute its "business judgment for that of counsel, absent evidence of fraud or overreaching"); *Strougo v. Bassini*, 258 F. Supp. 2d 254, 257 (S.D.N.Y. 2003) ("absent evidence of fraud or overreaching, courts consistently have refused to act as Monday morning quarterbacks in evaluating the judgment of [class] counsel"); *In re McDonnell Douglas Equip. Leasing Sec. Litig.*, 838 F. Supp. 729, 737 (S.D.N.Y. 1993) ("in analyzing a proposed [class] settlement, courts have consistently refused to substitute their business judgment for that of counsel, absent evidence of fraud or overreaching").

In determining if a proposed settlement is fair, reasonable and adequate, courts in this Circuit look to the factors enumerated in *Grinnell*, 495 F.2d at 463. As modified for application to cases that do not involve a damages fund, "these so-called *Grinnell* factors include: (1) the complexity, expense and likely duration of the litigation, (2) the reaction of the class to the settlement, (3) the stage of the proceedings and the amount of discovery completed, (4) the risks of establishing liability, (5) the risks of establishing damages, [and] (6) the risks of maintaining

the class action through the trial." *Joel A.,* 218 F.3d at 138, citing *Robertson v. National Basketball Ass'n,* 556 F.2d 682, 684 n.1 (2d Cir. 1977).[6] In finding that a settlement is fair, not every factor must weigh in favor of settlement; "rather the court should consider the totality of these factors in light of the particular circumstances." *Thompson v. Metropolitan Life Ins. Co.,* 216 F.R.D. 55, 61 (S.D.N.Y. 2003).

In this case, it is clear that the proposed settlement is entitled to the strongest presumption of fairness, and that consideration of the applicable *Grinnell* standards weighs unequivocally in favor of final approval.

## V.    The "Presumption Of Fairness" Is Warranted Because The Settlement Was Negotiated At Arms' Length By Experienced Counsel After Meaningful Proceedings Before An Experienced And Respected Mediator

Following a full decade of highly adversarial litigation, this settlement agreement was negotiated over a period of six months between experienced and fully-informed counsel assisted by a nationally known and well respected mediator, Kenneth Feinberg. As Mr. Feinberg recites in his Declaration in this matter, "the lawyers on both sides were deeply committed to their long-held positions. To say they dealt with each other at arms' length is a real understatement. To say that this case was hard-fought is even more of an understatement. It was my observation that every inch of ground in this negotiation was earned; nothing was given." Feinberg Decl., ¶ 10.

By the time the parties got to the bargaining table, they were in an excellent position to evaluate the prospects of continued litigation. Over the 10-plus years since the initial case

---

[6] In addition to these six factors, the *Grinnell* test applied in damages cases also includes three additional factors which were omitted by the Second Circuit in the injunctive-only *Joel A.* case: "(7) the ability of the defendant to withstand a greater judgment . . . ; (8) the range of reasonableness of the settlement fund in light of the best possible recovery . . . ; [and] (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation . . ." *Grinnell,* 495 F.2d at 463.

subject to this settlement was filed, Class Counsel participated in more than 160 depositions; reviewed and produced documents totaling in the tens of millions of pages; fully briefed and argued cross-motions for summary judgment supported by hundreds of exhibits; extensively briefed and argued motions to dismiss on statutes of limitations and arbitration grounds; prepared numerous expert reports and took and defended multiple expert depositions on merits and class certification issues; fully briefed and argued a class certification motion; and prosecuted an appeal through the Second Circuit (three separate rounds of briefing plus oral argument) and to the U.S. Supreme Court (two separate rounds of certiorari briefing and one full-blown merits appeal).

Informed as they were by all of these experiences, Class Counsel's negotiation of the instant settlement is entitled to the presumption of fairness. *See McReynolds,* 588 F.3d at 803 (presumption of fairness warranted "after meaningful discovery.") The presumption is further warranted by the testimony of Mr. Feinberg. Courts recognize that the use of an experienced mediator "in the settlement negotiations strongly supports a finding that they were conducted at arm's length and without collusion." *In re Telik, Inc. Sec. Litig.*, 576 F. Supp. 2d 570, 576 (S.D.N.Y. 2008).

## VI. Evaluation Of The Applicable *Grinnell* Factors Confirms That The Settlement Satisfies The "Fair, Adequate and Reasonable" Standard

Consideration of the *Grinnell* factors identified by the Second Circuit in *Joel A.* leaves little room for doubt that the settlement is "fair, adequate and reasonable" within the meaning of Rule 23(e). These factors – putting aside the "reaction of the class" factor, which is unripe for consideration until objections are filed – fall into two main groups: (a) the scope of the litigation to date and the likely scope into the future, absent settlement; and (b) the risks of establishing liability and relief, absent settlement.

## A.    Scope Of Litigation Factors (*Grinnell* Factors 1 and 3)

Approval is warranted in light of "(1) the complexity, expense and likely duration of the litigation" as well as "(3) the stage of the proceedings and the amount of the discovery completed." As set forth above, the litigation efforts to date have been staggering in their scope. And it stands to reason that a class trial or trials seeking sweeping relief for 4.2 million Amex merchants representing all industries, sizes and geographies would be likewise sprawling. Proceedings to date have run more than 10 years. Going forward, it is difficult to estimate what the timeline would be, but "many years" is a safe bet. In fact, truly massive additional delay is likely based upon the motion to compel arbitration of the Class Plaintiffs' equitable claims that was *sub judice* at the time this settlement was reached. The resolution of that motion would engender appeals that could very plausibly end up back in the U.S. Supreme Court on the open (and arguably cert-worthy) issue of whether an arbitration clause may force a party to relinquish the right to sue for broad relief under Clayton Act § 16.

The expense of continued litigation, meanwhile, is enormous. To date, compensable out-of-pocket expenses for expert witnesses, database management, travel and other items exceed $5 million, and the approximate value of lawyer-hours spent over the past decade of litigation is either $83.5 million or $99 million (depending on how one accounts for the time value of money), as discussed in more detail in the accompanying petition for attorneys' fees and costs. Here again, it is impossible to speculate what the costs and fees would be going forward but they will be very extensive on any scenario that does not posit Class Plaintiffs losing a dispositive motion in the near future.

Finally, while the extraordinary "amount of the discovery completed" was discussed above, the *quality* of the discovery taken in these cases relates directly to the relief achieved in

21

this settlement. In particular, painstaking investigation into Amex's real-world experience with legal surcharging in Australia (including many depositions in Hawaii and elsewhere of Amex-Australia witnesses) yielded unique evidence of the pro-competitive power of surcharging -- particularly where price regulation has driven a large gap between the pricing on competing products. Thus, in Australia, ███████████████████ central bank regulation of Visa and MasterCard credit card interchange rates opened up a large gap in pricing between those products and Amex cards, giving merchants an incentive to surcharge Amex cards and drive traffic to Visa/MasterCard.[7] Likewise, in the U.S., the Federal Reserve's regulation of debit card interchange has opened up a large gap between credit cards and debit cards, giving merchants an incentive to surcharge credit cards and drive traffic to debit. Discovery likewise established that debit and credit are extremely close substitutes – indeed, one of the few areas of agreement between the experts for Amex and the Individual Merchant Plaintiffs was that consumers can readily be switched between debit and credit usage.[8]

---

[7] *See, e.g.,*



[8] Individual Merchant Plaintiffs argued – as the Class Plaintiffs have always argued as well—that debit and credit cards *would* be considered part of the same relevant market *if* the surcharge and steering restrictions were abolished. ████████████████████████████ Amex's argument is that debit and credit cards should be considered part of the same relevant market *today*, because the challenged restraints cannot (as a legal or economic matter) be considered in defining a relevant product market.

The structure of the settlement, then, very much grew out of the lessons learned in the discovery process. Class Counsel not only had ample opportunity through the discovery process to learn the strengths and weaknesses of its case, but also – and even more importantly – to understand the structural elements that promise merchants real value in the real world. In a word, we learned that what really matters is a settlement that provides merchants the ability to surcharge credit cards (even if monolithically) in favor of debit cards.

**B.      Litigation Risk Factors (*Grinnell* Factors 4-6)**

The proposed settlement is further clearly reasonable in light of "(4) the risks of establishing liability, (5) the risks of establishing damages, [and] (6) the risks of maintaining the class action through the trial." *Joel A.*, 218 F.3d at 138.

**1.      *Liability Risk***

While Class Counsel has always been unpersuaded by Amex's arguments that it lacks market power and that its rules relating to surcharging are pro-competitive, it is clear that these defenses pose very significant risks to the Class Plaintiffs. As this Court is aware from the summary judgment motions that Amex made in the Government and Individual Merchant Plaintiff cases, Amex is aggressively pursuing these defenses with some of the world's most highly regarded economic experts and lawyers. Its arguments are well presented, cogent, and likely to appeal to certain members of the Court of Appeals. *See, e.g., In re Visa Check-MasterMoney Antitr. Litig.*, 280 F.3d 124, 147 (2d Cir. 2001) (Jacobs, C.J., dissenting from affirmance of class certification and expressing skepticism of plaintiffs' economic theories). Even if Amex loses at the district court level, it has long been Class Counsel's perception that Amex will emphasize that no appellate court has yet provided an in-depth treatment of the proper approach to market definition and market power in a so-called two-sided market, and it will

invite a thorough economic exploration of what is arguably *terra nova* – a strategy that not only highlights the risk that Amex might convince an appellate tribunal that it lacks substantial market power, but one that underscores the tremendous length of the likely road ahead.

### 2. *Damages/Relief Risk*

The Second Circuit in *Joel A.* seemingly included as a *Grinnell* factor the risk of "establishing damages," although that settlement did not include any release of damages claims. 218 F.3d at 142 (the "release explicitly preserves the right of an individual plaintiff to sue for damages") (internal punctuation omitted). Arguably, the logic is that even in a case that has no damages release, it may be relevant to ascertain whether the settling class plaintiffs *could have* obtained a class damages award. If so, this factor militates strongly in favor of approval.[9]

It is beyond serious dispute that a merchant class action for damages is simply unavailable in the wake of *Italian Colors*. The overwhelming majority of Amex-accepting merchants in the U.S. are bound by an arbitration clause. The remainder may only seek damages in accordance with the terms of their dispute resolution provisions, which invariably mandate one-on-one arbitration. The instant settlement makes those arbitrations as viable and realistic an option as they can possibly be, expressly providing each individual arbitral claimant the right to access for use in its arbitration all of the copious data and evidence that Class Counsel has marshaled over the years of this litigation. The litigation road to damages, by contrast, is simply a dead end after *Italian Colors*.

The risk of being unable to obtain any injunctive relief that would apply across the market is also extremely high, even if liability can be established. On its pending motion to

---

[9]  It is also possible that the Court of Appeals simply misspoke, and really meant the risk of establishing entitlement to injunctive relief. See *Marisol A. v. Giuliani*, 185 F.R.D. 152, 164 (S.D.N.Y. 1999) (enumerating factor as "Risk Of Establishing Damages [Remedies]") (brackets in original). In any event, we discuss that injunctive relief risk immediately below.

compel arbitration in *Amex ASR*, American Express contends that no merchant has any right to seek injunctive relief that would affect other merchants, but may seek relief *only* as to the contractual terms applicable *to that merchant*. See Amex Mem. dated 8/5/2013, DE 262; Reply Mem., DE 265. Specifically, Amex argues that the injury-in-fact claimed by any individual merchant (whether a large Individual Merchant Plaintiff or a small merchant) can be redressed by granting that individual merchant the right to steer or surcharge its own customers, and that marketwide relief is therefore not available in a non-class case, within the meaning of applicable case law. Amex Reply Mem, DE 265 at 4-7. Further, Amex argues that a 23(b)(2) class action aimed at changing its marketwide rules is unavailable under the text of the Card Acceptance Agreement and the Supreme Court's *Italian Colors* decision. *Id.*

Class Counsel vigorously opposed the motion, and we continue to believe we have the better of the argument. But the magnitude of the risk here is patent. Further, having made the round-trip to the Supreme Court in this matter twice already, it was Class Counsel's considered opinion that a Supreme Court grant of certiorari on this injunctive issue was not unlikely. And that assumes that Class Plaintiffs would prevail not only before this Court but also at the Circuit Court level, where the prospects of any appeal in this basic area are highly unpredictable, as the splintered *en banc* proceedings in *Italian Colors* demonstrated. *Amex IV*, 681 F.3d at 139 (opinion of Pooler, J.), 142 (Jacobs, C.J., dissenting), 149 (Cabranes, J. dissenting), 149 (Raggi J. dissenting).

### 3. *Class Certification Risks*

The sixth *Grinnell* factor refers to the "risks of maintaining the class action through the trial." Here, the risk of being unable to certify a class are significant for all the same reasons that

are discussed above relating to Amex's current motion to compel arbitration (inasmuch as the agreements ban class proceedings on their face).

### 4. *Marcus Action-Specific Risks*

Lastly, in the absence of this settlement, there is an overwhelming risk that merchants would receive no value from the *Marcus* litigation. While Marcus Corp. itself is not bound by an arbitration clause as pertains to the case challenging the Honor All Cards rule (see above at 11, n. 5) the fact is that virtually all members of the putative class Marcus seeks to represent *are* bound by the clause. In the judgment of Class Counsel, it is likely that a renewed motion by Marcus Corp. to certify a damages class would fail on numerosity grounds. *See* Fed. R. Civ. P. 23(a)(1).

And on top of that risk, Amex has of course asserted formidable merits defenses to the Honor All Cards case in its summary judgment motion, including that it lacks substantial market power; that plaintiffs failed to establish two separate products; that plaintiffs failed to establish likely anticompetitive effects of the coercive tie; and that the claim is time barred. In addition, while Marcus Corp.'s 2008 motion for class certification was denied not on the merits but merely as a scheduling matter, and subject to renewal, Amex did assert powerful defenses to that motion which it would reassert if the motion were revived. Among other defenses, Amex argues that if the relevant products were untied, such that the price of the tied product were to fall (which is the nub of plaintiffs' damage theory, *see* above at 9, n. 4), then the price of the tying product would rise – in which case, the effect on merchants could only be gauged by an individualized inquiry that looks at the payment mix at each merchant. While Plaintiffs submitted expert testimony and evidence to rebut that hypothesis in 2008, it is totally unclear how that issue would play out if litigated today.

## VII. Discussion Of Anticipated Objections

It is premature to discuss the reaction of the members of the Class, as objections are not due to be filed until June 6, 2014 under the Court's scheduling order. DE 334. However, the Individual Merchant Plaintiffs have already raised certain issues in the preliminary approval process, representatives of certain objectors in the MDL 1720 case have indicated that they intend to likewise object here (letter to Court from Jeffrey I. Shinder, dated 2/21/14, DE 337) and a handful of early objections have been received already. Accordingly, we can address here at a high level of generality some of the basic expected objections in this case.

### A. Value Of Surcharging Rights In General (MDL 1720 Redux)

Certain objectors in MDL 1720 voiced skepticism concerning the value to U.S. merchants of the right to surcharge – a theme that is echoed in some of the objections already filed here. There were three main areas of argument.

1. The "Amex Problem": First, many merchants pointed out that the new Visa/MasterCard surcharging rules force Amex-accepting merchants to surcharge Amex transactions as a condition of being permitted to surcharge Visa and MasterCard transactions, and they argued that they are unable to surcharge Amex transactions because of Amex's rules. *Payment Card Interchange*, 2013 U.S. Dist. LEXIS 179340 at *64-66. Plainly, with the instant settlement, this objection is now moot.

2. State Statutes: Second, many merchants complained that they cannot use the new surcharging tool because they operate in states, like New York, that have enacted bans on surcharging. But Class Counsel and colleagues have attacked those state statutes as unconstitutional, and Judge Rakoff of the Southern District recently struck down the New York statute on First and Fourteenth Amendment grounds in *Expressions*. Indeed, observing in his

final approval decision that the New York statute "has bitten the dust in the brief interval since the fairness hearing," Judge Gleeson opined that "there is reason to believe that [the other] state-law impediments to a full deployment of the proposed relief" will likewise be held unconstitutional, adding that "[n]o-surcharge laws are not only anti-consumer, they are arguably irrational." *Payment Card Interchange*, 2013 U.S. Dist. LEXIS 179340 at *60. And since that time, identical constitutional challenges have indeed been filed to the anti-surcharging laws in Florida, Texas and California. *Dana's Railroad Supply v. Bondi*, 14-CV-00134-RH-CAS (N.D. Fla.); *Rowell v. Abbott*, 14-CV-00190-LY, (E.D. Tex.); *Italian Colors Restaurant v. Harris*, 14-CV-00604 (N.D. Cal.). And plaintiffs' counsel in all those cases (including Class Counsel here) have stated publicly their intent to challenge each and every such state antisurcharging law.

3.    <u>Merchant Interest Level</u>.  Third – a distant third, in terms of the amount of attention given to each objection – some merchants expressed skepticism concerning the extent to which U.S. merchants are likely to deploy surcharges in the near term.  But there are strong reasons (many of which were not available to Judge Gleeson in MDL 1720) to expect widespread adoption of surcharging, including:

- In Australia, where observers were similarly skeptical about the uptake of surcharging at the start of the reform period, the latest data discloses that 60% of large merchants currently surcharge, and 40% of all merchants currently surcharge.  Frankel Decl., ¶ 41 and Fig. 4.; East & Partners, Australian Merchant Payments, Market Analysis Report, December 2013, p. 31.

- In a recent study by market research firm Olinger Group, more than 60% of merchants who saw a 2-minute informational video stated that they would surcharge.  Of the remainder, most stated they would surcharge if at least some of their competitors did.  The video presented surcharging as automated and hassle-free, as vendors in the marketplace will surely present the option, and it was

exhibited to merchant sectors including dry cleaners, beauty salons, home improvement, auto repair, law firms and several others. Olinger Decl., Ex. 1.

- In industries where Visa, MasterCard and American Express have allowed merchants for some years now to assess "convenience fees" – really just a euphemism for permissible surcharges – these fees are in fact imposed on substantial numbers of credit card transactions in those industries. In other words, where merchants *may* impose such fees, they *do* impose them, in substantial numbers. Frankel Decl., ¶ 36.

- Enforcement data obtained in cases challenging state anti-surcharging laws show considerable levels of merchant surcharging in clear violation of state laws. Florida officials, for example, sent 41 cease and desist letters to merchants for surcharging between January and June 2013 alone. Friedman Decl., ¶ 8.

- 

- In the competitive acquiring marketplace in the U.S., entrepreneurial service providers are gearing up right now to offer services that automate the surcharge process, and are likely to advertise and promote surcharge-related services. Levy Decl., ¶¶ 4-5.

- Pursuant to the Settlement Agreement, Class Counsel will deploy a $2 million advertising fund, earmarked to inform merchants of their new-found surcharging rights. SA, Friedman Decl., Ex. A, ¶ 18.

**B.    Lack Of Differential Surcharge Rights**

The Individual Merchant Plaintiffs have indicated that they will object to the extent that the instant settlement does not allow them to engage in what the IMPs call "differential surcharging" – *i.e.*, the imposition of surcharges that treat American Express credit cards less favorably than surcharges upon other *credit* card brands.  This objection overlooks several key realities.

1.    *The Credit-Debit Rate Differential Swamps Interbrand Rate Differentials*

First, the relative price differences to merchants between all credit cards and all debit cards absolutely swamp any differences between and among the credit card brands.  As discussed in the accompanying report of Dr. Alan Frankel, at 34, n. 76, the average *mix-adjusted* price differential between Amex and MasterCard is reported by Amex as being just ███ basis points (███%), and the mix adjusted premium over Visa is only ███ basis points (███%).[10]

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████ And as Dr. Frankel shows, even if one failed to adjust for mix, the premium over Visa, MasterCard and Discover would *still* only be between ███████ basis points.  See Frankel Decl., at 18, Fig. 3. These are extremely small differences, and there is no evidence anywhere in the world that differentials of this magnitude

---

[10]    Mix adjustment, as used in this context, takes account of the product mix each merchant sees on Amex.  So for example, a *mix adjusted* comparison would compare Amex corporate cards with Visa commercial cards, and Amex Membership Rewards cards with Visa Signature cards. A mix-adjusted analysis takes the product-mix breakdown of Amex (corporate vs. high-rewards vs. plain-vanilla-revolving-credit vs. pre-paid cards, etc.) and asks what the fees would be if Visa rates were applicable to that particular mix of transactions.  A *non-mix-adjusted* analysis, by contrast, flatly assumes that all Visa transactions occur at the average Visa rate.  Failing to adjust for mix overlooks that a surcharged Corporate Card holder will presumably switch to a Visa commercial card, and a surcharged Platinum Card holder will presumably switch to Visa Signature.

(much less the more accurate, mix-adjusted magnitudes) would induce merchants to engage in differential surcharging, even if it were permitted.

The spread between credit cards and debit cards, on the other hand, is 157 basis points on average. Frankel Decl., ¶ 35. That spread is even greater than the spreads that prevailed in Australia between Amex and Visa/MasterCard at their high water mark. And as has been seen, those Australian differentials – the "giant gaps" that opened up in Australia -- were broad enough to incite widespread surcharging activity by merchants, and huge consequent cost savings.

The upshot here is two-fold. First, if merchants use the tools provided by this settlement and impose a single surcharge on all credit card transactions without imposing any surcharge on debit card transactions, the cost savings they will realize are more significant, by orders of magnitude, than what merchants could save by imposing surcharges on one credit card brand but not another. And second, the cost differential between credit and debit is such that real world data gives us reason to expect that merchants will want to use the surcharging tool to drive traffic from one product to the other. By contrast, there is no sound reason to expect the spreads between card brands would incite surcharging behavior.

2. *Differential Surcharging Is Illegal In Ten States, And No Constitutional Challenge Applies*

As discussed above, ten states have statutes that make the imposition of surcharges on credit cards illegal. Having successfully knocked out the New York statute, *see Expressions, supra,* merchants represented by Class Counsel here have filed challenges to the three largest remaining states' anti-surcharging laws and plan to challenge the rest, based on the First Amendment to the U.S. Constitution. Critically, these constitutional challenges are *simply not available* to merchants who would seek to engage in differential surcharging.

The constitutional challenge is not available in the differential surcharging context because the whole point of the constitutional case is that the illegal activity (imposing a fee for all credit card transactions) is mathematically identical to conduct that is expressly legal (offering a discount for anything but credit). If the merchant advertises a price of $100 and a $2 discount for debit/cash/checks, that is legal. But if he advertises a price of $98, and a $2 surcharge for using a credit card, that is illegal. In either case, the commercial offer is the exact same: a higher price for credit, and a lower price for everything else. What is different is merely how that commercial offer is communicated. Plainly, then, the laws do not regulate *conduct*; they regulate *speech*. And under clearly applicable commercial speech principles, the laws do not survive First Amendment scrutiny. *See Expressions,* 2013 U.S. Dist. LEXIS 143415.

But now change the facts, to address the would-be differential surcharger. What if a merchant-plaintiff wants to impose a surcharge *only* on American Express cards? This merchant's illegal activity (imposing a fee for just Amex transactions) is not mathematically equivalent to legally protected conduct (offering a discount for anything but credit). As applied to *this* merchant, then, the law does not regulate speech: it does not dictate the words he must use to communicate a plainly lawful offer; it bans *conduct*. This merchant thus has no First Amendment argument at all. If our clients in the case before Judge Rakoff had testified that they wanted to engage in this sort of "differential" surcharging, the *Expressions* case would have been dismissed out of hand. What our clients testified was that they wish to impose a single surcharge for the use of all credit cards, which is mathematically identical to a permitted discount for the use of everything but credit cards. *See, e.g.*, Supplemental Declaration of Steve Milles dated 7/29/2013, 13-CV-03775-JSR, DE 42.

The implications here are powerful. While certain merchants may argue that their sole interest lies in seeking rights to engage in differential surcharging, those merchants ignore the fact that the laws of 10 states (including New York, California, Texas, Florida and others that collectively account for nearly half of U.S. transaction volume) prohibit the conduct they seek to engage in, and that these merchants have *no viable argument whatsoever* against those state statutes.

>    3.    *Alternative Sources For Differential Treatment Rights*

Lastly, it would be a mistake to consider the surcharging relief obtained here in a vacuum. Rather, as discussed above, this settlement is taking place on the eve of the Government's trial against American Express. If DOJ wins its trial, it will obtain important differential treatment rights for class members, including the right to offer discounts and other inducements for the use of competing credit card brands. Merchants whose primary focus is on chipping away at their credit card rates through negotiations – but who are disinclined for whatever reason to use the new surcharging tool to recoup acceptance costs or shift volume to debit – may gravitate towards relying on the DOJ-supplied tool of differential discounting.

On the other hand, if DOJ were to lose at trial, then merchants will not have the ability to engage in differential discounting. But then, if DOJ loses, it is hard to see why private plaintiffs would have won. On that scenario, the value of the relief obtained in the instant settlement will be all the more stark.

## C.    Due Process/Adequacy Of Representation Considerations

In complex injunctive settlements, there are invariably some class members who take the position that they would have preferred additional, better or different injunctive relief terms. Thus in *Robertson v. NBA*, 556 F.2d 682 (2d Cir. 1976), where the relief obtained by Class

Plaintiffs including Oscar Robertson served to revamp NBA draft policies, objectors including Wilt Chamberlain complained that the relief stopped short of achieving true free agency. Likewise, in *Joel A.*, 218 F.3d 132 (2d Cir. 2000), where the settlement agreement broadly overhauled the child welfare system, objectors complained that it failed to achieve special protections for gay foster children. And in *Wal-Mart*, which altered the Visa and MasterCard honor-all-cards rules, objectors complained that the settlement failed to obtain relief on claims they had brought attacking *other* Visa and MasterCard rules, including the so-called exclusionary rule and the default interchange rules. In essence, the objectors in all these cases argued that the class settlement "left significant claims on the table." *Wal-Mart*, 396 F.3d at 109-110.

But what matters, in the Second Circuit, is not whether an objector can conceive of better or different relief. Indeed, it does not even matter whether the Class Plaintiffs *tried* to obtain better or different relief. All that matters, the Second Circuit holds, is whether there was *adequate representation*. The "essential question," according to the Court of Appeals in *Wal-Mart*, "is whether the interests that were served by the settlement were compatible with those [of the absent class members] when the plaintiffs negotiated the release of the [absent class members'] separate claims." *Wal-Mart Stores,* 396 F.3d at 110. "Due process does not require that all class claims be pursued. Instead, . . . adequate representation of a particular claim . . . is determined by the alignment of interests of class members, not proof of vigorous pursuit of that claim." 396 F.3d at 113.

In this case, the interests are perfectly aligned and represented. All Class Plaintiffs and all class members have a shared – and indeed identical – interest in obtaining broad and meaningful rights to surcharge. Class Plaintiffs did not contract to release any claims that they themselves do not possess. On the contrary, they released claims that they *do* possess –

including the claim seeking broader differential surcharge rights – because their informed and conflict-free judgment was that the interests of all class members were best served by the instant settlement.

## VIII. Class Notice Was Adequate By Any Measure

Due process requires that notice "fairly apprise the prospective members of the class of the terms of the proposed settlement and the options that are open to them in connection with the proceedings." *Wal-Mart,* 396 F.3d at 114. The standard for determining the adequacy of a settlement notice in a class action "is measured by reasonableness." *Id.* at 113.

Here, the parties implemented a Court-approved notice plan that amply satisfies the requirements of due process and Rule 23. As detailed in the report filed on March 25, 2014 by Epiq Solutions, the Court-appointed administrator charged with executing the notice plan approved by the Court in the preliminary approval order, Epiq Solutions: (1) sent postcards via First Class Mail to each of the millions of Amex-accepting merchants in the United States for whom American Express maintains a postal address, providing basic information on the settlement and directing them to the case website and a toll-free phone number for complete information; (2) published notice in a combination of national and regional business publications as well as retailer trade journals; and (3) established a case website containing a long-form notice and other case documents (www.amexmerchantsettlement.com), and established a toll-free telephone service to provide information regarding the settlement. DE 346.

By any measure, the Court-approved notice plan was "reasonable" when it issued and it has been faithfully executed, as detailed in the report of the Class Administrator.

## CONCLUSION

For all the foregoing reasons, Class Plaintiffs respectfully request that the Court grant final approval of of the consolidated class action proceedings in *In re American Express Anti-Steering Rules Antitrust Litig.,* 11-MD-2221 and *Marcus Corp. v. American Express Co.*, 13-CV-07355.

Dated: April 15, 2014

<div style="margin-left:40%">

**FRIEDMAN LAW GROUP, LLP**

/s/Gary B. Friedman
Gary B. Friedman
Tracey Kitzman
Scott Levy
Rebecca Quinn
270 Lafayette Street
New York, New York 10012
(212) 680-5150
gfriedman@flgllp.com

</div>

Mark Reinhardt, Esq.
Mark Wendorf, Esq.
**REINHARDT WENDORF &**
**BLANCHFIELD**
332 Minnesota Street
St. Paul, Minnesota 55101
(651) 297-2100

Read K. McCaffrey, Esq.
**PATTON BOGGS LLP**
2550 M Street, NW
Washington, DC 20037
(202) 457-6000