UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------x
IN RE: AMERICAN EXPRESS ANTI-STEERING
RULES ANTITRUST LITIGATION

This Document Relates To:
CONSOLIDATED CLASS ACTION
------------------------------------------------------------------x
THE MARCUS CORPORATION,
on behalf of itself and all similarly situated persons,

         Plaintiff,
  - against -

AMERICAN EXPRESS COMPANY et al.,

         Defendants.
------------------------------------------------------------------x

11-MD-02221 (NGG) (RER)

ECF ACTION

13-CV-07355 (NGG) (RER)

ECF ACTION

DECLARATION OF GARY B. FRIEDMAN IN SUPPORT OF (1) CLASS PLAINTIFFS'
MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT AND (2) CLASS
COUNSEL'S MOTION FOR AN AWARD OF ATTORNEYS FEES AND COSTS, AND FOR
LEAVE TO DISTRIBUTE SERVICE AWARDS

GARY B. FRIEDMAN declares, pursuant to 28 U.S.C. § 1746:

  1.  I am a member of Friedman Law Group, LLP ("FLG"), co-lead counsel for the Class Plaintiffs in *Marcus v. American Express* and *In re American Express Anti-Steering Rules Antitrust Litigation*. I submit this Declaration in support of both: (i) Class Plaintiffs' Motion For Final Approval Of Settlement (the "Final Approval Motion"); and (ii) Motion Of Class Counsel For Award Of Attorneys' Fees And Costs, And For Leave To Distribute Service Awards (the "Fee Motion").

  2.  More specifically, this Declaration is intended to place before the Court and its technical advisor copies of certain documents relied upon in our brief supporting the Final

1

Approval Motion, and in the supporting Declaration of Alan S. Frankel, Ph.D. Additionally, I will attest to certain facts referenced in both motions.

3. Annexed to this Declaration are true and correct copies of the following documents referred to in the Frankel Declaration and our Approval Motion, along with a notation as to whether the document is being filed publicly or – because we were unable to procure the consent of the producing party – under seal:

| Ex. | Description | Public/Sealed |
|---|---|---|
| A | Class Action Settlement Agreement | Public |
| B | American Express Merchant Regulations – U.S. October 2011, AMEXNDR10800035 (Section 3 "Card Acceptance") | Public |
| C | Excerpts of Expert Report of Dr. Christopher Vellturo in *Amex ASR* dated April 3, 2013 (¶¶105, 194-197, 281, 344, 506, 523-24). | Sealed |
| D | Excerpt of Dep. of Visa witness E. Buse dated 5/9/07 in Amex v. Visa, at 237-38 | Sealed |
| E | Monthly Findings From Competitive Intelligence Monitoring Service, dated March 7, 2005, AMEXM50062903, at '907 | Sealed |
| F | Boston Consulting Group Report, DFS003783 at 59 | Sealed |
| G | 30(b)(6) Deposition of Discover in *AMEX ASR* at 212-13 | Sealed |
| H | Nilson Report #1034, February 2014, p. 1. | Public |
| I | KAE, "US Debit Markets: Key Insights," 1/4/2011, AMEXNDR11079539 at '559. | Public |
| J | Shell Experiment, MCW_AMEX_00401419 at '44 (slide 26) | Sealed |
| K | Visa Convenience Fee Document, VUSAMDL1-00748463 | Sealed |
| L | Visa U.S.A. White Paper on convenience fees, VUSAMDL1-09042437 at 5 | Sealed |
| M | Deposition Excerpts of American Express Witnesses (S. McCurdy; A. Singh; G. Begg; P. Beckert) | Sealed |
| N | Presentation: "Differential Surcharge And The Australian Marketplace" 8/10/07 AMEX-DOJ-10133629 at '631 | Sealed |

| | | |
|---|---|---|
| O | Presentation: "Managing Differential Surcharge (etc)" AMEXNDR17415688 at '690 | Sealed |
| P | Presentation: "Effects Of Surcharging In Australia" AMEXNDR02054703 at '711). | Sealed |
| Q | Presentation: "Surcharge Task Force" AMEXNDR01788794 at '803 | Sealed |
| R | MDL-1720 30(B)(6) Deposition of Visa U.S.A. Relating to Australia, Testimony of Tolan Steele, November 5, 2008, p. 149. | Sealed |
| S | MDL-1720 Deposition of Albert Naffah, October 7, 2008, p. 75. | Public |
| T | Amex's "Interactive Model for Visa Pricing" AMEXNDR11099175 (electronic only) | Sealed |
| U | Amex's "Interactive Model for MasterCard Pricing" AMEXNDR11099174 (electronic only) | Sealed |
| V | American Express Discount Rate Actuals, AMEXNDR11007601 (electronic only) | Sealed |
| W. | Letter from Philip C. Korologos to Gary B. Friedman dated December 13, 2013 | Public |

4.      The almost singular focus of FLG and its predecessor firm for the past decade has been the prosecution of antitrust litigation on behalf of merchants against credit card companies, and related activities. More than 60% of FLG's partner time since inception has been spent on the litigation against American Express, and most of the remainder has been spent on litigation against Visa and MasterCard, in MDL 1720. Prior to founding FLG in 2005-06, I had a more general law practice. My then-partner and I handled paying cases in a variety of areas, including not just antitrust but also civil rights, sports litigation and employment discrimination, where we had the chance to try cases in this Court and elsewhere. By 2005, however, it was clear to me that the demands of running the payment systems cases were incompatible with a traditional law practice and demanded a full-time focus and unique structure.

5. In order to finance our activities over the past decade, we have engaged a number of co-counsel who have provided financial support, along with other resources such as support services or junior attorneys. As a consequence, FLG has very substantial obligations owing out of any award of attorneys fees in this case. A corollary is that our receipts at the end of the day will be substantially less than appears on the face of the application.

6. In addition to running the cases against American Express – including theorizing and developing the Anti-Steering Rules case and Honor-All-Cards tying case, and assuming a primary role along with co-lead counsel in executing the litigation – FLG also developed the challenge to Visa and MasterCard's no-surcharge rules and took a laboring oar in litigating and then negotiating the settlement of the no-surcharge side of the MDL 1720 class action. Further, and as an outgrowth of all of the above efforts, we conceived (along with my colleague Deepak Gupta, who worked with us on the *Italian Colors* matter at the Supreme Court level) of challenges to the state anti-surcharging statutes rooted in the First and Fourteenth Amendment. We then, on behalf of a handful of merchant clients, challenged the New York statute, N.Y. General Obligations Law § 518. We succeeded in having that statute overturned, *Expressions Hair Design et al. v. Schneiderman*, 13-cv-03775 (JSR), 2013 U.S. Dist. LEXIS 143415 (S.D.N.Y. Oct. 3, 2013), and are currently in the process of briefing the State's appeal before the Second Circuit.

7. In connection with *Expressions*, our legislative history research showed that the opponents and critics of the federal surcharging ban in the early 1980s came to include economists from the Reagan White House, the Federal Trade Commission, and many lawmakers. The Federal Reserve also issued a strongly worded report proposing that the law be allowed to lapse. Our legislative history research at the state level showed us that the state anti-

4

surcharging statutes were extensively lobbied for by fake-consumer organizations backed by the big credit card networks. *See, e.g.,* Associated Press, *Consumers Gain Friends in Credit Card Fight*, Ocala Star-Banner, April 2, 1984 (describing purported "consumer coalition bankrolled by American Express and Visa").

8. Subsequent to *Expressions*, we have filed on behalf of merchants similar constitutional challenges against the laws of Florida, Texas and California. Our intention, in due course, is to challenge each of the ten state statutes. In connection with our challenge in Florida, we served state Freedom Of Information Law requests, and obtained enforcement data relating to the anti-surcharging statute. Among other things, we received 41 distinct cease-and-desist letters sent by the Florida Attorney General's office to allegedly surcharging merchants between (mostly) January and July 2013.

9. Facts relating to the procedural history of the *Marcus, Italian Colors* and *Amex Anti-Steering Rules* cases are accurately set forth in the accompanying brief in support of the Final Approval Motion, at Section II. In addition, as set forth in the Fee Motion brief, at 4, I can confirm that American Express produced roughly one million of pages of documents prior to the effective date of the 2006 amendment to Rule 34, in a so-called "naked TIFF" format, without optical character recognition or any other features enabling electronic searches. Our vendors (who tried to apply OCR but met with limited success) believed the OCR had been stripped off before production was made. Be that as it may, the production format caused us to incur millions of dollars in manual document review time. *See generally, In re Payment Card Interchange*, 2007 WL 121426 (E.D.N.Y. Jan. 12, 2007) (Orenstein, M.J.) (addressing practice of producing naked TIFFs without meta-data before and after amendment to Rule 34). I recall

raising the issue in 2005 or '06, to no avail, both with Amex counsel and at a status conference before Judge Daniels (although we have not been able to locate a transcript).

10. The negotiations of the instant settlement were decidedly arms' length and hard fought, as attested to by mediator Kenneth Feinberg in his accompanying declaration. And the most contentious meetings were the ones that Mr. Feinberg did not see. Any suggestion that American Express lightly acceded to the rules changes that form the heart of the settlement is preposterous. American Express does not issue debit cards in the United States. Our settlement, meanwhile, provides the most potent tool in the history of payments markets for steering transaction volume from credit cards to debit cards. It may well be that the instant settlement, from Amex's perspective, is preferable to allowing Amex cards to be discriminatorily surcharged. But that does not by any stretch imply that the instant relief was easy to obtain, or easy for American Express to agree to.

11. In the course of the settlement negotiations, my team and the Amex team were always careful to maintain the separateness between (i) discussions concerning the injunctive relief package, and (ii) discussions concerning money – whether damages or attorneys fees. In the meetings and calls that we held before the engagement of Mr. Feinberg, we never once touched on the subject of attorneys fees; instead, our discussions focused on the terms of the injunctive relief. In the initial mediation sessions that we held with Mr. Feinberg, we discussed and resolved injunctive relief first, and only then turned to issues that involved money. In fact, at a June 2013 mediation session held at Cravath, our team noted to Mr. Feinberg that it appeared the injunctive terms had been agreed to, and that the parties could turn to financial issues. Mr. Feinberg then left the plaintiffs' room, went to the American Express room, and then returned with a handwritten sheet of paper detailing the injunctive terms that the parties had agreed upon,

and that are reflected in the Settlement Agreement. We intentionally and explicitly acknowledged these terms before addressing financial issues. Our understanding was that the agreed-upon injunctive terms would apply so long as the parties managed to reach agreement on the other elements of a settlement (which in the event we had prevailed in the Supreme Court, could have entailed class damages).

12. FLG's billing rates have been submitted to courts in connection with attorneys' fee applications that were approved in other class action cases, including two recent applications made in this District in antitrust class actions: (i) *In re Air Cargo Shipping Services Antitrust Litigation*, 06-MD-1775(JG) (VVP) and (ii) *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 05-MD-1720 (JG)(JO).

I declare under penalty of perjury that the foregoing is true and correct.

Dated: New York, New York
April 15, 2014

GARY B. FRIEDMAN