**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

<span style="color:red">**REDACTED VERSION**</span>

-------------------------------------------------------------------x

IN RE: AMERICAN EXPRESS ANTI-STEERING
RULES ANTITRUST LITIGATION

This Document Relates To:                          11-MD-02221 (NGG) (RER)
CONSOLIDATED CLASS ACTION

-------------------------------------------------------------------x

THE MARCUS CORPORATION,
on behalf of itself and all similarly situated persons,

                                                  13-CV-07355 (NGG) (RER)

                    Plaintiff,

          - against -

AMERICAN EXPRESS COMPANY et al.,

                    Defendants.

-------------------------------------------------------------------x


**DECLARATION OF ALAN S. FRANKEL, PH.D.**

1.  **INTRODUCTION** ............................................................................................................... 1

1.1.  Assignment ............................................................................................................. 1

1.2.  Qualifications .......................................................................................................... 2

1.3.  Summary of Opinions ............................................................................................. 5

2.  **"Steering" With Differential Prices or Other Tactics Constrains Market Power and is Ubiquitous Throughout the Economy** ........................................................................ 7

3.  **The Agreement Will Benefit Merchants** ..................................................................... 9

3.1.  Credit Cards are Substantially More Costly to Merchants Than Other Payment Methods, Including Debit Cards. .......................................................................... 10

3.2.  At the Level of Credit Card Fees Prevailing in the United States, Many Merchants are Likely to Surcharge Credit Card Transactions ............................................... 17

3.3.  Surcharging Permits Merchants to Recoup the Cost of Credit Card Payments Directly From Customers Who Use Credit Cards and Set Lower Posted Prices ..... 23

3.4.  Many Customers Will React to Credit Card Surcharges by Using Lower Cost Alternatives at Merchants that Surcharge, Reducing Costs and Prices ................. 24

3.5.  The Threat to Networks of Lost Transaction Volume From Credit Card Surcharges Will Generate a Previously Suppressed Competitive Constraint on the Level of Credit Card Merchant Fees .................................................................................. 28

3.6.  The Agreement Benefits Merchants With Respect to All Current Credit Card Usage, Not Only American Express Card Usage ................................................... 31

3.7.  Summary ............................................................................................................... 32

4.  **Remaining Competitive Restrictions Do Not Eliminate Benefits to Class Members from the Proposed Settlement** ............................................................................................. 33

4.1.  Remaining Elements of the American Express NDP ............................................. 33

4.2.  State Statutes ....................................................................................................... 35

5.  **Conclusion** ................................................................................................................. 36

# 1. INTRODUCTION

## 1.1. Assignment

1.      Under the terms of agreements governing merchant acceptance of American Express cards, merchants may not add a fee or surcharge, or otherwise disfavor customers who present American Express cards to make purchases or discourage customers from using their American Express cards relative to the use of any other credit card or debit card.  I refer to requirements like these generally as "anti-steering rules" and to the American Express requirements as its "Non-Discrimination Policy" or "NDP."[1]

2.      On January 7, 2014, Plaintiffs – several merchants that accept American Express cards for payment and a proposed Settlement Class of merchants that accept those cards (generally, "Class Plaintiffs") – and the Defendant American Express Company entities ("American Express") filed a proposed Class Settlement Agreement ("Agreement").

3.       Under the terms of the Agreement, (1) U.S. merchants that accept American Express cards will be newly permitted to add a surcharge to transactions completed using an American Express card even if they do not surcharge the use of debit cards or certain other non-credit card payment methods;[2] and (2) American Express will be permitted to continue to enforce some limitations on merchant surcharging of American Express card transactions.[3]

4.      I have been asked by Class Counsel to determine whether the relief provided for by the Agreement will generally benefit the members of the class.

---

[1]      See AMEXNDR10800035, at '068 (American Express Merchant Regulations – U.S.), October 2011.
[2]      Class Settlement Agreement, ¶8.
[3]      Id.

**1.2. Qualifications**

5. I have been a full-time professional economist since 1985. I am the Director of Coherent Economics, LLC, which I founded in 2008.[4] I am also a Senior Editor of the Antitrust Law Journal, the leading professional journal dedicated to legal and economic issues arising in antitrust, competition, and consumer protection disputes. I have served on the Editorial Board of the Journal since 1996.

6. I received a B.A. in economics (with honors) in 1982, an M.A. in economics in 1985, and a Ph.D. in economics in 1986, each from the University of Chicago. My primary field of concentration in the Ph.D. program was Industrial Organization, which includes the analysis of competitive issues which arise in antitrust law disputes.

7. Since 1985, I have analyzed economic issues arising in connection with hundreds of antitrust and other types of disputes. I have served as an expert witness in many proceedings in the United States, as well as in Canada, Australia, the United Kingdom, New Zealand, and before the European Commission in Brussels, Belgium. Many of these engagements have concerned disputes involving financial intermediaries and payment networks. I have been engaged as an expert in such matters by private parties, as well as governmental agencies including the United States Department of Justice, the Canadian Competition Bureau, the United Kingdom Office of Fair Trading, and the New Zealand Commerce Commission.

---

[4] I am also a Senior Advisor to Compass Lexecon, a leading consulting firm specializing in the application of economics to legal, regulatory, and public policy disputes. (Compass Lexecon, however, did not assist me in preparing this Declaration.) Compass Lexecon was formed in early 2008 by the combination of Lexecon and COMPASS (Competition Policy Associates). From 1985 to 1996, and from 2004 to 2008, I was employed by Lexecon, most recently as a Senior Vice President. Between 1996 and 2004, I was employed by LECG, another economic consulting firm.

8.      I have been qualified as an expert witness in the United States District Courts for the Northern District of California, the Northern District of Illinois, the Eastern District of Pennsylvania, the Eastern District of Virginia, the District of Columbia and the U.S. Court of Federal Claims, as well as the California Superior Court in Alameda County.  I have provided deposition testimony in proceedings in other jurisdictions.  I have also presented testimony or expert economic analysis in proceedings in Australia, the United Kingdom, New Zealand, and before the European Commission in Brussels, Belgium.

9.      I began studying competition in payment card networks in the 1980s.  Since then, I have written and spoken extensively about the economics of payment card networks and the competitive effects of anti-steering rules.  I have authored or coauthored numerous articles in professional publications concerning competition issues arising in payment card networks, which have been cited by economists, regulators, and others in many countries.  In 2006, I organized the publication of an issue of the Antitrust Law Journal dedicated largely to antitrust issues arising in payment card networks.

10.      I have spoken about competition in payment card networks at professional conferences on many occasions, including at events sponsored by the U.S. Federal Reserve Bank of New York; the Federal Reserve Bank of St. Louis; the Federal Reserve Bank of Chicago; the Federal Reserve Bank of Kansas City; the Federal Reserve Bank of Boston, the American Bar Association's Section of Antitrust Law; the American Bar Association's Consumer Financial Services Committee; the Chicago Bar Association; The Clearing House Association; the Econometric Society in Auckland, New Zealand; the Organization for Economic Cooperation and Development in Paris, France; the International Cards and Payments Council in Rome, Italy; and

at a conference sponsored by the Reserve Bank of Australia and the Melbourne Business School in Sydney, Australia.

11.     I have issued reports, testified, or been engaged as an expert witness in numerous matters involving payment card networks, including the following:

a.  I testified at an oral hearing in 2001 in the European Commission's investigation of Visa's cross-border interchange fees, on behalf of the merchant association Eurocommerce.

b.  In 2002, I testified at trial in California state court in a case challenging MasterCard and Visa currency conversion fees on foreign transactions made by U.S. cardholders.

c.  Professor Dennis Carlton and I served as experts and issued a joint report at the request of the United Kingdom's Office of Fair Trading ("OFT") in connection with the OFT's 2005 decision concerning MasterCard's interchange fees.

d.  In 2005, I submitted briefs of evidence (expert reports) on behalf of the New Zealand Commerce Commission, in connection with Commission cases challenging currency conversion fees charged to New Zealand cardholders.

e.  I testified at an oral hearing in 2006 in the European Commission's investigation of MasterCard's cross-border interchange fees, on behalf of Eurocommerce.

f.  In Australia, I submitted two reports, in 2007 and 2008, to the Reserve Bank of Australia on behalf of the Australian Merchant Payments Forum, a merchant group, as part of the Reserve Bank's review of its regulation of interchange fees, no-surcharge rules, and other competitive practices in that country's credit and debit card networks.

g.  In 2008, I testified at an oral hearing at the European Commission in connection with the Commission's investigation of Visa Europe, on behalf of Eurocommerce.

h.  In 2009, I submitted a brief of evidence on behalf of the New Zealand Commerce Commission in litigation against MasterCard, Visa, and their New Zealand member banks challenging the defendants' interchange fees and anti-steering rules.

i.  In 2012, I testified at trial on behalf of Canada's Commissioner of Competition in a matter challenging MasterCard and Visa anti-steering rules.

j.  In 2013, I submitted a report and gave deposition testimony on behalf of a class of independent truck stops, primarily concerning anti-steering rules enforced by Comdata, the largest card network serving over the road truck fleets and truck stops.

k.  In U.S. class action litigation (MDL-1720) challenging interchange fees, anti-steering rules, and other conduct of MasterCard and Visa, I submitted reports in 2009 and 2010 on behalf of the plaintiff class, and declarations in 2013 relating to the settlement agreement reached in that case, including with respect to relaxation of MasterCard and Visa no-surcharge rules.[5]

12.  I attach my CV as Appendix 1.

### 1.3. Summary of Opinions

13.  In the remainder of this report, I explain the bases for the following main opinions.

14.  **Opinion #1: steering, including especially by charging higher prices for products with higher costs, is a normal part of the competitive process and constrains market power and prices.** I review this commonsense point in Part 2.

15.  **Opinion #2: the ability to surcharge American Express cards without surcharging debit cards will benefit merchants and their customers.** In Part 3, I analyze the economic effects of surcharging and prohibitions of surcharging in credit card markets. I explain that the ability to surcharge credit card transactions benefits merchants by enabling them to recoup the cost of credit card acceptance, by shifting transactions to lower cost payment methods such as debit cards and cash, by generating competitive constraints on the level of fees charged by credit card networks, and by shiftting general consumer payment patterns away from credit cards and towards debit cards. American Express' NDP prevents

---

[5] In preparing this Declaration, I draw in part on the analysis I described in my Declarations in MDL-1720.

merchants from surcharging its credit cards (and in economic effect, any credit cards) without also surcharging debit cards, which would have largely defeated the economic purposes of surcharging. The Agreement thus liberates this long suppressed economic force which operates to reduce merchant payment costs.

16. **Opinion #3: merchants would be even better off without the remaining limitations on surcharging that the Agreement permits American Express to enforce, but the relaxation of the American Express NDP under the terms of the Agreement will nevertheless benefit merchants.** In Part 4, I analyze the remaining elements of American Express' anti-steering rules that are not eliminated by the Agreement. I address the fact that, under the terms of the Agreement, American Express may continue to prohibit merchants from differentially surcharging American Express transactions relative to other credit card transactions, and that American Express may limit the amount of any surcharge to the amount of the merchant fee paid by the merchant for acceptance of the American Express transaction. Although competition would be further enhanced were those remaining restrictions eliminated, I conclude that merchants nevertheless will benefit from the relief that is contained in the Agreement. In particular, merchants can be expected to benefit significantly from the fact that they will now be able to surcharge credit card transactions without surcharging debit card transactions.

17. **Opinion #4: state statutes do not prevent merchants from benefiting from the Agreement.** It has sometimes been argued that relaxation of no-surcharge rules would not benefit merchants because statutes in a number of states might restrict or prohibit merchant surcharging of credit card transactions. In Part 4, I also explain that to the extent that such

statutes are enforceable and effectively prevent merchants from surcharging, they reduce but do not eliminate the benefits to merchants from the Agreement. Moreover, restrictions on credit card surcharges under various states' laws have historically not been competitively important, because the major credit card networks all prohibited surcharges under their respective rules. Now, state statutes are subject to both economic and legal challenge, and one court has recently ruled that a state restriction on surcharging is unconstitutional.[6]

## 2. "Steering" With Differential Prices or Other Tactics Constrains Market Power and is Ubiquitous Throughout the Economy

18.     In retail payment systems, "steering" typically refers to actions merchants take to influence their customers' choice of payment method or brand. These actions can range from signage or prompts that encourage the use of the merchant's preferred payment method to prices that differ depending on the payment method used. Price differences are frequently referred to as "surcharges" or "discounts," but surcharges might also be referred to as a "credit card service fee" or similar term, reflecting an explicit additional fee charged to a merchant's customer for use of a credit card.

19.     Steering occurs throughout the retail economy. One of the fundamental features of the price system in a market economy is that prices signal to buyers the relative cost or scarcity of a product or service. Attributes other than price, such as promotional efforts, product placement, inventory, delivery times, and many others, can also vary across alternative products or services and influence purchase decisions.

---

[6]     See *Expressions Hair Design v. Schneiderman*, 13 CIV. 3775, 2013 WL 5477607, at *2 (S.D.N.Y. Oct. 3, 2013).

20.     When the cost or profitability to the merchant of selling one product (or service) differs significantly from another, it is common for the merchant to set different prices (or other terms of sale) for the two products.  It surprises no one if a merchant posts different prices per pound for apples and oranges, or for different varieties of apples.

21.     In some cases, a merchant may choose not to differentiate the prices of alternative products despite cost differences between the two.[7]  But as the cost difference widens, more merchants will choose to treat buyers of the two products differently by charging different prices, and the extent of any price difference will tend to increase as the cost gap widens.  The same is true of services merchants provide to their customers.  Merchants may offer free parking, but they are less likely to do so in costly city locations than in lower cost suburban locations, all else equal.  Decisions whether to charge for ancillary services, or to set different prices for products that generate different costs to the merchant, are typically left to individual merchants, constrained by competition from other merchants and the necessity for them to cover their costs to remain in operation.  So some merchants might offer free delivery, while others charge for delivery, and still others offer free 5-day delivery but charge for faster delivery.  The competitive process determines to what extent those strategies succeed.

22.     Differential pricing or promotion at retail is a principal mechanism by which competition between merchants' *suppliers* occurs.  If a merchant sells products that are substitutes, any one supplier that attempts to increase its price (unrelated to market cost increases) runs the risk that merchants will raise the price for that supplier's products (or

---

[7]     I termed this phenomenon "price coherence" in a 1998 article.  Alan S. Frankel, Monopoly and Competition in the Supply and Exchange of Money, 66 Antitrust Law Journal 313 (1998).

reduce promotional effort, etc.) but not the alternative products, inducing some consumers to switch to the lower cost products. In a highly competitive market, the attempted price increase is defeated (or deterred), because so many sales are lost that the price increase proves to be unprofitable to the supplier.

### 3. The Agreement Will Benefit Merchants

23. In competitive markets, a low price supplier typically has a competitive *advantage* over a high price supplier (all else equal), because merchants will tend to set lower retail prices for lower cost products, i.e., they *steer*, and some consumers will shift their purchases to the lower priced product if they are (at least to some degree) substitutes. A supplier that keeps its prices to merchants lower than suppliers of substitute products thus gains sales volume and can make up more profit from additional sales than it sacrifices by keeping its prices low. Simultaneously, because the high priced supplier loses sales, its ability to profitably maintain or increase its prices is constrained by the existence of the low cost alternatives.

24. Payment card networks like American Express have used anti-steering rules to suppress this basic competitive process with respect to the networks' card acceptance services provided to and paid for by merchants. In this part, I explain the following.

- Credit cards typically cost merchants substantially more to accept than other payment methods, and in particular, debit cards.

- At the difference between the cost to merchants of accepting debit cards and credit cards in the United States, many merchants are likely to adopt credit card surcharges when they are permitted to do so.

- Surcharging permits merchants to recoup the cost of credit cards directly from customers who use credit cards. This allows merchants to set lower posted prices.

- When merchants' customers confront surcharges to use credit cards to make a payment, but not for debit cards or cash, many of them are likely to switch to the non-surcharged alternatives, especially where those alternatives are close functional substitutes (as debit cards and credit cards are).[8] This directly reduces merchants' total payment costs.

- Frequent surcharges on credit cards will likely shift consumer preferences towards more frequent use of debit cards even when particular merchants do not surcharge.

- Defections by cardholders avoiding surcharges reduce the fee revenue and profits of card issuers and networks and generate competitive pressure on networks to reduce the level of their merchant fees. This further benefits merchants.

- American Express' NDP significantly reduces the number of merchants that can economically surcharge any credit transactions, thus reducing the benefits that merchants otherwise would obtain from their recently obtained ability to surcharge MasterCard and Visa credit card transactions. The benefits of the Agreement thus extend beyond reductions in costs currently incurred to process American Express transactions, by permitting merchants more effectively to reduce all of their credit card acceptance fees.

### 3.1. Credit Cards are Substantially More Costly to Merchants Than Other Payment Methods, Including Debit Cards.

25. Merchants generally find that credit cards cost significantly more to accept than other forms of payment.[9] For example, a 2000 Food Marketing Institute study (sponsored by American Express and conducted by Pricewaterhouse Coopers) found that for every $100 of

---

[8] American Express contends that its credit card services compete in a broad relevant market that includes debit card (and other payment) services even with the NDP in place. Individual plaintiffs' expert Christopher Velturo contends that ███████████████████████████████████████████████████ ███████████████████████████████████████████████████ ███████████████████████████████████████████████████ ██████████████

[9] Unless specifically stated otherwise, I use the term "credit cards" in this declaration to refer to card accounts (whether or not a physical card is used or just a card account number) that are funded by the account holder after the purchase, whether or not an extended credit facility is attached to the account (e.g., all revolving credit card accounts and charge cards).

payment volume, credit card transactions[10] cost merchants twice as much or more in payment costs if the customer used a credit card rather than a check, PIN debit card, or cash (Figure 1).[11] The study explains that "[s]ettlement costs, including interchange fees, are the key component of credit/off-line debit cards [sic] costs."[12]



Figure 1
FMI 2000 Study of Relative Paymentt Costs

---

[10]   Credit card transactions in this FMI study were combined with "offline" (signature authorized) MasterCard or Visa debit cards, which at the time were priced similarly to merchants as were those networks' credit card transactions. Subsequent developments in debit card acceptance costs are discussed further below.

[11]   "It All Adds Up: An Activity-Based Cost Study of Retail Payments, conducted for the Food Marketing Institute by PricewaterhouseCoopers," p. 15. The FMI study also reports the cost to merchants of food stamp coupons and WIC payments (lower than credit cards per transaction, but higher per dollar of purchase amount) and electronic benefit transfer (EBT) payments (much lower than credit cards under both measures). Paper food stamps have since been phased out and replaced with EBT cards.

[12]   Id., p. 14. Interchange fees are set by MasterCard and Visa and are collected by their card issuing member banks. As I have explained elsewhere, interchange fees directly and fully increase merchant fees by a like amount. American Express sets merchant fees directly. American Express' resulting merchant fees are generally somewhat higher than the fees a merchant pays to accept the same transaction on a MasterCard or Visa card, as I show below.

26.    There have been a number of significant developments that have affected the fees merchants pay to accept credit or debit card transactions since 2000.

- In 2003, MasterCard and Visa settled a case brought by a class of merchants involving those networks' "honor all cards" rules.[13] Subsequently, merchants could make separate decisions regarding acceptance of MasterCard credit cards and MasterCard debit cards, and separate acceptance decisions regarding acceptance of Visa credit cards and Visa debit cards.  Following the settlement, the networks' interchange fees for signature debit card acceptance declined.[14]

- Also in 2003, MasterCard and Visa lost their appeal of a 2001 decision finding that those networks' prohibitions on their member banks' issuance of American Express or Discover branded cards was anticompetitive.  Subsequently, MasterCard and Visa credit card interchange fee rates increased.[15]  Moreover, both networks introduced premium tiers of credit cards designed to compete more closely with American Express.[16] Interchange fees (and thus merchant fees) were higher – sometimes substantially so – for these premium MasterCard and Visa credit cards.

---

[13]    *See In re Visa Check/Mastermoney Antitrust Litig.*, 297 F. Supp. 2d 503 (E.D.N.Y. 2003), *aff'd sub nom. Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96 (2d Cir. 2005).

[14]    Federal Reserve Bank of Kansas City, Payments System Research Department, "Credit and Debit Interchange Fees in the United States," August 2013 Update, http://www.kc.frb.org/publicat/psr/dataset/US_IF_August2013.pdf. ("FRBKC Trends"), Part II.

[15]    Id., Part I.

[16]    ████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████

- Between 2000 and 2011, PIN debit interchange fees increased, "converging" towards signature debit interchange fee rates.[17]

- In June 2010, the Dodd-Frank Wall Street Reform and Consumer Protection Act was enacted. Among the provisions of the Dodd-Frank Act was the regulation (by the Federal Reserve) of the level of debit card interchange fees – the main element of the fees merchants pay to accept debit card transactions – for banks with assets in excess of $10 billion. In 2011, the Federal Reserve began enforcing caps on debit card interchange fees (both signature and PIN).[18] For many transactions, the resulting cap is significantly below the interchange fee that otherwise would apply.[19]

27.     Figure 2 displays data reported by the Federal Reserve on the overall average debit card interchange fee that prevailed before and after regulation became effective on some banks. In 2012, the overall weighted average debit card interchange fee in the United States was 0.79% of the transaction amount. The average signature debit interchange fee was 0.89% and the average PIN interchange fee was 0.62%.[20] Interchange fees are paid to card issuers.

---

[17]   FRBKC Trends, Part III.
[18]   Fumiko Hayashi, "The New Debit Card Regulations: Effects on Merchants, Consumers, and Payments System Efficiency," Federal Reserve Bank of Kansas City Economic Review (2013Q1), pp. 89-118, at p. 91. http://www.kc.frb.org/publicat/econrev/pdf/13q1Hayashi.pdf
[19]   FRBKC Trends, Parts II-IV.
[20]   "Average Debit Card Interchange Fee by Payment Card Network," http://www.federalreserve.gov/paymentsystems/files/Avg_IF_by_PCN.xls.



**Figure 2**
**Debit Interchange Fee Rates - Average of All Banks**

28.     U.S. merchants pay much higher fees to accept credit cards.  In 2009,

MasterCard's overall average U.S. credit card interchange fee was 1.99%.[21] Visa data produced

in MDL-1720 similarly showed that Visa's average domestic credit card interchange fee in the

United States was ████ in 2008.[22] The Department of Justice's expert in related litigation,

Prof. Michael Katz, reports that more recent Visa data indicate that Visa's average credit card

interchange fee was ████[23]

---

[21]     Declaration of Alan S. Frankel, Ph.D., in re Payment Card Interchange Fee and Merchant Discount Antitrust
        Litigation, April 10, 2013,
        https://www.paymentcardsettlement.com/Content/Documents/SettlementDocs/Frankel_Alan_Decl.pdf, ¶39,
        citing MasterCard Systemwide Interchange Report_GCMS Cleared Purchase Vol_US Issued Acquired 2009.xls.
[22]     ████████████████████████████████████████████████████
[23]     ████████████████████████████████████████████████████████
        ████████████████████████

29.     In addition, merchant fees cover network fees and the acquirer's own fee.[24]

██████████████████████████████████████████████████████████████

██████[25] This implies that it costs merchants about ██████ on average to accept MasterCard

credit cards and ██████ to accept Visa credit cards.[26]

30.     A 2009 report by the U.S. Government Accountability Office describes a survey

of 750 small merchants that found that the fee paid by these merchants to accept Discover

Card was slightly higher than the fee paid to accept MasterCard and Visa Cards.[27] Other

evidence suggests that Discover Card fees tend to be similar to the fees that merchants pay to

accept MasterCard and Visa credit cards.  For example, the Department of Justice cites ██████

████████████████████████████████ for the proposition that 96% of Discover's

volume is priced between Visa and MasterCard rates.[28] Lacking comprehensive Discover Card

data, I assume that Discover Card transactions cost merchants ████████████████████████

████████████████ on average, about ██████.

31.     American Express' own merchant discount rate, on average, was ██████ in

2010.[29]

---

24   The "acquirer" is the bank or processor that contracts with the merchant to accept MasterCard and Visa card
     transactions.
25   ████████████████████████████████████████████████████████
     ██████████████████████
26   The fees paid by different merchants and for different transactions vary depending on factors including
     merchant type, merchant size, transaction type, and card type.
27   United States Government Accountability Office, Credit Cards: Rising Interchange Fees Have Increased Costs
     for Merchants, but Options for Reducing Fees Pose Challenges, November 2009,
     http://www.gao.gov/assets/300/298664.pdf, p. 18.
28   DOJ Brief (Public Version), U.S. v. American Express, 10-CV-4496, DE # 321, fn. 23, citing ████████████
     ████████████████████████████████████████████████████████████████
29   ████████████████████████████████████████████████████

32.     In 2013, Discover Card accounted for a reported 5.3% of U.S. credit card purchase volume, American Express accounted for 26.4%, and MasterCard and Visa accounted for 23.3% and 45.0%, respectively.[30] Although these averages and computations are only indicative (and will usually not apply exactly to any particular individual merchant) they suggest that the average fee charged to U.S. merchants to accept credit cards is roughly 2.48% of the purchase amount (the weighted average of the above described rates).

33.     For MasterCard and Visa signature debit transactions, I assume that merchants pay the same ▮▮▮▮ in network and acquirer fees as for credit card transactions.[31] For PIN debit transactions, the Federal Reserve reports that merchants paid about 3.2 cents per transaction in network fees.[32] This implies an additional 8 basis points (0.08%) in network fees.

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮[33] I assume that those PIN acquirer fees average 10 basis points (0.10%).[34] Overall, merchants thus incur fees of about 1.35% to accept signature debit cards and 0.80% to accept PIN debit cards, for a weighted average of 1.14% for all debit cards. This means that in the United States credit cards cost merchants an average of about 134 basis points (1.34%) more than debit cards.

---

[30] Nilson Report #1034, February 2014, p. 8.
[31] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ MasterCard and Visa network fees appear to be very similar for credit and signature debit transactions. See, e.g., http://www.cardfellow.com/blog/credit-card-processing-fees/#assessments and https://www08.wellsfargomedia.com/downloads/pdf/biz/merchant/merchantpassthroughfees.pdf.
[32] "Average Debit Card Interchange Fee by Payment Card Network," http://www.federalreserve.gov/paymentsystems/regii-average-interchange-fee.htm.
[33] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
[34] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

34.     But credit card transactions migrating to debit cards will save merchants more than 134 basis points, on average.  While credit card interchange fees (and thus merchant fees) generally increase proportionately with the transaction amount, most debit card interchange fees (particularly, those subject to regulation under the Dodd-Frank Act) are a fixed amount. Thus, the debit card merchant fee as a percentage of the transaction amount declines with the size of the transaction, and, in particular, is lower if computed at the amount of the average credit card transaction than at the level of the average debit card transaction.

35.     For the year ending December 31, 2013, the average Visa and MasterCard credit card transaction amount was $85.61.[35]  If a transaction in the amount of $85.61 were processed using a debit card instead of a credit card, adjusting just the interchange fee for the larger transaction size results in the relative effective merchant fee percentages shown in Figure 3. An average credit card transaction shifted to a debit card saves a merchant 157 basis points (1.57% of the transaction amount).[36]  This computation takes into account the proportion of debit card transactions using PIN vs. signature debit networks, the proportion of each of those transaction types that is exempt from Federal Reserve interchange fee regulation, and the respective interchange fee rates of those transactions.

---

[35]  Based on MasterCard data released at: http://phx.corporate-ir.net/External.File?t=1&item=VHlwZT0yfFBhcmVudElEPTUwNzQ0NzJ8Q2hpbGRGRJRD01MzEyNDE= and Visa data released at: http://investor.visa.com/files/doc_financials/Visa%20Inc.%202014%20Operational%20Performance%20Data.pdf.  American Express' average transaction amount is greater than for MasterCard and Visa, so this computation is conservative.

[36]  Accordingly, given that U.S. credit card transaction volume is presently around $2.4 trillion per year (see Nilson Report #1034), for every one percent of U.S. merchant credit card volume that is surcharged, U.S. merchants will save (from customers switching to debit or paying surcharges even if set just at the differential between credit and debit) 1% x 1.57% x $2.4 trillion, or roughly $377 million, per year.



**Figure 3**
**Average Credit and Debit Card Merchant Fees At Average Credit Card Transaction Size**

### 3.2. At the Level of Credit Card Fees Prevailing in the United States, Many Merchants are Likely to Surcharge Credit Card Transactions

36.     Even in the United States, where surcharging has generally been prohibited, there have been some exceptions.  Some universities, governments, and utilities, for example, have been permitted to add "convenience fees" – i.e., surcharges – to accept credit cards for purchases such as tuition payments.  One survey found that over 25 percent of Universities that accept credit card payments for tuition do in fact apply a convenience fee.[37]

37.     In general, however, it is likely to take time for surcharging to become widespread when merchants have previously been prohibited from the practice and their customers are unaccustomed to it.  In Australia, merchants obtained the ability to surcharge

---

[37] "Universities deal with tuition paid by credit card," http://www.creditcards.com/credit-card-news/pay-college-tuition-credit-cards-1271.php (citing a report from the National Association of College and University Business Officers).

credit card transactions in 2003.  In June 2005, the first period for which Australian consulting firm East and Partners reported in detail on merchant surcharging practices, the percentage of merchants utilizing this new tool ranged from 6.9% for the largest Australian merchants to 1.4% for the smallest.  But those percentages grew significantly.  (Figure 4)

**Figure 4**
**Percentage of Merchants Surcharging in Australia, by Size**



38.     The likelihood that a merchant will surcharge credit card transactions depends on the cost it incurs to accept credit cards.[38]  This accords with common sense, but other

---

[38]   Another factor influencing the likelihood that a merchant will differentially price two products is the cost of administering differential prices relative to a single price.  As technology has improved and transaction costs have declined, it has become easier to administer more complicated prices and fees at the point of sale.  In the 1970s, many merchants still had clerks manually use printed sales tax tables to determine the amount of sales taxes applicable at the point of sale.  In the era of electronic point of sale terminals, different sales tax rates for different items can be automatically tallied.  Credit card surcharges can similarly be processed once updated technology is deployed. Similarly, airlines and other merchants selling goods or services over the

evidence confirms it.  For example, in a submission in connection with a proceeding in Australia, MasterCard stated that, "[m]erchants will have a higher incentive to surcharge the higher merchant fees are… An increase in merchant service fees will clearly raise the gains from surcharging relative to the costs, and hence make it more likely that surcharging will occur."[39]

39.    Surveys performed on behalf of the European Commission found that surcharging was more common in the Netherlands, where merchant fees were higher, than in Sweden, where merchant fees were lower.[40]

40.    In Australia, merchants surcharge high fee cards more frequently than they surcharge low fee cards.  Following regulated reductions in MasterCard and Visa interchange fees in December 2003, the average merchant fee in Australia for American Express cards was 2.49%, while the merchant fee for MasterCard and Visa credit card transactions averaged 1.18%, for a difference in Australia of 131 basis points.[41]  Since the final quarter of 2003,

---

Internet routinely offer a menu of optional services for additional fees. Dennis Carlton and I have explained that travel agent commissions were once themselves bundled into airline ticket prices, but the widespread adoption of the Internet led to an unbundling in which lower fares can be purchased by customers willing to use the Internet, and optional travel agent fees can be paid by those who prefer additional assistance. Technology also permits governments to charge lower tolls to automobiles that use efficient transponder payment systems instead of cash.  See Dennis W. Carlton and Alan S. Frankel, "Transaction Costs, Externalities, and 'Two-Sided' Payment Markets," 2005 Columbia Business Law Review 617 (2005), pp. 620-21.

[39]    MasterCard Worldwide, "Payments System Regulation: Response by MasterCard Worldwide to the Issues for the 2007/08 Review," (Submission to the Reserve Bank of Australia), August 31, 2007, pp. 16-17. http://www.rba.gov.au/payments-system/reforms/review-card-reforms/pdf/mc-31082007.pdf.  An Australian bank similarly conceded that "the level of surcharging is likely to be positively correlated with the level of interchange rates. Any other conclusion appears to sit uncomfortably with the normal dynamics of a competitive marketplace."  Letter of 31 August 2007 from Westpac Banking Corporation to Michelle Bullock, Head of Payments Policy Department, Reserve Bank of Australia, p. 2. http://www.rba.gov.au/payments-system/reforms/review-card-reforms/pdf/wbc-03092007.pdf

[40]    E. Vis & J. Toth, "The abolition of the Non-discrimination Rule," ITM Research for Competition DG: Amsterdam, March 2000, pp. 7-8; IMA Market Development AB, "Study Regarding the Effects of the Abolition of the Non-discrimination Rule in Sweden," prepared for European Commission Competition Directorate General, February 29, 2000, p. 18. http://www.creditslips.org/files/netherlands-no-discrimination-rule-study.pdf

[41]    Reserve Bank of Australia, Payments Data "Average Merchant Fees for Debit, Credit and Charge Cards," http://www.rba.gov.au/statistics/tables/xls/c03hist.xls.

American Express merchant fees have, on average, exceeded MasterCard and Visa merchant fees by 117 basis points.[42]

41.     The generally higher cost to merchants to accept American Express cards and Diners Club branded cards than MasterCard and Visa credit cards has led merchants to be particularly likely to surcharge the former brands.  Among all merchants in Australia surveyed in December 2013 that accept MasterCard and Visa cards, about 38% apply at least some credit card surcharges.  34.8% of surveyed Australian merchants accept American Express cards.  Of those, 81.5% apply surcharges. At the 6.7% of merchants that accept Diners Club cards (like American Express, a significantly more costly brand than MasterCard or Visa in Australia), 83.6% apply surcharges.[43]  (Figure 5)



Figure 5
Percent of Australian Merchants Surcharging by Brand Accepted

---

[42]     Id.  I discuss the trend of American Express fees in Australia further in Part 3.6.
[43]     East & Partners, Australian Merchant Payments, December 2013, pp. 23, 34

42.     In Australia, average American Express and Diners Club merchant fees in December 2013 were, respectively, 1.73% and 2.02%,[44] and according to East and Partners, over four out of every five merchants that accept those cards apply surcharges to them.  As described previously, in the United States, the average fee for all credit cards is 2.49% – substantially more than American Express and Diners Club cost merchants in Australia.  It is thus likely that if rates persist at current U.S. levels, many merchants would apply surcharges to credit cards if free to do so.

43.     Many Australian merchants responded in the Australian surveys conducted since 2005 that they were "planning" to introduce surcharges or were "considering" doing so.  In fact, over time, many of those have subsequently done so.  (Table 1)

Table 1
Surcharge Status in Australia, by Merchant Size

| | Largest | | | Large | | | SME | | | Micro | | | Total | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Currently Surcharging | Planning to surcharge | Actively Considering | Currently Surcharging | Planning to surcharge | Actively Considering | Currently Surcharging | Planning to surcharge | Actively Considering | Currently Surcharging | Planning to surcharge | Actively Considering | Currently Surcharging | Planning to surcharge | Actively Considering |
| Jun-05 | 6.9% | 17.7% | 29.0% | 4.2% | 14.4% | 30.1% | 2.8% | 13.1% | 27.9% | 1.4% | 6.0% | 8.8% | | | |
| Dec-05 | 7.9% | 19.4% | 28.0% | 5.3% | 16.6% | 34.1% | 3.1% | 14.0% | 29.6% | 1.6% | 6.5% | 10.1% | | | |
| Jun-06 | 11.6% | 22.1% | 30.4% | 8.0% | 19.0% | 37.0% | 4.6% | 16.6% | 34.0% | 2.4% | 9.0% | 15.6% | | | |
| Dec-06 | 14.2% | 27.7% | 32.6% | 9.3% | 21.1% | 39.6% | 5.4% | 19.1% | 35.4% | 4.9% | 10.1% | 16.9% | 7.3% | 17.4% | |
| Dec-07 | 22.5% | 36.0% | | 15.1% | 27.8% | | 8.4% | 24.6% | | 10.5% | 19.3% | | 12.5% | 24.8% | |
| Dec-08 | 29.0% | 45.5% | | 23.5% | 34.8% | | 16.2% | 30.3% | | 13.8% | 28.6% | | 18.4% | 32.8% | |
| Dec-09 | 38.9% | 46.0% | 10.8% | 29.0% | 39.5% | 23.5% | 21.9% | 37.9% | 24.3% | 18.9% | 34.0% | 24.0% | 24.5% | 37.9% | 21.9% |
| Dec-10 | 44.1% | 41.8% | 6.0% | 36.1% | 34.0% | 24.3% | 24.5% | 37.2% | 19.5% | 22.6% | 32.9% | 15.7% | 28.3% | 35.7% | 16.6% |
| Dec-11 | 50.6% | 36.9% | | 40.3% | 32.9% | | 29.2% | 38.9% | | 26.7% | 34.0% | | 33.0% | 35.7% | |
| Dec-12 | 60.2% | 29.2% | | 45.7% | 31.3% | | 34.0% | 37.7% | | 30.4% | 31.2% | | 37.9% | 31.1% | |
| Jun-13 | 61.7% | 30.7% | | 47.1% | 32.6% | | 35.8% | 39.0% | | 31.1% | 32.2% | | 39.1% | 34.1% | |
| Dec-13 | 65.0% | 26.8% | 1.3% | 50.6% | 26.5% | 12.2% | 38.9% | 33.0% | 14.0% | 32.8% | 29.0% | 24.9% | 41.7% | 29.5% | 16.5% |

Source: East and Partners merchant surveys.

---

[44]    The average merchant fee for MasterCard and Visa in Australia was 0.83% in December 2013.  Reserve Bank of Australia, Payments Data "Average Merchant Fees for Debit, Credit and Charge Cards," http://www.rba.gov.au/statistics/tables/xls/c03hist.xls.

44.     I understand that in the United States, a survey conducted by the Olinger Group finds that a substantial fraction of merchants state that given the opportunity, they would surcharge credit cards.[45]   The Australian experience suggests that such statements are credible.

### 3.3. Surcharging Permits Merchants to Recoup the Cost of Credit Card Payments Directly From Customers Who Use Credit Cards and Set Lower Posted Prices

45.     If merchants effectively must charge the same price for credit card customers and debit card or cash customers, then the only way to recoup the higher credit card acceptance costs is to raise prices generally to all customers irrespective of payment method used.  In 1998, I noted that this has a regressive impact, because credit card use is more likely among higher income consumers, and many low income consumers may not have any credit card.[46]  Federal Reserve economists have agreed with my analysis.[47]

46.     The most direct effect of surcharging credit cards is that merchants obtain a source of revenue to offset the cost of accepting those cards.[48]

---

[45]   The Olinger Group, Credit Card Merchant Surcharge Study, March 2014, p. 8.

[46]   Alan S. Frankel, "Monopoly and Competition in the Supply and Exchange of Money," 66 Antitrust Law Journal 313 (1998), p. 346 ("The interchange fee 'tax' on cash paying customers that funds the benefits provided to credit card customers is probably regressive, because the poor use cash relatively more and credit cards relatively less than the wealthy.").

[47]   Scott Schuh, Oz Shy and Joanna Stavins, "Who Gains and Who Loses from Credit Card Payments? Theory and Calibrations," Research Department, Federal Reserve Bank Boston, presented at The Economics of Payments IV conference at the Federal Reserve Bank New York, March 26, 2010, p. 1 ("Merchants may want to recoup the merchant fee only from consumers who pay by credit card. In practice, however, credit card associations impose a "no surcharge rule" (NSR) that prevents merchants in the United States from doing so. Instead, merchants must mark up the retail price of goods and services for all consumers to recoup the cost of the merchant fee."); abstract ("Using actual data, our calibrations show that three-quarters of banks' revenue from credit cards is indirectly generated from cash payers. Then we show how this subsidy translates to transfers from low to high income buyers.") https://www.bostonfed.org/economic/ppdp/2010/ppdp1003.pdf

[48]   In 1902, Sears analogously allowed customers to pay for their catalog orders with postage stamps, but required payment of a 5 percent surcharge, so if "you order an article priced at $2.00 and send stamps you should send $2.10. If a $3.00 article you should send $3.15 in stamps." Sears, Roebuck and Co. 1902 Catalog, p. 4.

47.     But surcharges on costly payments alter the competitive economics of merchants, which can be expected to reduce their posted prices for cash, debit, or check transactions, stimulating more sales to non-surcharged customers.  This economic effect has been acknowledged by MasterCard and by economists who have consulted for MasterCard.[49]

### 3.4. Many Customers Will React to Credit Card Surcharges by Using Lower Cost Alternatives at Merchants that Surcharge, Reducing Costs and Prices

48.     Currently, credit card issuers encourage consumers to use credit cards by offering reward programs that offer benefits to cardholders based on their usage of the credit card.  But those rewards typically are worth far less than the fees paid by merchants to accept the customer's credit card.  Consumers, however, are unaware of the costs to merchants that result from their payment choices and are given no economic incentive to consider those costs when choosing a payment method.  This generates a market failure (analogous to the economic effects of commercial bribery) which harms merchants and their customers alike in the aggregate.  The ability to surcharge can align the incentives of merchants and their customers so that customers use credit cards only when the benefit to the merchants and the customers together exceed the cost.

49.     Consumers do not like to pay "surcharges" and the evidence shows that many consumers will switch to an alternative, non-surcharged form of payment method to avoid

---

[49]     MasterCard Worldwide, "Payments System Regulation, Response by MasterCard Worldwide to the Issues for the 2007/08 Review, August 31, 2007, http://www.rba.gov.au/payments-system/reforms/review-card-reforms/pdf/mc-31082007.pdf, p. 17 ("[A] decision to surcharge card sales (as an example of merchant discouragement behaviour) would be accompanied by the scope for reducing prices for non-credit card sales…"); Christian Koboldt, Dan Maldoom and Roger Salsas, "How strong are merchant constraints on interchange fees?" DotEcon Discussion Paper 11/01, April 2011, http://www.dotecon.com/assets/images/dp1101.pdf, p. 28 ("[S]urcharging credit card sales would allow the merchant to reduce the price of cash sales, thereby attracting additional customers from other, non-surcharging merchants who would charge more for cash sales as a result of spreading the cost of credit card acceptance over all prices.")

them.[50]   When confronted with a surcharge on credit cards, consumers may be particularly

likely to switch to a debit cards, which are close functional substitutes for credit cards[51] and

would be better economic substitutes if merchants can surcharge credit cards.

50.    When U.S. merchants have been permitted to charge "convenience fee"

surcharges, many customers have switched to alternative payment methods. As one Visa

document explained:



51.    Another Visa document states:



52.    In the Netherlands, one study found that "a large minority of retailers" assessed

surcharges.[54]   Merchants that did so experienced a significantly lower share of payments on the

surcharged cards.[55]

---

[50]    Indeed, if consumers did not shift their usage away from surcharged cards, card networks like American
Express would have no reason to be concerned by surcharging.

[51]    ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬
▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

[52]    ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

[53]    ▬▬▬▬▬▬▬▬▬▬▬

[54]    Wilko Bolt, Nicole Jonker and Corry van Renselaar, Incentives at the Counter: An Empirical Analysis of
Surcharging Card Payments and Payment Behaviour in the Netherlands, Journal of Banking & Finance (2010),
p. 2. http://www.sciencedirect.com/science/article/pii/S0378426609002416

[55]    Id., p. 5.

53.     In Australia, where surcharging is more common on Diners Club cards than MasterCard and Visa cards (or debit cards), Diners Club reported to the RBA that "[t]he effect of surcharging Diners Club has been to significantly reduce the number of transactions that are paid for using Diners Club cards…"[56] The RBA concluded that in Australia "consumers appear to respond to price signals by avoiding surcharges where possible."[57] East and Partners similarly concluded that "[t]he effect of lifting restrictions on merchant surcharging has seen cardholders refusing to absorb the higher costs of using their credit cards and increasingly opting for cheaper debit cards to make payments."[58]

54.     The results of an RBA payment choice study "suggest that around half of consumers that hold a credit card will seek to avoid paying a surcharge by either using a different payment method that does not attract a surcharge (debit card or cash) or going to another store."[59]

55.     ██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████[60]████████████████████████████

██████████████████████████████████████████████████

---

[56] "Review of Reform of Australia's Payments System: Regulation of Credit Card Payments and the role of Diners Club," September 6, 2007, Report to Diners Club (commercial-in-confidence version) by the Allen Consulting Group, p. 12. http://www.rba.gov.au/payments-system/reforms/review-card-reforms/pdf/dc-06092007.pdf

[57] Reserve Bank of Australia, Review of Card Surcharging: A Consultation Document, June 2011, p. 3. http://www.rba.gov.au/publications/consultations/201106-review-card-surcharging/pdf/201106-review-card-surcharging.pdf

[58] "Merchant Surcharging in Australia," East & Partners, February 2007, p. 7.

[59] Reserve Bank of Australia, "A Variation to the Surcharging Standards: Final Reforms and Regulation Impact Statement," June 2012, p. 3. http://www.rba.gov.au/payments-system/reforms/cards/201206-var-surcharging-stnds-fin-ref-ris/pdf/201206-var-surcharging-stnds-fin-ref-ris.pdf

[60] ████████████████████████████████████████████

[REDACTED] [61]

[REDACTED] [62]

56.     The Australia Payments Clearing Association notes that "credit card usage in Australia has moderated significantly over the past few years, alongside a strong shift towards debit cards" and concludes that "[w]hile multiple factors are at work in this shift from credit to debit cards, the consumer response to surcharging is likely a factor."[63] The RBA itself shared this assessment, concluding that "there has been a clear shift towards consumers using debit cards in preference to credit cards between 2007 and 2010" and one factor contributing to this shift has been "the increased prevalence of surcharging on credit card transactions."[64]

57.     In the United States, at current levels of merchant fees, every $100 of spending that migrates from credit cards to debit cards will save merchants $1.57.  As explained in the last section, merchants that surcharge will likely drive a significant share of customers to switch to debit cards or cash (or recoup the cost of credit card fees).  But even merchants that do not surcharge can benefit from the existence of surcharging generally in the retail marketplace, because the cumulative experience of cardholders confronting surcharges for use of credit

---

[61]     [REDACTED]

[62]     [REDACTED]

[63]     Australian Payments Clearing Association: Submission to the RBA on Review of Card Surcharging, A Consultation Document, July 2011, p. 3. http://www.rba.gov.au/payments-system/reforms/submissions-card-surcharging/australian-payments-clearing-association.pdf

[64]     Strategic Review of Innovation in the Payments System: Results of the Reserve bank of Australia's 2010 Consumer Payments Use Study, June 2011, p. 16.  See also, Steve Worthington, "Regulatory Interventions and their Consequences in the Australian Payment System," Australian Centre for Financial Studies, 10/28/2013, p. 29 ("A further influence on the shift from the use of credit cards for payment to the use of debit  cards has been the RBA's intervention on surcharging, which was intended to reduce the restrictions on this practice and hence increase the transparency of the MSF's that were charged when using particular credit or charge cards."). http://www.australiancentre.com.au/sites/default/files/NewsDocs/Commissioned%20Paper_Regulatory%20Interventions%20and%20their%20consequences%20in%20the%20Australian%20payment%20card%20system.pdf

cards may intensify the relative migration that has already been occurring in the United States towards increased preferences by consumers to use debit cards and place credit cards in the "back of wallet."[65]

### 3.5. The Threat to Networks of Lost Transaction Volume From Credit Card Surcharges Will Generate a Previously Suppressed Competitive Constraint on the Level of Credit Card Merchant Fees

58.     Because higher merchant fees lead to more surcharging (when permitted) and surcharging leads to loss of credit card transaction volume – and thus card network profits – networks face a competitive constraint on the level of their merchant fees that does not exist if merchants cannot surcharge.  As Economist C. Christian von Weizsäcker explained in a report submitted on behalf of MasterCard:

> Price competition of payment systems for merchants is enhanced by the fact that surcharges (and cash discounts, etc.) are possible.  From the point of view of the payments system, surcharging of the system by many merchants is to be avoided.  The attractiveness of cards among cardholders is negatively affected by widespread surcharging... Therefore the risk of increased surcharging after an increase of fees is one of the most powerful forces to keep merchant fees low.  We would expect that actual surcharging is rather infrequent because payment systems have a great interest to avoid merchant surcharging of their system.  But nevertheless, merchants' right to surcharge imposes substantial downward pressure on merchant fees.  The same analysis would apply with respect to discounts for preferred forms of payment like cash.[66]

59.     In a submission to the RBA, MasterCard emphasized that the price constraining effects flowed from the *ability* to surcharge, whether or not a merchant actually surcharges:

---

[65]     ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Card networks have referred to this generalized response to surcharging as a threat to their "brands," but such threats are the normal competitive consequences of maintaining high prices.

[66]     C. Christian von Weizsäcker, "Economics of Credit Cards:  Expert report on behalf of MasterCard International Incorporated and Europay International SA, 23rd January 2002, http://www.rba.gov.au/payments-system/reforms/cc-schemes/consult-doc-responses/mastercard-0302-3.pdf, pp. 19-20.

MasterCard considers that the ability of merchants to discourage card use, by such means as cash discounts and surcharging, should be more than sufficient to avoid excessive interchange fees. Credit card schemes have an interest in avoiding discouragement by merchants, because it lessens card use. It should not, therefore, be surprising that schemes will set interchange fees to dissuade widespread discouragement practices by merchants. A low level of discouragement might therefore simply reflect that merchants are not unhappy with their current merchant fees relative to the benefits they obtain from accepting cards. That is simply the nature of bargaining – one does not need to exercise an option for it to have value to the merchant.

The threat of discouragement has value to the merchant (in restraining merchant fees) as long as it is credible, even if it is not exercised.[67]

60.     Concerning surcharging in Australia, Visa executive Tolan Steele testified that



Mr. Steele testified that surcharging

61.     A MasterCard executive in Australia and New Zealand, Albert Naffah, testified that "MasterCard has acknowledged that surcharging could be one of those weapons" available to a merchant to deter the networks from increasing interchange fees.[70] Mr. Naffah acknowledged that MasterCard had reduced its interchange fee rates applicable to gas stations to reduce the frequency of surcharging:

---

[67]   "Payments System Regulation: Response by MasterCard Worldwide to the Issues for the 2007/08 Review," August 31, 2007, http://www.rba.gov.au/payments-system/reforms/review-card-reforms/pdf/mc-31082007.pdf, pp 16-17.

[68]

[69]

[70]   Deposition of Albert Naffah, in MDL-1720, October 7, 2008, p. 75.

[W]e don't want to see our cardholders surcharged at a point of sale -- at the point of sale. And if we're seeing excessive surcharging at a particular segment or on a particular card type, or a pattern that we identify, then we'll try and do whatever we can, so long as it's commercially sensible and reasonable and profitable to do so, to create, remove that incentive for surcharging.

We have, for example, in Australia, in the last time -- the last time we reviewed our interchange fees there, we identified that they started to appear, the incidence of surcharging on fuel purchases was increasing on MasterCard cards, so we put in place a special incentive interchange fee for fuel merchants at a low -- very low level, in an attempt to remove that incentive or that -- create an incentive for them not to surcharge our cards.[71]

62.     Before the Australian reforms went into effect, MasterCard claimed that it was a "naïve view of the market" to believe that there would be any competitive pressure on American Express or Diners Club to reduce their merchant fees.[72] Visa similarly stated that "it is difficult to argue that competitive pressures would force [American Express and Diners Club] into a reduction of their merchant service fees in a half-regulated environment."[73] In fact, as Figure 6 shows, both American Express and Diners Club have reduced their average merchant fee rates significantly since 2003.

---

[71]   Id., pp. 184-85. MasterCard's credit card interchange fee rate for petroleum merchants in Australia is now 0.32%. http://www.mastercard.com.au/merchant/getting_started/interchange_rates.html. Visa's service station rate is 0.33%. http://www.visa.com.au/aboutvisa/interchange/interchange.shtml.

[72]   MasterCard International Incorporated, 'Response to the December 2001 Consultation Document of the Reserve Bank of Australia', March 2002, p. 37. http://www.rba.gov.au/payments-system/reforms/cc-schemes/consult-doc-responses/mastercard-0302-1.pdf

[73]   Visa International, "Submission to The Reserve Bank of Australia: Inclusion of Closed Card Schemes in the Designation Process," 17 April 2001, p. 6. http://www.rba.gov.au/payments-system/reforms/cc-schemes/iii-submissions-vol2/t3-visa-170401.pdf



**Figure 6**
**Cumulative Change in American Express and Diners Club Average**
**Merchant Discount Rates in Australia Since March 2003**

Source: http://www.rba.gov.au/statistics/tables/xls/c03hist.xls.

### 3.6. The Agreement Benefits Merchants With Respect to All Current Credit Card Usage, Not Only American Express Card Usage

63.     As the result of an agreement to settle litigation in MDL-1720, MasterCard and Visa agreed to permit merchants in the United States to surcharge those networks' credit card transactions, provided that Amex-accepting merchants surcharge American Express cards. But there is a problem: American Express continued to prohibit surcharges unless a merchant surcharges all cards, including debit cards, and the settlement in MDL-1720 did not permit merchants to surcharge MasterCard or Visa debit cards. Most merchants, however, would have no interest in surcharging debit cards in the United States with current credit and debit card fees in place, but many are likely to want to surcharge credit cards to encourage customers to use their less costly debit cards. The relaxation of MasterCard and Visa no-surcharge rules is useful to merchants, but that value is significantly attenuated as long as American Express

31

retains its own NDP, because most merchants that accept American Express cards cannot profitably drop acceptance of those cards so they can take advantage of their new ability to surcharge MasterCard and Visa transactions.

64.     In effect, American Express' NDP acts as a veto on merchant surcharges, except for merchants that can profitably refuse to accept American Express cards.  The Agreement frees merchants to surcharge all of their credit card transactions without surcharging their low cost debit card transactions, and thus represents a significant competitive liberalization of the payment marketplace.

**3.7. Summary**

65.     The anticompetitive effects of no-surcharge rules are obvious.  They directly prohibit normal competitive forces from steering customers to lower cost alternatives and constraining the level of fees charged by card networks.  When credit card acceptance fees are at the level prevailing in the United States, it is very likely that a growing number of merchants will choose to surcharge the use of credit cards when they are freed to do so.  Surcharges permit merchants to recoup payment costs, steer customers to use lower cost payments such as debit cards and cash, and generate competitive pressure on credit card networks to lower the level of their merchant fees in order to reduce the prevalence of surcharging.  By providing merchants with the opportunity to surcharge credit card transactions, the Agreement generates a significant benefit for U.S. merchants.

**4. Remaining Competitive Restrictions Do Not Eliminate Benefits to Class Members from the Proposed Settlement**

**4.1. Remaining Elements of the American Express NDP**

66.     As a settlement, the Agreement represents a compromise.  Although merchants will be permitted to surcharge credit card transactions, under the terms of the Agreement, American Express will still be able to prohibit merchants from differentially surcharging the use of American Express cards relative to other credit cards.[74] American Express can also prevent merchants from setting a surcharge at a level that exceeds the merchant discount rate charged to the merchant for that transaction, or the maximum surcharge permitted by another credit card network, whichever is lower.[75]

67.     As I explained in Part 3, in Australia, American Express' merchant discount rate exceeded the average MasterCard/Visa rate by 131 basis points in 2003.  MasterCard and Visa merchant fees fell below 1% by 2005, and in December 2013 the average for those brands stood at 0.83%.  Many merchants therefore have opted to surcharge American Express and Diners Club cards but not MasterCard and Visa card transactions, or to surcharge those brands at different rates.  Differential surcharging has successfully pressured the more costly networks to reduce the gap between their merchant fees and those of MasterCard and Visa, and that gap continues to decline.

68.     In Australia, the average MasterCard and Visa interchange fee is set by regulation at 0.50%.  In the United States, the situation is very different.  MasterCard and Visa's average interchange fees are about 2%.  The 177 basis point gap in this country is not between

---

[74]     Agreement, ¶8(b).

[75]     Id., ¶8(c).

American Express and MasterCard or Visa, but rather between the cost of accepting an average credit cards transaction vs. the cost of accepting an average debit card transaction. The differences between American Express and the other networks' average merchant fees are much less pronounced in the United States than in Australia. For the United States, I estimate MasterCard, Visa, and Discover Card merchant fees ranging from ▮▮▮▮▮▮▮▮ less than American Express' average merchant discount rate. Moreover, as I described in Part 3.1, following the loss in 2003 by MasterCard and Visa in litigation brought by the Department of Justice, those networks introduced premium tiers of credit cards designed to compete more closely with American Express' offerings to high-spend cardholders. To the extent that merchants did (hypothetically) surcharge American Express cards but not other credit card brands, the affected cardholders would be likely to switch disproportionately to above-average cost cards carrying those other brands.[76] This would increase the average MasterCard and Visa merchant fees and reduce the difference between them and American Express.

69. These are just averages, and some individual merchants will experience larger differences. Being able to differentially surcharge by credit card brand would be useful to merchants. But the main differential surcharging made possible by the Agreement – between credit cards and debit cards – was previously prohibited by American Express' NDP, and will benefit merchants.

---

[76] 

70.     The other main restriction that American Express may enforce under the Agreement is a cap on the amount of any surcharge not to exceed the merchant discount rate paid by the merchant for American Express transactions.

71.     Merchants would be even better off if there were no limit on the amount of any surcharge, but with an average merchant discount rate of 2.61%, most merchants will be permitted to post surcharges at amounts of, for example, 2% or 2.5% without violating American Express' policy.[77]

### 4.2. State Statutes

72.     It is sometimes argued that statutes in a number of states forbid credit card surcharges, which eliminates any value to merchants from elimination of network no-surcharge rules.[78] I disagree for two main reasons.  First, until very recently, state surcharge restrictions were not binding constraints because the networks themselves forbid surcharging.  Now, states face competitive and legal challenges that previously would have been irrelevant. Competitively, states risk that some merchants will locate in other states that permit surcharges.  This was the pattern with credit card usury limits: states that eliminated usury limits attracted credit card issuers.  Legally, I understand that New York's statute was recently held to be unconstitutional, and that challenges to other state statutes governing surcharging are pending.

73.     Second, the geographic scope of the credit card acquiring market is nationwide. MasterCard and Visa, for example, do not set separate interchange fees in separate states.

---

[77]    In Australia, the RBA has recently permitted card networks to limit surcharges to amounts reasonably related to the level of merchant fees paid.
[78]    See Transcript of Fairness Hearing in MDL-1720, dated September 12, 213 at 54.

Thus, any competitive pressure emerging from surcharges where they are permitted will tend to benefit merchants even in any states that do forbid surcharging.

## 5. Conclusion

74.     I have explained in many venues during the past twenty years my views that card networks use anti-steering rules (especially no-surcharge rules) to restrict competition, enhance market power, and maintain anticompetitively high merchant fees.  In my view, merchants should be free to compete with other merchants over the terms of sale, including any surcharges, discounts, or other incentives with respect to payment methods.  The relief obtained in MDL-1720 was an important step towards creating competition over credit card acceptance fees charged to merchants.  Notably, however, the value of that relief for U.S. merchants was diminished by American Express' NDP, which forbid surcharges unless a merchant also surcharges all other credit and debit cards.  The Agreement in this case eliminates that roadblock so that merchants can effectively surcharge all credit card payments, recouping the cost of those payments and steering additional transaction volume to debit cards.  Although further liberalization would benefit merchants, the relief obtained in the Agreement will significantly benefit merchants throughout the United States.


April 10, 2014


Alan S. Frankel, PhD.



# ALAN S. FRANKEL

Coherent Economics LLC
2800 Acacia Terrace
Buffalo Grove, Illinois 60089
(847) 913-8187
alan.frankel@coherentecon.com

## EDUCATION

UNIVERSITY OF CHICAGO, Chicago, Illinois
Ph.D., Economics, December 1986.
M.A., Economics, March 1985.
B.A., Economics, March 1982.

## PRESENT POSITIONS

COHERENT ECONOMICS, LLC,
Founder and Director, 2008 -

COMPASS LEXECON, Chicago, IL.
Senior Advisor, 2008 -
Senior Vice President, 2004 – 2008.
Vice President, 1989 - 1996.
Economist, 1985 - 1989.

ANTITRUST LAW JOURNAL
Senior Editor, 1999 -
Associate Editor 1998 - 1999
Assistant Editor 1996 - 1998

## PROFESSIONAL AND ACADEMIC EXPERIENCE

LECG, Evanston, Illinois.
Director, 1998-2004
Principal, 1996-1997
UNIVERSITY OF CHICAGO, GRADUATE SCHOOL OF BUSINESS, Chicago, IL, 1983 - 1984.
Research Assistant

UNIVERSITY OF CHICAGO, COMMITTEE ON PUBLIC POLICY STUDIES,
Chicago, IL, 1983
<u>Teaching Assistant</u>

UNIVERSITY OF CHICAGO, DEPARTMENT OF ECONOMICS, Chicago, IL, 1980 - 1982.
<u>Research Manager</u> for U.S. Environmental Protection Agency contract research project.

Various consulting work, including National Association of Realtors and Synergy Inc., 1981 - 1983.

## FIELDS OF SPECIALIZATION

Industrial Organization, Antitrust, Intellectual Property, Applied Econometrics, Regulation, Financial Institutions, Payment Systems, Damages.

## PUBLICATIONS

"Towards a Competitive Card Payments Marketplace," in Reserve Bank of Australia, Payments System Review Conference, Proceedings of a Conference held in Sydney on 29 November 2007 (2008).

"Economic Effects of Interchange Fees," with Allan Shampine, 73 Antitrust Law Journal 627 (2006).

"Transaction Costs, Externalities, and 'Two-Sided' Payment Markets," with Dennis Carlton, 2005 *Columbia Business Law Review* 617 (2005).

"Interchange Fees in Various Countries: Comment on Weiner and Wright," in Interchange Fees in Credit and Debit Card Industries: What Role for Public Authorities?" Federal Reserve Bank of Kansas City (2005).

"The Control of Externalities in Sports Leagues: An Analysis of Restrictions in the National Hockey League," with Dennis Carlton and Elizabeth Landes, 112 *Journal of Political Economy* S268 (2004).

"Editor's Note: EFT Networks And The Canadian Experience" 67 *Antitrust Law Journal* 385 (1999)

"Monopoly and Competition in the Supply and Exchange of Money," 66 *Antitrust Law Journal* 313 (1998).

"Cash Machines: Fee Disclosure and Competition vs. Regulation," with James Langenfeld, *The Global Competition Review* (August/September 1997).

"'Sea-Change' or 'Submarkets?'" (Federal Trade Commission v. Staples, Inc. and Office Depot, Inc.), with James Langenfeld, *The Global Competition Review* (June/July 1997).

"Antitrust and Payment Technologies," with Dennis Carlton, 77 Federal Reserve Bank of St. Louis *Review* 41, December 1995.

"The Antitrust Economics of Credit Card Networks: Reply to Evans and Schmalensee Comment," with Dennis Carlton, 63 *Antitrust Law Journal* No. 3, Spring 1995.

"The Antitrust Economics of Credit Card Networks," with Dennis Carlton, 63 *Antitrust Law Journal* No. 2, Winter 1995.

<u>Countervailing Effects of Automobile Emission Control Regulations</u>, Ph.D. dissertation, University of Chicago, Department of Economics, 1986.

## SPEECHES

"Comments on Kay, Manuszak and Vojtech," The Economics of Payments VII, Federal Reserve Bank of Boston, April 2014.

"Interchange Regulation – A Pitched Battle of Ideas," panelist, The Clearing House annual meeting, November 2012.

"Payment Innovation: Competitive Impediments and Opportunities," presented at *Consumer Payment Innovation in the Connected Age*, Federal Reserve Bank of Kansas City, March 2012.

"Does Disclosure Matter?," American Bar Association Section of Antitrust Law, Panel on the Proposed Consumer Financial Protection Agency, Washington, DC, April 2010.

"The MasterCard Decision: An Economic Review," Organization for Economic Cooperation and Development, Paris, France, June 2008.

"Towards a Competitive Card Payments Marketplace," Reserve Bank of Australia and Melbourne Business School, Sydney, Australia, November 2007.

"Evaluating Self-Regulation of Interchange Fees," Organization for Economic Cooperation and Development, Paris, France, June 2006.

"A More Competitive, Deregulated Market Structure: The Role of Networks vs. the Role of Banks," International Cards & Payments Council, Rome, Italy, October 2005

"House of Cards: The Economics of Interchange Fees," Presented at *Antitrust Activity in Card-Based Payment Systems: Causes and Consequences*, Federal Reserve Bank of New York, September 2005.

"Dysfunctional Competition in Retail Payment Systems," Presented at *Innovations, Incentives, and Regulation: Forces Shaping the Payments Environment*, Federal Reserve Bank of Chicago, May 2005

"Interchange Fees in Various Countries: Comments on Weiner and Wright," Presented at *Interchange Fees in Credit and Debit Card Industries:  What Role for Public Authorities?* Federal Reserve Bank of Kansas City, Santa Fe, New Mexico, May 2005.

Columbia University School of Law, *Conference on Two-Sided Markets*, April 2005.

Chicago Bar Association Antitrust Committee speaker, Credit Card Issues, February 2002.

"Anticompetitive Effects of Interchange Fees," Econometrics Society Australasian Meetings, Auckland, New Zealand, July 2001

American Bar Association Antitrust Section, Financial Markets Committee *Brownbag Seminar* on interchange fees, Washington, DC, March 2001

"The Economic Analysis of Intellectual Property Damages," Panel discussion moderator, Chicago, Illinois, October 1998

Spring Antitrust Developments panelist, Vedder, Price, Kaufman & Kammholz, P.C., May 1997.

*Credit Card Pricing and Competition:  The Environment Today and Future Marketplace and Regulatory Trends*, before the American Bar Association, Consumer Financial Services Committee, November 1995

"Antitrust and Payment Technologies," presented at Antitrust and Payment Systems, Federal Reserve Bank of St. Louis, May 1995


**FELLOWSHIPS**

Olin Foundation Fellowship, Center for the Study of the Economy and the State, Graduate School of Business, University of Chicago, 1984.

University of Chicago Graduate Economics Fellowship, 1982 - 1984.

**PROFESSIONAL AFFILIATIONS**

Member, American Economic Association, 1984 - present.

Associate Member, American Bar Association, 1991 - present. (Section of Antitrust Law)

**TESTIMONY AND OFFICIAL PROCEEDINGS**

Report, Deposition, and Supplemental Report in <u>Marchbanks Truck Service, Inc. et al. v. Comdata Network, et al.</u>

Report, Reply Report and Testimony in <u>The Matter Between The Commissioner of Competition and Visa Canada Corporation and MasterCard International Incorporated</u>.

Joint Report, Rebuttal Report, Deposition and Trial Testimony in <u>Best Buy Co., Inc., v. AU Optronics Corp., et al., In Re LCD (Flat Panel) Antitrust Litigation</u>, United States District Court, Northern District Of California, San Francisco Division

Testimony before the European Commission in <u>Visa Europe</u>.

Brief of Evidence and Reply Brief of Evidence, in <u>New Zealand Commerce Commission v. Cards NZ Limited and Others, DSE (NZ) Limited and Others</u>.

Report to the Reserve Bank of Australia in its *Review of Payment Systems Reforms*.

Brief of Evidence, in <u>New Zealand Commerce Commission v. American Express International (NZ) Incorporated</u>

Testimony before the European Commission in <u>MasterCard</u>.

Brief of Evidence, in <u>New Zealand Commerce Commission v. Westpac Banking Corporation</u>, District Court, Auckland, New Zealand.

Brief of Evidence, in <u>New Zealand Commerce Commission v. Bank of New Zealand, Limited</u>, District Court, Auckland, New Zealand.

Joint Report, <u>In the Matter of the Decision of the Office of Fair Trading dated 6 September 2005 No. CA 98/05/05 of 6 September 2005 in Case CP/0090/00/S (MasterCard Multilateral Interchange Fee)</u>, Competition Appeal Tribunal (U.K.)

Declaration, Report, Rebuttal Report, Deposition and Declaration and Reply Declaration Regarding Proposed Class Settlement, <u>In Re Payment Card Interchange Fee and Merchant Discount Antitrust Litigation</u>, U.S. District Court, Eastern District of New York.

Brief of Evidence, in <u>New Zealand Commerce Commission v. ANZ National Bank Limited</u>, <u>New Zealand Commerce Commission v. Bank of New Zealand, Limited</u>, District Court, Auckland, New Zealand.

Declaration in <u>David Salkin v. MasterCard International</u>, Court of Common Pleas, Philadelphia County, Pennsylvania.

Report in <u>CFS-Related Securities Litigation</u>, U.S. District Court, Northern District of Oklahoma, and District Court for Tulsa County, State of Oklahoma.

Report in <u>Commercial Financial Services, Inc., v. Mayer Brown Rowe & Maw, P.A., f/k/a Mayer Brown & Platt, and J.P. Morgan Securities, Inc., f/k/a Chase Securities, Inc</u>., Civil Action No. CJ 2002 03028, District Court of Tulsa County, State of Oklahoma.

Rebuttal Testimony and Affidavit in <u>TDS Metrocom, LLC v. Wisconsin Bell, Inc. d/b/a SBC Wisconsin</u>, Public Service Commission Of Wisconsin Docket No. 6720-TI-175.

Affidavit and Deposition in <u>Elizabeth A. Fischer and Jennifer Herbst, on Behalf of Themselves and All Others Similarly Situated, v. MasterCard International, Inc</u>.

Direct Testimony and Rebuttal Testimony on Behalf of SBC Illinois Before The Illinois Commerce Commission, Docket No. 03-0553.

Report in V.P. Intellectual Properties, L.L.C. v. Nobel Biocare USA, Inc., Implant Innovations, Inc. And Implant Innovations International Corporation v. Leonard I. Linkow, And Anthony W. Rinaldi.

Report and Trial Testimony in Enrique Calva-Cerqueira v. United States of America.

Report, Deposition, Amended Report, and Direct Testimony in Charter Federal Savings Bank v. United States of America

Declaration, Deposition, Trial Testimony, and Rebuttal Testimony in Adam Schwartz vs. Visa International, Inc., Visa International Service Association, Inc., Visa USA, Inc., and MasterCard International, Inc.

Report in Cardiac Pacemakers, Inc., Guidant Sales Corporation, and Eli Lilly and Company v. St. Jude Medical, Inc., Pacesetter, Inc., and Ventritex, Inc.

Testimony before the European Commission in Visa International.

Declaration, Report, Deposition, and Supplemental Report in Columbia First Bank, FSB v. United States of America

Affidavit in Century Shopping Center Fund I, Limited Partnership v. Frank Pio Crivello

Report and Deposition in Gregory F. Daniel, et al. v. American Board of Emergency Medicine, et al.

Report and Declaration in 1st Home Liquidating Trust v. Unites States of America

Report and Deposition in Pi Electronics Corp. v. United States of America

Report in WDP Limited v. Gelatin Products International, Inc. and R.P. Scherer Corp.

Joint Declaration, Joint Report, Deposition, Trial Testimony, and Rebuttal Testimony in C. Robert Suess, et al. v. United States of America.

Declaration and Supplemental Declaration in Robert Johnstone, et al. v. First Bank National Association, et al.

Testimony in Keisha Johnson, Shapearl, et al. v. Aronson Furniture Co. and Heilig-Meyers Co.

Report, Deposition and Trial Testimony in ProtoComm Corporation v. Novell Advanced Services (Formerly Fluent)

Joint Affidavit in Kahn v. Emerson Electric Co., Hazeltine Corporation and Motorola, Inc. et al.

Affidavit, Deposition and Trial Testimony in Masco Corporation of Indiana v. Price Pfister, Inc.

Deposition in Loomis Armored, Inc. v. City of Chicago.

Joint Declaration, Joint Reply Declaration, and Joint Supplemental Declaration in the Matter of Mahurkar Double Lumen Hemodialysis Catheter Patent Litigation.

Deposition in American Fidelity Fire Insurance v. General Railway Signal Corp.

Deposition in General Farebox, et al. v. Landa Corp., et al.

Affidavit in Lincoln Savings & Loan Association v. Federal Home Loan Bank Board and M. Danny Wall.


**OTHER**

FAA-certified private pilot

PADI-certified open water diver

April 2014