UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---------------------------------------------------------------x
IN RE: AMERICAN EXPRESS ANTI-STEERING
RULES ANTITRUST LITIGATION

11-MD-02221 (NGG) (RER)

This Document Relates To:
CONSOLIDATED CLASS ACTION

ECF ACTION

---------------------------------------------------------------x
THE MARCUS CORPORATION,
on behalf of itself and all similarly situated persons,

13-CV-07355 (NGG) (RER)

Plaintiff,
- against -

ECF ACTION

AMERICAN EXPRESS COMPANY et al.,

Defendants.
---------------------------------------------------------------x

## DECLARATION OF MARK A. WENDORF

I, Mark A. Wendorf hereby declare as follows:

1. I am a partner in the law firm of Reinhardt Wendorf & Blanchfield, ("RWB") co-Lead Counsel in the above captioned class action. This Declaration is made in support of Class Plaintiffs' Motion For Final Approval Of Class Action Settlement and Class Counsel's Motion For An Award Of Attorneys' Fees And Costs And Leave To Distribute Service Awards. I hereby declare, based upon my personal knowledge, information provided to me by staff under my supervision, and upon a review of documents, that the following is true and correct.

2. The first part of this declaration describes generally the work Class Counsel[1] performed on behalf of the class in order to bring this case to a successful conclusion. The second part describes the time and expenditures that Class Counsel committed to this litigation,

---

[1] As used in this declaration, the term "Class Counsel" refers to the three co-lead counsel firms – Friedman Law Group LLP, Patton Boggs LLP and Reinhardt Wendorf & Blanchfield (collectively, "Lead Counsel") – as well as the 31 firms that worked under their direction. The term "Lead Counsel" refers to co-lead counsel.

- 1 -

and the criteria that Lead Counsel employed in reviewing Class Counsel's time billing and expenses records. The third part sets forth the basis for incentive awards that are requested for the class representatives.

## I. Litigation Work Performed by Class Counsel on Behalf of the Class

3. Over the nearly eleven year duration of this litigation, which began in 2003, 34 law firms, including more than 200 attorneys, paralegals and other support staff have worked to bring the litigation to a successful conclusion on behalf of the class.

4. A summary account of the work performed by Class Counsel is set forth in the Procedural History section of Class Plaintiffs' Memorandum Of Law In Support Of Final Approval Of Class Settlement, as well as the Factual Background section of Class Counsel's Memorandum Of Law In Support Of An Award Of Attorneys' Fees And Costs And For Leave To Distribute Service Awards.

5. Throughout the litigation, Class Counsel had to address a myriad of novel substantive, procedural and expert issues. Without attempting to provide an exhaustive list of all of Class Counsel's activities during the course of this extraordinarily complex litigation, the following provides an illustration as to the variety of activities in which Class Counsel were engaged:

  a. Investigating and drafting pleadings including 19 separate complaints and amended complaints.

  b. Briefing and arguing before the United States Judicial Panel on Multidistrict Litigation.

  c. Organizing a coordinated leadership structure as well as assigning and supervising the work of the 30-plus participating firms.

  d. Preparing discovery requests including eight sets of requests for production of documents and seven sets of interrogatories and responding

to 15 sets of document requests and three sets of interrogatories served by defendants.

e. Organizing document retention, storage and reviewing systems to handle the over 30 million pages of documents produced during the course of this litigation.

f. Taking, defending or otherwise participating in over 160 depositions of witnesses, including several foreign-based American Express witnesses who were deposed in Hawaii.

g. Reviewing depositions in related litigation, including approximately 70 witnesses from *American Express Travel Related Services, Inc. v. Visa USA, Inc., et al.*, 04-cv-08967 (BJ) and at least 20 witnesses from *In re Visa Check / Mastermoney Antitrust Litig.*, 96-cv-5238 (JG).

h. Briefing, responding to and arguing numerous discovery-related motions.

i. Briefing, responding to and arguing numerous substantive motions, including motions for transfer and consolidation, motions to dismiss, class certification, three separate motions for summary judgment, and motions to exclude expert testimony.

j. Preparing briefs and arguments for three successful appeals to the Second Circuit Court of Appeals and two appeals to the United States Supreme Court.

k. Retaining and working with expert witnesses who provided six separate reports, including reports on damages and class certification.

l. Preparing a white paper for the Antitrust Division of the United States Department of Justice.

m. Engaging in settlement negotiations including meetings and telephone conferences with mediator Kenneth Feinberg that resulted in the class settlement now before the Court.

## II. Class Counsel's Lodestar and Legal Expenses

### A. Time and Lodestar

6. Throughout the course of this litigation Class Counsel committed over 176,000 hours of professional time. This extraordinary commitment resulted in an investment of $73,796,376 in time billings. This "lodestar" figure represents work performed at historical

rates and after the adjustments detailed below in Section C. Attached as <u>Exhibit A</u> is a listing of the post-adjustment lodestar for each Class Counsel firm.

7.  Both the Supreme Court and the Second Circuit have approved the practice of awarding fees based upon the firms' current rates or other enhancements, to compensate for the delay in receiving compensation, inflationary losses, and the loss of interest. Because this case required over a decade of intensive litigation undertaken by counsel at tremendous risk, calculating lodestar at current rates would appear to be particularly appropriate. Accordingly, I instructed my staff to make this calculation after all of the adjustments set forth below were made to the historic lodestar. If current rates are applied to Class Counsel's time, the case-wide lodestar is $83,535,658.

8.  Because of the passage of time, a number of attorneys that worked on the litigation are no longer with the firms that engaged them, and therefore their rates could not be increased to current rates. This group includes, for example, approximately 25 attorneys who performed primarily document review in the early stages of this case and whose historic lodestar in excess of $10,000,000 could not be adjusted to current rates. Therefore, in order to provide further context for the court's consideration, I asked my staff to add 9% simple annual interest, which is the pre-judgment interest rate applicable in New York under CPLR § 5004, to the historic lodestar (after all adjustments). Case wide lodestar plus interest is approximately $99,149,214.

9.  Class Counsel's hourly billing rates range from $195 for newly admitted attorneys to $925 for senior partners. As set forth below, Lead Counsel "capped" the maximum billing rate for a senior partners at $800 for purposes of this submission. The rates billed by each firm were those that were normally charged by that firm for similar work for clients who pay by the

hour, or, if the firm was a contingent firm, were hourly rates that had previously been approved by a court as part of a fee petition. For example, in *In re Payment Card Interchange Fee And Merchant Discount Antitrust Litigation*, MDL 05-1720 (JG)(JO), (E.D.N.Y.), and *In re Air Cargo Shipping Service Antitrust Litigation*, 06-MD-1775(JG)(VVP), the Courts approved fees for my firm on the basis of the same historical billing rates that we have submitted here. In addition, for the Court's reference attached hereto are excerpts from the National Law Journal Annual Billing Survey for 2003 (Exhibit C), 2005 (Exhibit D), 2007 (Exhibit E), 2010 (Exhibit F), and 2013 (Exhibit G), which are the years covered by the litigation. The NLJ Annual Billing Survey demonstrates that Class Counsel's rates are well within the range of rates for firms specializing in complex, large-scale litigation, such as the instant litigation.

10. Lead Counsel also endeavored to determine whether there were any Brooklyn-based firms that had the resources and experience necessary to prosecute an action similar to the present litigation and to then compare Class Counsel's rates to the rates of those firms. Lead Counsel was unable to find any law firm in Brooklyn that would have been capable of maintaining a sustained, multi-front, decade-long attack on American Express's honor-all-cards and anti-steering rules. This conclusion is based on the following inputs. First, I directed my staff to review Martindale-Hubbell. There were no Brooklyn firms listed in the Antitrust or Class Action categories. I then directed my staff to analyze MDL records to determine which Brooklyn firms participated in antitrust class actions. This investigation was conducted as follows. First, all active antitrust cases listed on the MDL statistical report on the MDL website were identified. Next, all MDL antitrust cases that had been closed were identified from the MDL terminated cases report. The result was a list of 130 antitrust cases (whether or not they were class action cases) transferred or closed by the MDL from approximately 2003 to March,

2014. My staff then identified the transferee court of each of the cases, and reviewed each of the federal court dockets through Pacer to identify all firms that had entered appearances in any of these cases. That review showed that no Brooklyn firm had entered appearances as class counsel on any of the antitrust cases transferred by the MDL from 2003 to March, 2014.

**B.    Legal Expenses**

11.    In addition to the significant commitment of attorney time detailed above, Class Counsel committed $5,542,727 to the litigation. These expenditures include $4,361,224 in payments made from the common litigation fund, $811,870 in out-of-pocket expenditures, and $369,633 in additional commitments (less reserves in the litigation fund). The listed figures include the adjustments to out-of-pocket expenses detailed below in Section C.

12.    RWB was tasked with maintaining the litigation fund, which was used to pay case-wide expenses such as expert witnesses and consultant fees (over $2.9 million), electronic document hosting (over $800,000), and court reporting and transcription services (over $195,000). At this time the amount remaining in the fund is $187,903, and there remains an outstanding balance of $557,536 owed for experts and consulting firms. Therefore the expenses that have been or will be paid from the common litigation fund are $4,730,857. Lead Counsel further anticipates that some amount of additional expenditures will be necessary in order to obtain final approval of the settlement.

13.    In addition to contributions to the litigation fund, Class Counsel incurred out-of-pocket expenses related to firm-specific costs, such as travel, computerized research, filing fees, document production, messenger and federal express. As would be anticipated, co-lead counsel has born the brunt of these expenses. Attached as Exhibit B is a chart summarizing each firm's

expenses (including contributions to the common litigation fund), following the review process set forth below.

14. Over the course of the past decade and at great risk, Class Counsel invested millions of dollars for the benefit of the class. Again to provide context to this Court, I asked my staff to apply 9% simple annual interest to the Class Counsel's expenses, which results in legal costs plus interest of $7,025,483.

### C. Lead Counsel's Review Of Class Counsel's Time Billing And Expense Submissions

15. Early in this case, Lead Counsel established a procedure for the monthly reporting of time and expenses by all firms active in the case. Lead Counsel then monitored the reported work of the firms, allocated work among the firms and kept track of the time and costs being billed. The monthly submissions included detailed time records describing the identity of the time keepers, the amount of time spent on specified tasks, and the resulting lodestar and itemization of expenses incurred. The monthly submissions were then combined into a single report by RWB and made available to the other co-leads.

16. In anticipation of eventually filing this fee and expense application, in late November, 2013, Lead Counsel sent a letter to all Class Counsel firms that established a systematic plan for review of time and expenses incurred in the litigation. The letter directed each firm to make a thorough and detailed review of all time and expenses submitted, list all attorneys who worked on the cases, including their level of experience and their current and historic billing rates, along with the time period that each historical rate was in effect. The letter also directed a responsible partner from each of the firms to ensure that the billings and expenses were complete and accurate, and to delete time billings according to specific criteria. These criteria included:

a. All time billed was to be reasonable to the amount of the work, described with sufficient specificity the task performed, contemporaneously recorded and include only work that was directed or authorized by Lead Counsel and reasonably directed to advancing the interests of the class or the firm's client.

b. Read and review time was to be eliminated unless necessary to a specific assignment from Lead Counsel.

c. Inadvertent duplicate entries, or entries mistakenly billed to these cases, were to be deleted.

d. Historical hourly rates were required to be those normally charged by the lawyer or paralegal for similar work for clients who pay by the hour, or, if the firm worked primarily on contingent matters, the hourly rates previously approved by a court as part of a fee petition.

e. The work was required to be commensurate with the attorney's level of experience. Partners were not to bill for work better suited to associates and associates were not to bill for work better suited to paralegals.

f. Time spent recording, reporting or monitoring time and expenses or preparing fee petition materials was to be deleted.

g. Time devoted to filing or other ministerial tasks was to be deleted.

h. All entries for attorneys or paralegals with fewer than 20 hours total; or other entries related primarily to coming up to speed on the cases were to be deleted. Likewise, time entries for summer associates, summer interns and summer clerks was to be deleted.

i. Travel time was to be reduced by 50% unless the time was clearly spent working on a compensable task and then, only a reasonable amount of time that was actually spent working on the case was allowed.

17. In addition to providing detailed time records, Lead Counsel directed each firm to provide detailed expense records. Firms were instructed to thoroughly review and correct the firm's expense reports, applying the following guidelines:

j. Expenses must have been incurred in the prosecution of these cases, and be necessary and specific to these cases.

k. Expenses that should have been billed to another case were to be deleted.

l. First class travel was to be reduced to coach.

  m. Expenses for meals were to be limited to $75.00 per person.

  n. Expenses for alcoholic beverages were excluded, and if such beverages were not itemized, the entire bill was to be reduced by 15%.

  o. Hotel incidental costs such as mini bar, laundry services, movies and fitness center charges were to be deleted.

  p. Payment of staff overtime was to be deleted.

18. As a result of the firms' review and editing of their submissions, historic lodestar submitted during the course of the litigation was reduced by $1,996,737 and expenses, excluding assessments previously submitted, were reduced by $38,691.

19. After receiving the time and expense submissions by the firms, I instructed staff from RWB to perform yet another review of the firms' submissions to ensure that all time or expense submissions were reasonable and necessary in litigating the cases on behalf of the class. This review included examining the detailed time and expense entries provided by the individual firms and highlighting individual entries about which there was a question or need for additional information. If it was not clear whether or not individual time entries were reduced, the final submission was compared to the original contemporaneous submission. In some cases, follow-up letters were sent to the firms requesting further explanation. Questions and recommendations for further reduction were then presented to and discussed with me. After further review of the materials (and on occasion consultation with other Lead Counsel), I approved additional reductions in both lodestar and expenses.[2] For example, Lead Counsel agreed to cap partner billing rates at $800, which resulted in reductions for five senior partners that have billing rates ranging from $850 to $925.

---

[2] The hundreds of hours of professional time that was devoted to this process has not been included in the lodestar submitted on behalf of my firm.

20. Following this detailed review by Lead Counsel, historic lodestar was reduced by another $406,214 and expenses were further reduced by $52,945.

**III.   Submissions in Support of Service Awards to Class Representatives.**

21. Class Counsel seeks leave to distribute services awards for each class representative in recognition of their time and efforts in relation to the litigation, which ranged from participating as a class representative in litigation that went through full discovery and summary judgment briefing (as the was the case for The Marcus Corporation), to participating in litigation that required the production of documents and preparation for deposition (as was the case of Italian Colors Restaurant and Il Forno) or simply the production of documents (as was the case of Animal Land, Lopez-Dejonge and Jasa). Attached hereto are true and accurate copies of declarations from each class representative detailing their efforts.

    a. Exhibit H, Declaration of Thomas F. Kissinger on behalf of The Marcus Corporation.

    b. Exhibit I, Declaration of Alan Carlson on behalf of Italian Colors Restaurant.

    c. Exhibit J, Declaration of Joseph Sucevenau on behalf of Il Forno, Inc.

    d. Exhibit K, Declaration of Marc Morrison on behalf of Animal Land, Inc.

    e. Exhibit L, Declaration of Laney DeJonge on behalf of Lopez-DeJonge, Inc.

    f. Exhibit M, Declaration of Jason Christopher Saucier on behalf of Jasa, Inc.

    g. Exhibit N, Declaration of Vincent J. Esades on behalf of Firefly Air Solutions, LLC.

    h. Exhibit O, Declaration of Al Torcini, Jr. on behalf of Plymouth Oil Corp.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Dated this 15 day of April, 2014.

_____
Mark A. Wendorf