FILED
IN CLERK'S OFFICE
US DISTRICT COURT E.D.N.Y.

★ MAY 2 1 2014 ★

BROOKLYN OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

IN RE AMERICAN EXPRESS
ANTI-STEERING RULES
ANTITRUST LITIGATION (II)

11-MD-02221-NGG-RER
ECF CASE

Judge Garaufis

THIS DOCUMENT RELATES TO:
CONSOLIDATED CLASS ACTION

THE MARCUS CORP.,
On behalf of itself and all similarly situated persons,

13-CV-07355-NGG-RER
ECF CASE

     Plaintiff,

  -against-

AMERICAN EXPRESS COMPANY, et al.,

     Defendants.

---

STATEMENT OF OBJECTIONS TO THE AMERICAN EXPRESS CLASS ACTION
SETTLEMENT OF ABSENT PUTATIVE RULE 23(B)(2) CLASS MEMBER
NATIONAL RETAIL FEDERATION

CLARICK GUERON REISBAUM LLP
40 West 25th Street
New York, New York 10010
(212) 633-4310

VORYS, SATER, SEYMOUR AND PEASE LLP
52 East Gay Street
Columbus, Ohio 43215
(614) 464-6400

*Attorneys for Objector National Retail Federation*

1

## I.   PRELIMINARY STATEMENT

Throughout this litigation, American Express ("Amex") fought tooth and nail to oppose class certification and enforce the arbitration provisions in its contracts. After it obtained a Supreme Court ruling that eviscerated plaintiffs' class claims and left this case on the brink of dismissal, Amex abruptly changed course. It agreed to a Rule 23(b)(2) settlement class that would give what Amex could not have obtained otherwise – a mandatory release of virtually all future claims by millions of businesses that are forbidden to opt out of the settlement to protect their own interests.

The proposed settlement tramples on the contractual rights of the National Retail Federation ("NRF") and its member retailers and restaurants, would certify a class that fails to comply with both the Due Process clause and Rule 23, provides empty "relief" that stifles competition rather than promoting it, and saddles unfortunate class members with a release that robs them of their ability to contest Amex's anticompetitive practices. The NRF therefore objects and urges this Court to reject the settlement.

First, the proposed settlement would violate the Rules Enabling Act by nullifying the contractual rights of the NRF and of many of its members to resolve disputes with Amex through the contractual alternative dispute resolution (ADR) procedures that Amex fought so hard to vindicate. The Class Plaintiffs, who sought desperately to avoid their own contractual ADR provisions, cannot adequately represent the interests of the NRF and those class members who want to preserve their ADR rights and control their own claims.

Second, the proposed settlement class cannot be certified under Rule 23(b)(2). *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541 (2011), holds that a mandatory Rule 23(b)(2) class may be certified only when the entire class shares a common, indivisible, and non-individualized interest in a claim, and the relief sought or obtained applies uniformly to and benefits the entire class all

2

at once.  That is, Rule 23(b)(2) may be used only in circumstances where opt-out rights would serve no purpose.

That this settlement cannot satisfy that exacting standard is established by the NRF's own contract with Amex, entered just days before the settlement was publicly announced.



The proposed settlement also fails the exacting standard of *Dukes* because it provides empty "relief" that is not injunctive in nature and does not benefit all class members equally. State laws bar surcharging by many class members, and Amex has reserved the right to buy off the surcharging rights of others.  Further, the release would improperly strip absent class members of their individualized claims for future damages in violation of the Seventh Amendment and the Due Process Clause.

3

Finally, the settlement is neither fair, reasonable, nor adequate.  Although Class Plaintiffs depict it as a triumph that will ultimately result in the lowering of merchant acceptance costs for all credit cards, in fact it represents a retreat from principles of honest competition.  It would insulate Amex, which imposes the highest fees on merchants of any payment card network, from competition from Visa and MasterCard by requiring merchants that wish to surcharge Amex cards to surcharge *all* other credit cards *and* then to surcharge Amex cards at the lowest surcharge amount imposed on any other credit card.  The settlement does not permit merchants to steer customers from Amex cards to lower cost credit cards.  It only allows steering between credit cards and debit cards – a fundamentally different product that Amex does not even offer.  There is no probative evidence that this surcharging regime would provide *any* real benefit to class members.  Amex, in contrast, will receive a future release from millions of merchants that will allow it to continue enforcing its other anticompetitive rules and practices.

This Court should not permit Amex to manipulate the litigation process to achieve such an untoward result; nor should it allow desperate Class Plaintiffs, whose claims are on the verge of dismissal, to bargain away the contractual and due process rights of class members.  Accordingly, this Court should refuse final certification of the proposed class and deny the Motion for Final Approval of the Settlement.

## II.    BACKGROUND

This brief sets forth the NRF's objections and the specific reasons and legal support for its objections to the proposed settlement.  The NRF's full name, address and telephone number are: National Retail Federation, 1011 New York Ave., N.W., Suite 1200, Washington, D.C. 20005, (202)-783-7971.  The NRF is a member of the putative settlement class because it

4

currently accepts and will in the future accept American Express-branded cards. The NRF's counsel are identified on the first page of this brief and in the signature blocks.

### A.  National Retail Federation

The NRF is the nation's largest retail trade association, having a membership of more than 8,000 merchants, most of which are members of the settlement class. The NRF's membership accounts for more than a trillion dollars in annual retail sales, millions of American jobs, and more than 100,000 store locations nationwide. Its members range from large department store chains to Main Street single-location businesses, and include specialty, apparel, discount, online, grocery, restaurant, and service establishments. The NRF and these merchants process millions of credit card transactions annually and pay billions of dollars in fees to Amex and interchange fees to the issuing banks that are members of the Visa and MasterCard networks. In making this objection, the NRF represents its own interests and the interests of its members, many of which do not have the resources to follow, analyze, and object to a complex settlement such as this one.

### B.  History of the Litigation

In 2003, Italian Colors Restaurant filed a class action complaint against Amex alleging Sherman Act violations. That class action was later transferred to the Southern District of New York and consolidated with other actions as *In re American Express Merchant Litigation*. Amex moved to dismiss in favor of arbitration based on a clause in its Card Acceptance Agreement with Italian Colors Restaurant. The parties litigated that issue for almost a decade, until the Supreme Court ruled in Amex's favor and held that the arbitration clause, which also precluded class resolution, must be enforced under the Federal Arbitration Act. *See Am. Express Co. v. Italian Colors Rest.*, 133 S. Ct. 2304 (2013).

In 2004, The Marcus Corporation filed a putative class action that asserted tying claims but did not challenge Amex's anti-steering and anti-surcharging rules. *See* Class Pls.' Mem. In support of Motion for Final Approval of Class Action Settlement at 11, 11 n.5, Apr. 15, 2014, ECF No. 362. Beginning in 2005, other class and individual actions against Amex were filed. In 2011, the consolidated *Animal Land* Complaint was filed in MDL 2221 and captioned *In re: American Express Anti-Steering Rules Antitrust Litigation*. The *Animal Land* Complaint sought certification of Rule 23(b)(3) and Rule 23(b)(2) classes of merchants that have accepted Amex-branded general purpose payment and credit cards.

In August 2013, after the Supreme Court decided *Italian Colors*, Amex moved to dismiss the *Animal Land* Complaint in favor of arbitration. At that same time, Amex was negotiating the current proposed settlement, which was announced in December 2013.

### C.    Proposed Settlement

The proposed settlement would certify a Rule 23(b)(2) class of "all Persons that as of the Settlement Preliminary Approval Date *or in the future* accept any American Express-Branded Cards at any location in the United States (including at a physical merchant location, online and mobile application)," excluding only Defendants and related parties.   Class Settlement Agreement ("Settlement Agreement") ¶ 2, Jan. 7, 2014, ECF No. 306-2 (emphasis added). The class specifically includes all such persons "regardless of whether such Persons have restricted, in any way, the means by which they can resolve disputes against Defendants or the procedural mechanisms available for the resolutions of disputes against the Defendants." *Id.* ¶ 3. The NRF thus is a member of the settlement class.

The Class Plaintiffs had originally sought to certify two classes, a Rule 23(b)(3) damages class and a Rule 23(b)(2) injunctive relief class. *See* Consol. Class Action Compl. ("*Animal*

6

*Land* Compl.") ¶ 16, 11-MD-02221-NGG-RER, March 23, 2011, ECF No. 27; Class Action Compl. "( *Marcus* Compl.) ¶ 9, 13-CV-07355-NGG-RER, July 13, 2004, ECF No. 1. Having lost the argument that they should not be forced to arbitrate their claims on an individual basis, Class Plaintiffs abandoned their damages claims – *and the damages claims of all other putative class members*. Proceeding to settle solely through the vehicle of a mandatory 23(b)(2) class obviously suits Amex's interests as well, insulating it from any claims for damages or injunctive relief with respect to its future conduct.

The proposed settlement would not touch Amex's honor-all-cards rule or most of its non-discrimination rules. Instead, Amex would allow merchants to surcharge Amex cards, but only if the merchant "imposes a surcharge for *all* Credit Cards accepted" and also complies with other detailed requirements. Settlement Agreement ¶ 13(b) (emphasis added); *see also id*. ¶ 8(a). Further, merchants may only apply a surcharge that is no higher than "any surcharge imposed on transactions effected with any other Credit Card, payment card, payment method, products or services accepted by the merchant." *Id*. ¶ 8(b). Merchants are forbidden from informing their customers regarding what they pay to Amex on card transactions, and therefore that the surcharge amount is less than their costs. *Id*. ¶ 13. In short, even though Amex charges higher merchant fees than Visa, MasterCard, and Discover, the settlement protects those high acceptance fees by ensuring that surcharging cannot be used to steer consumers away from using Amex cards in favor of lower-cost credit and general purpose payment cards.

Because the settlement makes surcharging credit cards an all-or-nothing proposition, it affirmatively undercuts merchants' surcharging abilities in another important way. Under the proposed settlement reached in MDL 1720, merchants may use surcharging to favor one network over another, for example by surcharging Visa transactions and not MasterCard transactions.

*See* Mem. and Order, *In re Payment Card Interchange Fee and Merchant Discount Antitrust Litig.*, No. 05-MD-1720 (JG) (JO), at 32-33, Dec. 13, 2013, ECF No. 6124.  Because the proposed Amex settlement requires a merchant that wants to surcharge Amex to surcharge *all* credit cards, however, merchants that wish to surcharge Amex must surrender their right to engage in the differential, interbrand surcharging that the MDL 1720 settlement permits.  The settlement thus has the perverse effect of thwarting the ability of merchants to exercise even the limited differential surcharging rights they received through the settlement of MDL 1720.

Class plaintiffs argue that the surcharging relief is meaningful because it allows merchants to steer consumers from credit cards to debit cards and there is a "vast price differential" between credit and debit cards.  *See* Class Pls.' Mem. at 3.  The fallacy in that argument is that credit cards and debit cards are different products.  *See In re Visa Check/Mastermoney Antitrust Litig.*, No. 96-CV-5238 (JG), 2003 U.S. Dist. LEXIS 4965, at *8-9 (E.D.N.Y. Apr. 1, 2003) ("Overwhelming evidence establishes that merchant demand for credit card services is distinct from merchant demand for debit card services: those services are sold separately; many merchants would refuse to use off-line debit services if given the choice to do so; and the defendants themselves have repeatedly acknowledged in their business strategy and marketing activities the distinctive attributes of their off-line debit services compared to their credit card services.").

Consumers use debit cards differently from credit cards because debit cards are linked to the consumers' bank accounts and money spent in debit card transactions is automatically deducted from such accounts.  Credit cards, on the other hand, allow consumers to access credit and make purchases that exceed the balances of their bank accounts.  Debit cards and credit cards also may offer different forms of rewards programs, purchase programs, and protection

8

against fraud.  It strains credulity to believe Amex would allow merchants to steer consumers

from credit to debit cards if it actually thought that relief was a threat to its business.[1]

A number of states prohibit surcharging.[2]  Merchants in those states will get no benefit

from the proposed settlement.  In addition, the settlement agreement allows Amex to buy off the

surcharging rights of individual merchants.  Settlement Agreement ¶ 10.  As a result, even if the

limited surcharging permitted by the settlement could have ameliorative effects on merchant

fees, the settlement hands Amex the ability to undercut whatever pro-competitive effect the

limited surcharging remedy might provide.  Amex can strategically buy off the surcharging

rights of carefully selected merchants – large, national retailers for example – and thereby

discourage any other businesses that might consider surcharging because they would do so at the

risk of consumer backlash for imposing surcharging when their principal competitors do not.[3]

---

[1] Moreover, because many Amex cards are used as corporate cards for reimbursable business travel and expenses, the users of those cards will not switch to using debit cards in the face of surcharging.

[2] *See* Cal. Civ. Code § 1748.1(a); Colo. Rev. Stat. § 5-2-212(1); Conn. Gen. Stat. § 42-133ff(a); Fla. Stat. Ann. § 501.0117(1); Kan. Stat. Ann. § 16a-2-403; Me. Rev. Stat. tit. 9-A, § 8-A 509(1); Mass. Ann. Laws ch. 140D, § 28A(a)(2); N.Y. Gen. Bus. Law § 518; Okla Stat. Ann. tit. 14A, § 2-417(A); Tex. Fin. CodeAnn. § 339.001(a); Utah Code Ann. § 13-38a-302. Legislation creating similar bans is pending in other states.  *See* Kevin Wack, *18 States Considering Bans on Credit Card Surcharges*, American Banker (Mar. 28, 2013, 10:22 AM ), http://www.americanbanker.com/issues/178_61/18-states-considering-bans-on-credit-card-surcharges-1057901_1.html (proposals to outlaw surcharging pending in Arkansas, Hawaii, Illinois, Indiana, Kentucky, Maryland, Michigan, Missouri, Nevada, New Jersey, New Mexico, Pennsylvania, Rhode Island, South Carolina, Tennessee, Utah, Vermont, and West Virginia). After the *American Banker* article was published, Utah enacted its statute.

The New York anti-surcharging statute was construed in *Expressions Hair Design v. Schneiderman*, No. 13 Civ. 3775, 2013 U.S. Dist. LEXIS 143415 (S.D.N.Y. Oct. 3, 2013).  That decision is now on appeal.

[3] Visa and MasterCard also may buy off surcharging rights from merchants under the MDL 1720 settlement.  Because the Amex settlement allows a merchant to surcharge Amex only if it surcharges all other credit cards, any merchant whose surcharging right has been bought off by Visa or MasterCard will also be barred from surcharging Amex cards, without getting any additional consideration for forgoing surcharging Amex cards.

In exchange for this grudging rule change, the settlement requires class members to release *all* claims for injunctive relief and *all* future claims for damages with respect to Amex's non-discrimination and anti-steering rules, honor-all-cards rules, any current or future rules that tie acceptance by merchants of any type of Amex-branded card to any other type of Amex-branded card, and any rules or provisions that are substantially similar to the current rules and provisions. Settlement Agreement ¶¶ 24-29, 31-34. The Release remains in effect at least for 10 years and will end only if Amex changes its honor-all-cards and non-discrimination rules, or Visa or MasterCard change their surcharging, honor-all-cards, and non-discrimination rules – which means the release could last in perpetuity and may be used to further lock in the alignment of Amex's rules and practices with those of its principal competitors. *Id.* ¶ 1(vv), ¶ 30.

The putative class members will receive no monetary relief in exchange for the release they would be forced to provide to Amex. Amex has agreed, however, to pay class counsels' fees and costs, up to $75 million. *Id.* ¶ 55. That payment, and a minor change in its rules that will effectively insulate it from competition, is a small price for Amex to pay for a sweeping release of claims that might have been pursued by millions of merchants.[4]

### D.   The NRF's Contract with Amex

█████████████████████████████████████   ███████████

███████████████████████████████████████████████████████

---

[4] As counsel for the individual merchant plaintiffs cogently noted at the February 6, 2014 hearing, "American Express is getting a release for an anticompetitive system that Visa and MasterCard agreed to change in their settlement and paid seven and a half billion dollars to get the release, and they are trying to get the whole thing for $75 million." Tr. of Conf. Before the Honorable Nicholas G. Garaufis United States District Judge at 8:11-15, Feb. 6, 2014, ECF No. 331.



## III.   ARGUMENT

### A.   The Proposed Settlement Class May Not Be Certified

To obtain final certification of the class, plaintiffs must demonstrate that the proposed

class meets the requirements of Rule 23(a) and Rule 23(b)(2).  *See Dukes*, 131 S. Ct. at 2551 ("A

party seeking class certification must affirmatively demonstrate his compliance with the Rule –

that is, he must be prepared to prove that there are *in fact* sufficiently numerous parties, common

questions of law or fact, etc.") (emphasis in original).  "[C]ertification is proper only if 'the trial

court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied.'" *Id.* (quoting *Gen. Tel. Co. of Southwest v. Falcon*, 457 U.S. 147, 161 (1982)). Plaintiffs bear the burden of establishing that a class can and should be certified by a preponderance of the evidence. *See Teamsters Local 445 Freight Div. Pension Fund v. Bombardier, Inc.*, 546 F.3d 196, 202 (2d Cir. 2008) ("[T]he preponderance of the evidence standard applies to evidence proffered to establish Rule 23's requirements."); *see also In re Am. Int'l Group, Inc. Sec. Litig.*, 689 F.3d 229, 238 (2d Cir. 2012).

Moreover, when as here a court is asked to certify a class for settlement purposes only, "the moment of certification requires 'heightened attention.'" *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 848-49 (1999) (alteration in original) (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 620 (1997)); *see also Amchem Prods.*, 521 U.S. at 621 ("[T]he standards set for the protection of absent class members serve to inhibit appraisals of the chancellor's foot kind – class certifications dependent upon the court's gestalt judgment or overarching impression of the settlement's fairness."). The Court's role in examining the propriety of certification is even more important at this stage of this proceeding, where the defendant has no further incentive to challenge certification and has suspiciously abandoned its long-standing approach to the litigation as it stands on the threshold of complete victory.

Here, Class Plaintiffs have offered *no* evidence that the proposed settlement class should be certified following the required "rigorous analysis" of the Rule 23 criteria. Indeed, Class Plaintiffs *admit the opposite and obvious*: that "the risk of being unable to certify a class are

[sic] significant . . . ." Class Pls.' Mem. at 25. As demonstrated below, the risk acknowledged by the Class Plaintiffs is reality – the proposed settlement class cannot be certified.[6]

      1.    The Proposed Settlement Class Violates the Rules Enabling Act

Under their contracts with Amex, many class members have substantive rights concerning the manner by which claims will be resolved.[7] In this litigation, Amex fought for almost a decade to vindicate those rights. The proposed settlement does not simply ignore those rights, it would breach them. However, neither Class Plaintiffs, Amex, nor this Court may use the procedure of a mandatory class settlement to strip the NRF of its substantive contractual rights.

The Rules Enabling Act, 28 U.S.C.S. § 2072(b), "forbids interpreting Rule 23 to 'abridge, enlarge or modify any substantive right.'" *Dukes*, 131 S. Ct. at 2561; *see also Ortiz*, 527 U.S. at 845 (noting the tension between a proposed Rule 23(b)(1) class settlement and the Rules

---

[6] The *Grinnell* factors that the Court must apply when determining whether to approve a settlement include the risk of maintaining the class action through trial, not the risk of never being able to certify a class in the first place. *See Detroit v. Grinnell Corp.*, 495 F.2d 448, 463 (2d Cir. 1974), *abrogated on other grounds by Goldberger v. Integrated Res., Inc.*, 209 F.3d 43 (2d Cir. 2000). The Court must address the appropriateness of class certification separate from the question of whether the settlement is fair, reasonable, and adequate under the *Grinnell* factors. Otherwise, rather than applying the "heightened attention" that the Supreme Court has mandated when determining whether a settlement class can be certified, *Ortiz*, 527 U.S. at 848-49, courts would instead apply no scrutiny when addressing certification of a settlement class. As the Supreme Court stated in *Ortiz*, "Rule 23 requires protections under subdivisions (a) and (b) against inequity and potential inequity at the pre-certification stage, quite independently of the required determination at postcertification fairness review under (e) that any settlement is fair in an overriding sense." *Ortiz*, 527 U.S. at 858; *see also Amchem Prods.*, 521 U.S. at 621 ("if a fairness inquiry under Rule 23(e) controlled certification, eclipsing Rule 23(a) and (b), and permitting class designation despite the impossibility of litigation, both class counsel and court would be disarmed").

█████████████████████████████████████████████
█████████████████████████████████████████████
█████████████████████████████████████████████

Enabling Act); *Amchem Prods.*, 521 U.S. at 613 ("Rule 23's requirements must be interpreted in keeping with Article III constraints, and with the Rules Enabling Act").

Contractual ADR clauses create substantive rights that trigger the protection of the Rules Enabling Act. The Federal Arbitration Act, 9 U.S.C.S. § 2, "creates federal substantive law requiring the parties to honor arbitration agreements." *Southland Corp. v. Keating*, 465 U.S. 1, 15 n.9 (1984). Amex invoked those substantive rights in *Italian Colors*, in which the Supreme Court found it likely that "invalidating private arbitration agreements denying class adjudication, would be an 'abridg[ment]' or 'modif[ication]' of a 'substantive right' forbidden" by the Rules Enabling Act. 133 S. Ct. at 2309-10.

For years, Amex embraced the importance of its contractual ADR rights and fought to enforce those rights against Class Plaintiffs who wanted to be free of them. The NRF has the same substantive rights to control the resolution of disputes as Amex did. Under the Rules Enabling Act, a mandatory Rule 23(b)(2) settlement class cannot be used to strip the NRF of those rights.

2.    The Proposed Settlement Class Does Not Satisfy Rule 23(a)

a.    *Commonality and Typicality Are Not Satisfied*

Rule 23(a) requires a showing that there are "questions of law or fact common to the class," Rule 23(a)(2), and that "the claims or defenses of the representative parties are typical of the claims or defenses of the class," Rule 23(a)(3). As the Supreme Court has recognized, these requirements "tend to merge." *Falcon*, 457 U.S. at 157-58 n.13. "What matters to class certification . . . is not the raising of common 'questions' – even in droves – but, rather, the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation. Dissimilarities within the proposed class are what have the potential to impede the

14

generation of common answers." *Dukes*, 131 S. Ct. at 2551 (emphasis in original) (quoting

Richard A. Nagareda, *Class Certification in the Age of Aggregate Proof*, 84 N.Y.U. L. Rev. 97,

132 (2009)).

Here, the different ADR provisions in Amex's merchant contracts preclude a finding of

either commonality or typicality.[8]  The threshold questions in any dispute – namely, where and

how it may be resolved – will depend on the specific contractual provisions applicable to those

claims.   There has been no showing whatsoever that, when these individual contract provisions

are honored, classwide proceedings have the capacity "to generate common *answers* apt to drive

the resolution of the litigation." *Dukes*, 131 S. Ct. at 2551 (emphasis in original).  As a result,

commonality and typicality are absent. *See In re Titanium Dioxide Antitrust Litig.*, 962 F. Supp.

2d 840, 861 (D. Md. 2013) (noting that "[s]ome courts have held that where certain members of

a class are subject to contracts containing arbitration clauses, while other class members are not,

those differences in contractual relationships destroyed the commonality and typicality of the

class"); *see also Renton v. Kaiser Found. Health Plan, Inc.*, 2001 U.S. Dist. LEXIS 20015 (W.D.

Wash. Sept. 24, 2001) (named plaintiff's claims are not typical because, among other things, she

is not subject to an arbitration provision while other putative class members are subject to such

an agreement).

The fact that Class Plaintiffs have assiduously attempted to avoid the ADR terms of their

own contracts with Amex further highlights the lack of commonality and typicality as it relates

to the NRF and those class members that want to preserve their contractual rights to control the

resolution of disputes with Amex.  Class Plaintiffs and Amex have ignored those interests and

---

[8] After the *Italian Colors* decision, it is a matter of public record that many Amex merchants, and
according to Class Plaintiffs virtually all Amex merchants, are subject to some form of ADR
provision.

rights of the putative class members, but this Court may not do so.  Amex is contractually bound to abide by its ADR procedures when resolving disputes with its individual merchants, and those contractual provisions destroy the commonality and typicality required under Rule 23(a).

             b.     *Adequacy of Representation Is Not Satisfied*

The Rule 23(a)(4) adequacy of representation requirement "serves to uncover conflicts of interest between named parties and the class they seek to represent." *Amchem Prods.*, 521 U.S. at 625.  Class Plaintiffs must show that they "'have an interest in vigorously pursuing the claims of the class, and must have no interests antagonistic to the interests of other class members.'" *In re Literary Works in Electronic Databases Copyright Litig.*, 654 F.3d 242, 249 (2d Cir. 2011) (quoting *Denney v. Deutsche Bank AG*, 443 F.3d 253, 268 (2d Cir. 2006)).  "Adequacy of representation must be determined independently of the fairness of the settlement . . . ." *Charron v. Wiener*, 731 F.3d 241, 249 (2d Cir. 2013).  In this case, Class Plaintiffs cannot adequately represent the interests of absent class members.

The putative class members have varying contract provisions governing how disputes with Amex may be resolved – and, equally important, differing interests in enforcing those provisions.  Class Plaintiffs tout their efforts to *avoid* the arbitration clauses in their contracts, Class Pls.' Mem. at 13-14, but the NRF wants to *enforce* its right to exercise individual control over dispute resolution.  Obviously, there is a fundamental conflict in these positions, manifested in the fact that the settlement negotiated by the Class Plaintiffs, if approved, would quash the very same individual contractual rights the NRF seeks to uphold.  Class representatives who agree to a settlement that foils the ability of class members to enforce valued contract rights are not adequate representatives of those class members.

Moreover, Class Plaintiffs have made it clear that they are either unable or unwilling to proceed on their claims for damages through arbitration or other ADR methods – which is why Class Plaintiffs are willing to release future damages claims. Class Plaintiffs' agreement to trade future damages claims for meager and worthless rules changes is in direct conflict with the interests of those putative class members that are able and willing to pursue their past and future damages claims through an ADR process.

3.     The Rule 23(b)(2) Settlement Class Cannot Be Certified

The Fifth Amendment prohibits the federal government from depriving persons of their property "without due process of law." U.S. Const. amend. V. That prohibition governs the federal court's entry of a judgment resolving a claim in litigation. The claim—a "chose in action"—is a "species of property protected by the . . . Due Process Clause," *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 428 (1982), so that the individual's right to pursue the claim is "a constitutionally recognized property interest," *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 807 (1985).

On that basis, the Supreme Court held in *Shutts* that, if a court "wishes to bind an absent plaintiff concerning a claim for *money damages or similar relief at law*, it must provide minimal procedural due process protection" to that plaintiff, including not only the "best-practicable" notice but also "an opportunity to remove himself from the class by executing and returning an 'opt out' or 'request for exclusion' form to the court." *Id.* at 811-12 (emphasis added). Since *Shutts*, the Supreme Court has never approved a class action judgment that attempted to resolve individualized legal claims without affording class members the right to opt out. Rather, the Court has reaffirmed that "mandatory class actions aggregating damages claims implicate the due process principle .... deep-rooted [in our] historic tradition that everyone should have his

17

own day in court." *Ortiz*, 527 U.S. at 846 (internal quotation marks omitted). It has repeatedly rejected class certification in cases where the "legal rights of absent class members" would be impermissibly "resolved regardless of either their consent, or, in a class with objectors, their express wish to the contrary." *Id.* at 847.

The Supreme Court recently held that in a non-opt-out, Rule 23(b)(2) class action, a federal court may not certify "claims for *individualized* relief," especially for "individualized award[s] of monetary damages." *Dukes*, 131 S. Ct. at 2557 (emphasis in original). Instead, "individualized monetary claims belong in Rule 23(b)(3)," which provides opt-out rights. *Id.* at 2558. Class members' individualized claims cannot be "precluded by litigation they had no power to hold themselves apart from." *Id.* at 2559. Instead, "plaintiffs with individual monetary claims [must] decide for themselves whether to tie their fates to the class representatives' or go it alone – a choice Rule 23(b)(2) does not ensure that they have." *Id.*

Rule 23(b)(2) permits a federal court to enter a class action judgment that binds the entire class *without* notice and opt-out rights, and applies only when the class seeks "final *injunctive* relief or corresponding *declaratory* relief [that] is appropriate respecting *the class as a whole.*" Fed. R. Civ. P. 23(b)(2) (emphasis added). By its terms, Rule 23(b)(2) does **not** apply in every case in which plaintiffs seek injunctive relief. Instead, the drafters were clear that: "Rule 23(b)(2) applies only when a single injunction or declaratory judgment would provide relief to each member of the class. It does not apply when each individual class member would be entitled to *different* injunction or declaratory judgment against the defendant." *Dukes*, 131 S. Ct. at 2557 (emphasis in original). Moreover, in a Rule 23(b)(2) class, "the relief sought must perforce affect the entire class at once." *Id.* at 2558. Accordingly, a class may be certified under Rule 23(b)(2) – with its denial of notice and opt-out rights – only in those relatively rare

18

instances in which the class members' interests in the claims are truly indivisible.[9]  *Id.*  That is

never the case with respect to "a class member's individualized claim for money."  *Id.*

Thus, mandatory Rule 23(b)(2) class actions are permissible only when two

circumstances are present that respect class members' right to pursue their own individualized

claims.  *See Dukes*, 131 S. Ct. 2558.  First, the class must be certified only with respect to a

claim as to which the entire class shares common, indivisible, and non-individualized interests.

Second, the relief sought or obtained on that claim must apply uniformly to and benefit the entire

class.  In such situations, a right to opt out would provide class members no benefit.  An

adequate class representative can be expected to pursue the common claim just as an absent class

member would if she were to opt out and bring her own suit.  Further, every class member will

be benefited by the relief in any event.  In the words of the Supreme Court, "[t]he key to the

(b)(2) class is 'the indivisible nature of the injunctive or declaratory remedy warranted – the

notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the

class members or as to none of them.'"  *Id.* at 2257 (internal quotes and citation omitted).

> a.   *Rule 23(b)(2) Certification Is Improper Because the Relief
> Provided Does Not Apply Equally to All Class Members*

In this case, the principal "relief" the settlement provides – the opportunity for class

members to surcharge their customers – does not qualify for Rule 23(b)(2) treatment because it

will not provide relief uniformly, indivisibly, and immediately to the entire putative class.  As

noted, surcharging is barred by law in ten states, and therefore retailers in those states will

---

[9]  The classic situation for a mandatory Rule 23(b)(2) is in the civil rights arena.  In those cases it
is clear that the class members' interests are aligned and thus they will all benefit from and find
value in the ultimate injunctive or declaratory relief.  In a complex commercial case such as this,
however, that uniformity of interests and benefit is missing.  Not all merchants have the same
interests in surcharging and the degree to which the putative class members may use or even
value the relief contained in the settlement will vary dramatically based on each merchants'
individual business considerations, the state in which they are located, and other factors.

receive no "relief" from that settlement provision. In addition, the settlement allows Amex to "buy off" the surcharging rights of particular merchants, further balkanizing what is supposed to be a cohesive, uniformly affected class. In short, surcharging will not provide the indivisible and immediate class-wide relief that Rule 23(b)(2) requires.[10]

> b.   *The Putative Rule 23(b)(2) Settlement Class Does Not Provide "Final Injunctive Relief"*

Rule 23(b)(2) is limited to class actions seeking "final injunctive relief or corresponding declaratory relief," *Dukes*, 131 S. Ct. at 2557, and is meant to capture actions like civil rights cases, where unlawful, class-based discrimination is "remedied by a single classwide order" – an "indivisible injunction benefitting all its members at once," *id.* at 2558. In this case, the only "relief" provided to the class – an agreed-upon rules change to permit surcharging only in limited circumstances – is not "final injunctive relief" and thus cannot trigger Rule 23(b)(2).

The settlement simply embodies an agreement by Amex to change its rules for a finite period. Amex can avoid the rules change by "buying off" the surcharging rights of individual merchants, Settlement Agreement ¶ 10, and also can terminate the settlement if the settlement in MDL 1720 is not finally approved after all appeals, *id.* ¶ 62. The rules change agreement thus is neither "final" nor an injunction within the meaning of equity practice, which is what Rule

---

[10] *See also Gates v. Rohm & Haas Co.*, 655 F.3d 255, 263 (3d Cir. 2011) (concluding that class could not be certified under Rule 23(b)(2) because medical monitoring relief was not a single injunction that would provide relief to each member of putative class); *Grovatt v. St. Jude Med., Inc. (In re St. Jude Med., Inc. Silzone Heart Valve Prods. Liab. Litig.)*, 425 F.3d 1116, 1122 (8th Cir. 2005) (rejecting Rule 23(b)(2) certification where "each plaintiff's need (or lack of need)" for proposed prospective relief was "highly individualized"); *Jefferson v. Ingersoll Int'l Inc.*, 195 F.3d 894, 897–98 (7th Cir. 1999) ("Rule 23(b)(2) is designed for all-or-none cases in which 'final relief of an injunctive nature or of a corresponding declaratory nature, settling the legality of the behavior with respect to the class as a whole, is appropriate.'") (quoting Rule 23(b)(2) advisory committee's note (1966)); *Cholakyan v. Mercedes-Benz USA, LLC*, 281 F.R.D. 534, 559 (C.D. Cal. 2012) (denying 23(b)(2) certification because "no single declaration or injunction" would benefit all members of class that included both current and former vehicle owners).

23(b)(2) contemplates. *Dukes*, 131 S. Ct. at 2557. A resolution that merely establishes a foundation for future, individualized determinations and that gives the defendants the ability to avoid the relief through monetary payments is not "final injunctive relief." *See M.D. v. Perry*, 675 F.3d 832, 847 (5th Cir. 2012); *Jamie S. v. Milwaukee Pub. Sch.*, 668 F.3d 481, 499 (7th Cir. 2012); *Randall v. Rolls-Royce Corp.*, 637 F.3d 818, 826 (7th Cir. 2011); *Kartman v. State Farm Mut. Auto Ins. Co.*, 634 F.3d 883, 892-93 (7th Cir. 2011).

The settlement does not "enjoin" any future conduct or activities of Amex; it simply modifies, by agreement, the terms of commercial relationships. Indeed, the settlement agreement uses "enjoin" only with respect to a court order *against the putative class*, rather than the defendant. Settlement Agreement ¶¶ 44(i), 60(h). That perverse result is not what Rule 23(b)(2) envisions. Merely calling relief provided to a settlement class injunctive relief does not make it so, just as the Supreme Court in *Ortiz* did not accept a "limited fund" created by agreement of the parties to a settlement as sufficient to justify certification of a Rule 23(b)(1)(B) class. *See Ortiz*, 527 U.S. at 864. Because the settlement does not provide "final injunctive relief," this Court should reject certification of a mandatory class under Rule 23(b)(2).

        c.    *The Rule 23(b)(2) Class Should Not Be Certified Because It Resolves Individualized Claims for "Monetary Relief"*

In *Dukes*, the Supreme Court held that claims for "monetary relief" may not be certified under Rule 23(b)(2) and that "claims for individualized relief …do not satisfy the Rule." 131 S. Ct. at 2557. The Court was motivated by due process concerns and a desire to avoid scenarios where "individual class members' compensatory-damages claims would be precluded by litigation they had no power to hold themselves apart from." *Id.* at 2559. That possibility "underscores the need for plaintiffs with individual monetary claims to decide for themselves whether to tie their fates to the class representatives' or go it alone – a choice Rule 23(b)(2) does

21

not ensure that they have." *Id.*; *cf. Ortiz*, 527 U.S. at 842, 844 (suggesting that application of Rule 23(b)(3) protections "avoids serious constitutional concerns raised by mandatory class resolution of individual legal claims, especially where a class seeks to resolve future liability in a settlement-only action"); *Hecht v. United Collection Bur., Inc.*, 691 F.3d 218, 222 (2d Cir. 2012) ("Absent class members have a due process right to notice and an opportunity to opt out of class litigation when the action is 'predominantly' for money damages.").

In this case, the action involves individualized claims for money damages. The antitrust claims asserted against Amex unquestionably sought recovery of money damages, asserting that Amex's anticompetitive conduct was causing the members of the putative class to pay too much for the privilege of accepting Amex cards. *See Marcus* Compl. ¶¶ 47-48, 56-57; *Animal Land* Compl. ¶¶ 48-49. Moreover, the proposed settlement unambiguously seeks to resolve individualized monetary claims, by requiring class members to release claims "for any damages or other monetary relief relating to the period after the Provisions Change Date and continuing to and including the Release Termination Date." Settlement Agreement ¶ 27; *see also id.* ¶ 31. The settlement class therefore cannot be certified under Rule 23(b)(2). *See Dukes*, 131 S. Ct. at 2557; *see also Richardson v. L'Oreal USA, Inc.*, No. 13-508, 2013 U.S. Dist. LEXIS 158599, *32-33 (D.D.C. Nov. 6, 2013).

        d.     *The NRF's Contract with Amex Establishes the Prerequisites for Certifying a Mandatory Class Are Not Met*

The NRF is like any other merchant – it accepts Amex cards in payment for the goods and services that it provides. ███████████████████

███████████████████████

███████████████████████

███████████████████████



The relief provided to the class therefore neither applies equally nor is final injunctive

relief. ███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████ Nothing could be further from the requirement

of *Dukes* that the claims to be certified must be common, indivisible, and not individualized, and

that the relief obtained must apply uniformly and benefit the entire class all at once.

4.    The Rule 23(b)(2) Settlement Class Should Not Be Certified Unless
the Settlement Is Modified To Allow All Class Members To Opt Out

The merchant discount fee practices of Amex have created, and will continue to create,

money damages claims. The NRF and its members have Due Process and Seventh Amendment

rights to decide for themselves whether to resolve those damages claims now, to bring an action

that aims to end or modify such merchant fee practices, or to wait and sue for damages at some

later point. By placing merchants in a putative Rule 23(b)(2) settlement class that does not

conform to the requirements of the Rule, Amex is attempting to deprive merchants of their

constitutional rights – a result that *Dukes* does not permit.

23

Other courts have insisted that Rule 23(b)(2) classes receive opt-out rights in appropriate cases,[11] and this Court similarly should hold that members of the Rule 23(b)(2) class must, at minimum, be given the right to opt out of the proposed settlement.

### B.   The Proposed Settlement Is Not Fair, Reasonable, or Adequate

This Court also "must carefully scrutinize the settlement to ensure its fairness, adequacy and reasonableness" and must review both "the negotiating process leading up to the settlement as well as the settlement's substantive terms." *D'Amato v. Deutsche Bank*, 236 F.3d 78, 85 (2d Cir. 2001). When a settlement is negotiated before class certification, "it is subject to a higher degree of scrutiny in assessing its fairness." *Id.*

Courts in the Second Circuit apply a nine-factor test to determine a settlement's substantive fairness. These factors are: (1) the complexity, expense and likely duration of the litigation, (2) the reaction of the class to the settlement, (3) the stage of the proceedings and the amount of discovery completed, (4) the risks of establishing liability, (5) the risks of establishing damages, (6) the risks of maintaining the class action through trial, (7) the ability of the defendants to withstand a greater judgment, (8) the range of reasonableness of the settlement fund in light of the best possible recovery, and (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation. *Id.* at 86 (citing *Grinnell Corp.*, 495 F.2d at 463) (internal quotation marks omitted)). Those factors weigh against approval of the proposed settlement in this case.

---

[11] *See McReynolds v. Richards-Cantave*, 588 F.3d 790, 800 (2d Cir. 2009) ("The right of a class member to opt-out in Rule 23(b)(1) and (b)(2) actions is not obvious on the face of the rule; however, the language of Rule 23 is sufficiently flexible to afford district courts discretion to grant opt-out rights in (b)(1) and (b)(2) class actions." (internal quotation marks omitted)); *see also Johnson v. Meriter Health Serv. Emp. Ret. Plan*, 702 F.3d 364, 370-71 (7th Cir. 2012); *Jefferson*, 195 F.3d at 898; *Eubanks v. Billington*, 110 F.3d 87, 93 (D.C. Cir. 1997); *Holmes v. Cont'l Can Co.*, 706 F.2d 1144, 1152, 1159 (11th Cir. 1983).

24

Notably, Class Plaintiffs ignore the last three *Grinnell* factors, arguing that only factors one through six apply in a 23(b)(2) class. *See* Class Pls.' Mem. at 18-19 (quoting *Joel A. v. Giuliani*, 218 F.3d 132, 138 (2d Cir. 2000)).[12] By doing so, Class Plaintiffs conveniently strip from the analysis any determination of whether the relief being obtained on behalf of the class is adequate, particularly when balanced against the scope of the release being mandated.

To be sure, Class Plaintiffs emphasize the complexity and expense of this case and the risks involved in pursuing this case as a class action, in view of the arbitration provisions and the Supreme Court holding in *Italian Colors*. *See* Class Pls.' Mem. at 21-26. Many of those risks flow directly from Class Plaintiffs' interests in avoiding the ADR provisions of their contracts and seeking a class-wide resolution. Such risks are not pertinent to those members of the class who want to enforce those ADR provisions or want to pursue any claims they may have individually, rather than on class-wide basis. Class Plaintiffs should not be permitted to use claimed litigation risks that are directly related to their particular interests as grounds for approving a settlement that directly impairs the interests of members of the putative class.

Indeed, the fact that the proposed settlement was reached when the claims of the Class Plaintiffs were hanging by a thread due to the arbitration and anti-class resolution clauses of their agreements with Amex should cause this Court to be more skeptical, rather than less, of the fairness, reasonableness, and adequacy of the settlement. With Class Plaintiffs confronting the likelihood of an impending, adverse ruling on their remaining claims, they had no incentive or leverage to hold firm for a better settlement. Instead, all of the normal settlement dynamics impelled them to salvage the class action by obtaining what meager "relief" they could, even if it

---

[12] In reality, the Court in *Joel A.* expressly addressed the relief being gained by the settlement and the scope of the release being provided. *See* 218 F.3d at 141-42.

meant bargaining away the contract and due process rights of absent class members who want to preserve and vindicate the ADR provisions in their agreements with Amex.

The *Grinnell* factors that consider the stage of proceedings and the amount of discovery that had been conducted also do not weigh in favor of the settlement. Although the actions have been pending for years, the *Anti-Steering Rules* litigation has focused on the arbitration issue, and for significant periods discovery was stayed while the arbitration issue was resolved.

The ability of Amex to withstand a greater judgment also weighs in favor of rejecting the Rule 23(b)(2) settlement. The surcharging scheme does not enjoin, impair, or impede the ability of Amex to set merchant fees or force Amex to compete with Visa and MasterCard over merchant acceptance costs. To the contrary, it would *reduce* competition between Amex, Visa, and MasterCard by requiring that Amex cards be surcharged at the same rate as Visa and MasterCard credit cards. Moreover, rather than affect Amex's practices or fees, the Rule 23(b)(2) settlement would merely allow merchants to attempt to shift a portion of Amex card acceptance fees to consumers. Amex could withstand a greater judgment because the surcharging scheme in the settlement is akin to no judgment against Amex at all.

The right to surcharge set forth in the proposed settlement also is limited in ways as to reduce its value to almost nothing. Because merchants may only surcharge Amex cards if they also surcharge all other credit cards that they accept, Settlement Agreement ¶ 13(b), many merchants will be unable to surcharge due to their other obligations and commercial interests. Of course, millions of other merchants will be barred from surcharging by state law. Class Plaintiffs blithely forecast that such laws will be struck down on constitutional grounds, Class Pls.' Mem. at 27-28, but it is undisputed that the anti-surcharging statutes remain on the books and enforceable. Class Plaintiffs may casually assume that the laws will disappear, but

merchants who may need to respond to consumer lawsuits or enforcement actions based on those laws do not have that luxury.

Class Plaintiffs also argue that there are "strong reasons" to "expect widespread adopting of surcharging." Class Pls.' Mem. at 28. They base this conclusion primarily on the results of a "survey" conducted by the Olinger Group. That survey, however, is fatally flawed and unreliable, and its results cannot be given any weight by this Court.[13] Indeed, Class counsel admits that the "surcharging solutions" presented to the participants in that survey *do not yet exist*. *See* Class Pls.' Mem. at 5; Decl. of Scott Levy ¶¶ 3-6, Apr. 15, 2014, ECF No. 366. This Court should not approve a settlement based on counsel's bald assurance that such solutions "are almost at hand" and that "it is reasonable to expect that entrepreneurial service providers in the marketplace will be distributing marketing materials that look a lot like the Olinger video." Class Pls.' Mem. at 5. Class members who are being forced to broadly release concrete claims of anti-competitive conduct should not have to rely on speculation and conjecture – especially when the proposed settlement itself creates notice and posting obligations that inevitably will impose real costs on any merchants that attempt to surcharge. *See* Settlement Agreement ¶ 13(b).

Class Plaintiffs also seek to "prove" that surcharging will be valuable by pointing to the experience of merchants and credit card companies in Australia. *See* Class Pls.' Mem. at 5-6, 28. That apples-to-oranges comparison fails because the underlying landscape of credit card use,

---

[13] For example, the video that was viewed before the participants' completed the survey was materially misleading. It indicated that the implementation of surcharging would be at no cost to the merchant and failed to mention the upfront costs that merchants would have to incur to comply with the rules and regulations governing surcharging, such as the requirement of signage. It also indicated that the merchant can recover the entire fee paid in connection with a credit card purchase, even though merchants will actually be limited to surcharging the Amex cards at the lowest amount they can surcharge other credit cards, even if that means they will not be able to surcharge the entire cost of acceptance of an Amex card.

interchange fees, and surcharging in Australia was entirely different from the situation here. There, the Reserve Bank of Australia had already capped interchange fees for Visa and MasterCard credit cards at a low rate. Merchants were then permitted to surcharge Amex cards – in what is known as differential surcharging – in an attempt to drive customers away from use of Amex cards and to use of Visa or MasterCard cards. Here, on the other hand, Amex cards can be surcharged only if Visa and MasterCard credit cards are surcharged as well *and* only if Amex is surcharged at the same rate as Visa and/or MasterCard. Thus the surcharging system envisioned in this proposed settlement not only will not increase competition between Amex and Visa and MasterCard over merchant costs, it will *destroy* such competition.[14]

Finally, the broad release and covenant not to sue as to injunctive claims and future damages claims imposed by the Rule 23(b)(2) settlement on class members are indefensible. The Supreme Court has cautioned against subverting "the public interest in vigilant enforcement of the antitrust laws," indicating that to "in effect confer [on the defendants] a partial immunity from civil liability for future [antitrust] violations . . . is consistent with neither the antitrust laws nor the doctrine of res judicata." *Lawlor v. Nat'l Screen Serv. Corp.*, 349 U.S. 322, 329 (1955). Accordingly, courts in this circuit and elsewhere have recognized that releases of future antitrust claims are void as a matter of public policy. *See In re Am. Express Merchants' Litig.*, 554 F.3d 300, 319 (2d Cir. 2009) ("[A]n agreement which in practice acts as a waiver of future liability

---

[14] Class plaintiffs' argument that the surcharging scheme will permit merchants to steer customers to use debit cards or cash when making their purchases, Class Pls.' Mem. at 31, fails because credit cards and debit cards are different products in different markets. There is simply no evidence that surcharging all credit cards will necessarily cause consumers to switch to debit or cash. The estimates of the value of surcharging provided by Alan Frankel, Class Pls.' Mem. at 7, also must be disregarded. Professor Frankel does not break out the purported savings to merchants from the surcharging of *Amex* cards; instead, his estimates are based on total credit card transaction volume in the United States. *Id.* at 6. Presumably this is because the Proposed Settlement does not permit merchants to surcharge Amex alone or differentially from other credit cards.

under the federal antitrust statutes is void as a matter of public policy."), *cert. granted and vacated on other grounds*, 130 S. Ct. 2401 (2010), *adhered to on remand*, 667 F.3d 204 (2d Cir. 2012), *cert. granted*, 133 S. Ct. 594 (2012); *Schwartz v. Dallas Cowboys Football Club, Ltd.*, 157 F. Supp. 2d 561, 578 (E.D. Pa. 2001) ("Because public policy prohibits a release from waiving claims for future violations of antitrust laws, and given that under the proposed release class members would be releasing unlitigated future claims, the releases are too broad.").

Further, the settlement would release claims arising from virtually any rule Amex has promulgated or may in the future promulgate. Settlement Agreement ¶ 30. The release therefore is woefully overbroad and entirely improper because it purports to address claims that were not raised in this case[15] and to release future claims based on Amex's future conduct.[16]

---

[15] *See Bond v. Ferguson Enters, Inc.*, No. 1:09-cv-01662, 2011 U.S. Dist. LEXIS 6976, at *19– 20 (E.D. Cal. Jan. 24, 2011) (finding release of "all claims . . . that were or could have been asserted in the Lawsuit based upon the facts alleged therein . . . arising out of any act, omission, transaction, or event that occurred or is alleged to have occurred up to the date of this Agreement" overbroad because it released claims unrelated to those in original action); *Karvaly v. eBay, Inc.*, 245 F.R.D. 71, 88 (E.D.N.Y. 2007) (criticizing release that "would constitute a waiver of claims completely unrelated to this action that could be brought under any of the statutes or common-law theories" alleged in complaint and noting that release "purports to strip millions of individuals of their rights to sue the defendants upon a wide range of offenses that have nothing to do with the misconduct alleged in the present action, for no more consideration than PayPal's agreement to make certain superficial changes to its website"); *Reade-Alvarez v. Eltman, Eltman, & Cooper, P.C.*, No. CV-04-2195, 2006 U.S. Dist. LEXIS 89226, at *33-36 (E.D.N.Y. Dec. 11, 2006) (ordering modification of release purporting to waive "'all claims . . . or liabilities of any kind whatsoever in law or in equity, arising out of agreement or imposed by federal or state statute, common law or otherwise, from the beginning of time to the date this Agreement is signed" to include only "claims involving 'identical factual predicate'"); *Schwartz*, 157 F. Supp. 2d at 566-67, 578 (declining to approve settlement of antitrust challenge asserting that NFL unlawfully "bundled" its satellite package in which NFL would offer, for one year, "Single Sunday Ticket" package that reduced bundling on satellite TV in exchange for class's release of all current and future claims related to NFL broadcasting – including bundling claims related to cable TV and the internet – for as long as defendants continued to offer the "unbundled" satellite package, and concluding that the broad release language permitted defendants to continue expanding most of their alleged bundling activities with impunity).
[16] *See Anderson v. Beland (In re Am. Express Fin. Advisors Secs. Litig.)*, 672 F.3d 113, 138 (2d Cir. 2011) (addressing scope of earlier classwide release and concluding that, "to the extent that

## C.      Notice Was Inadequate To Inform Absent Putative Class Members

Finally, the proposed settlement cannot be approved because the notice provided by Class

Plaintiffs and Amex to absent class members was inadequate.  Due process requires that absent

putative class members be given meaningful notice about the terms of the proposed settlement,

including the rights they are being forced to surrender.  The right to object to a settlement is

meaningless if the notice does not advise class members that their rights will be impaired and, as

a result, does not allow them to protect their interests.[17]

In this case, the notice failed to inform absent class members that the proposed settlement

agreement may strip them of their contractual ADR rights, whether they wish to exercise those

rights or not. 

It is no accident that the notice was silent on this important

---

[the claims] involve conduct occurring after the Class Period, [they] cannot be Released
Claims"); *Authors Guild v. Google Inc.*, 770 F. Supp. 2d 666, 677 (S.D.N.Y. 2011) (concluding
that release "from liability for certain future acts" amounted to no more than "an attempt to use
the class action mechanism to implement forward-looking business arrangements that go far
beyond the dispute before the Court in this litigation"); *Schwartz*, 157 F. Supp. 2d at 578
(declining to certify release that would not only bar past claims – which the court recognized as a
permissible use of settlement releases – but also claims based on defendant's future conduct);
*Shults v. Champion Int'l Corp.*, 821 F. Supp. 520, 524 (E.D. Tenn. 1993) ("No settlement that
precludes future, unknown causes of action can be considered fair, reasonable, or in the best
interests of the class as a whole.").

[17] *See Vassalle v. Midland Funding, LLC*, 708 F.3d 747, 759, 759 n.2 (6th Cir. 2013) (notice did
not inform class members of release's effect on related lawsuits and failed to identify "principal
ground" on which class member might object to settlement; right to opt out is "illusory" when
notice failed to inform class members "of their most significant ground of objection"); *Twigg v.
Sears, Roebuck & Co.*, 153 F.3d 1222, 1229 (11th Cir. 1998) (no claim preclusion because notice
insufficient to inform plaintiff that claims akin to his were part of class claims); *Nat'l Super
Spuds v. N.Y. Mercantile Exch.*, 660 F.2d 9, 16 (2d Cir. 1981) (lack of objection "means even
less when, as here, the notice of settlement did not adequately apprise class members who also
held claims in respect of unliquidated contracts that these too were being placed on the block
although those class members were to receive nothing in return").  The notice "must 'fairly
apprise the prospective members of the class of the terms of the proposed settlement and of the
options that are open to them in connection with the proceedings.'" *Wal-Mart Stores, Inc. v.
Visa*, 396 F.3d 96, 114 (2d Cir. 2005) (quotations omitted).

30

issue. Moreover, the notice failed to explain that absent class members would be releasing all claims for future damages. *See* Settlement Agreement ¶ 27.

## IV.    CONCLUSION

The NRF strongly objects to the proposed settlement, which strips it of its contractual rights in violation of the Rules Enabling Act, requires certification of a class that does not comply with the criteria of Rule 23(a) and represents an improper use of Rule 23(b)(2), robs merchants of their due process rights and Seventh Amendment right to a jury trial, and is not fair, reasonable, or adequate. This Court therefore should reject the proposed settlement.

DATED:  May 21, 2014

CLARICK GUERON REISBAUM LLP

By:  *Gregory A. Clarick*

Gregory A. Clarick, gclarick@cgr-law.com
Nicole Gueron, ngueron@cgr-law.com
Isaac Zaur, izaur@cgr-law.com
40 West 25th Street
New York, New York 10010
(212) 633-4310

VORYS, SATER, SEYMOUR AND PEASE LLP

Michael J. Canter (application for admission
    *pro hac vice* pending)
    mjcanter@vorys.com
Robert N. Webner (application for
    admission *pro hac vice* pending)
    rnwebner@vorys.com
Alycia N. Broz (application for admission
    *pro hac vice* pending)
    anbroz@vorys.com
52 East Gay Street
Columbus, Ohio 43215
(614) 464-6400

*Attorneys for Objector National Retail Federation*

31