**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE AMERICAN EXPRESS ANTI-STEERING RULES ANTITRUST LITIGATION (II) | No. 11-md-2221 (NGG) (RER) |

---

## OBJECTION OF THE BUCKEYE INSTITUTE FOR PUBLIC POLICY SOLUTIONS TO AMERICAN EXPRESS CLASS ACTION SETTLEMENT

---

Adam E. Schulman (*pro hac vice*)
CENTER FOR CLASS ACTION FAIRNESS
1718 M Street NW, No. 236
Washington, DC 20036
Phone: (610) 457-0856
Email: shuyande24@gmail.com

*Attorney for Objector The Buckeye Institute for Public Policy Solutions*

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................ I

TABLE OF AUTHORITIES ...................................................................................... II

INTRODUCTION ........................................................................................................ 1

I.    Objector Buckeye Institute for Public Policy Solutions is a member of the class, and
      Intends to Appear Through Counsel at the Fairness Hearing. ................................... 2

II.   A mandatory 23(b)(2) certification is impermissible. ............................................... 4

      A.    This class cannot be certified under (b)(2) because of the monetary components at
            stake. ................................................................................................................ 6

            1.    Monetary claims predominate from the perspective of the cause of action
                  alleged by the class. ................................................................................ 7

            2.    Monetary claims predominate from the perspective of the release. ................... 10

            3.    Predominance is not a matter of class counsel's subjective preferences; they
                  cannot circumvent (b)(2)'s strictures by settling for injunctive relief ............... 12

III.  The temporally unbounded class definition violates Fed. R. Civ. P. 23(e)(1), (e)(5), and
      the requirement of ascertainability. ......................................................................... 13

IV.   Even if the class is certifiable, this settlement is not fair. ........................................ 16

      A.    The conjunction of attorneys' fees and no monetary relief for class members
            signals an unfair, lawyer-driven settlement. ......................................................... 19

      B.    The settlement includes an impermissible waiver of claims that accrue after final
            approval. ............................................................................................................ 25

V.    Awarding plaintiffs' counsel the $75 million they request would constitute an abuse of
      discretion. .............................................................................................................. 28

CONCLUSION ............................................................................................................ 33

# TABLE OF AUTHORITIES

**Cases**

*Aho v. Americredit Fin. Servs.*,
   No. 10-cv-1373, 2011 WL 3047677, 2011 U.S. Dist. LEXIS 80426 (S.D Cal. Jul.
   25, 2011) ........................................................................................................11

*Alaniz v. Saginaw County*,
   No. 05-10323, 2009 U.S. Dist. LEXIS 43340 (E.D. Mich. May 21, 2009) ...................... 15

*Allison v. Citgo Petroleum Corp.*,
   151 F.3d 402 (5th Cir. 1998)..............................................................................6

*Amchem Prods. Inc. v. Windsor*,
   521 U.S. 591 (1997)................................................................... 4, 10, 15, 16, 27-28

*Ansoumana v. Gristede's Operating Corp.*,
   201 F.R.D. 81 (S.D.N.Y. 2001) ....................................................................... 15

*Authors Guild v. Google Inc.*,
   770 F. Supp. 2d 666 (S.D.N.Y. 2011).................................................................27

*Bacon v. Honda of Am. Mfg., Inc.*,
   205 F.R.D. 466 (S.D. Ohio 2001) ......................................................................13

*Blessing v. Sirius XM Radio Inc.*,
   2011 WL 1194707, 2011 U.S. Dist. LEXIS 32791 (S.D.N.Y. Mar. 29, 2011) ............. 9-10

*Bolin v. Sears Roebuck & Co.*,
   231 F.3d 970 (5th Cir. 2000)......................................................................9, 12, 13

*Calderon v. Ashmus*,
   523 U.S. 740 (1998)......................................................................................27

*Cargill, Inc v. Monfort of Colorado, Inc.*,
   479 U.S. 104 (1986) ......................................................................................8

*Cassese v. Williams*,
   503 Fed. Appx. 55 (2d Cir. 2012) ....................................................................30

*Central States SE & SW Areas Health & Welfare Fund v.*
   *Merck-Medco Managed Care, LLC*,
   504 F.3d 229 (2d Cir. 2007)............................................................................16

*Checker Motors Corp. v. Chrysler Corp.*,
   405 F.2d 319 (2d Cir. 1969)..............................................................................9

*Chemical Bank v. Haseotes*,
   13 F.3d 569 (2d Cir. 1994) ................................................................9

*Christ v. Beneficial Corp.*,
   547 F.3d 1292 (11th Cir. 2008) .........................................................9

*City of Pontiac Gen. Emples. Ret. Sys. v. Lockheed Martin Corp.*,
   954 F. Supp. 2d 276 (S.D.N.Y. 2013) ...............................................31

*Coffman v. Breeze Corp.*,
   323 U.S. 316 (1945) .........................................................................27

*Creative Montessori Learning Ctrs. v. Ashford Gear LLC*,
   662 F.3d 913 (7th Cir. 2011) ...........................................................25

*Cruz v. Dollar Tree Stores, Inc.*,
   No. 07-2050, 2009 U.S. Dist. LEXIS 62817 (N.D. Cal. Jul. 2, 2009) ............................. 15

*D'Amato v. Deutsche Bank*,
   236 F.3d 78 (2d Cir. 2001) ......................................................... 7, 17

*Denney v. Deutsche Bank AG*,
   443 F.3d 253 (2d Cir. 2006) .............................................................17

*Dennis v. Kellogg Co.*,
   697 F.3d 858 (9th Cir. 2012) ...........................................................17

*Detroit v. Grinnell Corp.*,
   495 F.2d 448 (2d Cir. 1974) (*Grinnell I*) ............................... 17, 32-33

*Detroit v. Grinnell Corp.*,
   560 F.2d 1093 (2d Cir. 1977) (*Grinnell II*) ......................................28

*Drug Mart Pharmacy Corp. v. Am. Home Prods. Corp.*,
   2007 U.S. Dist. LEXIS 93493 (E.D.N.Y. Dec. 20, 2007) .....................8

*Eisen v. Carlisle & Jacquelin*,
   391 F.2d 555 (2d Cir. 1968) .............................................................10

*Ellis v. Costco Wholesale Corp.*,
   657 F.3d 970 (9th Cir. 2011) ...........................................................13

*Eubank v. Pella Corp.*,
   __F.3d__, 2014 U.S. App. LEXIS 10332 (7th Cir. Jun. 2, 2014) ...............................18, 24

*Felix v. Northstar Location Servs.*,
   290 F.R.D. 397 (W.D.N.Y. 2013) .....................................................30

*Goldberger v. Integrated Res.*,
    209 F.3d 43 (2d Cir. 2000) ................................................................................... 29-30

*Gulf Oil Co. v. Bernard*,
    452 U.S. 89 (1981) ................................................................................................ 15

*Gunnells v. Healthplan Servs.*,
    348 F.3d 417 (4th Cir. 2003) .................................................................................. 5

*Hecht v. United Collection Bureau*,
    691 F.3d 218 (2d Cir. 2012) ................................................................... 5, 7, 12, 13

*Hensley v. Eckerhart*,
    461 U.S. 424 (1983) ............................................................................................. 31

*Hubbard v. Donahoe*,
    958 F. Supp. 2d 116 (D.D.C. 2013) ...................................................................... 31

*In re Agent Orange Prods. Liab. Litig.*,
    611 F. Supp. 1296 (E.D.N.Y. 1985) ..................................................................... 31

*In re Agent Orange Prods. Liab. Litig.*,
    818 F.2d 216 (2d Cir. 1987) .................................................................................. 19

*In re Am. Express Fin. Advisors Secs. Litig.*,
    672 F.3d 113 (2d Cir. 2011) .................................................................................. 25

*In re Baby Prods. Antitrust Litig.*,
    708 F.3d 163 (3d Cir. 2013) .................................................................................. 17

*In re Bluetooth Headset Prods. Liab. Litig.*,
    654 F.3d 935 (9th Cir. 2011) ........................................................ 17, 18, 20, 23, 25, 29

*In re Citigroup Inc. Secs. Litig.*,
    965 F. Supp. 2d 369 (S.D.N.Y. 2013) ............................................................. 20, 31

*In re Classmates.com Consolidated Litig.*,
    No. 09-cv-0045-RAJ, 2012 U.S. Dist. LEXIS 83480 (W.D. Wash. Jun. 15, 2012) ............ 3

*In re Cmty. Bank of N. Va. & Guar. Nat'l Bank of Tallahassee Second Mortg. Litig.*,
    418 F.3d 277 (3d Cir. 2005) .................................................................................. 24

*In re Dry Max Pampers Litig.*,
    724 F.3d 713 (6th Cir. 2013) ..................................................................... *passim*

*In re Excess Value Ins. Coverage Litig.*,
    598 F. Supp. 2d 380 (S.D.N.Y. 2005) ............................................................. 23, 29

*In re Fosamax Prods. Liab. Litig.*,
248 F.R.D. 389 (S.D.N.Y. 2008) ......................................................................14

*In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*,
55 F.3d 768 (3d Cir. 1995).......................................................... 6-7, 20, 23, 28

*In re Katrina Canal Breaches Litig.*,
628 F.3d 185 (5th Cir. 2010)....................................................................17, 20

*In re Literary Works in Elec. Databases Copyright Litig.*,
654 F.3d 242 (2d Cir. 2011)................................................................... 4-5, 17

*In re LivingSocial Mktg. & Sales Practices Litig.*,
MDL No. 2254, 2013 WL 1181489, 2013 U.S. Dist. LEXIS 40059 (D.D.C. Mar.
22, 2013) .........................................................................................................23

*In re Magazine Antitrust Litig.*,
00 Civ. 4889 (RCC), 2004 WL 254425, 2004 U.S. Dist. LEXIS 1845 (S.D.N.Y.
Feb. 5, 2004) ...................................................................................................29

*In re Mercury Interactive Corp. Secs. Litig.*,
618 F.3d 988 (9th Cir. 2010)..........................................................................30

*In re Monumental Life Ins. Co.*,
365 F.3d 408 (5th Cir. 2004)...........................................................................13

*In re Nexium (Esomeprazole) Antitrust Litig.*,
297 F.R.D. 168 (D. Mass. 2013) .......................................................................9

*In re Oracle Secs. Litig.*,
132 F.R.D. 538 (N.D. Cal. 1990) ....................................................................23

*In re Payment Card Interchange Fee & Merchant Discount Antitrust Litig.*,
2013 U.S. Dist. LEXIS 179340 (E.D.N.Y. Dec. 13, 2013)........................12, 26

*In re Rezulin Prods. Liab. Litig.*,
210 F.R.D. 61 (S.D.N.Y. 2002) .........................................................................7

*In re Telectronics Pacing Sys. Inc.*,
221 F.3d 870 (6th Cir. 2000)...........................................................................13

*In re Wachovia Preferred Sec. & Bond/Notes Litig.*,
2011 U.S. Dist. LEXIS 155622 (S.D.N.Y. Dec. 30, 2011) .............................. 20

*In re Wal-Mart Stores, Inc.*,
  No. 06-02069, 2008 WL 1990806, 2008 U.S. Dist. LEXIS 109446 (N.D. Cal.
  May 2, 2008) ........................................................................................................ 14-15

*Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.*,
  596 F.2d 70 (2d Cir. 1979) ...................................................................................9

*Janes v. Triborough Bridge & Tunnel Auth.*,
  No. 06 Civ 1427, 2011 U.S. Dist. LEXIS 115831 (S.D.N.Y. Oct. 4, 2011) ....................11

*Kakani v. Oracle Corp.*,
  No. C 06-06493 WHA, 2007 WL 179377, 2007 U.S. Dist. LEXIS 47515 (N.D.
  Cal. Jun. 19, 2007) .............................................................................................18

*Kartman v. State Farm Mut. Auto. Ins. Co.*,
  634 F.3d 883 (7th Cir. 2011) ...............................................................................9

*Kottaras v. Whole Foods Mkt., Inc.*,
  281 F.R.D. 16 (D.D.C. 2012) ...............................................................................9

*Lacovara v. Hard Rock Cafe Int'l (USA), Inc.*,
  No. 10 Civ 7821, 2012 U.S. Dist. LEXIS 24023 (S.D.N.Y. Feb. 24, 2012) ....................30

*Langbecker v. Elec. Data Sys. Corp.*,
  476 F.3d 299 (5th Cir. 2007) ...............................................................................26

*Marcus v. BMW of N. Am., LLC*,
  687 F.3d 583 (3d Cir. 2012) ...............................................................................14

*Masters v. Wilhelmina Model Agency, Inc.*,
  473 F.3d 423 (2d Cir. 2007) .................................................................................8

*Mba v. World Airways*,
  369 Fed. Appx. 194 (2d Cir. 2010) (unpublished) ............................................28

*McDaniel v. County of Schenectady*,
  595 F.3d 411 (2d Cir. 2010) ...............................................................................32

*Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth*,
  473 U.S. 614 (1985) ...........................................................................................8

*Morrow v. Washington*,
  277 F.R.D. 172 (E.D. Tex. 2011) ...................................................................... 11

*Mueller v. CBS, Inc.*,
  200 F.R.D. 227 (W.D. Pa. 2001) ...................................................................... 14

---

*Mullane v. Central Hanover Bank & Trust Co.*,
339 U.S. 306 (1950) ................................................................................................. 15

*N.Y. State Ass'n for Retarded Children, Inc. v. Carey*,
711 F.2d 1136 (2d Cir. 1983) ............................................................................. 29-30

*Ortiz v. Fibreboard Corp.*,
527 U.S. 815 (1999) .............................................................................................10, 12

*Padro v. Astrue*,
11-cv-1788 (CBA) (RLM), 2013 U.S. Dist. LEXIS 150494 (E.D.N.Y. Oct. 17,
2013) ....................................................................................................................29

*Phillips Petroleum Co. v. Shutts*,
472 U.S. 797 (1985) ...............................................................................................12

*Plummer v. Chemical Bank*,
668 F.2d 654 (2d Cir. 1982) ....................................................................................4

*Postier v. Louisiana-Pacific Corp.*,
No. 09-cv-03290-JCS, 2014 U.S. Dist. LEXIS 33611 (N.D. Cal. Mar. 13, 2014) ...........30

*Precision Assocs. v. Panalpina World Transp., Ltd.*,
2013 WL 4525323 (E.D.N.Y. Aug. 27, 2013) ............................................................. 20

*Randall v. Rolls-Royce Corp.*,
637 F.3d 818 (7th Cir. 2011) ...................................................................................11

*Reiter v. Sonotone Corp.*,
442 U.S. 330 (1979) ................................................................................................8

*Reynolds v. Benefit Nat'l Bank*,
288 F.3d 277 (7th Cir. 2002) ...................................................................................30

*Richardson v. L'Oreal USA, Inc.*,
__ F. Supp. 2d __, 2013 WL 5941486 (D.D.C. Nov. 6, 2013) ...................3, 10, 12, 19, 20

*Robinson v. Metro-North Commuter R.R. Co.*,
267 F.3d 147 (2d Cir. 2001) ...................................................................................13

*Rodriguez v. Nat'l City Bank*,
726 F.3d 372 (3d Cir. 2013) .....................................................................................5

*Rouse v. Caruso*,
No. 2:06-cv-10961, 2013 U.S. Dist. LEXIS 19946 (E.D. Mich. Jan. 7, 2013)................12

*Saur v. Snappy Apple Farms*,
203 F.R.D. 281 (W.D. Mich. 2001) ............................................................. 14

*Schwartz v. Dallas Cowboys Football Club, Ltd.*,
157 F. Supp. 2d 561 (E.D. Pa. 2001) ...........................................................26

*SCM Corp. v. Xerox Corp.*,
507 F.2d 358 (2d Cir. 1974)............................................................................9

*Scott v. City of New York*,
626 F.3d 130 (2d Cir. 2010)..........................................................................30

*Sobel v. Hertz Corp.*,
No. 3:06-cv-00545-LRH-RAM, 2011 U.S. Dist. LEXIS 68984 (D. Nev. Jun. 27,
2011) .......................................................................................................24, 32

*Staton v. Boeing Co.*,
327 F.3d 938 (9th Cir. 2003).................................................................. 19, 23

*Stephenson v. Dow Chem. Co.*,
273 F.3d 249 (2d Cir. 2001) ...................................................................... 15

*Strong v. BellSouth Telecomms., Inc.*,
137 F.3d 844 (5th Cir. 1998)........................................................................28

*TBK Partners, Ltd. v. Western Union Corp.*,
675 F.2d 456 (2d Cir. 1982)..........................................................................26

*Thorn v. Jefferson-Pilot Life Ins. Co.*,
445 F.3d 311 (4th Cir. 2006)........................................................................11

*Trollinger v. Tyson Foods, Inc.*,
No. 4:02-cv-23, 2007 U.S. Dist. LEXIS 88866 (E.D. Tenn. Dec. 3, 2007)..................... 15

*Vassalle v. Midland Funding LLC*,
708 F.3d 746 (6th Cir. 2013)........................................................................17

*Wal-Mart Stores, Inc. v. Dukes*,
131 S. Ct. 2541 (2011) ......................................................4, 5, 6, 10, 11, 12, 13

*Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*,
396 F.3d 96 (2d Cir. 2005)......................................................................26, 32

*Weinberger v. Great Northern Nekoosa Corp.*,
925 F.2d 518 (1st Cir. 1991) .......................................................................24

*Weiner v. Snapple Beverage Co.*,
  No. 07-cv-8742, 2010 WL 3119452 (S.D.N.Y. Aug. 5, 2010) .........................................14

*Wike v. Vertrue, Inc.*,
  2010 WL 3719524, 2010 U.S. Dist. LEXIS 96700 (M.D. Tenn. Sept. 15, 2010) ........... 15

*Zimmerman v. Portfolio Recovery Assocs., LLC*,
  2013 U.S. Dist. LEXIS 174182 (S.D.N.Y. Dec. 11, 2013) ........................................ 31-32

---

## Rules and Statutes

15 U.S.C. § 1 .............................................................................................................8

15 U.S.C. § 4 .............................................................................................................8

15 U.S.C. § 26 .........................................................................................................8, 9

Fed. R. Civ. P. 23 ............................................................................................ *passim*

Fed. R. Civ. P. 23(a)(4).............................................................................................25

Fed. R. Civ. P. 23(b)(2)...................................................................................... *passim*

Fed. R. Civ. P. 23(b)(3).........................................................................................5, 10

Fed. R. Civ. P. 23(e) ......................................................................................... *passim*

Fed. R. Civ. P. 23(e)(1)......................................................................................... 13-16

Fed. R. Civ. P. 23(e)(2)............................................................................................. 16

Fed. R. Civ. P. 23(e)(5)......................................................................................... 13-16

Fed. R. Civ. P. 23(g)(4)............................................................................................. 25

Fed. R. Civ. P. 23(h) ...........................................................................................28, 30

## Other Authorities

2 Newberg on Class Actions,
  § 8.04...................................................................................................................14

7 B Charles Alan Wright et al.,
  Federal Practice and Procedure § 1787 (2d ed. 1986) .............................................14

AMERICAN LAW INSTITUTE,
    PRINCIPLES OF THE LAW OF AGGREGATE LITIG. § 3.05(c) (2010)......................16

Brickman, Lester,
    LAWYER BARONS (2011) .................................................................29

Brunet, Edward,
    *Class Action Objectors: Extortionist Free Riders or Fairness Guarantors*, 2003
    U. CHI. LEGAL F. 403 (2003) ..........................................................3

Burch, Elizabeth Chamblee,
    *Optimal Lead Plaintiffs*, 64 VAND. L. REV. 1109 (2011).................................13

Ching, Andrew T. & Fumiko Hayashi,
    *Payment Card Rewards and Consumer Payment Choice*, 34 J. BANKING & FIN.
    1773 (2010) .............................................................................22

Coben, James Richard,
    *Creating a 21st Century Oligarchy: Judicial Abdication to Class Action
    Mediators*, 5 PENN ST. Y.B. ARB. & MEDIATION 162 (2013) ...........................18

Elhauge, Einer,
    *Disgorgement as an Antitrust Remedy*, 76 ANTITRUST L. J. 79 (2009) ...............11

Federal Judicial Center,
    MANUAL FOR COMPLEX LITIGATION § 21.222 (4th ed. 2004) ..........................14

Federal Judicial Center,
    MANUAL FOR COMPLEX LITIGATION § 21.612 (4th ed. 2004) ..........................7

Fitzpatrick, Brian T.,
    *The End of Objector Blackmail?*, 62 Vand. L. Rev. 1623 (2009)......................4

Grimmelmann, James
    *Future Conduct and the Limits of Class Action Settlements*, 91 N.C. L. REV. 387
    (2013) ...........................................................................25, 26-27

Isaacharoff, Samuel,
    *Class Action Conflicts*, 30 U.C. DAVIS L. REV. 805 (1997) .............................15

Isaacharoff, Samuel,
    *Preclusion, Due Process, and the Right to Opt Out of Class Action*, 77 NOTRE
    DAME L. REV. 1057 (2002).........................................................6, 10

Karlsgodt, Paul & Raj Chohan,
    *Class Action Settlement Objectors: Minor Nuisance or Serious Threat to*

  *Approval*, BNA: Class Action Litig. Report (Aug. 12, 2011)...............................................3

Kacyznski, Elizabeth R.,
  *The Inclusion of Future Members in Rule 23(b)(2) Class Actions*, 85 COLUM L.
  REV. 397 (1985) ......................................................................................15

Lahav, Alexandra D.,
  *Symmetry and Class Action Litigation*, 60 UCLA L. REV. 1494 (2013) ...........................3

Liptak, Adam,
  *When Lawyers Cut Their Clients Out of the Deal*, N.Y. TIMES (Aug. 13, 2013)................3

Mullenix, Linda,
  *No Exit: Mandatory Class Actions in the New Millennium and the Blurring of
  Categorical Imperatives*, 2003 U. CHI. LEGAL F. 177 (2003) ...........................................13

NEWBERG ON CLASS ACTIONS (4th ed. 2002),
  § 12:15.......................................................................................................26

Report of Alan Sykes, No. 05-md-01720, Dkt. 5965 (E.D.N.Y. Aug. 28, 2013)................... 21-22

Semeraro, Steven,
  *Settlement Without Consent: Assessing the Credit Card Merchant Fee Class
  Action*, __COLUM BUS. L. J.__ (forthcoming 2014), *available at*
  http://ssrn.com/abstract=2427467 .................................................................. 21-22, 23, 28

Silver, Charles,
  *Due Process and the Lodestar Method*, 74 TUL. L. REV. 1809 (2000).......................29, 32

Wolfman, Brian & Alan B. Morrison, *What the* Shutts *Opt-Out Right Is and What It
  Ought to Be,* 74 UMKC L. REV. 729 (2006)...................................................................13

# INTRODUCTION

The problem with this settlement lies as much in its conception as in its execution. Class counsel has operated as if its role is that of a intermediary brought in to broker a mandatory prospective business arrangement between absent class members and the defendant. American Express ("Amex") , in turn, stands to obtain a judicial decree affording it immunity from future liabilities against to-be-determined individuals, for acts committed at to-be-determined times, at to-be-determined locations, and by to-be-determined means.

This is not how the class action device is supposed to function. In fact, it is not how any Article III proceedings function. The judiciary and Federal Rule of Civil Procedure 23 are not instruments by which enterprising plaintiffs lawyers can barter away unknown people's unaccrued future claims against an alleged antitrust violator in exchange for a brokerage fee of $75 million. Ironically, the operative complaint bemoans the exact state of affairs that this settlement effects: it insulates Amex from liability for alleged violations of antitrust laws, thereby facilitating such violations. *See* Consolidated Class Action Complaint ("Complaint") (11-md-2221, Dkt. 27) ¶¶4, 75.

Class counsel are fiduciaries and trustees for the absent class members. It is their ethical responsibility to prioritize first and foremost obtaining compensation and relief for class members. Instead, the concrete payout by the defendant in this settlement—$75 million—has been allocated exclusively to class counsel and the named plaintiffs via the settlement fees provisions. Amex has agreed to permit limited surcharging under certain conditions. But this has not been adequately demonstrated to be a net gain for putative class members, who  must now acquiesce to other contested practices of Amex. Absent class members will ultimately pay for their meager consideration (and for their own counsel's sizable fee award) by agreeing to release Amex from liability in potential perpetuity.

The settlement has four fatal legal flaws that each independently require rejection. *First*, the use of a mandatory Rule 23(b)(2) class runs afoul of Supreme Court commands and the

Federal Rules of Civil Procedure. *See infra* § II. *Second*, the class definition unlawfully includes individuals who have no current relationship with the defendant. *See infra* § III. *Third*, class counsel and the named plaintiffs capture the only verifiable benefit Amex provides in this settlement. *See infra* § IV.A. *Fourth*, the settlement would have absent class members release unripe, indeterminate claims. *See infra* § IV.B.

I.    **Objector Buckeye Institute for Public Policy Solutions is a member of the class, and intends to appear through counsel at the fairness hearing.**

The Buckeye Institute for Public Policy Solutions ("Buckeye") is an Ohio-based 501(c)(3) organization that conducts research and generates scholarship on public policy issues. Buckeye's offices are located at 88 East Broad Street, Suite 1120, Columbus, Ohio 43215. Buckeye's president, Robert Alt, is reachable by phone at (614) 224-4422 and by email at robert@buckeyeinstitute.org.[1] In mid-March, Buckeye received direct notice of this settlement. For several years, Buckeye has been accepting Amex Branded Cards for online donations. Thus, Buckeye qualifies as a class member, with standing to object to the settlement and fee request. *See* Class Settlement Agreement ("Settlement") (Dkt. 306-2) ¶2; Class Settlement Preliminary Approval Order ("PAO") (Dkt. 333) ¶4.

Buckeye's attorney, Adam Schulman of the Center for Class Action Fairness ("CCAF"), a Public Interest Law Firm, is representing him pro bono and has been granted admission *pro hac vice*. His contact information can be found in the signature block of this document. As described in the contemporaneously filed Notice of Intent to Appear, he intends to appear at the fairness hearing. Buckeye joins any objections not inconsistent with the objections it makes below.

CCAF, founded in 2009, represents class members *pro bono i*n class actions where class counsel employs unfair class action procedures to benefit themselves at the expense of the class. *See e.g., In re Dry Max Pampers Litig.*, 724 F.3d 713, 716-17 (6th Cir. 2013) (*"Pampers"*)

---

[1] As attested in the accompanying declaration of Adam E. Schulman, Mr. Alt has been traveling this week and will file a declaration of his own next week.

(describing CCAF's client's objections as "numerous, detailed, and substantive.") (reversing settlement approval and certification); *Richardson v. L'Oreal USA, Inc.*, __F. Supp. 2d__, 2013 WL 5941486, at \*14 (D.D.C. Nov. 6, 2013) (Bates, J.) (describing CCAF's client's objection as "comprehensive and sophisticated" and noting that "[o]ne good objector may be worth many frivolous objectors in ascertaining the fairness of a settlement.") (rejecting settlement approval and certification); Adam Liptak, *When Lawyers Cut Their Clients Out of the Deal*, N.Y. TIMES, Aug. 13, 2013, at A12 (calling CCAF's president "[t]he leading critic of abusive class-action settlements").

CCAF has won millions of dollars for class members. *See, e.g., In re Classmates.com Consol. Litig.*, No. C09–45RAJ, 2012 U.S. Dist. 2012 WL 3854501, at \*9 (W.D. Wash. June 15, 2012) (noting that CCAF's client "was relentless in his identification of the numerous ways in which the proposed settlements would have rewarded class counsel…at the expense of class members" and "significantly influenced the court's decision to reject the first settlement and to insist on improvements to the second").

Because it has been CCAF's experience that class action attorneys often employ ad hominem attacks in attempting to discredit objections, it is perhaps relevant to distinguish CCAF's mission from the agenda of those who are termed "professional objectors." A "professional objector" is a specific legal term referring to for-profit attorneys who attempt or threaten to disrupt a settlement unless plaintiffs' attorneys buy them off with a share of the attorneys' fees. Some courts presume that such objectors' legal arguments are not made in good faith. Edward Brunet, *Class Action Objectors: Extortionist Free Riders or Fairness Guarantors*, 2003 U. CHI. LEGAL F. 403, 437 n.150 (2003). This is not CCAF's modus operandi. Paul Karlsgodt & Raj Chohan, *Class Action Settlement Objectors: Minor Nuisance or Serious Threat to Approval*, BNA: CLASS ACTION LITIG. REPORT (Aug. 12, 2011) (distinguishing CCAF from professional objectors). CCAF refuses to engage in *quid pro quo* settlements, does not extort attorneys, and has never withdrawn an objection in exchange for payment. Instead, it is funded

entirely through charitable donations and court-awarded attorneys' fees.

Nonetheless, to preempt any possibility of a false and unjustifiable accusation of objecting in bad faith and seeking to extort class counsel, Buckeye is willing to stipulate to an injunction prohibiting itself from accepting compensation in exchange for the settlement of this objection. *See* Brian T. Fitzpatrick, *The End of Objector Blackmail?*, 62 VAND. L. REV. 1623 (2009) (suggesting inalienability of objections as solution to objector blackmail problem). Buckeye brings this objection through CCAF in good faith to protect the interests of the class.

## II.     A mandatory 23(b)(2) certification is impermissible.

"Class-action settlements are different from other settlements." *Pampers*, 724 F.3d at 715. "[I]n class-action settlements the district court cannot rely on the adversarial process to protect the interests of the persons most affected by the litigation—namely, the class. Instead, the law relies upon the fiduciary obligations of the class representatives and, especially, class counsel, to protect those interests. And that means the courts must carefully scrutinize whether those fiduciary obligations have been met." *Id.* at 718 (internal quotation omitted). Thus, through its oversight responsibility, the court itself assumes a derivative fiduciary obligation to the class. *Plummer v. Chemical Bank*, 668 F.2d 654, 658 (2d Cir. 1982). This judicial duty to vouchsafe the rights of the absent plaintiffs extends to the decision to grant class certification, obliging district courts to conduct a "rigorous analysis" to ensure compliance with the Rule 23 certification prerequisites. *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011). A proponent of class certification "must affirmatively demonstrate his compliance with the Rule." *Id*.

Aside from trial manageability concerns, that burden is no lighter when the Court is confronted with a settlement-only class certification. In fact, the specifications of Rule 23(a) and (b)(2) are "designed to protect absentees by blocking unwarranted or overbroad class definition" and "demand undiluted, even heightened, attention in the settlement context." *Amchem Prods. Inc., v. Windsor*, 521 U.S. 591, 620 (1997); *In re Literary Works in Elec. Databases*, 654 F.3d

242, 249 (2d Cir. 2011) (similar); *Pampers*, 724 F.3d at 721 ("These requirements are scrutinized more closely, not less, in cases involving a settlement class"); *Rodriguez v. Nat'l City Bank*, 726 F.3d 372, 380 (3d Cir. 2013) (the "policy in favor of voluntary settlement does not alter the 'rigorous analysis' needed to ensure that the Rule 23 requirements are satisfied."). Put another way, "it is not the mission of Rule 23(e) to supply the cohesion that legitimizes a settlement-only class action…." *Gunnells v. Healthplan Servs.*, 348 F.3d 417, 451 (4th Cir. 2003) (Niemeyer, J., concurring in part and dissenting in part).

Rule 23(b)(2) allows a class action to be maintained if 23(a)(1)-(4) are satisfied and "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Rule 23(b)(2), however, lacks several vital protections attending class members in a (b)(3) class including the statutory right to exclude oneself and the statutory right to the "best notice practicable." Given this state of affairs, courts should be most vigilant in their enforcement of the boundaries of (b)(2) classes. The most potent textual limitation on (b)(2) certifications is the prescription that "final injunctive or corresponding declaratory relief [be] appropriate with respect to the class as a whole." Fed R. Civ. P. 23(b)(2).

The Supreme Court has distilled a notable consequence that follows from this textual prescription. A (b)(2) class is not suitable for asserting monetary claims that accrue on an individual basis. *Dukes*, 131 S. Ct. at 2557 ((b)(2) "does not authorize class certification when each class member would be entitled to an individualized award of monetary damages."); *Hecht v. United Collection Bureau*, 691 F.3d 218, 223 (2d Cir. 2012) (stating that "*Dukes* abrogated *Robinson* as a test for (b)(2) certification" by prohibiting (b)(2) certification at least where monetary claims are more than incidental). Both *Dukes* and *Hecht* construe (b)(2) narrowly so to avoid potential constitutional infirmities in Rule 23. Any time a class action seeks monetary relief on the basis of individualized aggregated claims, as opposed to a unitary group claim, Rule 23 must be read to demand a 23(b)(3) certification.

**A.  This class cannot be certified under (b)(2) because of the monetary components at stake.**

Although *Dukes* disclaimed the significance of "predominating" injunctive claims,[2] even if the opinion is read most narrowly—to adopt the *Allison v. Citgo Petroleum*[3] standard and permit non-individualized, incidental monetary relief within a constitutionally-viable (b)(2) class—this settlement cannot meet that standard.[4] "At a minimum" *Dukes* affirmatively commands courts to avoid certifying "claims for individualized relief" within (b)(2) classes. 131 S. Ct. at 2557. As such, it makes sense to evaluate the nature of the monetary claims at stake in this settlement under the minimum threshold test of *Wal-Mart*. Do the monetary claims accrue to the class as a whole (i.e. are they incidental?) or do they accrue to individual class members (i.e. are they predominating?)?

The predominance inquiry is made less tractable by the fact that the plaintiffs and defendants seek certification of a settlement-only class. Delaying certification until settlement poses various problems, *see In re Gen. Motors Corp. Pick-up Truck Fuel Tank Prods. Liab.*

_____

[2] *See Dukes*, 131 S. Ct. at 2559 ("The mere 'predominance' of a proper (b)(2) injunctive claim does nothing to justify elimination of Rule 23(b)(3)'s procedural protections: It neither establishes the superiority of *class* adjudication over *individual* adjudication nor cures the notice and opt-out problems. We fail to see why the Rule should be read to nullify these protections whenever a plaintiff class, at its option, combines its monetary claims with a request—even a 'predominating request'—for an injunction.").

[3] 151 F.3d 402 (5th Cir. 1998). *Allison* announced the renowned "incidental damages" formulation of when monetary claims could be encompassed within a (b)(2) certification. Incidental damages are those "that flow directly from liability to the class *as a whole* on the claims forming the basis of the injunctive or declaratory relief." *Wal-Mart*, 131 S. Ct. at 2560 (quoting *Allison*, 151 F.3d at 415).

[4] It suffices to say that the claims here are not group-based, but are compensatory ones that accrued to individual merchants under the Sherman Act. *See* Samuel Issacharoff, *Preclusion, Due Process, and the Right to Opt Out of Class Actions*, 77 NOTRE DAME L. REV. 1057, 1073 (2002) (noting "an important distinction in the nature of the claim between those that truly inhere in the collective entity of the class and those that are merely an aggregation of what might otherwise be self-sustaining individual causes of action."). For the sake of completeness, however, see the remainder of this section.

*Litig.*, 55 F.3d 768, 786-800 (3d Cir. 1995) ("*GM Trucks*"), and calls for heightened judicial scrutiny of the settlement and certification. *Id.* at 807; *accord Pampers,* 724 F.3d at 721; *D'Amato v. Deutsche Bank*, 236 F.3d 78, 85 (2d Cir. 2001); Federal Judicial Center, MANUAL FOR COMPLEX LITIGATION § 21.612 (4th ed. 2004).

In the context of a 23(b)(2) settlement, however, the analytical problems are all the more pronounced, because of the added difficulty in determining whether monetary relief is incidental. If this class was being certified for trial, the (b)(2) analysis would be a comparatively easy matter of two steps: (1) looking to the complaint to determine whether any monetary relief sought is incidental and thus non-predominant; and (2) ensuring that the class has the requisite cohesiveness / homogeneity of interests.[5] But because this is a settlement class, two new factors complicate the equation: (3) the actual relief obtained in the settlement; and (4) the claims released in the settlement. *See Hecht v. United Collection Bureau*, 691 F.3d 218, 223-24 (2d Cir. 2012) (explaining how to discern "predominance" in a (b)(2) settlement class by "review[ing] the …complaint, Stipulation of Settlement, and Settlement Order").

Because of the caution needed when dealing with (b)(2) classes, this Court should not certify the class if any of the above factors weigh against certification. From the perspective of due process, however, it is the settlement's release that is the holy grail. It is the vehicle for deprivation of an absent class member's right to sue. Thus, when certifying a (b)(2) settlement class, a court should ensure that the release does not burden monetary claims. Ultimately here, the types of claims class members possess and the claims they will release both lead to the inescapable conclusion that monetary claims predominate. The parties may not end-run this conclusion by settling for non-compensatory injunctive relief.

### 1. Monetary claims predominate from the perspective of the cause of action alleged by the class.

As is necessary with a nationwide class of merchants, this case has been prosecuted on

---

[5] Cohesiveness is an implicit prerequisite of any properly certified (b)(2) class. *E.g., In re Rezulin Prods. Liab. Litig*., 210 F.R.D. 61, 75 (S.D.N.Y. 2002).

behalf of the class under the federal Sherman Act, 15 U.S.C. §§ 1 *et seq. See* Complaint ¶16. Although the Sherman Act itself in its early incarnation did not permit private plaintiffs to seek injunctive relief,[6] the plaintiffs plead jurisdiction under the later-added section 16 of the Clayton Act, which allows private parties to obtain injunctive relief to prevent "threatened loss or damage." 15 U.S.C. § 26. The complaint seeks both injunctive and monetary relief. Complaint 26. But the monetary remedy predominates.

Injury in an antitrust case is a dollars-and-cents injury. *Reiter v. Sonotone Corp.*, 442 U.S. 330, 342 (1979) ("[A] wrongful deprivation of … money" is "an injury in…'property' under § 4 [of the Sherman Act]"); *see specifically* Complaint ¶¶46 (alleging "injury in the form of overcharge"). Harm to the pocketbook the *sine qua non* of antitrust injury, regardless of whether the means of remedy sought is injunction, actual and treble damages, or both. *Cargill, Inc. v. Monfort of Colorado, Inc*., 479 U.S. 104, 113 (1986) ("complementary remedies for a single set of injuries"); *Drug Mart Pharmacy Corp. v. Am. Home Prods. Corp*., 2007 U.S. Dist. LEXIS 93493, 2007 WL 4526618 (E.D.N.Y. Dec. 20, 2007) (holding that where the allegedly illegal practice has been ongoing for some time, failure to establish damages is fatal to claims for injunctive relief).

Remedying past injury, not making new rules, is the purpose of antitrust private action. "[T]he antitrust private action was created primarily as a remedy for the victims of antitrust violations." *Masters v. Wilhelmina Model Agency, Inc*., 473 F.3d 423, 434 (2d Cir. 2007). Monetary damages (trebled) is the means by which the statutory scheme offers compensations and relief to antitrust victims. *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth*, 473 U.S. 614, 635 (1985). The societal "policing function" that accompanies that remedy is "incidental." *Id*. Because, in class proceedings, class counsel's fiduciary duty runs to putative class members rather than to members of the general public, compensatory goals must necessarily take precedence over other incidental purposes.

---

[6] *See* 15 U.S.C. § 4 (reserving injunctive suits to the purview of the Attorney General).

Concomitantly, the text and structure of the Clayton Act subordinates the injunctive remedy to this remedy of damages. Section 16 of the Clayton Act "is merely declarative of ordinary equitable principles." *SCM Corp. v. Xerox Corp.*, 507 F.2d 358, 360 (2d Cir. 1974). Under these principles, an injunctive remedy will not lie where monetary relief is an adequate alternative. *Id.* at 363; *Chemical Bank v. Haseotes*, 13 F.3d 569, 573 (2d Cir. 1994) ("[G]enerally speaking, an injunction is not available to remedy a loss that may be remedied by an award of money damages."); *Jackson Dairy, Inc. v. H. P. Hood & Sons, Inc.*, 596 F.2d 70, 72 (2d Cir. 1979) ("[I]rreparable injury means injury for which a monetary award cannot be adequate compensation."); *Checker Motors Corp. v. Chrysler Corp.*, 405 F.2d 319, 324 n.5 (2d Cir. 1969) ("[T]he availability of treble damages constitutes an adequate remedy at law, and therefore is in itself a sufficient ground upon which to deny the injunctive relief."). The structure of Rule 23(b)(2) is congruent; certification is "necessarily improper" when money damages are an adequate remedy. *Kartman v. State Farm Mut. Auto. Ins. Co.*, 634 F.3d 883, 892 (7th Cir. 2011).

In circumstances where injunctive relief is not available under the underlying statute, any attempted (b)(2) certification is doomed *ab initio*. *Bolin v. Sears Roebuck & Co.*, 231 F.3d 970, 977 n.39 (5th Cir. 2000) ("[T]he unavailability of injunctive relief under a statute would automatically make (b)(2) certification an abuse of discretion."); *accord Christ v. Beneficial Corp.*, 547 F.3d 1292, 1298 (11th Cir. 2008).

In light of the above, it is not surprising that courts routinely find (b)(2) certifications improper in federal antitrust cases pursuing both monetary and injunctive remedies. *In re Nexium (Esomeprazole) Antitrust Litig.*, 297 F.R.D. 168, 173-74 (D. Mass. 2013) (finding that although faced with "continuing harms," the class's damages claims were not "incidental to the injunctive or declaratory relief.") (quoting *Dukes*, 131 S. Ct. at 2557); *Kottaras v. Whole Foods Mkt., Inc.*, 281 F.R.D. 16, 27 (D.D.C. 2012) ("It is clear that money damages are at the heart of this [antitrust] case. The injury alleged is financial loss…the equitable relief is clearly incidental to the monetary relief, not the reverse."); *Blessing v. Sirius XM Radio Inc.*, 2011 WL 1194707,

2011 U.S. Dist. LEXIS 32791 (S.D.N.Y. Mar. 29, 2011) (refusing to certify (b)(2) class where complaint alleged antitrust violations and sought both monetary and injunctive relief). As the Second Circuit has observed in a Sherman Act suit, "[s]ubsection (b)(2) was never intended to cover causes…where the primary claim is for damages, but is only applicable where the relief sought is exclusively or predominantly injunctive or declaratory." *Eisen v. Carlisle & Jacquelin*, 391 F.2d 555, 564 (2d Cir. 1968).

Mandatory (b)(2) classes are only allowable where the injunctive remedy sought is "indivisible" "perforce affecting the entire class at once." *Dukes*, 131 S. Ct. at 2558. Where each merchant has an individual agreement with the defendant, that is not the case. *See* Settlement ¶10 ("Nothing in this…Agreement shall prevent the Defendants from agreeing with merchants…not to impose a surcharge …."). If this case can be certified, it belongs under (b)(3)—not b(2)—with other cases asserting the "most adventuresome" claims at the growing edge of class proceedings. *Amchem*, 521 U.S. at 614-15; *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 861-62 (1999).

### 2. Monetary claims predominate from the perspective of the release.

Next, a thorough (b)(2) analysis entails examining the preclusive effects that the settling parties intend to foist upon absent class members. Samuel Isaacharoff, *Preclusion, Due Process, and the Right to Opt Out of Class Actions*, 77 NOTRE DAME L. REV. 1057, 1068-73 (2002); *Richardson*, 2013 WL 5941486, at *9 ("[T]he focus here is…whether the judgment will bind absent class members as to their damages claims."). Determining the preclusive effects is easier in the settlement context where the agreement and notice should detail the scope of the precluded/released claims. Here, sections 26 and 27 of the settlement agreement delineate the contours of the release.

In a (b)(2) class settlement, the release should confine itself to future claims for injunctive relief, without encroaching on absent class members' rights to bring claims for monetary relief in the future. The cardinal issue is whether the settling parties have done enough by limiting the release's applicability to (1) "claims…for any form of declaratory, injunctive, or equitable relief"

currently possessed (Settlement ¶26) and (2) "claims…for any damages or other monetary relief relating to the period after the Provisions Change Date and continuing to and including the Release Termination Date" (Settlement ¶27). Read together, these provisions amount to exempting only legal monetary claims from scope of the waiver. This violates (b)(2).

First, as the Supreme Court recently made clear in *Dukes*, the proper division in the (b)(2) analysis is not between "equitable" and "legal" claims but between "injunctive" and "monetary" ones. 131 S.Ct. at 2560; *see also Randall v. Rolls-Royce Corp.*, 637 F.3d 818, 825–26 (7th Cir. 2011); *Thorn v. Jefferson-Pilot Life Ins. Co.*, 445 F.3d 311, 331 (4th Cir. 2006). A waiver of "equitable" claims bars absent class members from seeking monetary relief in the form of disgorgement or restitution. *See* Einer Elhauge, *Disgorgement as an Antitrust Remedy*, 76 ANTITRUST L. J. 79, 80 n.6 (2009) ("Monetary disgorgement is an available remedy for private parties."). In the wake of *Dukes*, the consensus is that disgorgement and restitution claims may not be incorporated into a mandatory class. *See, e.g., Morrow v. Washington*, 277 F.R.D. 172, 203 (E.D. Tex. 2011) (equitable restitution and compensatory damage claims are not incidental); *Huber v. Taylor*, No. 002-304, 2011 WL 4553154, 2011 U.S. Dist. LEXIS 111704, at *21 n.16 (W.D. Pa. Sept. 29, 2011) (refusing to certify a (b)(2) class when "disgorgement…is an individual right of each wronged [class member]."); *Aho v. Americredit Fin. Servs.,* No. 10-cv-1373, 2011 WL 3047677, 2011 U.S. Dist. LEXIS 80426, at *20 (S.D. Cal. Jul. 25, 2011) ("[R]estitutionary relief…is not incidental"); *Janes v. Triborough Bridge & Tunnel Auth.*, No. 06 Civ. 1427, 2011 U.S. Dist. LEXIS 115831, at *16 (S.D.N.Y. Oct. 4, 2011) (same). Thus, ¶26 errs by failing to account for equitable monetary relief.

The error of ¶27 is far more grievous. It self-consciously releases all monetary claims that may accrue after the injunctive provisions have come into effect. Class counsel and the named plaintiffs are attempting to extinguish several types of non-incidental monetary claims in exchange for nothing more than injunctive relief. "[A] putative class representative, by crafting an injunctive relief class for his own tactical reasons, should not be permitted to place class

members' ability to pursue individualized claims for monetary relief in question." *Rouse v. Caruso*, No. 2:06-CV-10961, 2013 U.S. Dist. LEXIS 19946, at *14 (E.D. Mich. Jan. 7, 2013) (quoting *Cholakyan v. Mercedes-Benz USA, LLC*, 281 F.R.D. 534, 559 (C.D. Cal. 2012)). There is no justification for such an attempted end-run around the constitutional right of exclusion announced in *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797 (1985). ¶27 reintroduces the exact problem that vexes the Supreme Court: the possibility that "individual class members' compensatory-damages claims [will] be precluded by litigation they had no power to hold themselves apart from." *Dukes*, 131 S. Ct. at 2559.

Combined, ¶¶26-27 implement what amounts to a limited opt-out scheme for certain non-equitable claims, as long as such claims do not accrue after the Provision Change Date. This type of scheme does not comport with *Shutts*'s plenary right of exclusion. *See Ortiz*, 527 U.S. at 847 n.23 (limited opt-out mechanism doesn't satisfy *Shutts*); *Richardson*, 2013 WL 5941486, at *10-*12 (rejecting (b)(2) certification where the proposed settlement would have waived class members' rights to use the class action device in prosecuting their monetary claims, even though they would have retained the right to sue for money in their individual capacities).

The jurisprudential reason why damages claims cannot be included in a mandatory class is because damages vary by individual class member. Just as that is true for claims that accrue before the settlement goes into effect, it is equally true of claims that accrue after the effective date. Because the release does not respect this principle, a (b)(2) certification cannot stand.

### 3. Predominance is not a matter of class counsel's subjective preferences; they cannot circumvent (b)(2)'s strictures by settling for injunctive relief.

Although it is a necessary precondition to a (b)(2) settlement certification that the class obtain injunctive relief, it is not a sufficient one. As shown by *Hecht* and *Bolin*, *inter alia*, this Court must also consider the injuries alleged, and the claims released. *But see In re Payment Card Interchange Fee & Merchant Discount Antitrust Litig.*, 2013 U.S. Dist LEXIS 179340, at *82 (E.D.N.Y. Dec. 13, 2013) (approving a (b)(2) certification based upon the injunctive relief obtained at settlement).

"Rule 23(b)(2) certainly cannot be read as requiring the court to accept the plaintiffs' ranking in importance of the various forms of relief they seek in the action." *Bacon v. Honda of Am. Mfg., Inc.*, 205 F.R.D. 466, 485 (S.D. Ohio 2001), *aff'd* 370 F.3d 565 (6th Cir. 2004); *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 986-87 (9th Cir. 2011) (citing *Wal-Mart*). Nor can the rule be read to allow the class representatives' subjective intentions to govern the predominance inquiry. *In re Monumental Life Ins. Co.*, 365 F.3d 408, 415 (5th Cir. 2004).

At the time of settlement, defendants' and named plaintiffs' interests will converge on certifying the class as easily as possible, without regard for the rights that absent class members would be afforded under (b)(3). *See In re Telectronics Pacing Sys. Inc.*, 221 F.3d 870, 880 (6th Cir. 2000) ("The bootstrapping of a Rule 23(b)(3) class into a Rule 23(b)(1)(b) class is impermissible and highlights the problem with defining and certifying class actions by reference to a proposed settlement."); *Bolin*, 231 F.3d at 976 (evincing concern that "plaintiffs may attempt to shoehorn damages actions into the Rule 23(b)(2) framework"); Elizabeth Chamblee Burch, *Optimal Lead Plaintiffs*, 64 VAND. L. REV. 1109, 1119 (2011); Brian Wolfman & Alan B. Morrison, *What the* Shutts *Opt-Out Right Is and What It Ought to Be*, 74 UMKC L. REV. 729, 740 (2006); Linda Mullenix, *No Exit: Mandatory Class Actions in the New Millennium and the Blurring of Categorical Imperatives*, 2003 U. Chi. Legal. F. 177, 241 (2003).

Restated, the problem the settling parties encounter is this: "the requirements for certification are not the defendant's to waive; they are intended to protect absent class members." Alexandra D. Lahav, *Symmetry and Class Action Litigation*, 60 UCLA L. Rev. 1494, 1506 (2013). To allow the parties' preference to control the outcome is to rehash the subjective *Robinson v. Metro-North Commuter R.R. Co.*, 267 F.3d 147 (2d Cir. 2001) test that has been decisively abrogated by *Dukes*. *See Hecht*, 691 F.3d at 223 (2d Cir. 2012) (noting the abrogation).

## III. The temporally unbounded class definition violates Rule 23(e)(1), (e)(5), and the requirement of ascertainability.

Fed. R. Civ. P. 23(e)(1) requires the court to direct reasonable notice of the settlement to

all members of the class who would be bound by the settlement. Notice allows class members a sound platform for assessing the strength of the case and the merits of the settlement in deciding whether to object or opt-out—when that right is available.[7] A class defined to include "all persons… [who] in the future accept any Amex Branded Cards…" necessarily transgresses the boundaries of Rule 23. Individuals who enter the class after the objection deadline will be deprived of their Rule 23(e)(1) right of notice and their (e)(5) right of objection. Were this proceeding merely a class certification and litigation to final judgment under 23(b)(2), there would be no statutory right to notice or objection—but as a 23(e) settlement, the class does have those rights and the class definition effectively obliterates that right for a substantial subclass.

Moreover, a threshold requirement in any potential Rule 23 certification is that the named plaintiffs propose an "ascertainable" and "identifiable" class.[8] "Individual class members need not be identified prior to certification, but class membership must be ascertainable prior to the end of the action." *Fosamax*, 248 F.R.D. at 395-96. "Clearly delineating the contours of the class…serves several important purposes." *Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 591-592 (3d Cir. 2012). These principles are violated by a class definition that has no definite class period and veers unbridled into the future.

Those courts that have analyzed the issue have reached a consensus conclusion: proposed classes with no fixed end date must be denied certification.[9] Commentators agree.[10] The Second

---

[7] *See* 7B Charles Alan Wright et al., FEDERAL PRACTICE AND PROCEDURE, § 1787 at 220 (2d ed.1986); 2 NEWBERG ON CLASS ACTIONS, § 8.04 at 8-17 ("[T]he purpose [of notice is] allowing the parties to make conscious choices that affect their rights in a litigation context.").

[8] *In re Fosamax Prods. Liab. Litig.*, 248 F.R.D. 389, 395-96 (S.D.N.Y. 2008); Federal Judicial Center, MANUAL ON COMPLEX LITIGATION § 21.222 (4th ed. 2004) ("The definition must be precise, objective, and presently ascertainable."); *Weiner v. Snapple Beverage Co.*, No. 07-cv-8742, 2010 WL 3119452, at *13 (S.D.N.Y. Aug. 5, 2010) (denying certification where plaintiffs "failed to show how the potentially millions of putative class members could be ascertained using objective criteria that are administratively feasible").

[9] *See Mueller v. CBS, Inc.*, 200 F.R.D. 227, 236 (W.D. Pa. 2001); *Saur v. Snappy Apple Farms, Inc.*, 203 F.R.D. 281, 285-86 (W.D. Mich. 2001); *In re Wal-Mart Stores, Inc.*, No. 06-02069,

Circuit has also suggested as much without "definitively decid[ing]" the question. *Stephenson v. Dow Chem. Co.*, 273 F.3d 249, 261 n.9 (2d Cir. 2001), *aff'd in part by an equally divided court and vacated in part on other grounds*, 539 U.S. 111 (2003) ("[P]laintiffs [who manifest symptoms from Agent Orange exposure only after the settlement was consummated] likely received inadequate notice…."). The Supreme Court has itself even "recognize[d] the gravity of the question whether class action notice sufficient under the Constitution and Rule 23 could ever be given to legions so unselfconscious and amorphous." *Amchem*, 521 U.S. at 628.

But even if Rule 23(e)(1) and (5) could be read to allow this open-ended class definition, the constitutional questions that would arise under *Mullane*[11] counsel against such an interpretation under the canon of construction that avoids constitutional doubt. *See e.g.*, *Wal-Mart*, 131 S. Ct. at 2559 (construing 23(b)(2) to avoid potential unconstitutionality); *Gulf Oil Co. v. Bernard*, 452 U.S. 89, 103-04 (1981) (holding that district court's order forbidding communication between counsel and absent class members violated Rule 23, and thus declining to decide whether such a ban violated the First Amendment).

---

2008 WL 1990806, 2008 U.S. Dist. LEXIS 109446, at *15-*16 (N.D. Cal. May 2, 2008); *Alaniz v. Saginaw County*, No. 05-10323, 2009 U.S. Dist. LEXIS 43340, at *5 (E.D. Mich. May 21, 2009); *Trollinger v. Tyson Foods, Inc.*, No. 4:02-CV-23, 2007 U.S. Dist. LEXIS 88866, at *8–*11 (E.D. Tenn. Dec. 3, 2007); *Cruz v. Dollar Tree Stores, Inc.*, No. 07-2050, 2009 U.S. Dist. LEXIS 62817, at *3-*5 (N.D. Cal. Jul. 2, 2009); *Wike v. Vertrue, Inc.*, 2010 WL 3719524, 2010 U.S. Dist. LEXIS 96700 (M.D. Tenn. Sept. 15, 2010); *see also Ansoumana v. Gristede's Operating Corp.*, 201 F.R.D. 81, 85 n.2 (S.D.N.Y. 2001).

[10] *See* Elizabeth R. Kaczynski, Note, *The Inclusion of Future Members in Rule 23(b)(2) Class Actions*, 85 COLUM. L. REV. 397 (1985) (asserting that including future members in class actions "is inconsistent with both the explicit requirements and the theoretical underpinnings of Rule 23" and poses "a serious threat to the due process rights of future members"); Samuel Issacharoff, *Class Action Conflicts*, 30 U.C. DAVIS L. REV. 805, 833 (1997) (advocating for "presumption against…non-closed class actions in which the class cannot be presently defined.").

[11] *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306 (1950) (explaining the due process parameters of notice in the class action context).

---

Accepting that 23(e)(1), (e)(5), and the implicit requirement of ascertainability limit the availability of futures classes is not unprecedented, nor need it be conceived of as a radical sea-change. Rather, class plaintiffs will be able to assert the same exact claims for the same exact relief; all that will be different is that absent class members will have the opportunity to receive the notice to which they are constitutionally entitled. As presently defined however, the class may not be certified.

## IV. Even if the class is certifiable, this settlement is not fair.

As discussed *supra* §§ II-III, this Court should reject the requested class certification. These arguments can bleed into the corollary 23(e)(2) question of whether the settlement is "fair, reasonable and adequate." For instance, if final injunctive relief is not appropriate respecting the class as a whole, any settlement that offers only injunctive relief will be per se inadequate. Nonetheless, there are several independent reasons that this Court should reject the settlement under 23(e) even if it accepts that the class certification itself is viable.

The burden of proving settlement fairness rests with the moving party. *Pampers*, 724 F.3d at 718 (compiling cases and authorities); American Law Institute, *Principles of the Law of Aggregate Litig.* § 3.05(c) (2010) ("*ALI Principles*"). "The inquiry appropriate under Rule 23(e) … protects unnamed class members from unjust or unfair settlements affecting their rights when the representatives become agreed to by fainthearted before an action is adjudicated or are able to secure satisfaction of their individual claims by a compromise." *Amchem*, 521 U.S. at 623 (quotation omitted). The parties' burden is yet heightened when the they seek approval of a pre-certification settlement. *D'Amato*, 236 F.3d at 85 (citing cases). Approval of a pre-certification settlement will occasion appellate review of "the entire settlement, paying special attention to the terms of the agreement containing convincing indications that the incentives favoring pursuit of self-interest rather than the class's interest in fact influenced the outcome of negotiations." *Dennis v. Kellogg Co.*, 697 F.3d 858, 867 (9th Cir. 2012) (internal quotation omitted).

The settling parties belabor the nine *Grinnell*[12] fairness criteria in their final approval papers. Memorandum in Support of Final Approval ("MFA") (Dkt. No. 362) at 20-27.[13] While satisfaction of those factors is necessary for approval under Rule 23(e), it is not sufficient. It cannot be overemphasized that—like the multi-factor tests of other circuits[14]—the *Grinnell I* factor test is not exhaustive. *Grinnell I*'s test simply does not provide an exclusive list of reasons to reject a settlement. *See, e.g.*, *In re Literary Works in Elec. Databases Copyright Litig.*, 654 F.3d 242 (2d Cir. 2011) (reviewing settlement and remanding to cure intra-class conflict); *Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco Managed Care*, 504 F.3d 229, 249 (2d Cir. 2007) ("*Cent. States*") (same); *Denney v. Deutsche Bank AG*, 443 F.3d 253 (2d Cir. 2006) (reversing approval due a provision that was unfair to a non-settling defendant).

Likewise, while it is *necessary* that a settlement is at "arm's length" without express collusion between the settling parties, it is not *sufficient*. "While the Rule 23(a) adequacy of representation inquiry is designed to foreclose class certification in the face of 'actual fraud, overreaching or collusion,' the Rule 23(e) reasonableness inquiry is designed precisely to capture instances of unfairness not apparent on the face of the negotiations." *Bluetooth*, 654 F.3d at 948 (internal quotation omitted). Courts "must be particularly vigilant not only for explicit collusion, but also for more subtle signs that class counsel have allowed pursuit of their own self-interests

---

[12] *Detroit v. Grinnell Corp.*, 495 F.2d 448 (2d Cir. 1974) (*Grinnell I*).

[13] Actually, they only belabor six, as they argue that factors (7), (8), and (9) may not be relevant. MFA 19 n.6.

[14] *Pampers*, 724 F.3d at 718 (looking beyond Sixth Circuit's seven-factor test to find settlement unfair when it constitutes "preferential treatment" for class counsel); *In re Baby Prods Antitrust Litig.*, 708 F.3d 163, 174 (3d Cir. 2013) (adding to Third Circuit's nine-factor fairness test, a new consideration: "the degree of direct benefit provided to the class"); *In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 946 (9th Cir. 2011) (consideration of eight-factor test "alone is not enough to survive appellate review); *Vassalle v. Midland Funding LLC,* 708 F.3d 746 (6th Cir. 2013) (finding abuse of discretion even though all factors favored final approval); *In re Katrina Canal Breaches Litig.*, 628 F.3d 185, 195 (5th Cir. 2010) (*Reed* factors are not the sole reasons a settlement should be rejected as unfair, unreasonable or inadequate under Rule 23(e)).

… to infect the negotiations." *Pampers*, 724 F.3d at 718 (internal quotation omitted).

The most common settlement defects are ones of allocation. This is because "the adversarial process—or 'hard-fought' negotiations—extends only to the amount the defendant will pay, not the manner in which that amount is *allocated* between the class representatives, class counsel, and unnamed class members." *Pampers*, 724 F.3d at 717 (emphasis in original). This is key because it puts the Second Circuit's "presumption of fairness" in perspective. *See* MFA 17-20 (discussing the presumption). To the extent the presumption exists, it only applies to suggest that the aggregate gross settlement is adequate, not that the division of the proceeds amongst the absent class members, class counsel and the named representatives is fair. Nor does the presence of a mediator assure a fair allocation. *Bluetooth,* 654 F.3d at 948-49 (neither presence of neutral mediator nor separation of fee negotiations from other settlement negotiations demonstrates that a settlement is fair).[15]

Allocational issues cannot be waived away simply by structuring the settlement as a constructive common fund, rather than as a traditional common fund. *See Eubank v. Pella Corp.,* __F.3d__, 2014 U.S. App. LEXIS 10332 (7th Cir. Jun. 2, 2014); *Pampers*, 724 F.3d at 717-18; *Bluetooth*, 654 F.3d at 943; *contra* Memorandum in Support of Attorneys' Fees ("Fee Memo")

---

[15] "There is no substitute for the requirement of district courts vetting the proposed settlement under Rule 23(e). It is also no answer to say that a private mediator helped frame the proposal. Such a mediator is paid to help the immediate parties reach a deal. Mediators do not adjudicate the merits. They are masters in the art of what is negotiable. It matters little to the mediator whether a deal is collusive as long as a deal is reached. Such a mediator has no fiduciary duty to anyone, much less those not at the table. Plaintiffs' counsel has the fiduciary duty. It cannot be delegated to a private mediator." *Kakani v. Oracle Corp.*, No. C 06-06493 WHA, 2007 WL 179377, 2007 U.S. Dist. LEXIS 47515, at *31 (N.D. Cal. Jun. 19, 2007); *see also* James Richard Coben, *Creating a 21st Century Oligarchy: Judicial Abdication to Class Action Mediators*, 5 PENN ST. Y.B. ARB. & MEDIATION 162, 163 (2013) (deference to mediators "is an abdication of judicial fiduciary duty to ensure that proposed class action settlements are fair to absent class members").

Dkt. 371-1 at 6-8. "That the defendant in form agrees to pay the fees independently of any monetary award or injunctive relief does not detract from the need carefully to scrutinize the fee award." *Staton v. Boeing Co.*, 327 F.3d 938, 964 (9th Cir. 2003). For either way, "the economic reality is that a settling defendant is concerned only with its total liability." *Pampers*, 724 F.3d at 717 (internal quotation omitted). Nor are issues of apportionment resolved by delaying agreement on fees until after the terms of the settlement have been negotiated. *Richardson*, 2013 WL 5941486, at *13 (citing *In re Cmty. Bank of N. Va. & Guar. Nat'l Bank of Tallahassee Second Mortg. Litig.*, 418 F.3d 277, 308 (3d Cir. 2005)). In other words, as long as the defendant willingly foots both bills, there is no way to avoid the "truism that there is no such thing as a free lunch." *Staton*, 327 F.3d at 964.

As the Second Circuit has described it, "The concern is not necessarily in isolating instances of major abuse, but rather is for those situations short of actual abuse, in which the client's interests are somewhat encroached upon by the attorney's interests." *In re Agent Orange Prods. Liab. Litig.*, 818 F.2d 216, 224 (2d Cir. 1987). This settlement presents one such instance of encroachment. While class counsel, the named representatives and the defendants are enriched by the fee allotment and mandatory, expansive release of claims, absent class members are left with only a modification of their prospective business arrangements with Amex. *Compare* Settlement ¶¶55-58 (fee provisions), *with* Settlement ¶8 (injunctive relief). The business practices modifications themselves are of indeterminate value, but two known facts demonstrate why this settlement demands rejection: (1) the fee provisions of the settlement confer the entire tangible value of the settlement on class counsel and the named representatives; and (2) the class is paying for Amex's outlays by immunizing Amex from future-accruing claims.

## A.  The conjunction of attorneys' fees and no monetary relief for class members signals an unfair, lawyer-driven settlement.

In accord with *Agent Orange's* directive to root out situations where the class's interests are encroached by the attorneys' interests, the Ninth Circuit recently identified three warning

signs of a class action settlement that is inequitable as between class counsel and the class. *Bluetooth*, 654 F.3d 935, 947 (9th Cir. 2011).

The first signal is "when counsel receive a disproportionate distribution of the settlement, or when the class receives no monetary distribution but class counsel are amply rewarded." *Id.* *Accord Pampers*, 724 F.3d at 718 ("preferential treatment" for class counsel renders settlements unfair); *In re GMC Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 803 (3d Cir. 1995) ("[N]on-cash relief…is recognized as a prime indicator of suspect settlements."); *Richardson*, 2013 WL 5941486, at *13 (concluding that allocating the entire monetary proceeds to class counsel is not fair). This is an example of the latter scenario; the class receives solely injunctive relief while the agreement permits class counsel to seek, unopposed, an award of fees, costs and incentive awards of $75 million. Settlement ¶55. A fee of $75 million might be commensurate with obtaining $600 million of value for class members. *See In re Citigroup Inc. Secs. Litig.*, 965 F. Supp. 2d 369 (S.D.N.Y. 2013) (awarding 12% fee ($70.8 million) from $590 million gross settlement); *In re Wachovia Preferred Sec. & Bond/Notes Litig.*, No. 09 Civ. 6351 (RJS), 2011 U.S. Dist. LEXIS 155622, at *10, *14 (S.D.N.Y. Dec. 30, 2011) (awarding 12% fee ($75.2 million) from $627 million gross settlement); *see generally Precision Assocs. v. Panalpina World Transp., Ltd.*, 2013 WL 4525323, 2013 U.S. Dist. LEXIS 121795 (E.D.N.Y. Aug. 27, 2013) (discussing the megafund approach).

But the burden of proving the quantum of benefit lies with the proponents of the settlement. *Pampers*, 724 F.3d at 719. They must demonstrably show that the settlement "secures some adequate advantage for the class." *In re Katrina Canal Breaches Litig.*, 628 F.3d 185, 195 (5th Cir. 2010). To date, the main attempt to quantify the injunctive relief is the declaration of Alan S. Frankel, and is only available to class members in redacted form. ("Frankel Decl.") Dkt. 370. Frankel's declaration suffers from unfounded assumptions. He assumes a *ceteris paribus* world in which imposition of surcharges alters nothing except allowing the merchant to capture the 1.57% differential between credit and debit card revenue. He assumes that the market, and

prices, will remain static before and after surcharging, as if credit card users were willing to pay yesterday's prices without yesterday's convenient absence of transaction fees. He assumes that customers will not take their business to the merchants that continue to bear transaction costs.[16] Why wouldn't Amex raise its interchange rates to offset the newly-minted surcharge right? *See* Steven Semeraro, *Settlement Without Consent: Assessing the Credit Card Merchant Fee Class Action*, ___ COLUM. BUS. L. J.____, 19 n.83 (forthcoming 2014), *available at* http://ssrn.com/abstract=2427467 (noting the "history of increasing interchange fees after settling litigation involving those fees."). In fact, the settlement is conscious of the fact that Amex can give rebates to merchants that agree to waive the right to surcharge. Settlement ¶10. Amex need not "threaten" individual merchants to do this. *See* MFA 15. All it has to do is raise the default rate across the board, and then negotiate downward from that with individual merchants. In fact, plaintiffs recognize this mathematical equivalence themselves. *See* MFA 32.

As Professor Alan Sykes opined as a court-appointed expert in the 1720 MDL, Frankel's prediction is predicated on a number of unproven ifs; "we simply do not know" what the value will be to merchants. Report of Alan Sykes, No. 05-md-01720, Dkt. 5965, at 43-44 (E.D.N.Y. Aug. 28, 2013); *see also* Fee Memo 2 ("[N]o one can predict with precision the level of savings that U.S. merchants will realize from the instant settlement…."). It is entirely possible that the ten states that currently prohibit surcharging will continue to do so, and even possible that new protectionist laws will emerge. It is entirely possible that "merchants in competitive markets would eschew the practice because its costs outweigh those of anticompetitive interchange fees." Semeraro, *supra* at 49-50; Sykes Report 36 (noting potentially significant offsetting costs to merchants considering surcharging).[17] Ultimately, "the impact of surcharging on market

---

[16] Frankel himself is on the cusp of acknowledging this latter possibility. *Id.* at ¶54 (observing results of a study that suggests about half of credit card users would avoid surcharging by either using a different payment method or "going to another store.")

[17] The plaintiffs suggest otherwise based upon anecdotal evidence from Australia, a country with a "substantially different regulatory environment[]" (Sykes Report 43) and based upon a survey

conditions is far from clear." *Id.* at 4; Sykes Report at 43 (benefits of surcharging are "highly uncertain" and potentially "small."). It is entirely possible that consumer biases toward certain payment methods may inhibit consumers from switching to debit cards from credit cards even when faced with new surcharges on credit transactions. To list some self-evident examples of functional difference between credit cards and debit cards, credit cards offer cardholders a credit line—borrowed money—whereas debit cards are tantamount to and limited by cash-in-possession. Even among cardholders who avoid interest rates by timely paying their balances, balances on debit transactions are due immediately while balances on credit cards are due in the pay period following that of the transaction date. In short, myriad factors affect consumers' decision to use certain payment cards over others. *See generally* Andrew T. Ching & Fumiko Hayashi, *Payment Card Rewards and Consumer Payment Choice*, 34 J. BANKING & FIN. 1773 (2010) (studying the effect of rewards programs on card use).

Additionally, Frankel does not even attempt to value the downside of the bargain: a decade-long prospective release of potential antitrust liability for Amex's anti-steering rules. *See* Settlement ¶27. This forward looking agreement is most valuable to Amex in order that they may forestall future lawsuits. *See infra* § IV.B. Whether class members come out ahead or behind overall cannot be currently determined, but we and plaintiffs acknowledge that there is vast uncertainty. One can put no stock in the plaintiffs' chart showing hundreds of millions or billions

---

of merchants' enthusiasm for surcharging administered *after* merchants viewed a promotional "stimulus video" wherein surcharging is treated like free money. For example, the video tells merchants, "either way, you win" and it implores merchants that "the rules have changed: take advantage." Buckeye invites the court to view the video, it's only 1:47 in length: http://vimeo.com/91543083. Trusting the resulting survey depends upon the court **not** viewing the video. It would be distressing if the $2 million Merchants Communication Fund (Settlement ¶18) is intended to be put to a similar propagandized use.

of dollars saved every year. MFA at 6-7.[18]

Class action settlements are plagued by attempts to estimate the value of inestimable injunctions, attempts which do nothing to serve the interest of the class and everything to serve the interest of class counsel. *See In re Oracle Secs. Litig.*, 132 F.R.D. 538, 544-45 (N.D. Cal. 1990) (Walker., J.) (referring to injunctive relief "expert valued at some fictitious figure" coupled with "arrangements to pay plaintiffs' lawyers their fees" to be the "classic manifestation" of the class-action agency problem); *In re LivingSocial Mktg. & Sales Practices Litig.*, MDL No. 2254, 2013 WL 1181489, 2013 U.S. Dist. LEXIS 40059, at *47 n.16 (D.D.C. Mar. 22, 2013) (rebuking a $54 million valuation of injunctive relief as "of marginal value" and noting that "the Court is unable to assess the reliability of the report."). "Precisely because the value of injunctive relief is difficult to quantify, its value is also easily manipulable by overreaching lawyers seeking to increase the value assigned to a common fund." *Staton*, 327 F.3d at 974; *In re Excess Value Ins. Coverage Litig.*, 598 F. Supp. 2d 380, 387-88 (S.D.N.Y. 2005) (same).

Further, a comparison with the allegations of the complaint illuminates the lackluster value of the injunctive relief obtained. *See Bluetooth,* 654 F.3d at 945 n.8 (examining whether relief obtained in settlement matched theory of the complaint); *In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 755, 810 (3d Cir. 1995) ("[T]he relief sought in the complaint serves as a useful benchmark in deciding the reasonableness of a settlement.") (internal quotation omitted). As with the 1720 MDL accord, the settlement here "ignore[s] the concerns at the heart of the complaint": the provisions that prevent instituting different surcharges against different credit card companies. Semeraro, *supra* at 16, 21-22; *see* Complaint ¶¶27, 31. Now reversing course, the plaintiffs argue that differential surcharging is not essential because the Amex premium over Visa, Mastercard and Discover is relatively small. MFA 30-33.

---

[18] In addition to the foregoing considerations, the chart does not even recognize Amex only has a 26.4% share of the market, instead basing the gains of surcharging on the total $2.4 trillion transactional volume in the United States across all credit card companies.

This reasoning forgets the basic theory of the antitrust violation—that the premium divergence is small only because each credit company has imposed non-discrimination rules that prevent them from having to compete with one another on price. Not only does the injunctive relief not redress this grievance, it entrenches the problem for the foreseeable future by granting immunity to Amex.[19]

The injunctive relief has not been proven commensurate with $75 million in attorneys fees. *Bluetooth*'s first warning sign is apparent.

*Bluetooth*'s second and third indicia of an unfair settlement—the presence of a "clear-sailing" agreement (whereby defendant consents not to challenge the award of fees to plaintiffs' counsel) and a "kicker" (whereby any excess fees reduction by the court reverts back to the defendant rather than to the class)—are also present here. *See also Eubank*, 2014 U.S. App. LEXIS 10332, at *17 (referring to the fee reversion as a "questionable provision of the settlement").The plaintiffs negotiated for the "red-carpet treatment on fees" afforded by a clear sailing agreement. *Weinberger v. Great N. Nekoosa Corp.*, 925 F.2d 518, 524 (1st Cir. 1991); *see* Settlement ¶55. This is inappropriate because it indicates that the class attorneys have negotiated a provision to protect their fee award at the expense of potential class benefits.[20] This provision "by its very nature deprives the court of the advantages of the adversary process" and "suggests, strongly" that its associated fee request should go "under the microscope of judicial scrutiny." *Weinberger*, 925 F.2d at 525. At a minimum, these two clauses are a warning sign of a self-

---

[19] The merits of a First Amendment challenge to state prohibitions on surcharging vis-à-vis prohibitions on differential surcharging (MFA 32) do not speak to the question of antitrust illegality.

[20] Although class benefits and fees may have been negotiated separately, that does nothing to allay any conflict unless "fee negotiations [are] postponed until the settlement has been judicially approved." *In re Cmty. Bank of N. Va. & Guar. Nat'l Bank of Tallahassee Second Mortg. Litig.*, 418 F.3d 277, 308 (3d Cir. 2005). Moreover, clear sailing undermines any benefits of separate negotiation. *Sobel v. Hertz*, No. 3:06-cv-00545, 2011 U.S. Dist. LEXIS 68984, at *45 (D. Nev. Jun. 27, 2011).

serving settlement that begs for justification: why was this negotiated in such a manner as to make the class worse off? *Bluetooth*, 654 F.3d 935.

The main beneficiaries of this settlement are the attorneys; combined with the questionable clear-sailing and "kicker" provisions of the settlement with the questionable relief, there is a question of Rule 23(a)(4) adequacy: were the class representatives and counsel in this case acting in the best interests of the class, or in the best interests of class counsel? *See Pampers*, 724 F.3d 713. If the latter, then the plaintiffs cannot satisfy the 23(a)(4) and (g)(4) adequacy inquiries. *See Creative Montessori Learning Ctrs. v. Ashford Gear LLC*, 662 F.3d 913, 917 (7th Cir. 2011) (counsel must show the district court that "they would prosecute the case in the interest of the class…rather than just in their interests as lawyers who if successful will obtain a share of any judgment or settlement as compensation for their efforts.").

**B.    The settlement includes an impermissible waiver of claims that accrue after final approval.**

Not only does the settlement direct all available tangible relief toward class counsel and the named representatives, the mandatory release of future claims affirmatively hampers class members. The settlement purports to bind (b)(2) class members to a prospective release of FCRA liability *after* the Provisions Change Date until the Release Termination Date (no sooner than ten years following the change date). *See* Settlement ¶¶1(vv), 27.

"The presence of a future-conduct release is, at the very least, a major warning sign that this is not a run-of-the-mill settlement. Courts should, nay must, look on future conduct settlements with more than their usual skepticism." James Grimmelmann, *Future Conduct and the Limits of Class Action Settlements*, 91 N.C. L. REV. 387, 430 (2013). "It is elementary that a settlement agreement cannot release claims that the parties were not authorized to release." *In re Am. Express Fin. Advisors Secs. Litig.*, 672 F.3d 113, 135 (2d Cir. 2011). When a settlement's agreed-upon release exceeds its permissible scope, both the defendants and class counsel get a benefit at the expense of absent class members. An expanded release makes the terms more valuable to the defendant while simultaneously inducing them to grant an even more sizable

award of fees to class counsel. As such, the terms of the release need to be closely policed.

To be authorized, all released claims must share "the identical factual predicate" underlying the claims of the original action. *TBK Partners, Ltd. v. Western Union Corp.*, 675 F.2d 456, 460 (2d Cir. 1982); *Wal-Mart Stores, Inc. v. Visa U.S.A. Inc*., 396 F.3d 96, 107 (2d Cir. 2005). Because the settling parties are attempting to waive liability for acts that have not yet occurred, those acts by definition cannot share a factual predicate with the acts alleged in the complaint. More than that however, the future card acceptance agreements will necessarily differ in substance from those at issue in this litigation (because of the injunctive terms of the settlement, and the discretion afforded Amex under the same). Allowing the defendants to insulate their future conduct with respect to post-settlement agreements—which have not even been implemented yet—cannot be permitted. *But see In re Payment Card Interchange Fee & Merchant Discount Antitrust Litig.*, 2013 U.S. Dist LEXIS 179340, at *70 (E.D.N.Y. Dec. 13, 2013) (permitting a similar waiver).

Class counsel and the named representatives are not authorized to trade these claims away. *See, e.g., Schwartz v. Dallas Cowboys Football Club, Ltd.*, 157 F. Supp. 2d 561, 577 (E.D. Pa. 2001) ("The release is also too broad because it bars later claims based on future conduct."); Newberg on Class Actions (4th ed. 2002) § 12:15 ("As a matter of settlement strategy, the defendants may negotiate a release of all claims **up to the date of settlement**, though this date naturally falls after the date the complaint was filed.") (emphasis added). *Cf. also In re Am. Express Fin. Advisors Secs. Litig.*, 672 F.3d at 138 ("[T]here can be no question that the [class members'] claims, to the extent that they involve conduct occurring after the Class Period, cannot be Released Claims."); *Langbecker v. Elec. Data Sys. Corp.*, 476 F.3d 299, 313 (5th Cir. 2007) ("[A] release does not ordinarily preclude claims based on subsequent conduct.").

"[F]uture-conduct releases are a monstrous hybrid between private and public planning, the worst of both worlds. They impose on people who have never heard of or consented to them—but they are negotiated by self-interested private parties rater than elected representatives.

Courts are planners of last resort: their job is to sort out the consequences of past plans gone awry, not to make new plans." Grimmelmann, 91 N.C. L. Rᴇᴠ. at 473 (internal quotation omitted). The settling parties in the Google Books settlement attempted a similar maneuver. *See Authors Guild v. Google Inc.*, 770 F. Supp. 2d 666 (S.D.N.Y. 2011). As part of that settlement, the parties stipulated that unless individual authors opted out of the settlement, they would release Google against liability for copyright infringement stemming from future acts. Judge Chin concluded that this "forward-looking business arrangement" exceeded the permissible scope of a release. *Id.* at 675, 679. If anything, the settlement here is more abusive because class members do not even have the option of opting out. *Cf. id.* at 686 (noting that if the settlement were restructured to be "opt-in" rather than "opt-out," it would alleviate many of the most apparent concerns).

Releasing future claims presents a further problem: it violates Article III of the Constitution. If Buckeye tried to bring a lawsuit against Amex today contending that its card acceptance agreement for the year 2017 will violate antitrust law, the complaint would be dismissed as unripe. Yet, just because they change the cover sheet to say "Proposed Settlement" rather than "Complaint," the Parties think they can have this Court issue an advisory opinion that Amex's future practices—as long as they comport with the settlement agreement—do not violate the Sherman Act or other antitrust laws. Because this ruling would bind all those who will accept Amex cards in perpetuity, the defendants would be obtaining a ruling that actually exempts them from any anti-steering antitrust suit prosecuted by any private plaintiff for at least the next ten years. Article III does not allow this. *Calderon v. Ashmus*, 523 U.S. 740, 747 (1998) (dismissing a suit pursuant to Article III that "attempt[ed] to gain a litigation advantage by obtaining an advanced ruling on an affirmative defense"); *Coffman v. Breeze Corp.*, 323 U.S. 316, 324 (1945) (relying on Article III and rejecting use of declaratory judgment as a "medium for securing an advisory opinion in a controversy which has not arisen"); *Amchem*, 521 U.S. at 612-13 (declining to reach Article III jurisdiction issue because resolution of class certification issue was "logically

antecedent to the existence of any Article III issues," but cautioning that "Rule 23's requirements must be interpreted in keeping with Article III constraints.").

Amex seeks in this settlement that which would be unobtainable at trial: the preclusion of unripe claims with respect to their honor-all-cards and non-discrimination rules. Keep in mind, a rule that has no anticompetitive effects today can become deleterious with a change in context tomorrow. *See* Semeraro, *supra*, at 67-69.[21]

## V. Awarding plaintiffs' counsel the $75 million they request would constitute an abuse of discretion.

The Court's fiduciary duty ascends a high summit "[i]n setting a fee award, [when] a court is to act as a fiduciary who must serve as a guardian of the rights of absent class members." *Mba v. World Airways*, 369 Fed. Appx. 194, 198 (2d Cir. 2010) (unpublished) (quoting *Cent. States*, 504 F.3d at 249 and *Detroit v. Grinnell Corp.*, 560 F.2d 1093, 1099 (2d Cir. 1977) ("*Grinnell II*")). The plaintiffs would have the Court abdicate its responsibility because this case presents a constructive common fund structure rather than a pure common fund. Fee Memo 3, 6-8. Deferring to counsel's request on this ground would be error.

"The court's review of the attorneys' fees component of a settlement agreement is… an essential part of its role as guardian of the interests of class members. To properly fulfill its Rule 23(e)[22] duty, the district court must not cursorily approve the attorney's fees provision of a class settlement or delegate that duty to the parties." *Strong v. BellSouth Telecomms., Inc.*, 137 F.3d 844, 850 (5th Cir. 1998) (constructive common fund); *In re GMC Pick-Up Truck Fuel Tank Prods. Liab. Litig.* ("*GM Trucks*"), 55 F.3d 768, 819-20 (3d Cir. 1995) (requiring "a thorough judicial review of fee applications...in all class action settlements" because "a defendant is

---

[21] Class counsel appears to be banking on "colleagues at the Department of Justice" to effectively undoing some of the future-looking immunity that the settlement provides Amex. MFA 4. That is not good enough. They may not play credit card roulette with class members' future rights.

[22] There is now also a duty under Rule 23(h).

interested only in disposing of the total claim asserted against it" and "the allocation between the class payment and the attorneys' fees is of little or no interest to the defense") (constructive common fund).

As described *supra* 18-19, 24, the constructive common fund / segregated fee structure does not remedy any inherent conflicts of interest between class counsel and the class. Rather, the plaintiffs' argument against scrutiny of their fees goes to show why *Bluetooth* was correctly decided and why the class is worse off when fees are entirely segregated from class relief. In line with plaintiffs' urging, a court generally has less motivation to scrutinize a fee award when the kicker combined with the clear sailing agreement means that any reversion will only go to the defendant that had already agreed to pay that amount. Charles Silver, *Due Process and the Lodestar Method*, 74 TUL. L. REV. 1809, 1839 (2000) (such a fee arrangement is "a strategic effort to insulate a fee award from attack"); Lester Brickman, LAWYER BARONS 522-25 (2011) (same; further arguing that reversionary kicker should be considered per se unethical). A segregated fee fund discourages thorough review, but the Court should discharge its responsibilities nevertheless, as district courts in this Circuit have done previously. *Excess Value*, 598 F. Supp. 2d 380, 391 (awarding $2.4 million rather than the $19.3 million requested to be commensurate with the class's settlement value) (constructive common fund case); *In re Magazine Antitrust Litig.*, 00 Civ. 4889 (RCC), 2004 WL 253325, 2004 U.S. Dist. LEXIS 1845, at *12 (S.D.N.Y. Feb. 5, 2004) (denying fee entirely based on lack of value of non-monetary class relief) (constructive common fund); *see also Padro v. Astrue*, 11-CV-1788 (CBA) (RLM), 2013 U.S. Dist. LEXIS 150494 (E.D.N.Y. Oct. 17, 2013) ("The Court does not agree with plaintiffs that the lack of a [pure] common fund necessarily vitiates conflict of interest concerns.").

Vindicating the Court's "overarching concern for moderation" is made difficult by the fact that the plaintiffs have not submitted sufficiently detailed lodestar records to allow the court (and objecting class members) to vet them properly. *Goldberger v. Integrated Res.*, 209 F.3d 43,

53 (2d Cir. 2000); *see* Declaration of Mark A. Wendorf, Dkt. 372 ("Wendorf Decl."). That master declaration offers no specific breakdown at all; it merely lists the ranges of hourly fees, total hours expended and general description of tasks undertaken. This is insufficient; "contemporaneous time records are a prerequisite for attorney's fees in this Circuit." *N.Y. State Ass'n for Retarded Children, Inc. v. Carey*, 711 F.2d 1136, 1147 (2d Cir. 1983); *Scott v. City of New York*, 626 F.3d 130, 133 (2d Cir. 2010) ("[W]e are adamant that, after *Carey*, applications for attorney's fees allowed by federal law 'must' be accompanied by contemporaneous time records."). A "summary spreadsheet reciting attorney names, hourly rates, and total hours spent" provides an "inadequate basis" to conduct a lodestar analysis, and even that much wasn't provided here. *Lacovara v. Hard Rock Cafe Int'l (USA), Inc.*, No. 10 Civ. 7821, 2012 U.S. Dist. LEXIS 24023, at *7 (S.D.N.Y. Feb. 24, 2012); *see also Postier v. Louisiana-Pacific Corp.*, No. 09-cv-03290-JCS, 2014 U.S. Dist. LEXIS 33611, at *8 (N.D. Cal. Mar. 13, 2014) ("[N]o billing records…makes it impossible for the Court to determine whether the hours expended on the litigation were reasonable.").[23]

"If plaintiffs and their attorneys are acting like they have something to hide from the absent class members, perhaps it's because they do." *Felix v. Northstar Location Servs.*, 290 F.R.D. 397, 408 (W.D.N.Y. 2013). Buckeye suggests the following avenues for exploration that may well reveal that the proclaimed $73.7 million lodestar is significantly overstated:

---

[23] Rule 23(h) fortifies this requirement, by requiring that class members have notice of and an opportunity to object to all the fee motion papers. *In re Mercury Interactive Corp. Sec. Litig.*, 618 F.3d 988, 994-95 (9th Cir. 2010); *but see Cassese v. Williams*, 503 Fed. Appx. 55, 57 (2d Cir. 2012) (departing from *Mercury* on the facts of that case). It is not sufficient that class members are able to make "generalized arguments about the size of the total fee"; the notice must enable them to determine which attorneys seek what fees for what work. *Mercury*, 618 F.3d at 991. Even before the implementation of Rule 23(h) in 2003, it would have been improper to "paralyze objectors" by in camera submission of fee applications. *Reynolds v. Benefit Nat'l Bank,* 288 F.3d 277, 286 (7th Cir. 2002).

---

**1.** Were high-rate attorneys spending an excessive amount of time performing lower level tasks that are typically performed at an inexpensive rate? "Michelangelo should not charge Sistine Chapel rates for painting a farmer's barn." *In re Citigroup Inc Secs. Litig.*, 965 F. Supp. 2d 369, 398 (S.D.N.Y. 2013) (quoting *Ursic v. Bethlehem Mines*, 719 F.2d 670, 677 (3d Cir. 1983) and refusing to award $330-$550/hr for document review work); *City of Pontiac Gen. Emples. Ret. Sys. v. Lockheed Martin Corp.*, 954 F. Supp. 2d 276, 280 (S.D.N.Y. 2013) (similar). Given that plaintiffs reveal that 25 document review attorneys amassed a lodestar "in excess of $10,000,000," and that millions upon millions of documents were reviewed, this is an area of concern. Wendorf Decl. ¶8.

**2.** Are there inefficiencies of duplication that need to be eliminated from the lodestar, especially in virtue of this being a settlement involving several cases, tens of firms, and hundreds of attorneys? *See Hensley v. Eckerhart*, 461 U.S. 424, 434 (1983) (declaring that fees should exclude "hours that are excessive, redundant, or otherwise unnecessary"); *Citigroup Secs.*, 965 F. Supp. 2d at 390 (rejecting notion that would "permit various competing firms to extract compensation for duplicative work"); *Hubbard v. Donahoe*, 958 F. Supp. 2d 116, 125 (D.D.C. 2013) (evincing concern at overstaffing and vague billing); *In re Agent Orange Prod. Liab. Litig.*, 611 F. Supp. 1296, 1320 (E.D.N.Y. 1985), *aff'd in part, rev'd in part*, 818 F.2d 226 (2d Cir. 1987) (disallowing conference time spent on nonsubstantive matters, such as "air[ing]... disputes with one another" and "haggl[ing] over finances.").

**3.** How many hours were unreasonably expended after settlement was reached? *See In re Citigroup Secs.*, 965 F. Supp. 2d at 391-92 (eliminating post-settlement hours). More generally, were any hours expended that did not confer a benefit upon the putative class?

**4.** Did class counsel exercise sound "billing judgment"? *See Id.* at 392-93.

**5.** When an actual base lodestar is deduced, what is the real multiplier being sought by class counsel? Is this multiplier warranted? *See Zimmerman v. Portfolio Recovery Assocs.*, LLC, 2013 U.S. Dist. LEXIS 174182 (S.D.N.Y. Dec. 11, 2013) (holding multiplier "enhancements may be

awarded [only] in 'rare and exceptional circumstances.'") (quoting *Perdue v. Kenny A.*, 559 U.S. 542, 552 (2010)); *McDaniel v. County of Schenectady*, 595 F.3d 411, 426 (2d Cir. 2010) (describing the "danger of 'routine overcompensation' for risk that has troubled this court in the context of 'mega-fund' class actions" and holding that "an award of no lodestar multiplier at all is within the district court's discretion.").

The above discussion presumes that the Court would elect to employ the lodestar method if it reaches the question of fees. Lodestar methodology has generally fallen into disfavor due to its tendency to create a conflict between class counsel and its clients. *See generally* Silver, *Due Process And The Lodestar Method*, 74 Tul. L. Rev. 1809, 1812 (2000) (observing "solid consensus that the contingent percentage approach minimizes conflicts more efficiently than the lodestar"). Judicial reliance on the lodestar will "create an unanticipated disincentive to early settlements, tempt lawyers to run up their hours, and compel district courts to engage in a gimlet-eyed review of line-item fee audits." *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 121 (2d Cir. 2005). In contrast, the percentage method "directly aligns the interests of the class and its counsel and provides a powerful incentive for the efficient prosecution and early resolution of litigation." As one court described the unsuitability of lodestar, "Class Counsel has requested for itself an uncontested cash award based on lodestar, rather than the value of the class recovery, with only a modest discount from the claimed lodestar amount. In other words, the class is being asked to 'settle,' yet Class Counsel has applied for fees as if it had won the case outright." *Sobel v. Hertz*, No. 3:06-CV-00545, 2011 U.S. Dist. LEXIS 68984, at *44 (D. Nev. Jun. 27, 2011).

No matter what methodology is selected, a court must assiduously discharge its duty to class members. But more than that, it should be cognizant of its duty to the public at large. It has been long recognized that "[f]or the sake of their own integrity, the integrity of the legal profession, and the integrity of Rule 23, it is important that courts should avoid awarding 'windfall fess' and that they should likewise avoid every appearance of having done so." *Grinnell*

*I*, 495 F.2d 448, 469. Otherwise, courts risk reifying the lamentable proverb that "[a] lawsuit is a fruit tree planted in a lawyer's garden." *Id.* (quotation omitted).

## CONCLUSION

For the foregoing reasons, Buckeye requests that this Court reject the proposed certification and settlement. At the very least, the Court should refuse to the approve the fee award as requested.

Dated: June 6, 2014.

_____
Adam E. Schulman (*pro hac vice*)
DC Bar No. 1001606
1718 M Street NW, No. 236
Washington, DC 20036
Phone: (610) 457-0856
Email: shuyande24@gmail.com

*Attorney for The Buckeye Institute for Public Policy Solutions*

## Certificate of Service

The undersigned certifies he electronically filed the foregoing Objection and associated Declaration and Notice of Intent to Appear via the ECF system for the Eastern District of New York, thus sending the Objection in writing to the Clerk of the Court and also effecting service on all attorneys registered for electronic filing. Additionally he caused to be served via first class mail a copy of this Objection and associated documents upon the following attorneys:

| | |
|---|---|
| **Elizabeth L. Grayer**<br>**Tamara Rubb**<br>Cravath, Swaine & Moore LLP<br>825 Eighth Avenue<br>New York, NY 10019 | **Jason L. Reimer**<br>**Steve D. Shadowen**<br>Hangley Aronchick Segal & Pudlin<br>30 N Third Street, Ste 700<br>Harrisburg, PA 17101 |
| **Daniel Ryan**<br>Hinshaw & Culbertson Llp<br>222 North Lasalle Street, #300<br>Chicago, IL 60601 | **John F. LaSalle**<br>**Eric Brenner**<br>Boies, Schiller & Flexner LLP<br>575 Lexington Avenue<br>New York, NY 10022 |
| **Read K. McCaffrey**<br>Patton Boggs LLP<br>2550 M Street NW<br>Washington, DC 20037 | **David Alan Scupp**<br>Constantine Cannon LLP<br>335 Madison Avenue, 9th Floor<br>New York, NY 10017 |
| **Mark Reinhardt**<br>Reinhardt, Wendorf & Blanchfield<br>E-1250 First National Bank Bldg.<br>332 Minnesota St.<br>St. Paul, MN 55101 | |

Dated: June 6, 2014.

_____

Adam E. Schulman