UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE AMERICAN EXPRESS ANTI-STEERING RULES ANTITRUST LITIGATION (II) | Master File No. 11-MD-02221 (NGG)(RER) |
| This Document Relates to:<br><br>CLASS ACTIONS | |

**OBJECTION OF SOUTHWEST AIRLINES CO.,
AIRTRAN AIRWAYS, INC.,
ALASKA AIRLINES, INC.,
DSW INC., AND NEWEGG, INC.
TO THE PROPOSED AMERICAN EXPRESS
RULE 23(B)(2) CLASS ACTION SETTLEMENT**

# TABLE OF CONTENTS

I.       INTRODUCTION ...................................................................................................1

II.      HISTORY OF THE CLASS ACTION LITIGATION .......................................2

         A.      The Tying Cases ........................................................................................2

         B.      The Anti-Steering Rules Cases ..................................................................3

         C.      *Italian Colors* and the Anti-Steering Cases ............................................4

III.     TERMS OF THE SETTLEMENT AGREEMENT ..............................................6

         A.      The No Discount and No Preference Rules Are Unchanged...................6

         B.      The "Modification" of the No Surcharge Rule ......................................7

         C.      The Settlement Agreement Allows Amex to Terminate Merchants Who
                 Utilize the Relief Provided by the Settlement..........................................8

         D.      The Settlement Agreement Gives Amex the Ability to Use Its Prepaid
                 Debit Cards to Circumvent any Beneficial Effects of Allowing Parity
                 Surcharging for All Credit Cards ..............................................................9

         E.      The Agreement Allows Amex to Back Out of the Settlement...............13

         F.      The Scope of the Release .......................................................................14

         G.      The Settlement Agreement Extinguishes Claims for Past Damages ....16

IV.      AS A MATTER OF LAW, THE CLASS CLAIMS CANNOT BE SETTLED
         THROUGH THE USE OF A NON-OPT-OUT CLASS IN COURT .............17

         A.      The Merchants' Right to Individually Arbitrate Their Damages and
                 Injunctive Relief Claims Precludes a Non-Opt-Out Class Resolution ..................17

         B.      The "No Modification" Clause of the Arbitration Agreements Does
                 Not Support a Non-Opt-Out Class Resolution.......................................19

V.       THE PROPOSED SETTLEMENT FAILS TO PROVIDE RELIEF THAT
         WOULD GENERATE MEANINGFUL PRICE COMPETITION AMONG
         AMEX AND ITS RIVALS.................................................................................22

         A.      The Proposed Class Settlement Leaves Amex's Merchant Restraints Almost
                 Entirely Intact.........................................................................................22

B. The Failure to Obtain the Same Rule Changes as the MDL 1720 Class Settlement Will Perpetuate the Market Distortions ...............................................25

    1. Differential surcharging among credit cards is significantly more valuable than parity surcharging........................................................25

    2. The proposed relief perpetuates barriers to entry. ....................................29

    3. The Proposed Settlement Perpetuates the Incentive to Increase Price. .....................................................................................................29

C. Class Counsel's Attempt to Minimize the Value of Allowing Differential Surcharging among Credit Cards is Disingenuous and Without Merit ................31

    1. Current Rate Differentials are Artificial and Irrelevant .............................31

    2. State Anti-Surcharging Statutes .................................................................31

D. The Government's Suit Does Not Excuse the Class's Failure to Eliminate Anticompetitive Conduct ........................................................................................34

VI. THE PROPOSED SETTLEMENT CLASS CANNOT BE CERTIFIED UNDER RULE 23 ...........................................................................................................................35

A. The Standard for Approval of a Settlement Class ..................................................35

B. The Class Plaintiffs Cannot Now Fairly Represent the Objectors.........................36

C. The Settlement Agreement Violates Due Process ..................................................37

D. The Proposed Settlement Violates the Enabling Act and *Italian Colors*...............38

VII. THE EQUITIES SUPPORT ALLOWING THE OBJECTORS TO OPT-OUT OF THE PROPOSED RULE 23(B)(2) CLASS ................................................................39

VIII. CONCLUSION.....................................................................................................................40

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*In re Am. Int'l Grp., Inc. Secs. Litig.*,
    689 F.3d 229 (2d Cir. 2012).................................................................35

*Amchem Prods., Inc. v. Windsor*,
    521 U.S. 591 (1997).......................................................................36

*American Express Co. v. Italian Colors Restaurant, Inc.*,
    133 S. Ct. 2304 (2013) ................................................................ *passim*

*Chauffeur's Training Sch., Inc. v. Spellings*,
    478 F.3d 117 (2d Cir. 2007)...........................................................34

*Conte v. Justice*,
    996 F.2d 1398 (2d Cir. 1993).........................................................34

*Contec Corp. v. Remote Solution Co.*,
    398 F.3d 205 (2d Cir. 2005)...........................................................22

*D'Amato v. Deutsche Bank*,
    236 F.3d 78 (2d Cir. 2001).............................................................35

*Drennan v. Van Ru Credit Corp.*,
    No. 96 C5789, 1997 WL 305298 (N.D. Ill. May 30, 1997) ....................40

*Expressions Hair Design v. Schneiderman*,
    975 F. Supp. 2d 430 (S.D.N.Y. 2013)..........................................32, 33

*Gueyffier v. Ann Summers, Ltd.*,
    43 Cal. 4th 1179 (2008) .................................................................21

*Harry Hoffman Printing, Inc. v. Graphic Commc'ns Int'l Union, Local 261*,
    950 F.2d 95 (2d Cir. 1991).............................................................20

*Jefferson v. Ingersoll Int'l Inc.*,
    195 F.3d 894 (7th Cir. 1999) ..........................................................39

*Johnson v. Meriter Health Servs. Emp. Ret. Plan*,
    702 F.3d 364 (7th Cir. 2012) ..........................................................39

*Kraft Foods, Inc. v. Office & Prof'l Emps. Int'l Union, AFL-CIO, CLC Local 1295*,
    203 F.3d 98 (1st Cir. 2000).............................................................21

*In re Literary Works in Elec. Databases Copyright Litig.,*
  654 F.3d 242 (2d Cir. 2011).................................................................................36

*Logan v. Zimmerman Brush Co.,*
  455 U.S. 422 (1982)...........................................................................................37

*Mastrobuono v. Shearson Lehman Hutton,*
  514 U.S. 52 (1995).............................................................................................21

*McReynolds v. Richards-Cantave,*
  588 F.3d 790 (2d Cir. 2009)...............................................................................39

*Newsome v. Up-to-Date Laundry, Inc.,*
  219 F.R.D. 356 (D. Md. 2004)............................................................................39

*Ortiz v. Fibreboard Corp.,*
  527 U.S. 815 (1999)...........................................................................................37

*PacifiCare Health Sys., Inc. v. Book,*
  538 U.S. 401 (2003)...........................................................................................21

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.,*
  No. 05-MD-1720 (JG) (JO), 2013 WL 6510737 (E.D.N.Y. Dec. 13, 2013)....................24, 26

*Penson v. Terminal Transp. Co., Inc.,*
  634 F.2d 989 (5th Cir. 1981) .............................................................................39

*Phillips Petroleum Co. v. Shutts,*
  472 U.S. 797 (1985)...........................................................................................37

*Southland Corp. v. Keating,*
  465 U.S. 1 (1984)...............................................................................................39

*Teamsters Local 445 Freight Div. Pen. Fund v. Bombardier, Inc.,*
  546 F.3d 196 (2d Cir. 2008)...............................................................................35

*Vera v. Saks & Co.,*
  335 F.3d 109 (2d Cir. 2003)........................................................................20, 21

*Wal-Mart Stores, Inc. v. Dukes,*
  131 S. Ct. 2541 (2011)........................................................................................38

### Statutes

9 U.S.C. § 2........................................................................................................39

15 U.S.C. § 1693o-2.................................................................................9, 10, 12

28 U.S.C. § 2072(b) ..........................................................................................39

Cal. Civ. Code § 1748.1(a) ...............................................................33

Colo. Rev. Stat. § 5-2-212(1) .........................................................33

Conn. Gen. Stat. § 42-133ff(a) .......................................................33

Fla. Stat. § 501.0117(1) ..................................................................33

Kan. Stat. Ann. § 16a-2-403 ...........................................................33

Mass. Gen. Laws Ch. 140D § 28A(a)(2) .......................................33

Me. Rev. Stat. tit. 9-A § 8-303(2)....................................................33

New York Gen. Bus. Law § 518 ......................................................33

Okla. Stat. tit. 14A § 2-211A...........................................................33

Tex. Fin. Code § 339.001(a) ...........................................................33

Utah Code § 13-38a-302...................................................................33

Southwest Airlines Co., AirTran Airways, Inc.,[1] Alaska Airlines, Inc., DSW, Inc., and Newegg, Inc. (collectively "Objectors") object to final approval of the proposed class settlement agreement dated December 19, 2013 ("Settlement Agreement"). The Objectors have standing as putative class members to object because they accepted American Express ("Amex") cards on the date that the proposed class settlement was preliminarily approved and continue to do so today.

## I.     INTRODUCTION

The most effective way to create price competition for merchant credit card services, and the most consistent with a free and competitive market, is to allow merchants to charge payment card users different prices that reflect the different costs associated with accepting different credit cards. Even if the merchant never actually implements a differential surcharge, a merchant with sufficient transaction volume will be able to negotiate lower rates with payment card networks just by the threat of differentially pricing the different card products and steering volume away from the higher priced card. Unfortunately, as a result of this proposed settlement, Class Counsel has given away this valuable right, and ensured that this powerful pro-competitive mechanism never sees the light of the day.

Because of the United States Supreme Court's decision in *American Express Co. v. Italian Colors Restaurant, Inc.*,[2] the Class, which consists of small merchants that individually possessed tiny claims against Amex, was facing near certain dismissal of its class claims, and therefore, left without any litigation leverage. Amex viewed that lack of leverage as a golden opportunity to mitigate the difficult position in which it currently finds itself in connection with the case brought by the United States Department of Justice, as well as litigation brought by the

---

[1] AirTran Airways, Inc. is a wholly-owned subsidiary of Southwest Airlines Co.

[2] 133 S. Ct. 2304 (2013) ("*Italian Colors*").

Individual Merchant Plaintiffs. In exchange for an incredibly broad release from the Class (which includes the Objectors), Amex agreed to pay Class Counsel up to $75 million in attorneys' fees and make such cosmetic changes to its No Surcharge, No Discount, and No Preference Rules (collectively "Merchant Restraints"), that they are of no benefit to merchants.

In many ways, the proposed settlement and circumstances under which it was reached, are a microcosm of one of the most significant issues that has existed in the payment card industry for some time. Namely, because of the various payment card networks' anti-steering rules, card networks like Amex have had all of the leverage vis à vis merchants, and the merchants, who as a practical matter are required to accept the payment cards of the major networks, are virtually powerless to resist ever increasing swipe fees. However, with the recent class settlement in *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, MDL 1720 (E.D.N.Y.) ("MDL 1720"), that began to change, and Amex's Merchant Restraints became the last significant barrier to the introduction of true competitive forces in the payment card marketplace. However, once again, Amex used its superior leverage here to obtain a beneficial deal for itself and a bad deal for merchants, and ensured that competitive forces remain noticeably absent from the marketplace.

For the reasons set forth below, the Objectors respectfully request that the Court deny final approval to the proposed class settlement.

## II.    HISTORY OF THE CLASS ACTION LITIGATION

### A.    The Tying Cases

Class Counsel originally filed a series of cases[3] alleging that Amex's Honor All Cards Rule constituted unlawful tying (the "tying cases"), and those cases were consolidated in the

---

[3] *See, e.g.*, *Italian Colors Rest. v. American Express Travel Related Servs. Co.*, 03-CV-03719 (SI) (N.D.C.A.); *Chez Noelle Rest. v. American Express Co., et al.*, 04-CV-00266 (GBD)

Southern District of New York. The tying cases did not challenge Amex's Merchant Restraints and were ultimately dismissed by Judge Daniels in favor of individual arbitration. The dismissal of the tying cases started an appellate journey that ultimately led to the Supreme Court's decision in *Italian Colors.*

## B.    The Anti-Steering Rules Cases

The Class plaintiffs in the anti-steering cases contended that Amex's Merchant Restraints unreasonably injure competition and sought damages from Amex, as well as an injunction enjoining the Merchant Restraints. The No Surcharge and No Discount Rules prevent differential pricing for the use of alternative payment cards and thereby eliminate interbrand horizontal price competition between Amex and other payment cards. More specifically, these "no price" rules prevent merchants from charging a consumer more to use high-cost Amex cards (*i.e.*, a surcharge) or less to use a lower-cost alternative card (*i.e.*, a discount). If merchants could charge a higher price to consumers who use an Amex card or a lower price to consumers who use an alternative card, Amex would have to lower its price or face a pro-competitive loss of business due to its higher price. By preventing merchants from differentially pricing the use of its cards, Amex eliminates horizontal price competition between itself and alternative payment cards that would otherwise occur. The purpose of the Class complaint in the anti-steering cases was to enjoin these rules so that horizontal price competition between Amex, MasterCard, Visa, and Discover credit cards would determine the market price for card acceptance.

The No Preference Rule (sometimes referred to as the "No Soft-Steering Rule") prevents merchants from truthfully informing consumers that Amex charges the merchant more than other payment cards; that the merchant must pass on this higher cost to all of its customers in the form

---

(S.D.N.Y.); *Mascari Enters. v. American Express Co., et al.*, 04-CV-00366 (GBD) (S.D.N.Y.); *Marcus Corp. v. American Express Co., et al.*, 04-CV-05432 (GBD) (S.D.N.Y.).

of higher prices; and that the merchant would prefer that the consumer use an alternative lower-cost card. But for the No Preference Rule, Objectors could use preference programs or soft-steering to cause consumers to switch to the lower-cost preferred cards, which would force Amex to lower its price or else lose significant card transaction volume.

## C.    *Italian Colors* **and the Anti-Steering Cases**

Because of *Italian Colors*, however, the Class anti-steering cases, which have been pending before this Court since March 2011, have barely gotten off the ground. On March 3, 2011, Magistrate Judge Reyes recognized that the anti-steering Class plaintiffs were bound by the same arbitration agreements as the *Italian Colors* plaintiffs.[4] Judge Reyes therefore stayed virtually the entirety of the anti-steering class action, including discovery, pending the final resolution of the arbitration issues in *Italian Colors*. The stay currently remains in effect.

On June 20, 2013, the Supreme Court decided *Italian Colors*. The Court held that the Amex arbitration provision obligating Amex and the merchants to individually arbitrate any claims on a non-class basis was enforceable. The Court stated that "arbitration is a matter of contract" and held that "courts must 'rigorously enforce' arbitration agreements according to their terms" – even where the arbitration clause contains a class action waiver that leaves the plaintiff without "an affordable procedural path to the vindication" of its statutory claims.[5] While Class Counsel battled for years in an effort to defeat Amex's arbitration clause and class waiver in an effort to preserve the viability of their class action, *Italian Colors* eliminated the ability of the Class plaintiffs in both the tying and the anti-steering rules cases to proceed in Court or as an arbitration class.

---

[4] Order dated March 3, 2011 (Dkt. No. 16).
[5] 133 S. Ct. 2304 at 2309.

Relying on *Italian Colors*, on July 10, 2013, Amex moved to dismiss the anti-steering class actions in favor of individual arbitration, a motion that was never decided because of this "settlement." The class conceded that its damage claims had to be dismissed, but argued that the claims for injunctive relief were not covered by *Italian Colors* and could remain in court.[6] According to the Class, the "parties to the arbitration agreement did not intend" that a claim for injunctive relief seeking to preclude Amex from enforcing its anti-steering rules would be resolved in arbitration.[7] The class made this argument even though the arbitration provision applies to "any claim … dispute or controversy between you and us" and states that "the arbitrator shall have the power and authority to award any relief that would have been available in Court, including equitable relief (*e.g.*, injunction, specific performance)."[8] In response to the Class' contention that the parties did not intend to arbitrate a claim to enjoin the Amex anti-steering rules, Amex observed that the Class position "obviously makes no sense."[9]

With the Class crippled by *Italian Colors* and likely facing complete dismissal of its claims, Amex saw a golden opportunity. With its damage claim admittedly gone and its claim for injunctive relief on the verge of dismissal, the Class "agreed" to "settle" with Amex. The terms of the resulting Settlement Agreement are what one would expect under these circumstances – totally one-sided and self-serving in favor of Amex.

In exchange for $75 million in attorneys' fees to Class Counsel, settlement class members, including the Objectors, get no monetary relief from this settlement. In addition, Amex makes a trivial change to one of its rules that utterly fails to increase competition between credit

---

[6] Pl. Mem. in Opp. to Motion to Dismiss dated July 24, 2013 (Dkt. No. 264), at 1.

[7] *Id*. at 3.

[8] Reply Mem. in Support of Motion to Dismiss dated Aug. 5, 2013 (Dkt. No. 265), at 2.

[9] *Id*.

card networks. Instead, the changes do quite the opposite. They actually ensure that the use of alternative credit cards will be priced identically or higher in perpetuity. The Settlement Agreement also protects Amex's debit cards from competition from MasterCard and Visa debit cards. In return, Amex gets a complete release for 10 years – and possibly forever – of any claim that its anti-steering rules should be enjoined, including the claims of the Objectors. Amex even gets a release of damage claims for future conduct.

### III.    TERMS OF THE SETTLEMENT AGREEMENT

The Class admits that its loss in *Italian Colors* "precipitated the instant settlement" and affected its terms.[10] Only some of those terms are discussed by the Class in its memorandum. Below is a more complete description of the proposed agreement.

### A.    The No Discount and No Preference Rules Are Unchanged

The Settlement Agreement provides *no* relief whatsoever with regard to the No Discount Rule or the No Preference Rule. After the settlement, a merchant is still prohibited by Amex from offering consumers a discount to use a MasterCard, Visa, or Discover card. Similarly, a merchant is still precluded from truthfully informing consumers that Amex charges the merchant more than other credit cards and that the merchant would prefer that the consumer use an alternative lower-cost credit card.

The Class suggests that its failure to obtain any relief on the No Discount and No Preference Rules – which are plainly intended to eliminate horizontal price competition and were featured prominently in the Class' complaint[11] – is unimportant because the Government can still challenge these rules. Yet, the release does in fact release claims for injunctive relief with respect

---

[10] Pl. Class Mem. at 13 (Dkt. No. 362).

[11] *See Consolidated Class Action Complaint* dated March 23, 2011, MDL No. 2221 (NGG) (RER) (Dkt. No. 27), at ¶ 27, *et seq.*

to these rules. In return for releasing those claims and being denied their day in arbitration on these claims, merchants receive nothing. In the end, Amex surrenders nothing and is allowed to continue its aggressive defense of those rules in the Government case. That is not a fair, reasonable, adequate, or even responsible, compromise of those claims.

**B.     The "Modification" of the No Surcharge Rule**

The Settlement Agreement does not allow for differential surcharging among credit cards.[12] Under the settlement, a merchant may surcharge Amex cards only if it surcharges all other credit cards it accepts and the Amex surcharge is not higher than the surcharge on any other card accepted by a merchant.[13] For example, assuming MasterCard charges a merchant, say, a 1.5% fee for its standard credit card and Amex charges that merchant a 2.5% fee, the merchant may only surcharge Amex cards 1.5% - as much as it surcharges the far less expensive MasterCard credit cards.

Because a merchant may surcharge Amex only if it surcharges all the other credit cards and no more than any other cards, merchants have no way to use lower prices to incentivize consumers to switch to the lower-cost credit cards. However, if a merchant were indeed allowed to differentiate between cards when surcharging, then the merchant could lawfully agree with one credit card company that, in exchange for lower rates from the favored card company, the merchant will surcharge other credit cards and thereby drive volume to the favored card company. To avoid losing sales, the other card companies would have no real choice but to respond with lower prices of their own, and price competition would push them to the competitive market rate. However, under the parity surcharge rule embodied in the proposed settlement, there is no mechanism to drive price competition between alternative credit cards.

---

[12] Settlement Agreement, ¶ 8; *see* Pl. Class Mem. at 3.

[13] *Id*. at ¶ 8(b), (c).

Instead, the proposed settlement virtually guarantees that credit card rates will continue their ascent, since the settlement ensures the competitive mechanism will remain locked up from the payment card marketplace.

The one proposed small modification to Amex's No Surcharge Rule is also of little value to merchants. Under the new rule, a merchant would no longer have to surcharge debit cards if it parity surcharges all credit cards.[14] The Class claims that this as a great achievement. As explained below, it is not.

## C. The Settlement Agreement Allows Amex to Terminate Merchants Who Utilize the Relief Provided by the Settlement

Even in the unlikely event a merchant were to parity surcharge, the Settlement Agreement allows Amex to continue to browbeat merchants because the agreement permits Amex to "terminate or refuse to renew the Card Acceptance Agreement of any merchant" so long as Amex does not do so "solely" because the merchant engages in permitted parity surcharging under the Settlement Agreement.[15] This provision explicitly allows Amex to terminate or cancel a merchant *predominantly* because the merchant has exercised its right under the Settlement Agreement to engage in parity surcharging. A fair and reasonable agreement would bar Amex from using the merchant's exercise of its right to parity surcharge as *any* part of the basis for terminating or refusing to renew a merchant's card acceptance agreement. Otherwise, Amex could merely take back with the left hand what Class Counsel claims was given with the right.

Refusing to accept Amex is, at best, financially disadvantageous for Objectors, and at worst, is financially impossible. Indeed, hundreds of other merchants of all classes and sizes

---

[14] *Id*. at ¶ 8(b).

[15] *Id*. at ¶ 10.

submitted declarations in connection with the class settlement approval in MDL 1720 confirming that they could not cease accepting Amex.[16] Yet, under a reasonable interpretation of the Settlement Agreement, Amex is free to tell a merchant to stop parity surcharging or it will be terminated or not renewed predominantly for that reason. Such threats will significantly deter merchants such as Objectors from even attempting to secure the limited benefits of parity surcharging that is allowed by the proposed settlement. It will not be difficult for Amex to conjure up an additional minor pretext for its threat to cancel a merchant. A minimally fair agreement would not allow Amex to use permitted behavior as *any* part of the basis for threatening to terminate or refusing to renew that merchant's card acceptance agreement.

**D.    The Settlement Agreement Gives Amex the Ability to Use Its Prepaid Debit Cards to Circumvent any Beneficial Effects of Allowing Parity Surcharging for All Credit Cards**

The Class argues that under the Durbin Amendment to the Dodd-Frank Financial Reform Act,[17] bank-issued debit card rates are regulated by the Federal Reserve Bank and are capped at far lower rates than prevailing credit card rates. Thus, the Class argues that if merchants parity surcharge all credit cards, consumers will naturally migrate to regulated lower-cost debit cards that are not surcharged, thereby causing the merchants' cost of card acceptance to plummet.[18] The Class is wrong in at least two ways.

First, not all bank-issued debit cards have regulated rates. Banks with less than $10 billion in assets are exempt from the Durbin Amendment. Therefore, the rates that the merchants pay to accept debit cards issued by these banks are unregulated, no different than the

---

[16] Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment in *United States of America, et al. v. American Express Co., et al.*, 10-CV-4496, at p. 3 (a copy of which can be found at http://www.justice.gov/atr/cases/f303800/303848.pdf).

[17] 15 U.S.C. § 1693o-2.

[18] Pl. Class Mem. at 3.

discount fees currently charged by Amex in connection with its credit and charge cards.[19] If consumers switch from parity surcharged credit cards to debit cards issued by the unregulated banks, there may be no savings at all to merchants for acceptance of these cards.

Second, and more importantly, the Class fails to mention that Amex currently issues such unregulated debit cards, which are not subject to any Durbin Amendment rate cap, and which Amex can utilize to easily circumvent any beneficial effect that parity surcharging provided by the Settlement Agreement might otherwise have.[20]

Class Counsel proudly claims that they have foreseen that Amex could use an unregulated, high-reward debit card to circumvent and "undermine the [parity] surcharging relief" provided by the settlement, and they claim to have built protections into the Settlement Agreement to prevent that result.[21] As the Class explains:

> Specifically, the Class Counsel was concerned that Amex might launch a reward-bearing, high-fee, non-Durbin-regulated traditional debit card product and advertise that that product is "surcharge free."[22]

As a result of this concern, the proposed Settlement Agreement attempts to "protect" merchants from this result by carving out from the Amex Honor All Cards Rule, an "American Express-Branded Traditional Debit Card." An "American Express-Branded Traditional Debit Card" is a Debit Card issued by a bank in affiliation with Amex.[23] Currently, "there … are no

---

[19] 15 U.S.C. § 1693o-2(a)(6)(A).

[20] 15 U.S.C. § 1693o-2(a)(7)(A)(ii) (exempting prepaid cards from rate regulation by the Federal Reserve). Amex's unregulated prepaid debit card products include Serve and Bluebird. *See* American Express Serve, http://www.serve.com; American Express Bluebird, http://www.bluebird.com.

[21] Pl. Class Mem. at 15.

[22] *Id.*

[23] Settlement Agreement, ¶ 1(g).

Amex Branded Traditional Debit Cards."[24] However, the Settlement Agreement states that, if Amex ever does provide an American Express-Branded Traditional Debit Card, then the Amex Honor All Cards Rule will not apply to that card.[25] Thus, if Amex ever provides an American Express-Branded Traditional Debit Card, then a merchant will be able to continue to accept Amex credit cards even if it refuses to accept the American Express-Branded Traditional Debit Card.[26]

This protection is, in reality, a paper shield. Class Counsel fails to recognize that the Settlement Agreement does not protect the merchants from Amex's ability to use a species of Debit Cards *that it already issues* to easily circumvent the Settlement Agreement. Although Amex may not currently issue "American Express-Branded Traditional Debit Cards," Amex currently does issue "Prepaid Cards,"[27] which, while considered a type of Debit Card under the Settlement Agreement,[28] are not considered American Express-Branded Traditional Debit Cards. As explained below, the Settlement Agreement exempts from the Honor All Cards Rule *only* the American Express-Branded Traditional Debit Cards that Amex does not currently provide.[29] The Amex Honor All Cards Rule explicitly *includes* Prepaid Cards, and under that rule, the

---

[24] *Id.* at ¶ 8(h).

[25] *Id.* at ¶ 8(f).

[26] *Id.* at ¶ 8(f), (j); Pl. Class Mem. at 15.

[27] Prepaid Cards are defined as "any card, plate or other payment code, token, device, or service where funds are loaded and/or reloaded prior to use at merchants." Settlement Agreement, ¶ 1(ss). *See* American Express Gift Cards & Business Gift Cards, http://www.americanexpress.com/gift-cards/?inav=menu_cards_giftcards; American Express Serve, http://www.serve.com (prepaid card); American Express Bluebird, http://www.bluebird.com (prepaid card).

[28] Settlement Agreement, ¶ 1(cc).

[29] Settlement Agreement, ¶¶ 8(f), (g).

- 11 -

Settlement Agreement would require merchants to accept Prepaid Cards.[30] Because those Prepaid Cards are not subject to rate regulation under the Durbin Amendment,[31] Amex is free to raise its Prepaid Card rates to merchants without regard to the rate cap for debit card transactions set by the Federal Reserve. Most relevant here, the Settlement Agreement perversely cements Amex's right to raise its Prepaid Card rates, as high as its charge and credit card products, if it so wishes.

Currently, Amex does not give rewards to its Prepaid Card users. However, if merchants commence parity surcharging credit cards and consumers start switching to debit cards – as Class Counsel predicts – Amex can easily start issuing high rewards to its Prepaid Card users and have the merchants subsidize these rates by charging the merchant high fees. The regulated debit card issuers will not have sufficient revenue from their regulated low rates to match Amex's rewards – which only Amex would be able to offer. The Amex high-reward Prepaid Cards would – as the Class concedes – have an "obvious" consumer appeal as compared to the regulated low-cost non-reward debit cards.[32] As a result, Amex will be able to blunt the migration from parity surcharged credit cards to low-cost regulated debit cards, and the only benefit that the Settlement Agreement supposedly provides to merchants will evaporate.

---

[30] *Id.* at ¶¶ 1(c), (g), (cc), 8(g), (h). Paragraph 1(c) defines "American Express-Branded Cards" to include both "Credit Cards" and "Debit Cards." Paragraph 1(cc) defines Debit Cards to include Prepaid Cards and gift cards. Paragraph 1(g) states that Prepaid Cards are not American Express-Branded Traditional Debit Cards. Paragraph 8(f) exempts American Express-Branded Traditional Debit Cards from the Honor All Cards Rule, but paragraph 8(g) states, "for the sake of clarity" that the exemption applies only to American Express-Branded Traditional Debit Cards and paragraph 8(h) states that the Honor All Cards Rule "will continue to require merchants … to accept all currently existing American Express-Branded Cards," which as noted above, are defined to include Debit Cards, including Prepaid Cards.

[31] 15 U.S.C. § 1693o-2(a)(7)(A)(ii).

[32] Pl. Class Mem. at 15.

**E.    The Agreement Allows Amex to Back Out of the Settlement**

Under the Settlement Agreement, Amex does not concretely commit to anything. Paragraph 62 of the Settlement Agreement gives Amex – but not the Class – the right to terminate the Settlement Agreement and make none of the supposedly beneficial changes to its rules if any one of seven different specified events occur.[33] Some of these events were virtually sure to occur when the Settlement Agreement was executed. For example, Amex has the right to terminate if the "Individual Merchant Plaintiffs" object to the Settlement Agreement – a virtually guaranteed outcome since these plaintiffs are separately pursuing their claims against Amex, and are seeking precisely the same relief the Class is attempting to give away. Other conditions of termination are events outside of this lawsuit and that effectively give Amex the option to opt-out of the Settlement Agreement for many years to come.

For example, paragraph 62(a) gives Amex the right to terminate the Settlement Agreement if the MDL 1720 class settlement agreement "is not finally approved (including after appeals have run) in the form in which it was preliminarily approved." The MDL 1720 class action settlement agreement was approved by Judge Gleeson on December 13, 2013. It is currently on appeal. A decision is not expected in that appeal for more than a year after the briefing ends, and that decision will almost certainly be followed by a petition for *certiorari*. If any part of that agreement is changed or rejected on appeal, then Amex can elect to back out of its Settlement Agreement. Essentially, Amex can wait and see how the case involving its rivals will be finally resolved before it commits to do anything. Although the class members, including the Objectors, are required to immediately surrender their rights to enjoin Amex's anticompetitive conduct, Amex is not obligated to change its rules until all appeals and petitions

---

[33] Settlement Agreement, ¶¶ 62, 63(a).

for rehearing and *certiorari* are exhausted in this case,[34] and, even then, can still back out of the Agreement if there is even a minor change to the MDL 1720 settlement agreement.

The unfairness of giving Amex, but not the merchants, the option to walk away from the settlement is plainly evident in paragraph 62(f). That paragraph grants Amex an option to terminate the Settlement Agreement if merchants representing 20% of Amex's charge volume object to it. It is ironic that Amex is given the option to freely walk away from the Settlement Agreement, but the objecting merchants are given no ability under any circumstances to get out of the agreement and are expected to have the proposed settlement shoved down their throats, in contravention of their bargained for contractual rights, which give them the right to arbitrate or litigate their dispute on a non-class basis.

## F. The Scope of the Release

Tellingly, the Class spends only one paragraph discussing the release given to Amex in the Settlement Agreement.[35] The Class' acknowledgement that the "[r]elease is broad," is an understatement, at best, and utterly fails to describe its far reaching consequences. The Settlement Agreement states that all merchants, regardless of "whether they object to this Class Settlement Agreement" and regardless of "whether or not they exercise any benefit provided under this Class Settlement Agreement,"[36] release all claims for damages or injunctive relief for any conduct after the change in Amex's rules.[37] Specifically, Amex is released from any past or future injunctive relief claim and any future damage claim on account of:

> 1. Any Amex rule or provision that limits a merchant's ability to (i) "indicate or imply a preference" for any alternative

---

[34] Settlement Agreement, ¶ 1(aaa).

[35] Pl. Class Mem. at 15.

[36] Settlement Agreement, ¶24.

[37] *Id*. at ¶¶ 1(uu), 41.

payment method or product, (ii) dissuade customers from using Amex cards, (iii) criticize Amex, (iv) to prompt consumers to use other payment mechanisms, (v) promote the use of other payment mechanisms, or (vi) inform consumers "about the cost of acceptance of payment cards, payment products or methods of payment."[38]

2. Any "no surcharge" rule; "no discount" rule; anti-steering rule; or rules that prevent a merchant from "favoring or steering customers to use" alternative payment forms.[39]

3. Amex's anti-class-action arbitration provisions.[40]

4. Any rules, such as the Honor All Cards Rule, that require a merchant to accept all Amex cards and any rule that "tie[s] acceptance by merchants of an American Express-Branded Card to any other type of American Express-Branded Card."[41]

5. The future effect of any of the above-identified rules or provisions.[42]

The breadth of the release can also be seen in its duration. The release not only covers injunctive relief claims, but also injunctive relief claims and damage claims for "continuing" conduct that occurs before the "Release Termination Date."[43] Although the "Release Termination Date" is a minimum of 10 years into the future after Amex changes its rules, it then continues indefinitely, and possibly forever, until the latest of: (a) when Amex changes its anti-

---

[38] *Id*. at ¶ 26(a).

[39] *Id*. at ¶ 26(b).

[40] *Id*. at ¶26(c). Amex's overreaching in the Settlement Agreement even provides that class members who do not have arbitration or class waiver provisions in their Amex agreements waive the right to participate in or act as a class representative in any suit by such merchants. Settlement Agreement, ¶ 29.

[41] *Id*. at ¶ 26(d), (e). Notably, this provision would prevent any meaningful challenge to Amex's Honor All Cards Rule should a merchant wish to challenge such rule because of their having to accept an unregulated Amex debit card that is not considered an "American Express-Branded Traditional Debit Card."

[42] *Id*. at ¶ 26(f).

[43] *Id*. at ¶ 27.

steering rules or its Honor All Cards Rule, or (b) when MasterCard and Visa change the rules they have agreed to in the settlement of MDL 1720.

**G.  The Settlement Agreement Extinguishes Claims for Past Damages**

Although Class Counsel has expressly stated that the Settlement Agreement permits an absent class member to "pursue damages claims against American Express based on the anti-steering rules and Honor All Cards rules … under whatever dispute resolution terms are applicable to that merchant,"[44] such an assurance is without comfort because the same Settlement Agreement takes away absent class members' ability to establish liability against Amex.[45] Paragraph 29 of the Settlement Agreement prohibits absent class members from "seek[ing] to establish … liability against [American Express] based, in whole or in part, upon any conduct covered by any of the claims" addressed in the Consolidated Class Complaint.[46] The Consolidated Class Complaint alleged, among other things, that the Amex Merchant Restraints are illegal and violate the antitrust laws.

It is axiomatic that a plaintiff in an antitrust action must establish liability before it can recover damages. Thus, a settlement that prohibits that plaintiff from establishing liability will, at a minimum, preclude the recovery of those damages. In short, Amex has constructed an agreement which allows for class members to seek redress of their past damages through arbitration or litigation (depending on their merchant agreement), but precludes those absent Class members from establishing the very liability which is required to prove their damages.

---

[44] Pl. Class Mem. at 16 (citing Settlement Agreement, ¶¶ 29, 40).

[45] *Id.*

[46] Not surprisingly, Amex admits no liability in the Settlement Agreement. *See* Settlement Agreement, ¶ 73.

Such a result - where American Express "giveth" with one hand and takes it away with the other – should not be condoned.

## IV. AS A MATTER OF LAW, THE CLASS CLAIMS CANNOT BE SETTLED THROUGH THE USE OF A NON-OPT-OUT CLASS IN COURT

### A. The Merchants' Right to Individually Arbitrate Their Damages and Injunctive Relief Claims Precludes a Non-Opt-Out Class Resolution

As a matter of law, a merchant's suit to enjoin the enforcement of Amex's anti-steering rules cannot be resolved through the use of a non-opt-out class. Almost all of Amex's card merchant acceptance agreements contain an arbitration clause that gives each merchant the contractual right to require that its claims for injunctive relief, and damages, be individually arbitrated on a non-class basis.[47] The Amex arbitration clause is a two way street. Among other things, the arbitration clause states that arbitration is required "by your or our election."[48] It also states that both "you and we are specifically barred" from proceeding "on a class or consolidated basis."[49] In its complaint, the Class itself recognized that the arbitration clause and class action waiver preclude "any challenge seeking to enjoin the application of [Amex's] anticompetitive rules to all merchants under Rule 23(b)(2)."[50] Thus, the proposed settlement impermissibly allows Amex to circumvent the parties' bargained for contractual rights and should not be approved.

---

[47] Declaration of Tracey Kitzman dated July 24, 2013 (Dkt. No. 264-3), at ¶ 3; Ex. A. Although the language of the standard Amex merchant acceptance agreements cited herein may not be identical to the merchant acceptance agreements of the Objectors or other merchants, the language is substantively the same.

[48] Declaration of Natalie Morales dated July 10, 2013 (Dkt. No. 262-2) ("Morales Decl."), Ex. C, at § 7.d.i.

[49] *Id*. at Ex. C, at § 7.d.iii.

[50] Cons. Class Compl., at ¶ 85.

- 17 -

The arbitration agreement plainly provides that either party may elect arbitration and that there can be <u>no</u> class or group treatment of the dispute:

> If arbitration is chosen by any party with respect to a claim, neither you nor we will have the right to litigate that claim in court or have a jury trial on that claim…. Further, you will not have the right to participate in a representative capacity or as a member of any class of claimants pertaining to any claim subject to arbitration. The arbitrator's decision will be final and binding. Note that other rights that you would have if you went to court may also not be available in arbitration.[51]

Following years of litigation by Amex on the issue, the Supreme Court in *Italian Colors* ruled in favor of Amex and, in the context of Amex's arbitration clause, affirmed that the contractual rights set forth in Amex's arbitration agreements with merchants must be respected, even to the preclusion of Rule 23 of the Federal Rules of Civil Procedure.[52] Incredibly, Amex now seeks exactly the opposite result – approval of a Rule 23(b)(2) non-opt-out class to prevent merchants from exercising the very contractual rights Amex sought and obtained in *Italian Colors* – the right to individually litigate or arbitrate their injunctive relief claims.

The Amex arbitration agreement and class waiver, however, creates *mutually* binding legal obligations on both Amex and the merchant. Provisions of the arbitration clause confirm that the agreement not to resolve claims on a class basis "binds" both Amex and each individual merchant. The arbitration clause expressly states: "there is no right or authority for any claims to be arbitrated or litigated on a class-action or consolidated basis, on behalf of the general public

---

[51] *See* Morales Decl., ¶¶ 6-7; Ex. C, at § 7.d.iii; Ex. B.

[52] The Supreme Court specifically concluded that the Amex arbitration agreement controlled over the conflicting provisions of Rule 23 and required class members to pursue "their claims individually – as they contracted to do." *Italian Colors*, 133 S. Ct. 2301 at 2304, 2309.

or other parties, or joined or consolidated with claims of other parties, *and you and we are specifically barred from doing so.*"[53]

Furthermore, the Amex arbitration clause and its class action waiver explicitly apply to claims for injunctive relief, which the arbitrator is empowered to grant. The arbitration clause states: "The arbitrator shall have the power and authority to award any relief that would have been available in court, *including equitable relief* (e.g., injunction, specific performance)...."[54] As a result, any contention that the obligation to individually arbitrate does not apply to claims for injunctive relief is simply not tenable.

Because the class action waiver provisions of the arbitration clause grant to each merchant (as well as Amex) the right to an individual resolution of its claims, including its claims for injunctive relief, and, because *Italian Colors* holds that those contract rights must be respected notwithstanding the provisions of Rule 23, a merchant cannot be compelled to resolve its claims either in court or through the medium of a Rule 23(b)(2) non-opt-out class. Amex's attempt to unilaterally extinguish (or ignore) a mutually binding contractual obligation must be rejected.

**B. The "No Modification" Clause of the Arbitration Agreements Does Not Support a Non-Opt-Out Class Resolution**

Contrary to the Class' argument in opposition to the Amex motion to dismiss, the "no modification" clause in the arbitration agreement does not deprive the arbitrator of the authority to enjoin the enforcement of Amex's anti-steering rules and, such an injunction would not modify the card acceptance agreement. Thus, the arbitration agreement is justly interpreted to cover claims to enjoin the enforcement of Amex's Merchant Restraints and the merchants' right

---

[53] Morales Decl., Ex. C § 7.d.iii (emphasis added).

[54] *Id.* at Ex. C § 7.d.iii (emphasis added).

to have their claims individually resolved in arbitration on a non-class basis is equally applicable to the injunctive relief sought against Amex.

First, the "no modification" clause does not preclude injunctive relief barring enforcement of the Amex Merchant Restraints. The full arbitration clause at issue states:

> Arbitrator's Authority. The arbitrator shall have the power and authority to award any relief that would have been available in court, including equitable relief (e.g., injunction, specific performance) and cumulative with all other remedies, shall grant specific performance whenever possible. The arbitrator shall have no power or authority to alter the Agreement or any of its separate provisions, including this section, nor to determine any matter or make any award except as provided in this section.[55]

More importantly, the arbitration agreement expressly provides that injunctive relief is available in arbitration. As a result, black-letter rules of contract construction prohibit an implied contrary result. Further, even Amex concedes that the "no modification clause" in this provision does not preclude an arbitrator from enjoining the enforcement of a provision of the card acceptance agreement.[56] Rather, consistent with federal antitrust law, the arbitrator "could, of course, enjoin enforcement of a term found unlawful," and the no modification clause "simply prevents the arbitrator from grafting new provisions onto the contract."[57]

The Second Circuit's decision in *Vera v. Saks & Co.*,[58] is directly on point. In *Vera*, the district court held that a claim seeking to enjoin enforcement of a contract provision had to be arbitrated even though the arbitration clause contained a "no change-or-modification" provision. The court held that the "no change" provision merely prohibited the arbitrator from "changing

---

[55] *Id*. at Ex. C.

[56] Amex Reply Memo in Support of Motion to Dismiss at 4-5 (Dkt. No. 265).

[57] *Id*. at 2; *see Harry Hoffman Printing, Inc. v. Graphic Commc'ns Int'l Union, Local 261*, 950 F.2d 95, 100 (2d Cir. 1991) ("a 'no modification' clause prohibits [arbitrators] from creating entirely new terms").

[58] 335 F.3d 109, 118 (2d Cir. 2003).

the terms of the [agreement]" and did "not exempt any category of disputes" from arbitration.[59] The Second Circuit affirmed, citing the "presumption in favor" of arbitration, and the defendant's concession (as here) that the arbitrator had authority to award injunctive relief.[60]

Setting aside the fact that the arbitration agreement expressly grants to the arbitrator "the power and authority to award . . . equitable relief (i.e. injunctions . . .),"[61] even if the "no modification" clause could be reasonably interpreted to deny the arbitrator the power to enjoin the enforcement of a term in the contract, that interpretation would, at most, merely create an ambiguity in the agreement, which would itself have to be resolved in arbitration. Such a conclusion necessarily follows from "the federal policy favoring arbitration" and the rule of construction that "ambiguities as to the scope of the arbitration clause itself are resolved in favor of arbitration."[62] Thus, even if there is an ambiguity in the Amex arbitration agreement, the arbitrator must determine whether the "no modification clause" denies the arbitrator the power to

---

[59] *Id.*

[60] *See also Kraft Foods, Inc. v. Office & Prof'l Emps. Int'l Union, AFL-CIO, CLC Local 1295*, 203 F.3d 98, 101-03 (1st Cir. 2000) (collecting cases and holding that the "no modification" clause did not preclude arbitrator from "fashioning of an appropriate remedy" that "nullified" a provision of the agreement); *Gueyffier v. Ann Summers, Ltd.*, 43 Cal. 4th 1179 (2008) (excusing the performance of contract provision held not to violate "no modification" clause in agreement).

[61] Morales Decl., Ex. C at § 7.d.iii.

[62] *PacifiCare Health Sys., Inc. v. Book,* 538 U.S. 401, 407 (2003) (in the face of an ambiguity as to whether the arbitrators had the power to grant the remedy requested due to conflicting provisions of the arbitration agreement, "the proper course is to compel arbitration" so that the arbitrator could "construe the remedial limitations" in the arbitration agreement); *Mastrobuono v. Shearson Lehman Hutton*, 514 U.S. 52, 62 (1995) (ambiguity as to whether arbitration agreement prevented arbitrators from awarding punitive damages must be resolved in arbitration); *Kraft Foods*, 203 F.3d at 100 ("Provided that the arbitrator 'is even arguably construing or applying the contract and acting within the scope of his authority', a court must not disturb his judgment[.]"); *Vera*, 335 F.3d at 118 ("[g]iven the ambiguity of the [arbitration] clause in relation to this issue [and] the presumption in favor of coverage … we conclude that Vera's … claim is arbitrable").

- 21 -

enjoin the enforcement of the Merchant Restraints in the merchant acceptance agreements.[63] As a

signatory to an arbitration agreement, Amex "cannot now disown its agreed-to obligation to

arbitrate *all* disputes, including the question of arbitrability."[64]

## V. THE PROPOSED SETTLEMENT FAILS TO PROVIDE RELIEF THAT WOULD GENERATE MEANINGFUL PRICE COMPETITION AMONG AMEX AND ITS RIVALS

### A. The Proposed Class Settlement Leaves Amex's Merchant Restraints Almost Entirely Intact

In addition to the fact that the proposed settlement is improper as a matter of law, it is

immaterial, ineffective, and inequitable. In truth, the proposed settlement actually *perpetuates*

the harm sought to be remedied by the Class, rather than avoiding it. The Class' proposed relief

is vastly inferior to the relief granted in the MDL 1720 class settlement. There, the class

settlement requires that Visa and MasterCard change their anti-steering rules to allow the

following forms of merchant steering:

- Differential surcharging among credit cards. Visa and MasterCard allow merchants to surcharge their credit card transactions, even if the merchant does not surcharge other credit card transactions.

- Differential surcharging between credit cards and debit cards. Visa and MasterCard allow merchants to surcharge Visa and MasterCard credit card transactions, even if the merchant does not surcharge debit card transactions.

- Differential discounting among payment forms. Visa and MasterCard each allow merchants to discount any other form of payment without requiring the merchant to offer the same discount on Visa or MasterCard transactions.

- Non-price steering: The MDL 1720 settlement eliminated MasterCard's "No Discrimination" rule which, like Amex's Merchant Restraints,

---

[63] *See also Mastrobuono*, 514 U.S. at 62 (referring remedial limitations in the arbitration agreement to the arbitrator for resolution).

[64] *Contec Corp. v. Remote Solution Co.*, 398 F.3d 205, 211 (2d Cir. 2005); *see also* JAMS Rule 11; AAA Rule 7 and NAF Rule 20(E), (F).

> prohibited merchants from using statements of preference and other forms of non-price steering to persuade customers to use other lower priced payment forms than MasterCard.

Instead of meeting the standard set by the class settlement in MDL 1720, this proposed settlement effectively eviscerates the relief obtained in MDL 1720, addressing only one small facet of Amex's Merchant Restraints - allowing merchants to refrain from surcharging debit cards *only* if they parity surcharge all credit cards. The proposed class settlement does *nothing* to address Amex's anticompetitive prohibition on merchants steering volume away from Amex to a lower priced credit card. Tellingly, the Class makes no effort in its motion for final approval to explain why Amex – a larger network by volume than MasterCard – should not be required to change the same anticompetitive conduct that Visa and MasterCard have agreed to change.

Most importantly, although merchants have already succeeded in changing Visa and MasterCard's rules in connection with the MDL 1720 class settlement, the efficacy of those changes hinge on the proposed settlement here. Under the MDL 1720 class settlement, Visa and MasterCard allow differential surcharging *only* so long as the merchant does not accept another credit card brand that imposes a more restrictive no surcharge rule on the merchant. This concept is referred to as the "level playing field" provision of the MDL 1720 settlement. Under the level playing field provision, if a competitor card network with an equal or higher price restricts the merchant's ability to surcharge, then the merchant must apply that more restrictive rule to MasterCard and Visa credit cards, too. For example, under the existing Amex card acceptance rules, if a merchant accepts Visa and Amex, and Amex's price to the merchant is equal to or higher than Visa's price, then the merchant cannot differentially surcharge a Visa transaction because *Amex's* rule forbids differential surcharging of Amex transactions. The proposed settlement rubber-stamps this result. The proposed settlement's "gift" of the ability to surcharge

Amex is in reality a Trojan Horse that takes away the benefits won in the MDL 1720 class settlement to differentially surcharge.

Because Amex cards are accepted by merchants who make more than 90% of the retail sales in America, the vast amount of retail commerce in America is now walled off from differential surcharging of MasterCard, Visa and Amex cards by the Amex Merchant Restraints, and now the proposed Settlement Agreement (if approved). This is "the American Express problem" that Judge Gleeson referenced in the Court's Order granting final approval to the MDL 1720 class settlement. It was Judge Gleeson's view that the "American Express problem" was one that "must be (and in fact is being) addressed elsewhere" and that "isolating American Express as the only remaining major network insulated from price competition will assist in the effort to 'fix' it."[65] Judge Gleeson was referring to the Individual Merchant Plaintiffs' request for injunctive relief against one of the Amex Merchant Restraints - the No Surcharge rule. The proposed settlement here, however, is specifically intended to prevent this Court from addressing the "American Express problem" by releasing the Individual Merchant Plaintiffs' (as well as any other merchant that wished to bring such claims) injunctive relief claims, and continuing to prevent a merchant from differentially surcharging MasterCard, Visa and Amex credit cards in order to stimulate horizontal price competition between those credit card companies.

Under the proposed Settlement Agreement, real price competition – *i.e.*, the demise of the Amex Rule – can never occur. Amex has no incentive to change its rule and MasterCard and Visa, who are also protected from horizontal price competition by the Amex Merchant Restraints, have every incentive to maintain the status quo. As a result, the Amex Release is likely to be forever – and so is the obstruction of horizontal price competition.

---

[65] *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, No. 05-MD-1720 (JG) (JO), 2013 WL 6510737, at *20 (E.D.N.Y. Dec. 13, 2013).

The proposed Settlement Agreement will not only cement the lack of horizontal price competition among credit card providers in perpetuity, it may also lead to unseemly and absurd results. Even under this settlement, Objectors are entitled to pursue their damage claims in arbitration (although, as noted above, an ambiguity exists concerning a merchant's ability to prove liability in any such proceeding because of the Settlement Agreement). If they prevail, they will have established that the Amex Merchant Restraints are anticompetitive and illegal. Due to the Settlement Agreement, however, the Objectors would be powerless either to stop the illegal conduct or seek damages for Amex's continuing imposition of those unlawful rules. The Settlement Agreement would, in effect, be a license to violate the law with impunity forever. That result cannot possibly constitute an acceptable resolution.

**B.     The Failure to Obtain the Same Rule Changes as the MDL 1720 Class Settlement Will Perpetuate the Market Distortions**

**1.     Differential surcharging among credit cards is significantly more valuable than parity surcharging.**

Class Counsel claims that the "Australian experience" confirms that the ability to parity surcharge all credit cards, but not debit cards, is sufficiently valuable to justify the continuation of all other aspects of Amex's anti-steering rules forever. However, Class Counsel badly misconstrues the "Australian experience," which plainly shows that not all differential surcharging is created equal.

In fact, the "Australian experience" shows that differential surcharging among credit cards is far more effective at causing Amex to lower its prices than the relief in the proposed settlement. Surcharging all credit cards the same amount, regardless of price differentials among those cards, is not a comparable substitute. The Reserve Bank of Australia ("RBA") has explained that parity surcharging actually "dulls price signals to consumers about the relative costs of different card systems" and prevents merchants from recovering all of their costs on

some credit cards whose prices are higher than the amount of the surcharge.[66] After a review of parity surcharging in 2011, the RBA reaffirmed that it was *differential* surcharging that improved competition because it allowed for transparency to customers about the relative costs of accepting credit cards.[67]

Southwest and Alaska are well positioned to understand the benefits of differential surcharging. As Judge Gleeson observed, "the conduct of the airlines is significant; in other markets that allow the surcharging permitted by the proposed settlement, airlines were among the first to adopt the practice, which has had the effect of moving transactions to cheaper payment alternatives."[68]

Nonetheless, based on an online survey conducted in conjunction with the Olinger Group (the "Olinger/Friedman survey"), the class claims that "more than half" the merchants would parity surcharge[69] and based on the East & Partners data the class claims that "some 40% of merchants (measured by volume) are surcharging" in Australia.[70] The first contention is

---

[66] Reserve Bank of Australia, *Review of Card Surcharging: A Consultation Document* at 6 (June 2011), http://www.rba.gov.au/publications/consultations/201106-review-card-surcharging.pdf. The RBA noted that merchants not recovering all of their acceptance costs under a parity surcharging scheme was especially problematic when one of the credit card networks capped the merchant's ability to surcharge at the cost of accepting that network's card.

[67] Reserve Bank of Australia, *A Variation to the Surcharging Standards – Final Reforms and Regulation Impact Statement* at 21 (June 2012), http://www.rba.gov.au/payments-system/reforms/cards/201206-var-surcharging-stnds-fin-ref-ris.pdf (concluding that parity surcharging across credit card networks is "a practice that distorts price signals to cardholders about the relative costs of different card payment methods").

[68] *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 2013 WL 6510737, at *7.

[69] Pl. Class Mem. at 5.

[70] *Id*. at 6.

misleading and based on a biased and unreliable survey. The second contention is simply wrong. This Court should disregard this "evidence" in support of the proposed Settlement Agreement.

The Olinger/Friedman survey was designed by the Olinger Group and Class Counsel. It did not attempt to sample all merchant segments in the U.S. and did not even randomly select the merchants it did survey. In fact, it surveyed only eight industry segments including beauty salons, auto services, taxi cabs, antique stores, lawyers, accounts and dry cleaners - hardly a representative cross-section of American retail commerce. Moreover, the average survey respondent can only be described as tiny, with an average gross revenue of only $450,000 per year. In other words, the Olinger/Friedman survey covered very small merchants in only a few industry segments that amount to a trivial amount of all retail sales.

Worse, the video that was shown to respondents before they filled out the survey both fails to mention critical information and affirmatively misstates other information. The respondents were told that they could surcharge, but they were not told they had to surcharge all credit cards to do so. This omission is fatal. A merchant might want to differentially surcharge one credit card, but not others, or surcharge one credit card a different amount than another, because consumers who want or need to use a credit card could switch to another credit card without paying the surcharge. If all credit cards were surcharged the same amount and there were no credit card that the consumer could switch to and mitigate the surcharge, the consumer might leave the store to go to another merchant that does not surcharge and the merchant would lose sales. That concern might reasonably dissuade merchants from parity surcharging, but the same concern would not be present for differential surcharging. There is no way to determine from the survey how many respondents – if any – would have reported a willingness to surcharge if they knew they had to equally surcharge all credit cards. The failure to advise the respondents that

they could only parity surcharge is yet another gaping hole in the reliability of the Olinger/Friedman survey. This massive defect is compounded by the fact that the video incorrectly tells the respondents that they will not lose any customers if they parity surcharge and that for the merchant it is a "win/win."

The Class' reliance on the East & Partners data from Australia fares no better. First, Australia allows differential surcharging among credit cards. The East & Partners Report measures how many merchants surcharge some credit card. It does not measure how many merchants surcharge all credit cards, nor does it reveal how many of them parity surcharge all credit cards. Second, the East & Partners Report concludes that 41.7% of all merchants surcharge some credit card, but does not indicate what percentage of all retail volume those merchants represent.[71] Tellingly, the East & Partners Report states that 38% of the merchants who accept Visa also surcharge some credit card; that 37.7% of the merchants who accept MasterCard also surcharge some credit card; but that 81.% of the merchants who accept the higher-priced Amex cards surcharge some credit card.[72] That data strongly implies that a great many of the Australian merchants who surcharge are differentially surcharging the high-cost Amex cards relative to other credit cards and that few of them are parity surcharging.[73] This is hardly unexpected because parity surcharging presents threats of lost business for consumers that cannot switch to cash or debit cards, while differential surcharging does not.

---

[71] East & Partners Report 2013, at p. 12.

[72] *Id.* at 34, Table 30.

[73] The merchants that accept Visa and MasterCard and surcharge some credit card may also accept Amex and surcharge only Amex.

## 2. The proposed relief perpetuates barriers to entry.

One of the most damaging anticompetitive effects of Amex's Merchant Restraints is that they restrict the ability of new credit card networks from entering the market and competing with Amex, Visa, and MasterCard. In a competitive environment, one of the factors that constrains prices is the possibility that if sellers charge high prices, a new firm may enter the market and use lower prices to win market share. The Amex Merchant Restraints restrict the ability of new entrants to act as competitive constraint on the networks' prices because merchants cannot use prices or other forms of communications to inform customers about the relative costs of accepting different credit cards. The proposed settlement promotes and perpetuates this reality.

The stifling effect of Amex's Merchant Restraints on new entrants is not just economic theory. Discover's real world experience as a new credit card network starting in the mid-1980's illustrates the anticompetitive effects of Amex's Merchant Restraints and the proposed class settlement. Even with pricing well below its chief rivals for years, Discover has failed to grow its share in the presence of the Merchant Restraints and today only has a 6% share of credit card transactions in the U.S. The proposed class settlement effectively prohibits differential treatment among Amex and other credit card networks using price or non-price methods. As a result, even if the settlement were approved, a new credit card network still would not be able to use lower prices to increase its share of merchants' transaction volume. The proposed class settlement therefore not only forever insulates Amex from price competition by its existing rivals Visa and MasterCard, but also from potential new entrants.

## 3. The Proposed Settlement Perpetuates the Incentive to Increase Price.

When viewed in connection with the MasterCard and Visa rule changes in the MDL 1720 class settlement, the proposed Amex class settlement actually perpetuates perverse incentives for Visa, MasterCard, and Amex to be the *highest* priced credit card network.

- 29 -

This is so because the Settlement Agreement does not allow merchants to surcharge Amex cards more than they surcharge MasterCard or Visa credit cards,[74] and the MDL 1720 class settlement does not allow merchants to surcharge those cards more than the average cost of acceptance.[75]

Thus, if MasterCard charges a fee of 1.5%, the merchant cannot surcharge MasterCard credit cards more than 1.5%. The merchant also cannot surcharge Amex more than 1.5%, even if Amex charges 2.5%. Amex is therefore sheltered from price competition and has every incentive to *raise* its price to 3% as doing so will not cost it any transaction volume. MasterCard, of course, also has every incentive to raise its price as its lower price will result in no additional transaction volume. Visa's incentive is the same. Thus, this settlement actually encourages all three networks to raise their rates instead of solving this fundamental problem. Indeed, the settlement calcifies the problem into the foreseeable future and perpetuates the perverse incentive to raise price without having to pay the competitive consequences.

The Settlement Agreement also creates other competitive distortions. If all credit cards are surcharged the same amount, consumers who pay the surcharge will have the incentive to switch to the network that provides the greatest rewards – which is usually the highest-priced card. This, of course, would actually raise the average fee paid by the merchant, and is a veiled way in which the proposed settlement may actually increase Amex's anticompetitive fees.

---

[74]    Settlement Agreement, ¶ 8(b-c).

[75]    *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, MDL 1720 (E.D.N.Y.) (Dkt. No. 1588-1), Class Settlement Agreement, at ¶¶ 42(a)(ii), 55(a)(ii).

**C.** **Class Counsel's Attempt to Minimize the Value of Allowing Differential Surcharging among Credit Cards is Disingenuous and Without Merit**

In a last-ditch effort to excuse its failure to obtain meaningful relief, the Class attempts to marginalize differential surcharging by claiming it has little to no value to merchants. Each of the Class' arguments in support fails.

**1.** **Current Rate Differentials are Artificial and Irrelevant**

First, the Class argues that differential surcharging among credit cards has little or no value because the rate differentials between Visa, MasterCard, and Amex *now* are relatively small. This observation misses the mark. Those relatively small differentials, which occur *with Amex's Merchant Restraints in place*, are precisely what one would expect because Amex's Merchant Restraints eliminate any incentive for Visa and MasterCard to reduce their prices to obtain additional volume.

The relevant question is not what the rates of Visa, MasterCard, and Amex are now, but what they would be in the *absence* of Amex's Merchant Restraints. The ability to differentially surcharge among credit cards would put competitive pressure on each of the three networks to avoid losing volume as the result of a differential surcharge. Each network would then have to lower its price to a more competitive level in order to avoid becoming the high-priced network, which would then be subjected to differential surcharging. It may very well be that even with differential surcharging among credit cards, the three major networks' rates will still not be that far apart. Their rates, however, will be at the significantly lower competitive rate.

**2.** **State Anti-Surcharging Statutes**

The Class also argues that differential surcharging has less value to the merchants than parity surcharging because differential surcharging is unlawful in 10 states. In a perverse attempt to justify its untenable position, the Class contends that it is unconstitutional to ban parity

surcharging, but a ban on differential surcharging is fair game.[76] Once again, the Class misses the woods for the trees.

First, and most importantly, in one of those states – New York – Judge Jed Rakoff of the Southern District of New York, in *Expressions Hair Design v. Schneiderman*, recently ruled that the New York anti-surcharging statute is unconstitutional and preliminarily enjoined its enforcement.[77] Similar suits are pending in other states, with similar results expected. Thus, any reliance on the currently besieged state anti-surcharging statutes is misplaced.

Further, the challenges to the state anti-surcharging statutes apply with equal force, regardless of the type of surcharging prohibited. For example, the New York statute struck down in *Expressions* states that "No seller … may impose a surcharge on a holder who elects to use a credit card in lieu of payment by cash, check or similar means."[78] Judge Rakoff held that the act of surcharging a credit card 2% was no different than giving a 2% discount to a cash customer. Because the act was the same, but speech to describe it was different, Judge Rakoff held that the New York statute unconstitutionally punished speech.[79] Thus, the contention that Judge Rakoff's opinion in *Expressions* applies to parity surcharging but not to differential surcharging is simply incorrect.

There is nothing in the New York statute that prohibits any kind of discount for the use of any form of payment including cash, check or debit cards. Under the statute, a merchant could offer a 2% discount for every payment form other than Amex cards only to customers who present an Amex card. That conduct, according to Judge Rakoff's analysis, is identical to

---

[76] Pl. Class Mem. at 4, 31-32.

[77] 975 F. Supp. 2d 430 (S.D.N.Y. 2013) ("*Expressions*").

[78] *Id.* at 436.

[79] *Id.* at 446-447.

imposing a differential surcharge of 2% only on the use of Amex cards. In both cases Amex –

and only Amex – is priced 2% above the alternative payment forms. The only difference is the

speech used to describe the conduct. Under *Expressions*, the statutory restriction on describing

the conduct as surcharging (*i.e.*, a surcharge on only Amex cards) is unconstitutional and parity

surcharging would not alter this result.[80]

      Indeed, if a distinction is to be drawn between the application of the language of the state

no-surcharge statute[81] to parity surcharging and differential surcharging, then it is far more likely

that differential surcharging will be found to be permissible and parity surcharging impermissible

than vice-versa. Specifically, a differential surcharge that is imposed only on Amex credit cards

and not on Visa, MasterCard or Discover credit cards is not imposed on the cardholder "in lieu of

payment by cash, check or similar means" as provided for by the statutes. It is imposed on the

cardholder in lieu of payment by Visa, MasterCard or Discover credit cards and therefore is

lawful. It is only parity surcharges on all credit cards that are imposed on the cardholder in lieu

of payment by cash or check, etc. that is currently unlawful. Thus, even assuming the survival of

the state anti-surcharging statutes, it is parity surcharging – the only form of relief that the

Settlement Agreement provides – that is most at risk of being held unlawful.

---

[80] *Id.* at 444-447.

[81] The operative statutory language of the statutes in eight of the remaining 10 states is identical to that of New York. *See* New York Gen. Bus. Law § 518; Cal. Civ. Code § 1748.1(a); Tex. Fin. Code § 339.001(a); Fla. Stat. § 501.0117(1); Mass. Gen. Laws Ch. 140D § 28A(a)(2); Me. Rev. Stat. tit. 9-A § 8-303(2); Okla. Stat. tit. 14A § 2-211A; Kan. Stat. Ann. § 16a-2-403; Colo. Rev. Stat. § 5-2-212(1). Connecticut's statute is slightly different, *see* Conn. Gen. Stat. § 42-133ff(a), while Utah's statute will expire at the end of June 2014. *See* Utah Code § 13-38a-302; *id.* § 63I-1-213.

**D.**     **The Government's Suit Does Not Excuse the Class's Failure to Eliminate Anticompetitive Conduct**

In yet another attempt to gloss over its failure to achieve *any* relief with regard to the No Discount Rule and the No Preference Rule, the Class suggests that the Government's pending suit against Amex will conclusively resolve those issues.[82] This effort fails.

Taking the Class' suggestion to its logical converse, the Class effectively contends that a Government loss at trial would prove that no merchant could ever mount a successful antitrust challenge against Amex's Merchant Restraints. This argument turns the concept of collateral estoppel on its head. Collateral estoppel prevents a party from relitigating an issue that was fully litigated and decided in another proceeding only if the party had "a full and fair opportunity" to contest the prior decision.[83] Amex, of course, will have the opportunity to contest the decision in the Government case and will be bound by the result. However, the merchants, including the Objectors, are not parties to that trial and therefore are not bound by its result.[84] The law is clear that even a complete victory by Amex in the Government's trial does not preclude the Objectors, or any other putative Class members, from having their own full and fair opportunity to challenge Amex's Merchant Restraints.[85]

---

[82] *See* Pl. Class Mem. at 33.

[83] *See Chauffeur's Training Sch., Inc. v. Spellings*, 478 F.3d 117, 132 (2d Cir. 2007).

[84] *See Conte v. Justice*, 996 F.2d 1398, 1402 (2d Cir. 1993) (collateral estoppel only applies against party to prior action, or their privies who exercise "practical control" over the prior action).

[85] *See id.* at 1400-1401 (due process prevents collateral estoppel from applying to litigants who never had a chance to present their evidence during prior proceeding involving different parties) (citing *Blonder-Tongue Labs, Inc. v. University of Ill. Found.*, 402 U.S. 313, 329 (1971)).

# VI.    THE PROPOSED SETTLEMENT CLASS CANNOT BE CERTIFIED UNDER RULE 23

## A.    The Standard for Approval of a Settlement Class

In order for a class settlement to be approved, the Class must demonstrate that its terms are fair, reasonable, and adequate.[86] The burden rests on the plaintiff class to do so.[87]

The Class has not met its burden. To the contrary, the settlement releases the claims of the Objectors and all other merchants and bars any attempt to enjoin Amex's anticompetitive conduct or obtain damages for the continuation of that conduct. The only relief obtained – the right to parity surcharge all credit cards without surcharging debit cards – is of no real benefit and is easily circumvented by Amex (*See* § IIID above). No relief whatsoever is obtained on Amex's No Discount or No Preference Rules (*See* § IIIA above). While the merchants give up much in return for very little, the real beneficiaries of this proposed settlement are Amex and Class Counsel. The Objectors respectfully submit that the settlement is unfair, inadequate, and unreasonable.

In addition to being unfair and inadequate, the proposed settlement fails to satisfy other mandatory requirements for the certification of a settlement class. As explained below: (1) the Class plaintiffs cannot fairly represent the interests of Objectors for purposes of settlement; (2) the Settlement Agreement violates Due Process because it releases individualized damage claims without affording class members the opportunity to opt out of the class; and (3) the settlement violates the Rules Enabling Act and the ruling in *Italian Colors* by negating the

---

[86] *D'Amato v. Deutsche Bank*, 236 F.3d 78, 85 (2d Cir. 2001) (trial court must "carefully scrutinize the settlement to ensure its fairness, adequacy and reasonableness").

[87] *Teamsters Local 445 Freight Div. Pen. Fund v. Bombardier, Inc.*, 546 F.3d 196, 202 (2d Cir. 2008) ("the preponderance of the evidence standard applies to evidence proffered to establish Rule 23's requirements"); *In re Am. Int'l Grp., Inc. Secs. Litig.*, 689 F.3d 229, 238 (2d Cir. 2012).

- 35 -

contractual right of each merchant to individually pursue its claims for injunctive relief in a non-class arbitration.

**B.      The Class Plaintiffs Cannot Now Fairly Represent the Objectors**

A class can be certified under Rule 23(c) and (b) only if it meets the "four threshold requirements" set forth in *Amchem Prods., Inc. v. Windsor*.[88] The last of those requirements is "adequacy of representation (representatives will fairly and adequately protect the interest of the class)."[89] In order to ensure that all members of the class are fairly represented, they must have the same interest and no fundamental conflicts or difference in position can exist between them.[90]

In the current case, the class representatives now have fundamentally different interests than the Objectors. First, the Class plaintiffs concede their damages claims must be dismissed as a result of *Italian Colors*. Those claims cannot proceed in Court or jointly with any other claimant in arbitration. However, the Objectors are able to proceed in arbitration or litigation, as the case may be, to seek these damages.

Because the Class plaintiffs' damage claims are worth little, if anything, the Class representatives have little interest in preserving those claims and are willing to release past and future damage claims for virtually nothing. The interest of the Objectors in those future damage claims, however, is worth billions of dollars and easily justifies the cost of arbitration or litigation in court. The interest of the Class and the Objectors in pursuing these future damage

---

[88] 521 U.S. 591, 619-21 (1997).

[89] *Id*. at 621 (interpreting Rule 23(a)(4), which requires that the interests of the class must be "fairly and adequately represented").

[90] *In re Literary Works in Elec. Databases Copyright Litig.*, 654 F.3d 242, 249 (2d Cir. 2011) (class plaintiff must "have an interest in vigorously pursuing the claims of the class"); *Amchem*, 521 U.S. at 625.

claims are at opposite ends of the spectrum and could not be more different. Yet, the Class seeks

approval of an agreement with Amex that releases the Objectors' future damage claims and

forces a release on the Objectors against their will.

It is understandable that a litigant would be highly motivated to settle at any cost when

faced with dismissal of claims worth far less than the cost of an individual arbitration. It is

inconceivable, however, that such a litigant has the same interests as, or could fairly represent the

interests of, national merchants such as Objectors.

**C.    The Settlement Agreement Violates Due Process**

In certain limited circumstances Rule 23(b)(2) allows for an injunction that binds an

entire class without notice or the right of an individual class member to opt-out of the class.[91]

However, the rule with regard to Rule 23(b)(3) classes for damages is different. A claim for

damages is a "species of property protected by the … Due Process Clause."[92] As a result, the

Supreme Court has held that if a court "wishes to bind an absent plaintiff concerning a claim for

money damages or similar relief at law, it must provide minimal procedural due process

protection" including "an opportunity to remove himself from the class by executing and

returning an 'opt out' or 'request for exclusion' form to the Court."[93] The Supreme Court has

confirmed that the rights of an absent class member to money damages cannot be resolved

without his consent or the opportunity to opt-out of the class to "have his own day in Court."[94]

---

[91] Fed. R. Civ. P. 23(b)(2).

[92] *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 428 (1982).

[93] *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 811-12 (1985).

[94] *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 846-47 (1999).

Most recently the Supreme Court held in *Wal-Mart Stores, Inc. v. Dukes*[95] that Rule 23(b)(2) "does not authorize class certification when each class member would be entitled to an individualized award of monetary damages." To the contrary, the Court held that "individualized monetary [damages] claims belong in Rule 23(b)(3)" – which explicitly requires opt-out rights.[96] The Court specifically stated that claimants "with individual monetary claims" must be allowed "to decide for themselves whether to tie their fates to the class representatives or go it alone."[97]

The Class has agreed to allow Amex to continue its No Discount and No Preference Rules, and to effectively retain its No Surcharge Rule, while purporting to release the Objectors' damage claims for that very conduct, in exchange for a trivial modification of Amex's rule. However, the Objectors' damages claims are highly individualized. The damage calculation depends on the transactional dollar volume on Amex cards at each merchant and the rate that the merchant pays Amex and is not a calculation that is applicable equally to all class members. As such, it must be treated under Rule 23(b)(3) and cannot be released as part of a Rule 23(b)(2) mandatory class with no right to opt-out.

Because the class settlement purports to release damage claims belonging to the Objectors without affording them the right to opt-out of the Class, the settlement cannot be approved because it would violate the Objectors' rights to Due Process.

**D.     The Proposed Settlement Violates the Enabling Act and *Italian Colors***

The Objectors have arbitration clauses in their merchant agreements that give each of them the contractual right to arbitrate their claims individually and outside of any class action. As explained below, the Objectors cannot be held in this class against their will and must be

---

[95] 131 S. Ct. 2541, 2557-58 (2011)

[96] *Id*. at 2558.

[97] *Id*. at 2559.

given the right to opt-out. That opt-out right defeats any supposed need for uniform treatment of all merchants.

The Rules Enabling Act,[98] "forbids interpreting Rule 23 to 'abridge, enlarge or modify any substantive right.'"[99] Arbitration agreements, enforceable under the Federal Arbitration Act,[100] "create[] federal substantive law requiring the parties to honor arbitration agreements."[101] In *Italian Colors* the Supreme Court held that denying enforcement of the Amex arbitration agreements "would be an 'abridgment' or 'modification' of a 'substantive right' forbidden" by the Enabling Act.

Here, Amex and the Class are attempting to deny each merchant the substantive contractual right to individually arbitrate their claims through an ill-advised application of Rule 23(b)(2) – precisely the conduct held by the Supreme Court forbidden by the Enabling Act in *Italian Colors*. Amex, having vindicated its contractual right to avoid class treatment in favor of individual arbitrations, now impermissibly seeks to deny the merchants their contractual right to do the same.

## VII.   THE EQUITIES SUPPORT ALLOWING THE OBJECTORS TO OPT-OUT OF THE PROPOSED RULE 23(B)(2) CLASS

It is widely acknowledged that this Court has discretion to grant opt-out rights in an injunctive relief class under Rule 23(b)(2).[102] Nonetheless, Amex ignores this authority and

---

[98] 28 U.S.C. § 2072(b).

[99] *Dukes*, 131 S. Ct. at 2561.

[100] 9 U.S.C. § 2.

[101] *Southland Corp. v. Keating*, 465 U.S. 1, 15 n.9 (1984).

[102] *See Johnson v. Meriter Health Servs. Emp. Ret. Plan*, 702 F.3d 364, 371 (7th Cir. 2012) ("notice and opt out, we just said, are permitted in a (b)(2) class action even though not required"); *McReynolds v. Richards-Cantave*, 588 F.3d 790, 800 (2d Cir. 2009) ("The right of a class member to opt-out in Rule 23(b)(1) and (b)(2) actions is not obvious on the face of the rule; however, 'the language of Rule 23 is sufficiently flexible to afford district courts discretion to

demands that the proposed settlement be an exclusively "non-opt out class."[103] Indeed, Amex has

advised the Court that it will walk away from the settlement otherwise.[104] In arguing that a Rule

23(b)(2) class settlement must be non-opt-out, Amex takes exactly the opposite position from the

one it took before Judge Gleeson. In MDL 1720, Amex submitted two briefs arguing that a

District Court can and should grant opt-out rights in a 23(b)(2) class settlement.[105] To reward

Amex's self-serving about-face in this action would be unjust.

## VIII. CONCLUSION

Based on the foregoing, the Objectors respectfully request that the Court deny final

approval to the proposed class settlement. Alternatively, this Court has the power to exclude the

Objectors from the settlement class by modifying the settlement class definition.[106]

---

grant opt-out rights in (b)(1) and (b)(2) class actions.'") (quoting *Eubanks v. Billington*, 110 F.3d 87, 94 (D.C. Cir. 1997)); *Jefferson v. Ingersoll Int'l Inc.*, 195 F.3d 894, 898 (7th Cir. 1999) ("the judge could treat a Rule 23(b)(2) class *as if* it were under Rule 23(b)(3), giving notice and an opportunity to opt out"); *Penson v. Terminal Transp. Co., Inc.*, 634 F.2d 989, 993 (5th Cir. 1981) ("[A]lthough a member of a class certified under Rule 23(b)(2) has no absolute right to opt out of the class, a district court may mandate such a right pursuant to its discretionary power under Rule 23"); *Newsome v. Up-to-Date Laundry, Inc.*, 219 F.R.D. 356, 364 (D. Md. 2004) ("[T]he Court has discretion to order that notice and opt-out rights be given to a (b)(2) class to … give class members the opportunity to appear through their own counsel or remove themselves from the action entirely.").

[103] *See, e.g.*, January 22, 2014 Hrg. Tr. at 33 ("It includes [the Objectors" because it is a non-opt out class.").

[104] *See* January 31, 2014 Korologos Ltr. to Court, at 2 (Dkt. No. 138) (Amex statement that unless all merchants, including the Individual Plaintiffs, are enjoined from pursuing their injunctive claims against Amex, then "the settlement will have to be undone because American Express will have no choice but to exercise its termination rights).

[105] *See* Objections of American Express to Preliminary Approval of the Class Settlement at 3, 16, MDL 1720, Nov. 11, 2012 (Dkt. No. 1680); Objection of American Express to Class Settlement Agreement at 22, MDL 1720, May 28, 2013 (Dkt. No. 2648).

[106] *See Drennan v. Van Ru Credit Corp.*, No. 96 C 5789, 1997 WL 305298 (N.D. Ill. May 30, 1997).

Dated:  June 6, 2014

HAGENS BERMAN SOBOL SHAPIRO LLP

By: /s/Jason A. Zweig

    Jason A. Zweig (JZ-8107)
555 Fifth Avenue
Suite 1700
New York, New York 10017
Tel: (212) 856-7227
Fax: (917) 210-3980
jasonz@hbsslaw.com

Paul E. Slater
SPERLING & SLATER, P.C.
55 West Monroe Street, Suite 3200
Chicago, Illinois 60603
Tel: (312) 641-3200
Fax: (312) 641-6492
pes@sperling-law.com

Joseph M. Vanek
David P. Germaine
VANEK, VICKERS & MASINI, P.C.
55 West Monroe Street, Suite 3500
Chicago, Illinois 60603
Tel: (312) 224-1500
Fax: (312) 224-1510
jvanek@vaneklaw.com
dgermaine@vaneklaw.com

*Counsel to Objectors Southwest Airlines Co.,
AirTran Airways, Inc., Alaska Airlines, Inc.,
DSW, Inc., and Newegg, Inc.*