UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

----------------------------------------------------------x

In re AMERICAN EXPRESS ANTI-                    :
STEERING RULES ANTITRUST                        :            11-MD-2221(NGG)(RER)
LITIGATION                                      :
                                                :            ORAL ARGUMENT
This Document Relates To:                       :            REQUESTED
ALL CLASS ACTIONS                               :

----------------------------------------------------------x

## MEMORANDUM OF LAW IN OPPOSITION TO MOTION
## FOR FINAL APPROVAL OF SETTLEMENT ON BEHALF OF:

7-Eleven, Inc.; Academy, Ltd. d/b/a Academy Sports + Outdoors; Aldo US Inc. d/b/a Aldo and Call It Spring; Amazon.com, Inc.; American Eagle Outfitters, Inc.; Ashley Furniture Industries, Inc.; Barnes & Noble, Inc.; Barnes & Noble College Booksellers, LLC; Beall's, Inc.; Best Buy Stores, L.P.; Boscov's, Inc.; Brookshire Grocery Company; Buc-ee's Ltd.; The Buckle, Inc.; Costco Wholesale Corporation; Euromarket Designs, Inc. d/b/a Crate & Barrel and CB2, Meadowbrook, L.L.C. d/b/a The Land of Nod; Dillard's, Inc.; Drury Hotels Company, LLC; Express, LLC; Foot Locker, Inc.; The Gap Inc.; HMSHost Corporation; IKEA North America Services, LLC; Lowe's Companies, Inc.; Marathon Petroleum Company LP; Martin's Super Markets, Inc.; Michaels Stores, Inc.; Mills Motor, Inc., Mills Auto Enterprises, Inc., Willmar Motors, LLC, Mills Auto Center, Inc., Fleet and Farm of Alexandria, Inc., Fleet Wholesale Supply of Fergus Falls, Inc., Fleet and Farm of Green Bay, Inc., Fleet and Farm of Menomonie, Inc., Mills Fleet Farm, Inc., Fleet and Farm of Manitowoc, Inc., Fleet and Farm of Plymouth, Inc., Fleet and Farm Supply Company of West Bend, Inc., Fleet and Farm of Waupaca, Inc., Mills E-Commerce Enterprises, Inc., Brainerd Lively Auto, LLC; National Association of Convenience Stores (NACS); National Grocers Association (NGA); Panda Restaurant Group, Inc.; Panera, LLC; PetSmart, Inc.; RaceTrac Petroleum, Inc.; Recreational Equipment, Inc. (REI); Republic Services, Inc.; Retail Industry Leaders Association (RILA); Roundy's Supermarkets, Inc.; Sears Holding Corporation; Speedway LLC; Starbucks Corporation; Stein Mart, Inc.; Wal-Mart Stores, Inc.; The Wet Seal, Inc., and YUM! Brands, Inc.

**CONSTANTINE CANNON LLP**
Jeffrey I. Shinder
Gary J. Malone
A. Owen Glist
David A. Scupp
335 Madison Avenue
New York, New York 10017
Telephone: (212) 350-2700
Email: jshinder@constantinecannon.com

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................1

FACTUAL BACKGROUND ...............................................................................6

    A.   The *Marcus* and *Animal Land* Actions and Their Factual Predicates ..............6

    B.   *Italian Colors* .....................................................................................7

    C.   The Proposed Settlement ...................................................................8

        1.   The Release ...........................................................................9

        2.   The Relief Provided to the Proposed Class ..................................9

        3.   Opposition to the Proposed Settlement ...................................11

ARGUMENT ................................................................................................12

I.    Applicable Standards Demand Heightened Scrutiny of Class Certification and, Separately, of Settlement Fairness ..............................................................12

II.   The Court Should Reject the Proposed Class Because the Release Violates Proposed Class Members' Rule 23 and Due Process Rights ..........................13

III.  The Court Should Reject the Proposed Class in Light of the Supreme Court's Decision in *Italian Colors* ..........................................................................16

IV.  The Court Should Reject the Proposed Class Because It Lacks the Required Cohesion of a Mandatory Class..................................................................19

V.   The Court Should Reject the Proposed Class Due to Inadequate Representation............23

    A.   The Proposed Settlement Improperly Releases Future Claims.......................23

    B.   The Release Impermissibly Extinguishes Claims That Could Not Have Been Brought in This Case ...............................................................................25

    C.   The Presence of a Mediator Does Not Ensure Adequate Representations ....................27

VI.  The Proposed Settlement Is Not Fair, Reasonable, or Adequate ......................27

    A.   Substantial Opposition to the Settlement Weighs Against Approval (*Grinnell* Factor 2)................................................................................................29

    B.   The Settlement Is Inadequate (*Grinnell* Factors 8 and 9)..............................29

        1.   The Limited and Illusory Surcharging Relief.....................................30

291286.11

a.  The Proposed Settlement's Surcharging Rules Will Not Have Any System-Wide Effect on Merchant Fees .........................................................................30

b.  Most Consumers Cannot Be Steered to Debit Cards from Credit Cards...............31

c.  The Proposed Settlement's Prohibition on Differential Surcharging Is Anticompetitive on Its Face ..............................................................................33

d.  The Olinger Group's Survey Is Not Credible .......................................................35

e.  Merchant Conduct in Australia Is Irrelevant Here.................................................36

C.  The Complexity, Expense and Duration of the Litigation (*Grinnell* Factor 1) and the Stage of the Proceedings and the Amount of Discovery Completed (*Grinnell* Factor 3)....................................................................................................................37

D.  The Risks of Establishing Liability, Damages, and Maintaining the Class Through the Trial (*Grinnell* Factors 4, 5, and 6) and the Ability of the Defendants to Withstand a Greater Judgment (*Grinnell* Factor 7) ....................................................38

CONCLUSION....................................................................................................................39

# TABLE OF AUTHORITIES

**Cases**

*Amchem Prods. v. Windsor,*
    521 U.S. 591 (1997) ................................................................................. 12, 13, 23

*American Express Co. v. Italian Colors Restaurant,*
    133 S. Ct. 2304 (2013) ..................................................................2, 8, 16-17, 18-19

*AT&T Mobility LLC v. Concepcion,*
    131 S. Ct. 1740 (2011) ............................................................................................ 16

*Authors Guild v. Google Inc.,*
    770 F. Supp. 2d 666 (S.D.N.Y. 2011) ................................................. 13, 26, 29, 38

*Barnes v. Am. Tobacco Co.,*
    161 F.3d 127 (3d Cir. 1998) ................................................................................... 19

*Casa Orlando Apartments, Ltd. v. Fed. Nat'l Mortgage Ass'n,*
    624 F.3d 185 (5th Cir. 2010) .................................................................................. 20

*City of Detroit v. Grinnell Corp.,*
    495 F.2d 448 (2d Cir. 1974) ................................................................................... 29

*D'Amato v. Deutsche Bank,*
    236 F.3d 78 (2d Cir. 2001) ..................................................................................... 27

*Dean Witter Reynolds, Inc. v. Byrd,*
    470 U.S. 213 (1985) ............................................................................................... 17

*Denney v. Deutsche Bank AG,*
    443 F.3d 253 (2d Cir. 2006) ................................................................................... 12

*Discover Fin. Servs. v. Visa U.S.A. Inc.,*
    598 F. Supp. 2d 394 (S.D.N.Y. 2008) ................................................................... 32

*E & L Consulting, Ltd. v. Doman Indus. Ltd.,*
    472 F.3d 23 (2d Cir. 2006) ..................................................................................... 25

*FTC v. Ind. Fed'n of Dentists,*
    476 U.S. 447 (1986) ............................................................................................... 39

*In re American Int'l Group, Inc. Sec. Litig.*,
   689 F.3d 229 (2d Cir. 2012) ............................................................................. 13, 20

*In re Auction Houses Antitrust Litig.*,
   42 Fed. App'x 511 (2d Cir. 2002) ..................................................................... 25, 26

*In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*,
   55 F.3d 768 (3d Cir. 1995) ...................................................................... 28, 29, 30, 37

*In re Int'l House of Pancakes Franchise Litig.*,
   487 F.2d 303 (8th Cir. 1973) ............................................................................... 29-30

*In re Literary Works in Elec. Databases Copyright Litig.*,
   654 F.3d 242 (2d Cir. 2011) ........................................................................ 19, 23, 27

*In re Managerial, Prof'l & Technical Employees*,
   No. MDL 1471, 02-CV-2924 (GEB), 2006 WL 38937 (D.N.J. Jan. 5, 2006) ........................ 20

*In re New Motor Vehicles Canadian Exp. Antitrust Litig.*,
   MDL 1532, 2011 WL 1398485 (D. Me. Apr. 13, 2011) ....................................... 28

*In re Payment Card Interchange Fee and Merchant Discount Antitrust Litig.*,
   No. 05-MD-1720(JG)(JO), 2013 WL 6510737 (E.D.N.Y. Dec. 13, 2013) ...................... 16, 21

*In re PNC Fin. Servs. Grp., Inc.*,
   440 F. Supp. 2d 421 (W.D. Pa. 2006) ................................................................ 28

*In re St. Jude Med., Inc.*,
   425 F.3d 1116 (8th Cir. 2005) ............................................................................ 19

*In re Visa Check/MasterMoney Antitrust Litig.*,
   297 F. Supp. 2d 503 (E.D.N.Y. 2003) ................................................................ 29

*In re Visa Check/MasterMoney Antitrust Litig.*,
   No. 96-CV-5238 (JG), 2003 WL 1712568 (E.D.N.Y.  Apr. 1, 2003) ........................ 32

*Jamie S. v. Milwaukee Pub. Sch.*,
   668 F.3d 481 (7th Cir. 2012) .............................................................................. 12

*Joel A. v. Giuliani*,
   218 F.3d 132 (2d Cir. 2000) ........................................................................... 13, 16

*Kartman v. State Farm Mut. Auto. Ins. Co.*,
   634 F.3d 883 (7th Cir. 2011) ............................................................................. 20

iv

*Karvaly v. eBay, Inc.*,
   245 F.R.D. 71 (E.D.N.Y. 2007) .................................................................... 26

*Lawlor v. National Screen Serv. Corp.*,
   349 U.S. 322 (1955) ............................................................................... 24-25

*Lemon v. Int'l Union of Operating Eng'rs*,
   216 F.3d 577 (7th Cir. 2000) ...................................................................... 20

*Logan v. Zimmerman Brush Co.*,
   455 U.S. 422 (1982) .................................................................................... 14

*M.D. ex rel. Stukenberg v. Perry*,
   675 F.3d 832 (5th Cir. 2012) ...................................................................... 20

*Milstein v. Huck*,
   600 F. Supp. 254 (E.D.N.Y. 1984) ............................................................. 28

*Minnesota Mining & Mfg. Co. v. Graham-Field, Inc.*,
   No. 96-CIV-3839(MBM), 1997 WL 166497 (S.D.N.Y. Apr. 9, 1997) ................ 25

*Nat'l Super Spuds, Inc. v. New York Mercantile Exch.*,
   660 F.2d 9 (2d Cir. 1981) .............................................................. 23, 25, 27

*Ortiz v. Fibreboard Corp.*,
   527 U.S. 815 (1999) ............................................................ 12, 13, 14, 15

*Phillips Petroleum Co. v. Shutts*,
   472 U.S. 797 (1985) ............................................................................... 13-14

*Plummer v. Chem. Bank*,
   668 F.2d 654 (2d Cir. 1982) ....................................................................... 27

*Robertson v. National Basketball Association*,
   556 F.2d 682 (2d Cir. 1977) ....................................................................... 16

*Robinson v. Metro-North Commuter R.R. Co.*,
   267 F.3d 147 (2d Cir. 2001) ....................................................................... 19

*Stephenson v. Dow Chem. Co.*,
   273 F.3d 249 (2d Cir. 2001) ....................................................................... 15

*United States v. Visa U.S.A., Inc.*,
    163 F. Supp. 2d 322 (S.D.N.Y. 2001)...........................................................................31

*United States v. Visa U.S.A., Inc.*,
    344 F.3d 229 (2d Cir. 2003)..................................................................................31, 32

*Vera v. Saks & Co.*,
    335 F.3d 109 (2d Cir. 2003)......................................................................................8, 9

*Wal-Mart Stores, Inc. v. Dukes*,
    131 S. Ct. 2541 (2011)..............................................................................1, 3, 15, 18, 19

*Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*,
    396 F.3d 96 (2d Cir. 2005)..............................................................................15, 25, 29

*Walsh v. Northrop Grumman Corp.*,
    No. 94-CV-5105(TCP), 1999 WL 184654 (E.D.N.Y. Mar. 25, 1999)....................................28

## Statutes

28 U.S.C. § 2702(b) ...................................................................................................18

9 U.S.C. § 2..............................................................................................................16

U.S. Const. amend. V................................................................................................13

## Other Authorities

American Law Institute, *Principles of the Law of Aggregate Litig.* § 3.05(c) (2010)..................28

Manual for Complex Litig. (Fourth) § 21.62 (2004) ....................................................29

Manual for Complex Litig. (Fourth) § 30 (2004) .......................................................37

Objectors[1] respectfully submit this memorandum of law in opposition to the motion for final approval of the proposed settlement, ECF No. 361.

## PRELIMINARY STATEMENT

This Court should reject the Proposed Settlement because it would violate Objectors' constitutional and contractual rights and further restrain competition in the payment industry.

The Proposed Settlement would extinguish the rights of merchants in the purported class by broadly releasing claims for future damages relating to American Express's anticompetitive rules, without providing merchants the opt-out rights that the Due Process Clause of the U.S. Constitution and Federal Rule of Civil Procedure 23 demand. The Proposed Settlement would restrain competition by providing no relief from the core restraints at issue in this case—namely, the Honor All Cards rule and Non-Discrimination Provisions—while immunizing those practices from merchant challenge, potentially forever. The settlement would also entrench a surcharging regime that would insulate American Express (and the other dominant credit card networks) from competition, empowering American Express to raise prices without fear of consequence. If the Proposed Settlement is approved, no merchant could challenge this anticompetitive regime.

---

[1] The Objectors are the following absent class members: 7-Eleven, Inc.; Academy, Ltd. d/b/a Academy Sports + Outdoors; Aldo US Inc. d/b/a Aldo and Call It Spring; Amazon.com, Inc.; American Eagle Outfitters, Inc.; Ashley Furniture Industries, Inc.; Barnes & Noble, Inc.; Barnes & Noble College Booksellers, LLC; Beall's, Inc.; Best Buy Stores, L.P.; Boscov's, Inc.; Brookshire Grocery Company; Buc-ee's Ltd.; The Buckle, Inc.; Costco Wholesale Corporation; Euromarket Designs, Inc. d/b/a Crate & Barrel and CB2, Meadowbrook, L.L.C. d/b/a The Land of Nod; Dillard's, Inc.; Drury Hotels Company, LLC; Express, LLC; Foot Locker, Inc.; The Gap Inc.; HMSHost Corporation; IKEA North America Services, LLC; Lowe's Companies, Inc.; Marathon Petroleum Company LP; Martin's Super Markets, Inc.; Michaels Stores, Inc.; Mills Motor, Inc., Mills Auto Enterprises, Inc., Willmar Motors, LLC, Mills Auto Center, Inc., Fleet and Farm of Alexandria, Inc., Fleet Wholesale Supply of Fergus Falls, Inc., Fleet and Farm of Green Bay, Inc., Fleet and Farm of Menomonie, Inc., Mills Fleet Farm, Inc., Fleet and Farm of Manitowoc, Inc., Fleet and Farm of Plymouth, Inc., Fleet and Farm Supply Company of West Bend, Inc., Fleet and Farm of Waupaca, Inc., Mills E-Commerce Enterprises, Inc., Brainerd Lively Auto, LLC; National Association of Convenience Stores (NACS); National Grocers Association (NGA); Panda Restaurant Group, Inc.; Panera, LLC; PetSmart, Inc.; RaceTrac Petroleum, Inc. (REI); Recreational Equipment, Inc. (REI); Republic Services, Inc.; Retail Industry Leaders Association (RILA); Roundy's Supermarkets, Inc.; Sears Holding Corporation; Speedway LLC; Starbucks Corporation; Stein Mart, Inc.; Wal-Mart Stores, Inc.; The Wet Seal, Inc.; and YUM! Brands, Inc.

1

This windfall to American Express comes as no surprise. Its victory in *American Express Co. v. Italian Colors Restaurant*, 133 S. Ct. 2304 (2013), left Plaintiffs here with virtually no leverage. Plaintiffs concede that *Italian Colors* precludes them from bringing any class-wide claims for damages, and agree that any such claims must now be resolved through bilateral arbitration. Nevertheless, the Proposed Settlement violates the valid class action waiver and arbitration provisions contained in merchants' Card Acceptance Agreements by resolving future damages claims on a class-wide basis, outside of arbitration. American Express's exploitation of a nearly defunct class case to gain class-wide immunity from future suits is directly contrary to the Supreme Court precedent it fought for years to establish.

While the Proposed Settlement is a terrible deal for members of the purported class, this Court does not need to reach the merits of the deal because Plaintiffs cannot meet the threshold requirement of showing that the class should be certified under Rule 23. Plaintiffs cannot meet the requirements for certification of a mandatory settlement class for at least four reasons.

*First*, the Proposed Settlement's release of future damages claims without providing an opt-out right violates merchants' due process rights. The Proposed Settlement does this by using a mandatory Rule 23(b)(2) class to settle individualized monetary claims—in contravention of the Supreme Court's clear admonition that "individualized monetary claims belong in Rule 23(b)(3)." *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2558 (2011) ("*Dukes*").

*Second*, the release would eviscerate the arbitration and class action waiver provisions in merchants' agreements, which are enforceable under *Italian Colors*. Plaintiffs and American Express agree that merchants' damages claims against American Express must be resolved through bilateral arbitration. Using a mandatory class action settlement to resolve these claims over the objections of merchants that want to preserve their contractual rights is impermissible.

2

*Third*, the proposed class lacks the cohesion required for a Rule 23(b)(2) settlement class. The Proposed Settlement creates conflicts among proposed class members by structuring injunctive relief—the limited "right" to surcharge—in a manner that potentially benefits only some merchants. Merchants in the 10 states (and Puerto Rico) that have banned surcharging are legally barred from exercising this "right" to surcharge. To the extent the limited surcharging relief provides any benefit, merchants that can surcharge will benefit at the expense of those that are barred from surcharging. Such a settlement class cannot be certified given the Supreme Court's holding in *Dukes* that "Rule 23(b)(2) applies only when a single injunction or declaratory judgment would provide relief to each member of the class." 131 S. Ct. at 2557.

*Fourth*, Plaintiffs cannot satisfy the Rule 23(a)(4) requirement that they "fairly and adequately protect the interests of the class." Plaintiffs have agreed to an overbroad release that extinguishes the claims of future merchants whose interests were not separately represented, as required by Supreme Court precedent. The released claims include all challenges to American Express's Honor All Cards rule and Anti-Steering Rules, as well as any "substantially similar" future version of those rules. Such a prospective release covering future rules and conduct, and the future effects of such rules and conduct, is beyond the permissible boundaries of a class action release. The release should also be rejected because releases of future antitrust violations are void as against public policy.

In addition to failing to meet the requirements for class certification, the court should reject the Proposed Settlement because it is not fair, reasonable, or adequate. Merchants would get virtually nothing in return for surrendering their constitutional and contractual rights, and their current and future claims. The sole relief granted to merchants is a limited ability to surcharge American Express transactions with a significant catch: merchants will be able to

3

surcharge American Express cards only if they equally surcharge all other networks' credit and charge cards. This ban on "differential surcharging" is patently anticompetitive. American Express agreed to it because it will eliminate merchants' ability to seek better terms from American Express by threatening to surcharge American Express transactions at a higher rate than other card networks' cheaper transactions. The Proposed Settlement thus precludes merchants from using the negotiating tools they employ with their vendors and suppliers that operate in competitive industries.

To make matters worse, the ban on differential surcharging likely will empower American Express to exploit its substantial market power over merchants to raise prices. Because the Proposed Settlement requires merchants to surcharge all credit card brands equally at an amount no greater than the lowest cost of acceptance of any network's card, merchants will not be able to use surcharging as a means to recoup the full cost of accepting higher-priced American Express transactions. American Express will thus obtain a competitive advantage over Visa, MasterCard, and Discover. Moreover, given American Express's market power over merchants—a market reality that is the centerpiece of the DOJ case against American Express— this anticompetitive surcharging regime would enable American Express to exploit this advantage by raising its prices. A settlement that insulates American Express from competition and empowers it to further exploit the very market power challenged in the case is neither fair, reasonable, nor adequate.

Plaintiffs fail to support their claim that the Proposed Settlement provides "real value" because it allows merchants to use surcharging as a means to steer customers from credit cards to debit cards. Due to competitive concerns, few merchants would employ surcharging lest they lose business to a non-surcharging competitor. Merchants that operate in the 10 states that

4

prohibit surcharging could not take advantage of the Proposed Settlement's "relief" at all. Surcharging would have no system-wide benefits because the discount rates American Express charges merchants are established on an individual and confidential basis.

Moreover, the viability of using surcharging as a means to steer customers from credit to debit is premised on the baseless assumption that credit cards and debit cards are reasonably interchangeable forms of payment for most consumers and merchants. They are not. Unlike debit cards, credit cards offer customers a line of credit that allows them to defer payment and revolve balances. Many credit cards also offer customers rewards, such as travel "miles," that are often more generous than the limited rewards debit cards offer. Consumers that need to revolve or want their rewards will be unreceptive to steering. Thus, the courts—including the Second Circuit—that have considered the question have determined that credit cards and debit cards are in different antitrust markets. Merchants' ability to steer consumers from credit cards to debit cards will be marginal, at best, and the number of merchants that will be willing to risk customer dissatisfaction for this marginal benefit almost certainly will be very small.

\* \* \*

Less than a year ago, Plaintiffs affirmed that their case was aimed at reforming American Express's anticompetitive rules, and injecting competition into an industry that has been insulated from competition for far too long:

> Plaintiffs seek equitable relief reforming Amex's "anti-steering" rules so as to allow U.S. merchants to pass on to their Amex-using customers the fees they incur for swiping an Amex card, and to otherwise steer customers to cheaper payment forms. The ability of merchants to make the costs of card acceptance transparent to consumers—and to give customers incentives to use cheaper card products—will compel Amex and rival networks to engage in price competition in the U.S. markets for card acceptance services. And once competition breaks out . . . , Amex's monopoly power will vanish, formidable barriers to entry will

5

dissolve, and the fees incurred by merchants and their customers on all payment networks will diminish.[2]

This Proposed Settlement, if approved, could ensure that these things never happen.[3] Given the inability to surcharge American Express transactions at a level above a merchant's cost of accepting Visa and MasterCard transactions, the Proposed Settlement would not "allow U.S. merchants to pass on" their American Express swipe fees. The Proposed Settlement's ban on differential surcharging, and its validation of all of American Express's other Anti-Steering Rules, precludes merchants from steering customers to "cheaper" credit cards, forbids merchants from making "the costs of card acceptance transparent to consumers," and ensures that no merchant will ever be able to "compel Amex and rival networks to engage in price competition" for merchant acceptance. The Proposed Settlement's release of all future merchant claims locks in "Amex's monopoly power," fortifies the industry's "formidable barriers to entry," and all but guarantees that "the fees incurred by merchants and their customers" will rise, not "diminish."

The Proposed Settlement is a bad deal, and the Court should reject it entirely.

## FACTUAL BACKGROUND

### A.      The *Marcus* and *Animal Land* Actions and Their Factual Predicates

The *Marcus* and *Animal Land* actions challenge a number of anticompetitive rules and restrictions that American Express imposes upon all merchants that accept its payment cards. The *Marcus* action challenges American Express's Honor All Cards rule, which requires that merchants either accept all American Express cards, or none. Marcus Compl. ¶¶ 2-3, 44. The *Animal Land* action challenges various restrictions that prevent merchants from providing

---

[2] Mem. of Law in Opp. to Defs.' Mot. to Dismiss the Proceedings in Favor of Arbitration, or, Alternatively, Dismiss Count III and Compel the Remaining Claims to Arbitration, ECF No. 264 at 1.

[3] It *would* ensure that these things never happen unless the Department of Justice ("DOJ") wins its case against American Express. Objectors support the DOJ's attempt to rescind the Non-Discrimination Provisions in toto. A victory by the DOJ would provide another reason to reject this Proposed Settlement since an injunction in the DOJ case should supersede and nullify the Proposed Settlement's provisions restricting differential surcharging.

6

customers—at the point of sale—with either information that would make credit card costs transparent or incentives to use cheaper forms of payment—including a competing network's payment card (the "Anti-Steering Rules" or "Non-Discrimination Provisions").  AL Compl. ¶ 1, 27-29.  These rules insulate American Express from competition for merchants from such networks as Visa, MasterCard, and Discover.  AL Compl. ¶ 1.

These restrictive rules enable American Express to charge merchants inflated fees, known as "merchant discount fees," that generally exceed the analogous interchange fees charged by Visa and MasterCard.  Marcus Compl. ¶¶ 47-48; AL Compl. ¶¶ 25-26.  Nevertheless, merchants agree to abide by American Express's rules because merchants, by and large, must accept American Express to satisfy their customers and avoid losing an unacceptable portion of sales to competitors.  Marcus Compl. ¶ 54; AL Compl. ¶ 48.[4]

## B.  *Italian Colors*

According to American Express, the Card Acceptance Agreement ("CAA") between American Express and virtually all of its merchants includes a broad arbitration provision that provides that (1) all claims between American Express and the merchant are subject to arbitration; (2) the merchant waives its right to litigate any claim against American Express in court; and (3) the merchant shall not participate in any class action, in court or in arbitration, as a representative or member of any class of claimants pertaining to any claim against American Express subject to arbitration.[5]  The arbitration provision states that it applies specifically to any class action relating to American Express's Honor All Cards rule, Non-Discrimination Provisions, or Anti-Steering Rules.  *Id.* at 6.

---

[4] *See also* Declaration of Jeffrey I. Shinder ("Shinder Decl.") Exs. 44 (Wet Seal ¶ 5); 34 (RaceTrac ¶ 5); 24 (Lowe's ¶ 7); 31 (Panda ¶ 4); 18 (Crate & Barrel ¶ 5); 43 (Walmart ¶6); 4 (Amazon ¶6); 23 (IKEA at 2).

[5] *See* Mem. of Law in Supp. of Defs.' Mot. to Dismiss the Proceedings in Favor of Arbitration, or Alternatively, Dismiss Count III and Compel the Remaining Claims to Arbitration, ECF No. 262-1 at 5-6.

291286.11

Accordingly, in 2004, American Express moved to dismiss the *Italian Colors* action, along with related consolidated actions that challenged the Honor All Cards rule, in favor of arbitration. *Id.* at 4. The District Court granted the motion to dismiss, and Plaintiffs appealed. *Id.* Beginning in 2006, the putative class actions challenging American Express's Anti-Steering Rules were stayed pending the outcome of the appeals in *Italian Colors.* On June 20, 2013, the Supreme Court ruled that the arbitration and class action waiver provisions in the CAA are enforceable. *See Italian Colors*, 133 S. Ct. at 2308-12.

Following the Supreme Court's decision, in July 2013, American Express moved to dismiss those actions that had been stayed pending the outcome of *Italian Colors*. *See* ECF No. 262. Notably, American Express argued—and Plaintiffs agreed—that *Italian Colors* precluded Plaintiffs from bringing their damages claims in these actions. The only issue on which the parties disagreed was whether Plaintiffs could bring their claims for injunctive relief. American Express argued that Plaintiffs' ability to bring injunctive claims was foreclosed by Second Circuit precedent. *See* ECF No. 265 at 2 (citing *Vera v. Saks & Co.*, 335 F.3d 109 (2d Cir. 2003)). That motion was fully briefed before this Court and remains *sub judice*.

### C.    The Proposed Settlement

One week after Judge Gleeson granted final approval of the class action settlement in *In re Payment Card Interchange Fee and Merchant Discount Antitrust Litigation*, No. 05-md-1720(JG)(JO) (E.D.N.Y.) (the "MDL 1720 Settlement"),[6] plaintiffs in the *Marcus* action filed a motion for preliminary approval of this Proposed Settlement. 13-CV-07355 (E.D.N.Y.), ECF Nos. 127, 128. The Proposed Settlement creates a mandatory settlement class pursuant to Fed.

---

[6] On December 13, 2013, over the objections of thousands of class members, Judge Gleeson granted final approval of the MDL 1720 Settlement. That order is currently on appeal by some 200 merchants in dozens of consolidated appeals. The appeals directly challenge the district court's decision to certify a mandatory Rule 23(b)(2) class for settlement purposes, including, as here, because it will force the release of future damages claims without providing an opt-out right, and because the nationwide merchant class in that case lacks the cohesion required under Rule 23.

291286.11

R. Civ. P. 23(b)(2) from which no merchant can opt out.[7]  Settlement ¶ 2.  This class is broadly

defined as "all Persons that as of the Settlement Preliminary Approval Date or in the future

accept any American Express-Branded Cards at any location in the United States . . . ."  *Id.*

### 1.    The Release

The Proposed Settlement forces merchants to give American Express a release of all

claims for injunctive relief, and for future damages, relating to American Express's Honor All

Cards rule and Anti-Steering Rules.  Settlement ¶¶ 24-41.  It also encompasses claims arising

from any American Express rule or provision that is "substantially similar."  *Id*. at ¶¶ 26(f);

27(e).  The release purports to be "as broad as legally permissible."  *Id.* ¶ 33.  The release

terminates only on the later of (a) 10 years following the American Express surcharging rules

changes described below or (b) the abandonment by American Express, Visa or MasterCard of

their new surcharging rules.  Settlement ¶ 1(vv).  If none of these dominant networks abandon

the new surcharging rules, the Proposed Settlement's release would likewise never end.  The

release endures regardless of the "future effect in the United States of the continued imposition

of or adherence to any" of American Express's Honor All Cards rule or Anti-Steering Rules, or

any "substantially similar" version of such rules.  *Id*. ¶¶ 26(f); 27(e).  The release purports to

extend beyond existing products to the extent American Express extends its Honor All Cards rule

and Anti-Steering Rules to mobile payments and other future technologies.  Settlement ¶ 1(bb).

### 2.    The Relief Provided to the Proposed Class

Under the Proposed Settlement, American Express will retain its Honor All Cards rule

and Anti-Steering Rules (with the narrow exception of the limited changes to the surcharging

restrictions).

---

[7] References to the Proposed Settlement are cited herein as "Settlement ¶ __."

291286.11

The sole benefit conferred to the proposed class is a modification of American Express's Non-Discrimination Provisions that would provide merchants with a limited ability to surcharge American Express transactions. The surcharge that a merchant could impose on an American Express transaction "must not be any higher than any surcharge imposed on transactions effected with any other Credit Card . . . ." Settlement ¶ 8(b). Due to the interplay between this Proposed Settlement and the MDL 1720 Settlement—which enables Visa and MasterCard to effectively adopt American Express's surcharging rules (MDL 1720 Settlement ¶¶ 42(a), 55(a))—Court approval of the Proposed Settlement would preclude merchants in the proposed class that also accept Visa and MasterCard from imposing "differential" surcharges on the three different networks' cards.

Notably, the MDL 1720 Settlement's modifications to Visa's and MasterCard's no-surcharging rules, which Plaintiffs' Counsel here claims to have taken a "laboring oar" in negotiating (Friedman Decl. ¶ 6), cap any surcharge in an amount at the merchant's cost of acceptance. *See* MDL 1720 Settlement ¶¶ 42(a)-(b), 55(a)-(b).[8] The combined effect of the Proposed Settlement and the MDL 1720 Settlement's surcharge cap is that, for a merchant that accepts Visa, MasterCard, and American Express cards, the uniform surcharge that such a merchant could impose on all credit card transactions would be less than the cost of accepting the more expensive American Express-branded cards. A merchant that accepts all three card brands and wants to surcharge would first calculate the surcharge that could be imposed on Visa or MasterCard transactions—whichever was lowest—and then impose that same surcharge on all three credit card brands. This ensures that merchants will not be able to recoup the full cost of

---

[8] *See also* Shinder Decl. Exs. 50, 51 (Visa and MasterCard costs of acceptance).

291286.11

accepting American Express,[9] and that American Express will have an embedded advantage over its competitors.[10]  Hausman ¶¶ 60- 61.

The surcharging rule changes take effect only after final approval of the settlement is granted and the Proposed Settlement is no longer subject to appeal.  Settlement ¶¶ 1(aa), (uu); 9.

### 3.    Opposition to the Proposed Settlement

Objectors signing onto this brief include the top "large-format value" store (and two of the top three in that category, **Walmart** and **Costco Wholesale**); the top online retailer (**Amazon**); the top specialty coffee retailer (**Starbucks**); the top electronics and entertainment retailer (**Best Buy**); the largest bookseller (**Barnes & Noble**); three of the largest convenience stores (**7-Eleven**, **Speedway**, and **RaceTrac Petroleum**); one of the largest pet stores (**PetSmart**); the second largest home improvement retailer (**Lowe's**); seven of the largest U.S. specialty apparel retailers (**Gap**, **Foot Locker**, **American Eagle**, **Aldo**, **Express**, **Wet Seal**, and **The Buckle**); three of the top furniture and houseware stores (**IKEA**, **Crate & Barrel**, and **Ashley Furniture**); five of the largest department stores (**Sears**, **Beall's**, **Boscov's**, **Dillard's**, and **Stein Mart**); the largest arts and crafts specialty retailer (**Michaels**); two of the top merchants in the travel sector (**HMSHost** and **Drury Hotels**); two of the largest sports and outdoors retailers (**Academy** and **REI**); three of the largest quick service food companies (**YUM! Brands**, **Panda Restaurant Group**, and **Panera**); regional grocery chains (**Brookshire's**, **Martin's Super Markets**, and **Roundy's**); the third largest waste management firm in the United States (**Republic Services**); a popular Texas travel center chain (**Buc-ee's**); a Midwest retailer that sells a variety of merchandise, from hunting equipment to auto parts and

---

[9] *See*, *e.g.*, Shinder Decl. Exs. 3 (Aldo ¶¶ 11-12); 7 (Barnes & Noble ¶¶ 11-12); 8 (Barnes & Noble College ¶¶11-12); 10 (Best Buy ¶¶ 13-15); 16 (Dillard's ¶¶ 11-12); 19 (Express ¶¶9-10); 26 (Martin's Super Markets ¶¶ 11-12); 32 (Panera ¶¶ 9-10); 33 (PetSmart ¶¶ 9-10); 40 (Speedway ¶¶ 10-11); 44 (Wet Seal ¶¶ 11-12); 24 (Lowe's ¶¶ 15-16); 1 (7-Eleven ¶¶ 13-14); 43 (Walmart ¶¶14-16); 20 (Foot Locker ¶¶ 12-13).

[10] The Report of Professor Jerry Hausman, dated June 6, 2014, is attached to the Shinder Declaration as Exhibit 46.

automobiles (**The Mills Companies**); and trade associations and cooperatives representing thousands of merchants nationwide (**NACS**, **NGA**, and **RILA**).

While the final tally is not yet known, numerous other prominent merchants are objecting to the Proposed Settlement. The significant opposition includes the Individual Merchant Plaintiffs in this MDL, as well as many of the nation's largest and most sophisticated merchants.

## ARGUMENT

### I. Applicable Standards Demand Heightened Scrutiny of Class Certification and, Separately, of Settlement Fairness

Class actions poised for settlement "demand undiluted, even heightened, attention . . . ." *Amchem Prods. v. Windsor*, 521 U.S. 591, 620 (1997). This is because "in settlement-only class actions the procedural protections built into the Rule to protect the rights of absent class members during litigation are never invoked in an adversarial setting." *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 847 (1999). Heightened scrutiny is even more essential in a mandatory settlement class, where "[t]he legal rights of absent class members . . . are resolved regardless of either their consent, or, in a class with objectors, their express wish to the contrary." *Id.*

Settlement proponents have the burden of meeting the requirements of class certification "independently of the general fairness review of the settlement . . . ." *Denney v. Deutsche Bank AG*, 443 F.3d 253, 268 (2d Cir. 2006). Thus, "[b]efore certification is proper for any purpose—settlement, litigation, or otherwise—a court must ensure that the requirements of Rule 23(a) and (b) have been met. These requirements should not be watered down by virtue of the fact that the settlement is fair or equitable." *Id.* at 270.

This is so because "principles of due process prevent individual named plaintiffs from binding—through litigation or court-approved settlement—absent class members the plaintiffs do not legally represent." *Jamie S. v. Milwaukee Pub. Sch.*, 668 F.3d 481, 502 (7th Cir. 2012).

12

The Supreme Court has held that "a fairness hearing under Rule 23(e) is no substitute for rigorous adherence to those provisions of the Rule 'designed to protect absentees.'" *Ortiz*, 527 U.S. at 849 (quoting *Amchem*, 521 U.S. at 620). In the settlement context, "Rules 23(a) and (b) continue to serve the purpose of 'focus[ing] court attention on whether a proposed class has sufficient unity so that absent members can fairly be bound by decisions of class representatives.'" *In re American Int'l Group, Inc. Sec. Litig.*, 689 F.3d 229, 239 (2d Cir. 2012) (quoting *Amchem*, 521 U.S. at 621).

The party seeking class certification bears the burden of establishing the existence of all four Rule 23(a) requirements of "numerosity, commonality, typicality, and adequacy." *See* Fed. R. Civ. P. 23(a); *Amchem*, 521 U.S. at 613. "In addition to satisfying Rule 23(a)'s prerequisites, parties seeking class certification must show that the action is maintainable under Rule 23(b)(1), (2), or (3)." *Amchem*, 521 U.S. at 614.

A court may not approve a settlement under Rule 23(e) unless it determines that the settlement is "'fair, adequate, and reasonable, and not a product of collusion.'" *The Authors Guild v. Google Inc.*, 770 F. Supp. 2d 666, 674 (S.D.N.Y. 2011) (quoting *Joel A. v. Giuliani*, 218 F.3d 132, 138 (2d Cir. 2000)).

## II.     The Court Should Reject the Proposed Class Because the Release Violates Proposed Class Members' Rule 23 and Due Process Rights

The Fifth Amendment prohibits the federal government from depriving persons of their property "without due process of law." U.S. Const. Amend. V. That prohibition governs the federal courts' entry of a judgment deciding a claim in litigation. The claim—a "chose in action"—is a "species of property protected by the . . . Due Process Clause," *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 428 (1982), so that the individual's right to pursue the

291286.11

claim is "a constitutionally recognized property interest." *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 807 (1985).

On that basis, the Supreme Court held in *Shutts* that if a court "wishes to bind an absent plaintiff concerning a claim for *money damages or similar relief at law*, it must provide minimal procedural due process protection" to that plaintiff, including not only the "best-practicable" notice but also "*an opportunity to remove himself from the class* by executing and returning an 'opt out' or 'request for exclusion' form to the court." 472 U.S. at 811-12 (emphasis added). The Supreme Court has reiterated that "mandatory class actions aggregating damages claims implicate the due process principle . . . deep-rooted [in our] historic tradition that everyone should have his own day in court." *Ortiz*, 527 U.S. at 846. It has repeatedly rejected class certification in cases where the "legal rights of absent class members" would be impermissibly "resolved regardless of either their consent, or, in a class with objectors, their express wish to the contrary." *Id.* at 847.

Due process requires "at a minimum" that absent class members have the opportunity to opt out of a class before their individualized claims for money damages can be extinguished. *Shutts*, 472 U.S. at 812. That is why damages classes are certified pursuant to Rule 23(b)(3), which permits courts to certify a class where common questions "predominate over any questions affecting only individual members" and the "class action is superior to" individual adjudication in both fairness and efficiency.

By contrast, Rule 23(b)(2) permits a federal court to enter a class action judgment that binds the entire class *without* notice and opt-out rights, and does *not* ask whether common questions predominate, because it applies only when the case consists exclusively of common questions in which the class has a single, indivisible interest. By its terms, that provision applies

14

only to the limited subset of claims that seek "final *injunctive* relief or corresponding *declaratory* relief [that] is appropriate respecting *the class as a whole*." Fed. R. Civ. P. 23(b)(2) (emphasis added). That language, the Supreme Court concluded in *Dukes*, could properly be read to apply "*only* to requests for such injunctive or declaratory relief," without permitting "the class certification of monetary claims at all." 131 S. Ct. at 2557 (emphasis in original).

Courts accordingly treat claims for future money damages as claims for legal relief entitled to the procedural protections of Rule 23 and the Due Process Clause. *See Ortiz*, 527 U.S. at 846 (focusing heavily on the capacity of the settlement to terminate monetary claims even though a large segment of the disputed claims were by "future claimants"); *Stephenson v. Dow Chem. Co.*, 273 F.3d 249, 260 (2d Cir. 2001) (recognizing that future damages claims cannot be released without "adequate representation . . . and an opportunity to opt out") (quoting *Shutts*, 472 U.S. at 811-12).

These principles mandate that the Proposed Settlement be rejected. The Proposed Settlement uses a Rule 23(b)(2) class to release future individualized damages claims without giving proposed class members the right to opt out. This is precisely the scenario anticipated— and forbidden—by the Supreme Court's unanimous opinion in *Dukes*. "Individual class members' compensatory-damages claims [have been] *precluded* by litigation they had no power to hold themselves apart from." *Dukes*, 131 S. Ct. at 2559 (emphasis in original). Each and every merchant that exists now or in the future is forever forbidden from pursuing any damages claim regarding American Express's Honor All Cards rule or Anti-Steering Rules. The release reaches not only any forward-looking claim regarding *these* rules, but every claim arising from any rule or provision that is "substantially similar" to them. Settlement ¶ 27(e).

15

Plaintiffs rely on inapposite authority in arguing that the Proposed Settlement's release does not violate due process. *See* Pl. Br. at 33-34. In *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96 (2d Cir. 2005), the settlement did not release any future claims, and the class was approved only under Rule 23(b)(3). In *Robertson v. National Basketball Association*, 556 F.2d 682 (2d Cir. 1977), decided 35 years before *Dukes* and nine years before *Shutts*, a class was certified pursuant to Rule 23(b)(1) to "avoid the inconsistent adjudication or compromise of class interests that might otherwise occur"). *Id.* at 685. Likewise, in *Joel A. v. Giuliani*, 218 F.3d 132 (2d Cir. 2000), also cited by Plaintiffs, the settlement contained a release "extremely limited in scope" that "explicitly preserves the right of an individual plaintiff [to sue] for damages or equitable relief tailored solely to the specific circumstances of that individual plaintiff." *Id.* at 142 (internal quotation marks omitted).[11]

## III. The Court Should Reject the Proposed Class in Light of the Supreme Court's Decision in *Italian Colors*

The Proposed Settlement impermissibly resolves on a class-wide basis merchants' individual damages claims that Plaintiffs and American Express characterize as being subject to a valid and enforceable arbitration and class action waiver provision in the merchants' CAAs. This violates binding Supreme Court precedent and provides an independent basis for the Court to deny certification of the (b)(2) class.

The Federal Arbitration Act "embod[ies] [a] national policy favoring arbitration." *AT&T Mobility LLC v. Concepcion*, 131 S. Ct. 1740, 1749 (2011). It provides that contractual

---

[11] To the extent Plaintiffs rely on the MDL 1720 final approval order, the MDL 1720 court's analysis did not consider the monetary claims subject to the mandatory release. *See In re Payment Card Interchange Fee and Merchant Discount Antitrust Litig.*, No. 05-MD-1720(JG)(JO), 2013 WL 6510737, at *23 (E.D.N.Y. Dec. 13, 2013) ("To allow [merchants] to opt out and pursue their own *rules-based injunctive relief* would eliminate the incentive to settle that Rule 23(b)(2) was designed in part to create.") (emphasis added). The MDL 1720 court also failed to address the fact that the Rule 23(b)(2) class violated the Supreme Court's holding in *Dukes*, and the court's failure to do so is currently a subject of the Second Circuit appeals.

16

agreements to arbitrate disputes "shall be valid, irrevocable, and enforceable."  9 U.S.C. § 2.

According to the Supreme Court, the FAA requires that courts "rigorously enforce arbitration

agreements according to their terms."  *Italian Colors*, 133 S. Ct. at 2309 (internal quotation

marks omitted).  The FAA "leaves no place for the exercise of discretion by a district court, but

instead mandates that district courts *shall* direct the parties to proceed to arbitration on issues to

which an arbitration agreement has been signed."  *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S.

213, 218 (1985) (emphasis in original).

    American Express claims that virtually every member of the proposed class has entered

into a valid, enforceable arbitration agreement with American Express.[12]  The parties agree that,

in light of *Italian Colors*, the arbitration agreement precludes each merchant from acting as a

representative or member of any class of merchants seeking damages from American Express.

*See* Pl. Br. at 24 ("It is beyond serious dispute that a merchant class action for damages is simply

unavailable in the wake of *Italian Colors*."); ECF No. 262-1.[13]

    The Proposed Settlement, however, would nullify these arbitration provisions that the

Supreme Court has held are valid and enforceable.  To the extent that merchants do have

arbitration agreements with American Express, the Proposed Settlement would resolve those

merchants' future damages claims—claims that Plaintiffs agree are subject to the CAA's

arbitration and class action waiver provision—through *class* litigation in *court*.  This is

impermissible, as the CAA unambiguously provides that such disputes must be resolved

---

[12] Certain Objectors' contracts with American Express are materially different from the description of American Express's agreements with merchants that are detailed in the parties' submissions.  We cite the parties' statements regarding American Express's merchant contracts merely to show that, to the extent those statements are true for at least some merchants, they show that the proposed (b)(2) class cannot be certified.  Nothing in this brief should be construed to derogate from any Objector's contractual rights with American Express.

[13] American Express asserts that the provision applies to any claims for injunctive relief as well.  *See* ECF No. 265 at 1-7.

291286.11

*individually* in *arbitration*. The Proposed Settlement deprives merchants of those contractual rights by forcing them to participate as members in the proposed class.

American Express spent years litigating the enforceability of the CAA's arbitration provision—through three Second Circuit decisions, back and forth to the Supreme Court—and ultimately succeeded. It then moved this Court to dismiss all of plaintiffs' claims, insisting that the American Express arbitration clause, including specifically the class action waiver, "*must* be enforced." ECF No. 262-1 at 2 (emphasis added). Now, however, American Express asks this Court to disregard the CAA's arbitration provision so that it can obtain the windfall benefits that the Proposed Settlement confers. Of course, with respect to *past* damages, the Proposed Settlement contemplates that those claims will be subject to arbitration. *See* Settlement ¶ 68 ("Damages Arbitrations"). American Express thus seeks to use the CAA's arbitration provision as both a sword and a shield. American Express cannot have it both ways. The Court should not allow American Express to use the Proposed Settlement to nullify merchants' contractual rights.

It is the height of cynicism for American Express to now seek an exception—that would benefit only American Express—to the rule it sought in its lengthy and successful battle to consign certain merchants' claims to mandatory arbitration. Under this exception, merchants would still be forced to arbitrate their claims against American Express except when American Express decides it is in its interest to use a class action settlement to limit all merchants' ability to challenge American Express's rules.

American Express's effort to use the Proposed Settlement to nullify merchants' rights to arbitrate their individual claims is also prohibited by the Rules Enabling Act, 28 U.S.C. § 2702(b). As the Supreme Court has held, that law "forbids interpreting Rule 23 to 'abridge, enlarge or modify any substantive right.'" *Dukes*, 131 S. Ct. at 2561. In fact, in *Italian Colors*,

18

the Court expressly stated that "it is likely" that using Rule 23 for the purpose of "invalidating private arbitration agreements denying class adjudication, would be an 'abridg[ment]' or 'modif[ication]' of a 'substantive right' forbidden by the Rules [Enabling Act]." 133 S. Ct. at 2309-10. Accordingly, this Court should reject the Proposed Settlement for the additional reason that it would use Rule 23 to invalidate private arbitration agreements in violation of the Rules Enabling Act.

## IV.    The Court Should Reject the Proposed Class Because It Lacks the Required Cohesion of a Mandatory Class

A mandatory Rule 23(b)(2) settlement class cannot be certified unless it is cohesive with a homogeneity of interests. The interests of the broad range of merchants that would be forced into this proposed class do not meet this standard.

In *Dukes*, the Supreme Court reaffirmed that "[t]he key to the (b)(2) class is the indivisible nature of the injunctive or declaratory remedy warranted." 131 S. Ct. at 2557 (citation omitted). A court cannot certify a (b)(2) class if the proposed relief is not "appropriate respecting the class *as a whole*." *Id.* (emphasis in original).[14] As the Second Circuit has noted, a (b)(2) class is based on "a presumption of cohesion and unity between absent class members and the class representatives such that adequate representation will generally safeguard absent class members' interests and thereby satisfy the strictures of due process." *Robinson v. Metro-North Commuter R.R. Co.*, 267 F.3d 147, 165 (2d Cir. 2001). "Because 'unnamed members are bound by the action without the opportunity to opt out' of a Rule 23(b)(2) class, even greater

---

[14] This argument is directed at the viability of the Proposed Settlement class—driven by the terms of the Proposed Settlement—and does not reflect on the ultimate certifiability of litigation classes. A settlement class must be examined by reference to the settlement. *See In re Literary Works in Elec. Databases Copyright Litig.*, 654 F.3d 242, 252 (2d Cir. 2011).

19

cohesiveness generally is required than in a Rule 23(b)(3) class." *In re St. Jude Med., Inc.*, 425 F.3d 1116, 1121 (8th Cir. 2005).[15]

The fact that class members may have certain common complaints about a defendant's practices is accordingly insufficient to make the class cohesive for purposes of Rule 23(b)(2), which "applies only when a *single* injunction . . . would provide relief to *each* member of the class." *Dukes*, 131 S. Ct. at 2557 (emphasis added).[16]

Far from being available to "each member of the class," the surcharging relief is actually *illegal* for many members of the purported class. *Dukes*, 131 S. Ct. at 2557. Surcharging is prohibited by law in 10 states (plus Puerto Rico), and in 2013, 23 states considered passing similar legislation. Shinder Decl. ¶¶ 3-27; Ex. 48. Merchants that operate in those states— including many Objectors that operate nationwide—are legally barred from taking advantage of the surcharging relief.[17] The proposed class thus fails the cohesion test because, *as a matter of law*, the relief is not common to the proposed class as a whole.

When "variations in state law might cause class members' interests to diverge," a "district court should pay particular attention to *Amchem*'s guidance that in the settlement context Rule 23's requirements 'designed to protect absentees by blocking unwarranted or

---

[15] *See also Lemon v. Int'l Union of Operating Eng'rs*, 216 F.3d 577, 580 (7th Cir. 2000) (similar); *Barnes v. Am. Tobacco Co.*, 161 F.3d 127, 142-43 (3d Cir. 1998) (similar).

[16] *See also M.D. ex rel. Stukenberg v. Perry*, 675 F.3d 832, 846 (5th Cir. 2012) (vacating (b)(2) certification order because district court erred in finding "it irrelevant that some of the class's requested relief would not apply to every class member"); *Kartman v. State Farm Mut. Auto. Ins. Co.*, 634 F.3d 883, 893 (7th Cir. 2011) ("[w]here a class is not cohesive such that a uniform remedy will not redress the injuries of *all* plaintiffs, class certification is typically not appropriate") (emphasis in original); *Casa Orlando Apartments, Ltd. v. Fed. Nat'l Mortgage Ass'n*, 624 F.3d 185, 200 (5th Cir. 2010) (finding that "forty percent of the class benefiting from an injunction is not sufficient to certify under (b)(2)"); *In re Managerial, Prof'l & Technical Employees*, No. MDL 1471, 02-CV-2924 (GEB), 2006 WL 38937, at *9 (D.N.J. Jan. 5, 2006) (certification under (b)(2) inappropriate when requested relief would not be "generally applicable to the class because it would have potentially conflicting effects on different members").

[17] *See, e.g.*, Shinder Decl. Exs. 2 (Academy ¶¶ 17-19); 7 (Barnes & Noble ¶¶ 14-18); 8 (Barnes & Noble College ¶¶ 13-16); 9 (Beall's ¶¶ 15-17); 12 (Brookshire's ¶¶12-13); 13 (Buc-ee's ¶ 8); 14 (The Buckle ¶¶ 14-18); 15 (Costco ¶¶ 14-17); 18 (Crate & Barrel ¶¶ 16-20); 16 (Dillard's ¶¶ 14-15); 29 (NACS ¶¶ 14-16); 34 (RaceTrac ¶¶16-18); 37 (RILA ¶¶ 15-18); 31 (Panda ¶¶ 13-17); 45 (YUM! Brands ¶¶12-15); 1 (7-Eleven ¶¶ 15-17); 36 (Republic Services ¶¶ 16-19); 3 (Aldo ¶¶ 15-17); 39 (Sears ¶¶ 16-18); 43 (Walmart ¶¶18-19).

291286.11

overbroad class definitions . . . demand undiluted, even heightened, attention.'" *In re American Int'l Group*, 689 F.3d at 243. Because members of the proposed class in the states that bar surcharging are foreclosed by law from using the class-wide relief, this settlement plainly violates *Dukes*' holding that "Rule 23(b)(2) applies only when a single injunction . . . would provide relief to each member of the class." 131 S. Ct. at 2257.

Plaintiffs cannot elude this requirement of Rule 23(b)(2) by suggesting that state laws banning surcharging may one day change or be struck down as unconstitutional. *See* Pl. Br. at 27-28. Rule 23(b)(2)'s requirement that the class have a cohesive interest in the proposed injunctive relief is not satisfied when one group of class members will gain an immediate right and some class members have only the potential of gaining that right at some unspecified date in the future. As the Supreme Court has held, "Rule 23(b)(2) applies only when a single injunction or declaratory judgment would provide relief to *each* member of the class," and is limited to cases where "the relief sought must perforce affect the *entire class at once*." *Dukes*, 131 S. Ct. at 2557-58 (emphasis added).

In addition to being insufficient to satisfy Rule 23(b)(2)'s requirement of cohesion as a matter of law, Plaintiffs' suggestion that anti-surcharging laws may eventually fall is both speculative and factually flawed. Plaintiffs rely on a recent opinion from Judge Rakoff striking down New York's no-surcharging law as a ban on speech foreclosed by the First Amendment, as well as Judge Gleeson's view that such laws are anti-consumer and "arguably irrational." Pl. Br. at 27-28 (quoting *In re Payment Card Interchange*, 2013 U.S. Dist. LEXIS 179340, at *60). Judge Rakoff's novel First Amendment theory—treating a pricing practice as speech rather than conduct—has never been successfully applied to previous surcharging bans enacted by the federal government and several other states. *See* Shinder Decl. Ex. 49, Brief of Attorney General

21

of New York at 5, No. 13-4537, *Expressions Hair Design v. Schneiderman* (2d Cir. Mar 13, 2014). Moreover, far from repealing surcharging bans, during 2013, when Visa's and MasterCard's rules were amended to permit limited surcharging, anti-surcharge bills that would create new restrictions on credit card surcharges were introduced in 23 states. Shinder Decl. ¶¶ 3-27; Ex. 48.[18] It is just as likely—if not more likely—that if merchants start to surcharge, there will be more state regulation of the practice rather than less.

Plaintiffs simply ignore the inherent conflicts in seeking surcharging relief that would be available to some merchants and legally barred to others. While some merchants in the 40 states that currently permit surcharging theoretically might have been willing to trade all their individual claims against American Express in return for a limited right to surcharge, merchants in the 10 states that would prohibit surcharging have no such interest.[19]

This fundamental flaw of giving superficially equal relief to persons that, in fact, would not benefit equally because of their different circumstances was one of the defects in the settlement rejected by the Supreme Court in *Ortiz*. In that case, the Supreme Court found that conflicting interests of present and future claimants were not resolved by giving them equal rights to a settlement fund because their different interests required different treatment—some claims were more valuable than others. As the Court held, "The very decision to treat them all the same is itself an allocation decision with results almost certainly different from the results that those with immediate injuries or claims of indemnified liability would have chosen." 527 U.S. at 857. Here, too, the decision to grant all merchants a limited right to surcharge is a

---

[18] Plaintiffs curiously argue that state statutes can constitutionally ban differential surcharging, but not uniform surcharging. Pl. Br. at 31-32. Nothing in any state statutes permits a merchant to apply uniform surcharges but not differential surcharges. *See, e.g.*, Tex. Fin. Code Ann. § 339.001(a) ("In a sale of goods or services, a seller may not impose a surcharge on a buyer who uses a credit card for an extension of credit instead of cash, a check, or a similar means of payment.").

[19] *See, e.g.*, Shinder Decl. Ex. 13 (Buc-ee's ¶¶ 7-8).

291286.11

"result[] almost certainly different from the results that" merchants that are precluded from surcharging "would have chosen." In fact, the Proposed Settlement exacerbated the lack of cohesion among merchants by giving all of them a limited right to surcharge that only some of them could exercise.[20]

## V. The Court Should Reject the Proposed Class Due to Inadequate Representation

Rule 23(a)(4) requires that class representatives must "fairly and adequately protect the interests of the class." As the Supreme Court has noted, the adequacy inquiry under Rule 23(a)(4) "serves to uncover conflicts of interest between named parties and the class they seek to represent." *Amchem*, 521 U.S. at 625. "When a court is asked to certify a class and approve its settlement in one proceeding, the Rule 23(a) requirements designed to protect absent class members 'demand undiluted, even heightened, attention.'" *In re Literary Works in Elec. Databases Copyright Litig.*, 654 F.3d 242, 249 (2d Cir. 2011) (quoting *Amchem*, 521 U.S. at 620). Plaintiffs have failed this test by propounding an egregiously defective settlement that benefits certain subgroups of the proposed class at the expense of others.

### A. The Proposed Settlement Improperly Releases Future Claims

As the Second Circuit has explained, whether there has been inadequacy of representation can be "apparent from examination of the settlement itself." *Nat'l Super Spuds, Inc. v. New York Mercantile Exch.*, 660 F.2d 9, 18 (2d Cir. 1981). Such "inadequacy of

---

[20] This lack of cohesion is further exacerbated by the Proposed Settlement's provision that "[n]othing in this Class Settlement Agreement shall prevent the Defendants from agreeing with merchants (a) not to impose a surcharge on any American Express-Branded Card transactions." Settlement ¶ 10. Thus, American Express remains free to balkanize the class after the fact, and create a system in which the allegedly common practice that underlies (b)(2) certification becomes uncommon once again. For example, if a large merchant who is an industry leader in a segment (for instance, McDonalds) decides to pursue surcharging, American Express can offer that merchant a break on its fees in exchange for its agreement not to surcharge. For competitive reasons, that would discourage other, similar merchants from surcharging as well. This may bring down the rate for McDonalds, but certainly not for the rest of the class. American Express's reserved right to cherry pick the surcharging relief is directly contrary to the Supreme Court's mandate that any relief to a (b)(2) class must be an "indivisible injunction benefitting all [class] members at once." *Dukes*, 131 S. Ct. at 2558.

291286.11

representation" is apparent when class representatives settle claims that go beyond the claims they were authorized to assert. *Id.* at 18.

In addition to releasing all claims currently in existence, the Proposed Settlement would release two distinct types of future claims. First, the Proposed Settlement would release the claims of all future merchants. Second, the Proposed Settlement would release all future claims of both current and future merchants. The Plaintiffs failed to provide adequate representation with respect to both types of future claims.

Supreme Court precedent is clear that the requirement of adequate representation is not met when one group of representatives represents both present and future claimants. As the Supreme Court stated in *Ortiz*, "it is obvious after *Amchem* that a class divided between holders of present and future claims (some of the latter . . . attributable to claimants not yet born) requires division into homogeneous subclasses under Rule 23(c)(4)(B), *with separate representation to eliminate conflicting interests of counsel*." 527 U.S. at 856 (emphasis added). Given that future merchants received no separate representation, their interests were not adequately protected, as required by Rule 23(a)(4).

Plaintiffs also proved to be inadequate representatives when they agreed to release all future claims of both current and future merchants. The release would purportedly grant American Express immunity not just from the claims asserted in this case, but from all merchant claims regarding its Honor All Cards rule and Anti-Steering Rules, and future versions of such rules that are "substantially similar," including future antitrust claims. Settlement ¶¶ 26(a)-(g), 27(a)-(e). The release also would cover future claims based on the future effects of such rules. Settlement ¶¶ 26(f), 27(e). Granting such prospective immunity through a release is void as against public policy. *See, e.g.*, *Lawlor v. National Screen Serv. Corp.*, 349 U.S. 322, 328-29

24

(1955) ("extinguishing claims which did not even then exist and which could not possibly have been sued upon in the previous case . . . would in effect confer on [defendants] a partial immunity from civil liability for future violations"); *Minnesota Mining & Mfg. Co. v. Graham-Field, Inc.*, No. 96-CIV-3839(MBM), 1997 WL 166497, at *3 (S.D.N.Y. Apr. 9, 1997) ("GFI could not have waived this claim in the releases because a prospective waiver of an antitrust claim violates public policy").

The release cannot pass muster under *Lawlor*. Claims concerning future rules and conduct, "could not possibly have been sued upon in the previous case" and, thus, permitting such a release "would in effect confer on [defendants] a partial immunity from civil liability for future violations." 349 U.S. at 328-29. The same is true for claims concerning the "future effects" of current rules or conduct, particularly when such claims are unripe today and will ripen in the future.[21]

### B.  The Release Impermissibly Extinguishes Claims That Could Not Have Been Brought in This Case

As the Second Circuit has noted, "[i]f a judgment after trial cannot extinguish claims not asserted in the class action complaint, a judgment approving a settlement in such an action ordinarily should not be able to do so either." *Super Spuds*, 660 F.2d at 18. A settlement may not "bar . . . claims, distinct from those represented by the class action plaintiffs, which depend not only upon a different legal theory but upon proof of further facts." *Id.* at 18 n.7. Accordingly, courts may not approve settlements that release claims that were not before the court, unless they are "based on the *identical* factual predicate as the class claims." *In re Auction*

---

[21] Restraints of trade often do not ripen into antitrust violations until anticompetitive effects are shown. *See, e.g.*, *E & L Consulting, Ltd. v. Doman Indus. Ltd.*, 472 F.3d 23, 29 (2d Cir. 2006). Because most restraints are evaluated under the rule of reason, it is not unusual that a practice or rule that is benign at inception can later raise serious antitrust issues, as market conditions and the impact of the practice or rule change over time.

*Houses Antitrust Litig.*, 42 Fed. App'x 511, 519 (2d Cir. 2002) (emphasis in original); *see also Wal-Mart v. Visa*, 396 F.3d at 107.

Here, the Proposed Settlement runs afoul of this controlling Second Circuit precedent by purporting to extinguish claims concerning future conduct and effects that cannot possibly have been part of the factual predicates to this case. *See Authors Guild*, 770 F. Supp. 2d at 676-77 (rejecting class settlement that released "liability for certain *future* acts" and future conduct "that go[es] far beyond the dispute before the Court") (emphasis in original). For example, American Express could attempt to extend their Honor All Cards rule to mobile payments and future technologies, and argue that the release here precludes merchants from challenging any such extension. By including mobile payments and future technologies within the definitions of "Credit Card" and "Debit Card," the Proposed Settlement inappropriately implies that mobile payments and future technologies should be treated no differently than traditional payment cards. This is a serious concern for many merchants.[22]

The release in this case cannot be approved under *Super Spuds* and its progeny:

> In the twenty-one years since *Super Spuds*, we have never affirmed the approval of a class action settlement which included the uncompensated impairment of non-class claims unless the non-class claims were based on the *identical* factual predicate as the class claims.

*In re Auction Houses*, 42 Fed. App'x at 519 (emphasis in original); *see also Karvaly v. eBay, Inc.*, 245 F.R.D. 71, 88-89 (E.D.N.Y. 2007) ("general release that purports to strip millions of individuals of their rights to sue the defendants upon a wide range of offenses that have nothing to do with the misconduct alleged in the present action . . . is an offense to the principle of due

---

[22] *See, e.g.*, Shinder Decl. Exs. 6 (Ashley Furniture ¶ 18); 10 (Best Buy ¶ 24); 11 (Boscov's ¶ 22); 15 (Costco ¶ 20); 21 (Gap ¶ 14); 26 (Martin's Super Markets ¶ 17); 28 (Mills Companies ¶ 18); 33 (PetSmart ¶ 20); 35 (REI ¶ 25); 41 (Starbucks ¶ 20); 14 (The Buckle ¶ 23); 16 (Dillard's ¶ 18); 17 (Drury Hotels ¶ 25); 19 (Express ¶ 20); 44 (Wet Seal ¶ 21); 43 (Walmart ¶ 26); 23 (IKEA at 6).

291286.11

process so egregious as to render the proposed settlement untenable"). This Proposed Settlement presents the same "offense to the principle of due process" and the Court should reject it.

The Court should reject the release outright and not defer the issue to future courts by approving it on the basis that it should be construed in accordance with the identical factual predicate doctrine. *See Super Spuds*, 660 F.2d at 16 (noting that "a federal court should determine for itself" the propriety of a class action release rather than "pass over the question" and allow some future court to "assume the unenviable task of deciding that its act was a nullity").

### C. The Presence of a Mediator Does Not Ensure Adequate Representations

Plaintiffs rely heavily on the presence of a mediator, Kenneth Feinberg, during the parties' negotiations. The presence of a respected mediator, however, does not ensure adequate representation. In *Literary Works*, the Second Circuit reversed the district court's approval of a class action settlement where Mr. Feinberg mediated the negotiations. 654 F.3d at 245. Despite Mr. Feinberg's declaration stating that the proposed class was "adequately represented during the lengthy course of the mediation," the Second Circuit held that the settlement was deficient for lack of adequate representation. *Id.* at 263. Even the dissent acknowledged that Mr. Feinberg's presence "by no means ensur[ed] fully adequate representation." *Id.*

### VI. The Proposed Settlement Is Not Fair, Reasonable, or Adequate

Plaintiffs also fail to meet their burden of showing that the Proposed Settlement is "fair, reasonable, and adequate" under Rule 23(e)(2). Like class certification, fairness is subject to heightened scrutiny when a mandatory settlement class is at issue. As the Second Circuit has stated, if a "settlement has been negotiated before class action determination . . . , the court must be doubly careful in evaluating the fairness of the settlement." *Plummer v. Chem. Bank*, 668 F.2d 654, 657 (2d Cir. 1982); *see also D'Amato v. Deutsche Bank*, 236 F.3d 78, 85 (2d Cir.

2001) (settlement negotiated prior to class certification "is subject to a higher degree of scrutiny in assessing its fairness").

Plaintiffs' argument that the Proposed Settlement is entitled to a "presumption of fairness" carries little weight in a mandatory settlement of such size, complexity, and economic importance. Respected commentators have rejected the presumption of fairness outright. *See* ALI, Principles of the Law of Aggregate Litig. § 3.05(c) & cmt. C (2010) (recommending that "a court should not apply any presumption that the settlement is fair and reasonable" because "the presence or absence of objectors may or may not be probative;" the experience of counsel should "not normally lighten the parties' burden of demonstrating fairness based on the specific facts of the settlement;" and "arm's-length negotiations should be a feature of every fair class settlement"); *see also In re New Motor Vehicles Canadian Exp. Antitrust Litig.*, MDL 1532, 2011 WL 1398485 (D. Me. Apr. 13, 2011) (citing ALI critique).

Generally, courts entertain the presumption of fairness only when—unlike here—"the number of objectors is relatively small." *Walsh v. Northrop Grumman Corp.*, No. 94-CV-5105(TCP), 1999 WL 184654, at *3 (E.D.N.Y. Mar. 25, 1999); *see also Milstein v. Huck*, 600 F. Supp. 254, 262 (E.D.N.Y. 1984); *In re PNC Fin. Servs. Grp., Inc.*, 440 F. Supp. 2d 421, 429-30 (W.D. Pa. 2006) (presumption applies where "only a small fraction of the class objects"); *In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 785 (3d Cir. 1995). As explained below, no presumption of fairness should attach to the Proposed Settlement.

In determining whether to find a settlement "fair, reasonable, and adequate," courts in this Circuit look to the following factors: (1) the complexity, expense and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the

28

amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing

damages; (6) the risks of maintaining the class through trial; (7) the ability of the defendants to

withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of

the best possible recovery; and (9) the range of reasonableness of the settlement fund to a

possible recovery in light of all the attendant risks of litigation (the "*Grinnell* factors").  *City of*

*Detroit v. Grinnell Corp.*, 495 F.2d 448, 463 (2d Cir. 1974).

### A.  Substantial Opposition to the Settlement Weighs Against Approval (*Grinnell* Factor 2)

The Second Circuit has held that the reaction of the class "is perhaps the most significant

factor in our *Grinnell* inquiry."  *Wal-Mart v. Visa*, 396 F.3d at 119; *see also In re Visa*

*Check/MasterMoney Antitrust Litig.*, 297 F. Supp. 2d 503, 511 (E.D.N.Y. 2003) (finding that

"the extremely small number of objectors—a mere 18 out of approximately five million Class

members—heavily favors approval").

Here, the negative reaction of the proposed class weighs heavily against approval.

*Authors Guild*, 770 F. Supp. 2d at 676 ("Not only are the objections great in number, some of the

concerns are significant."); *Gen. Motors Corp.*, 55 F.3d at 785, 812 ("the number and

vociferousness of the objectors" is a factor to consider in weighing reasonableness).  The

Objectors raise grave concerns that the settlement violates due process rights while providing

them virtually no relief and binding them to an overbroad release that actually leaves them worse

off.  Approving a *mandatory* settlement class over the principled objection of so many absent

members of the proposed class would be unjust.

### B.  The Settlement Is Inadequate (*Grinnell* Factors 8 and 9)

The Proposed Settlement is unreasonable because it fails to address the core claims in the

case.  *See* Manual for Complex Litigation (Fourth) § 21.62 (2004) ("Reasonableness depends on

29

an analysis of the class allegations and claims and the responsiveness of the settlement to those claims."); *In re Int'l House of Pancakes Franchise Litig.*, 487 F.2d 303, 304 (8th Cir. 1973) (affirming disapproval of settlement because of opposition by class members and the fact "that it would continue in effect the very provisions . . . challenged as violative of the anti-trust laws").

Although American Express's Honor All Cards rule and Anti-Steering Rules are at the heart of this case, the Proposed Settlement does nothing to remedy these anticompetitive rules. Instead, the Proposed Settlement leaves these rules essentially intact, and may perpetually immunize them from future merchant antitrust challenge. *See Gen. Motors Corp.*, 55 F.3d at 810 (rejecting settlement in light of "the dramatic divergence of the settlement terms from the relief originally sought").

## 1. The Limited and Illusory Surcharging Relief

The Proposed Settlement's surcharging "relief" would have little value, if any, to the proposed class.[23]

### a. The Proposed Settlement's Surcharging Rules Will Not Have Any System-Wide Effect on Merchant Fees

Given the 10 state prohibitions on surcharging and the competitive constraints on merchants, the amount of surcharging that might be enabled by the Proposed Settlement could not possibly have a system-wide impact on American Express's merchant fees. This would be the case if the Proposed Settlement permitted unrestricted surcharging—which it does not—and thus, the meager value of credit-to-debit surcharging only further reinforces the Proposed

---

[23] To the extent Plaintiffs suggest that the DOJ case could remedy the deficiencies in the Proposed Settlement's surcharging relief, the Proposed Settlement should be assessed on its own merits, not against the backdrop of the possibility that the DOJ case will remedy the Proposed Settlement's anticompetitive effects. Moreover, Plaintiffs have asserted that the DOJ's case does not address American Express's surcharging rules. *See* ECF No. 264 at 2 n.1 ("The Government has made clear that its case against American Express does not encompass Amex's rules restricting surcharges . . . ."). That assertion, however, ignores the fact that the DOJ case concerns the need for interbrand competition—the very dynamic that the Proposed Settlement's ban on differential surcharging has been designed to prevent. As such, a victory in the DOJ case should result in an outright rejection of the Proposed Settlement.

291286.11

Settlement's lack of value. As Professor Hausman explains, merchants will not surcharge if they conclude that the costs of surcharging, in terms of lost sales to competitors that do not surcharge, will outweigh any benefits. Hausman ¶¶ 45-48. In fact, his analysis shows that it does not take many lost sales to render surcharging unprofitable. *Id.* at ¶ 45. Given the intensely competitive U.S. retail environment, this factor alone will ensure that most merchants will not benefit from the Proposed Settlement, particularly given the stark likelihood that most consumers will not be willing to switch from credit cards to debit cards.

### b. Most Consumers Cannot Be Steered to Debit Cards from Credit Cards

Plaintiffs assert that the Proposed Settlement will allow merchants to steer customers from credit cards to debit cards. The purported value of credit-to-debit steering, however, rests on the faulty premise that when faced with a credit card surcharge, customers would switch from credit to debit cards. Credit cards provide consumers with deferred payment, as well as the opportunity to revolve balances.[24] Hausman ¶ 12, 22. Debit cards do not.[25] *Id.* at ¶ 22. Credit cards often come bundled with rewards programs that allow customers to earn points that are redeemable for things like travel and merchandise. *Id.* at ¶¶ 14, 30. Debit rewards are rare (*see id.* at ¶ 30), especially in the post-Durbin Amendment era.[26]

---

[24] "Since the merchants' demand for general purpose cards is derived from consumers' demand to use these cards, their attitudes also reflect consumer attitudes." *United States v. Visa U.S.A., Inc.*, 163 F. Supp. 2d 322, 337 (S.D.N.Y. 2001).

[25] Some banks offer overdraft facilities on debit cards. However, these are rarely used because of their high fees and limits. *See* Hausman ¶ 22 n.6.

[26] Some consumers may be resistant to switching to debit cards because of the perception that consumers are safer using credit cards, and may prefer putting the banks' money at risk as opposed to putting their checking accounts at risk. This concern is exacerbated by the rise in data breaches, which some in the payments industry have predicted will lead to the "demise of the debit card." *See* Shinder Decl. Ex. 52 (CUNA, "Target Breach Effect on Payment Systems Under Debate" (Jan. 2, 2014)).

Every court that has considered this issue has cited consumer evidence to show that credit and debit cards are not in the same market.[27] *See United States v. Visa U.S.A., Inc.*, 344 F.3d 229, 239 (2d Cir. 2003) ( "if prices for general purpose payment cards were to rise significantly, cardholders would likely pay the increased fees, rather than abandon their cards in favor of other forms of payment"); *Discover Fin. Servs. v. Visa U.S.A. Inc.*, 598 F. Supp. 2d 394, 401 (S.D.N.Y. 2008) ("[g]eneral purpose credit and charge cards is a relevant market"); *In re Visa Check/MasterMoney Antitrust Litig.*, No. 96-CV-5238 (JG), 2003 WL 1712568, at *7 (E.D.N.Y. Apr. 1, 2003) (no rational jury could deny that credit cards comprised a distinct market from debit cards). Recently, in denying American Express's motion for summary judgment in the DOJ's case, this Court noted that, for purposes of that motion, "all parties have agreed to treat debit cards as belonging to a separate market." 10-cv-04496 (NGG)(RER) ECF No. 369 at 2 n.2, 10. This Court accordingly rejected as irrelevant American Express's argument that, despite American Express's Anti-Steering Rules, merchants can use promotions to "induce customers to use a payment form other than a credit or charge card, including debit cards." *Id.* at 15.

Because most consumers do not view credit cards and debit cards as reasonably interchangeable, the number of consumers that might switch from credit to debit when faced with a surcharge on credit card transactions is likely to be very small.[28] In fact, only consumers that are uninterested in deferring payment, revolving balances, or maximizing rewards are likely

---

[27] Plaintiffs do the DOJ no favors here. The Proposed Settlement implies a relevant market as one that includes both credit and debit cards. This conflicts with the relevant market alleged by the DOJ of only credit and charge cards. Approval of this Proposed Settlement would therefore undermine the DOJ's case.

[28] Many merchants have unique reasons why they could not (or would not) realistically steer customers from credit to debit. *See, e.g.*, Shinder Decl. Exs. 17 (Drury Hotels ¶ 18 (pre-authorization standards in the hotel industry make debit a not-preferred payment method for Drury or its customers)); 36 (Republic Services ¶ 15 (many government and quasi-government customers make payments that exceed $75,000 per month)); 18 (Crate & Barrel ¶ 15 (average ticket size of credit cards is approximately twice that for debit cards)); 11 (Boscov's ¶ 15) (large-ticket items like "sofas and diamond rings are much more frequently purchased with credit cards")); 16 (Dillard's ¶13); 38 (Roundy's ¶ 13).

291286.11

to consider switching to debit when faced with a surcharge. That rules out switching consumers with the most expensive premium cards, which bear the most rewards, as well as many of the less affluent consumers that carry "vanilla" credit cards and are more likely to need to revolve balances. Rather than use a debit card in response to a credit card surcharge, these consumers are more likely to take their business to a non-surcharging merchant. When the meager numbers of switchable consumers are weighed against the possibility of lost sales and the operational costs, it is hard to imagine that more than a handful of merchants, likely merchants in niche sectors with market power, will surcharge if these rules changes go into effect. *See* Hausman ¶¶ 73, 82, 84.[29]

### c. The Proposed Settlement's Prohibition on Differential Surcharging Is Anticompetitive on Its Face

Plaintiffs dismiss the importance of differential surcharging by pointing out that the difference between credit card and debit card rates is far greater than the differences among credit card network rates. Pl. Br. at 3. This argument is belied by two economic considerations. First, very few merchants will attempt to use surcharging to steer consumers from credit to debit because the payment methods are not fungible for most consumers and because of the legal and competitive constraints that limit surcharging in any event. Hausman ¶¶ 29-30, 50, 92. Second, the fact that credit card network pricing has tended to cluster reflects the oligopolistic nature of the market. Hausman ¶ 87. It says nothing about the potential value of differential surcharging, which could be used by isolated merchants to drive bargains with the networks. Accordingly, Plaintiffs' arguments dismissing the potential value of differential surcharging to certain merchants should be disregarded.

---

[29] Indeed, the customer attrition resulting from surcharging is confirmed by data from Australia. *See* Hausman ¶ 76.

291286.11

Plaintiffs do not even try to argue that the limited surcharging relief will jumpstart interbrand competition in this industry.[30] They instead tout the ability of merchants to recoup their costs of accepting American Express. This claim, however, is belied by the fact that merchants cannot recoup the full cost of accepting American Express under the Proposed Settlement. The Proposed Settlement requires that surcharges for American Express credit card transactions shall not exceed the surcharges merchants apply to competing general purpose credit card networks. Because American Express is usually the most expensive credit card network, and because Visa's and MasterCard's rules cap merchants' ability to surcharge their transactions at their lower cost of acceptance, merchants that elect to surcharge will be limited to the lower Visa and MasterCard surcharge caps.

To make matters worse, this provision entrenches a competitive advantage that American Express is likely to exploit. As Professor Hausman explains, American Express likely will raise its rates since merchants will be unable to raise their surcharges in response. Hausman ¶ 88. American Express has the power to do that, as demonstrated by the many Objectors who attest to their inability to drop American Express.[31] And it will have the incentive to exploit that power because higher rates will enable it to fund higher rewards and thereby enable it to attract more

---

[30] To suggest that surcharging might become widespread, Plaintiffs point to industries where the card networks have allowed merchants to assess "convenience fees." Pl. Br. at 29. The merchants that assess such fees include secondary schools, colleges and universities for purposes of accepting tuition, and courts that administer and process fees, alimony, and child support payments. *See*, *e.g.*, Shinder Decl. Ex. 53 (The MasterCard® Convenience Fee Program for Government and Education). Unlike the rest of the class, these merchants are not subject to competitive concerns regarding lost customers when they charge convenience fees. A student will not choose to attend another university because her current one charges a convenience fee. One convicted of a traffic violation will not pay his fine at another court if the one that convicted him charges him a convenience fee. *See* Hausman ¶ 77. Given these merchants' unique circumstances, their conduct says nothing about what merchants in competitive industries might do.

[31] American Express's market power is demonstrated by Objectors' inability to drop American Express. *See*, *e.g.*, Shinder Decl. Exs. 3 (Aldo ¶ 6); 7 (Barnes & Noble ¶ 6); 8 (Barnes & Noble College ¶ 6); 14 (The Buckle ¶ 4); 19 (Express ¶ 4); 21 (Gap ¶ 5); 22 (HMSHost ¶ 4); 28 (Mills Companies ¶ 4); 29 (NACS ¶ 7); 38 (Roundy's ¶ 4); 40 (Speedway ¶ 4); 44 (Wet Seal ¶ 5); 39 (Sears ¶7); 36 (Republic Services ¶ 5); 35 (REI ¶5); 17 (Drury Hotels ¶ 7); 18 (Crate & Barrel ¶5); 4 (Amazon ¶ 6); 32 (Panera ¶ 4).

34

cardholders.  At the end of the day, the Proposed Settlement not only eliminates the one benefit

of surcharging—the ability of at least some merchants to benefit from interbrand competition

through differential surcharging—while empowering American Express to raise its rates to

further entrench its power.

<h4 style="text-align:center">d.  The Olinger Group's Survey Is Not Credible</h4>

Plaintiffs present the results from a survey conducted by the Olinger Group that

supposedly shows that merchants are likely to surcharge.  As explained in the expert reports of

Scott Elder (Shinder Decl. Ex. 49) and Jerry Hausman, this survey was designed to elicit a "yes"

answer to the question of whether a merchant is willing to surcharge .  Olinger effectively

gerrymandered the survey sample by only choosing merchants from eight industries that are not

representative of the class and tend to deliver non-branded services for which there may be less

price competition.  Elder at 2-5; Hausman ¶ 49.

The video shown to respondents was propaganda for surcharging, not a balanced

informational piece.  Elder at 5-6.  The video makes surcharging sound more appealing and more

accessible than it is under any of the new rules.  It does not mention the numerous restrictions

that make surcharging infeasible for most merchants, such as the questionable legal status of the

practice, brand level caps, burdensome disclosure requirements, the inability to differentially

surcharge, and the technical difficulties of implementing surcharging.[32]  The video also

misleadingly tries to dispel merchants' concerns regarding customer attrition.  Given the biased

---

[32] In fact, even Plaintiffs have identified a number of the technical difficulties of implementing surcharging that would require substantial investment by merchants.  *See* Levy Decl. ¶ 3.   And, Plaintiffs can only vaguely identify two entities that are supposedly developing solutions.  The Court should not approve the Proposed Settlement that utilizes a mandatory class based on Plaintiffs' Counsel's speculation and conjecture that surcharging solutions "are almost at hand."  In fact, First Data Corporation, the largest payment processor in the United States, announced last year that "First Data has decided not to implement global support for [surcharging] . . . nor will First Data owned terminal or advanced product solutions be updated for surcharge."  Shinder Ex. 43 (Walmart ¶¶ 21-22).  The fact that the largest processor in the United States does not see merchants' desire for surcharging as sufficient enough to warrant the investment in the technical ability to implement it far outweighs Plaintiffs' Counsel's vague suppositions.

35

survey design and the pro-surcharging spin of the video, the fact that only 68% of respondents said that they would impose a surcharge actually indicates merchants' *un*willingness to surcharge.  Elder at 6.[33]  The proffered survey should be given no weight.

### e.      Merchant Conduct in Australia Is Irrelevant Here

Plaintiffs argue that American Express's experience in Australia shows the "pro-competitive power of surcharging . . . ."  Pl. Br. at 22.  This is wrong.  To the extent the Australian example is illustrative of anything relevant to the Proposed Settlement, it actually undermines Plaintiffs' contention that the surcharging relief will provide class-wide relief.  If anything, Australia confirms that surcharging will have no impact on American Express's rates.

Since 2003, surcharging has been permitted by all the major networks in Australia, under more favorable conditions than it would be in the United States if the Proposed Settlement is approved.  Unlike here, surcharging in Australia is freely permitted and not banned by any states.  Hausman ¶ 52.  Yet, as Professor Hausman explains, surcharging has not affected American Express's rates in Australia.  Although American Express's rates have been much higher than Visa's and MasterCard's since 2003 (when Visa and MasterCard rates were subjected to rate regulation and American Express's were not), the gap between American Express rates and Visa/MasterCard rates has not changed.  *Id.* at ¶ 69 ("Note that AmEx merchant fees remain approximately 0.90% (90 basis points) above the VMC merchant fees which has been their approximate position since surcharging was introduced in 2003.").  In fact, American Express's rates in 2013 "are significantly higher than the VMC merchant fees before

---

[33] Further, it is widely recognized that survey respondents' stated intentions in response to a survey question are typically a significantly upward-biased estimate of actual behavior.  Hausman ¶ 49.  The Olinger survey analysis makes no attempt to correct for this well-known bias.  *Id.*

36

*RBA* [Reserve Bank of Australia] *regulation began . . . .*" *Id.* at ¶ 69. [34]  The conclusion that

surcharging has had no impact on American Express rates is reinforced by the fact that American

Express (and Diners Club) shares have increased, even though merchants can surcharge their

more expensive transactions.  According to Professor Hausman, "[w]hen the higher price

alternative gains share as has happened in Australia, I conclude that surcharging has not been

effective in decreasing merchants' fees."  Hausman ¶ 71.  Similarly, credit-card usage, including

American Express's, recently has gained relative to debit-card usage in Australia even though

credit is more expensive to merchants than debit.  *Id.* at ¶ 78.  These data also refute the

proposition that surcharging credit cards in the U.S. would divert transactions to debit.

If surcharging has failed to reduce system-wide rates in Australia, where it has been free

of the restrictions that would operate here, there is simply no basis to conclude that it will have

any system-wide impact in the United States.[35]

### C.  The Complexity, Expense and Duration of the Litigation (*Grinnell* Factor 1) and the Stage of the Proceedings and the Amount of Discovery Completed (*Grinnell* Factor 3)

As with any antitrust class action, the complexity, expense, and duration of this litigation

are significant, as are the burdens on the parties and the Court if litigation were to continue.  *See*

Manual for Complex Litigation (Fourth) § 30 (2004) (noting propensity of antitrust class actions

to be complex, expensive, and extensive).  Complexity and expense of further litigation,

however, do not justify an inadequate settlement, particularly where absent class members' due

process rights have been bargained away in exchange for a flawed settlement that gives

defendants far more than they could have won at trial.  *See Gen. Motors Corp.*, 55 F.3d at 784;

---

[34] While American Express rates have declined since 2003, Professor Hausman and the RBA attribute that decline to the impact of Visa's and MasterCard's much lower regulated fees and some merchants' ability to threaten to drop the much more expensive American Express transactions.  Hausman ¶ 68.

[35] Dr. Frankel's report also overstates the amount of surcharging in Australia, for multiple reasons.  Hausman ¶¶ 72-80.

*Authors Guild*, 770 F. Supp. 2d at 675, 686 (denying final approval of settlement despite finding "[f]urther litigation would be complex, expensive, and time-consuming").

> ### D. The Risks of Establishing Liability, Damages, and Maintaining the Class Through the Trial (*Grinnell* Factors 4, 5, and 6) and the Ability of the Defendants to Withstand a Greater Judgment (*Grinnell* Factor 7)

Plaintiffs argue that "[t]he alternative to this settlement is not a better settlement; it is no settlement." Pl. Br. at 7. But that is only because, given *Italian Colors*, Plaintiffs here have virtually no leverage in negotiating a class settlement. As an initial matter, no amount of risk can justify putting merchants in a worse position than they would be if Plaintiffs lost at trial. The release bars numerous claims that could not have been brought in this case, and grants American Express immunity from claims going forward that it could not have achieved at trial. Risks do not justify a settlement whose viability depends on depriving merchants of their due process rights. Nor can diffused "risk" justify a settlement that enables American Express to implement anticompetitive revisions to its Honor All Cards rule and Non-Discrimination Provisions free of merchant challenge.

Moreover, while the class case may face risks due to *Italian Colors*, the merits of merchants' (and the DOJ's) claims against American Express are strong. In fact, American Express's "market power" defense—the primary "liability risk" put forth by Plaintiffs—has been defused by this Court's recent decision denying American Express's motion for summary judgment in the DOJ's case. There, American Express moved for summary judgment on the ground that the DOJ had failed to come forward with evidence that American Express had market power and therefore had failed to make out a rule-of-reason case against American Express's Anti-Steering Rules. 10-cv-04496 (NGG)(RER) ECF No. 369 at 9.[36] This Court

---

[36] The DOJ and American Express agreed that American Express's rules were vertical agreements subject to the rule of reason and not the per-se rule. 10-cv-04496 (NGG)(RER) ECF No. 369 at 9.

rejected American Express's focus on market share and followed Supreme Court and Second Circuit precedent that proof of "an actual adverse effect on competition," *e.g.,* higher prices or lower output, suffices to make out a *prima facie* case under the rule of reason. *See id.* at 9-12 (citing *FTC v. Indiana Fed'n of Dentists*, 476 U.S. 447, 460-61 (1986), and collecting Second Circuit cases). Given American Express's ability to maintain higher pricing to merchants, the ability of merchants (and the DOJ) to make the requisite anticompetitive showing is strong.

But for this Proposed Settlement, merchants would be able to seek substantial damages and individual injunctive relief in court or in individual arbitrations depending on their contracts. However, other than with respect to past damages, the Proposed Settlement deprives them of this ability and locks in the very rules challenged in this case, in exchange for illusory surcharging relief and a hefty payout to Plaintiffs' Counsel.

## CONCLUSION

For the reasons stated above, the Court should deny the motion for final approval.

DATED: June 6, 2014
        New York, New York

**CONSTANTINE CANNON LLP**

By:_____/s_____
    Jeffrey I. Shinder
    Gary J. Malone
    A. Owen Glist
    David A. Scupp
335 Madison Avenue
New York, New York 10017
Telephone: (212) 350-2700
Facsimile: (212) 350-2701
Email: jshinder@constantinecannon.com

*Attorneys for Objectors*

39