**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

-----------------------------------------------------------------x

IN RE: AMERICAN EXPRESS ANTI-STEERING
RULES ANTITRUST LITIGATION (II)

This Document Relates To:                          11-MD-02221 (NGG) (RER)
CONSOLIDATED CLASS ACTION                                    ECF Case

-----------------------------------------------------------------x

THE MARCUS CORPORATION,
on behalf of itself and all similarly situated persons,

                                                   13-CV-07355 (NGG) (RER)

      Plaintiff,

               - against –

AMERICAN EXPRESS COMPANY, et al.,

      Defendants.

-----------------------------------------------------------------x


**REDACTED – PUBLIC VERSION**


**MEMORANDUM OF AMERICAN EXPRESS IN RESPONSE
TO OBJECTIONS TO THE CLASS SETTLEMENT
AGREEMENT AND IN SUPPORT OF FINAL APPROVAL**


BOIES, SCHILLER & FLEXNER LLP          CRAVATH, SWAINE & MOORE LLP
575 Lexington Avenue, 7th Floor         825 Eighth Avenue
New York, New York 10022                New York, New York 10019
Tel.: (212) 446-2300                    Tel.: (212) 474-1000
Fax: (212) 446-2350                     Fax: (212) 474-3700

July 11, 2014

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................. iii

PRELIMINARY STATEMENT ......................................................................................... 1

I.     THE SETTLEMENT IS FAIR, REASONABLE, AND ADEQUATE. ........................... 3

     A.    The Settlement Is Procedurally Fair. ................................................................ 4

           1.    The Sworn Declaration of Mediator Kenneth Feinberg Establishes That the Settlement Is Procedurally Fair. ................................................ 4

           2.    *Italian Colors* Did Not Compromise the Procedural Integrity of the Settlement. ....................................................................................... 6

     B.    The Settlement Is Substantively Fair. .............................................................. 6

           1.    Objections That the Settlement Undermines and Is Inferior to the Relief Obtained in MDL 1720 Are Inaccurate and Improperly Ignore the Benefits Secured by the Settlement. ...................................... 8

           2.    Objectors' Speculation About Potential Actions by American Express Does Not Undermine the Value of the Settlement. ................... 12

           3.    Objectors' Complaints That They Did Not Get More in the Settlement Are Unavailing. .......................................................... 14

II.    CERTIFICATION OF A MANDATORY SETTLEMENT CLASS UNDER RULE 23(b)(2) IS NECESSARY AND APPROPRIATE. ........................................................ 16

     A.    Certification Under Rule 23(b)(2) Is Proper: The Settlement's Relief Is Indivisible and Final. .................................................................................... 16

     B.    Certification of a Mandatory Rule 23(b)(2) Class Without Opt-Out Rights is Necessary and Appropriate. ...................................................................... 18

           1.    A Mandatory Rule 23(b)(2) Class Satisfies the Requirements of Due Process. .................................................................................. 18

           2.    A Mandatory Rule 23(b)(2) Class Does Not Violate the Rules Enabling Act. ....................................................................................... 19

           3.    There Is No Basis for Creating Opt-Out Rights in This Case. .................. 22

                a.    A mandatory class settlement is fully consistent with *Dukes* ........ 22

                b.    Merchants' arbitration agreements do not give them a right to opt out of a mandatory class. ........................................................ 24

c.       Allowing objectors to opt out would destroy the value of the Settlement for American Express. .................................................26

d.       Governmental entities acting like merchants that accept American Express cards should not be permitted to opt out. .........................26

III.    THE RELEASE COVERS CLAIMS WITH THE IDENTICAL FACTUAL PREDICATE AS THE SETTLED CONDUCT AND IS THEREFORE PROPER UNDER WELL-SETTLED LAW ...................................................................................28

CONCLUSION ....................................................................................................................32

# TABLE OF AUTHORITIES

**Case Law**

*Am. Express Co. v. Italian Colors Rest.*,
    133 S. Ct. 2304 (2013) ...................................................................................6, 19

*Animal Science Prods., Inc. v. Hebei Welcome Pharm. Co. (In re Vitamin C Antitrust Litig.)*,
    279 F.R.D. 90 (E.D.N.Y. 2012) .....................................................................32

*Brown v. Ticor Title Ins. Co.*,
    982 F.2d 386 (9th Cir. 1992) ..........................................................................32

*Burlington N. R.R. Co. v. Woods*,
    480 U.S. 1 (1987) ............................................................................................21

*Bus. Guides, Inc. v. Chromatic Commc'ns Enters., Inc.*,
    498 U.S. 533 (1991) ........................................................................................21

*County of Suffolk v. Long Island Lighting Co.*,
    907 F.2d 1295 (2d Cir. 1990) .........................................................................18

*Dalton v. Educ. Testing Serv.*,
    87 N.Y.2d 384 (1995)......................................................................................14

*Deposit Guar. Nat'l Bank v. Roper*,
    445 U.S. 326 (1980) ........................................................................................21

*Duprey v. Conn. Dep't of Motor Vehicles*,
    191 F.R.D. 329 (D. Conn. 2000) ....................................................................29

*Fresco v. Auto. Directions, Inc.*,
    No. 03-CIV-61063, 2009 WL 9054828 (S.D. Fla. Jan. 20, 2009) .................18

*FTC v. Guignon*,
    390 F.2d 323 (8th Cir. 1968) ..........................................................................27

*Hanna v. Plumer*,
    380 U.S. 460 (1965) ........................................................................................22

*ICC v. S. Rwy. Co.*,
    543 F.2d 534 (5th Cir. 1976) ..........................................................................27

*In re Am. Express Fin. Advisors Sec. Litig.*,
    672 F.3d 113 (2d Cir. 2011) ...........................................................................25

*In re Citigroup Inc. Sec. Litig.*,
    965 F. Supp. 2d 369 (S.D.N.Y. 2013) ............................................................. 7

*In re Currency Conversion Fee Antitrust Litig.*,
    361 F. Supp. 2d 237 (S.D.N.Y. 2005) ................................................. 21, 22, 26

*In re Gen. Elec. Co. Sec. Litig.*,
    No. 09 Civ. 1951 (DLC), 2014 WL 534970 (S.D.N.Y. Feb. 11, 2014) ........................... 30

*In re Literary Works in Elec. Databases Copyright Litig.*,
    654 F.3d 242 (2d Cir. 2011) ............................................................... 30

*In re Ocean Shipping Antitrust Litig.*,
    500 F. Supp. 1235 (S.D.N.Y. 1980) ........................................................ 27

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*,
    No. 05-MD-1720 (JG) (JO), 2013 WL 6510737 (E.D.N.Y. Dec. 13, 2013) ............. passim

*In re Telik, Inc. Sec. Litig.*,
    576 F. Supp. 2d 570 (S.D.N.Y. 2008) .................................................... 5, 26

*In re Union Carbide Corp. Consumer Prods. Bus. Sec. Litig.*,
    718 F. Supp. 1099 (S.D.N.Y. 1989) ........................................................ 14

*In re Visa Check/MasterMoney Antitrust Litig.*,
    192 F.R.D. 68 (E.D.N.Y. 2000), *aff'd*, 280 F.3d 124 (2d Cir. 2001) ............................... 23

*Kirke La Shelle Co. v. Paul Armstrong Co.*,
    263 N.Y. 79 (1933) ........................................................................ 14

*Latino Officers Ass'n City of N.Y. v. City of N.Y.*,
    209 F.R.D. 79 (S.D.N.Y. 2002) ............................................................. 29

*Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*,
    551 U.S. 877 (2007) ....................................................................... 15

*M/A-COM Sec. Corp. v. Galesi*,
    904 F.2d 134 (2d Cir. 1990) ............................................................... 14

*Me. State Ret. Sys. v. Countrywide Fin. Corp.*,
    No. 2:10-CV-00302, 2013 WL 6577020 (C.D. Cal. Dec. 5, 2013) ................................. 11

*Marisol A. v. Giuliani*,
    126 F.3d 372 (2d Cir. 1997) ............................................................... 29

*McReynolds v. Richards-Cantave*,
    588 F.3d 790 (2d Cir. 2009) ............................................................ 3, 4

*Parisi v. Goldman, Sachs & Co.*,
    710 F.3d 483 (2d Cir. 2013) ............................................................ 21

*Robidoux v. Celani*,
    987 F.2d 931 (2d Cir. 1993) ............................................................ 29

*Robinson v. Metro-North Commuter R.R. Co.*,
    267 F.3d 147 (2d Cir. 2001) ............................................................ 18

*Shady Grove Orthopedic Assocs. v. Allstate Ins. Co.*,
    559 U.S. 393 (2010) ............................................................ 2, 20, 21

*Shaw v. Toshiba Am. Info. Sys., Inc.*,
    91 F. Supp. 2d 942 (E.D. Tex. 2000) ............................................................ 28

*Sibbach v. Wilson & Co.*,
    312 U.S. 1 (1941) ............................................................ 20

*Sullivan v. DB Invs., Inc.*,
    667 F.3d 273 (3d Cir. 2011) ............................................................ 26

*TBK Partners, Ltd. v. W. Union Corp.*,
    675 F.2d 456 (2d Cir. 1982) ............................................................ 28, 29

*United States v. Hercules*,
    961 F.2d 796 (8th Cir. 1992) ............................................................ 27

*United States v. U.S. Dist. Court for N. Mar. I.*,
    694 F.3d 1051 (9th Cir. 2012) ............................................................ 27

*United States v. Visa U.S.A., Inc.*,
    344 F.3d 229 (2d Cir. 2003) ............................................................ 11

*United States v. Walcott*,
    972 F.2d 323 (11th Cir. 1992) ............................................................ 27

*Wal-Mart Stores, Inc. v. Dukes*,
    131 S. Ct. 2541 (2011) ............................................................ passim

*Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*,
    396 F.3d 96 (2d Cir. 2005) ............................................................ 5, 7, 28

## Rules

Fed. R. Civ. P. 23(b)(2) ...................................................................................passim

Fed. R. Civ. P. 23(b)(3) ...............................................................................23, 25, 28

Fed. R. Civ. P. 23(e)(2) ............................................................................................. 3

## Statutes

15 U.S.C. § 1693o-2(b)(2)(A) .................................................................................. 10

28 U.S.C. § 516 ........................................................................................................ 27

28 U.S.C. § 519 ........................................................................................................ 27

28 U.S.C. § 2072(b).......................................................................................2, 19, 20

## PRELIMINARY STATEMENT

Defendants American Express Company and American Express Travel Related Services Company, Inc. ("American Express" or "Amex") respectfully submit this memorandum in response to objections to the Class Settlement Agreement dated December 19, 2013 (the "Settlement" or "Settlement Agreement" or "SA") (Dkt. No. 306-2), and in support of final approval of the Settlement.

The Settlement represents a hard-fought compromise negotiated by the parties at arm's-length under the guidance of a nationally respected mediator that settles Class Plaintiffs'[1] claims before the Court. At the time of the Settlement, Class Plaintiffs were seeking class-wide injunctive relief and attorneys' fees under the antitrust laws. The Settlement provides both. As part of the Settlement, American Express agrees to provide injunctive relief in the form of changes to American Express's rules that will for the first time allow Class members to surcharge credit and charge transactions without also requiring them to surcharge debit transactions. (SA ¶ 8(e).) In addition, American Express agrees to pay attorneys' fees in an amount to be determined by the Court up to a cap of $75 million.[2] (*Id.* ¶ 55.) In exchange, Class members agree to release—for a period of up to at least ten years following the implementation of the rule changes agreed to in the Settlement—claims for both injunctive and monetary relief based on the same factual predicate as claims in the underlying litigation, except Class members

---

[1] "Class" means the Settlement Class as defined in the Settlement Agreement (SA ¶ 1(ww)) and "Class Plaintiffs" refers to the Class Plaintiffs as defined in the Settlement Agreement (SA ¶ 1(v)).

[2] The Settlement also provides that American Express will pay up to $2 million in costs associated with providing notice to Class members, and an additional $2 million to establish a fund for the purpose of educating Class members about the rule changes under the Settlement. (SA ¶¶ 17-18.)

do not release claims for monetary damages for the period prior to the implementation of the agreed-to rule changes.  (*Id.* ¶¶ 24-41.)

This is a fair, reasonable, and adequate settlement of the Class's claims.  Some objectors nevertheless argue that the changes to American Express's rules are merely cosmetic, and will create no meaningful benefit for merchants.  That contention, however, is inconsistent with the position of many of those same objectors who previously complained about their inability to surcharge credit but not debit cards in connection with the settlement in MDL 1720.[3]

Additionally, the Settlement is fully consistent with Federal Rule of Civil Procedure 23(b)(2), due process, and the Rules Enabling Act (28 U.S.C. § 2072(b)).  The Class Plaintiffs' challenge to American Express's generally applicable merchant policies seeks structural relief of exactly the type for which Rule 23(b)(2) is intended.  Such relief cannot be secured for the Class without use of a mandatory class under Rule 23(b)(2), since any right to opt out would destroy the uniformity of rules that American Express requires to run its business, and therefore would remove any incentive for American Express to agree to the Settlement.

Moreover, the Rules Enabling Act does not prohibit a Rule 23(b)(2) settlement class in this case.  The Supreme Court has held that procedural rules such as Rule 23 do not violate the Rules Enabling Act even when they may have incidental effects on substantive rights.  *See Shady Grove Orthopedic Assocs. v. Allstate Ins. Co.*, 559 U.S. 393 407-13 (2010).  Accordingly, certification of a mandatory, non-opt out class is fully consistent with the Rules Enabling Act, even if it incidentally affects arbitration rights held by some Class members.

---

[3] *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, No. 05-MD-1720 (JG) (JO), 2013 WL 6510737 (E.D.N.Y. Dec. 13, 2013) ("MDL 1720") (memorandum opinion and order granting final approval of class action settlement).

The Settlement is also fully consistent with the Supreme Court's decision in *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541 (2011).  *Dukes* held that a Rule 23(b)(2) class cannot be certified if plaintiffs' claims predominantly seek damages.  *Id.* at 2557.  But here, the Settlement only resolves injunctive relief claims.  The Settlement does not release damages claims for conduct before the implementation of the rule changes agreed to in the Settlement.  Future damages claims are released only insofar as necessary to protect American Express from being sued for its continued adherence to the terms of the Settlement.  Nothing in *Dukes* precludes such a limited release ancillary to a Rule 23(b)(2) class settlement.

For these reasons, and notwithstanding objections lodged by a small percentage of Class members, the Settlement should be finally approved.

## I.    THE SETTLEMENT IS FAIR, REASONABLE, AND ADEQUATE.

The legal standard for approving a class settlement is that it be "fair, reasonable, and adequate."  Fed. R. Civ. P. 23(e)(2).  Specifically, the court examines the "negotiating process leading up to the settlement, *i.e.*, procedural fairness, as well as the settlement's substantive terms, *i.e.*, substantive fairness."  *McReynolds v. Richards-Cantave*, 588 F.3d 790, 803-04 (2d Cir. 2009) (alterations and internal quotations omitted).  Here, a small percentage of the Class challenges both the procedural and substantive fairness of the Settlement.  As discussed below, none of these objections warrants denial of final approval of the Settlement.

## A. The Settlement Is Procedurally Fair.

### 1. The Sworn Declaration of Mediator Kenneth Feinberg Establishes That the Settlement Is Procedurally Fair.

Certain objectors question the procedural fairness of the Settlement, arguing that Class Counsel[4] gave away the Class's interests in exchange for attorneys' fees. (*See, e.g.*, Individual Merchant Plaintiffs ("Individual Merchants") Obj., Dkt. No. 399, at 1-2 (contending that the parties' compromise settlement "borders on conspiratorial").) These objections are without merit.

First, the Settlement leaves the award and amount of any attorneys' fees to the Court. (SA ¶¶ 1(p), 55-58.) The Settlement stands even if Class Counsel receive no attorneys' fees. (*Id.*) This structure refutes any argument of collusion. *See McReynolds*, 588 F.3d at 804 ("[P]rimarily because class counsel left the issue of attorney's fees to the discretion of the District Court, there was no indication that the Settlement was the product of bad faith or collusion." (internal quotations omitted)).

Second, these objections are completely refuted by the sworn declaration of nationally renowned mediator, Kenneth Feinberg. Mr. Feinberg conducted the mediation in this case over a period of six months, which ultimately resulted in the Settlement. Mr. Feinberg notes that "[t]his was a very complicated antitrust mediation, conducted by highly experienced and able antitrust lawyers who had lived with the case for many years before mediating their differences." (Declaration of Kenneth R. Feinberg, Dkt. No. 369, ¶ 10.) Mr. Feinberg confirms that "every inch of ground in this mediation was earned; nothing was given." (*Id.*) Characterizing the parties' dealings as "arms' length" and "hard-fought" would be a "real understatement." (*Id.*)

---

[4] "Class Counsel" refers to the law firms of Friedman Law Group LLP, Patton Boggs LLP, and Reinhardt, Wendorf & Blanchfield. (SA ¶ 1(t).)

For example, at the opening mediation, "the parties' views on the substantive issues were widely divergent and their expectations for settlement were very far apart," and "each side proved deeply committed to its position and vigorously resistant to ceding any ground." (*Id.* ¶ 5.) Only after days of mediation in which the "lawyers on both sides were deeply committed to their long-held positions" were the parties "able to agree upon the basic contours of appropriate injunctive relief that would apply." (*Id.* ¶¶ 6, 10.)

As Mr. Feinberg's sworn declaration attests, the Settlement is clearly procedurally fair because it was the product of a rigorous and adversarial process negotiated at arm's length under the guidance of a well-respected, skilled mediator. *See In re Telik, Inc. Sec. Litig.*, 576 F. Supp. 2d 570, 576-77 (S.D.N.Y. 2008) (finding that use of a mediator strongly supports a finding of procedural propriety and a presumption of fairness); *see also Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 117 (2d Cir. 2005) (finding that "collusion or coercion could not conceivably have tainted the process" and that "there could not be any better evidence of procedural integrity" where there was "aggressive litigation spanning nearly a decade" and "impassioned settlement negotiations" before a mediator (alterations and quotations omitted)).

Additionally, as noted above, the Settlement leaves the amount of attorneys' fees to be awarded to the discretion of the Court. While the parties did agree to a cap on the amount of attorneys' fees and costs that American Express would agree to pay (if, and only if, the Court were to make such an award), they did so only "*after* they had already reached accord on the basic terms of the settlement." (Feinberg Decl. ¶ 8.)

The facts of the mediation as sworn to by Kenneth Feinberg and the Court's discretion over any fee award strongly support the procedural fairness of the Settlement.

### 2. *Italian Colors* Did Not Compromise the Procedural Integrity of the Settlement.

Some objectors argue that the Settlement is suspect because it was negotiated after the Class purportedly lost any negotiating leverage following the Supreme Court's decision in *American Express Co. v. Italian Colors Restaurant*, 133 S. Ct. 2304, 2309-10 (2013) (holding class action waivers in arbitration agreements to be enforceable), and that, as a result, Class Counsel accepted empty relief in order to collect attorneys' fees. (*See, e.g.*, Target Corp., et al. Omnibus Obj., Dkt. No. 490, at 23-24.) These objections are baseless.

First, Mr. Feinberg's sworn declaration describing the mediation as "hard fought" where "every inch of ground in this mediation was earned," "nothing was given" (Feinberg Decl. ¶ 10) is not consistent with a negotiation in which one party dominates the other.

Second, briefing before this Court amply demonstrates that Class Counsel strongly believe that they could still pursue claims for class-wide injunctive relief, attorneys' fees, and costs notwithstanding *Italian Colors*. (*See* Class Pls. Arbitration Opp'n Mem., Dkt. No. 264, at 5-18; Class Pls. Final Approval Mem., Dkt. No. 362, at 7 (noting that Class Plaintiffs "believe [they] have the better of the argument").) These issues have been the subject of extensive briefing that is now *sub judice* and provided the Class Plaintiffs leverage during the settlement negotiations. Although American Express disagrees with Class Plaintiffs' position, American Express determined in its business judgment that a compromise settlement was justified given the legal uncertainty.

### B. The Settlement Is Substantively Fair.

In determining the substantive fairness of a proposed settlement, the "question for the Court is not whether the settlement represents the highest recovery possible . . . but whether it represents a reasonable one in light of the many uncertainties the class faces." *In re Citigroup*

*Inc. Sec. Litig.*, 965 F. Supp. 2d 369, 384 (S.D.N.Y. 2013). As the Second Circuit has emphasized, "There is a range of reasonableness with respect to a settlement—a range which recognizes the uncertainties of law and fact in any particular case and the concomitant risks and costs necessarily inherent in taking any litigation to completion . . . ." *Wal-Mart Stores*, 396 F.3d at 119 (internal quotation and alteration omitted); *see also id.* at 117 ("In this Circuit, courts examine the substantive fairness, adequacy, and reasonableness of a class settlement according to the '*Grinnell* factors.'").[5]

Here, some objectors argue that the Settlement is not substantively fair on the grounds that (1) it undermines and is inferior to the settlement in MDL 1720; (2) it does not prevent American Express from potentially taking certain actions that allegedly undermine the relief provided to the Class; and (3) it provides only some of the relief originally sought by Class Plaintiffs in this litigation. These objections are baseless and ignore the actual benefits provided by the Settlement, which are fair, reasonable, and adequate in light of the significant risk that Class Plaintiffs would not be able to secure *any* benefits for the Class if the litigation were to continue.

---

[5] The "*Grinnell* factors" are: "(1) the complexity, expense and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the state of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through the trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; [and] (9) the range of reasonableness of the settlement fund to a possible recovery in light of all of the attendant risks of litigation." *Wal-Mart Stores*, 396 F.3d at 117.

1. **Objections That the Settlement Undermines and Is Inferior to the Relief Obtained in MDL 1720 Are Inaccurate and Improperly Ignore the Benefits Secured by the Settlement.**

In objecting to the substantive fairness of the Settlement, some objectors misconstrue the true relationship between this Settlement and other litigation, as well as the relief obtained through the Settlement here. (*See, e.g.*, Individual Merchants Obj. at 29-30, 41-42.) Such other litigation includes: (1) the DOJ's case against Visa and MasterCard in *United States v. American Express Co.*, No. 10-CV-4496 (NGG) (RER) (E.D.N.Y), which resulted in a consent decree (Dkt. No. 143 ("Consent Decree")); (2) the class action against Visa and MasterCard in MDL 1720, which resulted in a settlement (*In re Payment Card*, No. 05-MD-1720 (JG) (JO) (E.D.N.Y.), Dkt. No. 1588-1 ("MDL 1720 SA")); and (3) the DOJ's case against American Express that is currently being tried before this Court (*United States v. American Express Co.*, No. 10-CV-4496 (NGG) (RER) (E.D.N.Y)).

With respect to litigation against Visa and MasterCard, those networks' rules were challenged by the DOJ and, separately, by a class of merchant plaintiffs in the MDL 1720 litigation. In July 2011, Visa and MasterCard entered into the Consent Decree with the DOJ. The Consent Decree does not address surcharging. Instead, it addresses other forms of steering such as discounts, in-kind incentives, and some types of signage or verbal steering among networks, card types, or other payment forms. (Consent Decree §§ IV(A)-(C).)

One year later, in July 2012, Visa and MasterCard settled the MDL 1720 litigation. Among other terms, the MDL 1720 Settlement Agreement incorporates the Consent Decree and further allows merchants to surcharge credit and charge cards (subject to certain limitations) so long as they do not also surcharge debit. (MDL 1720 SA ¶¶ 40, 42, 53, 55.) The MDL 1720 Settlement Agreement provides that merchants who surcharge Visa and MasterCard credit card transactions must do so on the same terms as other payment products they accept. (*Id.* ¶¶

42(a)(iv-v), 42(b)(iv-v), 55(a)(iv-v), 55(b)(iv-v).)  As a result, several objectors complained in

MDL 1720 that the settlement would be of little value for merchants who accept American

Express cards because American Express's current non-discrimination provisions ("NDPs")

provide that merchants who surcharge American Express credit and charge cards must also

surcharge debit cards, while Visa and MasterCard's rules prohibit surcharging of debit cards.[6]  In

approving the MDL 1720 settlement, Judge Gleeson referred to this issue as the "American

Express problem."  *In re Payment Card*, 2013 WL 6510737, at *20.

As the Class Plaintiffs noted (Class Pls. Final Approval Mem. at 3), the Settlement here

benefits Class members in part by eliminating the purported "American Express problem" by

modifying American Express's current NDPs to allow merchants that accept American Express

to surcharge credit and charge cards without also surcharging debit cards.  (*See* SA ¶8(a)-(e).)

The Settlement does not otherwise impact American Express's NDPs, leaving intact the

limitations against discriminatory steering and discounting prohibited by the NDPs.  Notably, the

Settlement likewise does not impact the case brought by the DOJ against American Express that

is currently being tried before this Court.  While the Settlement requires Class members to

release any claims they may have related to American Express's NDPs, including with respect to

the steering and discounting that is the subject of the DOJ case, all Class members would be

---

[6] For example, in MDL 1720, 7-Eleven, Inc. (also an objector in this case) argued: "If a merchant
wanted to surcharge as provided under the Proposed Settlement, the merchant would be required
to surcharge American Express transactions.  American Express Rule 3.2 would then require the
merchant to surcharge all payment cards equally, including debit cards and brands or card-
products with lower acceptance costs. . . . . Surcharging on debit cards, however, is not
permissible under the Proposed Settlement, which only allows surcharging on credit cards."  7-
Eleven, Inc. Obj., No. 05-MD-1720, Dkt. No. 2442, ¶¶ 14, 17; *see also* The Home Depot Obj.,
No. 05-MD-1720, Dkt. No. 2591, at 25-26; NRF Obj., No. 05-MD-1720, Dkt. No. 2538, at 18-
19; Target Corp., et al. Obj., No. 05-MD-1720, Dkt. No. 2495-1, at 8 (making similar
arguments).

permitted to take advantage of any changes to American Express's NDPs resulting from the DOJ case.  (SA ¶ 35.)

Furthermore, in addition to the benefits provided by the Settlement, all merchants remain free to exercise the rights provided under the Durbin Amendment to offer discounts or in-kind incentives "for payment by the use of cash, check, debit, or credit cards" so long as the discount or in-kind incentives for using debit or credit "do not differentiate on the basis of issuer or payment card network."  15 U.S.C. § 1693o-2(b)(2)(A).

Objectors, nevertheless, argue that the Settlement is inadequate because it permits only parity surcharging among credit cards and thus prevents merchants from taking advantage of the ability to differentially surcharge Visa and MasterCard purportedly obtained in the settlement of MDL 1720.  (*See, e.g.*, National Retail Federation ("NRF") Obj., Dkt. No. 385, at 8; Southwest Airlines Co., et al. Obj., Dkt. No. 424, at 23.)  These objectors are incorrect because they overstate the relief obtained in MDL 1720.  As mentioned above, that settlement did not provide for an unqualified right to surcharge Visa and MasterCard, but rather "condition[ed] a merchant's ability to surcharge a Visa or MasterCard credit card on the requirement that it also surcharge other payment products of equal or greater cost of acceptance."  *In re Payment Card*, 2013 WL 6510737, at *20.  Accordingly, objectors' complaint that they cannot differentially surcharge Visa and MasterCard is a product of the MDL 1720 settlement.  The Settlement here cannot be judged inadequate or unfair simply because it fails to overcome limitations that other parties agreed to in a completely different settlement.

Additionally, objectors' contention that the Settlement does nothing to solve the "American Express problem" is belied by their own prior objections to the MDL 1720 settlement.  Many of the same objectors previously argued that the inability to differentially

surcharge credit and *debit* cards was a flaw in the MDL 1720 settlement.[7]  The Settlement here

resolves that problem by giving merchants the opportunity to surcharge American Express

without having to also surcharge debit.  (S.A. ¶ 8(a)-(e).)

Finally, objections claiming that this Settlement is inadequate because it is inferior to the

MDL 1720 settlement (*see, e.g.*, Individual Merchants Obj. at 29-30) compare "apples to

oranges" and ignore the fact that each case presented very different strengths and weaknesses

when settlement was reached.  *See, e.g.*, *Me. State Ret. Sys. v. Countrywide Fin. Corp.*, No. 2:10-

CV-00302 MRP, 2013 WL 6577020, at *13 (C.D. Cal. Dec. 5, 2013)  ("[A]ny comparison in

settlement values is meaningless without considering the relative strengths, weaknesses, and

risks involved in the instant cases with those present in other . . . class actions.").  For example,

in MDL 1720, there were different and broader claims against Visa and MasterCard, including

allegations that those networks had conspired with banks to keep merchant fees high.  *See In re*

*Payment Card*, 2013 WL 6510737, at *8.  No such allegations have been made against American

Express in this case.  Moreover, unlike American Express in this case, in MDL 1720 Visa and

MasterCard had to concede that courts have found that they have market power under the

antitrust laws.  *See United States v. Visa U.S.A., Inc.*, 344 F.3d 229, 239-40 (2d Cir. 2003)

(affirming district court's finding of market power, which was inferred in part from the fact that

---

[7] For example, in MDL 1720, Belk, Inc. (also an objector in this case) complained: "[B]ecause
we accept American Express, if we wanted to surcharge Visa and MasterCard transactions, we
also would have to surcharge Visa and MasterCard labeled *debit* cards, thus discouraging
consumers from using debit, even though debit is a cheaper form of payment.  Our company
needs to be able to accept American Express and *not* surcharge debit cards."  NRF Obj., No. 05-
MD-1720, Dkt. No. 2538, Ex. 16, ¶ 7 (Declaration of Belk, Inc.).  Other objectors here who
advanced a similar argument in MDL 1720 include Brooks Brothers Group, Inc., Estee Lauder
Companies, Inc., Pacific Sunwear of California, Inc., rue21, inc., and Tiffany and Company.
Although these merchants did not obtain this relief in MDL 1720, they do obtain this precise
relief from the Settlement in this case.

Visa and MasterCard members together accounted for approximately 73% of the dollar volume of credit and charge card transactions). The materially different "strengths, weaknesses, and risks" presented in MDL 1720 thus undermine objectors' efforts to use the MDL 1720 settlement as evidence that the current Settlement is inadequate.

### 2. Objectors' Speculation About Potential Actions by American Express Does Not Undermine the Value of the Settlement.

Some objectors argue that American Express might take actions that could limit merchants' willingness to engage in the surcharging permitted by the Settlement. For example, objectors argue that American Express might "buy off" the surcharging rights of some merchants so that other merchants will not be inclined to surcharge out of concern that they will lose customers to their non-surcharging competitors. (*See, e.g.*, NRF Obj. at 9.) This is not a criticism of the Settlement, but rather an acknowledgement that other factors, including the acceptance decisions of competitors, may play a role in an individual merchant's decision to engage in conduct permitted by the Settlement.[8] American Express requires the flexibility to reach mutually beneficial arrangements regarding welcome acceptance with merchants of all sizes, and by reserving those rights, American Express has not interfered with any merchant's ability to surcharge under the Settlement. *See In re Payment Card*, 2013 WL 6510737, at *20 ("[T]he mere fact that merchants may *choose* not to avail themselves of the proposed relief . . .

---

[8] Some objectors complain that Visa and MasterCard can also "buy off" merchants, who will then be unable to surcharge American Express because of the parity surcharge requirement of this Settlement. (*See, e.g.*, NRF Obj. at 9 n.3; Target Corp., et al. Omnibus Obj. at 7 n.6.) Again, this is not a criticism of the Settlement but a recognition that some merchants may *choose* not to take advantage of benefits provided by the Settlement in order to negotiate with Visa and MasterCard. *See In re Payment Card*, 2013 WL 6510737, at *20, *26 (the fact that merchants with sufficient transaction volume can negotiate for lower fees does not undermine the settlement).

does not compel the conclusion that the indisputably procompetitive rules changes are not a valuable achievement.").

Certain objectors also argue that American Express may terminate Class members who engage in surcharging under the Settlement.  (*See, e.g.*, Individual Merchants Obj. at 15.) However, the Settlement states that "American Express will not terminate or refuse to renew the card acceptance agreement of any merchant solely as a consequence of such merchant imposing surcharges in compliance with this Class Settlement Agreement . . . ."  (SA ¶ 10.)  Objectors appear to believe that, so long as they engage in surcharging, American Express should not be allowed to stop doing business with them, regardless of whatever other conduct they may decide to engage in, including conduct having nothing to do with surcharging.  The fact that American Express has not agreed that it will never terminate any Class member for any reason does not undermine the value of the settlement.

Additionally, some objectors argue that American Express could raise merchant fees on prepaid cards that cannot be surcharged, while simultaneously enticing customers to use these cards by offering greater rewards.  (*See, e.g.*, Individual Merchants Obj. at 16-19.)  Offering a rewards product that cannot be surcharged does not affect the ability of merchants to surcharge American Express-branded credit and charge cards under the Settlement and thus does not undermine the relief provided by the Settlement.

Furthermore, objectors ignore the fact that the parties have agreed that the Settlement Agreement is "governed by the good faith and fair dealing obligations applicable to contracts under New York law."  (SA ¶ 90; *and see* Friedman Decl., Dkt. No. 364, Ex. W (Dec. 16, 2013 Letter from P. Korologos to G. Friedman).)  That obligation includes a pledge that neither party "shall do anything which has the effect of destroying or injuring the right of the other party to

receive the fruits of the contract," *M/A-COM Sec. Corp. v. Galesi*, 904 F.2d 134, 136 (2d Cir. 1990) (per curiam) (citing *Kirke La Shelle Co. v. Paul Armstrong Co.*, 263 N.Y. 79, 87 (1933), and a promise "not to act arbitrarily or irrationally." *Dalton v. Educ. Testing Serv.*, 87 N.Y.2d 384, 389 (1995). American Express has thus agreed not to undertake any actions that would destroy or injure the rights of the Class to receive the benefits of the Settlement. None of the potential actions identified by the objectors injure or destroy those rights.

### 3. Objectors' Complaints That They Did Not Get More in the Settlement Are Unavailing.

Notwithstanding the relief provided by the Settlement's modification of American Express's NDPs and "honor all cards" provisions ("HAC Provisions") to permit surcharging of American Express, Visa, and MasterCard credit and charge cards but not debit cards, some objectors nevertheless complain that the Settlement did not go far enough. (*See, e.g.*, Southwest Airlines Co., et al. Obj. at 6-7; Home Depot U.S.A., Inc. Obj., Dkt. No. 410, at 7.) The Settlement, however, represents a hard-fought compromise between the parties and it is axiomatic that in a compromise neither party gets everything it wants. *See In re Union Carbide Corp. Consumer Prods. Bus. Sec. Litig.*, 718 F. Supp. 1099, 1103 (S.D.N.Y. 1989) ("The essence of settlement is compromise.").

The Individual Merchant Plaintiffs, for example, rely on record evidence from Australia in objecting that the ability to differentially surcharge would be more effective than the injunctive relief provided by the Settlement. (*See* Individual Merchants Obj. at 27-28, 30-32, 34-35, 39.) For purpose of assessing the fairness of the Settlement, however, comparisons to Australia are misplaced because the Reserve Bank of Australia has regulated the payments industry by, among other things, directly regulating the rates charged by Visa and MasterCard. There is no comparable government regulation of credit and charge cards in the United States.

Moreover, these objectors ignore the fact that Class Plaintiffs faced a significant risk that they would not be able to attain *any* relief for the Class if the case proceeded. Class Plaintiffs, whose claims would be analyzed under the rule of reason, bear the burden of proving the existence of a relevant market and that American Express has antitrust market power in that market. *See Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 85-86 (2007). However, for the reasons discussed at length in American Express's Pretrial Brief in *United States v. American Express Co.*, No. 10-CV-4496, Dkt. No. 514 ("American Express Pretrial Br."), Class Plaintiffs cannot meet this burden.[9] Even if Class Plaintiffs could somehow prove a relevant market and market power, they must also show that the NDPs and HAC Provisions are anticompetitive, which they are not. (*See* American Express Pretrial Br. at 77-113.) Indeed, when considering similar provisions in Visa and MasterCard's merchant contracts, Judge Gleeson noted in MDL 1720 that these contractual provisions "undeniably have significant procompetitive effects" and "could quite easily withstand" scrutiny under the rule of reason. *In re Payment Card*, 2013 WL 6510737, at *6, *20. Objectors fail to take these substantial litigation risks into account when they argue that they are entitled to more extensive relief than what is provided by the Settlement. These objections should be rejected because, as Judge Gleeson put it, "it is hard to persuasively challenge a compromise on the ground that it fails to eliminate rules that even a complete success on the merits might not eliminate." *Id.* at *6.

---

[9] For example, Class Plaintiffs will not be able to prove the existence of a relevant market that excludes debit cards. (*See* American Express Pretrial Br. at 22-34.) Any argument that the relevant market does not include debit cards is severely outdated and fails to take into account the wealth of recent data demonstrating the interchangeability of debit cards with credit and charge products in today's market. (*Id*. at 25-34.) In addition, American Express's relatively small market share undermines any finding of market power, and there is no evidence that American Express has supracompetitive prices, much less control over price. (*Id*. at 43-70.)

## II. CERTIFICATION OF A MANDATORY SETTLEMENT CLASS UNDER RULE 23(b)(2) IS NECESSARY AND APPROPRIATE.

Objectors argue that the Class should not be certified as a mandatory settlement class under Rule 23(b)(2) for three reasons: (1) the Settlement does not provide for final, indivisible injunctive relief as required under Rule 23(b)(2); (2) a non-opt-out settlement class under Rule 23(b)(2) violates due process and the Rules Enabling Act; and (3) the Court should grant opt-out rights to objectors with arbitration agreements. Objectors' arguments are incorrect. The use of a mandatory settlement class under Rule 23(b)(2) is entirely appropriate here. Indeed, the proposed relief in this case, which would change American Express's rules for all Class members, is precisely the type of situation that a mandatory class under Rule 23(b)(2) is meant to address.

### A. Certification Under Rule 23(b)(2) Is Proper: The Settlement's Relief Is Indivisible and Final.

Contrary to objectors' arguments (*see, e.g.*, NRF Obj. at 17-24), this is a classic Rule 23(b)(2) case. "A Rule 23(b)(2) class is warranted when 'the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief . . . is appropriate respecting the class as a whole.'" *In re Payment Card*, 2013 WL 6510737, at *26 (quoting Fed. R. Civ. P. 23(b)(2)). As the Supreme Court stated in *Dukes*, the test under Rule 23(b)(2) is whether the challenged conduct—here, American Express's NDPs and HAC Provisions—"can be enjoined or declared unlawful only as to all of the class members or as to none of them." *Dukes*, 131 S. Ct. at 2557 (internal quotations omitted). Indeed, the Advisory Committee Notes to Rule 23(b)(2) point to surcharge and tying cases as classic 23(b)(2) cases.[10]

---

[10] "Thus an action looking to specific or declaratory relief could be brought by a numerous class of purchasers, say retailers of a given description, against a seller alleged to have undertaken to sell to that class at prices higher than those set for other purchasers, say retailers of another

Certain objectors nevertheless argue that the injunctive relief provided by the Settlement does not benefit all Class members and therefore is not indivisible. For example, some objectors contend that state laws prohibiting surcharging prevent some merchants from benefiting from the negotiated rule changes. (*See, e.g.*, NRF Obj. at 19-20.) That is incorrect as a matter of law. The Advisory Committee Notes to Rule 23(b)(2) make clear that "[a]ction or inaction is directed to a class within the meaning of this subdivision even if it has taken effect or is threatened only as to one or a few members of the class, provided it is based on grounds which have general application to the class." Thus, the fact that some class members are not yet affected by the alleged violation does not prohibit a Rule 23(b)(2) class. Likewise, contrary to the argument of some objectors (*see, e.g.*, Target Corp., et al. Omnibus Obj. at 19), the fact that some Class members may make the business decision not to engage in surcharging does not mean that the relief provided by the Settlement is divisible. *In re Payment Card*, 2013 WL 6510737, at *26 ("The fact that some merchants may elect not to avail themselves of the rule, or are prohibited by factors beyond the scope of this lawsuit from surcharging, does not undermine my conclusion that the class is sufficiently cohesive to warrant Rule 23(b)(2) relief in this case.").

Some objectors also claim that the relief provided by the Settlement is not "final" because American Express has agreed to change its rules only for a ten-year period. (*See, e.g.*, NRF Obj. at 20-21.) This argument is incorrect. Courts routinely certify Rule 23(b)(2) settlement classes where the "final injunctive relief" includes a sunset period on a defendant's obligation. *See, e.g.*,

---

description, when the applicable law forbids such a pricing differential. So also a patentee of a machine, charged with selling or licensing the machine on condition that purchasers or licensees also purchase or obtain licenses to use an ancillary unpatented machine, could be sued on a class basis by a numerous group of purchasers or licensees, or by a numerous group of competing sellers or licensors of the unpatented machine, to test the legality of the 'tying' condition." Fed. R. Civ. P. 23(b)(2) advisory committee's notes.

*Fresco v. Auto. Directions, Inc.*, No. 03-CIV-61063, 2009 WL 9054828, at *18 (S.D. Fla. Jan. 20, 2009) (certifying a Rule 23(b)(2) settlement class where seven- and ten-year sunset provisions applied to defendants' various obligations under the settlement agreement). Indeed, the settlement approved in MDL 1720 included a provision for certain obligations of the defendant networks to expire after a period of years. *See* MDL 1720 SA ¶ 45. Consistent with the holdings in MDL 1720 and numerous other cases, the relief provided by the Settlement here is final.

**B.** **Certification of a Mandatory Rule 23(b)(2) Class Without Opt-Out Rights is Necessary and Appropriate.**

Objectors argue variously that, without a right to opt out, a mandatory Rule 23(b)(2) class is improper because it violates due process, the Rules Enabling Act, or the arbitration agreements that certain Class members have with American Express. (*See, e.g.*, NRF Obj. at 13-14, 17-24.) These objections are incorrect.

**1.** **A Mandatory Rule 23(b)(2) Class Satisfies the Requirements of Due Process.**

It is well settled that a properly certified class under Rule 23(b)(2) is binding on absent class members and satisfies due process even though the Rule "provides no opportunity for . . . class members to opt out." *Dukes*, 131 S. Ct. at 2258; *County of Suffolk v. Long Island Lighting Co.*, 907 F.2d 1295, 1302 (2d Cir. 1990) (stating that if a party "could not have properly opted out of the mandatory class, it is bound by the class settlement if it is upheld, as are all other members of the class"). Because of the indivisible relief in a Rule 23(b)(2) class, "there is a presumption of cohesion and unity between absent class members and the class representatives such that adequate representation will generally safeguard absent class members' interests and thereby satisfy the strictures of due process." *Robinson v. Metro-North Commuter R.R. Co.*, 267 F.3d 147, 165 (2d Cir. 2001) (emphasis added), *abrogated on other grounds by Wal-Mart v.*

*Dukes*, 131 S. Ct. 2541 (2011).  In this case, where the change of American Express's rules

under the Settlement affects all Class members, and where absent Class members are adequately

represented by Class Plaintiffs, the requirements of due process are satisfied.[11]  (*See* Class Pls.

Final Approval Mem., Dkt. No. 362, at 33-35.)

> ### 2. A Mandatory Rule 23(b)(2) Class Does Not Violate the Rules Enabling Act.

Certain objectors (*e.g.*, NRF Obj. at 13-14) contend that their arbitration agreements

create a "substantive right" to pursue arbitration which, under the Rules Enabling Act, cannot be

abrogated through certification of a non-opt-out class under Rule 23(b)(2).  *See* 28 U.S.C. §

2072(b) (the Federal Rules "shall not abridge, enlarge, or modify any substantive right").

These objectors are mistaken.[12]

The Supreme Court has held that procedural rules such as Rule 23 do not violate the

Rules Enabling Act even when they may have incidental effects on substantive rights.

Accordingly, where Rule 23(b)(2)'s requirements are met, as they are here, the certification of a

---

[11] Where there is no adequacy of representation, a class cannot properly be certified without at least allowing those absent class members who are inadequately represented to opt out.  For example, American Express objected to approval of the class settlement in MDL 1720 because there was a fundamental conflict between American Express and the MDL 1720 class representatives arising from the fact that class counsel and a large portion of the class in that case are suing American Express in the instant action concerning related issues.  As a result, American Express argued that the mandatory class could not be certified so long as American Express remained in the class.  The mandatory class here does not suffer from such a fundamental conflict regarding adequacy of representation, and no objector has argued to the contrary.

[12] The premise that Rule 23(b)(2) has abrogated objectors' arbitration rights is not correct. Where Class Plaintiffs have entered into a settlement that this Court finds has satisfied the requirements of Rule 23, the natural consequence of that settlement is that it releases Class members' arbitration rights as a matter of contract, just as it releases certain substantive rights under the antitrust laws.  This is fully consistent with the Rules Enabling Act and *Italian Colors.  See Italian Colors*, 133 S. Ct. at 2309.

mandatory, non-opt out class is fully consistent with the Rules Enabling Act, even where some absent class members might otherwise have a right to arbitrate their claims if they had been brought individually.

In *Sibbach v. Wilson & Co.*, 312 U.S. 1 (1941), the Supreme Court considered a challenge to Federal Rules of Civil Procedure 35 and 37 and rejected the argument that those admitted "rules of procedure" nonetheless violated the Rules Enabling Act. *Id.* at 11. Petitioner argued that "Congress intended that in regulating procedure this court should not deal with important and substantial rights theretofore recognized." *Id.* at 13. The Court rejected this argument, finding that "[i]f we were to adopt the suggested criterion of the importance of the alleged right we should invite endless litigation and confusion worse confounded." *Id.* at 14. Instead, the *Sibbach* Court enunciated the following test to determine whether a rule violates the Rules Enabling Act: "The test must be whether a rule really regulates procedure,—the judicial process for enforcing rights and duties recognized by substantive law and for justly administering remedy and redress for disregard or infraction of them." *Id.*

In *Shady Grove*, Justice Scalia, writing for the plurality, noted that *Sibbach* is "seven decades" old "settled law" and its "governing rule" which "focus[es] on the Federal Rule as the proper unit of analysis" is "alive and well." *Shady Grove*, 559 U.S. at 413 & n.12. The plurality explicitly followed the standard established in *Sibbach*: "In sum, it is not the substantive or procedural nature or purpose of the affected state law that matters, but the substantive or procedural nature of the Federal Rule. We have held since *Sibbach,* and reaffirmed repeatedly, that the validity of a Federal Rule depends entirely upon whether it regulates procedure. If it does, it is authorized by § 2072 and is valid in all jurisdictions, with respect to all claims, regardless of its incidental effect upon state-created rights" said to be abridged by the Federal

Rule." *Id.* at 410 (citations omitted). That is, the "test is not whether the rule affects a litigants' substantive rights; most procedural rules do. What matters is what the rule itself regulates: If it governs only the manner and the means by which a litigants' rights are enforced, it is valid; if it alters the rules of decision by which the court will adjudicate those rights, it is not." *Id.* at 407 (alterations, citations, and internal quotations omitted).

*Sibbach* and *Shady Grove* provide ample basis to certify the Settlement Class here, notwithstanding the objectors' argument that class certification will override their substantive rights to arbitration. The fact that objectors will not be able to invoke their arbitration rights is merely an incidental effect of the procedural mandate of Rule 23(b)(2), which creates a mandatory, non-opt out class where the Class Plaintiffs seek indivisible injunctive relief and the other requirements of Rule 23 are satisfied. *See Parisi v. Goldman, Sachs & Co.*, 710 F.3d 483, 488 (2d Cir. 2013) ("[T]he right of a litigant to employ Rule 23 is a procedural right only, ancillary to the litigation of substantive claims." (quoting *Deposit Guar. Nat'l Bank v. Roper*, 445 U.S. 326, 332 (1980))). Indeed, a contrary result would seriously undermine the operation of Rule 23(b)(2), by effectively giving absent class members with arbitration agreements the unilateral ability to opt out of the class. *See Bus. Guides, Inc. v. Chromatic Commc'ns Enters., Inc.*, 498 U.S. 533, 551 (1991) ("Rules which incidentally affect litigants' substantive rights do not violate" the Rules Enabling Act if they are "reasonably necessary to maintain the integrity of that system of rules." (quoting *Burlington N. R.R. Co. v. Woods*, 480 U.S. 1, 5 (1987))).

A similar approach has been taken by at least one court within the Second Circuit. *See In re Currency Conversion Fee Antitrust Litig.*, 361 F. Supp. 2d 237 (S.D.N.Y. 2005). There, although the court found that the defendants' arbitration rights were "substantive contractual rights," the court rejected the argument that, under the Rules Enabling Act, those rights could not

incidentally be affected by Rule 23. *Id.* at 255-56. Specifically, the court ruled that Rule 23(d)'s procedural rules governing defendants' communications with absent class members precluded the enforcement of arbitration agreements that defendants had sought to add to the parties' contracts after the commencement of the class action. *Id.* at 256. The court noted that "the Federal Rules carry a heavy presumption of validity," and that courts "have been 'instructed to apply the Federal Rule[s], and can refuse to do so only if the Advisory Committee, [the Supreme Court], and Congress erred in their prima facie judgment that the Rule in question transgresses neither the terms of the Enabling Act nor constitutional restrictions.'" *Id.* at 255 (quoting *Hanna v. Plumer*, 380 U.S. 460, 471 (1965)). The court reasoned that any "argument that a substantive right is abridged if [a court] does not enforce arbitration agreements applies an inappropriate and mechanical outcome-determinative test." *Id.* at 256. The court also noted that defendants were free to enter into arbitration agreements with the plaintiffs so long as they did not violate the procedural provisions of Rule 23(d). *Id.* at 256 n.10. Ultimately, the court concluded that it was "not voiding defendants' right to arbitrate their disputes," rather it was "merely subjecting the contractual right of [defendants] to the procedural considerations imposed by the Federal Rules." *Id.* at 256 n.10. The same reasoning supports class certification here.

### 3. There Is No Basis for Creating Opt-Out Rights in This Case.

Certain objectors urge the Court to grant them the right to opt out of the Class prior to final approval of the Settlement. There is no basis for creating opt-out rights in this case.

#### a. A mandatory class settlement is fully consistent with *Dukes*.

Certain objectors argue that absent class members must have the right to opt out under *Dukes* because the Settlement releases future damages claims. (*See, e.g.*, 7-Eleven, Inc., et al. Obj., Dkt. No. 430, at 15.) That argument misconstrues *Dukes*. *Dukes* held that Rule 23(b)(2) certification is improper where the injunctive relief sought by class members is combined with

"individualized" damages claims based on past conduct. *See Dukes*, 131 S. Ct. at 2557. That holding is inapplicable here, however, because Class Plaintiffs are not seeking to certify a class with respect to any damages claims with respect to past conduct. Rather, Class Plaintiffs seek only structural injunctive relief which "must perforce affect the entire class at once," *id.* at 2558, not monetary relief.

Opt-outs are not allowed in such cases. Thus, for example, in *In re Visa Check/MasterMoney Antitrust Litigation*, 192 F.R.D. 68 (E.D.N.Y. 2000), *aff'd*, 280 F.3d 124 (2d Cir. 2001), the Court certified a class challenging parts of Visa and MasterCard's "honor all cards" provisions under Rule 23(b)(2) since the provisions were "generally applicable" to the class as a whole. *Id.* at 88-89. The court did not provide for opt-out rights to the (b)(2) portion of the class, reserving that solely for the "damages action" certified under 23(b)(3). *Id.* at 89. The Second Circuit, finding that the entire action could proceed under Rule 23(b)(3), did not reach the question of whether a non-opt-out class under Rule 23(b)(2) was appropriate. *See In re Visa Check*, 280 F.3d at 147. Likewise, in MDL 1720, the court certified a non-opt-out class under Rule 23(b)(2) because the injunctive relief provided in that settlement was "generally applicable to all merchants." *In re Payment Card*, 2013 WL 6510737, at *23. The court held that the plaintiffs' claims for injunctive relief from the "bundle of network rules," which they claim led to supracompetitive interchange fees, was "the proper subject of a (b)(2) class from which no opt-outs are permitted." *Id.* at *23.

Nor does the Settlement's release of future damages claims run afoul of *Dukes*. The release of future damages claims is designed merely to effectuate the injunctive aspect of the Settlement by ensuring that American Express's continued adherence to the Settlement cannot give rise to a claim for damages. No defendant would have an incentive to settle a Rule 23(b)(2)

class without protection against damages claims for doing what the settlement prescribes.

Nothing in *Dukes* suggests, much less holds, that such damages release is contrary to Rule

23(b)(2). As discussed below (*see* Section III, *infra*), *Dukes* did not address the proper scope of

a release in a class action settlement. Moreover, *Dukes* expressly reserved the question whether

"incidental" damages claims could be included in a (b)(2) class.

> **b.** **Merchants' arbitration agreements do not give them a right to opt out of a mandatory class.**

Some objectors argue that their card acceptance agreements with American Express

allegedly provide an opt-out right from a mandatory class under Rule 23(b)(2). (*See, e.g.*, NRF

Obj. at 3, 22-24; Target Corp., et al. Omnibus Obj. at 9-10.) These objectors are mistaken

because their agreements do not confer opt-out rights from a mandatory Rule 23(b)(2) class.

For example, the NRF's card acceptance agreement states ██████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████ (Declaration of Gregory A. Clarick in Support

of NRF's Objection, Dkt. No. 436, Ex. A, ¶ 7(c)(iii).) ████████████████████████

██████████ ██████████████████████████ and even if they did, such protections

do not amount to an opt-out right from a mandatory class.[13]



---

[13] The reference to previously filed class actions in the NRF Agreement does not change this analysis. The NRF Agreement states: ███████████████████████████████████████
███████████████████████████████████████████ (Clarick NRF Decl.,
Ex. A, ¶ 7(c)(iii).) The agreement then states that this section applies to any previously filed class action relating to the NDPs or HAC Provisions. (*Id.*) This means, for example, ████████
██████████████████████████████████████████████████████████████████████
██████████████████████████████████████████████ It does not mean
that the NRF has the right to opt out of a properly certified mandatory Rule 23(b)(2) class.

Similarly, Luxottica's card acceptance agreement does not confer an opt-out right.  The agreement states ███████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████ (Declaration of Gregory Clarick in Support of Luxottica's Objection, dated June 6, 2014, Ex. A, ¶¶7(m), 7(d).)  However, ████████████████████████████████████████████████████████████

██████████████ Big Lot's card acceptance agreement does not confer an opt-out right for the same reason.  (*See* Declaration of Gregory Clarick in Support of Big Lot's Objection, dated June 6, 2014, Ex. A, ¶ 7(d)(ii) (describing Big Lot's █████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████).)

More generally, nothing in American Express's arbitration agreements with merchants even purports to allow a merchant to opt-out of a mandatory class certified under Rule 23(b)(2). And, in general, arbitration agreements do not confer on the parties an unqualified right to opt out of a class.  Thus, the Second Circuit has refused to allow class members with arbitration agreements to opt-out of even a Rule 23(b)(3) opt-out class once the deadline for opting has passed.  *In re Am. Express Fin. Advisors Sec. Litig.*, 672 F.3d at 132-33 (affirming denial of requests by investors with arbitration agreements to opt out of a (b)(3) class after the opt-out deadline).  Private parties to a private contract do not have the authority to grant one another opt-out rights from certified mandatory classes.  The opt-out right is not simply a matter of contract between private parties, but governed by the court.  In certifying a mandatory class in this case, the Court is "not voiding [objectors'] rights to arbitrate their disputes," rather it is "merely

subjecting the contractual right of [objectors] to the procedural considerations imposed by the Federal Rules." *In re Currency Conversion*, 361 F. Supp. 2d at 256 n.10.

      **c.**      **Allowing objectors to opt out would destroy the value of the Settlement for American Express.**

In addition to contravening the plain language of Rule 23(b)(2), providing opt-out rights should not be allowed where injunctive relief would benefit even those class members who opt out. "If merchants could opt out of the (b)(2) class, they would reap the benefits of that relief anyway, as the injunctive relief is generally applicable to all merchants." *In re Payment Card*, 2013 WL 6510737 at *23. As Judge Gleeson observed in rejecting opt-out requests in MDL 1720, permitting opt-outs would "eliminate the incentive" for defendants to settle since further litigation could still be brought despite the agreed-upon conduct changes that were negotiated as part of the Settlement. *Id.* In the present case, achieving certainty in its rules provisions is the fundamental reason for American Express to agree to the Settlement. Allowing opt-outs would undermine that certainty and deprive American Express of the benefit of its bargain. *See In re Telik*, 576 F. Supp. 2d at 584 ("Without the settlement class device, Defendants could not obtain a Class-wide release and therefore would have had little, if any, incentive to enter into the Settlement."); *Sullivan v. DB Invs., Inc.*, 667 F.3d 273, 311 (3d Cir. 2011) ("From a practical standpoint, however, achieving global peace is a valid, and valuable, incentive to class action settlements."). Without the uniformity and certainty of a non-opt-out class, American Express has no incentive to continue with the Settlement. The Court should decline the invitation to put the wishes of a handful of objectors above the benefits to the Class under the Settlement.

      **d.**      **Governmental entities acting like merchants that accept American Express cards should not be permitted to opt out.**

The objection by the United States that its agencies, instrumentalities, and officers were impermissibly included in the Settlement Class is meritless. (*See* United States of America Obj.,

Dkt. No. 412, Ex. 2 (Apr. 17, 2014 Letter from P. Korologos to C. Conrath).) Nothing in 28

U.S.C. §§ 516 and 519 remotely suggests that the United States is exempt from being a class

member in a properly certified class action under Rule 23. To counsel's knowledge, neither

provision has ever been interpreted to create such an exemption. Rather, those sections simply

"concern[] the allocation of responsibility, *within the government*, for representing the United

States as party." *United States v. U.S. Dist. Court for N. Mar. I.*, 694 F.3d 1051, 1059 (9th Cir.

2012) (emphasis added); United States of America Obj., Ex. 2 (Apr. 17, 2014 Letter from P.

Korologos to C. Conrath (discussing these arguments at greater length)).[14] Nor does the

language of Rule 23 support any distinction between governmental entities and other entities.

Indeed, such an exemption would undermine Rule 23(b)(2), which by definition applies

where the challenged conduct is applicable to the entire class. Here, the Settlement Class

includes all merchants that accept American Express cards, including governmental entities that

act as merchants and accept American Express-branded cards to process payments. (SA ¶¶ 1(rr),

2.) The injunctive relief provided in the Settlement Agreement thus extends to these

governmental entities that act just like any other merchant. *See, e.g.*, *In re Payment Card*, 2013

WL 6510737, at *18-19 (reasoning that "the injunctive relief at the heart of the settlement inures

---

[14] The Attorney General has authority under Sections 516 and 519 to object to the Settlement, but those statutes do not grant the United States any ability to opt out of a mandatory class, which is governed by Rule 23(b)(2). Indeed, all of the authority on which the United States relies involves disputes between DOJ and other agencies over the conduct of litigation, or involve the United States or one of its agencies as a named party. *ICC v. S. Rwy. Co.*, 543 F.2d 534 (5th Cir. 1976) (dispute between DOJ and ICC over ICC's ability to enforce ICC-issued orders)); *FTC v. Guignon*, 390 F.2d 323, 324 (8th Cir. 1968) (dispute between DOJ and FTC over enforcement of FTC-issued subpoenas); *In re Ocean Shipping Antitrust Litig.*, 500 F. Supp. 1235, 1238-39 (S.D.N.Y. 1980) (dispute between DOJ and Federal Maritime Commission on FMC's attempt to intervene as a party); *United States v. Hercules, Inc.*, 961 F.2d 796, 799 (8th Cir. 1992) (enforcement action); *United States v. Walcott*, 972 F.2d 323, 328 (11th Cir. 1992) (named plaintiff). None consider whether the United States has an opt-out right under Rule 23(b)(2).

equally to the benefit of every single member of the merchant class"). Accordingly, for the same reasons that no other merchants should be granted opt-out rights as discussed above, the Court should not grant opt-out rights to the United States or any other governmental entities acting as merchants.

The United States' position is also inconsistent with cases in which governmental entities have been included as class members under Rule 23. *See, e.g.*, *Shaw v. Toshiba Am. Info. Sys. Inc.*, 91 F. Supp. 2d 942, 953 (E.D. Tex. 2000). While it is true that the United States in *Shaw* affirmatively consented to be bound to the class settlement, *Shaw* nevertheless makes clear that governmental entities may be class members under Rule 23(b)(3). *See id.* Given that, there is no basis in the language of Rule 23 to conclude that governmental entities cannot also be class members under Rule 23(b)(2). Whether the United States has the right to opt out is a function of the distinction between Rule 23(b)(2) and 23(b)(3) class actions. The United States has no special prerogative under the Rule to opt out of a properly certified mandatory class.

**III. THE RELEASE COVERS CLAIMS WITH THE IDENTICAL FACTUAL PREDICATE AS THE SETTLED CONDUCT AND IS THEREFORE PROPER UNDER WELL-SETTLED LAW.**

Certain objectors argue that that the release provided in the Settlement is overbroad because it covers "virtually any rule Amex has promulgated or may promulgate in the future" and therefore covers "claims that were not raised in this case." (*See, e.g.*, NRF Obj. at 29.) This is inaccurate. The release by its plain language covers only claims related to the NDP and HAC Provisions—the core conduct challenged in this lawsuit and the conduct which is being settled. (*See* SA ¶¶ 26-27.) "The law is well established in this Circuit and others that class action releases may include claims not presented and even those which could not have been presented as long as the released conduct arises out of the 'identical factual predicate' as the settled conduct." *Wal-Mart Stores*, 396 F.3d at 107 (quoting *TBK Partners, Ltd. v. W. Union Corp.*, 675

F.2d 456, 460 (2d Cir. 1982). In other words, a settlement release may cover claims "arising from a shared set of facts" as those in the complaint. *See id.* at 109. By covering *only* claims related to the NDPs and HAC provisions challenged by Class Plaintiffs, the release is tailored *only* to claims with the "identical factual predicate" of the settled conduct. Indeed, the release expressly states that it covers only claims that "fall within the identical factual predicate doctrine as applied to the Marcus Action and the Animal Land Consolidated Action." (SA ¶¶ 26-27.) The release is appropriate because it solely "cover[s] claims that are or could have been alleged in this case." *In re Payment Card*, 2013 WL 6510737, at *22.

Some objectors complain that the release improperly includes future merchants and covers claims related to American Express's future conduct. (*See, e.g.*, Home Depot U.S.A., Inc. Obj., at 33-34.) Such objections are without merit. First, the Second Circuit has approved certification of classes that include future class members. *See, e.g.*, *Marisol A. v. Giuliani*, 126 F.3d 372, 375 (2d Cir. 1997) (affirming certification of a (b)(2) class of "[a]ll children who are or who will be in the custody of the New York City Administration for Children's Services"); *Robidoux v. Celani*, 987 F.2d 931, 939 (2d Cir. 1993) (reversing denial of a (b)(2) class action and remanding for "certification of a class comprising at least 'all current and future Vermont applicants for assistance from the Food Stamps and ANFC programs'"). Indeed, this is a well-embraced principle for courts in this Circuit. *See, e.g.*, *Duprey v. Conn. Dep't of Motor Vehicles*, 191 F.R.D. 329, 338 (D. Conn. 2000) ("It is not at all uncommon for a class to include future members, who may generally avail themselves of the same relief available to class members who have already sustained damages."); *Latino Officers Ass'n City of N.Y. v. City of N.Y.*, 209 F.R.D. 79, 90 & n.87 (S.D.N.Y. 2002) (finding no need to certify separate subclasses of present and future claimants where similar legal theories are available to both present and future claimants"

and "any equitable relief to which the class would be entitled would be of the sort that would affect present and future claimants in the same way").

Second, the Second Circuit recently reaffirmed that, where defendants' future conduct falls within the same set of facts underlying plaintiffs' claims, a release of claims for both monetary and injunctive relief regarding future conduct is proper. *See In re Literary Works in Elec. Databases Copyright Litig.*, 654 F.3d 242, 248 (2d Cir. 2011) (finding release of future claims for monetary and injunctive relief proper where the complaint sought "injunctive relief for future uses, and therefore contemplate[d] these alleged future injuries"). Here, in the underlying litigation, Class Plaintiffs sought injunctive relief as to American Express's future enforcement of its NDPs and HAC Provisions. (Animal Land Consolidated Action Compl. ¶¶ 62-63; Marcus Action Compl. ¶ 3.) Accordingly, it is permissible for the release to cover all claims related to such future conduct.

Moreover, the only released claims related to future conduct are those involving the very rule changes for which the Class bargained in settlement negotiations. Without such a release, American Express would be subject to the "Catch 22" of subjecting itself to potential future liability by agreeing to the rule changes in the Settlement. "In exchange for a new, going-forward rules structure," American Express is "entitled to bargain for and receive releases of claims that are or could have been alleged based on the identical factual predicate of the claims in this case." *In re Payment Card*, 2013 WL 6510737, at *22. Such releases are "essential to providing defendants the litigation peace they legitimately expect in return for the settlement of claims." *Id.*; *and see In re Gen. Elec. Co. Sec. Litig.*, No. 09 Civ. 1951 (DLC), 2014 WL 534970, at *8, (S.D.N.Y. Feb. 11, 2014) ("[T]he suggestion that the release was overly broad because it does not permit future claims based on new evidence of wrongdoing reflects a

fundamental misunderstanding of the purpose of class action releases . . . . Indeed, one reason that most corporate defendants are willing to settle a class action is a desire for litigation peace.").

To be clear, the release does not cover claims for damages based on American Express's conduct prior to the implementation of the rules contemplated by the Settlement. The release thus does not cover future damages claims based on pre-Settlement conduct. *See In re Payment Card*, 2013 WL 6510737, at *22 (finding that the release in MDL 1720 "appropriately limit[s] future damages claims based on the pre-settlement conduct of the networks"). In addition, the release does not cover future injunctive or monetary "claims based on new rules or new conduct or a reversion to the pre-settlement rules." *Id.* at *22-23. A Rule 23(b)(2) class release is proper when it covers claims for injunctive and monetary relief based on a defendant's continued adherence in the future to the terms of the Settlement. *See, e.g.*, *id.* at *22. That is precisely what the release does in the Settlement and is therefore proper.

Objectors have identified no case supporting their assertion that future damages claims cannot be released in a 23(b)(2) class settlement. In fact, their principal cases do not even address the proper scope of a release for a 23(b)(2) class. For example, in *Dukes*, the Supreme Court did not address a Rule 23(b)(2) class settlement or decide what kind of release a Rule 23(b)(2) settlement class could provide, much less hold that such a class could settle claims for injunctive relief but not release all prospective claims of liability for defendants' continued adherence to that injunctive relief in the future. *See* 131 S. Ct. at 2547, 2550-61. Moreover, nothing in *Dukes* suggests that a release of future damages claims cannot be included to effectuate an injunctive class settlement, especially where the released claims are solely related to compliance with the terms of the injunctive relief. Other cases cited are inapposite because

they concerned only whether *res judicata* barred class members' claims for past damages and are inapplicable here where the Settlement permits Class members to pursue existing damages claims. *See, e.g.*, *Brown v. Ticor Title Ins. Co.*, 982 F.2d 386, 392 (9th Cir. 1992); *Animal Science Prods., Inc. v. Hebei Welcome Pharm. Co.* (*In re Vitamin C Antitrust Litig.*), 279 F.R.D. 90, 114-15 (E.D.N.Y. 2012).

## CONCLUSION

For the reasons stated above, American Express respectfully requests that the Court grant final approval of the Settlement.

Dated: July 11, 2014                                          Respectfully submitted,
New York, New York


/s/ Philip C. Korologos                                      /s/ Kevin J. Orsini
Donald L. Flexner                                            Evan R. Chesler
Philip C. Korologos                                          Peter T. Barbur
Eric J. Brenner                                              Kevin J. Orsini
BOIES, SCHILLER & FLEXNER LLP                                CRAVATH, SWAINE & MOORE LLP
575 Lexington Avenue, 7th Floor                              825 Eighth Avenue
New York, New York 10022                                     New York, New York 10019
Tel.: (212) 446-2300                                         Tel.: (212) 474-1000
Fax: (212) 446-2350                                          Fax: (212) 474-3700


*Counsel for Defendants American Express Travel*
*Related Services Company, Inc. and American Express Company*