**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

----------------------------------------------------------------x

IN RE: AMERICAN EXPRESS ANTI-STEERING
RULES ANTITRUST LITIGATION

This Document Relates To:                    11-MD-02221 (NGG) (RER)
CONSOLIDATED CLASS ACTION

----------------------------------------------------------------x

THE MARCUS CORPORATION,
on behalf of itself and all similarly situated persons,

                                             13-CV-07355 (NGG) (RER)

                        Plaintiff,

            - against -

AMERICAN EXPRESS COMPANY et al.,             **<u>REDACTED - PUBLIC VERSION</u>**

                        Defendants.

----------------------------------------------------------------x

**REPLY MEMORANDUM OF LAW IN FURTHER**
**SUPPORT OF CLASS PLAINTIFFS' MOTION FOR FINAL**
**<u>APPROVAL OF CLASS ACTION SETTLEMENT</u>**

July 11, 2014

## TABLE OF CONTENTS

TABLE OF AUTHORITIES…………………………………………………………..iv

PREAMBLE……………………………………………………………………………1

SUMMARY OF RELEVANT FACTS AND LAW………………………………..…..4

STATEMENT OF RELEVANT FACTS…....…………………………………………9

    A.  The Value Of The Settlement…………………………………………………9

        1.  The Settlement Gives All Merchants The Right to Engage in
            Simple Surcharging Immediately………………………………………10
            a.  Universal Relief………………………………………………...11
            b.  Immediate Relief & State Statutes………………………………...12

        2.  Surcharge Responses: Stay-And-Pay; Switch-To-Debit; "Zero Lost Sales"…….13
            a.  Lost Sales…………………………………………………………13
            b.  Switching to Debit………………………………………………...14
            c.  Paying the Surcharge……………………………………………...19

        3.  Quantification Of Savings Based On Consumer Surcharge Responses…...……19
            a.  Average U.S. Merchant Rates……………………………………...20
            b.  Shifting To Debit Is What Matters – For Everyone……………....………22

        4.  "Simple Surcharging" Is The Surcharging Merchants Actually *Do*……………23
            a.  Australian Parity Surcharging……………………………………24
            b.  Airlines, Hotels & Rental Cars……………………………………25
            c.  Acquirer Information……………………………………………...27

        5.  The Olinger Study And What It Does And Does Not Show……………………28
            a.  The Olinger Study………………………………………………28
            b.  The Snowball Effect; Merchants Will Surcharge…………………………31

        6.  Other Objections Regarding Competitive Effects Of The Settlement Are
            Baseless……………………………………………………………32
            a.  Effect On Merchant Fees………………………………………32
            b.  Barriers to Entry; Barriers to Competition…………………………33
            c.  "Soft Steering."………………………………………………34

        7.  The Alternative To The Settlement…………………………………………34

i

B.  Responses To Objector-Specific Issues……………………………………………...36

   1.  The Individual Merchant Plaintiffs……………………………………………36

   2.  Former Counsel From Patton Boggs……………………………………………38

   3.  Blue Cross and Blue Shield Health Insurers…...………………………….……39

   4.  United States………………………………………………………………….…39

ARGUMENT…………………...……………………………………………………………...40

I.  The Settlement Amply Satisfies The *Grinnell* Factors…………………………….......40

   A.  Factor 2: Reaction Of The Class……………………………………………………41

   B.  Factor 7: Ability To Withstand Greater Relief…………..……………………………41

II.  Due Process Neither Mandates Opt Out Rights Nor Prevents The Release
    Of Incidental Future Damages Claims……………………...……………………………..43

   A.  Rule 23(b)(2) Does Not Permit Opt-Outs…………………………………………43

   B.  The Release Does Not Violate Due Process………………………………………..45

       1.  The Release Does Not Improperly "Bless" Illegal Conduct……………….....45

       2.  The Release Of Future Damages Claims Is Proper………………………….45

   C.  In Any Event, There Are No "Future Damages" In This Case,
       Given The Opportunity To Mitigate Provided By The Settlement………………49

III.  The Objections Based On Contractual Dispute Resolution Provisions
     Are Without Merit……………………………………………………………………51

   A.  The Right To Arbitrate Claims May Be Extinguished Via
       A Mandatory Class Action, Just Like Any "Substantive Right"
       Or Chose-In-Action……………………………………………………………...51

B.  The Objectors' Claimed "Right To Avoid Class Litigation"
Does Not Implicate The Rules Enabling Act And Would Be
Unenforceable In Any Event……………………………………………………54

1.  The Rules Enabling Act Has No Application………………………………..54

2.  Any Contractually Bestowed "Right" To Opt Out Of
A Mandatory Class Would Be Clearly Unenforceable………………………57

C.  Policy Implications Of The Arbitration-Related Objections……………………58

IV.    The Requirements of Rule 23(b)(2) And 23(a) Are Amply Satisfied…………………..59

A.  Rule 23(b)(2) Cohesiveness…………………………………………………...59

B.  Adequacy Of Representation…………………………………………………60

C.  Typicality And Commonality…...……………………………………………63

CONCLUSION…………………………………………………………………………..65

## TABLE OF AUTHORITIES

CASES                                                                                          PAGE(S)

*American Express Co. v. Italian Colors Rest.*,
   133 S. Ct. 2304 (2013)……………………………………………...35, 56, 58, 60, 61

*Ames v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
   567 F.2d 1174 (2d Cir. 1977)…………………………………………………57

*AT&T Mobility v. Concepcion*,
   131 S. Ct. 1740 (2011)……………………………………………………...56

*City of Detroit v. Grinnell Corp.*,
   495 F.2d 448 (2d Cir. 1974)…………………………………………………...7, 40

*Continental Ore Co. v. Union Carbide and Carbon Corp.*,
   370 U.S. 690 (1962)……………………………………………………...47

*County of Suffolk v. Long Island Lighting Co.*,
   907 F.2d 1295 (2d Cir. 1990) ….……………………………………………...52

*Desiderio v. Nat'l Ass'n of Sec. Dealers, Inc.*,
   191 F.3d 198 (2d Cir. 1999)…………………………………………………...57

*Expressions Hair Design v. Schneiderman*,
   975 F. Supp. 2d 430 (S.D.N.Y. 2013)……………………………………...12

*Hecht v. United Collection Bureau, Inc.*,
   691 F.3d 218 (2d Cir. 2012)……………………………………………….43, 46

*In re Am. Exp. Fin. Advisors Secs. Litig.*,
   672 F.3d 113 (2d Cir. 2011)…………………………………………………...8, 52

*In re Am. Int'l Group Secs. Litig.*,
   689 F.3d 229 (2d Cir. 2012)……………………………………………...64

*In re Auction Houses Antitrust Litig.*,
   2001 U.S. Dist. LEXIS 1713 (S.D.N.Y. Feb. 22, 2001)………………………...61

*In re Colt Indus. Shareholder Litig.*,
   77 N.Y.2d 185 (1991)…………………………………………………….44

*In re Lehman Bros. Secs. & Erisa Litig.*,
   2012 U.S. Dist. LEXIS 90796 (S.D.N.Y. June 29, 2012)………………………...52

*In re Literary Works in Electronic Databases Copyright Litig.*,
    654 F.3d 242 (2d Cir. 2011)……………………………………………………...48

*In re Painewebber Ltd. P'ships Litig.*
    1996 U.S. Dist. LEXIS 9195 (S.D.N.Y. July 1, 1996)
    *appeal dismissed* 94 F.3d. 49 (2d Cir. 1996)…………………………………...52, 53

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*,
    2013 U.S. Dist. LEXIS 179340 (E.D.N.Y. Dec. 13, 2013)…………………………*passim*

*In re Piper Funds, Inc.*,
    71 F.3d 298 (8th Cir. 1995)……………………………………………………...53

*In re Tamoxifen Citrate Antitrust Litig.*,
    466 F.3d 187 (2d Cir. 2006)……………………………………………………...47

*In re Titanium Dioxide Antitrust Litig.*,
    962 F. Supp. 2d 840 (D. Md. 2013)……………………………………………63, 64

*In re Visa Check/Mastermoney Antitrust Litig.*,
    280 F.3d 124 (2d Cir. N.Y. 2001)……………………………………………….50

*In re Visa Check/MasterMoney Antitrust Litig.*,
    2003 U.S. Dist. LEXIS 4965 (E.D.N.Y. 2003)……………………………………18, 50

*Joel A. v. Giuliani*,
    218 F.3d 132 (2d Cir. 2000)……………………………………………………...60

*M/A-COM Sec. Corp. v. Galesi*,
    904 F.2d 134 (2d Cir. 1990)……………………………………………………...48

*Mathews v. Eldridge*,
    424 U.S. 319 (1976)……………………………………………………………...49

*Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth*,
    473 U.S. 614 (1985)……………………………………………………………...57

*National Super Spuds, Inc. v. New York Mercantile Exchange*,
    660 F.2d 9 (2d Cir. 1981)……………………………………………………….60

*Ortiz v Fibreboard Corp.*,
    527 U.S. 815 (1999)……………………………………………………………...61

*Phillips Petroleum Co. v. Shutts*,
    472 U.S. 797 (1985)……………………………………………………………...43

*POM Wonderful LLC v. Organic Juice USA. Inc.*,
    769 F. Supp. 2d 188 (S.D.N.Y. 2011)……………………………………………...30

*Renton v. Kaiser Foundation*,
    2001 U.S. Dist. LEXIS 20015 (W.D. Wash. Sept. 24, 2001)……………………..63, 64

*Robertson v. National Basketball Ass'n*,
    556 F.2d 682 (2d Cir. 1977)……………………………………………………44, 45

*Robinson v. Metro-North Commuter R.R.*,
    267 F.3d 147 (2d Cir. 2001)……………………………………………………...44

*Schering Corp. v. Pfizer, Inc.*,
    189 F.3d 218 (2d Cir. 1999)……………………………………………………...30

*Shady Grove Orthopedic Assocs, P.A. v. Allstate Ins. Co.*,
    559 U.S. 393 (2010)…………………………………………………...8, 54, 55, 56

*Sibbach v. Wilson & Co.*,
    312 U.S. 1 (1941)………………………………………………………………...56

*Stephenson v. Dow Chem. Co.*,
    273 F.3d 249 (2d Cir. 2001)
    *aff'd* in part, 539 U.S. 111 (2003)……………………………………………60, 61

*Stott v. Capital Fin. Servs.*,
    277 F.R.D. 316 (N.D. Tex. 2011)……………………………………………….53

*St. Paul Fire & Marine Ins. Co. v. Emp'rs Reinsurance Corp.*,
    919 F. Supp. 133 (S.D.N.Y. 1996)……………………………………………57

*Strougo v. Bassini*,
    258 F. Supp. 2d 254 (S.D.N.Y. 2003)……………………………………………9

*TBK Partners, Ltd. v. W. Union Corp.*,
    675 F.2d 456 (2d Cir. 1982)……………………………………………………...62

*Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*,
    396 F.3d 96 (2d Cir. 2005)…………………………………9, 38, 40, 48, 49, 60, 61, 62

*Wal-Mart Stores, Inc. v. Dukes*,
    131 S. Ct. 2541 (2011)……………………………………………43, 44, 46 58, 63

*Wong v. CKX, Inc.*,
    890 F. Supp. 2d 411 (S.D.N.Y. 2012)…………………………………….......57

*Zenith Radio Corp. v. Hazeltine Research*,
    395 U.S. 100 (1969)………………………………………………………………...59

**STATUTES**

Clayton Act § 16…………………………………………………………………………..58, 59

**OTHER AUTHORITIES**

Fed. R. Civ. P. 23………………………………………………………………………*passim*

C. Wright & A. Miller, Federal Practice and Procedure §1775
    (3d. ed. 2013)………………………………………………………………………….39

At the outset, and before turning to the merits of the objections to the proposed class settlement (the "Settlement"), we feel compelled to make some very brief observations concerning the broader context in which the principal objections arise.  We believe this will aid the Court as it sorts through charges that the Settlement is "[r]idiculous!," "an absurdity," "conspiratorial," a "charade" and "sad."  Without some context, such comments suggest that some merchants genuinely disapprove of the Settlement proposed here on its merits.

## Preamble

Agendas that have precious little to do with American Express's merchant rules are colliding in this proceeding at high velocities – throwing off quite a bit of heat, but not much in the way of light.

Contrary to their explicit statements here, the Individual Merchant Plaintiffs were consulted before, during and after the negotiations that resulted in this Settlement; they reviewed a draft term sheet with the written permission of American Express; they volunteered to go to Washington and help explain the virtues of the deal to the Department of Justice; and they pronounced the Settlement as "excellent" for the Class.  *See* IMP Obj. at 20 (DE 399); Reply Decl., ¶¶ 2-8, Ex. 1 (email corresp. and attachments) and Ex. 2 at 21 (Jan. 14, 2014 Hr'g Tr.).[1]  As we informed the Court in January, the plaintiffs had all expected "that Amex and the IMPs would engage in good-faith negotiations following our settlement."  Letter from G. Friedman to the Court, DE 329, at 6.  Unfortunately, those negotiations never happened.

---

[1]  As used here, citations to "IMP Obj." or "7-Eleven Group Obj." and so forth refer to the objections filed by particular objector groups, and we provide a docket entry the first time such an objection is referenced. Citations to "Reply Decl." refer to the Reply Declaration of Gary B. Friedman dated July 11, 2014, submitted with this Memorandum.

But because they never happened, the IMPs – who were happy to live by the injunctive terms of this Settlement when they believed they could negotiate a monetary deal – are now attacking the Settlement, claiming the class representatives and counsel ("impotent," "crippled," "shameless") have sold out the interests of class members in order to recoup attorneys' fees and costs.  IMP Obj. at 3, 7.  Understandably, the IMPs want a live injunctive claim so they can lever the greatest possible monetary settlement from Amex.  But their 61-page submission, heavy on *ad hominem* attacks, is light on economics and even lighter on any legal basis for upsetting the Settlement.  In fact, the legal arguments they *do* make – concerning the release of future damage claims, for example, or the non-opt-out character of the class certification – are identical to the challenges made to the MDL 1720 settlement that these same IMPs so staunchly defended.  The sole difference between the two cases is this: in MDL 1720, the IMPs settled their damages cases and then supported the class injunctive settlement.  Here, they were not able to settle their damages case, and so turned against the class injunctive settlement they were otherwise prepared to support.

Also to be taken with some large grains of salt are the objections of the National Retail Federation (DE 436) and its fellow objector-appellants in the MDL 1720 settlement, including Home Depot (DE 408), the 7-Eleven Group (DE  422) and the Target Group (DE 490)  (together, the "1720 Objectors").  From the extensively organized "MerchantsObject" campaign in MDL 1720, to their widely disseminated media statements criticizing the settlement reached in Judge Gleeson's courtroom as a "backroom deal," Reply Decl. Ex. 3 at 1-2 (NRF press release), these

Objectors have shown they are committed to overturning the MDL 1720 settlement at all costs.[2] It is not our intention to impugn their objectives, which they quite openly acknowledge are to eliminate the Visa/MasterCard "default interchange" system; rather, we seek only to highlight their deep commitment to overturning MDL 1720.[3]

But that very commitment to reversing MDL 1720 demands that these Objectors oppose the instant Settlement – no matter how good the Settlement is. The Objectors' flagship challenge in MDL 1720 is that the surcharging relief is valueless because merchants cannot surcharge Amex cards. Quite literally, every one of their objections in the district court and briefs in the Second Circuit has relied on Amex's surcharge ban as a reason – and often the primary reason – why the MDL 1720 settlement should not be approved. Reply Decl., ¶ 9. The 1720 Objectors need this "Amex problem" firmly in place and unresolved if they wish to achieve their stated objective. And this Settlement threatens to take the "Amex problem" off the table. That is why a group of merchants who have never evinced the slightest interest in asserting a legal claim against American Express over all the decades that it banned surcharging outright are now complaining

---

[2]   The aggressive "MerchantsObject" campaign – run by NRF, 7-Eleven Group and their counsel – was the focus of several Orders in MDL 1720 mandating the removal of overreaching and clearly false statements from Objector websites. MDL 1720, DE 1963. Showing their zeal to attack the 1720 settlement at *all* costs, the NRF and other trade associations (represented here in the 7-Eleven Group) convinced thousands of their own small merchant constituents to register their supposed displeasure by not merely objecting, but also opting out, and thus leaving these small merchants with no way to participate in the $6 billion class fund, and no opt-out representation. MDL 1720, DEs 6328, 6335. The MDL 1720 court has recently indicated an intention to allow these merchants to opt back into the class. MDL 1720, DE 6335.

[3]   The MDL 1720 settlement apparently makes it difficult for the 1720 Objectors to persuade Congress to regulate *credit card* interchange rates the same way that it regulated debit card rates in the Durbin Amendment. Senator Durbin's office told the 1720 Objectors that the settlement will "<u>foreclose the prospect</u>" of interchange legislation, and "that their <u>efforts to have Congress rein in credit-card swipe fees will be imperiled</u> if they support" the MDL 1720 agreement. Reply Decl. Ex. 4 at 1 (Bloomberg article) (emphasis added).

that this Settlement curtails their future ability to sue Amex for placing limitations on the ability to surcharge.

So enough "heat."  Accusations and counter-accusations relating to the parties' motivations (including those of Class Counsel, who have worked for a decade to bring this case to this point for the benefit of all merchants) are unilluminating.  This application for final approval must be resolved based on the law and the facts.  Our aim in this Memorandum is to illuminate for the Court the well-established legal principles and clear economic facts that govern the instant application for final approval of the Settlement.

## SUMMARY OF THE RELEVANT FACTS AND LAW

The key facts, it turns out, are largely undisputed.  As documented below, no serious issue exists with respect to the following ten propositions, which provide ample basis for approval of the Settlement:

1.     Final approval of the Settlement will deliver to six million merchants the right to surcharge Amex, Visa, MasterCard and Discover credit card transactions immediately, subject only to a handful of state restrictions that are almost certainly unenforceable, as Judge Gleeson observed.

2.     Absent the Settlement, Amex-accepting merchants cannot surcharge Amex, Visa, MasterCard or Discover credit card transactions at all.

3.     The Objectors offer no alternative benefit whatsoever for the six million class members in the event the Settlement is rejected.

4.     According to the NRF and other Objectors, if the Settlement is rejected, then each merchant claimant in an arbitration will only be permitted to seek relief for itself, and could not seek a rules change benefiting any other merchant.  Thus, the NRF could not seek relief for any of its constituents – but only for itself as a small card-accepting entity seeking the right to surcharge its dues-paying members.

4

5.      The IMPs are not offering to seek broad relief for the benefit of all merchants – much less do they offer to present any settlement of their cases to this Court for approval after a notice and objection process, or to assume fiduciary duties to merchants.

6.      When merchants exercise their power to surcharge under the Settlement, many consumers will shift to debit, thus expanding the usage of debit relative to credit. The 1720 Objectors *purport* to dispute this point, but their economic expert has testified that, faced with credit card surcharges, "credit card customers could ***easily*** shift to a competing payment form, e.g. EFTPOS [debit]," and therefore "[t]he use of [debit] will increase if surcharges are levied on credit card transactions."  The experts for the IMPs, Amex and the Class Plaintiffs all concur.

7.      Where the consumer does switch to debit in the face of a surcharge, the merchant will save, on average, 1.57% of the total purchase amount (157 bps). Where the consumer uses his credit card and pays the surcharge, the merchant will recoup, on average, roughly 240 bps.

8.      Even those merchants who choose not to take advantage of the right to surcharge under the Settlement stand to benefit from an increase in consumers' increased use of debit cards.  And all U.S. merchants benefit from having increased options to avoid high acceptance costs.

9.      In Australia, the overwhelming majority of surcharging is "simple surcharging" (sometimes called "parity surcharging"), where the same surcharge amount is imposed on all credit card brands.

10.     Simple surcharging is simple.  Point-of-sale solutions (software, terminal, etc.) are available in the marketplace right now to all merchants, along with compliant disclosure signage.  And the mandated disclosures, as approved in MDL 1720, are inoffensive and fair.

The upshot of these facts, and all the evidence discussed below and in the accompanying Rebuttal Declaration of Dr. Alan S. Frankel ("Frankel Reply Decl."), is that the Settlement

represents tremendous value as compared to the status quo today.  The fundamental error that the Objectors make is to compare the post-Settlement world **not** to the world as we know it today, but to an idealized world of unrestricted market-wide differential surcharging rights.  And yet, not one of the Objectors has sketched any path whatsoever to this idealized world.  Class Plaintiffs have been forthright that, yes, it would have been desirable to achieve for the six million class members the ability to engage in differential surcharging *within* the credit card category, over and above the right to engage in differential surcharging *as between* the credit card and debit card categories, as the Settlement allows.  But desirable and achievable are two different things.

In fact, according to the arguments made here by the IMP Objectors and the 1720 Objectors, it is *literally impossible* to reach that promised land of market-wide intra-credit-card differential surcharging through private litigation.  The NRF has asserted that the Amex arbitration agreement "explicitly precludes a merchant from seeking in arbitration <u>any relief on behalf of any other merchant</u>."  *See* below at 35.  And all the Objectors claim – quite wrongly in our view – that the Class's pending arguments against enforcement of that clause are doomed, and the Class is "at death's door." IMP Obj. at 49; *see also* NRF Obj. at 1, 4; Target Group Obj. at 4.  So while it may be more *desirable* to have both differential and simple surcharging than simple surcharging alone, on the Objectors' view it is unavailable as a litigation outcome – it is a legal mirage.  Any claimed marginal superiority of full-blown differential surcharging over simple

surcharging would thus be irrelevant to the question of whether the Settlement is fair, reasonable and adequate.[4]

The governing legal principles are straightforward. First, as the undisputed facts show, the Settlement amply satisfies the factors enumerated in *City of Detroit v. Grinnell Corp.,* 495 F.2d 448 (2d Cir. 1974) for evaluating a class action settlement. Second, the specific legal objections raised by Objectors are all without merit. Those objections fall into several basic categories: (1) arguments that were rejected in *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 2013 U.S. Dist. LEXIS 179340 (E.D.N.Y. Dec. 13, 2013); (2) arguments based upon the presence of arbitration clauses in Amex card acceptance agreements; and (3) arguments questioning the adequacy of Class Plaintiffs to represent the Class and satisfy the requirements of Rule 23.

The main argument raised in MDL 1720, and urged again here, is the contention that a non-opt-out settlement improperly releases claims for "future damages" flowing from the defendant's maintenance of its only-partially-revised card-acceptance rules following the Settlement. But a Rule 23(b)(2) release – *i.e.*, the release of future claims for liability based upon continuing conduct – *necessarily* carries with it a release of the ability to claim damages based on that same conduct. Were it otherwise, no injunctive case could ever settle. As Judge Gleeson held in MDL 1720, the (b)(2) release "appropriately limit[s] future damages claims based on the

---

[4] There is one litigation path to full-blown differential surcharging, and it is not hindered by the Settlement here. Down the line, the Department of Justice could take action in the event that it determines that the relief provided in the instant Settlement coupled with the relief it wins in *U.S. v. American Express* proves insufficient. Indeed, in Tunney Act proceedings before this Court in connection with its settlement of its case against Visa and MasterCard, the Department made clear that it reserves the right to bring suit challenging network restrictions on surcharging in the future, should market conditions warrant. Response of Plaintiff United States to Public Comments on the Proposed Final Judgment, 10-CV-4496 (NGG), DE 119 at 12-13.

pre-settlement [and continuing] conduct of the networks." *In re Payment Card*, 2013 U.S. Dist. LEXIS 179340, at *72.

Moreover, there are no "future damages" in this case. In a post-Settlement world, any claim for overcharge damages based upon Amex's anti-steering, honor-all-cards or other rules will encounter a dispositive mitigation defense: the claimant could have avoided all damages by engaging in the simple surcharging permitted by the Settlement. Judge Gleeson and the Second Circuit recognized precisely such a mitigation-by-steering defense in the *Visa Check* litigation. *See* below at 49-51.

The arbitration-related objections, meanwhile, are simply meritless. Second Circuit law is clear that a class settlement release appropriately extinguishes any contractual right to arbitrate, just as it extinguishes rights to litigate and the ability to enforce all manner of property rights and liberty interests. This is what releases do. *See In re Am. Exp. Fin. Advisors Secs. Litig.*, 672 F.3d 113, 133 (2d Cir. 2011) ("the Class Settlement extinguished not only the ability of Class Members to bring Released Claims against Ameriprise as a matter of substance, but also the Class Members' right to arbitrate those claims.") And even if the Court were to agree with certain objectors' claims that their Amex contracts provide a distinct "right" to be excluded from class actions, the Supreme Court has made clear that, in federal court, any such right will give way to the processes of Rule 23 without implicating any concerns under the Rules Enabling Act. *See Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.,* 559 U.S. 393 (2010) (a state-law-based right to be free of class actions is properly overridden in a federal court by application of Rule 23 without implicating Rules Enabling Act).

The interests of all class members, moreover, are cohesive and adequately represented, such that Rule 23(b)(2) certification is appropriate and the release comports with due process. To

be sure, class members have varying personal preferences.  Some have stated they would prefer to pursue claims for full-blown differential surcharge rights, even at the risk of losing all surcharge rights.  But "adequate representation of a particular claim . . . is determined by the alignment of interests of class members," and not by whether representative plaintiffs pursued all claims at all costs.  *Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*, 396 F.3d 96, 113 (2d Cir. 2005).  And interests are fully aligned here because, as the court noted in MDL 1720, "every single merchant that elects to avail itself of the new rules changes will have received the same benefit."  *In re Payment Card,* 2013 U.S. Dist. LEXIS 179340, at *82.

The existence of arbitration clauses in merchant contracts does nothing to change the cohesiveness analysis.  Whether bound by an arbitration clause or not, each and every member of the Class would have the unquestioned right – in the absence of this Settlement – to challenge the non-discrimination provisions in its Amex contract and seek for itself the legal right to engage in full-blown differential surcharging.  Each merchant is in that same boat.  And where interests are aligned in this fashion, as Judge Sweet has put it, courts will not "act as Monday morning quarterbacks in evaluating the judgment of [class] counsel" in determining "to take the bird in the hand instead of the prospective flock in the bush."  *Strougo v. Bassini*, 258 F. Supp. 2d 254, 257-58 (S.D.N.Y. 2003).

## STATEMENT OF RELEVANT FACTS

### A.    THE VALUE OF THE SETTLEMENT

For all their fiery rhetoric, the Objectors fail to provide any factual basis for doubting the extraordinary value of the relief delivered in this Settlement, which is abundantly supported by the record evidence, as discussed below.

### 1.    The Settlement Gives All Merchants The Right To Engage In Simple Surcharging Immediately

Depending upon how one tallies merchant locations, there are approximately six million Amex-accepting merchants in the United States.[5]  These merchants account for the overwhelming majority of U.S. credit card sales volume.  As soon as the approval of the instant Settlement becomes final (defined in the Settlement Agreement to include the exhaustion of any appeals), American Express will change its rules to allow each of those six million merchants to surcharge Amex cards immediately, subject to the terms set forth in the Settlement Agreement.  The one contractual restriction of any consequence[6] – which Objectors focus on – is that the amount of the surcharge on Amex cannot exceed the amount of the surcharge imposed on any other credit card brand; *i.e.*, the merchant may engage only in "simple surcharging."  Objectors also focus on an external restriction: certain state laws that restrain merchant surcharging.  But subject to those restrictions, both of which are addressed immediately below, it is undisputed that all U.S. merchants will have the immediate right to surcharge Amex credit and charge cards for the first time ever.  And as a further direct consequence of this Settlement, these same six million merchants will be free to surcharge Visa, MasterCard and Discover cards, for the first time ever.

---

[5]  Amex is accepted at approximately six million merchant locations in the U.S.  Reply Decl. Ex. 5 at 10 (Nilson Report #1011).  The number of merchant *accounts* is lower, and under four million.

[6]  Other restrictions have also drawn objections.  7-Eleven and its co-declarants say it is "unacceptable" to require them to "disclose to customers at the point of sale that it is imposing the surcharge" when it is the "onerous fees" of the networks that drive them to surcharge.  *See, e.g.,* American Eagle Decl., ¶14, DE 430-6; Lowes Decl., ¶24, DE 430-25.  But of course, 7-Eleven is free to post signage that the card networks' rates have driven it to surcharge.  Home Depot complains that the maximum surcharge amount is too difficult to calculate. Home Depot Decl., ¶16, DE 409-2.  But if the maximum permissible surcharge is hard to calculate to the last basis point, Home Depot could always set the surcharge amount a little lower, to be safe.  Other Objectors challenge the requirement that merchants must disclose surcharging at all.  *See, e.g.*, Restoration Hardware Obj. at 5, DE 402. But disclosure is plainly reasonable and procompetitive.  *In re Payment Card,* 2013 U.S. Dist. LEXIS 179340, at *67.

a.     **Universal Relief.**  A critical feature of the relief in this Settlement is its universality of application.  The fact that all six million Amex-accepting merchants will now be able to surcharge is important to the analysis for two separate reasons.  First is the utilitarian point that giving six million merchants the right to do simple surcharging does more good for U.S. merchants as a whole than giving each of 15 or 50 (or 500 for that matter) well-resourced and motivated merchants the right to initiate an individual arbitration at which, if the merchant wins, it may seek for itself alone the right to engage in full-blown differential surcharging.

But second, each merchant benefits if other merchants have the right to surcharge as well. As the IMPs' experts and Dr. Frankel all concur, the Australian surcharging story is a snowball-effect story.  *See* Declaration of Dr. Alan Frankel submitted with Class Plaintiff's opening brief ("Frankel Decl."), ¶¶ 37, 41, 43 (DE 367); Frankel Reply Decl., ¶¶ 46-47; Reply Decl. Ex. 7 at ¶¶ 242-243 (Vellturo Report).  Merchants gradually overcame their so-called "first mover" issues (which the 1720 Objectors grossly overstate) until the dam broke – and then surcharging took hold broadly in the marketplace, to the point where 80% of Amex-accepting merchants are imposing surcharges today according to the East & Partners Co. reports that the Reserve Bank of Australia replies upon.  Reply Decl. Ex. 8 at 34 (East Report 2013).  So *each merchant* benefits from the fact that *other merchants* may also surcharge.   Indeed, as much as the Objectors overstate the so-called "first mover" problem, it is surely the case that no one wants to be the only shop in town – or in a given merchant category – imposing surcharges.

Relatedly, as shown by Dr. Frankel, a major benefit of the Settlement is that it induces consumers to switch to debit cards.  Frankel Decl., ¶¶ 49, 56-57; Frankel Reply Decl., ¶¶ 60-63. And as consumers move debit to the front of their wallets and modify their spending habits, even non-surcharging merchants stand to benefit.  This benefit is lost without universality of relief.

11

Accordingly, in addition to all the other reasons, the relief in this Settlement is superior to the alternative because of its universality.

      **b.**    **Immediate Relief & State Statutes.**  As mentioned above, the Settlement also provides relief that is *immediate*, subject only to the state statute issue.  In our opening brief, at 27-28, we explained that the state anti-surcharging statutes are unconstitutional and argued that it is reasonable to assume– just as Judge Gleeson did – that they will all meet the same fate that the New York statute did in *Expressions Hair Design v. Schneiderman*, 975 F. Supp. 2d 430 (S.D.N.Y. 2013).  *See In re Payment Card,* 2013 U.S. Dist. LEXIS 179340, at *60.  The Objectors apparently find this position unreasonable.  The IMPs call for a "reality check," suggesting that other courts may yet reject *Expressions*.  IMP Obj. at 39. The Target Group cannot bring itself even to acknowledge the New York statute was ruled unconstitutional, noting only that it "was *construed*" in *Expressions* and is on appeal. Target Group Obj. at 7 n. 5. The 7-Eleven Group, meanwhile, details legislative activity in some 23 states, Obj. at 20, 22, conjuring a patchwork quilt statutory landscape that they believe destroys class cohesiveness.[7]

      But there is only one Constitution.  And in the long run (or maybe not-so-long run), there will be only one answer to the question of whether these materially identical statutes pass muster under that Constitution. In the meantime, it is certainly appropriate for this Court to give some consideration to what that answer will likely be.  Class Counsel has explained why we believe the

---

[7]  Class Counsel does not doubt the accuracy of 7-Eleven's claim that 23 bills have been introduced around the country.  But we do know that none of those bills have passed, with the single exception of a one-year trial ban in Utah that the legislature allowed to expire as of June 30, 2014.  Utah Code Ann. § 13-38a-302 (2013).  Class Counsel has visited extensively with legislators in many of these 23 states, and has found that opposition to these bills runs deep and legislators understand, as Judge Gleeson did, that anti-surcharging laws are "arguably irrational."  *In re Payment Card,* 2013 U.S. Dist. LEXIS, 179340 at *60.  Reply Decl., ¶ 11.

right answer is the same answer that Judge Rakoff rendered and that Judge Gleeson predicted will be adopted elsewhere.  Objectors have proffered nothing at all on the other side.

Moreover, even if the focus were to remain on the very short run – where a handful of states have restrictions on the books, and there is abundant constitutional litigation and political lobbying both for and against surcharge legislation – it seems inarguable that the removal *right now* of the private ordering bans on simple surcharging (*i.e.*, the Amex, Visa and MasterCard rules) puts merchants in that handful of states one step closer to meaningful relief.  Directionally, everyone benefits.

> **2.      Surcharge Responses: Stay-And-Pay; Switch-To-Debit; "Zero Lost Sales"**

When the merchant imposes a surcharge under the Settlement, the otherwise credit-card-using consumer will engage in one of several responses.  She will either: (1) stick with her credit card and pay the applicable surcharge; (2) switch to a non-surcharged payment form, such as debit or cash; or (3) leave the store.  We will address these responses in reverse order.

> **a.      Lost Sales.** ███████████████████████
████████████████████████████████████████████
███████████████████████████████████████████
████████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████
███████████████████████████████████████
████████████████████████████████████████
████████████████████████████████

Meanwhile, the 1720 Objectors' expert, Professor Hausman, has cited to a consumer survey that asked Australian customers on a prospective basis how they would respond if surcharged, and found significant number claimed that they would leave the store. [8] Hausman Report, ¶ 72. But ████████████████████ tell a very different story, as the experts for IMPs have acknowledged.   Now, in their objections, the IMPs say in essence: well, there are zero lost sales when merchants *differentially* surcharge, but simple surcharging is a different ballgame. IMP Obj. at 33-35; *see also* 7-Eleven Group Obj. at 31, 32-33.

But this is clearly not the case, as shown below.  First, as discussed in the next subsection, consumers can just as easily switch to a debit card as they can to another credit card, in response to a surcharge – and maybe more easily, given that 92% of consumers have a debit card in their wallet, whereas only 64% have credit cards from more than one network.  *See* Reply Decl. Ex. 10 at 6 (Federal Reserve Discussion Paper) and Ex. 11 at 18 and table V (Rysman Paper).   And second, perhaps for that reason, the *overwhelming* majority of surcharging activity in Australia – in fact, more than 90% of it – is simple surcharging. *See* below at 24-27. That tells us that merchants *do not lose significant sales* from engaging in simple surcharging.

     **b.**    **Switching to Debit.**  The interchangeability of debit and credit is sufficiently high that the imposition of surcharges on credit card transactions will cause many – and perhaps most – consumers to switch to debit cards.  At the outset, this is not a legal debate about the contours of a relevant product market.  We and Dr. Frankel certainly agree with the IMPs and the Government that debit and credit are in separate markets today, and we take no

---

[8]   In fact, 14% of customers claimed they would leave the store – a monumental figure.  If it bore any relation to lived reality, then merchants in Australia would never surcharge.  But of course, 40% of the largest and most sophisticated merchants do choose to surcharge, as do 80% of Amex-accepting merchants. Reply Decl. Ex. 8 at 23, 34 (East Report 2013). These merchants are not suicidal.  Rather, it turns out that prospective consumer responses to questions about their likely reactions to a small surcharge are unreliable.

position about what the parameters of a relevant product market will be once the anti-steering barrier comes down.  Frankel Reply Decl., ¶¶ 32, 56-61.

The Class is also in accord with the IMPs' economic expert, Professor Joseph Stiglitz, who explained in his merits report in this case that anti-surcharging restraints, among other effects, ███████████████████████████████████████████ ███████████████████ Reply Decl. Ex. 6 at ¶ 29 (Stiglitz ASR Report).  In his MDL 1720 reports, Professor Stiglitz also explained how lifting these restraints will allow merchants to steer credit card users to debit cards:



*Id.* at ¶ 68-82 (Stiglitz MDL 1720 Report); at 63 (Stiglitz MDL 1720 Reply Report).

15

The IMPs' other expert economist, Dr. Vellturo, has expressed similar views, repeatedly

emphasizing that 

Reply Decl. Ex. 7 at ¶¶

105, 373, 506 (Vellturo Report); *see also id.*, ¶¶ 380, 524.  Dr. Vellturo concludes that, if the anti-

steering restraints were removed, then

*Id.* at ¶ 524.

*Id.*  To Dr. Vellturo, clearly, consumers faced with simple

surcharges on credit cards would flock to debit in droves.

Meanwhile, American Express's experts, of course, argue that debit and credit cards are

sufficiently interchangeable that they should be considered in the same relevant product market

*today*. At trial in *U.S. v. American Express*, Amex has stated it will present evidence that

Individual Merchant Plaintiff loyalty databases demonstrate high levels of fungibility as between

debit and credit cards for individual shoppers.  While this evidence (which the Court is likely to

receive well before the fairness hearing on this Motion) may not be probative on questions of

market power, it may be extremely powerful in showing that consumers faced with a monetary

incentive will readily switch from credit cards to debit cards.

So all the experts for IMPs, Amex and Class Plaintiffs are in accord.  That leaves the 1720

Objectors.  In his declaration supporting the 1720 Objectors on this motion, Professor Hausman

asserts that customers faced with surcharges will not switch to debit cards, citing primarily legal

decisions from the early 2000s.  But it turns out that Professor Hausman has elsewhere

acknowledged – repeatedly and pointedly – that consumers faced with credit card surcharges can

16

*easily* switch to debit cards, and will.  Written testimony from Prof. Hausman, produced by New Zealand regulators in response to a "freedom of information" style request, contain the following statements.  (Note: most of what we call "debit" is usually referred to as "EFTPOS" in New Zealand and Australia):

- "The least cost acceptance vehicle for many merchants is EFTPOS.  The use of EFTPOS will increase if surcharges are levied on credit card transactions."

- "credit card customers . . . could easily shift to a competing payment form, e.g., EFTPOS."

- If merchants may surcharge, then they will "attempt to steer consumers to the use of lower cost payment options such as EFTPOS or credit cards with lower [merchant fees]."

- "the agreement among the banks to enforce the Visa and MasterCard rules leads to anti-competitive restrictions, e.g. the no surcharge rule, on possible merchant strategies to cause consumers to use lower cost payment options, e.g. EFTPOS cards."

- "In his further discussion of surcharging as free-riding… Prof. Wright neglects to take into account that many consumers carry more than one credit card which they can switch to or use their EFTPOS card."

- If the no-surcharge rule were eliminated, "[m]any of these credit card users would switch to EFTPOS."

- "many people carry more than one credit card and almost all credit card users also have an EFTPOS card. Customers who do not want to pay the surcharge will switch to another credit card or use their EFTPO"S card."

Reply Decl. Ex. 12 at 17, 36-37, n. 111, 42-43 (Hausman NZ Report), and Ex. 13 at 25-26, 36 (Hausman NZ Reply Report).  This evidence fully pulls the credibility rug out from under Professor Hausman's testimony here.

Moreover, the 1720 Objectors misplace their reliance on court decisions – which are concerned with formalistic relevant market determinations – to answer the *economic* question of the extent to which consumers will switch to debit in the face of credit card surcharging.  It is particularly bizarre that the NRF points to Judge Gleeson's decision in *Visa Check* and argues that

the court's market definition analysis implies that consumers would not switch in the event of a surcharge.  NRF Obj. at 8.  In reality, Judge Gleeson held the *exact opposite*: "That consumers might switch to another form of payment in the event of a surcharge on their credit card transactions does not alter the fact that there is no cross-elasticity of demand at the merchant level between defendants' products and all other forms of payment."  *In re Visa Check/Mastermoney Antitrust Litig.*, 2003 U.S. Dist. LEXIS 4965, at *10 (E.D.N.Y. 2003).  And *United States v. Visa*, as this Court has recently pointed out, was not focused on the merchant side of the market.  *See U.S. v. American Express,* Order of June 24, 2014 at 26, DE 510.[9]

   The Reserve Bank of Australia provides further evidence on this point, observing that EFTPOS has grown in Australia as a result of surcharging:  "there has been a clear shift towards consumers using debit cards in preference to credit cards between 2007 and 2010. A number of factors may have contributed to this slowdown in the use of credit cards. First is the increased prevalence of surcharging on credit card transactions since the first study was undertaken."  Reply Decl. Ex. 16 at 16 (RBA Consultation Document).  Likewise, the Australia Payments Clearing Association, in its submissions to the RBA, confirmed a "strong shift towards debit cards. The number of weekly MasterCard/Visa credit card transactions has declined from 1.4 per person to 1.2 per person, while eftpos has increased from 1.5 to 2.1 per person per week and scheme debit from 0.5 to 1.3 per person per week in the same period."  The APCA, which partly manages EFTPOS, concluded that "the consumer response to surcharging is likely a factor" in driving this "shift from credit cards to debit cards." Reply Decl. Ex. 17 at 3 (APCA Submission).

---

[9] The 2000 *U.S. v. Visa* trial, moreover, was based on 1990s evidence.  Since that time, there has been considerable convergence in functionality between debit and credit: the major U.S. banks now provide for revolving credit or overdraft access on substantially all demand deposit accounts.  Reply Decl. Ex. 14 at ii (FDIC study).  Security features – once truly disparate between debit and credit – have now largely converged, with consumer liability limited to $50 on both (although lost-card reporting requirements may differ).  Reply Decl. Ex. 15 at 2 (FTC consumer information).

       **c.**    **Paying the Surcharge.**   Where the customer uses her chosen credit or charge card and pays a surcharge, the merchant recoups most or all of its card acceptance costs. Objectors are right to point out that, under the simple surcharging restriction agreed to in the Settlement, the merchant will generally be unable to recoup 100% of his card acceptance costs. *See* 7-Eleven Group Obj. at 4, 10, 34; IMP Obj. at 32, n. 63 and 37-38; NRF Obj. at 27, n. 13; Home Depot Obj.; 9-10.  Thus, if a merchant pays 250 bps on Visa and Discover, 260 bps on MasterCard, and 270 bps on Amex, it can recoup "only" 250 bps – *i.e.*, "*only*" 93% of its costs on Amex, 96% of its MasterCard costs, and 100% of its Discover and Visa costs.  In the absence of this Settlement, of course, the merchant can recoup none of its costs on any of these brands.

### 3.   <u>Quantification Of Savings Based On Consumer Surcharge Responses</u>

      In his opening Declaration here, Dr. Frankel showed the magnitude of the spreads between Amex and its competitors.  To state the obvious, they are quite slim.[10]  On a product-mix-adjusted basis, which is absolutely the proper way to look at the true rate differentials,



On a <u>non</u>-product-mix-adjusted basis, the spreads are ▮▮▮ over ▮▮ and ▮▮▮ over ▮▮▮▮▮.  Frankel Decl., ¶¶ 28-35 and Fig. 3.

---

[10]  In our opening brief, we explained that because the intra-credit card spreads are so thin, the evidence suggests that merchants will not be motivated to engage in differential surcharging in any event.  (Thus for example there is no evidence showing that Australian merchants ever surcharge Diners but not Amex, or Visa but not MasterCard.  The spreads are too thin).  However, we should have been clear that this logic does not apply to the soft steering tools sought by DOJ.  Even if all brands were priced at absolute parity, it would make sense for say Discover to pay a merchant consideration (thus effectively lowering acceptance costs) in return for joining a "We Prefer Discover Cards" campaign.

None of the Objectors take issue with Dr. Frankel's presentation of the operative rate data, (other than a misunderstanding voiced by the IMPs relating to the methodology of Amex's product mix adjustment exercise).[11]  It is therefore clear what merchants stand to recoup – at least on an averaged basis, across the market – from customers who pay the simple surcharges authorized by the Settlement.

There is also no genuine dispute regarding Dr. Frankel's calculation of the average spreads of credit card rates over debit card rates.  The IMPs make a loud and intemperate objection that the Class Plaintiffs somehow ignored unregulated debit, thus overstating the value of switching to debit.  IMP Obj. at 16.  However, for his debit card rate, Dr. Frankel plainly used a blend that factored in both unregulated and Durbin-regulated debit interchange rates, in proportion to their relative volumes.  Frankel Decl., ¶ 27 and n. 20.  Dr. Frankel made clear that he relied on data provided by the Federal Reserve which, on its face, explicitly averages regulated and unregulated debit transactions.  *See* Reply Decl. Ex. 21 (Federal Reserve data set).

    a.    **Average U.S. Merchant Rates.**  The following chart illustrates the spreads between and among the credit card networks' rates, both on a mix-adjusted and non-adjusted basis, and it further shows the differential between credit cards and debit cards.  We reprint it here because it so graphically illustrates the point that the surcharging allowed by the Settlement is the surcharging that matters, as discussed in the next section:

---

[11]  *See* Pl. Opening Br. at 30, n. 10 and IMP Obj. at 11, n. 15.  The IMPs wrongly state that the exercise compares all Amex cards to the high-priced Visa cards.  *Id.*  That is untrue.



**b.** **Shifting To Debit Is What Matters – For Everyone.** As the chart shows, the benefits of steering to debit are simply obvious. Thus, merchant witnesses regularly explained that their interest in obtaining greater steering rights is animated by a desire to shift consumer spending to *debit* in particular. ██████ merchant witnesses confirmed that:



Since it is so obvious that the ability to shift meaningful volume to debit is the highest and best use for any steering tool – and particularly surcharging – the Objectors have retreated to the argument that increasing debit usage fails to benefit certain merchants. *See* 7-Eleven Group Obj. at 30-31; NRF Obj. at 9, n. 1; Target Group Obj. at 7, n. 4. The point of this argument is, presumably, that for some merchants debit is not a realistic payment option. *See* 7-Eleven Group Obj. at 32 and n. 28. The average ticket is too high for an airlines or a car rental agency to see much if any volume on debit, according to this line of attack.

22

But this argument falls apart if debit usage today is significant at big-ticket travel and entertainment merchants.  And sure enough, the argument falls apart.  At JetBlue, ███ of Visa spending was on Visa debit over a one-year reporting period ended 2011.  Reply Decl. Ex. 28 (Visa data sets).  At Enterprise Car Rental, ███ of Visa spend was on debit over that period.  At Carnival Cruise and US Airways, the figures were ███ and ███ .  *Id.*  Outside of T&E, of course, the numbers are much higher – at Wal-Mart, ███ of Visa volume was debit over the period.  *Id.*  But the point here is that all merchants stand to benefit from increased debit usage, and increased debit usage is not somehow implausible for any category of merchants.

In fact, increased debit usage by U.S. consumers is a plainly reasonable expectation coming out of this Settlement.  Certainly, debit appears to have substantial room to grow in the U.S. (where 53% of Visa volume is on debit) as compared to elsewhere (*e.g.*, where "[a]lmost 80% of Visa Europe's business is on debit cards.").  *See* Reply Decl. Ex. 29 at 9 (Nilson Report #1041) and Ex. 30 at 2 (Visa Europe Report).  As simple surcharging spreads, over time, there is no reason to doubt that the needle on the U.S. debit-to-credit ratio will move, and merchants will benefit hugely.  If debit moves by just five points (a more modest swing than the ███ shift discussed by ███ , *see* above at 23) that will spell savings for U.S. merchants of many tens of billions of dollars.  Frankel Decl., ¶ 35, n. 36.  And those savings will benefit non-surcharging merchants, who save 1.57% of every transaction that moves from credit to debit.  *Id.*; Frankel Reply Decl., ¶ 57.

### 4.     **"Simple Surcharging" Is The Surcharging Merchants Actually *Do***

A principal theme of the Objectors is that merchants will not use simple surcharging, but would only be interested in using full-blown differential surcharging.  Nothing could be further from the available evidence.

a.      **Australian Parity Surcharging.**  In Australia, the overwhelming majority of surcharging is simple surcharging: *i.e.*, all credit cards are surcharged at one simple rate. Differential surcharging – where Amex is either singled out for surcharges or is surcharged at a higher level – ███████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████  Meanwhile, that same year, <u>**75%**</u> of Amex-accepting merchants imposed surcharges, according to the authoritative East and Partners reports that the RBA relies upon, and that number has since grown to 81%.  Reply Decl. Ex. 32 at 30 (East Report 2011).  These side-by-side facts, by themselves, fully destroy the Objectors' argument, and we could stop right here.[12]

But there is more.  The National Retail Association of Australia –the largest merchant group in that country – has explained to the RBA why simple surcharging is so important:

> For retailers who elect to surcharge credit card purchases, simplicity and efficiency are primary considerations in setting such fees. . . . Surcharges must be easy for consumers to identify and calculate and easy for retail sales staff to administer. **Often a single surcharge for all credit cards will be preferred by retailers due to its simplicity of operation** and the ability of the retailer to look at their total costs related to such transactions in establishing an appropriate fee.

Reply Decl. Ex. 33 at ¶ 2 (NRA Submission).  Likewise, the trade association covering livery and taxi fleets explained that "blending is essential to avoid costly and excessively complex IT systems development costs which differential surcharging would impose."  Reply Decl. Ex. 34 at

---

[12]  The IMPs inexplicably write that the East & Partners data "strongly implies that a great many of the surcharging Australian merchants are differentially surcharging."  IMP Obj. at 34-35.  The data cited by IMPs, Reply Decl. Ex. 8 at 34, implies no such thing.  It shows Amex is accepted at only 34.8 % of Visa-accepting merchants; that 38% of Visa acceptors surcharge; and that 81% of Amex acceptors surcharge. *Id.* All this data is totally consistent with ████████████████████████████████████ ████████████████████  This just means that over 75% of all Amex-acceptors do parity surcharging, and those merchants account for most of the 38% of Visa acceptors who surcharge.

14-15 (Cabfare Submission).  In fact, the taxi groups' "analysis of differential surcharging indicates that it would deliver negligible benefits to consumers in this industry."  *Id.*

Meanwhile, the Australian Merchant Payments Forum observed in an RBA submission that simple surcharges, or "blended surcharges," have been effectively used in real-world rate negotiations, contrary to the speculative arguments by Objectors here:  "**Blended surcharges have effectively been used as a negotiating tool** by some merchants to lower their merchant fees.  Any constraints on blended surcharges would weaken merchants negotiating position, potentially resulting in higher MSFs and in turn higher prices to consumers."  Reply Decl. Ex. 35 at 4 (AMPF Submission).

      **b.**      **Airlines, Hotels & Rental Cars.**  Airlines around the world overwhelmingly use "simple surcharging" rather than differential surcharging.   All of the significant domestic carriers in Australia and New Zealand impose simple surcharges.  This list includes, among others: Qantas, Virgin Australia, Air New Zealand, Jetstar and Tiger Air Australia: each of these airlines surcharges the credit cards of all networks at a single price point. Reply Decl., ¶ 10.  For flights purchased in the UK, British Airways imposes a simple surcharge on all credit card transactions, as does EasyJet.  *Id.*   Budget carrier Ryan Air charges 2% for Amex, Visa and MasterCard, and nothing on debit.  *Id.*   Lufthansa does the same, in the countries where it is permitted to do so.  *Id.*   Air France, meanwhile, explains in detail on its Australia website why it imposes a "Credit Card Surcharge To Compensate For Rising Costs," and the surcharge that it imposes is a simple surcharge: "The surcharge applies to all credit cards and is non-refundable. Of course, you can continue to use other – free – payment methods as well, such as debit card or bank transfer."  Ex. 36 (Air France web capture).

On the other side of the ledger, our research discloses two smaller regional airlines that are engaged in differential surcharge. Regional Express imposes higher surcharges on Amex (3.95%) than on Visa/MC (1.95%). Reply Decl., ¶ 10. And Air North, a small airline servicing Northern Australia, surcharges Amex and Diners at 3% and Visa/MC at 1%. *Id.*

The story at major hotel chains is quite similar. Accor identifies itself as "Australia's largest hotel group, with over 150 hotels in Australia" including the Sofitel and Pullman brands. Accor advises that, on all brands: "Credit card payments relating to Australian hotels incur a merchant service fee of 1.5% in addition to the total amount payment, excluding prepaid rates." Reply Decl., ¶ 10. Likewise, Mantra Group – the "second largest network of hotels" – imposes a 2% surcharge on all card brands. *Id.* And at Hilton Hotels, which has a significant presence in Australia, all "[c]redit card payments … incur a merchants service fee of 1.5%." *Id.* The same is true at Marriott Hotels (1.5% simple surcharge); Hyatt Hotels (1.5% simple surcharge); Four Seasons (2% simple surcharge); Westin (1.5% simple surcharge); and TRF Hotels, a large chain (1.5% simple surcharge). *Id.* On the other side of the ledger, Intercontinental advises its guests will "incur a merchant service fee of 3% for American Express, Diners Club & JCB (except advance purchase rates) and 1.5% for other cards (and all advance purchase rates)." *Id.*

The Hertz rental car chain, meanwhile, imposes "Credit or charge card surcharge: A minimum of 1.5% or the percentage rate as otherwise noted on the Rental Form of any amount charged to the Card." Reply Decl., ¶ 10. And EuropCar advises that "Credit Card charges will incur a 1.65% surcharge for Visa, Mastercard, AMEX and Diners." *Id.* The Avis/Budget chain, meanwhile, apparently does not surcharge. *Id.* No chain we could find surcharges on a differential basis. *Id.*

26

So here again, it is impossible to square the Objectors' disparagement of simple surcharging – and by extension the entirety of their economic argument – with the available evidence in the real world.[13]

        **c.**    **Acquirer Information.**  In our opening papers, we included a declaration from Class Counsel Scott Levy affirming, based on his own knowledge, that acquirers were on the verge of offering one-stop solutions that allow merchants to easily engage in simple surcharging.  That drew some ire from Objectors, with NRF and others seizing on the statement as a sort of admission that such solutions do not *currently* exist in the marketplace.  NRF Obj. at 27; 7-Eleven Group Obj. at 35, n. 32.

We should have been clearer: There are *already* in the marketplace simple surcharging solutions that are fully functional, fully MDL-1720-compliant, and easy to use, as attested by CEO David Leppek of merchant acquirer Transaction Services (known as "TRX") – a "leading provider of payment processing services …based on a proprietary technology infrastructure that allows us to make fundamental changes to our products without having to rely on the legacy payments industry infrastructure."  Reply Decl. Ex. 37 at 1 (Leppek Ltr. Decl.).   In his letter-declaration, Mr. Leppek explains that TRX has invested considerably in developing these solutions, and has begun to "market the surcharging program," albeit not to merchants in the states that ban the practice.  *Id.* at 2.  He also explains that the terminals and compliant surcharge disclosure signage are provided to merchants free of charge, when they switch their business to

---

[13] Further supporting our position is the fact that some of these merchants only started simple surcharging after entering into an agreement with American Express whereby Amex dropped the merchant's rate low enough that simple surcharging became a realistic option. *See, e.g.*, IMP Obj. at 10, 35  In other words, the utility (for these merchants) of the right to differentially surcharge was to get Amex rates close enough to Visa/MasterCard to make simple surcharging work.  *Simple* surcharging is the endgame. ███████████████
███████████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████████

TRX or otherwise sign up.  *Id*. at 1-2.  And of course, for Mr. Leppek and his competitors, the real action so far as "market[ing] the surcharging program" is concerned, will not commence until this Settlement is final.

5.     The Olinger Study And What It Does And Does Not Show

a.     **The Olinger Study**.  As the immediately preceding discussion of Mr. Leppek's TRX makes clear, we know that once simple surcharging is universally available, there will be competitors in the U.S. marketplace (albeit perhaps not all states, at first) trying to differentiate themselves from other merchant acquirers and ISOs by offering one-stop-shopping surcharge capabilities.  This is not speculation, as Mr. Leppek and Mr. Levy have made plain, and it makes sense.  Even in a very competitive marketplace, acquirers earn a significant margin on small merchant accounts in particular.  By offering a fully automated surcharging service, these acquirers can win business away from their less forward-thinking competitors.

Therefore, *knowing* that there will be competitors in the acquiring market seeking to persuade merchants to sign up for surcharging services, Class Counsel engaged The Olinger Group to test the effectiveness of mock commercial messaging.  The Objectors complain that the video is not "objective."  It is not supposed to be "objective".  It is supposed to be *effective*.  It is a sales piece, and the Olinger survey tests the effectiveness of the sales messaging.

The video is **100% truthful**.  Objectors complain about the claim that the service will be made available at "no cost to you, the merchant."  But that is the truth, as Mr. Leppek's declaration makes clear.  The acquirers give the merchant the terminal and the signage, and it costs nothing for the merchant to switch from its current acquirer to Mr. Leppek's TRX or another similar acquirer.  Also, the small-merchant target audience of the video, like the client base for TRX and its competitors, already pay "the same merchant fee for all card brand transactions."

28

Reply Decl. Ex. 37 at 2 (Leppek Ltr. Decl.).   It is therefore fully truthful to tell these merchants

they can recoup 100% of the merchant fee via a surcharge.  They will simply surcharge the full

amount of the merchant fee they incur.  Objectors also complain that the statement "services are

coming on to the market" is false.  Well, the services *are* on the market.  So it's true.

Other quibbles make less sense.  7-Eleven complains the video does not explain that the

practice is (arguably) illegal in some states.  7-Eleven Group Obj. at 35.  But the video wasn't

shown in those states.   Other objectors complain the 100-second video does not detail all of the

provisions relating to surcharging in the MDL 1720 agreement, including the surcharge amount

limitation and disclosure requirements.  *See* IMP Obj. at 9; 7-Eleven Group Obj. at 35; NRF Obj.

at n. 13. No advertisement would do that.  And the idea that the video falsely implies that

merchants may differentially surcharge is absurd: the video speaks only of putting a surcharge on

credit cards without surcharging debit.  There is not the slightest hint that the merchant may

engage in intra-credit-card differential surcharging.

Some Objectors also complain about the survey methodology.  But as explained in the

accompanying Declaration of Robert Sims, Ph.D., a survey expert who consults with the Olinger

Group, the methodology of the Olinger's surveying work was meticulous.  Reply Decl. Ex. 38

(Sims Decl.).  And indeed, that is why companies like Individual Merchant Plaintiff CVS hire

The Olinger Group all the time to test the efficacy of commercial messages in the marketplace.

They do solidly reliable survey work.

Another complaint is that the merchants surveyed do not comprise a random sample of all

merchants.  And that is true.  We only tested a handful of categories. It is also true that we tested

smaller merchants.  We did not think it feasible to proceed in any other way – *i.e.*, to test scores of

merchant categories, or induce large companies to participate in a survey.  And so, because the

survey was limited to certain categories and merchant sizes, the reach of our claims regarding what it proves is similarly limited.  Here is what the survey proves:  in the categories that were tested, merchants within the size parameters of those sampled are *extremely* receptive to commercial messaging of the type contained in the video, and are *very* interested in surcharging credit cards without surcharging debit cards.

Attacking surveys is easy.  As this Court and others have held, "there is 'no such thing as a perfect survey.  The nature of the beast is that it is a sample, albeit a scientifically constructed one.'"  *U.S. v. American Express*, Order of June 24, 2014 at 18, DE 510.  (citation omitted).  That is why "errors in a survey's methodology – such as those alleged here – generally bear upon the probative weight to be afforded to the survey, rather than its admissibility."  *Id*, citing *Schering Corp. v. Pfizer, Inc*., 189 F.3d 218, 228 (2d Cir. 1999).  *Accord POM Wonderful LLC v. Organic Juice USA. Inc.*, 769 F. Supp. 2d 188, 197 (S.D.N.Y. 2011) ("When evaluating survey evidence, errors in a survey's methodology usually go to the weight accorded to its conclusions rather than its admissibility.")

In the end, it is for the Court to determine what to take from the fact that small merchants in the categories of auto repair, dry cleaning, law firms, hair and beauty salons, accountants, livery/taxi, home improvement and furniture/antique stores are eager – *overwhelmingly* eager – to avail themselves of the relief under the Settlement.  Class Plaintiffs submit that a great deal can be inferred from this fact, especially in light of Australian evidence showing that small merchants in the Australian service economy, just like the Olinger survey responders here, started the snowball rolling down the hill that has led to the point where 80% of Amex-accepting merchants in Australia are surcharging today.

30

### b. The Snowball Effect; Merchants Will Surcharge.



In the United States, small merchants in service industries are poised to avail themselves of surcharging. The Olinger study shows us that much. And there is no sound reason to doubt that the practice will grow. The Australian evidence shows us that. Objectors who posit that Amex will simply "buy off" industry leaders with rate reductions – *e.g.*, NRF Obj. at 3, 9, 20 – are missing the lesson of Australia. Buying off industry leaders doesn't work to stem

surcharging.[15]  Nor is there any basis for the wild speculation that Amex will terminate merchants for simple surcharging (and in fact, the Settlement prevents it unless Amex has another reason for termination).  *See, e.g.*, IMP Obj. at 12; Spirit Obj., ¶ 2, DE 462.[16]

Finally, while Professor Hausman expresses doubt that U.S. merchants will impose surcharges, he has previously chastised other experts for making the same reflexive arguments and ignoring the evidence from Australia.  Thus, testifying in opposition to MasterCard's expert before the New Zealand competition commission, Prof. Hausman stated: "Prof. von Weizsacker claims that merchants would be unlikely to surcharge.  This claim is contrary to the evidence from Australia."  Reply Decl. Ex. 13 at 28 (Hausman NZ Reply Report)(emphasis added).  Professor Hausman also rejected the idea that only merchants with market power would engage in surcharging.  In New Zealand, he testified that "market actions refute the claim that only large merchants, with market power, will surcharge credit card transactions if permitted to do so."  Reply Decl. Ex. 12 at 15-16, n. 45 (Hausman NZ report).

**6.    Other Objections Regarding Competitive Effects Of The Settlement Are Baseless**

      a.    **Effect On Merchant Fees.**  Some Objectors argue that any benefits to merchants will be offset by rate increases, which they claim are the inevitable result of rules under which the amount of any surcharge is frozen at parity across all brands.  *See* 7-Eleven Group Obj. 4, 8, 34.  This argument makes no sense.  The surcharge amount has been frozen at parity for decades; the maximum surcharge on all credit card brands in the U.S. is zero, under long-

---

[15]  It is also a curious argument coming from the Objectors that Amex will simply "buy off" prospective surchargers after this Settlement takes effect.  Elsewhere, these merchants profess that they *want* to trade their surcharging rights for rate reductions.  *See* IMP Obj. at 41; 7-Eleven Group Obj. at 4; Home Depot Obj. at 5-6; Southwest Obj. at 1, DE 424.

[16]  The argument that Amex will terminate merchants for simple surcharging is in substantial tension with the Objectors' argument that the relief here is painless for American Express and "is akin to no judgment against Amex at all."  NRF Obj. at 26.  *See also* 7-Eleven Group Obj. at 37; Target Group Obj. at 7.

prevailing network rules.  There is therefore no logic to support the accusation that this

Settlement, by limiting the surcharge amount on Amex to those on other cards, will induce Amex

to raise its rates.  Here again, the Objectors have fallen into the trap of comparing this Settlement

to an idealized world of perfect competition and not to the status quo *today*.

It is also noteworthy that the Amex rule emerging from this Settlement is indistinguishable

from the rule that Discover has had on its books for years: a merchant may surcharge Discover

credit cards provided that, in so doing, it does not treat Discover credit cards less favorably than

any other network credit card. *See* Reply Decl. Ex. 45 at '205 (Discover Operating Regulations).

And no merchant is arguing – and the Class has certainly not argued – that Discover's rule is

harming competition.

      **b.**     **Barriers to Entry; Barriers to Competition.**  Nor is there any merit to the

argument that the Settlement will erect barriers to entry, and "insulate Amex from price

competition. . . from potential new entrants."  IMP Obj. at 37.  Any such barriers exist *today*. This

Settlement does not create them.  Moreover, if a putative competitor believes that Amex's rules

present an anticompetitive barrier to entry, that would-be competitor may sue and it is undisputed

that nothing in the release here would affect any such claim.[17]  Furthermore, real-world

competitor Discover testified to its view of the Amex conduct that impedes competition in the

credit card market.  In *U.S. v. American Express,* the day before this Memorandum is being filed,

Discover President Roger Hochschild testified that Discover has been prevented from

implementing its desired programs to win market share by its rivals' bans on merchants using

"preference programs" and "incentive programs" to steer consumers to Discover.  For Discover,

---

[17]   The Settlement here is 100% clear that competitor claims are not released.  SA ¶ 34c.  In MDL 1720, there have been some allegations – principally by Amex – that the release could be construed to affect competitors' claims.  Judge Gleeson disagreed. *In re Payment Card,* 2013 U.S. Dist. LEXIS 179340, at *74-75.

the ability to engage in these soft steering programs is apparently the necessary and sufficient condition for competition in the credit card market.  And for merchants, the benefits of such competition *inside* the credit card industry will be greatly enhanced by simple surcharging, which will open up the field of competition to include debit.

           **c.**    **"Soft Steering."**   Objectors criticize the Class for abdicating claims relating to the non-surcharge-related steering that is the subject of the DOJ trial.  These criticisms are misplaced.  If DOJ wins its trial – and we will know soon enough – then the criticisms are moot.  But if DOJ loses, as a realistic matter, class members like IMPs are not injured by the Class's supposed "abandonment" of soft steering because there is simply no reason to believe that the IMPs would have done any better before this Court in a bench trial for equitable relief, given the DOJ's powerful position on market power and the potential challenges faced by merchant-plaintiffs for whom Amex represents less than 5% of plastic spending.  We are not saying that a DOJ loss would be accorded collateral estoppel effect, *see* IMP Obj. at 41-42; rather, our point is a practical one.[18]

### 7.   <u>The Alternative To The Settlement</u>

       The Objectors never describe the alternative to the Settlement.  They do not argue that, absent this Settlement, a properly represented class will somehow lead merchants to the land of full-blown differential surcharging.  To the contrary: according to NRF and other Objectors, the Class is on the brink of losing the motion to compel arbitration of the equitable claims; therefore, if this Settlement is rejected, each merchant will only be permitted to seek relief *for itself* in

---

[18]  Also, the IMPs note four changes that were made to the Visa and MasterCard rules and complain the Class here obtained only one of the four - abolishing the ban on simple surcharge.  IMP Obj. at 29.  But two others of the four ("differential discounting" and "non-price steering") were obtained by <u>DOJ</u> against Visa and MasterCard in its consent decree, just as we believe they will be obtained by DOJ here.  The fourth is differential surcharge.  And even there, the MDL 1720 deal has a parity feature insofar as it requires surcharges on Amex cards as a condition of surcharging Visa and MasterCard.

arbitration, and would not be able to seek a rule change benefiting any other merchant. Thus, rejection of the Settlement would consign all merchants to a world where each merchant may only seek to change the contractual rules that bind that merchant alone. And yet, they *admit* that meaningful relief requires an injunction that benefits merchants across the market-place. The *amicus curiae* brief that Objector NRF filed in support of the *Italian Colors* plaintiffs at the Supreme Court says it all:

> In addition, in situations involving ongoing market-wide harm, as in much of the recent payment systems antitrust litigations in which merchants serve as direct purchaser plaintiffs, **meaningful relief requires an injunction on behalf of large groups of merchants**. The arbitration clause contained in the American Express Card Acceptance Agreement, however, explicitly **precludes a merchant from seeking in arbitration any relief on behalf of any other merchant**. Pet. App. 67a. Effectively this means **no merchant subject to this agreement can effect systemic change.**

Reply Decl. Ex. 47 at 9 (NRF amicus curiae brief) (emphasis added).[19]  And as discussed above, the IMPs are of no help to other merchants, as they will not subject any resolution of their claims to court approval, much less a constitutionally adequate notice and objection process.

If the Settlement were disapproved, moreover, the Objectors would be restrained by state anti-surcharging statutes, as we explained in our opening brief at 31-33. The Objectors do not dispute our account of the constitutional theory we are advancing in *Expressions* as well as in

---

[19] The *Italian Colors* Court, of course, never reached the issue of the enforceability of Amex's arbitration clause in cases where market-wide injunctive relief is required to permit the effective vindication of rights. That is the issue presented in the motion that was *sub judice* before this Court at the time this Settlement was reached. Notably, while Objectors proclaim the Class was on the brink of losing that motion, *not one* of them tackles our argument (which the above NRF quote supports) that enforcement of the Amex no-broad-relief clause as to these injunctive claims precludes vindication of rights under *Italian Colors*.

federal courts in Texas, California and Florida.  They can't.[20]  Instead, the Objectors point out that the district court in *Expressions* did not happen to discuss the differential vs. parity surcharging issue at all, and that the statutes themselves draw no distinction between differential and parity surcharging.  *See* IMP Obj. at 39-40; 7-Eleven Obj. at 22, n.18.  Those observations miss the point.

If this Settlement is not approved, then there will be no challenge to the state statutes. Who would be able to prosecute such a challenge?  Not the objectors, who protest that they seek only the ability to do *differential* surcharging. Those merchants cannot testify – as they must – that they seek to engage in surcharging conduct that is identical to permitted discounting conduct. And they won't be able to ride the coat-tails of the small merchants any longer.  The Article III standing of the current slate of merchant plaintiffs in the state statute challenges will be jeopardized, as states argue that their bans on surcharging cause no injury-in-fact to a merchant that is precluded from surcharging anyway, by operation of Amex's rules.  And why would these small merchants bother to soldier on in the constitutional litigation if they are bound by Amex's surcharge ban?

## B.   RESPONSES TO OBJECTOR-SPECIFIC ISSUES

### 1.   The Individual Merchant Plaintiffs

Apparently – and unfortunately for all concerned, as we have no wish to wade into these waters – the IMPs believe that it advances their position to paint this Court a picture in which they

---

[20] The reason lies in the First Amendment's distinction between the regulation of conduct and the regulation of speech.  Parity surcharging is the exact same *conduct* as discounting for cash and debit: in both cases, the merchant charges one price for cash and debit, and one price for credit cards.  Because parity surcharging is mathematically equivalent conduct to discounting for cash and debit, it is clear the state laws do not regulate the *conduct* of parity surchargers, but only the *words* the merchant may use to describe that conduct ("surcharge" vs. "discount").  Differential surcharging, on the other hand, is not identical to discounting for cash and debit.  Thus, as we explained, if a plaintiff brought a First Amendment challenge to an anti-surcharging statute explaining that he wants to engage in differential surcharge, his case would be summarily thrown out of court.

developed the case against Amex's anti-surcharging rules, and the Class Plaintiffs went along for the ride, subject to a "stay." But the reality is otherwise.

Class Plaintiffs conceived and developed the surcharge case against Amex and filed it years before the IMPs followed suit with nearly identical cases. It was Class Plaintiffs who developed the brand-denominated market theory, ██████████████████████████ ███████████████████████████████████████████████████████████ █████████████████████████████████████████████████ It was the Class Plaintiffs who took the lead on the development of the Australian evidence: we alone requested (and fought for) all the relevant Australia documents; marshaled those mammoth productions; presented PowerPoint tutorials for the IMPs (in Miami) and for DOJ (by web meeting) on the evidence relating to Amex's Australian experience; and then took the lead in depositions on surcharge issues. According to a chart submitted by Amex to the Court, in the depositions that were jointly noticed (including all surcharge-related depositions), the Class Plaintiffs took the lead *nearly twice as often* as the IMPs. Reply Decl. Ex. 48. And as for the on-again-off-again "partial stay" – which by its terms had no effect on our role in depositions but limited only our ability to demand additional discovery – Judge Reyes put the issue in perspective with some practical advice: "why not just, say, shoot off an e-mail [to IMP counsel Mr. Blechman] -- 'Bill, here's a letter, please put it under your letter head." Reply Decl. Ex. 49 at 45 (May 16, 2011 Hr'g Tr.). It was good advice and well heeded. In the end, the only import of the "partial stay" on discovery was to postpone the discovery Amex would take of Class Plaintiffs.[21]

---

[21]   Actually, as we advised Judge Reyes, the partial stay prevented us from seeking discovery on <u>one</u> issue, where no other plaintiff group joined our requests: namely, we wanted to take discovery into Amex's systematic imposition of arbitration clauses upon its merchant base. Reply Decl. Ex. 49 at 20-21 (May 16, 2011 Hr'g Tr.).

The IMPs also make the claim that the Settlement is unfair to them because they have made huge investments of money and time.  But they fail to note that those were all investments in developing the liability and damages case they will present to a jury.  Not one page from all the copious expert reports they submitted goes to issues of forward-looking relief.  Presumably, none of the money they have spent, and none of the lawyer-hours either, will have been wasted if they are precluded from putting on an injunctive case.  Moreover, there is nothing unusual about a class action release extinguishing claims that are already underway and being actively pursued by class members.  In *Wal-Mart*, the so-called Membership Rules (or Nu-City) objectors were actively litigating claims that the district court and Second Circuit held were appropriately released, as were the Pasta Bella plaintiff objectors.  306 F.3d at 106-113.[22]

### 2.   <u>Former Counsel From Patton Boggs</u>

A former Patton Boggs attorney, Christopher Hellmich, makes no complaint about the terms of the Settlement, but rather complains that the Court's Order appointing as co-lead counsel the *law firms* of Friedman Law Group LLP, Reinhardt Wendorf & Blanchfield and Patton Boggs LLP was unfair or wrong because it failed to account for the fact that certain prior interim lead counsel orders had designated co-lead counsel by both law firm *and* lawyer name (with Mr. Hellmich being one of the identified lawyers).  DE 419.  The notion that Mr. Hellmich was "excluded" from discussions of substantive terms is, in any event, laid to rest by the undisputed declaration of the mediator, Mr. Feinberg, which notes that Mr. Hellmich participated in the very

---

[22]  The IMPs (like some other Objectors) also complain that the Settlement may be terminated if the MDL 1720 Settlement is not finally approved.  But the cross-reference to MDL 1720 is just a by-product of the fact that the three networks are not all together in a single case.  The MasterCard settlement as a practical matter will rise and fall with the Visa settlement and vice versa, and no one can complain about that.  Here, both private plaintiff groups – the IMPs and the Class – tried to sue all three together (as the DOJ in fact was able to do).  And for administrative reasons, that did not work out.  But the cross referencing of the settlement approvals hardly cuts against approval.  And as for Amex's ability to terminate based on objections from merchants or DOJ, that window of opportunity has come and gone.

mediation session where the terms of the injunctive settlement were agreed upon and put into writing.   DE 369 ¶¶ 4, 6; *see also* Friedman Opening Decl. dated April 15, 2014 at ¶ 11.

### 3.      **Blue Cross and Blue Shield Health Insurers**

Blue Cross complains that surcharging is unattractive for its affiliates under the Affordable Care Act because (to oversimplify) certain "medical loss ratios" force them to spend 80 cents of every dollar (including of surcharge revenue) on health care.  DE 417.   The argument is that the Settlement would "affect them differently;" not that it would injure them.  *In re Payment Card,* 2013 U.S. Dist. LEXIS 179340, at *75-76 (rejecting identical challenge from Blue Cross objectors).  In any event, all class members "need not be aggrieved by or desire to challenge a defendant's conduct in order for some of them to seek relief under Rule 23(b)(2)," since "[w]hat is necessary is that the challenged conduct be premised on a ground that is applicable to the entire class." C. Wright & A. Miller, Federal Practice and Procedure §1775 (3d. ed. 2013).  And in any event, they do benefit from the relief – even if they choose not to surcharge – insofar as they will incur lower costs as consumers shift to debit.

### 4.      **United States**

The United States – which asserts no objection to the merits of the Settlement – argues that federal governmental card-accepting business units cannot properly be bound by a private settlement.  DE 412.  The Government's objection presents a legal question, which the Government and American Express are briefing.  To the extent the Government is correct, we agree that these business units should not be bound by the Settlement**.**

## **ARGUMENT**

**I.**     **THE SETTLEMENT AMPLY SATISFIES THE *GRINNELL* FACTORS**

There is little dispute here that the Settlement amply satisfies the *Grinnell* factors:

> The factors are: (1) the complexity, expense and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages [or injunctive relief]; (6) the risks of maintaining the class action through the trial; (7) the ability of the defendants to withstand a greater judgment [or injunctive relief]; (8) the range of reasonableness of the settlement fund [or outcome] in light of the best possible recovery [or outcome]; (9) the range of reasonableness of the settlement fund [or outcome] to a possible recovery in light of all the attendant risks of litigation.

*Wal-Mart,* 396 F.3d at 117, citing *Grinnell*, 495 F.2d at 463.

As shown above, the reasonableness of the Settlement outcome in light of any other "possible" litigation outcome (factor 8), and in light of "all the attendant risks of litigation" (factor 9) is manifest.  The risks of establishing liability and relief, and of being able to maintain a Class through trial, (factors 4, 5 and 6) are not just undisputed by the Objectors, they are greatly overstated by the Objectors, who insist (wrongly) the Class case would have been dismissed on the currently pending motion. The complexity, expense and duration of the litigation (factor 1) are conceded outright, as Objectors argue only that these factors "do not justify" what they see as an "inadequate settlement." 7-Eleven Group Obj. at 37.  And it is simply beyond argument that the stage of the proceedings and the copious discovery record provide the Court "sufficient evidence to determine the adequacy of settlement."  *Wal-Mart*, 396 F.3d at 117 (factor 3).

So that leaves the reaction of the Class (factor 2) and Amex's ability to withstand greater relief (factor 7).

### A.   Factor 2: Reaction Of The Class

The reaction of the Class in this case is markedly more positive than it was in MDL 1720, where the court observed the reactions were a "mixed bag" but "conclude[d] on balance that the reaction of the class favors approval of the proposed settlement."  *In re Payment Card,* 2013 U.S. Dist. LEXIS 179340, at **35, 37.

In MDL 1720, there were approximately 6,000 objectors, representing 0.05% of roughly 12 million class members.  In this case, Class Counsel is aware of 327 objectors, roughly half of whom are local affiliates that signed on to the objection of the parent organization Blue Cross. Given the long-mobilized and well organized nature of the campaign to stop the MDL 1720 settlement, the objections here are strikingly small in number.  In a Class of almost four million merchant accounts (a more relevant measure here than the six million merchant locations), the Objectors (including the Blue Cross affiliates) comprise just over 0.008% of the class members – *i.e.*, eight one-thousandths of one percent.  Still, as was the case in MDL 1720, the Objectors are significant.  In MDL 1720, objectors represented about "19% of the total transaction volume," *In re Payment Card,* 2013 U.S. Dist. LEXIS 179340, at *34, ██████████████████████

████████████████████████████

On balance, Class Plaintiffs submit that this factor favors the Settlement – albeit not in the decisive and obvious fashion that every other *Grinnell* factor does.[23]

### B.   Factor 7: Ability To Withstand Greater Relief

Finally, the ability of American Express to withstand greater relief is, at the very least, an

---

[23] The reaction of the Class here was particularly muted with respect to the notice provided to Class Members.  The only objections complained that the notice should have specifically advised merchants "that the proposed settlement agreement may strip them of their contractual ADR rights" and claims for "future damages."  NRF Obj. 30-31. But the short form Notice clearly advises that the merchant "will be bound by. . . the releases explained in the Class Settlement Agreement, which is available at the case settlement website." *See* www.amexmerchantsettlement.com.

open issue.  On Amex's view, it would be all too easy for merchants to impose surcharges upon Amex cards alone, without also imposing surcharges on Visa and MasterCard, owing to Amex's lesser market power.  And when merchants do surcharge only Amex, it is undisputed that Amex's business suffers tremendously.



In their damages case, the IMPs posit a but-for world of full-blown differential surcharging and (perhaps rightly) take the position that it makes no difference if Amex would be unable to survive in that world; what matters is how much money merchants would have saved in the absence of the illegal activity.  But in an injunctive settlement it absolutely matters.  And whether or not Amex could survive full-blown differential surcharging, it is surely beyond debate that they would *never* – under any circumstances – enter into any settlement agreement that allowed U.S. merchants to surcharge Amex cards without surcharging competitor cards as well.

This factor, then, also favors the Settlement.

## II.  DUE PROCESS NEITHER MANDATES OPT OUT RIGHTS NOR PREVENTS THE RELEASE OF INCIDENTAL FUTURE DAMAGES CLAIMS

### A.  Rule 23(b)(2) Does Not Permit Opt-Outs

Due process has only ever been held to require opt-out rights in class actions that seek to bind plaintiffs with respect to already-existing claims for money damages.  The Supreme Court in *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 811-12 (1985) held that "[a]bsent class members have a due process right to notice and an opportunity to opt out of class litigation when the action is 'predominantly' for money damages."  *Hecht v. United Collection Bureau, Inc*., 691 F.3d 218, 222 (2d Cir. 2012), quoting *Shutts*.  And *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2557 (2011) built on *Shutts* to the extent of holding that "the right to notice and an opportunity to opt out under Rule 23 now applies not only when a class action is predominantly for money damages, but also when a claim for money damages is more than 'incidental.'"  *Hecht,* 691 F.3d at 222, citing *Dukes*, 131 S. Ct. at 2557.  *Dukes* was concerned with the practice of labelling cases that were really aimed at obtaining monetary compensation (by whatever name) as claims for "equitable relief," governed by Rule 23(b)(2).  What *Dukes* did was to end the practice, once quite common, of sneaking monetary claims in through the equitable door.

Outside of the pre-*Dukes* context of hybrid monetary-equitable classes, courts simply *do not permit* opt-outs in Rule 23(b)(2) class actions.  Now that *Dukes* has essentially made hybrid classes extinct, it is hard to see what basis there could ever be for allowing an opt-out from a mandatory class, and the Objectors cite to none.  In any event, there is no question that the Class here seeks *solely* equitable relief.  The Settlement would compel Amex to drop its effective outright ban on surcharging, and to permit all U.S. merchants to impose surcharges subject to negotiated conditions.  There is no issue here of using (b)(2) to certify a class that will obtain monetary relief, as in *Dukes*.

As the Second Circuit has repeatedly affirmed, when the relief sought is solely injunctive, the Due Process Clause requires no opt out rights, but is satisfied by a showing of adequate representation: "Where class-wide injunctive or declaratory relief is sought in a (b)(2) class action for an alleged group harm, there is a presumption of cohesion and unity between absent class members and the class representatives such that adequate representation will generally safeguard absent class members' interests and thereby satisfy the strictures of due process." *Robinson v. Metro-North Commuter R.R.*, 267 F.3d 147, 165 (2d Cir. 2001). *See also Robertson v. National Basketball Ass'n,* 556 F.2d 682, 685-86 (2d Cir. 1977) (due process, in a mandatory class action, requires "adequacy of representation, notice and opportunity to participate and be heard" and "preclusion of the opt-out right in a (b)(2) settlement does not violate due process.")

The New York Court of Appeals has explained why there is no federal constitutional right to opt out of injunctive class actions: "When a class seeks to compel certain behavior on the part of an entity… [and] seeks to enjoin actual conduct that it considers to be detrimental to the class, there is an interest in . . . avoid[ing] the possibility of conflicting judgments . . . which would subject the defendants to varying and possibly inconsistent obligations." *In re Colt Indus. Shareholder Litig.,* 77 N.Y.2d 185, 195 (1991). These concerns are heightened in the settlement context: "[t]o permit limitless collateral challenges under these circumstances would greatly diminish the possibility that complicated class actions for equitable relief would ever settle before trial, because it would be likely that compromises carefully arrived at would be unraveled by subsequent litigation in other jurisdictions." *Id*. at 195.

### B.      The Release Does Not Violate Due Process

### 1.      The Release Does Not Improperly "Bless" Illegal Conduct

Objectors argue that the release here would improperly sanctify ongoing illegal conduct. But the controlling legal test is whether the conduct, taken as a whole, is clearly illegal on its face. The conduct at issue, as a whole, is a continued ban on differential surcharging while permitting parity surcharging and (depending on what happens in the DOJ trial) perhaps permitting other forms of differential steering.  That package of conduct is far from clearly illegal on its face – no matter how the DOJ trial is resolved – and the objection fails.

The Second Circuit's *Robertson* decision is fatal to the Objectors.  The objectors argued there that the settlement "perpetuates. . . classic group boycotts."  556 F.2d at 686.  The Court of Appeals acknowledged that a "settlement that authorizes the continuation of clearly illegal conduct cannot be approved, but a court in approving a settlement should not in effect try the case by deciding unsettled legal questions."  *Id*.  The court noted "the alleged illegality of the settlement agreement is not a legal certainty" and that the "challenged practices have not been held to be illegal per se in any previously decided case."  *Id*.   Because the "settlement agreement here must be looked at as a whole," and because it "radically modified" certain complained-of practices, while leaving other contested practices unmodified, the court easily determined that "the settlement authorizes no future conduct that is clearly illegal." *Id*.  *See also In re Payment Card*, 2013 U.S. Dist. LEXIS 179340, at *75.

### 2.      Release Of Future Damages Claims Is Proper

Objectors claim that the Rule 23(b)(2) release violates due process because it releases future-damages claims without providing a right to opt out. *See, e.g.*, Home Depot Obj. at 16; 7-Eleven Group Obj. at 2, 13-16; IMP Obj. at 52; Target Group Obj. at 21-22.  But these arguments

ignore the fact that the Rule 23(b)(2) injunctive-relief settlement requires changes to the networks' rules and conduct as part of a settled resolution regarding permissible going-forward conduct. As an *incident* or *by-product* of settling claims challenging that going-forward conduct, class members are necessarily compelled to release claims for future damages arising from that same conduct. Under *Dukes* and *Hecht*, due process demands opt-out rights only "when a claim for money damages is more than 'incidental.'" *Hecht,* 691 F.3d at 222, citing *Dukes*, 131 S. Ct. at 2557. Here, there is no claim for damages at all, and the foreclosure of any future damages claim is paradigmatically "incidental" – it is a by-product of a genuine (b)(2) release on an equitable claim.

The release does not violate due process by barring claims for future damages based on the going-forward rules structure agreed to in this Settlement. The going-forward rules structure will be the product of three principal factors: (i) the express requirement contained in the Settlement that American Express drop its ban on simple surcharging; (ii) the reformation of Amex's restraints on non-surcharge-related steering that result from the Department of Justice trial, in the event that the DOJ prevails; and (iii) the rules that are not explicitly rewritten by either the Settlement or the DOJ case. All of these rules work together, and their combined effect in the future will be very different than it has been in the past. The *package* of these rules – in which the right to surcharge is surely the most dramatic feature, but is still merely one part of a greater whole – is what the Class stands to receive, and what the Court should consider on this application.

The Objectors distort this reality by asking the Court to focus on the isolated components of the going-forward rules structure that are not expressly altered, and then complaining that releasing damage claims for that strand of conduct amounts to an unwarranted gift to American

Express.  *See, e.g.*, IMP Obj. at 10.  Such atomized analysis, however, is clearly improper under well-established antitrust principles.  *See In re Tamoxifen Citrate Antitrust Litig.*, 466 F.3d 187, 200-01 (2d Cir. 2006) (analysis of competitive effects of conduct should proceed without "tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each"), quoting *Continental Ore Co. v. Union Carbide and Carbon Corp.*, 370 U.S. 690, 699 (1962) (warning courts against "dismembering" challenged rules, "viewing [the] separate parts" and then "wiping the slate clean after scrutiny of each.")

Another distortion is the idea that the release would insulate Amex for damages that it inflicts on class members in the future through new courses of conduct.  New conduct is not released under the Settlement – a point the IMPs fail to appreciate.  The IMPs construct a hypothetical under which Amex would engineer a pre-paid card product specifically to thwart the ability of merchants to use the surcharging relief here and to "stem the migration from parity surcharged credit cards to low-cost regulated debit cards."  IMP Obj. at 19.

At the outset, the IMPs' hypothetical is speculative.  It posits that Amex will successfully market a "surcharge-avoider" pre-paid product with souped-up rewards and other new features, supported by ramped-up merchant fees, and that it will succeed in inducing consumers to abandon traditional debit, thereby allowing Amex to essentially take over the debit market because "regulated debit card issuers will not have enough revenue from their low rates to match Amex's rewards – which only Amex will be able to offer."  IMP Obj. at 19.  Notably, pre-paid cards comprise only 4% of the market today; ██████████████████████████████████ ████████████████████████████████ Reply Decl. Ex. 51 at 9 (Nilson Report #1040) ████████████████████████████

But assuming for the sake of argument that Amex in the future *were* to explicitly market a specifically engineered "surcharge-avoider" card to "stem the migration from parity surcharged credit cards to low-cost regulated debit cards," that would appear to be new conduct. If there is a legal claim on this hypothetical that rests on a factual predicate that *does not exist today,* that claim would fall outside the release.[24] But such hypotheticals provide a poor basis for gauging the scope of a release. As Judge Gleeson held with respect to objectors' speculation about future actions the networks might take: "I need not and cannot catalog here all the claims that fall within or without the release. It suffices to say that the releases do not cover new, future anticompetitive conduct and rules." *In re Payment Card,* 2013 U.S. Dist. LEXIS 179340, at *74.

In the end, the only "future damages" that are precluded under the Settlement are claims for damages based upon American Express's adherence to the bargained-for going-forward rules structure that is the core of this Settlement. Allowing objectors to seek future damages for the changes in rules and conduct that form the core basis of the injunctive-relief provisions of this settlement would amount to impermissible collateral attacks on the settlement, effectively undermining the settlement and preventing finality. Without an assurance of finality, no defendant would ever agree to a Rule 23(b)(2) injunctive-relief settlement. *In re Literary Works in Electronic Databases Copyright Litig.*, 654 F.3d 242, 247-48 (2d Cir. 2011) ("[p]arties often reach broad settlement agreements encompassing claims not presented in the complaint in order to achieve comprehensive settlement of class actions, particularly when a defendant's ability to limit his future liability is an important factor in his willingness to settle."); *Wal-Mart,* 396 F. 3d

---

[24]  While it is not totally clear on the IMPs' hypothetical, it would also appear that Amex's specific actions designed to undermine the relief here would violate the good faith and fair dealing obligation of SA ¶ 90 and New York law. That duty prevents a party from doing "anything which has the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *M/A-COM Sec. Corp. v. Galesi*, 904 F.2d 134, 136 (2d Cir. 1990).

at 106 ("[p]ractically speaking, 'class action settlements simply will not occur if the parties cannot set definitive limits on defendants' liability.'"); *In re Payment Card,* 2013 U.S. Dist. LEXIS 179340, at *72 (Rule 23(b)(2) releases "appropriately limit future damages claims based on the pre-settlement conduct" that will continue as a component of the going-forward structure approved in the settlement).

> ### C.     In Any Event, There Are No "Future Damages" In This Case, Given The Opportunity To Mitigate Provided By The Settlement

Charitably, the Objectors' arguments with respect to future damages – which as shown above are unsupported in the case law – could be read as requesting this Court or an appellate tribunal to fashion a new rule, and announce that due process opt-out rights will attach wherever a Rule 23(b)(2) settlement would bar future damage claims.  For the reasons stated above, we submit that such a proposed judge-made rule would eviscerate Rule 23(b)(2) and render even the most serious injunctive cases (like this one) totally unsettleable.

But even putting aside the fatal legal flaws in Objectors' position, it is clear on the facts of this case that due process would not demand any opt out rights based on future damages.  The process due, in any case, will vary based on the weight of the interest at stake.  *See Mathews v. Eldridge*, 424 U.S. 319, 334 (1976) (due process is "flexible and calls for such procedural protections as the particular situation demands.")  And the weight of potential future damages claims here is roughly zero.  Following the Settlement, any merchant claim for overcharge damages based on American Express's rules will be valueless – or nearly so – because the merchant-claimant could have mitigated any claimed damage by engaging in the simple surcharging relief afforded under the Settlement. When a merchant exercises its right to surcharge, it will recoup all (or nearly all) the costs it incurs for accepting credit cards, and the balance will shift to debit or cash.  Thus, its cost of acceptance will be below the debit rate.  Not

even the aggressive damages theories that the IMPs have put forward in this case would reduce payment acceptance costs so low.  Dr. Vellturo's most aggressive model posits a "but-for" cost of acceptance that is *above* the merchant's cost of debit acceptance. Reply Decl. Ex. 7 at ¶ 524 (Vellturo Report).  Here, the real world option exists for the merchant to bring its acceptance costs significantly *below* the debit rate, by engaging in simple surcharging.

Thus, even if the IMPs were allowed to seek damages based on Amex's rules subsequent to final approval of the Settlement, those claims would be barred by the mitigation defense. Judge Gleeson recognized precisely such a mitigation defense in his 2003 summary judgment decision in the *Visa Check* case, holding that the defendants may defeat plaintiffs' honor-all-cards rule challenges by showing that "merchants could have mitigated their damages (by, for example, 'steering' their customers to online debit transactions)."  *In re Visa Check/MasterMoney Antitrust Litig.*, 2003 U.S. Dist. LEXIS 4965, at *26.  The Second Circuit also recognized this mitigation-by-steering defense in the course of affirming class certification in the same litigation. 280 F.3d 124, 138 (2nd Cir. 2001).

In his class certification dissent in *Visa Check* – subsequently adopted by the Second Circuit in overruling that decision – Chief Judge Jacobs observed "[e]nforcement of the mitigation duty may be even more critical in antitrust cases than in cases sounding in contract or tort because an antitrust plaintiff seeking treble damages can profit by avoiding mitigation of loss" – *i.e.*, because of "the perverse impact of trebling on a plaintiff's incentive to minimize damage." 280 F.3d at 150.

For present purposes, therefore, we must assume courts and arbitrators will be most vigilant in "enforcement of the mitigation duty" to counter the "perverse" incentives against mitigating that are present in treble damage cases.  If an Objector such as, say, Southwest Airlines

seeks future damages based on its inability to engage in differential surcharging, the arbitrator

will simply note that Southwest could have done what Air France, Qantas, Ryan Air, Lufthansa,

Air New Zealand and others do all over the world (*see* above at 25-26): it could have engaged in

simple surcharging, as permitted by this Settlement.  And if it had done that, the arbitrator will

say, its claimed damages would not be *diminished*, they would be *eliminated*, as shown above.

## III.   THE OBJECTIONS BASED ON CONTRACTUAL DISPUTE RESOLUTION PROVISIONS ARE WITHOUT MERIT

Objectors raise various arguments to the effect that the non-opt-out class cannot be

certified, and a Rule 23(b)(2) class settlement cannot be approved, without compromising their

substantive rights in a fashion that offends the Federal Arbitration Act, the Due Process Clause

and/or the Rules Enabling Act.  *See, e.g.*, 7-Eleven Group Obj. at 13, 19; NRF Obj. at 13, 17;

Target Group Obj. at 12, 17; Home Depot Obj. at 19.

None of these arguments withstand scrutiny.

### A.   The Right To Arbitrate Claims May Be Extinguished Via A Mandatory Class Action, Just Like Any "Substantive Right" Or Chose-In-Action

The right to pursue relief in Court to vindicate property or liberty interests is a core

constitutionally protected entitlement: not just the Due Process Clause of the Fifth and Fourteenth

Amendments, but also the First Amendment right to petition and the Seventh Amendment right to

jury trial all safeguard this most important right.  And yet, it is beyond dispute that Rule 23(b)(2)

and 23(b)(1) authorize the certification of non-opt-out classes under which class members *forfeit*

the right to pursue claims against a defendant.  *See, e.g.*, *Dukes*, discussed above at 43-44.

Objectors including Home Depot lose sight of this principle when they argue that "the FAA, due

process and Supreme Court precedent forbid certification of any no-opt-out class under which

Home Depot would forfeit its right to arbitrate its future damages and injunctive relief claims

against AMEX."  Home Depot Obj. at 30; *see also* IMP Obj. at 53; 7-Eleven Group Obj. at 16-17.
Objectors are wrong: the FAA does not inhabit a constitutional plane north of the First, Fifth,
Seventh and Fourteenth Amendments.

Under controlling Second Circuit precedent, a class action settlement extinguishes the
right of class members to bring released claims, *specifically including* any right the class member
might otherwise have had to arbitrate those claims: "In other words, the Class Settlement
extinguished not only the ability of Class Members to bring Released Claims against Ameriprise
as a matter of substance, but also the Class Members' right to arbitrate those claims."  *In re Am.
Exp. Fin. Advisors Secs. Litig.*, 672 F.3d at 13 ("*AEFA*").  The *AEFA* court emphasized that "a
class-action settlement binds all class members who did not [opt out]" – whether that is because
they failed or declined to opt out, or because they could not opt out of a mandatory non-opt-out
class: "if a party 'could not have properly opted out of the mandatory class, it is bound by the
class settlement if it is upheld, as are all other members of the class'."  *AEFA,* 672 F.3d at 129,
quoting *County of Suffolk v. Long Island Lighting Co.*, 907 F.2d 1295, 1302 (2d Cir. 1990).
*Accord In re Lehman Bros. Secs. & Erisa Litig*., 2012 U.S. Dist. LEXIS 90796, at *54 (S.D.N.Y.
June 29, 2012) ("previously-existing agreement to arbitrate has been superseded by a release
contained in a [class action] settlement agreement.")

Courts in this Circuit and elsewhere *reject* the argument, urged here by Objectors, that a
mandatory class action may not abridge the right to arbitrate, even as it extinguishes class
members' rights to litigate:  "Just as it would be 'incongruous' if the Court had the power to
protect its judgments by enjoining subsequent litigation but not subsequent arbitration, [citation
omitted], it would be incongruous if the Court had the authority to stay pending litigation, but not
to enjoin arbitration, 'in aid of its jurisdiction' even before judgment is entered."  *In re*

52

*Painewebber Ltd. P'ships Litig.*, 1996 U.S. Dist. LEXIS 9195, at *13 (S.D.N.Y. July 1, 1996), (citations omitted) (certifying mandatory settlement class).  Following *Painewebber*, the court in *Stott v. Capital Fin. Servs.,* 277 F.R.D. 316, 341 (N.D. Tex. 2011) noted that the position urged here by Objectors would "imply that a contractually-provided right is more protected than rights provided by the Fifth or Seventh Amendments to the Constitution."  *Stott* is highly instructive. The court there expressly rejected objections that its certification of a mandatory settlement class interfered with the objectors' contractual rights to have disputes resolved in arbitration.  Broadly affirming "a federal court's power under the All Writs Act to enjoin competing proceedings by individual class members," the court held that its orders enjoining arbitrations and certifying the non-opt-out class were "not prevented by the Federal Arbitration Act or the Rules Enabling Act." 277 F.R.D. at 341.[25]

The rule could hardly be otherwise.  Mandatory class actions *always* extinguish substantive claims in which would-be claimants have property and liberty interests.  If the contractual right to have claims resolved in arbitration is indeed a "substantive right" protected by the FAA (as Objectors assert) then that right is of equal dignity with all of the rights that are extinguished in every mandatory class action.  Like any other substantive right, the right to arbitrate a claim may be extinguished provided the requisites of rule 23(b)(2) are met.

---

[25]  *Stott* involved a mandatory "limited fund" class action under Rule 23(b)(1), just as the instant case involves a mandatory injunctive relief class action under Rule 23(b)(2).  The principles are quite the same: in either case, mandatory treatment is required because competing claims would undercut the efficacy of the relief provided by the rule.  A Rule 23(b)(3) class action is on an entirely different footing.  Thus, the Stott court distinguished *In re Piper Funds, Inc.,* 71 F.3d 298 (8th Cir. 1995).  *Piper* merely held that the "district court's basis for enjoining the arbitration was insufficient" where the class settlement was purely a 23(b)(3) opt out settlement, and it was clear the objector would be allowed to opt out anyway.  *Stott,* 277 F.R.D at 340.  The point of *Piper* – relied on by Home Depot Obj. at 29-30 – was simply that the district court's injunction against arbitration or litigation pending settlement approval, entered under the All Writs Act, was plainly <u>not</u> necessary in aid of the Court's jurisdiction.

**B.** **The Objectors' Claimed "Right To Avoid Class Litigation" Does Not Implicate The Rules Enabling Act And Would Be Unenforceable In Any Event**

Separate and apart from the claimed right to pursue arbitration, Objectors complain that the proposed Rule 23(b)(2) Settlement violates the Rules Enabling Act by depriving them of contractual rights to be excluded from any class litigation. *See, e.g.*, Target Group Obj. at 12 (claiming "contractual rights … to avoid class litigation"); *id.* at 9 (asserting a "right to opt out of this case"); NRF Obj. at 2, 15-16 (same); 7-Eleven Group Obj. at 7 (claiming a general right to "not participate in any class action in court.")  While Class Plaintiffs do not agree with the Objectors' construction of their acceptance agreements as promising them a right to opt out of mandatory class proceedings – and none of the agreements speak of opting out – this argument would lack merit even if the Objectors' construction were correct.

**1.** **The Rules Enabling Act Has No Application**

Any claimed contractual right to exemption from the *procedures* set forth in Rule 23(b)(2) is a paradigmatically *procedural* right, by any measure.  The Rules Enabling Act provides only that the federal rules "shall not abridge, enlarge or modify any *substantive right*." 28 U.S.C. §2072(b).  So the Rules Enabling Act challenge fails based on the plain text of the statute.  *See Shady Grove*, 559 U.S. 393, 431-436 (2010) (Stevens, J., concurring) (the right to be free of class action is a procedural right and the Rules Enabling Act does not operate to block application of Rule 23 procedures).[26]

---

[26]   Justice Stevens concurred in the decision but proceeded on a different rationale than the plurality opinion written by Justice Scalia, discussed immediately below.  To Justice Stevens, what mattered is that the "right" to be free of class procedures is, of course, "procedural" and for this reason the Enabling Act is not implicated.  The instant case is much easier than *Shady Grove*, where the state rule granting a "right" to be free of class actions in treble damage suits could at least be characterized as rule that "defines the dimensions of a state-created claim."  *Id.* at 429 (Stevens, J., concurring (quoting the dissent)).  Here, the provisions simply block class procedures – they are "'procedural' in the ordinary sense of the term."  *Id.* Whether one looks at Justice Stevens's concurrence or the plurality is not important in this case.  In fact,

Moreover, Justice Scalia's plurality opinion in *Shady Grove* makes clear that the deprivation of a claimed right to avoid class litigation does not implicate the Rules Enabling Act. There, the defendant Allstate claimed a right not to be subject to class litigation, based on a provision of New York law, precisely as the Objectors here claim a right not to be subject to class litigation, based on a provision of their contracts. The plurality opinion rejected the Rules Enabling Act challenge, noting that Rule 23 "really regulat[es] procedure" and "merely enables a federal court to adjudicate claims of multiple parties at once, instead of in separate suits." 559 U.S. at 408, 411.

Plainly, the whole reason that Rule 23(b)(2) exists is to "enable a federal court to adjudicate" the *injunctive* "claims of multiple parties at once, instead of in separate suits." *Id.* at 408. And it does that the only way that makes sense: by providing that, so long as certain procedural safeguards are met (including class cohesiveness, adequacy of representation, substantive fairness and – at least in significant cases – an orderly objection process on notice to class members) then the representative plaintiffs will be afforded the latitude to strike a compromise for the benefit of all class members. That is the process. And when objectors complain about that process – *e.g.*, because they don't like how Class Counsel has represented their interests in negotiations – then that is still very much a complaint about the process. The *outcome* of the process will inevitably affect people's substantive rights and liabilities. But that doesn't sweep the rules governing that process into the Rules Enabling Act.

This was precisely the point in *Shady Grove*: procedural rules have practical and substantive effects all the time. After observing that "we have rejected every statutory challenge to a Federal Rule that has come before us," and reciting a laundry list of Federal Rules that the

---

all three opinions – plurality, Justice Stevens and dissent – would lead to the same result here: the Rules Enabling Act challenge lacks merit.

Court has "found to be in compliance with [28 U.S.C.] §2072(b)," Justice Scalia noted that "[e]ach of these rules had some practical effect on the parties' rights, but each undeniably regulated only the process for enforcing those rights; none altered the rights themselves, the available remedies, or the rules of decision by which the court adjudicated either." *Id.* at 407-408.

And while the Objectors here will complain that the outcomes of the mandatory class action process affect "important" rights, *Shady Grove* makes short shrift of that line of argument too. The Court cited *Sibbach v. Wilson & Co.*, 312 U.S. 1, 13 (1941), where it rejected the challenge that Rule 35 ran roughshod over "substantial and important" state law rights protecting against involuntary submission to physical examinations: "If we were to adopt the suggested criterion of the importance of the alleged right we should invite endless litigation and confusion worse confounded. The test must be whether a rule really regulates procedure..." *Shady Grove*, 559 U.S. at 410, quoting *Sibbach*, 312 U.S.at 13–14 (citations omitted).[27]

Finally, the Rules Enabling Act no more prevents a mandatory class action from extinguishing the right to arbitrate than from extinguishing any constitutionally protected right to pursue litigation. *See* above at 51-52. And for Rules Enabling Act purposes, it is clear that the right to arbitrate is procedural, as it governs only the forum and manner in which a party's substantive claim will be heard: "[b]y agreeing to arbitrate a statutory claim, a party does not forgo the substantive rights afforded by the statute; it only submits to their resolution in an

---

[27] *Italian Colors* provides no support for Objectors' Rules Enabling Act argument. The Court there, 133 S. Ct. at 2309-10, simply rejected a construction of Rule 23 that would "establish an entitlement to class proceedings" in arbitration – a construction the Court has said would disfigure the institution of arbitration beyond recognition. *See AT&T Mobility v. Concepcion*, 131 S. Ct. 1740 (2011). Thus, Justice Scalia wrote in *Italian Colors*, the proposed construction of Rule 23 would "likely" amount to "an abridgment or modification of a substantive right." 133 S. Ct. at 2309-10 (punctuation omitted). Plainly, *Italian Colors* has no bearing on the Enabling Act argument here, which falls squarely within *Shady Grove*.

arbitral, rather than judicial, forum." *Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth*, 473

U.S. 614, 628 (1985). Numerous courts in this Circuit have echoed this point.[28]

### 2.   Any Contractually Bestowed "Right" To Opt Out Of A Mandatory Class Would Be Clearly Unenforceable

Moreover, there is no merit in the argument, made by the Target Objectors in particular,

that specific language in some merchants' dispute resolution clauses gives those merchants a right

to opt out of an otherwise mandatory class.  Target Group Obj. at 8-11, and accompanying

declarations of Gregory A. Clarick attaching merchant agreements.  It is simply not the case that

the welfare of six million merchants is hostage to the contractual clauses in play between the

defendant and these particular retailers.

First of all, the agreements just do not say that.  They do not provide that the merchant

may opt out of a mandatory non-opt-out class.  None even speak of "opting out."  Second, even if

they had said that explicitly, such clauses could not possibly bind the Court or the Class.  Imagine

a limited fund class settlement under Rule 23(b)(1) where the settlement class is mandatory and

non-opt-out because there is not enough money to go around to satisfy all claimants.  According

to Target, it could nonetheless opt out and pursue 100 cents on the dollar – consequences be

damned – because it has an arbitration clause that allows it to opt out of class settlements.  We

respectfully submit that no court would allow that.  A mandatory class is a mandatory class.  Rule

---

[28] *See Desiderio v. Nat'l Ass'n of Sec. Dealers, Inc.*, 191 F.3d 198, 205-206 (2d Cir. 1999) (holding that substantive rights under Title VII are "not in any way diminished" when "only the forum—an arbitral rather than a judicial one—is affected, and plaintiff's rights may be as fully vindicated in the former as in the latter"); *Ames v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 567 F.2d 1174, 1180 (2d Cir. 1977) (holding that a CFTC regulation retroactively nullified an arbitration agreement because "[a]rbitration is a form of procedure, not of substantive law" and "a substantial and efficient remedy remain[ed]"); *Wong v. CKX, Inc.*, 890 F. Supp. 2d 411, 423 (S.D.N.Y. 2012) (Koeltl, J.) (holding that "[t]he right to have a dispute heard in an arbitral forum is a procedural right that affects the forum that will decide the substantive rights of the parties"); *St. Paul Fire & Marine Ins. Co. v. Emp'rs Reinsurance Corp.*, 919 F. Supp. 133, 139 (S.D.N.Y. 1996) (Sotomayor, J.) (finding that arbitration clauses affect only "procedural right[s]" and "the parties' substantive rights remain amply protected").

23(b)(2) is no different. *See Dukes* 131 S. Ct. at 2557 (Rule 23(b)(2) provides for "mandatory classes: The Rule provides no opportunity for … (b)(2) class members to opt out.").

### C. Policy Implications Of The Arbitration-Related Objections

Rule 23(b)(2) does not permit opt-outs. According to the Objectors, parties with an arbitration clause cannot be bound by a settlement that does not permit opt-outs. Therefore, if the objectors are right, a company that has arbitration clauses in its customer agreements would be fully insulated against Rule 23(b)(2) litigation – meaning it would be inoculated against any threat that private litigation could ever force market-wide reform of its illegal practices.

The Supreme Court's decision in *Italian Colors* left the door ajar for the plaintiffs to show that market-wide injunctive relief is necessary to allow them to effectively vindicate their rights under Clayton Act § 16, which authorizes broad injunctive relief for antitrust violations. Along with its *amicus* the Chamber of Commerce, Amex invited the Court in *Italian Colors* to rule that there is no "effective vindication" doctrine, and that even an arbitration clause that forbids plaintiffs from seeking statutory rights (such as the right to seek broad reform injunctions under the Clayton Act) would be enforceable. But the Supreme Court declined that invitation. Whatever else the effective vindication doctrine may mean after *Italian Colors*, Justice Scalia's opinion makes clear that it "would certainly cover a provision in an arbitration agreement forbidding the assertion of certain statutory rights" – such as a provision in an arbitration agreement that bans the assertion of the right under Clayton Act § 16 to seek broad market-wide relief. *American Express Co. v. Italian Colors Rest.,* 133 S. Ct. 2304, 2310 (2013).

The door that the Supreme Court expressly left ajar would be slammed shut by the Objectors who contend that, once a company like Amex has arbitration agreements in its contracts with customers, its rules and conduct *cannot* be reformed by a class action under Rule 23(b)(2).

As applied here, the Objectors would slam that door in the faces of six million U.S. merchants who stand to gain enormously from the relief afforded by the Settlement.  And indeed, the Objectors would slam that door in their own faces (for whatever reason) as Rule 23(b)(2) furnishes the only vehicle by which merchants nationwide can possibly obtain any ability to surcharge credit cards.

As Home Depot argues, "effective enforcement of the antitrust laws" requires robust private enforcement.  Home Depot Obj. at 4.  And indeed, the virtue of private equitable suits for injunctive relief under Clayton Act § 16 "is that they effectively pry open to competition a market that has been closed by defendants' illegal restraints."  *Zenith Radio Corp. v. Hazeltine Research*, 395 U.S. 100, 133 (1969).  Here, the Objectors' novel argument would reduce Clayton Act § 16 to rubble.  It would mean that no company's illegal restraints could ever be reformed – no market could ever be "pried open" – via a mandatory 23(b)(2) class action injunction, so long as the defendant company has any arbitration agreements in place with its customers.

## IV.    THE REQUIREMENTS OF RULE 23(b)(2) AND 23(a) ARE AMPLY SATISFIED

### A.    Rule 23(b)(2) Cohesiveness

The cohesiveness required by Rule 23(b)(2) is clearly present for the reasons given by Judge Gleeson in MDL 1720:  "Because all the members of the injunctive relief class were subject to the same rules, and because the relief afforded by that class is a change to those rules, the class satisfies the requirement that defendants have 'acted or refused to act on grounds that apply generally to the class, so that final injunctive relief . . . is appropriate respecting the class as a whole.' Fed. R. Civ. P. 23(b)(2)."*In re Payment Card*, 2013 U.S. Dist. LEXIS 179340, at *84, n. 20.  As a consequence, and because the "rules reforms created by the settlement – in particular,

the ability for merchants to surcharge – affect all (b)(2) class members equally," the cohesiveness requirement of Rule 23(b)(2) is satisfied.  As Judge Gleeson explained:

> [b]y ending a specific merchant restraint that prohibits point-of-sale, competition-enhancing actions, every single merchant that elects to avail itself of the new rules changes will have received the same benefit. And because that benefit redesigns the relationship between the each merchant and the networks in precisely the same manner, the structural relief is generally applicable to the class in the manner required by Rule 23(b)(2).

*In re Payment Card*, 2013 U.S. Dist. LEXIS 179340, at *82-83.

## B. Adequacy Of Representation

The law in the Second Circuit could not be more clear: Adequacy of representation exists wherever the representative plaintiffs possess the same claims as the class member objector.  *Wal-Mart,* 306 F.3d at 111.  The Second Circuit has "considered whether a subset of a class can <u>ever</u> lack adequate representation when the lead plaintiffs of that class possess the claims of that subset."  *Id.*, citing *Joel A. v. Giuliani,* 218 F.3d 132 (2d Cir. 2000) (emphasis added).  And the answer it gave was an unequivocal "**<u>no</u>**" – so long as the lead plaintiffs possess the same claims that the objector subset does, the objecting class members are adequately represented.  *Id.* at 109-113.  *See* Class Pl. Opening Br. at 33-35.

Thus, the Second Circuit explained in *Wal-Mart* that the cases in which adequacy of representation has been found to be lacking – including the cases relied upon by Objectors here – are all cases where the lead plaintiffs *did not possess* claims they were purporting to release.  *National Super Spuds, Inc. v. New York Mercantile Exchange,* 660 F.2d 9 (2d Cir. 1981), the *Wal-Mart* court explained, "hinged on the fact that the class representatives did not possess the unliquidated futures" whereas the settlement released claims for holders of those unliquidated futures.  306 F.3d at 111.   Likewise the *Wal-Mart* court distinguished *Stephenson v. Dow Chem.*

60

*Co.*, 273 F.3d 249, 261 (2d Cir. 2001), *aff'd* in part, 539 U.S. 111 (2003), because the release in the "settlement covered class members who had not yet manifested injury [in 1994]," but the deal "only provided for recovery for those individuals whose [injury] was discovered prior to 1994." 306 F.3d at 110.  *Ortiz v Fibreboard Corp.,* 527 U.S. 815 (1999), is identical to *Stephenson*.  The lead plaintiffs sought to release claims for class members that had not yet manifested injury, although the recovery was limited to those with already-manifested injuries.[29]  And the Second Circuit also distinguished *In re Auction Houses Antitrust Litig.,* 2001 U.S. Dist. LEXIS 1713 (S.D.N.Y. Feb. 22, 2001) because the proposed agreement there released claims of participants in foreign auctions, while the lead plaintiffs only possessed claims relating to domestic auctions. 306 F.3d at 111-12 (*Auction Houses* held the "class could not settle its claims by sacrificing other claims of class members that 'were not within the description of claims assertable by the class.'")

   In this case, every Class Plaintiff possesses all of the same claims as every Objector.  The Class Plaintiffs possess claims attacking the rule against differential surcharge, every bit as much as the Objectors do.  Were it not for the Settlement, each class representative – just like every other class member – would have the right to walk into an arbitration or a court and seek an Order that allows it to impose differential surcharges on its own Amex-using customers.  But the Class Plaintiffs have made an educated and conflict-free choice to sacrifice that "flock in the bush" in order to obtain the "bird in the hand," and to rescind the ban on simple surcharges for all U.S. merchants.   Exactly as in *Wal-Mart*, the Objectors' purported "adequacy of representation" challenges really just "amount to baseless allegations that the plaintiffs left significant claims on the table." 306 F.3d at 109-110 (internal quotations omitted).

---

[29]   In an attempt to sow confusion and invoke echoes of *Stephenson* and *Ortiz*, some Objectors note that the release applies to "future" merchants.  But those merchants receive the exact same benefits as the members of the class: they are coming into a world that will be rid of the ban on surcharging.

The Objectors' other arguments relating to adequacy of representation are similarly meritless. 7-Eleven argues that adequacy is lacking because the Settlement release is too broad and sweeps in the application of Amex's surcharge rules to new and emerging credit card technologies. 7-Eleven Group Obj. at 26. But this is not an adequacy issue: all class members are in the same boat to the extent the Settlement affects the application of surcharges to future credit card devices. And as a scope-of-release objection, it fails because the Settlement Agreement is explicit (SA ¶ 26) that it *only* releases claims that share the "identical factual predicate" of the claims litigated here. *See In re Payment Card,* 2013 U.S. Dist. LEXIS 179340, at *72. Judge Gleeson rejected the identical challenge in MDL 1720: "The full array of future claims embraced by such a release necessarily involves a measure of uncertainty, but the Second Circuit has clearly established the rule of decision: 'The law is well established in this Circuit and others that class action releases may include claims not presented and even those which could not have been presented as long as the released conduct arises out of the 'identical factual predicate as the settled conduct.'" *Id.* at 70, quoting *Wal-Mart*, 306 F.3d at 107 and *TBK Partners, Ltd. v. W. Union Corp.*, 675 F.2d 456, 460 (2d Cir. 1982).

Nor is an adequacy issue created by the presence in the Class of co-branding partners, such as Macy's. Target Group Obj. at 16-17. These merchants possess the same claims as the Class Plaintiffs. Moreover, the relief is potentially very meaningful to a co-brand partner – especially if DOJ prevails. If the co-brand merchant does not want to surcharge its own co-branded card, it can surcharge all credit cards and advertise the fact that the merchant will pick up the tab for the surcharge on the co-branded card. And more broadly, a DOJ win will open up numerous avenues for combining simple surcharges with other steering techniques that can benefit co-brand and other merchants.

Least persuasive of all is the complaint by the NRF that adequacy is lacking because the class representatives are passing up the opportunity to arbitrate individually for the chance to settle globally in court, whereas the NRF wishes only to exercise its valued right to arbitrate. NRF Obj. at 16.  This objection amounts merely to an assertion that Class Plaintiffs left claims on the table, and is miscast as an adequacy of representation challenge.  Moreover, it is a stunning argument coming from a party that has acknowledged to the Supreme Court that "meaningful relief requires an injunction on behalf of large groups of merchants," and that "no merchant subject to this [arbitration] agreement" can possibly obtain such relief.  *See* above at 35.

### C.    Typicality And Commonality

As in MDL 1720, "key questions of law and fact – the application of the antitrust laws to uniform [Amex] policies – are common.  Common *answers* to those questions are inevitable, *see Dukes*, 131 S.Ct. at 2551, since the questions focus on the application of law to the defendants' conduct (which was essentially the same toward all class members), not on the individual conduct of many different plaintiffs."  *In re Payment Card,* 2013 U.S. Dist. LEXIS 179340 at n.20. Typicality is satisfied because "the named Plaintiffs' claims are for the same type of injury under the same legal theory as the rest of the class." *Id*. (citation omitted).

In this case, however, Objectors try to toss a monkey wrench into the typicality analysis by pointing to (supposedly) varying dispute resolution clauses among class members.  But the objection does not stand up.  Objectors point to cases where a defendant asserted an arbitration defense that would require individualized responses from class members and render the class device unmanageable.  *See In re Titanium Dioxide Antitrust Litig*., 962 F. Supp. 2d 840, 862 (D. Md. 2013); *Renton v. Kaiser Foundation*, 2001 U.S. Dist. LEXIS 20015 (W.D. Wash. Sept. 24, 2001).  All these cases say is that, when the defendant asserts a defense based on the alleged

63

existence of arbitration clauses, class may be defeated if the difficulties of resolving contract-by-contract enforceability questions predominate over common issues: "Here, individual questions of law and fact as to the enforcement of provisions of class members' contracts predominate over any common issues.  The likely difficulties in managing individual questions of contract formation and interpretation are especially pertinent to this finding."  *Titanium Dioxide,* 962 F. Supp. 2d at 862.  Manageability is the key concept here:  the *Titanium Dioxide* court recognized that the arbitration defense created "difficulty in managing a class action" and in "managing individual questions."  *Id.  Renton*, similarly, held that defenses based on arbitration clauses presented "unresolved issue[s] whose determination may vary from state to state and from district to district," thus swamping common questions with individual inquiries. 2001 U.S. Dist. LEXIS 20015, at *16.

These cases don't help the Objectors at all.  They show that the assertion of an arbitration defense can make a class action *unmanageable* as a result of the need for individualized analysis of contracts, just like the assertion of unique statute of limitations defenses can.  These defenses affect the certifiability of a class *only where the defendant is asserting the defense.*  Plainly, where the defendant is *not* seeking dismissal based on arbitration clauses – *e.g.*, in a settlement context – that defense does not create individual issues.  That is why courts hold that concerns with "how the case will or can be tried" are "no longer problematic in the settlement context."  *In re Am. Int'l Group Secs. Litig.*, 689 F.3d 229, 239 (2d Cir. 2012) (citations omitted).

64

## <u>CONCLUSION</u>

For all the foregoing reasons, and those set forth in their opening memorandum of law,

Class Plaintiffs respectfully request that the Court grant final approval of the Settlement.

Dated: July 11, 2014

**FRIEDMAN LAW GROUP, LLP**

/s/Gary B. Friedman_____
Gary B. Friedman
Tracey Kitzman
Scott Levy
Rebecca Quinn
270 Lafayette Street
New York, New York 10012
(212) 680-5150
gfriedman@flgllp.com

Mark Reinhardt, Esq.
Mark Wendorf, Esq.
**REINHARDT WENDORF &
BLANCHFIELD**
332 Minnesota Street
St. Paul, Minnesota 55101
(651) 297-2100

Read K. McCaffrey, Esq.
**SQUIRE PATTON BOGGS LLP**
2550 M Street, NW
Washington, DC 20037
(202) 457-6000