*In re: American Express Anti-Steering Rules Antitrust Litigation*, 11-MD-2221 and
*Marcus Corp. v. American Express Co.*, 13-CV-7355

Report of Professor C. Scott Hemphill

August 11, 2014

## I. Introduction

I have been appointed by the Court in connection with the proposed Class

Settlement Agreement resolving litigation against American Express in these two

matters. My assignment is to review submissions about the settlement and offer an

independent assessment of "conflicting economic models, the economic value and

effect of the proposed rule changes," the settlement's interaction with an earlier

settlement of antitrust litigation against Visa and MasterCard, and arguments about the

effect of *United States v. American Express Co.*, which is currently pending in this Court.

Feb. 27, 2014 Order at 2 (Dkt. 344).

This report contains my economic assessment of the Agreement. In preparing

the report, I reviewed the expert declarations filed on behalf of plaintiffs and objectors;

memoranda filed by parties and objectors, to the extent that they addressed economic

issues; and, as relevant, supporting materials associated with the declarations and

memoranda. I do not address the many legal issues raised by objectors. In preparing this

report, I have not discussed substantive matters with the Court, parties, or objectors. *Id.*

at 3-4.

The report proceeds in three parts. The remainder of this part describes the

Agreement, its relationship to several other cases against Amex and its competitors, and

the scope of my analysis. Part II discusses conflicting arguments about the economic value and effect of surcharging, the main injunctive relief granted by the Agreement. Part III addresses economic evidence of merchant interest in and benefit from surcharging.

The proposed Agreement settles two antitrust suits brought by merchants that accept Amex cards. The cases are putative class actions challenging different aspects of the Amex merchant agreement. The first, actually a set of consolidated cases, concerns conduct already very familiar to this Court, the requirement that merchants must not "steer" a customer to other forms of payment through surcharges, discounts, or softer forms of persuasion. Plaintiffs contend that the anti-steering rules impose a barrier to price competition at the merchant point of sale that, if removed, would permit merchants to shift volume to cheaper payment methods and place pressure on high-priced networks to lower their merchant fees. In addition, as to the no-surcharge component of the anti-steering rules, they believe that surcharging would permit a merchant to collect revenue to offset the expense of merchant fees.

The second case, *Marcus*, challenges the requirement that a merchant must "honor all cards" by accepting all Amex cards if it accepts any of them. The major focus is an alleged tie between Amex charge cards and "Amex-branded revolving credit cards." Pl. Mem. 9 & n.4. (The *Marcus* complaint also lists prepaid and offline debit cards as tied products, but these are not a focus of the settlement filings.) As with the anti-steering challenge, plaintiffs allege that Amex's conduct causes merchants to pay inflated fees to Amex and its competitors. The specific theory of harm in *Marcus*,

2

however, is different. Plaintiffs argue that the tie has caused merchants to pay too much in Amex credit card fees, in turn providing an opportunity for competitors to charge high prices as well. *Id.* Plaintiffs believe that removing the tie would cause credit card fees to fall.

Plaintiffs see a large opportunity to lower merchant fees. In 2013, according to a widely cited report, U.S. merchants paid $53 billion in fees on $2.4 trillion in credit card transaction volume. Merchant Processing Fees in the U.S., Nilson Report No. 1041, May 2014, at 12. (Except where context suggests otherwise, I use "credit card" to include Amex's charge card product.) A 100-basis-point decrease in fees, applicable to 5% of charge volume, would save merchants more than $1 billion per year. A drop of five basis points, applied to 100% of charge volume, would have the same effect. Plaintiffs and their expert, Dr. Alan Frankel, offer similar calculations to suggest that the potential merchant benefits from lower fees are very large. Frankel Decl. ¶ 35 n.36; Pl. Mem. 6-7.[1]

The Agreement seeks to lower fees by granting to Amex-accepting merchants a limited right to surcharge credit cards. Amex merchant regulations currently prohibit a surcharge unless debit is surcharged as well. The Agreement permits a merchant to surcharge Amex cards without also surcharging debit cards, subject to the important limitation that the surcharge must not exceed "any surcharge" on other credit cards. Agreement ¶ 8(b), (e). For example, a merchant could not combine a 2% Amex surcharge with a 1% Visa surcharge because the Amex surcharge would be higher than

---

[1] The calculations by Dr. Frankel and plaintiffs are based on the average price difference between credit and debit, which is larger than 100 basis points. These calculations are applied to the charge volume of all credit card brands, not just Amex, which is appropriate given that the Agreement's relief would apply to all credit card brands. Frankel Reply Decl. ¶ 87.

"any surcharge" on a competing credit card. The parties and objectors understand the Agreement to require that if a merchant imposes an Amex surcharge, it must impose an equal or higher surcharge on Visa and MasterCard credit cards.[2]

This Agreement alters the effect of an earlier agreement settling a set of merchant suits that challenged the anti-steering rules of Visa and MasterCard. The Visa-MasterCard Agreement ("VMC Agreement") contains a "level playing field" provision that permits, as to Amex acceptors, a surcharge for Visa and MasterCard only to whatever extent Amex allows it. VMC Agreement ¶¶ 42(a)(iv), (b)(iv), 55(a)(iv), (b)(iv). The combined result of these two agreements is to permit only "parity" surcharging of credit cards. Amex, Visa, and MasterCard credit cards can be surcharged all at the same level, or not at all. More targeted forms of steering are prohibited. For example, a merchant may not engage in brand surcharging (often referred to as differential surcharging) by levying a fee on Amex alone, or Amex at a higher level than Visa. This and other limitations of the surcharging relief are discussed in Part II.

The surcharging relief provided by the Agreement bears a close connection to the thrust of plaintiffs' anti-steering case, which challenges the no-surcharge rule as one component of the anti-steering rules. The plaintiffs' attention to surcharges distinguishes their case from the Justice Department anti-steering suit, which does not challenge Amex's no-surcharge rule. June 21, 2013 Letter of United States at 2 (No. 10-

---

[2] It is unclear whether ¶ 8(b) prohibits a surcharge on Amex alone, as this surcharge would not be higher than "any surcharge" on other brands—there would be no other surcharges. This end-run may be ruled out by interpreting "any surcharge" to include zero surcharges, or by reliance on the merchant regulations, which continue to require fees to be "imposed equally" on other credit cards.

CV-4496, Dkt. 273). This focus on surcharges is shared by a third set of anti-steering cases brought by the individual merchant plaintiffs (IMPs), a group of supermarkets and drugstores.

The relief offered in the Agreement is less tightly tied to the *Marcus* case. Surcharges are not at issue in *Marcus*, and the Agreement leaves the honor-all-cards rule intact. The Agreement does touch upon the honor-all-cards rule by exempting traditional debit cards from the merchant's honor-all-cards obligation. Agreement ¶ 8(f). Amex does not currently offer such cards. *Id.* ¶¶ 8(g), (h). Plaintiffs explain this provision not by reference to the conduct complained of in *Marcus*, but as a way to safeguard the surcharging relief against evasion by Amex. Pl. Mem. 15.

Before examining the surcharging relief in detail, it may be helpful to clarify the scope of the present assessment. The economic function of a careful review of a class action settlement is to ameliorate a principal-agent problem. In a class action, class members do not have a strong incentive to monitor their lawyers. The potential result is a settlement that benefits the lawyers but not the class members. In theory, class representatives have a responsibility to pick up the slack, but in practice they are often ineffective. The settlement approval process provides an important check to make sure that counsel do not sell out the class.

This evaluation includes both an inquiry into the effects of the settlement and a comparison to the outcome of litigation. Evaluation of litigation requires an assessment of the relief secured if plaintiffs win, discounted by an estimated probability of plaintiffs losing. Estimating the probability of success ultimately entails some inquiry into the

merits of plaintiffs' case, though in practice it often suffices to identify substantial sources of litigation risk for the plaintiffs.

Such an evaluation of the merits was undertaken as part of the approval process for the VMC Agreement. The district court appointed Professor Alan Sykes to conduct an economic assessment. In his assessment, Professor Sykes offered an analysis of the risks to plaintiffs if they pursued litigation instead of settling. There, settlement had occurred on the eve of trial, and Professor Sykes relied in part on the merits expert reports filed by the parties. His evaluation included some discussion of the Visa and MasterCard anti-steering rules while focusing primarily on questions, including conduct such as default interchange rules, that are not at issue here.

This report does not offer an analysis of the merits of plaintiffs' anti-steering and honor-all-cards cases, as I lack the materials and mandate to do so. The plaintiffs' anti-steering case is still at an early stage and lacks a well-developed presentation of the merits. To be sure, significant insight could be gleaned by reviewing materials in the two related anti-steering cases, which are at a more advanced stge. However, my assignment does not include advising the Court on the substance of other cases. As for *Marcus*, an evaluation is feasible but would be of limited use, as the merits analysis would still be missing a critical piece of the puzzle.

I therefore limit my analysis to an assessment of the value to merchants of a parity surcharge right under the Agreement. To a lesser degree, I also discuss the value of a right to levy brand surcharges. The value of brand surcharges may be relevant to the Court's consideration of the available relief if plaintiffs litigated their case to a

successful conclusion.[3] Moreover, plaintiffs offer an economic analysis that minimizes the differences between parity surcharges and brand surcharges, so it seems useful to offer a discussion of these claims.

This analysis is necessarily qualitative, given limitations in the available evidence about surcharging. The analysis draws on the arguments and evidence presented by plaintiffs and objectors, though I also discuss issues they have not raised. I focus on the arguments that strike me as most important to an economic assessment, and have not attempted a comprehensive review of all the arguments made.

Finally, in assessing the Agreement, I confine myself to an analysis of the effect on class members. The settlement might also have effects on customers and payment networks (among others) that might either increase or possibly diminish the social benefits of the relief, or have a distributional effect. For example, Professor Joseph Stiglitz, an expert for the IMPs, argues that the Agreement preserves a subsidy from low-cost cardholders to high-cost cardholders. Stiglitz Decl. ¶ 4. These further effects do not bear on the principal-agent problem that I understand to be the function of the class action approval exercise.

---

[3] Another possible value is in comparing settlements. Plaintiffs make the "utilitarian point" that the right to parity surcharge for all class members is more valuable than brand surcharges for a small number of merchants. Pl. Reply Mem. 11. That conclusion is not obvious, however, and does not follow from a simple count of the number of merchants affected. Ex ante, it is possible that a brand surcharge limited to one or several merchant segments—supermarkets, say—brings a larger benefit. Addressing that question requires an analysis of both forms of surcharge.

**II. Conflicting Models of Surcharging Relief**

As noted above, plaintiffs argue that the Amex anti-steering rules impose a barrier to price competition at the point of sale. This price competition, if fully permitted, would come from other credit card networks, which have a somewhat lower cost of acceptance, and from debit cards, which are more than 100 basis points cheaper. As a consequence of the restraints, plaintiffs argue, these payment networks' lower fees do not lead to higher sales.

The idea behind surcharging relief is to put a price on a costly service that some customers use more than others. By way of analogy, an airline might decide to charge for telephone reservations or luggage, rather than offer these costly services for free. Imposing a price that reflects cost sends a signal to customers, and causes a customer to internalize the effect of her decision on the merchant. Internalization aligns the incentives of the customer and the merchant, not the customer and the payment network. The decision to impose a price reflects multiple factors, including the cost of the service and the cost of implementing a pricing mechanism.

Customers currently experience the choice of payment method as zero cost. Thus, in theory, setting a higher price for more costly payment methods might be expected to have several benefits for merchants discussed by Dr. Frankel. Frankel Decl. ¶¶ 46-62. If customers simply pay the fee, this revenue offsets its cost of credit card acceptance. If customers avoid the fee in favor of lower-price payment methods, this shift saves the merchant the difference between the high-price payment method and the method actually chosen. Consumer avoidance also places pressure on a high-price

payment network, upon suffering or anticipating this shift in volume, to lower its price. Beyond these benefits, Frankel identifies a further benefit to merchants, that customers gradually become acclimated to lower-price payment methods.

Objectors offer three broad arguments against the surcharging relief in the Agreement:

[1] Surcharging relief in general has little or no value in light of merchant competition that makes surcharging unprofitable, state prohibitions, and practical barriers to implementation.

[2] The particular surcharging relief secured in the Agreement is ineffective, because limited to parity surcharges and subject to a maximum cap.

[3] The relief in the Agreement is actually counterproductive. It is not merely ineffective but affirmatively harmful to merchants.

This Part considers these objections in turn.


**A. Surcharges in General**

Objectors identify three hurdles to successful surcharging. The first problem is potentially the most important, but also the most difficult to assess. Objectors argue that merchant competition undermines the incentive to adopt surcharging in the first place. If, say, Hertz imposes a surcharge on its rental car customers, some customers will defect to Avis and other competitors that do not employ a surcharge. Although surcharging by all car rental companies might be collectively beneficial, because industry-wide surcharges leave the defectors with nowhere else to turn, there is a

collective action problem among the merchants. As explained by Professor Jerry Hausman, an expert for the 7-Eleven objectors, the prospect of lost volume discourages a merchant from a unilateral change in payment practice that customers dislike. Hausman Decl. ¶¶ 45-47.

Here is a simple numerical example. Suppose a merchant would save 100 basis points if it implements a surcharge, either by collecting the surcharge or shifting volume to a lower-priced card. Suppose further that the merchant has a profit margin of 19% on that set of customers without the surcharge. (This margin would rise to 20% on the remaining customers if the surcharge is implemented.) If 5% of customers defect, the surcharge breaks even.[4] If defections are higher, the merchant savings is lower, or margins are higher, the surcharge is unprofitable to implement. On the other hand, if defections are lower, the merchant savings is higher, or margins are lower, the surcharge is profitable.

The underlying logic is analogous to an argument previously discussed by the Court, that customer "insistence" may discourage a merchant from making decisions about payment method that reduce the merchant's fees but at the expense of customer defections. May 7, 2014 Mem. at 18-19 (10-CV-4496, Dkt. 369). Here, the decision is whether to levy a surcharge on a particular brand or method of payment, rather than to cease acceptance altogether.

Customer defection is not the only potential harm. Objectors contend that customers, if confronted with a new and unusual surcharge at the point of sale, will

---

[4] If the merchant imposes a surcharge, it saves 1% on the 95% of sales that it retains. At the same time, it loses 19% on the 5% of customers that defect. The two effects balance out.

have a negative reaction. Some will complain or insist on an explanation, slowing down the payment process. Others will pay quietly but blame the merchant rather than the payment network. IKEA US Decl. 5 (Shinder Decl. Ex. 23). This latter effect is potentially enhanced by the merchant's obligation under ¶ 13 of the Agreement to "take the blame" for the surcharge. Home Depot Mem. 8. These harms might pose a further impediment to the introduction of surcharging. That said, if surcharging proves a success and spreads, the blame and customer resistance could be expected to dissipate over time.

Plaintiffs' most powerful response is to point to Australia, where surcharging has been effect for more than ten years. That evidence suggests that—at least in certain circumstances—customers do not defect in response to a surcharge; that merchants therefore find it profitable to surcharge; and that credit card fees fall as a result. Objectors challenge plaintiffs' understanding of the Australian experience and its relevance to U.S. surcharging, noting (among other points) that much of the evidence is about brand surcharges, not parity surcharges.[5] I take up the Australian evidence in Part III.

Dr. Frankel also offers a theoretical response to the customer defection concern, arguing that there is a second countervailing business-stealing opportunity that favors the surcharging merchant. High credit card fees, if not subjected to a price, are

---

[5] Professor Hausman offers the further argument that Australian evidence is irrelevant because merchant competition in the United States is more intense, and hence defections will be higher. Hausman Decl. ¶ 76. Dr. Frankel disagrees. Frankel Reply Decl. ¶¶ 50-51. The question of merchant competition strikes me as complex, as its intensity might be expected to affect not only the rate of customer defection, but also the size of merchant margins and credit card fees. I lack a firm basis for adjudicating this disagreement between the two experts.

ultimately subsidized by all customers in the form of higher overall prices for goods and services offered by the merchant. A merchant, if freed of the subsidy, might have the ability and incentive to lower its posted prices to all customers. That move would potentially increase its profits relative to competitors. Frankel Decl. ¶ 47; Frankel Reply Decl. ¶ 55. The objectors and their experts do not offer a response on this point. The importance of the point may depend on the size of the overall discount, which is likely to be small, its salience to customers compared to the salience of the surcharge, and the degree to which the savings from lower credit card fees are passed on to customers in practice. Dr. Frankel does not offer evidence on these points.

The second issue raised by objectors is that approximately one-third of U.S. credit card volume is immune to surcharging. Surcharges are illegal under state law in ten states accounting for 35% of U.S. commerce, plus Puerto Rico. Hausman Decl. ¶ 53. The share of credit card charges immune to surcharging is likely similar. Dr. Frankel concedes that state prohibitions reduce the value of surcharging, at least in the short run. Frankel Decl. ¶ 17. Thirty-five percent likely understates the reduction in surcharging caused by state bans, because some multistate merchants would find it too costly to run multiple systems to accommodate the different regimes. See, e.g., Wal-Mart Decl. ¶ 20 (Shinder Decl. Ex. 43).[6]

In the long run, the prevalence of state-level surcharge bans might fall or possibly increase. New York's ban has been invalidated on constitutional grounds, and

---

[6] Professor Hausman suggests additional interstate complications, such as merchants and customers located in different states, or Internet sales made to a customer in a state different from the billing address. Hausman Decl. ¶¶ 54-55. I have not attempted to assess the economic importance of these asserted legal uncertainties.

others have been challenged. On the other hand, these challenges may fail, and in the meantime, other states have considered banning surcharges. Either way, even a short-run impediment to surcharging in these states appears likely to have a longer-term effect. Surcharging is a practice that, if it works, spreads by degrees, as merchants and customers grow accustomed to it. This accumulation is likely to be slowed down by the state bans, though I am unable to quantify the extent of that longer-term effect.

The third problem is practical. Plaintiffs' submissions suggest that an infrastructure for automated surcharging is not ready for use. In a declaration, plaintiffs describe a daunting set of difficulties that remain to be solved. They note that making the necessary changes is "expensive and mostly outside of the control of merchants." Levy Decl. ¶ 3. For example, the largest payments processor has decided not to support surcharging, and just one of eight major processors (accounting for 98% of volume) supports surcharging. *Id.*; Wal-Mart Decl. ¶ 21.

The actual degree of this problem is unclear from the submitted materials. Plaintiffs also state that the problems are in the process of being solved. Levy Decl. ¶¶ 4-6. For example, one independent service operator aimed at smaller merchants, in conjunction with the single processor that supports surcharging, has developed a system that accommodates surcharging. *Id.* ¶ 4. In their reply, plaintiffs emphasize that this particular system is ready for surcharging now, but do not appear to fully address all the problems raised in the declaration. Pl. Reply Mem. 5, 27-28; see also Pl. Mem. 5 ("almost at hand").

These implementation challenges reduce the overall benefits of surcharging relief. The resistance of processors indicates a chicken-and-egg problem in commencing surcharges on a large scale. Payments processors are unlikely to invest in technical solutions until merchants demonstrate the willingness to surcharge. Merchants may be slow to surcharge until an automated solution is available. The processors' reluctance also provides a market signal that processors doubt that surcharging will be adopted by merchants.

**B. Parity Surcharges**

As already noted, the relief offered in the Agreement is a parity surcharge, not a brand surcharge. Objectors posit that parity surcharges are much less powerful than brand surcharges for two reasons. First, a parity surcharge steers customers to debit, which is a larger and hence less feasible leap than a brand surcharge, which steers customers to another credit card brand. Second, even if parity surcharges are feasible, they offer little ability to accomplish one of the asserted benefits of surcharges, which is to apply pressure on credit card networks to reduce fees. Beyond responding to these points, plaintiffs suggest that the perceived advantages of brand surcharges are overblown because the gap in merchant fees between Amex and its competitors is small. I discuss these points in turn, and in addition assess a further limitation of parity surcharges, the inability to impose a product surcharge.

**1. Steering to Debit**

Parity surcharging rests on the proposition that merchants can successfully steer customers from credit to debit, rather than from one credit card brand to another. Enhancing competition from debit has been a significant, albeit secondary focus of anti-steering litigation. For example, the plaintiffs' complaints give some attention to competition from debit. By contrast, the main thrust of Judge Gleeson's opinion approving the VMC Agreement was its potential to increase interbrand credit card competition.[7]

Plaintiffs argue that merchants would find a parity surcharge attractive because many customers, in the face of such a surcharge, will switch to debit. Much of the analysis is devoted to showing that, conditional on a surcharge, a merchant would see a significant shift of customer volume to debit. See, e.g., Frankel Reply Decl. ¶¶ 58, 63. One example cited by Dr. Frankel is an experiment ███████████████████████ ████████████████████████████████████████. Frankel Decl. ¶ 49 n.51.[8]

---

[7] Compare Class Action Complaint ¶¶ 1, 22-23, Performance Labs., Inc. v. American Express Co., No. 06-CV-2974 (S.D.N.Y. Apr. 16, 2006); Consolidated Class Action Complaint ¶ 26, In re American Express Anti-Steering Rules Antitrust Litigation, No. 11-MD-2221 (E.D.N.Y. Mar. 23, 2011) with In re Payment Card Interchange Fee and Merchant Discount Antitrust Litigation, No. 05-MD-1720, 2013 WL 6510737, at *18 (E.D.N.Y. Dec. 13, 2013). See also Complaint ¶ 21(a), Rite Aid Corp. v. American Express Travel Related Services Co., No. 08-CV-2315 (E.D.N.Y. June 10, 2008) (discussing competition from debit).

[8] In their reply, plaintiffs quote the deposition testimony of grocery store witnesses. Pl. Reply Mem. 22. The deposition excerpts discuss merchant interest in shifting customers from credit to debit but stop short of an endorsement of parity surcharging. The most helpful excerpt expresses an interest in using surcharges to shift customers to debit, though the idea appears to be to shift customers from Amex alone, rather than credit cards generally. Shifting customers from Amex alone would risk fewer defections, since some customers could shift to other credit cards instead. Another merchant discusses shifting customers from Amex to other credit cards, as well as debit, which again

However, such evidence is insufficient to establish that a parity surcharge would be profitable in the first place. To establish profitability, plaintiffs need to show that there would be few defections from a surcharge of all credit cards. Even if some or many customers would shift to debit, a small number of defectors will render the surcharge unprofitable.

Plaintiffs' argument is strongest in contexts where debit and credit cards are close substitutes. The ease of substitution seems highest for smaller ticket and "everyday" purchases. For other purchases, customers may not regard credit and debit as close substitutes. For example, credit cards offer deferred payment, which is important to many customers, particularly for large-ticket items. Hausman Decl. ¶ 22; 7-Eleven Mem. 32 n.28.[9] Customers enrolled in rewards programs are also relatively more reluctant to switch, as are users of corporate cards. Target Omnibus Mem. 7 n.4. Overall, the defection problem seems likely to be a serious challenge for efforts to steer customers to debit through parity surcharges, given the low substitutability for many customers.

Plaintiffs point to the large price gap between credit and debit as establishing a large opportunity for parity surcharges. The merchant fee for debit is more than 100 basis points lower than credit. In particular, Dr. Frankel estimates a gap of 134 basis

_____

would risk fewer defections. Several discuss discounting under the Durbin amendment, not surcharges.

[9] In their reply, plaintiffs note that at several travel and entertainment merchants, Visa debit accounts for a substantial minority of total Visa spend. Pl. Reply Mem. 23. This point is useful for the goal identified by plaintiffs in the reply, which is to show that some customers will use debit even for a big-ticket item. However, it is not very informative for the more demanding and more relevant question, predicting how many current credit users will defect rather than switch to debit in response to a parity surcharge.

points, based on average merchant fees of 1.14% for debit and 2.48% for credit. Frankel Decl. ¶¶ 27, 32-33. He derives an even lower estimate for debit by noting that many debit charges are a fixed amount, rather than a percentage. Because the average credit transaction is larger than the average debit transaction, applying debit fee levels to the average credit card transaction yields an even smaller merchant fee for debit. That calculation, not fully described in the declaration, produces a debit fee of 0.91%. Frankel Decl. ¶¶ 34-35 & fig.3. The resulting gap between 0.91% and 2.48% is 157 basis points, the figure principally relied on by plaintiffs. Pl. Mem. 3, 31.

This enormous credit-debit gap, however, only presents a large opportunity if a low enough level of customer defections makes parity surcharges profitable. The large gap itself might reflect a low degree of substitutability between credit cards and debit cards. Professor Hausman notes that the gap has widened in the period following federal regulation of debit interchange rates, without credit card fees showing much sensitivity to the reduction in debit card prices. Hausman Decl. ¶ 26. On the other hand, one implication of plaintiffs' position is that it is the merchant restraints themselves which have prevented equilibration, rather than a difference in underlying customer demand.

Some objectors argue that if credit card services to merchants are a relevant antitrust market, this conclusion necessarily implies that steering to debit through parity surcharges must be ineffective. 7-Eleven Mem. 32 & n.27; National Retail Federation Mem. 8. Plaintiffs disagree. To see why, suppose that a relevant market is established by asking whether a hypothetical credit card monopolist can raise its price above a

competitive level or, more conservatively, above the prevailing level. Plaintiffs could be expected to answer yes, arguing that a merchant is unable to refuse acceptance of credit cards because the level of customer insistence is too high. Even if that conclusion is correct, it remains open to argue that surcharging is profitable, even though the more drastic course of refusal is not. The upshot is that a market definition that excludes debit cards can coexist with profitable parity surcharging that shifts volume to debit cards.

## 2. Pressure to Reduce Merchant Fees

One of the claimed benefits of surcharges, discussed above, is that a shift in volume places pressure on a high-priced network to lower its fees. For a brand surcharge, the mechanism for doing so is clear, as surcharges are aimed at a single brand. In principle, the credit card networks could be pitted against one another.

Dr. Frankel accepts that an agreement that permitted brand surcharges would be more powerful than the relief in the Agreement. Frankel Decl. ¶¶ 66-71. As Dr. Frankel acknowledges, targeting a single brand is useful in two respects. First, if one brand is more expensive, merchants could target that brand with a brand surcharge to bring it into line with the others. Frankel Reply Decl. ¶ 75. Second, even if the brands all price at the same level, a merchant could apply competitive pressure by means of a brand surcharge on a single network, trading lower fees for a lower surcharge. *Id.* ¶ 77 & n.130.

A parity surcharge lacks these tools. Dr. Frankel argues that a shift to debit by customers, upon a successful implementation of parity surcharges, would in turn

"generate competitive pressure" on the credit card networks to lower fees. Frankel Decl. ¶ 24. It is not clear, however, how this asserted pressure would translate into lower merchant fees in practice. A parity surcharge is imposed on all brands, but each brand controls only its own pricing. It is not apparent that a single brand's reduction of its own fee will be rewarded with a merchant's reduction in the all-brand surcharge. For Visa and MasterCard, which use national fee schedules, it is unclear how this targeted reduction for a surcharging merchant would even be accomplished. Moreover, if a brand's unilateral decrease in its merchant fee did result in the removal of a surcharge, the reward would be shared with competing networks that did not contribute to its removal. For these reasons, the "pressure" of lost volume seems less likely to result in a reduction in merchant fees.

A parity surcharge has a further related disadvantage with respect to the opportunity for entry by new credit card networks. Prohibitions on brand surcharges and other forms of brand-level steering make it more difficult for a discount entrant or repositioned incumbent to thrive, because merchants lack a means to reward the lower-priced network. Stiglitz Decl. ¶ 25; IMP Mem. 36-37; Southwest Mem. 29. A parity surcharge preserves the inability to reward new lower-priced networks.[10]

---

[10] As Home Depot notes, this effect is potentially accentuated by the wide range of payment methods that must be treated in parity with credit cards under Agreement ¶ 1(bb). Home Depot Mem. 7.

### 3. The Size of the Amex Gap

Dr. Frankel and plaintiffs downplay the comparative value of brand surcharges, emphasizing their conclusion that Amex's merchant fee is only slightly higher than its credit card competitors. Frankel Reply Decl. ¶ 75. However, a small or nonexistent premium, if true, would not negate the advantage of brand surcharging discussed above. Plaintiffs' theory is that the prices of multiple brands are at a higher than competitive level, which is consistent with prices being high but similar. IMP Mem. 38-39; 7-Eleven Mem. 33. One claimed advantage of brand surcharges is the ability to play one network against another, an advantage that does not depend upon differences in merchant fees.

Moreover, the Amex gap in numerous industries is larger than plaintiffs suggest. Plaintiffs emphasize a comparison of Amex's merchant fee and its internal estimate of "mix-adjusted" fees for MasterCard and Visa.[11] The result of this comparison, previously noted by the Court, is that Amex has an average mix-adjusted premium of 3 basis points over MasterCard, and 8 basis points over Visa. See May 7, 2014 Mem. at 5 (10-CV-4496, Dkt. 369). In particular, Amex's average rate is ███, compared to MasterCard and Visa rates of ███ and ███.

Mix adjustment is at the heart of an Amex modeling exercise to estimate the merchant premium in a particular industry. As plaintiffs explain, it is an effort to "tak[e] account of the product mix each merchant sees on Amex." Pl. Mem. 30 n.10. For

---

[11] Pl. Preliminary Approval Mem. 4; Pl. Mem. 30; Pl. Reply Mem. 20-21. The data can be found in Friedman Decl. Ex. T, U, and V. The calculation is reported in Frankel Decl. ¶ 68 n. 76. All figures are for 2010.

example, if all of an airline's Amex customers switched to Visa, how much would the airline save? This difference is not captured by simply comparing the average discount fees. After all, if an Amex cardholder enrolled in a rewards program switched to Visa, she would likely switch not to a plain-vanilla or "average" Visa card, but to a Visa card with a richer rewards offering. Such cards carry a higher interchange fee. Similarly, corporate cardholders would switch to a Visa corporate card with similar attributes. With mix adjustment, Amex takes Visa pricing as given, and applies it to the Amex card portfolio.

Matching the Amex customer base to analogous Visa cards, and then applying the relevant (estimated) Visa fees, yields an estimate of the Amex premium on an apples-to-apples basis. This form of mix adjustment is an appropriate way to step into the shoes of a merchant considering surcharging. Because Amex has a mix of cards that corresponds to Visa and MasterCard offerings with high interchange rates, applying this adjustment causes the estimated fees for MasterCard and Visa to rise.

The IMPs reject mix adjustment, dismissing the approach as "deeply flawed." IMP Mem. 11 n.17. They do not spell out their critique, but note that "[t]he differential between Amex cards and non-reward MasterCard and Visa credit cards is much higher." *Id.* That statement is correct but seems inapt for the reasons given above. The IMPs also offer a specific numerical comparison of Amex with a plain-vanilla MasterCard at a high-volume supermarket. The comparison is marred by the fact that they appear to use a particular MasterCard *interchange* rate, rather than the total merchant fee, to make the comparison. The example is also puzzling because the effect of mix adjustment appears

to be small for MasterCard in supermarkets. High-interchange MasterCard cards are only 10 basis points more expensive than low-interchange cards, judging from the rate sheet cited by the IMPs. Where the interchange rates are tightly clustered, adjusting for mix has only a small effect. Overall, the IMPs' critique does not persuade me that mix adjustment is unhelpful for understanding a merchant's payment alternatives.

After applying the mix adjustment, there remains a large gap between Amex and its credit card competitors in many industries. For example, the apples-to-apples comparison for airlines leaves Amex with a premium of more than ██████████ over MasterCard and Visa. In particular, Amex has an airlines merchant fee of ████. MasterCard's mix-adjusted rate is ████, and Visa's is ████. (Without the mix adjustment, the gap is nearly ██████████, again using Amex's internal estimates.) The mix-adjusted gap in other travel and entertainment industries ████████. This large gap is not present across the board. In some industries, the mix-adjusted gap is small or negative.

In order to reach the conclusion that the gap is only 3 (and 8) basis points for MasterCard (and Visa), plaintiffs make a further adjustment. Plaintiffs use the weighted average of all of these industry-level estimates, where the weights are based on Amex's industry mix. Because Amex is more heavily weighted in high-fee industries such as airlines, compared to MasterCard and Visa, this weighted average produces a further increase in the Visa and MasterCard rates. Put another way, the large premium for airlines and other industries is watered down by industries in which the premium is small or non-existent.

This fully aggregated, all-industries figure is less helpful for understanding how a merchant *in a particular industry* views its payment alternatives. The point is to get a handle on what "each merchant sees," and for this purpose, the more useful figure is the more specific industry-level rate. Although the Amex model does include a summary table that reports a weighted average of all industries, the main point of the model is industry-specific comparisons.

In their discussion of mix adjustment, plaintiffs appear to imply that the Government's expert, Professor Michael Katz, shares the view that I have criticized: "[Professor Katz] contends the real margin is just a little broader, citing to testimony indicating that Amex's claimed premium is understated by one or two basis points." Pl. Mem. 30. For this proposition, plaintiffs cite several pages of Professor Katz's report, but the cited materials do not bear out plaintiffs' statement. The cited passage of Professor Katz's report discusses the Amex mix adjustment exercise but offers no endorsement that an average comparison across all industries is the proper approach for evaluating a particular firm's payment alternatives. In fact, these paragraphs discuss the Amex premium for a single industry, airlines. Nor does the passage indicate that the degree of understatement is just one or two basis points. In the cited materials, Professor Katz does not take a view on the size of the understatement, and the Amex sources cited in the report provide a range of estimates.

Dr. Frankel also offers a second measure of the Amex premium by developing his own estimate of average MasterCard and Visa merchant rates. Frankel Decl. ¶¶ 28-29, 31. This measure relies on the Amex mix adjustment model for an estimate of network

and acquirer fees. For the interchange rates, Dr. Frankel uses MasterCard and Visa's

actual interchange rates of 1.99% and 1.97%. Combined with the network and acquirer

fee estimate of 0.46%, he arrives at a total merchant fee of 2.45% and 2.43% for

MasterCard and Visa, yielding an Amex premium of ███████████ and ███████████.

This second measure seems less helpful for the analysis of a merchant's payment

alternatives, as it is neither mix-adjusted nor pitched at the industry level. Taken as a

whole, the data presented on the Amex premium does not appear to undercut the value

of brand surcharges.


**4. Product Surcharges**

Beyond parity surcharging and brand surcharging, there is a third type of

surcharge to consider. Product surcharges are yet more targeted than brand surcharges.

For example, a merchant might wish to focus its surcharge on high-fee cards, such as

Visa Signature or MasterCard World cards. The merchant could surcharge just these

products or surcharge them at a higher rate. The VMC Agreement permits product

surcharges, subject to limitations including the level playing field restriction. VMC

Agreement ¶¶ 42(b), 55(b).

The submissions say little about how this Agreement affects the availability of

product surcharges or the effect that a limit on product surcharges might have.

"Differential surcharging," as discussed by plaintiffs, means brand surcharging. Pl. Mem.

30. The objectors do not focus on product surcharges. An exception is Professor Stiglitz,

who concludes that product surcharges are prohibited by the Agreement, which he

views as a further competitive limitation compared to unrestricted surcharging. Stiglitz Decl. ¶¶ 30-31.

The Agreement does appear to prevent product surcharges, though I have not seen an explanation of this point in the submitted materials. To see why, suppose that a merchant wished to charge a 2% surcharge for Visa Signature and a 1% surcharge for plain-vanilla Visa cards. Under Agreement ¶ 8(b)'s least-of-all-surcharges provision, Amex would receive the benefit of the 1% surcharge. But Visa *also* enjoys the benefit of a least-of-all-surcharges provision, thanks to the level playing field limitation. So the Visa Signature surcharge would be limited to 1% as well.[12]

Product surcharges are a potentially important tool for merchants. Professor Stiglitz offers the example of a particular Visa rewards card whose price to supermarket merchants is 90 basis points higher than a plain-vanilla Visa card. Stiglitz Decl. ¶ 30 n.49. In response, Dr. Frankel accepts the principle that product surcharges could be useful, but states that there are "practical impediments" to its implementation that restrict its availability in practice. Dr. Frankel cites a study from Australia, where product surcharges are permitted but rare or possibly non-existent. Frankel Reply Decl. ¶ 19 n.29.

The cited study discusses one practical impediment, which is that Australian merchants often pay acquirers at a simple blended rate—indeed, a single rate that mixes Visa and MasterCard, credit and debit fees. Another practical impediment is that merchants have difficulty identifying the interchange rate for a particular card at the

---

[12] Professor Stiglitz reaches a similar result using different reasoning. Stiglitz Decl. ¶ 31.

point of sale, which is a prerequisite to an effective product surcharge. IKEA US MDL-1720 Decl. ¶¶ 23-27 (Hausman Decl. Attach. I). Thus, the lack of product surcharges has multiple causes beyond the Agreement. However, I am not in a position to offer a further assessment of the importance of this limitation.

## C. The Surcharge Cap

The surcharge relief in the Agreement is also limited in its absolute size. A merchant may not impose a surcharge larger than its cost of Amex acceptance. Agreement ¶ 8(c). More important, thanks to the VMC Agreement, the maximum surcharge is effectively capped by the average cost of acceptance for Visa or MasterCard. VMC Agreement ¶¶42(a)(ii), 55(a)(ii). That cap, in turn, applies to Amex, because the Amex surcharge cannot be higher than "any surcharge" on a competing credit card. This latter restriction is the binding constraint, so long as Amex remains more expensive than its competitors. Thus, the surcharge cap is in part a consequence of the limitations of the VMC Agreement.

Thanks to the cap, most merchants would be unable to set a surcharge that fully covers the merchant fee for accepting Amex. The feasible surcharge, however, is high enough to cover the increment between Amex and debit fees. This limitation applies not only to Amex, but to high-fee Visa and MasterCard cards as well, which have a merchant fee larger than the maximum permitted surcharge.

One important question, to which the materials do not provide a ready answer, is whether this cap has a significant effect on a merchant's willingness to surcharge. To

26

put the question another way, is there a sizable set of merchants that would be willing

to implement an infeasible 3% parity surcharge, but not a feasible 2% surcharge? I am

doubtful but lack the information to offer a firm view. Part of the answer depends on

customer response. If a merchant levies a surcharge, a larger surcharge can be expected

to reduce the number of customers that pay the fee, leaving a smaller number to pay

the larger fee, while shifting some of them to unsurcharged methods of payment and

causing some to defect. If that overall mixture of effects is profitable to the merchant,

then a larger surcharge is valuable, and its unavailability is meaningful.


**D. Is the Agreement a Step Backwards?**

Some objectors and experts express the concern that the Agreement will make

matters worse. The most natural interpretation for "worse" is to compare the effect of

the Agreement to the status quo with no agreement. An alternative baseline is to

compare the Agreement to the relief available if plaintiffs litigated and won their case.

This comparison is legitimate, too, as part of the evaluation discussed in Part I, which

includes an assessment of the relief from a litigation win, discounted by the probability

of losing.

It is important, however, not to conflate the two comparisons. Some statements

that the Agreement is "worse" are making a comparison of the second type. For

example, Professor Hausman states that the Agreement "removes" or "eliminates" the

leverage offered by brand surcharges. Hausman Decl. ¶¶ 42, 63, 87. The baseline for

these statements is not the status quo, but a but-for world with more powerful relief.

Some objectors similarly assert that the settlement is a step backwards, while elaborating that the settlement (merely) "perpetuates," "calcifies," "rubber-stamps," or "does not solve" existing problems. IMP Mem. 37-38; Southwest Mem. 23, 30.

In particular, some objectors assert that the Agreement makes matters worse relative to the seeming promise offered by the VMC Agreement. Thanks to the level playing field provision, restrictions in Amex surcharges also apply to Visa and MasterCard. For example, one objector criticizes the Agreement for "thwarting the ability of merchants to exercise" the "rights" received in the VMC Agreement. National Retail Federation Mem. 8. The basis for Professor Stiglitz's conclusion that the Agreement makes matters "worse" is that the Amex rules are "perpetuated," and that the Agreement "imped[es]" the positive effect "that otherwise would result from the Visa MasterCard settlement." Stiglitz Decl. ¶ 26. These statements adopt a baseline in which Amex relief would be unrestricted and fully unlock the Visa and MasterCard relief that is otherwise limited by the level playing field provision. Again, these statements are framed relative to a but-for world of more effective surcharging, not the status quo.

The same is true of some statements that merchant fees might increase after the Agreement. For example, Professor Hausman concludes that merchants "will be made worse off" by the settlement, because they will lack effective tools to respond to increased prices. Hausman Decl. ¶ 88. Professor Stiglitz similarly concludes that post-Agreement, Amex can increase its prices "without concern." Stiglitz Decl. ¶ 33. However, the competitive dynamic—a merchant's inability to respond to an increased fee—is equally true today, according to objectors' understanding of the market. Indeed,

the analysis of continuing price increases is part of some objectors' diagnosis of the status quo. Professor Stiglitz argues that merchant fees and customer rewards continue to increase in a "rewards spiral," a condition that "currently exists." *Id.* ¶ 4. The statement that prices will continue to rise does not necessarily constitute a worsening relative to the status quo. The same appears to be true of Professor Hausman's concerns that the settlement will promote "oligopoly behavior" or a "price fix" outcome. Hausman Decl. ¶¶ 61-62.

* * *

To summarize, objectors have raised very substantial doubt about the likelihood and extent of merchant utilization of parity surcharging under the Agreement. Merchant competition and likely customer resistance combine to make surcharging a risky proposition, particularly for the pioneers. The alternative of debit is an acceptable substitute only as to some customers and for some purchases. Brand surcharges are more promising because the destination to which customers are steered, another credit card, is a close substitute for more customers. Moreover, surcharging is prohibited as to roughly one-third of U.S. commerce, a limitation that has likely spillover effects for the other states. Finally, surcharging faces serious implementation challenges, and it is unclear whether and when the necessary technical means will become generally available.

Despite these concerns, it is possible that some pioneer merchants might overcome customer resistance to surcharging. This might occur, for example, in particular industries or forms of distribution such as online sales. Theory does not

furnish a decisive answer to these questions. The next part takes up evidence about

merchant interest in and benefit from parity surcharges.


## III. Evidence

This part discusses evidence that might bear on several questions raised in Part

II: Do customers tolerate parity surcharges? Can merchants thereby profit from

imposing surcharges? And will surcharges place pressure on credit card brands to

reduce their fees? Plaintiffs offer two kinds of economic evidence in support of their

view that parity surcharging will be helpful to U.S. merchants: the successful adoption of

surcharging in Australia, and a survey commissioned by plaintiffs, in which merchants

indicated that they would be interested in surcharging if it were permitted. These

sources are considered in turn. I then discuss other evidence from the U.S. market that

might be considered as well.


## A. Australia

The primary evidence of real-world surcharges comes from Australia. In 2003,

merchants gained the ability to impose brand surcharges. That same year, regulators

reduced the average interchange rate for Visa and MasterCard from 0.95% to 0.55%. (In

2007, the interchange rate was reduced by another five basis points.) Visa and

MasterCard rates promptly dropped, resulting in a large gap between these brands and

Amex—131 basis points in December 2003. Frankel Decl. ¶ 40.

Surcharging started slowly and gradually picked up steam. According to a periodic survey by East & Partners, a consulting firm, less than 10% of the largest merchants surveyed surcharged by the end of 2005, rising to 65% by the end of 2013. Smaller merchants have lagged in their uptake. Thirty-three percent of the smallest merchants, and 42% of surveyed merchants overall, surcharged by the end of 2013. Frankel Decl. ¶ 37 fig.4; East & Partners, Australian Merchant Payments: Market Analysis Report 31 tbl.24 (Dec. 2013).

Professor Hausman counters that these figures overstate the prevalence of Australian surcharging, noting that according to a 2010 Reserve Bank of Australia (RBA) survey, customers paid a surcharge on just 5% of transactions. Hausman Decl. ¶ 72. Professor Hausman offers a plausible explanation of the gap between the RBA and East & Partners figures, which is that some merchants use surcharges in only a component of their business, such as online and telephone sales, which have a higher reported surcharge rate. *Id.* ¶ 73. In reply, Dr. Frankel does not directly challenge this explanation, but argues that brand surcharges help explain the difference, because many customers facing a differential brand surcharge at a merchant will use a non-surcharged credit card. Frankel Reply Decl. ¶ 47.[13]

---

[13] Dr. Frankel also replies that surcharges are valuable in part because some Australian merchants have traded away the right to surcharge for lower fees. Frankel Reply Decl. ¶¶ 47, 49 n.78. This argument supports the importance of the ability to levy a brand surcharge, but does not help explain the gap, because the East & Partners figure implies that a large number of firms have *not* traded away their rights. Additional evidence of low surcharging rates is offered in a letter from major retailer Woolworths to the RBA (cited in Stiglitz Decl. ¶ 20 n.27), asserting that the largest merchants do not surcharge.

In support of the proposition that few customers defect from a surcharging merchant, and that surcharging is profitable for a merchant, plaintiffs point to Amex documents about brand surcharging of Amex cards. Plaintiffs emphasize Amex's conclusion, reflected in its internal presentations, that customers in Australia do not defect in response to such a surcharge. ███████████████████████

███████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

███████████████████████████████

██████████████████████████████████

█████████████████████████████████

████████████████████████████████

Plaintiffs also rely on Australian data for the proposition that surcharging places pressure on merchants to reduce their fees. In the decade since surcharges were introduced, Amex's merchant rates fell by 78 basis points, from 2.51% to 1.73%. Hausman Decl. ¶ 69 tbl.1. Dr. Frankel attributes this decrease to the ability to levy brand surcharges on Amex. Frankel Decl. ¶ 67. Substantial evidence on this point comes from

██████████████████████████████████████

███████████████████████████████████████

█████████████████████████████████████

███████████████████████████████████████

█████████████████████████████████

████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████

████████████████████████████

Professor Hausman challenges the conclusion that the ability to surcharge caused the decrease in Amex merchant rates. He argues that the key source of the downward pressure was not the merchant's ability to surcharge Amex, but rather its ability to refuse Amex acceptance altogether. A 2008 RBA study similarly cites this factor. Hausman Decl. ¶ 68. It seems likely that merchant threats of non-acceptance played some role in lowering Amex rates. One reconciliation of these views is that both threats of refusal and brand surcharges placed downward pressure on Amex rates.

A pressing question is whether the Australian experience with *brand* surcharging is applicable to *parity* surcharging in the United States. As discussed in Part II, U.S. customers are being asked to switch to debit, rather than credit. Dr. Frankel emphasizes two points of analogy between the United States and Australia—that in both countries, the targeted payment methods have a high rate, and the fee gap between surcharged and unsurcharged cards is large. Frankel Reply Decl. ¶48. These points of similarity, however, do not directly address the question of whether steering to debit yields too many defections to be profitable for a merchant.

More powerful would be evidence that *parity* surcharges in Australia were and are profitable for merchants. (A further question, to which I return below, is whether profitable parity surcharging places downward pressure on merchant fees.) Dr. Frankel

cites several studies stating that Australia has seen a shift from credit to debit, and that surcharges are one reason that this has occurred.[14] Frankel Decl. ¶¶ 53, 56. It is unclear from the quotations to what extent this shift comes from parity rather than brand surcharges. Dr. Frankel also cites a study showing that in response to a surcharge, some customers shift to debit rather than defect. *Id.* ¶ 54. The fact that some customers switch to debit, however, does not address the key question of how many of the remaining customers would defect instead, in response to a parity surcharge.[15]

Professor Hausman cites data suggesting that parity surcharges are unprofitable in Australia. The 2010 RBA survey discussed above also found that 14% of Visa and MasterCard customers, if faced with a hypothetical 1% surcharge, would defect rather than pay or switch to debit or cash. Hausman Decl. ¶ 45. That is an unprofitably high defection rate over a wide range of merchant profit margins.

In their reply submissions, plaintiffs and Dr. Frankel offer a new proposed fact: that equal surcharges, not differential surcharges, account for the great majority of surcharging in Australia. Pl. Reply Mem. 5, 14, 24-27; Frankel Reply Decl. ¶ 48.[16] This

---

[14] Professor Hausman challenges the debit-to-credit shift by noting that debit usage grew (slightly) more than credit in 2013. Hausman Decl. ¶ 78. However, the 2013 result appears to be unusual. The overall trend over the past decade has been a shift to debit. Frankel Reply Decl. ¶¶ 67-69.

[15] Another study cited by Dr. Frankel suggests that in response to a surcharge, there are no defections. Frankel Decl. ¶ 55. ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████ Professor Hausman posits that these cards are "typically" Visa and MasterCard credit cards, rather than debit, but the basis for this conclusion is unstated. Hausman Decl. ¶ 75. At a minimum, it is not clear that the alternative card is always or usually a debit card.

[16] I use the phrase "equal surcharge" rather than "parity surcharge" in this context to emphasize that in Australia, equal surcharges are a merchant's choice, not the result of a restriction

new proposed fact suggests a different basis for thinking that Australia is relevant to understanding U.S. parity surcharges (albeit one in some tension with the claim that it is the size of the gap that matters). Equal surcharges would suggest more directly that customers tolerate a surcharge that steers them to debit.

The basis for this proposed new fact is twofold. First, the degree of differential surcharges in 2010, as reported in Amex internal data, is low—███████[17] By contrast, the overall surcharging of Amex by merchants is high, according to East & Partners (75% in 2010), yielding an inference that most surcharging of Amex—and hence most surcharging—is equal surcharging. Second, plaintiffs have undertaken a new informal survey of the online businesses of large travel-and-entertainment merchants. Reply Mem. 25-27; Friedman Reply Decl. ¶ 10. The result reported by plaintiffs is that equal surcharging is common and differential surcharges are rare.

In evaluating this new proposed fact, it would be helpful to hear from the objectors, who have not had an opportunity to respond. The following reactions must be regarded as somewhat tentative. Plaintiffs' view conflicts with the contention of IMPs that differential surcharging is common and parity surcharging is rare. IMP Mem. 34-35. The IMPs point to East & Partners data from 2013 showing that 82% of Amex-accepting merchants surcharge, but only 38% of Visa and MasterCard-accepting

---

in the range of feasible surcharges. This distinction is important for evaluating the relevance of the Australian evidence for the claim that a parity surcharge places competitive pressure on a network to reduce price, as discussed below.

[17] ████████████████████████████████████
Compare Pl. Reply Mem. 24 with Frankel Reply Decl. ¶ 48 n.76. Judging from the cited document, plaintiffs appear to be correct.

merchants do so. The IMPs take this contrast as evidence of widespread differential surcharging.

However, more frequent surcharging of Amex compared to Visa or MasterCard, as a fraction of each network's accepting merchants, can coexist with low levels of differential surcharging. To take a simplified example, suppose all merchants accept Visa and MasterCard, but only one-third of them accept Amex. (The real East & Company figure is 35%.) Suppose further that the Amex-accepting merchants, and only these, surcharge all cards at the same level. The result is that 100% of Amex-accepting merchants surcharge, but just one-third of Visa and MasterCard-accepting merchants do so. There is a large difference across brands in the surcharge rate, even without any differential brand surcharging. Equally consistent with the East & Partners data is a high degree of differential surcharging. We just don't know from the East & Partners data taken alone.

The new proposed fact prompts a reconsideration of the claimed high prevalence of surcharging in Australia. As discussed above, East & Partners concludes that more than 40% of merchants surcharge, while the RBA study finds that only 5% of transactions are surcharged. Dr. Frankel's proposed reconciliation is that differential surcharging of some credit cards but not others helps explain the discrepancy. But if differential surcharging is rare, we must look elsewhere for an explanation—for example, to Professor Hausman's view that Australian surcharges are mainly limited to certain modes of distribution, such as online and telephone sales. That view would also be consistent with plaintiffs' new survey, which appears to focus on online sales.

The new evidence of equal surcharging may be helpful in demonstrating that parity surcharges are sustainable and profitable for merchants, without causing too many defections. However, two limitations are important to emphasize. First, the evidence would demonstrate a large effect from surcharging only to the extent that such surcharges are in fact widespread in Australia. As discussed above, this is unclear. Second, data about surcharging today in Australia is of less use in understanding about how surcharging was implemented in the first place. After all, once all merchants in an industry are surcharging—whether parity or brand surcharging—the question of defection recedes in importance. The new evidence is uninformative about whether equal surcharges were a successful tool in the commencement of surcharging, and the ███████████████████████████████████████████████████████████ ████████████████████████████████████████.

At first blush, evidence of equal surcharging in Australia might also be thought useful in support of an argument that in the United States, payment networks would reduce their rates in response to a parity surcharge. However, for this purpose, an equal brand surcharge and a parity surcharge are not equivalent. In Australia, the ability to implement a brand surcharge is the key to plaintiffs' account of falling Amex rates. An equal brand surcharge could be the end result of individualized bargaining between a merchant, wielding the threat of brand surcharge, and a particular payment network. An equal brand surcharge does not suffer from the problem of parity surcharges discussed in Part II, that parity surcharges lack a mechanism for rewarding a single network for

reducing its fees. The new evidence of equal surcharges is thus not informative about the use of parity surcharges as an instrument of lowering merchant fees.

**B. The Olinger Survey**

Plaintiffs also rely on a survey, commissioned by plaintiffs and prepared by the Olinger Group, to assess merchant receptivity to a message about surcharging. The respondents were shown a short, persuasive video about surcharging. Of 800 merchants in the main results, 23% (187/800) reported that they already surcharge. Of the remaining 613, after viewing the video, 68% (414/613) said they would surcharge if that option became available. In response to a follow-up question, another 21% (130/613) said they would be willing to surcharge if competitors did so, and the remaining 11% (69/613) said they would not surcharge even if competitors did so.

The survey is challenging to interpret in the form initially submitted by plaintiffs. A subsequent declaration by the survey designer and a draft version of the survey questionnaire are helpful in working out the sequence of questions, composition of the sample, and relationships among the various charts. For example, these materials clarify that the 613 responses relied on for the main results are a combination of two disparate groups: [1] 522 merchants that accept credit cards but do not surcharge, and [2] 91 merchants that do not accept credit cards.[18]

---

[18] The declaration of Dr. Robert Sims is Exhibit 38 of the Friedman reply declaration. The draft questionnaire is attached to the report prepared by Scott Elder and offered by the 7-Eleven objectors. Also helpful is a report prepared by Professor Rao Unnava for the Target objectors, which contains additional specific figures culled from a spreadsheet of survey results.

Several aspects of the survey's design undermine its utility in assessing the likely effects of the Agreement. The first problem is representativeness. The survey is not of merchants in general, but eight categories of small businesses, such as dry cleaners and taxis. Elder Rep. 2-5. The most frequent and most important credit card-using merchants are omitted entirely. Plaintiffs explain that these are the merchants that it was feasible to survey. Pl. Reply Mem. 29. However, that makes the survey less useful for predicting the effect of surcharging relief.

Moreover, a surprisingly high percentage of the surveyed merchants already surcharge—23%, as noted above, and a higher percentage of the surveyed merchants that accept credit cards. An even larger fraction—40% (318/800)—currently offer a discount for debit, check, or cash. More than half use some form of monetary steering, and some report using both surcharges and discounts. On the other hand, a sizable number of respondents currently do not accept credit cards at all. As the IMPs note, the

---

These materials are also useful for understanding the IMPs' challenge to the arithmetic of three survey charts. IMP Survey Mem. 13-14. The first challenged chart labels the set of 613 respondents discussed in the text as "respondents who do not currently charge customers extra when paying by credit card." Olinger Study 10. The IMPs read this label to exclude the 91 non-acceptors discussed in the text. The mix-up is resolved by recognizing that the figure also includes the non-acceptors.

The second chart analyzes a set of 171 merchants that do not currently accept credit cards, Olinger Study 11, which is larger than the set of 91 non-acceptors. The difference is explained in the survey designer's declaration. Sims Decl. 1. There were originally 880 respondents, not 800, 171 of whom do not accept credit cards. After watching the video, 91 respondents expressed an interest in accepting credit cards and were included in the main results. (The 91 include a small number for whom the video elicited an interest in accepting credit cards, but not in surcharging.) The remaining 80 showed no interest and were dropped from the analysis, thereby reducing the sample from 880 to 800.

The third chart discusses 731 merchants "who accept credit cards and indicate a willingness to use a surcharge." Olinger Survey 12. This chart is an analysis of the 800 respondents, minus the 69 die-hards, discussed in the text, that refused to show interest in surcharging even after a video and follow-up questions. Sims Decl. 1. The chart includes some merchants that do not accept credit cards but expressed an interest in doing so, and the IMPs' criticism stems from the inaccurate label.

surveyed merchants are quite unlike the universe of credit card accepting merchants.

IMP Survey Mem. 5.

The survey's value is further undercut by the design of the persuasive video message. As plaintiffs candidly acknowledge, the survey's purpose was to determine the respondents' receptivity to a brief commercial message about surcharging. Pl. Reply Mem. 28-30. However, the persuasive message conveyed in the video omits central elements of real-life surcharging under the Agreement. For example, the video breezily treats surcharging as a no-lose proposition, assuming away the critical and difficult question of merchant competition and customer defections. The video emphasizes the successful Australian experience, telling respondents that the largest and most sophisticated merchants surcharge, but leaving out that this level of surcharging took a decade to emerge and that small businesses such as respondents surcharge at much lower rates. The video also depicts a 3% surcharge, a level that is currently infeasible given the surcharge cap. Overall, the Olinger survey offers little assistance in predicting the likelihood that merchants would use the relief provided by the Agreement.

**C. Additional U.S. Evidence**

Another real-world source of evidence about surcharging is the three million U.S. merchants that accept Visa and MasterCard, but not Amex. These merchants may surcharge under the VMC Agreement without the limitations of the level-playing-field rule. Since January 2013, they have been free to parity surcharge or brand surcharge. Levy Decl. ¶ 3. Plaintiffs' declaration suggests that the degree of surcharging of Visa and

MasterCard so far by these merchants may be quite limited. *Id.* Aside from the declaration, there is surprisingly little discussion of this issue in the settlement submissions.

The current degree of surcharging, and the reasons for its limits, could provide additional insight about whether the relief in the Agreement is valuable to merchants. If indeed the amount of surcharging is negligible, one possible reason could be a difference in sophistication or size of these merchants, compared to those that accept Amex. More troubling reasons would include practical difficulties of implementation and merchant disinterest. Also useful, though somewhat further afield, would be an evaluation of these merchants' real-world experience with discounting under the Government's settlement with MasterCard and Visa, and merchants' experience with untargeted discounting of debit under the Durbin Amendment.

One drawback of the present Agreement, from the standpoint of economic evaluation, is the long delay before it takes effect. The VMC Agreement provided for the relevant rule change to be implemented within 60 days of preliminary approval. VMC Agreement ¶¶ 42, 55. A quick implementation after preliminary approval provides an opportunity for early real-world feedback about how a settlement works in practice, furnishing months of useful data before an approval is finalized (or years, once an appeal is taken into account). By contrast, the present Agreement provides for relief to take effect only after the exhaustion of all appeals. Agreement ¶¶ 1(uu), 1(aaa), 9. That delay deprives the evaluative process of a potentially useful source of information. For injunctive relief with highly uncertain effect such as that contained in the Agreement,

and in light of the principal-agent problem that the evaluation is intended to overcome, the contrast seems particularly stark.

One further source of U.S. evidence is of limited use in assessing the likely effectiveness of the Agreement. Dr. Frankel notes several exceptional instances in which surcharges have been successfully implemented in the United States. Frankel Decl. ¶¶ 36, 50. The examples focus on convenience fees sometimes imposed by universities, governments, and utilities. However, these examples do not support the conclusion that surcharging is likely to be implemented by merchants in competitive industries. The examples come from merchant categories that do not face the risk of customer defection in the face of surcharging. Hausman Decl. ¶ 77. The examples, if anything, tend to underscore the difficulty faced by most merchants. Indeed, a Visa white paper cited by Dr. Frankel ███████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

**Conclusion**

Based on the submitted materials, the effect of the relief provided by the Agreement is highly uncertain. There is a substantial probability that its effect will be small or zero. The remedy is untested and somewhat speculative. There is little demonstrated merchant appetite for parity surcharges in the United States. Pioneer merchants willing to surcharge may be slow to emerge, given the risk of customer defection to competitors. The Australian evidence suggests that surcharging can be

successful, but much of this evidence pertains to brand surcharging, not parity surcharging. Moreover, surcharges in the United States face particularized challenges not present in Australia, such as its illegality in some states.

Although it is unclear whether the relief will have a significant effect, neither can such an effect be ruled out. Under the right conditions, surcharging might indeed break out, perhaps in certain industries or forms of distribution. In a steady state in which all competitors in an industry are surcharging, the defection concern could be expected to dissipate over time.

August 11, 2014

_____

C. Scott Hemphill