1   UNITED STATES DISTRICT COURT
    EASTERN DISTRICT OF NEW YORK
2   -------------------------------------------x

3   IN RE: AMERICAN EXPRESS ANTI-STEERING

4   RULES ANTITRUST LITIGATION (II)    11-MD-02221-NGG-RER

5   -------------------------------------------x
    THE MARCUS CORPORATION, on behalf of
6   itself and all similarly situated persons,

7                   Plaintiff,          13-CV-07355-NGG-RER

8           versus                      UNITED STATES DISTRICT COURT
                                        BROOKLYN, NEW YORK
9   AMERICAN EXPRESS COMPANY, et al.,
                    Defendants.
10  ----------------------------------x
                                SEPTEMBER 17, 2014
11                              10:00 A.M.

12                  TRANSCRIPT OF FAIRNESS HEARING
            BEFORE THE HONORABLE NICHOLAS G. GARAUFIS,
13              UNITED STATES DISTRICT COURT JUDGE

14

15              A P P E A R A N C E S :

16  Attorneys for Proponents

17  FRIEDMAN LAW GROUP LLP
    270 Lafayette St
18  Suite 1410
    New York, NY 10012
19
    BY:  GARY FRIEDMAN, ESQ.
20

21  BOIES, SCHILLER & FLEXNER LLP
    575 Lexington Avenue
22  Seventh Floor
    New York, NY 10022
23
    BY:  PHILIP C. KOROLOGOUS, ESQ.
24       JOHN F. LaSALLE III, ESQ.

25

```
 1    A P P E A R A N C E S: (CONT'D)

 2    Attorneys for Target Objector Group and National Retail
                  Federation:
 3
      VORYS, SATER, SEYMOUR AND PEASE LLP
 4    52 East Gay Street
      Columbus, OH 43215
 5
      BY:  MICHAEL J. CANTER, ESQ.
 6         ROBERT N. WEBNER, ESQ.

 7
      Attorneys for 7-Eleven Objector Group:
 8
      CONSTANTINE CANNON LLP
 9    335 Madison Avenue, 9th Floor
      New York, NY 10017
10
      BY:  JEFFREY I. SHINDER, ESQ.
11

12    Attorneys for Blue Cross and Blue Shield Health Insurer
                  Objectors:
13
      MILLER & CHEVALIER CHARTERED
14    655 Fifteenth Street, N.W., Suite 900
      Washington, D.C. 20005-5701
15    BY:  ADAM P. FEINBERG, ESQ.

16

17    Attorneys for The Buckeye Institute for Public Policy
                  Solutions:
18
19    Center for Class Action Fairness

20    BY:  ADAM E. SCHULMAN, ESQ.

21

22

23

24

25
```

```
1    A P P E A R A N C E S:  (CONT'D)

2    Attorneys for Unlimited Vacations and Cruises, Inc., Lasko
     Enterprises, Inc., and Annamarie Falvo d/b/a The Silk House:
3
     JOHN J. PENTZ, ESQ.
4    19 Widow Rites Lane
     Sudbury, MA 01776
5
     BY:  JOHN J. PENTZ, ESQ.
6

7    Attorneys for Home Depot:

8    BONDURANT MIXSON & ELMORE, LLP
     1201 West Peachtree St NW
9    Suite 3900
     Atlanta, GA 30309
10
     BY:  FRANK M. LOWREY IV, ESQ.
11

12   Attorneys for American Express:

13   CRAVATH, SWAINE & MOORE LLP
     Worldwide Plaza – 825 Eighth Avenue
14   New York, NY 10019-7475

15   BY:  STUART W. GOLD, ESQ.

16

17   Attorneys for Southwest Airlines Co., Airtran Airways, Inc.,
     Alaska Airlines, Inc., DSW, Inc., and Newegg, Inc.:
18
     SPERLING & SLATER, P.C.
19   55 W. Monroe Street
     Suite 3300
20   Chicago, IL 60603

21   BY:  PAUL E. SLATER, ESQ.

22

23

24

25
```

```
1    A P P E A R A N C E S:  (CONT'D)

2    HAGENS BERMAN SOBOL SHAPIRO LLP

3    555 Fifth Avenue, Suite 1700
     New York, NY 10017
4    BY:  JASON A. ZWEIG, ESQ.

5

     Attorneys for United States of America:
6
     U.S. DEPARTMENT OF JUSTICE
7    601 D St. NW – PHB Room 9537
     Washington, DC 20004
8
     BY:  ADAM J. SCHWARTZ, ESQ.
9         MARK H. HAMER, ESQ.

10

11

12   Court Reporter:

13   Charisse Kitt, CRI, CSR, RMR, FCRR
     225 Cadman Plaza East, Room N357
14   Brooklyn, New York  11201
     Tel: (718) 613-2606 Fax: (718) 613-2696
15

16   Proceedings recorded by mechanical stenography, transcript
     produced by computer.
17

18

19

20

21

22

23

24

25
```

Proceedings

1          THE COURT:  Please be seated.

2          THE CLERK:  Civil cause for a fairness hearing.

3    Lead counsel for the parties state your appearances.

4          MR. FRIEDMAN:  Gary Friedman for the class

5    plaintiffs.  Good morning, your Honor.

6          THE COURT:  Good morning.

7          MR. KOROLOGOUS:  Good morning, your Honor.  Philip

8    Korologous for American Express.

9          THE COURT:  Good morning.  All right.  And?

10         MR. CANTER:  Your Honor, Michael Cantor for the

11   objectors, Target and National Retail Federation.

12         THE COURT:  All right.  As we get to the objectors'

13   portion of the fairness hearing, we'll have you state your

14   appearance again for the court reporter.

15         All right.  This is a fairness hearing regarding the

16   class settlement agreement in In Re American Express

17   Anti-Steering Rules Antitrust Litigation, 11-MD-2221 and

18   Marcus Corporation versus American Express Company,

19   13-CV-7355.

20         We're going to proceed today in accordance with the

21   order that I issued recently beginning with the proponents of

22   the approval of the agreement.  First class plaintiffs,

23   Mr. Friedman will speak first and then I understand on behalf

24   of AmEx, Mr. Korologous you're going to speak second.

25         MR. KOROLOGOUS:  That's correct, your Honor.

Mr. Friedman

1          THE COURT:  And you're allotted 60 minutes and we
2     have a timer.  And you are, of course, permitted to use less
3     time than you're allotted.  But you are certainly permitted to
4     use as much time as you're allotted.
5          Is there anything we need to do before we begin the
6     presentations?  Hearing nothing, let's start on behalf of the
7     class plaintiffs.  Mr. Friedman.
8          MR. FRIEDMAN:  Good morning, your Honor.
9          THE COURT:  Good morning.
10          MR. FRIEDMAN:  Gary Friedman for the class
11     plaintiffs.
12          Ten years ago, the Marcus Corporation filed suit
13     against American Express.  Marcus turned to the legal system
14     and the antitrust laws to try to find some way to control
15     their payment card acceptance costs because normal market
16     forces were not working.  If someone had told Marcus at that
17     time that we would be standing here today one fairness hearing
18     away from merchants in the United States having the right to
19     impose surcharges on credit card transactions, not just on
20     AmEx but also on Visa cards, on MasterCard cards, on Discover
21     cards for the first time ever in US history, Marcus would have
22     been thrilled.
23          Thrilled because the settlement agreement here today
24     provides Marcus and 6 million other merchants with
25     unprecedented opportunities to control those card acceptance

CHARISSE KITT, CRI, CSR, RMR, FCRR
Official Court Reporter

Mr. Friedman

1    costs by recouping the fees that they paid to the credit card

2    networks, by driving transaction volume to debit which is far

3    cheaper, by driving transaction to cash also by driving

4    transaction card volume to other credit card brands on which

5    the consumer is not responsible for paying a surcharge.  And

6    I'll unpack all of that here in my remarks this morning.

7              Ten years ago, the idea of being able to surcharge

8    credit cards in the United States seemed farfetched.  In

9    Australia, the experiment with credit card surcharging was in

10   its earliest infancy.  And all the merchants there, all the

11   large merchants were saying they will never do it, it'll never

12   take hold.  The Australian Retail Federation in its

13   submissions pre-reform to the Reserve Bank of Australia said

14   that it is totally unrealistic to expect that merchants will

15   take up surcharging in Australia, it won't happen, the quote,

16   competitive forces amongst merchants with key surcharging

17   could ever, catching on.  And that sounds a lot like what

18   we're going to hear here, from the objecting merchants, from

19   some of the objecting merchants.

20             And here at home, the idea of surcharging just

21   seemed like a pipe dream.  You had the Visa no surcharge rule,

22   the MasterCard no surcharge rule, Discover had a rule back

23   then, and there's the AmEx rule.  On top of that, there were

24   ten state statutes, the enforceability of which no one ever

25   doubted and which no one had any incentive to challenge,

CHARISSE KITT, CRI, CSR, RMR, FCRR
Official Court Reporter

Mr. Friedman

1  whether in the courthouse or the state house, because of all

2  those network rules.

3          So for a merchant in, say, New York state there were

4  four -- all four network rules and state law, in essence five

5  walls standing between that merchant and the ability to engage

6  in surcharging.

7          THE COURT:  Well, let me just ask you this:  There

8  are no surcharging statutes in a number of states.  Correct?

9          MR. FRIEDMAN:  Correct.

10         THE COURT:  We can start with California.  Right?

11  Do they have a non-surcharging law?

12         MR. FRIEDMAN:  They have a statute.  It's been held

13  by courts there to actually compel only disclosure of the

14  surcharge but that's going to get sorted out because there is

15  an ongoing litigation challenging it directly.

16         THE COURT:  And then there's Texas.

17         MR. FRIEDMAN:  Yes.

18         THE COURT:  They have one.  And Florida has one.

19         MR. FRIEDMAN:  Yes.

20         THE COURT:  And several other states have them.

21         MR. FRIEDMAN:  Correct.

22         THE COURT:  So as of this moment, there are

23  impediments to permitting surcharging in those jurisdictions.

24  Correct?

25         MR. FRIEDMAN:  That's correct.  That's exactly

Mr. Friedman

1   right.

2          THE COURT:  All right.  And if approved, this

3   settlement will be of varying consequence to residents in

4   those states and others.

5          MR. FRIEDMAN:  That is exactly right.

6          So for the majority of merchants, this is the last

7   wall, what's on the table right here today.  For some

8   merchants in some states, it's the second to the last wall.

9          THE COURT:  The last wall being statutory.

10          MR. FRIEDMAN:  The last wall being statutory.  And

11   without this network rule being removed, there can be no

12   statutory challenge.  There's no incentive, nobody will do it.

13   This makes that meaningful.  It puts every merchant one step

14   closer.  For the vast majority, it gets them all the way home.

15   For a handful, they have another mountain to climb.  And those

16   mountains are being climbed.  As we've pointed out in our

17   papers, there are constitutional challenges afoot in Texas, in

18   Florida, in California.

19          THE COURT:  But if you're a company with a national

20   operation, take Home Depot or CVS or Rite Aid, they could

21   impose surcharging certain places but not in other places if

22   this settlement is approved.  Right?

23          MR. FRIEDMAN:  For the time being, they could

24   surcharge only in some places but not in other places if the

25   settlement is approved.  I will point out, however, that if

Mr. Friedman

1    the settlement weren't approved, then some of the objectors

2    here, the individual merchant plaintiffs in particular, are

3    keen on saying they want to hold out for differential

4    surcharging, the same is true there.

5         THE COURT:  We'll get to differential surcharging in

6    a moment.

7         MR. FRIEDMAN:  Okay.

8         THE COURT:  Go ahead.

9         MR. FRIEDMAN:  But, your Honor, you pretty much

10   brought me to the point of that, which is that for the

11   majority of US merchants this is it, this is the last obstacle

12   on a very long road.

13        So what I want to cover is, is I want to talk about

14   some of the elements of value that this settlement provides to

15   US merchants.  I want to talk about why it is that we are so

16   sure that these tools are going to in fact be used in the

17   marketplace.  And then I will address the class certification

18   issues.  But I'm going to start by talking about what the

19   settlement does, what it is, and I think it's useful to have

20   that out on the table.

21        The core of the settlement agreement is that it

22   allows for surcharges.  And the surcharging has to be done on

23   a parity basis, it can't exceed the surcharge amount on any

24   other credit card brand.  It can't exceed the cost of

25   acceptance that the merchant has on American Express.

Mr. Friedman                                    11

1          THE COURT:  Why did you press for differential

2   surcharging?  What's the reason for parity surcharging in this

3   case?

4          MR. FRIEDMAN:  We certainly did press for

5   differential surcharging, and this reflects a compromise.  And

6   what I want to explain here this morning is just how much

7   value there is in parity surcharging.  Would differential

8   surcharging have been better?  I think we've said throughout

9   our papers that it would have been.

10         I can't imagine a world where American Express

11  willingly agrees to allow its cards to be differentially

12  surcharged freely across the United States.  I don't think

13  that that is a viable litigation outcome on any model.  We've

14  looked very carefully at everything every objector has had to

15  say.

16         I don't want to be cute here, but I think we used

17  the term in one of our briefs, it's a litigation mirage, you

18  can't get there from here.  We tried to get there from here.

19  We tried.  We went through quite -- but -- now, I should dial

20  that back.  There is -- if the -- we could still make a run at

21  differential surcharging.  There is one way that you can get

22  through the court system differential surcharging for all

23  merchants in America.  There's one way.  I'll sketch it out

24  right now, though it had been at the back app with my

25  presentation.

Mr. Friedman

1          If the settlement is rejected then, then the next up

2     is the -- then there's the motion to dismiss our equitable

3     claims, the class equitable claims in favor of arbitration.

4          We have strong arguments based on the vindication of

5     rights doctrine from the Supreme Court.  The Supreme Court

6     reaffirmed the vindication of rights doctrine, it did not

7     disavow it in Italian colors.  And that's the portal that we

8     want to -- I think that's very clear, Justice Scalia made

9     statements reaffirming that there's a vindication of rights

10    doctrine.  I think this is a situation in which it applies.

11         Obviously, the objectors here disagree with that.

12    Though nobody has spent any time in their submissions taking

13    on this vindication of rights issue.  But the only thing that

14    is certain is that there will be appeals.  However your Honor

15    rules, it's appealable.  Well, yes, but it's appealable in

16    either direction and it is every bit the big heavy appellate

17    case the Italian colors was, and I think frankly more so.

18         And I think that the -- so it's a very difficult

19    road ahead.  I think that there's a substantial likelihood of

20    certiorari being granted.  Who knows where it leads.  The

21    problem is if we go that road and we lose, then for 6 million

22    merchants there's no ability to surcharge, none.  So it's very

23    risky.  It would be a very risky gamble to just go into

24    that -- to embark on that appellate journey understanding that

25    if we're unsuccessful, that's it for 6 million merchants.

Mr. Friedman

1          Now, what's really important, what I really want to

2    convey to your Honor is just how much potential there is in

3    the parity surcharge and relief to give relief to merchants,

4    to do all the things that we set out to do when we brought the

5    case from Marcus Corporation over a decade ago and to incite

6    competition inside the credit card network.  This is a

7    compromise.  And I want to focus on the value of what it is

8    that we compromised for.

9          THE COURT:  Do you have any indication on the ease

10   with which it will be possible to engage parity surcharging

11   for the restaurateur down the block here if this settlement is

12   approved?  I mean, some of what I've read is to the effect

13   that it's difficult to explain, it's difficult to sell, and

14   it's difficult to do.

15         MR. FRIEDMAN:  It is easier to explain the parity

16   surcharge.  It's easier to do a parity surcharge than any

17   other form of surcharge.  This is the simplest surcharge.

18   This is credit cards, 2 percent, debit free, we're done, as

19   opposed to some schedule of rates.  So it's easier than

20   differential.  But there's another aspect.  I think --

21         THE COURT:  But the parity surcharge would be by

22   type of merchant?  It would be different for different classes

23   of merchants?  For instance, airlines or retail drug chains or

24   major big box retailors, there would be different parity

25   surcharges for different classes of merchants?

Mr. Friedman

1        MR. FRIEDMAN:  We cannot possibly know.  And let me

2   put some flesh on the bones of that answer.

3        You'd think listening to the objectors, for example,

4   that parity surcharging cannot possibly take hold in the

5   places -- the places where it's most difficult to take hold,

6   where there's a real impediment, are places where credit and

7   debit are least substitutable.  So that would be, say, high

8   ticket merchants or merchants that have other drabs on

9   substitutability between credit and debit, like hotels.

10        But here's what we know.  In Australia all of the

11   hotels, virtually all of the hotels are parity surcharging.

12   That's a real life experiment, that's real world evidence, and

13   we see that there.  And if you're going to adopt -- if you're

14   going to have the intuition or the theory that customer

15   defection risks doom parity surcharging, you have to account

16   for that real world evidence.  Because if they're going to

17   doom it anywhere, it's in high ticket.  But they don't.

18        The other -- I mean, the hotels -- the other point,

19   as long as we're on it, I'll stay on this point and Scott, can

20   we go to the hotel slide because I think it's illustrative,

21   another argument that we've heard from the objectors is, oh,

22   well, where you're not going to see parity surcharging is in

23   markets where it's competitive and the 7-Eleven objector's

24   expert Professor Hausman said well, we think Australia is less

25   competitive than the United States, and in competitive sectors

Mr. Friedman

1    you're not going to see parity surcharging breaking out.  But

2    there's not a lot more competitive sectors than this.

3         Within a stone's throw of the Sydney Opera House,

4    literally within a half a mile, every single one of these

5    brands, every brand you see coming on here is parity

6    surcharging.  By the way, there are also a couple of other

7    hotels in the area that choose not to surcharge.  That's fine.

8    The Intercontinental doesn't surcharge.  Great.  All of these

9    brands do.  Clearly, this is a competitive market.  Clearly it

10   is.  It's just common sense.

11        Actually, if you can hit the next slide.  Car

12   rentals at the Sydney airport, I mean, talk about a

13   competitive market, this is just as naked it as it gets.  It's

14   right out there for the world to see.  There's the cars,

15   there's the rates.  And half of these brands are parity

16   surcharging.

17        And parity surcharging is nearly universal in huge

18   slots of commerce in Australia.  So when the objectors proffer

19   the theory that customer defection risk will doom parity

20   surcharging, they have to account for the evidence.  You can't

21   just ignore the evidence.  And the evidence tells us that it

22   will take hold.  It will take hold.

23        What do we have?  We have merchants here saying, oh,

24   we're not going to do it.  Well, that's what they said in

25   Australia.  And every excuse that they've come up with for why

Mr. Friedman

1    what happened there wouldn't happen here falls like a rock.

2           The other one that the objectors have proffered is

3    that well, parity surcharging can really only happen where

4    there had been differential surcharging.  So they would

5    explain away our evidence of widespread parity surcharging by

6    saying well, those folks had been doing differential.  But if

7    you look at these hotels, not one of them -- all of them are

8    doing brand-wide parity surcharging.  Not one of them began

9    their surcharging lives during differential surcharging.  And

10   we know that from comprehensive AmEx data.

11          So the theory has to be able to survive the evidence

12   and it just doesn't.  It doesn't.  And my concern is that the

13   other side of the argument here is all based on just sort of

14   intuition, and our side is based on evidence.

15          There's one other suggestion that objectors have

16   made to try to explain the evidence of widespread parity

17   surcharging in Australia.  I would be remiss if I didn't

18   mention it.  And that is the notion that merchants do it

19   online, that, well, it's a niche practice, surcharging in

20   Australia, and people just do it online, a facet of their

21   business.

22          But if you just think about it for a moment, that

23   really doesn't hold water because if the risk you're concerned

24   about is customer defection, then I would submit the last

25   place that you would do parity surcharging is online because

CHARISSE KITT, CRI, CSR, RMR, FCRR
Official Court Reporter

Mr. Friedman

1    it's so easy for customers to defect.  You can go from Amazon

2    to iTunes with a click of a mouse.  Right?  But if you wanted

3    to go from Home Depot to Lowe's, you have to get your bags,

4    get in your car, it's a much bigger deal.  And there's no

5    evidence, there's just no evidence that surcharging is more

6    prevalent online.  So all of that evidence just, I think, is

7    so strong in favor of our relief.

8            And I'd like to focus on the indicative aspects

9    because some of the criticism that we come in for in the

10   objection papers is that the relief here doesn't do anything

11   to foster competition inside the credit card space, you know,

12   that it's totally reliant on the dynamics of moving people to

13   debit and so forth.

14           And there's something getting lost here.  We've

15   mentioned in a couple of our submissions now that the parity

16   surcharging relief that's provided for in this agreement and

17   the relief that will grow out of a Justice Department victory,

18   should they be victorious in the trial, if you take those two

19   strands of relief and put them together, that they open up

20   tremendous competitive opportunities where the whole is far

21   greater than some of the parts.

22           And there's an example that we gave.  These briefs

23   are lengthy.  But in our reply brief in the context of Macy's,

24   and what we said there was if Macy's doesn't want to surcharge

25   its own co-branded card, what it can do is it can impose a

18

1    parity surcharge on all credit cards, say 2 percent, whatever,

2    and say, but if you use your Macy's card, the surcharge is on

3    us, we'll take it off the bill.  And that would have the

4    effect of steering volume to the Macy's card, a good thing

5    from Macy's perspective.  And it also gives people who want to

6    use a resolving credit a surcharge-free option, which is a

7    very large part of the critique of our relief, that we're not

8    affording a surcharge free revolving credit card option but

9    there you are in that example.  I think you see that.  And

10   that's kosher under the settlement agreement, this example.

11           And what I just wanted to spend a minute on here is

12   thinking about the opportunities to expand that basic concept,

13   because it goes far beyond code brands.  You could have

14   Discover come to Hyatt or my client Marcus hotels and say, how

15   about this:  Surcharge everybody at 2 percent and we'll

16   advertise that if they use their Discover card at the hotel

17   that the surcharge will never appear on their monthly

18   statement.  The surcharge will never appear on the monthly

19   statement.  It might be at the point of sale but they'll never

20   actually have to pay it.  And it'll look something like this.

21   We put a slide up, this is a mockup, it's not -- you know,

22   this is not a real deal, we didn't do a commercial negotiation

23   here.

24           But it informs the consumer that Marcus imposes a

25   surcharge, tells them something about why and tells them if

Mr. Friedman                                                    19

1   you use Discover card at Marcus hotels, the surcharge is on

2   us.  And I think that there's a couple of powerful

3   implications here that weren't mention.  One is that you're

4   giving the cardholder, you're giving the consumer a

5   surcharge-free option for using revolving credit cards if you

6   buy into the theory that to not do that would court customer

7   defection risk, and we don't buy that theory for the reasons

8   that I've talked about in Australia where just having pure

9   parity surcharging obviously is not costing anybody lost

10  sales.  So I actually don't buy that theory.  But if you do

11  buy that theory, here's a surcharge-free revolving credit card

12  option.

13          So in that sense, it ameliorates the customer

14  defection risk and it makes it easier to do parity

15  surcharging.

16          THE COURT:  What is the benefit of this settlement

17  if you're wrong and merchants, large merchants in the United

18  States and small decide that they there's resistance to parity

19  surcharging, and you have this settlement which limits the

20  rights of merchants to adjudicate through various means their

21  complaints that arise out of their merchant agreements with

22  American Express and they don't get the surcharge because it,

23  as a practical matter, has resulted in consumer resistance?

24  So what's the benefit that has now accrued to the merchants

25  who are covered by this agreement?

                              Mr. Friedman                           20

1            MR. FRIEDMAN:  Okay, your hypothetical asks me to

2    assume that parity surcharging which is ubiquitous in

3    Australia is just is a nonstarter here.

4            THE COURT:  I've never been to Australia.  I don't

5    know how consumers think in Australia.  If you'd like to send

6    me there, you know, so that I can conduct a survey, that would

7    be fine.  But I'm talking about -- Australia is a -- it may be

8    a large country geographically but it's a small country in

9    terms -- and it's monolithic as opposed to the United States

10   which is more heterogenous.  You know, the middle is different

11   from each of the ends, the south is different from the north.

12   There are all kinds of issues that play in the United States,

13   in terms of consumer loyalties and consumer preferences and

14   regional preferences and so forth that I can't even imagine.

15   We could write an encyclopedia on the subject.

16           I'm just asking you what if your theory is not

17   applicable or the Australian experience is not applicable to

18   the market here, the heterogenous market in the United States,

19   then what has been gained for the merchants as a consequence

20   of this settlement if it's approved.

21           MR. FRIEDMAN:  First of all -- okay, I understand.

22   First of all, I think that the heterogeneity that you're

23   talking about supports the proposition that surely there will

24   be pockets of commerce in which this practice is profitable

25   for merchants.  It's certainly profitable, it makes sense to

                  CHARISSE KITT, CRI, CSR, RMR, FCRR
                        Official Court Reporter

Mr. Friedman                                                    21

1    do it and -- but if it were -- like if you take -- if you're

2    saying -- if the hypothetical is that merchants won't do it,

3    like they can't do it, if there was a congressional, if there

4    was a federal law that says they can't do it.

5              THE COURT:  Let me be more practical.  Let's say I'm

6    buying a ticket from one point to another on an airline and I

7    see that Airline A has a 2 percent parity surcharge, but

8    Airline B, and that's a very competitive industry, has decided

9    that it's going to benefit from Airline A's decision and it's

10   not going to impose that surcharge and so I'm going to pay

11   2 percent less on Airline B on the same point-to-point trip

12   that I would have taken on Airline A.

13             MR. FRIEDMAN:  If that hypothesis were -- if that

14   were correct, everybody would be Southwest, bags fly free, but

15   they're not.  But they're not.  And we know Southwest has the

16   bags fly free.  You know a lot more about the airline industry

17   than I ever will, but that bag, if you checked two bags on

18   Delta or United or whatever, that's like, that as a percentage

19   of the ticket, I think somebody did 13 percent of the average

20   ticket or something like that but they don't move that much

21   more --

22             THE COURT:  I'm asking if they decide to compete on

23   the surcharge, you know, it's -- obviously it's more complex

24   than the simple hypothetical that I gave you.  But if they

25   decide to compete on the surcharge and there's pushback on

CHARISSE KITT, CRI, CSR, RMR, FCRR
Official Court Reporter

Mr. Friedman

1    Airline A, they can go back to not surcharging so that they're

2    not at a disadvantage on price.  You know, when you go from --

3    as you said, if you click on Airline A and then you click on

4    Airline B and Airline B isn't charging the surcharge.

5             MR. FRIEDMAN:  But what I'm trying to say, your

6    Honor, is that today you click on Airline A and you're paying

7    for bags, you click on Airline B and it's Southwest and you

8    don't pay for bags.  And Southwest isn't eating everybody's

9    lunch.  They're doing okay with the bags fly free but it

10   hadn't swept the industry.  And that's the point we were

11   making, too.

12            I know you don't want to talk about Australia, but

13   why wouldn't Marriott hotels say, we'll surcharge free?  On

14   that theory they would just, they would eat up the whole

15   industry, everybody would come flocking to them if that theory

16   were right.  The problem is the theory is wrong.  It is pure

17   theory.  And this is evidence, we have evidence.

18            And further, when you apply it in the context like

19   on the slide that you see in front of you, it's a form of

20   surcharging that very much does lead to competition inside

21   credit cards.  And any merchant can do it.  And the restaurant

22   that you talked about in the earlier hypothetical, they should

23   be able to do a deal with their credit card companies to have

24   the surcharge come off.

25            You know, Professor Hemphill asked the objectors,

Mr. Friedman

1    suggested that it would be useful if they could account for

2    the Australia evidence.  And I think that was driven by his

3    understanding that if you're going to say well, Australia is

4    different, that's fine, but tell us, it's different because

5    what.  It's different because one thing or another and they

6    don't have an answer.  So I don't think we can just ignore it.

7           We also have other indications domestically.  We do

8    see surcharging all the time, we see it in the form of

9    convenience fees.  We see liveries and taxies surcharging.  I

10   just flew into Newark airport this weekend, they charge $5.50

11   more.  If you take a taxi now into Manhattan, $5.50 extra

12   charge if you pay by credit card.  They jump through certain

13   hoops to make that legitimate under Visa's existing rules and

14   to not run afoul, to not sort of front run the settlement that

15   we have here.  But it's going to take off.  It's going to take

16   off.

17          The other side of the equation, though, to your

18   Honor's hypothetical is the value of what's being given up.

19   What's being given up by merchants here is the ability to

20   challenge these rules.  This idea that they're sort of the

21   entire American Express rulebook is getting sort of cart

22   blanche forever in all of its applications is just not the

23   case.

24          THE COURT:  Well, Professor Hemphill had some issues

25   with parity surcharges.  And what's the difference between

Mr. Friedman                                   24

1    parity and equal surcharging?

2              MR. FRIEDMAN:  So his use of -- his phraseology was

3    new to me.  And I think, and I can stand corrected here, I

4    think what he meant by that was that equal surcharging, that

5    term was where the merchant had the option of differentially

6    surcharging who was choosing to do it and was using parity

7    surcharging for the situation that would apply here, where the

8    merchants only -- I don't know.  I don't know.  But I have to

9    say I don't really understand, I didn't understand, I found

10   that confusing.  I found most of his report clear as a bell, I

11   understood it, but I didn't get that.

12             THE COURT:  Go ahead.

13             MR. FRIEDMAN:  So the virtues that are associated

14   with differential surcharging engendering competition -- if

15   you look at this, going back to this slide, that's a very

16   valuable slot to be in where Discover is.  That's saying steer

17   traffic our way.  Right?  Customers are going to flock to it.

18             Mr. Hochschild, Discover's president, came in here

19   during the trial and said Discover wants to have some way that

20   by reducing its overall costs to merchants that it can gain

21   volume.  And the MDPs and the rules that existed from the

22   other networks, they precluded that.

23             THE COURT:  Does the post settlement agreement

24   present a carve-out from the MDPs for the time of steering

25   that is involved in this discover ad?

CHARISSE KITT, CRI, CSR, RMR, FCRR
Official Court Reporter

Mr. Friedman

1          MR. FRIEDMAN:  No.

2          THE COURT:  Because this is a form of steering.

3          MR. FRIEDMAN:  This is.  As I said, this is a

4    confluence of --

5          THE COURT:  You can do this in Australia maybe.

6          MR. FRIEDMAN:  This is a confluence of the DOJ

7    relief, if they are victorious.

8          THE COURT:  So now I have to figure out what's going

9    on in that case?  I don't even have their paperwork yet.

10         MR. FRIEDMAN:  I know.  The trucks will be arriving

11   tomorrow with the boxes.

12         THE COURT:  They have to come in through the loading

13   dock.

14         MR. FRIEDMAN:  But this model, this slide that's up

15   here does presuppose absolutely this is a form of steering

16   that would require the MDP relief.  However -- Scott hit the

17   next slide -- this one does not.  This is Discover,

18   unilaterally without merchant involvement could come out with

19   a card.  We came up with the It's On Us card from Discover,

20   all your credit card surcharges are on us.  You use this card,

21   we'll absorb the surcharge.  It's a terrific competitive

22   position.  It makes surcharging easier for merchants, if there

23   is something like this out there in the marketplace.

24         THE COURT:  You know, I see a revision in the

25   merchant agreement for American Express with merchants if

Mr. Friedman

1  that's the consequence, that this -- I can imagine when there

2  are renewals, based on my seven weeks of experience with the

3  bench trial, that, that American Express -- and I'm not their

4  lawyer, obviously -- that American Express might find

5  something like this to be in effect a form of steering on the

6  part of not Discover, which they can do, but on the part of a

7  merchant which accepts both Discover and American Express.

8          MR. FRIEDMAN:  Well, I'm glad you said that, your

9  Honor.  What that reflects is an appreciation of the potency

10  of this tool and they would react to it, that they would want

11  to react to it by shutting it down.  And I don't disagree that

12  they might.  But they can't.  But they can't.

13          This is unilateral action by Discover that is

14  doing -- it's nothing different than Discover -- Discover can

15  do its cash back, but they're saying wherever there's a

16  surcharge, if you use this Discover On Us card, we'll eat the

17  surcharge and we'll give you a rebate.

18          And what our settlement agreement says is that the

19  amount of the surcharge across all brands has to be the same,

20  it has to be parity, after accounting for all discounts and

21  rebates that are offered at the point of sale.  And this

22  rebate is happening not at the point of sale, Discover's

23  advertising it, Discover's delivering the rebate on the

24  monthly statement.

25          And I'm pretty confident that American Express isn't

Mr. Friedman

1   going to disagree.  This doesn't violate anything and there's

2   nothing that American Express can do to make it violate

3   anything.  And the consequence is that what you're going to

4   have is competition, it's competition inside the credit card

5   industry, it's steering, it's effective steering.  And of

6   course, the possibilities are even broader if the DOJ

7   prevails.

8          THE COURT:  So this could result in going back to

9   other, Visa and MasterCard could embrace the same idea.

10          MR. FRIEDMAN:  Yes.  Yes, let the bidding again.

11   Yes, we'll pay half your surcharge, we'll pay three quarters,

12   we'll pay the whole thing.  We'll pay the surcharge,

13   whatever -- let's say Discover is sitting around saying, you

14   know what, we don't have deep enough penetration in airlines.

15   AmEx is eating our lunch on airlines.  They own the airline

16   space, them and MasterCard.  Let's do a card that says

17   whenever you incur a surcharge on an airline, it's on us.  The

18   possibilities are endless, it's competition.  It's

19   competition.  We should be welcoming it.  And it makes it

20   easier.

21          So if the supposition that the objectors have

22   proffered, and Professor Hemphill was sympathetic to this

23   concept, that it's very hard to get surcharging going if

24   you're not offering a surcharge-free option to revolving

25   credit card preferring people, this does that.  This does

Mr. Friedman

1    that.  That's what I really wanted to convey.

2              I'm going to wind down now --

3              THE COURT:  Well, do you have more to say.

4              MR. FRIEDMAN:  I do.

5              THE COURT:  Well, let me hear some more.

6              MR. FRIEDMAN:  Okay.  On other issues, though, this

7    is the -- the other -- okay, so here's what I want to talk

8    about that rises to the level.  If you're going to look at the

9    settlement, under the law what we have to do is take the value

10   of the settlement and compare it to the alternative.  It's a

11   comparative analysis.  We have to look at the alternative.  So

12   let's take a moment and look at what happens if the settlement

13   is rejected.  So step one is we go into that giant appellate

14   popcorn machine again.

15             THE COURT:  You're going there?  Everyone's going --

16   I assume --

17             MR. FRIEDMAN:  Well, with that one, I'm not troubled

18   by that one.  I mean, I don't mean to be hubristic.  If we're

19   going up on a settlement, it would be one thing.  What I'm

20   talking about is on the motion to dismiss in favor of

21   arbitration, Italian Colors redux, that's a load, just

22   speaking from personal experience.  And --

23             THE COURT:  I think they'd love to see you up in the

24   Second Circuit and the Supreme Court.  Italian Colors, the

25   name, it has appeal written all over it.

Mr. Friedman

1        MR. FRIEDMAN:  And I want to get my batting average

2   in the Supreme Court up to 500.  But --

3        THE COURT:  We all have dreams.  But go ahead.

4        MR. FRIEDMAN:  So that's one road and I had spoken a

5   little bit about that earlier, that's the class road.  Let's

6   talk about for any given merchant plaintiff.  If the

7   settlement is rejected, they can go seek differential

8   surcharge or whatever.  And most of the objectors haven't told

9   us what they're interested in, but they can go under the

10  dispute resolution provisions in their contract, and for most

11  folks that's going to be arbitration.

12        So first they have the merits risk, they have to

13  convince the arbitrator that they're going to win on the

14  merits.  And American Express is going to say, and your Honor

15  has had some taste of this here in the trial, they're going to

16  say if you allow this steering practice on an unfettered basis

17  of American Express cards, then that's going to really cripple

18  our ability to provide this differentiated service which is

19  pro competitive value.

20        That defense is going to be more powerful in the

21  differential surcharge case I submit than it has been here.

22  But then say that the claimant gets past that level, now

23  they're at the remedy stage.  Now they're telling an

24  arbitrator, let's say it's Home Depot, that they need to have

25  unfettered differential surcharge of American Express cards,

Mr. Friedman

1    the ability to do that across all Home Depot stores.  And just

2    like in this trial, you had Mr. Chenault come in here and

3    others and tell you about what much less potent forms of

4    steering would do to their brand.  This arbitrator is going to

5    be told that if he rules that way, it's going to cost

6    thousands of jobs, I don't know, billions in market

7    capitalization, whatever their argument is going to be.  I'm

8    just saying it's no walk in the park.  It's a very heavy lift.

9            Let's assume they get through all that and then they

10   have an arbitrator who is actually prepared to do that.  Then

11   what happens?  Realistically on Planet Earth that case

12   settles, that's what happens.  The merchant had some leverage,

13   they use it, they use it to settle the case for more than they

14   think that they could have gotten from the damages suit alone.

15   It's a confidential settlement and that's it.  There's no

16   positive spillover effects.  There's nothing to benefit any of

17   the other 6 million merchants.  We have 6 million merchants in

18   this class, none of them benefit a lick from that private

19   confidential settlement.

20           So those are the two things that we're weighing

21   here, the tremendous competition unlocking value of the

22   surcharging relief in the settlement agreement, which is

23   supported by evidence.  And I understand the intuitions.  I'm

24   not saying the intuitions in themselves, they're crazy to

25   have, I get them.  But if they don't withstand the evidence,

Mr. Korologous

1  then they shouldn't guide the ruling.  That's my fundamental

2  position.

3          I'm already leaving Mr. Korologous less time.  If

4  it's okay with you --

5          THE COURT:  I'm going to give him his 20 minutes.

6          MR. FRIEDMAN:  Okay.

7          THE COURT:  Because I've asked you a lot of

8  questions and so if you have something more to say, please say

9  it.

10          MR. FRIEDMAN:  I'm happy to say there are legal

11  objections that are raised and I think that it's kind of

12  natural to raise those then on the rebuttal case.  So, for

13  example, the due process objection, Rules Enabling Act

14  objection, prepared to speak about all those, it's kind of a

15  reply briefing for me to get into it here.

16          THE COURT:  Okay, why don't you wait until the end.

17          MR. FRIEDMAN:  Then the only other issue is the

18  attorneys' fee application.  If you're just as happy with us

19  putting that to the end, because we've said everything in the

20  papers, there's no surprises.

21          THE COURT:  All right.  Thank you very much.

22          MR. FRIEDMAN:  Thank you, your Honor.

23          THE COURT:  Okay.  Mr. Korologous.

24          MR. KOROLOGOUS:  Good morning, your Honor.

25          THE COURT:  Good morning.

Mr. Korologous

 1          MR. KOROLOGOUS:  Philip Korologous for American

 2    Express.

 3          As the court knows, after a lengthy investigation

 4    the Department of Justice in 15 plaintiff states chose not to

 5    challenge American Express's prohibitions against

 6    discriminatory surcharges.  We obviously believe that was both

 7    a pro consumer choice and the right choice by the Department

 8    of Justice.  But the class in 15 individual merchants did

 9    challenge our parity surcharging requirements.  It required

10    parity even with debit cards.  AmEx has heard the concerns of

11    its merchants but it also must protect its differentiated

12    services model.  It's careful evaluation of the situation has

13    led it to believe that there is a way to give merchants a

14    surcharging option that would not eliminate our ability to

15    provide valuable differentiated services to consumers and to

16    merchants.

17          This is a major concession for American Express,

18    especially given the weaknesses of the merchants cases,

19    especially given the weaknesses of their cases on surcharging,

20    including the weakness in the class's case in light of the

21    Italian Colors decision on arbitration provisions.

22          As the court knows, the company was and remains

23    determined to fight to preserve the rest of its

24    nondiscrimination provisions as critical to the companies

25    survived.  We believe that our compromise on surcharging as

Mr. Korologos

1    well as our compromise on the contractual rights to enforce

2    individual arbitration provisions are a significant value to

3    merchants.

4              On the other hand, and as I'll discuss further,

5    we've made clear that this is as far as we can go to achieve a

6    compromise that would apply classwide.

7              This settlement is both procedurally fair and

8    substantively fair therefore meeting the standards for

9    approval.  As the Second Circuit said in the Wal-Mart case,

10   there could not be any better evidence of procedural integrity

11   than a history of aggressive litigation and impassioned

12   settlement negotiations before a mediator.  That's what

13   happened here.  The class wanted more relief, we wanted less.

14   The class felt it had the right to proceed as a class on

15   injunctive relief claims.  We disagreed.  Luckily, we had the

16   good services of Ken Feinberg, without whom I don't think we

17   would be here today because he kept bringing us back to the

18   table.  As he noted in his affidavit, it would be a real

19   understatement to say that the negotiations were arm's length

20   and hard-fought.

21             Some objectors have claimed that because of the

22   Italian Colors case the class was fatally wounded and that

23   class counsel entered into the agreement with American Express

24   to get paid their $75 million in attorneys' fees.  But as the

25   Second Circuit noted in the McReynolds, primarily because

Mr. Korologous

```
1    class counsel left the issue of attorneys' fees to the
2    discretion of the district court, there was no indication that
3    the settlement was the product of bad faith or collusion.  The
4    same is true here.
5            We have not agreed to pay $75 million, we've agreed
6    to pay whatever your Honor orders.  And if that amount is much
7    less, the class is obligated to continue with the settlement
8    even if they do not get what they're asking for in their
9    attorneys' fees.  The settlement is substantively fair.  In
10   applying the Grinnell factors, the Second Circuit has noted
11   that there is a range of reasonableness with respect to a
12   settlement but recognizes the uncertainties of law and fact in
13   any particular case.
14           The settlement responds to merchants' requests for
15   some changes to the MDPs by allowing merchants to surcharge
16   credit and charge transactions while not surcharging debit
17   transactions.  While AmEx continues to believe that
18   surcharging is bad for consumers, we responded to the call for
19   some changes to our MDPs with the most reasonably able in our
20   belief to provide while maintaining our ability to provide our
21   differentiated services.
22           The settlement also resolves what Judge Gleeson
23   referred to as the American Express problem in his approval of
24   the settlement in 1720.  There your Honor will recall many of
25   the same objectors that are here complained that because of
```

Mr. Korologos                                    35

1   the juxtaposition of Visa and MasterCard's prohibitions on any

2   surcharge and debit cards a prohibition that continues today

3   even after the 1720 settlement combined with American

4   Express's requirement that if there is a surcharge on American

5   Express cards it needs to be the same across all cards,

6   credit, charge and debit cards.  Those objectors complained in

7   1720 that that meant with American Express's rules and the no

8   surcharging obligations for debit from Visa and MasterCard,

9   they could not get to any of the benefits under 1720.

10          This settlement unlocks that.  This answers that.

11  It may not be a complete answer for all of the issues that

12  merchants have raised about surcharging.  It doesn't resolve

13  state laws.  It doesn't resolve the complexities of the

14  competitive environment.  It doesn't resolve the technology

15  issues.  But as Judge Gleeson noted, this is one issue.  This

16  is across the board benefit for all merchants whether they

17  choose to engage in it or not, whether they have the ability

18  to engage in it or not.  It is benefit for all merchants and

19  therefore since it applies to everybody satisfies Rule 23 and

20  the due process standards under the Dukes case.  It is a

21  benefit for the class that is approvable.  It is but one piece

22  of the mosaic, as he called it, to solve the many issues that

23  merchants are complaining about.  But it is one piece in

24  benefit for merchants.

25          THE COURT:  Well, let me ask you this, and perhaps

Mr. Korologous

1    you can address the issue in terms of class certification

2    under Rule 23, having to do with a necessity, I think with

3    (b)(2) class, to have commonality and typicality.  And I spent

4    almost seven weeks listening to testimony, you were there for

5    most of it —

6              MR. KOROLOGOUS:  I was, your Honor.

7              THE COURT:  — about the customized MDPs that you

8    have with certain merchants at American Express.

9              And my question is:  Is there really sufficient

10   commonality and typicality for class certification where you

11   have many of the largest merchants in America who have

12   national chains of stores where they have special terms in

13   their MDP arrangements with American Express as opposed to the

14   vast majority of small merchants who were simply handed the

15   merchant agreement and told this is it, take it or leave it?

16             MR. KOROLOGOUS:  Your Honor, there is typicality and

17   commonality.  The claims are related to aspects of the

18   nondiscrimination rules that do apply across the board.  Take

19   surcharging and differential surcharging for instance.  There

20   are no agreements, negotiated or formal agreements, in which

21   American Express allows American Express cards to be

22   differentially surcharged against.  There are none.  We have

23   been consistent with that issue across the board.

24             And the classes claims that that violates the

25   antitrust laws.  It is a claim that applies equally for all

Mr. Korologous

 1   merchants and therefore satisfies the commonality and

 2   typicality both for the class certification under 23(b)(2) and

 3   also the due process analysis that the Supreme Court has done

 4   in Dukes and other cases to satisfy that standard.

 5              With respect to some of the differences, take Home

 6   Depot that operates in the ten or so states that have rules

 7   that affect its ability to surcharge.  That's going to be true

 8   even if this case is not approved for settlement and even if,

 9   somehow, despite all of the hurdles to show relevant market

10   that debit is not in the market so they can have a market

11   where they argue that there is some level of market power the

12   pro competitive effects of our steering -- of our non-steering

13   rules generally but also of the no differential surcharging

14   agreements, if they can achieve all of the hurdles they have

15   to get through to win the case they still face ten states that

16   have these no surcharging rules.

17              They still have competitors that might chose or even

18   announce that despite what has happened in the settlement or

19   despite what has happened in the victory in court, they're

20   going to not surcharge, they are still going to have

21   technology issues that need to be solved.  That's part of the

22   mosaic, as Judge Gleeson put it, that exists in the entire

23   issue of the payments industry.  This is but one piece of that

24   mosaic.  This is the piece that the class and the merchants

25   believe benefits them.

Mr. Korologous                                    38

1          Let's look at the issue, for instance, of whether

2     debit is in the market more than there will be a benefit to

3     substitutability between credit and debit.  Look at the

4     individual merchant's damages case.  In their case, it is

5     premised on the ability of stores to get consumers to shift

6     from credit and charge cards to debit cards.  Their entire

7     supposed overcharge theory which we believe has a lot of flaws

8     but it is premised on calculation that builds off of a PIN

9     debit rate and says there are a few other things like the

10    uniqueness of American Express and fraud that we're going to

11    add to that rate, but it is driven by substitution from credit

12    and charge cards to debit if steering and surcharging is

13    allowed.  That's the very kind of substitution that we believe

14    in our case and that we've discussed with your Honor ought to

15    be showing that debit is in the market.  But it also goes to

16    the issue of whether there is value, in their view, in their

17    submissions in this court as to whether there's value to this

18    settlement.

19          And again, it's a piece of the mosaic.  It is a

20    benefit to them, they believe, to be able to do this.  It's

21    not going to solve all of their issues, nor can it.  This

22    court doesn't have the ability to eliminate ten different

23    states' laws.  It doesn't have the ability to solve the

24    technology problem.  It doesn't have the ability, nor should

25    it, even contemplate saying that merchants should not compete

Mr. Korologous

1   with one another about whether they're going to surcharge

2   their consumers or not.

3          THE COURT:  I walked in here, I thought I was

4   powerfied.  Now I know I'm just here for the ride.

5   Mr. Korologous, I appreciate you delineating all the ways I

6   can't do things.

7          MR. KOROLOGOUS:  It's not to say it's limiting on

8   your Honor's powers, but it's simply a recognition of the

9   various issues that merchants complain about, including in

10  their objections here that do not go to the issue of whether

11  this settlement is approvable, but whether they could get

12  more.

13          Many of the objectors argue that essentially from

14  the base, including with respect to their arbitration clauses,

15  that they want to do it on their own.  They want to opt out,

16  they have the ability to do better than this.  But Rule

17  23(b)(2) exists.  It exists to create non-opt-out claims.

18  This case has not raised concerns such as the objectors raise

19  under Dukes of settling a case that involves both injunctive

20  relief and damages.  Damages are preserved.  Any pre rules

21  change conduct by American Express for which we're found

22  liable for are damages that every member of the class will

23  continue to preserve.

24          THE COURT:  Well, I understand the theory behind the

25  Supreme Court's decision in Dukes.  I think we have a very

Mr. Korologous

1    different situation here, quite frankly.  I'm concerned about,

2    what the tradeoff that was negotiated through Mr. Feinberg,

3    which is on the one hand the merchants, if they won, get their

4    parity surcharge; on the other hand, American Express gets the

5    tradeoff of limiting for all intents and purposes, any future

6    challenges to the MDPs.  Isn't that basically right?

7                MR. KOROLOGOUS:  Yes, but there's a footnote.

8                THE COURT:  Including merchants who aren't even

9    currently accepting the American Express card.  In other

10   words, future draft picks.

11               MR. KOROLOGOUS:  Correct.

12               THE COURT:  So I go into business tomorrow selling

13   flowers, which a lot of Greek people do.  All right.  And I

14   take the American Express card because I'm up on, I'm up on

15   Madison Avenue and 85th Street where people pay a lot for

16   flowers, but I can't challenge, I'm limited as to what I can

17   do in terms of challenging the MDP.

18               MR. KOROLOGOUS:  In that instance that's correct,

19   your Honor.  And as part of the relief that American Express

20   is willing to enter into providing for the first time this

21   kind of surcharging that does not require parity with debit

22   surcharging, American Express requires uniformity across the

23   class for that relief.  That means not just the existing

24   merchants today but should a new merchant come along.  There

25   are a number of cases we cite in our brief where future

Mr. Korologous

1   members of the class are bound, one of the Giuliani cases, one

2   of those cases, but there's certainly is the power in

3   approving the Rule 23(b)(2) settlement to settle claims

4   including for future class members.

5         THE COURT:  And that could affect many thousands of

6   merchants over a ten-year period.

7         MR. KOROLOGOUS:  It certainly could but they would

8   be getting the same benefits as the class of merchants that

9   exist today get.  They would get the same benefit of

10  proceeding under the revised rules with the right to surcharge

11  credit and charge cards at one even level among that group

12  while not surcharging debit cards.

13        THE COURT:  Aside from the Visa/MasterCard

14  settlement, has there ever been a settlement that had the kind

15  of reach in terms of the numbers of entities that were

16  affected, commercial entities that were affected as this

17  settlement would apply to, to your knowledge?

18        MR. KOROLOGOUS:  I'm sure there have been.  They

19  don't spring to my mind.  Perhaps discussions with my group

20  and when I stand back up this afternoon, I'll bring to light

21  some of the broad instances.

22        THE COURT:  I'd be curious.

23        MR. KOROLOGOUS:  But the issue, again, in those

24  cases, as well as in this case, is whether there is uniformity

25  of the claims that are brought and the relief that's being

Mr. Korologous

1   granted in the settlement.  And that's the analysis under the

2   due process consideration under Dukes and under the language

3   of Rule 23(b)(2), including as identified in the advisory

4   notes of that decision.

5          THE COURT:  Well, I mean, the objectors constitute a

6   wide range of major commercial entities and in this country

7   and so I have a concern that if so many entities which have

8   such a considerable role in the marketplace in America object

9   on various grounds to the settlement that it may be that while

10  the smaller merchants, restaurants, the florist and others

11  don't find it to be objectionable, at least according to what

12  we have in the record here, but many of the larger merchants

13  find it to be objectionable that there's something more to it

14  than meets the eye from my standpoint and I'd be concerned

15  about that.

16         MR. KOROLOGOUS:  Well, you're right, your Honor,

17  there are two ways to look at it in terms of the absolute

18  number of merchants.  There were millions of notices sent out.

19  There are, depending upon how you count it, maybe 4 million

20  top of chain merchants, 6 million if you count locations.

21  There are objectors here.  Again, there's a different way to

22  look at them.  There are either about 350 or if you group the

23  Blue Cross entities together, there are about 175, I believe,

24  a tiny fraction of all of the merchants.

25         The other way to look at it is on a charge volume

Mr. Canter

1   basis where the percentage is much higher because the number

2   of merchants that are here are large merchants in a variety of

3   industries.  But, again, it comes down to application of the

4   rule and whether the standards are satisfied of whether the

5   injunctive relief is relief that will apply to all merchants,

6   not whether they will all then choose to do something under

7   that.  They will have the right to chose that.  They will now

8   have the option that they did not have before.

9          And as Judge Gleeson said and as other cases have

10  recognized, that kind of an option is an advancement for them

11  that is sufficient when you go through and satisfy the

12  Grinnell factors, which as our papers say, and as the classes

13  papers say are satisfied here, that is sufficient under Rule

14  23(b)(2), and under the due process considerations to approve

15  this settlement.  Thank you, your Honor.

16         THE COURT:  Okay.  Thank you.  All right.  Now, I

17  just wanted to point out that I'm allowing 90 minutes for the

18  proponents rebuttal and some of these issues might be further

19  flushed out during the rebuttal, so let's move on now.  What

20  I'd like to do is I've allocated 35 minutes for the Target

21  objectors group and National Retail Federation.  And according

22  to my notes, the spokesperson will be Mr. Cantor.

23         MR. CANTER:  Yes, your Honor.

24         THE COURT:  Just state your appearance for the

25  record, if you will.

1        MR. CANTER:  Your Honor, my name is Michael Canter

2    and I represent the group of Target objectors and the National

3    Retail Federation.  And if I may, your Honor, we have a couple

4    of demonstratives and we've printed them out as well put them

5    electronically.  And if I could pass those up to your Honor at

6    this point.

7        THE COURT:  Sure, give them to my clerk.

8        MR. CANTER:  Thank you.

9        MR. FRIEDMAN:  Your Honor, may I control the screen?

10       THE COURT:  Yes.  There you go.

11       MR. CANTER:  Your Honor, we represent the 18 Target

12   objectors and the National Retail Federation.  And as your

13   Honor has already noted, they represent some of the largest

14   national retailors in the country.  The National Retail

15   Federation is the leading retail industry trade association.

16   We are coordinating our arguments this morning for time, et

17   cetera, with the 7-Eleven objectors, the individual plaintiffs

18   and with Home Depot.

19       My argument is going to focus on the implications of

20   Italian Colors as well as why this settlement does not pass

21   muster under Rule 23(a) and 23(b)(2).

22       The first reason that the settlement must be

23   rejected is it violates the Supreme Court's decision in

24   Italian Colors.  As your Honor knows, Italian Colors holds

25   that a contract right to have a claim resolved through

1    arbitration is a substantive right and it's protected by the

2    Federal Arbitration Act and the Rules Enabling Act and Rule 23

3    cannot be used to abridge that right.  This settlement would

4    do just the opposite.  It would use Rule 23 to strip our

5    clients of their contractual arbitration rights.

6            The proponents point to certification of the

7    mandatory class in 1720 and say that this class should be

8    certified as well.  This case is not like 1720.  As your Honor

9    probably knows, Visa and MasterCard contracts, merchant

10   contracts do not have arbitration clauses.  Italian Colors was

11   not an issue in Judge Gleeson's courtroom, it is an issue in

12   this courtroom.

13           Soon after Italian Colors was decided, AmEx moved to

14   dismiss or to compel arbitration in this case.  It's motion

15   accurately summarized the holding in Italian Colors.  And this

16   is what it said:  Here the Supreme Court has already ruled

17   that the American Express arbitration clause, including

18   specifically the class action waiver, must be enforced.  But

19   the merchants have the same arbitration rights that AmEx has.

20   And why is that?  That is because AmEx contracts are mutual.

21           Let me bring to your Honor's attention, and we've

22   submitted this with the objection of limited brands, that the

23   clause in the limited brands contract, any claim that has not

24   been resolved pursuant to Section A or B –– A is the meet and

25   good faith provision and B is the mediation provision –– any

Mr. Cancer

1   dispute that's is not resolved through A or B shall be

2   resolved, and we've emphasized this, upon the election by you

3   or us.  So both parties can take the other to arbitration.

4          Neither AmEx nor class plaintiffs dispute that this

5   settlement, if approved, would eliminate that arbitration

6   right.  The Target objectors assert that the settlement must

7   be rejected because it would use Rule 23 to strip merchants of

8   their arbitration rights and that violates Italian Colors and

9   the Rules Enabling Act.  The class plaintiffs argue that they

10  have the authority as class representatives to weigh the

11  arbitration rights of absent class members.

12         Our clients never authorized class plaintiffs to

13  waive their arbitration rights.  Instead, our clients have

14  actually invoked their arbitration rights and their letters to

15  American Express have been attached to their objections.

16         The class plaintiffs as Rule 23 representatives have

17  no independent authority to waive the arbitration rights of

18  absent class members.  This is because Rule 23 does not

19  grant them that power under Italian Colors.  In addition, the

20  class plaintiffs are not even valid class representatives.

21  They waived their arbitration rights years ago.  The class

22  plaintiffs are not adequate because they do not have the same

23  substantive arbitration rights as the absent class members.

24         These same facts create an irreconcilable conflict.

25  The class plaintiffs never wanted to arbitrate their claims

Mr. Cancer                                         47

1    against American Express, they wanted to litigate.  As you've

2    heard, they fought for years for the right to litigate but

3    lost in the Supreme Court.  Having lost, the class plaintiffs

4    now want to bargain away the arbitration rights of the absent

5    class members.

6            This is not a circumstance where the class

7    plaintiffs and the absent class members share the same claims

8    but disagree over the terms of settlement.  This is a case

9    where the parties do not have the same claims and that's an

10   irreconcilable conflict and for that reason settlement must be

11   rejected.

12           Let me turn now to 23(a)(2) and 23(a)(3).  As we've

13   said, most of the absent class members all have contractual

14   rights entitling them to unique ADR processes, alternative

15   dispute resolution processes, and to individual resolutions of

16   those disputes with AmEx.  The class representatives have

17   waived their rights and therefore under Rule 23(a) they do not

18   share the claims of the class and therefore the settlement

19   fails 23(a).

20           The settlement class also fails (a)(2).  This is

21   because the court cannot look at the AmEx merchant agreements

22   that the class plaintiffs have and determine from them what

23   the ADR rights of all of the class members are.  It was

24   established at the government trial, as your Honor knows, that

25   AmEx negotiates different contracts with different merchants.

Mr. Cancer                                                           48

1    And we looked at some of the transcript, and this slide just

2    summarizes some of the testimony that you heard that

3    indicates, as already mentioned here this morning, that AmEx

4    negotiates with individual merchants.

5              That testimony did not focus on the ADR clauses, it

6    focused on the nondiscrimination clauses.  And that's because

7    ADR was not an issue in the government trial.  But the

8    interest Target objectors and the National Retail Federation

9    have submitted evidence that the ADR rights vary from merchant

10   to merchant entitling different merchants to resolve their

11   claims in different ways.

12             And this particular chart, this is a compilation of

13   all of the evidence that we submitted for our clients on the

14   objection.  And of course down the right-hand side are the

15   merchants that we represent and they are ordered in terms of

16   size of sales.  So Target is the largest.  National Retail

17   Federation is actually the smallest.  American Signature would

18   be the smallest actual merchant.  And across the top are the

19   different options for how -- the different -- I call it the

20   different paths that a dispute resolution process could take.

21   They all start, virtually all, the same way and that is you

22   give notice, and we've done that.  But the second column is an

23   interesting provision.  It says that, when you start a dispute

24   resolution with AmEx, you have to meet in good faith and try

25   to resolve that.  And I contend there is not a court in this

Mr. Cantor

1    country that wouldn't enforce an obligation to meet in good

2    faith that AmEx has put into its provisions.

3           Then you get to mediation and there are different

4    options on mediation.  Some of the merchants have mandatory

5    mediation.  Others have mediation by election, meaning, one

6    party can require the other party to come to mediation.

7           And then in the last of the three columns is

8    mediation by agreement where both parties have to agree.  Fail

9    to resolve, you go on to arbitration.  And it follows the same

10   pattern as mediation.  There's mandatory arbitration, elective

11   arbitration, where one party can compel the other to

12   arbitration, and then arbitration only by agreement.  The

13   colors indicate which merchants have the same path.  So Target

14   has a unique path.  No other merchant in our small sample, our

15   client group, has a contract like Target's.

16          Macy's has its own path.  Even though it's the

17   secretary largest, it has a path that's different than

18   Target's.  TJX, which is T.J. Maxx, and a couple of other

19   stores brands like that, has its own path and Staples has its

20   own path and Limited Brands has its own path.

21          Then you get into a group of companies, and again

22   coming down in size of company, where the next three companies

23   Bon-Ton's, Office Depot, and OfficeMax, all have the same path

24   in their contracts.  And these are all negotiated.  And Macy's

25   and Target specifically negotiated these provisions to meet

Mr. Cancer

1    the kind of dispute resolution that they wanted, as the TJX
2    Staples and Limited Brands, L Brands.  Ascena and Saks and
3    Chico's have their own path in their contracts.  And the
4    National Retail Federation has it's own path.
5              And at the bottom we have the Morales declaration
6    that was filed in support of the motion to compel arbitration
7    by AmEx, and that's for the smaller merchants.  And what
8    you'll note is that the smaller merchant path is actually
9    different than all of the larger merchants.  Just to give your
10   Honor a sense of what we're talking about, because I know
11   you've heard a lot of testimony that we have not been privy to
12   as objectors, but our largest client Target, for example, has
13   $75 billion in retail sales annually.  Macy's has 25 billion.
14   American Signature has 1 billion.  All much larger than the
15   class representatives here who I believe the Morales
16   declaration was intended to represent what their arbitration
17   rights looked like in their agreement.  So millions of
18   merchants who have different arbitration agreements, different
19   ADR paths than the larger merchants.
20             Now, this isn't all of AmEx's millions of merchants,
21   these are the only contracts that we have privy to.  And we
22   thought once we looked at them and we saw them, what we
23   realized is that because there has to be commonality in an
24   (a)(3) class action, (a)(3) requirement, that the court has to
25   be able to look at the representative's contract and answer

Mr. Canter                                                    51

1   the question what are the ADR rights of the class.  It's

2   pretty obvious from just this sample that that can't be done

3   and for that reason (a)(3) isn't satisfied.

4           THE COURT:  Could you just explain something on this

5   chart?  The difference between arbitration at election of

6   either party and arbitration by agreement, how did the -- I

7   understand the election.  But what's arbitration by agreement?

8   Does it require both sides to agree to the arbitration?

9           MR. CANTER:  It does, your Honor.  That's exactly

10  what it means.

11          THE COURT:  And so Target has a merchant agreement

12  with American Express where it could reject arbitration and go

13  to litigation.  Is that right?

14          MR. CANTER:  It could.

15          THE COURT:  As with the case with Macy's and T.J.

16  Maxx?

17          MR. CANTER:  That's correct.  We believe that what

18  the Supreme Court is saying in Italian Colors is it is not

19  limited, the holding is not limited to simply arbitration.

20  What the court is saying is that when you make an agreement,

21  like any of these agreements, that provide for how your

22  dispute is going to be resolved, that that is an enforceable

23  substantive right because it's negotiated in a contract and

24  the Rules Enabling Act protect that substantive right.  That

25  also happens to coincide with the Federal Arbitration Act

CHARISSE KITT, CRI, CSR, RMR, FCRR
Official Court Reporter

Mr. Canter

52

1  which provides special protection for arbitration.  So we

2  believe that Italian Colors reaches all of the variations that

3  are represented by our clients.

4          THE COURT:  So is it your view that if this class

5  settlement agreement is approved, that it will somehow affect

6  Target's right to reject arbitration and go to litigation?

7          MR. CANTER:  It will affect Target's rights to have

8  good faith negotiations with AmEx over issues such as

9  surcharging.  If Target desires to have a conversation with

10 AmEx about surcharging as part of its larger contract

11 negotiations, we want to surcharge, we want the right to

12 parity surcharge, we don't really care about surcharging, we

13 want something different than that.

14         Target, which American Express absolutely wants to

15 be in, has the leverage to have those conversations and they

16 agreed when they enter this contracted that if they have a

17 dispute they're going to sit down with each other in good

18 faith and try to resolve that.  This settlement strips that

19 away.

20         THE COURT:  I'm trying to understand why that is if

21 at the end of the day after mandatory mediation Target can

22 turn around and say, we decided -- we're the, you know,

23 800-pound bully in this relationship and we're just going to

24 go to litigation and we're not going to go to arbitration.

25         MR. CANTER:  They could do that but for the

1    settlement.  This settlement strips their right to go to

2    litigation because of the release that is imposed upon Target.

3             THE COURT:  All right.  So you're saying that this

4    settlement, proposed settlement, effectively modifies the

5    merchant agreement between Target and American Express in that

6    regard?

7             MR. CANTER:  It absolutely does.  They negotiated

8    their relationship, including how they would resolve disputes

9    with each other.  This settlement comes in in the middle of

10   that and changes it.

11            THE COURT:  Go ahead.

12            MR. CANTER:  The next two columns are interesting

13   and I'm going to get to the last column in a moment, but the

14   second-to-last column is the provision that was sustained in

15   Italian Colors which says you can't participate in the class.

16   These are the merchants that have that provision in our group.

17            And the last column indicates the merchants where

18   their contracts reserve to them the right to accept the relief

19   or reject the relief and not to participate at all in the

20   settlement.  And I'll get to that in a just a moment.

21            I just want to bring to your Honor's attention why

22   this kind of evidence was not brought to your Honor's

23   attention as part of the motion for settlement approval.  And

24   there's a footnote in the material that the class has

25   submitted which is very telling and that is that they did not

1   take discovery of the kind of information that we've just put

2   in front of your Honor.  So they had no way of knowing what

3   the real facts were that either support or required denial of

4   the (a)(2) and (a)(3) issue.

5          So because the alternative dispute resolution rights

6   of all the punitive class members cannot be determined in one

7   stroke, to quote from Dukes, the settlement class must be

8   rejected.  The third reason settlement must be rejected is

9   that it fails to meet the stringent procedural requirements

10  required by the Supreme Court's decisions in Amchem, Ortiz and

11  Dukes for certification of a mandatory (b)(2) class.

12         Dukes establishes that it's the proponent's burden

13  to justify depriving absent class members of their opt-out

14  rights.  Objectors have no burden.  Dukes establishes that

15  there is only one justification for a mandatory (b)(2) class

16  and that's what Dukes calls an indivisible injunction.  That's

17  an injunction that provides identical relief to the entire

18  class at once.

19         And the evidence of justification, the evidence of

20  the indivisible character of the injunctive relief must be

21  sufficient to support findings of fact and must be evaluated

22  under the standard of heightened attention to that

23  justification.

24         And the Supreme Court, of course, explained why,

25  which is that the plaintiffs and defendants are now allying in

Mr. Canter

1    interest in terms of the settlement and you really don't have

2    an adversarial proceeding.

3           THE COURT:  Doesn't parity surcharging across the

4    board provide that identicality of relief that the Wal-Mart

5    decision requires for a (b)(2) class certification?

6           MR. CANTER:  It does not.  Parity surcharging

7    affects different merchants differently.  You've already heard

8    about Macy's, we'll talk about that a little more.  There has

9    been no justification for why parity surcharging requires that

10   every merchant be bound.  Merchants can decide for themselves

11   whether they want to surcharge or not.  And they can decide to

12   give a release.

13          THE COURT:  But it's a tool that's available to all

14   of the merchants who are covered by the proposed settlement.

15   Right?  I mean, you don't have to avail yourself of every

16   benefit but it's a benefit that is available to every

17   merchant.  So that's the distinction between what you're

18   saying and I would assume the argument made by the proponents.

19          MR. CANTER:  Well, it's certainly not available to

20   the merchants in those surcharge states.  That's clear as a

21   matter of law.  There was a decision two weeks ago in Florida

22   sustaining that statute.

23          THE COURT:  I didn't know about that decision.  I'm

24   sure you'll tell me.

25          MR. CANTER:  Your Honor, I actually have a copy I

Mr. Canter

1    can pass up if I may.

2              THE COURT:  At what level was it?

3              MR. CANTER:  District Court, Northern District of

4    Florida.

5              MR. GERMAINE:  We sent it.  We sent it to the court.

6    We sent it to you.

7              THE COURT:  Thank you.

8              MR. CANTER:  So the prediction that these statutes

9    are going to fall was at least premature.

10             THE COURT:  You don't have anything from the

11   11th Circuit yet?

12             MR. CANTER:  No, that's just two week old.

13             THE COURT:  Okay.  Go ahead, please.

14             MR. CANTER:  So as I said, we've got the

15   non-surcharge states and we've got Professor Hemphill's

16   conclusion that most merchants are not going to be able to

17   take advantage of that.  What I want to address --

18             THE COURT:  He doesn't think it's clear that they

19   would be able to because there's no data on whether they would

20   or could.

21             MR. CANTER:  And I believe that that is --

22             THE COURT:  Except for Australia.

23             MR. CANTER:  But that is particularly significant in

24   view of the fact it's the proponents burden to bring forth

25   evidence under heightened scrutiny which justifies the

Mr. Canter                                                                57

1    imposition of a mandatory class.

2            THE COURT:  They're arguing that the Australian

3    experience with surcharging is instructive in that regard.

4    It's not as if we're dealing without any knowledge about how

5    the surcharging has worked in a major market.  Australia is a

6    major market.  It may not be California, but it's a major

7    market.  So wouldn't that be supportive of that type of

8    finding on my part?

9            MR. CANTER:  My understanding is that that evidence

10   is disputed.  But beyond that point there is no justification

11   for saying to a merchant, we've got to have every merchant in

12   the country on this settlement for parity surcharging to be

13   effective.

14           Any merchant can decide for itself whether it wants

15   to be in this settlement or not and take advantage of parity

16   surcharging and give the release that AmEx wants.  There is no

17   justification -- There's no necessity in the sense of an

18   indivisible injunction that every merchant has to be in this

19   settlement.  The relief doesn't require it.  The relief is

20   individual.

21           THE COURT:  But a (b)(2) class does require, there

22   is no opt out in the (b)(2) class.  Right?

23           MR. CANTER:  Well, not on the face but there are

24   courts that have allowed opt outs from (b)(2) classes.

25           THE COURT:  Are you suggesting that this court would

58

1    allow opt outs from a (b)(2) class?

2              MR. CANTER:  Frankly, I don't know how else you

3    would vindicate the arbitration rights of the individual

4    merchants that have those rights without allowing them to

5    decide whether or not to protect those rights or to give them

6    up.

7              THE COURT:  Well, the objectors here represent a

8    large portion of the merchant spend, all right, if you will.

9    The spend of merchants in the United States.

10             So giving them an opt out would potentially

11   eviscerate the benefit of this settlement the very large

12   number of small merchants who are not opting out.

13             MR. CANTER:  Two responses to that.  Number one,

14   that would be true only because American Express would choose

15   to walk away from the settlement under those circumstances.

16   It doesn't need to.  Merchants who choose to stay in the

17   settlement can do so, can provide the release and can exercise

18   parity surcharging.

19             But more importantly, the Supreme Court actually

20   addressed this issue.  Section IV of the Italian Colors

21   decision addresses the question of whether there is an

22   exception to Italian Colors which says if you really need to

23   have a mandatory class because the relief will only be

24   effective on a wide classwide basis, is that a basis to

25   override the arbitration rights.  And the court answered no,

Mr. Cancer

 1    that the substantive rights supersede whatever benefit might

 2    come from the settlement and that the issue of how beneficial

 3    the settlement is, the Rule 23(e) issue, is not relevant to

 4    the (a) and (b) issues.

 5             I want to draw your Honor's attention to the Macy's

 6    situation.  And so Macy's entered into a co-branding

 7    relationship with AmEx that Macy's believes is very valuable.

 8    And here by the admission of the plaintiffs, Macy's would have

 9    to surcharge its own card and then plaintiff's begin to

10    speculate and theorize about how Macy's can build a workaround

11    around that.

12             And I have just want to show very quickly.  So this

13    is already actually been said here in the courtroom, but it

14    says, Macy could offer to give back the money.  That's not

15    free.  That's not easy, that's complicated, that runs the risk

16    of consumer confusion.  It runs the risk of consumer

17    dissatisfaction.  And the merchants are trying to tell Macy's

18    how to run its business.  And Macy's respectfully doesn't need

19    that help.

20             So let me get back to the issue of justification.

21    AmEx makes a very important concession in its reply brief in

22    support of this settlement.  And what it says is, that without

23    the uniformity and certainty of a non-opt-out class, American

24    Express has no incentive to continue with the settlement.

25    This is no justification at all.

Mr. Cancer

1           The Supreme Court in Dukes is very clear.  This is
2    all about the rights of the absent class members and the
3    justification that is required pertains to the character of
4    the relief.  It has nothing to do with what American Express's
5    wishes are or demands are or negotiated position is.  The
6    focus has to be exclusively on the character of the relief.
7    And this relief doesn't qualify.
8           You heard the testimony of, I believe his name is
9    Quagliata.  He testified repeatedly.  He said over and over
10   again that AmEx will negotiate nonstandard, nondiscrimination
11   provisions with merchants and they're willing to -- with
12   companies, that they want to have as their AmEx accepting
13   merchants, they're willing to have negotiations.
14          Paragraph 10 of the settlement agreement reserves to
15   AmEx the right to continue having those negotiations.  They
16   can buy off the rights of certain merchants who they select
17   and they can say, we're going to give you money if you want
18   surcharge.  If that is true, where is the justification for a
19   mandatory class?
20          And then finally I want to bring to your Honor's
21   attention, this was the last column on the colored chart.
22   This is the provision from the Luxottica agreement.  Luxottica
23   is the company that runs LensCrafters and Sunglass Hut and all
24   of that.  This is the provision that they negotiated.  And I
25   have underlined and highlighted the relevant language which

Mr. Canter                                    61

1   says, if you wish to receive the consideration that goes to

2   the class, then you deliver us the same release that the class

3   gets.  But it's Luxottica's option.

4           You've reserved the right to decline any remedies,

5   and we agree that you've retained your right to pursue an

6   individual claim that is not part of a class action.

7           So this looks like for all the world like an opt-out

8   right, to me.  And there's three of our clients that have

9   these.  And if these three clients have that right, why

10  shouldn't every merchant have that right.  Where is the

11  necessity in the relief that it be indivisible so that it's

12  imposed on every merchant?

13          THE COURT:  So what you're saying is that if you're

14  large enough you can negotiate an opt-out right but if you're

15  not you're stuck?  Is that what you're saying?

16          MR. CANTER:  I can't say that because I don't know

17  what all the agreements look like that American Express has.

18  I've only seen 18 of them.  And those 18 we've displayed for

19  you.  And three of them who actually are not very large, the

20  NRF is very small in terms of the amount of transaction volume

21  that it has.

22          THE COURT:  What does Luxottica do?

23          MR. CANTER:  Luxottica —

24          THE COURT:  What is their business?

25          MR. CANTER:  Sunglass Hut.

```
 1              THE COURT:  Yeah, Sunglass Hut.

 2              MR. CANTER:  And LensCrafters.  And they have --

 3              THE COURT:  International chain?

 4              MR. CANTER:  International chain.  They have about

 5    two and a half billion dollars in retail sales through their

 6    chain.  They also have a lot of wholesale business.  But

 7    through their chain that's what they have.

 8              So let me turn to one last issue in the few minutes

 9    that I have, and that is the mandatory release.  The release

10    violates both Rule 23 and the due process clause.  Dukes is

11    clear, the only claims that can be resolved through a (b)(2)

12    mandatory class are those claims that can be resolved through

13    indivisible injunctions.  And this release does two things.

14    It resolves a whole host of unspecified injunctive claims and

15    it releases a whole host of money damages claims.

16              It can't release, under Dukes, in a mandatory class,

17    the claims for injunctive relief because there has not been

18    the proceedings and the heightened scrutiny and the evidence

19    to demonstrate that those claims can be resolved by an

20    indivisible injunction.  And the monetary claims cannot be

21    resolved because Dukes simply prohibits resolving monetary

22    claims through a (b)(2) mandatory injunction.

23              The proponents argue that that limitation in Dukes,

24    that prohibition should be interpreted to apply only

25    retrospectively and should not apply to prospective damage
```

1   claims, individualized damage claims.  But that's not

2   consistent with Dukes.

3         Dukes draws are very simple line.  Indivisible

4   injunctive claims, yes, those can be resolved if the proper

5   demonstration has been made.  But individualized damage claims

6   can never be resolved.  It says nothing about when those

7   damage claims are or are not incurred.

8         So our problem with the mandatory release is we've

9   gone through a long proceeding and we're going to go through a

10  long proceeding today that's going to focus on the relief that

11  the class gets the parity surcharging.  And one of the things

12  your Honor will be looking at is, is it indivisible in

13  character.  And if your Honor finds that it is, and we think

14  you should not, but if you find that it is, then in through

15  the back door with no scrutiny whatsoever comes all of these

16  other claims that are resolved and all the injunctive claims

17  and all the monetary claims.

18        So for all of those reasons we think the settlement

19  must be rejected.  We thank you for your time.

20        THE COURT:  Thank you very much.  Okay.  I think we

21  should take a ten-minute break.  We'll take a ten-minute

22  break.

23        (Brief Recess.)

24        (Continued on the next page.)

25        (In open court.)

Mr. Shinder

64

```
1              THE COURT:  All right.  The next objector group will
2    be the 7-Eleven objector group.  And speaking for that group
3    is Mr. Shinder, from Constantine Cannon.
4              MR. SHINDER:  Yes.
5              THE COURT:  Mr. Shinder, welcome.
6              MR. SHINDER:  Good afternoon, your Honor.
7              THE COURT:  Good afternoon.
8              MR. SHINDER:  Jeff Shinder from Constantine Cannon,
9    the 7-Eleven objectors.
10             Your Honor, the proposed settlement is the product
11   of American Express exploiting a virtually defunct class case
12   to engineer a settlement that protects it from the competition
13   that matters, the competition it's most afraid of -- brand
14   competition via differential surcharging.  But this deal is
15   worse than one that merely perpetuates the status quo.
16   Because by proposing to lock in anticompetitive rules through
17   a court approved settlement that includes an impermissible
18   forward looking release, this settlement actually threatens to
19   make a bad situation even worse.
20             Your Honor, for my clients the backdrop of this deal
21   is deeply troubling.  On the one hand, you have plaintiffs,
22   who during the litigation phase of the case repeatedly said
23   their case was about engineering price competition between
24   American Express and rival networks like Discover, who now
25   disavow the importance of that and contend that that
```

CHARISSE KITT, CRI, CSR, RMR, FCRR
Official Court Reporter

Mr. Shinder

1   competition is comparatively trivial to the supposed benefits

2   of parity surcharging.

3           On the other hand, you have American Express, who in

4   the DOJ case claimed that softer forms of steering, of

5   differential steering could threaten its very existence; but

6   in this proceeding they are all too willing to agree to parity

7   surcharging, which will lock in a situation where the

8   differentiation they're afraid of will never happen.  Against

9   that backdrop, your Honor, this settlement must be rejected

10  for three reasons:

11          First, it must be rejected because the proposed

12  mandatory settlement class should not be certified for the

13  reasons Mr. Canter stated;

14          Second, it must be rejected because the deal that

15  offers merchants virtually nothing, a conclusion that

16  Professor Hemphill found –– and I'll come back to that in a

17  minute –– while releasing potentially forever valuable claims

18  against differential, the rules that bar differential

19  surcharging ––

20          THE COURT:  You don't really believe that it will

21  release it forever?  I mean, changes occur; markets change

22  rather often and rather quickly and we have –– we don't have a

23  crystal ball that these provisions won't be altered

24  substantially in five or ten years that would lift the

25  injunctive nature of the agreement as to the class.  Wouldn't

Mr. Shinder                                                    66

1    you agree with that?

2            MR. SHINDER:  No.  Actually, your Honor, I would

3    respectfully disagree with that.

4            THE COURT:  Why?

5            MR. SHINDER:  If the settlement is approved, there

6    would be no incentive for American Express to alter the rules.

7    The parity surcharging rules that is agreed to here, it's not

8    protected by that at all.  It protects them against the

9    differentiation they're afraid of.  And this release, because

10   it's tied to the release in the MDL–1720 settlement, could

11   potentially go on forever.  And the release also reaches

12   substantially similar versions of the rules and the future

13   effect, claims concerning the future effects, getting to your,

14   you know, the market may change.  Well, the release reaches

15   claims concerning the future effects of those rules, including

16   future versions of those rules.  So they would have no

17   incentive –– as long as Visa and MasterCard stay within the

18   MDL–1720, and they have this, they have no incentive to change

19   the rules, and this could go on forever.

20           THE COURT:  When an investor or an investor group

21   decides that they're going to enter the credit card issuing

22   market, that could change everything, couldn't it, if they

23   decide that they're going to get in it?  And that requires

24   then that Visa, MasterCard, American Express, and Discover

25   make adjustments to their business models.  That's a

Mr. Shinder                                                    67

1   circumstance that could occur, if they saw the credit card

2   business -- if there were a group of investors that saw the

3   credit card business as, you know, fertile territory for

4   profit.

5          MR. SHINDER:  The scenario you postulated was about

6   investors on the issuing market.  The market in which they

7   compete is the network market for merchants.  There has been

8   no material entry into that market since Discover in 1985.  It

9   is still the four brands.  That's telling.  And, yeah, we can

10  speculate, who knows what's going to happen in 20 years.  Of

11  course I don't have a crystal ball.

12         THE COURT:  Well, this agreement invites us to

13  speculate, don't you think?

14         MR. SHINDER:  And that's the problem.  What I can

15  tell you safely today, if you approve this and parity

16  surcharging is the, you know, quote/unquote, law across the

17  three dominant brands, they will have no incentive to change

18  their rules.  And if nothing else changes going forward, this

19  release could go on forever.  That's a problem.  That's a

20  problem.  That's the third reason why this settlement should

21  be rejected.

22         So let me just go back over some of those points.

23  On the settlement class certification, you know, issues, we

24  wholeheartedly agree with the argument that you heard from

25  Mr. Canter -- and we will not burden the Court with rehashing

Mr. Shinder                                    68

1    any of them -- but I want to address one question you posed to

2    Mr. Canter, your Honor, which was the evidence from Australia,

3    does it support certification of this mandatory settlement

4    class?  And the first thing I'd say about Australia, your

5    Honor, is, you know, we are weary.  We invite the Court to be

6    weary about accepting Australia as being opposite to the

7    United States, for various reasons, and we rely on our papers.

8          For the sake of discussion, let's say Australia is

9    opposite.  What does it tell you, in terms of certifiability

10   of this class?  What Australia shows is it took time for

11   surcharging to take hold -- years.  And so let's say that

12   would be the case here, that parity surcharging would spread.

13   They would be pioneers.  More and more merchants would do it.

14         What that shows, especially when you juxtapose that

15   against the fact that you have some states that band the

16   practice and some states that don't, the circumstance you

17   don't have in Australia, is that over time some merchants are

18   going to benefit -- again, assuming there's value in this,

19   which we don't -- and others won't.  In fact, it's even worse

20   than that.  Let me pose a hypothetical.

21         You've got a gas station on the border of Texas,

22   Texas and Arkansas, and another gas station across the street

23   in Arkansas.  One state bands surcharges, the other state does

24   not.  So the merchants in Arkansas engage in parity

25   surcharging, and it's as beneficial as Mr. Friedman said.  It

Mr. Shinder                                        69

1   will benefit at the direct expense of its competitor across

2   the border.  That is the essence of a situation where you have

3   a class –– where you have a supposed class relief that benefit

4   some to the detriment of others.  That can't possibly be a

5   cohesive class, especially in a mandatory context, whereas the

6   Supreme Court said the relief must be indivisible and provide

7   relief to the entire class at once.

8         And so Australia actually refutes the

9   certifiability, sorry, your Honor, of the (b)(2) class.

10        THE COURT:  Let me ask you about this.  If you go to

11  a gas station now –– let's bring it down to its simplest basic

12  set of facts.  You go to a gas station and there are two

13  prices for a gallon of gas.  One is the cash price and the

14  other is the credit card price.  All right?

15        And is there any reason to believe that people ––

16  that customers, consumers are reluctant to use a credit card

17  because they can pay 10 cents less at the cash price than at

18  the credit card price?  That's a surcharge right there.  Is

19  there any evidence to indicate that consumers try to find a

20  place where there's no difference between cash and credit

21  card?

22        MR. SHINDER:  I don't have any evidence of that,

23  your Honor.  It may well be that consumers want their rewards,

24  so they're perfectly comfortable, you know, with paying, you

25  know, with a credit card in that situation.  I don't have any

Mr. Shinder

70

1    evidence of that, but --

2           THE COURT:  That goes to the question of whether

3    consumers are worried about a surcharge.

4           MR. SHINDER:  Well, that's -- that scenario is a

5    discount as opposed to a scenario where they're facing a

6    surcharge, which --

7           THE COURT:  Well, it is a surcharge.

8           MR. SHINDER:  It's a more forceful form of steering,

9    so it doesn't necessarily --

10          THE COURT:  Why is that a discount as opposed to a

11   surcharge?

12          MR. SHINDER:  What I understand your hypothetical to

13   be, it's a gas station and it says, I'll discount if you pay

14   with cash --

15          THE COURT:  No.  No.  It says, this is the cash

16   price, which is the basic price.  But if you care to use a

17   credit card, there is an additional charge of 10, 15 cents per

18   gallon of gasoline.

19          MR. SHINDER:  Well, the way that plays out in the

20   real world, is it's used as a discount for cash.  And so

21   consumers see that, I get a discount if I pay with cash, at

22   one price and it has a lower price.

23          THE COURT:  It's interesting you see it that way.

24          MR. SHINDER:  So they're not posted it as a

25   surcharge.

Mr. Shinder

1          THE COURT:  Go ahead.

2          MR. SHINDER:  So let me address some of the

3    substantive fairness issues in the time I have left.  This

4    really is very simple.  Professor Hemphill nailed it.  We

5    concluded that, quote, there is a substantial probability that

6    the proposed settlement's effect will be small or zero.

7    That's at page 42 of his report.  His bottom-line conclusion

8    leaves no doubt, no doubt that the proposed deal will provide

9    little or no value for several reasons, including the

10   following:  That few merchants, if any, with parity surcharge,

11   due to state restrictions -- and I will note, as Mr. Canter

12   did, that one of those restrictions was just upheld in

13   Florida; fewer customer defections and technical impediments;

14          Two, that unlike brand surcharging, parity

15   surcharging, quote/unquote, lacks the tools to generate

16   inter-brand competition and class parity surcharging almost

17   certainly would not inject any price competition or result in

18   price reductions for merchants;

19          And three, the differential surcharging by contrast

20   introduces a, quote/unquote, clear mechanism by which

21   meaningful price competition and price reduction for merchants

22   can resolve.  And all of the experts, your Honor, that have

23   commented on this settlement agree with that conclusion.  Let

24   me repeat that.  All of the experts before you agree,

25   including plaintiffs' expert, Dr. Frankel, that differential

Mr. Shinder

1    or brand surcharging would be highly pro-competitive and, yet,

2    the proposed settlement would bar that practice potentially

3    forever.

4              How can such an anticompetitive outcome be the

5    proper resolution of an antitrust case?  Your Honor, we submit

6    that the answer to that is self-evident.

7              Now, plaintiffs' response to Professor Hemphill's

8    dispositive conclusions includes a lot of smoke and mirrors

9    about parity versus differential surcharging in Australia and

10   talk about different reports from Australia.  I will leave the

11   response to that to others.

12             But when it came to Professor Hemphill's emphatic

13   conclusion that there is, quote, little demonstrated merchant

14   appetite for parity surcharging in the United States,

15   plaintiffs are tellingly silent, other than saying, We should

16   look at Australia again.  Last I checked, the geographic

17   market in this case is the U.S., not Australia.  This case is

18   about competition here.  And if anything, Professor Hemphill's

19   conclusions regarding U.S. merchants' lack of appetite to

20   engage in parity surcharging were understated.

21             You have before you today an awful lot of the top

22   merchants in this country, from Wal-Mart to Amazon to

23   Starbucks to 7-Eleven to Target to Macy's, I can go on and on,

24   to Home Depot, not to mention pretty much the entire

25   supermarket and drugstore industry.  Beyond Wal-Mart and

Mr. Shinder

1    Amazon, our group alone includes leading merchants from

2    literally every merchant sector and trade associations like

3    RILA, NACS, and the NJA, that represent thousands of

4    merchants.  These merchants are vigorous competitors and they

5    disagree on almost everything.  But today they stand before

6    you united in opposition to this deal, saying the same

7    thing -- that parity surcharging is of little or no value to

8    them and they want out.

9           This Grinnell factor, the most important factor in

10   that analysis should easily end the fairness inquiry.  Your

11   Honor, in highlighting the universal opposition to the

12   settlement amongst the merchants that have come forward to

13   address this settlement, not one merchant has come forward to

14   support it, other than the proposed class reps.  I cannot help

15   but note how unreasonable it is to even suggest that a

16   mandatory class should extinguish their claims on the

17   recommendation of proposed class reps who have barely

18   litigated the issues.

19          As Professor Hemphill put it, quote, the plaintiffs'

20   anti-steering case is still at an early stage and lacks a well

21   developed presentation of the merits, closed quote.

22          At the risk of some understatement, your Honor,

23   allowing the views of proposed class representatives who have

24   not developed a case, who know knowing about the objectors'

25   businesses, to trump the considered objections of

Mr. Shinder

1    sophisticated merchants, who should presume to know what is in

2    their best interest, cannot be justified.

3          Before concluding on the fairness issue I would like

4    to address American Express' repeated invitation in this reply

5    to the Hemphill report that the Court defer its evaluation of

6    parity surcharging until the DOJ market definition questions

7    are resolved.  If anything, American Express' insistent

8    request is a powerful admission that the plaintiffs today have

9    failed to discharge their burden of showing the fairness of

10   the settlement based on the record that is before your Honor.

11         After all, what American Express is really saying is

12   that even though a lot of them -- the largest merchants in the

13   country have come forward to say that parity surcharging is of

14   no value and even though the independent expert, after

15   reviewing plaintiffs' evidence and arguments, found that

16   parity surcharging is likely of little or no value, the

17   evidence in another proceeding, that's not here today, should

18   somehow trump those conclusions and those objections.

19         That should be rejected out of hand, your Honor.  It

20   would be patently unfair to allow plaintiffs, after they

21   failed to discharge their burden today, to supplement their

22   showing with evidence from another proceeding, evidence that

23   the objectors have had no ability to challenge or respond to.

24   That unfairness is magnified by the fact that that improper

25   supplemental showing would be in service of a mandatory class

Mr. Shinder

1   settlement that purports to extinguish their claims.

2              Lastly, even if it were proper to do what American

3   Express request, the evidence in the DOJ case, which was not

4   directed at parity surcharging or the question of whether such

5   surcharging would be negated by customer defections, is highly

6   unlikely to cast a meaningful new light on the settlements'

7   lack of value.

8              Before I conclude, I'd like to make a few points

9   about the DOJ case, since its relationship to this inquiry has

10  been raised.

11             First and foremost, no matter what happens in the

12  DOJ case, this settlement should be rejected.  We say that for

13  two main reasons:  First, the predicate question your Honor

14  has to address is whether the mandatory -- the proposed

15  mandatory settlement class can be certified.  And we submit

16  that it should not be certified.  That inquiry is entirely

17  independent of the DOJ case;

18             Second, even if the DOJ were to lose, and let me be

19  clear, we think it should win, but even if the DOJ --

20             THE COURT:  Mr. Hammer is happy to hear endorsement

21  of his position.  Go ahead.

22             MR. SHINDER:  Even if we were to lose, that result

23  would have little or no bearing on the key questions that go

24  to fairness here, this parity surcharging having a meaningful

25  value, the DOJ has litigated that.  And can a settlement that

76

1    jettisons strong merchant claims against differential, the

2    rules that bar differential surcharging while inshrining an

3    impermissible forward looking release cannot be justified.

4    The DOJ didn't address those questions either.

5              The second broad point I want to make, is that if

6    the DOJ wins, this settlement must be rejected -- period; full

7    stop.  As your Honor is well aware, after seven weeks of

8    trial, the DOJ case is about stimulating, for the first time,

9    true inter-brand or network competition by giving the

10   merchants the ability to engage in differential or brand

11   steering.

12             Even plaintiffs' expert, as I said before, readily

13   conceives that differential steering is much more likely than

14   parity surcharging to give merchants what they really want --

15   the ability to play the networks off against each other to get

16   price concessions and inject some real competition into this

17   marketplace, like they do with vendors and suppliers in every

18   other industry every day.  Against that backdrop it is pretty

19   clear, that if the DOJ wins, it will become immediately

20   apparent that the relief in this settlement would be entirely

21   superfluous.  Because of the DOJ, merchants would have the

22   valuable steering tools that they want, and parity surcharging

23   would be, at best, a useless dead letter and, at worst,

24   confusing, because some merchants might have a hard time

25   understanding why they can differentiate via discounting and

Mr. Shinder

1  soft steering but not via surcharge.

2          THE COURT: But even if the -- if the Department of

3  Justice is successful, one can assume that the process of

4  appeal is going to go on for many years, it could even end up

5  to the Supreme Court. And in the meantime if the settlement

6  agreement is turned down, the merchants won't have the benefit

7  of being able to surcharge during that entire period. So

8  they're not going to get the benefit of the settlement, to the

9  extent there is a benefit, even if the DOJ wins their case.

10 It's going to be a long time and coming. There's going to be

11 years and years and years, I assume, based on how fast the

12 litigation process operates at the appellate level. There are

13 7,000 pages of transcript in the government case and 1,000 --

14 more than 1,000 exhibits, and the issues are very complicated.

15         What harm is done by allowing the parity surcharging

16 as long as that's going on?

17         MR. SHINDER: The harm is done. I'm going to assume

18 your question presupposes approve the settlement, parity

19 surcharging.

20         THE COURT: Just as for the sake of argument.

21         MR. SHINDER: And for the sake of the harm that is

22 done, it's locking in, through a court approved settlement, an

23 anticompetitive construct and approving a release that reaches

24 forward and permissibly that is worst than getting nothing.

25 And so that would be affirmatively harmful.

CHARISSE KITT, CRI, CSR, RMR, FCRR
Official Court Reporter

```
 1              But getting back to the point I was making.  I'll
 2    take your point, that there is an appeal.  There may or may
 3    not be a stay pending appeal, but what I'm trying to do is
 4    focus your Honor on the two -- the results of the DOJ case
 5    highlights it.  If they win and they survive appeal, assuming
 6    there is a stay pending appeal, and they give merchants the
 7    ability to differentiate in different ways by steering, parity
 8    surcharging is useless.  It just highlights once more how
 9    little value there is in the settlement.  That's the point I'm
10    trying to make.
11              THE COURT:  Do you think that the court's choice as
12    to whether debit is in the relevant market for antitrust
13    purposes, in the Justice Department case, has any bearing on
14    what's done here?
15              MR. SHINDER:  It doesn't, your Honor, actually for
16    the reasons that Professor Hemphill -- he talked about this in
17    his report, that market definition does not dispositive that.
18    The granular question is whether customer defection is --
19    whether the lack -- the low level of substitutability between
20    credit and debit in most venues would apply an amount of
21    customer defection, such that most merchants wouldn't engage
22    in parity surcharging.  While substitutability between credit
23    and debit is obviously embedded in the market definite
24    inquiry, if you were to find that the market is a broad one,
25    American Express postulates, which, if you want my opinion,
```

Mr. Shinder                                                    79

1    would be a mistake.  But let's say you were to find them.

2    That would not be dispositive of the question that matters

3    here, which is -- and as Professor Hemphill laid out, it

4    doesn't take much in the way of customer defection to render

5    parity surcharging unprofitable.  You know, there is some

6    overlap but it's a distinct question.

7              THE COURT:  All right.

8              MR. SHINDER:  I'm out of time but I do have --

9              THE COURT:  Is anything else briefly that you want

10   to add?

11             MR. SHINDER:  Well, I'd like to, if I may, just

12   comment on a slide that Mr. Friedman talked about.

13             So, your Honor, I talked at length about what

14   American Express is really afraid of and what matters is

15   differentiation at the point of sale via surcharging.  This

16   settlement is all about protecting them from that.  So

17   assuming AmEx would allow this.  Well, here's why:

18             First of all, a few things to say about this.  This

19   scenario preserves the parity regime and lack of

20   differentiation at the point of sale.  What Mr. Friedman is

21   saying, Well, even though there cannot be differentiation at

22   the point of sale, the competition that matters to American

23   Express, Discover can do this, you know, in terms of its

24   communication with cardholders.  This goes on everyday already

25   in the current world.  This is the equivalent of an award.  So

CHARISSE KITT, CRI, CSR, RMR, FCRR
Official Court Reporter

Mr. Shinder

1    it's --

2            THE COURT:  This is the slide -- just for the sake

3    of the record, this slide doesn't have a number.  So this is

4    the slide that displays only the Discover logo and it says:

5    *Your credit card surcharges are on us.  Surcharges will show*

6    *up on receipt but never on your monthly bill.*  And this has

7    only the Discover logo and not the merchant's logo on it.

8            MR. SHINDER:  Yes.

9            THE COURT:  As opposed to the other slide which had

10   two logos on it?

11           MR. SHINDER:  Yes.

12           THE COURT:  Go ahead.

13           MR. SHINDER:  So what I'm trying to convey is this

14   competition, Mr. Friedman has a Rico moment.  Yes, this is

15   going to happen.  This happens already.  Discover is free to

16   advertise and no one restrains them from doing this.  The

17   consumer, you know, use your Discover card at a gas station

18   over the summer and I will -- you know, we will spruce up your

19   cash back.  We'll give you 5 percent instead of 2 percent.

20           I know a little bit about Discover because I

21   represented them for years.  They're free to do this today.

22   There's nothing about this that introduces any competition

23   that doesn't happen today.

24           The other point is this kind of promotion would only

25   make sense if parity surcharging were to take hold.  A

Mr. Arnold

1   predicate to this is there's lots of parity surcharges such

2   that Discover can say, you know what, instead of saying to

3   customers over the summer, where the gas bill spikes, we'll

4   add some cash back, we'll do this instead.

5           Again, knowing something about Discover, the only

6   way that they're even going to consider that is if there's

7   lots of parity surcharging, and for all the reasons that I've

8   said and what Professor Hemphill said, it's not going to

9   happen.  It's not going to happen.

10          THE COURT:  All right, thank you very much.

11          MR. SHINDER:  Thank you.

12          THE COURT:  Okay.  And finally this morning we'll

13  hear from Mr. Arnold.  Welcome back, Mr. Arnold.

14          MR. ARNOLD:  Thank you.  But before we start my

15  clock, your Honor, I have a question I would like to answer,

16  but it's not my area.  I'm going to be pushed for time any

17  way, and I've -- as an opponent of the chess clock in a trial,

18  I shouldn't be doing this.  The question you asked

19  Mr. Shinder --

20          THE COURT:  Oh, I'm going to start the clock.

21          MR. ARNOLD:  Well, I was hoping I could hold on to

22  these documents.

23          THE COURT:  And if you have more to say, we can save

24  it until after lunch.  If I stop the clock, I'm going to have

25  20 lawyers asking me to stop the clock.  I know how that

Mr. Arnold                                    82

1    works.  It's sort of a creeping insidious process.

2              MR. ARNOLD:  Real quickly.  The question you asked

3    Mr. Shinder about whether -- would there be some relief from

4    the American Express settlement while the Government appeal

5    goes, whichever way its going.  You heard Mr. Friedman say

6    there's going to be an appeal from this also.  American

7    Express has not committed itself to change a thing until all

8    of these appeals are run; every one of them are run.  So

9    they're going to be running a parallel course.  There's not

10   going to be any relief coming out of this, and that's it.

11   That's my answer and I will now go to what I was delegated to

12   come up here and talk about.

13             Your Honor, I have some exhibits.  May I pass these

14   up?

15             THE COURT:  Are you going to put them up on the

16   screen?

17             MR. ARNOLD:  Yes, we are.  But I may not be -- I

18   hate doing this, but I've got a lot of evidence, so I want to

19   try to have this here.  If I don't get through all of them,

20   you have them in front of you.

21             THE COURT:  Is that on?

22             MR. ARNOLD:  Okay, there it is, your Honor.  Thank

23   you.

24             THE COURT:  There you go.

25             MR. ARNOLD:  Now, in starting this, my -- what I

```
 1    wanted to do is get up here and talk a little bit about this

 2    settlement versus the underlying merits of a powerful

 3    antitrust case.  But before I start, there's something that

 4    I'd like to talk about, and that is, that the Visa-MasterCard

 5    case, throughout that case and particularly during the really

 6    contentious mediation and approval process, Judge Gleeson

 7    regularly reminded everybody participating, including people

 8    that weren't happy with the settlement, that this was an

 9    antitrust case -- no more and no less.  That he couldn't do

10    more nor could the class be asked to do more than the

11    antitrust laws would permit.

12           Most of the objectors -- and it was a lot of

13    publicity to the objections there.  And it had a lot to do --

14    not with the number, because the number is strong here.  And

15    you haven't heard a lot of publicity here.  The reason was,

16    there was some lobbying efforts in congress, they were trying

17    to get evidence up there.  They admitted it in the fairness

18    hearing, that that's what they were doing.  So there was a lot

19    of publicity, a lot of news releases and stuff about our

20    position, you aren't reading here.  But our position here is

21    more united, more clear, and more focused on exactly what the

22    problem is.

23           Now, the objectors in the Visa-MasterCard case were

24    wanting more.  They wanted basically rate regulation.  They

25    wanted the interchange fees to be -- in some way for
```

Mr. Arnold                                                    84

1   Judge Gleeson to interfere with the setting of those rates.

2   And Judge Gleeson kept reminding us, this is a market solution

3   and that's all we can get done here.

4          Now, he also pointed out that some market solution,

5   that he could deal with only Visa and MasterCard.  And he

6   pointed out that there was an American Express problem.  And I

7   think I'll get this right on the first one.

8          And he said in his order, there was an American

9   Express problem.  And he reminded all of the litigants, and of

10  course we were there supporting the class settlement, the

11  lawyers and the clients that are in front of you, the

12  individual merchants case were supporting that settlement.

13  And we were supporting that settlement because it did take all

14  it could do to unleash the market forces of horizontal price

15  competition for network services.  That's what that was.

16         Now, the objectors here are united because this is

17  an antitrust case -- no more, no less.  The class here is

18  attempting to get a relief and give a pass to American Express

19  going forward for less than what the antitrust laws require.

20  This case was brought to introduce horizontal price

21  competition into this marketplace where it's clearly absent.

22  This settlement, and we're all united in it, does not do that.

23  In fact, it could be worst than that.

24         Now, what the worst part of it is, that if -- and as

25  Judge Gleeson said, that if American Express is the only

CHARISSE KITT, CRI, CSR, RMR, FCRR
Official Court Reporter

Mr. Arnold                                                     85

1   remaining major network, its insulated price competition will

2   assist in the efforts to fix it.

3          Now, Mr. Friedman suggesting that that American

4   Express problem that he was talking about being fixed by this

5   settlement is inaccurate.  It's not correct.  It does not

6   introduce any horizontal price competition.  It actually

7   interferes with it.  Because parity surcharging does not allow

8   for any merchant to award any lower rates.

9          So you're actually going to encourage an escalation

10  of rates.  Because American Express can keep raising their

11  rate and say, Well, I can't be surcharged any more than Visa

12  and MasterCard, so I can keep pricing it up.  It actually has

13  a reverse effect.

14         THE COURT:  Well, let me just point out that there

15  are limits on what the plaintiff class representatives could

16  do in this case that didn't exist.

17         MR. ARNOLD:  There's no question.

18         THE COURT:  No, no.  When the Visa-MasterCard case

19  was being resolved, and that is basically -- these class

20  representatives have been to the Supreme Court three times in

21  Italian Colors.  So, you know, now there are more limited

22  options.  Right?

23         MR. ARNOLD:  Well, no, there's more limited options

24  for them to litigate in the Federal Court but that certainly

25  tells you why they should not be allowed to come to Federal

CHARISSE KITT, CRI, CSR, RMR, FCRR
Official Court Reporter

```
1    Court and try to give away everyone else's rights, including

2    my client's rights, who are here in court, who do not have

3    limited options.  Who are -- who are prepared and have a fully

4    discovered case and prepared to move ahead, hopefully not long

5    after the Government's case.

6            But, your Honor, the biggest problem with this is

7    that if you approve this settlement, after seven hard years of

8    litigation in the Visa-MasterCard case, you would have

9    basically helped them take away the -- what was fought for in

10   the Visa-MasterCard case.  Because as Judge Gleeson pointed

11   out, he could only affect the Visa-MasterCard activity.  This

12   case is designed -- our case is designed to take and others

13   who want to litigate with them.

14           Our clients, by the way, are here in court.  We're

15   not looking for an arbitration discussion or anything else,

16   because we're here.  But this settlement would take away our

17   ability and all the other merchants in the country ability to

18   utilize the ability -- I mean the Visa-MasterCard settlement.

19   And Professor Hemphill noted that in his report.  And

20   Professor Hemphill got this report right.

21           There's a couple of questions that he asked in

22   there.  But given the record he had and given the fact that

23   we've lived with this case for all of these years, we were all

24   terribly impressed with the way he was able to understand this

25   stuff, as we go through.
```

Mr. Arnold

87

```
 1              THE COURT:  May I ask a historical question?

 2              MR. ARNOLD:  Yes.

 3              THE COURT:  Why is it that this -- this case was not

 4    part of that case or that it was not added to that case?

 5    Because I would have been delighted to share or to provide

 6    this case to Judge Gleeson.

 7              MR. ARNOLD:  Your Honor, as you well know, the

 8    Eastern District of New York has the rule that related cases

 9    goes to the judge to decide whether it's related or not.  We

10    filed our case, said it was related.  Judge Gleeson declined

11    it.  I think it was a gift to you, a Christmas gift.

12              THE COURT:  He's done that to me before.

13              MR. ARNOLD:  He did it this time, your Honor,

14    because he had the opportunity.  But I honestly think, having

15    put in his ten years -- eight or nine years in the Wal-Mart

16    case and the six or seven more here, I think at the moment

17    when he turned it down, we were in the middle of that case, he

18    had not emersed himself in the details.  I think if we had

19    filed the case right during that mediation, I believe he would

20    have taken it, because by then he understood that this was a

21    three-prong problem.

22              THE COURT:  I was just curious.  I'm delighted to be

23    here with you.

24              MR. ARNOLD:  We gave him all the chances in the

25    world to help you out, but unfortunately --
```

Mr. Arnold

 1          THE COURT:  I tried several times to help me out but
 2    nobody agreed with that.  Go ahead.
 3          MR. ARNOLD:  I want to back up just one moment,
 4    because a lot of this conversation, and sometimes when you
 5    were asking questions trying to parse what's going on here
 6    with what people's positions are and, for example, when
 7    Mr. Shinder was saying that what you thought was a surcharge,
 8    he said was a discount.
 9          THE COURT:  Well, we have a disagreement about that.
10          MR. ARNOLD:  Here is the point, you don't have to
11    disagree.
12          THE COURT:  Because we never had a surcharge until a
13    certain point when, as I understand it, there was an added
14    charge to the -- to the station owner for accepting credit
15    payment, credit card payment.  And I don't know how that came
16    about, but that's how it was explained to me at the point of
17    sale on one occasion.
18          MR. ARNOLD:  But here's my point.
19          THE COURT:  Go ahead.  That's not evidence in this
20    case.  I'm just asking the question.
21          MR. ARNOLD:  No, no.  But the point, what is
22    evidence in this case is that every economist agrees that a
23    price is a price.  Surcharging and discounting are just
24    prices.  What -- what's happened here, when Visa and the banks
25    years and years ago were fighting this, just like American

Mr. Arnold

1    Express is fighting it now, they were able to get legislation

2    in some of these states to put a pejorative label on

3    surcharging.

4            And the truth is -- you have a background in the

5    airline industry -- the airline industry has unfolded this,

6    it's called -- any modern economist will tell you, those are

7    antiquated terms -- it is called unbundled pricing.  That is

8    attributing the price to the cost generator.  That's how you

9    do it, and it's called unbundled pricing.  And that's why in

10   New York Judge Wyckoff found the statute unconstitutional,

11   because it was -- it was stopping the communication, it wasn't

12   stopping surcharging.  It was simply saying, you can't call it

13   surcharging.

14           The example is -- you hit on it yourself, at the gas

15   price.  The example is, the price is a dollar.  If you use the

16   card I want you to, it's 98 cents.  That's a discount.  The

17   price is 98 cents.  You use the cards I don't want you to use,

18   it's a $1.  That's a surcharge.  That's an absurdity in

19   economic terms.

20           It's only because it's nomenclature and it helps.

21   I've been wrestling with this for years.  Once you get that in

22   your head, this other stuff, you see it's a bunch of arcane

23   rules that are plugged in here, all for the purpose of

24   avoiding by the banks and the networks and American Express,

25   avoiding horizontal price competition between each other.  No,

Mr. Arnold                                                   90

1    you can't do that.  So you can't set a price communication in

2    any direction.  And when you step to that, then this case

3    becomes much simpler, and it's simple for this simple reason.

4          The American Express rule clearly restrains

5    inter-brand price competition, and everybody agrees on that.

6    Everyone agrees on that, including American Express.  And

7    they -- they have a defense.  Now, I'm not raising by their

8    defense, and I'll talk about that in a minute.  But this is --

9    this is Mr. Funda, his trial testimony here.  He says, and

10   this, your Honor, if I wanted to title it differently, I would

11   say that this is a confession of a monopolist, that's what it

12   should be subtitled.  Because what he says here is, when asked

13   if -- if American Express ever tries to lower its price to

14   compete for business, and he basically says, I don't think

15   anybody's business strategy is to be cheaper than the next

16   guy.

17         Well, he should be in other businesses because a

18   merchant, every client in this place and objecting to this,

19   their object is to control their cost and be cheaper than

20   their competitor.

21         Now, if you provide some quality, then people may

22   pay the extra price, but they choose to insulate themselves

23   from price competition with these rules.  And so in the end he

24   says, no, we don't compete on cost.  Basically he's saying the

25   reason they don't compete on cost is because they have these

Mr. Arnold                                    91

 1    rules that doesn't require them to compete on cost.

 2             Every merchant in America would sign up for a rule

 3    like that, if they could get them.  The problem is, they

 4    can't.  They've been able to embed this thing into a process

 5    that evolved over the advancement of economics and law coming

 6    together that this thing is now seen as being illegal.  They

 7    got away with this for years.  The law used to count up market

 8    sharing percentages instead of looking at the direct group of

 9    market power, which you recognized in your summary judgment

10    opinion in the Department of Justice.

11             Now, I want to keep moving.  What I want to point

12    out here is that everyone, the experts, American Express'

13    experts in the DOJ case, Professor Gilbert; the expert in our

14    case, Professor Ordover; Professor Stiglitz, our expert;

15    Dr. Frankel, the class's expert; Dr. Katz, the expert for the

16    Department of Justice, they all agree that this restrains

17    inter-brand competition, as does American Express.  And this

18    is the one that's most important to me.

19             I'm going to skip ahead here.  And that is that

20    Discover and MasterCard agree that it restrains, and so does

21    Visa.  Visa recognizes and they've changed their rules.

22             And so in the class case they all recognize that it

23    restrains horizontal price competition, and they walked away

24    from it.  Only American Express, still on the wrong side of

25    history, is hanging on to this thing.  And what we are

1    suggesting is that if you look at the Discover testimony --

2    now, I've been doing antitrust litigation for over 40 years,

3    and I've never seen a better competitor testimony than the

4    testimony presented right here in your courtroom, in which

5    Discover -- there's no hypotheticals here.  Mr. Friedman is

6    talking about hypotheticals.  There's no hypotheticals here.

7    This is a company that launched the very product that we're

8    saying would come into play in this nation, if these rules

9    were removed, and they couldn't get any traction with that

10   product because of these rules.  They eventually just raised

11   their price and became one with a club, and he basically told

12   you here that their business model, they would return to it if

13   this rule was removed.  And what they did, that starts the

14   downward spiral, it introduces the horizontal price

15   competition.  So there's no hypotheticals here.

16           You have in your courtroom under oath the man who

17   has the company that launched the very product that all these

18   merchants are here saying that we'll change -- we'll change

19   the surface here of competition in this country if American

20   Express' rules are removed.

21           Now --

22           THE COURT:  The settlement.  We're going to talk

23   about the settlement too.

24           MR. ARNOLD:  I am going to talk about the

25   settlement.  But remember -- I should have put on my -- I

Mr. Arnold

```
 1   should have had a T-shirt on that said Grinnell IV.  I'm up
 2   here on the fourth element, and that is the strength of the
 3   case.  That is the strength of the case that's being given
 4   away here in this -- we're virtually zero.  This is a case
 5   that has tremendous power and traction and is being basically
 6   the injunctive relief and the ability to do something about
 7   this and interject this competition is being basically given
 8   away.
 9             The truth is, your Honor, I don't know how we are
10   here.  This settlement gives away way, way too much for a case
11   like this and locks all these merchants into this.  But I
12   recognize we have to go through this process and I apologize
13   if I've gotten a little too excited about it.  But
14   Professor Stiglitz, who is our professor, but here's a guy who
15   has done a number of major issues for countries and
16   governments and everyone else.  He basically says here that,
17   that various entry are created, you're not going to get any
18   new competition.  As you were asking earlier, would a group of
19   investors come into this?  The answer is no, they will not
20   come in as long as they cannot differentiate themselves in
21   some way.
22             Discover is the last entry.  And the reason Discover
23   is the last entry is because they got in and found out they
24   could get no traction, because these rules stand in the way.
25   If these rules are changed in an appropriate way, differential
```

Mr. Arnold

1    surcharging, unbundle pricing, forget surcharging,

2    discounting, if unbundled pricing is permitted -- and by the

3    way, if -- if we win our case, if the Department of Justice

4    wins theirs, they'll get part of it.  If we win our case,

5    they'll get it all.  And that means the watch word will be

6    differential pricing.  And you won't be wondering whether it's

7    a surcharge or discounting.

8            Now, quickly, and the whole argument here about the

9    fact that this is what would happen, and all due respect to

10   Mr. Friedman, I'm not in any way belittling anything that he's

11   done.  But he puts that example up there about the Discover

12   card.  Your Honor, Mr. Shinder is right, you can do that

13   today.  That's not -- that's not at the point of sale.  That's

14   not -- that's not communicating the price directly, and so it

15   supplies no additional value at all.  But the whole point is

16   that the marketplace should decide all of this and the

17   marketplace -- once again, when I was trying to back you away

18   from how do you surcharge, how do you do this, these merchants

19   already have all types of different plans.  For example, the

20   grocery store, Kroger, or any particular --

21            THE COURT:  A&P.

22            MR. ARNOLD:  A&P, if they -- if they choose, they

23   have rewards programs, they give you extra things if you buy

24   there and everything.  If you are free to price unbundle, then

25   they are free to say, all right, if you have -- if you get gas

Mr. Arnold                                    95

1   points here, if you do this, we'll give you double gas points

2   if you use a Discover card, because they give us a cheaper

3   price.  We give you no gas points if you use an American

4   Express, because it's too expensive for us.  No one gets

5   offended over that, it communicates the -- is that a discount

6   or a surcharge?  That's why you don't need to dance on the

7   head of that needle.  Basically it's an unbundled price and

8   that's why all the central market planners that everybody

9   volunteered, all the critics are saying, well, merchants won't

10  do this, merchants won't do that.  The truth is, if you stop

11  interfering with horizontal price competition, if you stop

12  interfering with that, merchants will figure it out and they

13  won't be dumb enough to walk out and say, Hey, give me

14  2 percent.  They don't want to offend anybody.  What they will

15  do is come up with creative ways to use all of their marketing

16  tools to encourage the use of certain cards, discourage the

17  use of others.  And as we know, if you do that the prices will

18  come down, including American Express' price.

19          Now, your Honor, and I -- and this is when I was

20  talking about the strength of the case.  Your Honor basically

21  has ruled in the Department of Justice case, that if, if

22  plaintiffs can prove an actual effect on competition, there's

23  no requirement to prove more than that, to prove the first

24  part of this case.  And I submit, American Express, and

25  virtually everyone has admitted that's proven.  The issue here

Mr. Arnold                                    96

 1    is American Express has put out what I call a bogus defense,

 2    it really is.

 3             Now, since I crossed the Brooklyn bridge I snapped a

 4    photograph of this, just so I could make this point.

 5             The United State Supreme Court has made it clear as

 6    it can possibly be that you cannot defend, cannot defend an

 7    anticompetitive practice by saying it's not reasonable for

 8    people to compete.  And of course the similar case on that is

 9    the National Society of Professional Engineers.  And the

10    reason I put the Brooklyn Bridge up there is because that was

11    about bridge building.

12             They offered up that they had to fix prices on

13    engineering services because bridges would fall.  Things would

14    happen terribly.  And the Supreme Court says, that's for other

15    areas.  It's not for the law of competition.  You cannot

16    justify highjacking the law of competition for some good

17    purpose.  And what American Express really is telling you is,

18    they've said it here, they've said it in our case, they say if

19    we -- if we are forced to compete, horrible things could

20    happen.  We could be off -- we cannot be in here giving Visa

21    and MasterCard their -- the competition that we give now.  It

22    could be a terrible thing to happen.

23             Well, the fact is the market decides that.  And if,

24    you know, if the Supreme Court says that the Brooklyn Bridge

25    or any other bridge in America could collapse because of price

Mr. Arnold                                                97

1   competition, but that's not the antitrust law's concern, it's

2   for other things, they certainly aren't going to worry about

3   the fact that American Express doesn't like the way it affects

4   their business model.

5           And so their defense is simply it's an insufficient

6   defense and they have attempted to hide it in what I call the

7   two-sided market fallacy.  They have attempted to say that

8   because it's a two-sided market you can't measure this

9   anticompetitive horizontal price fixing thing that they've put

10  together here, this inhibiter of price competition which they

11  can't avoid so they have to admit it, so they came up with

12  something else.  They came up with the same thing that Visa

13  and MasterCard offered up until they gave up.  And that is

14  that you look at the issuing side and you look at the other

15  side, the network side, and you put them together and you look

16  at that effect, and it all sounds nice.  There's just two

17  problems with it:  One, no court has ever accepted that as a

18  measure of the way you do it, and you will never find one that

19  will.

20          Secondly, this is just an economic theory, but more

21  importantly, your Honor, they don't do it.  They do not do it.

22  Their testimony, and I've put this up, Ms. Langwith, who is

23  the vice-president for pricing of merchant services in

24  America.  And her definition in our case, basically in the

25  classes case, she gave the testimony that this is significant,

Mr. Arnold

1    *In the pricing group, do you receive any data from the cost of*

2    *American Express' loyalty program?*

3          She says, *No, that would not be something that we*

4    *would typically see or have data on.  I mean, those are costs*

5    *that are part of the issuer's side of American Express.  So we*

6    *don't -- they don't usually look at our costs, and we don't*

7    *usually look at their costs.*

8          They can tell you about two-sided markets but they

9    don't operate their business that way.  They do not do it.

10   And the question was, *Are those costs relative to how you set*

11   *your prices to merchants?*

12         *We don't really set our prices to merchants based on*

13   *cost.  So -- we set our price based on the value that we*

14   *deliver to merchants, by industry, by merchant size.  So the*

15   *cost is not a factor in that.*

16         Once again, a confession of the monopolist, they

17   didn't have to pay attention to the cost, but more importantly

18   a confession that the two-sided market theory is a fallacy.

19   Not only does the law recognize it, but American Express

20   doesn't do it, your Honor.  And Discover's president, again,

21   he's talking about basically the same stuff, about whether

22   there's a two-sided market operation here.  Is there -- do the

23   rewards cause them to do that.  And the answer is no.  There's

24   no problem with being able to do this.  If they compete, they

25   can still do it because they make money on that side of the

Mr. Arnold

1  marketplace.

2          I'll get now to the settlement itself.

3          THE COURT:  How much time do you have?

4          MR. ARNOLD:  Well, actually you started the clock,

5  the two questions, I don't -- see, I told you wanted to keep

6  that chest clock myself.

7          THE COURT:  Go ahead and let's see how far you go.

8          MR. ARNOLD:  As you know, obviously everyone is

9  reminding you of what Professor Hemphill said, that the

10  probability is effectively small or zero, and he's talking

11  about the parity surcharging.  He also said that he can't see

12  how there's a mechanism to lower prices using parity

13  surcharging.  And he's 100 percent correct on that.  That's

14  why every major network in America is saying don't do this.

15  By the way, you had a couple of people here talking about

16  surcharging.

17          We're not -- we brought this case and fought to get

18  that very right and that's what we're here to do.  But it's

19  not the right to charge 2 percent, it is the right to unbundle

20  pricing, and that's what we're here fighting for and that's

21  what we're trying to get done.  And as Professor Hemphill

22  says, there is a mechanism in that to get the price done.

23          Now, this is -- he got this -- this is a very

24  interesting thing.  He says that this actually creates the

25  interest we're talking about, where a group of investors are

Mr. Arnold

1    going to come in and start a credit card company.  The court's

2    expert says that won't happen because -- with this relief --

3    because parity surcharge preserves the inability to reward new

4    or lower priced networks.

5         So if you can't come in and get market shares,

6    there's no reason to investment your money.  This time

7    American Express docked, instead of investing somewhere else.

8    And that's basically why you're not going to get entry and the

9    antitrust laws want to encourage that.

10        Now --

11        THE COURT:  Want to encourage what?

12        MR. ARNOLD:  To encourage entry, encourage price

13   competition, and lower -- and if there's -- the way you hold

14   people who say that they have value in their product and

15   therefore people will pay more for it.  The way you hold them

16   accountable is hold them to horizontal price competition.  And

17   if, in fact, they're right, then their market share will say

18   it's exactly as they were.  If they are, in fact, incorrect,

19   they'll lose market share and the market decides that, no

20   central planners of any type have to give you a set of rules

21   about how that's going to work.  The market will decide that.

22        Now, I want to try to skip ahead in just a moment.

23   Here, I'll be the -- I guess Mr. Friedman and I agreed on this

24   completely.  American Express is a good laboratory for looking

25   at this case, for the part you're being asked to look at.  And

Mr. Arnold

1  American Express agrees with this too.  And the reason I say

2  American Express agrees with us, is we have the documents

3  American Express.

4         Now, I'm not putting their documents up on the

5  screen, your Honor, because they're under protective order,

6  they're in your folder but I'm going to refer to a couple of

7  them in general terms.  I'm not going to put them up for

8  general publication.  But the fact is that when American

9  Express's attorneys were trying to talk to the Department of

10 Justice from bringing the law suit, they basically said

11 American Express's experience in Australia, confirms that a

12 significant number of card members who are exposed to

13 differential surcharging shift their purchases to other

14 payment method.  The documents that we have here reference to

15 them.  Every one of them shows you that in their planning for

16 the United States of America, not Australia, they're planning

17 here, they relied upon, studied, and analyzed the appearance

18 in Australia and they concluded there that differential

19 surcharging was a risk.

20        They basically, if you read those reports closely,

21 you'll see that they say their plan is not to treat parity

22 surcharges any different than companies that don't surcharge.

23 It's the differential surgeries that they're trying to stop.

24 Because they recognize parity surcharging they can get away

25 with it, because they can keep going up, claim they got better

Mr. Arnold

102

1  value, and they can keep raising the price.  There's no

2  pressure to put it back down.

3       Now, the other documents that I didn't want to put

4  up, but I put it in your folder, have to do with the fact that

5  American Express knows parity surcharging has no effect.

6  Those documents, look at the notes in there.  They're not

7  afraid of parity surcharging.  They would agree to this, I

8  believe, that this is a -- this is a classic brown pass here.

9  You know, throw me in here and make me have to do parity

10 surcharging.  I swear I don't want that to happen, yet their

11 only internal document say they don't really care.

12      So this victim session, they're talking about how

13 they've made this adjustment in their business plan.  This is

14 it called -- this is a qualified slight retreat that actually

15 is through the excellent lawyers, no one ever accused them of

16 not having great lawyers -- and they do have them sitting

17 right there.  And they have come up with a clever strategy to

18 actually -- that's right, they are -- clever strategy to

19 actually make -- take what is an impending defeat.

20      Because this -- they will never -- this two-market

21 fallacy will never -- I don't think it'll withstand this

22 scrutiny, part of it will not withstand the scrutiny of the

23 Second Circuit.  So they virtually admitted that they have

24 rules that interfere with horizontal price competition that

25 they got this excuse that they basically call it the two-sided

Mr. Arnold

1  market.  No court is going to let them get away with that.  So

2  this is an attempt to try to pull this thing -- basically,

3  pull it out of the hat.

4         Now, I want this one quick moment because I'm

5  actually going to finish, I think.  Now, American Express has

6  offered up the other thing, this horrible thing that could

7  happen, what I would call a highly dramatic presentation that

8  they would go out of business if this thing -- if you actually

9  rule against them, that they would be threatened.

10         THE COURT:  We're back on the Government's case now?

11         MR. ARNOLD:  But it's part of the record here, your

12  Honor, that's what we're looking at.

13         THE COURT:  Okay.  I just want to make sure what

14  we're talking about here.

15         MR. ARNOLD:  Okay.

16         THE COURT:  We're not talking about the settlement,

17  we're talking about the --

18         MR. ARNOLD:  That's right.

19         THE COURT:  -- MDPs.  The settlement has nothing to

20  do with the MDP.

21         MR. ARNOLD:  Well, the settlement doesn't the way

22  it's set up, that's just the way it's structured.

23         THE COURT:  Okay, go ahead.

24         MR. ARNOLD:  But my point is that's why they would

25  agree to something like this, so that they can avoid being in

Mr. Arnold

1    jeopardy for those things that they are attempting to

2    underscore their entire defense of this two-sided market by

3    saying something horrible is going to happen to American

4    Express if it doesn't happen.  It didn't happen.

5            Well, you know, Mr. Chenault is one of the top

6    executives in America, and he's looking after his company the

7    way he felt he should, and he's being paid to do.  But when

8    he's talking to investors, you Honor, he never once ever

9    suggested -- in fact, he says the experience in Australia is

10   they're doing great.  Both parts are doing great, not just the

11   part he's suggesting here, about the bank, their proprietary

12   business is doing great and their financial statements look

13   like they are doing great, and it sounds like he's being

14   accurate, in not being dramatic with them and maybe a little

15   more dramatic here.

16           The last part of this was that in our case Professor

17   Stiglitz was asked, you realize American Express could go out

18   of business if, in fact, differential surcharge becomes part

19   of this?  And he was asked, do you think that would be a good

20   idea, less competition?

21           And they asked him three times.  He kept qualifying

22   it by saying he thought the best thing to do was for American

23   Express to change their rules and become a viable competitor

24   here and help introduce price competition in the case.  But

25   after being pressed three or four times, he basically said

CHARISSE KITT, CRI, CSR, RMR, FCRR
Official Court Reporter

Mr. Arnold

1    that the choice -- if the choice is between American Express

2    remaining in business with -- with that rule in place, which

3    prevents all other price -- horizontal price competition from

4    being removed, that the price competition would be better,

5    because they're the only reason this competition is not taking

6    place today.

7              Now, having -- so I will end on a way that gives --

8    that fits what I was supposed -- I kind of got excited about

9    the merits of the case, your Honor, and I apologize for that.

10   But this one little isolated part --

11             THE COURT:  You couldn't say a word for seven weeks.

12   I'm sure that was difficult.

13             MR. ARNOLD:  It was difficult.  I asked Todd for

14   time two or three times back there.

15             THE COURT:  I'm sure.

16             MR. ARNOLD:  Is that American Express has created in

17   this very document, not only do they never have to commit to

18   changing these rules until all the appeals are run, but

19   secondly, they have an escape clause in here that they agree

20   not to terminate merchants solely for surcharges, but they

21   didn't commit not to terminate them for surcharging as one of

22   a group of causes.  And the simple thing in having watched

23   what they did in Australia, a simple scenario is this:  They

24   simply told merchants that aren't growing market share and

25   they said, you know, you are on a list now that can't -- that

1   just -- you're marginal, whether we're going to keep you or

2   not, you're not market share.  By the way, you all happen to

3   be the people that are surcharging.  We're going to exercise

4   our rights and not do business with you and terminate you.

5   And because they could establish, real easy records to

6   establish, you could selectively send out messages like that,

7   is not solely for surcharging and they could terminate them.

8           THE COURT:  How does that square with the

9   presentation that American Express made in the Government's

10  case that -- that they are at a competitive disadvantage with

11  Visa and MasterCard and the proof of that is that so many

12  fewer merchants accepting American Express cards because of

13  the perception that the discount rate is higher for American

14  Express merchants, some merchants simply will not accept the

15  card because of the higher discount rate.

16          MR. ARNOLD:  That's the classic case we heard in law

17  school, when someone basically murders their parents and then

18  ask for mercy because they're an orphan.  They basically --

19  they basically are saying, our prices are so high that we're

20  at a competitive disadvantage on merchants that don't feel the

21  market power and compunction.

22          This is a very interesting point.  We went through

23  this for a number of years.  In both cases, your case and

24  Judge Gleeson's case, and in both cases what happens here is

25  that their market power is directly tied, maintained by their

Mr. Arnold                                                  107

1  rules, but they have to get in the door first.  And you'll see

2  actually in one of those documents where they went to a small

3  merchant fee appoint -- I can't say that -- a small merchant

4  fee, a very small amount.  And then once they got the

5  merchants, they jumped it back up, almost doubled the price.

6          And of course they didn't lose a lot of those

7  merchants.  Because once they get in, and insistence starts

8  inside the thing, then they can't drop it.  So the answer is

9  that their claim that -- that they're at a competitive

10  disadvantage is one of their own making, if they are.  Because

11  they certainly can get into as many merchants as they want to.

12         Now, American Express also is taking advantage of

13  another -- of another phenomena of their.  And this is all due

14  respect to them, because they know they were very snobby.  At

15  one time, when I was a young lawyer, I couldn't get an

16  American Express card.  Because they were kind of snobby.  You

17  know, you had to really have a good income --

18         THE COURT:  Do you have one now?

19         MR. ARNOLD:  I do.  The reason is, they've lowered

20  their standard.  They have lowered their standard.  They

21  lowered from the merchants that they go to and they lowered it

22  for the people that they allow to get an American Express.

23         THE COURT:  If you keep this up, you'll be getting a

24  cancelation.

25         MR. ARNOLD:  I've been expecting one for years.

Mr. Arnold

1   But, any way, the answer is, they're not at a competitive

2   disadvantage.  They've chosen to position themselves in the

3   market that way.  That's what they've done.

4        THE COURT:  Do you think there's —— you started off

5   by mentioning that Judge Gleeson on repeated occasions said

6   that the contours of the Visa—MasterCard case, were that it

7   was an antitrust case.

8        MR. ARNOLD:  That's correct.

9        THE COURT:  All right.  Is there any allusion in

10  this case, that it's anything other than an antitrust case?

11       MR. ARNOLD:  No, your Honor, there isn't.  And

12  that's why all of the merchants here that opposed it are all

13  united, that this thing doesn't work, and the criticisms are

14  fairly consistent.  If you had attended that hearing it was ——

15  it was more of a three—ring circus.  People were up with every

16  type of complaint possible, including don't approve this

17  because Congress will never regulate rates if you do, all

18  those types of things.

19       And Judge Gleeson would continue to repeat, that's

20  not our issue.  I can't do that.  I'm only here for this.  And

21  a lot of fairly influential merchants who —— because they had

22  been involved in the lobbying efforts to Congress to try to

23  get regulation, and they were really seriously believing that

24  might impair their ability to go to Congress and say, look at

25  these rates, you should regulate them.

Mr. Arnold

1          And that's -- so the answer is, he repeated that

2     because of that issue.  That's not the issue here except, as I

3     said earlier, antitrust case -- no more, no less.

4     Unfortunately, this is way less than what the strength of

5     that -- and I'll remind -- my number four here, that is

6     Grinnell, element number four, the strength of the case, this

7     is a powerful case.  And, your Honor, I thank you for your

8     patience.

9          THE COURT:  I just have one more question.  Does the

10    existence of the Durbin Amendment have any effect or influence

11    on this situation involving the class settlement?

12         MR. ARNOLD:  No, it does not, your Honor.  The

13    Durbin Amendment, that's not absolutely correct.  Because the

14    Durbin Amendment had some merchants, the smaller merchants,

15    lower their rates.  Now for some larger merchants, like most

16    of the people here, their debit rate actually went up, because

17    of the way when it got regulated.

18         But to the extent it made debit cards something to

19    steer to, that's -- it has some minor impact but it's not

20    debit card steering, that's the critical issue here, it is the

21    steering between these credit card companies.  Since you asked

22    that, I was going to -- I was almost going to say something

23    about Mr. Korologous' argument about, that we had based our

24    whole case, our damages on the debit card issue.  I started to

25    say something, and Mr. Almon back there said don't get

Mr. Arnold                                        110

1    distracted, get up and talk about what you want to talk about.

2    But the fact is that it was misleading about what he said.

3             It is true, our expert used debit, as a define to

4    try to figure out what a but for price would be.  He wasn't

5    saying that that was –– that that is what –– that the –– that

6    that was the competition.  He was saying that's the only –– in

7    this payment system, that's the only competitive price I can

8    find.  So I used that and built it backwards and things that

9    are peculiar to credit cards, that's what the price ought to

10   be.  Thank you, your Honor.

11             THE COURT:  Thank you.

12             MR. ARNOLD:  I appreciate it.

13             THE COURT:  All right.  Why don't we take lunch

14   until 2:30 and then we'll move on with the next speaker.

15   Thank you.

16             (Luncheon recess.)

17             (Continued on the next page.)

18

19

20

21

22

23

24

25

Mr. Feinberg

1           A F T E R N O O N   S E S S I O N

2                    2:30 P.M.

3           (In open court.)

4           THE COURT:  All right, before we proceed, let me

5    just mention that one of my new law clerks is a former

6    associate of Cravath, Swaine & Moore, but is in no way

7    involved in dealing with this litigation in chambers.  So I

8    just wanted to mention that and put it right on the record.

9           Okay, the next group is Blue Cross and Blue Shield

10   health insurers, objectors.  Mr. Feinberg.

11          MR. FEINBERG:  Thank you, your Honor.  Good

12   afternoon.  Adam Feinberg on behalf of several dozen Blue

13   Cross and Blue Shield health insurers, and the entities that

14   own them and some of their affiliate entities.

15          And I thought, your Honor, I would start by

16   explaining just a little bit about who we are.  As you may or

17   may not know, Blue Cross and Blue Shield Association licenses

18   out to different health insurers across the country, the right

19   to use the Blue Cross and Blue Shield trademarks.  And the

20   clients that I represent are the licensees of those trademarks

21   in almost all of the states across the nation as well as some

22   health insurers that are owned by the same companies that own

23   these Blue Cross entities that also have non-Blue Cross

24   branded business.  But Blue Cross in and of itself, Blue Cross

25   branded business covers about one in three Americans.  So the

Mr. Feinberg

1    group of health insurers that I represent is an enormous

2    portion of the health insurance business in the United States.

3            And I think it's fair to say that American Express

4    probably has no idea how the health insurance industry works

5    and I know that the class representative, class

6    representatives have no idea how the health insurance industry

7    works, and that is precisely why they make a very bad set of

8    representatives at least as it relates to negotiating a

9    settlement that would bind health insurers.

10           So what I would like to do, your Honor, is just

11   explain a little bit about the market in which health insurers

12   operate and particularly with the market that exists starting

13   essentially as of the beginning of this year with the

14   effectiveness of most of the important parts of the Affordable

15   Care Act.

16           So the Affordable Care Act, amongst other things,

17   created health insurance exchanges, these are electronic

18   marketplaces that you probably are familiar with, on which

19   insurance companies sell and compete for business in the

20   individual and soon to be small market business.  There are

21   currently millions of individuals in the United States who

22   purchase health insurance through this market and it's

23   estimated by the federal government that that number will run

24   in the tens of millions in the next few years.

25           And these healthcare exchanges, these internet-based

Mr. Feinberg

1   healthcare exchanges can be run either by a state, if it

2   elects to do so, or by the federal government if the state

3   doesn't do it itself.  And as you may also be familiar with,

4   your Honor, more and more states are opting not to do it

5   themselves and are leaving that job to the federal government.

6          And when the federal government operates one of

7   these exchanges, they require health insurers to enter into a

8   written agreement and they impose a whole source or a whole

9   set of rules and regulations on such health insurers.  And

10  there is one such rule that is particularly important in this

11  case.  It expressly outlaws the use of surcharging or even

12  discounting.

13         I know you and Mr. Arnold were engaging in a back

14  and forth about whether or not there is a difference between

15  those two things, but for our purposes it doesn't matter.

16  Both of them are expressly prohibited by the Department of

17  Health and Human Services when you are selling products on

18  federally run healthcare exchanges.

19         So for example, one of my clients is Blue Cross and

20  Blue Shield of Louisiana.  They operate in a state that has a

21  healthcare exchange run by the federal government.  They

22  simply cannot surcharge or discount for that matter.  In all

23  of their business sold on the internet-based marketplace that

24  was created by the Affordable Care Act.

25         In addition to that, the Affordable Care Act creates

Mr. Feinberg

114

1   rules that are known as the MLR, or medical loss ratio.  And

2   these are essentially pricing regulations that say that health

3   insurer must spend, in the individual market at least and in

4   the small business, in the small employer market, must spend

5   80 percent of all of the revenue they receive with a certain

6   very limited exception on healthcare-related expenses.  That's

7   mostly doctors visits, wellness programs and things like that.

8          The other 20 percent is allowed to go to profit and

9   all of their administrative expenses.  And in that category

10  would be the discount rates or discount charges that are

11  charged by American Express and that we're here today to talk

12  about.

13         And so if you take a discount rate that's whatever

14  it may be for a particular merchant but roughly 2 percent,

15  let's say, that is a huge portion of the 20 percent that a

16  health insurer has to cover all of its administrative expenses

17  and profit.  And we put a couple of declarations in the

18  record.  The health insurers that I represent are all over the

19  map.  Some of them do not meet this threshold.  And so if they

20  are charged a discount rate they cannot pass that on to their

21  customers in any way, shape or form.  They can't raise their

22  prices, they can't surcharge, because if they do, they end up

23  giving 80 percent of it right back to the consumer via a

24  rebate that is required by the Affordable Care Act if you do

25  not meet the 80 percent MLR threshold.  And that MLR group

Mr. Feinberg

1    applies to all of the business, not just the business that is

2    sold on the internet-based exchanges that I talked about

3    previously.

4           And so while most of the reasons that health

5    insurers have for accepting credit cards relate to the

6    exchanges that are created by the Affordable Care Act.  In

7    fact, I think every one of the declarations that we put in

8    notes that these Blue Cross entities firmly believe that

9    simply cannot sell on an internet-based marketplace unless you

10   take credit cards.  I think that's sort of an obvious point.

11   But that is where most of their credit card transactions are

12   likely to occur.

13          But even aside from that fact, aside from that

14   marketplace where the rule says if it's run by the federal

15   government they cannot surcharge, totally aside from that, we

16   have these MLR rules which effectively limit, if not

17   eliminate, the ability of a health insurer to surcharge or

18   view any other mechanism for that matter to pass on the cost

19   discount charges to its customers.

20          And there is one other element of this regulatory

21   backdrop that I think is important here.  And that is the

22   timing.  So all of this came into being for calendar year 2014

23   in terms of these exchanges, and you could enroll as early as

24   October of last year but that was the beginning, that was the

25   first time that any health insurer was selling on the

Mr. Feinberg

1    internet.  And for many health insurers, that was the first

2    time they were accepting credit cards.  And so we have some

3    examples of insurers who put declarations in the record that

4    say they actually right now take American Express.

5            But I think it's important to note that a good many

6    of the Blue Cross and Blue Shield health insurers do not take

7    American Express, they are still trying to figure out what the

8    credit card business is all about and whether they want to

9    take credit cards at all; and, if so, which ones do they want

10   to take.

11           And so some of these companies, while they're very

12   likely to take credit cards in the future, do not take them

13   right now but they would still be covered by the class

14   definition to the extent that it covers merchants who accept

15   American Express in the future.

16           And I'm not going to get into the due process

17   arguments.  I know some of the other objectors are going to

18   get into that, but some of my clients are the classic examples

19   of the so-called future draft picks that you mentioned before.

20   They did not get any notice that this case was going on.  They

21   got no notice of the post settlement.  They happen to be here

22   now because they heard about it from some of their brother and

23   sister Blue Cross entities across the county who did take

24   American Express and did get the memo.  How many other

25   entities out there didn't any such notice and didn't find out

Mr. Feinberg

1    about this otherwise, of course, who knows.

2                But at the end of the day, the Blue Cross and Blue

3    Shield entities believe that the settlement should be rejected

4    for a whole host of reasons, all -- well, I should say most

5    which relate to the fact that they simply get little, if any

6    benefit out of this settlement.

7                We completely agree with the objectors that you

8    heard previously that the value of this settlement is

9    extremely low in that parity surcharging isn't going to do any

10   good.  But whatever small value that might have had for the

11   average merchant, it's substantially less, if anything, for

12   health insurers, for the reasons I said previously.  They

13   simply cannot surcharge if they're selling at least on these

14   internet-based exchanges.  And even when they're selling at

15   other marketplaces, they are bound by these MLR rules which

16   prohibit them from -- at least if they're at or above the

17   80 percent threshold which prohibit them from passing on the

18   cost.

19               And so they look at the settlement and say I'm

20   getting nothing and they want no part of it.  You had asked

21   before, well, wouldn't an entity at least get temporarily some

22   benefit out of parity surcharging while courts of appeals were

23   sorting this all out.  Well, in our view, it's not worth the

24   release they have to give.  They get so little, if anything,

25   out of it, the deal is simply bad.  And it's not as compared

Mr. Feinberg

1    to what they might get in a lawsuit, they're not parties in

2    any pending lawsuit, unlike some of the other objectors, they

3    don't want anything to happen.  They just don't want to be

4    bound by the settlement that's being proposed in this case.

5              And I just give you a complete hypothetical example.

6    But some of the rules that are included in the release in this

7    case relate to the honor all card rules.  There's no real

8    relief that's given with respect to that.  But hypothetically

9    if the Blue Cross entities cared only about the honor all card

10   rules and didn't care anything about the surcharging rules

11   because they are of no moment to them as they are prohibited

12   by other laws and regulations from surcharging, this case is a

13   disaster for them.  They get zero relief in terms of the honor

14   all card rules but they're giving a release that prohibits

15   them from suing both for injunctive relief and for damages on

16   some other element of the rules that American Express has in

17   place in exchange for literally nothing of value.  And that

18   simply isn't fair.

19             And I know some of the objectors in the past had

20   already covered some of the legal bases but we believe that

21   the different situation that health insurers find themselves

22   in means that the typicality and commonality requirements of

23   Rule 23(a)(2) and (3) are simply not met and also that the

24   unity required by Rule 23(b)(2) is not met, and likewise that

25   there's no fair, reasonable and adequate settlement as

Mr. Schulman                                    119

1   required by Rule 23(e)(2).

2            This is simply a terrible deal for health insurers

3   and they don't want any part of it and they don't believe that

4   it is fair given that there's no value to them in it.  Thank

5   you, your Honor.

6            THE COURT:  Thank you.  All right, the next objector

7   is Buckeye Institute for Public Policy Solutions.

8   Mr. Schulman.

9            MR. SCHULMAN:  Good afternoon, your Honor.

10           THE COURT:  Good afternoon.

11           MR. SCHULMAN:  Adam Schulman for the Buckeye

12  Institute for Public Policy Solutions.  Some objectors who

13  have previously spoken have addressed the merits of the

14  underlying litigation vis-a-vis the proposed settlement.

15  That's the Grinnell factor for, and that's an objection to the

16  adequacy of the settlement.  It's a valid objection but it's

17  only one part of the inquiry that this court's obligated to

18  make.  I'd like to put aside for the moment the substantive

19  antitrust merits of the litigation and address where this

20  settlement really falls short in our view.  Its failure to

21  comply with many of Rule 23 structural safeguards.

22           First, the proposed certification.  As we've heard

23  from other objectors, the (b)(2) certification is untenable.

24  The settling parties maintain that a (b)(2) certification is

25  proper because of what the settlement obtains, unitary

Mr. Schulman

1    injunctive relief.

2         Other objectors dispute the premise that the relief

3    obtained really is actually indivisible.  And I think the

4    other objectors have the better of that argument.  But

5    importantly, the point I want to make is the entire

6    disagreement is besides the point.  Wal-Mart v. Dukes cannot

7    be read to say that any (b)(2) certification goes if the

8    plaintiffs obtain indivisible injunctive relief.  Rather,

9    while it is one necessary precondition of a (b)(2) class, it

10   is not the only precondition.

11        Dukes expressed concerns about preclusion of absent

12   class members' damages claims.  The language that Dukes used

13   was by litigation that they had no power to hold themselves

14   apart from; that is to say, the release of the settlement

15   matters.  (b)(2) settlements are only allowed to release

16   injunctive claims.  Here the settlement extinguishes all

17   damages claims, future damages claims until the release

18   termination date, and even currently existing monetary claims

19   for disgorgement or restitution, that is nonlegal monetary

20   claims.

21        What is more, if the plaintiffs are correct that all

22   that is necessary is obtaining injunctive relief within the

23   Second Circuit was wrong in Hecht v. United Collection Bureau,

24   a case that postdated Dukes.  In that case, that was a Fair

25   Debt Collection Practices Act case where their relief obtained

Mr. Schulman

1    was in agreement of the defendant not to make violating calls

2    any longer.  But the court said you had to look at more than

3    just the relief obtained, you had to look at the settlement

4    class, you had to look at the settlement release itself.

5           Now, the plaintiffs seek to have this court reimpose

6    exactly what Dukes repudiated, the subjective standard based

7    on whether the named plaintiffs and class counsel think that

8    injunctive relief is important.  If Dukes did one thing, it

9    would reject that very standard for (b)(2) certification.

10          Buckeye's second objection to certification is that

11   the settlement class, as defined, is unascertainable.  This is

12   the future draft picks issue in our view, because the class

13   includes all persons who in the future accept AmEx branded

14   cards even if they don't accept such cards now.

15          Futures classes are unacceptable because they

16   deprive individuals of their right to notice an objection,

17   both rights guaranteed under Rule 23(e).  Both the Supreme

18   Court and the Second Circuit, as well as numerous district

19   courts, have suggested that such an open-ended class

20   definition is unacceptable.

21          The plaintiffs and Mr. Korologous's response today

22   is to say that future merchants receive exactly the same

23   benefits as current members of the class.  First of all, I

24   don't agree that's correct.  A hypothetical individual who

25   starts accepting cards in five years doesn't get the same

1    indivisible relief, they only get five years.  But if they

2    don't get to ten years, the settlement assures.

3            THE COURT:  Well, but the relief doesn't have to be

4    identical for it to be lawful.  In other words, it could be

5    that one company gets more benefit than another company from

6    the relief.  But if the relief is lawful and appropriate, then

7    they get as much relief as their circumstances permit.

8            THE JUROR:  Well, I think (b)(2) requires more than

9    just being lawful and appropriate.  I think it requires more

10   indivisibility than that.  But even if --

11           THE COURT:  On your theory you could never have a

12   settlement that envisioned that --

13           MR. SCHULMAN:  People coming into the class later.

14           THE COURT:  People coming into the class later.  Is

15   that the law?

16           MR. SCHULMAN:  I believe that that would be the law.

17   I think, if you look at Amchem, it said that the concern of

18   futures classes, it raises -- that they recognized the gravity

19   of the question, they rejected the settlement on other

20   grounds.  But I think that if they had reached the question,

21   they would have said that that's the law, and it hasn't been

22   teed up.

23           And the Second Circuit said something similar in I

24   think Stephenson versus Dow Chemical.  But even if you viewed

25   that as indivisible relief and the future class members are

123

Mr. Schulman

1    receiving the same as current class members, that's not

2    relevant.  What's relevant is that they never received notice,

3    they never received an opportunity to object.  And Buckeye has

4    the right not to have its claim the way this part of a class

5    that's overbroad and unascertainable like that.

6            Now I'd like to discuss the fairness of the

7    settlement terms for a moment.  There are two overarching

8    components of this settlement in our view.  There's a cash

9    component of just over $75 million.  As we note from In Re Dry

10   Max Pampers and a variety of other cases cited in our

11   objection, this is a real component of the settlement even

12   though it's formally segregated from class relief.  It's a

13   component that the defendants were willing to put on the

14   table.  Nearly 100 percent of this component is going to class

15   counsel and the named representatives.

16           Then there is the injunctive component.  American

17   Express will amend its standard contract to permit parity

18   surcharging for at least ten years following the effective

19   date.  Professor Hemphill has concluded, of course, that the

20   value of this proposed relief is highly uncertain with a

21   substantial probability that its effect will be small or zero.

22           So that's the potential upside, but there's another

23   half of the equation that needs to be considered, the

24   potential downside for class members.  That is more

25   specifically the concessions that the settlement makes on

1    behalf of those class members in waiving their rights to

2    assert antitrust claims after the provisions change date until

3    the settlement release as long as American Express abides by

4    its obligations to comply with the injunctive terms of the

5    agreement.

6           With this future looking release, it's no mystery

7    why American Express is advocating so vociferously for the

8    settlement.  Whatever benefit there exists in American

9    Express's agreement to allow parity surcharging is more than

10   offset by the concessions that the parties seek to have the

11   court memorialize.  For good reason, the law doesn't authorize

12   class action attorneys to impose these future costs on absent

13   class members, especially on class members who are not even

14   permitted to opt out of the agreement.

15          The law doesn't allow the parties to overwrite the

16   statutory text of the Sherman Act and bind absent class

17   members to the parties' conception of what the scheme should

18   look like.  But it's even worse to pretend when valuing the

19   settlement that these costs and concessions are not part of

20   the arrangement when they clearly are.

21          I've reviewed and scrutinized hundreds of

22   settlements and I cannot recall any other settlement where a

23   full 18 paragraphs of the agreement and many more subsections

24   are devoted to detailing the class's release.  Detail itself

25   is commendable but the number of paragraphs here only lets us

Mr. Schulman

1  know how enormous the scope of the release is.  It does little

2  to clarify what is and what is not release.

3          We can't know how great these costs imposed by the

4  release will be, because no one knows what the relevant market

5  will look like in five or ten years and whether the

6  contractual scheme imposed by this settlement will comply with

7  the antitrust laws in that context.

8          If American Express's release from large scale

9  liability based on future conduct, it's entirely possible that

10 this is a negative value settlement for class members.  Such

11 settlements are prohibited by the Class Action Fairness Act,

12 specifically by 28 U.S.C. Section 1713.

13         Another problem with the prospective release of

14 claims is that fundamentally American Express is in the

15 driver's seat.  Because of the nature of private enterprise,

16 American Express dictates its future course of conduct.  So

17 prospective agreements that waive future claims are tantamount

18 to a game of chess where the defendant is always playing as

19 white.  For example, the release includes, quote, the future

20 effect in the United States of the continued imposition or of

21 adherence to any rule or provision identified above, any rule

22 or provision as modified by this class settlement agreement,

23 and any rule or provision that is substantially similar.

24         Now, what does that say about the situation where

25 American Express continues to adhere the requirements of

126

Mr. Schulman

1   Paragraph 8 of the settlement agreement but adds in some new

2   term into the merchants' contracts that may violate the law?

3          What does it say about how to interpret whether a

4   modification goes beyond being --

5          THE COURT:  Slow down.

6          MR. SCHULMAN:  I'm sorry, I'm trying to get

7   everything in.

8          THE COURT:  Well, if you go a little over and you

9   still have something to say, I'll let you say it.

10          MR. SCHULMAN:  Okay.

11          THE COURT:  No reason to race through it because I

12   have to be able to absorb it.

13          MR. SCHULMAN:  Good point.

14          THE COURT:  And the court reporter has to be able to

15   memorialize it, which you would like of course.

16          MR. SCHULMAN:  Good point, your Honor.

17          THE COURT:  Go ahead.

18          MR. SCHULMAN:  So what -- the agreement doesn't say

19   anything about what is substantially similar or not.  What is

20   clear is that American Express is in the driver's seat.

21          To put this another way, the terms of the

22   prospective agreement are way overreaching by releasing future

23   conduct class members' claims that the parties have no right

24   to release and at the same time not detailed enough by

25   preventing wiggle room that could prevent the class from

Mr. Schulman                                        127

1    obtaining any benefit of the bargain.

2            I don't say this to impugn the competence of the

3    attorneys for the settling parties in ironing out the

4    particular terms.  I'd rather -- what I mean to say is that

5    the error was in even trying to come to this type of future

6    looking agreement in the first place.  This is not the type of

7    agreement fit for settlement of a class action lawsuit pending

8    before an Article III tribunal.  It's more like a consent

9    decree that the DOJ or FCC might reach in an enforcement

10   action.  I strongly the court to look at Judge Chin's decision

11   in Authors Guild v. Google, a 2011 settlement rejection out of

12   the Southern District.

13           Fundamentally, there is a misconception of the role

14   of class counsel that is present.  Class counsel are

15   fiduciaries and trustees for the absent class members.  Class

16   counsel are not mediators of a prospective business

17   arrangement between absent class members and the defendants

18   for which they'll entitle themselves to a 75 million-dollar

19   brokerage fee.

20           The settling parties have stressed the importance of

21   compromise and there's something to that notion.  But a valid

22   compromise is arriving at some settlement between the amount

23   sought in the complaint, billions of dollars, and the amount

24   that would be received if the case was wholly unsuccessful,

25   zero dollars.  Never, ever should the class be put at risk of

Mr. Schulman                                                128

 1   being worse off than they would be if the suit was never

 2   filed.  But here that's just what the release of future claims

 3   does, it risks the class being put at a worse position than if

 4   the suit was never filed in the first place.

 5           Finally, I'd like to touch on the fee request in the

 6   event the court is inclined to reach that question.  For

 7   multiple reasons, the request cannot be approved consistent

 8   with Rule 23(h).  Procedurally, the plaintiffs ask for a

 9   lodestar-based award without the submission of billing records

10   Second Circuit law does not permit this.  But now confronted

11   with this argument, the plaintiffs rationalize that this rule

12   only applies to contested fee shifting pursuant to civil

13   rights in labor laws, yet the class action subcontext is no

14   different.  If anything, the scrutiny must be even more

15   vigorous.

16           Federal Rule of Civil Procedure 23(h) requires that

17   class members receive notice of the fee motion and an

18   opportunity to object to the same.  The advisory committee

19   notes for 23(h) presuppose that there will be plenary

20   oversight by both class members and this court, yet class

21   counsel's argument is that they are permitted to conduct the

22   oversight themselves and then file a bare bones summary of

23   their work.  That's wrong.

24           Class counsel has deprived everyone of the ability

25   to scrutinize their fee requests.  And substantively the

Mr. Schulman

 1   75 million-dollar request is also untenable because it's

 2   excessive.  A 75 million-dollar fee award would be

 3   commensurate with the demonstrated benefit of roughly

 4   $600 million, yet as Professor Hemphill makes clear, the

 5   demonstrated benefit here is precisely nothing.  And as I

 6   mentioned earlier, the potential cost to absent class members

 7   of the future looking release is great.

 8           Class counsel has not cited any other settlement

 9   that obtained only injunctive relief and where class counsel

10   was awarded $75 million in fees because it's very likely that

11   none exists.  The class benefit, or lack thereof, is relevant

12   even if the court had records sufficient to apply the lodestar

13   method.  As the Ninth Circuit said recently in In Re HP Inkjet

14   Printer litigation, plaintiffs' attorneys don't get paid

15   simply for working, they get paid for obtaining results.

16   Appropriate use of the lodestar calibrates the award downward

17   where the degree of success is limited.

18           Here the plaintiffs seek their entire punitive

19   lodestar or close to it.  Even though the class is being asked

20   to settle for no compensatory relief at all, they seek to use

21   their crude lodestar to insulate themselves from the risk of

22   pursuing an unprofitable case, something the court cannot and

23   should not do.  I welcome any questions.

24           THE COURT:  I would only mention that I think that

25   your analogy of a brokerage commission to legal fees doesn't

Mr. Schulman

1  appear to me to be necessarily appropriate where, you know,

2  brokerage fee is earned based on a contract where the result

3  will afford the brokerage fee whether the broker spent five

4  hours or 500 hours to bring the parties together.

5          Legal fees, as you pointed out, are subject to the

6  court's review of billing records and other appropriate

7  evidence of the work that was done and the nature of the work,

8  the benefit, and so on.  So I'm not --

9          MR. SCHULMAN:  I agree completely.  That's my entire

10 point, is that they shouldn't be trying to act as a mediator.

11 They are just representing the plaintiffs.  They're not

12 representing the plaintiffs and defendants trying to get them

13 to a settlement at any cost.  That's exactly the point of what

14 I'm trying to get across, that they misperceived themselves.

15 They've abandoned the fiduciary role because of the

16 possibility that the settlement could be a negative value

17 settlement for certain class members or for the entire class.

18         THE COURT:  You're saying they're fiduciary and

19 they're also an advocate at the same time?

20         MR. SCHULMAN:  For the class.  That's -- that's what

21 their role is supposed to be and they acted in this settlement

22 more like a mediator, that's our view.  And that is not

23 appropriate.

24         THE COURT:  And you would like to take the

25 settlement and ignore everything that came before the

Mr. Pentz

1   settlement, in other words, all the litigation that happened

2   before the settlement, and unsuccessful as it was in Italian

3   Colors, so you want to limit this to just the narrow scope of

4   the negotiations with American Express?

5              MR. SCHULMAN:  No, no, no, that's not what I'm

6   saying.  I'm not saying that they can't be compensated as

7   lodestar for that work that was put into the case.

8              THE COURT:  Okay.

9              MR. SCHULMAN:  What I'm saying is that their role is

10  not reaching settlement at all costs.  If it risks a

11  potentially negative result for their clients.  And that was

12  the -- that was the mistake of the settlement in our view.

13             THE COURT:  Thank you.

14             Okay.  The next speaker is John Pentz.

15             MR. PENTZ:  Yes, your Honor.  Good afternoon, John

16  Pentz on behalf of Unlimited Vacations, Lasko Enterprises and

17  The Silk House.

18             THE COURT:  And Unlimited Vacations, do they have

19  any trade names or are they just Unlimited Vacations?

20             MR. PENTZ:  They're just Unlimited Vacations, a

21  travel agency, your Honor.

22             THE COURT:  Proceed, please.

23             MR. PENTZ:  Well,WELL, there are plenty of reasons

24  not to approve this settlement today.  As we heard this

25  morning, first of all you cannot use 23(b)(2) to release

Mr. Perry                                              132

 1    future claims.  Number two, the lead plaintiffs are neither

 2    typical nor adequate to represent the absent class members

 3    here.  Class members -- number three, class members are

 4    differently situated.  And number four, as Professor Hemphill

 5    has found, the proposed -- the only relief that could possibly

 6    flow to the class is likely to have no value.

 7            But the class counsel and American Express are

 8    trying to trap you with a false choice.  They say that unless

 9    continued litigation in this case can produce a better result

10    than this settlement, you have to approve the settlement no

11    matter how little value anyone may find it might have.

12            Now, while that is typically true in a lot of

13    consumer cases that hit a brick wall, for example, another

14    circuit might issue a decision that guts the case and assures

15    a defendant a victory, at that point the parties may enter

16    into a settlement for coupons of dubious value, but the court

17    may nevertheless -- typically courts do approve those

18    settlements because they make a finding that the claims have

19    zero litigation value.

20            Now, those settlements are approved sometimes upheld

21    but they differ in two major respects from this settlement.

22    Number one, in those cases the only thing that's being

23    released are the claims that have already accrued and have

24    already been found to have zero litigation value.  And number

25    two, those cases do not release claims that may accrue in the

Mr. Pentz

1    future for future conduct and essentially tie the class's

2    hands to ever raise the same claims again.  Essentially they

3    just wipe the slate clean and the class is free going forward

4    to bring the exact same claims.

5           Class counsel this morning raised the specter that

6    this case will go on for quite some time and may even work its

7    way back up to the Supreme Court again.  Well, so what?  Who

8    cares how long this case takes to eventually, you know, die

9    it's last whimper.  That's not the comparison.  The comparison

10   is what other class members can do in future arbitration and

11   future litigation.  As we saw today, some of the objectors

12   ultimately after they go through mediation and arbitration

13   have a right to file a case in court.  And it's those -- it's

14   that litigation to which this settlement has to be compared

15   not what happens to this case once your Honor rejects the

16   settlement, because I think everybody agrees, this case is as

17   Mr. Shinder called this morning, defunct.

18          Not every failed case has to end in a bad

19   settlement.  And while typically it provides a way out for

20   both parties and it gives class counsel a little bit of

21   compensation for their failed efforts, this is a case where

22   what the parties proposed is much worse than that.  I agree

23   with Mr. Shinder and with Mr. Schulman that this is a negative

24   value settlement.  In other words, the class would be better

25   offer if this case had never been filed.  They'd be better off

Mr. Pentz

1    with the possibility, the threat that they can still bring an

2    antitrust class action for the practices of not permitting

3    differential surcharges.

4          With respect to the fees, I take a little bit of a

5    different approach than Mr. Schulman.  I do agree that the

6    75 million that American Express has agreed to pay the class

7    counsel in fees is pretty much the salvage value of this class

8    action.  And it's all flowing, all the cash is flowing to

9    class counsel and none of it is flowing to the class.  Now, of

10   course, 75 million in the context of the damages demanded here

11   is a pittance, it couldn't possibly be distributed.  So that's

12   not my chief objection to the fee.

13         But the maximum fee in this case would be class

14   counsel's lodestar if they achieved a settlement that

15   permitted differential surcharging.  The holy grail.

16   According to Perdue v. Kenny A., a successful plan, one that

17   prevails after trial is entitled to his or her lodestar and no

18   more.  In this case and also Hensley v. Eckerhart requires the

19   fee to reflect the plaintiff's degree of success.  If you

20   haven't achieved 100 percent success in the case, you're not

21   entitled to 100 percent of your lodestar.  So if the lodestar

22   would be the fee for achieving the right to differentially

23   surcharge, what would be an appropriate fee for achieving what

24   they've achieved here which is parity surcharging?  I would

25   submit it's less than 50 percent of that lodestar.

Mr. Lowrey

1          And with that I'll rest.  Thank you, your Honor.

2          THE COURT:  Thank you very much.  Okay.  And now

3  we'll hear from Mr. Lowrey who represents Home Depot.

4  Mr. Lowrey, welcome.

5          MR. LOWREY:  Thank you, your Honor.  I think the

6  most important question you asked today came when the

7  plaintiffs were extolling the benefits of parity surcharging.

8  And you asked, and I wrote it down, what is the benefit of

9  this settlement if you are wrong.  And plaintiffs argued with

10  your premise, but everybody in this courtroom knows that the

11  answer to that question is none, your Honor, no benefit if

12  we're wrong.

13          Now, the release is going to be exactly the same.

14  We're going to release all rights to challenge all rules

15  except for the ones they modify.  That release is going to

16  last for at least ten years, plus as long as American Express

17  and Visa and MasterCard maintain their current rules.  That

18  release is going to apply regardless of the future market

19  effects.  That language was read to you earlier, it's in the

20  settlement agreement.

21          Should the markets change in the future such that

22  these rules have an anticompetitive effect they do not have

23  now, you will have taken away the right away from us to bring

24  that claim.

25          Ultimately what the plaintiffs want you to do here

Mr. Lowrey

1    is they want you to predict the benefits of limited surcharge

2    and predict that those benefits are going to outweigh the cost

3    of the immunizing all of the rules that are immunized from

4    challenge by the settlement.

5             Now, your expert said that the benefits of this

6    settlement are highly uncertain, there's substantial

7    probability that the effect will be small or zero.  I don't

8    know how your crystal ball works, mine has proved horribly

9    unreliable.  I remember in the 1990s, I told one of my law

10   partner, why are you talking about getting a website, no one

11   is ever going to hire a law firm basined on what it says on

12   the website.  And now Martindale-Hubbell books they're just in

13   furniture stores to fill up the loose space on the shelves.

14            Predicting technological and market developments for

15   the next ten or 20 years is a lot to ask of anyone.  You could

16   hold this hearing for a year, you could hear from an expert

17   every day, we could all go to Australia, take a field trip, we

18   could all go rent cars, and at the end of all of that, the

19   best you'd ever be able to say is maybe, maybe this settlement

20   will produce a benefit.  So I submit that is the last kind of

21   settlement you should be forcing on everyone with no right to

22   opt out.

23            You asked, markets might change in the future, maybe

24   a new investor group will come in, start a new credit card

25   company.  Well, this settlement takes away our ability to

Mr. Lowrey                                                137

1  reward that innovation and reward the low cost competitor.  If

2  their interchange fee is lower than American Express's, we

3  have to drop the surcharge to match the new entrant's lower

4  interchange fee.  That wouldn't produce any competitive

5  pressure on American Express, we couldn't reward that new low

6  cost competitor by discriminating in its favor or steering

7  business to it.

8          So one of the major issues we have that this

9  settlement really comes down to the adequacy of any group of

10 merchants, this one or any other group of merchants making

11 those choices for everyone.

12         The case law tells you that adequacy of

13 representation requires your crucial scrutiny under two

14 circumstances; one is when there is going to be a settlement

15 and there's not going to be a trial where you get to

16 thoroughly understand, hear all the evidence, hear all the

17 witnesses, and the other is a settlement where there is no

18 opt-out right like this one.

19         Now, the plaintiffs' answer to that is to say just

20 look at the paper, your Honor.  If you just look at the four

21 corners of the settlement agreement, all merchants are getting

22 the same rights and they're giving up the same rights so we

23 must have an adequacy of representation to do this on

24 everyone's behalf.  But that's the wrong analysis.  We're

25 giving up a list of rights and we're getting some rights.

Mr. Lowrey                                    138

1           The problem is merchants value these rights very

2     differently.  So, think about it for a minute.  Wouldn't it be

3     amazing if 6 million merchants, current or future, regardless

4     of their size or their leverage, vis-a-vis American Express,

5     regardless of what kind of contract they have negotiated with

6     American Express, regardless of their business type, their

7     customer base, the regulatory structure they answer to, the

8     location, it would be amazing if all merchants actually valued

9     the various rules that we give up or the various rights we

10    give up under this settlement the same as the rights we're

11    getting.  That's something that would have to be proved to

12    you, and I can't even imagine the evidence that would prove

13    it.  But I don't have to because that evidence is completely

14    missing from this record.  There's no evidence that the rights

15    that are taken away are valued by all merchants less than the

16    rights that are given.  There is a conflict.  Why should one

17    small group of merchants, this group or anyone else get to

18    make that choice for everyone?

19          Why is their judgment about what's good for our

20    business better than our judgment about what is good for our

21    business?  I think the court has already remarked that the

22    volume of American Express transactions represented by the

23    objectors essentially dwarfs any volume represented by the

24    named plaintiffs.  Not your words but I think that the record

25    is clear on that.  Why did they get to make the decision for

Mr. Lowrey

1    us?

2              If you were going to make a decision on this and you

3    could build an annex to this courthouse and get all 6 million

4    merchants in here, the last thing you would do is say, hey,

5    you four, what do you think.  Okay, that's what we're doing,

6    everybody else, what they said.  You'd never do that.  But

7    that's exactly what they're asking you to do here.

8              What's the alternative, they say?  Well, look, this

9    case doesn't have to proceed as a class action at all.  The

10   alternative is simply that you don't involuntarily extinguish

11   our rights.  If that means there's no settlement, there's no

12   settlement.  If that means that you don't certify this class

13   at all and just allow these plaintiffs to proceed on their own

14   against American Express, so be it.  But the answer is let

15   everyone decide for themselves.  That's our right.

16             And the plaintiffs' answer to that is, well, if the

17   large merchants aren't in this, how do we ever help the small

18   merchants.  Well, they might as well stand before you and

19   admit that they're taking our claims and using them to

20   subsidize relief from merchants that couldn't get it without

21   our claims.  And that is a classic conflict of interest.  They

22   are selling off the large merchant claims to get relief for

23   the small merchants.  That is a conflict of interest and

24   represent no group, not criticizing this group, no group would

25   be adequate to make that decision for everyone.

Mr. Lowrey

```
1              THE COURT:  But your client, along with other
2    objectors are extremely large merchants have a great deal of
3    leverage in the process of negotiating merchant agreements
4    with -- the merchant agreement with American Express.  So you
5    have -- those small merchants don't have a seat at the table.
6    You have a seat at the table.  And you and other large
7    merchants, as was shown at the trial that we had over the
8    summer, do indeed negotiate specific terms that are beneficial
9    to them in a give and take situation.  So you really -- in
10   that sense, you have a great deal of leverage in dealing with
11   American Express that the smaller merchants who are also
12   members of this proposed class do not have.  How do you
13   address that?
14             MR. LOWREY:  Well, a couple of things about that.
15   That leverage is not translated into a favorable interchange
16   fee, I can tell you that.  That's one thing.
17             They may not have the same seat at the table they
18   do, "they" being the small merchants, but that's why there's a
19   conflict here.  They can't take our seat at the table.  They
20   can't force us to stay at the table to protect them.  You
21   know, it's not our job to look out for anyone but us.  And if
22   the class has conflicts like that, you don't certify a class
23   and impose a solution on everyone.
24             We may have more leverage than the small merchants,
25   that doesn't mean that we can afford to give up all of our
```

Mr. Lowrey

1    legal rights to challenge their entire slate of rules except

2    for this one.  We can't afford to do that.  We need to resort

3    to the legal system and it can't be taken away from us without

4    our consent, which is really the major point that I want to

5    emphasize.

6           To me, it is absolutely clear under the Dukes

7    decision that this settlement cannot be imposed on us without

8    opt-out rights.  When you go back tonight and you read Dukes,

9    because I know you're going to jump right into this, read

10   Section 3 and mark with your red pen.

11          THE COURT:  I've read Dukes a number of times.

12          MR. LOWREY:  Well, you probably highlighted the same

13   passage that I did.

14          THE COURT:  We venerate Dukes.

15          MR. LOWREY:  I sleep with it under my pillow myself,

16   your Honor.  Your copy of Dukes probably has the same passage

17   highlighted that mine does.

18          THE COURT:  Okay.

19          MR. LOWREY:  And it's the one that talks about how

20   even a properly certified (b)(2) class that predominates over

21   damages, even if you have those things, properly certified

22   (b)(2) class that predominates, you still can't take away

23   individualized damages without a right of opt-out.  Now, the

24   plaintiffs' answer to that is, wait, we're providing only

25   injunctive relief, we're not providing any damages.  Because

Mr. Lowrey

142

1    we're providing only injunctive relief, we can release and

2    settle your damages claims.  That can't be right.  It can't be

3    right.

4              The Supreme Court says the opposite of that in Dukes

5    and I found -- I mean, I honestly think that that point

6    doesn't need authority but I found some.  There is a good

7    decision called Richardson versus L'Oreal.  It's reported at

8    991 F Supp. 2d 181.  And the good stuff is on page 199.

9    That's a District of DC decision.  And the exact point that

10   court made, you heard the same argument the plaintiffs made

11   here because we aren't giving any monetary relief.  We can

12   simply extinguish damages claims about allowing a right of

13   opt-out.  And the court said that's absurd, that's exactly

14   what Wal-Mart rejected.

15             THE COURT:  Who was the judge in that case?

16             MR. LOWREY:  I don't have that written down, your

17   Honor.  Obviously a very wise jurist.

18             UNKNOWN SPEAKER:  Judge Bates, your Honor.

19             THE COURT:  I'm sorry?

20             UNKNOWN SPEAKER:  Judge Bates, your Honor.

21             MR. LOWREY:  As I said, let me acknowledge right now

22   because you'll hear it on rebuttal, the Visa/MasterCard

23   approval order rejected this argument.  I admit that.  No

24   secret about that.  What the Visa/MasterCard approval order

25   says is -- there are two sentences that really address this

Mr. Lowrey

 1    issue.

 2              The first one:  Rule 23 contemplates binding

 3    settlements with no opt-out rights where the injunctive relief

 4    achieved by the settlement is appropriate for the class as a

 5    whole.  No question that's true.  But it doesn't contemplate

 6    binding settlements with no opt-out rights where you're

 7    extinguishing individual damages.

 8              The other sentence is this one.

 9              THE COURT:  Is this the sentence from Judge

10    Gleeson's decision?

11              MR. LOWREY:  It is, your Honor, at page 41 of the

12    docket entry version.

13              THE COURT:  Go ahead.

14              MR. LOWREY:  The second sentence says this, The

15    (b)(2) settlement here is limited to going forward injunctive

16    relief that changes the structure of the network's practices.

17    Also absolutely true, but the release is not.  The release in

18    settlement is not limbed to injunctive relief.  It wasn't in

19    that case and it isn't here.  The release here encompasses all

20    of our future damages claim.  And that's what you can't do

21    without letting us opt out.

22              So the plaintiffs say, well, judge, no one would

23    settle (b)(2) claims if you couldn't release related damages.

24    Now, let's be clear about one thing.  The damages claim we're

25    talking about are not damages that somehow flow from them

CHARISSE KITT, CRI, CSR, RMR, FCRR
Official Court Reporter

Mr. Lowrey                                    144

1    allowing surcharge, right?  They're not going to violate the

2    antitrust laws by letting us do stuff.  The damages claims

3    we're talking about are from the list of rules that they have

4    now and that they get to have forever, or at least ten years

5    plus under this settlement.

6              But I acknowledge that, (b)(2) is no use to you if

7    what you want to do is have final relief that extinguishes all

8    individual damages claims.  We sell tools at the Home Depot

9    and if someone bought a screwdriver and came back to us and

10   said, look, this screwdriver is defective, I can't use it to

11   drive nails, one of our guys in the orange apron would say,

12   politely I hope, you got the wrong tool.  And that's the

13   problem here.  (b)(2) is the wrong tool if what you want to do

14   is extinguish future damages claims.  Is that inconvenient?

15   Well, yeah, it's more inconvenient than having to give people

16   notice and the opportunity to opt out.  But due process is an

17   inconvenience.  The rules are chock full of inconveniences.

18             A couple of points on the authorities they cite.

19   They cite Robertson versus NBA.  That was decided 34 years

20   before Dukes by the Second Circuit, can't possibly govern

21   here.  There's a typo in the plaintiffs' citation on it on

22   page 44 of their reply brief.  They quoted as saying

23   preclusion of the opt-out right in a (b)(2) settlement does

24   not violate due process.  The actual text in the case is

25   talking about a (b)(1) settlement.  I know that's an

Mr. Lowrey                                          145

1    inadvertent typo but my point is just to clarify that

2    Robertson does not address the (b)(2) questions that Dukes

3    does address.  And Dukes governs anyway, right --

4              THE COURT:  What?

5              MR. LOWREY:  Dukes governs anyway regardless of what

6    the Second Circuit said in 1977.

7              They also cite Literary Works, that case, and they

8    cite the Wal-Mart v. Visa decision.  And those were both cases

9    where there were broad releases including future claims in

10   Literary Works.  And in both cases, there was a right of opt

11   out.  In Literary Works, there was a right of opt out from the

12   future copyright release portion of the settlement.  And in

13   Wal-Mart versus Visa the very point the court made is, yes,

14   this release is binding.  If you didn't want to be bound by

15   it, you should have opted out.

16             Well, that's what we would like to be able to do

17   here and that's what these plaintiffs seek to deny us the

18   right to do.

19             THE COURT:  You think there would have been a

20   settlement with an opt-out provision?

21             MR. LOWREY:  I don't know.  They obviously have to

22   tell you no, right?  If that's like the story about you buy my

23   lawnmower for 70 or 80 dollars, and your response is well,

24   obviously 80 is out of the question.  I mean, they obviously

25   can't show up and say, yeah, we would have done the deal

Mr. Lowrey

1    either way.  They've got to say, it wouldn't be a deal if you

2    allowed opt-outs.

3           But let's assume for a moment there wouldn't be a

4    deal if opt-outs were allowed.  All that shows is that they

5    have to take the claims of the large merchants as part of the

6    settlement, that they're using -- they're buying off our

7    claims for relief we consider to be worthless or very little

8    value and taking our rights.

9           They haven't really tried to make the argument that

10   our damages claims are merely incidental, I don't think their

11   heart would be in it anyway.  But to the extent they do argue

12   that, let me speak on that briefly.  And I may run a few

13   seconds over if that's okay.

14          THE COURT:  Go ahead.

15          MR. LOWREY:  Our damages claims can't be viewed as

16   merely incidental under Dukes.  Their first explanation of why

17   they're merely incidental is to say, look, you're just giving

18   these up basically to make the injunctive relief work.  In so

19   many words, because your getting injunctive relief we've got

20   to take your damages claims.  Well, if that argument made

21   damages claims incidental, then they would have been

22   incidental in Dukes and they would be incidental in every case

23   where all you grant is injunctive relief.

24          The key thing here is that our antitrust damages are

25   just as individualized as the back pay damages were in Dukes.

Mr. Lowrey

1   They depend on each merchant's experience and leverage.  What

2   interchange fee could we have negotiated without these

3   merchant rules?  There's probably a different answer for every

4   merchant in this room, and it depends on circumstances and

5   size.

6        I would add this, unlike back pay, which for some

7   reason had traditionally been viewed as equitable and

8   appropriate for (b)(2) relief.  If the traditionally equitable

9   nature of back pay didn't make those damages incidental in

10  Dukes, there's no way our damages at law for antitrust could

11  be incidental.

12       You know, in our future damages that's a very

13  valuable right.  You know, troubled damages in the future

14  would compensate us for any violation but it would also deter

15  future conduct.  So troubled damages double as an injunction.

16  It gives you most of what an injunction would give you plus

17  three times every dollar you lose.  That is an extraordinarily

18  valuable right that can't be taken from us without the right

19  to opt out.

20       Those are really the remarks that I had planned to

21  make, your Honor.  Any questions particularly about Dukes?  I

22  mean, to me that issue is absolutely clear so much so that I

23  don't see the counterargument.  So if there is any -- if there

24  is any different view or out that we could test, I would

25  appreciate the opportunity to do it.  But if you've heard the

Mr. Slater

```
 1    answers to everything, then I'll...

 2                THE COURT:  Thank you very much.

 3                MR. LOWREY:  Thank you very much.

 4                THE COURT:  Before we go any further, I see the

 5    senior partner from Cravath, Swaine & Moore is here.

 6                MR. GOLD:  Good afternoon, your Honor.

 7                THE COURT:  Good afternoon.  Nice to see you,

 8    Mr. Gold.

 9                Now, when I walked in this building this afternoon,

10    Mr. Chesler was walking in.  And now there's no Mr. Chesler.

11    So is this a test for my powers of observation?

12                MR. GOLD:  I'm now going to try to play the role.

13                THE COURT:  But he came into the building this

14    morning.

15                MR. GOLD:  He did, but he had a prior engagement

16    that required him to leave.

17                THE COURT:  Oh, all right.  Okay.  I thought it was

18    something I said.

19                MR. GOLD:  No, your Honor.

20                THE COURT:  All right.  Thank you.

21                At this point we're up to Southwest Airlines, et al.

22    Mr. Slater, good afternoon, sir.  Nice to see you.

23                MR. SLATER:  Good afternoon, your Honor.  Paul

24    Slater on behalf of the Southwest Airlines group and also the

25    individual independent merchants.
```

Mr. Slater

1          Your Honor, before I start I'd like to hand out a
2     couple of documents that I'd like to use for the court.
3          THE COURT:  Do you plan to put anything up on the
4     screen?
5          MR. SLATER:  No.  And I'm not even sure I'm going to
6     use the three documents that I have.
7          THE COURT:  Go right ahead.
8          MR. SLATER:  Thank you, your Honor.  A fair amount
9     of what I had planned to say has already been said by others
10    and I won't repeat it.
11         THE COURT:  Thank you.
12         MR. SLATER:  What I would like to do is address four
13    specific points and then a recap of the Grinnell factors that
14    control this court's decision.  The first issue I'd like to
15    talk about is the purported need for uniformity in the
16    enforcement of the antisteering rules.  AmEx claims in its
17    papers that the antisteering rules must be uniformly applied
18    to all merchants.
19         This is the only justification which is given for
20    why we have a non-opt-out class which imposes on the objectors
21    and certainly on the individual merchant plaintiffs a release
22    which is not to their liking.
23         AmEx never explains why it is that uniformity is
24    required in the application of their antisteering rules, they
25    just say it.  The contention, your Honor, as was noted earlier

CHARISSE KITT, CRI, CSR, RMR, FCRR
Official Court Reporter

Mr. Slater

1   today, is contrary to the evidence of the testimony at the

2   trial during the government case.  Mr. Quagliata, the AmEx

3   employee -- and I got some of that testimony in those

4   documents that I've handed you, but they've already been put

5   up by Mr. Canter.

6          Mr. Quagliata very clearly said that for large

7   merchants that they negotiated the individual exceptions to

8   the antisteering rules and they do not apply those rules

9   uniformly to all of the large merchants.  So there is no need

10  for this purported uniformity.

11         Now, a few minutes ago your Honor inquired as to

12  whether the ability to negotiate with American Express gave or

13  indicated that the large merchants had some leverage with

14  American Express.  It does not, quite the contrary.  One of my

15  clients, Southwest Airlines, testified at the trial.  AmEx

16  went to them and said, we're raising your price.  I won't go

17  into the numbers because they're confidential.  AmEx said to

18  Southwest Airlines, the largest airlines in the United States

19  of America, tough, we're raising your price.  There's nothing

20  you can do about it.

21         The reason that there's nothing the merchant can do

22  about it is because the merchant can't respond to differential

23  surcharging or, as Mr. Arnold said, differential pricing.  The

24  merchant can't say, well, you can raise my price but I'm going

25  to pass it on to the consumer and if he doesn't like paying

Mr. Slater

1    that price for your supposedly wonderful service, he'll

2    migrate to a different credit card, you will lose volume.

3    That's exactly what is supposed to happen in a competitive

4    market where price competition, the very touchstone to the

5    antitrust laws where price competition is respected and is

6    allowed to operate.

7         The reason that Southwest Airlines and the other

8    merchants can't have that leverage is because the antisteering

9    rules, the no differential surcharge rule, no differential

10   pricing rule, prevents them from exercising that incentive,

11   which Professor Hemphill said is the touchstone of horizontal

12   price competition.

13        So I believe the first point I want to make is that

14   uniformity is not needed in the application of the rules.

15   There's no justification for imposing this release on the

16   unwilling objectors, and that the fact that the large

17   merchants can negotiate with American Express does not mean

18   that they have leverage with regard to the pricing issues.

19        The second point I want to cover is with regard to

20   the humanness of objectors.  The classes contend that there

21   are very few objectors and that this weighs in favor of

22   approval.  Your Honor, I would submit that exactly the

23   opposite is true.  There are very few proponents.  The only

24   merchants in America who step forward to support this

25   settlement are the few relatively small plaintiffs represented

Mr. Slater

1    by class counsel.

2              There are a great many objectors and, as your Honor

3    has noticed, they are the largest merchants in America.  Your

4    Honor, under Tab B in the documents that I've handed out, this

5    is Exhibit 8 to the report of the Dr. Vellturo, his opening

6    report submitted on April 3, 2013.  And Dr. Vellturo is one of

7    the expert economists for the individual merchant plaintiffs.

8              This is a list of the hundred largest retailers in

9    the United States as of 2011.  Your Honor, 19 of the top 20

10   merchants on this list are here in this courtroom objecting to

11   this settlement.  Twenty-four of the top 27 on this list are

12   here objecting to this settlement.  The other three merchants

13   aren't here at all.  They don't -- it's not that they support

14   the settlement they just haven't weighed in.

15             The list of objectors reads like a who's who of

16   American retailers.  You've got Wal-Mart, Target, Costco, Home

17   Depot, BestBuy, Sears, Amazon, Staples.  Your Honor, I can go

18   on, but you got the idea.  All of the major drugstore chains

19   in America are individual merchant plaintiffs.  All of them

20   object.  That's Walgreen, CVS, and Rite Aid.  All of the major

21   supermarket chains in America are here objecting to this

22   settlement.  Not one major merchant, your Honor, has stepped

23   forward to say that they support this settlement.  Not one.

24             Not one major merchant in America has stepped

25   forward and said that they would parity surcharge or that it's

Mr. Slater

1  of any value to them.  None.  The handful of small merchants

2  represented by class counsel do not speak for the major

3  merchants and they cannot possibly be an adequate

4  representative for the major merchants.

5          Let me move to the next subject.  The class claims

6  that, quote, the great majority, the great majority, their

7  term, of surcharging in Australia is parity surcharging.  They

8  also claim that most merchants who surcharge in Australia, and

9  I quote again, apply the same surcharge to all brands.  Your

10 Honor, that contention is incorrect.

11         In 2007, class counsel asked East & Partners the

12 source of the data which is the fount of their argument.  They

13 asked East & Partners to do a special report for class

14 counsel.  Class counsel didn't reference this in their papers

15 but I've attached it in that little folder.  This is under Tab

16 C.  This is the merchant surcharging in Australia market

17 analysis report addendum for the Friedman Law Group, LLB.

18         Your Honor, at page 2 of the report it says this:

19 The average surcharges applied by merchants on charged cards,

20 AmEx and Diners, are typically twice the average surcharge on

21 credit cards.  So in Australia the average rate which AmEx is

22 surcharged is more than double.  The chart below shows that

23 Visa and MasterCard are surcharged at an average rate of

24 1 percent.  AmEx's average surcharge is 2.1 percent.  It's a

25 little bit more than double the rate.

Mr. Slater

1           The majority, the vast majority of the surcharging

2   in Australia is differential surcharging.  In fact, at page 3

3   of the same report, it says that of the merchants who

4   surcharge, and I quote, the majority surcharge differential

5   with charge cards –– remember that's their term for AmEx and

6   Diners Club –– with charge cards clearly targeted more than

7   credit cards.  The merchants in Australia differentially

8   surcharge.  The impact of that is enormous, it drives rates

9   down.

10           We've cited to your Honor, and again I won't go into

11  the data because it's under protective order, but we've cited

12  to your Honor instance after instance of where a large

13  merchant was able to go to AmEx in Australia and say, I will

14  differentially surcharge your card unless you lower your

15  price.  In other words, let the downward bidding begin.  Let

16  the price competition begin.  And AmEx reduced their price by

17  enormous magnitudes in response to the ability to

18  differentially surcharge.

19           Your Honor, the East & Partners report from 2009,

20  which was cited in our papers, says the same thing.  The East

21  & Partners report from 2010 and 2012, again, says that higher

22  priced cards, that would be AmEx and Diners, are surcharged

23  more often and they're surcharged at a higher rate.

24           Your Honor, I have one final observation, then I'll

25  get briefly to the Grinnell factors.  And the observation is

Mr. Slater                                            155

1    this:  This settlement puts, I believe, the court and

2    certainly the individual merchant plaintiffs in an unfair

3    posture.  Now, why do I say that?  The class and AmEx agree

4    that the individual merchant plaintiffs are entitled to a

5    trial on their past damage claims, no matter what happens with

6    this settlement.

7              Let's assume that we go forward and we prove at

8    trial that the ban, the prohibition on differential

9    surcharging is unlawful.  Let's assume the court has approved

10   of this settlement.  Here is the uncomfortable position in

11   which we would find ourselves.  The individual merchants will

12   have established that the ban on differential surcharging is

13   unlawful.  But we will have been ordered by this release to

14   not challenge or enjoin the continuation of that unlawful

15   behavior and we would have been ordered by your Honor that we

16   can't seek damages for the continuation of that unlawful

17   activity.

18             Your Honor, I do not believe that any settlement

19   which has the potential for resulting in that event where

20   we've established the illegality and are denied any remedy

21   going forward, I don't believe that any settlement that does

22   that could possibly be characterized as fair, adequate or

23   reasonable.

24             Let me move briefly to the Grinnell factors because

25   I really don't think the class can establish a single one of

Mr. Slater

1    them.

2           THE COURT:  Do you think the question that you just

3    raised is a question of law?

4           MR. SLATER:  Your Honor, could I pump the question

5    by saying it's probably a mixed law question of fact.

6           THE COURT:  Well, if it's a mixed question, then

7    it's a question for the court.  If it's a question of fact,

8    it's a question for the jury.  I'm just wondering --

9           MR. SLATER:  Oh, maybe I didn't understand your

10   Honor's question.  Are you asking whether the question of

11   whether the prohibition on differential surcharging is a

12   question of law or a question of fact?

13          THE COURT:  Right.

14          MR. SLATER:  It would be for the jury to determine

15   whether the prohibition on differential surcharging amounted

16   to an unreasonable restraint of trade within the meaning of

17   the Sherman Act.

18          I also believe that as a matter of law a direct

19   prohibition on horizontal inter-brand price competition is a

20   violation of the Sherman Act.  So, again, I would say that as

21   a matter of law what they've done is unlawful.  If we thought

22   that it would have advanced things, we would have filed a

23   motion for summary judgment on that grounds.  But given the

24   history of summary judgment in the Second Circuit, we decided

25   it would be better just to try the case.

1          But do I believe as a matter of law a ban on

2     horizontal inter-brand price competition is unlawful?

3     Absolutely.  It is the paradigm sim of the Sherman Act.  It's

4     the one thing you cannot ever do.

5          THE COURT:  And so we can have a jury trial and the

6     jury could come up with an answer and there could still be a

7     judgment based on a question of law afterwards?

8          MR. SLATER:  Procedurally, Judge, I honestly don't

9     know the answer to that question.

10         THE COURT:  Well, it's pretty complicated.  I'm just

11    trying to get some help.

12         MR. SLATER:  Yeah, and I wish I could --

13         THE COURT:  I'm sure everyone will be willing to

14    help me later on.  I'll wait on that.  We're jumping way ahead

15    of ourselves here.  Go ahead.

16         MR. SLATER:  Let me move quickly to the Grinnell

17    factors, your Honor.

18         The first factor is the complexity, duration and

19    expense of the litigation that is left.  In other words, how

20    much expense and litigation is left to be done.

21         With regard to the individual merchant plaintiffs,

22    Judge, none.  We've already gone through all the hurdles and

23    all the hoops.  We've completed fact discovery, we've

24    submitted three rounds of expert reports.  As your Honor

25    knows, we've done the expert depositions and we've briefed and

Mr. Slater                                    158

1    argued summary judgment.  There's nothing left for us to do.

2    We've suffer -- or no gain no benefit in the reduction of the

3    burden on us by a resolution now not to our liking.

4                THE COURT:  By the way, and this has nothing to do

5    with the fairness hearing, how long do you think your case

6    would be to present at trial?  Have you thought about that?

7                MR. SLATER:  Can I deter to Mr. Arnold on this one?

8                THE COURT:  I could plan the rest of my career here.

9                MR. ARNOLD:  Your Honor, Richard Arnold on behalf of

10   the individual plaintiffs.  We think that depending on the

11   ruling in the DOJ case, if the DOJ prevails, there's going to

12   be some preclusion issues regarding American Express.  But

13   assuming just in a vacuum without presuming any of that, we

14   think, and having sat and watched this trial, as well as you

15   kept that chest clock we think 50 hours for each side we can

16   try the case.

17               THE COURT:  Fifty hours?

18               MR. ARNOLD:  50 hours, yes, your Honor.

19               THE COURT:  I was just curious.

20               MR. ARNOLD:  Yes.  On each side, I mean they

21   obviously --

22               THE COURT:  No, I understand that.  I got it.  All

23   right.  Thank you.

24               MR. SLATER:  Your Honor, the second Grinnell factor

25   is the reaction of the class.  I would submit that the

Mr. Slater

1    reaction of the class was very, very heavily against the

2    approval of this settlement.  Not one merchant has stepped

3    forward to say they support the resolution.

4           The third factor is the state of the proceeding, the

5    amount of the discovery completed.  Again, in our case all the

6    discovery is completed, we're ready to go.  In the class case,

7    no class representative has ever been deposed.  There has been

8    no class discovery taken either by AmEx or by the class

9    itself.  There have been no expert reports, no expert

10   depositions and of course no summary judgment practice.

11          It would be upside down, Judge, to put the less

12   prepared case in a position of preference over the more

13   prepared and ready to go.  So we submit that this factor

14   weighs heavily against approval.

15          The fourth factor is the risk of establishment

16   liability.  Mr. Arnold addressed this.  We think the case on

17   the merits is extremely strong.  We think the defense is very

18   weak.  And we think the settlement and resolution is very

19   weak.  The comparison of the quality of the settlement and the

20   quality of the relief to the strength of the merits of the

21   case weighs heavily, heavily against approval.

22          The risk of establishing damages is the

23   fifth factor.  Your Honor, this one can't possibly help the

24   class because each merchant, according to the settlement

25   they've reached, would have to go to his own individual

Mr. Slater                                    160

1    arbitration to establish his own damages.  No burden is

2    alleviated by the quality of this settlement.

3              The sixth factor is the risk of maintaining the

4    class through trial.  Again, your Honor, this factor is very,

5    very clear.  We know what the risk is, that this class will be

6    able to be held together.  The class acknowledges that due to

7    Italian Colors it has no damage claim and cannot proceed as a

8    damaged class.  We know from the motion filed by American

9    Express that it's very unlikely that they have no claim for

10   injunctive relief either.

11             The posture of this case, and the likelihood of

12   maintaining a class through trial is functionally zero.

13   That's precisely why the class should not be permitted to

14   settle against our will of our claims.  Excuse me, can I get a

15   glass of water, Judge?

16             Your Honor, the seventh factor is the ability of

17   American Express to withstand the greater judgment.  Two

18   points.  They can clearly withstand a greater judgment of

19   $75 million.

20             With regard to injunctive relief, it's clear from

21   Australia that they can withstand a judgment that says

22   merchants can differentially surcharge.  That's effectively

23   what happened to them in 2003 due to the order of the Reserve

24   Bank of Australia.  They're doing fine in Australia.  They had

25   to lower their price and they had to compete on a price.  But

Mr. Slater

1    that's not a death knell.  That's just get in line and get out

2    there and compete with everybody else just like everybody

3    else.

4              The eighth factor is the reasonableness of

5    settlement in light of the best possible recovery.  Your

6    Honor, the best possible recovery here from my perspective is

7    that they're ordered to stop prohibiting differential pricing,

8    let the horizontal inter-brand price competition take hold and

9    let it do its work.

10             So what's the settlement?  As been told to your

11   Honor several times today, Professor Hemphill found the

12   settlement to be of no or little value.  The benefits to the

13   class of the ability to differentially surcharge, including

14   the small merchants, Judge, would be enormous.  If we go to

15   trial and win, those small merchants are going to be lining up

16   claiming collateral estoppel.  And the terrible, you know,

17   fate that will befall them, which has been predicted by some

18   in this courtroom today, is not true.  All they'll have to do

19   is figure out what their damages are and batter up.

20             The ninth factor is the reasonableness of settlement

21   fund in light of the litigation risk.  This one is pretty

22   easy, there is no settlement fund.

23             Your Honor, I've overstepped my time which I really

24   was hoping not to do.  I apologize for that.

25             THE COURT:  That's quite all right.

Mr. Schwartz

162

1          MR. SLATER:  Thank you very much.

2          THE COURT:  All right.  Next we have Mr. Schwartz

3     representing the United States of America.

4          MR. SCHWARTZ:  Thank you, your Honor.  Adam Schwartz

5     with the Civil Division of the United States.

6          THE COURT:  Were you here during the trial?

7          MR. SCHWARTZ:  I was not, your Honor.  I am here

8     with Mr. Hamer because there's sort of different forms of

9     relief rather than pursuing an enforcement action.

10          THE COURT:  I see.

11          MR. SCHWARTZ:  The civil division is involved in

12     this matter.

13          THE COURT:  Fine.  Welcome.

14          MR. SCHWARTZ:  Thank you.  While the other objectors

15     that you've heard from today have raised objections regarding

16     the merits of the case, the United States here is in a

17     slightly different position.  We are here, as we said in our

18     papers, because we do not believe we should be here.  The

19     United States has never once asked to be a part of the this

20     class, and pursuant tore 28 U.S.C. 516 and 519, the authority

21     to represent the United States is vested in the attorney

22     general or his designee.

23          THE COURT:  Okay, stop.  Do the parties to this

24     proposed settlement agree that the United States should not be

25     party to this settlement under the statute that was just

Mr. Schwartz

1    identified?

2         MR. KOROLOGOUS:  I'm not sure I completely follow

3    your Honor's question.  American Express --

4         THE COURT:  Well, the government is saying that they

5    shouldn't be covered by the settlement, that they shouldn't be

6    subject to the terms of the settlement if it's approved

7    because of that statute.  I'm just wondering whether you have

8    a view on it so that Mr. Schwartz doesn't have to stand here

9    for 15 minutes and tell me all the reasons why.

10        MR. KOROLOGOUS:  We do and we oppose the

11   government's position.  We believe that they are merchants.

12        THE COURT:  Okay, thank you.  Now you can speak.

13   Otherwise you would have to sit down.

14        MR. SCHWARTZ:  I would gladly sit down if our

15   interests would be protected.  But I believe that is the

16   problem here, that those statutes not only refer to instances

17   where the United States is a party to the litigation but also

18   instances where the United States has an interest in the

19   litigation.

20        THE COURT:  And in this case you have an interest.

21        MR. SCHWARTZ:  In this case we have an interest in

22   the litigation as claims for the United States have been

23   included in the class settlement when they were not originally

24   included.  In the consolidated class action complaint, in MDL

25   2221, it excluded all government entities from the settlement

Mr. Schwartz

1    class.  The settlement that is before you today includes all

2    governmental entities and there's no carve-out for the United

3    States.

4           As I said before, the attorney general or his

5    designee has not been involved in the negotiation of the

6    settlement and in fact was not apprised of the settlement

7    until after class counsel and counsel for American Express

8    negotiated the settlement and then provided notice of

9    the settlement to all parties.

10          American Express nor class counsel can point to a

11   single statute that gives them the authority to represent the

12   United States over the attorney general.  The only regulation

13   that they're relying on is Rule 23 of the Federal Rules of

14   Civil Procedure.  As the case law interpreting 28 U.S.C. 516

15   and 519 has said, though, in order for there to be a grant of

16   authority from the attorney general to another individual to

17   represent the United States, there has to be a clear and

18   unambiguous grant of the authority.  Nowhere in Federal Rule

19   of Civil Procedure 23 will you find any grant of authority

20   stating that either class counsel or counsel for the defendant

21   in that action has the authority to represent the United

22   States.

23          We were not party to that litigation and we did not

24   give our consent to be a part of this litigation.

25          I want to the contrast --

Mr. Schwartz                                           165

1          THE COURT:  In fact, you have -- the government, the

2    United States has avoided any involvement in the question of

3    surcharging, isn't that --

4          MR. SCHWARTZ:  That's correct.  To this point we

5    have.  And our interest --

6          THE COURT:  Are you planning to jump in?

7          MR. SCHWARTZ:  Your Honor --

8          THE COURT:  I just want to be forewarned.

9          MR. SCHWARTZ:  At this time, your Honor, the answer

10   to that is no.  Obviously the United States is made up of

11   multiple agencies and entities, and the reason that the

12   attorney general has this authority is because there has to be

13   in a sense a clearinghouse for one person to represent the

14   interests of the United States and determine which entity's

15   concerns would take priority over another.

16         THE COURT:  All right.

17         MR. SCHWARTZ:  What I do want to do is contrast

18   Federal Rule of Civil Procedure 23 with the False Claims Act.

19   The False Claims Act, as your Honor may or may not be aware,

20   allows private parties, relators, to bring cases in the name

21   of the government.

22         THE COURT:  I'm very familiar with relators of the

23   False Claims Act.

24         MR. SCHWARTZ:  Excellent.

25         THE COURT:  My docket is filled with the --

Mr. Schwartz

1          MR. SCHWARTZ:  Well, we're trying to move them as

2    quickly as we can, your Honor, but as you know, they keep

3    coming and we --

4          THE COURT:  Oh, I have other things to do, so don't

5    bother yourself.  Go ahead.

6          MR. SCHWARTZ:  Well, I just want to make point that

7    obviously in the False Claims Act if the government decides

8    not to proceed with an action, there's a provision that

9    expressly gives the relator and his attorney the right to

10   proceed.  There's nothing in either the advisory notice or in

11   Federal Rule 23 itself that provides that if the government

12   does not make a decision to opt in or join a non-opt-out class

13   action that the government's claims can be resolved without

14   its involvement.  So that is not present here.

15          One argument that on the papers American Express has

16   made is that 516 and 519 are just ministerial statutes and

17   that they really just deal with how the government internally

18   handles its business.  So the attorney general is vested with

19   the authority to represent the United States, but other

20   entities like the FTC or ICC have to go through the attorney

21   general.

22          I contend that that would create an absurd result

23   where a private party is vested with more authority to

24   represent the interests of the United States than an agency of

25   the United States.  So if that authority is granted, then

Mr. Schwartz                                         167

1   private litigants in class action lawsuits will be able to

2   resolve any number of claims on behalf of the government

3   without the government ever getting notice of that.  This

4   would completely obliterate the purpose of Rule 516 and 519

5   which is for the attorney general to proceed with litigation

6   and to be a centralized warehouse to handle that ligation and

7   determine what's in the best interests of the United States.

8           It would create a quagmire and a public policy

9   disaster.  There would be no way -- there's hundreds of class

10  actions going on throughout the country at any one time and

11  for the United States to somehow stay apprised of all of these

12  without getting any proper notice and try and figure out

13  whether the interests of the United States are being

14  compromised without any of its involvement would just be an

15  impossible task for the United States to engage in.

16          THE COURT:  Well, but on the other hand, the United

17  States is heavily involved in an aspect of this case.  There

18  are basically three elements, three parts to this case.

19          There's the class action, there's the individual

20  merchant plaintiffs case.  Right?

21          MR. SCHWARTZ:  Mm-hmm.

22          THE COURT:  There are those two.  And then there's

23  the government's case of the Sherman Act Section 1.

24          MR. SCHWARTZ:  The enforcement action, correct.

25          THE COURT:  The enforcement action.  So it is very

Mr. Schwartz

1    familiar with the overall situation in this, quote, case but

2    it has chosen not to involve itself in the class action.

3            MR. SCHWARTZ:  That's correct, your Honor.  We've

4    elected to pursue at this time remedy through the enforcement

5    action that Mr. Hamer and the antitrust division is bringing.

6    So we have purposefully not joined this class action and this

7    litigation, and we're now put in a position where the United

8    States for, in my understanding, the first time would be held

9    against its will as part of a class and have to accept class

10   relief and thereby extinguish claims that the government may

11   be able to bring at a later time.

12           THE COURT:  Okay.  Thank you.

13           MR. SCHWARTZ:  Thank you, your Honor.

14           THE COURT:  Thank you very much.

15           All right.  Now on the list I have Dashon Hines.

16           MR. SLATER:  Your Honor, I believe Mr. Hines

17   informed us that he would not be here today.

18           THE COURT:  He's not here today?  Well, if he's not

19   here, he's not here.  Is Mr. Hines here?

20           All right.  I note that Mr. Hines requested time but

21   that he is not here today.

22           MR. SLATER:  We were in communication with him and

23   he told us that other people could use his time.

24           THE COURT:  Oh, well, that's very kind of him.

25           All right, what we're going to do at this point --

Mr. Schwartz                                   169

1    well, let me ask this, is there anyone who is not on the list

2    who is an objector who wishes to be heard at this time?  All

3    right.  Hearing no one, what remains is the proponents'

4    rebuttal and let's take a ten-minute break and then I'll hear

5    from the proponents.  Thank you.

6              MR. KOROLOGOUS:  Thank you.

7              (Brief recess.)

8              (Continued on the next page.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Mr. Korologous
170

1              (In open court.)

2              THE COURT:  Okay.  Now we'll have deponents

3    rebuttal, Mr. Korologous.

4              MR. KOROLOGOUS:  Good afternoon, your Honor.

5              THE COURT:  How long did you want to take?

6              MR. KOROLOGOUS:  Your Honor, I'm going to make a

7    variety of quick points, I'm not sure exactly how long they'll

8    take, but then the balance of time I will leave to the moving

9    class for the final order.

10             THE COURT:  Okay, please go ahead.

11             MR. KOROLOGOUS:  Thank you, your Honor.  Your Honor,

12   going roughly in some of the order that we heard some of the

13   objections, at least for the points that American Express

14   wishes to address, I'd like to start by focusing on apparently

15   one of your favorite cases, Dukes, and identify, again, what

16   the standard is under 23(b)(2) and under Dukes for approval.

17             Judge Gleeson in the 1720 case described it as Rule

18   23(b)(2) class is warranted when the party opposing the class

19   has acted or refused to act on grounds that apply generally to

20   the class so that final injunctive relief is appropriate

21   respecting the class as a whole.  And as the Supreme Court

22   said in Dukes, the test is whether the challenged conduct,

23   which here is American Express's nondiscrimination provisions

24   in its Honor All Card provisions, whether those provisions can

25   be enjoined or declared unlawful only as to all of the class

Mr. Korologous                                     171

1    members or as to none of them.  In other words, Rule 23(b)(2)

2    applies only when a single injunction or declaratory judgment

3    would provide relief to each member of the class.

4            And the relief here is the rules change, that's

5    agreed to in the settlement.  That does not go to the question

6    of who will benefit how much by being able to invoke that rule

7    change or not, who has issues with states or other laws or

8    technology or competitive questions as to whether they can

9    engage in it.  So I believe it's clear, your Honor, that the

10   settlement here satisfies the standard for 23(b)(2) and as

11   that applies under Dukes.

12           There was some comments with respect to the Rules

13   Enabling Act.  And on that, your Honor, the Supreme Court has

14   healed that procedural rules such as Rule 23 do not violate

15   the Rules Enabling Act even when they have incidental effects

16   on substantive rights.  And this dates right back to 1941 in

17   the Sibbach versus Wilson case where the Supreme Court

18   enunciated the following test:  The test must be whether a

19   rule really regulates procedure – the judicial process for

20   enforcing rights and duties recognized by substantive law and

21   for justly administering remedy and redress for disregard or

22   infraction of them.

23           Then --

24           THE COURT:  Do you think incidental effects includes

25   the potential effect on 20 percent of the merchants in the

Mr. Korologous

1    United States?  Is that incidental to a rules change or is

2    that a substantial potential effect?  I mean, isn't it a

3    question of how you define incidental effects?

4            MR. KOROLOGOUS:  I think there is certainly an issue

5    with respect to incidental effects.  The question I think here

6    is what are those effects.  Here we've got merchants who say

7    they have arbitration clauses.  That's what the basis of the

8    Rules Enabling Act argue.  That question goes to simply

9    whether they can litigate.  Their request is they want to opt

10   out and be able to litigate.

11           In the arbitration they claim in these objections.

12   But that's no different than any other litigant.  Just because

13   you don't have an arbitration clause doesn't mean you do not

14   have a right to litigate.  And every opt-out request is a

15   request to be able to litigate on their own.  Some do not even

16   bring a claim.  Others can bring a claim and seek better

17   relief.

18           THE COURT:  They're saying it's the tail wagging the

19   dog here, that the class members who are bringing this -- the

20   punitive class members who are bringing this litigation do not

21   have a level of interests that the objectors have in terms of

22   consequences of being limited as to how they can proceed

23   if they have a claim.  I mean, isn't there something that --

24   you know, isn't there a balancing that needs to be done in a

25   situation like that?  You know, I could as an attorney bring a

Mr. Korologous                                    173

1    class action with a handful of representative members of the

2    class and then I make a deal with the defendant and claim that

3    the class is adequately represented and I can simply negotiate

4    away the rights that the other punitive class members have and

5    the effect of negotiating those rights away has much greater

6    consequence to the objectors than it has to the original class

7    members who brought the litigation?  Is that -- I mean, how

8    would we deal with that?

9              MR. KOROLOGOUS:  I think, your Honor, that question,

10   rather than just to the Rules Enabling Act, goes to broader

11   question of application of a 23(b)(2) class in this case at

12   all, including represent --

13             THE COURT:  Right, I jumped to that question.

14             MR. KOROLOGOUS:  I just wanted to make sure that was

15   clear in my mind.

16             THE COURT:  No, I understand what you're saying, but

17   I'm trying to deal with, you know, the heart of what the

18   objectors are saying.

19             MR. KOROLOGOUS:  Certainly, your Honor.  I think

20   there are two parts to that question, and I'll address the

21   first and likely leave most of the second to Mr. Friedman; the

22   second being whether he and his clients can appropriately be

23   representative of the other members of the class in its

24   entirety.

25             Related to that, of course, is the structural and

CHARISSE KITT, CRI, CSR, RMR, FCRR
Official Court Reporter

Mr. Korologos                                          174

1   procedural question of how you resolve that question and

2   whether that is applicable here which goes to the, again, the

3   question as in Dukes of what is the claim that is brought and

4   what is the relief that's being evaluated and should that

5   apply to the class.  The claim is on behalf of all merchants

6   that are subject to this rule.  Well, all merchants that

7   accept American Express or that might in the future are

8   subject to these rules.  They have slight differens but not --

9   that get negotiated, as we've seen from some of the objectors'

10  statements here and also from the DOJ trial, but those

11  differences don't have differences on the issues that are

12  being resolved here on surcharging.  American Express doesn't

13  allow differential surcharging under any agreement, negotiated

14  or not.

15          We have Honor All Cards rules with everybody on

16  every agreement, whether it's negotiated or not.  That's the

17  way our rules are set up, that's what these claims are about,

18  that's what the class is seeking relief on and that's what the

19  relief is that is being granted.  So from a structural

20  standpoint as to the relief, I believe that answer more than

21  satisfies Rule 23(b)(2) and Dukes.

22          Now, perhaps beginning to address the second issue a

23  little bit -- but again I think it's more Mr. Friedman's

24  issue -- some of the arguments I've heard about on, I believe

25  it was the Home Depot's counsel that sounded a lot like you

Mr. Korologos                                                    175

1    can't have class actions.  You can't have class

2    representatives unless you build an annex on the courthouse to

3    have all 6 million merchants come in.  You simply can't get

4    there because there will be differences.  There are always

5    going to be differences among the class.  The issue is whether

6    the differences matter so that the class representatives

7    cannot adequately represent the interests of all parties that

8    are absent class members or class members that are there.  And

9    the standards, we believe, are clearly met with respect to

10   that in this case, your Honor.

11           Your Honor, there was a, you recall, and it's

12   related to this point, at least with respect to the

13   arbitration clause issue, you recall the colorful chart with

14   many columns and many colors on it.  And that, again, goes to

15   the question of whether there are differences among the class

16   that require differences to be dealt with and not dealt with

17   on a classwide basis.

18           But that kind of a chart could easily be created in

19   a case that has no arbitration clause, if you simply made it

20   about where can you go to get your relief.  Well, that depends

21   on the case, is it a federal question or is it diversity.  Do

22   you have diversity or not?  That depends on what state you

23   live in compared to the defendant.  How much your damages are.

24   Can you go to the court here in Brooklyn or do you have to go

25   to federal court in Los Angeles?

Mr. Korologous                                      176

1              All of these things are differences that every

2     litigant faces.  Just the mere fact that these litigants have

3     an arbitration clause does not give them some heightened

4     ability to get out of a properly constituted Rule 23(b)(2)

5     class.

6              THE COURT:  Well, it's a question of what's being

7     given up too, not just what are they getting but what are they

8     not getting.  And it may not be important to the class

9     representatives as to whether there are restrictions on future

10    litigation and other future remediation under the merchant

11    acceptance agreements.  Right?

12             But it may be that the punitive class members who

13    are not the lead class members of the steering committee who

14    brought the case, that their ability to exercise their rights

15    will be disparaged in ways that the lead class members would

16    not experience simply by virtue of the nature of their -- of

17    the MDP's that they negotiated or other aspects of their

18    agreements with American Express, which give them certain --

19    currently give them certain rights in litigation or at

20    arbitration that are extremely valuable to them, which they

21    could not exercise.  So it's a package, isn't it?

22             MR. KOROLOGOUS:  It is a package.  And the question

23    again, as stated in Dukes, is whether it is a uniform package

24    for the class, and here it is.  The issue, for instance, with

25    respect to -- let me back up and again make clear so that

CHARISSE KITT, CRI, CSR, RMR, FCRR
Official Court Reporter

Mr. Korologous                                                        177

1    there's no question of what the release does in this case.  It

2    releases injunctive relieve claims.  While it releases

3    steering injunctive relief claims, it's got an express

4    provision that whatever the outcome in the DOJ case, the class

5    members will benefit from them.

6              So while they've released their claims to bring

7    their own injunction for that, they will live with the DOJ

8    case.  So there's no harm to them with respect to that unless

9    somebody could try to articulate that DOJ was not

10   appropriately capable to try the case in order to achieve the

11   ends that it was seeking, which again were with respect to

12   steering and not with respect to surcharging.

13             An example on that would be the individual merchants

14   cases.  We believe, obviously, there are a lot of flaws in the

15   Department of Justice's case.  But one of those flaws dows not

16   include what the individual merchant's flaw in addition is,

17   which is their requirement for them to achieve their case that

18   they prove a single brand market, where it's American Express

19   only, effectively arguing that American Express does not

20   compete with Visa, MasterCard or Discover.

21             So they have even an additional impediment.  So I

22   don't think there is anybody that can come forward and say

23   that they are disadvantaged with respect to steering.  They

24   are also not disadvantaged with respect to bringing any claims

25   for past conduct, meaning any conduct preceding when American

Mr. Korologous

1   Express implements the new rules.

2          All of that conduct under the current rules, to the

3   extent they believe and are able to prove in their individual

4   actions that American Express is both liable and that they've

5   suffered damages that are compensable, they will be able to

6   prove that.  Now, we certainly think they will not succeed.

7   But they will have that right.  That is not released.

8          What is released with respect to damages or relating

9   to damages for future conduct where we act consistent with our

10  new rules.  There would be no incentive for us or any other

11  merchant settling an injunctive relief class if it had to face

12  damages for following the injunction that gets approved by the

13  court, as it must be.  There is simply no incentive to that.

14  Judge Gleeson directly addressed that, that there would be no

15  such incentive.  Other courts have addressed that as well.

16         And the release of those future damages is not

17  inconsistent with Dukes.  I believe I heard one objector say

18  damages may not never be released under Dukes.  That's not

19  what Dukes says.  Dukes expressly leaves open the possibility

20  of the release of damages that are incidental to the

21  injunctive relief, and nothing could be more incidental than

22  to say that a party should suffer a damages claim against it

23  for following the injunction that is permitted by the court to

24  settle the case.

25         THE COURT:  That's why it's extremely important that

Mr. Korologous

1    in assessing the proposal that the overall scope of the

2    agreement be such that the objectors that all of the class

3    members, including the objectors, will prospectively be

4    treated fairly and be able to protect their rights, because

5    the preclusion of certain types of remedies in this agreement

6    make it clear that the ability of these objectors to vindicate

7    certain rights, potentially, may be foreclosed.

8            And that's a matter of great concern, particularly

9    when you have a class that's allegedly millions of parties

10   strong.  And we've got 20 percent of the merchant group, in

11   terms of sales or operations, you know, sitting in the

12   courtroom saying that they think this is unfair to them.

13   That's a very large percentage of a nationwide class of

14   merchants.  I mean, you can add up all the restaurants in

15   America and you're not going to come close, I think, to the

16   group that's objecting in terms of their position in the

17   overall marketplace in the United States.

18           That's surmise on my part.  I love restaurateurs.

19   My family comes from the background of restaurateurs.  Maybe

20   your family.

21           MR. KOROLOGOUS:  It does indeed, your Honor.

22           THE COURT:  So I'm not disparaging them

23   individually, I'm just saying collectively what do they

24   account for as opposed to all of these objectors, and isn't it

25   important that I take very careful consideration of the

Mr. Korologous                                                    180

1   arguments that they have made that the settlement doesn't

2   adequately protect their rights going forward?

3            MR. KOROLOGOUS:  It is important to look at that,

4   your Honor.  And again, there are a couple of ways that the

5   court needs to ensure that that exists here, and it does.

6   First is, again, Rule 23(b)(2), in its application to make

7   sure that there is adequate representation and uniformity of

8   the relief.

9            The other is to get a look at the scope of the

10  release and whether that is an appropriate scope of releasable

11  claims.  And to solve that issue, including because it was

12  such a hot button issue in the 1720 case where there was a lot

13  of dispute about the scope of release and the way that release

14  was written -- and I believe that one is actually a lot longer

15  than the one here -- goes to the question of what the

16  identical factual predicate is.  And it is clear under the

17  case law and it is undisputed by everybody in this case, as

18  well as everybody in the 1720 case, that a release may release

19  claims consistent with that doctrine.  And that's exactly how

20  the release in this case is phrased.  So if it's identical

21  factual predicate, if it's meets that doctrine, it is

22  released.  If it does not meet that doctrine, it is not

23  released.  We solved that structurally --

24            THE COURT:  What's the status of the 1720 case?

25            MR. KOROLOGOUS:  The appeal briefs have gone in.  I

CHARISSE KITT, CRI, CSR, RMR, FCRR
Official Court Reporter

Mr. Korologous                                    181

1   believe the response briefs are due about a month from now and

2   then there will be period of two to four weeks or so after

3   that for reply briefs.

4              THE COURT:  For what, for reply?

5              MR. KOROLOGOUS:  For replies.

6              THE COURT:  And then there will an argument --

7              MR. KOROLOGOUS:  An argument will be scheduled and

8   then --

9              THE COURT:  And we'll find out some day if the

10  circuit agrees with Judge Gleeson?

11             MR. KOROLOGOUS:  I suspect it will be argued and

12  decided sometime in 2015.

13             THE COURT:  So I have no way of knowing at this

14  point whether the circuit court is embracing -- will embrace

15  or not embrace the outcome of 1720 at this time?

16             MR. KOROLOGOUS:  In its totality, I think that's

17  right.

18             THE COURT:  It would have been helpful.  But since

19  they haven't received the complete package yet, I can't really

20  say anything about the delay.  The delay is that it's the

21  normal course of litigation.

22             MR. KOROLOGOUS:  Correct, your Honor.  Let me

23  address a few other points that came up.  There were some

24  comments by some merchants that the relief here because it

25  requires parity surcharging will actually set things back

CHARISSE KITT, CRI, CSR, RMR, FCRR
Official Court Reporter

Mr. Korologous                                    182

1   because it will allow American Express to raise its rates.

2   But parity surcharging exists today under American Express's

3   rules.  American Express does not have a no surcharging rule,

4   it has a parity surcharging rule.  American Express's rates

5   are going down, they're not going up.  So we don't think that

6   argument gets them anywhere.

7            THE COURT:  Where are Visa and MasterCard on parity

8   surcharging?

9            MR. KOROLOGOUS:  They now have the 1720 settlement

10  and they've had that since, whenever that was, the beginning

11  of 2013 I think that went into effect.

12           THE COURT:  Have any of their merchants engaged in

13  parity surcharging?

14           MR. KOROLOGOUS:  I believe there is information in

15  the record here that there have been very few engaging in

16  surcharging among those merchants that do not accept American

17  Express, which is where they are able to do that because --

18           THE COURT:  Right.

19           MR. KOROLOGOUS:  -- there's the what Judge Gleeson

20  called the American Express problem.  We don't necessarily

21  like that phrase but that's what he called it.

22           THE COURT:  I understand what he's saying.

23           MR. KOROLOGOUS:  But that issue applies to the vast

24  majority of merchants, about six out of nine depending on how

25  you count.  But, again, that is the problem that is solved by

Mr. Korologous                                    183

1   this issue on this settlement.

2          THE COURT:  So as to those 4 billion merchants who

3   did not take American Express -- was it 4 million?

4          MR. KOROLOGOUS:  I think about three.

5          THE COURT:  Three.  Who do take Visa and MasterCard

6   and Discover, have they had the right to parity surcharge

7   since Judge Gleeson's decision?

8          MR. KOROLOGOUS:  Yes, your Honor, they've had the

9   right to engage in a variety of different surcharging and

10  steering as well as a result of the Department of Justice

11  settlement.  You will recall that was an issue where we talked

12  about the statements made by Christine Barney at the time the

13  settlement was announced.

14         THE COURT:  Oh, yes, thanks for reminding me.

15         MR. KOROLOGOUS:  And that -- you know, that was an

16  issue in that case as well, whether merchants had engaged in

17  that steering.  But, similarly, those same merchants are among

18  the merchants who would have the ability to take advantage now

19  of the changing rules of 1720 because they are not subject to

20  what Judge Gleeson called the American Express problem.

21         THE COURT:  So do we know how many of them have

22  rushed off to engage in --

23         MR. KOROLOGOUS:  We don't know.

24         THE COURT:  Okay.

25         MR. KOROLOGOUS:  Your Honor, there was something

Mr. Korologous                                          184

1   that Mr. Arnold said in his remarks about Judge Gleeson that

2   reminded me of a case where you asked me about other cases

3   that have involved settlements that have crossed a broad swath

4   of industries and that is another case against Visa which is

5   the Wal-Mart versus Visa case which involved -- it ended up

6   having a class certified under 23(b)(2), as well as 23(b)(3).

7   The case settled.

8           That was a case about allowing merchants to choose

9   not to accept debit cards and only accept credit cards.

10  Before that case, Visa and MasterCard rules had an Honor All

11  Card rule that required the acceptance of debit cards if

12  merchants also accepted credit cards.  So again, that covered

13  some 4 million merchants or so at that time.  But, again, it

14  crossed a similar swath of industries because, again, it was

15  merchants that accepted Visa and MasterCard.

16          THE COURT:  Was that a settlement?  Was there a

17  settlement?

18          MR. KOROLOGOUS:  It did settle, your Honor.

19          THE COURT:  And were there major objections borne

20  against that settlement?

21          MR. KOROLOGOUS:  I don't recall.  I believe some

22  others here were involved in that.  I think Mr. Friedman may

23  be able to answer some questions with respect to that.

24          THE COURT:  All right.  Thank you.

25          MR. KOROLOGOUS:  Mr. Arnold also took on my

CHARISSE KITT, CRI, CSR, RMR, FCRR
Official Court Reporter

Mr. Korologous

1    representation to your Honor about their damages claims and

2    their damages theory in this case where I indicated that their

3    damages theory was based on PIN debit rates and using that as

4    a baseline.

5            And Mr. Arnold spoke some of Mr. Vellturo of –– I

6    can't recall right now whether it's Professor or Dr. Vellturo,

7    who was their expert.  It is Dr. Christopher Vellturo.  And I

8    don't think there should be any doubt about what the

9    plaintiffs' damages theory is and that it's based on a

10   baseline end of it.

11           And for that, while there are a variety of cites in

12   both American Express's papers in this settlement approval

13   process as well as in the class papers, I would refer your

14   Honor to July 3, 2013 surrebuttal report of Dr. Christopher

15   Vellturo.  And specifically I'll quote from paragraph 213

16   which is in the section about the overcharge assessment where

17   he is addressing criticisms of my baseline AmEx but–for fee.

18           He ends that sentence with the following sentence:

19   However, what really matters is that PIN debit rates have

20   always been low and in the but–for world merchants could have

21   credibly used differential pricing of AmEx vis–a–vis debit to

22   shift transaction volumes to this less costly form of payment

23   and drive down AmEx merchant fees."

24           So in this very case with these very objectors

25   claiming that there's no benefit by being able to shift

Mr. Korologous

1    customers from credit to debit, their own expert disagrees

2    with their presentations here.

3           Your Honor, I should also note, I think it was one

4    of the earlier slides that Mr. Arnold put up about surcharging

5    and discounting and whether there's a difference there.

6    Apparently, the Department of Justice thinks there's a

7    difference, since they brought a case that sought to overturn

8    or undo American Express's rules prohibiting differential

9    discounting but they did not seek to overturn American

10   Express's rules with respect to differential surcharging.

11          Your Honor, you will recall that I mentioned the

12   Giuliani case, it's actually Joel A. versus Giuliani.  That is

13   a case that should help the court with respect to the issue of

14   future class members because that is a case that expressly

15   included both current and future class members.  I think it

16   involved childcare industry.  But it was injunctive relief

17   that could apply both to existing members as well as future

18   class members.  I believe that responds to some of the issues

19   raised including by the Buckeye Institute.

20          One additional point based on, I believe it was the

21   Home Depot presentation.  I want to make clear that what Judge

22   Gleeson approved in 1720, the release there did expressly

23   include the release of future damages claims for claims that

24   would follow the rules.  And that's, I believe found in

25   paragraph 68 of the Visa/MasterCard settlement agreement in

Mr. Korologous                                    187

1    1720.

2              May I have a moment, your Honor?

3              THE COURT:  Sure.

4              MR. KOROLOGOUS:  Two more points, your Honor.

5    First, a simple reference point with respect to the government

6    arguments.  We've addressed those with one short final section

7    of our brief.  And I refer the court to American Express's

8    position with respect to the government there.

9              The issue is really, in our view, that yes, the

10   Department of Justice has to act on behalf of any agency of

11   the United States, but that's to conduct litigation.  And here

12   the way the government would be conducting litigation is to

13   either appear as a party, and they're not a class

14   representative and therefore not a party, or to object.  And

15   they've stood here today and objected.  The Department of

16   Justice has, we believe, fulfilled the rules consistent with

17   that.  We don't see anything in the cases or in the statutes

18   that allow the government to have the ability to claim they're

19   not part of the class inconsistent with the arguments the

20   government has made.  But I refer your Honor to the issues

21   there.

22             THE COURT:  Are you aware of any cases where the

23   government has been included as a member of a class in a

24   (b)(2) class situation?

25             MR. KOROLOGOUS:  I'm not sure it was (b)(2), I think

Mr. Korologous

1   it was a (b)(3) class.  There is the Shaw case that we cite in

2   our papers on that.

3           THE COURT:  You would be knocked out in a (b)(3)

4   situation.

5           MR. KOROLOGOUS:  You can be.  But the point there,

6   your Honor, is that while they were not dragged into that,

7   they chose to be represented by the class without going

8   through the procedures that they say are required under those

9   statutes.  And so we believe that that case supports our

10  position.  I do agree with the government.

11          We've not been able to find a case where the

12  government has been required to be included in a class by that

13  principle.  But in that one case we did find that it is

14  somewhat analogous they voluntarily chose to be represented by

15  class counsel.

16          THE COURT:  That's a little different from what we

17  have here.

18          MR. KOROLOGOUS:  It is, your Honor.

19          Finally, your Honor, with respect to some of the

20  arbitration arguments here and sort of back to the Rules

21  Enabling Act points to some extent.  I think it's important to

22  remember again, all of these objections that are seeking

23  opt-outs are essentially saying they want to go on their own.

24  But that is, again, a right that any litigant would have,

25  whether they have an opt-out, whether they have an arbitration

Mr. Korologous

1   right or not.  None of the contracts that they cite, we didn't

2   see a column on the colorful chart, grant an opt-out right.

3           Indeed, there are cases we cite in our papers that

4   say you cannot contractually enter into an opt-out right.  And

5   the arguments that they claim a right to arbitration, those

6   are rights that can be impacted by Rule 23(b)(2).  That is the

7   kind of conduct that can occur.

8           I think it's important to note that these merchants

9   did not bring an arbitration.  This case has been around for

10  years.  There's been a great deal of notoriety with respect to

11  it, including because of its interplay with 1720, where there

12  was not only a great deal of notoriety but there was the

13  settlement, there was the notice to all class members which is

14  an overlapping and broader class with perhaps a handful of

15  people that accept only American Express and not Visa and

16  MasterCard, where they got notice not just of the existence of

17  this kind of litigation, the Visa/MasterCard case, but that

18  the case there was to involve a 23(b)(2) non-opt-out, in a

19  case where they would be bound by the information -- by the

20  settlement that was included there.

21          And despite that, these merchants did not bring

22  individual claims, they did not bring the kind of claim that

23  might put them in a different situation, might have different

24  arguments, but we don't have to deal with them if they had

25  brought claims that we were trying to resolve under the

Mr. Korologous

1    arbitration.  But that's not an issue the court needs to fix.

2         These litigants did not exercise those rights and

3    have not raised them until they come in to court here with

4    respect to objections in a very different context than

5    bringing a claim on their own to exercise those arbitration

6    rights for these rules American Express has had, and your

7    Honor heard, for decades.

8         THE COURT:  But on the other hand, the original

9    cases brought before me were brought by the individual

10   merchant plaintiffs, that's how we got here.

11        MR. KOROLOGOUS:  In this court --

12        THE COURT:  It may have gotten transferred from

13   Judge Gleeson who didn't accept the related -- alleged

14   proposed related status of those cases so that he would handle

15   them.

16        But Italian Colors is a Southern District case.

17   Right?  That case belonged to Judge Daniels.  Right?

18        MR. KOROLOGOUS:  Mr. Friedman can more clearly

19   address than I can.  His case existed before the case of the

20   individual merchants that's before your Honor.

21        THE COURT:  Not here, though.

22        MR. KOROLOGOUS:  Not in front of your Honor, that's

23   correct.

24        THE COURT:  Judge Daniels sent me that case.  Isn't

25   that right?

Mr. Korologous                    191

1          MR. FRIEDMAN:  I don't want to step

2    on Mr. Korologous.

3          THE COURT:  No, I'm not done with him.

4          MR. FRIEDMAN:  Okay.  He knows the answers to this

5    anyway.

6          MR. KOROLOGOUS:  There was --

7          THE COURT:  How is that important to me in deciding

8    this?

9          MR. KOROLOGOUS:  Because the -- because the class

10   has had its case longer than anybody else.  Nobody, other than

11   the individual merchants that are here, has brought a claim.

12         THE COURT:  Obviously, the individual merchants

13   didn't seize the moment to join in in the case in the Southern

14   District.  Right?

15         MR. KOROLOGOUS:  Right, they tried to do it --

16         THE COURT:  They brought an individual case in the

17   Eastern District that they thought was going to go to Judge

18   Gleeson and it ended up with me.  And then I got the MDL.

19         MR. KOROLOGOUS:  You got benefits from both courts.

20         THE COURT:  I'm so lucky.  But my point is, if they

21   had -- if they thought that they could be adequately

22   represented in the other district, in the other case, they

23   would have been there but they weren't.

24         MR. KOROLOGOUS:  Well, my point in mentioning the

25   individual merchants is to carve them away.  There's nobody

Mr. Korologous

1   that is here arguing an arbitration clause, the individual

2   merchants are not, because they've got their claims in court

3   before your Honor without impact of arbitration clauses some

4   of which they have.  But American Express has agreed not to

5   invoke them for their claims.

6          So everybody that is here before your Honor raising

7   an arbitration clause, every single one of them did not bring

8   their own claim in any court at any time despite the long

9   pending nature of the class.

10          THE COURT:  Let me just ask you this, if you look at

11   this proposed settlement agreement, AmEx gets out of it, or

12   the result is that there is some uniformity in the

13   anti-surcharging rules.  In other words, there are limits.

14   Parity surcharging becomes the approach that's used under this

15   agreement.  Right?

16          And so there's a certain uniformity of how

17   surcharging issues are handled, but American Express still

18   retains its MDPs and it still retains the ability to negotiate

19   another critical element of the relationship between the

20   merchant and AmEx and so -- and that's individually negotiated

21   with large merchants.  Right?

22          MR. KOROLOGOUS:  Yes.

23          THE COURT:  So what you end up with is in certain

24   respects AmEx basically gets the best of both worlds.  It can

25   continue to negotiate the MDPs but the merchants can only

Mr. Korologous

1   implement a type of surcharging which is, according to some,

2   of little or no real benefit to the merchants.

3           So the question is:  Is this a fair settlement?  If

4   you get to do everything that you think is important that I

5   heard seven weeks of testimony about, but the merchants get

6   parity surcharging, which is of dubious or questionable

7   benefit to the merchants?  And I'll take that up with

8   Mr. Friedman as well.  But you might as well answer since the

9   benefit is to American Express allegedly.

10          MR. KOROLOGOUS:  Your Honor, first of all, with

11  respect to some aspects of our MDPs, the ability of American

12  Express to go forward with respect to those will be decided by

13  your Honor, in appellate courts with respect to the DOJ case

14  insofar as steering.

15          THE COURT:  Let's say they haven't met their burden

16  for the sake of this discussion.

17          MR. KOROLOGOUS:  Okay, I'll agree with that.

18          THE COURT:  Well, no, for the sake of this

19  discussion.

20          MR. KOROLOGOUS:  I understand.  I understand.

21          THE COURT:  I don't even have your papers yet.

22          MR. KOROLOGOUS:  Tomorrow, your Honor.  We're

23  working on them over here as we speak.

24          THE COURT:  Where is Mr. Orsini?

25          UNKNOWN SPEAKER:  Working on them, your Honor.

Mr. Korologous

1         THE COURT:  Yeah, he's not here, which worries me.

2         MR. KOROLOGOUS:  It worries all of us.

3         THE COURT:  You can tell him.

4         But you understand my point, that, let's say the

5    government is not successful and all we're left with here is

6    the class settlement agreement and some litigation over

7    damages from the individual merchants plaintiffs that goes to

8    damages which have already allegedly been experienced.

9         MR. KOROLOGOUS:  I believe the right way to look at

10   it, your Honor, at least from American Express's perspective,

11   is that we have with this settlement some limitations on what

12   we can require under our agreement with merchants.  Regardless

13   of whether it's negotiated or not, we will have limitations on

14   what we can do.  We will have to allow merchants to

15   differentially surcharge as between the group of credit and

16   charge cards on the one hand where there needs to be parity

17   surcharge, but they may need to surcharge that group

18   differently than they do debit.  And that is a change from

19   what American Express does today.  And so that ratchets back

20   the MDPs by that amount.

21        You're correct that American Express could still

22   negotiate but it cannot take that benefit away from the class

23   because we've got a settlement agreement, at least not without

24   blowing our release.  We can't take that benefit away from the

25   class.

Mr. Korologous

1          And so, yes, we will continue as we have to neglect

2     agreements, as we must, unlike Visa and MasterCard that just

3     impose rules.  But we will have limitations on what we can do

4     with that.  Just like if we were to lose, arguendo, the DOJ

5     case, we would have further limitations on what we could

6     negotiate with respect to steering.

7          THE COURT:  If American Express implements and

8     produces a new product, a debit product, how would that

9     potentially impact the future rights of merchants except the

10    American Express, under this agreement, if it at all?

11         MR. KOROLOGOUS:  Under the agreement, it depends on

12    the kind of debit card that is introduced.  If it is what we

13    define as a traditional debit card that draws on a deposit

14    account, that is a card that merchants would not need to

15    accept.  So that would be a change in our Honor All Cards

16    rule, that merchants could chose, if they don't like that

17    card, if they felt -- for instance, I believe this was one of

18    the reasons that the class asked for this in the agreement.

19    If they felt that was a channel by which American Express was

20    trying to circumvent the issues with respect to surcharging

21    that we settle in here with respect to credit and charge cards

22    compared to debits by packing in a traditional debit card that

23    has awards, merchants could choose not to accept that.  They

24    could say, look, that's a high priced debit, I don't want to

25    deal with it because you're running rewards through that and

Mr. Korologous

1    choose not to, despite what has been our Honor All Cards rule

2    before that any product we issue has to be accepted by

3    American Express if they chose to accept any cards.

4              THE COURT:  Is that realistic for the consumer, that

5    if you take your -- assuming you have more for that product,

6    you take your AmEx debit card into a merchant who accepts the

7    American Express card and the merchant then says, no, we don't

8    honor that American Express card, are you willing to do that?

9              MR. KOROLOGOUS:  Well, I think, your Honor, that it

10   is at least sufficiently possible for merchants to do that,

11   including because they would have the right perhaps with just

12   a sign that says we accept American Express but we don't

13   accept this American Express debit card, that what it does is

14   imposes discipline on American Express not to engage in that

15   conduct.  And so I believe this was described by the class in

16   its brief as a safety valve stop to prevent American Express

17   from having that means of circumventing the other rules.

18   So --

19             THE COURT:  It also flies in the face of the

20   repeatedly stated comments by witnesses in the government

21   trial that it's important that the American Express card be

22   welcomed at merchants who agree to accept the card.

23             MR. KOROLOGOUS:  Right.  And I don't want to speak

24   on behalf of the business, but I'm sure based on that

25   testimony and my knowledge of the business, American Express

Mr. Friedman

1    would not want to create the kind of confusion that that would

2    create by welcome acceptance by having some cards that

3    American Express has out there that are not accepted.

4            THE COURT:  Right, I understand.

5            MR. KOROLOGOUS:  So we would not try to force it.

6            THE COURT:  So I think it's really -- it's a

7    provision which is there but really doesn't have any immediate

8    possibility of being implemented.

9            MR. KOROLOGOUS:  Right.  We don't think it's going

10   to be an issue but I do believe it provides some benefit the

11   way Mr. Friedman negotiated it to prevent American Express

12   from having an end run.

13           THE COURT:  Okay.

14           MR. KOROLOGOUS:  Thank you, your Honor.

15           THE COURT:  Thank you very much.

16           Mr. Friedman, you get the last word.

17           MR. FRIEDMAN:  Thank you, your Honor.

18           I think a lot of the discussion comes down to

19   adequacy of representation.  And the question of the tail

20   wagging the dog is an adequacy representation question.  And,

21   you know, we have a different view on the tail and the dog to

22   start with.  Okay?

23           THE COURT:  Well, who are you -- who are

24   representative clients for the class?

25           MR. FRIEDMAN:  The representative clients --

CHARISSE KITT, CRI, CSR, RMR, FCRR
Official Court Reporter

Mr. Friedman                                    198

1            THE COURT:  Who are the companies that initiated all

2    of this?

3            MR. FRIEDMAN:  This was initiated -- in addition to

4    the Marcus Corporation that's been discussed here today, a

5    couple of -- there's two restaurants, the Italian Colors

6    restaurant.

7            THE COURT:  We know about them.

8            MR. FRIEDMAN:  Right.  Animal Land, a pet relocation

9    company.  There's a liquor store, a gas station.  There's a

10   handful of small merchants.  Those are mom-and-pop operations

11   with the exception of Marcus which is a New York Stock

12   Exchange traded company.  It's a mid to large size hotel

13   operator.  It operates Hilton, Marriotts and others.

14           THE COURT:  In other words, they have franchises to

15   operate hotels?

16           MR. FRIEDMAN:  Right.  They also have their own

17   brand named hotels.  They have good resorts in Wisconsin and

18   Las Vegas under their own brand.

19           THE COURT:  My question is not to disparage any of

20   their interests in bringing this litigation.  But in terms of,

21   you know, whether they adequately represent, you know,

22   8 million merchants, including the merchants who are

23   objecting, that's a question.

24           MR. FRIEDMAN:  So they brought this case and started

25   this, brought the case in the first instance in 2006, two and

Mr. Friedman

1    a half years before the individual merchant plaintiffs did,

2    and it was in front of Judge Pauley.  You remember that?

3              THE COURT:  Oh, I remember that.  Both Judge Pauley

4    and Judge Daniels --

5              MR. FRIEDMAN:  He wanted to be on the Brooklyn

6    Bridge.

7              THE COURT:  -- have been very enthusiastic about my

8    handling of this case.

9              MR. FRIEDMAN:  Yes, right.  Right.  And so we

10   brought this to get relief for all merchants because we

11   thought that this is an area where it's not just American

12   Express's business imperative that this be uniform but there's

13   an -- that there are values to the universality.  We walked

14   through a bunch of that in our paper.  We thought it's

15   important to have the broad relief.

16             So the question that arises, the legal question, to

17   put this into a legal framework is, is there adequacy of

18   representation.  Because we're not using these words

19   colloquially.  Right?  We're using them in the sense of what

20   does the Second Circuit mean when it talks about adequacy of

21   representation, what is it under the law.

22             And the Second Circuit has a -- and I'm going to

23   quote from the Joel A. versus Giuliani case that Mr --

24   actually, this quote is to the Wal-Mart case at the Second

25   Circuit which is quoting Joel A.  And it's, the Second Circuit

Mr. Friedman                                      200

1    has considered whether a subset of a class can ever lack

2    adequate consideration, adequate representation when the lead

3    plaintiffs of that class possessed the claims of that subset.

4            So it all comes down -- I know you've seen this in

5    the briefing.  It all comes down to whether we possess the

6    same claims.  And the answer is we possess the same claims.

7    Every case that was adverted to by the objectors as being a

8    case where there was -- where adequacy of representation was

9    found lacking, every single one is a case where the

10   representative plaintiffs didn't possess the same claims as

11   the absent class members, as the objecting class members.

12           There is a case, I think it was Home Depot, I might

13   be wrong.  It was talking about Stephenson versus Dow

14   Chemical, one of the Agent Orange cases, and you have there a

15   class of people who had already gotten sick from their

16   exposure to the product.  And they reached a settlement not

17   only on behalf of themselves but also on behalf of those

18   people for whom the illness hadn't manifested.  And they took

19   all the money for the people who were already sick and set

20   aside none for the others.

21           That's the same fact pattern as in Ortiz versus

22   Fibreboard, a Supreme Court case, and Super Spuds, the Second

23   Circuit.  This isn't that.  This isn't that.  So to find that

24   adequacy of representation is lacking, you have to find that

25   we don't possess the same claims.

Mr. Friedman

1          You know, Home Depot, if it wants to go forward, has

2     the ability to go forward and press a claim seeking

3     differential surcharging under whatever dispute resolution

4     provisions it has in its agreement, arbitration, court, it

5     doesn't matter.  That's a lesson I absorbed from Justice

6     Scalia, that these are all equal in all of these different

7     forums, it doesn't matter where.  So they can go ahead and

8     press their claim for differential discharge.  Well, so can

9     Marcus.  So can Italian Colors.  So can Animal Land.  And it's

10    not just that they have the formal legal technical ability to

11    do it.  We shouldn't have doubted that they will do it and

12    they would do it.

13         Animal Land, as I said in my opening remarks,

14    started what became MDL 1720 when it filed a case for

15    injunctive relief only again Visa in 2005.  Italian Colors.

16    Nobody should doubt the resolve of these merchants.  Nobody

17    should doubt how serious they are about controlling their

18    acceptance costs.  They've been out in front of this from day

19    one.  They're out in front of the cases that are attacking the

20    state statutes.  Those aren't money makers.

21         THE COURT:  I understand.  But it may not be as

22    important to them to give up a right in the future as it is to

23    some of the other members.

24         MR. FRIEDMAN:  I would respectfully disagree.  It

25    might not be as remunerative.

Mr. Friedman

1          THE COURT:  As remunerative?

2          MR. FRIEDMAN:  It might not be as -- it's not worth

3    as much.  I'm going to agree with you absolutely,

4    unconditionally, it is not worth as much by orders of

5    magnitude to Italian Colors Restaurant to give up the rights

6    as it is to Home Depot.  I agree with that.

7          THE COURT:  Okay.

8          MR. FRIEDMAN:  But legally where are we?  The

9    question is, is there adequacy of representation?  And there

10   is.  What these merchants have decided, each of them has the

11   same ability to go forward and seek to get their differential

12   surcharge rights, is it's not worth it.  It's better to take

13   the bird in the hand than the flock in the bush.

14         THE COURT:  But once I approve this class settlement

15   agreement --

16         MR. FRIEDMAN:  Yes.

17         THE COURT:  -- they lose the ability to negotiate

18   other aspects in the future of their relationship with

19   American Express because some of their rights have been folded

20   into the agreement.  Isn't that right?

21         MR. FRIEDMAN:  They lose their right to seek

22   differential surcharging.  And I think -- I'm just trying -- I

23   think that's what your Honor is saying.  It's -- they lose

24   their right to go into the court, into arbitration, or

25   elsewhere and say, I want the right to do unfettered

Mr. Friedman

1    differential surcharging, that's correct.  They're settling

2    for a second best, that's correct.

3            Six million merchants will get this second best and

4    there's a tremendous overstatement that's been repeated by

5    objector after objector here about the extent to which

6    differential surcharging is superior to imparity surcharging.

7    The nomenclature itself is misleading.  But the slides that I

8    put up earlier, there is a great deal of competition inside

9    the credit card industry that's going to be fomented by this

10   relief that we're calling parity surcharging.

11           THE COURT:  But they also lose other rights, they

12   lose the right to challenge the Honor All Cards provision,

13   don't they —

14           MR. FRIEDMAN:  Well, some —

15           THE COURT:  — and to challenge the MDPs, the

16   existence of the MDPs?

17           MR. FRIEDMAN:  Right.

18           THE COURT:  Which is the heart of the government's

19   case and the government might not win their case.

20           MR. FRIEDMAN:  Not one person — okay, can I take

21   those in pieces —

22           THE COURT:  Sure.

23           MR. FRIEDMAN:  — because I think they're very

24   distinct.  Not one objector has come in here and said they

25   have any interest remotely in challenging the Honor All Cards

Mr. Friedman                                    204

1    rule.  We had an Honor All Cards theory.  We prosecuted it in

2    Marcus and we –– and there's just no question in the minds of

3    anybody who ever went forward with that theory that this

4    package of relief here solves that problem.

5                THE COURT:  Let's talk about the MDPs.

6                MR. FRIEDMAN:  Okay.

7                THE COURT:  I have witness after witness in the

8    bench trial over the summer ––

9                MR. FRIEDMAN:  Right.  Right.

10               THE COURT:  –– who indicated their problems with the

11   MDPs.

12               MR. FRIEDMAN:  That's right.  So this is a really

13   unique situation.  I know of no other situation quite like it.

14   But the situation is this:  We have this trial, the United

15   States against American Express.  They joined our party in

16   2010.  We were thrilled that they did.

17               Now, in this settlement context, if they weren't

18   there could we have settled this case this way and just walked

19   away from the MDPs?  Would we have?  I don't think so.  But

20   they do exist.  And it's an understatement of the world to say

21   that this is a very able legal team.  They are bringing ––

22   they're bringing those claims.  If they win those claims, it's

23   moot.  If they lose those claims, why on earth should we think

24   that we would have done better?

25               THE COURT:  Because you have market power as a

Mr. Friedman

205

1   class, don't you?  I mean, what you're doing -- I'm just

2   playing devil's advocate here.

3               MR. FRIEDMAN:  Okay.

4               THE COURT:  What you're doing is you're

5   relinquishing to the government the negotiation or the

6   resolution of the MDP issue.

7               MR. FRIEDMAN:  Yes.

8               THE COURT:  And you're making a settlement with

9   American Express that doesn't include a resolution of the MDP

10  issue because you're relying on the government to be

11  successful.

12              THE PLAINTIFF:  Correct.  And if the government --

13  with the full understanding that if the government isn't

14  successful, we weren't going to be.  That was our judgment.

15              THE COURT:  If the government -- but if the

16  government --

17              MR. FRIEDMAN:  On MDP.

18              THE COURT:  If the government isn't successful --

19              MR. FRIEDMAN:  Right.

20              THE COURT:  -- would your agreement be fair to

21  the members of the class?

22              MR. FRIEDMAN:  If the government isn't successful,

23  if the government isn't successful, then we cut the deal of

24  the century.  Okay, if the government isn't successful, the

25  relief for the merchant class is just parity surcharging but

CHARISSE KITT, CRI, CSR, RMR, FCRR
Official Court Reporter

Mr. Friedman                                              206

1    no one was going to get anything.

2              If the government is unsuccessful in this case, they

3    have all of the advantages, their market power theory, the

4    ability -- you know, as opposed to drugstores and supermarkets

5    for whom American Express represents a very small portion of

6    their spend, the government can come in and they bring in

7    Discover and they're talking about the market, if anybody is

8    able to prevail on market power it's them.

9              Second, their case is an easier case.

10             THE COURT:  I didn't understand the point about the

11   drugstores.  What are you saying about the drugstores?

12             MR. FRIEDMAN:  My point is that there's -- I

13   think -- I don't want to take anything from Mr. Arnold and

14   Mr. Slater's case, great lawyers and good friends.

15             THE COURT:  Just tell me what your point is.

16             THE PLAINTIFF:  My point is that -- well, my point

17   is simply that they have certain challenges.  They have

18   clients for whom American Express represents a very small

19   percentage of their spending.  And a jury -- I don't know what

20   inferences the jury is going to make.

21             THE COURT:  Were you here when the chairman of

22   Walgreens came in and told us his story?

23             MR. FRIEDMAN:  Yes.

24             THE COURT:  Pretty compelling story about the power

25   of American Express in connection with insistence, wouldn't

Mr. Friedman

1    you say?

2              MR. FRIEDMAN:  I would.  So maybe that suggests that

3    all plaintiff groups should be in a position of winning here.

4    But recall the point that I was making was that our judgment

5    was that if DOJ is to not prevail on those claims, we have no

6    reason to believe that we would have prevailed on those

7    claims.  And if that's true, we're not walking away from

8    anything.

9              THE COURT:  Well, you made a big point about

10   differentiated as opposed to parity surcharging.  Right?  But

11   isn't it true that in Australia -- I know I'm opening

12   Pandora's box with Australia.  But Australia there's a lot of

13   differentiated surcharging.  That point was made by someone --

14             MR. FRIEDMAN:  Mr. Slater made that point.

15             THE COURT:  Yes.

16             MR. FRIEDMAN:  We put in compelling evidence that

17   actually suggests that the vast majority of surcharging in

18   Australia is on a parity basis.  Mr. Slater came in and they

19   put in evidence from the same source, credible also, that

20   suggests if you do the math that much less than what we were

21   saying is parity.

22             Nobody is asking your Honor to be the arbiter of

23   that.  I don't think that that's necessary.  What we do

24   know -- what we do know is absolutely undisputed is that huge

25   swaths of commerce in Australia entire industries, hotels, car

Mr. Friedman

1    rental, air, are doing parity surcharging.  And I just don't

2    understand for the life of me how we can sweep this evidence

3    under the rug.

4             Mr. Arnold came in here and said Australian evidence

5    is terribly important.  Mr. Slater is relying on Australian

6    evidence.  Their experts are relying on Australian evidence.

7    We're all looking at Australia evidence.

8             I think part of the problem, if I may stick my neck

9    out a little bit for better or for worse, is in Professor

10   Hemphill's report he placed a fair amount of reliance on the

11   work of the expert for 7-Eleven, and that was Professor

12   Hausman.  He's a very well respected economist.  And Professor

13   Hausman made some flat-out errors, and we pointed those out

14   respectfully, in response to Professor Hemphill's report.

15            Once you give due consideration to the undisputed

16   evidence you'll see that there is massive, massive parity

17   surcharging in Australia.  And if even -- even -- even any

18   percent of that represents what we're going to see here in the

19   United States -- and I think you would see more parity

20   surcharging in the United States than Australia.

21            One quick slide, the Allen chart.  You know, in

22   Australia there's a substantial premium in American Express's

23   rate over the rate of Visa and MasterCard.  So that suggests

24   that people would want to surcharge differentially and not on

25   a parity basis.

Mr. Friedman

1           The picture in the United States is very, very
2   different.  So --
3           THE COURT:  I'm sorry, which?  This is new.
4           MR. FRIEDMAN:  Well, it's only new in its electronic
5   form.
6           THE COURT:  No, it's new today.
7           MR. FRIEDMAN:  It's new today, that's right.  It's
8   in our slide.  It was in our brief.  I wasn't sure if that was
9   a joke.
10           THE COURT:  Okay, that's fine.  Well --
11           MR. FRIEDMAN:  The -- we get even -- I don't know if
12   your monitor is as fuzzy as this one.
13           THE COURT:  They're all the same.
14           MR. FRIEDMAN:  That's the point, is that you've
15   got -- is that this is the surcharging that matters in the
16   United States, it's parity.  And to the extent that you want
17   to introduce competition, if you're willing to surcharge, then
18   you can do exactly what I was talking about in my remarks here
19   this morning.  Do this parity surcharging and cut deals with
20   Discover, cut deals with American Express, cut deals with
21   MasterCard, then you get to the same place.
22           THE COURT:  Okay.
23           MR. FRIEDMAN:  So another issue, much is being made
24   of just the fact itself that all these large merchants are
25   objecting.  And I'm concerned that this fact is sort of --

Mr. Friedman

1   become sort of a factor unto itself.  And so I wanted to say a

2   couple of things about that.

3           One, Mr. Arnold stated that in 1720 all the

4   objectors that you have here, other than his group, they were

5   not objectors in 1720, but the 1720 objectors were objecting

6   in furtherance of a regulatory legislative agenda that they

7   wanted to see a capping of interchange rates, and they thought

8   that that was undermined by the 1720 settlement.

9           In objecting to the 1720 settlement, including now

10  on appeal of the Second Circuit, their top level argument is

11  that the surcharging relief we got in 1720 does us no good

12  because there's this American Express problem.  So they need

13  the AmEx problem to stay exactly where it is, as a problem so

14  that they can defeat the 1720 settlement.

15          None of these objectors in here said anything to you

16  about having any genuine interest in wanting to, oh, the

17  release harm -- nobody came in and said, the release harms me

18  because I want to sue AmEx for X, the release harms me because

19  it's going to force me to give up my right to sue AmEx for Y.

20  It's just for some unstated thing in the future.

21          And I think that's telling.  I think that's telling.

22  I think that you kind of put those facts together and you get

23  a picture that it's not that there's some genuine ground swell

24  of support against this deal, that this deal actually

25  prejudices their interest.  It doesn't.  It prejudices their

Mr. Friedman

1  ability to defeat the 1720 settlement which has been this

2  political cause celeb.

3         You asked earlier about if we had domestic

4  indications of interest in parity surcharging.  And, you know,

5  because I tend to rely on all of the overwhelming evidence

6  that we have from Australia that you asked me about

7  domestically.  So it's not going to rise to that level.

8  Obviously, we don't have the kind of data that we have from

9  Australia but just sort of anecdotally, the gas stations that

10 you engaged in colloquy with I think it was Mr. Shinder, you

11 know, gas stations that have -- whether you want call to it a

12 surcharge or whatever, you know, two prices, the dual pricing,

13 very common, we all know that.  It's all parity.  Have you

14 ever seen it vary by brand?  You have?

15        THE COURT:  Some say it's 10 cents, some say it's

16 15.

17        MR. FRIEDMAN:  No, by brand.

18        THE COURT:  By brand?

19        MR. FRIEDMAN:  Yeah.  So they'll say credit card, I

20 forget the prices today, credit card is 4.50, you know, cash,

21 whatever it is.

22        THE COURT:  You got to find a new gas station.

23        MR. FRIEDMAN:  Okay.  So whatever it is, credit card

24 price.

25        THE COURT:  What did you mean by that?  I didn't

Mr. Friedman

 1   understand what you meant.

 2           MR. FRIEDMAN:  So it's a credit card price and cash

 3   price.

 4           THE COURT:  Right.

 5           MR. FRIEDMAN:  But within credit price, have you

 6   ever see Visa price, MasterCard price, Discover price,

 7   American Express price?  I'll bet not.  Parity surcharging.

 8           THE COURT:  I see.

 9           MR. FRIEDMAN:  You see my point?

10           THE COURT:  I see your point.

11           MR. FRIEDMAN:  That's what surcharging merchants are

12   going to do.  That's what they're going to do.  This idea that

13   we need to be differential, it's not true, it doesn't happen.

14   That's not the way it works.  You know how complicated it

15   would be to do it differently by brand?  Your head would

16   spinning at the pump.

17           THE COURT:  I would surmise as a consumer it might

18   depend on the ticket price of a particular item.  If they're

19   buying a subzero refrigerator for $10,000, you can bet that a

20   savvy wealthy consumer might want to do differential ––

21   understand that there might be differential surcharging

22   because the differential surcharge could mean the difference

23   of hundreds and hundreds of dollars.

24           MR. FRIEDMAN:  I totally get that.

25           THE COURT:  I'm just saying.

Mr. Friedman

```
 1              MR. FRIEDMAN:  I share ––
 2              THE COURT:  Over gasoline it's a different story.
 3              MR. FRIEDMAN:  So ex ante I would share that's
 4    surmise.  As a matter of evidence, high ticket is exactly
 5    where we see parity surcharging in Australia.  And I told you
 6    it's literally undisputed fact that all of the hotels are
 7    doing parity surcharging, all the airlines, not all, virtually
 8    all.  It's in our papers.  That's literally undisputed.
 9              THE COURT:  Okay.
10              MR. FRIEDMAN:  In the United States, livery, you
11    know the example that I give earlier ––
12              THE COURT:  Livery?
13              MR. FRIEDMAN:  Livery, you know, car services.
14              THE COURT:  Yeah.
15              MR. FRIEDMAN:  So they're very often surcharging in
16    the US, parity.  They don't do it differently by brand.  I
17    mentioned the anecdotal example the other day.  You come into
18    Newark airport, it's 5.50 extra.  Not by brand.
19              But government official payments testified in this
20    case.  They do, I call it surcharging, they call it
21    convenience fees.  Whatever.  But it's not different prices
22    for different brands.
23              THE COURT:  Well, it was.  They have two different
24    product lines.  One is a parity surcharge, because they got
25    AmEx, according to the testimony, to lower its discount rate.
```

Mr. Friedman

1    And the other one they identified the online that if you use

2    your American Express card it costs you a different price --

3              THE PLAINTIFF:  Right.

4              THE COURT:  -- as a surcharger.

5              MR. FRIEDMAN:  Okay.  But --

6              THE COURT:  I'm just saying --

7              MR. FRIEDMAN:  Okay, I got you.

8              THE COURT:  -- this is what happened.

9              MR. FRIEDMAN:  DMVs, parking violation bureaus,

10   college tuition, all the people who are doing convenience fees

11   around the country, it's parity, parity, parity.  So in terms

12   of domestic.  And the illegal surcharges.  As you know, we've

13   been leading those -- you may know.  We've been leading those

14   cases challenging the state, anti-surcharging statutes,

15   including the one for Judge Rakoff here in New York.

16             And the Florida AG, for example, has a file on

17   people who have surcharged.  They send cease and desist

18   letters.  We got that from Florida request.  We included that

19   evidence in our moving papers.  Those are parity surcharges.

20   Those are the surcharges that people are doing.  They're

21   illegal, but it tells you it's parity surcharging.

22             Mr. Slater and Mr. Arnold couldn't be more powerful

23   in coming in here and telling you surcharging matters, people

24   are going to surcharge, this tool matters.  I agree with them

25   it matters.

Mr. Friedman

1        So the question becomes, are we talking about parity
2   surcharging or differential surcharging?  All the evidence --
3   it's not all the evidence.  Most of the evidence is on my side
4   of this one.  Mr. Slater, I give him credit on some of the
5   Australian evidence that he mentioned before, I promise not to
6   drag your Honor into.
7        Mr. Korologous --
8        THE COURT:  They're saying that the marketplace
9   should decide and you're saying you and American Express
10  should decide.
11       MR. FRIEDMAN:  Well --
12       THE COURT:  I mean, that's --
13       MR. FRIEDMAN:  Neither of us have the option to say
14  that the marketplace should decide.  If this is the only
15  option for 6 million merchants, that's the problem, that's the
16  problem.  It would be easier if that weren't the case.
17       THE COURT:  I'm only playing devil's advocate here.
18       MR. FRIEDMAN:  I know.
19       THE COURT:  I haven't reached any conclusions but
20  I'm trying to bring out all of these considerations so that I
21  have a better understanding of where everybody is.
22       MR. FRIEDMAN:  Right.  If there was any suggestion
23  about how the 6 million merchants could get relief with
24  whichever flavor, parity or differential, other than the
25  settlement, we would have heard of it.  It ain't there.  So

216

Mr. Friedman

1    it's this or nothing for 6 million merchants and those guys

2    want a little bit more for themselves.  I don't begrudge them

3    that, but that's the story.

4            THE COURT:  Do you think 6 million merchants even

5    know what's going on?

6            MR. CANTER:  No, but do you think that -- I don't

7    know how many merchants there are in Australia, but do you

8    think they knew at the beginning?  They didn't know either.

9    And then it happened.  It happened.  It started from nothing.

10   We know that they -- oh, surcharging is never going to get

11   hold -- take hold, and now it's undisputed that 40 percent of

12   Australian merchants are surcharging.  By the way, that's one

13   of the facts that Professor Hemphill, with all respect, got a

14   little bit wrong based on Professor Hausman's misreading of

15   the evidence, which well --

16           THE COURT:  You've pointed that out.

17           MR. FRIEDMAN:  Pardon?

18           THE COURT:  You've pointed that out.

19           MR. FRIEDMAN:  Yeah, but I just wanted to tell you

20   that that's the place where it goes.

21           THE COURT:  What other points would you like to

22   make?

23           MR. FRIEDMAN:  Okay, Mr. Korologous stole my thunder

24   on cohesiveness.

25           THE COURT:  That's fine.

Mr. Friedman

1          MR. FRIEDMAN:  I want to talk about arbitration

2    really quickly, because counsel for the NRF was here and said

3    that it's very important that the NRF have its right to pursue

4    its ability to go into arbitration, that it values this right,

5    wants the ability to go pursue its right in arbitration.  I

6    want to read to you what the NRF and its lawyers wrote to the

7    Supreme Court as an amicus brief.  Just real quick, it's two

8    lines.

9          THE COURT:  From which case?

10          MR. FRIEDMAN:  My case.

11          THE COURT:  Nice.

12          MR. FRIEDMAN:  Sorry.

13          THE COURT:  Which time?

14          MR. FRIEDMAN:  Oh, which time at the Supreme Court?

15    The merits time, the bad one.  The last time.

16          THE COURT:  The last time?

17          MR. FRIEDMAN:  Yeah.  Yeah.

18          THE COURT:  Go ahead.

19          MR. FRIEDMAN:  Meaningful relief requires an

20    injunction on behalf of large groups of merchants.  How do

21    you -- I don't know how you square that with what NRF was in

22    here saying today.

23          Meaningful relief requires an injunction on behalf

24    of large groups of merchants.  And then they go on and they

25    say, the American Express agreement, quote, explicitly

Mr. Friedman

1    precludes a merchant from seeking in arbitration any relief on

2    behalf of any other merchant.  And so they say it totally

3    precludes the possibility of meaningful relief.  So what

4    they're arguing for here is, please let us go pursue

5    meaningless relief.

6           I want to just touch on something Mr. Korologous did

7    and then I think I'm done, and that is the argument that from

8    all these dispute resolution clauses that you saw, the big

9    chart, according to, it was Mr. Canter, many of these

10   merchants have a right, a contractual right to be free of

11   class actions.

12          We bargained for the ability to get out of a class

13   action, they say.  That's fine.  The Shady Grove case that

14   Mr. Korologous mentioned, here is what that case was really

15   about.  That case said there was a New York State statute that

16   gave the defendant a right to be free of class actions in a

17   troubled damage case.  Don't you remember it came out -- it

18   was in CPLR, that you have the right to be free of class

19   actions.

20          And the argument, it went up to the Supreme Court,

21   was the defendant saying hey, we have a right, state law right

22   to be free of class actions.  And the application of Rule 23

23   to this in the federal court, that violates the Rules Enabling

24   Act because that's a substantive right.  Scalia said, no, it's

25   not.  Justice Scalia said, no, it's not.  No, it's not.

Mr. Friedman

1  That's just Rule 23 doing its procedural thing being Rule 23.

2       And the fact that it might affect substantive

3  interests as in the Sibbach case that Mr. Korologous talked

4  about, that's of no moment, that's true in every case.  And if

5  they're right on the Rules Enabling Act, then Rule 23(b)(2) is

6  a walking Rules Enabling Act violation, because in every

7  mandatory class settlement people's substantive rights were

8  foreclosed.  You can't -- I couldn't think of one in which

9  that wouldn't be the case.

10      So that's all I've got.

11      THE COURT:  Thank you.

12      MR. FRIEDMAN:  Thank you.

13      THE COURT:  Now, there are have been a number of

14  exhibits that have been offered here today and I need to give

15  them numbers so that the record is clear.

16      MR. FRIEDMAN:  Oh, I'm sorry, your Honor, I don't

17  know, did we hand up our slides.  We neglected to hand up our

18  slides, so may I approach?

19      THE COURT:  Sure.

20      All right, I'm going to number them.  Court's

21  Exhibit No. 1 is the class plaintiffs' presentation which I

22  was going to ask for hard copy on but I now have a hard copy.

23      Court's Exhibit No. 2 is the Target Objectors, the

24  NRF's presentation provided by Mr. Canter.

25      Court's Exhibit No. 3 is the individual merchant

Mr. Friedman

1   plaintiffs' presentation provided by Mr. Arnold.

2           Court's Exhibit No. 4 is chart entitled quote,

3   Acceptance of AmEx at the top 100 retailers by 2011 US sales

4   which was presented by counsel for Southwest Airlines,

5   Mr. Slater.

6           Court's Exhibit No. 5 was a document entitled

7   Merchant Surcharging Australia, end quote, and dated

8   March 2007, which was also presented by Mr. Slater.

9           Court's Exhibit No. 6 is excerpts from the testimony

10  of Mr. Quagliata from the bench trial in the government's case

11  against American Express, which similarly was presented by

12  Mr. Slater.

13          I think that covers it.

14          (Court Exhibits 1 through 6 received in evidence.)

15          THE COURT:  Anything else that I've missed?  I don't

16  think so.  Okay.

17          With regard to confidential sealed material, to the

18  extent that any exhibit provided to the Court includes

19  information that must remain confidential under the protective

20  order in this case, the party who proffered the document

21  should provide the court with a copy suitable for public

22  dissemination by this Friday, the confidential versions will

23  be filed under seal for the purposes of completing the record

24  of today's hearing.

25          Okay, is there anything further from the proponents?

CHARISSE KITT, CRI, CSR, RMR, FCRR
Official Court Reporter

Mr. Friedman                                                    221

1              MR. FRIEDMAN:  No, your Honor.

2              MR. KOROLOGOUS:  No, your Honor.

3              THE COURT:  Anything further from the objectors that

4    hasn't been said three or six times?

5              MR. FRIEDMAN:  No, your Honor.

6              THE COURT:  Okay, thank you everyone.

7              (Adjourned.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Mr. Friedman

1                        **I N D E X**

2    **SPEAKERS:**                              **PAGE**

3    MR. FRIEDMAN ....................................6
     MR. KOROLOGOUS .................................31
4    MR. CANTER .....................................44
     MR. SHINDER ....................................64
5    MR. ARNOLD .....................................81
     MR. FEINBERG .................................111
6    MR. SCHULMAN .................................119
     MR. PENTZ ....................................131
7    MR. LOWREY ...................................135
     MR. SLATER ...................................148
8    MR. SCHWARTZ .................................162
     MR. KOROLOGOUS ...............................170
9    MR. FRIEDMAN .................................197

10

11

12   **COURT'S EXHIBITS MARKED IN EVIDENCE**

13   1 through 6 ..................................220

14

15

16

17

18

19

20

21

22

23

24

25

**$**

$1 [1] 89/18
$10,000 [1] 212/19
$5.50 [2] 23/10 23/11
$600 [1] 129/4
$600 million [1] 129/4
$75 [6] 33/24 34/5 50/13 123/9 129/10 160/19
$75 billion [1] 50/13
$75 million [5] 33/24 34/5 123/9 129/10 160/19

**-**

----------------------------------------x [2] 1/2 1/5
----------------------------------------x [1] 1/10

**0**

01776 [1] 3/4

**1**

1 billion [1] 50/14
1 percent [1] 153/24
1,000 [2] 77/13 77/14
10 [4] 60/14 69/17 70/17 211/15
100 [1] 220/3
100 percent [4] 99/13 123/14 134/20 134/21
10012 [1] 1/18
10017 [2] 2/9 4/3
10019-7475 [1] 3/14
10022 [1] 1/22
10:00 [1] 1/11
11-MD-02221-NGG-RER [1] 1/4
11-MD-2221 [1] 5/17
11201 [1] 4/14
11th Circuit [1] 56/11
1201 [1] 3/8
13 percent [1] 21/19
13-CV-07355-NGG-RER [1] 1/7
13-CV-7355 [1] 5/19
1410 [1] 1/18
15 [5] 32/4 32/8 70/17 163/9 211/16
17 [1] 1/10
1700 [1] 4/3
1713 [1] 125/12
1720 [26] 34/24 35/3 35/7 35/9 45/7 45/8 66/10 66/18 170/17 180/12 180/18 180/24 182/9 183/19 186/22 187/1 189/11 201/14 210/3 210/5 210/5 210/8 210/9 210/11 210/14 211/1
1720 at [1] 181/15
175 [1] 42/23
18 [4] 44/11 61/18 61/18 124/23
181 [1] 142/8
19 [2] 3/4 152/9
1941 [1] 171/16
1977 [1] 145/6
1985 [1] 67/8
199 [1] 142/8
1990s [1] 136/9

**2**

2 percent [9] 13/18 18/1 18/15 21/7 21/11 80/19 95/14 99/19 114/14
2.1 percent [1] 153/24
20 [5] 31/5 67/10 81/25 136/15 152/9
20 percent [4] 114/8 114/15 171/25 179/10
20004 [1] 4/7
20005-5701 [1] 2/14
2003 [1] 160/23
2005 [1] 201/15
2006 [1] 198/25
2007 [2] 153/11 220/8

**2009** [1] 154/19
**2010** [2] 154/21 204/16
**2011** [3] 127/11 152/9 220/3
**2012** [1] 154/21
**2013** [3] 152/6 182/11 185/14
**2014** [2] 1/10 115/22
**2015** [1] 181/12
**213** [1] 185/15
**2221** [2] 5/17 163/25
**225** [1] 4/13
**23** [51] 35/19 36/2 37/2 39/17 41/3 42/3 43/14 44/21 44/21 45/2 45/4 46/7 46/16 46/18 47/12 47/12 47/17 47/19 59/3 62/10 118/23 118/24 119/1 119/21 121/17 128/8 128/16 128/19 131/25 143/2 164/13 164/19 165/18 166/11 170/16 170/18 171/1 171/10 171/14 173/11 174/21 176/4 180/6 184/6 184/6 189/6 189/18 218/22 219/1 219/1 219/5
**25** [1] 50/13
**2606** [1] 4/14
**2696** [1] 4/14
**27** [1] 152/11
**270** [1] 1/17
**28** [3] 125/12 162/20 164/14
**2:30** [2] 110/14 111/2
**2d** [1] 142/8

**3**

30309 [1] 3/9
3300 [1] 3/19
335 [1] 2/9
34 [1] 144/19
35 [1] 43/20
350 [1] 42/22
3900 [1] 3/9

**4**

4 billion [1] 183/2
4 million [2] 42/19 183/3
4.50 [1] 211/20
40 [1] 92/2
40 percent [1] 216/11
41 [1] 143/11
42 [1] 71/7
43215 [1] 2/4
44 [1] 144/22

**5**

5 percent [1] 80/19
5.50 [1] 213/18
50 [2] 158/15 158/18
50 percent [1] 134/25
500 [2] 29/2 130/4
516 [4] 162/20 164/14 166/16 167/4
519 [4] 162/20 164/15 166/16 167/4
52 [1] 2/4
55 [1] 3/19
555 [1] 4/3
5701 [1] 2/14
575 [1] 1/21

**6**

6 million [13] 6/24 12/21 12/25 30/17 30/17 42/20 138/3 139/3 175/3 215/15 215/23 216/1 216/4
60 [1] 6/1
601 [1] 4/7
60603 [1] 3/20
613-2606 [1] 4/14
613-2696 [1] 4/14
655 [1] 2/14
68 [1] 186/25

**7**

7,000 [1] 77/13

**7-Eleven** [7] 2/7 14/23 44/17 64/2 64/9 72/23 208/4
**70** [1] 145/23
**718** [2] 4/14 4/14
**7355** [1] 5/19
**7475** [1] 3/14
**75 million** [2] 134/6 134/10
**75 million-dollar** [3] 127/18 129/1 129/2

**8**

8 million [1] 198/22
80 [2] 145/23 145/24
80 percent [4] 114/5 114/23 114/25 117/17
800-pound [1] 52/23
825 [1] 3/13
85th Street [1] 40/15

**9**

90 [1] 43/17
900 [1] 2/14
9537 [1] 4/7
98 [2] 89/16 89/17
991 [1] 142/8
9th [1] 2/9

**A**

A's [1] 21/9
A.M [1] 1/11
abandoned [1] 130/15
abides [1] 124/3
ability [46] 8/5 12/22 23/19 29/18 30/1 32/14 34/20 35/17 37/7 38/5 38/22 38/23 38/24 39/16 74/23 76/10 76/15 78/7 86/17 86/17 86/18 93/6 108/24 115/17 128/24 136/25 150/12 154/17 160/16 161/13 176/4 176/14 179/6 183/18 187/18 192/18 193/11 201/2 201/10 202/11 202/17 206/4 211/1 217/4 217/5 218/12
able [33] 7/7 16/11 22/23 34/19 38/20 50/25 56/16 56/19 77/7 86/24 89/1 91/4 98/24 126/12 126/14 136/19 145/16 154/13 160/6 167/1 168/11 171/6 172/10 172/15 178/3 178/5 179/4 182/17 184/23 185/25 188/11 204/21 206/8
about [170] 10/13 10/15 10/18 15/12 16/22 16/24 18/12 18/15 18/25 19/8 20/7 20/23 21/16 22/12 22/22 28/8 28/20 29/5 29/6 30/3 31/14 35/12 35/23 36/7 39/1 39/9 40/1 42/15 42/22 42/23 50/10 52/10 52/12 55/8 55/8 55/23 57/4 59/10 60/2 62/4 63/6 64/23 67/5 68/4 68/6 69/10 70/3 72/9 72/10 72/18 73/24 75/9 76/8 78/16 79/12 79/13 79/16 79/18 80/20 80/22 81/5 82/3 82/12 83/1 83/4 83/19 85/4 88/9 88/16 90/8 92/6 92/23 92/24 93/6 93/13 94/8 94/11 95/20 96/11 97/2 98/8 98/21 98/21 99/11 99/15 99/25 100/21 102/12 103/14 103/16 103/17 104/11 105/8 109/23 109/23 110/1 110/1 110/2 111/16 111/25 112/11 113/14 114/12 115/2 116/8 116/22 117/1 118/9 118/10 120/11 125/24 126/3 126/19 136/10 138/2 138/19 138/20 140/14 141/19 142/12 142/24 143/24 143/25 144/3 144/25 145/22 147/21 149/15 150/20 150/22 158/6 174/17 174/24 175/20 180/13 181/1 181/20 182/24 183/4 183/12 184/1 184/2 184/8 185/1 185/8 185/16 186/4 193/5 198/7 199/7 199/20 200/13 201/17 203/5 204/5 206/7 206/10 206/11 206/24 207/9 209/18 210/2 210/16 211/3 211/6 215/1 215/23 217/1 218/15 219/4
above [2] 117/16 125/21
abridge [1] 45/3
absent [18] 46/11 46/18 46/23 47/4 47/7 47/13 54/13 60/2 84/21 120/11 124/12 124/16

**A**

absent... [6] 127/15 127/17 129/6 132/2
175/8 200/11
absolute [1] 42/17
absolutely [10] 25/15 52/14 53/7 109/13
141/6 143/17 147/22 157/3 202/3 207/24
absorb [2] 25/21 126/12
absorbed [1] 201/5
absurd [2] 142/13 166/22
absurdity [1] 89/18
accept [18] 53/18 106/14 116/14 121/13
121/14 168/9 174/7 182/16 184/9 184/9
189/15 190/13 195/15 195/23 196/3 196/12
196/13 196/22
acceptance [2] 6/15 6/25 10/25 176/11
184/11 197/22 201/18 220/3
accepted [5] 97/17 184/12 184/15 196/2
197/3
accepting [8] 40/9 60/12 68/6 88/14 106/12
115/5 116/2 121/25
accepts [2] 26/7 196/6
accordance [1] 5/20
according [7] 42/11 43/21 134/16 159/24
193/1 213/25 218/9
account [5] 14/15 15/20 23/1 179/24 195/14
accountable [1] 100/16
accounting [1] 26/20
accrue [1] 132/25
accrued [2] 19/24 132/23
accurate [1] 104/14
accurately [1] 45/15
accused [1] 102/15
achieve [4] 33/5 37/14 177/10 177/17
achieved [4] 134/14 134/20 134/24 143/4
achieving [1] 134/22 134/23
acknowledge [2] 142/21 144/6
acknowledges [1] 160/6
across [17] 11/12 26/19 30/1 35/5 35/16
36/18 36/23 40/22 48/18 55/3 67/16 68/22
69/1 111/18 111/21 116/23 130/14
act [35] 31/13 45/2 45/2 46/9 51/24 51/25
112/15 112/16 113/24 113/25 114/24 115/6
120/25 124/16 125/11 130/10 156/17 156/20
157/3 165/18 165/19 165/23 166/7 167/23
170/19 171/13 171/15 172/8 173/10 178/9
187/10 188/21 218/24 219/5 219/6
acted [2] 130/21 170/19
action [27] 2/19 26/13 45/18 50/24 61/6
124/12 125/11 127/7 127/10 128/13 134/2
134/8 139/9 162/9 163/24 164/21 166/8
166/13 167/1 167/19 167/24 167/25 168/2
168/5 168/6 173/1 218/13
actions [7] 167/10 175/1 178/4 218/11
218/16 218/19 218/22
activity [2] 86/11 155/17
actual [3] 48/18 95/22 144/24
actually [37] 8/13 15/11 18/20 19/10 30/10
46/14 48/17 50/8 55/25 58/19 59/13 61/19
64/18 66/2 69/8 78/15 85/6 85/9 85/12 99/4
99/24 102/14 102/18 102/19 103/5 103/8
107/2 109/16 116/4 120/3 138/8 180/14
181/25 186/12 199/24 207/17 210/24
ad [1] 24/25
ADAM [6] 2/15 2/20 4/8 111/12 119/11
162/4
add [5] 38/11 79/10 81/4 147/6 179/14
added [2] 87/4 88/13
addendum [1] 153/17
addition [4] 46/19 113/25 177/16 198/3
additional [4] 70/17 94/15 177/21 186/20
address [20] 10/17 36/1 56/17 68/1 71/2
73/13 74/4 75/14 76/4 119/19 140/13 142/25
145/2 145/3 149/12 170/14 173/20 174/22

181/23 190/19
addressed [6] 58/20 119/13 159/16 178/14
178/15 187/6
addresses [1] 58/21
addressing [1] 185/17
adds [1] 126/1
adequacy [1] 119/16 137/9 137/12 137/23
197/19 197/20 199/17 199/20 200/8 200/24
202/9
adequate [9] 46/22 118/25 132/2 139/25
153/3 155/22 180/7 200/2 200/2
adequately [5] 173/3 175/7 180/2 191/21
198/21
adhere [1] 125/25
adherence [1] 125/21
Adjourned [1] 221/7
adjudicate [1] 19/20
adjustment [1] 102/13
adjustments [1] 66/25
administering [1] 171/21
administrative [2] 114/9 114/16
admission [2] 59/8 74/8
admit [3] 97/11 139/19 142/23
admitted [3] 83/17 95/25 102/23
adopt [1] 14/13
ADR [7] 47/14 47/23 48/5 48/7 48/9 50/19
51/1
advanced [1] 156/22
advancement [2] 43/10 91/5
advantage [4] 56/17 57/15 107/12 183/18
advantages [1] 206/3
adversarial [1] 55/2
adverted [1] 204/17
advertise [2] 18/16 80/16
advertising [1] 26/23
advisory [3] 42/3 128/18 166/10
advocate [3] 130/19 205/2 215/17
advocating [1] 124/7
affect [6] 37/7 41/5 52/5 52/7 86/11 219/2
affected [2] 41/16 41/16
affects [2] 55/7 97/3
affidavit [1] 33/18
affiliate [1] 111/14
affirmatively [1] 77/25
afford [2] 130/3 140/25 141/2
Affordable [6] 112/14 112/16 113/24 113/25
114/24 115/6
affording [1] 18/8
afoot [1] 9/17
afoul [1] 23/14
afraid [5] 64/13 65/8 66/9 79/14 102/7
after [22] 26/20 32/3 35/3 45/13 52/21 74/11
74/14 74/20 76/7 81/24 86/5 86/7 104/6
104/25 124/2 133/12 134/17 154/12 164/7
181/2 203/5 204/7
afternoon [13] 41/20 64/6 64/7 111/12 119/9
119/10 131/15 148/6 148/7 148/9 148/22
148/23 170/4
afterwards [1] 157/7
AG [1] 214/16
again [39] 5/14 27/10 28/14 38/19 41/23
42/21 43/3 49/21 60/10 68/18 72/16 81/5
94/17 98/16 98/20 133/2 133/7 153/9 154/10
154/21 156/20 159/5 160/4 170/15 174/2
174/23 175/14 176/23 176/25 177/11 180/4
180/6 182/25 184/12 184/13 184/14 188/22
188/24 201/15
against [24] 6/13 32/5 36/22 47/1 65/8 65/18
66/8 68/15 76/1 76/15 76/18 103/9 139/14
159/1 159/14 159/21 160/14 168/9 178/22
184/4 184/20 204/15 210/24 220/11
agencies [1] 165/11
agency [3] 131/21 166/24 187/10
agenda [1] 210/6

Agent [1] 200/14
aggressive [1] 33/11
ago [7] 6/12 7/7 13/5 46/21 55/21 88/25
150/11
agree [26] 49/8 51/8 61/5 65/6 66/1 67/24
71/23 71/24 91/16 91/20 102/7 103/25 105/19
117/7 121/24 130/9 133/22 134/5 155/3
162/24 188/10 193/17 196/22 202/3 202/6
214/24
agreed [9] 34/5 34/5 52/16 66/7 88/2 100/23
134/6 171/5 192/4
agreement [60] 5/16 5/22 6/23 10/21 17/16
18/10 19/25 24/23 25/25 26/18 30/22 33/23
36/15 49/8 49/12 50/17 51/6 51/7 51/11 51/20
52/5 53/5 60/14 60/22 65/25 67/12 77/6 113/8
121/1 124/5 124/9 124/14 124/23 125/22
126/1 126/18 126/22 127/6 127/7 135/20
137/21 140/4 174/13 174/16 179/2 179/5
186/25 192/11 192/15 194/6 194/12 194/23
195/10 195/11 195/18 201/4 202/15 202/20
205/20 217/25
agreements [13] 19/21 36/20 36/20 37/14
47/21 50/18 51/21 61/17 125/17 140/3 176/11
176/18 195/2
agrees [8] 11/11 88/22 90/5 90/6 101/1 101/2
133/16 181/10
ahead [26] 10/8 12/19 24/12 29/3 53/11
56/13 71/1 75/21 80/12 86/4 88/2 88/19 91/19
99/7 100/22 103/23 126/17 143/13 146/14
149/7 157/14 157/15 166/5 170/10 201/7
217/18
Aid [2] 9/20 152/20
ain't [1] 215/25
air [1] 208/1
airline [11] 21/6 21/7 21/8 21/9 21/11 21/12
21/16 22/1 22/3 22/4 22/4 22/6 22/7 27/15
27/17 89/5 89/5
airlines [13] 3/17 3/17 13/23 27/14 27/15
148/21 148/24 150/15 150/18 150/18 151/7
213/7 220/4
airport [3] 15/12 23/10 213/18
Airtran [1] 3/17
Airways [1] 3/17
al [2] 1/9 148/21
Alaska [1] 3/17
all [246]
alleged [1] 190/13
allegedly [3] 179/9 193/9 194/8
Allen [1] 208/21
alleviated [1] 160/2
allocated [1] 43/20
allotted [2] 6/1 6/3 6/4
allow [14] 11/11 29/16 58/1 74/20 79/17 85/7
107/22 124/9 124/15 139/13 174/13 182/1
187/18 194/14
allowed [8] 38/13 57/24 85/25 114/8 120/15
146/2 146/4 151/6
allowing [8] 34/15 43/17 58/4 73/23 77/15
142/12 144/1 184/8
allows [3] 10/22 36/21 165/20
allusion [1] 108/9
allying [1] 54/25
Almon [1] 109/25
almost [6] 36/4 71/16 73/5 107/5 109/22
111/21
alone [2] 30/14 73/1
along [2] 40/24 140/1
already [19] 31/3 44/13 45/16 48/3 55/7
59/13 79/24 80/15 94/19 118/20 132/23
132/24 138/21 149/9 150/4 157/22 194/8
200/15 200/19
also [43] 6/20 7/3 15/6 18/5 23/7 32/11 34/22
37/3 37/13 38/15 47/20 51/25 62/6 66/11 82/6
84/4 99/11 107/12 111/23 113/3 118/23 129/1

**A**

also... [21] 150/19 154/18 140/11 143/17
145/7 147/14 148/24 153/8 156/18 163/17
174/10 177/24 184/12 184/25 186/3 196/19
198/16 200/17 203/11 207/19 220/8
alter [1] 66/6
altered [1] 65/23
alternative [6] 28/10 28/11 47/14 54/5 139/8
139/10
always [3] 125/18 175/4 185/20
am [2] 92/24 162/7
amazing [2] 138/3 138/8
Amazon [4] 17/1 72/22 73/1 152/17
Amchem [2] 54/10 122/17
ameliorates [1] 19/13
amend [1] 123/17
Amendment [3] 109/10 109/13 109/14
America [18] 4/5 11/23 36/11 42/8 91/2
96/25 97/24 99/14 101/16 104/6 150/19
151/24 152/3 152/19 152/21 152/24 162/3
179/15
AMERICAN [207] 1/3 1/9 3/12 5/8 5/16
5/18 6/13 10/25 11/10 19/22 23/21 25/25 26/3
26/4 26/7 26/25 27/2 29/14 29/17 29/25 32/1
32/5 32/17 33/23 34/23 35/3 35/4 35/7 36/8
36/13 36/21 36/21 38/10 39/21 40/4 40/9
40/14 40/19 40/22 45/17 46/15 47/15 47/1 48/17
50/14 51/12 52/14 53/5 58/14 59/23 60/4
61/17 64/11 64/24 65/3 66/6 66/24 74/4 74/7
74/11 75/2 78/25 79/14 79/22 82/4 82/6 84/6
84/8 84/18 84/25 85/3 85/10 88/25 89/24 90/4
90/6 90/13 91/12 91/17 91/24 92/19 95/3
95/18 95/24 96/1 96/17 97/3 98/2 98/5 98/19
100/7 100/24 101/1 101/2 101/3 101/8 101/11
102/5 103/5 104/3 104/17 104/22 105/1
105/16 106/9 106/12 106/13 107/12 107/16
107/22 112/3 114/11 116/4 116/7 116/15
116/24 118/16 123/16 124/3 124/7 124/8
125/8 125/14 125/16 125/25 126/20 131/4
132/7 134/6 135/16 137/2 137/5 138/4 138/6
138/22 139/14 140/4 140/11 150/12 150/14
151/17 152/16 158/12 160/8 160/17 163/3
164/7 164/10 166/15 170/13 170/23 174/7
174/12 176/18 177/18 177/19 177/25 178/4
182/1 182/2 182/3 182/4 182/16 182/20 183/3
183/20 185/12 186/8 186/9 187/7 189/15
190/6 192/4 192/17 193/9 193/11 194/10
194/19 194/21 195/7 195/10 195/19 196/3
196/7 196/8 196/12 196/13 196/14 196/16
196/21 196/25 197/3 197/11 199/11 202/19
204/15 205/9 206/5 206/18 206/25 208/22
209/20 210/12 212/7 214/2 215/9 217/25
220/11
American Express [1] 107/16
Americans [1] 111/25
AmEx [53] 5/24 6/20 7/23 16/10 27/15 32/10
34/17 45/13 45/19 45/20 46/4 47/16 47/21
47/25 48/3 48/24 49/2 50/7 52/8 52/10 57/16
59/7 59/21 60/10 60/12 60/15 79/17 121/13
149/16 149/23 150/2 150/15 150/17 153/20
153/21 154/5 154/13 154/16 154/22 155/3
159/8 185/17 185/21 185/23 192/11 192/20
192/24 196/6 210/13 210/18 210/19 213/25
220/3
AmEx's [2] 50/20 153/24
amicus [1] 217/7
among [5] 41/11 175/5 175/15 182/16 183/17
amongst [3] 7/16 73/12 112/16
amount [12] 10/23 26/19 34/6 61/20 78/20
107/4 127/22 127/23 149/8 159/5 194/20
208/10
amounted [1] 156/15
analogous [1] 188/14

analogy [1] 129/25
analysis [6] 28/11 37/3 42/1 73/10 137/24
153/17
analyzed [1] 101/17
anecdotal [1] 213/17
anecdotally [1] 211/9
Angeles [1] 175/25
Animal [3] 198/8 201/9 201/13
Annamarie [1] 3/2
annex [2] 139/3 175/2
announce [1] 37/18
announced [1] 183/13
annually [1] 50/13
another [21] 9/15 13/20 14/21 21/6 23/5 39/1
68/22 74/17 74/22 107/13 107/13 122/5
123/22 125/13 126/21 132/13 164/16 165/15
184/4 192/19 209/23
answer [26] 14/2 23/6 35/11 50/25 72/6
81/15 82/11 93/19 98/23 107/8 108/1 109/1
135/11 137/19 138/7 139/14 139/16 141/24
147/3 157/6 157/9 165/9 174/20 184/23 193/8
200/6
answered [1] 58/25
answers [3] 35/10 148/1 191/4
ante [1] 213/3
anti [5] 1/3 5/17 73/20 192/13 214/14
anti-steering [3] 1/3 5/17 73/20
anti-surcharging [2] 192/13 214/14
anticompetitive [6] 64/16 72/4 77/23 96/7
97/9 135/22
antiquated [1] 89/7
antisteering [5] 149/16 149/17 149/24 150/8
151/8
antitrust [26] 1/4 5/17 6/14 36/25 72/5 78/12
83/3 83/9 83/11 84/17 84/19 92/2 97/1 100/9
108/7 108/10 109/3 119/19 124/2 125/7 134/2
144/2 146/24 147/10 151/5 168/5
any [115] 7/25 10/23 11/13 12/12 13/9 13/16
22/21 29/6 30/16 33/10 34/13 35/1 35/9 39/20
40/5 45/23 45/25 51/21 57/4 57/14 61/4 68/1
69/15 69/19 69/22 69/25 71/10 71/17 78/13
80/22 81/16 82/10 85/6 85/8 85/8 85/11 89/6
90/2 92/9 93/17 94/10 94/20 96/25 98/1
100/20 101/22 108/1 109/9 109/10 114/21
115/18 115/25 116/20 116/25 117/5 117/9
118/2 119/3 120/7 121/2 124/22 125/21
125/21 125/23 127/1 129/8 129/23 130/13
131/19 137/4 137/9 137/10 138/23 141/25
142/11 147/14 147/21 147/23 147/24 148/4
153/1 155/18 155/20 155/21 158/13 164/19
165/2 167/2 167/16 167/12 167/14 172/12
174/13 177/24 177/25 178/10 182/12 185/8
187/10 187/22 188/24 192/8 192/8 196/2
196/3 197/7 198/19 203/25 208/17 210/16
215/19 215/22 218/1 218/2 220/18
anybody [6] 19/9 95/14 177/22 191/10 204/3
206/7
anybody's [1] 90/15
anyone [5] 132/11 136/15 138/17 140/21
169/1
anything [27] 6/5 17/10 27/1 27/3 56/10
72/18 74/7 79/9 86/15 94/10 108/10 117/11
117/24 118/3 118/10 126/19 128/14 149/3
181/20 187/17 206/1 206/13 207/8 210/15
220/15 220/25 221/3
anyway [4] 145/3 145/5 146/11 191/5
anywhere [2] 14/17 182/6
apart [1] 120/14
apologize [3] 93/12 105/9 161/24
app [1] 11/24
apparent [1] 76/20
apparently [2] 170/14 186/6
appeal [10] 28/25 77/4 78/2 78/3 78/5 78/6
82/4 82/6 180/25 210/10

appealable [2] 12/15 12/15
appeals [4] 12/14 82/8 105/18 117/22
appear [4] 18/17 18/18 130/1 187/13
appearance [3] 5/14 43/24 101/17
appearances [1] 5/3
appellate [5] 12/16 12/24 28/13 77/12 193/13
appetite [2] 72/14 72/19
applicable [3] 20/17 20/17 174/2
application [7] 31/18 43/3 149/24 151/14
173/11 180/6 218/22
applications [1] 23/22
applied [2] 149/17 153/19
applies [8] 12/10 35/19 36/25 115/1 128/12
171/2 171/11 182/23
apply [16] 22/18 24/7 33/6 36/18 41/17 43/5
62/24 62/25 78/20 129/12 135/18 150/8 153/9
170/19 174/5 186/17
applying [1] 34/10
appoint [1] 107/3
appreciate [3] 39/5 110/12 147/25
appreciation [1] 26/9
apprised [2] 164/6 167/11
approach [3] 134/5 192/14 219/18
appropriate [12] 93/25 122/6 122/9 129/16
130/1 130/6 130/23 134/23 143/4 147/8
170/20 180/10
appropriately [2] 173/22 177/10
approvable [2] 35/21 39/11
approval [13] 5/22 33/9 34/23 53/23 83/6
142/23 142/24 151/22 159/2 159/14 159/21
170/16 185/12
approve [9] 43/14 67/15 77/18 86/7 108/16
131/24 132/10 132/17 202/14
approved [18] 9/2 9/22 9/25 10/1 13/12
20/20 37/8 46/5 52/5 64/17 66/5 77/22 128/7
132/20 155/9 163/6 178/12 186/22
approving [2] 41/3 77/23
April [1] 152/6
April 3 [1] 152/6
apron [1] 144/11
arbiter [1] 207/22
arbitrate [1] 46/25
arbitration [69] 12/3 28/21 29/11 32/21 33/2
39/14 45/1 45/2 45/5 45/10 45/14 45/17 45/19
46/3 46/5 46/8 46/11 46/13 46/14 46/17 46/21
46/23 47/4 49/9 49/10 49/11 49/12 49/12 50/6
50/16 50/18 51/5 51/6 51/7 51/8 51/12 51/19
51/25 52/1 52/6 52/24 58/3 58/25 86/15
133/10 133/12 160/1 172/7 172/11 172/13
175/13 175/19 176/3 176/20 188/20 188/25
189/5 189/9 190/1 190/5 192/1 192/3 192/7
201/4 202/24 217/1 217/4 217/5 218/1
arbitrator [4] 29/13 29/24 30/4 30/10
arcane [1] 89/22
are [308]
area [3] 15/7 81/16 199/11
areas [1] 96/15
aren't [8] 40/8 83/20 97/2 105/24 139/17
142/11 152/13 201/20
argue [6] 37/11 39/13 46/9 62/23 146/11
172/8
argued [3] 135/9 158/1 181/11
arguendo [1] 195/4
arguing [4] 57/2 177/19 192/1 218/4
argument [24] 14/21 16/13 30/7 44/19 55/18
67/24 77/20 94/8 109/23 120/4 128/1 128/21
142/10 142/23 146/9 146/20 153/12 166/15
181/6 181/17 182/6 210/10 218/7 218/20
arguments [11] 12/4 44/16 74/15 116/17
174/24 180/1 187/6 187/19 188/20 189/5
189/24
arise [1] 19/21
arises [1] 199/16
Arkansas [3] 68/22 68/23 68/24

**A**

arm's [1] 33/19
Arnold [16] 81/13 81/13 113/13 150/23
158/7 158/9 159/16 184/1 184/25 185/5 186/4
206/13 208/4 210/3 214/22 220/1
around [5] 27/13 52/22 59/11 189/9 214/11
arrangement [2] 124/20 127/17
arrangements [1] 36/13
arriving [2] 25/10 127/22
Article [1] 127/8
articulate [1] 177/9
as [258]
Ascena [1] 50/2
aside [6] 41/13 115/13 115/13 115/15 119/18
200/20
ask [10] 8/7 35/25 69/10 87/1 106/18 128/8
136/15 169/1 192/10 219/22
asked [25] 22/25 31/7 81/18 82/2 83/10 86/21
90/12 100/25 104/17 104/19 104/21 105/13
109/21 117/20 129/19 135/6 135/8 136/23
153/11 153/13 162/19 184/2 195/18 211/3
211/6
asking [10] 20/16 21/22 34/8 81/25 88/5
88/20 93/18 139/7 156/10 207/22
asks [1] 20/1
aspect [2] 13/20 167/17
aspects [5] 17/8 36/17 176/17 193/11 202/18
assert [2] 46/6 124/2
assessing [1] 179/1
assessment [1] 185/16
assist [1] 85/2
associate [1] 111/6
associated [1] 24/13
association [2] 44/15 111/17
associations [1] 73/2
assume [10] 20/2 28/16 30/9 55/18 77/3
77/11 77/17 146/3 155/7 155/9
assuming [5] 68/18 78/5 79/17 158/13 196/5
assures [2] 122/2 132/14
Atlanta [1] 3/9
attached [2] 46/15 153/15
attacking [1] 201/19
attempt [1] 103/2
attempted [2] 97/6 97/7
attempting [2] 84/18 104/1
attended [1] 108/14
attention [7] 45/21 53/21 53/23 54/22 59/5
60/21 98/17
attorney [10] 162/21 164/4 164/12 164/16
165/12 166/9 166/18 166/20 167/5 172/25
attorneys [14] 1/16 2/2 2/7 2/12 2/17 3/2 3/7
3/12 3/17 4/5 101/9 124/12 127/13 129/14
attorneys' [1] 31/18 33/24 34/1 34/9
attributing [1] 89/8
Australia [61] 7/9 7/13 7/15 14/10 14/24
15/18 15/25 16/17 16/20 19/8 20/3 20/4 20/5
20/7 22/12 23/2 23/3 25/5 56/22 57/5 68/2
68/4 68/6 68/8 68/10 68/17 69/8 72/9 72/10
72/16 72/17 101/11 101/16 101/18 104/9
105/23 136/11 153/7 153/8 153/16 153/21
154/2 154/7 154/13 160/21 160/24 160/24
207/11 207/12 207/12 207/18 207/25 208/7
208/17 208/20 208/22 211/6 211/9 213/5
216/7 220/7
Australian [8] 7/12 20/17 57/2 208/4 208/5
208/6 215/5 216/12
authorities [1] 144/18
authority [13] 46/10 46/17 142/6 162/20
164/11 164/16 164/18 164/19 164/21 165/12
166/19 166/23 166/25
authorize [1] 124/11
authorized [1] 46/12
Authors [1] 127/11

avail [1] 55/15
available [3] 55/13 55/16 55/19
Avenue [1] 1/21 2/3 2/13 4/3 40/15
average [8] 21/19 29/1 117/11 153/19 153/20
153/21 153/23 153/24
avoid [2] 97/11 103/25
avoided [1] 165/2
avoiding [2] 89/24 89/25
award [5] 79/25 85/8 128/9 129/2 129/16
awarded [1] 127/10
awards [1] 195/23
aware [5] 76/7 165/19 187/22
away [29] 6/18 16/5 47/4 52/19 58/15 86/1
86/9 86/16 91/7 91/23 93/4 93/8 93/10 94/17
101/24 103/1 135/23 135/23 136/25 138/15
141/3 141/22 173/4 173/5 191/25 194/22
194/24 204/19 207/7
awful [1] 72/21

**B**

back [38] 7/22 11/20 11/24 22/1 24/15 26/15
27/8 33/17 41/20 59/14 59/20 63/15 65/16
67/22 78/1 80/19 81/4 81/13 88/3 94/17 102/2
103/10 105/14 107/5 109/25 113/13 114/23
133/7 141/8 144/9 146/25 147/6 147/9 171/16
176/25 181/25 188/20 194/19
backdrop [4] 64/20 65/9 76/18 115/21
background [2] 89/4 179/19
backwards [1] 110/8
bad [7] 34/3 34/18 64/19 112/7 117/25
133/18 217/15
bag [1] 21/17
bags [7] 17/3 21/14 21/16 21/17 22/7 22/8
22/9
balance [1] 170/8
balancing [1] 172/24
ball [3] 65/23 67/11 136/8
ban [2] 155/8 155/12 157/1
band [1] 68/15
bands [1] 68/23
bank [3] 7/13 104/11 160/24
banks [2] 82/4 89/24
bar [3] 65/18 72/2 76/2
bare [1] 128/22
barely [1] 73/17
bargain [2] 47/4 127/1
bargained [1] 218/12
Barney [1] 183/12
base [2] 39/14 138/7
based [24] 12/4 16/13 16/14 26/2 74/10 77/11
98/12 98/13 109/23 112/25 113/23 115/2
115/9 117/14 121/6 125/9 128/9 130/2 157/7
185/3 185/9 186/20 196/24 216/5
baseline [3] 185/4 185/10 185/17
bases [1] 118/20
basic [3] 18/12 69/11 70/16
basically [26] 40/6 83/24 85/19 86/9 90/14
90/24 92/11 93/5 93/7 93/16 95/7 95/20 97/24
98/21 100/8 101/10 101/20 102/25 103/2
104/25 106/17 106/18 106/19 146/18 167/18
192/24
basined [1] 136/11
basis [9] 10/23 29/16 43/1 58/24 58/24 172/7
175/17 207/18 208/25
Bates [2] 142/18 142/20
batter [1] 161/19
batting [1] 29/1
be [337]
be as [1] 202/2
bearing [2] 75/23 78/13
became [2] 92/11 201/14
because [157] 6/15 6/23 8/1 8/14 14/16 14/20
16/23 16/25 17/9 18/13 19/22 23/4 23/5 25/2
31/7 31/19 33/17 33/21 33/25 34/25 40/14

43/1 45/20 46/7 46/18 46/22 47/21 48/6 50/10
50/23 53/21 53/2 54/5 56/19 58/14 58/23
61/16 62/7 62/21 64/16 65/1 65/9 66/9
69/17 76/21 76/24 80/20 83/14 84/13 84/16
85/7 85/10 86/10 86/16 87/5 87/14 87/20 88/4
88/12 89/11 89/20 90/12 90/17 90/25 92/10
93/23 93/24 95/2 95/4 96/10 96/13 96/25 97/8
98/25 100/2 100/3 101/5 101/24 101/25
102/20 103/4 105/5 106/5 106/12 106/15
106/18 107/7 107/10 107/14 107/16 108/17
108/21 109/2 109/13 109/16 114/22 116/22
118/11 119/25 121/12 121/15 125/4 125/15
126/11 129/1 129/10 130/15 132/18 133/16
138/13 141/9 141/25 142/11 142/22 146/19
150/17 150/22 151/8 154/11 155/24 159/24
162/8 162/18 163/7 165/12 172/12 175/4
179/4 180/11 181/24 182/1 182/17 183/19
184/14 186/14 189/11 191/9 191/9 192/2
194/23 195/25 196/11 199/10 199/18 202/19
203/23 204/25 205/10 210/12 210/18 210/18
211/5 212/22 213/24 217/2 218/24 219/6
become [3] 76/19 104/23 210/1
becomes [4] 90/3 104/18 192/14 215/1
been [68] 6/22 8/12 11/8 11/9 11/24 16/4
16/6 20/4 20/19 29/21 36/23 41/14 41/18
45/24 46/15 50/11 55/9 59/13 62/17 63/5 67/7
75/10 85/20 87/5 89/21 91/4 92/2 107/25
108/22 122/21 132/24 133/25 145/19 146/21
147/7 149/9 150/4 155/13 155/15 159/7 159/7
159/9 161/10 161/17 163/22 164/5 181/18
182/15 185/20 187/23 188/11 188/12 189/9
189/10 191/23 194/8 196/1 198/4 199/7
201/18 202/19 203/4 211/1 214/13 214/13
219/13 219/14 221/4
befall [1] 161/17
before [35] 1/12 6/5 33/12 43/8 71/24 72/21
73/5 74/3 74/10 75/8 76/12 81/14 83/3 87/12
111/4 116/19 117/21 127/8 130/25 131/2
139/18 144/20 148/4 149/1 164/1 164/4
184/10 190/9 190/19 190/20 192/3 192/6
196/2 199/1 215/5
began [1] 16/8
begin [4] 6/5 59/9 154/15 154/16
beginning [6] 5/21 112/13 115/24 174/22
182/10 216/8
begrudge [1] 216/2
behalf [18] 1/5 5/23 6/6 111/12 124/1 131/16
137/24 148/24 158/9 167/2 174/5 187/10
196/24 200/17 200/17 217/20 217/23 218/2
behavior [1] 155/15
behind [1] 39/24
being [48] 7/7 9/9 9/10 9/11 9/16 9/23 12/20
23/18 23/19 41/25 68/6 77/7 85/4 88/19 91/6
93/3 93/5 93/7 98/24 100/25 103/25 104/7
104/13 104/14 104/25 105/4 115/22 118/4
122/9 124/4 128/1 128/3 129/19 132/22
140/18 167/13 171/6 172/22 173/22 174/4
174/12 174/19 176/6 185/25 197/8 200/7
209/23 219/1
belief [1] 34/20
believe [54] 32/6 32/13 32/25 34/17 37/25
38/7 38/13 38/20 42/23 50/15 51/17 52/2
56/21 60/8 65/20 69/15 87/19 102/8 115/8
117/3 118/20 119/3 122/16 151/13 155/1
155/18 155/21 156/18 157/1 162/18 163/11
163/15 168/16 171/9 174/20 174/24 175/9
177/14 178/3 178/17 180/14 181/1 182/14
184/21 186/18 186/20 186/24 187/16 188/9
194/9 195/17 196/15 197/10 207/6
believes [1] 59/7
believing [1] 108/23
belittling [1] 94/10
bell [1] 24/10
belonged [1] 190/17

**B**

below [1] 133/22
bench [3] 26/3 204/8 220/10
beneficial [3] 59/2 68/25 140/8
benefit [44] 19/16 19/24 21/9 30/16 30/18 35/16 35/18 35/21 35/24 38/2 38/20 41/9 55/16 55/16 58/11 59/1 68/18 69/1 69/3 77/6 77/8 77/9 117/6 117/22 122/5 124/8 127/1 129/3 129/5 129/11 130/8 135/8 135/11 136/20 158/2 171/6 177/5 185/25 193/2 193/7 193/9 194/22 194/24 197/10
benefits [11] 35/9 37/25 41/8 65/1 121/23 135/7 136/1 136/2 136/5 161/12 191/19
BERMAN [1] 4/2
besides [1] 120/6
best [10] 74/2 76/23 104/22 136/19 161/5 161/6 167/7 192/24 203/2 203/3
BestBuy [1] 152/17
bet [2] 212/7 212/19
better [17] 11/8 33/10 39/16 92/3 101/25 105/4 120/4 132/9 133/24 133/25 138/20 156/25 172/16 202/12 204/24 208/9 215/21
between [19] 8/5 14/9 23/25 38/3 51/5 53/5 55/17 64/23 69/20 78/19 78/22 89/25 105/1 109/21 113/14 127/17 127/22 192/19 194/15
beyond [4] 18/13 57/10 72/25 126/4
bidding [2] 27/10 154/15
big [4] 12/16 13/24 207/9 218/8
bigger [1] 17/4
biggest [1] 86/6
bill [3] 18/3 80/6 81/3
billing [2] 128/9 130/6
billion [5] 50/13 50/13 50/14 62/5 183/2
billions [2] 30/6 127/23
bind [2] 112/9 124/16
binding [3] 143/2 143/6 145/14
bird [1] 202/13
bit [13] 12/16 29/5 80/20 83/1 111/16 112/11 133/20 134/4 153/25 174/23 208/9 216/2 216/14
blanche [1] 23/22
block [1] 13/11
blowing [1] 194/24
Blue [24] 2/12 2/12 42/23 111/9 111/9 111/12 111/13 111/17 111/17 111/19 111/19 111/23 111/23 111/24 111/24 113/19 113/20 115/8 116/6 116/6 116/23 117/2 117/2 118/9
board [4] 35/16 36/18 36/23 55/4
bogus [1] 96/1
BOIES [1] 1/21
Bon [1] 49/23
Bon-Ton's [1] 49/23
BONDURANT [1] 3/8
bones [2] 14/2 128/22
books [1] 136/12
border [2] 68/21 69/2
borne [1] 184/19
both [27] 26/7 32/6 33/7 37/2 39/19 46/3 49/8 51/8 62/10 104/10 106/23 106/24 113/16 118/15 121/17 121/17 128/20 133/20 145/8 145/10 178/4 185/12 186/15 186/17 191/19 192/24 199/3
bother [1] 166/5
bottom [2] 50/5 71/7
bottom-line [1] 71/7
bought [1] 144/9
bound [6] 41/1 55/10 117/15 118/4 145/14 189/19
box [2] 13/24 207/12
boxes [1] 25/11
brand [24] 10/24 15/5 16/8 30/4 64/13 71/14 71/16 72/1 76/9 76/10 90/5 91/17 156/19 157/2 161/8 177/18 198/17 198/18 211/14

211/17 211/18 212/15 213/16 213/18
brand-wide [1] 168
branded [4] 71/19 71/24 111/25 121/13
branding [1] 59/6
brands [16] 7/4 15/5 15/9 15/15 18/13 26/19 45/22 45/23 49/19 49/20 50/2 50/2 67/9 67/17 153/9 213/22
break [3] 63/21 63/22 169/4
breaking [1] 15/1
brick [1] 132/13
bridge [6] 96/3 96/10 96/11 96/24 96/25 199/6
bridges [1] 96/13
brief [10] 17/23 40/25 59/21 63/23 144/22 169/7 187/7 196/16 209/8 217/7
briefed [1] 157/25
briefing [2] 31/15 200/5
briefly [4] 79/9 146/12 154/25 155/24
briefs [5] 11/17 17/22 180/25 181/1 181/3
bring [2] 41/20 45/21 53/21 56/24 60/20 69/11 130/4 133/4 134/1 135/23 165/20 168/11 172/16 172/16 172/25 177/6 189/9 189/21 189/22 192/7 206/6 215/20
bringing [10] 33/17 101/10 168/5 172/19 172/20 177/24 190/5 198/20 204/21 204/22
broad [6] 41/21 76/5 78/24 145/9 184/3 199/15
broader [3] 27/6 173/10 189/14
broker [1] 130/3
brokerage [4] 127/19 129/25 130/2 130/3
BROOKLYN [7] 1/8 4/14 96/3 96/10 96/24 175/24 199/5
brother [1] 116/22
brought [18] 10/10 13/4 41/25 53/22 84/20 99/17 173/7 174/3 176/14 186/7 189/25 190/9 190/9 191/11 191/16 198/24 198/25 199/10
brown [1] 102/8
Buckeye [5] 2/17 119/7 119/11 123/3 186/19
Buckeye's [1] 121/10
build [3] 59/10 139/3 175/2
building [3] 96/11 148/9 148/13
builds [1] 38/8
built [1] 110/8
bully [1] 52/23
bunch [6] 89/22 199/14
burden [9] 54/12 54/14 56/24 67/25 74/9 74/21 158/3 160/1 193/15
Bureau [1] 120/23
bureaus [1] 214/9
bush [1] 202/13
business [38] 16/21 40/12 59/18 61/24 62/6 66/25 67/2 67/3 90/14 90/15 92/12 97/4 98/9 102/13 103/8 104/12 104/18 105/2 106/4 111/24 111/25 112/2 112/19 112/20 113/23 114/4 115/11 115/1 116/8 127/16 137/7 138/6 138/20 138/21 166/18 196/24 196/25 199/12
businesses [2] 73/25 90/17
but-for [2] 185/17 185/20
button [1] 180/12
buy [7] 19/6 19/7 19/10 19/11 60/16 94/23 145/22
buying [3] 21/6 146/6 212/19

**C**

Cadman [1] 4/13
calculation [1] 38/8
calendar [1] 115/22
calibrates [1] 129/16
California [3] 8/10 9/18 57/6
call [10] 34/18 48/19 89/12 96/1 97/6 102/25 103/7 211/11 213/20 213/20
called [11] 35/22 89/6 89/7 89/9 102/14 116/19 133/17 142/7 182/20 182/21 183/20
calling [1] 203/10

calls [2] 54/16 121/1
game [17] 24/18 25/19 72/12 88/15 97/11 97/12 119/22 130/25 135/6 144/9 148/13 181/23 206/22 207/18 208/4 210/17 218/17
can [133] 8/10 9/11 11/21 14/19 15/11 16/3 17/1 17/25 17/25 20/6 22/1 22/21 23/6 24/3 24/20 25/5 26/1 26/6 26/14 27/2 29/7 29/9 33/5 36/1 37/10 37/14 38/21 46/3 46/3 49/6 49/11 52/21 55/10 55/11 56/1 57/14 58/17 58/17 58/17 59/10 60/16 60/17 61/14 62/11 62/12 62/19 63/4 63/6 67/9 67/14 69/17 71/22 72/4 72/23 73/15 75/25 76/25 77/3 79/23 81/2 81/23 84/3 85/10 85/12 94/12 95/22 96/6 98/8 98/25 101/24 101/25 102/1 103/25 107/11 110/7 113/1 132/9 133/10 134/1 140/16 140/25 142/1 142/11 150/20 150/21 150/24 151/17 152/17 155/25 157/5 158/7 158/15 160/14 160/18 160/21 160/22 163/12 164/10 166/2 166/13 170/24 171/8 172/9 172/16 172/22 173/3 173/22 175/20 175/24 177/22 179/14 188/5 189/6 189/7 190/18 190/19 192/24 192/25 194/3 194/12 194/14 195/3 200/1 201/7 201/8 201/9 201/9 203/20 206/6 208/2 209/18 210/14 212/19
can't [60] 10/23 10/24 11/10 11/18 15/20 20/14 21/3 21/4 26/12 26/12 39/6 40/16 51/2 53/15 61/16 62/16 69/4 85/11 89/12 90/1 90/1 91/4 97/8 97/11 99/11 100/5 105/25 107/3 107/8 108/20 114/21 114/22 125/3 131/6 138/12 140/19 140/20 141/2 141/3 141/22 142/2 142/2 143/20 144/10 144/20 145/25 146/15 147/18 150/22 150/24 151/8 155/16 159/23 175/1 175/1 175/3 181/19 185/6 194/24 219/8
cancelation [1] 107/24
CANNON [3] 2/8 64/3 64/8
cannot [32] 14/1 14/4 45/3 47/21 54/6 62/20 73/14 74/2 76/3 79/21 93/20 96/6 96/6 96/15 96/20 113/22 114/20 115/9 115/15 117/13 120/6 124/22 128/7 129/22 131/25 141/7 153/3 157/4 160/7 175/7 189/4 194/22
CANTER [9] 2/5 44/1 65/13 67/25 68/2 71/11 150/5 218/9 219/24
Cantor [2] 5/10 43/22
capable [1] 177/10
capitalization [1] 30/7
capping [1] 210/7
car [4] 15/11 17/4 207/25 213/13
card [79] 6/15 6/19 6/25 7/1 7/4 7/4 7/9 10/24 13/6 17/11 17/25 18/2 18/4 18/8 18/16 19/1 19/11 22/23 23/12 25/19 25/19 25/20 25/20 26/16 27/4 27/16 27/25 40/9 40/14 59/5 66/21 67/1 67/3 69/14 69/16 69/21 69/25 70/17 80/5 80/17 88/15 89/16 94/12 95/2 100/1 101/12 106/15 107/16 109/20 109/21 109/24 115/11 116/8 118/7 118/9 118/14 136/24 151/2 154/14 170/24 184/11 195/12 195/13 195/14 195/17 195/22 196/6 196/7 196/8 196/13 196/21 196/22 203/9 211/19 211/20 211/23 212/2 214/2
cardholder [1] 19/4
cardholders [1] 79/24
cards [55] 6/20 6/20 6/21 7/8 11/11 13/18 18/1 19/5 22/21 29/17 29/25 32/10 35/2 35/5 35/5 35/6 36/21 38/6 38/6 38/12 41/11 41/12 89/17 95/16 106/12 109/18 110/9 115/5 115/10 116/2 116/9 116/12 121/14 121/14 121/25 153/19 153/21 154/5 154/6 154/7 154/22 174/15 184/9 184/9 184/11 184/12 194/16 195/15 195/21 196/1 196/3 197/2 203/12 203/25 204/1
care [10] 52/12 70/16 102/11 112/15 112/16 113/24 113/25 114/24 115/6 118/10
cared [1] 118/9

Case 1:11-md-02221-NGG-RER   Document 1   Filed 09/19/14   Page 228 of 255 PageID #: 15177

career [1] 188/4
careful [1] 32/12 179/25
carefully [1] 11/14
cares [1] 133/8
cars [2] 15/14 136/18
cart [1] 23/21
carve [3] 24/24 164/2 191/25
carve-out [2] 24/24 164/2
case [241]
cases [29] 32/18 32/19 37/4 40/25 41/1 41/2
41/24 43/9 87/8 106/23 106/24 123/10 132/13
132/22 132/25 145/8 145/10 165/20 170/15
177/14 184/2 187/17 187/22 189/3 190/9
190/14 200/14 201/19 214/14
cash [15] 7/3 26/15 69/13 69/17 69/20 70/14
70/15 70/20 70/21 80/19 81/4 123/8 134/8
211/20 212/2
cast [1] 75/6
catching [1] 7/17
category [1] 114/9
cause [3] 5/2 98/23 211/2
causes [1] 105/22
cease [1] 214/17
celeb [1] 211/2
Center [1] 2/19
central [2] 95/8 100/20
centralized [1] 167/6
cents [5] 69/17 70/17 89/16 89/17 211/15
century [1] 205/24
certain [16] 9/21 12/14 23/12 36/8 60/16
88/13 95/16 114/5 130/17 176/18 176/19
179/5 179/7 192/16 192/23 206/17
certainly [15] 6/3 11/4 20/25 41/2 41/7 55/19
71/17 85/24 97/2 107/11 149/21 155/2 172/4
173/19 178/6
certainty [1] 59/23
certifiability [2] 68/9 69/9
certification [15] 10/17 36/1 36/10 37/2 45/6
54/11 55/5 67/23 68/3 119/22 119/23 119/24
120/7 121/9 121/10
certified [7] 45/8 65/12 75/15 75/16 141/20
141/21 184/6
certify [2] 139/12 140/22
certiorari [1] 12/20
cetera [1] 44/17
chain [5] 42/20 62/3 62/4 62/6 62/7
chains [4] 13/23 36/12 152/18 152/21
chairman [1] 206/21
challenge [7] 7/25 9/12 23/20 32/5 32/9
40/16 74/23 135/14 136/4 141/1 155/14
203/12 203/15
challenged [1] 170/22
challenges [3] 9/17 40/6 206/17
challenging [4] 8/15 40/17 203/25 214/14
chambers [1] 111/7
chances [1] 87/24
change [18] 39/21 65/21 66/14 66/18 66/22
67/17 82/7 92/18 92/18 104/23 124/2 135/21
136/23 171/4 171/7 172/1 194/18 195/15
changed [2] 91/21 93/25
changes [6] 34/15 34/19 53/10 65/21 67/18
143/16
changing [2] 105/18 183/19
channel [1] 195/19
character [4] 54/20 60/3 60/6 63/13
characterized [1] 155/22
charge [15] 23/10 23/12 34/16 35/6 38/6
38/12 41/11 42/25 70/17 88/14 99/19 154/5
154/6 194/16 195/21
charged [3] 114/11 114/20 153/19
charges [2] 114/10 115/19
charging [1] 22/4

Charisse [1] 4/13
chart [10] 48/12 51/5 69/21 153/22 175/13
175/18 189/2 208/22 218/9 220/2
CHARTERED [1] 2/13
cheaper [4] 7/3 90/15 90/19 95/2
checked [2] 21/17 72/16
Chemical [2] 122/24 200/14
Chenault [2] 30/2 104/5
Chesler [2] 148/10 148/10
chess [2] 81/17 125/18
chest [2] 99/6 158/15
CHEVALIER [1] 2/13
Chicago [1] 3/20
Chico's [1] 50/3
chief [1] 134/12
childcare [1] 186/16
Chin's [1] 127/10
chock [1] 144/17
choice [7] 32/7 32/7 78/11 105/1 105/1 132/8
138/18
choices [1] 137/11
choose [10] 15/7 35/17 43/6 58/14 58/16
90/22 94/22 184/8 195/23 196/1
choosing [1] 24/6
chose [7] 32/4 37/17 43/7 188/7 188/14
195/16 196/3
chosen [2] 108/2 168/2
Christine [1] 183/12
Christmas [1] 87/11
Christopher [2] 185/7 185/14
circuit [23] 28/24 33/9 33/25 34/10 56/11
102/23 120/23 121/18 122/23 128/10 129/13
132/14 144/20 145/6 156/24 181/10 181/14
199/20 199/22 199/25 199/25 200/23 210/10
circumstance [3] 47/6 67/1 68/16
circumstances [4] 58/15 122/7 137/14 147/4
circumvent [1] 195/20
circumventing [1] 196/17
circus [1] 108/15
citation [1] 144/21
cite [8] 40/25 144/18 144/19 145/7 145/8
188/1 189/1 189/3
cited [5] 123/10 129/8 154/10 154/11 154/20
cites [1] 185/11
civil [8] 5/2 128/12 128/16 162/5 162/11
164/14 164/19 165/18
claim [29] 36/25 44/25 45/23 61/6 101/25
107/9 123/4 135/24 143/20 143/24 153/8
160/7 160/9 172/11 172/16 172/16 172/23
173/2 174/3 174/5 178/22 187/18 189/5
189/22 190/5 191/11 192/8 201/2 201/8
claimant [1] 29/22
claimed [2] 33/21 65/4
claiming [2] 161/16 185/25
claims [104] 12/3 12/3 33/15 36/17 36/24
39/17 41/3 41/25 46/25 47/7 47/9 47/18 48/11
62/11 62/12 62/14 62/15 62/17 62/19 62/20
62/22 63/1 63/1 63/4 63/5 63/7 63/16 63/16
63/17 65/17 66/13 66/15 73/16 75/1 76/1
120/12 120/16 120/17 120/17 120/18 120/20
124/2 125/14 125/17 126/23 128/2 132/1
132/18 132/23 132/25 133/2 133/4 139/19
139/21 139/22 142/2 142/12 143/23 144/2
144/8 144/14 145/9 146/5 146/7 146/10
146/15 146/20 146/21 149/16 153/5 155/5
160/14 163/22 165/18 165/19 165/23 166/7
166/13 167/2 168/10 174/17 177/2 177/3
177/6 177/24 180/11 180/19 185/1 186/23
186/23 189/22 189/25 192/2 192/5 200/3
200/6 200/6 200/10 200/25 204/22 204/22
204/23 207/5 207/7
clarify [2] 125/2 145/1
class [293]
class's [4] 32/20 91/15 124/24 133/1

classes [9] 13/22 13/25 36/24 43/12 57/24
97/25 121/15 122/18 154/20
classic [4] 102/8 106/16 116/18 119/21
classwide [3] 33/6 58/24 175/17
clause [10] 45/17 45/23 62/10 105/19 172/13
175/13 175/19 176/3 192/1 192/7
clauses [7] 39/14 45/10 48/5 48/6 172/7
192/3 218/8
clean [1] 133/3
clear [28] 12/8 24/10 33/5 55/20 56/18 60/1
62/11 71/20 75/19 76/19 83/21 96/5 126/20
129/4 138/25 141/6 143/24 147/22 160/5
160/20 164/17 171/9 173/15 176/25 179/6
180/16 186/21 219/15
clearinghouse [1] 165/13
clearly [10] 15/9 15/9 84/21 90/4 124/20
150/6 154/6 160/18 175/9 190/18
clerk [1] 44/7
clerks [1] 111/5
clever [2] 102/17 102/18
click [5] 17/2 22/3 22/3 22/6 22/7
client [5] 18/14 49/15 50/12 90/18 140/1
client's [1] 86/2
clients [19] 45/5 46/12 46/13 48/13 52/3 61/8
61/9 64/20 84/11 86/14 111/20 113/19 116/18
131/11 150/15 173/22 197/24 197/25 206/18
climb [1] 9/15
climbed [1] 9/16
clock [8] 81/15 81/17 81/20 81/24 81/25 99/4
99/6 158/15
close [2] 129/19 179/15
closed [1] 73/21
closely [1] 101/20
closer [1] 9/14
club [2] 92/11 154/6
co [3] 3/17 17/25 59/6
co-branded [1] 17/25
co-branding [1] 59/6
code [1] 18/13
cohesive [1] 69/5
cohesiveness [1] 216/24
coincide [1] 51/25
collapse [1] 96/25
collateral [1] 161/16
Collection [2] 120/23 120/25
collectively [1] 179/23
college [1] 214/10
colloquially [1] 199/19
colloquy [1] 211/10
collusion [1] 34/3
colored [1] 60/21
colorful [2] 175/13 189/2
colors [29] 12/7 12/17 28/21 28/24 32/21
33/22 44/20 44/24 44/24 45/10 45/13 45/15
46/8 46/19 49/13 51/18 52/2 53/15 58/20
58/22 85/21 131/3 160/7 175/14 190/16 198/5
201/9 201/15 202/5
Columbus [1] 2/4
column [6] 48/22 53/13 53/14 53/17 60/21
189/2
columns [3] 49/7 53/12 175/14
combined [1] 35/3
come [35] 15/25 17/9 18/14 22/15 22/24
25/12 25/18 30/2 40/24 49/6 59/2 65/16 73/12
73/13 74/13 82/12 85/25 92/8 93/19 93/20
95/15 95/18 100/1 100/5 102/17 127/5 136/24
157/6 175/3 177/22 179/15 190/3 203/24
206/6 213/17
comes [8] 43/3 53/9 63/15 137/9 179/19
197/18 200/4 200/5
comfortable [1] 69/24
coming [9] 15/5 49/22 77/10 82/10 91/5
122/13 122/14 166/3 214/23
commendable [1] 124/25

**C**

commensurate [1] 129/3
comment [1] 79/12
commented [1] 71/23
comments [3] 171/12 181/24 196/20
commerce [3] 15/18 20/24 207/25
commercial [3] 18/22 41/16 42/6
commission [1] 129/25
commit [2] 105/17 105/21
committed [1] 82/7
committee [2] 128/18 176/13
common [2] 15/10 211/13
commonality [6] 36/3 36/10 36/17 37/1
50/23 118/22
communicates [1] 95/5
communicating [1] 94/14
communication [4] 79/24 89/11 90/1 168/22
companies [11] 22/23 32/24 49/21 49/22
60/12 101/22 109/21 111/22 112/19 116/11
198/1
company [15] 1/9 5/18 9/19 32/22 49/22
60/23 92/7 92/17 100/1 104/6 122/5 122/5
136/25 198/9 198/12
comparative [1] 28/11
comparatively [1] 65/1
compare [1] 28/10
compared [4] 117/25 133/14 175/23 195/22
comparison [3] 133/9 133/9 159/19
compel [4] 8/13 45/14 49/11 50/6
compelling [2] 206/24 207/16
compensable [1] 178/5
compensate [1] 147/14
compensated [1] 131/6
compensation [1] 133/21
compensatory [1] 129/20
compete [15] 21/22 21/25 38/25 67/7 90/14
90/24 90/25 91/1 96/8 96/19 98/24 112/19
160/25 161/2 177/20
competence [1] 127/2
competition [61] 13/6 17/11 22/20 24/14
27/4 27/4 27/18 27/19 30/21 64/12 64/13
64/14 64/23 65/1 71/16 71/17 71/21 72/18
76/9 76/16 79/22 80/14 80/22 84/15 84/21
85/1 85/6 89/25 90/5 90/23 91/7 91/23 92/15
92/19 93/7 93/18 95/11 95/22 96/15 96/16
96/21 97/1 97/10 100/13 100/16 102/24
104/20 104/24 105/3 105/4 105/5 110/6 151/4
151/5 151/12 154/16 156/19 157/2 161/8
203/8 209/17
competitive [22] 7/16 14/23 14/25 14/25 15/2
15/9 15/13 17/20 21/8 25/21 29/19 35/14
37/12 72/1 106/10 106/20 107/9 108/1 110/7
137/4 151/3 171/8
competitor [6] 69/1 90/20 92/3 104/23 137/1
137/6
competitors [2] 37/17 73/4
compilation [1] 48/12
complain [1] 39/9
complained [2] 34/25 35/6
complaining [1] 35/23
complaint [3] 108/16 127/23 163/24
complaints [1] 19/21
complete [3] 35/11 118/5 181/19
completed [3] 157/23 159/5 159/6
completely [6] 100/24 117/7 130/9 138/13
163/2 167/4
completing [1] 220/23
complex [1] 21/23
complexities [1] 35/13
complexity [1] 157/18
complicated [4] 59/15 77/14 157/10 212/14
comply [3] 119/21 124/4 125/6
component [5] 123/9 123/11 123/13 123/14
123/16
components [1] 123/8
comprehensive [1] 16/10
compromise [7] 11/3 13/7 32/25 33/1 33/6
127/21 127/22
compromised [2] 13/8 167/14
compunction [1] 106/21
computer [1] 4/16
conceives [1] 76/13
concept [2] 18/12 27/23
conception [1] 124/17
concern [5] 16/12 42/7 97/1 122/17 179/8
concerned [4] 16/23 40/1 42/14 209/25
concerning [2] 66/13 66/15
concerns [4] 32/10 39/18 120/11 165/15
concession [2] 32/17 59/21
concessions [4] 76/16 123/25 124/10 124/19
conclude [1] 75/8
concluded [3] 71/5 101/18 123/19
concluding [1] 74/3
conclusion [5] 56/16 65/15 71/7 71/23 72/13
conclusions [4] 72/8 72/19 74/18 215/19
conduct [16] 20/6 39/21 125/9 125/16 126/23
128/21 133/1 147/15 170/22 177/25 177/25
178/2 178/9 187/11 189/7 196/15
conducting [1] 187/12
confession [3] 90/11 98/16 98/18
confident [1] 26/25
confidential [6] 30/15 30/19 150/17 220/17
220/19 220/22
confirms [1] 101/11
conflict [6] 46/24 47/10 138/16 139/21
139/23 140/19
conflicts [1] 140/22
confluence [2] 25/4 25/6
confronted [1] 128/10
confusing [2] 24/10 76/24
confusion [2] 59/16 197/1
congress [4] 83/16 108/17 108/22 108/24
congressional [1] 21/3
connection [1] 206/25
consent [3] 127/8 141/4 164/24
consequence [5] 9/3 20/19 26/1 27/3 173/6
consequences [1] 172/22
consider [2] 81/6 146/7
considerable [1] 42/8
consideration [5] 42/2 61/1 179/25 200/2
208/15
considerations [2] 43/14 215/20
considered [3] 73/25 123/23 200/1
consistent [7] 36/23 63/2 108/14 128/7 178/9
180/19 187/16
consolidated [1] 163/24
CONSTANTINE [3] 2/8 64/3 64/8
constitute [1] 42/5
constituted [1] 176/4
constitutional [1] 9/17
construct [1] 77/23
consumer [16] 7/5 18/24 19/4 19/23 20/13
20/13 32/7 59/16 59/16 80/17 114/23 132/13
150/25 196/4 212/17 212/20
consumers [10] 20/5 32/15 34/18 38/5 39/2
69/16 69/19 69/23 70/3 70/21
CONT'D [3] 2/1 3/1 4/1
contemplate [2] 38/25 143/5
contemplates [1] 143/2
contend [4] 48/25 64/25 151/20 166/22
contention [2] 149/25 153/10
contentious [1] 83/6
contested [1] 128/12
context [7] 17/23 22/18 69/5 125/7 134/10
190/4 204/17
continuation [2] 155/14 155/16
continue [7] 34/7 39/23 59/24 60/15 108/19
123/16
192/25 195/1
continued [5] 63/24 110/17 125/20 132/9
169/8
continues [3] 34/17 35/2 125/25
contours [1] 108/6
contract [10] 29/10 44/25 45/23 49/15 50/25
51/23 52/10 123/17 130/2 138/5
contracted [1] 52/16
contracts [10] 45/9 45/10 45/20 47/25 49/24
50/3 50/21 53/18 126/2 189/1
contractual [5] 33/1 45/5 47/13 125/6 218/10
contractually [1] 189/4
contrary [2] 150/1 150/14
contrast [3] 71/19 164/25 165/17
control [5] 6/14 6/25 44/9 90/19 149/14
controlling [1] 201/17
convenience [3] 23/9 213/21 214/10
conversation [2] 52/9 88/4
conversations [1] 52/15
convey [3] 13/2 28/1 80/13
convince [1] 29/13
coordinating [1] 44/16
copy [5] 55/25 141/16 219/22 219/22 220/21
copyright [1] 145/12
core [1] 10/21
corners [1] 137/21
CORPORATION [5] 1/5 5/18 6/12 13/5
198/4
correct [25] 5/25 8/8 8/9 8/21 8/24 8/25
21/14 40/11 40/18 51/17 85/5 99/13 108/8
109/13 120/21 121/24 165/4 167/24 168/3
181/22 190/23 194/21 203/1 203/2 205/12
corrected [1] 24/3
cost [18] 10/24 30/5 89/8 90/19 90/24 90/25
91/1 98/1 98/13 98/15 98/17 115/18 117/18
129/6 130/13 136/2 137/1 137/6
Costco [1] 152/16
costing [1] 19/9
costly [1] 185/22
costs [13] 6/15 7/1 24/20 98/4 98/6 98/7
98/10 124/12 124/19 125/3 131/10 201/18
214/2
could [87] 7/17 9/20 9/23 11/20 18/13 20/15
23/1 25/18 27/8 27/9 30/14 33/10 35/9 39/11
41/5 41/7 44/5 48/20 51/4 51/12 51/14 52/25
56/20 59/14 65/5 66/10 66/19 66/22 67/1
67/19 77/4 81/21 83/10 84/5 84/14 84/23
85/15 86/11 91/3 93/24 96/4 96/19 96/20
96/22 96/25 103/6 104/17 106/5 106/6 106/7
115/23 122/4 122/11 126/25 130/16 132/5
136/15 136/16 136/17 136/18 139/3 147/2
147/10 147/24 155/22 156/4 157/6 157/6
157/12 158/8 168/23 172/25 175/18 176/21
177/9 178/21 185/20 186/17 191/21 194/21
195/5 195/16 195/23 195/24 204/18 212/22
215/23
couldn't [11] 66/22 83/9 92/9 105/11 107/15
134/11 137/5 139/20 143/23 214/22 219/8
counsel [30] 5/3 33/23 34/1 121/7 123/15
127/14 127/14 127/16 128/24 129/8 129/9
132/7 133/5 133/20 134/7 134/9 152/1 153/2
153/11 153/14 153/14 164/7 164/7 164/10
164/20 164/20 174/25 188/15 217/2 220/4
counsel's [2] 128/21 134/14
count [4] 42/19 42/20 91/7 182/25
counterargument [1] 147/23
countries [1] 93/15
country [13] 20/8 20/8 42/6 44/14 49/1 57/12
72/22 74/13 86/17 92/19 111/18 167/10
214/11
county [1] 116/23
couple [15] 15/6 17/15 19/2 44/3 49/18 86/21
99/15 101/6 114/17 140/14 144/18 149/2
180/4 198/5 210/2

**C**

coupons [1] 132/16
course [17] 6/2 27/6 48/14 54/24 67/11 82/9
84/10 96/8 107/6 117/1 123/19 125/16 126/15
134/10 159/10 173/25 181/21
court [100] 1/1 1/8 1/13 4/12 5/14 11/22 12/5
12/5 19/6 28/24 29/2 32/3 32/22 34/2 37/3
37/19 38/17 38/22 45/16 47/3 47/21 48/25
50/24 51/18 51/20 54/24 56/3 56/5 57/25
58/19 58/25 60/1 63/25 64/17 67/25 68/5 69/6
74/5 77/5 77/22 85/20 85/24 86/1 86/2 86/14
96/5 96/14 96/24 97/17 103/1 111/3 121/2
121/5 121/18 124/11 126/14 127/10 128/6
128/20 129/12 129/22 132/16 133/7 133/13
138/21 142/4 142/10 142/13 145/13 149/2
155/1 155/9 156/7 170/1 170/21 171/13
171/17 175/24 175/25 178/13 178/23 180/5
181/14 186/13 187/7 190/1 190/3 190/11
192/2 192/8 200/22 201/4 202/24 217/7
217/14 218/20 218/23 220/14 220/18 220/21
court's [15] 39/25 44/23 54/10 78/11 100/1
119/17 130/6 149/14 219/20 219/23 219/25
220/2 220/6 220/9 222/12
courthouse [3] 8/1 139/3 175/2
courtroom [9] 45/11 45/12 59/13 92/4 92/16
135/10 152/10 161/18 179/12
courts [8] 8/13 57/24 117/22 121/19 132/17
178/15 191/19 193/13
cover [1] 10/13 114/16 151/19
covered [6] 19/25 55/14 116/13 118/20 163/5
184/12
covers [3] 111/25 116/14 220/13
CPLR [1] 218/18
CRAVATH [3] 3/13 111/6 148/5
crazy [1] 30/24
create [6] 39/17 46/24 166/22 167/8 197/1
197/2
created [6] 93/17 105/16 112/17 113/24
115/6 175/18
creates [2] 99/24 113/25
creative [1] 95/15
credible [1] 207/19
credibly [1] 185/21
credit [68] 6/19 7/1 7/4 7/8 7/9 10/24 13/6
13/18 14/6 14/9 17/11 18/1 18/6 18/8 19/5
19/11 22/21 22/23 23/12 25/20 27/4 27/25
34/16 35/6 38/3 38/6 38/11 41/11 66/21 67/1
67/3 69/14 69/16 69/18 69/20 69/25 70/17
78/20 78/22 80/5 88/14 88/15 100/1 109/21
110/9 115/5 115/10 115/11 116/2 116/8 116/9
116/12 136/24 151/2 153/21 154/7 184/9
184/12 186/1 194/15 195/20 203/9 211/19
211/20 211/23 212/2 212/5 215/4
creeping [1] 82/1
CRI [1] 4/13
cripple [1] 29/17
critical [3] 32/24 109/20 192/19
criticism [1] 17/9
criticisms [2] 108/13 185/17
criticizing [1] 139/24
critics [1] 95/9
critique [1] 18/7
Cross [16] 2/12 42/23 111/9 111/13 111/17
111/19 111/23 111/23 111/24 111/24 113/19
115/8 116/6 116/23 117/12 118/9
crossed [3] 96/3 184/3 184/14
crucial [1] 137/13
crude [1] 129/21
Cruises [1] 3/2
crystal [3] 65/23 67/11 136/8
CSR [1] 4/13
curious [3] 41/22 87/22 158/19
current [7] 79/25 121/23 123/1 135/17 138/3

178/2 186/15
currently [4] 40/9 112/21 120/18 176/19
customer [11] 14/21 15/19 16/24 19/6 79/13
71/13 75/5 78/18 78/21 79/4 138/7
customers [7] 17/1 24/17 69/16 81/3 114/21
115/19 186/1
customized [1] 36/7
cut [4] 205/23 209/19 209/20 209/20
cute [1] 11/16
CV [2] 1/7 5/19
CVS [2] 9/20 152/20

**D**

D.C [1] 2/14
d/b/a [1] 3/2
damage [7] 62/25 63/1 63/5 63/7 155/5 160/7
218/17
damaged [1] 160/8
damages [56] 30/14 38/4 39/20 39/20 39/22
62/15 109/24 118/15 120/12 120/17 120/17
134/10 141/21 141/23 142/15 142/21 142/22
143/7 143/20 143/23 143/24 143/24 144/2
144/8 144/14 146/10 146/15 146/20 146/21
146/24 146/25 147/9 147/10 147/12 147/13
147/15 155/16 159/22 160/1 161/19 175/23
178/5 178/8 178/9 178/12 178/16 178/18
178/20 178/22 185/1 185/2 185/3 185/9
186/23 194/7 194/8
dance [1] 95/6
Daniels [3] 190/17 190/24 199/4
Dashon [1] 168/15
data [7] 16/10 56/19 98/1 98/4 153/12 154/11
211/8
date [3] 120/18 123/19 124/2
dated [1] 220/7
dates [1] 171/16
day [7] 52/21 76/18 117/2 136/17 181/9
201/18 213/17
DC [2] 4/7 142/9
dead [1] 76/23
deal [28] 17/4 18/22 22/23 64/14 64/20 65/14
71/8 73/6 84/5 117/25 119/2 140/2 140/10
145/25 146/1 146/4 166/17 173/2 173/8
173/17 189/10 189/12 189/24 195/25 203/8
205/23 210/24 210/24
dealing [3] 83/17 141/7 140/10
deals [3] 209/19 209/20 209/20
dealt [2] 175/16 175/16
death [1] 161/1
debit [41] 7/2 13/18 14/7 14/9 17/13 32/10
34/16 35/2 35/6 35/8 37/10 38/2 38/3 38/6
38/9 38/12 38/15 40/21 41/12 78/12 78/20
78/23 109/16 189/10 189/24 109/24 110/3
184/9 184/11 185/3 185/19 185/21 186/1
194/18 195/8 195/12 195/13 195/22 195/24
196/6 196/13
debits [1] 185/22
Debt [1] 120/25
decade [1] 13/5
decades [1] 190/7
decide [15] 19/18 21/22 21/25 55/10 55/11
57/14 58/5 66/23 87/9 94/16 100/21 139/15
215/9 215/10 215/14
decided [8] 21/8 45/13 52/22 144/19 156/24
181/12 193/12 202/10
decides [4] 66/21 96/23 100/19 166/7
deciding [1] 191/7
decision [22] 21/9 32/21 39/25 42/4 44/23
55/5 55/21 55/23 58/21 127/10 132/14 138/25
139/2 139/25 141/7 142/7 142/9 143/10 145/8
149/14 166/12 183/7
decisions [1] 54/10
declaration [2] 50/5 50/16
declarations [3] 114/17 115/7 116/3

declaratory [1] 171/2
declared [1] 179/25
decline [1] 61/4
declined [1] 87/10
decree [1] 127/9
deep [1] 27/14
deeply [1] 64/21
defeat [3] 102/19 210/14 211/1
defect [1] 17/1
defection [8] 14/15 15/19 16/24 19/7 19/14
78/18 78/21 79/4
defections [2] 71/13 75/5
defective [1] 144/10
defend [2] 96/6 96/6
defendant [8] 121/1 125/18 132/15 164/20
173/2 175/23 218/16 218/21
defendants [5] 1/9 54/25 123/13 127/17
130/12
defense [8] 29/20 90/7 90/8 96/1 97/5 97/6
104/2 159/17
defer [1] 74/5
define [3] 110/3 172/3 195/13
defined [1] 121/11
definite [1] 78/23
definition [5] 74/6 78/17 97/24 116/14
121/20
defunct [1] 64/11 133/17
degree [2] 129/17 134/19
delay [2] 181/20 181/20
delegated [1] 82/11
delighted [2] 87/5 87/22
delineating [1] 39/5
deliver [2] 61/2 98/14
delivering [1] 26/23
Delta [1] 21/18
demanded [1] 134/10
demands [1] 60/5
demonstrate [1] 62/19
demonstrated [3] 72/13 129/3 129/5
demonstration [1] 63/5
demonstratives [1] 44/4
denial [1] 54/3
denied [1] 155/20
deny [1] 145/17
DEPARTMENT [17] 4/6 17/17 32/4 32/7
77/2 78/13 91/10 91/16 94/3 95/21 101/9
113/16 177/15 183/10 186/6 187/10 187/15
depend [2] 147/1 212/18
depending [3] 42/19 158/10 182/24
depends [4] 147/4 175/20 175/22 195/11
deponents [1] 170/2
deposed [1] 159/7
deposit [1] 195/13
depositions [2] 157/25 159/10
Depot [16] 3/7 9/20 17/3 29/24 30/1 37/6
44/18 49/23 72/24 135/3 144/8 152/17 186/21
200/12 201/1 202/6
Depot's [1] 174/25
deprive [1] 121/16
deprived [1] 128/24
depriving [1] 54/13
described [2] 170/17 196/15
designed [2] 86/12 86/12
designee [2] 162/22 164/5
desires [1] 52/9
desist [1] 214/17
despite [6] 37/9 37/18 37/19 189/21 192/8
196/1
Detail [1] 124/24
detailed [1] 126/24
detailing [1] 124/24
details [1] 87/18
deter [2] 147/14 158/7
determine [4] 47/22 156/14 165/14 167/7

Case 1:11-md-02221-NGG-RER   Document 543   Filed 09/19/14   Page 231 of 255 PageID #: 15780

determined [2] 32/23 54/6
detriment [1] 69/4
developed [2] 73/21 73/24
developments [1] 136/14
devil's [2] 205/2 215/17
devoted [1] 124/24
dial [1] 11/19
dictates [1] 125/16
did [38] 11/1 11/4 12/6 21/19 32/8 43/8 48/5
51/6 53/25 71/12 84/13 87/13 92/13 105/23
116/20 116/23 116/24 121/8 138/25 141/13
148/15 164/23 170/5 183/3 184/18 186/9
186/22 188/13 189/9 189/21 189/22 190/2
192/7 199/1 204/16 211/25 218/6 219/17
did the [1] 51/6
didn't [26] 16/17 18/22 24/9 24/11 55/23
76/4 85/16 98/17 102/3 104/4 105/21 107/6
116/25 116/25 118/10 145/14 147/9 153/14
156/9 189/1 190/13 191/13 200/10 206/10
211/25 216/8
die [1] 133/8
differ [1] 132/21
difference [7] 23/25 51/5 69/20 113/14 186/5
186/7 212/22
differences [9] 37/5 174/11 174/11 175/4
175/5 175/6 175/15 175/16 176/1
differens [1] 174/8
different [54] 13/22 13/22 13/24 13/25 20/10
20/11 23/4 23/4 23/5 26/14 38/22 40/1 42/21
47/25 47/25 48/10 48/11 48/19 48/19 48/20
49/3 49/17 50/9 50/18 50/18 52/13 55/7 72/10
78/7 94/19 101/22 111/18 118/21 128/14
134/5 147/3 147/24 151/2 162/8 162/17
172/12 183/9 188/16 189/23 189/23 190/4
197/21 201/6 209/2 213/2 213/21 213/22
213/23 214/2
differential [63] 10/3 10/5 11/1 11/5 11/7
11/21 11/22 13/20 16/4 16/6 16/9 24/14 29/7
29/21 29/25 36/19 37/13 64/14 65/5 65/18
65/18 71/19 71/25 72/9 76/1 76/2 76/10 76/13
93/25 94/6 101/13 101/18 101/23 104/18
134/3 134/15 150/22 150/23 151/9 151/9
154/2 154/4 155/8 155/12 156/11 156/15
161/7 174/13 185/21 186/8 186/10 201/3
201/8 202/11 202/22 203/1 203/6 212/13
212/20 212/21 212/22 215/2 215/24
differentially [11] 11/11 24/5 36/22 134/22
154/7 154/14 154/18 160/22 161/13 194/15
208/24
differentiate [3] 76/25 78/7 93/20
differentiated [6] 29/18 32/11 32/15 34/21
207/10 207/13
differentiation [5] 65/8 66/9 79/15 79/20
79/21
differently [7] 55/7 90/10 132/4 138/2
194/18 212/15 213/16
difficult [7] 12/18 13/13 13/13 13/14 14/5
105/12 105/13
Diners [3] 153/20 154/6 154/22
direct [3] 69/1 91/8 156/18
directed [1] 75/4
direction [2] 12/16 90/2
directly [4] 8/15 94/14 106/25 178/14
disadvantage [5] 22/2 106/10 106/20 107/10
108/2
disadvantaged [2] 177/23 177/24
disagree [8] 12/11 26/11 27/1 47/8 66/3 73/5
88/11 201/24
disagreed [1] 33/15
disagreement [2] 88/9 120/6
disagrees [1] 186/1
disaster [1] 118/13 167/9

disavow [2] 12/7 64/25
discharge [3] 74/9 74/23 204/8
discipline [1] 196/15
disclosure [1] 8/13
discount [17] 70/5 70/10 70/13 70/20 70/21
88/8 89/16 95/5 106/13 106/15 113/22 114/10
114/10 114/13 114/20 115/19 213/25
discounting [7] 76/25 88/23 94/2 94/7 113/12
186/5 186/9
discounts [1] 26/20
discourage [1] 95/16
discover [40] 6/20 7/22 18/14 18/16 19/1
24/16 24/19 24/25 25/17 25/19 26/6 26/7
26/13 26/14 26/14 26/16 27/13 64/24 66/24
67/8 79/23 80/4 80/7 80/8 80/17 80/20 81/2
81/5 91/20 92/1 92/5 93/22 93/22 94/11 95/2
177/20 183/6 206/7 209/20 212/6
Discover's [4] 24/18 26/22 26/23 98/20
discovered [1] 26/10
discovery [5] 54/1 157/23 159/5 159/6 159/8
discretion [1] 34/2
discriminating [1] 137/6
discriminatory [1] 32/6
discuss [2] 33/4 123/6
discussed [2] 38/14 198/4
discussion [5] 68/8 86/15 193/16 193/19
197/18
discussions [1] 41/19
disgorgement [1] 120/19
dismiss [2] 12/2 28/20 45/14
disparage [1] 198/19
disparaged [1] 176/15
disparaging [1] 179/22
displayed [1] 61/18
displays [1] 80/4
dispositive [2] 72/8 78/17 79/2
dispositive that [1] 78/17
dispute [14] 29/10 46/1 46/4 47/15 48/20
48/23 50/1 51/22 52/17 54/5 120/2 180/13
201/3 218/8
disputed [1] 57/10
disputes [2] 47/16 53/8
disregard [1] 171/21
dissatisfaction [1] 59/17
dissemination [1] 220/22
distinct [2] 79/6 203/24
distinction [1] 55/17
distracted [1] 110/1
distributed [1] 134/11
district [15] 1/1 1/1 1/8 1/13 34/2 56/3 56/3
87/8 121/18 127/12 142/9 190/16 191/14
191/17 191/22
diversity [2] 175/21 175/22
division [3] 162/5 162/11 168/5
DMVs [1] 214/9
do [223]
dock [1] 25/13
docked [1] 100/7
docket [2] 143/12 165/25
doctors [1] 114/7
doctrine [6] 12/5 12/6 12/10 180/19 180/21
180/22
document [4] 102/11 105/17 220/6 220/20
documents [11] 81/22 101/2 101/4 101/14
102/3 102/6 107/2 149/2 149/6 150/4 152/4
does [55] 10/19 22/20 24/23 25/15 25/17
27/25 27/25 40/21 44/20 46/18 51/8 51/9 53/7
55/6 57/21 61/22 62/13 68/3 68/9 68/23 78/17
84/22 85/5 85/7 91/17 91/20 98/19 106/8
109/9 109/12 125/1 125/24 126/3 128/3
128/10 141/17 144/23 145/2 145/3 150/14
151/17 155/21 166/12 171/5 176/3 177/1
177/19 179/21 180/5 180/22 182/3 194/19
196/13 199/20 210/11

doesn't [53] 15/8 16/12 16/12 16/23 17/10
17/24 27/1 35/12 35/13 35/14 38/22 38/23
38/24 55/5 56/18 57/19 58/16 59/18 60/7 70/9
78/15 79/4 80/3 80/23 91/1 97/3 98/20 103/21
104/4 108/13 113/3 113/15 121/25 122/3
124/11 124/15 126/18 129/25 139/9 140/25
142/6 143/5 150/25 163/8 172/13 174/12
180/1 197/7 201/5 201/7 205/9 210/25 212/13
dog [3] 172/19 197/20 197/21
doing [22] 16/16 16/8 22/9 26/14 80/16 81/18
82/18 83/18 92/2 104/10 104/10 104/12
104/13 139/15 160/24 205/1 205/4 208/1 213/7
214/10 214/20 219/1
DOJ [29] 25/6 27/6 65/4 74/6 75/3 75/9
75/12 75/17 75/18 75/19 75/25 76/4 76/6 76/8
76/19 76/21 77/9 78/4 91/13 127/9 158/11
158/11 174/10 177/4 177/7 177/9 193/13
195/4 207/5
dollar [5] 89/15 127/18 129/1 129/2 147/17
dollars [5] 62/5 127/23 127/25 145/23 212/23
domestic [2] 211/3 214/12
domestically [2] 23/7 211/7
dominant [1] 67/17
don't [125] 11/12 11/16 14/17 19/7 19/10
19/22 20/4 21/20 22/8 22/12 23/6 23/6 24/8
24/8 24/9 25/9 26/11 27/14 28/18 30/6 30/25
31/16 33/16 41/19 42/11 52/12 55/1 55/15
56/10 58/2 61/16 65/20 65/22 67/11 67/13
68/16 68/17 68/19 69/22 69/25 82/19 88/10
88/15 89/17 90/14 90/24 90/25 93/9 95/6
95/14 97/21 98/6 98/6 98/6 98/9 98/12 99/5
99/14 101/22 102/10 102/11 102/21 106/20
108/16 109/25 110/13 118/3 118/3 119/3
119/3 121/14 121/24 122/2 127/2 129/14
136/7 138/13 139/10 139/12 140/5 140/22
142/16 145/21 146/10 147/23 152/13 155/21
155/25 157/8 166/4 172/13 174/11 177/22
182/5 182/20 183/23 184/21 185/8 187/17
189/24 191/1 193/21 195/16 195/24 196/7
196/12 196/23 197/9 200/25 203/13 204/19
205/1 206/13 206/19 207/23 208/1 209/11
211/8 213/16 216/2 216/6 217/21 218/17
219/16 220/15
done [25] 10/22 13/18 37/3 48/22 51/2 77/15
77/17 77/22 78/14 84/3 87/12 93/15 94/11
99/21 99/22 108/3 130/7 145/25 156/21
157/20 157/25 172/24 191/3 204/24 218/7
doom [3] 14/15 14/17 15/19
door [2] 63/15 107/1
double [4] 95/1 147/15 153/22 153/25
doubled [1] 107/5
doubt [5] 71/8 71/8 185/8 201/16 201/17
doubted [2] 7/25 201/11
Dow [2] 122/24 200/13
down [25] 13/11 26/11 28/2 43/3 48/14 49/22
52/17 69/11 77/6 87/17 95/18 102/2 126/5
135/8 137/9 142/16 154/9 159/11 163/13
163/14 182/5 185/23 197/18 200/4 200/5
downside [1] 123/24
downward [3] 92/14 129/16 154/15
dows [1] 177/15
dozen [1] 111/12
Dr [1] 185/6
Dr. [7] 71/25 91/15 91/15 152/5 152/6 185/7
185/14
Dr. Christopher [2] 185/7 185/14
Dr. Frankel [2] 71/25 91/15
Dr. Katz [1] 91/15
Dr. Velituro [2] 152/5 152/6
drabs [1] 14/8
draft [3] 40/10 116/19 121/12
drag [1] 215/6
dragged [1] 188/6
dramatic [3] 103/7 104/14 104/15

# D

draw [1] 59/5
draws [2] 63/3 195/13
dream [1] 7/21
dreams [1] 29/3
drive [2] 144/11 185/23
driven [2] 23/2 38/11
driver's [2] 125/15 126/20
drives [1] 154/8
driving [3] 7/2 7/3 7/3
drop [2] 107/8 137/3
drug [1] 13/23
drugstore [2] 72/25 152/18
drugstores [3] 206/4 206/11 206/11
Dry [1] 123/9
DSW [1] 3/17
dual [1] 211/12
dubious [2] 132/16 193/6
due [16] 31/13 35/20 37/3 42/2 43/14 62/10
71/11 94/9 107/13 116/16 144/16 144/24
160/6 160/23 181/1 208/15
Dukes [49] 35/20 37/4 39/19 39/25 42/2 54/7
54/11 54/12 54/14 54/16 60/1 62/10 62/16
62/21 62/23 63/2 63/3 120/6 120/11 120/12
120/24 121/6 121/8 141/6 141/8 141/11
141/14 141/16 142/4 144/20 145/2 145/3
145/5 146/16 146/22 146/25 147/10 147/21
170/15 170/16 170/22 171/11 174/3 174/21
176/23 178/17 178/18 178/19 178/19
dumb [1] 95/13
duration [1] 157/18
Durbin [3] 109/10 109/13 109/14
during [9] 16/9 24/19 43/19 64/22 77/7 83/5
87/19 150/2 162/6
duties [1] 171/20
dwarfs [1] 138/23
dynamics [1] 17/12

# E

each [11] 20/11 52/17 53/9 76/15 89/25 147/1
158/15 158/20 159/24 171/3 202/10
earlier [11] 22/22 29/5 93/18 109/3 129/6
135/19 149/25 186/4 203/8 211/3 213/11
earliest [1] 7/10
early [2] 73/20 115/23
earned [1] 130/2
earth [2] 33/11 204/23
ease [1] 13/9
easier [8] 13/15 13/16 13/19 19/14 25/22
27/20 206/9 215/16
easily [2] 73/10 175/18
East [6] 2/4 4/13 153/11 153/13 154/19
154/20
EASTERN [3] 1/1 87/8 191/17
easy [4] 17/1 59/15 106/5 161/22
eat [2] 22/14 26/16
eating [2] 22/8 27/15
Eckerhart [1] 134/18
economic [2] 89/19 97/20
economics [1] 91/5
economist [3] 88/22 89/6 208/12
economists [1] 152/7
effect [18] 13/12 18/4 26/5 66/13 71/6 85/13
95/22 97/16 102/5 109/10 123/21 125/20
135/22 136/7 171/25 172/2 173/5 182/11
effective [7] 27/5 57/13 58/24 123/18
effectively [5] 53/4 99/10 115/16 160/22
177/19
effectiveness [1] 112/14
effects [10] 30/16 37/12 66/13 66/15 135/19
171/15 171/24 172/3 172/5 172/6
efforts [4] 83/16 85/2 108/22 133/21
eight [1] 87/15

eighth [2] 3/13 161/4
eighth factor [1] 161/4
either [31] 12/16 42/23 51/6 54/3 76/4 113/1
146/1 159/8 160/10 164/20 166/10 187/13
216/8
elected [1] 168/4
election [4] 46/2 49/5 51/5 51/7
elective [1] 49/10
electronic [2] 112/17 209/4
electronically [1] 44/5
elects [1] 113/2
element [5] 93/2 109/6 115/20 118/16 192/19
elements [2] 10/14 167/18
Eleven [7] 2/7 14/23 44/17 64/2 64/9 72/23
208/11
eliminate [4] 32/14 38/22 46/5 115/17
ELMORE [1] 3/8
else [13] 58/2 67/18 79/9 86/15 93/16 97/12
100/7 138/17 139/6 161/2 161/3 191/10
220/15
else's [1] 86/1
elsewhere [1] 202/25
embark [1] 12/24
embed [1] 91/4
embedded [1] 78/23
embrace [3] 27/9 181/14 181/15
embracing [1] 181/14
emersed [1] 87/18
emphasize [1] 141/5
emphasized [1] 46/2
emphatic [1] 72/12
employee [1] 150/3
employer [1] 114/4
Enabling [2] 31/13 45/2 46/9 51/24 171/13
171/15 172/8 173/10 188/21 218/23 219/5
219/6
encompasses [1] 143/19
encourage [6] 85/9 95/16 100/9 100/11
100/12 100/12
encyclopedia [1] 20/15
end [15] 31/16 31/19 52/21 73/10 77/4 90/23
105/7 114/22 117/2 133/18 136/18 185/10
192/23 197/12 220/7
ended [3] 121/19 184/5 191/18
endless [1] 27/18
endorsement [1] 75/20
ends [3] 20/11 177/11 185/18
enforce [2] 33/11 49/1
enforceability [1] 7/24
enforceable [1] 51/22
enforced [1] 45/18
enforcement [6] 127/9 149/16 162/9 167/24
167/25 168/4
enforcing [1] 171/20
engage [8] 5/13 13/10 35/17 35/18 68/24
72/20 76/10 78/21 167/15 171/9 183/9 183/22
196/14
engage in [1] 183/22
engaged [3] 182/12 183/16 211/10
engagement [1] 148/15
engaging [2] 113/13 182/15
engendering [1] 24/14
engineer [1] 64/12
engineering [2] 64/23 96/13
Engineers [1] 96/9
enjoin [1] 155/14
enjoined [2] 170/25
enormous [5] 112/1 125/1 154/8 154/17
154/10
enough [4] 27/14 61/14 95/13 126/24
enroll [1] 115/23
ensure [1] 180/5
enter [6] 40/20 52/16 66/21 113/7 132/15
189/4

entered [2] 33/23 59/6
enterprise [1] 125/15
Enterprises [2] 3/2 131/16
enthusiastic [1] 199/7
entire [14] 23/21 37/22 38/6 54/17 69/7
72/24 77/7 104/2 120/5 129/18 130/9 130/17
141/1 207/25
entirely [3] 75/16 76/20 125/9
entirety [1] 173/24
entities [17] 41/15 41/16 42/6 42/7 42/23
111/13 111/14 111/23 115/8 116/23 116/25
117/3 118/9 163/25 164/2 165/11 166/20
entitle [1] 127/18
entitled [5] 134/17 134/21 155/4 220/2 220/6
entitling [2] 47/14 48/10
entity [1] 117/21
entity's [1] 165/14
entrant's [1] 137/3
entry [7] 67/8 93/17 93/22 93/23 100/8
100/12 143/12
enunciated [1] 171/18
environment [1] 35/14
envisioned [1] 122/12
equal [3] 24/1 24/4 201/6
equally [1] 36/25
equation [2] 23/17 123/23
equitable [4] 1/2 1/2/3 147/7 147/8
equivalent [1] 79/25
error [1] 127/5
errors [1] 208/13
escalation [1] 85/9
escape [1] 105/19
ESQ [16] 1/19 1/23 1/24 2/5 2/6 2/10 2/15
2/20 3/3 3/5 3/10 3/15 3/21 4/4 4/8 4/9
essence [2] 8/4 69/2
essentially [7] 39/13 112/13 114/2 133/1
133/2 138/23 188/23
establish [4] 106/5 106/6 155/25 160/1
established [3] 47/24 155/12 155/20
establishes [2] 54/12 54/14
establishing [1] 159/22
establishment [1] 159/15
estimated [1] 112/23
estoppel [1] 161/16
et [3] 1/9 44/16 148/21
evaluated [2] 54/21 174/4
evaluation [2] 32/12 74/5
even [57] 20/14 25/9 27/6 32/10 34/8 35/3
37/8 37/8 37/17 38/25 40/8 41/11 46/20 49/16
64/19 68/19 73/15 74/12 74/14 75/2 75/18
75/19 75/22 76/12 77/2 77/4 77/9 79/21 81/6
113/11 115/13 117/14 120/18 121/14 122/10
122/24 123/11 124/13 124/18 127/5 128/14
129/12 129/19 133/6 138/12 141/20 141/21
149/5 171/15 172/15 177/21 193/21 208/17
208/17 208/17 209/11 216/4
even if [1] 122/10
event [2] 128/6 155/19
eventually [2] 92/10 133/8
ever [21] 6/21 7/17 7/24 21/17 41/14 90/13
97/17 102/15 104/8 127/25 133/2 136/11
136/19 139/17 157/4 159/7 167/3 200/1 204/3
211/14 212/6
every [38] 9/13 11/14 12/16 15/4 15/5 15/25
39/22 55/10 55/15 55/16 57/11 57/18 61/10
61/12 73/2 76/17 76/18 82/8 88/22 90/18 91/2
99/14 101/15 108/15 115/7 133/18 136/17
146/22 147/3 147/17 172/14 174/16 176/1
192/7 200/7 200/9 219/4 219/6
everybody [17] 18/15 21/14 22/15 35/19 83/7
90/5 95/8 133/16 135/10 139/6 161/2 161/2
174/15 180/17 180/18 192/6 215/21
everybody's [1] 22/8

# E

everyday [1] 79/24
everyone [15] 86/1 90/6 91/12 93/16 95/25 99/8 128/24 136/21 137/11 138/18 139/15 139/25 140/23 157/13 221/6
everyone's [2] 28/15 137/24
Everyone's going [1] 28/15
everything [9] 11/14 31/19 66/22 73/5 94/24 126/7 130/25 148/1 193/4
evidence [63] 14/12 14/16 15/20 15/21 15/21 16/5 16/11 16/14 16/16 17/5 17/5 17/16 22/17 22/17 23/2 30/23 30/25 33/10 48/9 48/13 53/22 54/19 54/19 56/25 57/9 62/18 68/2 69/19 69/22 70/1 74/15 74/17 74/22 74/22 75/3 82/18 83/17 88/19 88/22 130/7 137/16 138/12 138/13 138/14 150/1 207/16 207/19 208/2 208/4 208/6 208/6 208/7 208/16 211/5 213/4 214/19 215/2 215/3 215/3 215/5 216/15 220/14 222/12
evident [1] 72/6
eviscerate [1] 58/11
evolved [1] 91/5
ex [1] 213/3
exact [2] 133/4 142/9
exactly [18] 8/25 9/5 51/9 83/21 100/18 121/6 121/22 130/13 135/13 139/7 142/13 151/3 151/22 170/7 180/19 209/18 210/13 213/4
example [19] 14/3 17/22 18/9 18/10 31/13 50/12 88/6 89/14 89/15 94/11 94/19 113/19 118/5 125/19 132/13 177/13 213/11 213/17 214/16
examples [2] 116/3 116/18
exceed [2] 10/23 10/24
excellent [2] 102/15 165/24
except [5] 56/22 109/2 135/15 141/1 195/9
exception [3] 58/22 114/6 198/11
exceptions [1] 150/7
excerpts [1] 220/9
excessive [1] 129/2
exchange [3] 113/21 118/17 198/12
exchanges [9] 112/17 112/25 113/1 113/7 113/18 115/2 115/6 115/23 117/14
excited [2] 93/13 105/8
excluded [1] 163/25
exclusively [1] 60/6
excuse [3] 15/25 102/25 160/14
executives [1] 104/6
exercise [6] 58/17 106/3 176/14 176/21 190/2 190/5
exercising [1] 151/10
exhibit [8] 152/5 219/21 219/23 219/25 220/2 220/6 220/9 220/18
exhibits [5] 77/14 82/13 219/14 220/14 222/12
exist [3] 41/9 85/16 204/20
existed [2] 24/21 190/19
existence [1] 65/5 109/10 189/16 203/16
existing [4] 23/13 40/23 120/18 186/17
exists [8] 37/22 39/17 39/17 112/12 124/8 129/11 180/5 182/22
expand [1] 18/12
expect [1] 7/14
expecting [1] 107/25
expense [1] 69/1 157/19 157/20
expenses [3] 114/6 114/9 114/16
expensive [1] 95/4
experience [8] 20/17 26/2 28/22 57/3 101/11 104/9 147/1 176/16
experienced [1] 194/8
experiment [2] 7/9 14/12
expert [20] 14/24 71/25 74/14 76/12 91/13 91/14 91/15 91/15 100/2 110/3 136/5 136/16

152/7 157/24 157/25 159/9 159/9 185/7 186/1 208/11
experts [5] 7/22 21/24 91/12 91/13 208/6
explain [7] 11/6 13/13 13/15 16/5 16/16 51/4 112/11
explained [2] 54/24 88/16
explaining [1] 111/16
explains [1] 149/23
explanation [1] 146/16
explicitly [1] 217/25
exploiting [1] 64/11
exposed [1] 101/12
exposure [1] 200/16
express [180] 1/3 1/9 3/12 5/8 5/16 5/18 6/13 10/25 11/10 19/22 23/21 25/25 26/3 26/4 26/7 26/25 27/2 29/14 29/17 29/25 32/2 32/17 33/23 34/23 35/5 36/8 36/13 36/21 36/21 38/10 39/21 40/4 40/9 40/14 40/19 40/22 45/17 46/15 47/1 51/12 52/14 53/5 58/14 59/24 61/17 64/11 64/24 65/3 66/6 66/24 74/11 75/3 78/25 79/14 79/23 82/4 82/7 84/6 84/9 84/18 84/25 85/4 85/10 89/1 89/24 90/4 90/6 90/13 91/17 91/24 95/4 95/24 96/1 96/17 97/3 98/5 98/19 100/7 100/24 101/1 101/2 101/3 102/5 103/5 104/4 104/17 104/23 105/1 105/16 106/9 106/12 106/14 107/12 107/16 107/22 112/3 114/11 116/4 116/7 116/15 116/24 118/16 123/17 124/3 124/7 125/14 125/16 125/25 126/20 131/4 132/7 134/6 135/16 137/5 138/4 138/6 138/22 139/14 140/4 140/11 150/12 150/14 151/17 158/12 160/9 160/17 163/3 164/7 164/10 166/15 170/13 174/7 174/12 176/18 177/3 177/18 177/19 178/1 178/4 182/1 182/3 182/17 182/20 183/3 183/20 189/15 190/6 192/4 192/17 193/9 193/12 194/19 194/21 195/7 195/10 195/19 195/19 196/7 196/8 196/12 196/13 196/14 196/16 196/21 196/25 197/3 197/11 202/19 204/15 205/9 206/5 206/18 206/25 209/20 210/12 212/7 214/2 215/9 217/25 220/11
Express' [6] 74/4 74/7 91/12 92/20 95/18 98/2
Express's [19] 32/5 35/4 35/7 60/4 101/9 101/11 124/9 125/8 137/2 170/23 182/2 182/4 185/12 186/8 186/10 187/7 194/10 199/12 208/22
expressed [1] 120/11
expressly [6] 113/11 113/16 166/9 178/19 186/14 186/22
extent [7] 77/9 109/18 116/14 146/11 178/3 188/21 203/5 209/16 220/18
extinguish [6] 73/16 75/1 139/10 142/12 144/14 168/10
extinguishes [2] 120/16 144/7
extinguishing [1] 143/7
extolling [1] 135/7
extra [4] 23/11 90/22 94/23 213/18
extraordinarily [1] 147/17
extremely [5] 117/9 140/2 159/17 176/20 178/25
eye [1] 42/14

# F

face [4] 37/15 57/23 178/11 196/19
faces [1] 176/2
facet [1] 16/20
facing [1] 70/5
fact [36] 10/16 34/12 54/21 56/24 68/15 68/19 74/24 84/23 86/22 94/9 96/23 97/3 100/17 100/18 101/8 102/4 104/18 110/2 115/7 115/13 117/5 151/16 154/2 156/5 156/7 156/12 157/23 164/6 165/1 176/2 200/21 209/24 209/25 213/6 219/2

factor [16] 73/9 73/9 98/15 119/15 157/18 158/24 159/4 159/11 159/15 159/23 160/3 160/4 160/6 161/4 161/20 210/7
factors [6] 34/10 43/12 149/13 154/25 155/24 157/17
facts [5] 46/24 54/3 69/12 210/22 216/13
factual [2] 180/16 180/21
Fail [1] 49/8
failed [4] 74/9 74/21 133/18 133/21
fails [3] 47/19 47/20 54/9
failure [1] 119/20
fair [13] 33/7 33/8 34/9 112/3 118/18 118/25 119/4 120/24 149/8 155/22 193/3 205/20 208/10
fairly [3] 108/14 108/21 179/4
fairness [15] 1/12 2/19 5/2 5/13 5/15 6/17 71/3 73/10 74/3 74/9 75/24 83/17 123/6 125/11 158/5
faith [6] 34/3 45/25 48/24 49/2 52/8 52/18
fall [2] 56/9 96/13
fallacy [3] 97/7 98/18 102/21
falls [2] 16/1 119/20
false [5] 132/8 165/18 165/19 165/23 166/7
Falvo [1] 3/2
familiar [4] 112/18 113/3 165/22 168/1
family [2] 179/19 179/20
far [5] 7/2 17/20 18/13 33/5 99/7
farfetched [1] 7/8
fast [1] 77/11
fatally [1] 33/22
fate [1] 161/17
favor [5] 12/3 17/7 28/20 137/6 151/21
favorable [1] 140/15
favorite [1] 170/15
Fax [1] 4/14
FCC [1] 127/9
FCRR [1] 4/13
federal [19] 21/4 45/2 51/25 85/24 85/25 112/23 113/2 113/5 113/6 113/21 115/14 128/16 164/13 164/18 165/18 166/11 175/21 175/25 218/23
federally [1] 113/18
Federation [10] 2/2 5/11 7/12 43/21 44/3 44/12 44/15 48/8 48/17 50/4
fee [21] 31/18 107/3 107/4 127/19 128/5 128/12 128/17 128/25 129/2 130/2 130/3 134/12 134/13 134/19 134/22 134/23 137/2 137/4 140/16 147/2 185/17
feel [1] 106/20
fees [14] 7/1 23/9 33/24 34/1 34/9 83/25 129/10 129/25 130/5 134/4 134/7 185/23 213/21 214/10
FEINBERG [5] 2/15 33/16 40/2 111/10 111/12
felt [4] 33/14 104/7 195/17 195/19
fertile [1] 67/3
few [13] 38/9 62/8 71/10 75/8 79/18 112/24 146/12 150/11 151/21 151/23 151/25 181/23 182/15
fewer [2] 71/13 106/12
Fibreboard [1] 200/22
fiduciaries [1] 127/15
fiduciary [2] 130/15 130/18
field [1] 136/17
Fifteenth [1] 2/14
fifth [2] 4/3 159/23
fifth factor [1] 159/23
Fifty [1] 158/17
fight [1] 32/23
fighting [3] 88/25 89/1 99/20
figure [6] 25/8 95/12 110/4 116/7 161/19 167/12
file [3] 128/22 133/13 214/16
filed [6] 6/12 50/6 87/10 87/19 128/2 128/4

**F**

finac... [5]  133/25 156/22 160/8 201/14
220/23
fill [1]  136/13
filled [1]  165/25
final [5]  144/7 154/24 170/9 170/20 187/6
finally [4]  60/20 81/12 128/5 188/19
financial [1]  104/12
find [21]  6/14 26/4 42/11 42/13 63/14 69/19
78/24 79/1 97/18 110/8 116/25 118/21 132/11
155/11 164/19 181/9 188/11 188/13 200/23
200/24 211/22
finding [2]  57/8 132/18
findings [1]  54/21
finds [1]  63/13
fine [8]  15/7 20/7 23/4 160/24 162/13 209/10
216/25 218/13
finish [1]  103/5
firm [1]  136/11
firmly [1]  115/12
first [35]  5/22 5/23 6/21 20/21 20/22 29/12
40/20 44/22 65/11 68/4 75/11 75/13 76/8
79/18 84/7 95/23 107/1 115/25 116/1 119/22
121/23 127/6 128/4 131/25 143/2 146/16
149/14 151/13 157/18 168/8 173/21 180/6
187/5 193/10 198/25
fit [1]  127/7
fits [1]  105/8
five [6]  8/4 65/24 121/25 122/1 125/5 130/3
fix [3]  85/2 96/12 190/1
fixed [1]  85/4
fixing [1]  97/9
flat [1]  208/13
flat-out [1]  208/13
flavor [1]  215/24
flaw [1]  177/16
flaws [3]  38/7 177/14 177/15
flesh [1]  14/2
flew [1]  23/10
FLEXNER [1]  1/21
flies [1]  196/19
flock [2]  24/17 202/13
flocking [1]  22/15
Floor [2]  1/22 2/9
Florida [7]  8/18 9/18 55/21 56/4 71/13
214/16 214/18
florist [1]  42/10
flow [2]  132/6 143/25
flowers [2]  40/13 40/16
flowing [3]  134/8 134/8 134/9
flushed [1]  43/19
fly [3]  21/14 21/16 22/9
focus [7]  13/7 17/8 44/19 48/5 60/6 63/10
78/4
focused [2]  48/6 83/21
focusing [1]  170/14
folded [1]  202/19
folder [3]  101/6 102/4 153/15
folks [2]  16/6 29/11
follow [2]  163/2 186/24
following [6]  71/10 123/18 171/18 178/12
178/23 185/18
follows [1]  49/9
fomented [1]  203/9
footnote [2]  40/7 53/24
force [1]  140/20 197/5 210/19
forced [1]  96/19
forceful [1]  70/8
forces [3]  6/16 7/16 84/14
forcing [1]  136/21
foreclosed [2]  179/7 219/8
foremost [1]  75/11
forever [8]  23/22 65/17 65/21 66/11 66/19

67/19 72/3 144/4
forewarned [1]  165/8
forget [2]  94/1 11/20
form [10]  13/17 22/19 23/8 25/2 25/15 26/5
70/8 114/21 185/22 209/5
formal [2]  36/20 201/10
formally [1]  123/12
former [1]  111/5
forms [3]  30/3 65/4 162/8
forth [4]  17/13 20/14 56/24 113/14
forums [1]  201/7
forward [23]  64/18 67/18 73/12 73/13 74/13
76/3 77/24 84/19 133/15 151/24 152/23
152/25 155/7 155/21 159/3 177/22 180/2
193/12 201/1 201/2 202/11 204/3
foster [1]  17/11
fought [4]  33/20 47/2 86/9 99/17
found [14]  24/9 24/10 39/21 65/16 74/15
89/10 93/23 132/5 132/24 142/5 142/6 161/11
186/24 200/9
fount [1]  153/12
four [12]  8/4 8/4 67/9 104/25 109/5 109/6
132/4 137/20 139/5 149/12 152/11 181/2
fourth [2]  93/2 159/15
fourth element [1]  93/2
fourth factor [1]  159/15
fraction [1]  42/24
framework [1]  199/17
franchises [1]  198/14
FRANK [1]  3/10
Frankel [2]  71/25 91/15
frankly [3]  12/17 40/1 58/2
fraud [1]  38/10
free [20]  13/18 18/6 18/8 19/5 19/11 21/14
21/16 22/9 22/13 27/24 59/15 80/15 80/21
94/24 94/25 133/3 218/10 218/16 218/18
218/22
freely [1]  11/12
Friday [1]  220/22
FRIEDMAN [22]  1/17 1/19 5/4 5/23 6/7
6/10 68/25 79/12 79/20 80/14 82/5 85/3 92/5
94/10 100/23 153/17 173/21 184/22 190/18
193/8 197/11 197/16
Friedman's [1]  174/23
friends [1]  206/14
front [9]  22/19 23/14 54/2 82/20 84/11
190/22 199/2 201/18 201/19
FTC [1]  166/20
fulfilled [1]  187/16
full [4]  76/6 124/23 144/17 205/13
fully [1]  86/3
functionally [1]  160/12
fund [2]  161/21 161/22
Funda [1]  90/9
fundamental [1]  31/1
fundamentally [2]  125/14 127/13
furniture [1]  136/13
further [7]  22/18 33/4 43/18 148/4 195/5
220/25 221/3
furtherance [1]  210/6
future [55]  40/5 40/10 40/25 41/4 66/12
66/13 66/15 66/16 116/12 116/15 116/19
120/17 121/12 121/13 121/22 122/25 124/6
124/12 125/9 125/16 125/17 125/19 126/22
127/5 128/2 129/7 132/1 133/1 133/1 133/10
133/11 135/18 135/21 136/23 138/3 143/20
144/14 145/9 145/12 147/12 147/13 147/15
174/7 176/9 176/10 178/9 178/16 186/14
186/15 186/17 186/23 195/9 201/22 202/18
210/20
futures [2]  121/15 122/18
fuzzy [1]  209/12

**G**

GA [1]  90/7
gain [2]  24/20 158/2
gained [1]  20/19
gallon [2]  69/13 70/18
gamble [1]  12/23
game [1]  125/18
GARAUFIS [1]  1/12
GARY [3]  1/19 5/4 6/10
gas [16]  68/21 68/22 69/11 69/12 69/13 70/3
80/17 81/3 89/14 94/25 95/1 95/3 198/9 211/9
211/11 211/22
gasoline [2]  70/18 213/2
gave [7]  17/22 21/24 87/24 97/13 97/25
150/12 218/16
Gay [1]  2/4
general [10]  101/7 101/8 162/22 164/4
164/12 164/16 165/12 166/18 166/21 167/5
generally [2]  37/13 170/19
generate [1]  71/15
generator [1]  89/8
genuine [2]  210/16 210/23
geographic [1]  72/16
geographically [1]  20/8
get [113]  5/12 8/14 10/5 11/18 11/18 11/21
17/3 17/4 19/22 24/11 27/23 29/1 30/9 30/25
31/15 33/24 34/8 35/9 37/15 38/5 39/11 40/3
41/9 41/9 49/3 49/21 53/13 53/20 59/20 66/23
70/21 76/15 77/8 82/19 83/1 83/17 84/3 84/7
84/18 89/1 89/21 91/3 92/9 93/17 93/24 94/4
94/5 94/25 99/2 99/17 99/21 99/22 100/5
100/8 101/24 103/1 107/1 107/7 107/11
107/15 107/22 108/23 109/25 110/1 116/16
116/18 116/20 116/24 117/5 117/21 117/24
118/1 118/13 121/25 122/1 122/2 122/7 126/6
129/14 129/15 130/12 130/14 137/15 138/17
138/25 139/3 139/20 139/22 144/4 154/25
157/11 160/14 161/1 161/1 174/9 175/3
175/20 176/4 180/9 193/4 193/5 197/16
199/10 202/11 203/3 206/1 209/11 209/21
210/22 212/24 215/23 216/10 218/12
gets [12]  9/14 15/13 29/22 40/4 61/3 63/11
95/4 122/5 178/12 182/6 192/11 192/24
getting [17]  17/14 23/21 41/8 66/13 77/24
78/1 107/23 117/20 136/10 137/21 137/25
138/11 146/19 167/3 167/12 176/7 176/8
giant [1]  28/13
gift [2]  87/11 87/11
Gilbert [1]  91/13
Giuliani [4]  41/1 186/12 186/12 199/23
give [43]  13/3 26/17 31/5 32/13 44/7 48/22
50/9 55/12 57/16 58/5 59/14 60/17 76/14 78/6
80/19 84/18 86/1 94/23 95/1 95/2 95/3 95/13
96/21 100/20 117/24 118/5 138/9 138/10
140/9 140/25 144/15 147/16 164/24 176/3
176/18 176/19 201/22 202/5 208/15 210/19
213/11 215/4 219/14
given [15]  23/18 23/19 29/6 32/18 32/19
86/22 86/22 93/3 93/7 118/8 119/4 138/16
149/19 156/23 176/7
gives [7]  18/5 93/10 105/7 133/20 147/16
164/11 166/9
giving [11]  19/4 19/4 58/10 76/9 96/20
114/23 118/14 137/22 137/25 142/11 146/7
glad [1]  76/8
gladly [1]  163/14
glass [1]  160/15
Gleeson [22]  34/22 35/15 37/22 43/9 83/6
84/1 84/2 84/25 86/10 87/6 87/10 108/5
108/19 170/17 178/14 181/10 182/19 183/20
184/1 186/22 190/13 191/18
Gleeson's [4]  45/11 106/24 143/10 183/7
go [94]  10/8 12/21 12/23 14/20 17/1 17/3

# G

go... [88] 22/1 22/2 24/12 28/13 29/3 29/7
29/9 33/5 39/10 40/12 43/11 44/10 49/9 51/12
52/6 52/24 52/24 53/1 53/11 56/13 63/9 66/11
66/19 67/19 67/22 69/10 69/12 71/1 72/23
75/21 75/23 77/4 80/12 82/11 82/24 86/25
88/2 88/19 93/12 99/7 99/7 103/8 103/23
104/17 107/21 108/24 114/8 126/8 126/17
133/6 133/12 136/17 136/18 141/8 143/13
146/14 148/4 149/7 150/16 152/17 154/10
154/13 155/7 157/15 159/6 159/13 159/25
161/14 165/6 166/20 170/10 171/5 175/20
175/24 175/24 188/23 191/17 193/12 201/1
201/2 201/7 202/11 202/24 217/4 217/5
217/18 217/24 218/4
goes [16] 18/13 38/15 61/1 70/2 79/24 82/5
87/9 120/7 126/4 172/8 173/10 174/2 175/14
180/15 194/7 216/20
going [153] 5/20 5/24 7/18 8/14 10/16 10/18
14/13 14/14 14/16 14/22 15/1 15/24 21/9
21/10 21/10 23/3 23/15 23/15 24/15 24/17
25/8 27/1 27/3 27/8 27/23 28/2 28/8 28/15
28/15 28/19 29/11 29/13 29/14 29/15 29/17
29/20 30/4 30/5 30/7 31/5 37/7 37/20 37/20
38/10 38/21 39/1 44/19 51/22 52/17 52/23
52/24 53/13 56/9 56/16 60/17 63/9 63/10
66/21 66/23 67/10 67/18 68/18 77/4 77/8
77/10 77/10 77/16 77/17 80/15 81/6 81/8 81/9
81/16 81/20 81/24 82/5 82/6 82/9 82/10 82/15
84/19 85/9 88/5 91/19 92/22 92/24 93/17 97/2
100/1 100/8 100/21 101/6 101/7 101/25 103/1
103/5 104/3 106/1 106/3 109/22 109/22
116/16 116/17 116/20 117/9 123/14 133/3
135/13 135/14 135/15 135/18 136/2 136/11
137/14 137/15 139/2 141/9 143/15 144/1
148/12 149/5 150/24 155/21 158/11 161/15
167/10 168/25 170/6 170/12 175/5 179/15
180/2 182/5 182/5 188/7 191/17 197/9 199/22
202/3 203/9 205/14 206/1 206/20 208/18
210/19 211/7 212/12 212/12 214/24 216/5
216/10 219/20 219/22
GOLD [2] 3/15 148/8
gone [3] 63/9 157/22 180/25
good [42] 5/5 5/6 5/7 5/9 6/8 6/9 18/4 31/24
31/25 33/16 45/25 48/24 49/1 52/8 52/17 64/6
64/7 96/16 100/24 104/19 107/17 111/11
116/5 117/10 119/9 119/10 124/11 126/13
126/16 131/15 138/19 138/20 142/6 142/8
148/6 148/7 148/22 148/23 170/4 198/17
206/14 210/11
Google [1] 127/11
got [39] 56/14 56/15 57/11 68/21 82/18 86/20
91/7 93/23 99/23 101/25 102/25 105/8 107/4
109/17 116/21 144/12 146/1 146/19 150/3
152/16 152/18 158/22 172/6 177/3 179/10
189/16 190/10 191/18 191/19 192/2 194/23
209/15 210/11 211/22 213/24 214/7 214/18
216/13 219/10
gotten [4] 30/14 93/13 190/12 200/15
govern [1] 144/20
government [45] 47/24 48/7 77/13 82/4
112/23 113/2 113/5 113/6 113/21 115/15
150/2 163/4 163/25 165/1 165/21 166/7
166/11 166/17 167/2 167/3 168/10 187/5
187/8 187/12 187/18 187/20 187/23 188/10
188/12 194/5 196/20 203/19 205/5 205/10
205/12 205/13 205/16 205/16 205/18 205/22
205/23 205/24 206/2 206/6 213/19
government's [8] 86/5 103/10 106/9 163/11
166/13 167/23 203/18 220/10
governmental [1] 164/2
governments [1] 93/16
governs [2] 145/3 145/5

grail [1] 134/15
grant [6] 46/19 146/23 164/15 164/18 164/19
189/2
grant an [1] 189/2
grant is [1] 146/23
grant of [3] 164/15 164/18 164/19
grant them [1] 46/19
granted [4] 12/20 42/1 146/25 174/19
granular [1] 78/18
gravity [1] 122/18
great [18] 15/8 102/16 104/10 104/10 104/12
104/13 125/3 129/7 140/2 140/10 152/2 153/6
153/6 179/8 189/10 189/12 203/8 206/14
greater [4] 17/21 160/17 160/18 173/5
Greek [1] 40/13
Grinnell [11] 34/10 43/12 73/9 93/1 109/6
119/15 149/13 154/25 155/24 157/16 158/24
Grinnell IV [1] 93/1
grocery [1] 94/20
ground [1] 210/23
grounds [4] 42/9 122/20 156/23 170/19
group [40] 1/17 2/2 2/7 41/11 41/19 42/22
43/21 44/2 49/15 49/21 53/16 64/1 64/2 64/2
66/20 67/2 73/1 91/8 93/18 98/1 99/25 105/22
111/9 112/1 114/25 136/24 137/9 137/10
138/17 138/17 139/24 139/24 139/24 148/24
153/17 179/10 179/16 194/15 194/17 210/4
groups [3] 207/3 217/20 217/24
Grove [1] 218/13
grow [1] 17/17
growing [1] 105/24
guaranteed [1] 121/17
guess [1] 100/23
guide [1] 31/1
Guild [1] 127/11
guts [1] 132/14
guy [2] 99/6 93/14
guys [2] 144/11 216/1

# H

had [65] 6/16 7/21 7/22 7/25 11/14 11/24
16/4 16/6 23/24 24/5 29/4 29/15 30/2 30/12
33/14 33/15 41/14 54/2 74/23 80/9 83/13
86/22 87/14 87/18 87/18 88/12 93/1 96/12
99/15 107/17 108/14 108/21 109/14 109/23
117/10 117/20 118/19 120/13 121/2 121/3
121/4 122/20 129/12 133/25 140/7 147/7
147/20 148/15 149/9 155/13 160/24 160/25
178/11 182/10 183/6 183/8 183/16 184/10
189/24 190/6 191/10 191/21 200/15 204/1
211/3
hadn't [2] 22/10 200/18
HAGENS [1] 4/2
half [6] 15/4 15/15 27/11 62/5 123/23 199/1
HAMER [3] 4/9 162/8 168/5
Hammer [1] 75/20
hand [14] 33/4 40/3 40/4 48/14 64/21 65/3
74/19 149/1 167/16 190/8 194/16 202/13
219/17 219/17
handed [3] 36/14 150/4 152/4
handful [5] 9/15 153/1 173/1 189/14 198/10
handle [2] 167/6 190/14
handled [1] 192/17
handles [1] 166/18
handling [1] 199/8
hands [1] 133/2
hanging [1] 91/25
happen [24] 7/15 16/1 16/3 65/8 67/10 80/15
80/23 81/9 81/9 94/9 96/14 96/20 96/22 100/2
102/10 103/7 104/3 104/4 104/4 106/2 116/21
118/3 151/3 212/13
happened [16] 16/1 33/13 37/18 37/19 88/24
131/1 160/23 214/8 216/9 216/9
happening [1] 26/22

happens [9] 28/12 30/11 30/12 51/25 75/11
80/16 106/24 133/15 155/5
happy [4] 31/10 31/18 75/20 83/8
hard [6] 27/23 33/20 76/24 86/7 219/22
219/22
hard-fought [1] 33/20
harm [5] 77/15 77/17 77/21 177/8 210/17
harmful [1] 77/25
harms [2] 210/17 210/18
has [152] 8/18 10/22 10/25 11/14 12/12
16/11 19/23 19/24 20/19 21/7 21/8 21/15
21/9 26/20 28/25 29/15 29/21 32/10 32/12
34/10 37/3 37/18 37/19 38/7 39/18 41/14
44/13 45/16 45/19 45/23 49/2 49/14 49/15
49/16 49/17 49/19 49/19 49/20 50/4 50/12
50/13 50/14 50/23 50/24 51/11 52/15 53/24
55/8 57/5 57/18 59/24 60/4 60/6 61/17 61/21
62/17 63/5 67/7 70/22 73/13 75/9 75/14 75/25
78/13 80/6 80/14 82/7 85/12 87/8 89/6 92/17
93/5 93/15 95/21 95/25 96/1 96/5 97/17 102/5
103/5 103/19 105/16 109/19 112/4 113/20
114/16 118/16 123/3 123/19 126/14 128/24
129/8 132/5 133/14 133/18 134/6 136/8
138/21 140/22 141/16 149/9 152/3 152/22
152/24 155/9 155/19 158/4 159/2 159/7 159/7
160/7 161/17 162/19 163/18 164/5 164/15
164/17 164/21 165/2 165/12 165/12 166/15
168/2 170/19 171/7 171/13 173/5 173/6
175/19 182/4 187/10 187/16 187/20 187/23
188/12 189/9 190/6 191/10 191/11 192/4
195/23 196/1 196/2 197/3 199/22 200/1 201/1
201/4 202/10 203/24 211/1 214/16
hasn't [2] 122/21 221/4
hat [1] 103/3
hate [1] 82/18
Hausman [1] 14/24 208/12 208/13
Hausman's [1] 216/14
have [405]
haven't [8] 29/8 83/15 134/20 146/9 152/14
181/19 193/15 215/19
having [17] 6/18 19/8 36/2 47/3 60/15 75/24
87/14 102/16 105/7 105/22 144/15 158/14
184/6 196/17 197/2 197/12 210/16
he [242] 24/4 30/5 33/17 33/18 35/22 56/18
60/9 60/9 78/16 83/9 84/4 84/5 84/5 84/8 84/9
85/4 86/11 86/21 86/22 86/24 87/13 87/14
87/17 87/17 87/19 87/20 88/8 90/9 90/12
90/14 90/17 90/23 92/11 93/16 94/11 99/11
99/11 99/23 99/24 104/7 104/7 104/8 104/9
104/19 104/21 104/22 104/25 109/1 110/2
110/4 110/6 148/13 148/15 148/15 150/25
168/17 168/21 168/23 173/22 182/21 185/17
185/18 190/14 191/4 199/5 208/10 215/5
he'll [1] 151/1
he's [17] 87/12 90/24 94/10 98/21 99/10
99/13 104/6 104/7 104/8 104/11 104/13
168/18 168/18 168/19 182/22 194/1 208/12
head [3] 89/22 95/7 212/15
healed [1] 171/14
health [27] 2/12 111/10 111/13 111/18
111/22 112/1 112/2 112/4 112/6 112/9 112/11
112/17 112/22 113/7 113/9 113/17 114/2
114/16 114/18 115/4 115/17 115/25 116/1
116/6 117/12 118/21 119/2
healthcare [5] 112/25 113/1 113/18 113/21
114/6
healthcare-related [1] 114/6
hear [10] 7/18 28/5 75/20 81/13 135/3 136/16
135/16 137/16 142/22 169/4
heard [25] 14/21 32/10 47/2 48/2 50/11 55/7
60/8 67/24 82/5 83/15 106/16 116/22 117/8
119/22 131/24 142/10 147/25 162/15 169/2
170/12 174/24 178/17 190/7 193/5 215/25
hearing [12] 1/12 5/2 5/13 5/15 6/6 6/17

Case 1:11-md-02221-NGG-RER    Document 543    Filed 09/19/14    Page 1 of 20 PageID #: 23283

# H

**hearing...** [6] 83/18 108/14 156/16 158/5 169/3 220/24
**heart** [3] 146/11 173/17 203/18
**heavily** [5] 159/1 159/14 159/21 159/21 167/17
**heavy** [2] 12/16 30/8
**Hecht** [1] 120/23
**heightened** [4] 54/22 56/25 62/18 176/3
**held** [3] 8/12 160/6 168/8
**help** [10] 59/19 73/14 87/25 88/1 104/24 139/17 157/11 157/14 159/23 186/13
**helped** [1] 86/9
**helpful** [1] 181/18
**helps** [1] 89/20
**Hemphill** [20] 22/25 23/24 27/22 65/16 71/4 73/19 74/5 78/16 79/3 81/8 86/19 86/20 99/9 99/21 123/19 129/4 132/4 151/11 161/11 216/13
**Hemphill's** [6] 56/15 72/7 72/12 72/18 208/10 208/14
**Hensley** [1] 134/18
**her** [2] 97/24 134/17
**here** [219] 6/17 6/23 7/6 7/18 7/20 9/7 10/2 11/6 11/16 11/18 14/21 12/11 13/11 15/5 15/23 16/1 16/13 17/10 17/14 18/11 18/23 19/3 20/3 20/18 23/15 23/19 24/3 24/7 24/18 25/15 29/15 29/21 30/2 30/21 31/15 33/13 33/17 34/4 34/25 39/3 39/4 39/10 40/1 42/12 42/21 43/2 43/13 45/16 48/3 50/15 58/7 59/8 59/13 66/7 68/12 72/18 74/17 75/24 78/14 79/3 82/12 82/19 83/1 83/14 83/15 83/20 83/20 84/3 84/16 84/17 86/2 86/14 86/16 87/16 87/23 88/5 88/10 88/24 89/23 90/9 90/12 91/12 91/19 92/4 92/5 92/6 92/12 92/15 92/18 92/19 93/2 93/4 93/10 93/16 94/8 95/1 95/25 96/18 96/20 97/10 98/22 99/15 99/18 99/20 100/23 101/14 101/17 102/8 102/9 103/11 103/14 104/11 104/15 104/24 105/19 106/24 108/12 108/20 109/2 109/5 109/16 109/20 114/11 115/21 116/21 120/16 124/25 128/2 129/5 129/18 132/3 134/10 134/24 135/25 139/4 139/7 140/19 142/11 143/15 143/19 143/19 144/13 144/21 145/17 146/24 148/5 152/10 152/12 152/13 152/21 155/10 157/15 158/8 161/6 162/6 162/7 162/16 162/17 162/18 163/8 163/16 166/14 168/17 168/18 168/19 168/19 168/21 170/23 171/4 171/10 172/5 172/6 172/19 174/2 174/10 174/12 175/24 176/24 180/5 180/15 181/24 182/15 184/22 186/2 187/11 187/15 188/17 188/20 190/3 190/10 190/21 191/11 192/1 192/6 193/23 194/1 194/5 195/21 198/4 203/5 203/24 204/4 205/2 206/21 207/3 208/4 208/18 209/18 210/4 210/15 214/15 214/23 215/17 217/2 217/22 218/4 218/14 219/14
**here's** [6] 14/10 19/11 28/7 79/17 88/18 93/14
**heterogeneity** [1] 20/22
**heterogenous** [2] 20/10 20/18
**hey** [3] 95/13 139/4 218/21
**hide** [1] 97/6
**high** [5] 14/7 14/17 106/19 195/24 213/4
**higher** [5] 43/1 106/13 106/15 154/21 154/23
**highjacking** [1] 96/16
**highlighted** [3] 60/25 141/12 141/17
**highlighting** [1] 73/11
**highlights** [2] 78/5 78/8
**highly** [5] 72/1 75/5 103/7 123/20 136/6
**Hilton** [1] 198/13
**him** [9] 31/5 87/24 104/21 148/16 168/22 168/24 191/3 194/3 215/4
**himself** [1] 87/18

**Hines** [4] 168/15 168/16 168/19 168/20
**hire** [1] 136/11
**his** [30] 23/2 24/2 24/11 24/16 30/5 33/18 34/23 60/8 71/7 71/7 71/21 78/17 84/8 86/19 87/15 90/9 104/6 134/17 152/5 159/25 160/1 162/22 164/4 166/9 168/23 173/22 184/1 190/19 206/22 210/4
**historical** [1] 87/1
**history** [4] 6/21 33/11 91/25 156/24
**hit** [4] 15/11 25/16 89/14 132/13
**hmm** [1] 167/21
**Hochschild** [1] 24/18
**hold** [18] 7/12 10/3 14/4 14/5 15/22 15/22 16/23 68/11 80/25 81/21 100/13 100/15 100/16 120/13 136/16 161/8 216/11 216/11
**holding** [2] 45/15 51/19
**holds** [1] 44/24
**holy** [1] 134/15
**home** [18] 3/7 7/20 9/14 9/20 17/3 29/24 30/1 37/5 44/18 72/24 135/3 144/8 152/16 174/25 186/21 200/12 201/1 202/6
**honestly** [3] 87/14 142/5 157/8
**honor** [198] 5/5 5/7 5/10 5/25 6/8 10/9 12/14 13/2 22/6 26/9 29/14 31/22 31/24 34/6 34/24 36/6 36/16 38/14 40/19 42/16 43/15 43/23 44/1 44/3 44/5 44/9 44/11 44/13 44/24 45/8 47/24 50/10 51/9 54/2 55/25 63/12 63/13 64/6 64/10 64/20 65/9 66/2 68/2 68/5 69/9 69/23 71/22 72/5 73/11 73/22 74/10 74/19 75/13 76/7 78/4 78/15 79/3 81/15 82/13 82/22 86/6 87/7 87/13 90/10 93/9 94/12 95/19 95/20 97/21 98/20 101/5 103/12 104/8 105/9 108/11 109/7 109/12 110/10 111/11 111/15 112/10 113/4 118/7 118/9 118/13 119/5 119/9 126/16 131/15 131/21 133/15 135/1 135/5 135/11 137/20 141/16 142/17 142/18 142/20 143/11 147/21 148/6 148/19 148/23 149/1 149/8 149/25 150/11 151/21 152/2 152/4 152/9 152/17 152/22 153/10 153/18 154/10 154/12 154/19 154/24 155/15 155/18 156/4 157/17 157/24 158/9 158/18 158/24 159/23 160/4 160/16 161/6 161/11 161/23 162/4 162/7 165/7 165/9 165/19 166/2 168/3 168/13 168/16 170/4 170/6 170/11 170/11 170/24 171/9 171/11 173/9 173/19 174/15 175/10 175/11 179/21 180/4 181/22 183/8 183/25 184/10 184/18 185/1 185/14 186/3 186/11 187/2 187/4 187/20 188/6 188/18 188/19 190/7 190/20 190/22 192/3 192/6 193/10 193/13 193/22 193/25 194/10 195/15 196/1 196/8 196/9 197/14 197/17 202/23 203/12 203/25 204/1 207/22 215/6 219/16 221/1 221/2 221/5
**Honor's** [9] 23/18 39/8 45/21 53/21 53/22 59/5 60/20 156/10 163/3
**HONORABLE** [1] 1/12
**hoops** [2] 23/13 157/23
**hope** [1] 144/12
**hopefully** [1] 86/4
**hoping** [2] 81/21 161/24
**horizontal** [15] 84/14 84/20 85/6 89/25 91/23 92/14 95/11 97/9 100/16 102/24 105/3 151/11 156/19 157/2 161/8
**horrible** [1] 96/19 103/6 104/3
**horribly** [1] 136/8
**host** [3] 62/14 62/15 117/4
**hot** [1] 180/12
**hotel** [3] 14/20 18/16 198/12
**hotels** [13] 14/9 14/11 14/11 14/18 15/7 16/7 18/14 19/1 22/13 198/15 198/17 207/25 213/6
**hours** [5] 100/4 132/25 158/15 158/17 158/18
**house** [4] 3/2 8/1 15/3 131/17
**how** [69] 11/6 13/2 18/14 20/5 42/19 48/19 51/6 51/21 53/8 57/4 58/2 59/2 59/10 59/18

**Hut** [3] 60/23 61/25 62/1
**Hyatt** [1] 18/14
**hypothesis** [1] 21/13
**hypothetical** [9] 20/1 21/2 21/24 22/22 23/18 68/20 70/12 118/5 121/24
**hypothetically** [1] 118/8
**hypotheticals** [4] 92/5 92/6 92/6 92/15

72/4 73/15 77/11 78/8 81/25 88/15 88/16 89/8 93/9 94/18 94/18 98/19 99/3 99/5 99/12 100/21 102/12 106/8 112/4 112/6 116/24 125/1 125/3 126/3 132/11 133/8 136/8 139/17 140/12 141/19 157/19 158/5 166/17 170/5 170/7 171/6 172/3 172/22 173/7 174/1 175/23 180/19 182/24 183/21 190/10 191/7 192/16 195/8 201/17 208/2 212/14 215/23 216/7 217/20 217/21
**however** [4] 9/25 12/14 25/16 185/19
**HP** [1] 129/13
**Hubbell** [1] 136/12
**hubristic** [1] 28/18
**huge** [3] 15/17 114/15 207/24
**Human** [1] 113/17
**humanness** [1] 151/20
**hundred** [1] 152/8
**hundreds** [4] 124/21 167/9 212/23 212/23
**hurdles** [3] 37/9 37/14 157/22

# I

**I give** [1] 213/11
**I'd** [16] 17/8 41/22 42/14 43/20 68/4 75/8 79/11 83/4 119/18 123/6 127/4 128/5 149/1 149/2 149/14 170/14
**I'll** [25] 7/6 11/23 14/19 33/4 41/20 53/20 65/16 70/13 78/1 84/7 90/8 99/2 100/23 109/5 126/9 135/1 148/1 154/24 157/14 169/4 173/20 185/15 193/7 193/17 212/7
**I'm** [92] 10/18 20/7 20/16 21/5 21/10 21/22 22/5 26/3 26/8 26/25 28/2 28/17 28/19 30/7 30/23 31/3 31/5 31/10 39/4 40/1 40/14 40/14 40/16 41/18 43/17 52/20 53/13 55/23 77/17 78/3 78/9 79/8 80/13 81/16 81/20 81/24 87/22 88/20 90/7 91/19 93/1 94/10 101/4 101/6 101/7 103/4 105/12 105/15 108/20 116/16 117/19 126/6 126/6 130/8 130/14 131/5 131/6 131/9 142/19 148/12 149/5 149/5 150/24 156/8 157/10 157/13 163/2 163/7 165/22 170/6 170/7 173/17 179/22 179/23 187/25 191/3 191/20 196/24 199/22 202/3 202/22 205/1 207/11 209/3 209/25 212/25 214/6 215/17 215/20 218/7 219/16 219/20
**I've** [24] 13/12 19/8 20/4 31/7 43/20 61/18 81/7 81/17 82/18 89/21 92/2 92/3 93/13 97/22 107/25 124/21 141/11 150/4 152/4 153/15 161/23 174/24 219/10 220/15
**ICC** [1] 166/20
**idea** [9] 7/7 7/20 23/20 27/9 104/20 112/4 112/6 152/18 212/12
**identical** [4] 54/17 122/4 180/16 180/20
**identicality** [1] 55/4
**identified** [4] 42/3 125/21 163/1 214/1
**identify** [1] 170/15
**if they** [1] 172/23
**ignore** [3] 15/21 23/6 130/25
**II** [1] 1/4
**III** [2] 1/24 127/8
**IL** [1] 3/20
**illegal** [3] 91/6 214/12 214/21
**illegality** [1] 155/20
**illness** [1] 200/18
**illustrative** [1] 14/20
**imagine** [4] 11/10 20/14 26/1 138/12
**immediate** [1] 197/7
**immediately** [1] 76/19
**immunized** [1] 136/3

**I**

immunizing [1] 136/3
impact [4] 109/19 154/8 192/3 195/9
impacted [1] 189/6
impair [1] 108/24
imparity [1] 203/6
impassioned [1] 33/11
impediment [1] 14/6 177/21
impediments [2] 8/23 71/13
impending [1] 102/19
imperative [1] 199/12
impermissible [2] 64/17 76/3
implement [1] 193/1
implemented [1] 197/8
implements [1] 178/1 195/7
implications [1] 19/3 44/19
importance [2] 64/25 127/20
important [23] 13/1 59/21 73/9 91/18 112/14
113/10 115/21 116/5 121/8 135/6 176/8
178/25 179/25 180/3 188/21 189/8 191/7
193/4 196/21 199/15 201/22 208/5 217/3
importantly [4] 58/19 97/21 98/17 120/5
impose [8] 6/19 9/21 17/25 21/10 113/8
124/12 140/23 195/3
imposed [5] 53/2 61/12 125/3 125/6 141/7
imposes [3] 18/24 149/20 196/14
imposing [1] 151/15
imposition [2] 57/1 125/20
impossible [1] 167/15
impressed [1] 86/24
improper [1] 74/24
impugn [1] 127/2
inability [1] 100/3
inaccurate [1] 85/5
inadvertent [1] 145/1
Inc [6] 3/2 3/2 3/17 3/17 3/17 3/17
incentive [11] 7/25 9/12 59/24 66/6 66/17
66/18 67/17 151/10 178/10 178/13 178/15
incidental [15] 146/10 146/16 146/17 146/21
146/22 146/22 147/9 147/11 171/15 171/24
172/1 172/3 172/5 178/20 178/21
incite [1] 13/5
inclined [1] 128/6
include [3] 177/16 186/23 205/9
included [8] 118/6 163/23 163/24 186/15
187/23 188/12 189/20 214/18
includes [8] 64/17 72/8 73/1 121/13 125/19
164/1 171/24 220/18
including [27] 32/20 39/9 39/14 40/8 41/4
42/3 45/17 53/8 66/15 71/9 71/25 83/7 86/1
90/6 95/18 108/16 145/9 161/13 173/12 179/3
180/11 186/19 189/11 196/11 198/22 210/9
214/15
income [1] 107/17
inconsistent [2] 178/17 187/19
inconvenience [1] 144/17
inconveniences [1] 144/17
inconvenient [2] 144/14 144/15
incorrect [2] 100/18 153/10
incur [1] 27/17
incurred [1] 63/7
indeed [3] 140/8 179/21 189/3
independent [4] 46/17 74/14 75/17 148/25
indicate [2] 49/13 69/19
indicated [3] 150/13 185/22 204/10
indicates [2] 48/3 53/17
indication [2] 13/9 34/2
indications [2] 23/7 211/4
indicative [1] 17/8
individual [43] 10/2 32/8 33/2 38/4 44/17
47/15 48/4 57/20 58/3 61/6 84/12 112/20
114/3 121/24 143/7 144/8 148/25 149/21
150/7 152/7 152/19 155/2 155/4 155/11

157/21 158/10 159/25 164/16 167/19 177/13
177/16 178/3 189/23 190/9 190/20 191/11
191/12 191/19 191/23 192/1 194/7 199/1
219/25
individualized [2] 63/1 63/5 141/23 146/25
individually [2] 179/23 192/20
individuals [2] 112/21 121/16
indivisibility [1] 122/10
indivisible [13] 54/16 54/20 57/18 61/11
62/13 62/20 63/3 63/12 69/6 120/3 120/8
122/1 122/25
industries [4] 43/3 184/4 184/14 207/25
industry [16] 21/8 21/16 22/10 22/15 27/5
37/23 44/15 72/25 76/18 89/5 89/5 98/14
112/4 112/6 186/16 203/9
infancy [1] 7/10
inferences [1] 206/20
influence [1] 109/10
influential [1] 108/21
information [4] 54/1 182/14 189/19 220/19
informed [1] 168/17
informs [1] 18/24
infraction [1] 171/22
inhibiter [1] 97/10
initiated [2] 198/1 198/3
inject [2] 71/17 76/16
injunction [13] 54/16 54/17 57/18 62/20
62/22 147/15 147/16 171/2 177/7 178/12
178/23 217/20 217/23
injunctions [1] 62/13
injunctive [36] 33/15 39/19 43/5 54/20 62/14
62/17 63/4 63/16 65/25 93/6 118/15 120/1
120/8 120/16 120/22 121/8 123/16 124/4
129/9 141/25 142/1 143/3 143/15 143/18
146/18 146/19 146/23 160/10 160/20 170/20
177/2 177/3 178/11 178/21 186/16 201/15
Inkjet [1] 129/13
innovation [1] 137/1
inquired [1] 164/14
inquiry [5] 73/10 75/9 75/16 78/24 119/17
inshrining [1] 76/2
inside [6] 13/6 17/11 22/20 27/4 107/8 203/8
insidious [1] 82/1
insistence [2] 107/7 206/25
insistent [1] 74/7
insofar [1] 193/14
instance [9] 13/23 36/19 38/1 40/18 154/12
154/12 176/24 195/17 198/25
instances [3] 41/21 163/16 163/18
instead [6] 46/13 80/19 81/2 81/4 91/8 100/7
Institute [4] 2/17 119/7 119/12 186/19
instructive [1] 57/3
insufficient [1] 97/5
insulate [1] 90/22 129/21
insulated [1] 85/1
insurance [6] 112/2 112/4 112/6 112/17
112/19 112/22
insurer [2] 2/12 114/3 114/16 115/17 115/25
insurers [17] 111/10 111/13 111/18 111/22
112/1 112/9 112/11 113/7 113/9 114/18 115/5
116/1 116/3 116/6 117/12 118/21 119/2
integrity [1] 33/10
intended [1] 50/16
intents [1] 40/5
inter [7] 71/16 76/9 90/5 91/17 156/19 157/2
161/8
inter-brand [7] 71/16 76/9 90/5 91/17 156/19
157/2 161/8
interchange [6] 83/25 137/2 137/4 140/15
147/2 210/7
Intercontinental [1] 15/8
interest [14] 48/8 55/1 74/2 99/25 139/21
139/23 163/18 163/20 163/21 165/5 203/25
210/16 210/25 211/4

interested [1] 29/9
interesting [5] 48/23 53/12 70/23 99/24
106/22
interests [9] 163/15 165/14 166/24 167/7
167/13 172/21 175/7 198/20 219/3
interfere [2] 84/1 102/24
interferes [1] 85/7
interfering [2] 95/11 95/12
interject [1] 93/7
internal [1] 102/11
internally [1] 166/17
International [2] 62/3 62/4
internet [6] 112/25 113/23 115/2 115/9 116/1
117/14
internet-based [5] 112/25 113/23 115/2
115/9 117/14
interplay [1] 189/11
interpret [1] 126/3
interpreted [1] 62/24
interpreting [1] 164/14
introduce [4] 84/20 85/6 104/24 209/17
introduced [1] 195/12
introduces [3] 71/20 80/22 92/14
intuition [2] 14/14 16/14
intuitions [2] 30/23 30/24
investigation [1] 32/3
investing [1] 100/7
investment [1] 100/6
investor [3] 66/20 66/20 136/24
investors [5] 67/2 67/6 93/19 99/25 104/8
invitation [1] 74/4
invite [1] 68/5
invites [1] 67/12
invoke [1] 171/6 192/5
invoked [1] 46/14
involuntarily [1] 139/10
involve [2] 168/2 189/18
involved [10] 24/25 108/22 111/7 162/11
164/5 167/17 184/3 184/5 184/22 186/16
involvement [4] 25/18 165/2 166/14 167/14
involves [1] 39/19
involving [1] 109/11
ironing [1] 127/3
irreconcilable [2] 46/24 47/10
is [920]
isn't [26] 22/4 22/8 26/25 40/6 50/20 51/3
108/11 117/9 118/18 143/19 165/3 172/2
172/23 172/24 176/21 179/24 190/24 200/23
200/23 202/20 205/13 205/18 205/22 205/23
205/24 207/11
isolated [1] 105/10
issue [52] 12/13 31/17 34/1 35/15 36/1 36/23
37/23 38/1 38/16 39/10 41/23 45/11 45/11
48/7 54/4 58/20 59/2 59/3 59/20 62/8 74/3
95/25 108/20 109/2 109/2 109/20 109/24
121/12 132/14 143/1 147/22 149/14 172/4
174/22 174/24 175/5 175/13 176/24 180/11
180/12 182/23 183/1 183/11 183/16 186/13
187/9 190/1 196/2 197/10 205/6 205/10
209/23
issued [1] 5/21
issuer's [1] 98/5
issues [27] 10/18 20/12 23/24 28/6 35/11
35/15 35/22 37/21 38/21 39/9 43/18 52/8 59/4
67/23 71/3 73/18 77/14 93/15 137/8 151/18
158/12 171/7 174/11 186/18 187/20 192/17
195/20
issuing [3] 66/21 67/6 97/14
it [547]
it'll [3] 7/11 18/20 102/21
it's [228]
Italian [27] 12/7 12/17 28/21 28/24 32/1
33/22 44/20 44/24 44/24 45/10 45/13 45/15
46/8 46/19 51/18 52/2 53/15 58/20 58/22

# I

Italian... [8] 85/21 131/2 160/7 190/16 198/5 201/9 201/15 202/5
item [1] 212/18
its [62] 7/10 7/12 11/11 17/25 23/22 24/20 26/15 32/11 32/11 32/23 37/7 49/2 49/16 49/19 49/19 49/20 52/10 59/9 59/18 59/21 65/5 69/1 69/11 74/5 75/9 79/23 82/5 85/1 90/13 114/16 115/19 119/20 123/4 123/17 123/21 124/4 125/16 133/6 137/6 149/16 161/9 166/14 166/18 167/14 168/9 170/24 173/23 180/6 181/16 182/1 189/11 191/10 192/18 196/16 201/4 209/4 213/25 217/3 217/4 217/5 217/6 219/1
itself [14] 1/6 57/14 82/7 99/2 111/24 113/3 121/4 124/24 159/9 166/11 168/2 203/7 209/24 210/1
iTunes [1] 17/2
IV [3] 3/10 58/20 93/1

# J

JASON [1] 4/4
Jeff [1] 64/8
JEFFREY [1] 2/10
jeopardy [1] 104/1
jettisons [1] 76/1
job [2] 113/5 140/21
jobs [1] 30/6
Joel [3] 186/12 199/23 199/25
JOHN [5] 1/24 3/3 3/5 131/14 131/15
join [2] 166/12 191/13
joined [2] 168/6 204/15
joke [1] 209/9
journey [1] 12/24
judge [45] 1/13 34/22 35/15 37/22 43/9 45/11 83/6 84/1 84/2 84/25 86/10 87/6 87/9 87/10 89/10 106/24 108/5 108/19 127/10 142/15 142/18 142/20 143/9 143/22 157/8 157/22 159/11 160/15 161/14 170/17 178/14 181/10 182/19 183/7 183/20 184/1 186/21 190/13 190/17 190/24 191/17 199/2 199/3 199/4 214/15
Judge Gleeson [1] 84/1
judgment [14] 91/9 138/19 138/20 156/23 156/24 157/7 158/1 159/10 160/17 160/18 160/21 171/2 205/14 207/4
judicial [1] 171/19
July [1] 185/14
jump [3] 23/12 141/9 165/6
jumped [2] 107/5 173/13
jumping [1] 157/14
jurisdictions [1] 8/23
jurist [1] 142/17
jury [6] 156/8 156/14 157/5 157/6 206/19 206/20
just [133] 6/19 7/20 8/7 11/6 12/23 13/2 15/10 15/13 15/21 16/12 16/13 16/20 16/22 17/5 17/6 18/11 19/8 20/3 20/16 22/14 23/6 23/10 23/22 28/21 30/1 30/8 31/18 39/4 40/23 43/17 43/24 45/4 48/1 50/9 51/2 51/4 52/23 53/20 53/21 54/1 56/12 59/12 67/22 71/12 77/20 78/8 79/11 80/2 85/14 87/22 88/3 88/20 88/23 88/25 92/10 96/4 97/16 97/20 100/22 103/13 103/22 104/10 106/1 109/9 111/5 111/8 111/16 112/10 115/1 118/3 118/5 121/3 122/9 123/9 128/2 130/11 131/3 131/19 131/20 133/3 136/12 137/20 139/13 145/1 146/17 146/25 149/25 152/14 156/2 156/8 156/25 157/10 158/13 158/19 161/1 161/2 162/25 163/7 165/8 166/6 166/16 166/17 167/14 172/12 173/10 173/14 176/2 176/7 179/23 189/16 192/10 195/2 195/4 196/11 199/11 201/10 202/22 204/2 204/18

# K

Katz [1] 91/15
keen [1] 10/8
keep [9] 85/10 85/12 91/11 99/5 101/25 102/1 106/1 107/23 166/2
Ken [1] 33/16
Kenny [1] 134/16
kept [4] 33/17 84/2 104/21 158/15
key [3] 7/16 75/23 146/24
kind [23] 31/11 34/13 38/13 40/21 41/14 43/10 50/1 53/22 54/1 80/24 105/8 107/16 136/20 138/5 168/24 175/18 189/7 189/17 189/22 195/12 197/1 210/22 211/8
kinds [1] 20/12
Kitt [1] 4/13
knell [1] 161/1
knew [1] 216/8
knocked [1] 188/3
know [113] 14/1 14/10 16/10 17/11 18/21 20/5 20/6 20/10 21/15 21/16 21/23 22/2 22/12 22/25 24/8 24/8 25/10 25/24 27/14 30/4 39/4 50/10 52/22 55/23 58/2 61/16 66/14 67/3 67/16 67/23 68/5 69/24 69/25 73/24 74/1 79/5 79/23 80/17 80/18 80/20 81/2 81/25 85/21 87/7 88/15 93/9 95/17 96/24 99/8 102/9 104/5 105/25 107/14 107/17 111/17 112/5 113/13 116/17 118/19 125/1 125/3 130/1 133/8 136/8 140/21 141/9 144/25 145/21 147/12 147/13 157/9 160/5 160/8 161/16 166/2 172/24 172/25 173/17 179/11 183/15 183/21 183/23 197/21 198/7 198/21 198/21 200/4 201/1 204/13 206/4 206/19 207/11 207/24 207/24 208/21 209/11 211/4 211/11 211/12 211/13 211/20 212/14 213/11 213/13 214/12 214/13 215/18 216/5 216/7 216/8 216/10 217/21 219/17
knowing [4] 54/2 73/24 81/5 181/13
knowledge [3] 41/17 57/4 196/25
known [1] 114/1
knows [13] 12/20 32/3 32/22 44/24 45/9 47/24 67/10 102/5 117/1 125/4 135/10 157/25 191/4
KOROLOGOUS [14] 1/23 5/8 5/24 31/3 31/23 32/1 39/5 170/3 191/2 215/7 216/23 218/6 218/14 219/3
Korologous' [1] 109/23
Korologous's [1] 121/21
kosher [1] 18/10
Kroger [1] 94/20

# L

L'Oreal [1] 142/7
label [1] 89/2
labor [1] 128/13
laboratory [1] 100/24
lack [6] 72/19 75/7 78/19 79/19 129/11 200/1
lacking [2] 200/9 200/24
lacks [2] 71/15 73/20

Lafayette [1] 1/17
laid [3] 79/3
Land [3] 198/8 201/9 201/13
Lane [1] 3/4
language [4] 42/2 60/25 120/12 135/19
Langwith [1] 97/22
large [26] 7/11 18/7 19/17 20/8 43/2 58/8 58/11 61/14 61/19 125/8 139/17 139/22 140/2 140/6 146/5 150/6 150/9 150/13 151/16 154/12 179/13 192/21 198/12 209/24 217/20 217/24
larger [6] 42/12 50/9 50/14 50/19 52/10 109/15
largest [9] 36/11 44/13 48/16 49/17 50/12 74/12 150/18 152/3 152/8
Las [1] 198/18
LaSALLE [1] 1/24
Lasko [2] 3/2 131/16
last [24] 9/6 9/8 9/9 9/10 10/11 16/24 49/7 53/13 53/14 53/17 60/21 62/8 72/16 93/22 93/23 104/16 115/24 133/9 135/16 136/20 139/4 197/16 217/15 217/16
Lastly [1] 75/2
later [4] 122/13 122/14 157/14 168/11
launched [2] 92/7 92/17
law [40] 1/17 8/4 8/11 21/4 28/9 34/12 55/21 67/16 91/5 91/7 96/15 96/16 98/19 101/10 106/16 111/5 122/15 122/16 122/21 124/11 124/15 126/2 128/10 136/9 136/11 137/12 147/10 153/17 156/3 156/5 156/12 156/18 156/21 157/1 157/7 164/14 171/20 180/17 199/21 218/21
law's [1] 97/1
lawful [3] 122/4 122/6 122/9
lawnmower [1] 145/23
laws [13] 6/14 35/13 36/25 38/23 83/11 84/19 100/9 118/12 125/7 128/13 144/2 151/5 171/7
lawsuit [3] 118/1 118/2 127/7
lawsuits [1] 167/1
lawyer [2] 26/4 107/15
lawyers [6] 81/25 84/11 102/15 102/16 206/14 217/6
lead [6] 5/3 22/20 132/1 176/13 176/15 200/2
leading [4] 44/15 73/1 214/13 214/13
leads [1] 12/20
least [16] 14/7 42/11 56/9 112/8 114/3 117/13 117/16 117/21 123/18 135/16 144/4 170/13 175/12 194/10 194/23 196/10
leave [5] 36/15 72/10 148/16 170/8 173/21
leaves [2] 71/8 178/19
leaving [2] 31/3 113/5
led [1] 32/13
left [6] 34/1 71/3 157/19 157/20 158/1 194/5
legal [11] 6/13 31/10 118/20 129/25 130/5 141/1 141/3 199/16 199/17 201/10 204/21
legally [1] 202/8
legislation [1] 89/1
legislative [1] 210/6
legitimate [1] 23/13
length [2] 33/19 79/13
lengthy [2] 17/23 32/3
LensCrafters [2] 60/23 62/2
less [20] 6/2 14/24 21/11 30/3 31/3 33/13 34/7 69/17 83/9 84/17 84/19 104/20 109/3 109/4 117/11 134/25 138/15 159/11 185/22 207/20
lesson [1] 201/5
let [35] 8/7 14/1 21/5 27/10 28/5 35/25 45/21 47/12 59/20 62/8 67/22 68/20 69/10 71/2 71/23 75/18 85/14 103/1 111/4 126/9 139/14 142/21 146/12 153/5 154/15 154/15 155/24 157/16 161/8 161/9 169/1 176/25 181/22 192/10 218/4
let's [24] 6/6 21/5 27/13 27/16 28/12 29/5

Case 1:11-md-02221-NGG-RER Document 394-2 Filed 06/19/14 Page 1 of 1 PageID #: 25788

## L

lct's... [18]  29/23 30/9 38/14 43/19 68/8 68/11
 69/11 79/1 99/7 114/15 143/24 146/3 155/7
 155/9 169/4 193/15 194/4 204/5
lets [1]  124/25
letter [1]  76/23
letters [2]  46/14 214/18
letting [2]  143/21 144/2
level [10]  28/8 29/22 37/11 41/11 56/2 77/12
 78/19 172/21 210/10 211/7
leverage [11]  30/12 52/15 138/4 140/3
 140/10 140/15 140/24 147/1 150/13 151/8
 151/18
Lexington [1]  1/21
liability [2]  125/9 159/16
liable [2]  39/22 178/4
licensees [1]  111/20
licenses [1]  111/17
lick [1]  30/18
life [2]  14/12 208/2
lift [2]  30/8 65/24
ligation [1]  167/6
light [5]  32/20 41/20 75/6 161/5 161/21
like [74]  7/17 7/21 14/9 16/1 17/8 18/20 20/5
 21/1 21/3 21/18 21/20 22/18 25/23 26/5 30/2
 38/9 43/20 45/8 49/15 49/19 50/17 51/21 61/7
 61/7 61/17 64/24 73/2 74/3 75/8 76/17 79/11
 81/15 83/4 88/25 91/3 93/11 97/3 103/25
 104/13 104/13 106/6 109/15 112/10 114/7
 119/18 123/5 123/6 124/18 125/5 126/15
 127/8 128/5 130/22 130/24 137/18 140/22
 145/16 145/22 149/1 149/2 149/12 149/14
 150/25 152/15 161/2 166/20 170/14 172/25
 174/25 182/21 195/4 195/16 204/13 216/21
likelihood [2]  12/19 160/11
likely [7]  74/16 76/13 115/12 116/12 129/10
 132/6 173/21
likewise [1]  118/24
liking [2]  149/22 158/3
limbed [1]  143/18
limit [2]  115/16 131/3
limitation [1]  62/23
limitations [4]  194/11 194/13 195/3 195/5
limited [15]  40/16 45/22 45/23 49/20 50/2
 51/19 51/19 85/21 85/23 86/3 114/6 129/17
 136/1 143/15 172/22
limiting [2]  39/7 40/5
limits [3]  19/19 85/15 192/13
line [3]  63/3 71/7 161/1
lines [2]  213/24 217/8
lining [1]  161/5
liquor [1]  198/9
list [9]  105/25 137/25 144/3 152/8 152/10
 152/11 152/15 168/15 169/1
listening [2]  14/3 36/4
literally [5]  15/4 73/2 118/17 213/6 213/8
Literary [3]  145/7 145/10 145/11
litigant [3]  172/12 176/2 188/24
litigants [4]  84/9 167/1 176/2 190/2
litigants in [1]  167/1
litigate [8]  47/1 47/2 85/24 86/13 172/9
 172/10 172/14 172/15
litigated [2]  73/18 75/25
litigation [45]  1/4 5/17 8/15 11/13 11/17
 33/11 51/13 52/6 52/24 53/2 64/22 77/12 86/8
 92/2 111/7 119/14 119/19 120/13 129/14
 131/1 132/9 132/19 132/24 133/11 133/14
 157/19 157/20 161/21 163/17 163/19 163/22
 164/23 164/24 167/5 168/7 172/20 173/7
 176/10 176/19 181/21 187/11 187/12 189/17
 194/6 198/20
little [32]  29/5 55/8 71/9 72/13 73/7 74/16
 75/23 78/9 80/20 83/1 93/13 104/14 105/10

111/16 112/11 117/5 117/24 125/1 126/8
132/11 133/20 134/4 146/7 153/15 153/25
161/12 174/23 184/9 216/13 217/24 224/1
216/14
live [2]  175/23 177/7
lived [1]  86/23
liveries [1]  23/9
livery [3]  213/10 213/12 213/13
lives [1]  16/9
LLB [1]  153/17
LLP [7]  1/17 1/21 2/3 2/8 3/8 3/13 4/2
load [1]  28/21
loading [1]  25/12
lobbying [2]  83/16 108/22
location [1]  138/8
locations [1]  42/20
lock [2]  64/16 65/7
locking [1]  77/22
locks [1]  93/11
lodestar [1]  128/9 129/12 129/16 129/19
 129/21 131/7 134/14 134/17 134/21 134/21
 134/25
lodestar-based [1]  128/9
logo [3]  80/4 80/7 80/7
logos [1]  80/10
long [16]  10/12 14/19 63/9 63/10 66/17 77/10
 77/16 86/4 93/20 124/3 133/8 135/16 158/5
 170/5 170/7 192/8
longer [3]  121/2 180/14 191/10
look [44]  16/7 18/20 24/15 28/8 28/11 28/12
 38/1 38/3 42/17 42/22 42/25 47/21 50/25
 61/17 72/16 92/1 97/14 97/14 97/15 98/6 98/7
 100/25 102/6 104/12 108/24 117/19 121/2
 121/3 121/4 122/17 124/18 125/5 127/10
 137/20 137/20 139/8 140/21 144/10 146/17
 180/3 180/9 192/10 194/9 195/24
looked [4]  11/14 48/1 50/17 50/22
looking [12]  63/12 64/18 76/3 86/15 91/8
 100/24 103/12 104/6 124/6 127/6 129/7 208/7
looks [1]  61/7
loose [1]  136/13
Los [1]  175/25
lose [14]  12/21 75/18 75/22 100/19 107/6
 147/17 151/2 195/4 202/17 202/21 202/23
 203/11 203/12 204/23
loss [1]  114/1
lot [4]  17/14 19/9 47/3 47/3
lot [29]  7/17 15/2 21/16 31/7 38/7 40/13
 40/15 50/11 62/6 72/8 72/21 74/12 82/18
 83/12 83/13 83/15 83/18 83/19 88/4 107/6
 108/21 132/12 136/15 174/25 177/14 180/12
 180/14 197/18 207/12
lots [2]  81/1 81/7
Louisiana [1]  113/20
love [2]  28/23 179/18
low [5]  78/19 117/9 137/1 137/5 185/20
Lowe's [1]  17/3
lower [12]  70/22 85/8 90/13 99/12 100/4
 100/13 109/15 137/2 137/3 154/14 160/25
 213/25
lowered [4]  107/19 107/20 107/21 107/21
LOWREY [3]  31/10 135/3 135/4
loyalties [1]  20/13
loyalty [1]  98/2
Luckily [1]  33/15
lucky [1]  191/20
lunch [4]  22/9 27/15 81/24 110/13
Luncheon [1]  178/13
Luxottica [4]  60/22 60/22 61/22 61/23
Luxottica's [1]  61/3

## M

MA [1]  3/4
machine [1]  28/14

Macy [1]  59/14
Macy's [18]  15/23 17/24 18/2 18/4 18/5
 49/16 49/24 50/13 51/15 55/8 59/5 59/6 59/7
 59/8 59/10 59/17 59/18 72/23
made [24]  12/8 16/16 33/5 55/18 63/5 96/5
 102/13 106/9 109/18 142/10 142/10 145/13
 146/20 165/10 166/16 175/19 180/1 183/12
 187/20 207/9 207/13 207/14 208/13 209/23
Madison [2]  2/9 40/15
magnified [1]  74/24
magnitude [1]  202/5
magnitudes [1]  154/17
main [1]  75/13
maintain [2]  119/24 135/17
maintained [1]  106/25
maintaining [3]  34/20 160/3 160/12
major [19]  13/24 32/17 42/6 57/5 57/6 57/6
 85/1 93/15 99/14 132/21 137/8 141/4 152/18
 152/20 152/22 152/24 153/2 153/4 184/19
majority [11]  9/6 9/14 10/11 36/14 153/6
 153/6 154/1 154/1 154/4 182/24 207/17
make [40]  11/20 23/13 27/2 51/20 64/19
 66/25 75/8 76/5 78/10 80/25 96/4 98/25 102/9
 102/19 103/13 112/7 119/18 120/5 121/1
 132/18 138/18 138/25 139/2 139/25 146/9
 146/18 147/9 147/21 151/13 166/6 166/12
 170/6 173/2 173/14 176/25 179/6 180/6
 186/21 206/20 216/22
makers [1]  201/20
makes [8]  9/13 19/14 20/25 25/22 27/19
 59/21 123/25 129/4
making [6]  22/11 78/1 107/10 137/10 205/8
 207/4
man [1]  92/16
mandatory [22]  45/7 49/4 49/10 52/21 54/11
 54/15 57/1 58/23 60/19 62/9 62/12 62/16
 62/22 63/8 65/12 68/3 69/5 73/16 74/25 75/14
 75/15 219/7
Manhattan [1]  23/11
manifested [1]  200/18
many [22]  34/24 35/22 36/11 39/13 41/5 42/7
 42/12 77/4 106/11 107/11 116/1 116/5 116/24
 119/21 124/23 146/19 152/2 175/14 175/14
 183/21 216/7 218/9
map [1]  114/19
March [2]  220/8
March 2007 [1]  220/8
MARCUS [15]  1/5 5/18 6/12 6/13 6/16 6/21
 6/24 13/5 18/14 18/24 19/1 198/4 198/11
 201/9 204/2
marginal [1]  106/1
mark [2]  4/9 141/10
MARKED [1]  222/12
market [67]  6/15 15/9 15/13 20/18 20/18
 30/6 37/9 37/10 37/10 37/11 38/2 38/15 57/5
 57/6 57/7 66/14 66/22 67/6 67/6 67/7 67/8
 72/17 74/6 78/12 78/17 78/23 78/24 84/2 84/4
 84/14 91/7 91/9 95/8 96/23 97/7 97/8 98/18
 98/22 100/5 100/17 100/19 100/19 100/21
 102/20 103/1 104/2 105/24 106/2 106/21
 106/25 108/3 112/11 112/12 112/20 112/22
 114/3 114/4 125/4 135/18 136/14 151/4
 153/16 177/18 204/25 206/3 206/7 206/8
marketing [1]  95/15
marketplace [14]  10/17 25/23 42/8 76/17
 84/21 94/16 94/17 99/1 113/23 115/9 115/14
 179/17 215/8 215/14
marketplaces [1]  12/18 117/15
markets [5]  14/23 65/21 98/8 135/21 136/23
Marriott [1]  22/13
Marriotts [1]  198/13
Mart [12]  33/9 55/4 72/22 72/25 87/15 120/6
 142/14 145/8 145/13 152/16 184/5 199/24
Martindale [1]  136/12

Martindale-Hubbell [1] 130/12
massive [3] 208/16 208/16
MasterCard [39] 6/20 7/22 27/9 27/16 35/8
41/13 45/9 66/17 66/24 83/4 83/23 84/5 85/12
85/18 86/8 86/10 86/11 86/18 91/20 96/21
97/13 106/11 108/16 135/17 142/22 142/24
153/23 177/20 182/7 183/5 184/10 184/15
186/25 189/16 189/17 195/2 208/23 209/21
212/6
MasterCard's [1] 35/1
match [1] 137/3
material [3] 53/24 67/8 220/17
math [1] 207/20
matter [17] 19/23 55/21 75/11 113/15 113/22
115/18 132/11 155/5 156/18 156/21 157/1
162/12 175/6 179/8 201/5 201/7 213/4
matters [10] 64/13 79/2 79/14 79/22 120/15
185/19 209/15 214/23 214/24 214/25
Max [1] 123/10
maximum [1] 134/13
Maxx [2] 49/18 51/16
may [45] 20/7 35/11 42/9 44/3 44/9 56/1 57/6
66/14 69/23 78/2 78/2 79/11 82/13 82/17 87/1
90/21 111/16 111/17 113/3 114/14 126/2
132/11 132/15 132/17 132/25 133/6 140/17
140/24 146/12 165/19 165/19 168/10 176/8
176/12 178/18 179/7 180/18 184/22 187/2
190/12 194/17 201/21 208/8 214/13 219/18
maybe [9] 25/5 42/19 104/14 136/19 136/19
136/23 156/9 179/19 207/2
McReynolds [1] 33/25
MD [2] 1/4 5/17
MDL [5] 66/10 66/18 163/24 191/18 201/14
MDL-1720 [2] 66/10 66/18
MDP [7] 25/6 36/13 40/17 103/20 205/6
205/9 205/17
MDP's [1] 176/17
MDPs [16] 24/21 24/24 34/15 34/19 36/7
40/6 103/19 192/18 192/25 193/11 194/20
203/15 203/16 204/5 204/11 204/19
me [61] 8/7 10/10 14/1 20/1 20/6 21/5 24/3
28/5 31/15 35/25 45/21 47/12 55/24 59/20
61/8 62/8 67/22 68/20 69/10 71/2 71/24 75/18
81/25 85/14 87/12 88/1 88/16 91/18 95/13
102/9 102/9 111/4 130/1 141/6 142/21 146/12
147/22 153/5 155/24 157/14 157/16 160/14
163/9 169/1 176/25 181/22 183/14 184/2
184/2 190/9 190/24 191/7 191/18 192/10
194/1 206/15 208/2 210/17 210/18 210/19
211/6
mean [27] 13/12 14/18 15/12 28/18 28/18
42/5 55/15 65/21 86/18 98/4 127/4 140/25
142/5 145/24 147/22 151/17 152/24 159/22
172/13 172/23 173/7 179/14 199/20 205/1
211/25 212/22 215/12
meaning [3] 49/5 156/16 177/25
meaningful [7] 9/13 71/21 75/6 75/24 217/19
217/23 218/3
meaningless [1] 218/5
means [8] 19/20 40/23 51/10 94/5 118/22
139/11 139/12 196/17
meant [3] 24/4 35/7 212/1
meantime [1] 77/5
measure [2] 97/8 97/18
mechanical [1] 4/16
mechanism [4] 71/20 99/12 99/22 115/18
mediation [12] 45/25 49/3 49/4 49/5 49/5
49/6 49/8 49/10 52/21 83/6 87/19 133/12
mediator [3] 33/12 130/10 130/22
mediators [1] 127/16
medical [1] 114/1
meet [8] 45/24 48/24 49/1 49/25 54/9 114/19

114/25 180/22
meeting [1] 33/8
meets [2] 42/14 180/5
member [3] 39/22 171/9 187/23
members [56] 41/1 41/4 46/11 46/18 46/23
47/5 47/7 47/13 47/23 54/6 54/13 60/2 101/12
121/23 122/25 123/1 123/24 124/1 124/13
124/13 124/17 125/10 127/15 127/17 128/17
128/20 129/6 130/17 132/2 132/3 132/3
133/10 140/12 171/1 172/19 172/20 173/1
173/4 173/7 173/23 175/8 175/8 176/12
176/13 176/15 177/5 179/3 186/14 186/15
186/17 186/18 189/13 200/11 200/11 201/23
205/21
members' [2] 120/12 126/23
memo [1] 116/24
memorialize [2] 124/11 126/15
mention [6] 16/18 19/3 72/24 111/5 111/8
129/24
mentioned [8] 17/15 48/3 116/19 129/6
186/11 213/17 215/5 218/14
mentioning [2] 108/5 191/24
merchant [82] 8/3 8/5 9/13 10/2 10/25 13/22
19/21 22/21 24/5 25/18 25/25 26/7 29/6 30/12
36/15 40/24 45/9 47/21 48/9 48/10 48/18
49/14 50/8 51/11 53/5 55/10 55/17 57/11
57/11 57/14 57/18 58/8 61/10 61/12 72/13
73/2 73/13 76/1 85/8 90/18 91/2 97/23 98/14
107/3 107/3 114/14 117/11 139/22 140/3
140/4 147/3 147/4 149/21 150/21 150/22
150/24 152/7 152/19 152/22 152/24 153/16
154/13 155/2 155/4 157/21 159/2 159/24
167/20 176/10 178/11 179/10 185/23 190/10
192/20 196/6 196/7 199/1 205/25 218/1 218/2
219/25 220/7
merchant's [4] 38/4 80/7 147/1 177/16
merchants [248]
merchants' [3] 34/14 72/19 126/2
mercy [1] 106/6
mere [1] 176/2
merely [4] 64/15 146/10 146/16 146/17
merits [11] 29/12 29/14 73/21 83/2 105/9
119/13 119/19 159/17 159/20 162/16 217/15
messages [1] 106/6
met [4] 118/23 118/24 175/9 193/15
method [2] 101/24 182/11
MICHAEL [3] 2/5 5/10 44/1
mid [1] 198/12
middle [3] 20/10 53/9 87/17
might [27] 18/19 26/4 26/12 37/17 43/18
59/1 76/24 108/24 117/10 118/1 127/9 132/11
132/14 136/23 139/18 174/7 189/23 189/23
193/8 200/12 201/25 202/2 203/19 212/17
212/20 212/21 219/2
migrate [1] 151/2
mile [1] 15/4
MILLER [1] 2/13
million [29] 6/24 12/21 12/25 30/17 30/17
33/24 34/5 42/19 42/20 123/9 127/18 129/1
129/2 129/4 129/10 134/6 134/10 138/3 139/3
160/19 175/3 183/3 184/13 198/22 203/3
215/15 215/23 216/1 216/4
millions [6] 42/18 50/17 50/20 112/21 112/24
179/9
mind [2] 41/19 173/15
minds [1] 204/2
mine [2] 136/8 141/17
ministerial [1] 166/16
minor [1] 109/19
minute [7] 18/11 63/21 63/21 65/17 90/8
138/2 169/4
minutes [7] 6/1 31/5 43/17 43/20 62/8 150/11
163/9
mirage [1] 11/17

mirrors [1] 72/8
misconception [4] 127/13
misleading [2] 110/2 203/7
misperceived [1] 130/14
misreading [1] 216/14
missed [1] 220/15
missing [1] 138/14
mistake [2] 79/1 131/12
mixed [2] 156/5 156/6
MIXSON [1] 3/8
MLR [5] 114/1 114/25 114/25 115/16 117/15
Mm [1] 167/21
Mm-hmm [1] 167/21
mockup [1] 18/21
model [5] 11/13 25/14 32/12 92/12 97/4
models [1] 66/25
modern [1] 89/6
modification [1] 126/4
modified [1] 125/22
modifies [1] 53/4
modify [1] 135/15
mom [1] 198/10
mom-and-pop [1] 198/10
moment [8] 8/22 10/6 16/22 28/12 53/13
53/20 80/14 87/16 88/3 100/22 103/4 118/11
119/18 123/7 146/3 187/2 191/13 219/4
monetary [6] 62/20 62/21 63/17 120/18
120/19 142/11
money [7] 59/14 60/17 62/15 98/25 100/6
200/19 201/20
monitor [1] 209/12
monolithic [1] 20/9
monopolist [2] 90/11 98/16
Monroe [1] 3/19
month [1] 181/1
monthly [4] 18/17 18/18 26/24 80/6
MOORE [3] 3/13 111/6 148/5
moot [1] 204/23
Morales [2] 50/5 50/15
more [78] 12/17 15/2 17/5 20/10 21/5 21/16
21/21 21/23 23/11 28/3 28/5 29/20 30/13 31/8
33/13 38/2 39/12 42/13 55/8 58/19 68/13
68/13 70/8 76/13 77/14 78/8 81/23 83/9 83/10
83/10 83/21 83/21 83/21 83/24 84/17 85/11
85/21 85/23 87/16 95/23 97/20 98/17 100/15
104/15 108/15 109/3 109/9 113/4 113/4
120/21 121/2 122/5 122/8 122/9 123/24 124/9
124/23 127/8 128/14 130/22 134/18 140/24
144/15 153/22 153/25 154/6 154/23 159/12
166/23 174/20 174/23 178/21 187/4 190/18
196/5 208/19 214/22 216/2
morning [18] 5/5 5/6 5/7 5/9 6/8 6/9 7/6 11/6
31/24 31/25 44/16 48/3 81/12 131/25 133/5
133/17 148/14 209/19
mosaic [4] 35/22 37/22 37/24 38/19
most [24] 14/5 24/10 29/8 29/10 34/19 36/5
47/13 56/16 64/13 73/9 78/20 78/21 83/12
91/18 109/15 112/14 115/4 115/11 117/4
135/6 147/16 153/8 173/21 215/3
mostly [1] 114/7
motion [8] 12/2 28/20 45/14 50/6 53/23
128/17 156/23 160/8
mountain [1] 9/15
mountains [1] 9/16
mouse [1] 17/2
move [8] 21/20 43/19 86/4 110/14 153/5
155/24 157/16 166/1
moved [1] 45/13
moving [4] 17/12 91/11 170/8 214/19
Mr [9] 81/13 148/10 168/16 168/19 199/23
207/14 208/4 214/22 216/23
Mr. [93] 5/23 5/24 6/7 24/18 30/2 31/3 31/23
39/5 40/2 43/22 64/3 64/5 65/13 67/25 68/2
68/25 71/11 75/20 79/12 79/20 80/14 81/13

## M

Mr... [71] 81/19 82/3 82/5 85/3 88/7 90/5
92/5 94/10 94/12 100/23 104/5 109/23 109/25
111/10 113/13 119/8 121/21 133/17 133/23
133/23 134/5 135/3 135/4 148/8 148/10
148/22 150/2 150/5 150/6 150/23 158/7
159/16 162/2 162/8 163/8 168/5 168/20 170/3
173/21 174/23 184/1 184/22 184/25 185/5
185/5 186/4 190/18 191/2 193/8 193/24
197/11 197/16 206/13 206/14 207/18 208/5
210/3 211/10 214/22 215/4 215/7 218/6 218/9
218/14 219/3 219/24 220/1 220/5 220/8
220/10 220/12
Mr. Almon [1]  109/25
Mr. Arnold [13]  81/13 113/13 150/23 158/7
159/16 184/1 184/25 185/5 186/4 206/13
210/3 214/22 220/1
Mr. Canter [7]  65/13 67/25 68/2 71/11 150/5
218/9 219/24
Mr. Cantor [1]  43/22
Mr. Chenault [2]  30/2 104/5
Mr. Chesler [1]  148/10
Mr. Feinberg [2]  40/2 111/10
Mr. Friedman [16]  5/23 6/7 68/25 79/20
80/14 82/5 85/3 92/5 94/10 100/23 173/21
184/22 190/18 193/8 197/11 197/16
Mr. Friedman talked [1]  79/12
Mr. Friedman's [1]  174/23
Mr. Funda [1]  90/9
Mr. Gold [1]  148/8
Mr. Hamer [2]  162/8 168/5
Mr. Hammer [1]  75/20
Mr. Hines [1]  168/20
Mr. Hochschild [1]  24/18
Mr. Korologous [9]  5/24 31/3 31/23 39/5
170/3 215/7 218/6 218/14 219/3
Mr. Korologous' [1]  109/23
Mr. Korologous's [1]  121/21
Mr. Lowrey [2]  135/3 135/4
Mr. Orsini [1]  193/24
Mr. Quagliata [3]  150/2 150/6 220/10
Mr. Schulman [3]  119/8 133/23 134/5
Mr. Schwartz [2]  162/2 163/8
Mr. Shinder [9]  64/3 64/5 81/19 82/3 88/7
94/12 133/17 133/23 211/10
Mr. Slater [7]  148/22 207/18 208/5 215/4
220/5 220/8 220/12
Mr. Slater's [1]  206/14
Mr. Vellturo [1]  185/5
Ms. [1]  97/22
Ms. Langwith [1]  97/22
much [38]  6/4 10/9 11/6 13/2 17/4 21/20
22/20 30/3 31/21 34/6 43/1 50/14 63/20 72/24
76/13 79/4 81/10 90/3 93/10 99/3 122/7
133/22 134/7 135/2 147/22 148/2 148/3
157/20 162/1 168/14 171/6 173/5 175/23
197/15 202/3 202/4 207/20 209/23
multiple [2]  128/7 165/11
murders [1]  106/17
must [24]  32/11 44/22 45/18 46/6 47/10 54/7
54/8 54/20 54/21 63/19 65/9 65/11 65/14 69/6
76/6 114/3 114/4 128/14 137/23 149/17
171/18 178/13 195/2 220/19
muster [1]  44/21
mutual [1]  45/20
my [67]  7/6 11/24 16/12 18/14 26/2 29/1 31/1
36/9 41/19 41/19 42/14 43/22 44/1 44/7 44/19
57/8 57/9 64/20 78/25 81/14 81/16 82/11
82/25 86/2 88/18 92/25 103/24 109/5 111/5
113/19 116/18 134/12 136/9 141/15
145/1 145/22 148/11 150/14 150/24 158/8
161/6 161/23 165/25 168/8 173/15 179/18
179/19 184/25 185/17 191/20 191/24 194/4

196/25 198/19 199/7 201/13 206/12 206/16
206/16 208/8 209/18 219/19 242/9 215/3
216/23 217/10
myself [2]  99/6 141/15
mystery [1]  124/6

## N

N.W [1]  2/14
N357 [1]  4/13
NACS [1]  73/3
nailed [1]  71/4
nails [1]  144/11
naked [1]  15/13
name [4]  28/25 44/1 60/8 165/20
named [4]  121/7 123/15 138/24 198/17
names [1]  131/19
narrow [1]  131/3
nation [2]  92/8 111/21
national [12]  2/2 5/11 9/19 36/12 43/21 44/2
44/12 44/14 44/14 48/8 48/16 50/4 96/9
nationwide [1]  179/13
natural [1]  31/12
nature [6]  65/25 125/15 130/7 147/9 176/16
192/9
NBA [1]  144/19
nearly [2]  115/17 123/14
necessarily [5]  70/9 130/1 182/20
necessary [3]  120/9 120/22 207/23
necessity [3]  36/2 57/17 61/11
neck [1]  208/8
need [16]  6/5 29/24 37/21 58/16 58/22 59/18
95/6 141/2 142/6 149/15 150/9 194/17 195/14
210/12 212/13 219/14
needed [1]  151/14
needle [1]  95/7
needs [6]  35/5 123/23 172/24 180/5 190/1
194/16
negated [1]  75/5
negative [4]  125/10 130/16 131/11 133/23
neglect [1]  195/1
neglected [1]  219/17
negotiate [11]  60/10 61/14 140/8 150/12
151/17 173/3 192/18 192/25 194/22 195/6
202/17
negotiated [19]  36/20 40/2 49/24 49/25 51/23
53/7 60/5 60/24 138/5 147/2 150/7 164/8
174/9 174/13 174/16 176/17 192/20 194/13
197/11
negotiates [1]  47/25 48/4
negotiating [3]  112/8 140/3 173/5
negotiation [3]  18/22 164/5 205/5
negotiations [7]  33/12 33/19 52/8 52/11
60/13 60/15 131/4
neither [3]  46/4 132/1 215/13
network [10]  8/2 8/4 9/11 13/6 67/7 76/9
84/15 85/1 97/15 99/14
network's [1]  143/16
networks [6]  7/2 24/22 64/24 76/15 89/24
100/4
never [31]  7/11 7/11 18/17 18/18 18/19 20/4
46/12 46/25 63/6 65/8 80/6 88/12 92/3 97/18
102/20 102/21 104/8 105/17 108/17 122/11
123/2 123/3 127/25 128/1 128/4 133/25 139/6
149/23 162/19 178/18 216/10
nevertheless [1]  132/17
new [33]  1/1 1/8 1/18 1/22 2/9 3/14 4/3 4/14
8/3 24/3 40/24 75/6 87/8 89/10 93/18 100/3
111/5 126/1 136/24 136/24 137/3 137/5 178/1
178/10 195/8 198/11 209/3 209/4 209/6 209/7
211/22 214/15 218/15
Newark [2]  23/10 213/18
Newegg [1]  3/17
news [1]  83/19
next [18]  12/1 15/11 25/17 49/22 53/12 63/24

64/1 90/15 110/14 110/17 111/9 112/24 119/6
131/14 136/15 153/5 162/2 169/8
NGG [2] 1/4 1/7
nice [4]  97/16 148/7 148/22 217/11
niche [1]  16/19
NICHOLAS [1]  1/12
nine [2]  87/15 182/24
ninth [2]  129/13 161/20
Ninth Circuit [1]  129/13
ninth factor [1]  161/20
NJA [1]  73/3
no [182]  7/21 7/22 7/24 7/25 8/8 9/11 9/12
12/22 17/1 17/5 25/1 30/8 30/15 31/20 34/2
35/7 36/20 37/13 37/16 46/17 49/14 54/2
54/14 55/9 56/12 56/19 57/10 57/16 57/17
57/22 58/25 59/24 59/25 63/15 66/2 66/6
66/16 66/18 67/8 67/17 69/20 70/15 70/15
71/8 71/8 71/9 73/7 74/14 74/16 74/23 75/11
75/23 80/16 83/9 83/9 84/17 84/17 85/17
85/18 85/18 85/23 88/21 88/21 89/25 90/24
92/5 92/6 92/15 93/19 93/24 94/15 95/3 95/4
95/23 97/17 98/3 98/23 98/24 100/6 100/19
102/1 102/5 102/15 103/1 108/11 109/3 109/3
109/12 111/6 112/4 112/6 116/21 117/20
118/7 118/11 118/25 119/4 120/13 124/6
125/4 126/11 126/23 128/13 129/20 131/5
131/5 131/5 132/6 132/10 134/17 135/11
136/10 136/21 137/17 138/14 139/11 139/11
139/24 139/24 142/23 143/3 143/5 143/6
143/22 144/6 145/22 147/10 148/10 148/19
149/5 150/9 151/9 151/9 151/15 155/5 158/2
158/2 158/22 159/7 159/8 159/9 159/9 159/10
160/1 160/7 160/9 161/12 161/22 164/2
165/10 167/9 169/3 172/12 173/16 175/19
177/1 177/8 178/10 178/13 178/14 181/13
182/3 185/25 191/3 193/2 193/18 196/7 204/2
204/13 206/1 207/5 209/6 210/11 211/17
216/6 218/24 218/25 218/25 219/4 221/1
221/2 221/5
No. [6]  219/21 219/23 219/25 220/2 220/6
220/9
No. 1 [1]  219/21
No. 2 [1]  219/23
No. 3 [1]  219/25
No. 4 [1]  220/2
No. 5 [1]  220/6
No. 6 [1]  220/9
nobody [9]  9/12 12/12 88/2 191/10 191/25
201/16 201/16 207/22 210/17
nomenclature [2]  89/20 203/7
non [9]  8/11 37/12 39/17 56/15 59/23 111/23
149/20 166/12 189/18
non-Blue [1]  111/23
non-opt-out [5]  39/17 59/23 149/20 166/12
189/18
non-steering [1]  37/12
non-surcharge [1]  56/15
non-surcharging [1]  8/11
nondiscrimination [5]  32/24 36/18 48/6
60/10 170/23
none [12]  12/22 30/18 36/22 129/11 134/9
135/11 153/1 157/22 171/1 189/1 200/20
210/15
nonlegal [1]  120/19
nonstandard [1]  60/10
nonstarter [1]  20/3
normal [2]  6/15 181/21
north [1]  20/11
Northern [1]  56/3
not [391]
note [6]  50/8 71/11 73/15 116/5 123/9 168/20
186/3 189/8
noted [7]  33/18 33/25 34/10 35/15 44/13
86/19 149/25

# N

notes [5] 42/4 43/22 102/6 115/8 128/19
nothing [2] 6/6 26/14 27/2 30/16 60/4 63/6
65/15 67/18 77/24 80/22 103/19 117/20
118/17 129/5 150/19 150/21 158/1 158/4
166/10 178/21 216/1 216/9
notice [14] 48/22 116/20 116/21 116/25
121/16 123/2 128/17 144/16 164/8 166/10
167/3 167/12 189/13 189/16
noticed [1] 152/3
notices [1] 42/18
notion [2] 16/18 127/21
notoriety [2] 189/10 189/12
now [96] 11/19 11/24 13/1 17/15 19/24 23/11
25/8 28/2 29/22 29/23 39/4 43/7 43/16 43/19
47/4 47/12 50/20 54/25 64/24 69/11 72/7
82/11 82/25 83/23 84/4 84/16 84/24 85/3
85/21 89/1 90/7 90/21 91/6 91/11 92/2 92/21
94/8 95/19 96/3 96/21 99/2 99/23 100/10
100/22 101/4 102/3 103/4 103/5 103/10 105/7
105/25 107/12 107/18 109/15 116/4 116/13
116/22 121/5 121/14 123/6 125/24 128/10
132/12 132/20 134/9 135/2 135/13 135/23
136/5 136/12 137/19 141/23 142/21 143/24
144/4 148/9 148/10 148/12 150/11 155/3
158/3 163/12 168/7 168/15 170/2 174/22
178/6 181/1 182/9 183/18 185/6 204/17 210/9
216/11 219/13 219/22
Nowhere [1] 164/18
NRF [5] 61/20 217/2 217/3 217/6 217/21
NRF's [1] 219/24
number [25] 8/8 40/25 42/18 43/1 58/12
58/13 80/3 83/14 83/14 93/15 101/12 106/23
109/5 109/6 112/23 124/25 132/1 132/3 132/4
132/22 132/24 141/11 167/2 219/13 219/20
numbers [3] 41/15 150/17 219/15
numerous [1] 121/18
NW [2] 3/8 4/7
NY [5] 1/18 1/22 2/9 3/14 4/3

# O

oath [1] 92/16
object [6] 42/8 90/19 123/3 128/18 152/20
187/14
objected [1] 187/15
objecting [12] 7/18 7/19 90/18 152/10 152/12
152/21 179/16 198/23 200/11 209/25 210/5
210/9
objection [11] 17/10 31/13 31/14 45/22 48/14
119/15 119/16 121/10 121/16 123/11 134/12
objectionable [2] 42/11 42/13
objections [12] 31/11 39/10 46/15 73/25
74/18 83/13 162/15 170/13 172/11 184/19
188/22 190/4
objector [11] 2/2 2/7 11/14 64/1 64/2 119/6
169/2 178/17 203/5 203/5 203/24
objector's [1] 14/23
objectors [67] 2/12 5/11 10/1 12/11 14/3
14/21 15/18 16/2 16/15 22/25 27/21 29/8
33/21 34/25 35/6 39/13 39/18 42/5 42/21
43/21 44/2 44/12 44/17 46/6 48/8 50/12 54/14
58/7 64/9 74/23 83/12 83/23 84/16 111/10
116/17 117/7 118/2 118/19 119/12 119/23
120/2 120/4 133/11 138/23 140/2 149/20
151/16 151/20 151/21 152/2 152/15 162/14
172/21 173/6 173/18 179/2 179/3 179/6
179/24 185/24 200/7 210/4 210/5 210/5
210/15 219/23 221/3
objectors' [3] 5/12 73/24 174/9
obligated [2] 34/7 119/17
obligation [1] 49/1
obligations [2] 35/8 124/4
obliterate [1] 167/4

observation [3] 148/11 154/24 154/25
obstacle [1] 10/11
obstacles [1] 120/8
obtained [4] 120/3 120/25 121/3 129/9
obtaining [3] 120/22 127/1 129/15
obtains [1] 119/25
obvious [2] 51/2 115/10
obviously [17] 12/11 19/9 21/23 26/4 32/6
78/23 99/8 142/17 145/21 145/24 145/24
158/21 165/10 166/7 177/14 191/12 211/8
occasion [1] 88/17
occasions [1] 108/5
occur [4] 65/21 67/1 115/12 189/7
October [1] 115/24
of the [1] 109/10
off [14] 18/3 22/24 23/15 23/16 38/8 60/16
76/15 96/20 108/4 128/1 133/25 139/22 146/6
183/22
offend [1] 95/14
offended [1] 95/5
offer [2] 59/14 133/25
offered [5] 26/21 96/12 97/13 103/6 219/14
offering [1] 27/24
offers [1] 65/15
Office [1] 49/23
OfficeMax [1] 49/23
official [1] 213/19
offset [1] 124/10
often [3] 65/22 154/23 213/15
oh [14] 2/4 14/21 15/23 81/20 148/17 156/9
166/4 168/24 183/14 199/3 210/16 216/10
217/14 219/16
okay [52] 10/7 20/1 20/21 22/9 28/6 28/7
31/4 31/6 31/16 31/23 43/16 56/13 63/20
81/12 82/22 103/13 103/15 103/23 111/9
126/10 131/8 131/14 135/2 139/5 141/18
146/13 148/17 162/23 163/12 168/12 170/2
170/10 183/24 191/4 193/17 197/13 197/22
202/7 203/20 204/6 205/3 205/24 209/10
209/22 211/23 213/9 214/5 214/7 216/23
220/16 220/25 221/6
old [1] 56/12
on Mr. Korologous [1] 191/2
once [14] 50/22 54/18 69/7 78/8 89/21 94/17
98/16 104/8 107/4 107/7 133/15 162/19
202/14 208/15
one [144] 6/17 7/24 7/25 8/18 8/18 9/13
11/17 11/21 11/23 15/4 16/2 16/7 16/8 16/15
19/3 21/6 23/5 25/17 28/13 28/17 28/18 28/19
29/4 35/15 35/21 35/23 37/23 39/1 40/3 41/1
41/1 41/11 49/5 49/11 54/6 54/15 58/13 62/8
63/11 64/15 64/21 68/1 68/23 69/13 70/22
71/12 73/13 77/3 78/24 80/16 82/8 84/7 88/3
88/17 91/18 92/11 95/4 97/17 97/18 101/15
102/15 103/4 104/5 105/10 105/21 107/2
107/10 107/15 107/18 107/25 109/9 111/5
111/25 113/6 113/10 113/19 115/7 115/20
119/17 120/9 121/8 122/5 125/4 132/22
134/16 136/9 136/10 137/8 137/10 137/14
137/18 138/16 140/16 141/2 141/19 143/2
143/8 143/22 143/24 144/11 150/14 152/6
152/22 152/23 152/24 154/24 155/25 157/4
158/7 159/2 159/23 161/21 165/13 166/15
167/10 169/3 170/15 177/15 178/17 180/14
180/15 186/3 186/20 187/6 188/13 192/7
194/16 195/17 200/9 200/14 201/19 203/20
203/24 206/1 208/21 209/12 210/3 213/24
214/1 214/15 215/4 216/12 217/15 219/8
ones [2] 116/9 135/15
ongoing [1] 8/15
online [5] 16/19 16/20 16/25 17/6 214/1
only [59] 8/13 9/24 12/13 16/3 24/8 31/17
49/12 50/21 54/15 58/14 58/23 61/18 62/11
62/24 80/4 80/7 80/24 81/5 84/5 84/25 86/11

89/20 91/24 98/19 102/11 105/5 105/17
108/20 110/6 110/7 118/9 119/17 120/10
120/15 122/1 124/25 128/7 129/9 129/4
132/5 132/22 141/24 142/1 149/19 151/23
163/16 164/12 170/25 171/2 177/19 184/9
189/12 189/15 192/25 200/17 201/15 209/4
215/14 215/17
open [6] 17/19 63/25 111/3 121/19 170/1
178/19
open-ended [1] 121/19
opening [3] 152/5 201/13 207/11
Opera [1] 15/3
operate [5] 98/9 112/12 113/20 151/6 198/15
operates [4] 37/6 77/12 113/6 198/13
operation [2] 9/20 98/22
operations [2] 179/11 198/10
operator [1] 198/13
opinion [2] 78/25 91/10
opponent [1] 81/17
opportunities [3] 6/25 17/20 18/12
opportunity [5] 87/14 123/3 128/18 144/16
147/25
oppose [1] 163/10
opposed [10] 113/19 20/9 36/13 70/5 70/10
80/9 108/12 179/24 206/4 207/10
opposing [1] 170/18
opposite [5] 45/4 68/6 68/9 142/4 151/23
opposition [2] 73/6 73/11
opt [37] 39/15 39/17 54/13 57/22 57/24 58/1
58/10 59/23 61/7 61/14 124/14 136/22 137/18
141/8 141/23 142/13 143/3 143/6 143/21
144/16 144/23 145/10 145/11 145/20 146/2
146/4 147/19 149/20 166/12 166/12 172/9
172/14 188/23 188/25 189/2 189/4 189/18
opt-out [15] 54/13 61/7 61/14 137/18 141/8
141/23 142/13 143/3 143/6 144/23 145/20
172/14 188/25 189/2 189/4
opt-outs [3] 146/2 146/4 188/23
opted [1] 145/15
opting [2] 58/12 113/4
option [12] 18/6 18/8 19/5 19/12 24/5 27/24
32/14 43/8 43/10 61/3 215/13 215/15
options [5] 48/19 49/4 85/22 85/23 86/3
orange [2] 144/11 200/14
order [12] 5/21 84/8 101/5 142/23 142/24
154/11 160/23 164/15 170/9 170/12 177/10
220/20
ordered [4] 48/15 155/13 155/15 161/7
orders [2] 34/6 202/4
Ordover [1] 91/14
original [2] 173/6 190/8
originally [1] 163/23
orphan [1] 106/18
Orsini [1] 193/24
Ortiz [2] 54/10 200/21
other [124] 6/24 7/4 8/20 9/21 9/24 10/24
13/17 14/8 14/18 14/18 15/6 16/2 16/13 16/15
23/7 23/17 24/22 27/9 28/6 28/7 30/17 31/17
33/4 37/4 38/9 40/4 40/9 42/25 43/9 46/3 49/6
49/11 49/14 49/18 52/17 53/9 63/16 65/3
68/23 69/14 72/15 73/14 76/15 76/18 80/9
80/24 86/17 89/22 89/25 90/17 96/14 96/25
97/2 97/14 101/13 102/3 103/6 105/3 108/10
112/16 114/8 115/18 115/20 116/17 116/24
117/15 118/2 118/12 118/16 119/23 120/2
120/4 122/4 122/19 123/10 124/22 129/8
130/6 131/1 133/10 133/24 137/10 137/17
140/1 140/6 143/8 151/7 152/12 154/15
157/19 162/14 166/4 166/19 167/16 168/23
171/1 171/7 172/12 173/4 173/23 176/10
176/17 178/10 178/15 180/9 181/23 184/2
190/8 191/10 191/22 191/22 192/13 196/17
198/14 201/23 202/18 203/11 204/13 210/4
213/17 214/1 215/24 216/21 218/2

# O

others [14] 9/4 30/3 42/16 49/5 68/19 69/4
72/11 86/12 95/17 149/9 172/16 184/22
198/13 200/20
otherwise [2] 117/1 163/13
ought [2] 38/14 110/9
our [124] 9/16 11/9 11/17 12/2 16/5 16/14
17/7 17/15 17/23 18/7 24/17 26/18 27/15
29/18 32/9 32/14 32/25 33/1 34/19 34/19
34/20 34/20 37/12 37/12 38/14 40/25 43/12
44/16 45/4 46/12 46/13 48/13 49/14 49/14
50/12 52/3 53/16 61/8 63/8 68/7 73/1 83/19
83/20 86/12 86/14 86/16 87/10 91/13 91/14
93/14 94/3 94/4 96/18 97/24 98/6 98/12 98/13
104/16 106/4 106/19 108/20 109/23 109/24
110/3 113/15 117/23 119/20 121/12 123/8
123/10 130/22 131/12 136/25 138/19 138/20
138/20 139/11 139/15 139/19 139/21 140/19
140/21 140/25 141/4 143/20 144/11 146/6
146/8 146/10 146/15 146/24 147/10 147/12
154/20 158/3 159/5 160/14 160/14 162/17
163/14 164/24 165/5 174/17 178/9 187/7
187/9 188/2 188/9 189/3 193/11 194/12
194/24 195/15 196/1 199/14 204/15 205/14
207/4 209/8 209/8 213/8 214/19 219/17
219/17
ourselves [2] 155/11 157/15
out [111] 8/14 9/16 9/25 10/3 10/20 11/23
13/4 15/1 15/14 17/17 19/21 24/24 25/8 25/18
25/23 39/15 39/17 42/18 43/17 43/19 44/4
54/13 57/22 58/10 58/12 59/23 61/7 61/14
70/19 73/8 74/19 79/3 79/8 82/10 84/4 84/6
85/14 86/11 87/25 88/1 91/12 93/23 95/12
95/13 96/1 103/3 103/8 104/17 106/6 110/4
111/18 116/7 116/25 116/25 117/6 117/22
117/23 117/25 124/14 127/3 127/11 130/5
133/19 136/22 137/18 140/21 141/8 141/23
142/13 143/3 143/6 143/21 144/16 144/23
145/11 145/11 145/15 145/20 145/24 147/19
147/24 149/1 149/20 152/4 161/1 161/19
164/2 166/12 167/12 172/10 172/14 176/4
181/9 182/24 188/3 188/25 189/2 189/4
189/18 192/11 197/3 201/18 201/19 208/9
208/13 208/13 215/20 216/16 216/18 218/12
218/17
outcome [4] 11/13 72/4 177/4 181/15
outlaws [1] 113/11
outs [5] 57/24 58/1 146/2 146/4 188/23
outweigh [1] 136/2
over [28] 13/5 28/25 41/6 47/8 52/8 60/9 60/9
67/22 68/17 80/18 81/3 91/5 92/2 95/5 114/18
123/9 126/8 140/7 141/20 146/13 159/12
164/12 165/15 193/23 194/6 204/8 208/23
213/2
overall [4] 24/20 168/1 179/1 179/17
overarching [1] 123/7
overbroad [1] 123/5
overcharge [2] 38/7 185/16
overlap [1] 79/6
overlapping [1] 189/14
overreaching [1] 126/22
override [1] 58/25
oversight [2] 128/20 128/22
overstatement [1] 203/4
overstepped [1] 161/23
overturn [2] 186/7 186/9
overwhelming [1] 211/5
overwrite [1] 124/15
own [24] 17/25 27/15 39/15 49/16 49/19
49/20 49/20 50/3 50/4 59/7 60/10 111/14
111/22 139/13 159/25 160/1 172/15 177/7
186/1 188/23 190/5 192/8 198/16 198/18
owned [1] 111/22

owner [1] 88/14

# P

P.C [1] 3/18
P.M [1] 111/2
package [5] 176/21 176/22 176/23 181/19
204/4
packing [1] 195/22
page [10] 63/24 71/7 110/17 142/8 143/11
144/22 153/18 154/2 169/8 222/2
pages [1] 77/13
paid [5] 7/1 33/24 104/7 129/14 129/15
Pampers [1] 123/10
Pandora's [1] 207/12
paper [2] 137/20 199/14
papers [19] 9/17 11/9 17/10 31/20 43/12
43/13 68/7 149/17 153/14 154/20 162/18
166/15 185/12 185/13 188/2 189/3 193/21
213/8 214/19
paperwork [1] 25/9
paradigm [1] 157/3
paragraph [4] 60/14 126/1 185/15 186/25
paragraphs [2] 124/23 124/25
parallel [1] 82/9
Pardon [1] 216/17
parents [1] 106/17
parity [126] 10/23 11/2 11/7 13/3 13/10
13/15 13/16 13/21 13/24 14/4 14/11 14/15
14/22 15/1 15/5 15/15 15/17 15/19 16/3 16/5
16/8 16/16 16/25 17/15 18/1 19/9 19/14 19/18
20/2 21/7 23/25 24/1 24/6 26/20 32/9 32/10
40/4 40/21 52/12 55/3 55/6 55/9 57/12 57/15
58/18 63/11 65/2 65/6 66/7 67/15 68/12 68/24
71/10 71/14 71/16 72/9 72/14 72/20 73/7 74/6
74/13 74/16 75/4 75/24 76/14 76/22 77/15
77/18 78/7 78/22 79/5 79/19 80/25 81/1 81/7
85/7 99/11 99/12 100/3 101/21 101/24 102/5
102/7 102/9 117/9 117/22 123/17 124/9
134/24 135/7 152/25 153/7 181/25 182/2
182/4 182/7 182/13 183/6 192/14 193/6
194/16 203/10 205/25 207/10 207/18 207/21
208/1 208/16 208/25 209/16 209/19
211/4 211/13 212/7 213/5 213/7 213/16
213/24 214/1 214/11 214/11 214/19 214/21
215/1 215/24
park [1] 30/8
parking [1] 214/9
parse [1] 88/5
part [33] 18/7 26/6 26/6 37/21 40/19 52/10
53/23 57/8 61/6 84/24 87/4 94/4 95/24 98/5
100/25 102/22 103/11 104/11 104/16 104/18
105/10 117/20 119/3 119/17 123/4 124/19
146/5 162/19 164/24 168/9 179/18 187/19
208/8
participate [2] 53/15 53/19
participating [1] 83/7
particular [7] 10/2 34/13 48/12 94/20 114/14
127/4 212/18
particularly [6] 56/23 83/5 112/12 113/10
147/21 179/8
parties [20] 5/3 46/3 47/9 49/8 118/1 119/24
124/10 124/15 126/23 127/3 127/20 130/4
132/15 133/20 133/22 162/23 164/9 165/20
175/7 179/9
parties' [1] 124/17
partner [2] 136/10 148/5
Partners [4] 153/11 153/13 154/19 154/21
parts [5] 17/21 104/10 112/14 167/18 173/20
party [14] 49/6 49/6 49/11 51/6 162/25
163/17 164/23 166/23 170/18 178/22 187/13
187/14 204/15 220/2
pass [9] 44/5 44/20 56/1 82/13 84/18 102/8
114/20 115/18 150/25
passage [2] 141/13 141/16

passing [1] 117/17
past [4] 29/23 118/19 155/5 173/25
patently [1] 74/20
path [11] 49/13 49/14 49/16 49/17 49/19
49/20 49/20 49/23 50/3 50/4 50/8
paths [2] 48/20 50/19
patience [1] 109/8
pattern [2] 49/10 200/21
PAUL [2] 3/21 148/23
Pauley [2] 199/2 199/3
pay [21] 18/20 21/10 22/8 23/12 27/11 27/11
27/12 27/12 34/5 34/6 40/15 69/17 70/13
70/21 90/22 98/17 100/15 136/4 146/25 147/6
147/9
paying [4] 7/5 22/6 69/24 150/25
payment [6] 6/15 88/15 88/15 101/14 110/7
185/22
payments [2] 37/23 213/19
Peachtree [1] 3/8
PEASE [1] 2/3
peculiar [1] 110/9
pejorative [1] 89/2
pen [1] 141/10
pending [5] 78/3 78/6 118/2 127/7 192/9
penetration [1] 27/14
PENTZ [4] 3/3 3/5 131/14 131/16
people [30] 16/20 17/12 18/5 27/25 40/13
40/15 69/15 83/7 90/21 96/8 99/15 100/14
100/15 106/3 107/22 108/15 109/16 122/13
122/14 144/15 168/23 189/15 200/15 200/18
200/19 208/24 214/10 214/17 214/20 214/23
people's [2] 88/6 219/7
per [1] 70/17
percent [28] 13/18 18/1 18/15 21/7 21/11
21/19 80/19 80/19 95/14 99/13 99/19 114/5
114/8 114/14 114/15 114/23 114/25 117/17
123/14 134/20 134/21 134/25 153/24 153/24
171/25 179/10 208/18 216/11
percentage [4] 21/18 43/1 179/13 206/19
percentages [1] 91/8
perception [1] 106/13
Perdue [1] 134/16
perfectly [1] 69/24
perhaps [5] 35/25 41/19 174/22 189/14
196/11
period [4] 41/6 76/6 77/7 181/2
permissibly [1] 77/24
permit [4] 83/11 122/7 123/17 128/10
permitted [8] 6/2 6/3 94/2 124/14 128/21
134/15 160/13 178/23
permitting [2] 8/23 134/2
perpetuates [1] 64/15
person [2] 165/13 203/20
personal [1] 28/22
persons [2] 1/6 121/13
perspective [3] 18/5 161/6 194/10
pertains [1] 60/3
pet [1] 198/8
phase [1] 64/22
PHB [1] 4/7
phenomena [1] 107/13
PHILIP [3] 1/23 5/7 32/1
photograph [1] 96/4
phrase [1] 182/21
phrased [1] 180/20
phraseology [1] 24/2
picks [3] 40/10 116/19 121/12
picture [2] 209/1 210/23
piece [5] 35/21 35/23 37/23 37/24 38/19
pieces [1] 203/21
pillow [1] 141/15
PIN [3] 38/8 185/3 185/19
pioneers [1] 68/13
pipe [1] 7/21

**P**

pittance [1] 13/11
place [10] 16/25 69/20 90/18 105/2 105/6 118/17 127/6 128/4 209/21 216/20
placed [1] 208/10
places [7] 9/21 9/21 9/24 9/24 14/5 14/5 14/6
plaintiff [5] 1/7 29/6 32/4 85/15 207/3
plaintiff's [2] 59/9 134/19
plaintiffs [56] 5/5 5/22 6/7 6/11 10/2 44/17 46/4 46/9 46/12 46/16 46/20 46/22 46/25 47/3 47/7 47/22 54/25 59/8 64/21 72/15 74/8 74/20 95/22 120/8 120/21 121/5 121/7 121/21 128/8 128/11 129/18 130/11 130/12 132/1 135/7 135/9 135/25 138/24 139/13 142/10 143/22 145/17 149/21 151/25 152/7 152/19 155/2 155/4 157/21 158/10 167/20 190/10 194/7 199/1 200/3 200/10
plaintiffs' [13] 71/25 72/7 73/19 74/15 76/12 129/14 137/19 139/16 141/24 144/21 185/9 219/21 220/1
plan [5] 101/21 102/13 134/16 149/3 158/8
Planet [1] 30/11
planned [2] 147/20 149/9
planners [2] 95/8 100/20
planning [3] 101/15 101/16 165/6
plans [1] 94/19
play [4] 20/12 76/15 92/8 148/12
playing [3] 125/18 205/2 215/17
plays [1] 70/19
Plaza [2] 3/13 4/13
please [6] 5/1 31/8 56/13 131/22 170/10 218/4
plenary [1] 128/19
plenty [1] 131/23
plugged [1] 89/23
plus [3] 135/16 144/5 147/16
pockets [1] 20/24
point [75] 9/25 10/10 14/18 14/19 18/19 21/6 21/11 21/11 22/10 26/21 26/22 43/17 44/6 45/6 57/10 76/5 78/1 78/2 78/9 79/15 79/20 79/22 80/24 85/14 88/10 88/13 88/16 88/18 88/21 91/11 94/13 94/15 96/4 103/24 106/22 115/10 120/5 120/6 126/13 126/16 130/10 130/13 132/15 141/4 142/5 142/9 145/1 145/13 148/21 151/13 151/19 164/10 165/4 166/6 168/25 175/12 181/14 186/20 187/5 188/5 191/20 191/24 194/4 206/10 206/12 206/15 206/16 206/16 207/4 207/9 207/13 207/14 209/14 212/9 212/10
point-to-point [1] 21/11
pointed [8] 9/16 84/4 84/6 86/10 130/5 208/13 216/16 216/18
points [14] 67/22 75/8 95/1 95/1 95/3 144/18 149/13 160/18 170/7 170/13 181/23 187/4 188/21 216/21
policy [4] 2/17 119/7 119/12 167/8
politely [1] 144/12
political [1] 211/2
pop [1] 198/10
popcorn [1] 28/14
portal [1] 12/7
portion [6] 5/13 58/8 112/2 114/15 145/12 206/5
pose [1] 68/20
posed [1] 68/1
position [17] 25/22 31/2 60/5 75/21 83/20 83/20 108/2 128/3 155/10 159/12 162/17 163/11 168/7 179/16 187/8 188/10 207/3
positions [1] 88/6
positive [1] 124/16
possess [4] 200/5 200/6 200/10 200/25
possessed [1] 200/3
possibilities [1] 27/6 27/18

possibility [5] 130/16 134/1 178/19 197/8 218/3
possible [6] 13/10 108/16 125/9 161/5 161/6 196/10
possibly [10] 14/1 14/4 69/4 96/6 132/5 134/11 144/20 153/3 155/22 159/23
post [2] 24/23 116/21
postdated [1] 120/24
posted [1] 70/24
postulated [1] 67/5
postulates [1] 78/25
posture [2] 155/3 160/11
potency [1] 26/9
potent [1] 30/3
potential [7] 13/2 123/22 123/24 129/6 155/19 171/25 172/2
potentially [7] 58/10 65/17 66/11 72/2 131/11 179/7 195/9
pound [1] 53/22
power [12] 37/11 41/2 46/19 91/9 93/5 106/21 106/25 120/13 204/25 206/3 206/8 206/24
powerfied [1] 39/4
powerful [6] 19/2 29/20 74/8 83/2 109/7 214/22
powers [2] 39/8 148/11
practical [2] 19/23 21/5
practice [7] 16/19 20/24 29/16 68/16 72/2 96/7 159/10
practices [3] 120/25 134/2 143/16
pre [2] 7/13 39/20
pre-reform [1] 7/13
preceding [1] 177/25
precisely [3] 112/7 129/5 160/13
precluded [1] 24/22
precludes [2] 218/1 218/3
preclusion [4] 120/11 144/23 158/12 179/5
precondition [2] 120/9 120/10
predicate [4] 75/13 81/1 180/16 180/21
predict [2] 136/1 136/2
predicted [1] 161/17
Predicting [1] 136/14
prediction [1] 56/8
predominates [2] 141/20 141/22
preference [1] 159/12
preferences [2] 20/13 20/14
preferring [1] 27/25
prejudices [2] 210/25 210/25
premature [1] 56/9
premise [2] 120/2 135/10
premised [2] 38/5 38/8
premium [1] 208/22
prepared [6] 30/10 31/14 86/3 86/4 159/12 159/13
present [4] 24/24 127/14 158/6 166/14
presentation [8] 11/25 73/21 103/7 106/9 186/21 219/21 219/24 220/1
presentations [2] 6/6 186/2
presented [4] 92/4 220/4 220/8 220/11
preserve [2] 32/23 39/23
preserved [1] 39/20
preserves [2] 79/19 100/3
president [3] 24/18 97/23 98/20
press [4] 11/1 11/4 201/2 201/8
pressed [1] 104/25
pressure [2] 102/2 137/5
presume [1] 74/1
presuming [1] 158/13
presuppose [2] 25/15 128/19
presupposes [1] 77/18
pretend [1] 32/16
pretty [9] 10/9 26/25 51/2 72/24 76/18 134/7 157/10 161/21 206/24
prevail [2] 206/8 207/5

prevailed [1] 207/6
prevails [3] 27/7 134/47 158/11
prevalent [1] 17/6
prevent [3] 126/25 196/16 197/11
preventing [1] 126/25
prevents [2] 105/3 151/10
previously [4] 115/3 117/8 117/12 119/13
price [82] 22/6 24/23 69/13 69/14 69/17 69/18 70/16 70/16 70/22 70/22 71/17 71/18 71/21 71/21 76/16 84/14 84/20 85/1 85/6 88/23 88/23 89/8 89/15 89/15 89/17 89/25 90/1 90/5 90/13 90/22 90/23 91/23 92/11 92/14 94/14 94/24 95/3 95/7 95/11 95/18 96/25 97/9 97/10 98/13 99/22 100/12 100/16 102/1 102/24 104/24 105/3 105/3 105/4 107/5 110/4 110/7 110/9 150/16 150/19 150/24 151/1 151/4 151/5 151/12 154/15 154/16 154/16 156/19 157/2 160/25 160/25 161/8 211/24 212/2 212/3 212/5 212/6 212/6 212/6 212/7 212/18 214/2
priced [3] 100/4 154/22 195/24
prices [12] 69/13 88/24 95/17 96/12 98/11 98/12 99/12 106/19 114/22 211/12 211/20 213/21
pricing [6] 85/12 89/7 89/9 94/1 94/2 94/6 97/23 98/1 99/20 114/2 150/23 151/10 151/18 161/7 185/21 211/12
primarily [1] 33/25
principle [1] 188/13
printed [1] 44/4
Printer [1] 129/14
prior [1] 148/15
priority [1] 165/15
private [5] 30/18 125/15 165/20 166/23 167/1
privy [2] 50/11 50/21
pro [4] 29/19 32/7 37/12 72/1
pro-competitive [1] 72/1
probability [4] 71/5 99/10 123/21 136/7
probably [7] 45/9 112/4 112/18 141/12 141/16 147/3 156/5
problem [30] 12/21 22/16 34/23 38/24 63/8 67/14 67/19 67/20 83/22 84/6 84/9 85/4 86/6 87/21 91/3 98/24 125/13 138/1 143/13 163/16 182/20 182/25 183/20 204/4 208/8 210/12 210/13 210/13 215/15 215/16
problems [2] 97/17 204/10
procedural [5] 33/10 54/9 171/14 174/1 219/1
procedurally [3] 33/7 128/8 157/8
procedure [5] 128/16 164/14 164/19 165/18 171/19
procedures [1] 30/8
proceed [11] 5/20 33/14 111/4 131/22 139/9 139/13 160/7 166/8 166/10 167/5 172/22
proceeding [8] 41/10 55/2 63/9 63/10 65/6 74/17 74/22 159/4
proceedings [2] 4/16 62/18
process [19] 31/13 35/20 37/3 42/2 43/14 48/20 62/10 77/3 77/12 82/1 83/6 91/4 93/12 116/16 140/3 144/16 144/24 171/19 185/13
processes [2] 47/14 47/15
produce [3] 132/9 136/20 137/4
produced [1] 4/16
produces [1] 195/8
product [12] 34/3 64/10 92/7 92/10 92/17 100/14 195/8 195/8 196/2 196/5 200/16 213/24
products [1] 113/17
Professional [1] 96/9
professor [36] 14/24 22/25 23/24 27/22 56/15 65/16 71/4 72/7 72/12 72/18 73/19 78/16 79/3 81/8 86/19 86/20 91/13 91/14 91/14 93/14 93/14 99/9 99/21 104/16 123/19

## P

professor... [11]  129/13 129/13 131/11 131/11
185/6 208/9 208/11 208/12 208/14 216/13
216/14
Professor Stiglitz [1]  93/14
proffer [1]  15/18
proffered [3]  16/2 27/22 220/20
profit [3]  67/4 114/8 114/17
profitable [2]  20/24 20/25
program [1]  98/2
programs [2]  94/23 114/7
prohibit [2]  117/16 117/17
prohibited [3]  113/16 118/11 125/11
prohibiting [2]  161/7 186/8
prohibition [6]  35/2 62/24 155/8 156/11
156/15 156/19
prohibitions [2]  32/5 35/1
prohibits [2]  62/21 118/14
promise [1]  215/5
promotion [1]  80/24
prong [1]  87/21
proof [1]  106/11
proper [5]  63/4 72/5 75/2 119/25 167/12
properly [3]  141/20 141/21 176/4
proponent's [1]  54/12
proponents [10]  1/16 5/21 43/18 45/6 55/18
56/24 62/23 151/23 169/5 220/25
proponents' [1]  169/3
proposal [1]  179/1
proposed [21]  53/4 55/14 64/10 65/11 71/6
71/8 72/2 73/14 73/17 73/23 75/14 118/4
119/14 119/22 123/20 132/5 133/22 140/12
162/24 190/14 192/11
proposing [1]  64/16
proposition [1]  20/23
proprietary [1]  104/11
prosecuted [1]  204/1
prospective [5]  62/25 125/13 125/17 126/22
127/16
prospectively [1]  179/3
protect [6]  32/11 51/24 58/5 140/20 179/4
180/2
protected [3]  45/1 66/8 163/15
protecting [1]  79/16
protection [1]  52/1
protective [3]  101/5 154/11 220/19
protects [2]  64/12 66/8
prove [8]  95/22 95/23 95/23 138/12 155/7
177/18 178/3 178/6
proved [2]  136/8 138/11
proven [1]  95/25
provide [13]  29/18 32/15 34/20 34/20 51/21
55/4 58/17 69/6 71/8 87/5 90/21 171/3 220/21
provided [5]  17/16 164/8 219/24 220/1
220/18
provides [7]  6/24 10/14 52/1 54/17 133/19
166/11 197/10
providing [4]  40/20 141/24 141/25 142/1
provision [15]  45/25 45/25 48/23 53/14
53/16 60/22 60/24 125/21 125/22 125/23
145/20 166/8 177/4 197/7 203/12
provisions [13]  29/10 32/21 32/24 33/2 49/2
49/25 60/11 63/23 124/2 170/23 170/24
170/24 201/4
public [5]  2/17 119/7 119/12 167/8 220/21
publication [1]  101/8
publicity [3]  83/13 83/15 83/19
pull [2]  103/2 103/3
pump [2]  156/4 212/16
punitive [5]  54/6 129/18 172/20 173/4
176/12
purchase [1]  112/22
purchases [1]  101/13
pure [2]  19/8 22/16
purported [2]  149/15 150/10
purports [1]  75/1
purpose [3]  89/23 96/17 167/4
purposefully [1]  168/6
purposes [4]  40/5 78/13 113/15 220/23
pursuant [3]  45/24 128/12 162/20
pursue [5]  61/5 168/4 217/3 217/5 218/4
pursuing [2]  129/22 162/9
pushback [1]  81/16
pushed [1]  81/16
put [42]  14/2 17/19 18/21 37/22 44/4 49/2
54/1 73/19 82/15 87/15 89/2 92/25 96/1 96/10
97/9 97/15 97/22 101/7 102/2 102/3 102/4
111/8 114/17 115/7 116/3 119/18 123/13
126/21 127/25 128/3 131/7 149/3 150/4
159/11 168/7 186/4 189/23 199/17 203/8
207/16 207/19 210/22
puts [3]  9/13 94/11 155/1
putting [2]  31/19 101/4

## Q

Quagliata [4]  60/9 150/2 150/6 220/10
quagmire [1]  167/8
qualified [1]  102/14
qualify [1]  60/7
qualifying [1]  104/21
quality [4]  90/21 159/19 159/20 160/2
quarters [1]  27/11
question [69]  9/9 51/1 58/21 68/1 70/2 75/4
75/13 77/18 78/18 79/2 79/6 81/15 81/18 82/2
85/17 87/1 88/20 98/10 109/9 122/19 122/20
128/6 135/6 135/11 143/5 145/24 156/2 156/3
156/4 156/5 156/6 156/7 156/8 156/10
156/10 156/12 156/12 157/7 157/9 163/3
165/2 171/5 172/3 172/5 172/8 173/9 173/11
173/13 173/20 174/1 174/4 174/3 175/15
175/21 176/6 176/22 177/1 180/15 193/3
197/19 197/20 198/19 198/23 199/16 199/16
202/9 204/2 215/1
questionable [1]  193/6
questions [12]  31/8 74/6 75/23 76/4 86/21
88/5 99/5 129/23 145/2 147/21 171/8 184/23
quick [4]  103/4 170/7 208/21 217/7
quickly [7]  59/12 65/22 82/2 94/8 157/16
166/2 217/2
quite [6]  11/19 40/1 133/6 150/14 161/25
204/13
quo [1]  64/15
quote [20]  7/15 54/7 67/16 71/5 71/15 71/20
72/13 73/19 73/21 125/19 153/6 153/9 154/4
168/1 185/15 199/23 199/24 217/25 220/2
220/7
quote/unquote [3]  67/16 71/15 71/20
quoted [1]  144/22
quoting [1]  199/25

## R

race [1]  126/11
raise [6]  31/12 39/18 114/21 133/2 150/24
182/1
raised [10]  31/11 35/12 39/18 75/10 92/10
133/5 156/3 162/15 186/19 190/3
raises [1]  122/18
raising [6]  85/10 90/7 102/1 150/16 150/19
192/6
Rakoff [1]  214/15
range [2]  34/11 42/6
ratchets [1]  194/19
rate [16]  38/9 38/11 83/24 85/11 106/13
106/15 109/16 114/13 114/16 153/21 153/23
153/25 154/23 208/23 208/23 213/25
rates [15]  13/19 15/15 84/1 85/8 85/10
108/17 108/25 109/15 114/10 154/8 182/1
182/4 185/3 185/19 210/7
rathes [6]  65/22 65/22 120/8 127/4 162/9
173/10
ratio [1]  114/1
rationalize [1]  128/11
RE [4]  1/3 5/16 123/9 129/13
reach [3]  41/15 127/9 128/6
reached [4]  122/20 159/25 200/16 215/19
reaches [4]  52/2 66/11 66/14 77/23
reaching [1]  131/10
react [2]  26/10 26/11
reaction [2]  128/25 159/1
read [8]  13/12 101/20 120/7 135/19 141/8
141/9 141/11 217/6
readily [1]  76/12
reading [1]  83/20
reads [1]  152/15
ready [2]  159/6 159/13
reaffirmed [1]  12/9
reaffirming [1]  12/9
real [15]  14/6 14/12 14/12 14/16 18/22 33/18
54/3 70/20 76/16 82/2 106/5 118/7 123/11
193/2 217/7
realistic [1]  196/4
Realistically [1]  30/11
realize [1]  104/17
realized [1]  50/23
really [43]  13/1 13/1 16/3 16/23 24/9 28/1
29/17 36/9 52/12 55/1 58/22 65/20 71/4 74/11
76/14 79/14 83/5 96/2 96/17 98/12 102/11
107/17 108/23 119/20 120/3 137/9 140/9
141/4 142/25 146/9 147/20 155/25 161/23
166/17 171/19 181/19 185/19 187/9 197/6
197/7 204/12 217/2 218/14
reason [23]  11/2 44/22 47/10 51/3 54/8 67/20
69/15 83/15 90/3 90/25 93/22 96/10 100/6
101/1 105/5 107/19 124/11 126/11 147/7
150/21 151/7 165/11 207/6
reasonable [3]  96/7 118/25 155/23
reasonableness [3]  34/11 161/4 161/20
reasonably [1]  34/19
reasons [16]  19/7 63/18 65/10 65/13 68/7
71/9 75/13 78/16 81/7 115/4 117/4 117/12
128/7 131/23 163/9 195/18
rebate [4]  26/17 26/22 26/23 114/24
rebates [1]  26/21
rebuttal [6]  31/12 43/18 43/19 142/22 169/4
170/3
recall [9]  34/24 124/22 175/11 175/13 183/11
184/21 185/6 186/11 207/4
recap [1]  149/13
receipt [1]  80/6
receive [5]  61/1 98/1 114/5 121/22 128/17
received [5]  123/2 123/3 127/24 181/19
220/14
receiving [1]  123/1
recently [2]  5/21 129/13
recess [3]  63/23 110/16 169/7
recognition [1]  39/8
recognize [4]  91/22 93/12 98/19 101/24
recognized [4]  43/10 91/9 122/18 171/20
recognizes [2]  34/12 91/21
recommendation [1]  73/17
record [14]  42/12 43/25 74/10 80/3 86/22
103/11 111/8 114/18 116/3 138/14 138/24
182/15 219/15 220/23
recorded [1]  4/16
records [4]  106/5 128/9 129/12 130/6
recouping [1]  7/1
recovery [2]  161/5 161/6
red [1]  141/10
redress [1]  171/21
reduced [1]  154/16
reducing [1]  24/20

Case 1:11-md-02221-NGG-RER Document 1024 Filed 10/31/14 Page 247 of 246 PageID #: 15738

reduction [2] 7/21 158/2
reductions [1] 71/18
redux [1] 28/21
refer [5] 101/6 163/16 185/13 187/7 187/20
reference [3] 101/14 153/14 187/5
referred [1] 34/23
reflect [1] 134/19
reflects [2] 11/5 26/9
reform [1] 7/13
refrigerator [1] 212/19
refused [1] 170/19
refutes [1] 69/8
regard [7] 53/6 57/3 151/18 151/19 157/21 160/20 220/17
regarding [4] 5/15 72/19 158/12 162/15
regardless [6] 135/18 138/3 138/5 138/6 145/5 194/12
regime [1] 79/19
regional [1] 20/14
regularly [1] 83/7
regulate [2] 108/17 108/25
regulated [1] 109/17
regulates [1] 171/19
regulation [3] 83/24 108/23 164/12
regulations [3] 113/9 114/2 118/12
regulatory [3] 115/20 138/7 210/6
rehashing [1] 67/25
reimpose [1] 121/5
reject [4] 51/12 52/6 53/19 121/9
rejected [20] 12/1 28/13 29/7 44/23 46/7 47/11 54/8 54/8 63/19 65/9 65/11 65/14 67/21 74/19 75/12 76/6 117/3 122/19 142/14 142/23
rejection [1] 127/11
rejects [1] 133/15
relate [3] 115/5 117/5 118/7
related [10] 36/17 87/8 87/9 87/10 114/6 143/23 173/25 175/12 190/13 190/14
relates [1] 112/8
relating [1] 178/8
relationship [6] 52/23 53/8 59/7 75/9 192/19 202/18
relative [1] 98/10
relatively [1] 151/25
relator [1] 166/9
relators [2] 165/20 165/22
releasable [1] 180/10
release [69] 53/2 55/12 57/16 58/17 61/2 62/9 62/9 62/13 62/16 63/8 64/18 65/21 66/9 66/10 66/11 66/14 67/19 76/3 77/23 117/24 118/6 118/14 120/14 120/15 120/17 121/4 124/3 124/6 124/24 125/1 125/2 125/4 125/8 125/13 125/19 126/24 128/2 129/7 131/25 132/25 135/13 135/14 135/15 135/18 142/1 143/17 143/17 143/19 143/23 145/12 145/14 149/21 151/15 155/13 177/1 178/16 178/20 180/10 180/13 180/13 180/18 180/18 180/20 186/22 186/23 194/24 210/17 210/17 210/18
released [7] 132/23 177/6 178/7 178/8 178/18 180/22 180/23
releases [5] 62/15 83/19 145/9 177/2 177/2
releasing [2] 65/17 126/22
relevant [8] 37/9 59/3 60/25 78/12 123/2 123/2 125/4 129/11
reliance [1] 208/10
reliant [1] 17/12
relied [1] 101/17
relief [110] 13/3 13/3 17/7 17/10 17/16 17/17 17/19 18/7 25/7 25/16 30/22 33/13 33/15 39/20 40/19 40/23 41/25 43/5 43/5 53/18 53/19 54/17 54/20 55/4 57/19 57/19 58/23 60/4 60/6 60/7 61/11 62/17 63/10 69/3 69/6 69/7 76/20 82/3 82/10 84/18 93/6 100/2 118/8

118/13 118/15 120/1 120/2 120/8 120/22 120/25 121/3 121/8 121/21 122/3 122/6 122/6 122/7 122/11 122/13 122/20 129/9 129/20 132/5 139/20 139/22 141/25 142/1 142/11 143/3 143/16 143/18 144/7 146/7 146/18 146/19 146/23 147/8 159/20 160/10 160/20 162/9 168/10 170/20 171/3 171/4 172/17 174/4 174/18 174/19 174/20 175/20 177/3 178/11 178/21 180/8 181/24 186/16 199/10 199/15 201/15 203/10 204/4 205/25 210/11 215/23 217/19 217/23 218/1 218/3 218/5
relieve [1] 177/2
relinquishing [1] 205/5
relocation [1] 198/8
reluctant [1] 69/16
rely [2] 68/7 211/5
relying [4] 144/13 205/10 208/5 208/6
remain [1] 220/19
remaining [2] 85/1 105/2
remains [2] 32/22 169/3
remarked [1] 138/21
remedies [2] 61/4 179/5
remedy [4] 29/23 155/20 168/4 171/21
remember [7] 92/25 136/9 154/5 188/22 199/2 199/3 218/17
remind [1] 109/5
reminded [3] 83/7 84/9 184/2
reminding [3] 84/2 99/9 183/14
remiss [1] 16/17
remotely [1] 203/25
removed [5] 9/11 92/9 92/13 92/20 105/4
remunerative [2] 201/25 202/1
render [1] 79/4
renewals [1] 26/2
rent [1] 136/18
rental [1] 208/1
rentals [1] 15/12
repeat [3] 71/24 108/19 149/10
repeated [4] 74/4 108/5 109/1 203/4
repeatedly [3] 60/9 64/22 196/20
replies [1] 181/5
reply [7] 17/23 31/15 59/21 74/4 144/22 181/3 181/4
report [17] 24/10 71/7 74/5 78/17 86/19 86/20 152/5 152/6 153/13 153/17 153/18 154/3 154/19 154/21 185/14 208/10 208/14
reported [1] 142/7
reporter [3] 4/12 5/14 126/14
reports [4] 72/10 101/20 157/24 159/9
represent [22] 44/2 44/11 44/13 48/15 50/16 58/7 73/3 111/20 112/1 114/18 132/2 139/24 162/21 164/11 164/17 164/21 165/13 166/19 166/24 173/12 175/7 198/2
representation [12] 137/13 137/23 180/7 185/1 197/19 197/20 199/18 199/21 200/2 200/8 200/24 202/9
representative [9] 112/5 153/4 159/7 173/1 173/23 187/14 197/24 197/25 200/25
representative's [1] 50/25
representatives [14] 46/10 46/16 46/20 47/10 50/15 73/23 85/15 85/20 112/6 112/8 123/15 175/2 175/6 176/9
represented [10] 52/3 80/21 138/22 138/23 151/25 153/2 173/3 188/7 188/14 191/22
representing [3] 130/11 130/12 162/3
represents [4] 135/3 206/5 206/18 208/18
reps [2] 73/14 73/17
repudiated [1] 121/6
request [9] 74/8 75/3 128/5 128/7 129/1 172/9 172/14 172/15 214/18
requested [1] 168/20
requests [2] 34/14 128/25

require [11] 25/16 40/21 49/6 51/8 57/19 57/21 84/19 91/1 113/7 175/16 194/12
required [12] 32/9 54/3 54/10 60/3 114/24 118/24 119/1 148/16 149/24 184/11 188/8 188/12
requirement [4] 35/4 50/24 95/23 177/17
requirements [4] 32/9 54/9 118/22 125/25
requires [12] 40/22 55/5 55/9 66/23 122/8 122/9 128/16 134/18 137/13 181/25 217/19 217/23
RER [2] 1/4 1/7
reserve [3] 7/13 53/18 160/23
reserved [1] 61/4
reserves [1] 60/14
residents [1] 9/3
resistance [2] 19/18 19/23
resolution [14] 29/10 47/15 48/20 48/24 50/1 54/5 72/5 158/3 159/3 159/18 201/3 205/6 205/9 218/8
resolutions [1] 47/15
resolve [13] 35/12 35/13 35/14 48/10 48/25 49/9 52/18 53/8 71/22 167/2 174/1 189/25 201/16
resolved [16] 44/25 45/24 46/1 46/2 51/22 62/11 62/12 62/19 62/21 63/4 63/6 63/16 74/7 85/19 166/13 174/12
resolves [1] 34/22 62/14
resolving [2] 18/6 62/21
resort [1] 141/2
resorts [1] 198/17
respect [33] 34/11 37/5 39/14 94/9 107/14 118/8 134/4 171/12 172/5 175/9 175/12 176/25 177/8 177/11 177/12 177/23 177/24 178/8 184/23 186/10 186/13 187/5 187/8 188/19 189/10 190/4 193/11 193/12 193/13 195/6 195/20 195/21 216/13
respected [2] 151/5 208/12
respectfully [4] 59/18 66/3 201/24 208/14
respecting [1] 170/21
respects [2] 132/21 192/24
respond [2] 74/23 150/22
responded [1] 34/18
responds [2] 34/14 186/18
response [9] 72/7 72/11 121/21 145/23 154/17 181/1 208/14
responses [1] 58/13
responsible [1] 7/5
rest [3] 32/23 135/1 158/8
restaurant [3] 22/21 198/6 202/5
restaurants [3] 42/10 179/14 198/5
restaurateur [1] 13/11
restaurateurs [2] 179/18 179/19
restitution [1] 120/19
restrains [5] 80/16 90/4 91/16 91/20 91/23
restraint [1] 156/16
restrictions [3] 71/11 71/12 176/9
result [9] 27/8 71/17 75/22 130/2 131/11 132/9 166/22 183/10 192/12
resulted [1] 19/23
resulting [1] 155/19
results [2] 78/4 129/15
retail [14] 2/2 5/11 7/12 13/23 43/21 44/3 44/12 44/14 44/15 48/8 48/16 50/4 50/13 62/5
retailers [3] 152/8 152/16 220/3
retailors [1] 13/24 44/14
retained [1] 61/5
retains [2] 192/18 192/18
retreat [1] 102/14
retrospectively [1] 62/25
return [1] 92/12
revenue [1] 114/5
reverse [1] 85/13
review [1] 130/6
reviewed [1] 124/21

Case 1:11-md-02221-NGG-RER   Document 1200-15   Filed 09/09/19   Page 247 of 255 PageID
#: 47949

**R**

reviewing [1] 14/15
revised [1] 41/10
revision [1] 25/24
revolving [4] 18/8 19/5 19/11 27/24
reward [4] 100/3 137/1 137/1 137/5
rewards [4] 69/23 94/23 98/23 195/25
Richard [1] 158/9
Richardson [1] 142/7
Rico [1] 80/14
ride [1] 39/4
right [177] 5/9 5/12 5/15 6/18 8/10 9/1 9/2 9/5 9/7 9/22 11/24 15/14 17/2 22/16 24/17 31/21 32/7 33/14 40/6 40/13 41/10 42/16 43/7 43/16 44/25 45/1 45/3 46/6 47/2 48/14 51/13 51/23 51/24 52/6 52/11 53/1 53/3 53/18 55/15 57/22 58/8 60/15 61/4 61/5 61/8 61/9 61/10 61/14 64/1 69/14 69/18 79/7 81/10 84/7 85/22 86/20 87/19 92/4 94/12 94/25 99/18 99/19 99/19 100/17 102/17 102/18 103/18 108/9 110/13 111/4 111/8 111/18 114/23 116/4 116/13 119/6 121/16 123/4 126/23 133/13 134/22 135/23 136/21 137/18 139/15 141/9 141/23 142/2 142/3 142/12 142/21 144/1 144/23 145/3 145/10 145/11 145/18 145/22 147/13 147/18 147/18 148/17 148/20 149/7 156/13 158/23 161/25 162/2 165/16 166/9 167/20 168/15 168/20 168/25 169/3 171/16 172/14 173/13 176/11 178/7 181/17 182/18 183/6 183/9 184/24 185/6 188/24 189/1 189/2 189/4 189/5 190/17 190/17 190/25 191/14 191/15 192/15 192/21 194/9 196/11 196/23 197/4 197/9 198/8 198/16 199/9 199/9 199/19 201/22 202/20 202/21 202/24 202/25 203/12 203/17 204/9 204/9 204/12 205/19 207/10 209/7 210/19 212/4 214/3 215/22 217/3 217/4 217/5 218/10 218/10 218/16 218/18 218/21 218/21 218/24 219/5 219/20
right-hand [1] 48/14
rights [72] 12/5 12/6 12/9 12/13 19/20 33/1 45/5 45/19 46/8 46/11 46/13 46/14 46/17 46/21 46/23 47/4 47/14 47/17 47/23 48/9 50/17 51/1 52/7 54/5 54/14 58/3 58/4 58/5 58/25 59/1 60/2 60/16 86/1 86/2 106/4 121/17 124/1 128/13 135/14 137/22 137/22 137/25 137/25 138/1 138/9 138/10 138/14 138/16 139/11 141/1 141/8 143/3 143/6 146/8 171/16 171/20 173/4 173/5 176/14 176/19 179/4 179/7 180/2 189/6 190/2 190/6 195/9 202/5 202/12 202/19 203/11 219/7
RILA [1] 73/3
ring [1] 108/15
rise [1] 211/7
rises [1] 28/8
risk [16] 15/19 16/23 19/7 19/14 29/12 59/15 59/16 73/22 101/19 127/25 129/21 159/15 159/22 160/3 160/5 161/21
risks [3] 14/15 128/3 131/10
risky [2] 12/23 12/23
Rite [2] 9/20 152/20
Rites [1] 3/4
rival [1] 64/24
RMR [1] 4/13
road [5] 10/12 12/19 12/21 29/4 29/5
ROBERT [1] 2/6
Robertson [2] 144/19 145/2
rock [1] 16/1
role [6] 42/8 127/13 130/15 130/21 131/9 148/12
room [4] 4/7 4/13 126/25 147/4
roughly [3] 114/14 129/3 170/12
rounds [1] 157/24
rug [1] 208/3

rule [68] 7/21 7/22 7/22 7/23 9/11 35/19 36/2 39/16 41/3 42/3 43/4 43/13 44/21 45/2 45/4 46/7 46/16 46/18 48/3 48/10 49/10 49/10 91/2 92/13 103/9 103/21 115/10 115/14 118/23 118/24 119/1 119/21 121/17 125/21 125/21 125/23 128/8 128/11 128/16 143/2 151/9 151/10 164/13 164/18 165/18 166/11 167/4 170/17 171/1 171/6 171/14 171/19 174/6 174/21 176/4 180/6 182/3 182/4 184/11 189/6 195/16 196/1 204/1 218/22 219/1 219/1 219/5
rulebook [1] 23/21
ruled [2] 45/16 95/21
rules [99] 1/4 5/17 8/2 8/4 12/15 23/13 23/20 24/21 30/5 31/13 35/7 36/18 37/6 37/13 37/16 39/20 41/10 45/2 46/9 51/24 64/16 65/18 66/6 66/7 66/12 66/15 66/16 66/19 67/18 76/2 89/23 90/23 91/1 91/21 92/8 92/10 92/20 93/24 93/25 100/20 102/24 104/23 105/18 107/1 113/9 114/1 115/16 117/15 118/6 118/7 118/10 118/10 118/14 118/16 135/14 135/17 135/22 136/3 138/9 141/1 144/3 144/17 147/3 149/16 149/17 149/24 150/8 150/8 151/9 151/14 164/13 171/4 171/12 171/14 171/15 172/1 172/8 173/10 174/8 174/15 174/17 178/1 178/2 178/10 182/3 183/19 184/10 186/8 186/10 186/24 187/16 188/20 190/6 192/13 195/3 196/17 218/23 219/5 219/6
ruling [2] 31/1 158/11
run [14] 11/20 23/14 23/14 59/18 82/8 82/8 105/18 112/23 113/1 113/18 113/21 115/14 146/12 197/12
running [2] 82/9 195/25
runs [3] 59/15 59/16 60/23
rushed [1] 183/22

**S**

safeguards [1] 119/21
safely [1] 67/15
safety [1] 196/16
said [74] 7/13 11/8 14/24 15/24 17/24 22/3 24/19 25/3 26/8 31/19 33/9 43/9 45/16 47/13 56/14 59/13 60/8 64/12 68/25 69/6 76/12 81/8 81/8 84/8 84/25 87/10 88/8 93/1 96/18 96/18 99/9 99/11 101/10 104/25 105/25 108/5 109/3 109/25 110/2 117/12 121/2 122/17 122/21 122/23 129/13 136/5 139/6 142/13 142/21 144/10 145/6 148/18 149/9 150/6 150/16 150/17 150/23 151/11 152/25 162/17 164/4 164/15 170/22 184/1 201/13 203/24 208/4 210/15 210/17 217/2 218/15 218/24 218/25 221/4
sake [6] 68/8 77/20 77/21 80/2 193/16 193/18
Saks [1] 50/2
sale [8] 18/19 26/21 26/22 79/15 79/20 79/22 88/17 94/13
sales [6] 19/10 48/16 50/13 62/5 179/11 220/3
salvage [1] 134/7
same [52] 10/14 21/11 26/19 27/9 34/4 34/25 35/5 41/8 41/9 45/19 46/22 46/24 47/7 47/9 48/21 49/9 49/13 49/23 61/2 73/6 97/12 98/21 111/22 121/22 121/25 123/1 126/24 128/18 130/19 133/2 133/4 135/13 137/22 137/22 138/10 140/17 141/12 141/16 142/10 153/9 154/3 154/20 183/17 200/6 200/6 200/10 200/21 200/25 202/11 207/19 209/13 209/21
sample [2] 49/14 51/2
sat [1] 158/14
SATER [1] 2/3
satisfied [3] 43/4 43/13 51/3
satisfies [4] 35/19 37/11 77/10 174/21
satisfy [2] 37/4 43/11
save [1] 81/23
savvy [1] 212/20

saw [5] 50/22 67/1 67/2 133/11 218/8
say [109] 8/3 11/15 14/7 18/4 18/2 18/14 21/5 22/5 22/13 23/5 24/9 27/13 28/3 29/14 29/16 29/22 29/24 31/8 31/8 31/10 33/19 39/7 43/12 43/13 45/7 52/22 60/17 61/16 68/4 68/8 68/11 74/13 75/12 79/1 79/18 81/2 81/23 82/5 85/11 90/11 94/25 95/13 96/18 97/7 100/14 100/17 101/1 101/21 102/11 105/11 107/3 108/24 109/22 109/25 112/3 114/2 114/15 116/4 117/4 117/19 120/7 120/14 121/22 125/24 126/3 126/9 126/9 126/18 127/2 127/4 132/8 136/19 137/19 139/4 139/8 143/22 144/11 145/25 146/1 146/17 149/9 149/25 150/24 152/23 154/13 155/3 156/20 159/3 172/6 177/22 178/17 178/22 181/20 188/8 189/4 193/15 194/4 195/24 202/25 204/20 207/1 210/1 211/15 211/19 215/13 217/25 218/2 218/13
saying [59] 7/11 10/3 15/23 16/6 21/2 24/16 26/15 27/13 30/8 30/24 38/25 51/18 51/20 53/3 55/18 57/11 61/13 61/15 72/15 73/6 74/11 79/21 81/2 88/7 89/12 90/24 92/8 92/18 95/9 96/7 99/14 104/3 104/22 106/19 110/5 110/6 130/18 131/6 131/6 131/9 144/22 156/5 163/4 172/18 173/16 173/18 179/12 179/23 182/22 188/23 202/23 206/11 207/21 212/25 214/6 215/8 215/9 217/22 218/21
says [39] 21/4 26/18 27/16 38/9 48/23 53/15 58/22 59/14 59/22 61/1 63/6 70/13 70/15 80/4 90/9 90/12 90/14 90/24 93/14 96/14 96/24 98/3 99/22 99/24 100/2 104/9 115/14 136/11 142/4 142/25 143/14 153/18 154/3 154/20 154/21 160/21 178/19 196/7 196/12
scale [1] 125/8
Scalia [4] 12/8 201/6 218/24 218/25
scenario [5] 67/5 70/4 70/5 79/19 105/23
schedule [1] 13/19
scheduled [1] 181/7
scheduled and [1] 181/7
scheme [2] 124/17 125/6
SCHILLER [1] 1/21
school [1] 106/17
SCHULMAN [5] 2/20 119/8 119/11 133/23 134/5
SCHWARTZ [4] 4/8 162/2 162/4 163/8
scope [6] 125/1 131/3 179/1 180/9 180/10 180/13
Scott [2] 14/19 25/16
screen [4] 44/9 82/16 101/5 149/4
screwdriver [2] 144/9 144/10
scrutinize [1] 128/25
scrutinized [1] 124/21
scrutiny [7] 56/25 62/18 63/15 102/22 102/22 128/14 137/13
seal [1] 220/23
sealed [1] 220/17
Sears [1] 152/17
seat [6] 125/15 126/20 140/5 140/6 140/17 140/19
seated [1] 5/1
second [35] 5/24 9/8 28/24 33/9 33/25 34/10 48/22 53/14 65/14 75/18 76/5 102/23 120/23 121/10 121/18 122/23 128/10 143/14 144/20 145/6 151/19 156/24 158/24 173/21 173/22 174/22 199/20 199/22 199/24 199/25 200/22 203/2 203/3 206/9 210/10
second-to-last [1] 53/14
secondly [2] 97/20 105/19
seconds [1] 146/13
secret [1] 142/24
secretary [1] 49/17
section [7] 45/24 58/20 125/12 141/10 167/23 185/16 187/6
sector [1] 73/2

**S**

sectors [2] 14/21 15/2
see [38] 14/13 14/22 15/1 15/5 15/14 18/9
21/7 22/19 23/8 23/8 23/9 25/24 28/23 70/21
70/23 89/22 98/4 99/5 99/7 99/11 101/21
107/1 147/23 148/4 148/7 148/22 162/10
187/17 189/2 208/16 208/18 208/19 210/7
212/6 212/8 212/9 212/10 213/5
seek [11] 29/7 121/5 124/10 129/18 129/20
145/17 155/16 172/16 186/9 202/11 202/21
seeking [5] 174/18 177/11 188/22 201/2
218/1
seemed [2] 7/8 7/21
seen [6] 61/18 91/6 92/3 174/9 200/4 211/14
segregated [1] 123/12
seize [1] 191/13
select [1] 60/16
selectively [1] 106/6
self [1] 72/6
self-evident [1] 72/6
sell [4] 13/13 112/19 115/9 144/8
selling [6] 40/12 113/17 115/25 117/13
117/14 139/22
send [3] 20/5 106/6 214/17
senior [1] 148/5
sense [9] 15/10 19/13 20/25 50/10 57/17
80/25 140/10 165/13 199/19
sent [5] 42/18 56/5 56/5 56/6 190/24
sentence [5] 143/8 143/9 143/14 185/18
185/18
sentences [1] 142/25
SEPTEMBER [1] 1/10
serious [1] 201/17
seriously [1] 108/23
service [3] 29/18 74/25 151/1
services [9] 32/12 32/15 33/16 34/21 84/15
96/13 97/23 113/17 213/13
session [1] 102/12
set [13] 13/4 69/12 90/1 98/10 98/12 98/13
100/20 103/22 112/7 113/9 174/17 181/25
200/19
setting [1] 84/1
settle [9] 30/13 41/3 129/20 142/2 143/23
160/14 178/24 184/18 195/21
settled [2] 184/7 204/18
settlement [270]
settlement that [1] 164/1
settlement's [1] 71/6
settlements [8] 120/15 124/22 125/11 132/18
132/20 143/3 143/6 184/3
settlements' [1] 75/6
settles [1] 30/12
settling [6] 39/19 119/24 127/3 127/20
178/11 203/1
seven [7] 26/2 36/4 76/7 86/7 87/16 105/11
193/5
seventh [2] 1/22 160/16
seventh factor [1] 160/16
several [8] 8/20 71/9 88/1 111/12 161/11
SEYMOUR [1] 2/3
Shady [1] 218/13
shall [1] 46/1
shape [1] 114/21
SHAPIRO [1] 4/2
share [9] 47/7 47/18 87/5 100/17 100/19
105/24 106/2 213/1 213/3
shares [1] 100/5
sharing [1] 91/8
Shaw [1] 188/1
she [2] 97/25 98/3
shelves [1] 136/13
Sherman [5] 124/16 156/17 156/20 157/3
167/23

Shield [8] 2/12 111/9 111/13 111/17 111/19
113/20 116/6 117/5
shift [4] 38/5 101/13 185/22 185/25
shifting [1] 128/12
SHINDER [11] 2/10 64/3 64/5 64/8 81/19
82/3 88/7 94/12 133/17 133/23 211/10
shirt [1] 93/1
short [2] 191/20 187/6
should [56] 11/19 17/18 22/22 27/19 38/24
38/25 40/24 45/7 62/24 62/25 63/14 63/21
65/12 67/20 72/15 73/10 73/16 74/1 74/17
74/19 75/12 75/16 75/19 85/25 90/12 90/17
92/25 93/1 94/16 104/7 108/25 117/3 117/4
124/17 127/25 129/23 135/21 136/21 138/16
145/15 160/13 162/18 162/24 174/4 178/22
185/8 186/3 186/13 201/16 201/17 204/23
207/3 215/9 215/10 215/14 220/21
shouldn't [7] 31/1 61/10 81/18 130/10 163/5
163/5 201/11
show [4] 37/9 59/12 80/5 145/25
showing [4] 38/15 74/9 74/22 74/25
shown [1] 140/7
shows [5] 68/10 68/14 101/15 146/4 153/22
shutting [1] 26/11
Sibbach [2] 171/17 219/3
sick [2] 200/15 200/19
side [13] 16/13 16/14 23/17 48/14 91/24
97/14 97/15 97/15 98/5 98/25 158/15 158/20
215/3
sided [7] 97/7 97/8 98/8 98/18 98/22 102/25
104/2
sides [1] 51/8
sign [2] 91/2 196/12
Signature [2] 48/17 50/14
significant [4] 33/2 56/23 97/25 101/12
silent [1] 72/15
Silk [2] 3/2 131/17
sim [1] 157/3
similar [6] 66/12 96/8 122/23 125/23 126/19
184/14
similarly [3] 1/6 183/17 220/11
simple [8] 21/24 63/3 71/4 90/3 90/3 105/22
105/23 187/5
simpler [1] 90/3
simplest [2] 13/17 69/11
simply [26] 36/4 39/8 51/19 62/21 89/12
97/5 105/24 106/14 113/22 115/9 117/5
117/13 117/25 118/18 118/23 119/2 129/15
139/10 142/12 172/8 173/3 175/3 175/19
176/16 178/13 206/17
since [10] 35/19 67/8 75/9 96/3 109/21
181/18 182/10 183/7 186/7 193/8
single [7] 15/4 155/25 164/11 171/2 177/18
192/7 200/9
sir [1] 148/22
sister [1] 116/23
sit [3] 52/17 163/13 163/14
sitting [3] 27/13 102/16 179/11
situated [2] 1/6 132/4
situation [21] 12/10 24/7 32/12 40/1 59/6
64/19 65/7 69/2 69/25 109/11 118/21 125/24
140/9 168/1 172/25 187/24 188/4 189/23
204/13 204/13 204/14
six [4] 87/16 182/24 203/3 221/4
Six million [1] 203/3
sixth [1] 160/3
sixth factor [1] 160/3
size [6] 48/16 49/22 98/14 138/4 147/5
198/12
sketch [1] 11/23
skip [2] 91/19 100/22
slate [2] 133/3 141/1
SLATER [12] 3/18 3/21 148/22 148/24
207/14 207/18 208/5 214/22 215/4 220/5

220/8 220/12
Slater's [1] 206/14
sleep [1] 141/15
slide [15] 14/20 15/11 18/21 22/19 24/15
25/14 25/17 48/1 79/12 80/2 80/3 80/4 80/9
208/21 209/8
slides [4] 186/4 203/7 219/17 219/18
slight [2] 102/14 174/8
slightly [1] 162/17
slot [1] 24/16
slots [1] 15/18
Slow [1] 126/5
small [30] 19/18 20/8 36/14 49/14 58/12
61/20 71/6 99/10 107/2 107/3 107/4 112/20
114/4 114/4 117/10 123/21 136/7 138/17
139/17 139/23 140/5 140/18 140/24 151/25
153/1 161/14 161/15 198/10 206/5 206/18
smaller [5] 42/10 50/7 50/8 109/14 140/11
smallest [2] 48/17 48/18
smoke [1] 72/8
snapped [1] 96/3
snobby [2] 107/14 107/16
so [239]
so-called [1] 116/19
SOBOL [1] 4/2
Society [1] 96/9
soft [1] 77/1
softer [1] 65/4
sold [2] 113/23 115/2
solely [2] 105/20 106/7
solution [3] 84/2 84/4 140/23
Solutions [3] 2/17 119/7 119/12
solve [4] 35/22 38/21 38/23 180/11
solved [2] 37/21 180/23 182/25
solves [1] 204/4
some [113] 6/14 7/19 9/7 9/8 9/24 10/1 10/14
13/12 13/19 14/2 17/9 17/21 23/24 24/19 28/5
29/15 30/12 33/21 34/15 34/19 37/5 37/11
41/21 43/18 44/13 48/1 48/2 49/4 67/22 68/15
68/16 68/17 69/4 71/2 73/22 76/16 76/24 79/5
81/4 82/3 82/13 83/16 83/25 84/4 89/2 90/21
93/21 96/16 106/14 109/14 109/15 109/19
111/14 111/21 114/19 116/2 116/11 116/17
116/18 116/22 117/21 118/2 118/6 118/16
118/19 118/20 119/12 126/1 127/22 133/6
133/11 137/25 142/6 147/6 150/3 150/13
157/11 158/12 161/17 170/12 170/12 171/12
172/15 174/9 174/24 176/3 181/9 181/23
181/24 184/13 184/21 184/23 185/5 186/18
188/19 188/21 192/3 192/12 193/1 193/11
194/6 194/11 197/2 197/10 201/23 202/19
203/14 208/13 210/20 210/23 211/15 211/15
215/4
somebody [2] 21/19 177/9
somehow [5] 37/9 52/5 74/18 143/25 167/11
someone [4] 6/16 106/17 144/9 207/13
something [30] 17/14 18/20 18/25 21/20
25/23 26/5 31/8 42/13 43/6 51/4 52/13 81/5
83/3 93/6 97/12 98/3 103/25 104/3 109/18
109/22 109/25 122/23 126/9 127/21 129/22
138/11 148/18 172/23 183/25 218/6
sometime [1] 181/12
sometimes [2] 88/4 132/20
somewhat [1] 188/14
somewhere [1] 100/7
soon [2] 45/13 112/20
sophisticated [1] 74/1
sorry [6] 69/9 126/6 142/19 209/3 217/12
219/16
sort [11] 16/13 23/14 23/20 23/21 82/1
115/10 162/8 188/20 209/25 210/1 211/9
sorted [1] 8/14
sorting [1] 117/23
sought [2] 127/23 186/7

**S**

sounded [1] 174/25
sounds [3] 7/17 97/16 104/13
source [3] 113/8 153/12 207/19
south [1] 20/11
Southern [1] 127/12 190/16 191/13
Southwest [11] 3/17 21/14 21/15 22/7 22/8
148/21 148/24 150/15 150/18 151/7 220/4
space [3] 17/11 27/16 136/13
speak [8] 5/23 5/24 31/14 146/12 153/2
163/12 193/23 196/23
speaker [2] 110/14 131/14
SPEAKERS [1] 222/2
speaking [2] 28/22 64/2
special [3] 36/12 52/1 153/13
specific [2] 140/8 149/13
specifically [5] 45/18 49/25 123/25 125/12
185/15
specter [1] 133/5
speculate [3] 59/10 67/10 67/13
spend [6] 18/11 58/8 58/9 114/3 114/4 206/6
spending [1] 206/19
spent [3] 12/12 36/3 130/3
SPERLING [1] 3/18
spikes [1] 81/3
spillover [1] 30/16
spinning [1] 212/16
spiral [1] 92/14
spoke [1] 185/5
spoken [2] 29/4 119/13
spokesperson [1] 43/22
spread [1] 68/12
spring [1] 41/19
spruce [1] 80/18
Spuds [1] 200/22
square [2] 106/8 217/21
St [3] 1/17 3/8 4/7
stage [2] 29/23 73/20
stand [6] 24/3 41/20 73/5 93/24 139/18 163/8
standard [9] 37/4 54/22 107/20 107/20 121/6
121/9 123/17 170/16 171/10
standards [4] 33/8 35/20 43/4 175/9
standing [2] 6/17 8/5
standpoint [2] 42/14 174/20
Staples [3] 49/19 50/2 152/17
Starbucks [1] 72/23
start [14] 6/6 8/10 10/18 48/21 48/23 81/14
81/20 83/3 100/1 111/15 136/24 149/1 170/14
197/22
started [6] 99/4 108/4 109/24 198/24 201/14
216/9
starting [2] 82/25 112/12
starts [3] 92/13 107/7 121/25
state [21] 5/3 5/13 7/24 8/1 8/3 8/4 35/13
43/24 68/23 68/23 71/11 96/5 113/1 113/2
113/20 159/4 175/22 201/20 214/14 218/15
218/21
stated [4] 65/13 176/23 196/20 210/3
statement [3] 18/18 18/19 26/24
statements [4] 12/9 104/12 174/10 183/12
states [70] 1/1 1/8 1/13 4/5 6/18 7/8 8/8 8/20
9/4 9/8 11/12 14/25 19/18 20/9 20/12 20/18
32/4 37/6 37/15 55/20 56/15 57/8 66/13 67/15
68/16 72/14 89/2 101/16 111/21 112/2 112/21
113/4 125/20 150/18 152/9 162/3 162/5
162/16 162/19 162/21 162/24 163/17 163/18
163/22 164/3 164/12 164/17 164/22 165/2
165/10 165/14 166/19 166/24 166/25 167/7
167/11 167/13 167/15 167/17 168/8 171/7
172/1 179/17 187/11 204/15 208/19 208/20
209/1 209/16 213/10
states' [1] 38/23
stating [1] 164/20

station [9] 68/21 68/22 69/11 69/12 70/13
80/17 88/14 198/9 211/22
stations [1] 211/17
status [3] 64/15 180/24 190/14
statute [7] 8/12 55/22 89/10 162/25 163/7
164/11 218/15
statutes [9] 7/24 8/8 56/8 163/16 166/16
187/17 188/9 201/20 214/14
statutory [4] 9/9 9/10 9/12 124/16
stay [8] 14/19 58/16 66/17 78/3 78/6 140/20
167/11 210/13
steer [2] 24/16 109/19
steering [34] 1/3 5/17 18/4 24/24 25/2 25/15
26/5 27/5 27/5 29/16 30/4 37/12 37/12 38/12
65/4 65/5 70/8 73/20 76/11 76/13 76/22 77/1
78/7 109/20 109/21 137/6 176/13 177/3
177/12 177/23 183/10 183/17 193/14 195/6
stenography [1] 4/16
step [5] 9/13 28/13 90/2 151/24 191/1
Stephenson [2] 122/24 200/13
stepped [3] 152/22 152/24 159/2
stick [1] 208/8
Stiglitz [3] 91/14 93/14 104/17
still [17] 11/20 37/15 37/17 37/20 67/9 73/20
91/24 98/25 116/7 116/13 126/9 134/1 141/22
157/6 192/17 192/18 194/21
stimulating [1] 76/8
Stock [1] 198/11
stole [1] 216/23
stone's [1] 187/15
stood [1] 187/15
stop [9] 76/7 81/24 81/25 95/10 95/11 101/23
161/7 162/23 196/16
stopping [2] 89/11 89/12
store [2] 94/20 198/9
stores [5] 30/1 36/12 38/5 49/19 136/13
story [5] 145/22 206/22 206/24 213/2 216/3
strands [1] 17/19
strategy [3] 90/15 102/17 102/18
street [5] 2/4 2/14 3/19 40/15 68/22
strength [6] 93/2 93/3 95/20 109/4 109/6
159/20
stressed [1] 127/20
stringent [1] 54/7
strip [2] 45/4 46/7
strips [2] 52/18 53/1
stroke [1] 54/7
strong [6] 12/4 17/7 76/1 83/14 159/17
179/10
strongly [1] 127/10
structural [3] 119/21 173/25 174/19
structurally [1] 180/23
structure [2] 138/7 143/16
structured [1] 103/22
STUART [1] 3/15
stuck [1] 61/15
studied [1] 101/17
stuff [6] 83/19 86/25 89/22 98/21 142/8
144/2
subcontext [1] 128/13
subject [7] 20/15 130/5 153/5 163/6 174/6
174/8 183/19
subjective [1] 121/6
submission [1] 128/9
submissions [4] 7/13 12/12 17/15 38/17
submit [10] 16/24 29/21 72/5 75/15 95/24
134/25 136/20 151/22 158/25 159/13
submitted [6] 45/22 48/9 48/13 53/25 152/6
157/24
subsections [1] 124/23
subset [2] 200/1 200/3
subsidize [1] 139/20
substantial [6] 12/19 71/5 123/21 136/6
172/2 208/22

substantially [5] 65/24 66/12 117/11 125/23
126/19
substantive [12] 45/1 46/23 51/23 51/24 59/1
71/3 119/18 171/16 171/20 218/24 219/2
219/7
substantively [3] 33/8 34/9 128/25
substitutability [4] 14/9 38/3 78/19 78/22
substitutable [1] 14/7
substitution [2] 38/11 38/13
subtitled [1] 90/12
subzero [1] 212/19
succeed [1] 178/6
success [3] 129/17 134/19 134/20
successful [9] 77/3 134/16 194/5 205/11
205/14 205/18 205/22 205/23 205/24
such [18] 39/18 42/8 52/8 72/4 75/4 74/21
81/1 113/9 113/10 116/25 121/14 121/19
125/10 135/21 171/14 178/15 179/2 180/12
Sudbury [1] 3/4
sue [2] 210/18 210/19
suffer [2] 158/2 178/22
suffered [1] 178/5
sufficient [5] 36/9 43/11 43/13 54/21 129/12
sufficiently [1] 196/10
suggest [1] 73/15
suggested [3] 23/1 104/9 121/19
suggesting [4] 57/25 85/3 92/1 104/11
suggestion [2] 16/15 215/22
suggests [4] 207/2 207/17 207/20 208/23
suing [1] 118/15
suit [5] 6/12 30/14 101/10 128/1 128/4
suitable [1] 220/21
Suite [5] 1/18 2/14 3/9 3/19 4/3
summarized [1] 45/15
summarizes [1] 48/2
summary [6] 91/9 128/22 156/23 156/24
158/1 159/10
summer [4] 80/18 81/3 140/8 204/8
Sunglass [1] 62/3
Super [1] 200/22
superfluous [1] 76/21
superior [1] 203/6
supermarket [2] 72/25 152/21
supermarkets [1] 206/4
supersede [1] 59/1
Supp [1] 142/8
supplement [1] 74/21
supplemental [1] 74/25
suppliers [1] 76/17
supplies [1] 94/15
support [11] 50/6 54/3 54/21 59/22 68/3
73/14 151/24 152/13 152/23 159/3 210/24
supported [1] 30/23
supporting [3] 84/10 84/12 84/13
supportive [1] 57/7
supports [2] 20/23 188/9
supposed [6] 38/7 65/1 69/3 105/8 130/21
151/3
supposedly [1] 151/1
supposition [1] 27/21
Supreme [30] 12/5 12/5 28/24 29/2 37/3
39/25 44/23 45/16 47/3 51/18 54/10 54/24
58/19 60/1 69/6 77/5 85/20 96/5 96/14 96/24
121/17 133/7 142/4 170/21 171/13 171/17
200/22 217/7 217/14 218/20
surcharge [113] 7/5 7/7 7/21 7/22 8/14 9/24
10/23 12/22 13/3 13/16 13/16 13/17 13/17
13/21 15/7 15/8 17/24 18/1 18/2 18/6 18/8
18/15 18/17 18/18 18/25 19/1 19/5 19/11
19/22 21/7 21/10 21/23 21/25 22/4 22/13
22/24 25/21 26/16 26/17 26/19 27/11 27/12
27/17 27/24 29/8 29/21 29/25 34/15 35/2 35/4
37/7 37/20 39/1 40/4 41/10 52/11 52/12 55/11
55/20 56/15 59/9 60/18 69/18 70/3 70/6 70/7

**S**

surcharge... [47] 70/17 70/23 71/10 71/1
77/88 77/88 88/12 89/18 94/7 94/18 95/6 100/3
101/22 104/18 113/22 114/22 115/15 115/17
117/13 134/23 136/1 137/3 144/1 151/9
152/25 153/8 153/9 153/20 153/24 154/4
154/4 154/8 154/14 154/18 160/22 161/13
183/6 194/15 194/17 194/17 202/12 208/24
209/17 211/12 212/22 214/15 215/22
surcharge-free [4] 18/6 19/5 19/11 27/24
surcharged [8] 11/12 36/22 85/11 153/22
153/23 154/22 154/23 214/17
surcharger [1] 214/4
surcharges [17] 6/19 10/22 13/25 23/25
25/20 32/6 68/23 80/5 80/5 81/1 101/22
105/20 134/3 153/19 214/12 214/19 214/20
surcharging [210] 7/9 7/15 7/16 7/20 8/6 8/8
8/11 8/23 9/21 10/4 10/5 10/22 11/2 11/2 11/5
11/7 11/8 11/21 11/22 13/10 14/4 14/11 14/15
14/22 15/1 15/6 15/16 15/17 15/20 16/3 16/4
16/5 16/8 16/9 16/9 16/17 16/19 16/25 17/5
17/16 19/9 19/15 19/19 20/2 22/1 22/20 23/8
23/9 24/1 24/4 24/6 24/7 24/14 25/22 27/23
30/22 32/9 32/14 32/19 32/25 34/16 34/18
35/8 35/12 36/19 36/19 37/13 37/16 38/12
40/21 40/22 41/12 52/9 52/10 52/12 55/3 55/6
55/9 57/3 57/5 57/12 57/16 58/18 63/11 64/14
65/2 65/7 65/19 66/7 67/16 68/11 68/12 68/25
71/14 71/15 71/16 71/19 72/1 72/9 72/14
72/20 73/7 74/6 74/13 74/16 75/4 75/5 75/24
76/2 76/14 76/22 77/15 77/19 78/8 78/22 79/5
79/15 80/25 81/7 85/7 88/23 89/3 89/12 89/13
94/1 94/1 99/11 99/13 99/16 101/13 101/19
101/24 102/5 102/7 102/10 105/21 106/3
106/7 113/11 117/9 117/22 118/10 118/12
123/18 124/9 134/15 134/24 135/7 150/23
153/7 153/7 153/16 154/1 154/2 155/9 155/12
156/11 156/15 165/3 174/12 174/13 177/12
181/25 182/2 182/3 182/4 182/8 182/13
182/16 183/9 186/4 186/10 192/13 192/14
192/17 193/1 193/6 195/20 201/3 202/22
203/1 203/6 203/6 203/10 205/25 207/10
207/13 207/17 208/1 208/17 208/20 209/15
209/19 210/11 211/4 212/7 212/11 212/21
213/5 213/7 213/15 213/20 214/14 214/21
214/23 215/2 215/2 216/10 216/12 220/7
sure [19] 10/16 41/18 44/7 55/24 103/13
105/12 105/15 149/5 157/13 163/2 170/7
173/14 180/7 187/3 187/25 196/24 203/22
209/8 219/19
surely [1] 20/23
surface [1] 92/19
surgeries [1] 101/23
surmise [3] 179/18 212/17 213/4
surprises [1] 31/20
surrebuttal [1] 185/14
survey [1] 20/6
survive [2] 16/11 78/5
survived [1] 32/25
suspect [1] 181/11
sustained [1] 53/14
sustaining [1] 55/22
SWAINE [3] 3/13 111/6 148/5
swath [2] 184/3 184/14
swaths [1] 207/25
swear [1] 102/10
sweep [1] 208/2
swell [1] 210/23
swept [1] 22/10
Sydney [2] 15/3 15/12
sympathetic [1] 27/22
system [4] 6/13 11/22 110/7 141/3

**T**

T-shirt [1] 95/1
T.J [2] 49/18 51/13
Tab [2] 152/4 153/15
table [9] 9/7 10/20 33/18 123/14 140/5 140/6
140/17 140/19 140/20
tail [3] 172/18 197/19 197/21
take [71] 7/12 7/15 9/20 14/4 14/5 15/22
15/22 17/18 18/3 21/1 23/11 23/15 23/15 28/9
28/12 36/15 36/18 37/5 40/14 46/3 48/20 54/1
56/17 57/15 62/3 63/21 68/11 78/2 79/4
80/25 84/13 86/9 86/12 86/16 102/19 110/13
114/13 115/10 116/4 116/6 116/9 116/10
116/12 116/12 116/23 130/24 134/4 136/17
140/9 140/19 141/22 146/5 146/20 161/8
165/15 169/4 170/5 170/8 179/25 183/3 183/5
183/18 193/7 194/22 194/24 196/5 196/6
202/12 203/20 206/13 216/11
taken [7] 21/12 87/20 135/23 138/15 141/3
147/18 159/8
takes [2] 133/8 136/25
taking [5] 12/12 105/5 107/12 139/19 146/8
talk [21] 10/13 10/15 15/12 22/12 28/7 29/6
55/8 72/10 82/12 83/1 83/4 90/8 92/22 92/24
101/9 110/1 110/1 114/11 149/15 204/5 217/1
talked [8] 19/8 22/22 78/16 79/12 79/13
115/2 183/11 219/3
talking [25] 10/18 20/7 20/23 28/20 50/10
85/4 92/6 95/20 98/21 99/10 99/15 99/25
102/12 103/14 103/16 103/17 104/8 136/10
143/25 144/3 144/25 200/13 206/7 209/18
215/1
talks [2] 141/19 199/20
tantamount [1] 125/17
Target [20] 2/2 5/11 43/20 44/2 44/11 46/6
48/8 48/16 49/13 49/25 50/12 51/11 52/9
52/14 52/21 53/2 53/5 72/23 152/16 219/23
Target's [4] 49/15 49/18 52/6 52/7
targeted [1] 154/6
task [1] 167/15
taste [1] 29/15
taxi [2] 23/11
taxies [1] 23/9
team [1] 204/21
technical [2] 71/13 201/10
technological [1] 136/14
technology [4] 35/14 37/21 38/24 171/8
teed [1] 122/22
Tel [1] 4/14
tell [14] 23/4 30/3 55/24 59/17 67/15 68/9
89/6 98/8 140/16 145/22 163/9 194/3 206/15
216/19
telling [7] 29/23 53/25 67/9 96/17 210/21
210/21 214/23
tellingly [1] 72/15
tells [6] 15/21 18/25 18/25 85/25 137/12
214/21
temporarily [1] 117/21
ten [18] 6/12 7/7 7/24 37/6 37/15 38/22 41/6
63/21 63/21 65/24 87/15 122/2 123/18 125/5
135/16 136/15 144/4 169/4
ten-minute [3] 63/21 63/21 169/4
ten-year [1] 41/6
tend [1] 211/5
tens [1] 112/24
term [5] 11/17 24/5 126/2 153/7 154/5
terminate [4] 105/20 105/21 106/4 106/7
termination [1] 120/18
terms [29] 20/9 20/13 36/1 36/12 40/17 41/15
42/17 47/8 48/15 55/1 61/20 68/9 79/23 89/7
89/19 101/7 115/23 118/13 123/7 124/4
126/21 127/4 140/8 163/6 172/21 179/11
179/16 198/20 214/11

**[continuation]**

terrible [3] 96/22 119/2 161/16
terribly [3] 86/24 96/14 208/5
terrific [1] 25/21
territory [1] 67/3
test [5] 147/24 148/11 170/22 171/18 171/18
testified [3] 60/9 150/15 213/19
testimony [17] 36/4 48/2 48/5 50/11 60/8
90/9 92/1 92/3 92/4 97/22 97/25 150/1 150/3
193/5 196/25 213/25 220/9
Texas [4] 8/16 9/17 68/21 68/22
text [2] 124/16 144/24
than [76] 6/3 13/16 13/19 14/25 15/2 17/21
21/17 21/24 26/14 29/21 30/13 33/11 38/2
39/16 42/14 49/17 50/9 50/14 50/19 52/13
64/15 68/20 69/17 72/15 73/14 76/13 77/14
77/24 83/10 84/19 84/23 85/11 90/15 90/19
92/3 95/23 101/22 108/10 109/4 121/2 122/5
122/8 122/10 124/9 128/1 128/3 132/10
133/22 134/5 134/25 137/2 138/15 138/20
140/24 144/15 153/22 153/25 154/6 162/9
166/24 172/12 173/6 173/10 174/20 178/21
180/15 190/4 190/19 191/10 191/10 194/18
202/13 207/20 208/20 210/4 215/24
thank [46] 31/21 31/22 43/15 43/16 44/8
56/7 63/19 63/20 81/10 81/11 81/14 82/22
109/7 110/10 110/11 110/15 111/11 119/4
119/6 131/13 135/1 135/2 135/5 148/2 148/3
148/20 149/8 149/11 158/23 162/1 162/4
162/14 163/12 168/12 168/13 168/14 169/5
169/6 170/11 184/24 197/14 197/15 197/17
219/11 219/12 221/6
thanks [1] 183/14
that [1521]
that structurally [1] 180/23
that's [232]
the members [1] 205/21
the settlement [1] 164/9
their [189] 6/15 12/12 16/9 16/20 18/16
18/17 19/20 19/21 22/23 25/9 26/3 29/10 30/4
30/7 32/19 33/24 34/8 36/13 38/4 38/6 38/16
38/16 38/21 39/2 39/10 39/14 39/15 40/3 45/5
46/8 46/13 46/14 46/14 46/15 46/21 46/25
47/17 48/10 49/24 50/3 50/3 50/16 50/17 53/1
53/8 53/18 54/13 60/12 61/24 62/5 62/7 64/23
66/25 67/18 69/23 73/16 74/2 74/9 74/21
74/21 75/1 77/9 85/10 90/7 90/19 90/19 90/20
91/21 92/11 92/12 95/15 96/21 97/4 97/5
97/22 98/7 98/9 100/14 100/17 101/4 101/13
101/15 101/21 102/10 102/13 104/2 104/11
104/12 104/23 106/17 106/25 106/25 107/9
107/10 107/13 107/20 107/20 108/24 109/15
109/16 111/14 113/23 114/9 114/20 114/21
115/11 116/22 120/25 121/16 122/7 124/1
128/23 128/25 129/18 129/21 130/21 131/9
131/11 133/21 135/17 137/2 138/4 138/4
138/6 138/6 138/19 139/13 141/1 144/22
146/10 146/16 149/22 149/24 153/6 153/12
153/14 154/5 154/16 155/5 160/25 161/19
172/9 172/15 176/14 176/14 176/16 176/17
176/17 177/7 177/17 177/17 178/3 179/4
179/16 180/2 182/12 185/1 185/2 185/2 185/7
186/1 186/2 188/23 190/5 192/2 192/5 192/8
193/15 198/16 198/18 198/20 200/15 201/8
201/17 202/11 202/18 202/19 202/21 202/24
203/19 204/10 206/3 206/6 206/9 206/19
208/6 210/10 210/25 210/25
their case [2] 203/19 206/9
theirs [1] 94/4
them [119] 8/20 9/14 16/7 16/7 16/8 17/19
18/25 18/25 22/15 27/16 30/18 30/25 37/25
38/20 42/22 43/10 44/4 44/4 44/9 46/19 47/14
47/22 50/22 50/22 53/18 58/4 58/5 58/10
61/18 61/19 66/8 68/1 73/8 74/12 79/1 79/16
76/16 80/21 82/8 82/15 82/19 82/20 85/24

Case 1:11-md-02221-NGG-RER   Document 243-3   Filed 09/17/14   Page 251 of 255 PageID #: 6615

them... [76] 86/16 87/13 91/1 91/3 97/13 98/23
100/15 100/16 101/7 101/7 101/15 101/15
102/15 102/16 103/1 103/9 104/14 105/21
106/7 107/14 108/25 111/14 113/16 114/19
116/12 117/16 117/17 118/11 118/13 118/15
119/4 130/12 139/19 140/9 140/20 143/25
150/16 151/10 152/19 153/1 156/1 160/23
161/17 164/11 166/1 171/1 171/22 176/3
176/18 176/19 176/20 177/5 177/8 177/17
179/12 179/22 182/6 183/21 189/23 189/24
190/3 190/15 191/25 192/5 192/7 193/23
193/25 198/7 199/19 201/22 202/10 206/8
214/24 216/2 219/15 219/20
themselves [15]   30/24 55/10 90/22 93/20
108/2 113/5 118/21 120/13 127/18 128/22
129/21 130/14 139/15 200/17 216/2
then [65]   5/23 7/23 8/16 10/1 10/17 12/1 12/1
12/2 12/21 16/24 20/19 22/3 29/17 29/22 30/9
30/10 31/1 31/12 31/17 43/6 49/3 49/7 49/12
49/21 59/9 60/20 61/2 63/14 66/24 87/20 90/2
90/21 94/24 100/17 106/17 107/4 107/8
110/14 122/6 123/16 128/22 146/21 148/1
149/13 154/24 156/6 164/8 166/25 167/22
169/4 170/8 171/23 173/2 181/2 181/6 181/8
191/18 196/7 205/23 209/17 209/21 216/9
217/24 218/7 219/5
theorize [1]   59/10
theory [23]   14/14 15/19 16/11 19/6 19/7
19/10 19/11 20/16 22/14 22/15 22/16 22/17
38/7 39/24 97/20 98/18 122/11 185/2 185/3
185/9 204/1 204/3 206/3
there [223]
there's [109]   7/23 8/16 9/12 11/23 12/2 12/9
12/19 12/22 13/20 14/6 15/2 15/14 15/15
16/15 17/4 17/5 17/14 17/22 19/2 19/18 21/25
26/15 27/1 30/15 30/16 31/20 38/17 40/7 41/2
42/13 42/21 49/10 53/24 56/19 57/17 61/8
68/18 69/20 77/10 80/22 81/1 81/6 82/6 82/9
83/3 85/17 85/23 86/21 92/5 92/6 92/15 95/22
97/16 98/22 98/23 99/12 100/6 100/13 102/1
108/4 118/7 118/25 119/4 123/8 123/22
127/21 136/6 137/15 138/14 139/11 139/11
140/18 144/21 147/3 147/10 148/10 150/19
150/21 151/15 158/1 158/11 162/8 164/2
166/8 166/10 167/9 167/19 167/19 167/22
177/1 177/8 182/19 185/25 186/5 186/6
189/10 191/25 192/16 198/5 198/9 198/9
199/12 203/4 204/2 206/12 207/12 208/22
210/12 210/23
thereby [1]   168/10
therefore [7]   33/8 35/19 37/1 47/17 47/18
100/15 187/14
thereof [1]   129/11
these [84]   10/16 15/4 15/8 15/15 16/7 17/22
23/20 37/16 43/18 46/24 49/24 49/25 50/21
51/21 53/16 56/8 61/9 61/9 63/15 65/23 73/4
81/22 82/8 82/13 85/19 86/23 89/2 90/23
90/25 92/8 92/10 92/17 93/11 93/24 93/25
94/18 105/18 108/25 109/21 111/23 112/17
112/25 112/25 113/7 114/2 115/8 115/16
115/23 116/11 117/13 117/15 124/12 124/19
125/3 135/22 138/1 139/13 145/17 146/18
147/2 167/11 172/11 174/8 174/17 176/1
176/2 179/6 179/24 185/24 188/22 189/8
189/21 190/2 190/6 199/18 201/6 201/6
201/16 202/10 209/24 210/15 215/20 218/8
218/9
they [488]
they'd [2]   28/23 133/25
they'll [8]   18/19 94/4 94/5 100/19 127/18
161/18 170/7 211/19
they're [83]   14/16 21/15 21/15 22/1 22/9

23/20 26/15 29/9 29/13 29/15 29/23 29/23
30/24 34/8 37/19 39/1 52/17 57/2 60/18 60/13
65/8 66/9 66/21 66/25 66/25 75/4 74/8 77/8
80/21 81/6 82/9 100/17 101/5 101/6 101/16
101/23 102/6 102/12 104/10 105/5 106/18
107/9 108/1 116/11 117/13 117/14 117/16
118/1 118/14 130/11 130/18 130/19 131/20
136/12 137/22 139/19 139/19 144/1 146/6
146/6 146/17 150/17 154/23 160/24 161/7
164/13 172/18 182/5 187/13 187/18 201/19
203/1 203/23 204/22 206/7 209/13 212/12
212/18 213/15 214/20 215/8 218/4 219/5
they've [23]   15/25 91/4 91/21 96/18 96/18
97/9 102/13 107/19 108/2 108/3 130/15
134/24 146/1 150/4 156/21 159/25 177/6
178/4 182/10 183/8 187/15 192/2 201/18
thing [33]   12/13 18/4 23/5 27/12 28/9 68/4
73/7 82/7 91/4 91/6 91/25 96/22 97/9 97/12
99/24 103/2 103/6 103/6 103/8 104/22 105/22
107/8 108/13 121/8 132/22 139/4 140/16
143/24 146/24 154/20 157/14 210/20 219/1
things [24]   13/4 30/20 38/9 39/6 62/13 63/11
79/18 94/23 96/13 96/19 97/2 104/1 108/18
110/8 112/16 113/15 114/7 140/14 141/21
156/22 164/4 176/1 181/25 210/2
think [125]   10/19 11/8 11/12 11/16 12/8
12/10 12/17 12/18 12/19 13/20 14/3 14/20
14/24 16/22 17/6 18/9 19/2 20/5 20/22 21/19
23/2 23/6 24/3 24/4 28/23 30/14 31/11 33/16
36/2 39/25 56/18 63/13 63/18 63/20 67/13
75/19 78/11 84/7 87/11 87/14 87/16 87/18
90/14 102/21 103/5 104/19 108/4 112/3 115/7
115/10 115/21 116/5 120/3 121/7 122/8 122/9
122/17 122/20 122/24 129/24 133/16 135/5
138/2 138/21 138/24 139/5 142/5 145/19
146/10 155/25 156/2 158/5 158/10 158/14
158/15 159/16 159/17 159/18 171/24 172/4
172/5 173/9 173/19 174/23 177/22 178/6
179/12 179/15 181/16 182/11 183/4 184/2
184/22 185/8 186/3 186/15 187/25 188/21
189/8 193/4 196/9 197/6 197/9 197/18 200/12
202/22 202/23 203/23 204/19 204/23 206/13
207/23 208/8 208/19 210/21 210/21 210/22
211/10 216/4 216/6 216/8 218/7 219/8 220/13
220/16
think that [1]   12/18
thinking [1]   18/12
thinks [1]   189/3
third [3]   54/8 67/20 159/4
this [561]
thoroughly [1]   137/16
those [96]   6/25 8/2 8/23 9/4 9/15 16/6 17/18
30/20 31/12 31/14 35/6 41/2 41/23 44/5 47/16
52/15 55/20 58/4 58/5 58/15 60/15 61/18
62/12 62/19 63/4 63/6 63/18 66/15 66/16
67/22 71/12 74/18 74/18 76/4 84/1 89/6 98/4
98/10 101/20 102/6 104/1 107/2 107/6 108/18
111/20 113/15 124/1 132/17 132/20 132/22
132/25 133/13 136/2 137/11 140/5 141/21
145/8 147/9 147/20 150/3 150/8 161/15
163/16 167/22 170/24 172/6 173/5 174/10
177/15 178/16 182/16 183/2 183/17 187/6
188/8 189/5 190/2 190/5 190/14 193/12
198/10 200/17 201/20 203/21 204/22 204/22
204/23 207/5 207/6 208/13 210/22 214/13
214/13 214/19 214/20 216/1
though [12]   11/24 12/12 23/17 28/6 49/16
74/12 74/14 79/21 123/12 129/19 164/15
190/21
thought [13]   39/3 50/22 88/7 104/22 111/15
148/17 156/21 158/6 191/17 191/21 199/11
199/14 210/7
thousands [3]   30/6 41/5 73/3
threat [1]   134/1

threaten [1]   65/5
threatened [1]   103/9
threatens [1]   64/18
three [26]   27/11 49/7 49/22 61/8 61/9 61/19
65/10 67/17 71/19 85/20 87/21 104/21 104/25
105/14 108/15 111/25 132/3 147/17 149/6
152/12 157/24 167/18 167/18 183/4 183/5
221/4
three-prong [1]   87/21
three-ring [1]   108/15
threshold [3]   114/19 114/25 117/17
thrilled [3]   6/22 6/23 204/16
through [39]   11/19 11/22 19/20 23/12 25/12
30/9 37/15 40/2 43/11 44/25 46/1 62/5 62/7
62/11 62/12 62/22 63/9 63/9 63/14 64/16
77/22 82/19 86/25 93/12 102/15 106/22
112/22 126/11 133/12 157/22 160/4 160/12
166/20 168/4 188/8 195/25 199/14 220/14
222/13
throughout [3]   11/8 83/5 167/10
throw [2]   15/3 102/9
thunder [1]   216/23
ticket [7]   14/8 14/17 21/6 21/19 21/20 212/18
213/4
tie [1]   133/1
tied [2]   66/10 106/25
time [49]   6/3 6/4 6/17 6/21 9/23 12/12 23/8
24/24 31/3 40/20 44/16 63/19 68/10 68/17
71/3 76/8 76/24 77/10 79/8 81/16 87/13 99/3
100/6 105/14 107/15 115/25 116/2 126/24
130/19 133/6 161/23 165/9 167/10 168/4
168/8 168/11 168/20 168/23 169/2 170/8
181/15 183/12 184/13 192/8 217/13 217/14
217/15 217/15 217/16
timer [1]   6/2
times [9]   85/20 88/1 104/21 104/25 105/14
141/11 147/17 161/11 221/4
timing [1]   115/22
tiny [1]   42/24
title [1]   90/10
TJX [2]   49/18 50/1
to the [1]   89/8
today [42]   5/20 6/17 6/23 9/7 22/6 33/17 35/2
40/24 41/9 63/10 67/15 72/21 73/5 74/8 74/17
74/21 80/21 80/23 94/13 105/6 114/11 121/21
131/24 133/11 135/6 150/1 161/11 161/18
162/15 164/1 168/17 168/18 168/21 182/2
187/15 194/19 198/4 209/6 209/7 211/20
217/22 219/14
today's [1]   220/24
Todd [1]   105/13
together [8]   17/19 42/23 91/6 97/10 97/15
130/4 160/6 210/22
told [12]   6/16 29/8 30/5 36/15 92/11 99/5
105/24 136/9 161/10 168/23 206/22 213/5
tomorrow [3]   25/11 40/12 193/22
Ton's [1]   49/23
tonight [1]   141/8
too [8]   22/11 65/6 92/23 93/10 93/13 95/4
101/1 176/7
took [3]   68/10 184/25 200/18
tool [5]   26/10 55/13 144/12 144/13 214/24
tools [5]   10/16 71/15 76/22 95/16 144/8
top [9]   7/23 42/20 48/18 72/21 104/5 152/9
152/11 210/10 220/3
tore [1]   162/20
totality [1]   181/16
totally [5]   7/14 17/12 115/15 212/24 218/2
touch [2]   128/5 218/6
touchstone [2]   151/4 151/11
tough [1]   150/19
traction [3]   92/9 93/5 93/24
trade [4]   44/15 73/2 131/19 156/16
traded [1]   198/12

## T

trademarks [2]  111/19 111/20
tradeoff [2]  40/2 40/5
traditional [2]  195/13 195/22
traditionally [2]  147/7 147/8
traffic [1]  24/17
transaction [5]  7/2 7/3 7/4 61/20 185/22
transactions [5]  6/19 34/16 34/17 115/11 138/22
transcript [4]  1/12 4/16 48/1 77/13
transferred [1]  190/12
translated [1]  140/15
trap [1]  132/8
travel [1]  131/21
treat [1]  101/21
treated [1]  179/4
tremendous [4]  17/20 30/21 93/5 203/4
trial [29]  17/18 24/19 26/3 29/15 30/2 47/24 48/7 76/8 81/17 90/9 134/17 137/15 140/7 150/2 150/15 155/5 155/8 157/5 158/6 158/14 160/4 160/12 161/15 162/6 174/10 196/21 204/8 204/14 220/10
tribunal [1]  127/8
tried [5]  11/18 11/19 88/1 146/9 191/15
tries [1]  90/13
trip [2]  21/11 136/17
trivial [1]  65/1
troubled [4]  28/17 147/13 147/15 218/17
troubling [1]  64/21
trucks [1]  25/10
true [16]  10/4 34/4 37/7 58/14 60/18 76/9 110/3 132/12 143/5 143/17 151/23 161/18 207/7 207/11 212/13 219/4
trump [2]  73/25 74/18
trustees [1]  127/15
truth [3]  89/4 93/9 95/10
try [18]  6/14 16/16 48/24 52/18 69/19 82/19 86/1 100/22 103/2 108/22 110/4 148/12 156/25 158/16 167/12 177/9 177/10 197/5
trying [26]  22/5 52/20 59/17 78/3 78/10 80/13 83/16 88/5 94/17 99/21 101/9 101/23 116/7 126/6 127/5 130/10 130/12 130/14 132/8 157/11 166/1 173/17 189/25 195/20 202/22 215/20
tuition [1]  214/10
turn [3]  47/12 52/22 62/8
turned [3]  6/13 77/6 87/17
Twenty [1]  152/11
Twenty-four [1]  152/11
twice [1]  153/20
two [43]  17/18 21/17 30/20 42/17 53/12 55/21 56/12 58/13 62/5 62/13 69/12 71/14 75/13 78/4 80/10 97/7 97/8 97/16 98/8 98/18 98/22 99/5 102/20 102/25 104/2 105/14 113/15 123/7 132/1 132/21 132/25 137/13 142/25 160/17 167/22 173/20 181/2 187/4 198/5 198/25 211/12 213/23 217/7
two-market [1]  102/20
two-sided [7]  97/7 97/8 98/8 98/18 98/22 102/25 104/2
type [8]  13/22 57/7 100/20 108/16 127/5 127/6 138/6 193/1
types [3]  94/19 108/18 179/5
typical [1]  132/2
typicality [5]  36/3 36/10 36/16 37/2 118/22
typically [5]  98/4 132/12 132/17 133/19 153/20
typo [1]  144/21 145/1

## U

U.S [3]  4/6 72/17 72/19
U.S.C [3]  125/12 162/20 164/14
ubiquitous [1]  20/2

ultimately [2]  133/12 135/25
unacceptable [2]  121/15 124/20
unambiguous [1]  67/8
unascertainable [2]  121/11 123/5
unbundle [3]  94/1 94/24 99/19
unbundled [4]  89/7 89/9 94/2 95/7
uncertain [2]  123/20 136/6
uncertainties [1]  34/12
uncomfortable [1]  155/10
unconditionally [1]  202/4
unconstitutional [1]  89/10
under [58]  18/10 23/13 28/9 29/9 35/9 35/20 36/2 37/2 39/19 41/10 42/1 42/2 42/2 43/6 43/13 43/14 44/21 46/19 47/17 54/22 56/25 58/15 62/16 92/16 101/5 121/17 137/13 138/10 141/6 141/15 144/5 146/16 152/4 153/15 154/11 162/25 170/16 170/16 171/11 174/13 176/10 178/2 178/18 180/16 182/2 184/6 188/8 189/25 192/14 194/12 195/10 195/18 199/21 201/3 208/3 220/19 220/23
underlined [1]  60/25
underlying [2]  83/2 119/14
undermined [1]  210/8
underscore [1]  104/2
understand [25]  5/23 20/21 24/9 24/9 30/23 39/24 51/7 52/20 70/12 86/24 88/13 137/16 156/9 158/22 173/16 182/22 193/20 193/20 194/4 197/4 201/21 206/10 208/2 212/1 212/21
understanding [7]  12/24 23/3 57/9 76/25 168/8 205/13 215/21
understated [1]  72/20
understatement [3]  33/19 73/22 204/20
understood [2]  24/11 87/20
undisputed [6]  180/17 207/24 208/15 213/6 213/8 216/11
undo [1]  186/8
unfair [3]  74/20 155/2 179/12
unfairness [1]  74/24
unfettered [1]  29/16 29/25 202/25
unfolded [1]  89/5
unfortunately [2]  87/25 109/4
uniform [2]  176/23 199/12
uniformity [10]  40/22 41/24 59/23 149/15 149/23 150/10 151/14 180/7 192/12 192/16
uniformly [2]  149/17 150/9
unilateral [1]  26/13
unilaterally [1]  25/18
unique [3]  47/14 49/14 204/13
uniqueness [1]  38/10
unitary [1]  119/25
united [63]  1/1 1/8 1/13 4/5 6/18 7/8 11/12 14/25 19/17 20/9 20/12 20/18 21/18 58/9 68/7 72/14 73/6 83/21 84/16 84/22 96/5 101/16 108/13 112/2 112/21 120/23 125/20 150/18 152/9 162/3 162/5 162/16 162/19 162/21 162/24 163/17 163/18 163/22 164/2 164/12 164/17 164/21 165/2 165/10 165/14 166/19 166/24 166/25 167/7 167/11 167/13 167/15 167/16 168/7 172/1 179/17 187/11 204/14 208/19 208/20 209/1 209/16 213/10
unity [1]  118/24
universal [2]  15/17 73/11
universality [1]  199/13
unlawful [7]  155/9 155/13 155/14 155/16 156/21 157/2 170/25
unleash [1]  84/14
unless [5]  115/9 132/8 154/14 175/2 177/8
unlike [4]  71/14 118/2 147/6 195/2
unlikely [2]  75/6 160/9
Unlimited [5]  3/2 131/16 131/18 131/19 131/20
unlocking [1]  30/21

unlocks [1]  35/10
unpack [1]  7/5
unprecedented [1]  6/25
unprofitable [2]  79/5 129/22
unquote [3]  67/16 71/15 71/20
unrealistic [1]  7/14
unreasonable [2]  73/15 156/16
unreliable [1]  136/9
unspecified [1]  62/14
unstated [1]  210/20
unsuccessful [4]  12/25 127/24 131/2 206/2
untenable [2]  119/23 129/1
until [12]  31/16 74/6 81/24 82/7 88/12 97/13 105/18 110/14 120/17 124/2 164/7 190/3
unto [1]  210/1
unwilling [1]  151/16
up [89]  7/15 12/1 15/25 17/19 18/21 22/14 23/18 23/19 25/14 25/19 28/19 28/23 29/2 40/14 40/14 41/20 44/5 56/1 58/6 77/4 80/6 80/18 82/12 82/14 82/15 83/1 83/17 85/12 88/3 91/2 91/7 93/1 94/11 95/15 96/10 96/12 97/11 97/12 97/13 97/13 97/22 101/4 101/7 101/25 102/4 102/17 103/6 103/22 107/5 107/23 108/15 109/16 110/1 114/22 122/22 133/7 136/13 137/22 137/25 138/9 138/10 140/25 145/25 146/18 148/21 149/3 150/5 157/6 161/15 161/19 165/10 174/17 176/7 176/25 179/14 181/23 182/5 184/5 186/4 191/18 192/23 193/7 201/22 202/5 203/8 210/19 218/20 219/17 219/17
upheld [2]  71/12 132/20
upon [4]  42/19 46/2 53/2 101/17
upside [2]  123/22 159/11
us [47]  6/21 10/11 10/15 15/21 18/3 19/2 23/4 25/19 25/20 26/16 27/17 29/9 31/18 33/17 46/3 61/2 67/12 80/5 84/2 95/2 95/4 101/2 124/25 135/23 139/1 140/20 140/21 141/3 141/7 143/21 144/2 144/9 145/17 147/14 147/18 158/1 158/3 168/17 168/23 178/10 194/2 206/22 210/11 213/16 215/13 218/4 220/3
use [35]  6/2 6/4 18/2 18/6 18/16 19/1 24/2 25/20 26/16 30/13 30/13 45/4 46/7 69/16 70/16 80/17 89/15 89/17 89/17 95/2 95/3 95/15 95/16 95/17 111/19 113/11 129/16 129/20 131/25 144/6 144/10 149/2 149/6 168/23 214/1
used [10]  10/16 11/16 45/3 70/20 91/7 110/3 110/8 120/12 185/21 192/14
useful [2]  10/19 23/1
useless [2]  76/23 78/8
using [8]  19/5 24/6 99/12 139/19 146/6 185/3 199/18 199/19
usually [2]  98/6 98/7
utilize [1]  86/18

## V

Vacations [5]  3/2 131/16 131/18 131/19 131/20
vacuum [1]  158/13
valid [3]  46/20 119/16 127/21
valuable [8]  24/16 32/15 59/7 65/17 76/22 147/13 147/18 176/20
value [40]  10/14 11/7 13/7 23/18 28/9 29/19 30/21 33/2 38/16 38/17 68/18 71/9 73/7 74/14 74/16 75/7 75/25 78/9 94/15 98/13 100/14 102/1 117/8 117/10 118/17 119/4 123/20 125/10 130/16 132/6 132/11 132/16 132/19 132/24 133/24 134/7 138/1 146/8 153/1 161/12
valued [2]  138/8 138/15
values [2]  199/13 217/4
valuing [1]  124/18
valve [1]  196/16

**V**

**variations** [1] 52/2
**variety** [5] 43/2 123/10 170/7 183/9 185/11
**various** [7] 19/20 39/9 42/9 68/7 93/17 138/9 138/9
**vary** [2] 48/9 211/14
**varying** [1] 9/3
**vast** [5] 9/14 36/14 154/1 182/23 207/17
Vegas [1] 198/18
Velltturo [6] 152/5 152/6 185/5 185/6 185/7 185/15
**vendors** [1] 76/17
**venerate** [1] 141/14
**venues** [1] 78/20
**version** [1] 143/12
**versions** [3] 66/12 66/16 220/22
**versus** [14] 1/8 5/18 72/9 83/2 122/24 142/7 144/19 145/13 171/17 184/5 186/12 199/23 200/13 200/21
**very** [84] 10/12 11/14 12/8 12/18 12/22 12/23 18/7 21/8 22/20 24/15 27/23 30/8 31/21 38/13 39/25 53/25 58/11 59/7 59/12 59/21 60/1 61/19 61/20 63/3 63/20 65/5 71/4 77/14 81/10 92/7 92/17 99/18 99/23 105/17 106/22 107/4 107/14 112/7 114/6 116/11 121/9 129/10 135/2 138/1 142/17 145/13 146/7 147/12 148/2 148/3 150/6 151/4 151/21 151/23 159/1 159/1 159/17 159/18 160/4 160/5 160/9 162/1 165/22 167/25 168/14 168/24 179/13 179/25 182/15 185/24 185/24 190/4 197/15 199/7 203/23 204/21 206/5 206/18 208/12 209/1 209/1 211/13 213/15 217/3
**vested** [3] 162/21 166/18 166/23
**via** [5] 64/14 76/25 77/1 79/15 114/23
**viable** [2] 11/13 104/23
**vice** [1] 97/23
**vice-president** [1] 97/23
**victim** [1] 102/12
**victorious** [2] 17/18 25/7
**victory** [3] 17/17 37/19 132/15
**view** [14] 38/16 52/4 56/24 115/18 117/23 119/20 121/12 123/8 130/22 131/12 147/24 163/8 187/9 197/21
**viewed** [2] 122/24 146/15 147/7
**views** [1] 73/23
**vigorous** [2] 73/4 128/15
**vindicate** [2] 58/3 179/16
**vindication** [4] 12/4 12/6 12/9 12/13
**violate** [6] 27/1 27/2 126/2 144/1 144/24 171/14
**violates** [5] 36/24 44/23 46/8 62/10 218/23
**violating** [1] 121/1
**violation** [4] 147/14 156/20 214/9 219/6
**virtually** [8] 14/11 48/21 64/11 65/15 93/4 95/25 102/23 213/7
**virtue** [1] 176/16
**virtues** [1] 24/13
**vis** [6] 119/14 119/14 138/4 138/4 185/21 185/21
**vis-a-vis** [3] 119/14 138/4 185/21
Visa [45] 6/20 7/21 27/9 35/1 35/8 41/13 45/9 66/17 66/24 83/4 83/23 84/5 85/11 85/18 86/8 86/10 86/11 86/18 88/24 91/21 91/21 96/20 97/12 106/11 108/6 135/17 142/22 142/24 145/8 145/13 153/23 177/20 182/7 183/5 184/4 184/5 184/10 184/15 186/25 189/15 189/17 195/2 201/15 208/23 212/6
Visa's [1] 23/13
Visa-MasterCard [8] 83/4 83/23 85/18 86/8 86/10 86/11 86/18 108/6
Visa/MasterCard [5] 41/13 142/22 142/24 186/25 189/17
**visits** [1] 114/7

**vociferously** [1] 124/7
**volume** [9] 7/2 7/4 18/4 24/21 42/25 61/20 138/22 138/23 151/22
**volumes** [1] 185/22
**voluntarily** [1] 188/14
**voluntary** [1] 188/14
**volunteered** [1] 95/9
VORYS [1] 2/3

**W**

**wagging** [2] 172/18 197/20
**wait** [3] 31/16 141/24 157/14
**waive** [3] 46/13 46/17 125/17
**waived** [2] 46/21 47/17
**waiver** [1] 45/18
**waiving** [1] 124/1
Wal [12] 33/9 55/4 72/22 72/25 87/15 120/6 142/14 145/8 145/13 152/16 184/5 199/24
Wal-Mart [12] 33/9 55/4 72/22 72/25 87/15 120/6 142/14 145/8 145/13 152/16 184/5 199/24
Walgreen [1] 152/20
Walgreens [1] 206/22
**walk** [3] 30/8 58/15 95/13
**walked** [5] 39/3 91/23 148/9 199/13 204/18
**walking** [3] 148/10 207/7 219/6
**wall** [5] 9/7 9/8 9/9 9/10 132/13
**walls** [1] 8/5
**want** [93] 10/3 10/13 10/13 10/15 11/6 11/16 12/8 13/1 13/7 17/24 18/5 22/12 26/10 28/7 29/1 39/15 39/15 47/4 52/11 52/11 52/13 53/21 55/11 56/17 59/5 59/12 60/12 60/17 60/20 68/1 69/23 73/8 76/5 76/14 76/22 78/25 79/9 82/18 86/13 88/3 89/16 89/17 91/11 91/11 95/14 100/9 100/11 100/22 102/3 102/10 103/4 103/13 107/11 110/1 116/8 116/9 117/20 118/3 118/3 119/3 120/5 131/3 135/25 136/1 141/4 144/7 144/13 145/14 151/13 151/19 164/25 165/8 165/17 166/6 170/5 172/9 186/21 188/23 191/1 195/24 196/23 197/1 202/25 206/13 208/24 209/16 210/18 211/11 212/20 216/2 217/1 217/6 218/6
**wanted** [20] 17/2 18/11 28/1 33/13 33/13 43/17 46/25 47/1 50/1 83/1 83/24 83/25 90/10 99/5 111/8 173/14 199/5 210/1 210/7 216/19
**wanting** [2] 83/24 210/16
**wants** [6] 24/19 52/14 57/14 57/16 201/1 217/5
**warehouse** [1] 167/6
**warranted** [1] 170/18
**was** [197] 7/9 12/17 17/24 21/3 21/4 23/2 24/2 24/4 24/5 24/6 24/6 27/22 32/6 32/22 33/22 34/2 34/3 36/6 39/3 40/2 45/10 45/13 47/23 48/7 50/6 50/16 53/14 53/22 55/21 56/2 56/9 60/21 64/23 67/5 68/2 71/12 75/3 78/1 81/21 82/11 83/8 83/12 83/15 83/16 83/18 84/6 84/8 84/15 84/20 85/4 85/19 86/9 86/24 87/3 87/4 87/10 87/11 87/20 87/22 88/7 88/7 88/8 88/13 88/16 89/11 89/11 92/12 92/13 94/17 95/19 96/10 98/10 101/19 104/16 104/17 104/19 104/22 105/8 105/12 105/13 107/15 108/7 108/14 108/15 109/22 109/22 110/2 110/5 110/6 113/24 115/24 115/24 115/25 116/1 116/20 120/13 120/23 120/24 121/1 127/5 127/24 128/1 128/4 129/10 130/7 131/2 131/7 131/11 131/12 135/19 140/7 142/15 144/19 145/10 145/11 148/10 148/17 149/25 154/13 154/20 158/19 159/1 161/24 162/7 162/25 164/6 171/12 173/14 174/25 175/11 177/9 177/11 180/11 180/12 180/14 182/10 183/3 183/11 183/13 183/15 183/25 184/8 184/14 184/16 184/16 185/3 185/7 186/3 186/16 186/20 187/25 188/1 189/12 189/13 189/18 189/20

191/6 191/17 195/17 195/19 195/19 196/15 198/3 199/2 200/3 200/8 200/8 200/12 200/13 205/14 206/1 207/4 207/4 207/5 207/13 208/11 209/8 209/8 209/18 210/8 211/10 213/23 215/22 217/2 217/21 218/9 218/14 218/15 218/18 218/21 219/22 220/4 220/6 220/8 220/11
**was made** [1] 207/13
Washington [2] 2/14 4/7
**wasn't** [4] 89/11 110/4 143/18 209/8
**watch** [1] 94/5
**watched** [2] 105/22 158/14
**water** [2] 16/23 160/15
**way** [65] 6/14 9/14 11/21 11/23 15/6 24/17 24/19 30/5 32/13 42/21 42/25 48/21 54/2 70/19 70/23 79/4 81/6 81/17 82/5 83/25 86/14 86/24 93/10 93/10 93/21 93/24 93/25 94/3 94/10 97/3 97/18 98/9 99/15 100/13 100/15 103/21 103/22 104/7 105/7 106/2 108/1 108/3 109/4 109/17 111/6 114/21 123/4 126/21 126/22 133/7 133/19 146/1 147/10 157/14 158/4 167/9 174/17 180/13 181/13 187/12 194/9 197/11 204/18 212/14 216/12
**ways** [7] 39/5 42/17 48/11 78/7 95/15 176/15 180/4
**we** [322]
**we'll** [25] 5/13 10/5 18/3 18/15 22/13 25/21 26/16 26/17 27/11 27/11 27/12 27/12 55/8 63/21 80/19 81/3 81/4 81/12 92/18 92/18 95/1 110/14 135/3 170/2 181/9
**we're** [65] 5/20 7/18 12/25 13/18 14/19 15/24 18/7 28/18 30/20 38/10 39/21 50/10 52/22 52/23 52/24 57/4 60/17 63/9 84/22 84/23 86/16 92/7 92/22 93/4 99/17 99/18 99/20 99/21 99/25 103/10 103/12 103/14 103/16 103/17 106/1 106/3 106/19 114/11 135/12 135/14 137/24 137/25 138/10 139/5 141/24 141/25 142/1 143/24 144/3 148/21 150/16 150/19 157/14 159/6 166/1 168/7 168/25 193/22 194/5 199/18 199/19 203/10 207/7 208/7 208/18
**we've** [41] 9/16 11/8 11/13 14/21 17/14 31/19 33/5 34/5 38/14 44/4 45/21 46/2 47/12 48/22 54/1 56/14 56/15 57/11 61/18 63/8 86/23 119/22 146/19 154/10 154/11 155/20 157/22 157/23 157/23 157/25 157/25 158/2 168/3 172/6 174/9 179/10 187/6 188/11 194/23 214/12 214/13
**weak** [2] 159/18 159/19
**weakness** [1] 32/20
**weaknesses** [2] 32/18 32/19
**wealthy** [1] 212/20
**weary** [2] 68/5 68/6
WEBNER [1] 2/6
**website** [2] 136/10 136/12
**week** [1] 56/12
**weekend** [1] 23/10
**weeks** [7] 26/2 36/4 55/21 76/7 105/11 181/2 193/5
**weigh** [1] 46/10
**weighed** [1] 152/14
**weighing** [1] 30/20
**weighs** [3] 151/21 159/14 159/21
**welcome** [6] 64/5 81/13 129/23 135/4 162/13 197/2
**welcomed** [1] 196/22
**welcoming** [1] 27/19
**well** [107] 8/7 12/15 14/22 14/24 15/24 16/3 16/6 16/19 23/3 23/24 26/8 28/3 28/5 28/17 33/1 35/25 39/24 41/24 42/5 42/16 44/4 44/20 45/8 55/19 57/23 58/7 66/14 67/12 69/23 70/4 70/7 70/19 73/20 76/7 79/11 79/17 79/21 81/21 85/11 85/14 85/23 87/7 88/9 90/17 95/9 96/23 99/4 103/21 104/5 111/21 117/4 117/21

well... [55] 11/23 121/18 122/3 122/8 126/8
133/7 136/25 139/8 139/16 139/18 139/18
140/14 141/12 143/22 144/15 145/16 145/23
146/20 150/24 156/6 157/10 158/14 163/4
166/1 166/6 167/16 168/18 168/24 169/1
174/6 175/20 176/6 178/15 180/18 183/10
183/16 184/6 185/13 186/17 191/24 193/8
193/8 193/18 196/9 197/23 201/8 203/14
206/16 207/9 208/12 209/4 209/10 213/23
215/11 216/15
Well,WELL [1] 131/23
wellness [1] 114/7
went [8] 11/19 106/22 107/2 109/16 150/16
182/11 204/3 218/20
were [73] 6/16 7/11 7/23 8/3 21/1 21/13
21/14 22/10 22/16 33/19 36/4 36/14 41/15
41/16 42/18 54/3 67/2 72/20 75/2 75/18 75/22
78/24 79/1 80/25 83/16 83/18 83/23 84/10
84/12 84/13 86/23 87/17 88/5 88/25 89/1 92/9
93/18 100/18 101/9 107/14 107/16 108/6
108/15 108/23 113/13 116/2 117/22 123/13
135/7 139/2 145/8 145/9 146/4 146/25 162/6
163/23 164/23 168/22 177/11 181/23 184/19
184/22 188/6 189/25 190/9 195/4 200/19
204/16 206/21 207/20 210/4 210/5 219/7
weren't [7] 10/1 19/3 83/8 191/23 204/17
205/14 215/16
West [1] 3/8
what [246]
what's [21] 9/7 11/2 13/1 19/24 23/18 23/19
23/25 25/8 51/7 67/10 78/14 88/5 88/24 123/2
138/19 139/8 161/10 167/7 176/6 180/24
216/5
whatever [16] 18/1 21/18 27/13 29/8 30/7
34/6 59/1 114/13 117/10 124/8 177/4 201/3
211/12 211/21 211/23 213/21
whatsoever [1] 63/15
when [48] 13/4 15/18 22/2 22/18 26/1 41/20
43/11 48/23 51/20 52/16 63/6 66/20 68/14
72/12 85/18 87/17 88/4 88/6 88/13 88/24 90/2
90/12 94/17 95/19 101/8 104/7 106/17 107/15
109/17 113/6 113/17 117/14 124/18 124/20
135/6 137/14 141/8 148/9 163/23 170/18
171/2 171/15 177/25 179/9 199/20 200/2
201/14 206/21
whenever [2] 27/17 182/10
where [91] 11/10 12/20 14/5 14/6 14/6 14/22
14/23 16/3 17/20 19/8 24/5 24/7 24/16 36/10
36/12 37/11 40/15 40/25 43/1 47/6 47/9 49/8
49/11 49/22 51/12 53/17 60/18 61/10 65/7
69/2 69/3 69/20 70/5 81/3 84/21 99/25 107/2
115/11 115/14 119/19 120/25 124/22 125/18
125/24 129/9 129/17 130/1 130/2 133/21
137/15 137/17 143/3 143/6 145/9 146/23
151/4 151/5 154/12 155/19 163/17 163/18
166/23 168/7 171/17 175/20 177/18 178/9
180/12 182/7 182/17 183/11 184/2 185/2
185/16 187/22 188/11 189/11 189/16 189/19
193/24 194/16 199/11 200/8 200/8 200/9
201/7 202/8 210/13 213/5 215/21 216/20
whereas [1] 69/5
wherever [1] 26/15
whether [65] 8/1 35/16 35/17 38/1 38/16
38/17 39/1 39/10 39/11 41/24 43/4 43/4 43/6
55/11 56/19 57/14 58/5 58/21 70/2 75/4 75/14
78/12 78/18 78/19 82/3 87/9 94/6 98/21 106/1
113/14 116/8 121/7 125/5 126/3 130/3 150/12
156/10 156/11 156/15 163/7 167/13 170/22
170/24 171/8 171/18 172/9 172/12 174/2
174/16 175/5 175/15 176/9 176/23 180/10
181/14 183/16 185/6 186/5 188/25 188/25
194/13 198/21 200/1 200/5 211/11

whether customer [1] 78/18
which [107] 7/2 7/4 7/24 7/25 10/10 12/10
13/10 18/6 19/19 20/22 20/24 20/24 26/6 26/7
29/18 30/22 36/20 38/7 39/21 40/3 40/13 42/7
43/12 49/13 49/18 52/1 52/14 53/15 53/25
54/25 56/25 58/22 60/25 67/7 67/6 68/2 68/19
70/6 70/16 71/20 75/3 78/25 79/3 80/9 91/9
92/4 97/10 105/2 112/11 112/18 115/16 116/9
117/5 117/15 117/17 126/15 127/18 133/14
134/24 141/4 147/6 149/19 149/20 149/22
151/11 153/12 153/21 154/20 155/11 155/19
161/17 161/23 165/14 167/5 170/23 174/2
176/18 176/20 177/11 177/17 182/17 184/4
184/5 185/16 189/13 192/4 193/1 193/6 194/1
194/8 195/19 197/7 198/11 199/25 203/5
203/18 209/3 211/1 216/15 217/9 217/13
217/14 219/8 219/21 220/4 220/8 220/11
whichever [2] 82/5 215/24
while [20] 14/6 34/17 34/20 41/12 42/9
65/17 76/2 78/22 82/4 115/4 116/11 117/22
120/9 132/12 133/19 162/14 177/2 177/6
185/11 188/6
whimper [1] 133/9
white [1] 125/19
who [82] 12/20 18/5 19/25 24/6 30/10 36/11
36/14 40/8 50/15 50/18 55/14 58/12 58/16
60/16 61/19 64/22 64/24 65/3 67/10 73/17
73/23 73/24 74/1 86/2 86/2 86/3 86/3 86/13
92/16 93/14 93/14 97/22 100/14 101/12
108/21 111/16 113/6 116/14 116/23
117/1 119/12 121/13 121/24 124/13 133/7
135/3 140/11 142/15 151/24 152/15 153/8
154/3 169/1 169/2 169/2 171/6 171/7 172/6
172/19 172/20 173/7 176/12 176/13 183/2
183/5 183/18 185/7 190/13 196/6 196/22
197/23 197/23 198/1 198/22 200/15 200/19
204/3 204/10 214/10 214/17 220/20
who's [1] 152/15
whole [13] 17/20 22/14 27/12 62/14 62/15
94/8 94/15 109/24 113/8 113/8 117/4 143/5
170/21
wholeheartedly [1] 67/24
wholesale [1] 62/6
wholly [1] 127/24
whom [4] 33/16 200/18 206/5 206/18
why [43] 10/15 11/1 15/25 18/25 22/13 31/16
44/20 45/20 52/20 53/21 54/24 55/9 61/9 66/4
67/20 70/10 76/17 85/25 87/3 89/9 95/6
95/8 99/14 100/8 103/24 108/12 110/13 112/7
124/7 136/10 138/16 138/19 138/25 140/18
146/16 149/20 149/23 155/3 160/13 163/9
178/25 204/23
wide [3] 16/8 42/6 58/24
widespread [2] 16/5 16/16
Widow [1] 3/4
wiggle [1] 126/25
will [116] 5/23 7/11 7/14 9/3 9/12 9/25 10/17
12/14 13/10 15/19 15/22 15/22 17/17 18/17
18/18 20/23 21/17 25/10 34/24 38/2 39/22
43/5 43/6 43/7 43/7 43/22 43/25 52/5 52/7
58/8 58/23 60/10 63/12 64/1 65/7 65/8 65/20
67/17 67/25 69/1 71/6 71/8 71/11 72/10 76/19
80/5 80/18 80/18 82/11 85/1 89/6 93/19 94/5
95/12 95/14 95/17 97/18 97/19 100/15 100/17
100/21 102/20 102/21 102/22 105/7 106/14
108/17 112/23 123/17 123/21 125/4 125/5
125/6 128/19 130/3 133/6 135/23 136/7
136/20 136/24 151/2 154/13 155/11 155/13
157/13 160/5 160/14 161/17 164/19 167/1
168/9 170/8 171/6 175/4 176/15 177/5 177/7
178/5 178/6 178/7 179/3 181/2 181/6 181/7
181/11 181/14 181/25 182/1 183/11 186/11
193/12 194/13 194/14 195/1 195/3 201/11
203/3 220/22

willing [8] 40/20 60/11 60/13 65/6 123/13
157/13 193/6 209/17
willingly [1] 11/11
Wilson [1] 171/17
win [9] 29/13 37/15 75/19 78/5 94/3 94/4
161/15 203/19 204/22
wind [1] 28/2
winning [1] 207/3
wins [4] 76/6 76/19 77/9 94/4
wipe [1] 133/3
Wisconsin [1] 198/17
wise [1] 142/17
wish [2] 61/1 157/12
wishes [3] 60/5 169/2 170/14
within [6] 15/3 15/4 66/17 120/22 156/16
212/5
without [22] 9/11 25/18 33/16 57/4 58/4
59/22 128/9 139/20 141/3 141/7 141/23
143/21 147/2 147/18 158/13 166/13 167/3
167/12 167/14 188/7 192/3 194/23
withstand [6] 30/25 102/21 102/22 160/17
160/18 160/21
witness [2] 204/7 204/7
witnesses [2] 137/17 196/20
won [1] 40/3
won't [15] 7/15 21/2 65/23 68/19 77/6 94/6
95/9 95/10 95/13 100/2 149/10 150/16 154/10
wonderful [1] 151/1
wondering [3] 94/6 156/8 163/7
word [3] 94/5 105/11 197/16
words [12] 40/10 122/4 131/1 133/24 138/24
146/19 154/15 157/19 171/1 192/13 198/14
199/18
work [10] 100/21 108/13 128/23 130/7 130/7
131/7 133/6 146/18 161/9 208/11
workaround [1] 59/10
worked [1] 57/5
working [4] 6/16 129/15 193/23 193/25
works [8] 82/1 112/4 112/7 136/8 145/7
145/10 145/11 212/14
world [10] 11/10 14/12 14/16 15/14 61/7
70/20 79/25 87/25 185/20 204/20
worlds [1] 192/24
Worldwide [1] 3/13
worried [1] 70/3
worries [2] 194/1 194/2
worry [1] 97/2
worse [8] 64/15 64/19 68/19 124/18 128/1
128/3 133/22 208/9
worst [4] 76/23 77/24 84/23 84/24
worth [4] 117/23 202/2 202/4 202/12
worthless [1] 146/7
would [205] 6/17 6/21 11/7 11/9 12/23 13/21
13/22 13/24 14/7 16/4 16/17 16/24 16/25 18/3
19/6 20/6 21/12 21/14 22/14 22/15 23/1 23/11
24/7 25/16 26/10 26/10 28/19 30/4 32/14 33/6
33/17 33/18 41/7 41/9 41/17 45/3 45/4 46/5
46/7 48/17 53/8 55/18 56/19 56/19 57/25 58/3
58/10 58/14 58/14 59/8 65/24 66/2 66/6 66/16
68/12 68/12 68/13 68/13 71/17 72/2 72/2 74/3
74/20 74/25 75/5 75/23 76/20 76/21 76/23
77/25 78/20 79/1 79/2 79/17 80/4 82/15 82/3
83/11 86/8 86/16 87/5 87/19 90/10 91/2 92/8
92/12 93/18 94/9 96/13 96/13 98/3 98/4 102/7
103/7 103/8 103/9 103/24 104/19 105/4
108/19 110/4 111/15 112/9 112/10 114/10
116/13 121/9 122/16 122/21 126/15 127/24
128/1 129/2 129/24 130/24 133/24 134/13
134/22 134/23 134/24 138/8 138/11 138/12
139/4 139/24 143/22 144/11 145/16 145/19
145/25 146/11 146/21 146/22 147/6 147/14
147/14 147/16 147/24 149/12 151/22 152/25
152/22 156/15 155/15 156/14 156/20 156/22
156/22 156/25 158/6 158/25 159/11 159/25

## W

would...[52]  160/14 163/13 163/14 165/15
165/15 166/22 167/4 167/8 167/9 167/14
168/8 168/17 171/3 173/8 176/15 177/13
178/10 178/14 181/18 183/18 185/13 186/24
187/12 188/3 188/24 189/19 190/14 191/23
195/5 195/8 195/14 195/15 196/11 197/1
197/1 197/5 201/12 201/24 204/19 204/24
205/20 207/2 207/6 208/19 208/24 212/15
212/15 212/17 213/3 215/16 215/25 216/21
wouldn't [13]  16/1 22/13 49/1 57/7 65/25
78/21 117/21 137/4 138/2 146/1 146/3 206/25
219/9
wounded [1]  33/22
wrestling [1]  89/21
write [1]  20/15
written [4]  28/25 113/8 142/16 180/14
wrong [12]  19/17 22/16 91/24 120/23 128/23
135/9 135/12 137/24 144/12 144/13 200/13
216/14
wrote [2]  135/8 217/6
Wyckoff [1]  89/10

## Y

yeah [11]  62/1 67/9 144/15 145/25 157/12
194/1 211/19 213/14 216/19 217/17 217/17
year [5]  41/6 112/13 115/22 115/24 136/16
years [35]  6/12 7/7 46/21 47/2 65/24 67/10
68/11 77/4 77/11 77/11 77/11 80/21 86/7
86/23 87/15 87/15 88/25 88/25 89/21 91/7
92/2 106/23 107/25 112/24 121/25 122/1
122/2 123/18 125/5 135/16 136/15 144/4
144/19 189/10 199/1
yes [30]  8/17 8/19 12/15 27/10 27/10 27/11
40/7 43/23 44/10 63/4 64/4 80/8 80/11 80/14
82/17 87/2 131/15 145/13 158/18 158/20
183/8 183/14 187/9 192/22 195/1 199/9
202/16 205/7 206/23 207/15
yet [9]  25/9 56/11 72/1 102/10 128/13 128/20
129/4 181/19 193/21
YORK [14]  1/1 1/8 1/18 1/22 2/9 3/14 4/3
4/14 8/3 87/8 89/10 198/11 214/15 218/15
you [549]
you'd [4]  14/3 20/5 136/19 139/6
you'll [7]  50/8 55/24 101/21 107/1 107/23
142/22 208/16
you're [52]  5/24 6/1 6/3 6/4 9/19 14/13 14/13
14/22 15/1 16/23 19/3 19/4 19/17 20/22 21/1
22/6 23/3 27/3 27/24 28/8 28/15 31/18 42/16
53/3 55/17 61/13 61/13 61/14 61/15 61/15
85/9 93/17 100/8 100/25 106/1 106/2 130/18
134/20 141/9 143/6 146/17 173/16 179/15
194/21 195/25 205/1 205/4 205/4 205/8
205/10 209/17 215/9
you've [13]  47/1 50/11 55/7 61/4 61/5 68/21
147/25 152/16 162/15 200/4 209/14 216/16
216/18
young [1]  107/15
your [261]
yourself [3]  55/15 89/14 166/5

## Z

zero [10]  71/6 93/4 99/10 118/13 123/21
127/25 132/19 132/24 136/7 160/12
ZWEIG [1]  4/4