UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA
STATE OF CONNECTICUT,
STATE OF IOWA,
STATE OF MARYLAND,
STATE OF MICHIGAN,
STATE OF MISSOURI,
STATE OF OHIO, and
STATE OF TEXAS
                              :

        Plaintiffs        10-CV-4496 (NGG)(RER)

  -against-        :  U.S. Courthouse
                              Brooklyn, N.Y.

AMERICAN EXPRESS COMPANY,
AMERICAN EXPRESS TRAVEL
RELATED SERVICES COMPANY, INC.
MASTERCARD INTERNATIONAL
INCORPORATED, and
VISA INC.

        Defendants    :

- - - - - - - - - - - - - - - X

IN RE AMERICAN EXPRESS
ANTI-STEERING RULES ANTITRUST :  11-MD-2221 (NGG)(RER)
LITIGATION (II)

- - - - - - - - - - - - - - - X

                         Thursday, October 9, 2014
                         10:00 a.m.

BEFORE:

        HONORABLE NICHOLAS G. GARAUFIS
          United States District Judge

Court Reporter:        VICTORIA A. TORRES BUTLER
                    225 Cadman Plaza East
                    Brooklyn, New York 11201
                    VButlerRPR@aol.com
Proceedings recorded by mechanical stenography, transcript
produced by Computer-Assisted Transcript.

VB     OCR    CRR

6773

```
 1   APPEARANCES:

 2   For the Plaintiff:        ANTITRUST DIVISION, LITIGATION III
     U.S.A.                    U.S. Department of Justice
 3                             450 Fifth Street NW
                               Suite 4000
 4                             Washington, DC 20530
                               BY:  CRAIG W. CONRATH
 5                                  JOHN SNYDER
                                    MARK HAMER
 6                                  SETH BENNET
                                    IHAN KIM
 7                                  THOMAS CARTER
                                    MARK RYAN
 8                                  ANDREW EWALT
                                    ETHAN GLASS
 9
     State of Ohio:            MITCHELL L. GENTILE
10

11   For the Defendant:        CRAVATH, SWAINE & MOORE LLP
     American Express          Worldwide Plaza
12   Company                   825 Eighth Avenue
                               New York, New York 10019
13                             BY:  KEVIN J. ORSINI
                                    EVAN R. CHESLER
14                                  PETER BARBUR

15
                               BOIES, SCHILLER & FLEXNER LLP
16                             575 Lexington Avenue
                               New York, New York 10022
17                             BY:  DONALD FLEXNER
                                    ERIC BRENNER
18                                  PHILIP C. KOROLOGOS

19                                  JESSE WEISS
                                    MARK CALIFANO
20                                  PETER BARBER
                                    GUNTHER BRIGHT
21

22                             ***

23

24

25
```

VB      OCR      CRR

1           (In open court.)

2           (Judge NICHOLAS G. GARAUFIS enters the courtroom.)

3           THE COURTROOM DEPUTY:  All rise.

4           THE COURT:  Please, be seated.

5           THE COURTROOM DEPUTY:  Civil call for oral argument.

6           Counsel, just state your appearances.

7           MR. CONRATH:  Good morning, Your Honor.

8           Craig Conrath for the United States.

9           THE COURT:  Good morning.

10          You can go round the table.

11          MR. HAMER:  Mark Hamer for the United States.

12          MR. BENNETT:  Good morning, Your Honor.

13          Seth Bennett for the United States.

14          MR. KIM:  Ihan Kim for the United States.

15          MR. CARTER:  Thomas Carter for the United States.

16          MR. RYAN:  Mark Ryan for the United States,

17   Your Honor.

18          MR. EWALT:  Good morning.

19          Andrew Ewalt for the United States.

20          MR. GLASS:  Ethan Glass for the United States.

21          THE COURT:  Mr. Glass, good morning.

22          MR. GLASS:  Good morning, Your Honor.

23          MR. GENTILE:  Mitch Gentile for the Plaintiff

24   States.

25          MR. CHESLER:  Good morning, Your Honor.

1        Evan Chesler for American Express.

2        MR. ORSINI:  Good morning, Your Honor.

3        Kevin Orsini for American Express.

4        MR. FLEXNER:  Good morning, Your Honor.

5        Donald Flexner for American Express.

6        MR. BRENNER:  Good morning, Your Honor.

7        Eric Brenner for American Express.

8        MR. KOROLOGOS:  Good morning.

9        Philip Korologos for American Express.

10       MR. WEISS:  Jesse Weiss for American Express.

11       MR. CALIFANO:  Good morning, Your Honor.

12       Mark Califano for American Express.

13       MR. BARBER:  Good morning, Your Honor.

14       Peter Barber for American Express.

15       THE COURT:  And Mr. Bright.

16       MR. BRIGHT:  Well, good morning, Your Honor.

17       Gunther Bright, American Express.

18       THE COURT:  Good morning, everybody.

19       This morning, we are going to have up to four hours

20   of oral argument by the parties.  I don't have a clock;

21   sometimes we put up a clock, but I am going to ask you to keep

22   an eye on the clock yourselves so that we don't go over time.

23       For the plaintiffs, I understand that Mr. Gentile is

24   going to speak first; is that right?

25       MR. GENTILE:  No, not first.

1          MR. CONRATH:  I think I speak first, Your Honor.

2          THE COURT:  All right.

3          MR. GENTILE:  I just have three minutes after he's

4     done speaking.

5          THE COURT:  Okay, that's fine.

6          Then, you are going to reserve some time for

7     rebuttal; is that right?

8          MR. CONRATH:  Yes, I hope to, Your Honor.  I will

9     reserve the remainder.  Let's say, I hope it's about 15

10    minutes.

11         THE COURT:  Okay.

12         And then who is going to speak for the Defense?

13         MR. CHESLER:  I will, Your Honor.

14         THE COURT:  Okay.  Thank you.

15         Is anyone going to be using any visual aid?

16         MR. CONRATH:  We have slides, Your Honor.

17         THE COURT:  We have to make sure that we have them

18    in the record as well.

19         MR. CONRATH:  Okay.

20         THE COURT:  So, we need a copy for the record.

21         How about the Defense?

22         MR. CHESLER:  We will also be using some,

23    Your Honor.

24         THE COURT:  Okay, very good.

25         MR. CONRATH:  I should add that the slides, the

1   electronic version of our slides is public.  The hardcopy

2   contains the full material where there have been some

3   redactions for confidentiality reasons.

4           THE COURT:  Okay.

5           Are we all set to go with the visual aid?

6           MR. BENNETT:  Yes, we are, Your Honor.

7           MR. CHESLER:  Your Honor, may I just ask a logistics

8   question?

9           THE COURT:  Of course.

10          MR. CHESLER:  As I think happened during the

11  openings as well, given the amount of time, the Government

12  will have one contiguous period of time for their closing and

13  I am just interested in the Court's preference because we may

14  get to a situation where, in the middle of my comments, we get

15  to a lunch break and I would rather do it without a break.

16          THE COURT:  I have been thinking about that.  What I

17  would like to do is take lunch at the end of the Government's

18  initial presentation and then we will come back after lunch

19  and have your presentation.  We will have an early lunch, in

20  other words.

21          MR. CHESLER:  All right.

22          THE COURT:  And then we will have any rebuttal at

23  that point.  I think that would be a better way instead of

24  breaking up your presentation into two parts, unless you feel

25  otherwise.

1          MR. CHESLER:  No, I much prefer the way Your Honor's

2   going to do it, thank you.

3          THE COURT:  That was my intention, I'm glad you

4   inquired.

5          Okay, Mr. Conrath.

6          MR. CONRATH:  All right.

7          THE COURT:  You may proceed.

8          MR. CONRATH:  Thank you, Your Honor.

9   SUMMATION

10  BY MR. CONRATH:

11         MR. CONRATH:  Good morning again, and may it please

12  the Court.

13         I want to start by thanking the Court and all of its

14  staff for the many courtesies that have been extended to us

15  throughout the course of this case and thank the Court as well

16  for making time available for us to have a six-week trial.

17         It turned out that trial gave us the opportunity to

18  learn a lot about this case.  We needed those six weeks.  We

19  had 38 witnesses, 19 merchants, we heard from all four of the

20  card networks, including 12 American Express witnesses and the

21  Court heard from four experts.

22         THE COURT:  Can I just interrupt for a moment?

23         MR. CONRATH:  Yes, certainly.

24         THE COURT:  The six-week trial also afforded you a

25  window into the position and the strengths and weaknesses of

1    each other's cases.

2              MR. CONRATH:  Yes.

3              THE COURT:  And in doing the post-trial briefing,

4    you also gained certain insights, I'm sure.

5              Has that provided a tool for possible resolution of

6    this case short of a court decision?  Has anything happened in

7    that regard?  I will ask both sides to comment on that now,

8    that I am not counting that against your time.  I am counting

9    that in favor of my future.

10             MR. CONRATH:  No, nothing has happened in that

11   regard, Your Honor.  I mean, as the Court knows, we originally

12   sued Visa, MasterCard and American Express.  Two of them

13   settled.  So it is, in principle, a settleable case.

14             THE COURT:  All right.

15             MR. CONRATH:  But nothing has happened in that

16   regard.

17             THE COURT:  Well, I would just say, again, that if

18   there is -- and we have a senior representative of

19   American Express here, as well as Counsel -- that if there is

20   some opportunity for a viable settlement of the case, it

21   should be pursued as I go forward with reaching a decision.

22             I will get further into the process of reaching a

23   decision later on after I have heard from both sides, but it

24   is my hope that if there is some possibility of reopening

25   discussions on that subject, that you will take advantage of

1   it, all right?

2          MR. CONRATH:  All right.  Thank you, Your Honor.

3   We're certainly willing, should there be some interest.

4          THE COURT:  Okay, go ahead.

5          MR. CONRATH:  All right.

6          Your Honor, one of the things we learned from

7   hearing from all those witnesses is that this market is

8   broken.  Christopher Priebe of Southwest Airlines you will

9   recall said that and it pretty much sums up what the evidence

10  shows.

11         This market is broken because there is no price

12  competition among credit card networks on merchant discount

13  rates.  The normal competitive pricing mechanism is broken.

14  Normally, if you have a lower price, you can expect to make

15  more sales as a result, but this market does not work that

16  way.

17         The result is the competitors in the market do not

18  have any incentive to offer low prices.  Jack Funda of

19  American Express expressed it quite clearly.  I don't think

20  it's anybody's business strategy to be cheaper than the next

21  guy so no, we don't compete on costs, he testified.

22         And it's important to note, he said, it isn't

23  anybody's strategy to be cheaper than the other guy.  What's

24  broken is broken for all competitors.  It's broken

25  market-wide.

1       What does that mean?  Well, as Mr. Hochschild of

2  Discover explained, it means that a strategy of low prices for

3  merchants is not viable because the merchants cannot shift

4  sale to the low cost competitor.  There is one thing that the

5  evidence at trial made clear is that there is no price

6  competition among credit card networks on merchant discount

7  rates.

8       There is something else about which the evidence is

9  clear.  Merchant steering works.  Amex said that in its

10  post-trial brief.  If merchants were free to steer customers,

11  then there would be merchants would be able to move some

12  sales.  What that means is that the connection between low

13  prices and more sales, more business, would be restored and

14  that critical part of the price setting mechanism could work

15  again.

16       Mr. Funda explained what would happen if merchant

17  steering were allowed.  Amex would have to compete harder both

18  for merchants and for cardholders.  He said what would happen

19  if the anti-steering rules weren't there would be we would be

20  fighting to retain the business by any means necessary.  We

21  may need to increase incentives to consumers, we may need to

22  reduce pricing to merchants.

23       And Mr. Priebe, from Southwest, said a similar

24  thing.  He said if we had the right to steer, we would be able

25  to negotiate a better price.

1      So, there is no price competition among credit card

2  networks on merchant discount rates, merchant steering would

3  allow that competition.  Amex's rules, that are the subject of

4  this case, block that merchant steering.

5      What, in general, does Amex say about those basic

6  propositions?  There isn't a huge fight about exactly what

7  happened in the market.  The fight is about what does it mean

8  legally.  In broad terms, Amex has two categories of defenses.

9      One I might characterize as sort of technical

10  antitrust defenses; we didn't prove it enough, we didn't prove

11  it in the right way, there's some thresholds in the law,

12  that's one category of defenses I'll go through them in a

13  moment.

14      The other category is it's a good thing that we

15  blocked that competition.  We can do something better and so

16  it's perfectly fine for to us block competition.  I'm going to

17  address those issues next.  But before I go on to those, let's

18  remember that this broken market is significant.

19      Merchants in the United States pay over $50 billion

20  in credit card fees.  You heard from merchants about how

21  credit card fees are one of their largest operating expenses.

22  Mr. Kimmet from Home Depot said that credit card fees cost

23  them almost as much as healthcare.  Mr. Thiel from Alaska

24  Airlines said they pay in credit card fees twice what it cost

25  them for their airport employees.  Mr. Holtey from Solitude

1    Ski Resort said that they spend more on credit card fees than

2    they do for the diesel fuel to groom their slopes.  These

3    restraints matter because credit card fees matter, this broken

4    market matters.

5            What I'm going to do is discuss some of the main

6    points about the law and the evidence addressing both our

7    affirmative case and some of American Express's responses.

8            The Court is obviously familiar with the three-step

9    process for the Rule of Reason under Section 1, so I'm not

10   going to repeat that, but I am going to follow this process

11   step-by-step as I discuss it today.  The first topic that I am

12   going to take up is the anticompetitive effects of

13   American Express's anti-steering rules.

14           First I want to touch on a few key legal principles

15   to keep in mind.  It's important to remember that the

16   antitrust laws are designed primarily to protect interbrand

17   competition and that's exactly what this case is about.  The

18   Amex anti-steering rules obstruct interbrand price

19   competition, the core thing that is protected by the antitrust

20   laws.

21           Second, to examine whether there are anticompetitive

22   effects on that competition under the Rule of Reason, as the

23   District Court in U.S. v Visa put it, you have to ask whether

24   the competitive process itself has been harmed and that same

25   principle was expressed by the Supreme Court in the Indiana

1    <u>Federation</u> case when it said that restraints harm competition

2    if they disrupt the proper functioning of the price setting

3    mechanism of the market.

4            Is that what's happened here?  Yes, it is.  The Amex

5    rules disrupt the proper functioning of the price setting

6    mechanism because they won't let a company who wants to have a

7    low price get a reward.  The competitor who cuts prices can't

8    make more sales as a result.  So, what's blocked by

9    American Express's rules is merchant steering.  Merchant

10   steering at the point of sale.

11           We should remember that steering in all parts of the

12   economy is an everyday part of competition.  Many merchants

13   came here and said that.  They steer customers in the process

14   of competing in their businesses.  Just one of them was John

15   Robinson from Ikea who explained that Ikea steers its

16   customers.  It's part of how they compete.

17           Merchants also testified that if they were free to

18   do it, they would be able to steer in the future.  They would

19   steer in a lot of different ways.  Each merchant in a

20   different market in a different industry with a different

21   company had a different idea about how to do it reflecting the

22   competitive realities they face, but what they said was if we

23   had the freedom to do it, we could do it and it would make a

24   difference to us.  They also, by the way, said they would

25   steer in a way to keep their customers happy so that their

1   customers will come back.

2          Now, Amex concedes some of the essential facts about

3   anticompetitive effects.  On the question of is steering

4   blocked I hope the Court remembers Mr. Glass's many signs that

5   illustrated various types of steering and how what was not

6   allowed by American Express' rules.

7          And Mr. Funda confirmed that the effect of that is

8   that if anti-steering were allowed, American Express might

9   have to reduce prices.  Amex also confirmed that it

10  aggressively enforces the rules even to the point of

11  terminating some merchants for noncompliance.

12         The upshot is the Amex rules mean that a credit card

13  network cannot cut prices and expect to increase the business

14  that it does.  But cutting prices to increase business is the

15  very essence of competition.  That's what this the Supreme

16  Court told us in Eastman Kodak Versus Image Tech.  Cutting

17  prices to increase business is the very essence of competition

18  and that's what's blocked here.

19         And that's an important legal principle and the

20  Court heard it confirmed from merchant after merchant who said

21  that in other parts of their business where they have

22  competitive options, if they can offer increased business,

23  they can get a better price, but not here.

24         The Court also heard that in Mr. Hochschild of

25  Discover who said that in other markets that he's worked in if

1  you have a lower price, you can do more business.  We asked

2  him, does that work in a credit card market?  He said no, it

3  doesn't work that way for merchants.  How does he know that?

4  Well, he knows it from experience.  Discover's experience is

5  the first and maybe the best example of direct evidence of an

6  actual adverse effect on competition.

7           Discover tried to compete as the low cost,

8  simple-priced, merchant-friendly network.  They offered lower

9  prices in exchange for more volume, major retailers were

10  interested and point of sale steering was essential for that

11  low price strategy to work.  Why was merchant steering

12  essential for that low price strategy to work?  Well, as

13  Mr. Hochschild explains in this excerpt it works because the

14  merchants' customers don't see the higher price.  Only the

15  merchant sees the price and if the network is going to

16  increase its business in response by having a low price, the

17  merchant has to be able to encourage the customers to do

18  something about it, to use the low price card.

19           But that strategy was not allowed to Mr. Hochschild

20  and Discover because of the anti-steering rules, at that time

21  of all three companies.  And Mr. Hochschild explained, he

22  testified.  What did you do?  Well, basically, their response

23  was if you can't beat them, we might as well join them and

24  they raised their price up to the level of approximately Visa

25  and MasterCard.

1        You can see that here in this next slide.  This is

2   an internal Discover slide.  It shows what happened because

3   the price mechanism was disrupted.  The price increased.  You

4   can see the low cost period and the closed competitive gap

5   period.  The price goes up.

6        What you see in this slide is direct evidence.  It's

7   direct evidence of what happens when there's harm to the

8   competitive process.  It is also direct evidence of increased

9   prices as a result of that harm to competition.  These are

10  Discover's prices.  They went up because of the restraints on

11  competition that wouldn't let them succeed with the lower

12  prices.  That's a price effect.  It's direct evidence.  It's

13  empirical evidence.

14       This is also evidence of a price effect because of

15  what did not happen.  The other three networks did not have to

16  respond to Discover's low price competition as Professor Katz

17  explain to the Court.  The other networks didn't have to say

18  oh my gosh, we're losing business, Discover's been increasing

19  its business, what are we going to do about it?  They were

20  insulated from that price competition and that, too, is a

21  price effect of restricted competition.

22       This is not just a price effect in the past, it's a

23  current effect and a future effect.  Mr. Hochschild testified

24  that if merchants obtain the freedom to steer, then Discover

25  would aggressively pursue a strategy of lowering our prices

1    and giving incentive to merchants that would steer incremental

2    volume to Discover.

3          THE COURT:  Well, hasn't there been a change in the

4    pricing structure of the different cards so that at present

5    the cards are at about the same pricing level overall with the

6    these premium cards that Visa and MasterCard are promoting,

7    and so in terms of the current market situation, is there

8    really a difference among the cards in terms of overall

9    discount rates?

10          MR. CONRATH:  So, there is much less difference than

11   there was at some points in the past, that's for sure.  And

12   why is that?  Why is that?  Because the card networks didn't

13   have anything to gain by being the cheaper guy.  They didn't

14   have anything to gain by being the cheaper guy.  So, what you

15   saw is Amex at the highest rates, as they've talked about,

16   Visa and MasterCard were moving up their rates in part by

17   offering these rates because that was where all the

18   competition was channelled; there was no way for a network to

19   benefit from being the lower priced guy.

20          And it's true that if you take a look today, would a

21   merchant encourage a single -- be able to gain a lot of money

22   by moving people among cards at current rates.  But

23   competition is a dynamic process.  So, the reason that we're

24   asking for this relief is so that merchants can go to networks

25   and say hey, we can give you more business; if you'll cut your

1    price, we can give you increased business and that's the way

2    the competitive process should work.  We don't have to be in a

3    world where all of them have the same high prices.  If there's

4    competition, there's room for those prices to come down.

5            THE COURT:  It can also be because the other card

6    networks have decided that Amex's strategy is good business.

7            MR. CONRATH:  Well, certainly, you can see why they

8    would say it's good business in the environment where it

9    doesn't gain you anything to be the cheap guy.  That's

10   certainly right, it makes perfect sense.  If I don't get

11   anything by being cheaper, why don't I be more expensive?

12   That's what Mr. Hochschild said in the earlier period.  We've

13   tried really hard to be the cheap guy, it's not working so

14   we'd better do something else.  That's part of why the market

15   is broken, because there's no way for a network to do that.

16           And the antitrust laws aren't about dictating a

17   particular price or saying you need to have this price, you

18   need to have this outcome.  They're about getting to the

19   outcome as a result of a competitive process.  The antitrust

20   laws say if we remove the restraints on competition, the

21   market will find its level.  And now there's a lot of evidence

22   in the record here that as a result of these rules, prices are

23   higher today than they would otherwise be, but the violation

24   is that they got there as a result of a process where

25   competition was broken, was impeded by the rules.

1          THE COURT:  Isn't it possible that this can be

2     resolved through market forces in an age where you've got

3     impending competition from let's say, PayPal working on a

4     different model from the charge or credit card model and that

5     there may be a correction in the relationships without any

6     kind of court intervention?

7               I am looking for ways to avoid court intervention.

8               MR. CONRATH:  Sure.

9               THE COURT:  Because taking a conservative approach

10    where there are competing facts and it's difficult to sort

11    them out, which I will do if necessary, but I am asking

12    whether there is a way of self-correction in the marketplace

13    where the parties in this case, meaning Amex and the settling

14    parties, Visa and MasterCard, have to reassess their model of

15    operation, including the model that is used by Amex.

16              MR. CONRATH:  Well, that is an appropriate question

17    to ask because intervention is a nontrivial act, of course,

18    and it makes perfect sense to ask that question.

19              The problem is that the anti-steering rules get in

20    the way of a lot of what might happen in the way of

21    developments to make the market more competitive.  To make the

22    market more competitive you need to be able to differentiate

23    among the payment forms and among specifically, the credit

24    card networks.

25              So, you remember Mr. Hochschild was asked about

1   PayPal and he says they're an important merchant for us, but

2   for us they're a merchant.  Merchants, they don't run a

3   separate network at all the different stores.  They're, of

4   course, more important online, but there is no danger of, no

5   evidence in the record especially, that PayPal is in any

6   danger or that Visa and MasterCard are in any danger of being

7   replaced by any kind of the new payment forms that are

8   happening.

9          THE COURT:  That was one of the, I think, implicitly

10  that was an argument being made by Amex, wasn't it?

11         MR. CONRATH:  I think it was and I think that's why

12  I referred to evidence in the record.  I don't think they even

13  put in evidence of what the current share of PayPal is, but

14  it's very, very small.

15         And the Court -- look.  Nobody knows what's going to

16  happen in 20 years, that's right.  But we have a record of

17  what the evidence is and what the market conditions are today

18  and that shows that the opportunity to grow by virtue of being

19  the low cost guy is blocked and that's the fundamental way

20  competition works.

21         The same thing is true about innovation.  The way

22  you get rewarded for innovation.  Just as more business is

23  your reward for being the low priced guy, it's also the reward

24  for being the innovative guy.  So, if the anti-steering rules

25  block merchants moving someone to a new competitor, they also

1   block innovation.  It's a topic that is on my list, but let me

2   talk about it now.

3           The Court recalls one of the possibilities that's

4   been thrown around is using mobile phones as a payment device.

5   Now, basically, at this point, those are wallets and they are

6   an electronic version of what's in your wallet.  You pull out

7   your mobile phone and it's got your card on it instead of

8   pulling out your wallet an it's got the cards in it.  It's not

9   new competition, it's a replacement for the wallet.

10          But, you will remember I think Mr. Priebe of

11  Southwest is on the Board of a group called MCX, which is a

12  consortium of merchants looking to innovate and find some way

13  to reduce and control their costs by doing something involving

14  mobile space.

15          What he says is we look at it, we need to be able to

16  do something to encourage people to use whatever we've set up.

17  We're very worried that we don't have the ability to do that

18  because anti-steering rules block anybody from moving volume.

19  So, if somebody comes along with a better idea, makes is

20  cheaper for merchants, how are they going to get steered to?

21          The answer is, you need the ability to differentiate

22  and that's why these anti-steering rules not only have blocked

23  past price competition, they're blocking current price

24  competition.  They're also impeding the kind of innovation

25  that could make this market more competitive in the future.

1        I see my efficient colleagues have put the relevant

2    slide up.  It's in the book at slide 24.  This is some of the

3    innovation that's blocked; that the evidence in the record

4    shows has been blocked.

5        Discover had a Project Monet, which is a

6    merchant-owned network as a way for merchants to explore

7    having a lower priced option.  Mr. Hochschild explained

8    couldn't get off the ground because they couldn't figure out

9    how to direct business to it in the face of the existing

10   anti-steering rules.  MCX I talked about.

11       Sinclair Oil.  The Court may recall Mr. Gibson of

12   Sinclair Oil and he said we've got this mobile app, it will

13   roll back the price at the pump at the moment depending on

14   what credit card and what the price of the credit card you've

15   got is.  It's very innovative, a way to directly reflect price

16   increases, reward the company with lower prices and reward the

17   consumer for choosing a lower card.  Can't use it now because

18   of the American Express anti-steering rules.

19       Official Payments talked about two things.  You

20   remember Mr. Mitchell, when we finally got him here, was able

21   to explain that Official Payments had a workaround, their

22   ChoicePay site, and that making that work was impeded, he had

23   explained, he was worried about it being impeded in the future

24   by the Amex anti-steering rule and then there was the

25   testimony in the closed session where he talked about a new

1   technology that would directly benefit consumers and merchants

2   using price information and new technology that he was

3   developing.

4           Those are all examples of the innovation, record

5   evidence of innovation that's been affected by the rules.

6   That's in addition to the general principle that the way you

7   get rewarded for innovating is by getting more business.  And

8   if merchants can't steer to you, that's going to reduce your

9   incentive to innovate and reduce the possibility that

10  innovation will get defused throughout the whole market.

11          So, it's a critical point for the Court to consider.

12  I think in light of the record evidence in this case, there is

13  no likelihood that at any time in the future, there is no

14  record evidence that there is some disruptive effect that is

15  going to wipe out the anticompetitive effects that we see

16  today and, in fact, the evidence says the innovation that

17  might make things better in this market is, if anything, going

18  to be impeded by the rules that are at issue in this case.

19          Let me talk just briefly about the other kinds of

20  direct evidence of price effect of an anticompetitive effect.

21  We're back on slide 19.

22          The Court will recall preference campaigns as

23  another category.  This example goes back way in the

24  early '90s.  Visa was a lot cheaper to merchants than Amex,

25  1.75 percent compared to 3.25 percent.  Visa developed this

1  strategy, Mr. Morgan testified to you, about how to use that

2  price difference to encourage customers to use -- merchants to

3  encourage their customers to use the cheaper Visa card.  They

4  developed this profit wheel and some signs saying we prefer

5  Visa.  This was classic competition on price.  Hey, do more

6  business with us because we're cheaper.  Classic competition

7  on price.  Competition on the merits.  And it worked.  Shares

8  shifted from Amex to Visa where the promotion was used.

9       Amex thought about how to respond.  They considered

10 a long list of ideas including some pro-competitive responses

11 that included various ways to cut prices, but in the end they

12 decided on an anticompetitive response.  They used their

13 anti-steering rules to shut down the preference campaign to

14 stop merchants from doing it and, as they said to themselves

15 internally, we thwarted this preference campaign.

16      Visa wasn't the only network to use a preference

17 campaign.  In fact, the evidence shows that all four networks

18 used them at some point.  Let's remember that MasterCard also

19 used it, using testimony from Ms. Biornstad.  She talked about

20 how they had a deal with Travelocity for a preference.  They

21 compensated Travelocity for that, which was a form of price

22 cut price competition.  Amex came along and said no, no, no,

23 violates the rules, stop it.  Travelocity had to stop it.

24 That price competition ended.  More evidence of a direct price

25 effect.  There was price competition.  It was blocked.

1          I guess there's a side note I should mention because

2   Amex has talked a number of times about MasterCard as a part

3   of the duopoly with Visa.  Of course, the Court knows we've

4   sued MasterCard twice, but it is important to remember just as

5   a factual matter, today Visa and MasterCard are no longer

6   joint ventures of this overlapping set of banks.  The networks

7   were spun off into independent companies and that's the market

8   structure today.  Mr. Morgan talked briefly about that.

9          Value recapture.

10         THE COURT:  Do you think Amex would have survived in

11  the environment that existed when it initiated the NDPs if it

12  hadn't done so against the relatively high market share of

13  Visa and MasterCard?  Was it really a defense mechanism to

14  permit them to survive and compete?  And are we looking at

15  this through a 20/20 hindsight?

16         MR. CONRATH:  I think it's always important to ask

17  yourself are we looking at what happened.  It's easy to look

18  in hindsight, but I think the answer is yes.

19         THE COURT:  Yes to what?

20         MR. CONRATH:  Yes, they would have survived.

21         THE COURT:  Oh.

22         MR. CONRATH:  The other answer would have been a

23  little out of character.

24         THE COURT:  No, I need a clear answer.

25         MR. CONRATH:  No, no, to clarify, let me explain

1   why.

2        It's clear that there was some shift of share in

3   those places, especially those local markets where they used

4   this strategy, but there were a lot of other things going on.

5   The big picture here of what was going on was that Amex was

6   very strong in the travel and entertainment merchants.

7   Historically, that had been their strong point.

8        THE COURT:  Are you going talk about the submarket

9   issue?

10       MR. CONRATH:  I am.

11       THE COURT:  Okay, go ahead.

12       MR. CONRATH:  I could go there now.

13       THE COURT:  I want to make sure we cover everything.

14  See, I don't have a structure.  When I think of it, I ask.

15  Mr. Chesler will find out about that later.

16       MR. CONRATH:  Well, I have a structure, I hope I

17  will get to all of it within the time allotted.  I'm going to

18  do my best.

19       THE COURT:  I teach at six.

20       MR. CONRATH:  Well, maybe you should have said four.

21       So, Amex was very strong in T&E.  Visa and

22  MasterCard were much stronger in sort of what we call the

23  everyday spend.  Each of them was kind of moving into the

24  other's turf which naturally set off competition and they

25  probably both felt threatened by that for sure and it made an

1    effect.

2            And it's true that Amex had some troubles at that

3    time and I think -- I'm not sure I can remember all the

4    questions we went through on this topic, I think with

5    Mr. Chenault, perhaps -- I think that's correct, but Amex had

6    decided to introduce a credit card in addition to their charge

7    card services, the Optima, which they had a lot of troubles

8    with.  It wasn't really successful, but it was another way

9    they were moving into the turf of the others.  It was a good

10   thing, that's a pro-competitive thing, but it didn't go very

11   well for them for a while, so they had some troubles from

12   that.

13           And they were trying to be a financial supermarket,

14   something for everyone, which maybe put some pressure on the

15   management.  I think Mr. Chenault acknowledged that they had a

16   bunch of problems, so American Express did have some rocky

17   period.  The idea that it was all the result of the Visa

18   preference campaign, which is frankly, not supported by the

19   evidence in the record.

20           Also, if you look closely at the evidence on this

21   question, what was happening also is credit card use in the

22   economy generally was growing.  So, it is true that

23   American Express's market share was declining, but the

24   reason -- and I think this is in Mr. Chenault's speech and

25   perhaps other evidence in the record, the speech that he

1    cited -- says that they were growing less slowly than Visa and

2    MasterCard.  So, when I say they lost share, that's certainly

3    correct.  That's not the same as saying they lost volume.

4    They were growing like this.  Visa and MasterCard were growing

5    like this.  That meant American Express's share was growing,

6    that's not the same as saying they were in danger of not

7    surviving.

8            Now, if they didn't react, if they didn't do what

9    Mr. Chenault came in and explained he did and was his job and

10   maybe is part of the reason why he's there today, because he

11   knew how to face a competitive challenge and respond to it,

12   what they did is they moved into everyday spend.  His insight

13   was we can't survive as just a travel and entertainment card.

14   We need to move into the rest of the market.  They did that.

15   They did that and that's why they succeeded and some of the

16   other travel and entertainment only cards didn't.  But that

17   was a result of competition.  They were competing and they

18   figured out a way to do it successfully and that's why they

19   are successful and today they're in every kind of business.

20           They have coverage of over 90 percent of the credit

21   card spending in the United States and that's why I say would

22   they have survived in the face of some merchants putting up

23   signs saying we prefer Visa?  Yes, they would have had to

24   compete harder.  Maybe they wouldn't have been able to keep a

25   3.25 percent as compared to 1.75 percent price differential

1   for as long as they did but sure, they could compete and

2   succeed in this market.

3           Let me just sum up on this, what's on slide 25.

4           What we've proved on the anticompetitive effect

5   point is that what's harm to the competitive process is a

6   broken link between cutting your price and increasing your

7   business.  There was a direct effect on prices, prices went

8   up, Discover's prices went up, the other companies didn't have

9   to respond to Discover's prices.  The price competition in the

10  form of preference campaigns existed, then it was stopped.

11  And there's also evidence of the harm to innovation which

12  eventually lead to a harm on output and quality.  And this is

13  proved through merchants explaining it, all three competitors

14  explaining it, some concessions from Amex and also, expert

15  testimony.

16          And this effect was a market-wide effect.  It's not

17  just a narrow effect on the percentage of the business that

18  Amex has because their rules are in marketplaces that cover

19  over 90 percent of credit card spend, the effect of these

20  rules is throughout the market.

21          So, what does Amex say about this?  Well, the main

22  thing they have to say about this is to criticize the legal

23  standard that we're applying and say well, no, no, no, you're

24  relying on Indiana Federation of Dentists and you're using it

25  wrong.  I'm going to tell you why that's not right.

1          Indiana Federation of Dentists, Supreme Court

2    confirmed that direct anticompetitive effects can be shown by

3    harm to the competitive process.  Amex claims that that test

4    is only available for the quick-look type of antitrust

5    analysis, but Todd v. Exxon in this Circuit confirmed that

6    Indiana Federation is not limited to quick-look cases.

7          And then, Amex wants to say well, you can't rely on

8    looking at the harm to the competitive process, at least in a

9    vertical case without empirical evidence the prices would be

10   higher or quality would increase.  Well, none of the cases

11   they cite for that proposition make that ruling.  The cases

12   they cite looked at the evidence that was at issue in those

13   cases, but they did not say that was the only kind of possible

14   evidence that applies to Todd, KMB, Tops, Capital Imaging.

15         In any event, in this case the Court didn't have to

16   reach that because we proved price effects, we proved quality

17   and innovation effects far beyond the burden that's been

18   required in any case before this.  There's concrete proof

19   actual competition that existed and was squelched, there's

20   plenty of hard facts in this case about anticompetitive effect

21   and so we meet whatever standard the Court concludes is the

22   correct one in this case.

23         THE COURT:  Well, isn't American Express saying in

24   its post-trial papers that this is a two-sided market and

25   looking only at the discount rate only looks at one side of

1  the market, and what you really need to do and you haven't

2  done it, is to prove a net anticompetitive effect on both

3  sides of the market and they have a unique business strategy,

4  the value proposition strategy and that addresses both sides

5  of the market and you haven't done it, so you lose?

6           I think, in a nutshell.

7           MR. CONRATH:  In a nutshell, that's their argument,

8  yes.

9           THE COURT:  So, what about that?

10          MR. CONRATH:  Okay.  Well, let's go to page 68.

11          THE COURT:  Oh, we're moving on.

12          MR. CONRATH:  We're moving right along.  We might

13 have to go back and touch some of those earlier pages if you

14 permit me the time.

15          THE COURT:  You're talking about the anticompetitive

16 effect on one side of the market and they're saying you've got

17 to look at the whole picture.

18          Go ahead.

19          MR. CONRATH:  So, let's talk about this because

20 really, they talked a lot about two-sidedness, they talked

21 about it in connection with market definition, competitive

22 effect and their justifications.

23

24          (Continued on following page.)

25

1        MR. CONRATH:  So, here's the core of what they're

2    saying.  It's all right if there's harm for merchants.

3    Merchants pay higher prices because of the restriction on

4    competition, but we can trump that because we say there's some

5    benefits to cardholders on this side.

6        There's no case that stands for that proposition.

7    No case.  No cited case that stands for the proposition or

8    anything even remotely like that.  No court has decided that

9    harm on one side of a two-sided platform can be offset by

10   benefits on the other side.

11       It is true that this market has two-sided

12   characteristics.  It's a fact about the market and has to be

13   considered.  Professor Katz testified he did it throughout his

14   testimony.  Every market has particular facts that you've got

15   to consider.  That's one of them in this market.  But courts

16   have been considering two-sided industries for years using

17   regular antitrust tools that are, and not doing the kind of

18   revolutionary turning the analysis upside down that really is

19   what AMEX is asking here.

20       If you look, the Times Picayune is the first

21   quotation you have there which is a newspaper market everyone

22   recognizes is two-sided.  What the court says is that every

23   newspaper is in two separate though interdependent markets and

24   it says this case only concerns one of those markets.

25       Now, AMEX tries -- so let's talk about market

1   definition first because AMEX tries to put the two side issues

2   into market definition and also talk about it in connection

3   with effects.

4        The way they try to put this into the market

5   definition question is to say that you should define a market

6   for transactions.  That's their way of putting all the

7   two-sided issues in the market definition.  It's also their

8   way of trying to make it part of the plaintiffs' burden.  They

9   want to get credit for anything happening to cardholders by

10  putting it in the same market with merchants.

11       Now, this approach is wrong in the way of thinking

12  about market definition because they're insisting on putting

13  things into the market that are not reasonably interchangeable

14  and reasonable interchangeability is the litmus test for

15  market definition.

16       So we can understand what's wrong with this by

17  looking at two slides where AMEX describes the credit card

18  industry.  One's in the ordinary course of business and one's

19  in this trial.

20       Let's take a look at the next slide.  This is the

21  ordinary course of business document.  This is a presentation

22  by Mr. Gilligan to the board of directors in 2010.  It shows

23  how AMEX thinks about the credit card industry.  You'll note

24  there are five entities on this chart.  You've got the

25  cardholder down on the lower right, the card issuer, the

1    network, the acquirer and the merchant.

2            You can see on this chart the two separate markets

3    which are part of it that were defined by the court in U.S. v.

4    Visa.  Markets that were in a minute, as we'll see, those two

5    markets would be lumped together by AMEX into a single market

6    for transactions the way they're, in what they're asking this

7    Court to do.  You see the lines on the right there between

8    issuers and cardholders.  That's what's going on in the market

9    for credit cards, the competition among issuers, AMEX and

10   banks, to provide cards to cardholders.  That was one market

11   in U.S. v. Visa.

12           Now, look in the middle.  The network there is

13   selling services to the card issuer and to the merchants and

14   you can see in this, one other feature of this presentation,

15   the kind of the light blue box that's around the issuer, the

16   network and the acquirer reflecting the fact that for some

17   transactions, AMEX itself is the issuer and for many

18   transactions, AMEX itself is the acquirer, it's always the

19   network for AMEX transactions, but it's true that AMEX also

20   deals with some third-party issuers like Wells Fargo Bank and,

21   as you heard testimony, it deals with some merchant acquirers,

22   it deals with merchants sometimes directly and sometimes

23   through acquirers.

24           When we look in the middle there, the network is

25   selling services to issuers and to merchants.  The main focus

1   in U.S. v. Visa was competition among networks in selling

2   services to issuers, that was the restriction that we wanted

3   the court to stop, and that was the other market in USA v.

4   Visa, network services being sold to issuers.  There's another

5   set of services sold to merchants as well.  Notice what's in

6   these two markets is not interchangeable.  If the cardholders

7   in the market for cards feel the price of credit cards is too

8   high, they can't decide to substitute some network services.

9   Those things are not interchangeable.

10          What AMEX wants to do with this market for

11  transactions is sweep together the competition among issuers

12  for cardholders and the competition among networks for issuers

13  along with the competition that's at issue in this case which

14  is the competition among networks for merchants all into one

15  market and we can see that on the next slide.

16          The next slide allows us to compare how AMEX

17  describes the market in this courtroom as compared with what

18  it was describing in the board room.

19          This slide is from Professor Gilbert's presentation.

20  It says at the top there, The product at issue is the

21  transaction.  And when we asked Professor Gilbert about that,

22  he said what that means is the flow around this whole loop

23  between the consumers and merchants, this whole thing on the

24  slide.  Professor Bernheim adopts that, that definition.

25          Well, what's wrong with that?  Well, one of the

1   things that's wrong with that is it just, it combines things

2   that aren't interchangeable.  If merchants face higher prices,

3   they can't substitute more credit cards.  There's different

4   competitions going on, there's -- and that's why it ultimately

5   is right to define them as different markets.  AMEX can point

6   to no court that has found anything like this as the relevant

7   market.

8           AMEX itself, let's remember, a few years ago,

9   alleged separate markets for network services and for card

10  issuance when it sued Visa and MasterCard and collected a

11  substantial settlement on that theory.  So this claimed market

12  definition just doesn't add up.  You see what's happening is

13  there is a lot of competition among issuers to sell cards to

14  cardholders.  AMEX wants to take credit for that and say well,

15  therefore, you can ignore the fact that there isn't price

16  competition among networks for merchants, but one of those

17  does not offset the other because they're not interchangeable.

18  But AMEX raises this issue and pushes it also in the context

19  of the effects.

20          Let's talk about how to consider two-sidedness in a

21  legal framework and go through the possibilities.  So, the

22  standard approach is quite direct, and it's what we think the

23  approach the Court should follow.

24          A two-sided platform, like a credit card network or

25  a newspaper, sells to two groups of customers.  Each group of

1  customers is entitled to the benefits of competition, is

2  entitled to the protection of the Sherman Act.  So, we are

3  here as a government enforcement case but imagine, and maybe

4  you can imagine it, a case where the merchants are the

5  plaintiffs, coming into court and saying we're injured by --

6            THE COURT:  I have a case like that.

7            MR. CONRATH:  I think you do.

8            -- we're injured, we're injured by a restriction on

9  competition.  There's a direct harm on the price setting, a

10 direct restriction of the price setting mechanism and it hurts

11 us.  What AMEX would have you say is sorry, merchants, there's

12 some other people, cardholders, they get a benefit, you don't

13 have to worry about it.

14           The antitrust laws protect competition wherever it

15 shows up and the way to think about the credit card industry

16 is, look, there are network services that are sold to issuers

17 and some of those get resold, then that is input in the

18 competition for cardholders.  There are network services sold

19 to merchants and the merchants are entitled to the benefit of

20 that competition without saying cardholders are better off.

21           That's, we think, the right approach.  It follows

22 Times Picayune.  It doesn't involve any complicated putting

23 together of one kind of competition with a different kind of

24 competition.

25           THE COURT:  Well, I think the other side is going to

1  say that they have a unique model and that it defies the

2  general analysis that you very clearly have posited.

3          What do you say about that?

4          MR. CONRATH:  Okay.  I saw a couple of things, so

5  hold with me here while I go through a couple.

6          THE COURT:  No, go ahead.  I'm just trying to move

7  on.

8          MR. CONRATH:  I'm doing my best.

9          THE COURT:  No, it raises the issue --

10         MR. CONRATH:  It does.  It does.

11         THE COURT:  -- that they raise in response to the --

12         MR. CONRATH:  Right.

13         THE COURT:  -- you know, the case law that this is,

14 this may be, you know, we have now moved into new territory in

15 antitrust analysis.  So unfortunately, it's in this

16 courtroom --

17         MR. CONRATH:  Yes.

18         THE COURT:  -- where we may be moving into that

19 territory, but I want to know what your response is to that

20 kind of argument.

21         MR. CONRATH:  Well --

22         THE COURT:  Go ahead.  Do it in your own time.

23         MR. CONRATH:  Let me take it at a high level and

24 then go back to where I was going to go.  This is an important

25 issue.  They're making a big deal of it and I want to take the

1    time to walk through it.

2          At a very high level, what they're saying is very

3    much, ah, this is a new thing, courts have never heard of it

4    in 120 years of the Sherman Act and you should do something

5    different.  That is the essence of what they're saying,

6    something no court has ever done before, but what's the logic

7    behind that?

8          We've discovered something special that lets us

9    block the kind of competition that we don't like on price for

10   merchants, force all the competition in the market into the

11   kind of competition that we do like which is competition on

12   being, on rewards for cardholders, and we should get to do

13   that even though other firms might choose a different kind of

14   competition.

15         The AMEX -- if the antitrust laws stand for one

16   thing is that I, as a competitor, don't get to dictate how my

17   rivals compete and if you accept the argument that American

18   Express is making, that's what they're saying:  We've got this

19   special model and we ought to be able to impose it on the

20   industry and make everybody try to be like us.  The antitrust

21   laws just can't be warped that far out of shape because

22   they're about letting the market work.  What the principle of

23   the antitrust law is not that we need a particular outcome, we

24   need a particular price.  The principle is Congress said

25   competition is the rule of the day and we're going to trust

1    the market participants, in this case, we're going to trust

2    merchants, cardholders, networks, making free and independent

3    decisions to come up with an outcome.  What AMEX is suggesting

4    is, no, no, if we've got an idea of how we want to compete, we

5    need to make sure nobody else can disrupt that, and that just,

6    you can't push the antitrust laws there.  That's

7    protectionism, not competition.

8           There is a way, and I think what I first described

9    is the right way to think about this, but an alternative

10   finding the Court might consider making is to think about

11   considering these pro-competitive benefits that AMEX says it

12   can provide in the kind of standard framework of Section 1

13   analysis.

14          First, the plaintiff proves an adverse

15   anti-competitive effect.  Defendant has an opportunity and the

16   burden to establish that there is some pro-competitive effects

17   that offset it.  Normally, the normal rule would be those

18   pro-competitive effects ought to be in the same market, but if

19   those are to be considered, that's where they belong, that's

20   who the burden belongs on.

21          If the Court goes there, we should win anyway

22   because AMEX has failed to meet that burden.  The evidence

23   that was produced at trial just doesn't prove what AMEX would

24   have to prove under that standard.  The evidence shows that

25   the anti-steering rules harm competition among networks for

1  merchant business and lead to higher prices.  AMEX hasn't

2  proved that the anti-steering rules generate enough benefits

3  on this other side to outweigh their anti-competitive arms.

4         They can't prove that because though some of these

5  facts are in the record and that steering rules increase cost

6  to merchants and merchants have to recover those costs from

7  all of their customers, not just the ones who pay with credit

8  cards.  So all customers pay some higher prices reflecting the

9  high costs of credit cards including those who pay with no

10  rewards cards, with either debit cards, checks and cash.  At

11  best, only AMEX cardholders or maybe other rewards cardholders

12  benefit from this kind of differentiated business model that

13  AMEX is telling you is the reason why you should do something

14  new and unprecedented.

15         AMEX offered no evidence, no evidence to explain how

16  the benefits that AMEX cardholders and other rewards

17  cardholders get offset the higher prices that are imposed on

18  the every day consumers of all the merchants who take American

19  Express credit cards in the form of higher retail prices.

20  They offered no evidence to try to explain how those are

21  offset.

22         (Continued on next page.)

23

24

25

1  (CONTINUING)

2        MR. CONRATH:  And, let's think about some of the

3  other evidence.  The evidence in the record shows that if we

4  think about what's the effect on cardholders and customers, if

5  merchant steering is allowed, sometimes cardholders and

6  customers are going to get a direct effect.

7        So, for example, I think we talked about an example

8  like this during trial, a customer goes in to Best Buy or

9  Sears and wants to buy a refrigerator, wants to use a credit

10 card.  The customer, if merchant steering was allowed, might

11 get the choice, do I use my American Express card I'll get

12 some reward later and maybe that would be good for me or do I

13 use my Discover card?  Maybe I can get 40 bucks off right now.

14       The customer, the customer doesn't get that choice

15 today.  If the customer could get that choice, then the

16 customer could choose which do I value more?  Do I value these

17 American Express rewards that I'm going to get later or do I

18 value the 40 bucks off today?  That's a choice the customer

19 makes.  It's a choice that's denied to the customer under the

20 current system.

21       THE COURT:  Why is that denied to the customer as

22 long as the customer makes the choice without any prompting

23 from the merchant?

24       MR. CONRATH:  Because the merchant can't offer him

25 the 40 bucks off.

 1          THE COURT:  You're saying 40 bucks off the --

 2          MR. CONRATH:  Refrigerator price.

 3          THE COURT:  -- purchase price as opposed to the

 4   rebate that the Discover card permits.

 5          MR. CONRATH:  Right, right.

 6          THE COURT:  Okay, got it.

 7          MR. CONRATH:  The danger of using a concrete

 8   example, Your Honor.

 9          THE COURT:  I understand now.

10          MR. CONRATH:  If the merchant's trying to steer

11   customers to a lower priced card, one of the ways it might do

12   it is by offering a discount.

13          THE COURT:  Right.

14          MR. CONRATH:  The customer gets to make that choice.

15          So, the current rule by Amex doesn't let that

16   customer have that choice.  Some customers might prefer the

17   immediate discount.  So, if we're talking about what is the

18   net effect on the cardholder side of the market, we don't just

19   think of the Amex rewards as a total benefit because there's

20   this other effect.  The customer doesn't get the immediate

21   benefit that he or she might have wanted.

22          Amex doesn't offer evidence that allows you to sort

23   out why it is that that loss of competition makes the customer

24   better off.  Basically, Amex is saying we know what the

25   customer wants, they shouldn't have that choice and there's no

1    way they can meet the burden of establishing that that's a

2    pro-competitive benefit.  It's an anticompetitive effect, in

3    fact, on the other side.

4           And finally, the other reason why Amex can't meet

5    this burden is that without the steering rules, merchants

6    would steer more frequently, as they explained at trial and

7    one of the things the issuers might do, including Amex, is

8    think what do I do if I want to make my cardholders less

9    amenable to steering?  Well, one thing I might do is increase

10   their reward, make it more attractive to them.

11          Mr. Funda testified about this.  That would be a

12   benefit to cardholders of more competition and American

13   Express has no explanation, no consideration of how it offsets

14   that, how that effect of their anti-steering rules, which is a

15   harm not only to issuers but to cardholders, they don't try to

16   offset that or explain why they meet their burden considering

17   the effect of their model.

18          There is a third possible approach, which I believe

19   is Amex's approach that it's incorrect.  If I understand their

20   argument, they say that the burden on plaintiffs is not only

21   to prove that the anti-steering laws harm competition for

22   merchants, but also to disprove the idea that the

23   anti-steering rules generate offsetting benefits for

24   customers.  So, they put all the burden on the plaintiff, not

25   only prove the harm to merchants, disprove the benefits to

1    merchants.

2              THE COURT:  To?

3              MR. CONRATH:  Benefit to cardholders.

4              THE COURT:  Cardholders.

5              MR. CONRATH:  Thank you, Your Honor.

6              First, let's point out they can't point to any case

7    that supports that proposition.  This approach would

8    dramatically alter antitrust analysis in any market with a

9    two-sided platform; newspapers, real estate, software, in

10   addition to credit card industry.  Even under this approach,

11   plaintiffs would prevail because the evidence that's in the

12   record actually enables the Court to find that the plaintiffs

13   have met this burden.  Why is that?

14             Evidence in the record shows that the anti-steering

15   rules harm competition among networks for merchant business.

16   The effect of that is higher prices for networks.  Amex does

17   not pass on all the revenue it takes from those higher prices

18   to its cardholders in the form of reward.  Neither in total,

19   nor in a marginal basis; that is, every extra dollar it gets

20   in revenue for merchants gets passed on to cardholders.  The

21   evidence does not establish this.  In fact, it establishes

22   that it does not happen.  Amex's CFO quoted by Professor Katz,

23   which he says is consistent with economic theory says if

24   merchant prices are higher, some of that's going go to Amex's

25   bottom line even if some it eventually goes to the

1    cardholders.  So, what's the net effect?

2            If plaintiffs incorrectly have to prove the net

3    effect, what's the net effect?  Higher prices for merchants,

4    only some of it is an offsetting benefit for cardholders.  The

5    net effect, if you really have to add the net effect, is

6    overall harm on the two side of sides of this platform.  So,

7    even under Amex's extreme and let me emphasize unwarranted

8    interpretation of the law, plaintiffs should prevail.

9            If you take the logic of Amex's approach just to see

10   what's wrong with it to its extreme, they're saying -- I mean,

11   it doesn't necessarily apply only to them.  This is a

12   two-sided market for everybody.  They're saying Visa could do

13   whatever it wants to stick it to merchants and as long as

14   there are benefits to cardholders, there's nothing anybody can

15   do about it.  That's the logic of Amex's position.

16           Amex's view is, I think, based on the kind of a

17   fundamentally wrong idea that is not supported factually in

18   the record.  It is that is there's some kind of inexorable

19   simple relationship between merchant prices and cardholder

20   benefits.  Merchant prices go up, cardholder prices go down,

21   and the reverse.

22           Well, you can maybe write a theoretical model that

23   shows that but the real world is more complicated than that

24   because there's a lot of other competitive factors going on.

25   Just to mention a few, cardholder fees, interest income, how

1    broadly your card is spread out.

2         THE COURT:  Well, you are leaving out shareholder

3    pressures.

4         MR. CONRATH:  Yes.

5         THE COURT:  The market, you know, there is another

6    market involved here and that is the stock market.  This is

7    not a not-for-profit corporation where they are just passing

8    along long the benefits from the discount rate to the

9    cardholder in terms of reward.  There is something in the

10   middle, too.  So, I just point that out to you, that I

11   understand that as a consumer.  You don't have to be a judge.

12   If you are alive in 2014, you understand that everyone has an

13   interest.

14        MR. CONRATH:  Yes.  Absolutely.

15        And Amex has to, absolutely has to figure out a way

16   to compete in a way that enables it to make a return to

17   shareholder.

18        THE COURT:  That was mentioned in testimony as well.

19        MR. CONRATH:  It's been mentioned in every antitrust

20   case I've ever been involved in, Your Honor.

21        THE COURT:  I thought I had mention it here.

22        MR. CONRATH:  We wouldn't want to let it go

23   unmentioned, I would feel disappointed.

24        THE COURT:  Thank you.

25        MR. CONRATH:  But it's important to take the context

1    of that because the idea that we get to block competition from

2    our rivals in order to earn more profits, it is not a

3    proposition that is defended in the antitrust laws.  That is

4    what we have heard, I think.

5           I think, if I get down here a little ways, I'm going

6    to say that's what this comes down to.  That's what this comes

7    down to.  They're saying we need to be protected from

8    competition so that we can earn more profits and that's not a

9    defense that's cognizable under the antitrust laws.  What

10   you're entitled to under the antitrust laws is the opportunity

11   to try your particular model, to try to offer your product.

12   You don't get a guarantee.

13          If the market doesn't respond, if merchants and

14   cardholders together, issuers, third-party business don't

15   accept your product, then you will face lower profits.  If you

16   make something that merchants and other consumers really like,

17   you get higher profits.  That's the way the competitive free

18   market works.  So, it's absolutely right to understand that

19   American Express is motivated by profit.  They should be.

20   That's what made this country great.  They've got to keep

21   trying to do a good job, but it doesn't give them a free pass

22   from facing competition.

23          And so, this brings us, frankly, to their defense,

24   but before I do that, I want to go on to this next point which

25   is to note that Discover is another entity in this market that

1    is also a closed loop, they're an issuer, an acquirer and a

2    network.  They don't share this inexorable up and down view

3    that is implicit in Amex's argument.  You can see that here in

4    the testimony from Mr. Hochschild.

5            We asked him when you set your prices for merchants

6    for accepting Discover card, do you consider the reward?  No.

7    If you increase the cost to your reward, in your view does it

8    justify telling a merchant that his price is higher?  No.  So,

9    there's another market participant that is similarly situated

10   in some ways to American Express that doesn't take this same

11   up one down the other point of view.  So, it's not the only

12   way to look at the market.

13           So, what does this two-sidedness argument come down

14   to?  In a way, it really comes down to we're entitled to

15   protection for our way of doing business.  We heard this in a

16   couple forms in the course of the trial.  The first form that

17   we heard it in was the suggestion that American Express would

18   go out of business if the anti-steering laws were removed.

19   Now, this was an argument that wasn't made in the answer or in

20   any expert report or in motion practice or I think even in

21   Amex's Pre-Trial brief or opening.  It showed up during the

22   trial and frankly, the weight of the evidence did not support

23   that extreme form of its claim.

24           You remember Mr. Gilligan and maybe it was clear to

25   everybody in the courtroom than it might be on the cold

1   record, his response to the idea that American Express would

2   go out of business could probably be characterized as

3   disbelief.  He said well, I plan to work here for another ten

4   years until I retire.  Amex's testifying experts didn't

5   support the claim that Amex would go out of business.  Amex

6   had an expert whose job was to talk about profitability.  He

7   didn't come to trial.

8           In short, the evidence just didn't back up the claim

9   that Amex would go out of business if it didn't have

10  anti-steering rules.  But if the Court will recall, you can't

11  really be too harsh on American Express for presenting this

12  because the claim that we're going to go out of business if we

13  have to face some new competition is something that's commonly

14  said by antitrust defendants who might be antitrust

15  defendants.

16          And the Court remembers the examples of the Visa

17  executive who testified in U.S. v. Visa that if the Court

18  ruled for the United States, Visa would disappear or the

19  MasterCard executive who testified that it would be a

20  shattered drawing put those into that same -- the statements

21  by American Express into that same category with those

22  statements.

23          THE COURT:  Well, I, just as a surmise, I took that

24  comment by Mr. Chenault as not so much a definitive

25  conclusion, but as a statement of great concern that if the

1  Amex business model no longer had viability because of an

2  antitrust violation, that it would be a great challenge to a

3  corporation which rested its profitability on such a business

4  model to make adjustments and that that would be something

5  that could cause major changes.  And so, uncertainties.

6          So, that's how I looked at it.  And I think that's a

7  fair reading of it as opposed to we're just going to go out of

8  business.  So, I understood it to be -- it was dramatic, but I

9  don't think it was meant to be absolutely definitive.

10          And I will ask Mr. Chesler about that, too.  I'm

11  hoping he will agree with me.  We will get there.  We will get

12  there.

13          MR. CONRATH:  I think that's a reasonable

14  interpretation.

15          THE COURT:  So, I don't want to look at that in the

16  extreme, all right?

17          MR. CONRATH:  And there is a softer version of that,

18  is the way I would put it, which is we need these rules to

19  protect our differentiated business model.

20          THE COURT:  Mr. Conrath, could we take a short

21  break?

22          MR. CONRATH:  That would be great, Your Honor.

23          THE COURT:  Let's take a ten-minute break and then

24  you can resume.

25          (Recess taken.)

1          (In open court.)

2          (Judge NICHOLAS G. GARAUFIS enters the courtroom.)

3          THE COURTROOM DEPUTY:  All rise.

4          THE COURT:  Please, be seated.

5          All right, just try to speak directly into

6    microphone, there are some microphone issues.

7          Thank you, you may proceed.

8    BY MR. CONRATH:  (Continuing)

9          MR. CONRATH:  All right.

10         Your Honor, what I hope to do now, I took advantage

11   of the break to look through and make sure I can efficiently

12   use my time.  What I'd like to do is go back to a couple of

13   other issues and then, not forgetting where we were in that

14   discussion, but I think I can work that in better if I go back

15   and answer some of the other questions, including about the

16   market and get back to that.  So, I'm not forgetting that, but

17   I'm going to try do that and streamline the presentation so we

18   can use the time efficiently.

19         THE COURT:  Very well, go ahead.

20         MR. CONRATH:  So, I am on slide 26.

21         So, we talked a little about market definition in

22   the context of two-sidedness.  I just want to touch that

23   because that was also another important theme of American

24   Express.

25         The Court will recall that the other dispute in this

1   was all about debit and how to think about debit, so let's

2   remember that the Supreme Court has reminded us in Continental

3   and Brown Shoe that market definition isn't to be used to

4   obscure competition, but to recognize competition where, in

5   fact, competition exists.

6           The standard of market definition is reasonable

7   interchangeability.  That's well-established.  And under the

8   antitrust laws, they tell us a way to address reasonable

9   interchangeability and it's this, and I'm going to summarize a

10  lot of what the evidence is and what the legal principles are

11  on market definition.

12          What the Courts tell us to look at on the question

13  of what's in the market and what's not, what's reasonably

14  interchangeable and what's not, is to ask this question.  If

15  the credit card networks all got together and raised the

16  prices to merchants, what could the merchant do about it?  If

17  the answer is what the merchant could do is turn to some other

18  product and defeat the price increase, then that other product

19  belongs in the relevant market.  So, if merchants could shift

20  to debit and defeat a price increase by credit card networks,

21  then debit's in the market.  But if they could not, then debit

22  is not in the market.

23          There is a standard way of implementing this past

24  the reasonable interchangeability.  It's the hypothetical

25  monopolist test.  Professor Katz did it.  He found the

1    relevant market that the Court has heard about.

2          American Express's economist recognized that that's

3    an appropriate way to define relevant markets.

4    Professor Bernheim even testified that only once before had he

5    ever offered an expert opinion on market definition without

6    using a hypothetical monopolist test, but the American Express

7    economist did not do it here.

8          Let's talk through the basic logic of how

9    Professor Katz defined market using the hypothetical

10   monopolist test.

11         We start by noting that merchant demand to accept

12   credit cards is derived from consumer demand.  Now,

13   American Express articulates that same point, but they act as

14   if that's the end of the analysis instead of the beginning.

15   As a result, most of the American Express evidence on this

16   subject winds up asking the wrong question.  They only asked

17   about cardholders and not about merchants.  Remember, market

18   definition, reasonable interchangeability, hypothetical

19   monopolist test, they're all about what happens in response to

20   a small price exchange.  If the hypothetical monopolist tries

21   to raise the price the merchants pay, then they make that

22   price increase stick.

23         Amex's answer to that is well, let's see if

24   cardholders could switch to debit.  That's the wrong question,

25   why would cardholders switch to debit?  They don't see the

1   price increases.  Not only do they pay it -- at least not

2   directly -- they don't see it's there.  The person who pays it

3   is the merchant.  That's who we've got to ask about, that's

4   what Professor Katz did.  As he explained, when you think

5   about that, the question you have to ask is could merchants

6   stop taking credit card and just rely on debit cards?  If

7   they're really in the same market, if they're really good

8   substitutes, that ought to happen.

9         What merchants think about when they do that is what

10  would happen to me if I stopped taking credit cards?  We know

11  the answer because we asked a lot of merchants whether that

12  was a realistic possibility, but the logic behind it is look

13  there's a core group of customers who want to use credit cards

14  or who need to use credit cards.  If I, the merchant, don't

15  take credit cards, I'm going to lose a substantial chunk of

16  those core customers who want to pay with credit cards.

17  American Express recognizes this concept.  You will remember

18  the testimony about compartmentalizing the spend.

19

20         (Continued on following page.)

21

22

23

24

25

1    MR. CONRATH:  And we asked merchants -- I'm going to

2   skip over a lot of evidence in the interest of time here,

3   but -- we asked merchants, Could you drop credit cards?  None

4   of those merchants came in and said that what AMEX's theory is

5   is correct.  None of those Americans said, No, no, I don't

6   have to worry about credit cards.  I could solve all my

7   problems with debits cards.

8        They all explained realistically to take credit

9   cards is an essential and important part of doing business.

10   Let's draw on the one that I remember, Mr. Bouchard from Sears

11   says, We sell a lot of refrigerators and stoves.  A lot of

12   people need to pay for those over time.  They need to use a

13   credit card.  We don't take credit cards.  We are not making

14   those sales.  You multiply that over merchant after merchant

15   after merchant, their core customers, merchants can't drop

16   credit cards.  A merchant cannot substitute debit card

17   acceptance for credit card acceptance.

18        The Court asked me to focus specifically about

19   Travel and Entertainment merchants.  Let's talk about the

20   submarket, the price discrimination market.

21        We tried and Professor Katz talked about within the

22   broader credit card market, credit card services to merchants

23   market a relevant market, a submarket, for T&E merchants,

24   Professor Katz explained.  And we cited the relevant law in

25   our papers, the proposition that we are applying here.

1          It's appropriate, if there's a group of customers

2     that can be targeted and are more vulnerable to a price

3     increase than the general market, to define a narrower market

4     and look at that and ask, Is this an area in which competition

5     could be harmed, higher prices could be imposed?  Professor

6     Katz did the same analysis and concluded, Yes, this is an area

7     where competition could be harmed.

8          AMEX, I think, has three criticisms of that

9     analysis, and let's go through each one.  The first one is the

10    question whether price discrimination is even possible.

11         The Court remembers a lot of testimony, I suspect,

12    from merchants who are paying widely different prices.

13    Merchants pay widely different prices.  AMEX says, Well,

14    that's not enough.  You have to ask prices compared to costs

15    in order to ask whether really it's price discrimination

16    that's going on.  Well, let's look at that.

17         If we look at slide 40, which is a place with an

18    internal AMEX document where AMEX did exactly that.  This

19    document is a presentation that was made to Ed Gilligan and

20    Bill Glenn.  It's from the division of American Express that

21    deals with Travel and Entertainment Industries, TEI, and it

22    talks about the concept of industry-specific variable

23    contributions, which is basically revenues, minus costs, and

24    they calculate them for industry by industry.

25         You can see the conclusion they reach.  It's right

1  in the middle there.  It says "TEI" -- Travel and

2  Entertainment --  "has some of the highest industry-variable

3  contributions in Merchant Services U.S. what that tells you

4  is, there is price discrimination.  Even when you think about

5  cost, they are getting a higher margin out of the Travel and

6  Entertainment Industries.  That's price discrimination.  It

7  happens.  It is possible.

8          You can look at the exact numbers here.  They are

9  redacted from the public versions.  In the slide, you can just

10  compare the T&E variable-contribution margins for car rentals,

11  lodging and the others to the -- to the blue box with the

12  yellow below.  Looking at the rest of Merchant Services U.S.,

13  you can see, yes, there is, even when you take costs into

14  account, there are higher prices for T&E. That first criticism

15  doesn't hold water when you look at the facts.

16          The second criticism American Express makes, they

17  accuse us of not defining the boundaries of the T&E market

18  precisely enough.  There's plenty of evidence in the record on

19  this point.

20          The next document really just sums it all up.  What

21  is T&E?  It is a well established proposition.  The previous

22  document was AMEX's own division for Travel and Entertainment.

23  This document is another document.  It lists exactly the

24  categories that we're talking about when we talk about Travel

25  and Entertainment, and it even lists many of the largest

1    merchants, the managed merchants in those categories.

2            So what is T&E?  It is well established in the

3    record.  That's clear.  That's not a valid criticism.  The

4    final criticism they make is a little different.  It's one

5    that I have never heard before.  It is that no firm, they say,

6    could do business and sustain itself only in T&E. Well, that's

7    a little bit of a red herring.  There's no authority that they

8    have cited for the proposition that a relevant market has to

9    be something in which a firm could sustain itself.  They cite

10   no authority for that proposition, and for the well-known

11   reason that it's often the case that firms sustain themselves

12   by competing in a variety of different markets.

13           And the Court, I think, heard the testimony on one

14   of the most obvious examples of this, which is airlines, where

15   it's well established that the relevant markets in airline

16   industries are city pairs, so the competition between New York

17   and Houston is different than the competition between Chicago

18   and Dallas.  And yet no firm could sustain and no airline

19   could sustain itself today serving just one of those relevant

20   markets; that is, New York to Houston or Chicago to Dallas.

21   Just to be an airline, you have to compete in a variety of

22   different markets.  That's true.

23           That doesn't get in the way of answering the

24   relevant question from an antitrust perspective, which is, is

25   there a market where competition could be harmed?  And the

1   answer to that in the airline industry is, Yes, for a city

2   pair.  It is also yes in this industry for Travel and

3   Entertainment.  Merchants within that sector are more

4   vulnerable, because they are more dependent on credit cards

5   and more dependent on American Express than merchants in other

6   sectors.

7           THE COURT:  Is that really a fair analogy?  In the

8   case of city pair comparison, first of all, in terms of

9   mergers, there's a lot of activity on the part of regulators,

10  including the Justice Department, in identifying potential

11  antitrust implications of proposed mergers.

12          In this situation, slide 41, you're talking about a

13  wide range of merchants, hundreds, thousands of merchants, and

14  you're not so particularized to two or three merchants

15  competing on a rarified basis between New York/Chicago or

16  San Francisco/Miami or whatever.  Is there a difference if

17  you've got a wide range of merchants, as opposed to an

18  industry where there are very few competitors?

19          MR. CONRATH:  So, I think maybe I should do a better

20  job of making the analogy.  I think the answer is that the

21  comparison is appropriate.  There are a few competitors in the

22  airline industry.  Airlines are the sellers in the airline

23  markets.  The buyers are diffuse.  They are all of us who

24  travel.  Those are the customers.  So, the competition is

25  among the airlines to sell people who want to get from

1    New York to Houston.  In the credit card space, there are few

2    networks competing with each other to do business with the

3    merchants who are in the Travel and Entertainment space, who

4    are the customers, and in this case take the place of the

5    individuals who travel.

6              So, the question is, If I'm a person who wants to

7    fly from New York to Houston, the relevant competition

8    question for me is, What are my competitive offers?  If I'm a

9    merchant in the T&E space and I'm saying, I want to take

10   credit cards, what are the competitive offers that I've got?

11   Well, it's the same four that we know.  I only have four.

12             And if I'm a merchant in the T&E space, I'm

13   particularly vulnerable, because a lot of people who want to

14   do business with T&E merchants are doing it with a corporate

15   card or a charge card, in which they really want to earn

16   rewards, so they are very insistent, more insistent than the

17   others.

18             I think the analogy is, in fact, right, and it talks

19   about how antitrust market definition and analysis works, and

20   this is why we often read about mergers that are resolved by

21   spinning off a particular asset that lets you compete in this

22   market.

23             So, the whole company was competing in a lot of

24   markets.  There was a reduction of competition in one or two

25   of them, maybe a merchant monopoly in one market, and the

1    antitrust solution was, We'll analyze competition in that

2    market where there's a merger of monopoly.  If the company

3    spins off that asset so the merger no longer turns it into a

4    monopoly there, we can solve it.  You see, the company as a

5    whole is competing in a lot of different markets.  They are

6    not asking the question, How do you sustain yourself just by

7    competing in that single market?

8            THE COURT:  We also had testimony regarding

9    corporations who have arrangements with different credit card

10   issuers having to do with their corporate travel arrangements.

11   How did that fit in, inasmuch as a company, company X, company

12   X can choose to go to a bank where it does most of its

13   banking, like Wells Fargo, which has a Visa card that it

14   offers, and corporation X can require all its employees to

15   travel on the Visa card -- corporate card from Wells Fargo.

16   How does that fit into this T&E analysis?

17           MR. CONRATH:  I think there might be three levels to

18   that answer.  So, there are --

19           THE COURT:  I'm sorry?

20           MR. CONRATH:  I'm worried about my time, your Honor,

21   so I'm going to say it fast.

22           THE COURT:  You have time.  I told you I'm here

23   until 6:00.

24           MR. CONRATH:  Thank you, your Honor.  We'll try not

25   to abuse that.

1          THE COURT:  Go ahead.  I'm more interested in

2    understanding than about whether you meet your time

3    requirements or not.  It's not carte blanche to do whatever

4    you want.  Maybe that's the wrong term to use.  I'm trying to

5    understand.  So, if you can help me understand, that's the

6    objective here.

7          MR. CONRATH:  I'll try to be helpful, your Honor.

8          THE COURT:  Go ahead.

9          MR. CONRATH:  So, there is a set of competition to

10   be the Cobrand cards for airlines, and, of course, you heard a

11   lot about that.  That's competition that relates to the

12   issuing side.

13          So, AMEX and another, banker two, competed to be

14   Delta's Cobrand.  They offered Delta various attractive

15   offers.  Delta bid them against each other.  The ultimate

16   upshot was that Delta helped AMEX issue cards.  So, that's a

17   kind of competition that is related here.  Doesn't go directly

18   to the merchant interaction.

19          There's another kind of competition -- this, I

20   think, is what your Honor was asking me about -- to be the

21   corporate card of a corporation.  So, I'm Crate & Barrel.  I

22   would want to have my employees have our corporate card to

23   travel with.  I will solicit bids from the different credit

24   card networks -- issuers, rather, to be my -- to provide

25   corporate cards for my employees.  That's a kind of

1  competition also where the corporation is going to choose one,

2  so it can get benefits of competition.

3         I think the court has heard that AMEX has a very

4  strong position in corporate cards.  I think their internal

5  records say something like seventy percent spent on corporate

6  cards is on AMEX cards.  But there are other operations for

7  the corporation in figuring out, Who do I want to be the card

8  that I will give to my employees?  That's another area of

9  competition.

10        How that affects merchants, the question for

11 merchants is, What cards do I have to accept and what are the

12 prices and the conditions?  What competition do I get as a

13 merchant among the credit card networks?

14        The way the corporate card thing works out -- works

15 is, a lot of corporations give it to you and say, Here, use

16 this when you travel.  That makes that customer a very

17 insistent customer, from the perspective of the merchant.  If

18 I'm the airline or the hotel, I need to accept American

19 Express cards, because there's so many American Express

20 corporate cards.  So, that is one of the ways that that -- the

21 way that kind of competition showed up mainly in this trial,

22 is explaining why T&E merchants are so dependent on accepting

23 American Express even in the face of very substantial price

24 increases.

25        Now, what about -- there are two more pieces.  I

1    think there are four instead of three.  I think the two more

2    pieces are this:  The Court also heard evidence about

3    corporations doing business with -- can a corporation do

4    business with -- choose to do business with a particular hotel

5    chain or a particular airline?  So, here, the most interesting

6    evidence actually comes from a different part of AMEX, which

7    is the travel agency part.

8          Your Honor may recall, it's a small part.  It used

9    to be a bigger part of AMEX just running travel agencies

10   mainly on behalf of corporations.  You remember Mr. Corbett

11   came in, and what he testified to is that AMEX is effectively

12   in the role of American.  AMEX is fine with steering.  They

13   say, We will sign preferred deals with particular airlines,

14   and we'll steer our customers to those preferred airlines who

15   are paying us to be preferred.  That's exactly what ought to

16   happen on a credit card space.

17         Merchants, just like AMEX does when it's a travel

18   agency, merchants ought to be free to sign a preferred deal,

19   get some compensation for that and encourage their customers

20   to use a particular card.

21         Now, one of the things that Mr. Corbett said is that

22   that doesn't always -- We can't steer everybody, because some

23   corporations have their own preference, and that's true.  So,

24   a corporation might say, I've got a corporate preference.  Not

25   the individual traveler, necessarily, but the corporation

1    prefers Hilton.  We have a deal with Hilton, and those

2    travelers will go with Hilton.  But from Hilton's perspective

3    as a merchant, the question -- I don't think that alters their

4    calculus on, Do I have to accept American Express?  Do I have

5    to accept Visa?  Do I have to accept MasterCard and Discover?

6    That's an example of what customers showing up at the door

7    want to pay with, those particular cards.

8          Maybe the final example on this topic, if you'll

9    remember, is a kind of steering that Mr. Thiel of Alaska

10   Airlines wanted to do and found that he couldn't do, which was

11   to approach some of the corporations that are in a city where

12   they could do a lot of travel on Alaska Airlines and say to

13   them, Hey, can I cut a special deal with you?  If you steer

14   your customers -- if you'll send your customers to me, I can

15   make a separate arrangement to pay you.

16         He said he raised that -- so, that's a form of

17   steering, a form of competition.  Mr. Thiel wants to say, If I

18   can get you to do business with me directly, I can do more

19   business.  He said he raised that with American Express, and

20   the answer -- I wish I can remember the exact phrase -- he

21   said, The answer was immediate and negative.  You can't do

22   that kind of steering.

23         That's -- so, that kind of arrangement that a

24   merchant might want to do with -- that a merchant, Alaska,

25   might want to do with some of its customers, business

1    travelers, is blocked by the antisteering.

2             So, I think those are the ways in which that kind of

3    corporate relationship with travel merchants and with the

4    networks plays out.

5             Have I answered that enough?  Okay.

6             So I, guess where we are is, on the T&E market,

7    defining a submarket or price discrimination market like that

8    is a well accepted form of market definition.  The market for

9    T&E merchants meets all the relevant tests, and the defenses

10   that we heard from the other side aren't enough reason to tell

11   us that we ought to take that off the table.  So, that's a

12   legitimate form of market definition that should be considered

13   by the Court.

14            I would like to talk briefly about market power.  If

15   we could go to slide 44.  The Court will remember this.  This

16   is a slide we put up at the beginning of the trial.

17            I just want to say -- we told you what we were

18   planning to prove.  I would like to briefly note this proof

19   came in.  This is a roadmap.  The U.S. v. Visa laid out a

20   roadmap for how to analyze market power.  A lot of times, the

21   court doesn't have the benefit of having this kind of a

22   roadmap.

23            We have gone through and proved these elements.  The

24   anti-competitive effect I have already talked about.  That was

25   one of the ways the U.S. v. Visa court concluded there was

1   market power.

2          Customer insistence.  American Express is very

3   clear, in both what it does internally and what it tells to

4   its merchants, that they have a lot of insistent customers.

5   The Court of Appeals told us, in USA v. Visa, that's a fact

6   for the judge in evaluating whether they have market power.

7   AMEX tried to say this is just puffery or salesmanship.  The

8   record evidence shows it's something they track very

9   carefully.  They quantify and use it in making decisions.

10  They use it in explaining to merchants why they ought to pay

11  the higher prices that American Express charges.

12          The third category of evidence on this roadmap is

13  price increases without losing merchants.  We went through the

14  example of value recapture, where American Express raised

15  prices on merchants representing sixty-five percent of its

16  travel volume.  No large merchants lost negligible, small

17  merchants lost negligible suppression.  The evidence

18  established this element of the USA v. Visa roadmap, as well.

19          THE COURT:  But on value recapture, wasn't that

20  overall kind of an unsuccessful program for American Express?

21  So, in spite of everything, the -- and all the arguments with

22  customer insistence and other arguments made with regard to

23  customers, and it still was not a successful program.

24          MR. CONRATH:  They had a couple of points about

25  that.  Frankly, they are not supported in the evidence.  Let

1  me go through those points.

2          MR. CONRATH:  If we look at slide 49.  This is

3  American Express's sum-up of where they were on value

4  recapture as of 2010.  What is the global cumulative benefit

5  of the value recapture program?  And you can see, these are

6  the five years, and as the Court recalls, it ended after this

7  case was brought.

8          THE COURT:  I'm sorry.  Is this a public document?

9          MR. CONRATH:  There are a couple of small

10 redactions.  I believe we have all the redactions that are

11 required.

12         MR. CHESLER:  There are redactions, your Honor.

13         THE COURT:  That's fine.  Thank you.

14         MR. CONRATH:  Thank you, your Honor.

15         The way this works, 2006, they imposed the price

16 increases that are reflected in blue, and they increased that

17 amount of PTI or Pre-Tax Income as a result of the price

18 increases, and those same price increases you can see

19 continued over the subsequent years.

20         Then there's another set of price increases in 2007.

21 That's the green price increases -- the red, by the way, is

22 international.  So, the rest of this is domestic.  I'm going

23 to ignore the rest -- and the green price increases, they

24 continued to be in effect over the next years.  Then in 2008,

25 an additional set, 2009, and the projections for 2010.

1       What they summarize, this has brought us a net at

2  this point of $1.3 billion.  Of course, I heard that they

3  didn't add additional new price increases after 2010.  But as

4  you can see with what happened with the blue bar and the green

5  bar here, those price increases continued to be in effect in

6  the market.

7       The Court will recall the airlines who came in who

8  experienced substantial price increases, and they said they

9  are still paying them.  Those weren't rolled back.  So, those

10 were successful price increases implemented in a market, made

11 money for American Express.  American Express says, No, no, it

12 was not successful.  They say a couple of things about that.

13 Let me touch on each of them.

14       THE COURT:  They discuss the rewards program in the

15 context of that, don't they?

16       MR. CONRATH:  So, they discussed the rewards.  I

17 think there are three topics.  One is the rewards program, one

18 is their claim that it backfired, and one is their claim that

19 overall, our prices were going down.  Let me touch each one of

20 them in turn.

21       THE COURT:  Go ahead.

22       MR. CONRATH:  So, the claims about the reward

23 program were claims made by Professor Bernheim that -- and his

24 claim was, did -- his claim was that the cost, American

25 Express's cost of its reward program, went up so much that it

1  negated some of the benefit of the price increase to

2  merchants.

3          So, Professor Katz had looked at that and said there

4  isn't evidence in the record, and he said the evidence doesn't

5  establish that they were raising the prices, and it was all

6  disappearing into rewards.  He said, No, it was profitable.

7  He looked specifically at the claims made by Professor

8  Bernheim.  He found a series of mistakes in there.  The

9  fundamental mistake is, he's asking what the rewards program

10  cost American Express, not, What is it worth to the

11  cardholder?

12         So, if the claim is that there are benefits to the

13  cardholder, that's not asking the right question.  Some of the

14  specifics we looked at illustrated that.  So, for example,

15  there was a period when Continental withdrew from the American

16  Express program, the value recapture program.  That made the

17  value recapture program less valuable to cardholders.  It's a

18  diminution in value.

19         How did Professor Bernheim throw this into his

20  numbers?  He looked at what happened in the short run, which

21  was, a lot of people who had American Express miles and lived

22  probably in Houston thought, I want to use these miles

23  immediately, before I lose the chance to use them on

24  Continental.  So, there's a big bump-up in the cost to

25  American Express as people rushed to use their miles, because

1  they didn't have the option.  The miles were worthless if they
2  did not use them.  They were not going to be able to use them
3  on Continental.  They rushed to use them.  That ran the cost
4  up, even though what really happened was, the value of the
5  program went down.

6          We saw the same thing.  Professor Katz went through
7  and analyzed this with respect to Delta.  Delta finds itself
8  in the position that it was in, whatever, made decisions to
9  make the value of the Sky Miles less, to diminish the value of
10 the Sky Miles.  It's harder to find a flight.  You have to pay
11 more miles for a flight.  In various ways, you know, acting as
12 appropriately in their own interest of protecting their own
13 profits, it made the Sky Miles program less attractive to
14 cardholders.  That's a diminution of value to the cardholders.

15         At the same time, American Express has to buy Delta
16 miles from Delta, so that they can give them out in their
17 rewards program, but because Delta was in a position to do so,
18 it raised the price to American Express of the Sky Miles.  And
19 so, Professor Bernheim said, Oh, look, American Express is
20 paying more for Sky Miles.  I will add that to the cardholder
21 benefits, and implicitly assume that's good for cardholders,
22 when in fact for the same number of miles, American Express
23 was paying more, but cardholders were getting less, because
24 Delta was now in a position to deliver less.

25         So, it's another way in which Professor Bernheim's

1   calculation, looking at how much does the rewards program cost

2   American Express, was asking the wrong question and coming to

3   a wrong conclusion.

4          So, Professor Katz's analysis was, there was a net

5   increase, even if you think of it two-sidedly, because

6   American Express was able to raise prices in value recapture,

7   and there were not offsetting rewards increases.

8          Professor Bernheim made a responsive claim that

9   actually there was an increase, but he measured the wrong

10  thing.  What he said was, there was an increase in the cost to

11  American Express.

12         Professor Katz looked at that and said, Not so.  You

13  look at what's really going on here, it's not an increase in

14  the value to the cardholders, it's not a benefit to the

15  cardholders, it's a higher cost to American Express, but not a

16  benefit to cardholders.  That doesn't reverse my conclusion

17  that value recapture was a profitable price increase, where

18  AMEX didn't lose merchants, because they have market power.

19         The final way in which American Express tries to say

20  this was not profitable or wasn't successful is, they say it

21  backfired.  They say, We annoyed our merchants.  You probably

22  heard that some of the merchants were annoyed by these price

23  increases.  You also heard the evidence that they could not do

24  anything about it.

25         There's one example that American Express points to,

1   and that's Continental.  What they argue, and they continue it

2   in their brief even though it's contrary to the evidence, is

3   to say that Continental was so angry at the price increase --

4   and it is true Continental was angry at the price increase,

5   there's no dispute there.  They say that is what caused

6   Continental to pull out of making its airport lounges

7   available to American Express card members as part of its

8   membership's part of the cardholder benefit and pull out of

9   the rewards program, letting people use their rewards on

10  Continental.

11          The problem with that is that the contemporaneous

12  evidence just doesn't support the claim that there was

13  retaliation for the price increase.  The contemporaneous

14  evidence includes, my recollection is, two documents.  One is

15  a document from the president or maybe the chief operating

16  officer of Continental, saying, The reason we have to do this

17  is that we've got a Cobrand with Chase, I think, and we

18  couldn't continue to have -- to be in the AMEX reward program

19  under our Cobrand agreement, or we would have to pay Chase

20  huge penalties.  That was going to happen no matter what.

21          And a contemporaneous American Express document

22  reports that same fact, says, The reason Continental is

23  pulling out is because their deal with Chase, their Cobrand

24  deal with Chase, requires it.

25          The argument that we are hearing in AMEX's papers,

1  that Continental punished us by pulling out of the rewards

2  program and pulling out of the lounge program because of our

3  value recapture price increase, is just not supported by the

4  record evidence.

5       THE COURT:  Continental could have negotiated a deal

6  with Chase that accommodated American Express cardholders with

7  regard to the lounge situation.  They could have leased space

8  at Newark Airport to American Express to create its own

9  lounge.  They have space at Newark terminal, wherever they are

10  at over there, that they had total control over.

11       And so, it may be that the primary reason was that

12  -- for the change, that it now had a Cobrand relationship with

13  Chase.  But it didn't have to exclude American Express card

14  members who buy tickets on Continental Airlines, I'm sure,

15  notwithstanding the fact that they are not the Cobrand card

16  for Continental.  They could have made adjustments,

17  accommodations so as not to inconvenience their own customers.

18       So, there must be -- my surmise is that there may be

19  some truth to the fact that they were not only not going out

20  of their way, but there might have been a form of retaliation.

21  You don't know that it wasn't or that it was.  You just know

22  that there's a Cobrand agreement with Chase, and that many of

23  the aspects of what would have been a Cobrand relationship

24  with American Express are now reposed in that relationship

25  with Chase; isn't that right?

1      MR. CONRATH:  Respectfully, I don't think so, your

2  Honor, and let me tell you why.

3      THE COURT:  Is there anything in the record about

4  that one way or the other?  That's the question, I suppose,

5  and not my imagination about the aviation industry.

6      MR. CONRATH:  Let me address both the aviation

7  industry and what's in the record.  What's in the record is, I

8  believe, two documents.

9      One is from a very high official at Continental

10  saying the reason -- he does indeed express frustration with

11  the price increase, no denying that, and lots of merchants who

12  came here did, saying The reason we have to do this is because

13  of our deal with Chase.

14      And there is a contemporaneous document from

15  American Express at that time repeating that statement.  This

16  was -- I don't know if the word "baked in" is used.  That's

17  the idea.  This was going to happen.

18      Now, but let's just think about this logically.

19  Could they have negotiated something?  Well, maybe.  We don't

20  know.  There is not record evidence about what they could have

21  negotiated.

22      THE COURT:  They have a lot of tenants over in that

23  terminal with whom they don't have a Cobrand agreement.

24      MR. CONRATH:  Sure.

25      THE COURT:  For instance, you know, they probably

1  have all -- all those places you go to eat that you shouldn't

2  go to eat; right, when you're getting on an airplane, or at

3  any other time, for that matter?  All right.

4          MR. CONRATH:  I think, in fact I believe that is

5  what's happening in that market.  American Express has leased

6  some space in a few airports, and I don't know if Newark is

7  one of them, but they have leased some space in a few airports

8  to set up their own lounge called the Centurion Lounge, in

9  part because as markets were changing, they found that not

10  just Continental but I think other airlines were not willing

11  to renew the prior arrangements they had.  And so, in some

12  places, American Express is leasing a space, and they are able

13  to find it, whether from an airline or from an airport

14  authority, and setting up their own lounges in order to

15  provide this benefit.

16          But I think the way to think about this market,

17  though, the relationship with Chase -- I hope I'm remembering.

18  I believe it was Chase.  It was a bank.  We'll talk about

19  Chase.  I think it's right.

20          Chase and Continental negotiated the terms of that

21  agreement.  Presumably -- I mean, just as you say thinking

22  about the incentives, Continental is giving up something by

23  promising not to have to do something with other airlines.

24  So, Continental is giving something up in order to make these

25  promises to Chase.  Presumably, it's part of the whole

1   bargain.

2          Chase thinks it's worth it to them, and Continental

3   finds the total package worth it to them.  So, it's not like

4   -- and there's certainly not any record evidence to suggest

5   that Continental could have just gone to Chase and said, Hey,

6   why don't you drop this provision of the contract?  No reason

7   to think that that's right, because Chase was getting

8   something for it, and we don't know.

9          But maybe what they are getting is, you know, access

10  that they can use to sell to their potential cardholders,

11  access and maybe exclusive access at particular airports, and

12  that's how competition works.

13         And the most important thing is, though, what it

14  says is that the decision that Continental made to cancel the

15  participation with American Express was driven by this

16  relationship with Chase.  Whatever else they negotiated or

17  could have negotiated with Chase, that's not -- the evidence

18  is clear that is what was driving their decision to terminate

19  that relationship.  They said, We would have to pay -- I think

20  the phrase is, We would have to pay some amount of money in

21  penalties to Chase if we didn't go ahead and do this.  So,

22  that tells you there's a contractual arrangement that the two

23  parties negotiated and that made sense for them.

24         So, this only comes up in our case, because American

25  Express raises it.  We kind -- how airport lounges get

1   resolved is kind of far afield.  It only comes here because

2   American Express makes the claim, which is just wrong, that

3   the reason for that change was that Continental was

4   retaliating for that particular price increase.  The evidence

5   just doesn't support that.

6            I guess I should, while I'm at it, point out the

7   other little thing that's wrong with the argument they are

8   making.  They are comparing in that -- the analysis that's in

9   the brief compares one point something billion in charge

10  volume, and compares that to the one point three billion in

11  Pre-Tax Income that was from the value recapture.  That is a

12  huge apples and oranges comparison.

13           Charge volume is the whole price of the airline

14  ticket.  The income that American Express gets out of that is

15  a couple of percent.  So, even when they are making -- the

16  argument is wrong as a factual causation matter.  But if you

17  look at what's being argued there, the comparisons that they

18  are making to try to over dramatically say, This wiped out any

19  benefit of the value recapture program, they are not even

20  comparing apples and oranges.  They are comparing apples and

21  bicycles, frankly.  Just this whole argument from American

22  Express just does not hold water.

23           Finally, you asked me about one other part of

24  American Express's argument about whether they were able to

25  increase prices.  They claim, Look, no, our prices really went

 1    down.  They use some arguments from Professor Bernheim on

 2    this.

 3         I'm going to switch to slide 52.  There are two

 4    things that Professor Bernheim did wrong that let him say

 5    prices are going down instead of up during the value recapture

 6    period.  One is, he ignored mix.  Part of what was going on

 7    was that as AMEX did less business at the expensive Travel and

 8    Entertainment merchants, and a higher proportion of its

 9    business at the cheaper, everyday spending business, their

10    average price would, of course, go down even if all the prices

11    are staying the same or even increasing.  So, he missed the

12    mix adjustment.

13         The other thing was, he made some frankly remarkable

14    changes to the discount rate revenue.

15         And if you look at the next slide, 53, this is a

16    slide from Professor Bernheim's report that we used in the

17    trial.  The Court may recall -- you can see here, this is

18    prices to the major domestic airlines, the largest airlines.

19    You'll see that virtually every domestic airline, you can see

20    the effect of the value recapture price increase on this

21    chart.

22         If you look at the price in the earliest year and

23    the price in the latest year, it's a pretty substantial run-up

24    in price, with two exceptions, JetBlue and Delta, and those

25    are two airlines that have a Cobrand agreement with American

1  Express.

2        What Professor Bernheim did was, he took all the

3  revenue from the Cobrand agreement, which is, he talked about

4  before, is an issuing-side agreement related to Delta getting

5  in the hands of a lot of people some American Express cards.

6  He took all that revenue, and he put it into this assessment

7  of what is American Express's revenue from its merchant

8  acceptance fees.  That produces the remarkable and, frankly,

9  incredible result that all the airlines in the country are

10  paying American Express several percent for the privilege of

11  accepting the American Express card.

12        But Delta is exactly the opposite.  He says with

13  Delta, American Express is paying Delta for the privilege of

14  having American Express cards there.

15        As Professor Katz says, that just economically makes

16  no sense.  The implication is that all the Cobrand payments

17  are a net zero, because he counts all the Cobrand revenue and

18  the pre-payment of miles revenue in as discount revenue.

19        If you want to know how important -- we know,

20  because there was testimony, that the reason Delta got a good

21  deal in that Cobrand in that prepurchase of miles negotiation

22  was, there was competition to be the Cobrand partner,

23  competition between American Express and one or two other

24  banks.

25        The suggestion that that -- that's why there are

1   these huge payments to Delta under the Cobrand and the

2   prepurchase agreements.  It's not because Delta agreed to

3   accept the American Express card.  It was going to accept the

4   American Express card whether or not it was the Cobrand deal,

5   and it would be paying a price probably along the line of what

6   the other airlines are paying.  The idea that every merchant

7   in the country is paying American Express but in this one case

8   it's the other way around just frankly is incredible.

9           The effect of this, we see on the charts that are on

10  the next page.  You can see the left-hand upper chart is

11  general markets.  The lower one is T&E. I'm just going to talk

12  about the general markets.

13          Professor Bernheim's calculation -- this is what

14  leads Professor Bernheim to say prices go down -- is the black

15  dashed line at the bottom.  Professor Katz said, If we just

16  correct for the Jet Blue and Delta errors, what we did is the

17  blue line in the middle.  So, you can see how huge is the

18  effect of that particular choice that Professor Bernheim made.

19  If we also correct for mix, you can see the orange line at the

20  top, which shows, as we've talked about, prices are going up

21  during the relevant value recapture period.

22          I think I was going through U.S. v. Visa roadmap

23  saying, We proved all the evidence we said we were going to

24  prove.  I'll gloss over the last one, which is market share,

25  and there's no dispute about the barriers to entry here.

1              In U.S. v. Visa, the Court found that MasterCard,

2      which was the number two firm at that time, had market power

3      with a twenty-six percent share.  Today, American Express is

4      the number two player in the industry.  It has a twenty-six

5      percent share.  AMEX agreed, when it sued MasterCard, the

6      twenty-six percent share was part of having the market power.

7      AMEX today has that.  That's another element in the proof that

8      we have met.

9              The Court asked about T&E. I'm going to skip some

10     other slides about the market power.  It's well established.

11             Because the Court asked about T&E, I would like to

12     talk about slide 59, which tells us that American Express's

13     market power is even more apparent in the market for Travel

14     and Entertainment merchants.  All the same market powers in

15     the U.S. v. Visa are here and even more so.  The market for

16     T&E is 34 percent.  Spend coverage is higher here than the

17     already high number that it is elsewhere.  Insistence is

18     stronger for T&E merchants than it is for the general market,

19     primarily because of corporate card insistence.  Also, if you

20     look at the way AMEX calculates, the insistence for T&E

21     merchants is higher.

22             On value recapture, the question of whether you can

23     impose price increases without losing customers, American

24     Express has special campaigns for raising prices in T&E

25     industries.  The Court heard evidence from a number of

1  airlines on the price increases that they faced.  It also

2  might remember evidence about restaurant value recapture one,

3  two and three.  So, the price increase evidence is even

4  stronger in the T&E industry than it is in the other.  And in

5  the same vein, you recall the margin evidence, the

6  variable-contribution evidence from the slide that we looked

7  at a little bit before, that shows that AMEX takes in more

8  revenue compared to costs in the T&E industries than it does

9  in other industries.  All of these just tell us that the

10  market power evidence that establishes generally that American

11  Express has market power is even stronger for the T&E sector.

12           (Continued on next page.)

13

14

15

16

17

18

19

20

21

22

23

24

25

1          MR. CONRATH:  (Continuing)  I've got just two more

2    topics I want to talk about, Your Honor.

3          When faced with this evidence, what does American

4    Express say?  I think I've got two things left I want to talk

5    about.  One is welcome acceptance.

6          They say we need to have these restrictions in order

7    to guarantee welcome acceptance at merchants, welcome

8    acceptance of the American Express card.

9          Well, this claim has been a little bit of a moving

10   target.  The Court may recall that before trial, what American

11   Express said was we need the rules in order to prevent

12   embarrassment of the cardholders when they try to use their

13   American Express card.

14         At trial, as indicated in the slide I'm looking at,

15   slide 62, at trial, they walked away from the embarrassment

16   claim.  And also at trial, the Court may recall that we asked

17   various American Express witnesses examples where steering is

18   allowed or takes place and said, well, does that interfere

19   with welcome acceptance, and they said no.  And this is no

20   surprise because merchants testified about steering and they

21   said, look, if we have the freedom to steer, we will do

22   steering in a way that keeps our customers happy for the very

23   good reason that they want that customer to come back.

24         John Robinson of IKEA was just one of many merchants

25   who testified to that.

1           Are you able to engage in these promotions without

2    annoying or offending your customers?

3           Yes.

4           And is that important to you?

5           Yes.

6           Well, naturally it is.  They want the merchant to

7    come back.

8           The other reason why we, we know this welcome

9    acceptance argument is wrong on the facts, just on the facts,

10   is that AMEX itself steers when it feels like it's in its own

11   interest to do so.

12          So we talked a moment ago about how AMEX steers in

13   its travel agency.  And Mr. Corbett testified that they're

14   able to do that without annoying or offending the customers.

15   AMEX has used prompting at checkout at merchants that have

16   AMEX co-brand cards without causing unwelcome acceptance.

17   There are discounts available only if you use AMEX at

18   Universal Studios I talked about with Mr. Chenault.  No

19   unwelcome feeling for other credit cards there.  The

20   preference arrangements AMEX has had with various other

21   entities without causing or any evidence that that causes

22   unwelcome acceptance.

23          The Court will remember Mr. Glass's signs.  This is

24   one of them, that AMEX said would be prohibited.  The

25   anti-steering rules wouldn't let them, wouldn't let a merchant

1   put up a sign that said this checkout line is for Discover

2   customers only.  And guess what?  We found out during the

3   course of this trial that AMEX itself had exactly that deal

4   with Radio City Music Hall, a separate payment window for

5   American Express cardholders.  They even had a provision in

6   the contract that if things got busy, somebody had to go out

7   in the lobby and say, hey, there's a special window over here

8   for American Express Cardholders only.

9           So you can't just take seriously as a factual matter

10  this claim that steering somehow is inherently going to make

11  customers feel unwelcome.  What really is going on here is

12  that American Express has taken the term "welcome acceptance"

13  and it's redefined it to mean something else basically.

14          They define "welcome acceptance" to mean, they say

15  we mean by that is there are no competitive offers from our

16  rivals allowed at the point of sale.  Even simple truthful

17  pricing information can't be provided at the point of sale.

18  Well, look, if you can do that, if you can take a perfectly

19  neutral term like "welcome acceptance" and redefine it as I

20  don't have to face competition, lots of companies, and get

21  away with it under the antitrust laws, lots of companies would

22  sign up for that, but the law, the law doesn't allow it.

23          A defendant, as the court, the Supreme Court said in

24  National Society of Professional Engineers, a defendant cannot

25  impose its views of the costs and benefits of competition in

1   the marketplace.  American Express can't say we won't allow

2   our rivals to compete with us in this way.  That's just not an

3   appropriate antitrust response.  You can't bootstrap yourself

4   into a legitimate pro-competitive justification for your rules

5   by defining no competition as welcome acceptance.  They can't

6   cite any case authority suggesting that would be an

7   appropriate reason for a restriction on competition.

8           And they frame this a little differently and this is

9   the topic that we left on before the break, Your Honor, which

10  is they say we need these rules to protect our differentiated

11  business model.  It's really an argument for protectionism and

12  it's well established in the antitrust laws that the antitrust

13  laws don't protect competitors that protect competition.  They

14  protect the process.

15          The antitrust laws do not allow American Express to

16  decide what competition it will face and what it will not

17  face.  Now, it's not surprising that AMEX, if it can get away

18  with it, would prefer to channel all the competition in the

19  market into the kind of a competition that American Express

20  likes, competition that provides the cardholder benefits, and

21  away from, to exclude the competition that American Express

22  does not like, competition to provide good value and low

23  prices to merchants.

24          That kind of argument was made in the second case

25  that I cited earlier which is Brown University.  The

1   defendants argued there that there was a restriction on price

2   and the defendant said, well, okay, this restriction on price

3   just makes us compete harder on some other things.  And the

4   court said, no, no, that is not a pro-competitive virtue.

5   That is a consequence of deciding not to compete on price.

6   You can't use that as a justification for your restriction on

7   price competition.

8           So it is, it is true, this differentiated business

9   model.  It is true that it is good for competition for AMEX to

10  have the right to try its business model in the market.  We

11  went to court 15 years ago to defend that right to try.  That

12  does not mean that AMEX has a right to succeed to guarantee

13  its success by blocking competition from other rivals.

14          Now, AMEX cites a series of statements from the

15  United States in United States versus Visa talking about the

16  importance of AMEX having a chance to bring its model,

17  differentiated business model in the market.  What's

18  interesting is each one of those also mentions Discover and

19  its differentiated model.  And what about Discover?  Because

20  if it's right that AMEX has a chance to try its differentiated

21  business model, so too does any other competitor have a chance

22  to try its differentiated business model.  What about

23  Discover's differentiated business model?

24          Discover's differentiated business model was we'll

25  bring low prices to merchants, attractive innovative rewards

1   to cardholders.  By the way, you can see it's a two-sided

2   innovative differentiated business model.  That was squelched.

3   It was squelched by the anti-steering rules.  It's still

4   squelched today as you heard the testimony from

5   Mr. Hochschild.

6           What does AMEX say about that?  Well, I put that

7   question to Mr. Bernheim.  His answer to Discover was

8   basically, well, why don't you try to be more like AMEX, why

9   don't you try to offer more rewards directly to cardholders.

10  That's not what the antitrust laws are about.  You as a

11  competitor don't get to dictate how your rivals compete with

12  you.  What the law requires is much simpler.  Just let

13  different business models compete in the marketplace without

14  these extraneous restrictions on somebody else's competition.

15          If there's merchant demand and cardholder demand for

16  another model -- American Express says it does and there's a

17  lot of reason to think they're right, there's something good

18  for merchants, something good for cardholders -- if they're

19  delivering value to merchants and to cardholders together, the

20  market will let them find a way to do it.  If they have to

21  adapt their model, they may have to cut their price a little

22  bit, that's what the antitrust laws require.

23          That package of benefits that they offer, if it's

24  got value and can succeed, it needs to do that in a world in

25  which other rivals are free to compete in their own

1    differentiated business model.

2         And what would happen if we get rid of American

3    Express's anti-steering rules?  Really, the best answer came

4    from an American Express executive, Mr. Funda.

5         He says, If we didn't have these anti-steering

6    rules, we would be fighting to retain the business by any

7    means necessary, right?

8         He said, Yes, we may need to increase incentives to

9    consumers, we may need to increase pricing to merchants.

10        In other words, get rid of the anti-steering rules,

11   there will be more competition.  That's what the antitrust

12   laws are all about.  That's why these anti-steering rules are

13   a violation of Section 1 and I'm going to ask the Court to

14   find that and we hope that you'll see it our way.

15        Thank you, Your Honor.

16        THE COURT:  Thank you very much.

17        Mr. Gentile?

18        MR. GENTILE:  May it please the Court, Mitch Gentile

19   on behalf of the plaintiff States.  Your Honor, I will be very

20   brief, just several minutes with respect to my argument.

21        We believe that the evidence elicited at trial has

22   shown that AMEX's anti-steering rules unreasonably restrict

23   price competition by limiting a merchant's ability to steer or

24   credit or charge transactions at the cheapest network.

25        The evidence has also demonstrated that AMEX's rules

1   even prevent truthful information concerning the cost of a

2   transaction from being disclosed by the merchants to their

3   customers as well as denying consumers the opportunity to

4   receive immediate benefits from a merchant based on a customer

5   selection of a lower cost credit or charge card.

6           AMEX's restrictions keep customers in the dark while

7   denying merchants critical tools for bargaining the credit

8   charge card networks.  Thus, they restrain competition between

9   all the credit and charge card networks on the merchant side

10  of this market.

11          Credit and charge card swipe fees imposed by the

12  network merchants exceed over $50 billion annually in the

13  United States.  Those transaction costs incurred by the

14  merchants are then passed on by the merchants to all consumers

15  in the form of higher prices for products.  What this means is

16  customers who pay with cash or that the poor who do not

17  qualify for credit cards are paying higher costs for their

18  products and services so that AMEX Cardmembers can receive the

19  rewards.  When costs facing businesses are insulated from

20  meaningful competitive forces allowing them to be inflated

21  unilaterally, as has been demonstrated in this case, this is a

22  concern for all who enforce our competition laws.  That is why

23  more than a third of the States have joined this important

24  litigation.

25          In conclusion, Your Honor, we urge this Court to

1   find that American Express has violated Section 1 of the

2   Sherman Act by its enactment and illegal enforcement of the

3   anti-steering rules.

4         Your Honor, on behalf of the seventeen plaintiff

5   States, we appreciate the time and the effort that you spent

6   on this litigation and we thank you.

7         THE COURT:  Thank you very much.

8         All right.  What we will do is take a lunch break

9   until 2:00 p.m. and we will resume with the defense

10  presentation at that time.

11         (Luncheon recess.)

12         (Continued on next page.)

13

14

15

16

17

18

19

20

21

22

23

24

25

1                   AFTERNOON SESSION

2            (The following occurred in open court.)

3            THE COURT:  Okay.  Yes, sir.

4            MR. CONRATH:  One more thing, if I can approach.

5            We used one slide electronically because my

6    colleagues officially put it up that wasn't in the deck.  We

7    already provided it to American Express.  If I can make copies

8    available.

9            THE COURT:  Just give it to Mr. Reccoppa.  And your

10   slide presentation will be marked as Plaintiffs' Exhibit A.

11           MR. CONRATH:  I think we haven't used that one yet.

12           THE COURT:  This is A.

13           MR. CONRATH:  And this is perhaps A-1, the one sheet

14   I handed you?

15           THE COURT:  Very good.  Okay.  Thank you.

16           All right.  Now we will proceed with the defense

17   closing.

18           Mr. Chesler?

19           MR. CHESLER:  Thank you, Your Honor.  Your Honor, we

20   too have some slides if we may hand them around.

21           THE COURT:  That's fine.  I was considering

22   prohibiting blue paper and to see if that might truncate your

23   presentation but it's too late now.  It looks like the

24   Manhattan directory in blue.

25           MR. CHESLER:  Your Honor has obviously not seen the

1   blue paper section of the due process clause.

2          THE COURT:  That's right.

3          MR. CHESLER:  If I may, Your Honor.

4          THE COURT:  Please.

5          MR. CHESLER:  Thank you.

6          I want to begin where Mr. Conrath began.  His first

7   sentence, I believe, was that this market is broken and I'm

8   sure Your Honor won't be surprised to hear me say that it is

9   far from broken.

10         This is, in many respects, a case about two cases.

11  The parties look at largely the same facts and see them in

12  dramatically different ways and, frankly, I say with respect,

13  the government largely ignores large portions of the case and

14  I'm going to try to spend some time pointing out the more

15  important things that they ignored today and in their papers

16  and, frankly, during the entire trial.

17         It is a market, however, in which if the government

18  were to have its way, we believe it would be broken.  And,

19  Your Honor, just as one tiny tidbit, Your Honor mentioned

20  PayPal this morning.  News has just recently come out that a

21  man by the name of Dan Schulman, who is a very senior

22  executive in American Express, in fact, was deposed in this

23  case, is leaving to become the CEO of PayPal and it's part of

24  what Your Honor I think was talking about, about the evolving

25  nature of this market and things that the government discounts

 1   because they don't fit their model, in fact, are quite

 2   important.

 3          Fourteen years ago, when the government called

 4   Mr. Chenault to the stand as their principal witness in the

 5   exclusionary rules case, as he testified under oath, the

 6   Assistant Attorney General of the United States at that time

 7   asked him to make sure that he emphasized the critical role

 8   that the AMEX differentiated product model plays in the

 9   marketplace, not to protect American Express, and indeed the

10   government never said to Judge Jones that they had brought

11   that lawsuit to protect American Express or Discover.  They

12   said they brought it to protect competition.

13          The principal way in which they sought to prove

14   that, and it's all over the papers that are admissions of the

15   government and it's all over the record in that case and it's

16   all over Mr. Chenault's testimony about which he testified

17   here as well, was that American Express was the best hope in

18   the marketplace to deal with the dominant Visa and MasterCard

19   networks and without American Express and its differentiated

20   model, no company with the tiny share of cards in force, the

21   tiny share of spend volume, the tiny share as compared to the

22   others of issuing banks, et cetera, could hope to be a

23   successful competitor and that was critical to the well-being

24   of the marketplace.

25          Now, when that lawsuit was brought, American Express

 1   had precisely the same nondiscrimination provisions in its
 2   merchant agreements as it has now.  It was actively enforcing
 3   them in the wake of the We Prefer campaign that Visa had
 4   perpetrated and I'm going to come back to that subject a
 5   little later.  It had something it does not have today which
 6   is a premium over Visa and MasterCard on merchant discount
 7   rates when you look at the average rate with proper mix
 8   adjustment and we'll come back to that.  And it has today the
 9   same, almost exactly the same market share of consumer spend,
10   of customer spend as it had 25 years ago even if you leave
11   debit out of the market, which we believe would be incorrect.
12        So the only thing I would submit, Your Honor, that's
13   changed since that lawsuit was brought, and the government
14   made all of the admissions it made to which Mr. Conrath only
15   referred for a brief moment at the end of his comments, the
16   only thing that's changed is the position of the United States
17   Department of Justice.  The same model has gone from being
18   pro-competitive to being a Sherman Act Section 1 violation.
19   They can't answer what they said before and they don't even
20   try because there is no rationale acceptable answer for that
21   turnaround.
22        As I said to Your Honor in the opening, the
23   government's case is premised entirely on guesswork, on
24   speculation.  Our defense is based upon the facts.  The
25   biggest speculation in which they engage, and it is remarkable

1   that an hour and 40 minutes of today's comments were about

2   competitive effects, and not once did the government mention

3   their principal witness on competitive effects with respect to

4   that issue, Dr. Katz, and there's a reason.  Because Dr. Katz

5   on cross-examination conceded the government's case away.

6            The government must prove, as I'll come to in a

7   moment, if they don't move the goal post in by 20 yards and

8   change the legal standards which is what they're trying to do,

9   they must prove an actual adverse effect upon competition in

10  the entire market.  That's what the Second Circuit has said

11  repeatedly is the standard here.

12           Now, what their expert said was if we eliminate the

13  NDPs -- let's put aside the fact that this is a two-sided

14  market for a moment.  The government suggested today that our

15  whole case depends upon you seeing this as a two-sided market.

16  Well, with respect, Your Honor, we believe you must because

17  that's what it is and indeed your summary opinion already said

18  that the parties seem to agree it's a two-sided market but

19  I'll come back to that as well.

20           Let's assume for the moment you only look at one

21  side, just the merchant side which the government spent

22  virtually all of its time at trial on and all of its time in

23  its closing.  What Dr. Katz said was if you eliminate the

24  nondiscrimination provisions, then the merchant discount rates

25  may go up, not down.  And if you eliminate those provisions,

1    then product differentiation which is quality of the product

2    may go down and not up.

3            We can find no case -- we've read every Section 1

4    case that the Second Circuit has decided in the last 35 years.

5    We can't find a single case in which a record that says that

6    the price effect which the plaintiff contends is evidence of

7    the anti-competitive effect could actually get worse, not

8    better, and have still found any violation of Section 1.  In

9    fact, we can't find a single rule of reason Section 1 case

10   decided by the Second Circuit in 35 years in which a violation

11   was found.  In every single one of the cases, the court found

12   that it was not a vertical restraint because when they looked

13   at the market under the proper standard, not the quick look

14   standard that the government would have you apply for the

15   first time in a vertical rule of reason case, the Second

16   Circuit has consistently found no violation.

17           Now, the government has a lot of theories for why,

18   for why the price will go in the direction that they've told

19   you repeatedly it will go if the NDPs were eliminated but they

20   don't have any facts and, in fact, as we'll come to, the facts

21   in the record as opposed to the speculation in the record all

22   go the other way.  Every time you look at the factual evidence

23   of what would happen in the absence of the NDPs, the evidence

24   goes against the government's theory which proves, I submit,

25   that there's something wrong with the theory.

1    So what do they do?  They change the legal standard.

2    Now, Mr. Conrath said this morning that we're asking the Court

3    to create a brand new standard that's never been used before.

4    With all respect to Mr. Conrath, that simply is untrue.

5    The case law that exists under the Sherman Act and

6    with respect to vertical restraints is a case law that we

7    embrace that doesn't require any tinkering or tampering.  If

8    you simply apply the law as it's been written, Your Honor, the

9    outcome here, we believe, is clearly one that comes out in our

10   favor.

11   The government, however, is really putting forth an

12   incredibly shrinking case and what do I mean by that?  First,

13   they told you in your papers, I didn't hear Mr. Conrath say it

14   this morning, but they told you in the papers they don't have

15   to prove relevant market, no relevant market is necessary.

16   Then they say, oh, but we proved one, and I'll come to what

17   they actually proved.  They said we don't have to prove power,

18   we can do it by direct facts.  Well, as Your Honor held, the

19   Second Circuit cases say you can do one way or the other.

20   They haven't done other one here and I'll come to that.  They

21   don't have to prove anything on the consumer side of the

22   market.  That's a separate side of the market they don't have

23   to contend with.  It is not.  Every single witness expert who

24   testified here including theirs said it's a two-sided market.

25   Dr. Katz's report in this case is literally full of the

1   agreements with our experts on the fact that it's a two-sided

2   market.  Your Honor's summary judgment opinion said the

3   parties already agreed it's a two-sided market.  However, they

4   don't think they have to prove anything with respect to half

5   of that market.

6           They don't even have to prove -- and this is where

7   they tried to move the goal post in now even more than they

8   did before -- they don't even have to prove there's an actual

9   adverse effect on competition.  All they have to do is show

10  the NDPs, here's a quote, "disrupt the price setting

11  mechanism."  They explicitly say, Your Honor, in their

12  proposed conclusions we don't have to prove any actual effect

13  on price.  Why do they say that?  Because they haven't proved

14  an actual effect on price.  Not only have they not proved it,

15  but their expert said it may go the wrong way and the factual

16  evidence is that it, in fact, goes the wrong way, namely, up.

17          So, instead of confronting the evidence, which you

18  didn't hear a word about, maybe Mr. Conrath is saving it for

19  rebuttal.  He never mentioned Dr. Katz's admissions.  He never

20  mentioned the 3 million plus merchants in the United States,

21  merchant locations, that do not accept American Express and

22  had been subject to Visa/MasterCard degree for the last three

23  plus years.  He didn't say a word about them and I'm going to

24  say more than a few words about them.

25          They've changed the standard or they tried.  They

1   said all we have to do is to show that the mechanism has been

2   disrupted.  I would submit, Your Honor, there's a reason why

3   they call vertical restraints restraints and that's because

4   every one of them restrains some form of competition.  The

5   question is whether it's an unreasonable restraint.

6           Merely saying that they don't have to prove any

7   effect on price, just that there's a mechanism that could be

8   disrupted, is not the standard.  If it were, take, for

9   example, the resale price maintenance case where the

10  manufacturer tells the retailer it cannot sell its product for

11  less than $10.  That obviously disrupts the pricing mechanism

12  but every resale price maintenance case decided in the Second

13  Circuit in the last 35 years has come out in favor of the

14  defense because they're not unlawful under a full reasonable

15  analysis according to the facts in every one of those cases,

16  yet they would be condemned under the government standard as

17  would exclusive dealing arrangements.

18          Obviously, they disrupt the pricing mechanism if you

19  say, I'm going to sell you all of my product and I refuse to

20  sell it to anybody else.  Well, you're going to be able to

21  charge perhaps more for my product than you would if there was

22  intra brand competition and my product was sold to your

23  competitors as well and yet, all of those cases have been

24  found in favor of the defense because they don't violate the

25  rule of reason.  What they might well violate, and that's why

1  the government embraces this new standard is the quick look

2  standard.

3         Now, there are three standards in the antitrust law

4  for evaluating conduct:  Per se, rule of reason and in between

5  is quick look.  All of the quick look cases that they cite,

6  all of them, are horizontal cases which makes sense because

7  the law of per se violations arose originally in the

8  horizontal context of price fixing and that's where it still

9  resides, in a horizontal price fixing case.  What's happened

10 is the Supreme Court said, among other places, in the Indiana

11 dentist case they rely on so heavily, there are going to be

12 cases where you look at it, you are going to be able to tell

13 it's so likely that there's a violation that we're not going

14 to engage in what Your Honor described as the most searching

15 form of antitrust analysis, namely, the rule of reason

16 analysis.  We're going to take a quick look.  And it is in the

17 context of those quick look cases that the language that the

18 government embraces here about only looking at the mechanism

19 and not having to find actual anti-competitive effects is

20 found.

21        I would respectfully submit, Your Honor, that were

22 this Court to apply the quick look standard to this vertical

23 rule of reason case, that would be legal error.  It's never

24 been done.  We can find no instance in which any rule of

25 reason vertical case has applied the quick look standard, yet

1   it's what the government argues for here and hangs so much of

2   its hat on.

3          The Indiana case is really the quintessential,

4   quintessential quick look case, and if Your Honor looks at

5   slide three in our deck is a quote from the California Dental

6   Association against Federal Trade Commission case in which the

7   Supreme Court says, describes when you apply the quick look

8   standard --

9          THE COURT:  It's coming.

10         MR. CHESLER:  Thank you.

11         It says, An observer with even a rudimentary

12  understanding of economics could conclude that the

13  arrangements in question would have an anti-competitive effect

14  on customers and markets.

15         That's the -- it's the per se light approach that

16  the Supreme Court adopted.  It doesn't apply in this case and

17  yet, the government sites horizontal cases for that standard.

18         The actual standard, Your Honor, is repeated in a

19  number of Second Circuit cases and slide four is two examples

20  of that.  One is the KMB Warehouse case from 1995.  It's a

21  Second Circuit case.

22         The quote we have put up here, there's several in

23  the opinion and we pulled out one of them which says, Isolated

24  statements of preference -- I like this person's product

25  rather than that -- are not a sufficient "empirical

1   demonstration concerning the adverse effect of the defendants'

2   arrangement on price or quality, quoting, in turn, from the

3   Jefferson Parish case in the Supreme Court.

4           In the Todd v. Exxon case, then Judge Sotomayor also

5   talked about what is required in the actual standard that

6   applies here when she pointed out that the plaintiff will have

7   to make a substantial presentation of evidence to support her

8   claim that salaries would have been higher without the

9   information exchange.

10          Not an expert who comes in and says let the chips

11  fall where they may, maybe the price will go up, maybe the

12  price will go down.  Not a plaintiff who's confronted with

13  actual U.S. market conditions in which the price went up, not

14  down.  But a plaintiff who makes, in Judge Sotomayor's words,

15  a substantial presentation of evidence to support the claim

16  that salaries or, in this case, prices would have been higher

17  without.

18          Now, to avoid confusion down the road, Your Honor,

19  there are two sections in the Indiana Federation opinion, two

20  separate pieces and one piece has a statement of the law which

21  is pretty straightforward with which, I think, everybody

22  agrees and that is, and certainly the government has argued

23  that in this case, that you can obviate the need to prove

24  market power by proving actual detrimental effects.

25          That's not the portion of the opinion that they

1    quote from.  The portion of the opinion they quote from is

2    where the Court recites the quick look standard and talks

3    about disrupting the pricing mechanism and that, as I said, is

4    not the law.

5            They also mischaracterize, Your Honor, other cases.

6    And one that I just want to pause on for a moment because it's

7    a case I'm going to come back to several times is the U.S. v.

8    Visa case, the rules decision, exclusionary rules decision.

9            They say in their conclusion of law, number 20 --

10   let's put up slide five.  They say, "Stunting price

11   competition is itself an adverse competitive effect," and they

12   cite U.S. v. Visa.  You'll note, Your Honor, that there's a

13   bracket around the "S" in "stunting" and they've capitalized

14   it so we pulled up the actual statement from the Visa case

15   from which they cropped the quote.

16           You'll see it says, The District Court found that

17   Visa USA and MasterCard's exclusionary rules -- let me pause

18   there -- harm competition by reducing overall card output --

19   that's an affirmative finding of an actual adverse effect,

20   reducing output -- and available card features which is

21   innovation, reducing innovation, as well as by decreasing --

22   not the possibility, but an actual adverse effect --

23   decreasing network services output -- and then comes the

24   phrase -- and stunting price competition.

25           They've excluded the whole front end of the sentence

1    in which all of the actual adverse impact language appears

2    which is the standard that the Court applied in U.S. v. Visa

3    and they cropped the quote for the last three words suggesting

4    to Your Honor in this finding, in this conclusion, I should

5    say, and others, that they need not prove any actual affect on

6    price.  Just affecting the mechanism is enough.

7            I would submit, Your Honor, they simply can't move

8    the goal post that way.  The legal question, as I said, is

9    whether there's an actual adverse effect upon competition in

10   the relevant market and part of the problem here, part of the

11   problem is that we in the government, although the government

12   gives lip service to this being a two-sided market, we

13   fundamentally disagree on what that means.  The government

14   says we're asking you to do something that's never been done

15   before and, again, we respectfully disagree.

16           We're asking Your Honor with great respect to apply

17   the law as it exists.  The law says you must find an actual

18   adverse effect upon competition in the relevant market.

19   That's where the dispute exists.  The government says the

20   relevant market is for merchant network services and

21   Mr. Conrath stood here today and he said to you, oh, American

22   Express's definition of the network, and he pointed to one of

23   Professor Gilbert's exhibits showing that the network goes all

24   the way around from merchants to consumers, that can't be

25   right.

1        And what was Mr. Conrath's explanation for why it

2   can't be right?  He said, well, you can't substitute one part

3   of the market for another, they're not reasonably

4   interchangeable.  That's a remarkable statement from somebody

5   with as much antitrust experience as Mr. Conrath who is as

6   learned in the field as I know he is.  Let me give you an

7   example.  Suppose the relevant market is for men's suits.

8   Would anybody suggest that you could wear two pairs of pants

9   instead of one of the jackets?  Do all the components of the

10  market have to be interchangeable with one another for there

11  to be a market?

12       The question here is whether a transaction completed

13  on AMEX's network is reasonably interchangeable with a

14  transaction completed on the Visa or the MasterCard or other

15  network.  It's the transaction.  It's not pieces, components.

16  It's not jackets versus pants.  It's suits versus suits.  So

17  the government, as it does over and over again in this case,

18  asks the wrong question and not surprisingly, it gets the

19  wrong answer.  Nor is the question whether you can ignore what

20  happens on one side of the market which is what they accuse us

21  of and look at only one.  They say, oh, you can do anything,

22  you can abuse the merchants any way you want as long as

23  there's a benefit to the consumer and American Express says

24  it's okay.  Mr. Conrath said, perhaps not in such a colorful

25  phrase as I used, but he made the same point this morning.

1            That, again, is a mischaracterization of our case.

2    We're not suggesting that at all.  To the contrary, what we're

3    saying is that the market as it exists today is conferring

4    competitive benefits on both the merchants and on the

5    consumers.  I don't think there's anyone in this courtroom who

6    could stand up here and credibly say to you that if we were

7    still a check and cash society, that there would be the volume

8    of gross domestic product in the United States today that

9    there is.  No one can say that and be credible.  And the

10   reason it's not credible is because so much of the gross

11   domestic product today in America rests on the back of other

12   forms of transactions than cash and check, namely, credit,

13   whether it's bank borrowing or the plastic we carry in our

14   pockets, debit cards, credit cards, et cetera.  It increases

15   demand.  Where is that demand exercised?  Where is the money

16   spent for that demand?  It's at the merchants.

17           The idea that we suggest that the merchants are long

18   suffering prisoners of our theory that only the consumers

19   benefit is frivolous.  They both benefit.  The consumer gets

20   her rewards, the merchant gets his purchase.  And the way the

21   consumer gets her rewards is by buying the product at the

22   merchant.  Everybody benefits.  And if we stop recruiting

23   Cardmembers, then merchants will have no interest in taking

24   our business, and if merchants stop carrying our cards,

25   consumers will have no interest in carrying our cards.  That's

1  the network effect in which all three economists agree.

2          You can't, Your Honor, with respect, accept the

3  reality of that network effect and then draw an impermeable

4  membrane down the middle of the market and say, I'm only going

5  to look at half.  I'm going to ignore the other side.  I'm

6  going to make believe that if a merchant pays more, she is

7  injured, as opposed to a merchant paying more and getting more

8  customers in her store buying more products.

9          Every merchant the government called who we asked

10  are you making more profit with the American Express card than

11  without said yes.  It's more profitable for me to carry the

12  American Express card than not.  And the way America works, at

13  least as I understand it, if it weren't, they would stop

14  carrying us the way three million plus others have chosen not

15  to and the government has proved nothing to contradict that.

16  Nothing.  They just ignore half the market and say that's okay

17  but we're not ignoring it.  We're looking at the benefits that

18  this model has provided to both, not to just one side.

19          And, Your Honor, it is not just an American Express

20  argument.  Their own expert -- and, again, they never

21  mentioned this today.  What did Dr. Katz say?  Let's look at

22  slide six.  What did Dr. Katz say when I asked him about his

23  testimony on First Data where he was on the other side of

24  Mr. Conrath and his team and he was critical of their theory?

25          It goes on to say, and I was referring to his

1  testimony in First Data, which was a debit network merger case

2  where the government was opposing a merger, "It is critical

3  not to draw unwarranted and misleading conclusions by focusing

4  solely on one side of a two-sided market.  I take it you agree

5  that you made that statement in that case, sir?  And he said,

6  I agree I made it and I agree with the statement.

7        Your Honor, that's exactly what the government is

8  doing here.  They're looking at one side and they're drawing

9  erroneous conclusions, but I say, again, even if you look at

10 only the one side, I challenge them to show you a case in

11 which the government's only economist has ever testified that,

12 in fact, the price effect that they say will come about may

13 not come about and the government prevailed showing that that

14 price effect was anti-competitive.  They can't.

15       Indeed, the closest we can find is a case in which

16 the court actually suggested that because there was going to

17 be more affirmative argument, more affirmative statement than

18 Dr. Katz said because there was going to be no change in the

19 price, that the plaintiff lost.  They couldn't prove an

20 anti-competitive effect because they couldn't prove that the

21 price would, in fact, go down.  Well, that principle, Your

22 Honor -- that's a Second Circuit case.  I believe it's KMB

23 Warehouse and if I have the citation wrong, I'll fix it later.

24       Your Honor, they can't prove that the price will, in

25 fact, go down and they didn't prove it.  The experts said

1   let's the chips fall where they may, the price may go up.  And

2   that brings me, Your Honor, to what we call the natural

3   experiment.

4          The natural experiment is what's been going on with

5   respect to the 3 million plus merchant locations that do not

6   accept American Express, that accept Visa, MasterCard and

7   Discover, and have been subject to the "but for" world that

8   the government conjures up for the last three to four years.

9          Now, as we put in the evidence about this, Your

10  Honor, their competitive impact statement to this Court and

11  the press conference they held the day they announced the

12  settlement both said there will be immediate, immediate

13  pro-competitive results.

14         In fact, the Wall Street Journal asked the

15  government at the press conference, You're telling us that

16  we'll all have to wait to see the results of this until the

17  American Express case is resolved?  And Assistant Attorney

18  General Varney said, oh, no, oh, no.  There are, she said,

19  4 million merchants in the United States that do not accept

20  the American Express card and you will see the benefits of

21  this settlement immediately.

22         So what's happened?  What did Mr. Hochschild of

23  Discover testify under oath happened?  The rates all went up.

24  Not a nickel of savings was passed on to consumers because

25  there weren't any savings to pass on.  All rates of all three

1    went up.  Surely the government can't suggest that we were

2    responsible for that.  We're not there.  So what do they

3    answer?  They've got a bunch of other theories.  Well, it's

4    too soon to tell.  They're small merchants.

5              Four years, Your Honor, is not too soon.  When

6    Dr. Katz was asked how long would he expect to wait until he

7    saw steering to debit after the Durban amendment, he said if

8    it isn't happening in a year, it's not going to happen.  They

9    didn't even try to explain why that year shouldn't apply here.

10             Why is four years not soon enough here and a year

11   was soon enough for steering to debit?  They said, well, it's

12   smaller merchants.  The merchants who do not accept American

13   Express are the same size as 98 percent of the merchants who

14   do accept American Express.  So, if the government genuinely

15   means that you shouldn't expect to see any change, you

16   shouldn't expect to see any decrease in merchant fees for the

17   98 percent of our merchants, then what they're telling you is

18   they brought this lawsuit for the 2 percent of the merchants

19   because the 98 percent are beyond help according to them.  If

20   they stand up on rebuttal and they say, oh, no, we brought it

21   on behalf of all the merchants, then I would like to know how

22   come the prices have gone up at the 4 million or 3 plus

23   million merchant locations that we're not present at.

24             So, I can't predict the future, but I can read and

25   I've read what Mr. Hochschild said, indeed, he said it in

1   response to a question I asked.  In fact, I was here.  So were

2   you.  He said the rates went up at all of those the merchants.

3   So, what's the actual evidence of fact of what happened, not

4   theory of what may happen in the new world, what's happened?

5   The rates have gone up.

6           I would, I would suggest, Your Honor, with great

7   respect, that to draw an inference from the government's

8   suggestion because 12 merchants came in and said, I think if I

9   can get rid of those darn NDPs, my rates would go down, I

10  could play these guys off against each other as if they were

11  selling couches to IKEA in a one-sided market, that's what the

12  guy from IKEA said, to base it on that when their own expert

13  said they might well go the wrong way and three plus million

14  merchants are paying more today than they were before in the

15  "but for" world the government conjures up would be an error.

16          THE COURT:  It might be that the Visa and MasterCard

17  are smarter than whoever that person was at the Justice

18  Department who made the comment and they decided, well, as

19  long as we have the cover of American Express with their

20  anti-steering provision, we're not going to go out and tell

21  the merchants that they can go out there and steer because we

22  can just raise the price until the AMEX case gets resolved.

23          MR. CHESLER:  Your Honor, that's a theory.  There's

24  not a shred of evidence.

25          THE COURT:  No, but what I'm saying is they have,

1  Justice Department had its theory and I can't divine why it is

2  that there isn't competition where there's the ability to

3  compete with one major exception, and that is that the AMEX

4  NDPs.

5          So, you know, I mean, I understand your argument,

6  but there are, you know, I'm a judge, you know.  I didn't go

7  to the Harvard Business School.  I assume this will be a, if

8  it isn't already, a project or a case at Harvard Business

9  School at some point.  I don't know what it will say, but it

10 will be out there and I'm thinking, you know, that it's an

11 unresolved issue.  So, for you to argue that it didn't happen,

12 it's because it's not a completed process.

13         Isn't that really what's going on here?

14         MR. CHESLER:  I don't think so, Your Honor, and let

15 me say why.

16         I'm not suggesting there aren't --

17         THE COURT:  And I'm not disparaging the Assistant

18 Attorney General.

19         MR. CHESLER:  I'm very happy, on the basis of joint

20 and several liability, Your Honor, I'm thrilled to hear it.  I

21 may add had you gone to the Stern School at NYU, there might

22 be a case on that subject.

23         THE COURT:  That was my mistake.

24         MR. CHESLER:  Your Honor, I'm not suggesting there

25 aren't many theories that one could offer for why.  I'm making

1  I think a simpler point and my point is this.

2          If you look simply at the facts, I think we all

3  agree in this record the facts are there are over 3 million

4  merchants for whom our NDPs don't exist, who are not subject

5  to the Visa or MasterCard NDPs because of the decree, and

6  their rates went up.  That's a fact.  And all I'm saying is

7  when you look at the theory the government supplied, it was

8  delivered by Dr. Katz who didn't say, I can tell you with

9  great confidence and, in fact, without exception the rates in

10 fact will go down.  He said they may well go up.  In fact, he

11 pointed out, as it's true, after the exclusionary rules case

12 was decided, the rates did go up.

13          Why?  Why did the rates go up after the exclusionary

14 rules?  Because of the competition that was unleashed on the

15 consumer side of this two-sided market which the government

16 says is not part of the same market, they were now competing

17 for the consumers and they raised the rates for the merchants

18 to provide funding to generate and fuel that competition on

19 the consumer side.  So, in fact, after the government won the

20 exclusionary rules case, merchant fees went up.  Dr. Katz

21 there predicted they would and he was right.  By the way, the

22 government said that would be a good thing.

23          Why was it a good thing in the exclusionary rules

24 case?  Because it was going to foster competition among the

25 consumers.  Now they say higher rates would be a bad thing and

1  they said they sued us to guarantee lower rates.  They didn't

2  tell you that they sued us because the lower rates might

3  happen.  They told you they sued us because the lower rates

4  would happen and their economist doesn't agree with that and

5  the facts in the record don't agree with that.

6          By the way, Your Honor, they mentioned Canada at one

7  point in the proceedings, the rules of conduct that have been

8  implemented in Canada.  What's happened in Canada?  Rates have

9  gone up.  That's two.  They mentioned Australia where the

10  government, unlike this government, regulated rates and

11  slapped a lid on Visa and MasterCard rates at half or I think

12  a quarter of what they were before.  What happened there?  The

13  consumer fees went up and the rewards went down.  The idea

14  that these are not an inexplicably linked two sides of one

15  market is simply inconsistent with everything in the record.

16  Whether you look at Canada, whether you look at Australia and,

17  most importantly, whether you look at the United States, they

18  have no factual scenario.

19          So, back to your suggestion of why, that may be the

20  answer, Your Honor.  I don't know and you don't know.  What I

21  do know, though, is if you look at the facts in the record,

22  every one of these goes the wrong way for them and their own

23  messenger didn't deliver the message as he was planning to

24  deliver it.  He said no, it could go the wrong way too.

25          Now let's come to Mr. Chenault.  You asked

1   Mr. Conrath.  You said you were saving that question for me.

2   Let me preempt that by answering that question if I may.

3            Mr. Chenault lived through the history of what

4   happened in what the government says was competition on the

5   merits.  It almost destroyed his company.  We saw and heard

6   the architect of that strategy.  He was on the stand.

7   Mr. Morgan.  We saw the contemporaneous report he delivered to

8   their board in Cannes, France.  He drew exactly the same

9   circle in his Visa document never having seen Chenault's

10  presentations of the circle of our model.  He drew the model

11  and he put a big fat "X" through the merchant fees.

12           This wasn't competition on the merits.  This wasn't

13  I'm going to do their playbook one better.  This was I'm going

14  to choke off the funding for their point of sale relationship

15  so that they can't fund those pesky rewards and what will we

16  do?  We will blast them back into a niche.

17           By the way, a niche which the government tells you

18  is a standalone relative antitrust market, travel and

19  entertainment which I'll come back to.

20           Their strategy was laid out in simple English almost

21  20 years ago.  Cut off the funding and it will kill them.  And

22  the American Express company lost one-fifth of its entire card

23  business in the United States in four years.  Mr. Conrath said

24  there was a lot of stuff going on, they were trying to be a

25  supermarket.  Where is the evidence that that had anything to

1   do with the near death of the company?  There's no evidence.

2   That's just a guess.

3         What the chairman of the board said -- he put

4   himself in a public courtroom with stock analysts standing in

5   the back.  I've never seen a CEO of an American company who

6   had the courage to do that, Your Honor.  The guy from Visa

7   that they keep pointing to, he was running a nonprofit

8   association owned by a bunch of faceless banks standing behind

9   him.  He wasn't the CEO of a public company who stood and sat

10  in a public courtroom and told the stock analysts that if I

11  lose this case, it might well kill my company.  He did that

12  because he lived through the history.

13        Now, to use your point, and the answer to your

14  question is I agree with you.  It was a dramatic statement to

15  make a point.  That the government would put American Express

16  in harm's way at a world of uncertainty, for what?  A theory

17  which their own expert wouldn't sign up for.  A theory which

18  is contradicted by the real world evidence that's happened at

19  those 3 million merchants over the last three or four years.

20  That was the point.

21        By the way, it wasn't, as the government suggests,

22  inconsistent with or not supported by anybody else in American

23  Express.  That's a remarkable statement.  Four other

24  executives came here.

25        THE COURT:  No, I know what Mr. Gilligan said.

1          MR. CHESLER:  Thank you.

2          THE COURT:  I was here for the six plus weeks.

3          MR. CHESLER:  That's how I recall it.

4          THE COURT: Yes.  Go ahead.

5          MR. CHESLER:  So let me go on.  I've talked about

6     the experiment.  I've talked about the foreign --

7          THE COURT:  I don't want you to get too excited

8     because your message is being received.  Would you like

9     something stronger?

10         MR. CHESLER:  Do you have any sedatives up there,

11    Your Honor?

12         THE COURT:  If you keep this up, I might need it.

13         Go ahead.

14         MR. CHESLER:  Okay.  The government also says that

15    our position is that merchants will not steer.  Your Honor, we

16    wouldn't be here if we thought merchants wouldn't steer.  We

17    could have done what Visa and MasterCard did, give them

18    sleeves out of our best settlements and go, fine.  They agreed

19    to that because no one is going to steer to us from them

20    because they don't have our cards in their wallets.  Steering

21    can only go one way here.

22         The record is, I don't think it's in dispute here

23    that most of our cardholders, almost all of them have the

24    other cards.  A very small percentage, one-third, different

25    estimates, about one-third of their cardholders have ours.

1   You cannot, as Dr. Katz admitted to me, you cannot steer a

2   consumer to a card she does not have.  So, of course, Visa and

3   MasterCard agree.

4            Our position is that steering will happen, not that

5   it won't happen, and when it does, it will create the very

6   uncertainty that Mr. Chenault was talking about.

7            Now, there's another factual basis in the record,

8   Your Honor, to demonstrate that the government's theory is

9   wrong.  Beyond Australia, beyond Canada, beyond the 3 million

10  plus U.S. merchant locations, and that's the theory that they

11  have about Discover.  They say Discover can't harm

12  competition.  We didn't sue Discover because their share is so

13  low, that they can't harm competition.  American Express has

14  got five times the charge volume that Discover has so we sued

15  American Express but not Discover.

16           Well, how about the many, many merchants in the

17  United States where according to the evidence in the record,

18  AMEX share has been as low as Discover's share has been?  Five

19  percent, 6 percent, 8 percent.  Why isn't the government's

20  "but for" world in existence there?  We can make a lot of

21  theories for why.  I'm just sticking to the facts.

22           It's not just that it's not happening where we don't

23  compete at all.  It's not happening where, according to the

24  government's theory, it should be happening because we can't

25  harm competition.  We can't be a threat to Visa and MasterCard

1   with 4, 5, 6 percent of the spend just like Discover according

2   to them can't stop it and yet it's not happening.  And the

3   reason Your Honor, I submit is clear.  Visa and MasterCard

4   don't compete against each other.  They are, in fact, a

5   duopoly.

6           They in fact have either three-quarters or

7   80 percent of the market depending on whether you put debit in

8   the market or not.  And I would submit, Your Honor, as we're

9   thinking about and as you go back to Chambers and you think

10  about the reasons for why the record is what it is, I would

11  submit that the most plausible, most realistic and most

12  consistent with the evidence reason is that Visa and

13  MasterCard don't compete against each other.  If they did,

14  they would be competing now at those merchants.  If they did,

15  they would run over us like a road kill at the merchants where

16  we have five percent like the government says they could be

17  doing with Discover.  They don't compete.  They were born as

18  twins.  They still act as twins.

19          You may remember one of the witnesses said, I think

20  it was Mr. Moore, that Visa and MasterCard were like two

21  entrances to a clubhouse at a single country club.  That's the

22  way he described them at the time he was giving his speech in

23  Cannes.  That's exactly what they are.  Oh, yes, they're

24  public and owned by separate groups of shareholders and maybe

25  overlapping.  When you look at their boards, there are a lot

1   of bank representatives on the boards.  The reality is that if

2   you left the two of them alone, this market would be

3   dramatically different from what it is today and it would not

4   be for the better.  It would be for the worse.

5              So, Mr. Chenault didn't tell you, didn't give you a

6   written guarantee that his model will die and his company will

7   die, but what he said was there is a real risk that it will

8   and the question is what's the other side of the weight, what

9   is the other side of the scale Your Honor must balance against

10  that real risk, a risk which almost came to fruition 20 years

11  ago in the We Prefer campaign.  The alternative is the

12  government's theory with all the factual scenarios of all

13  those merchants and all those situations going the wrong way.

14             So, what did the government actually prove?  They

15  called a dozen or more, 15 merchants, and say I would like to

16  pay less.  And if I didn't have NDPs, I believe I would pay

17  less.  Well, Your Honor, as I said in the opening, everybody

18  would like to pay less for everything.  That doesn't equal an

19  antitrust violation.

20             In fact, the government says, well, AMEX's prices

21  have increased over time.  No, they haven't.  Even Dr. Katz's

22  price chart which Mr. Conrath put up this morning, while it

23  doesn't have as dramatic a slope down as the Bernheim chart

24  does, it's drifting down, not upward.  So, the prices have not

25  gone up.

1          In fact, if we look at slide 15, there's going to be

2     a blank on the screen because this is confidential data, but

3     it's in your book, Your Honor.  This is a chart that

4     Professor Bernheim used which covered the time frame of 2002

5     to 2010 in which he talked about what actually has happened to

6     the AMEX rates over that period of time with respect to their

7     merchants.

8          There's no support in the record for the suggestion

9     that the prices, using merchant discount rate as the price and

10    ignoring the two-sided price.  There's no evidence the price

11    has gone up.  The evidence is the price has gone down and the

12    slope depends upon whether you look at our expert or theirs

13    but both of them go down.

14          (Continued on next page.)

15

16

17

18

19

20

21

22

23

24

25

1        MR. CHESLER:  In fact, your Honor, the government

2    suggested the prices are too high.  And I would submit there

3    is no evidence in the record to support the proposition that

4    as a matter of antitrust law, our prices are too high.

5        In order for a plaintiff to prove that a price is

6    too high for anti-competitive purposes, for antitrust

7    purposes, they have to demonstrate what the price would be in

8    the absence of the restraint.  In fact, if this were a private

9    case, the plaintiffs would have to be able to prove, Here is

10   what it would be without the NDP, and here is what it is, and

11   I'm entitled to my damages.

12       The government doesn't have to prove damages.  It

13   has to prove an actual adverse effect.  Mr. Conrath didn't

14   refer to, in fact they didn't prove, what the price would in

15   fact be in the absence of the restraints.  They just said,

16   It's too high.

17       Well, saying it's too high doesn't constitute an

18   antitrust violation, and saying if there were steering, the

19   prices would go down, we doubt whether that would actually

20   happen given what's happened that the price, to the discount

21   rates.  But suggesting it would go down doesn't prove it was

22   too high to begin with.  Prices are only too high for

23   antitrust purposes if they are supra-competitive prices.

24       Suggesting that AMEX's price is higher than Visa's,

25   putting aside the fact that the premium is gone, pointing to a

1  particular merchant and saying, American Express got whatever,

2  twenty basis points and Visa got 220, therefore, it's too

3  high, with respect, that doesn't prove it's too high.  It

4  proves the arithmetic.  It proves the AMEX price is higher

5  than the Visa price for a different product that's in the same

6  market.  It's higher.  That's all it proves.  And there's

7  nothing illegal about that.

8          Cars compete with other cars, where the prices

9  differ dramatically because they are differentiated.  Airline

10  tickets compete with airline tickets, and yet one airline

11  charges more to get to a same city from another one because

12  they believe they have differentiated their product and they

13  can charge more.

14          The fact that AMEX has a higher rate at some

15  merchants than others is proof of nothing other than it has a

16  higher rate at some merchants' than others.  The unrebutted

17  testimony from four separate witnesses, Chenault, Quagliata,

18  Gilligan and Flindon, the unrebutted testimony is that on the

19  mix-adjusted basis, which their witness Mr. Hochschild

20  admitted is the fair way to compare prices in this industry,

21  there is no American Express premium.  It's gone.  They say

22  the market is broken.  There's no competition.  It's gone

23  because there is competition.

24          The AMEX prices have come down.  Whether you look at

25  two sides or one side, they have come down, and Visa and

1   MasterCard have gone up.  Why have they gone up?  Because they

2   have enormous market power, that's why.  They control seventy

3   percent or eighty percent, depending upon how you count, of

4   the market.

5           One other reason they have gone up, because the

6   government won their case fifteen years ago.  Every time we

7   turn on the TV and every time you stop at an airport and look

8   at the sign on the wall telling you what's in your wallet,

9   that competition is being driven by what the government did

10  and what my client has done and what Visa and MasterCard have

11  had to do.  Your Honor may remember that there's a document in

12  the record in which Chase says, We're copying the AMEX

13  playbook.  They are not doing it because they want to.  They

14  are not doing it because they feel like it.  They are doing it

15  because they have to.

16          Why do they have to?  Because we are differentiating

17  a product and offering rewards to people that they were not

18  offering.  They have not only matched this, I think

19  Mr. Chenault said, They are ahead of us now.  We have to catch

20  up.  We have to invest more on the consumer side to catch up

21  to them, because they have lapped us in some respects.  They

22  are not doing that because they feel like it.  That's in fact

23  the competitive market, which the government says is broken.

24          (Pause)

25          THE COURT:  Let's proceed.

1          MR. CHESLER:  Thank you, your Honor.

2          Several more points on this competitive-effect

3     issue.

4          First, the government says these are two separate

5     markets, one involving merchants, one involving consumers.

6     They cite you to cases, the Philadelphia National Bank case,

7     the Topco case, which they say stands for the proposition that

8     you cannot defend diminished competition in one market on the

9     basis that there's an increase in competition in another

10    market.  That is an unremarkable proposition, with which we

11    agree.  It doesn't have anything to do with this case.  This

12    is a case that involves a market.

13         I'll say it one more time and I'll stop.  Even if

14    you only look at half of their market, their competitive

15    effects case goes the wrong way.  I said before that we are

16    not asking your Honor to apply a new principle of law, but

17    rather the long-existing principle of law that they must prove

18    adverse effects in the market.

19         I would cite, if you look at slide seven, this is a

20    quote from the KMB Warehouse case in the Second Circuit from

21    1995, in which the court states the often-repeated test in the

22    Circuit, "KMB has thus failed to come forward with any

23    evidence that defendant's actions adversely affected service,

24    quality, or price, market-wide."

25         What is in the market is a case-by-case

1   determination based on the facts in that case, but the law

2   that you must look market-wide for the effects is long

3   established, and that case, among many others, says that.

4          I said to your Honor before that there was a case in

5   which the plaintiff's evidence showed that the price would

6   remain the same if the alleged restraint was eliminated, and

7   the Court said that was dispositive and fatal to the

8   plaintiff's case.

9          I said I thought it was KMB Warehouse, and I might

10  have misspoken.  I did.  It's the Capital Imaging case.  This

11  is slide 12.  Here, the Second Circuit says, in 1993, but

12  Capital concedes in its brief, that whether or not it is

13  admitted into the physicians' association -- there was a

14  physician wouldn't let the plaintiff in -- the fee for

15  radiological services would remain the same.

16         And it goes on and says, "Therefore, Capital has not

17  made an adequate showing of a detrimental effect to obviate

18  the need."  They didn't say that the pricing mechanism has

19  been tampered with.  It was.  What they failed to do was show

20  that the prices were in fact higher than they would be.  And

21  when the Court made the finding that they hadn't shown that,

22  the Court dismissed their claim.  And that, your Honor, is the

23  problem with the government's case here.  They have not shown

24  they are in fact higher.  They are aspirational, said they

25  think they are higher, but they have not proved it.

1        Your Honor, I was going to spend some time, which I

2   don't think I need to, frankly, on the testimony of the

3   various American Express executives on what they foresee as

4   happening to them and their business were this to go away.  I

5   think that you have that in mind, and I am not, in the

6   interest of time, going to spend time on that.

7        I do want to spend just a few more moments on the

8   Visa We Prefer matter.  I wanted to show your Honor, so we

9   have it in front of you-- and I have it specifically referred

10  to here, slide 28 -- this was the diagram that I mentioned

11  before that Mr. Morgan used, not for trial but many, many

12  years ago he was planning his campaign.  As he says in the

13  testimony next to it:  "And you thought breaking the success

14  cycle would pressure American Express' merchant discount and

15  weaken their financial --

16        "Yes.

17        "You also thought that if you could break the

18  premium of price success cycle, you could encourage consumer

19  preference for Visa and keep AMEX as a niche product, right?

20

21        "Yes."

22        Mr. Chenault lived through it.  He made what he

23  called his call-to-arms speech eighteen years ago, long before

24  he was even called as the government's star witness in the

25  Exclusionary Rules case, let alone had any inkling in his head

1   this case would take place.  This was not a

2   made-for-litigation position.  He said what he said it was.

3   It was a call to arms.

4         What he said in that speech was without Welcome

5   Acceptance, our investments don't matter.  They are for

6   naught.  They won't help us.  They won't drive the

7   competition, because our customers will be scared away and,

8   therefore, none of it matters.  You can make all the

9   investments you want up front.  If at the end of the day

10  people aren't in fact using your card, the investments don't

11  matter.

12        Now, the government suggests that Welcome Acceptance

13  is a pretext of some kind to insulate American Express from

14  competition.  It is exactly the opposite, your Honor.  It is a

15  competitive force that American Express has spent a fortune

16  developing for decades, so that it could survive and prosper

17  in a market dominated by other networks.

18        I think Mr. Silverman perhaps stated it best.  He

19  said in a network-effect market -- remember, he's the young

20  fellow who runs the consumer side of the American Express

21  business, came from one of the Internet companies -- he said,

22  In a network-effect business, where you don't get consumers if

23  you don't have merchants, and you don't have merchants if you

24  don't get consumers, you either have to be the biggest or the

25  best.

1

2          American Express is never going to be the biggest,

3   no matter what it does.  The deficits are too great.  The

4   lingering effects of the exclusionary rules and the agreements

5   that were entered into with the banks after the exclusionary

6   rules, which have essentially preserved and perpetuated many

7   of the adverse effects of those rules, continue as real forces

8   in the marketplace.

9          There are seven banks I think that issue American

10  Express cards.  There are 10,000 that issue Visa and

11  MasterCards, etcetera.  We are the smallest cards in location

12  and force.  They are never going to make up the deficit.  They

13  have to be better.

14         What Mr. Chenault got on the stand and said was, In

15  some respects today, we are not better, because some of the

16  competitors are doing a very good job of duplicating and even

17  improving upon our playbook, so we have to be vigilant to jump

18  ahead of them again.  That is not, I submit, a description of

19  a broken market.  It is a description of the paradigm of a

20  competitive market.

21         The evidence about the Visa campaign also showed

22  that Visa was acutely aware of something your Honor heard a

23  lot about during this case called the spilling-over effect.

24         If you look at slide 30.  Mr. Morgan was asked:

25  "And you were asked about this at your deposition.  You

1  understand the point that is reflected here is that the We

2  Prefer Visa campaign may influence consumers beyond just the

3  store that displays the We Prefer signage; right?

4          "Yes, I do.

5          "That's what it means by, no matter what kind of

6  cash register you are standing in front of; right?

7          "Yes.

8          "So, even though you've got We Prefer at T&E

9  merchants, even if you are standing in front of a cash

10 register Everyday Spend merchants or a home retailer, the way

11 you designed this program was that We Prefer could influence

12 behavior in all those circumstances; right?

13         "Right."

14         That's, again, a feature of this market, which is

15 different from many other markets.  And there's tons of

16 evidence in this record about how what happens at a merchant

17 affects what happens at other merchants.

18         There was the example of losing the Continental

19 lounge, and AMEX spend levels in the State of New Jersey

20 declined, not just at the lounges and not just at the airport.

21 There's the example of making a deal with Safeway, and

22 spending in the store near Safeway stores went up.  That's the

23 spillover effect.

24         What Visa understood as acutely as American Express

25 did is, if they could choke off the point of sale, if they

1    could kill the funding source for the benefits to consumers,

2    it was not just putting the AMEX model in jeopardy, blasting

3    them back to be a niche T&E supplier, the spillover effect of

4    doing that would hurt them across the board.  And that is why

5    they lost a fifth of their entire card business in four years,

6    because it has a spiraling, snowballilng effect.

7            The empirical studies that are in evidence show that

8    AMEX's network remains today highly sensitive to spillover.

9    And slide 32, which is from an internal AMEX document,

10   DX 404 from 2007, many years after the We Prefer campaign,

11   demonstrates that the spillover effect still takes place.  You

12   see it's says, in the highlighted area, "Twenty-five percent

13   of the card members suggest that such experiences do affect

14   future usage propensity."  They look at it all the time, your

15   Honor, because it's so important to the success of their

16   business and their ability to compete

17           And you may remember, there was some questioning of

18   Dr. Katz, in which he conceded, and if you look at slide 34,

19   this is from Dr. Katz's examination, we were looking at a

20   study that was done of the impact that writing about in the

21   economic literature about the Everywhere You Want to Be

22   campaign, and the We Prefer, Everywhere You Want to Be came

23   before the We Prefer.

24           The data we are talking about at this page of the

25   transcript shows, in terms of their cardholder tracking study

1   of consumer perceptions of which card is accepted by more

2   merchants, American Express starts at twenty-five percent.

3   After Everywhere You Want To Be, they are down to eight.  But

4   after We Prefer, it's cut in half again, and they are down to

5   nine.  It was working.

6           Whether you agree with Mr. Chenault's ultimate

7   observation or not, he lived through that history.  He saw the

8   power of what would happen to that business model, which

9   fourteen years ago the government allowed was the best hope

10  for this industry, and he saw, he, Mr. Chenault, saw what

11  could happen to it in the face of exactly the relief that the

12  government is asking for here.

13          By the way, I won't stop on it now, slide 35 in your

14  book shows as recently as three or four years ago, Visa was

15  looking at another campaign, in which they said there would be

16  a contagion effect by -- again, that's just the provocative

17  word for spillover -- a contagion effect on American Express's

18  use at other merchants as a result of the strategy they were

19  considering to do at the time.  So, it's not competition on

20  the merits, your Honor.  It's real, and he lived it.

21          And if you look at Mr. Hochschild's testimony at

22  slide 38, I was asking him here about what happens if a

23  customer has a negative experience at the point of sale:

24  "Isn't it also the case that if the customer has a negative

25  experience at the point of sale as a result of the merchant

1   attempting, for whatever reason, to get her to use a different

2   card, that that can impact the customer's perceptions of the

3   product, their perceptions of your brand, the likelihood that

4   they will continue to use it, so that that can be detrimental

5   to the relationship you have with your customer?  Don't you

6   agree with that, sir?

7           "Yes."

8           He admitted elsewhere in his testimony that Discover

9   adopted its own nondiscrimination provisions in order to

10  attempt to protect itself against that kind of

11  life-threatening conduct.  Now, he had explanations about, Oh,

12  ours aren't really the same as AMEX's.  When I showed him the

13  language, they are the same.  I asked him if he told his

14  merchants they were not really the same.  He said, No, we are

15  in the process of working that out.

16

17          Again, what he may do in the future is speculation.

18  What we have now is NDP's that look almost exactly the same as

19  ours and implemented for the same reason.  The only difference

20  is, the government didn't sue them, because their shares are

21  too low and they are not worried about them.  Yet they put all

22  their chips -- and I heard Mr. Conrath say today they are

23  putting their chips on the Discover box in the roulette board.

24  There was protectionism.  American Express is here urging

25  protectionism.  Discover is the answer.  Free them up from the

1   bonds of these NDP's, and they'll set you free.  They are like

2   the old Washington senators.  They have been in the basement

3   for twenty-five years.  They have never left twenty-five

4   percent of the market.

5           You heard what Mr. Hochschild said when I asked him,

6   Why aren't you pursuing this strategy at the merchant where we

7   don't do business, where you don't even have NDP's Visa and

8   MasterCard?  He said, Well, we looked at the top hundred.

9   They all had American Express as a vendor, as well, so we just

10  closed down the committee.

11          The only evidence in the record of how much business

12  is available at the three million-plus merchant locations that

13  he walked away from was Mr. Bernheim's estimate of $280

14  billion of spend every year.  Mr. Hochschild thought perhaps

15  it was not important enough to look at that.  So, what's

16  happened to his rates?  Has he pursued the strategy which the

17  government thinks he's going to pursue, which the government

18  wants you to implement here by deciding against us?  Again,

19  theories.  You can have lots of theories.  What are the facts?

20  The facts are that he's had an opportunity for the last three

21  and a half years to do exactly what he says he would do, and

22  he hasn't done it.

23          Instead, he's raised his rates.  When he was asked

24  why, he said, After I looked at the top hundred, I gave up, so

25  I ignored the $280 billion that was sitting out in the

1  marketplace.  Maybe that's why he's at five percent of the

2  market.  Maybe those kinds of business judgments have

3  something to do with that.

4          What we do know about the facts is, he didn't do it.

5  Frankly, when you look at the Visa and MasterCard documents,

6  tons of which are in this recorder, you will look long and

7  hard to find any references, let alone any suggestions, that

8  they take Discover as a serious threat.  They are filled with

9  AMEX references.  They don't care about Discover.  Discover is

10  almost meaningless to them, for the reason that the government

11  didn't sue them.  They can't hurt anybody.  There aren't

12  enough people using the card.  There isn't enough spend volume

13  on the card.  The idea that -- take any one of the merchants

14  that they put on the stand, take Sears, take any one of them,

15  Ikea --

16          THE COURT:  Take Walgreens.

17          MR. CHESLER:  Let's take Walgreens.  Remember what

18  Mr. Rein said.  I'm going to spend a few minutes on him before

19  I finish today.  Mr. Rein said the reason he reversed his

20  decision after a sleepless night, having announced he was

21  cancelling us publicly after he got whatever complaints he

22  got, he then cancelled those.  When I asked him why, he said,

23  Because I didn't want to disappoint or inconvenience my

24  customers.  I didn't want to inconvenience them.

25          He was advertised as an insistence story by the

1   government.  He was going to prove that, We have market power,

2   antitrust market power, by virtue of insistence.  He didn't

3   prove anything of the sort.  He had a thousand complaints with

4   over 800,000 American Express customers.  He had an in-house

5   expert who said, We could lose 5.3 percent of the AMEX spend

6   and be fine.

7          1,000 complaints out of 850,000 customers is so much

8   less than 5.3 percent.  It's a tiny decimal point lost in the

9   rounding.  Why did he say he reversed himself?  Because he

10  didn't want to inconvenience any customers.  That's what he

11  said.  Okay.

12         Well, he carries Discover for the same reason.

13  Think about the likelihood.  Think about the likelihood that

14  he's going to tick off -- to hopefully use a politically

15  correct phrase in this courtroom -- his Visa and MasterCard

16  customers by steering them to Discover.

17         Visa and MasterCard have -- I don't want to misstate

18  the record -- it's something like three-quarters or more of

19  the American Express's share of the spend at Walgreen's as

20  single digits, and Discover was about the same size.  Let's

21  assume they were both seven percent.  The two of us together

22  were fifteen percent.  That means Visa and MasterCard are 85

23  percent of Walgreen's spend.

24         Is it realistic for your Honor to presume, given

25  that Walgreens got on the stand and sorry that he reinstated

1   us because he didn't want to inconvenience any customers, that

2   he would say to the customers who account for eighty-five

3   percent of his purchase volume that, I want you to use

4   Discover?  There's no evidence in the record to support that.

5   There's no evidence that he would.  He didn't do it in the

6   example the government cited.  He didn't want his customers to

7   walk across the street, any customer, to CVS and fill her

8   prescriptions there with our card.  That's why he did it.

9   That was his testimony.

10          So, the question is, have they demonstrated, has the

11  government proven, anti-competitive effects?  I would say they

12  have.

13          Last point on competitive effects.  Free-riding.

14          The cases are legion that say that free-riding is in

15  fact anti-competitive, and rules that prevent it are in fact a

16  good thing.  And the evidence shows that in fact, the effects

17  of the marketing campaigns that American Express does with

18  merchants linger well, well beyond the time when the campaign

19  is over.

20          Dunkin' Donuts is a good example, where they said

21  their sales increased from the campaign, continued after the

22  campaign was over.  If those customers are steered away from

23  American Express, that's free riding, because that benefit to

24  American Express is taken away.  The investment we made in

25  that campaign, the effect of which survive the campaign, is

1   taken away by the steering.  That's classic free-riding.  And

2   the record also pointed to fixed expenses that in fact will be

3   lost in the event of steering, which is also free-riding.

4           So, your Honor, with that, I want to turn, if I may,

5   to market definition.

6           Now, with respect to the market, as Mr. Conrath said

7   and we agree about that, there are two issues.  One is debit,

8   and one is T&E. Let me talk about debit.

9           First, I said, when I said something about the

10  government's incredibly shrinking cases, they say in their

11  papers, We don't have to prove market definition.  We prove

12  anti-competitive effect we're done.  We have to prove it could

13  be, which I have covered.  In fact, they do have to prove a

14  relevant market.

15          And slide 50, two Second Circuit cases, KMB

16  Warehouse and the City of New York v. Group Health, many

17  others cases we could cite, they all say the same thing.  Your

18  Honor said it in one of the sentences of your summary judgment

19  opinion.  The first step is to prove the relevant market

20  before you go on to the other issues in the case.  So, I think

21  the law is pretty clear, in the law of the case as well as

22  this circuit, that they have to prove a relevant market.

23          What does the government do with respect to market

24  definition?  Well, they obviously want to keep debit out.

25  There's no secret about that.  If you put debit in the market,

1   American Express's share of charge volume is 13.9 percent a

2   year or so ago.  I asked Professor Katz, Can you give me a

3   single case where a defendant has ever been found to have

4   antitrust market power with that share?  He cited the Vons

5   Grocery case.  It's not a vertical case.  It's the only one he

6   can think of.  We can't find one.  Not one.  It's obvious that

7   debit has to stay out of the market.  Because if it doesn't.

8   The government has a real problem on market power.

9           So, they do two things that I would characterize,

10  your Honor, as an absolutist view of market definition,

11  neither of which we believe is supported by the law.

12          And they are, one, that the competition must be

13  perfect.  They must be perfect substitutes for one another in

14  order to keep them in the market.  Number two, that the test

15  is an all-or-nothing test.  Would you throw away this pen and

16  use only another pen?  And if you wouldn't throw this one

17  away, then you haven't proved that the two are in the same

18  market.  Neither of those absolutist tests is the law.

19          Let me start with perfect competition.  They ask --

20  slides 51, 52 and 53.  I won't put them up.  They are excerpts

21  from Dr. Bernheim's examinations where Mr. Conrath asked him a

22  series of hypotheticals:  Suppose you woke up on Tuesday and

23  you wanted to do one or the other.  You wouldn't agree with

24  that, that one is the substitute for the other?  It doesn't

25  have to be perfect competition, and that's not in the law.

1        In fact, if we look at slide 54 for a second, when

2   Professor Katz was on the stand, I asked him whether, a

3   question on the same hypothetical, and he said, Well, I said,

4   But you in fact put nonrevolving charge cards and revolving

5   credit cards in the same relevant market, don't you?  And I

6   want to pause on the question for a moment, your Honor,

7   because if perfect competition were the standard, if it had to

8   be a for-everyone-in-the-market debit, is always a perfect

9   substitute for credit or charged in order for them to be in

10  the same market, then the government could not have suggested

11  the general-purpose, general-card card market.  Revolving

12  credit and nonrevolving credit are not substitutes for each

13  other.

14        There are millions of people in this country who

15  have to carry a balance on their cards, because they can't pay

16  it off in full, and they are prepared to pay the interest as

17  high as they are in order -- because they can't afford to pay

18  the balance down to zero.  The government put the revolvers

19  and nonrevolvers in the same market, because they are not

20  perfect substitutes.

21        THE COURT:  I think we went through this.  I

22  understand your point.  This is not associated with the charge

23  card or a credit card that is used as a charge card, like,

24  let's say, one of the noncharge American Express cards?

25        MR. CHESLER:  Yes.

1          THE COURT:  Yes.

2          THE COURT:  Like the Starwood card or the Delta card

3     or one of those other cards?

4          MR. CHESLER:  Yes, your Honor, it is.

5          THE COURT:  Whereas the debit card has the

6     particular aspect of it where you use it, the money comes

7     right out of your checking account, and it's gone.  Basically,

8     a substitute for cash, in the sense that at the point of sale,

9     that money has departed your control?

10         MR. CHESLER:  That's right.

11         Just as if you are using a pure charge card, two

12    weeks later, three weeks later, when that bill comes, all of

13    that money also departs your account, because you have to pay

14    the bill in full if you are not a revolving card?

15         THE COURT:  Correct.

16         MR. CHESLER:  My only point is this.  Not that there

17    are not other ways for the company to earn money on the float

18    rather than on fees.  Just that they are not perfect

19    substitutes.  They are overlapping substitutes.  They are

20    reasonably interchangeable substitutes, and the government

21    puts them both in their market.  Yet when it comes to debit,

22    as the questions Dr. Bernheim illustrates, the government's

23    argument, is debit and credit have to be perfect or else they

24    are not in the market.

25         When I asked that question of Professor Katz,

1   basically the same hypothetical, he said, Yes, because as I

2   have just testified, I think this focuses on reasonable

3   interchangeability from the customer's perspective, and

4   looking at an individual customer and whether he or she would

5   be willing to switch is the wrong way to look at it.  I have

6   to take a quicker perspective in terms of what's happening

7   with customers overall.  And then you've got to see what it

8   means in terms of the merchant decision calculus.  Then

9   there's no conflict with what I have done there and what I

10  have done.  You don't confuse it with the perfect competition

11  model, is what I am saying.

12          Also, with respect to all-or-nothing substitution,

13  that's not the law.  And again, let me start with AMEX v. the

14  credit cards that are in the government's market.  The

15  government relies itself on testimony of witnesses, merchants

16  who say, I would not cancel American Express, even if it were

17  higher by some significant price than Visa.  The government

18  points to that as supposed evidence of our power.  But I ask

19  your Honor just to think about that in terms of what they have

20  told you the standard for defining a market is, and

21  Mr. Conrath used it against today.

22          The evidence was, you wouldn't throw one product out

23  and replace it in with the other.  They are not in the same

24  market.  You have all these merchants saying, I wouldn't throw

25  out American Express.  I continue to use it and credit, even

1    if there's a significant price disparity between the two.

2          Well, if that's the case, then the government's

3    evidence with respect to AMEX and Visa, for example, is

4    inconsistent with their theory that it's all or nothing, that

5    unless people will throw out credit cards and use debit only,

6    debit is not in the market.  They are not going to throw out

7    AMEX and use Visa only, yet they have them both in the same

8    market.

9          The answer, your Honor, lies in two places.  It lies

10   with respect to the consumer side of the market, and it lies

11   with respect to the merchant side of the market.  And I would

12   add a third one.  It lies in what the networks are saying to

13   themselves about the competition they face.  Let me pause on

14   that last one just for a moment.

15         Mr. Gilligan testified, you remember, and he

16   testified to the first presentation he ever made in front of

17   the American Express board, and it was a presentation on what

18   the company's strategy should be coming out of the recession.

19   And they observed that there was a significant move toward

20   debit during the recession, as people tried to be more

21   conservative about their financial affairs and discipline

22   themselves to use cards that would require them to pay it off

23   as they made the purchase, so they wouldn't get out ahead of

24   them on their finances.

25         What was the presentation that Mr. Gilligan made?

1   Well, if we look at slide 55, this is where he was talking

2   about it.  He says, Well, these are my speaking points on this

3   slide.  The slide was showing that -- I think the trend I just

4   said, that we believed consumer credit card volume was going

5   to shrink coming out of the recession.  Debit was growing

6   fast, and we wanted to position charge to be a smarter

7   alternative to debit in the minds of our customers.

8          If we did that, we thought charge card growth would

9   start accelerating, that it would become a growth part of the

10  company.

11         Your Honor, that's a real-world illustration of what

12  we are saying, and there's evidence from all four of the

13  networks internally saying to themselves, Debit is taking our

14  share away of credit.  Debit is a significant competitor.

15  It's taking a share away.

16         Here is the president telling the board, We have to

17  sell charge as a good alternative to debit, because otherwise

18  debit is going to take a share away from us coming out of the

19  recession.  That's competition.  That's the kind of real-world

20  competition that courts look to to players in the market.  I

21  know who our competitors are, and I see in the marketplace,

22  and that's what Mr. Gilligan was telling the board.

23         If you look at the consumer side, Mr. Conrath

24  pointed to the government's description here that merchant

25  demand for payment card acceptance is derived from consumer

1  demand.  He said American Express thinks that's the endpoint,

2  not the starting point.  Respectfully, that's not what we

3  think.  We think it's important.  We think consumer demand is

4  critical.  We have put in evidence on both sides, both

5  consumer and merchant side, and I'm going to take a few

6  moments on that, if I may.

7          So, what does the consumer side first say?  We put

8  in evidence about the Federal Reserve Bank, of the Boston

9  survey, where the very provisions that the government says are

10 a critical distinction between debit and credit, security,

11 acceptance, convenience, on all of those parameters, the

12 survey says that the consumers view them as comparable as

13 between debit and credit, yet the government says there's a

14 distinction.

15         Among other things, slide 57, which I'll point out,

16 is a chart that was used in the testimony that went to that

17 point.  We also, your Honor, spent a fair amount of time

18 during Dr. Bernheim's testimony on the merchant loyalty card

19 data.

20         To net it all out, without going through each one of

21 the slides, we showed that the majority of the consumers at

22 every one of the merchants from which we had the data, the

23 majority, were using both credit charge and debit.  What we

24 also showed is that the same consumers were shopping in the

25 same stores for purchases of the same size, sandwiching back

1   and forth.  One day they would use a general purpose or charge

2   card.  Another day, they would use a debit card.

3           We also showed when an AMEX card member switched to

4   something else on the next purchase, she was at least as

5   likely to use a debit card the next time as she was to use

6   another credit card, such as Visa or MasterCard.  That

7   evidence has never been available in any proceeding about this

8   marketplace before.

9           It wasn't available during the U.S. v. Visa case,

10  and I suspect it would have been quite different fifteen years

11  ago, but it's available to your Honor now.  It's again

12  real-world evidence of what real people are doing at stores

13  with the cards in their wallets.  If you come in on Monday and

14  you spend $10 and use your AMEX card and come back on Thursday

15  and spend $12, and use your debit card in the same store,

16  that's what the loyalty card data showed.

17          When three-quarters or two-thirds of all the

18  customers in the database are using both forms of cards at

19  that store, that suggests that they are competitive

20  alternatives.

21          Now, the government says, Well, what about T&E?

22  They are different.  First of all, T&E is thirty percent of

23  our business, which means that 70 percent of our business is

24  everyday spend, and these are everyday spend merchants from

25  which you have that loyalty data.

1       What the record also shows is that the T&E merchants

2  -- I'll come to the merchant side -- they are doing a number

3  of things that again are real-world evidence that debit and

4  credit compete with each other.

5       One thing is, the merchant evidence showed that the

6  fastest growing part of their spend profile is debit, over and

7  over again.  It was either their house card or the debit card

8  that was growing the fastest.  At that merchant, to buy their

9  product, debit was growing, if not the fastest, then second

10 only to their house card.

11      Second thing it showed was, for many of the

12 merchants, they were not even able to separate out the charges

13 that they were receiving from their acquirers for their Visa

14 credit and their Visa debit charges.  They were just lumped

15 together as one charge.  They were not even teased out for the

16 benefit of the merchants.  They had no idea how it allocated

17 out for them.

18      The third thing the record shows about merchants,

19 that they track blended rates.  They are looking at their Visa

20 credit and their Visa debit charges, and they are blending

21 them together for their internal tracking purposes, and they

22 are blending them together when they negotiate with American

23 Express for American Express's merchant discount rates.

24      And the next three charts, the next three slides,

25 are confidential, so I won't put them up on the screen.  For

1    your reference, they are 60, 61 and 62.  And these are

2    references to specific situations involving the use by

3    merchants of blended rates in negotiating AMEX rates.  So, the

4    idea that there's no evidence or insufficient evidence on the

5    merchant side to show that debit and credit in the real world

6    are considered alternatives is simply not so.  Let me spend a

7    moment on the Cobrand here.

8           Cobrand, the record shows, is forty percent of

9    American Express's charge volume.  It's huge.  It's literally

10   forty percent of their business.  And we had, your Honor, over

11   and over again, examples of Cobrand negotiations where the

12   merchant was insisting upon the right to issue a Cobrand debit

13   card, and since AMEX doesn't have a debit card, they were

14   insisting on the right to issue somebody else's brand debit

15   card, and the evidence from several different witnesses was

16   that American Express resisted that.  Why?  Well, the

17   evidence, the testimony was, We resisted it because we were

18   afraid of the impact that a Cobrand debit card would have on

19   our charge volumes and our charge fees.

20           (Continued on next page.)

21

22

23

24

25

1  (CONTINUING)

2        MR. CHESLER:  Again, Your Honor, that's not a kind

3  of artificially constructed laboratory experiment for the

4  courtroom.  It's real world negotiations between merchants and

5  American Express.  And the merchants were insisting in some of

6  the negotiations, the evidence showed, that in order for

7  American Express not to agree to a co-brand debit card, they

8  would have to make concessions on the co-brand charge card

9  relationship as an incentive for the merchant to back away

10  from the demand for a co-brand debit card.

11        Again, that's merchant side evidence.  Blended

12  rates, co-brand negotiations.  All of these pieces of

13  evidence, the soaring percentage of spend on debit are all

14  merchant side evidence, which is quite consistent with the

15  consumer side evidence of what's happened in the last six,

16  eight years in the marketplace with respect to debit.

17        And lastly, Your Honor, the networks.  Again these

18  are confidential, so I won't put them up on the screen, but if

19  Your Honor looks at slide 63, 64, 65, you will see competitor

20  networks.  Internal contemporaneous documents in which they

21  are telling themselves -- not for publication, but for their

22  own business purposes -- that debit is taking share away from

23  their credit products, that they have to respond, they have to

24  take action with respect to the competitive threat posed by

25  debit.

1          And slide 66 is a very similar statement, this one

2     from American Express.  Consumer payment method is migrating

3     from credit to debit.  That's what all the networks are saying

4     to themselves.

5          What does the Government say?  Well, the Government

6     says use a SSNIP test.  Professor Katz says well a SSNIP test

7     is a way -- not the only way he can see, it's only a way --

8     and he concedes that he's not used it in every case.  As

9     Mr. Conrath said Professor Bernheim cited a case in which he

10    didn't use it.  And what Professor Bernheim explained is that

11    a SSNIP test is only a valuable additional tool when you have

12    quantitative price-related data, which nobody had here.  And

13    if you don't have quantitative price-related data that you can

14    put into your SSNIP model, all you're doing is expressing the

15    qualitative competition you've seen elsewhere through the lens

16    of a different test, the SSNIP test.

17         And, in fact, Professor Katz did a regression which

18    I asked him about in one of his reports, after the Durbin

19    Amendment and what he found in his regression analysis is

20    that, in fact, credit volume decreased by eight percent and

21    debit volume increased by about 16 percent.  Exactly the kind

22    of quantitative change you would expect to see if two things

23    were, in fact, constraining one another, if they were

24    competitive.  And that's Dr. Katz's regression analysis, not

25    Dr. Bernheim's.

1          I'd like to turn to travel and entertainment and

2     then just a little bit on market power and I'll be done,

3     Your Honor.  Travel and entertainment.

4               THE COURT:  Go ahead.

5               MR. CHESLER:  Four points.

6               First.  It appears, Your Honor, to us, admittedly we

7     are advocates so we may be too cynical, but it appears this

8     was a litigation-driven strategy because it was a way for the

9     Government to put something up on the board in which

10    American Express had at least 30 percent of some market since

11    no other market floating around here has that kind of a share.

12              And the reason I say that that's what it is, is

13    their rationale for defining this market is price

14    discrimination.  Before you ever get to the concession

15    Dr. Katz made that you only find price discrimination if you

16    look at price as compared to cost, if you look at margin,

17    let's just look at even just price for a moment.

18              The record is clear that American Express charges

19    different prices for different industries.  It has price

20    schedules, discount rates schedules for different industries.

21    Professor Katz conceded that if you're going to define a

22    market based upon the fact that American Express rates to T&E

23    merchants are different from their rates to everyday spend

24    merchants, then every industry could sustain a separate market

25    definition because the rates are different for each industry.

1        So, why didn't they have a fast food market?  Why

2   didn't they have an airline that goes interstate or

3   international market?  Why didn't they have a market for

4   restaurants where the bill is going to be over a hundred

5   dollars for dinner?  Because they wanted a market that had

6   over 30 percent.  Because the principle, the principle doesn't

7   make any sense here.  The principle would define 100 different

8   markets because they charge a different rate to each industry.

9        Second.  Professor Katz admitted that you need to

10  look at cost.  Price minus cost tells you whether you're

11  discriminating because you're getting different rates of

12  return for different industries.  The Government's proposed

13  findings on this issue appear at numbers 626 to 632 of their

14  submission.  There is not the word cost once in those

15  findings.  Not once.

16       Professor Katz said you've got to look at the

17  margins.  And when I asked him that when his SSNIP test wasn't

18  it true that according to his analysis American Express earned

19  the same gross margin in T&E and non-T&E, 17 percent, he said

20  yes.  His calculations came out to the same margin.

21       So, he didn't accept a proposition that different

22  prices means different markets or he'd have had an armada of

23  different markets.  He just aggregated together a bunch for

24  T&E.  He accepted the proposition that you have to deduct

25  cost, you have to look at margin, but then I confront him with

1   his margin calculations in the context of SSNIP and show that

2   he's got the same margin for both, yet they hold on to the T&E

3   market.

4           Your Honor, the market makes no sense; not because

5   it couldn't be sustained as a commercial operation, although

6   that's a pretty relevant piece of evidence.  The fact that if

7   we had continued to be in our niche, as Visa said, we probably

8   would be in the dirt pile of history by now.  But that's not

9   really our point.  Our point is that the spillover is so clear

10  here that the market makes no sense as a defensible market.

11          Take the following proposition.  I fly after court

12  today to Chicago.  I buy a ticket on American Airlines.

13  That's a T&E transaction.

14          I take a cab, I don't know where the cab is, if it's

15  in or it's out, let's leave the cab aside.

16          I get to the hotel, I check into the hotel with my

17  American Express card, T&E transaction.

18          On the way to the elevator, I realize I left my

19  razor and shaving cream at home.  I stop in to the newsstand

20  and spend five bucks on a razor and some shaving cream.  Is

21  that a T&E transaction?  I don't know and they haven't told

22  you.

23          I decide I'm hungry, I want a snack.  I go down the

24  street to McDonald's and I buy a Big Mac.  Their Exhibit that

25  they showed you today had McDonald's, Wendy's, Burger King.

1   They're all T&E merchants according to the Government.

2        They told you that the problem, the reason we have

3   power in the T&E market as they call it, is that those vendors

4   have to do business with us because we have 70 percent of

5   corporate cards and we have a lot of market power, but they

6   have Wendy's and Burger King in the market.  Are they honestly

7   telling you our corporate cards give us power with Wendy's and

8   Burger King?

9        So, you might say that makes no sense, I'll chop

10  them out.  Where do you stop chopping?  They haven't told you

11  where.  They've got Subway Sandwiches in there, too.  Are they

12  in or are they out?  I don't know.  They haven't proven the

13  market.

14       I've been doing this for 37 years, 38 years, I've

15  defended a lot of companies in a lot of antitrust cases.  The

16  plaintiff always tells you exactly who's in the market.  They

17  have not only not told you, they've given you no set of rules

18  so you can figure it out.  The market, Your Honor, makes no

19  sense and the spillover effect is fatal to the market.  And

20  city pair analysis doesn't work, Your Honor.  It doesn't work

21  because of spillover.

22       The analogy just doesn't work.  If you fly from

23  New York to Chicago and that's a city pair, you fly from

24  New York to Chicago.  Our point is while you you're sitting at

25  the airport you buy a New York Times and you buy a chocolate

1   donut, if you can't use your American Express card for that

2   trip -- you might have left it home in your chest of drawers,

3   you might just stick it back in your pocket -- you can't use

4   it, you're going to use one card for the trip, that's

5   spillover and it's not speculation.  It's a real fact and it's

6   all over this record.  That's why the T&E market makes no

7   sense.

8           Let me turn to market power, Your Honor.

9           I don't think even the Government says it's not

10  important, they simply say they can solve the problem of

11  market power by their alternative theory of anticompetitive

12  effects.  Well, I've spent a lot of time on effect, so I'm not

13  going to go back there.  So, let me look at the power

14  evidence-qua-power evidence.  Because they say that they've

15  also proven their case the old-fashioned way.

16          Well, why is it so important?  First.  It's

17  important, Your Honor, because you asked this question

18  actually at an earlier conference before the trial and it may

19  have been at the summary judgment argument.  You asked both of

20  us how am I supposed to go anecdotal evidence of what

21  individual witnesses say to get to what is true of the

22  marketplace?  How am I supposed to get there?  Great question

23  and it's a daunting task.

24          Here, my point is this.  The reason that market

25  power is so important even if the Government tries to go the

1    shortcut route of anticompetitive effects, and even assuming

2    contrary to what I've said before they actually had proven

3    actual adverse effects -- which they haven't -- how do you

4    know that you can extrapolate from the examples they've given

5    you to an anticompetitive effect in the marketplace?

6          Well, one sanity check on that is to look at the

7    evidence of power because everyone I think agrees, and

8    Professor Katz admitted, that a company that does not have

9    market power, in fact, cannot be expected to visit

10   anticompetitive effects to the market through its conduct that

11   the antitrust laws should care about.  So, one sanity check on

12   whether the anecdotal evidence is good or not is looking at

13   the separate evidence of power or not.

14         So, what is the separate evidence of power?

15         First, I said this before but it bears repeating in

16   this context, the reason the Government says they're not suing

17   Discover is because Discover has a low share.  Share matters.

18   Share suggests whether you can or you can't harm.  So, what

19   are the metrics here?

20         Slide 74, cards in force.  We're last.  Last.  And

21   by the way, in the Visa case, which the Government doesn't

22   like me quoting from, the Government stated if you're not

23   ubiquitous, you can't be a viable competitor in this market.

24   I can cite that quote to you in a few moments.  53 million

25   card versus 254, 178.  You heard testimony over and over again

1  to many merchants we're not relevant because no one shows up

2  with our card.  We're last in a field of four.

3         Transactions, slide 75.  17 percent.  Visa and

4  MasterCard have over 70 percent of the transactions involved.

5  That's not dollars, Your Honor.  That's the number of

6  transactions, 17 percent.

7         Slide 76, merchants in locations in force.  We've

8  seen this chart many times before.  We're at about two thirds

9  of the others.  A full third of the merchants who accept their

10  card do not accept ours.  That's the experiment I talked

11  about.

12         Slide 77.  Charge volume, 26 percent.  Visa's

13  got 45 percent.  MasterCard almost the same percentage as ours

14  and as I said, they don't compete with each other in the real

15  world.  Combined, they're about 70 percent and that's without

16  debit in the market.  If you put debit in, our share goes down

17  to 13.9.

18         Now, the Government says well, MasterCard was found

19  to have power in the U.S. v. Visa case with a comparable

20  share.  Well, when MasterCard argued in that case that they

21  couldn't be found to have power because they were only five

22  percentage points different from Amex, which was held up as

23  the poster child of a victim by the Government in that case,

24  the Government said that's a red-herring, a phrase that

25  Mr. Conrath used this morning in a different on text.  The

1   Government said that's a red-herring.

2          That's a red-herring because, in that case,

3   MasterCard was jointly owned by the same banks as Visa.  The

4   relevant comparison is MasterCard then versus Amex now.  And

5   what the Government said was you can't compare the MasterCard

6   share to the American Express share because they're commonly

7   owned with Visa, they're controlled by the banks, they're

8   accepted at virtually every merchant in America, they've got

9   multiple numbers of the cards in force as compared to

10  American Express.  They were citing exactly the same metrics

11  then to argue the opposite side of the same issue that they're

12  arguing now, and now they're backhanding the metrics.  They

13  don't matter.  The Government can't explain that 180.  They

14  don't try.  It's not in their papers because they don't have

15  an explanation.

16         The law in the Second Circuit, Your Honor, is if, in

17  fact, you have less than a 30 percent share, there is a

18  presumption that you lack power.  It's not a rebuttal.  It's a

19  presumption.  Judge McMahon in the <u>Commercial Data Servers</u>

20  <u>versus IBM</u> case says that.  She cites a bunch of Second

21  Circuit cases and elsewhere for the proposition.  You've got

22  to come forward with substantial evidence to overcome that

23  presumption.

24         But for the MasterCard example, which as I said is

25  dramatically different, they have no other examples.  Case

1   after case after case with shares this low say no, no power.

2   No power.  Not to mention all the other metrics, which are

3   also lower.

4        So, the Government also says that it's Amex's choice

5   that it's smaller, so we shouldn't get any benefit from being

6   smaller having many fewer locations accepting us, it's a

7   self-inflicted wound.  Quagliata, Pojero, Chenault, Gilligan.

8   They came in here one after another after another saying it's

9   a huge deficit for us.  It's the most common argument that

10  companies use against us when bidding for their corporate card

11  business, that our acceptance is lower.

12       Silverman came in and talked about the problem of

13  active merchants versus inactive merchants and having so many

14  in San Francisco that are inactive.  About being in Montana

15  and being unable essentially to find any merchants that accept

16  your card.  That these are big problems if you go on a

17  vacation and you have your Amex card.  It simply strains

18  credibility, Your Honor, to suggest that American Express is

19  happily sitting back in fourth place because it wants to.

20       It is inconsistent with the sworn testimony of all

21  of those executives that they've tried zero discount rate

22  proposal, they have tried all sorts of techniques, they've got

23  intermediaries out now trying to sign up merchants to fill the

24  gap and despite all their efforts the gap grows because the

25  others are signing more merchants.  The idea that they're

1   sitting back voluntarily and doing that is simply inconsistent

2   with the record.

3           Let me turn, Your Honor, to the other evidence about

4   power.  Pricing.

5           Well, if share doesn't work, what else do you do?

6   Well, you could try looking at price.  I said before the

7   Government says our price is too high, but they haven't proved

8   what the competitive level is so they can't say they're super

9   competitive.  They can only say they're higher.

10          Second.  On a mixed basis, they're not higher.  The

11  premium is gone and that testimony is unrebutted.

12          Their expert said economic profits are the right

13  measure.  They used accounting profits.  The cases are quite

14  clear and the economic literature is quite clear that in an

15  antitrust case the proper measure if you're trying to prove

16  financial basis for power, use economic profits.  They didn't

17  do that.

18          They point to our filings with the SEC and they say

19  look, American Express has profits.  Well, if having profits

20  was enough, then virtually every company in the Dow and many

21  more who aren't in the Dow would have antitrust power,

22  monopoly power, market power.  Because they're profitable.

23  Obviously, that's not the standard, Your Honor, and it

24  shouldn't be suggested that it is.

25          So, they just don't have a pricing basis and when

1    they talk about margins, the only margins they refer to are

2    accounting margins again.  And when they made the suggestion

3    to Mr. Silverman well, if you make four billion bucks, why

4    don't you just take a billion off the table and lower your

5    rates to the merchants by a million dollars, you'd still make

6    three, he explained to them, a little tutorial can't on the

7    way public corporations work.  Your investors stay with you if

8    you get an adequate return on investment and they leave if

9    they don't.

10            And American Express has made the judgment that they

11   can't do that for two reasons.  One, it would kill the return

12   on investment to their investors and two, if they took that

13   kind of financing out of this circle that they're in, of this

14   business model that they're in, then their product

15   differentiation recedes, the insistence and loyalty of the

16   customers as Dr. Katz admitted evaporates, you remember his

17   dog food analogy, and they become an undifferentiated product

18   in a market dominated by the other two networks.

19            So the Government's suggestion of how American

20   Express should run its business, with respect, doesn't work

21   and the people who actually run its business explained to the

22   Court and to the Government why it doesn't work.

23            With respect to the efforts to acquire merchants

24   Your Honor, just a few examples.

25            Safeway.  They had to take a test.  Do you remember,

1   they did a test out in Hawaii to show that they were worthy of

2   being accepted by Safeway and they flunked the test?  And

3   Mr. Pojero said well, I think maybe we screwed up the way we

4   structured the test, but we won.  So, what did they do?  They

5   had to pay a huge signing bonus to get Safeway.  That's not

6   evidence of a company with the kind of power that violates the

7   antitrust laws.

8           Publix.  It took five to seven years of negotiations

9   to convince Publix to take American Express cards and then we

10  had to pay renewal bonuses to them to stay in the game.

11          GEICO.  We sent them one of these insistence

12  letters.  We said oh, look what could happen if you stop

13  taking American Express.  It took eight months to resolve

14  their cancellation threat.  They weren't persuaded by the

15  insistence numbers and, in fact, it was only after we lowered

16  their net effective discount rate and an independent actuarial

17  firm came in and confirmed that Amex was delivering more value

18  to them than the bank card were that GEICO agreed to renew.

19          We've got evidence with respect to Apple, with

20  respect to Target, with respect to Dell and many others,

21  concession after concession after concession to keep and renew

22  merchants.  I would submit, Your Honor, that where you need to

23  make a compelling showing, a substantial showing of power,

24  where you haven't proven the anticompetitive effects on their

25  face, that's not a compelling showing of power.  It's quite

1    the opposite.

2          Value recapture.  Your Honor, one your questions

3    really got to the meat of the batting order.  Value recapture

4    is over.  If we had power over price and we were rational

5    business people, why would we stop charging merchants more

6    when we could?  We stopped for the reasons Mr. Gilligan came

7    in here, sat in that chair and swore under oath were true.  He

8    said the pain was greater than the gain.

9          We were destroying our relationships with merchants.

10   He said I personally spoke to the Continental people.  They

11   told me how angry they were over value recapture.  Now

12   Mr. Conrath said oh, but there's a contemporaneous document

13   that says it's the Chase relationship.  Well, I went back and

14   looked at the document while Mr. Conrath was speaking and, in

15   fact, the document goes on for two pages and it discusses two

16   things.

17         It says we have an arrangement with Chase which

18   would make it difficult for to us continue.  Not impossible,

19   difficult.  And then it says and you guys are saying we're

20   hostile to you?  We're putting up signs in our lounges saying

21   that after a certain date we're no longer going to take Amex?

22   If you want to see hostility, Mr. Gilligan, look at what your

23   own team is doing.  You pushed through a $12 or $13 million

24   rate increase -- that's value recapture -- and then you went

25   to pay with points so that if you use points your customers

1  could pay their bills for our airline and you didn't so much

2  as give us a telephone call.  That's hostility, he said.

3  Mr. Conrath didn't tell you about the back half of the memo.

4          Most importantly, Mr. Gilligan swore to this Court

5  that he personally killed the value recapture program because

6  of the damage it was doing to the merchants.  If he could get

7  away with it and they had no choice and they were the

8  prisoners of war that the Government would have you to

9  believe, they wouldn't have had to do that.  They did it

10  because they had to.

11          Now, with respect to price on value recapture.

12  Mr. Conrath spent a fair amount of time repeating what

13  Dr. Katz said.

14          THE COURT:  Can I just ask you about value

15  recapture?

16          MR. CHESLER:  Yes, sir.

17          THE COURT:  If it was such a terrible idea, who in

18  his right mind would even propose an idea like that at a

19  sophisticated corporation like American Express unless that

20  individual or that group that approved it, thought that they

21  could do exactly what you said they couldn't do.

22          MR. CHESLER:  Right and I will explain it because

23  it's what the record shows.

24          THE COURT:  Oh.

25          MR. CHESLER:  Here's what the evidence shows.  Ten

1    years of virtually no rate increases, almost none at a whole

2    wide swath of merchants.

3            Costs for rewards going up.  Redemptions are

4    skyrocketing through the roof.  Rates have remained the same.

5    Without the benefit of the rearview mirror, the analysis was

6    well, they're getting more value, we're driving demand at

7    these merchants because we're reserving more and more money to

8    pay for those rewards, those rewards only get redeemed when

9    they actually use the card at these merchants, we're

10   delivering buyers to these merchants, but we're not raising

11   our rates.  So, we think we can raise our rates to do exactly

12   what the name suggested.  Recapture value that we were

13   providing to the merchants which we weren't capturing because,

14   unlike most products I'm familiar with, the rates hadn't

15   changed in a decade.

16           With the benefit of hindsight, Your Honor, not

17   foresight, you heard what Mr. Gilligan said.  It got a lot of

18   people very angry.  It was more harm than good.  I killed it.

19   If he had known that was going to happen at the beginning, I

20   completely agree with you, why would anybody have done that?

21   But the record shows they didn't.  They thought they could get

22   more money for the value they were providing and that they

23   were charging lesser price than they were entitled to.  They

24   got some, they didn't get others and then they got a lot of

25   people angry.

1        By the way, as everybody admitted, it didn't reverse

2   the decline in the discount rates.  It slowed the rate of the

3   decline.  Over time the discount rates continued to decline,

4   notwithstanding value recapture and it was stopped four years

5   ago.

6        Your Honor, even if you write it off as evidence of

7   a dumb idea, I submit to you it's not evidence of antitrust

8   market power.  That's not a story consistent and I haven't

9   seen any case law that they've cited that has stories that end

10  that way in which the Court says yup, that looks like power

11  over price to me.  I haven't seen them.

12       So, Your Honor, that leaves one other issue about

13  power, which Mr. Chenault didn't really directly mention.  He

14  mentioned it by implication and that's insistence.  I just

15  want to spend a moment on insistence.

16       In the Visa case the Court says, and Mr. Conrath put

17  up a chart that had what he called the road map to prove

18  power, one of which was customers are insistent in the Visa

19  case.  And as I said to Your Honor in the opening and I just

20  remind you of this, insistence that's driven by investing in

21  consumer benefits is not the same thing as insistence that's

22  driven by necessity.

23       If you are a merchant who wants to accept plastic

24  transactions in this country, you must carry Visa and

25  MasterCard.  That's why that bar was nine-point-some million

1   merchants and we're at six.  Whatever the Government's

2   theories may be for why there are three-plus million locations

3   that don't carry us, the fact is they don't carry us and they

4   must think they're doing just fine without us or they would

5   carry us.

6           They haven't told you about more than a handful of

7   merchants that are on a cash only or check only basis.

8   Virtually all of them accept plastic and if you accept

9   plastic, you accept Visa and MasterCard.  That's a utility.

10  That kind of insistence is evidence of market power and the

11  Second Circuit was correct to observe it.

12          Insistence that's born out of a continuous

13  investment, as their own experts testified, if the rewards

14  went down, the loyalty would go down.  If you stop providing a

15  really high level of benefits to your consumer, I would expect

16  to see their share of spend decline, is what he said.  I would

17  expect to see a drop-off in the insistence of the customers.

18  That's not market power.  Whatever word you want to use, it's

19  not antitrust market power.  And it's certainly not analogous

20  to what was the case in the Visa and MasterCard case.  It

21  simply isn't.

22          Now, the Government says well, small merchants have

23  no choice.  They also say, as I said before, they're not

24  benefitting at all from the Visa-MasterCard decree.  In fact,

25  I think they said Visa and MasterCard, Dr. Katz said they

1   won't even talk to the small merchants, so I'm not surprised

2   that nothing's happened.  Well, then this case must come down

3   to a case for the two percent of the merchants.  If

4   the 98 percent are somehow captives and nothing's going to

5   help them, then this is a case for the two percent.

6           Every single witness the Government called as a

7   merchant witness is in that two percent.  And as Your Honor

8   said the other day in the fairness hearing on the settlement,

9   you know, there's an issue about the leverage that those

10  merchants have to negotiate with American Express.  That

11  leverage was displayed from that witness stand over and over

12  and over again.  Apparently the Government's new theory is

13  that they brought the lawsuit just for them because

14  the 98 percent are beyond help.  That doesn't make much sense.

15          And by the way, when they point to the small

16  merchants we called, they misstate the record.  They refer to

17  Strictly Bicycles, Mr. Gutierrez that had the bike shop over

18  near the George Washington Bridge, remember him?  They cite

19  him in their finding of fact 163.

20          They say well, even he said he wouldn't drop

21  American Express.  Well, what did he actually say?  He said I

22  won't drop American Express because they are a really good

23  partner, they are valuable to me.  They gave me a business

24  loan.  I was able to buy property next to my store when I

25  couldn't get a bank loan.  That part got left out of the

1  finding.

2          Small merchants matter.  As I said before, the

3  millions who don't carry us are the same size as the

4  98 percent of those who do.

5

6          (Continued on following page.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          MR. CHESLER:  In conclusion, Your Honor, by the case

2    law, with durability, we cite it in our papers, it has to be

3    durable power in order to be antitrust power.

4          So, in conclusion, what to say about the

5    government's "but for" world.  It's a world which according to

6    Dr. Katz is one in which merchant discount rates might go up,

7    not down, in which the quality of the product, the

8    differentiation of the product might go down, not up, in which

9    merchants would be free to discriminate in almost any way they

10   wish.  The only limitation appears to be you can't

11   affirmatively disparage the product, but as we demonstrated in

12   the evidence at trial, we can say things like the welfare of

13   my family depends upon you not using that card, please, please

14   don't do this to my family.  There's nothing in the

15   government's case that suggests people couldn't do that.  And

16   more, American Express can't do anything about it.

17          We can't even say if you, merchant, are standing

18   between me and the consumer who carries my card and every

19   single consumer with my card who walks into your store is met

20   with that kind of a hostile reception, I'm stuck.  I have to

21   stay in business with you because if I terminate you, then

22   according to the government, I'm through the back door doing

23   what their proposed injunction would prevent me to do from the

24   front door.

25          I can't find any precedent for that, Your Honor, any

1  precedent for the proposition that a seller of a product must

2  submit to that kind of discrimination against its product by

3  the vendors, the intermediaries with whom it does business who

4  sit between it and the ultimate consumer and is powerless to

5  do anything about it.  More importantly, that the antitrust

6  laws require that result.

7          Now, they can cite you a lot of cases that say they

8  foster competition and a lot of general platitudes of the

9  purpose of the law, but that kind of blatant discrimination

10  that injures somebody's business and they can't even walk away

11  would be unprecedented.

12          And insistence won't stop the process because as the

13  steering takes place and as the funds for funding the rewards

14  go down, the rewards will go down and as Dr. Katz admitted as

15  the rewards recede, so too will the loyalty of the customers.

16  And that's what we saw, not I, I wasn't there, but that's what

17  Mr. Chenault and his colleagues saw in the '90s, in the We

18  Prefer campaign.  That's precisely what they lived through.

19          So, the government has not satisfied the correct

20  legal standard.  Instead, they moved or attempted to move the

21  goal post in to the wrong standard.

22          And I submit, Your Honor, that American Express is

23  today exactly what it was when the government sued Visa and

24  MasterCard and called Mr. Chenault to the stand.  It was the

25  best hope in the market, not Discover which barely shows up in

 1 | the internal documents of Visa and MasterCard, and by their
 2 | own admission, can't move anything anywhere and which didn't
 3 | do exactly what they say it would do if it had the opportunity
 4 | when it had the opportunity over the past three or four years.
 5 | Discover is not the answer.  And for them to put their eggs in
 6 | the Discover basket and attack American Express as a
 7 | competitor, given what they did 14 years ago is pretty
 8 | stunning.
 9 |         This is not a case about protecting American
10 | Express.  It's a case about protecting competition and,
11 | therefore, Your Honor, with all respect, we ask that you enter
12 | judgment in favor of American Express and against the
13 | government's case.
14 |         Thank you very much.
15 |         THE COURT:  Thank you.  Let me just ask you a
16 | question.
17 |         MR. CHESLER:  Yes.
18 |         THE COURT:  Just for the sake of this discussion,
19 | you sort of dipped into the remedy department very adroitly in
20 | your last three sentences.
21 |         MR. CHESLER:  Thank you, Your Honor.
22 |         THE COURT:  Well, but I caught it.
23 |         MR. CHESLER:  Yes, you did.
24 |         THE COURT:  And you gave the parade of horrors
25 | remedy that might be imposed, let's say.

1        Is there something short, were there to be a finding

2   of a Sherman Act Section 1 violation, is there something short

3   of that extreme remedy that you sort of posted to me just now?

4        Is there anything in between the parade of horrors

5   and the NDPs?

6        MR. CHESLER:  Your Honor, the honest answer to that

7   is I don't know.  We have not spent time trying to construct

8   alternative remedies because we have been focused on the

9   merits of why we think no remedy is required.  The only remedy

10  we've ever heard about or seen from the government is the Visa

11  MasterCard remedy so I have no idea.  I don't believe so.

12       THE COURT:  You understand why I'm asking.  I mean,

13  you sort of posed --

14       MR. CHESLER:  Right.

15       THE COURT:  -- the parade of horrors remedy that you

16  think is appropriate for all the reasons you stated because

17  you don't think there's liability and, you know, I understand

18  your position, but I'm just trying to get a sense of at what

19  point, should that ever happen, would we come back and talk

20  about appropriate remedies once, if there were a finding

21  liability.

22       I haven't concentrated on remedies either because

23  I'm concentrating on liability.

24       MR. CHESLER:  Good.

25       THE COURT:  But I'm just wondering whether that's,

1    we would save that for another day and another proceeding.

2              MR. CHESLER:  I understand.  Substantively, my

3    answer is I doubt it but I honestly don't know because as I

4    said, we've been focused entirely on liability.

5              Procedurally, Your Honor, the one thing I would cite

6    to you is the history of the U.S. v. Microsoft case where I

7    believe the trial court did not hold separate proceedings

8    vis-a-vis remedy before entering an injunction.  That went up

9    to the DC Circuit and if I have my history correct, and I'm

10   doing this from memory, I believe the DC Circuit vacated the

11   remedy and sent it back and said there had to be separate

12   evidentiary proceedings with respect to the remedy.

13             THE COURT:  There was Judge Cote in the Apple case

14   too.

15             MR. CHESLER:  That may well be.

16             THE COURT:  Where she, step one was liability and

17   then they came back and discussed --

18             MR. CHESLER:  I was just thinking Judge Cotark --

19             THE COURT:  Judge Kotelly.  I know Judge Kotelly,

20   yes.

21             MR. CHESLER:  That's one example that comes to mind

22   procedurally in answering your question.

23             THE COURT:  And, I mean, the procedural solution

24   that Judge Cote utilized is another example of taking the

25   matter one step at a time, but thank you.

1          MR. CHESLER:  I believe that's right.  Thank you,

2   Your Honor, very much.

3          THE COURT:  Thank you very much.

4          Mr. Conrath?

5          MR. CONRATH:  I would like to do a brief rebuttal.

6          THE COURT:  Do you want a couple of minutes?

7          MR. CONRATH:  I would appreciate a couple of

8   minutes.

9          THE COURT:  Very good.  We will take a ten-minute

10  break.

11         MR. CONRATH:  Thank you.

12         THE COURT:  Thank you.

13         (Court is in recess.)

14         (The following occurred in open court.)

15         THE COURT:  All right.  Please be seated.

16         Mr. Conrath?

17         MR. CONRATH:  I will be brief, Your Honor.

18         THE COURT:  Okay.  Go ahead.

19         MR. CONRATH:  So I will be brief because I believe

20  almost all the issues that we've discussed with you today are

21  covered in our papers.  I'll try to highlight maybe a few that

22  can benefit from additional comment, but I won't belabor this.

23         THE COURT:  All right.  Fine.

24         MR. CONRATH:  So I'm going to go through, just touch

25  on a few topics.

1        The first topic is the question of issuer

2   competition.  We heard a lot of arguments, the substance of

3   which was look at all this competition among issuers to issue

4   cards and pay no attention to that suppression of competition

5   over here for merchants.

6        And as I think we've said, that's inappropriate but

7   I just like to read the portion from the District Court

8   opinion in U.S. v. Visa because a very parallel argument was

9   made there.  This is at page 330.

10       The defendants argue strenuously that no consumer

11  harm results from the exclusionary rules because the member

12  banks of the associations compete fiercely as card issuers

13  with each other and with American Express and Discover to

14  offer lower interest rates and all manner of incentive

15  programs to card consumers.  This issuer level of competition,

16  however, does not take the place of competition at the network

17  level.

18       And I submit, Your Honor, that same principle

19  applies here.  There's a lot of competition on issuers.  No

20  dispute about that.  It doesn't answer the question about the

21  restriction of competition here.

22       In U.S. v. Visa, let's remember what happened.  A

23  restriction was removed and that, the restriction on

24  competition for, among networks for issuers.  That did

25  increase that competition.  That restriction was on the other

 1  side of the, of the network platform.  Get rid of the

 2  restriction that exists on this side of the network platform,

 3  a similar thing will happen.  There will be additional

 4  competition and that's what we're asking the Court to do in

 5  this case.

 6          The second area of topics I'd like to talk about

 7  involves price effect.  We've proved both harm to the

 8  competitive process, disruption of that essential connection

 9  between cutting your prices and increasing your business in

10  the words of the Supreme Court.

11          Indiana Federation stands for two principles that

12  are relevant and I just want to go back to that.  The first is

13  that a finding of actual sustained effects on adverse effects

14  on competition can be legally sufficient to support a finding

15  that the restraint was unreasonable, even in the absence of

16  elaborate market analysis.  That's one proposition.  The

17  second one is that process harm is a direct effect.  If

18  there's conduct that is likely enough to disrupt the proper

19  functioning of a price setting mechanism in the market may be

20  condemned even absent proof that it resulted in higher prices

21  or, as here, the virtues of higher price services than would

22  incur in its absence.

23          Just stepping back in the Indiana Federation for a

24  moment and thinking about the bigger picture, what that was a

25  majority of dentists in two counties in Indiana said we're not

1   going to give the insurance companies x-rays.  The court said

2   that was clear enough interference with the price setting

3   mechanism that it can be found unlawful.

4           Look what we found here after a six-week trial.  The

5   most direct form of price competition, the kind that's likely

6   to work for merchants has been impeded because, and has cut

7   the connection on what the Supreme Court has said is the

8   essence of competition, cutting price to increase your

9   business.  This is a much stronger case when you think about

10  it for finding a harm to the competitive process.  But that

11  doesn't matter, really, it doesn't have to matter because

12  there's evidence, direct evidence of price effect here.

13          There was price of competition.  It was suppressed.

14  The single clearest case is watching that line of prices go up

15  in Discover's chart.  There were low prices.  They couldn't

16  succeed in the market because of the anti-steering rules and

17  prices increased.  That is direct evidence of a price effect.

18  By itself, it's sufficient.  It happened in the past.

19  Mr. Hochschild said if I had the chance, I'd do it again.

20  That ought to be enough to meet our burden whatever the

21  standard is.

22          Now, there was some questions about what

23  Professor Katz said about price.  So we heard -- I think the

24  Court saw Professor Katz and --

25          THE COURT:  I definitely saw him.

1          MR. CONRATH:  Yes.

2          THE COURT:  Is this a test?  Go on.

3          MR. CONRATH:  And maybe "observed" is the right word

4    that I'm looking for because you probably observed that if you

5    asked Professor Katz a direct question, you are going to get a

6    direct answer.

7          He was asked, is it possible, if we removed these

8    restraints, is it possible that price could go up and he

9    answered, as he must, yeah, it's possible.  He is explaining

10   that the principle of the antitrust laws is that the antitrust

11   laws don't tell you what prices have to be, what products have

12   to be offered.  The principle is let competition decide.  Let

13   the market decide.  Yes, it's possible if you remove the

14   restraints, you know, AMEX might decide they're better off as

15   a super premium card.  Maybe that involves higher prices.

16   There is evidence that there will be competition to increase

17   rewards possibly.

18          What's the overwhelming weight of the evidence?  So,

19   there wasn't a follow-up question to Dr. Katz, well, what do

20   you think, what in your professional opinion is probable, but

21   he testified about that extensively.  His professional opinion

22   is that what's probable is prices will be lower if there is

23   more competition and he explained why that is extensively and

24   that's more than sufficient evidence to reflect the fact that

25   there's been harm to, to competition in the form of increased

1    prices in this market.

2         THE COURT:  Well, let me ask you this.

3         Let's assume that Mr. Chenault is right, all right,

4    and we go to the extreme here and the NDPs go away and there's

5    competition in the marketplace and American Express can't find

6    a business model that is viable in competition with Visa and

7    MasterCard, the grand duopoly of the plastic world.  All

8    right?  And American Express disappears from true, a true

9    competitive posture with the duopoly.

10        Now, the duopoly is out there alone.  There is no

11   competition.  They get to do basically what they do either

12   because they know that they can both do it or because they

13   know each other's modus operandi and they figure they're both

14   going in the same direction, you know, they're rocketing up to

15   more expensive discount rates.

16        How does that square with your objective to promote,

17   in the Justice Department, to promote competition?

18        MR. CONRATH:  Okay.  May I take that in two parts?

19        THE COURT:  Sure.

20        MR. CONRATH:  One, the first part is that that --

21   and I understand why American Express is making that argument.

22   I can't tell you how many times I've heard the argument that

23   the world will end if we can't continue this particular

24   anti-competitive restraint.  With all respect, it's very

25   unlikely.

1          American Express is the largest issuer of cards in

2    the country.  It has about, I think, a 25 percent share in the

3    card issuing market.  Remember, American Express is in the

4    issuing market as well as the network market.

5          THE COURT:  I understand.  You all have taught me

6    about the issuing market.  It reminds me of that other subject

7    I don't even want to say.

8          MR. CHESLER:  Does it begin with a "D"?

9          THE COURT:  I don't know what you're talking about.

10         Go ahead.

11         MR. CONRATH:  All right.  There -- I believe the

12   second largest is perhaps Chase which is about 20 percent so

13   they are in a very favorable position in the issuing market

14   which, of course, is very important for them.  They --

15         THE COURT:  But do you really -- let me ask you this

16   as a practical matter.  As compared to just Chase --

17         MR. CONRATH:  Yes.

18         THE COURT:  -- Chase's reach is so extensive.  They

19   could easily bypass American Express in the issuing market and

20   they are certainly aggressively attempting to do that if the,

21   if my mailbox is any, is any indication.  All right?

22         If American Express loses this case, wouldn't that

23   make it more likely that it would be less able to compete in

24   the issuing market or should I care about that from a legal

25   standpoint?

1          MR. CONRATH:  Well, that's the second part of my

2     question.

3          THE COURT:  Go ahead.

4          MR. CONRATH:  But I was resisting getting to it

5     until I talked about the first part.

6          THE COURT:  Go ahead.  Continue.

7          MR. CONRATH:  Okay.  But the answer is the antitrust

8     law doesn't protect competitors, they protect competition is

9     the second question, but let me go back to the first point and

10    answer it.

11         Could Chase easily overtake American Express?  Well,

12    if it was easy, why don't they do it today?  All right.

13    American Express -- so American Express has a lot of

14    advantages for competition.  Just think about it.  I mean,

15    they're not -- we're not here to protect them, the laws are

16    not to protect them, but just to think realistically because

17    they're making an important argument which is, say, look, this

18    is going to be terrible for us.  I think we have to evaluate

19    that critically and think about how realistic that claim is.

20         They have 25 percent share in the issuing market.

21    They have a base of very loyal cardholders.  They have a very,

22    very prominent and valuable brand name.  I won't recall

23    exactly, but more valuable than Visa, more valuable than

24    MasterCard.

25         THE COURT:  It's in the record.

1          MR. CONRATH:  It's in the record.  Almost everything

2    we say is probably in the record.

3          They have a very talented of employees.  I mean,

4    we're -- you saw a lot of their employees there.  They're a

5    talented group.  They have a lot of resources and they have a

6    very wide merchant network covering more than 90 percent of

7    the credit card spend.  So they have a lot of competitive

8    assets.

9          So the question, a question is would a change in the

10   anti-steering rules make it impossible for them to continue to

11   use those assets to succeed in the marketplace or, or to be in

12   the marketplace because, let's face it, I think nobody would

13   say, well, they're entitled to their same current level of

14   success.  That's about what their argument amounts to.  They

15   say, we've achieved this, we're entitled to maintain our

16   current position, anything that's going to badger us will spin

17   us over the cliff.

18          (Continued on next page.)

19

20

21

22

23

24

25

1    MR. CONRATH:  If you look back at the history of the

2    20 years of market share, they have been up and down but not a

3    lot.  It's I think from nineteen to twenty-six percent.  So

4    they haven't been at the bottom and there have been variations

5    and there has been competition.  You have to expect that if

6    the antisteering rules are removed they will face more

7    competition.  But they have been able to succeed by making a

8    package that appeals to cardholders.  They have some services

9    to merchants as well.  But they have always been the

10   high-price card to merchants and perceived as such.  If they

11   have to offer somewhat lower prices to merchants in order to

12   maintain their position they are a very competitive and

13   thoughtful company.  They are going to do that.  You heard

14   Mr. Funda's testimony.  We would be fighting for the business

15   every day with more incentives for our cardholders and with

16   more lower prices for merchants.

17        Now, that does put them in the position that they

18   have to think about, Well, are we going to have exactly the

19   same level of profits that we've always had?  If there's

20   anything they are not guaranteed, it's that.  It's clear that

21   they are not.

22        So you know looking at the reality of the

23   marketplace, will they face some competitive challenges?  Yes.

24   But what is it we think that Chase might do that might drive

25   American Express out?  I mean if they offer additional

1   rewards, well, American Express can offer additional rewards.

2   That's what Chase has been doing, the two of them, and others

3   are competing in that vein.  If they offer lower prices to

4   merchants, that's true, too.

5           So let's go to the second half of the question.

6   Maybe there are two parts of it.  I think the first thing I

7   want to say is you know the premise is I think overstated.

8   American Express has a lot of competitive assets it can bring

9   to bear.  The second part of that is, Well, would that lead to

10  a world in which American Express is just gone and Visa and

11  MasterCard are left?  That's not an attractive proposition.

12  But we have to ask the question from an antitrust perspective

13  and it's putting -- you put a harsh question to me, your

14  Honor.  Let's give the most direct answer.  What is it that we

15  think Visa and MasterCard would do that would be bad if they

16  face less competition?  Well, raise prices, offer less

17  quality.  What's been happening with the antisteering rules in

18  place, raising prices, not just American Express but Visa and

19  MasterCard, prices are in the one way rachet up.

20          Why is that?  Because it's nobody's business

21  strategy to be the cheaper guy.  Perfectly rational for

22  everyone who is in the marketplace today.  Don't try to be the

23  cheaper guy because it doesn't get you anything.  So what's

24  the solution?  Is get rid of the thing that is standing in the

25  way of their being a reward for the cheaper guy and let all

1    the card networks compete to see who can succeed in all

2    aspects of the market.  Let's be attractive and cheap to

3    merchants, efficient to merchants.  Give them quick turn

4    around payments.  Be attractive to cardholders.  Give them

5    rewards.  Give them quick service.  Give them low interest

6    rates.  Charge low fees.  All those are aspects of sustaining

7    yourself in this business.

8            The market we're focused on is the one where the

9    restriction is.  You can't benefit from being more efficient

10   and lower priced in that market.  That's the one narrow point

11   that we're trying to ask.

12           So, yes, it's harsh to say it but the antitrust laws

13   don't say -- if it were really true that American Express had

14   a business model that was subtracting value from the economy

15   it couldn't sustain itself in the face of competition.  The

16   antitrust laws don't say you get to block competition in order

17   to sustain a model that doesn't work.  Now, I don't for a

18   moment think that's what's going to happen here.  I think they

19   are a very successful and impressive company that has had a

20   lot of success and brings a lot of assets.

21           If you ask me the hard question:  Do the antitrust

22   laws protect someone if it turns out they have a business

23   model that just isn't desired by the consumers?  You know, the

24   history is littered with companies -- to which the answer is

25   no.  It's a harsh answer.  I don't think it's relevant in this

1   case.  American Express has shown itself to be adaptable.

2   They have adapted through challenges that look a lot more

3   difficult than just we have to face some price competition at

4   the point of sale.

5           THE COURT:  And the issue of the relevant market and

6   whether debit fits in the relevant market.

7           MR. CONRATH:  The next one on my list.

8           THE COURT:  Okay.

9           MR. CONRATH:  Let me turn to it.

10          THE COURT:  What weight should I put on the

11  Congressional initiative that -- I can't recall the name of it

12  -- that took place recently that established certain

13  regulatory limitations on debit?  That one.  Should that be

14  significant to me in I guess applying the relevant market or

15  is there something else?

16          MR. CONRATH:  I would say the fact that Congress

17  acted should not be.  But I love to argue that Congress knows

18  what markets are and you should follow it.

19          THE COURT:  You're not going to get an argument from

20  me about that.  I just want to know from you whether you think

21  that there's some weight that should be given in the third

22  branch when considering these things, since the antitrust laws

23  are a creation, a legislative creation in and of themselves.

24          MR. CONRATH:  I observe that Congress regulated

25  certain changes that related to debit cards and didn't impose

1    the same regulatory changes on credit cards at the same time.

2    I observed that without comment.

3              THE COURT:  All right.  What were you going to say?

4              MR. CONRATH:  And one of them relates to that which

5    is that there was -- the effect of the -- one effect of the

6    Durbin Amendment regulation is a bit of evidence that tells

7    you something, the huge change in prices, very small, if any,

8    reactions.  I think there was some discussion of a regression

9    that Professor Katz had and while most of this is in our

10   findings of fact I'm not going to detail the regression

11   analysis.  The trial transcript at 4080 to 4081 explains why

12   that evidence, Professor Katz's opinion that tells you that

13   debit and credit are not in the same market.  Huge price drop,

14   very small reaction.  That's not what you see when two

15   products are in the same market.

16             The bigger point is that what we heard a lot of talk

17   about debit today and what it revealed is that American

18   Express is still asking the wrong question on the question of

19   debit.  We agree there are customers who use debit.  We agree

20   there are more customers using debit today than there were 20

21   years ago.  We agree there are some customers who can switch

22   from debit to credit.

23             AMEX would tell you that that's all you should look

24   at.  We have to think about what's the question we're trying

25   to ask.  That is a relevant question if you are thinking about

1    your issuing side, like, for example, if you are signing up

2    someone to a Cobrand agreement and thinking about whether

3    there can be an issuer.  If I'm a credit card issuer of any

4    kind and I think, A., some people will use debit instead of

5    credit.  I have to think about that.  We agree with that

6    proposition.

7              The question we are asking is a much narrower

8    question.  The question is:  Is there a relevant market for

9    merchant network services to merchants?  We have to ask, if a

10   hypothetical monopolist put a price increase on merchants what

11   can the merchants do to defeat the price increase?  The fact

12   that there are some customers who use both debit and credit

13   does not answer that questions.  The answer to that question

14   is:  What can the merchant do?  The merchant has to ask itself

15   can I switch anybody and Professor Katz explains explained why

16   that's an extremely unprofitable and unlikely strategy.

17             What's left is can I drop credit and rely on debit?

18   And you heard the explanation from the merchants, from

19   Professor Katz, there's a core customers who want to use

20   credit cards.  AMEX basically wants to ignore them and focus

21   on the people who use both.  But if you are a merchant you

22   don't have that luxury.  You have to try to get every customer

23   you can.  You certainly can't ignore a big chunk of customers

24   who want to spend with credit or who need to spend with credit

25   that you are going to lose to the competitor down the street

1  who does take credit cards.  That's the question that has to

2  be asked in defining a market.

3            We had a lot of talk about how people use credit and

4  how some of those people also use debit.  Some people use

5  debit only.  All true.  That's not the dispute.  The right

6  question is:  What could merchants do?  The answer is it's not

7  practical to substitute acceptance of debit cards for

8  acceptance of credit cards.

9            I wanted to talk briefly about Travel and

10 Entertainment submarket.  We heard some discussion about this

11 and the proposition that in theory you could make every

12 industry a separate market and as if that was a surprise.  We

13 asked Professor Katz that on direct.  It is a common fact

14 about market definition that sometimes you can -- I think a

15 term that Professor Katz used, that there are aggregation

16 markets.

17            You could look at every user of a ball bearings in

18 the country, just to reach into the past antitrust cases.

19 Each one uses a slightly different ball bearing.  Is each one

20 a market?  Yes, maybe.  But it makes sense to talk about them

21 all together and that's what Professor Katz did and he

22 explained clearly the logic of looking both at the broad

23 market and asking one submarket where there's a realistic

24 question of whether there are significantly different

25 conditions and doing the analysis for those.

1      The standard common antitrust tool -- and let's keep

2   in mind that the purpose of market definition is not to

3   obscure reality but to illuminate reality.  That's what he's

4   trying to do.  What's real market reality here?  We can look

5   at the whole thing.  Let's see if there's anything special

6   about T&E. That's what that amounts to.

7           And I explained the proposition that a good example

8   here of why you can have an antitrust market even if one firm

9   can't supply it and airline city pairs was the example and we

10  heard back, no, no, that's different because there are no

11  spill-over effects.

12          Well, with all due respect as someone who did spend

13  sometime dealing with the airline industry, there are a lot of

14  spill-over effects in the airline industry.  If you are an

15  airline and you have a flight from New York to Houston, that

16  has a huge spill-over effect on your ability to run a

17  profitable flight in Houston as to San Antonio or Houston to

18  Midland.  That's an industry that is full of spill-over

19  effects.  That's not a distinguishing feature at all.  The

20  principle though applies to any kind of industry.  There's

21  nothing, no case, no authority, no economic literature that

22  suggests a relevant market should in any way have to be

23  coterminous with a firm being able to supply that whole

24  market.

25          And I think I'll just touch on one other topic which

1  is the last topic you discussed with Mr. Chesler and I think I

2  would say, yes, I think it's appropriate that we get to a

3  remedy phase as the court knows and I think the right way to

4  do it, if we get to remedy, there should be some form of

5  separate proceeding in the form of asking the parties to

6  submit proposals.  We're not suggesting that you include that

7  in this opinion, although both sides included some authority

8  on the subject of remedy and in the conclusions of law.

9          The more common practice is to say, all right, we

10  have a liability decision, if we're fortunate enough to need

11  an additional proceeding at that point, you can ask for papers

12  and we'll propose a way to go.

13          With all that, your Honor, unless you have something

14  else for me, thank you for the time.  We would like to ask you

15  to find that there's been a violation of section one of the

16  Sherman Act.

17          THE COURT:  Thank you very much.

18          With respect to the defense's slides, I'm marking

19  them as Defense Exhibit 1.

20          MR. CHESLER:  Thank you, your Honor.

21          THE COURT:  On this hearing.

22          Is there anything else from the government?

23          MR. CONRATH:  No, your Honor.

24          THE COURT:  Anything from the states?

25          MR. GENTILE:  No, your Honor.

1          THE COURT:  Anything from you, Mr. Chesler?

2          MR. CHESLER:  No, your Honor, just the thanks of our

3     entire team for all your courtesies and that of your staff.

4          THE COURT:  Thank you to all of you, and we are

5     adjourned.

6

7                          oooooo0oooooo

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# I N D E X

**WITNESS**                                           **PAGE**


        SUMMATION

        BY MR. CONRATH                               6778

        SUMMATION

        BY MR. CHESLER                               6865

        REBUTTAL

        BY MR. CONRATH                               6949

# $

**$10** [2] - 6873:11, 6920:14
**$12** [2] - 6920:15, 6937:23
**$13** [1] - 6937:23
**$280** [2] - 6908:13, 6908:25
**$50** [2] - 6782:19, 6863:12

# '

**'90s** [2] - 6794:24, 6945:17

# 1

**1** [10] - 6783:9, 6811:12, 6862:13, 6864:1, 6868:18, 6870:3, 6870:8, 6870:9, 6947:2, 6966:19
**1,000** [1] - 6910:7
**1.3** [1] - 6841:2
**1.75** [2] - 6794:25, 6799:25
**10,000** [1] - 6903:10
**10-CV-4496** [1] - 6772:8
**100** [1] - 6926:7
**10019** [1] - 6773:12
**10022** [1] - 6773:16
**10:00** [1] - 6772:18
**11-MD-2221** [1] - 6772:15
**11201** [1] - 6772:23
**12** [3] - 6778:20, 6885:8, 6900:11
**120** [1] - 6810:4
**13.9** [2] - 6913:1, 6931:17
**14** [1] - 6946:7
**15** [4] - 6776:9, 6860:11, 6894:15, 6895:1
**16** [1] - 6924:21
**163** [1] - 6942:19
**17** [3] - 6926:19, 6931:3, 6931:6
**178** [1] - 6930:25
**180** [1] - 6932:13
**19** [2] - 6778:19, 6794:21
**1993** [1] - 6900:11
**1995** [2] - 6875:20, 6899:21

# 2

**2** [1] - 6884:18
**20** [8] - 6791:16, 6869:7, 6877:9, 6889:21, 6894:10, 6955:12, 6958:2, 6962:20
**20/20** [1] - 6796:15
**2002** [1] - 6895:4
**2006** [1] - 6840:15
**2007** [2] - 6840:20, 6905:10
**2008** [1] - 6840:24
**2009** [1] - 6840:25
**2010** [5] - 6804:22, 6840:4, 6840:25, 6841:3, 6895:5
**2014** [2] - 6772:17, 6818:12
**20530** [1] - 6773:4
**220** [1] - 6897:2
**225** [1] - 6772:23
**24** [1] - 6793:2

**25** [4] - 6800:3, 6868:10, 6955:2, 6956:20
**254** [1] - 6930:25
**26** [2] - 6823:20, 6931:12
**28** [1] - 6901:10
**2:00** [1] - 6864:9

# 3

**3** [6] - 6872:20, 6883:5, 6884:22, 6887:3, 6890:19, 6892:9
**3.25** [2] - 6794:25, 6799:25
**30** [4] - 6903:24, 6925:10, 6926:6, 6932:17
**32** [1] - 6905:9
**330** [1] - 6950:9
**34** [2] - 6854:16, 6905:18
**35** [4] - 6870:4, 6870:10, 6873:13, 6906:13
**37** [1] - 6928:14
**38** [3] - 6778:19, 6906:22, 6928:14

# 4

**4** [3] - 6883:19, 6884:22, 6893:1
**40** [6] - 6813:13, 6813:18, 6813:25, 6814:1, 6828:17, 6869:1
**4000** [1] - 6773:3
**404** [1] - 6905:10
**4080** [1] - 6962:11
**4081** [1] - 6962:11
**41** [1] - 6831:12
**44** [1] - 6838:15
**45** [1] - 6931:13
**450** [1] - 6773:3
**49** [1] - 6840:2

# 5

**5** [1] - 6893:1
**5.3** [2] - 6910:5, 6910:8
**50** [1] - 6912:15
**51** [1] - 6913:20
**52** [2] - 6851:3, 6913:20
**53** [3] - 6851:15, 6913:20, 6930:24
**54** [1] - 6914:1
**55** [1] - 6918:1
**57** [1] - 6919:15
**575** [1] - 6773:16
**59** [1] - 6854:12

# 6

**6** [2] - 6892:19, 6893:1
**60** [1] - 6922:1
**61** [1] - 6922:1
**62** [2] - 6856:15, 6922:1
**626** [1] - 6926:13
**63** [1] - 6923:19
**632** [1] - 6926:13
**64** [1] - 6923:19
**65** [1] - 6923:19
**66** [1] - 6924:1

**6778** [1] - 6968:7
**68** [1] - 6802:10
**6865** [1] - 6968:9
**6949** [1] - 6968:11
**6:00** [1] - 6833:23

# 7

**70** [4] - 6920:23, 6928:4, 6931:4, 6931:15
**74** [1] - 6930:20
**75** [1] - 6931:3
**76** [1] - 6931:7
**77** [1] - 6931:12

# 8

**8** [1] - 6892:19
**80** [1] - 6893:7
**800,000** [1] - 6910:4
**825** [1] - 6773:12
**85** [1] - 6910:22
**850,000** [1] - 6910:7

# 9

**9** [1] - 6772:17
**90** [3] - 6799:20, 6800:19, 6957:6
**98** [6] - 6884:13, 6884:17, 6884:19, 6942:4, 6942:14, 6943:4

# A

**A-1** [1] - 6865:13
**a.m** [1] - 6772:18
**ability** [6] - 6792:17, 6792:21, 6862:23, 6886:2, 6905:16, 6965:16
**able** [24] - 6781:11, 6781:24, 6784:18, 6786:17, 6788:21, 6790:22, 6792:15, 6793:20, 6799:24, 6810:19, 6843:2, 6844:6, 6848:12, 6850:24, 6857:1, 6857:14, 6873:20, 6874:12, 6896:9, 6921:12, 6942:24, 6955:23, 6958:7, 6965:23
**absence** [5] - 6870:23, 6896:8, 6896:15, 6951:15, 6951:22
**absent** [1] - 6951:20
**absolutely** [4] - 6818:14, 6818:15, 6819:18, 6822:9
**absolutist** [2] - 6913:10, 6913:18
**abuse** [2] - 6833:25, 6879:22
**accelerating** [1] - 6918:9
**accept** [25] - 6810:17, 6819:15, 6825:11, 6835:11, 6835:18, 6837:4, 6837:5, 6853:3, 6872:21, 6881:2, 6883:6, 6883:19, 6884:12, 6884:14, 6926:21, 6931:9, 6931:10, 6933:15, 6940:23, 6941:8, 6941:9
**acceptable** [1] - 6868:20
**acceptance** [19] - 6827:17, 6852:8, 6856:5, 6856:7, 6856:8, 6856:19, 6857:9, 6857:16, 6857:22, 6858:12, 6858:14, 6858:19, 6859:5, 6918:25,

6919:11, 6933:11, 6964:7, 6964:8
**Acceptance** [2] - 6902:5, 6902:12
**accepted** [5] - 6838:8, 6906:1, 6926:24, 6932:8, 6936:2
**accepting** [4] - 6820:6, 6835:22, 6852:11, 6933:6
**access** [3] - 6849:9, 6849:11
**accommodated** [1] - 6846:6
**accommodations** [1] - 6846:17
**according** [6] - 6873:15, 6884:19, 6892:17, 6892:23, 6893:1, 6926:18, 6928:1, 6944:5, 6944:22
**account** [4] - 6829:14, 6911:2, 6915:7, 6915:13
**accounting** [2] - 6934:13, 6935:2
**accuse** [2] - 6829:17, 6879:20
**achieved** [1] - 6957:15
**acknowledged** [1] - 6798:15
**acquire** [1] - 6935:23
**acquirer** [4] - 6805:1, 6805:16, 6805:18, 6820:1
**acquirers** [3] - 6805:21, 6805:23, 6921:13
**Act** [7] - 6808:2, 6810:4, 6864:2, 6868:18, 6871:5, 6947:2, 6966:16
**act** [3] - 6790:17, 6825:13, 6893:18
**acted** [1] - 6961:1
**acting** [1] - 6843:11
**action** [1] - 6923:24
**actions** [1] - 6899:23
**active** [1] - 6933:13
**actively** [1] - 6868:2
**activity** [1] - 6831:9
**actual** [22] - 6786:6, 6801:19, 6869:9, 6872:8, 6872:12, 6872:14, 6874:19, 6875:18, 6876:5, 6876:13, 6876:24, 6877:14, 6877:19, 6877:22, 6878:1, 6878:5, 6878:9, 6878:17, 6885:3, 6896:13, 6930:3, 6951:13
**actuarial** [1] - 6936:16
**acutely** [2] - 6903:22, 6904:24
**adapt** [1] - 6861:21
**adaptable** [1] - 6961:1
**adapted** [1] - 6961:2
**add** [7] - 6776:25, 6807:12, 6817:5, 6841:3, 6843:20, 6886:21, 6917:12
**addition** [3] - 6794:6, 6798:6, 6816:10
**additional** [8] - 6840:25, 6841:3, 6924:11, 6949:22, 6951:3, 6958:25, 6959:1, 6966:11
**address** [3] - 6782:17, 6824:8, 6847:6
**addresses** [1] - 6802:4
**addressing** [1] - 6783:6
**adequate** [2] - 6900:17, 6935:8
**adjourned** [1] - 6967:5
**adjusted** [1] - 6897:19
**adjustment** [2] - 6851:12, 6868:8
**adjustments** [2] - 6822:4, 6846:16
**admission** [1] - 6946:2
**admissions** [3] - 6867:14, 6868:14, 6872:19

**admitted** [9] - 6892:1, 6897:20, 6900:13, 6907:8, 6926:9, 6930:8, 6935:16, 6940:1, 6945:14
**admittedly** [1] - 6925:6
**adopted** [2] - 6875:16, 6907:9
**adopts** [1] - 6806:24
**adroitly** [1] - 6946:19
**advantage** [2] - 6779:25, 6823:10
**advantages** [1] - 6956:14
**adverse** [16] - 6786:6, 6811:14, 6869:9, 6872:9, 6876:1, 6877:11, 6877:19, 6877:22, 6878:1, 6878:9, 6878:18, 6896:13, 6899:18, 6903:7, 6930:3, 6951:13
**adversely** [1] - 6899:23
**advertised** [1] - 6909:25
**advocates** [1] - 6925:7
**affairs** [1] - 6917:21
**affect** [2] - 6878:5, 6905:13
**affected** [2] - 6794:5, 6899:23
**affecting** [1] - 6878:6
**affects** [2] - 6835:10, 6904:17
**affirmatively** [1] - 6944:11
**afford** [1] - 6914:17
**afforded** [1] - 6778:24
**afield** [1] - 6850:1
**afraid** [1] - 6922:18
**AFTERNOON** [1] - 6865:1
**age** [1] - 6790:2
**agencies** [1] - 6836:9
**agency** [3] - 6836:7, 6836:18, 6857:13
**aggregated** [1] - 6926:23
**aggregation** [1] - 6964:15
**aggressively** [3] - 6785:10, 6787:25, 6955:20
**ago** [17] - 6807:8, 6857:12, 6860:11, 6867:3, 6868:10, 6889:21, 6894:11, 6898:6, 6901:12, 6901:23, 6906:9, 6906:14, 6913:2, 6920:11, 6940:5, 6946:7, 6962:21
**agree** [22] - 6822:11, 6869:18, 6881:1, 6882:4, 6882:6, 6887:3, 6888:4, 6888:5, 6890:14, 6892:3, 6899:11, 6906:6, 6907:6, 6912:7, 6913:23, 6923:7, 6939:20, 6962:19, 6962:21, 6963:5
**agreed** [5] - 6853:2, 6854:5, 6872:3, 6891:18, 6936:18
**agreement** [8] - 6845:19, 6846:22, 6847:23, 6848:21, 6851:25, 6852:3, 6852:4, 6963:2
**agreements** [4] - 6853:2, 6868:2, 6872:1, 6903:4
**agrees** [2] - 6876:22, 6930:7
**ahead** [20] - 6780:4, 6797:11, 6802:18, 6809:6, 6809:22, 6823:19, 6834:1, 6834:8, 6841:21, 6849:21, 6891:4, 6891:13, 6898:19, 6903:18, 6917:23, 6925:4, 6949:18, 6955:10, 6956:3, 6956:6
**aid** [2] - 6776:15, 6777:5

**airline** [20] - 6830:15, 6830:18, 6830:21, 6831:1, 6831:22, 6835:18, 6836:5, 6848:13, 6850:13, 6851:19, 6897:9, 6897:10, 6926:2, 6938:1, 6965:9, 6965:13, 6965:14, 6965:15
**Airlines** [6] - 6780:8, 6782:24, 6837:10, 6837:12, 6846:14, 6927:12
**airlines** [15] - 6830:14, 6831:22, 6831:25, 6834:10, 6836:13, 6836:14, 6841:7, 6848:10, 6848:23, 6851:18, 6851:25, 6852:9, 6853:6, 6855:1
**airplane** [1] - 6848:2
**airport** [7] - 6782:25, 6845:6, 6848:13, 6849:25, 6898:7, 6904:20, 6928:25
**Airport** [1] - 6846:8
**airports** [3] - 6848:6, 6848:7, 6849:11
**Alaska** [2] - 6782:23, 6837:9, 6837:12, 6837:24
**alive** [1] - 6818:12
**all-or-nothing** [2] - 6913:15, 6916:12
**alleged** [2] - 6807:9, 6900:6
**allocated** [1] - 6921:16
**allotted** [1] - 6797:17
**allow** [4] - 6782:3, 6858:22, 6859:1, 6859:15
**allowed** [9] - 6781:17, 6785:6, 6785:8, 6786:19, 6813:5, 6813:10, 6856:18, 6858:16, 6906:9
**allowing** [1] - 6863:20
**allows** [2] - 6806:16, 6814:22
**almost** [13] - 6782:23, 6868:9, 6889:5, 6889:20, 6891:23, 6894:10, 6907:18, 6909:10, 6931:13, 6939:1, 6944:9, 6949:20, 6957:1
**alone** [4] - 6894:2, 6901:25, 6909:7, 6954:10
**alter** [1] - 6816:8
**alternative** [6] - 6811:9, 6894:11, 6918:7, 6918:17, 6929:11, 6947:8
**alternatives** [2] - 6920:20, 6922:6
**alters** [1] - 6837:3
**amenable** [1] - 6815:9
**Amendment** [2] - 6924:19, 6962:6
**amendment** [1] - 6884:7
**AMERICA** [1] - 6772:3
**America** [3] - 6880:11, 6881:12, 6932:8
**American** [218] - 6773:11, 6775:1, 6775:3, 6775:5, 6775:7, 6775:9, 6775:10, 6775:12, 6775:14, 6775:17, 6778:20, 6779:12, 6779:19, 6780:19, 6783:7, 6783:13, 6784:9, 6785:6, 6785:8, 6793:18, 6798:16, 6798:23, 6799:5, 6801:23, 6810:17, 6812:18, 6813:11, 6813:17, 6815:12, 6819:19, 6820:10, 6820:17, 6821:1, 6821:11, 6821:21, 6823:23, 6825:2, 6825:6, 6825:13, 6825:15, 6826:17, 6828:20, 6829:16, 6831:5, 6835:18, 6835:19, 6835:23, 6836:12, 6837:4, 6837:19, 6839:2, 6839:11, 6839:14, 6839:20, 6840:3, 6841:11, 6841:24, 6842:10,

6842:15, 6842:21, 6842:25, 6843:15, 6843:18, 6843:19, 6843:22, 6844:2, 6844:6, 6844:11, 6844:15, 6844:19, 6844:25, 6845:7, 6845:21, 6846:6, 6846:8, 6846:13, 6846:24, 6847:15, 6848:5, 6848:12, 6849:15, 6849:24, 6850:2, 6850:14, 6850:21, 6850:24, 6851:25, 6852:5, 6852:7, 6852:10, 6852:11, 6852:13, 6852:14, 6852:23, 6853:3, 6853:4, 6853:7, 6854:3, 6854:12, 6854:23, 6855:10, 6856:3, 6856:8, 6856:10, 6856:13, 6856:17, 6858:5, 6858:8, 6858:12, 6859:1, 6859:15, 6859:19, 6859:21, 6861:16, 6862:2, 6862:4, 6864:1, 6865:7, 6866:22, 6867:9, 6867:11, 6867:17, 6867:19, 6867:25, 6872:21, 6878:21, 6879:23, 6881:10, 6881:12, 6881:19, 6883:6, 6883:17, 6883:20, 6884:12, 6884:14, 6885:19, 6889:22, 6890:5, 6890:15, 6890:22, 6892:13, 6892:15, 6897:1, 6897:21, 6901:3, 6901:14, 6902:13, 6902:15, 6902:20, 6903:2, 6903:9, 6904:24, 6906:2, 6906:17, 6907:24, 6908:9, 6910:4, 6910:19, 6911:17, 6911:23, 6911:24, 6913:1, 6914:24, 6916:16, 6916:25, 6917:17, 6919:1, 6921:22, 6921:23, 6922:9, 6922:16, 6923:5, 6923:7, 6924:2, 6925:10, 6925:18, 6925:22, 6926:18, 6927:12, 6927:17, 6929:1, 6932:6, 6932:10, 6933:18, 6934:19, 6935:10, 6935:19, 6936:9, 6936:13, 6938:19, 6942:10, 6942:21, 6942:22, 6944:16, 6945:22, 6946:6, 6946:9, 6946:12, 6950:13, 6954:5, 6954:8, 6954:21, 6955:1, 6955:3, 6955:19, 6955:22, 6956:11, 6956:13, 6958:25, 6959:1, 6959:8, 6959:10, 6959:18, 6960:13, 6961:1, 6962:17

**AMERICAN** [3] - 6772:10, 6772:10, 6772:15

**Americans** [1] - 6827:5

**Amex** [46] - 6781:9, 6781:17, 6782:5, 6782:8, 6783:18, 6784:4, 6785:2, 6785:9, 6785:12, 6788:15, 6790:13, 6790:15, 6791:10, 6793:24, 6794:24, 6795:8, 6795:9, 6795:22, 6796:2, 6796:10, 6797:5, 6797:21, 6798:2, 6798:5, 6800:14, 6800:18, 6800:21, 6801:3, 6801:7, 6814:15, 6814:19, 6814:22, 6814:24, 6815:4, 6815:7, 6816:16, 6818:15, 6821:5, 6821:9, 6822:1, 6931:22, 6932:4, 6933:17, 6936:17, 6937:21

**AMEX** [91] - 6803:19, 6803:25, 6804:1, 6804:17, 6804:23, 6805:5, 6805:9, 6805:17, 6805:18, 6805:19, 6806:10, 6806:16, 6807:5, 6807:8, 6807:14, 6807:18, 6808:11, 6810:15, 6811:3, 6811:11, 6811:22, 6811:23, 6812:1, 6812:11, 6812:13, 6812:15, 6812:16,

6828:8, 6828:13, 6828:18, 6834:13, 6834:16, 6835:3, 6835:6, 6836:6, 6836:9, 6836:11, 6836:12, 6836:17, 6839:7, 6844:18, 6845:18, 6851:7, 6854:5, 6854:7, 6854:24, 6857:5, 6857:10, 6857:12, 6857:15, 6857:16, 6857:17, 6857:20, 6857:24, 6858:3, 6859:17, 6860:9, 6860:12, 6860:14, 6860:16, 6860:20, 6861:6, 6861:8, 6863:18, 6867:8, 6885:22, 6886:3, 6892:18, 6895:6, 6897:4, 6897:14, 6897:24, 6898:12, 6901:19, 6904:19, 6905:2, 6905:9, 6909:9, 6910:5, 6916:13, 6917:3, 6917:7, 6920:3, 6920:14, 6922:3, 6922:13, 6953:14, 6962:23, 6963:20

**Amex's** [25] - 6782:3, 6789:6, 6815:19, 6816:22, 6816:24, 6817:7, 6817:9, 6817:15, 6817:16, 6820:3, 6820:21, 6821:4, 6825:23, 6827:4, 6829:22, 6845:25, 6862:22, 6862:25, 6863:6, 6879:13, 6894:20, 6896:24, 6905:8, 6907:12, 6933:4

**amount** [5] - 6777:11, 6840:17, 6849:20, 6919:17, 6938:12

**amounts** [2] - 6957:14, 6965:6

**analogous** [1] - 6941:19

**analogy** [5] - 6831:7, 6831:20, 6832:18, 6928:22, 6935:17

**analysis** [24] - 6801:5, 6803:18, 6809:2, 6809:15, 6811:13, 6816:8, 6825:14, 6828:6, 6828:9, 6832:19, 6833:16, 6844:4, 6850:8, 6873:15, 6874:15, 6874:16, 6924:19, 6924:24, 6926:18, 6928:20, 6939:5, 6951:16, 6962:11, 6964:25

**analysts** [2] - 6890:4, 6890:10

**analyze** [2] - 6833:1, 6838:20

**analyzed** [1] - 6843:7

**Andrew** [1] - 6774:19

**ANDREW** [1] - 6773:8

**anecdotal** [2] - 6929:20, 6930:12

**angry** [2] - 6845:3, 6845:4, 6937:11, 6939:18, 6939:25

**announced** [2] - 6883:11, 6909:20

**annoyed** [2] - 6844:21, 6844:22

**annoying** [2] - 6857:2, 6857:14

**annually** [1] - 6863:12

**answer** [37] - 6792:21, 6796:18, 6796:22, 6796:24, 6820:19, 6823:15, 6824:17, 6825:23, 6826:11, 6831:1, 6831:20, 6833:18, 6837:20, 6837:21, 6861:7, 6862:3, 6868:19, 6868:20, 6879:19, 6884:3, 6888:20, 6889:13, 6907:25, 6917:9, 6946:5, 6947:6, 6948:3, 6950:20, 6953:6, 6956:7, 6956:10, 6959:14, 6960:24, 6960:25, 6963:13, 6964:6

**answered** [2] - 6838:5, 6953:9

**answering** [3] - 6830:23, 6889:2, 6948:22

**ANTI** [1] - 6772:15

**anti** [45] - 6781:19, 6783:13, 6783:18, 6785:8, 6786:20, 6790:19, 6791:24, 6792:18, 6792:22, 6793:10, 6793:18, 6793:24, 6795:13, 6811:15, 6811:25, 6812:2, 6812:3, 6815:14, 6815:21, 6815:23, 6816:14, 6820:18, 6821:10, 6838:24, 6857:25, 6861:3, 6862:3, 6862:5, 6862:10, 6862:12, 6862:22, 6864:3, 6870:7, 6874:19, 6875:13, 6882:14, 6882:20, 6885:20, 6896:6, 6911:11, 6911:15, 6912:12, 6952:16, 6954:24, 6957:10

**anti-competitive** [13] - 6811:15, 6812:3, 6838:24, 6870:7, 6874:19, 6875:13, 6882:14, 6882:20, 6896:6, 6911:11, 6911:15, 6912:12, 6954:24

**anti-steering** [32] - 6781:19, 6783:13, 6783:18, 6785:8, 6786:20, 6790:19, 6791:24, 6792:18, 6792:22, 6793:10, 6793:18, 6793:24, 6795:13, 6811:25, 6812:2, 6815:14, 6815:21, 6815:23, 6816:14, 6820:18, 6821:10, 6857:25, 6861:3, 6862:3, 6862:5, 6862:10, 6862:12, 6862:22, 6864:3, 6885:20, 6952:16, 6957:10

**ANTI-STEERING** [1] - 6772:15

**anticompetitive** [17] - 6783:12, 6783:21, 6785:3, 6794:15, 6794:20, 6795:12, 6800:4, 6801:2, 6801:20, 6802:2, 6802:15, 6815:2, 6929:11, 6930:1, 6930:5, 6930:10, 6936:24

**antisteering** [3] - 6838:1, 6958:6, 6959:17

**ANTITRUST** [2] - 6772:15, 6773:2

**antitrust** [65] - 6782:10, 6783:16, 6783:19, 6789:16, 6789:19, 6801:4, 6803:17, 6808:14, 6809:15, 6810:15, 6810:20, 6810:23, 6811:6, 6816:8, 6818:19, 6819:3, 6819:9, 6819:10, 6821:14, 6822:2, 6824:8, 6830:24, 6831:11, 6832:19, 6833:1, 6858:21, 6859:3, 6859:12, 6859:15, 6861:10, 6861:22, 6862:11, 6874:3, 6874:15, 6879:5, 6889:18, 6894:19, 6896:4, 6896:6, 6896:18, 6896:23, 6910:2, 6913:4, 6928:15, 6930:11, 6934:15, 6934:21, 6936:7, 6940:7, 6941:19, 6944:3, 6945:5, 6953:10, 6956:7, 6959:12, 6960:12, 6960:16, 6960:21, 6961:22, 6964:18, 6965:1, 6965:8

**Antonio** [1] - 6965:17

**anyway** [1] - 6811:21

**app** [1] - 6793:12

**apparent** [1] - 6854:13

**appeals** [1] - 6958:8

**Appeals** [1] - 6839:5

**appear** [1] - 6926:13

**appearances** [1] - 6774:6

**APPEARANCES** [1] - 6773:1

**Apple** [2] - 6936:19, 6948:13

**apples** [3] - 6850:12, 6850:20
**applied** [2] - 6874:25, 6878:2
**applies** [4] - 6801:14, 6876:6, 6950:19, 6965:20
**apply** [9] - 6817:11, 6870:14, 6871:8, 6874:22, 6875:7, 6875:16, 6878:16, 6884:9, 6899:16
**applying** [3] - 6800:23, 6827:25, 6961:14
**appreciate** [2] - 6864:5, 6949:7
**approach** [13] - 6790:9, 6804:11, 6807:22, 6807:23, 6808:21, 6815:18, 6815:19, 6816:7, 6816:10, 6817:9, 6837:11, 6865:4, 6875:15
**appropriate** [9] - 6790:16, 6825:3, 6828:1, 6831:21, 6859:3, 6859:7, 6947:16, 6947:20, 6966:2
**appropriately** [1] - 6843:12
**approved** [1] - 6938:20
**architect** [1] - 6889:6
**area** [5] - 6828:4, 6828:6, 6835:8, 6905:12, 6951:6
**argue** [5] - 6845:1, 6886:11, 6932:11, 6950:10, 6961:17
**argued** [4] - 6850:17, 6860:1, 6876:22, 6931:20
**argues** [1] - 6875:1
**arguing** [1] - 6932:12
**argument** [31] - 6774:5, 6775:20, 6791:10, 6802:7, 6809:20, 6810:17, 6815:20, 6820:3, 6820:13, 6820:19, 6845:25, 6850:7, 6850:16, 6850:21, 6850:24, 6857:9, 6859:11, 6859:24, 6862:20, 6881:20, 6882:17, 6886:5, 6915:23, 6929:19, 6933:9, 6950:8, 6954:21, 6954:22, 6956:17, 6957:14, 6961:19
**arguments** [4] - 6839:21, 6839:22, 6851:1, 6950:2
**arithmetic** [1] - 6897:4
**armada** [1] - 6926:22
**arms** [3] - 6812:3, 6901:23, 6902:3
**arose** [1] - 6874:7
**arrangement** [5] - 6837:15, 6837:23, 6849:22, 6876:2, 6937:17
**arrangements** [6] - 6833:9, 6833:10, 6848:11, 6857:20, 6873:17, 6875:13
**articulates** [1] - 6825:13
**artificially** [1] - 6923:3
**aside** [3] - 6869:13, 6896:25, 6927:15
**aspect** [1] - 6915:6
**aspects** [3] - 6846:23, 6960:2, 6960:6
**aspirational** [1] - 6900:24
**assessment** [1] - 6852:6
**asset** [2] - 6832:21, 6833:3
**assets** [4] - 6957:8, 6957:11, 6959:8, 6960:20
**Assistant** [3] - 6867:6, 6883:17, 6886:17
**Assisted** [1] - 6772:25
**associated** [1] - 6914:22

**Association** [1] - 6875:6
**association** [2] - 6890:8, 6900:13
**associations** [1] - 6950:12
**assume** [5] - 6843:21, 6869:20, 6886:7, 6910:21, 6954:3
**assuming** [1] - 6930:1
**attack** [1] - 6946:6
**attempt** [1] - 6907:10
**attempted** [1] - 6945:20
**attempting** [2] - 6907:1, 6955:20
**attention** [1] - 6950:4
**Attorney** [3] - 6867:6, 6883:17, 6886:18
**attractive** [7] - 6815:10, 6834:14, 6843:13, 6860:25, 6959:11, 6960:2, 6960:4
**Australia** [3] - 6888:9, 6888:16, 6892:9
**authority** [6] - 6830:7, 6830:10, 6848:14, 6859:6, 6965:21, 6966:7
**available** [10] - 6778:16, 6801:4, 6845:7, 6857:17, 6865:8, 6877:20, 6908:12, 6920:7, 6920:9, 6920:11
**Avenue** [2] - 6773:12, 6773:16
**average** [2] - 6851:10, 6868:7
**aviation** [2] - 6847:5, 6847:6
**avoid** [2] - 6790:7, 6876:18
**aware** [1] - 6903:22

## B

**backfired** [2] - 6841:18, 6844:21
**backhanding** [1] - 6932:12
**bad** [2] - 6887:25, 6959:15
**badger** [1] - 6957:16
**baked** [1] - 6847:16
**balance** [3] - 6894:9, 6914:15, 6914:18
**ball** [2] - 6964:17, 6964:19
**bank** [6] - 6833:12, 6848:18, 6880:13, 6894:1, 6936:18, 6942:25
**Bank** [3] - 6805:20, 6899:6, 6919:8
**banker** [1] - 6834:13
**banking** [1] - 6833:13
**banks** [6] - 6796:6, 6805:10, 6852:24, 6867:22, 6890:8, 6903:5, 6903:9, 6932:3, 6932:7, 6950:12
**bar** [3] - 6841:4, 6841:5, 6940:25
**BARBER** [2] - 6773:20, 6775:13
**Barber** [1] - 6775:14
**BARBUR** [1] - 6773:14
**barely** [1] - 6945:25
**bargain** [1] - 6849:1
**bargaining** [1] - 6863:7
**Barrel** [1] - 6834:21
**barriers** [1] - 6853:25
**base** [2] - 6885:12, 6956:21
**based** [5] - 6817:16, 6863:4, 6868:24, 6900:1, 6925:22
**basement** [1] - 6908:2
**basic** [2] - 6782:5, 6825:8
**basis** [11] - 6816:19, 6831:15, 6886:19, 6892:7, 6897:2, 6897:19, 6899:9, 6934:10, 6934:16, 6934:25, 6941:7

**basket** [1] - 6946:6
**batting** [1] - 6937:3
**bear** [1] - 6959:9
**bearing** [1] - 6964:19
**bearings** [1] - 6964:17
**bears** [1] - 6930:15
**beat** [1] - 6786:23
**become** [3] - 6866:23, 6918:9, 6935:17
**BEFORE** [1] - 6772:19
**began** [1] - 6866:6
**begin** [3] - 6866:6, 6896:22, 6955:8
**beginning** [3] - 6825:14, 6838:16, 6939:19
**behalf** [4] - 6836:10, 6862:19, 6864:4, 6884:21
**behavior** [1] - 6904:12
**behind** [3] - 6810:7, 6826:12, 6890:8
**belabor** [1] - 6949:22
**belong** [1] - 6811:19
**belongs** [2] - 6812:20, 6824:19
**below** [1] - 6829:12
**benefit** [29] - 6788:19, 6794:1, 6808:12, 6808:19, 6812:12, 6814:19, 6814:21, 6815:2, 6815:12, 6816:3, 6817:4, 6838:21, 6840:4, 6842:1, 6844:14, 6844:16, 6845:8, 6848:15, 6850:19, 6879:23, 6880:19, 6911:23, 6921:16, 6933:5, 6939:5, 6939:16, 6949:22, 6960:9
**benefits** [25] - 6803:5, 6803:10, 6808:1, 6811:11, 6812:2, 6812:16, 6815:23, 6815:25, 6817:14, 6817:20, 6818:8, 6835:2, 6842:12, 6843:21, 6858:25, 6859:20, 6861:23, 6863:4, 6880:4, 6880:22, 6881:17, 6883:20, 6905:1, 6940:21, 6941:15
**benefitting** [1] - 6941:24
**BENNET** [1] - 6773:6
**BENNETT** [2] - 6774:12, 6777:6
**Bennett** [1] - 6774:13
**Bernheim** [18] - 6806:24, 6825:4, 6841:23, 6842:8, 6842:19, 6843:19, 6844:8, 6851:1, 6851:4, 6852:2, 6853:14, 6853:18, 6861:7, 6894:23, 6895:4, 6915:22, 6924:9, 6924:10
**Bernheim's** [7] - 6843:25, 6851:16, 6853:13, 6908:13, 6913:21, 6919:18, 6924:25
**Best** [1] - 6813:8
**best** [11] - 6786:5, 6797:18, 6809:8, 6812:11, 6862:3, 6867:17, 6891:18, 6902:18, 6902:25, 6906:9, 6945:25
**better** [17] - 6777:23, 6781:25, 6782:15, 6785:23, 6789:14, 6792:19, 6794:17, 6808:20, 6814:24, 6823:14, 6831:19, 6870:8, 6889:13, 6894:4, 6903:13, 6903:15, 6953:14
**between** [19] - 6781:12, 6800:6, 6805:7, 6806:23, 6817:19, 6830:16, 6830:17, 6831:15, 6852:23, 6863:8, 6874:4, 6917:1, 6919:10, 6919:13, 6923:4,

6944:18, 6945:4, 6947:4, 6951:9

**beyond** [8] - 6801:17, 6884:19, 6892:9, 6904:2, 6911:18, 6942:14

**bicycles** [1] - 6850:21

**Bicycles** [1] - 6942:17

**bid** [1] - 6834:15

**bidding** [1] - 6933:10

**bids** [1] - 6834:23

**Big** [1] - 6927:24

**big** [6] - 6797:5, 6809:25, 6842:24, 6889:11, 6933:16, 6963:23

**bigger** [3] - 6836:9, 6951:24, 6962:16

**biggest** [3] - 6868:25, 6902:24, 6903:2

**bike** [1] - 6942:17

**bill** [3] - 6915:12, 6915:14, 6926:4

**Bill** [1] - 6828:20

**billion** [9] - 6782:19, 6841:2, 6850:9, 6850:10, 6863:12, 6908:14, 6908:25, 6935:3, 6935:4

**bills** [1] - 6938:1

**Biornstad** [1] - 6795:19

**bit** [6] - 6830:7, 6855:7, 6856:9, 6861:22, 6925:2, 6962:6

**black** [1] - 6853:14

**blanche** [1] - 6834:3

**blank** [1] - 6895:2

**blast** [1] - 6889:16

**blasting** [1] - 6905:2

**blatant** [1] - 6945:9

**blended** [3] - 6921:19, 6922:3, 6923:11

**blending** [2] - 6921:20, 6921:22

**block** [8] - 6782:4, 6782:16, 6791:25, 6792:1, 6792:18, 6810:9, 6819:1, 6960:16

**blocked** [10] - 6782:15, 6784:8, 6785:4, 6785:18, 6791:19, 6792:22, 6793:3, 6793:4, 6795:25, 6838:1

**blocking** [2] - 6792:23, 6860:13

**blue** [8] - 6805:15, 6829:11, 6840:16, 6841:4, 6853:17, 6865:22, 6865:24, 6866:1

**Blue** [1] - 6853:16

**Board** [1] - 6792:11

**board** [10] - 6804:22, 6806:18, 6889:8, 6890:3, 6905:4, 6907:23, 6917:17, 6918:16, 6918:22, 6925:9

**boards** [2] - 6893:25, 6894:1

**bOIES** [1] - 6773:15

**bonds** [1] - 6908:1

**bonus** [1] - 6936:5

**bonuses** [1] - 6936:10

**book** [3] - 6793:2, 6895:3, 6906:14

**bootstrap** [1] - 6859:3

**born** [2] - 6893:17, 6941:12

**borrowing** [1] - 6880:13

**Boston** [1] - 6919:8

**bottom** [3] - 6816:25, 6853:15, 6958:4

**Bouchard** [1] - 6827:10

**boundaries** [1] - 6829:17

**box** [3] - 6805:15, 6829:11, 6907:23

**bracket** [1] - 6877:13

**branch** [1] - 6961:22

**brand** [10] - 6857:16, 6871:3, 6873:22, 6907:3, 6922:14, 6923:7, 6923:8, 6923:10, 6923:12, 6956:22

**break** [6] - 6777:15, 6822:21, 6822:23, 6823:11, 6859:9, 6864:8, 6901:17, 6949:10

**breaking** [2] - 6777:24, 6901:13

**Brenner** [1] - 6775:7

**BRENNER** [2] - 6773:17, 6775:6

**Bridge** [1] - 6942:18

**brief** [10] - 6781:10, 6820:21, 6845:2, 6850:9, 6862:20, 6868:15, 6900:12, 6949:5, 6949:17, 6949:19

**briefing** [1] - 6779:3

**briefly** [5] - 6794:19, 6796:8, 6838:14, 6838:18, 6964:9

**BRIGHT** [2] - 6773:20, 6775:16

**bright** [1] - 6775:15

**Bright** [1] - 6775:17

**bring** [3] - 6860:16, 6860:25, 6959:8

**brings** [3] - 6819:23, 6883:2, 6960:20

**broad** [2] - 6782:8, 6964:22

**broader** [1] - 6827:22

**broadly** [1] - 6818:1

**broken** [17] - 6780:8, 6780:11, 6780:13, 6780:24, 6782:18, 6783:3, 6789:15, 6789:25, 6800:6, 6866:7, 6866:9, 6866:18, 6897:22, 6898:23, 6903:19

**Brooklyn** [2] - 6772:9, 6772:23

**brought** [9] - 6840:7, 6841:1, 6867:10, 6867:12, 6867:25, 6868:13, 6884:18, 6884:20, 6942:13

**Brown** [2] - 6824:3, 6859:25

**bucks** [6] - 6813:13, 6813:18, 6813:25, 6814:1, 6927:20, 6935:3

**bump** [1] - 6842:24

**bump-up** [1] - 6842:24

**bunch** [5] - 6798:16, 6884:3, 6890:8, 6926:23, 6932:20

**burden** [12] - 6801:17, 6804:8, 6811:16, 6811:20, 6811:22, 6815:1, 6815:5, 6815:16, 6815:20, 6815:24, 6816:13, 6952:20

**Burger** [3] - 6927:25, 6928:6, 6928:8

**business** [98] - 6780:20, 6781:13, 6781:20, 6785:13, 6785:14, 6785:17, 6785:21, 6785:22, 6786:1, 6786:16, 6787:18, 6787:19, 6788:25, 6789:1, 6789:6, 6789:8, 6791:22, 6793:9, 6794:7, 6795:6, 6799:19, 6800:7, 6800:17, 6802:3, 6804:18, 6804:21, 6812:1, 6812:12, 6816:15, 6819:14, 6820:15, 6820:18, 6821:2, 6821:5, 6821:9, 6821:12, 6822:1, 6822:3, 6822:8, 6822:19, 6827:9, 6830:6, 6832:2, 6832:14, 6836:3, 6836:4, 6837:18, 6837:19, 6837:25, 6851:7, 6851:9, 6859:11, 6860:8, 6860:10, 6860:17, 6860:21, 6860:22, 6860:23, 6860:24, 6861:2, 6861:13, 6862:1,

6862:6, 6880:24, 6889:23, 6901:4, 6902:21, 6902:22, 6905:5, 6905:16, 6906:8, 6908:7, 6908:11, 6909:2, 6920:23, 6922:10, 6923:22, 6928:4, 6933:11, 6935:14, 6935:20, 6935:21, 6937:5, 6942:23, 6944:21, 6945:3, 6945:10, 6951:9, 6952:9, 6954:6, 6958:14, 6959:20, 6960:7, 6960:14, 6960:22

**Business** [2] - 6886:7, 6886:8

**businesses** [2] - 6784:14, 6863:19

**busy** [1] - 6858:6

**BUTLER** [1] - 6772:22

**Buy** [1] - 6813:8

**buy** [9] - 6813:9, 6843:15, 6846:14, 6921:8, 6927:12, 6927:24, 6928:25, 6942:24

**buyers** [2] - 6831:23, 6939:10

**buying** [2] - 6880:21, 6881:8

**BY** [8] - 6773:4, 6773:13, 6773:17, 6778:10, 6823:8, 6968:7, 6968:9, 6968:11

**bypass** [1] - 6955:19

---

## C

**cab** [3] - 6927:14, 6927:15

**Cadman** [1] - 6772:23

**calculate** [1] - 6828:24

**calculates** [1] - 6854:20

**calculation** [2] - 6844:1, 6853:13

**calculations** [2] - 6926:20, 6927:1

**calculus** [2] - 6837:4, 6916:8

**Califano** [1] - 6775:12

**CALIFANO** [2] - 6773:19, 6775:11

**California** [1] - 6875:5

**call-to-arms** [1] - 6901:23

**campaign** [18] - 6795:13, 6795:15, 6795:17, 6798:18, 6868:3, 6894:11, 6901:12, 6903:21, 6904:2, 6905:10, 6905:22, 6906:15, 6911:18, 6911:21, 6911:22, 6911:25, 6945:18

**campaigns** [4] - 6794:22, 6800:10, 6854:24, 6911:17

**Canada** [5] - 6888:6, 6888:8, 6888:16, 6892:9

**cancel** [2] - 6849:14, 6916:16

**cancellation** [1] - 6936:14

**cancelled** [1] - 6909:22

**cancelling** [1] - 6909:21

**Cannes** [2] - 6889:8, 6893:23

**cannot** [9] - 6781:3, 6785:13, 6827:16, 6858:24, 6873:10, 6892:1, 6899:8, 6930:9

**Capital** [4] - 6801:14, 6900:10, 6900:12, 6900:16

**capitalized** [1] - 6877:13

**captives** [1] - 6942:4

**capturing** [1] - 6939:13

**car** [1] - 6829:10

**card** [148] - 6778:20, 6780:12, 6781:6,

6782:1, 6782:20, 6782:21, 6782:22, 6782:24, 6783:1, 6783:3, 6785:12, 6786:2, 6786:18, 6788:12, 6789:5, 6790:4, 6790:24, 6792:7, 6793:14, 6793:17, 6795:3, 6798:6, 6798:7, 6798:21, 6799:13, 6799:21, 6800:19, 6804:17, 6804:23, 6804:25, 6805:13, 6807:9, 6807:24, 6808:15, 6813:10, 6813:11, 6813:13, 6814:4, 6814:11, 6816:10, 6818:1, 6820:6, 6824:15, 6824:20, 6826:6, 6827:13, 6827:16, 6827:17, 6827:22, 6832:1, 6832:15, 6833:9, 6833:13, 6833:15, 6834:21, 6834:22, 6834:24, 6835:7, 6835:13, 6835:14, 6836:16, 6836:20, 6845:7, 6846:13, 6846:15, 6852:11, 6853:3, 6853:4, 6854:19, 6856:8, 6856:13, 6863:5, 6863:8, 6863:9, 6863:11, 6877:18, 6877:20, 6881:10, 6881:12, 6883:20, 6889:22, 6892:2, 6902:10, 6905:5, 6905:13, 6906:1, 6907:2, 6909:12, 6909:13, 6911:8, 6914:11, 6914:23, 6915:2, 6915:5, 6915:11, 6915:14, 6918:4, 6918:8, 6918:25, 6919:18, 6920:2, 6920:3, 6920:5, 6920:6, 6920:14, 6920:15, 6920:16, 6921:7, 6921:10, 6922:13, 6922:15, 6922:18, 6923:7, 6923:8, 6923:10, 6927:17, 6929:1, 6929:4, 6930:25, 6931:2, 6931:10, 6933:10, 6933:16, 6933:17, 6936:18, 6939:9, 6944:13, 6944:18, 6944:19, 6950:12, 6950:15, 6953:15, 6955:3, 6957:7, 6958:10, 6960:1, 6963:3

**cardholder** [13] - 6804:25, 6814:18, 6817:19, 6817:20, 6817:25, 6818:9, 6842:11, 6842:13, 6843:20, 6845:8, 6859:20, 6861:15, 6905:25

**Cardholders** [1] - 6858:8

**cardholders** [55] - 6781:18, 6803:5, 6804:9, 6805:8, 6805:10, 6806:6, 6806:12, 6807:14, 6808:12, 6808:18, 6808:20, 6810:12, 6811:2, 6812:11, 6812:16, 6812:17, 6813:4, 6813:5, 6815:8, 6815:12, 6815:15, 6816:3, 6816:4, 6816:18, 6816:20, 6817:1, 6817:4, 6817:14, 6819:14, 6825:17, 6825:24, 6825:25, 6842:17, 6843:14, 6843:21, 6843:23, 6844:14, 6844:15, 6844:16, 6846:6, 6849:10, 6856:12, 6858:5, 6861:1, 6861:9, 6861:18, 6861:19, 6891:23, 6891:25, 6956:21, 6958:8, 6958:15, 6960:4

**Cardmembers** [2] - 6863:18, 6880:23

**cards** [80] - 6788:4, 6788:5, 6788:6, 6788:8, 6788:22, 6792:8, 6799:16, 6805:9, 6805:10, 6806:7, 6807:3, 6807:13, 6812:8, 6812:9, 6812:10, 6812:19, 6825:12, 6826:6, 6826:10, 6826:13, 6826:14, 6826:15, 6826:16, 6827:3, 6827:6, 6827:7, 6827:9, 6827:13, 6827:16, 6831:4, 6832:10,

6834:10, 6834:16, 6834:25, 6835:4, 6835:6, 6835:11, 6835:19, 6835:20, 6837:7, 6852:5, 6852:14, 6857:16, 6857:19, 6863:17, 6867:20, 6880:14, 6880:24, 6880:25, 6891:20, 6891:24, 6903:10, 6903:11, 6914:4, 6914:5, 6914:15, 6914:24, 6915:3, 6916:14, 6917:5, 6917:22, 6920:13, 6920:18, 6928:5, 6928:7, 6930:20, 6932:9, 6936:9, 6950:4, 6955:1, 6961:25, 6962:1, 6963:20, 6964:1, 6964:7, 6964:8

**care** [3] - 6909:9, 6930:11, 6955:24

**carefully** [1] - 6839:9

**carries** [2] - 6910:12, 6944:18

**carry** [8] - 6880:13, 6881:11, 6914:15, 6940:24, 6941:3, 6941:5, 6943:3

**carrying** [3] - 6880:24, 6880:25, 6881:14

**cars** [2] - 6897:8

**carte** [1] - 6834:3

**CARTER** [2] - 6773:7, 6774:15

**Carter** [1] - 6774:15

**case** [150] - 6778:15, 6778:18, 6779:6, 6779:13, 6779:20, 6782:4, 6783:7, 6783:17, 6784:1, 6790:13, 6794:12, 6794:18, 6801:9, 6801:15, 6801:18, 6801:20, 6801:22, 6803:6, 6803:7, 6803:24, 6806:13, 6808:3, 6808:4, 6808:6, 6809:13, 6811:1, 6816:6, 6818:20, 6830:11, 6831:8, 6832:4, 6840:7, 6849:24, 6853:7, 6859:6, 6859:24, 6863:21, 6866:10, 6866:13, 6866:23, 6867:5, 6867:15, 6868:23, 6869:5, 6869:15, 6870:3, 6870:4, 6870:5, 6870:9, 6870:15, 6871:5, 6871:6, 6871:12, 6871:25, 6873:9, 6873:12, 6874:9, 6874:11, 6874:23, 6874:25, 6875:3, 6875:4, 6875:6, 6875:16, 6875:20, 6875:21, 6876:3, 6876:4, 6876:16, 6876:23, 6877:7, 6877:8, 6877:14, 6879:17, 6880:1, 6882:1, 6882:5, 6882:10, 6882:15, 6882:22, 6883:17, 6885:22, 6886:8, 6886:22, 6887:11, 6887:20, 6887:24, 6890:11, 6896:9, 6898:6, 6899:6, 6899:7, 6899:11, 6899:12, 6899:15, 6899:20, 6899:25, 6900:1, 6900:3, 6900:4, 6900:8, 6900:10, 6900:23, 6901:25, 6902:1, 6903:23, 6906:24, 6912:20, 6912:21, 6913:3, 6913:5, 6917:2, 6920:9, 6924:8, 6924:9, 6929:15, 6930:21, 6931:19, 6931:20, 6931:23, 6932:2, 6932:20, 6932:25, 6933:1, 6934:15, 6940:9, 6940:16, 6940:19, 6941:20, 6942:2, 6942:3, 6942:5, 6944:1, 6944:15, 6946:9, 6946:10, 6946:13, 6948:6, 6948:13, 6951:5, 6952:9, 6952:14, 6955:22, 6961:1, 6965:21

**case-by-case** [1] - 6899:25

**cases** [27] - 6779:1, 6801:6, 6801:10,

6801:11, 6801:13, 6866:10, 6870:11, 6871:19, 6873:15, 6873:23, 6874:5, 6874:6, 6874:12, 6874:17, 6875:17, 6875:19, 6877:5, 6899:6, 6911:14, 6912:10, 6912:15, 6912:17, 6928:15, 6932:21, 6934:13, 6945:7, 6964:18

**cash** [8] - 6812:10, 6863:16, 6880:7, 6880:12, 6904:6, 6904:9, 6915:8, 6941:7

**catch** [2] - 6898:19, 6898:20

**categories** [3] - 6782:8, 6829:24, 6830:1

**category** [5] - 6782:12, 6782:14, 6794:23, 6821:21, 6839:12

**caught** [1] - 6946:22

**causation** [1] - 6850:16

**caused** [4] - 6845:5

**causes** [1] - 6857:21

**causing** [2] - 6857:16, 6857:21

**Centurion** [1] - 6848:8

**CEO** [3] - 6866:23, 6890:5, 6890:9

**certain** [4] - 6779:4, 6937:21, 6961:12, 6961:25

**certainly** [10] - 6778:23, 6780:3, 6789:7, 6789:10, 6799:2, 6849:4, 6876:22, 6941:19, 6955:20, 6963:23

**cetera** [2] - 6867:22, 6880:14

**CFO** [1] - 6816:22

**chain** [1] - 6836:5

**chair** [1] - 6937:7

**chairman** [1] - 6890:3

**challenge** [3] - 6799:11, 6822:2, 6882:10

**challenges** [2] - 6958:23, 6961:2

**Chambers** [1] - 6893:9

**chance** [5] - 6842:23, 6860:16, 6860:20, 6860:21, 6952:19

**change** [10] - 6788:3, 6846:12, 6850:3, 6869:8, 6871:1, 6882:18, 6884:15, 6924:22, 6957:9, 6962:7

**changed** [4] - 6868:13, 6868:16, 6872:25, 6939:15

**changes** [4] - 6822:5, 6851:14, 6961:25, 6962:1

**changing** [1] - 6848:9

**channel** [1] - 6859:18

**channelled** [1] - 6788:18

**character** [1] - 6796:23

**characteristics** [1] - 6803:12

**characterize** [2] - 6782:9, 6913:9

**characterized** [1] - 6821:2

**charge** [31] - 6790:4, 6798:6, 6832:15, 6850:9, 6850:13, 6862:24, 6863:5, 6863:8, 6863:9, 6863:11, 6873:21, 6892:14, 6897:13, 6913:1, 6914:4, 6914:22, 6914:23, 6915:11, 6918:6, 6918:8, 6918:17, 6919:23, 6920:1, 6921:15, 6922:9, 6922:19, 6923:8, 6926:8, 6931:12, 6960:6

**charged** [1] - 6914:9

**charges** [6] - 6839:11, 6897:11,

6921:12, 6921:14, 6921:20, 6925:18
**charging** [2] - 6937:5, 6939:23
**chart** [11] - 6804:24, 6805:2, 6851:21, 6853:10, 6894:22, 6894:23, 6895:3, 6919:16, 6931:8, 6940:17, 6952:15
**charts** [2] - 6853:9, 6921:24
**Chase** [28] - 6845:17, 6845:19, 6845:23, 6845:24, 6846:6, 6846:13, 6846:22, 6846:25, 6847:13, 6848:17, 6848:18, 6848:19, 6848:20, 6848:25, 6849:2, 6849:5, 6849:7, 6849:16, 6849:17, 6849:21, 6898:12, 6937:13, 6937:17, 6955:12, 6955:16, 6956:11, 6958:24, 6959:2
**Chase's** [1] - 6955:18
**cheap** [3] - 6789:9, 6789:13, 6960:2
**cheaper** [13] - 6780:20, 6780:23, 6788:13, 6788:14, 6789:11, 6792:20, 6794:24, 6795:3, 6795:6, 6851:9, 6959:21, 6959:23, 6959:25
**cheapest** [1] - 6862:24
**check** [6] - 6880:7, 6880:12, 6927:16, 6930:6, 6930:11, 6941:7
**checking** [1] - 6915:7
**checkout** [2] - 6857:15, 6858:1
**checks** [1] - 6812:10
**Chenault** [20] - 6798:5, 6798:15, 6799:9, 6821:24, 6857:18, 6867:4, 6888:25, 6889:3, 6892:6, 6894:5, 6897:17, 6898:19, 6901:22, 6903:14, 6906:10, 6933:7, 6940:13, 6945:17, 6945:24, 6954:3
**Chenault's** [4] - 6798:24, 6867:16, 6889:9, 6906:6
**CHESLER** [51] - 6773:13, 6774:25, 6776:13, 6776:22, 6777:7, 6777:10, 6777:21, 6778:1, 6840:12, 6865:19, 6865:25, 6866:3, 6866:5, 6875:10, 6885:23, 6886:14, 6886:19, 6886:24, 6891:1, 6891:3, 6891:5, 6891:10, 6891:14, 6896:1, 6899:1, 6909:17, 6914:25, 6915:4, 6915:10, 6915:16, 6923:2, 6925:5, 6938:16, 6938:22, 6938:25, 6944:1, 6946:17, 6946:21, 6946:23, 6947:6, 6947:14, 6947:24, 6948:2, 6948:15, 6948:18, 6948:21, 6949:1, 6955:8, 6966:20, 6967:2, 6968:9
**Chesler** [6] - 6775:1, 6797:15, 6822:10, 6865:18, 6966:1, 6967:1
**chest** [1] - 6929:2
**Chicago** [5] - 6830:17, 6830:20, 6927:12, 6928:23, 6928:24
**chief** [1] - 6845:15
**child** [1] - 6931:23
**chips** [4] - 6876:10, 6883:1, 6907:22, 6907:23
**chocolate** [1] - 6928:25
**choice** [13] - 6813:11, 6813:14, 6813:15, 6813:18, 6813:19, 6813:22, 6814:14, 6814:16, 6814:25, 6853:18,

6933:4, 6938:7, 6941:23
**ChoicePay** [1] - 6793:22
**choke** [2] - 6889:14, 6904:25
**choose** [5] - 6810:13, 6813:16, 6833:12, 6835:1, 6836:4
**choosing** [1] - 6793:17
**chop** [1] - 6928:9
**chopping** [1] - 6928:10
**chosen** [1] - 6881:14
**Christopher** [1] - 6780:8
**chunk** [2] - 6826:15, 6963:23
**circle** [3] - 6889:9, 6889:10, 6935:13
**Circuit** [19] - 6801:5, 6869:10, 6870:4, 6870:10, 6870:16, 6871:19, 6873:13, 6875:19, 6875:21, 6882:22, 6899:20, 6899:22, 6900:11, 6912:15, 6932:16, 6932:21, 6941:11, 6948:9, 6948:10
**circuit** [1] - 6912:22
**circumstances** [1] - 6904:12
**citation** [1] - 6882:23
**cite** [14] - 6801:11, 6801:12, 6830:9, 6859:6, 6874:5, 6877:12, 6899:6, 6899:19, 6912:17, 6930:24, 6942:18, 6944:2, 6945:7, 6948:5
**cited** [9] - 6799:1, 6803:7, 6827:24, 6830:8, 6859:25, 6911:6, 6913:4, 6924:9, 6940:9
**cites** [2] - 6860:14, 6932:20
**citing** [1] - 6932:10
**city** [8] - 6830:16, 6831:1, 6831:8, 6837:11, 6897:11, 6928:20, 6928:23, 6965:9
**City** [2] - 6858:4, 6912:16
**civil** [1] - 6774:5
**claim** [20] - 6820:23, 6821:5, 6821:8, 6821:12, 6841:18, 6841:24, 6842:12, 6844:8, 6845:12, 6850:2, 6850:25, 6856:9, 6856:16, 6858:10, 6876:8, 6876:15, 6900:22, 6956:19
**claimed** [1] - 6807:11
**claims** [4] - 6801:3, 6841:22, 6841:23, 6842:7
**clarify** [1] - 6796:25
**classic** [3] - 6795:5, 6795:6, 6912:1
**clause** [1] - 6866:1
**clear** [16] - 6781:5, 6781:9, 6796:24, 6797:2, 6820:24, 6830:3, 6839:3, 6849:18, 6893:3, 6912:21, 6925:18, 6927:9, 6934:14, 6952:2, 6958:20
**clearest** [1] - 6952:14
**clearly** [4] - 6780:19, 6809:2, 6871:9, 6964:22
**client** [1] - 6898:10
**cliff** [1] - 6957:17
**clock** [3] - 6775:20, 6775:21, 6775:22
**closed** [4] - 6787:4, 6793:25, 6820:1, 6908:10
**closely** [1] - 6798:20
**closest** [1] - 6882:15
**closing** [3] - 6777:12, 6865:17, 6869:23
**club** [1] - 6893:21

**clubhouse** [1] - 6893:21
**co** [6] - 6857:16, 6923:7, 6923:8, 6923:10, 6923:12
**co-brand** [5] - 6857:16, 6923:7, 6923:8, 6923:10, 6923:12
**Cobrand** [24] - 6834:10, 6834:14, 6845:17, 6845:19, 6845:23, 6846:12, 6846:15, 6846:22, 6846:23, 6847:23, 6851:25, 6852:3, 6852:16, 6852:17, 6852:21, 6852:22, 6853:1, 6853:4, 6922:7, 6922:8, 6922:11, 6922:12, 6922:18, 6963:2
**cognizable** [1] - 6819:9
**cold** [1] - 6820:25
**colleagues** [3] - 6793:1, 6865:6, 6945:17
**collected** [1] - 6807:10
**colorful** [1] - 6879:24
**combined** [1] - 6931:15
**combines** [1] - 6931:15
**coming** [6] - 6808:5, 6844:2, 6875:9, 6917:18, 6918:5, 6918:18
**comment** [5] - 6779:7, 6821:24, 6885:18, 6949:22, 6962:2
**comments** [3] - 6777:14, 6868:15, 6869:1
**Commercial** [1] - 6932:19
**commercial** [1] - 6927:5
**Commission** [1] - 6875:6
**committee** [1] - 6908:10
**common** [4] - 6933:9, 6964:13, 6965:1, 6966:9
**commonly** [2] - 6821:13, 6932:6
**companies** [10] - 6786:21, 6796:7, 6800:8, 6858:20, 6858:21, 6902:21, 6928:15, 6933:10, 6952:1, 6960:24
**company** [24] - 6784:6, 6784:21, 6793:16, 6832:23, 6833:2, 6833:4, 6833:11, 6867:20, 6889:5, 6889:22, 6890:1, 6890:5, 6890:9, 6890:11, 6894:6, 6915:17, 6918:10, 6930:8, 6934:20, 6936:6, 6958:13, 6960:19
**COMPANY** [2] - 6772:10, 6772:11
**Company** [1] - 6773:12
**company's** [1] - 6917:18
**comparable** [2] - 6919:12, 6931:19
**compare** [4] - 6806:16, 6829:10, 6897:20, 6932:5
**compared** [9] - 6794:25, 6799:25, 6806:17, 6828:14, 6855:8, 6867:21, 6925:16, 6932:9, 6955:16
**compares** [2] - 6850:9, 6850:10
**comparing** [3] - 6850:8, 6850:20
**comparison** [4] - 6831:8, 6831:21, 6850:12, 6932:4
**comparisons** [1] - 6850:17
**compartmentalizing** [1] - 6826:18
**compelling** [2] - 6936:23, 6936:25
**compensated** [1] - 6795:21
**compensation** [1] - 6836:19
**compete** [31] - 6780:21, 6781:17,

6784:16, 6786:7, 6796:14, 6799:24, 6800:1, 6810:17, 6811:4, 6818:16, 6830:21, 6832:21, 6859:2, 6860:3, 6860:5, 6861:11, 6861:13, 6861:25, 6886:3, 6892:23, 6893:4, 6893:13, 6893:17, 6897:8, 6897:10, 6905:16, 6921:4, 6931:14, 6950:12, 6955:23, 6960:1

**competed** [1] - 6834:13

**competing** [12] - 6784:14, 6790:10, 6799:17, 6830:12, 6831:15, 6832:2, 6832:23, 6833:5, 6833:7, 6887:16, 6893:14, 6959:3

**competition** [183] - 6780:12, 6781:6, 6782:1, 6782:3, 6782:15, 6782:16, 6783:17, 6783:19, 6783:22, 6784:1, 6784:12, 6785:15, 6785:17, 6786:6, 6787:9, 6787:11, 6787:16, 6787:20, 6787:21, 6788:18, 6788:23, 6789:4, 6789:20, 6789:25, 6790:3, 6791:20, 6792:9, 6792:23, 6792:24, 6795:5, 6795:6, 6795:7, 6795:22, 6795:24, 6795:25, 6797:24, 6799:17, 6800:9, 6801:19, 6803:4, 6805:9, 6806:1, 6806:11, 6806:12, 6806:13, 6806:14, 6807:13, 6807:16, 6808:1, 6808:9, 6808:14, 6808:18, 6808:20, 6808:23, 6808:24, 6810:9, 6810:10, 6810:11, 6810:14, 6810:25, 6811:7, 6811:25, 6814:23, 6815:12, 6815:21, 6816:15, 6819:1, 6819:8, 6819:22, 6821:13, 6824:4, 6824:5, 6828:4, 6828:7, 6830:16, 6830:17, 6830:25, 6831:24, 6832:7, 6832:24, 6833:1, 6834:9, 6834:11, 6834:17, 6834:19, 6835:1, 6835:2, 6835:9, 6835:12, 6835:21, 6837:17, 6849:12, 6852:22, 6852:23, 6858:20, 6858:25, 6859:5, 6859:7, 6859:13, 6859:16, 6859:18, 6859:19, 6859:20, 6859:21, 6859:22, 6860:7, 6860:9, 6860:13, 6861:14, 6862:11, 6862:23, 6863:8, 6863:22, 6867:12, 6869:9, 6872:9, 6873:4, 6873:22, 6877:11, 6877:18, 6877:24, 6878:9, 6878:18, 6886:2, 6887:14, 6887:18, 6887:24, 6889:4, 6889:12, 6892:12, 6892:13, 6892:25, 6897:22, 6897:23, 6898:9, 6899:8, 6899:9, 6902:7, 6902:14, 6906:19, 6913:12, 6913:19, 6913:25, 6914:7, 6916:10, 6917:13, 6918:19, 6918:20, 6924:15, 6945:8, 6946:10, 6950:2, 6950:3, 6950:4, 6950:15, 6950:16, 6950:19, 6950:21, 6950:24, 6950:25, 6951:4, 6951:14, 6952:5, 6952:8, 6952:13, 6953:12, 6953:16, 6953:23, 6953:25, 6954:5, 6954:6, 6954:11, 6954:17, 6956:8, 6956:14, 6958:5, 6958:7, 6959:16, 6960:15, 6960:16, 6961:3

**competitions** [1] - 6807:4

**competitive** [69] - 6780:13, 6783:24, 6784:22, 6785:22, 6787:4, 6787:8,

6789:2, 6789:19, 6790:21, 6790:22, 6792:25, 6795:10, 6798:10, 6799:11, 6800:5, 6801:3, 6801:8, 6802:21, 6811:11, 6811:15, 6811:16, 6811:18, 6812:3, 6815:2, 6817:24, 6819:17, 6832:8, 6832:10, 6838:24, 6858:15, 6859:4, 6860:4, 6863:20, 6868:18, 6869:2, 6869:3, 6870:7, 6874:19, 6875:13, 6877:11, 6880:4, 6882:14, 6882:20, 6883:10, 6883:13, 6896:6, 6896:23, 6898:23, 6899:2, 6899:14, 6902:15, 6903:20, 6911:11, 6911:13, 6911:15, 6912:12, 6920:19, 6923:24, 6924:24, 6934:8, 6934:9, 6951:8, 6952:10, 6954:9, 6954:24, 6957:7, 6958:12, 6958:23, 6959:8

**competitive-effect** [1] - 6899:2

**competitor** [12] - 6781:4, 6784:7, 6791:25, 6810:16, 6860:21, 6861:11, 6867:23, 6918:14, 6923:19, 6930:23, 6946:7, 6963:25

**competitors** [10] - 6780:17, 6780:24, 6800:13, 6831:18, 6831:21, 6859:13, 6873:23, 6903:16, 6918:21, 6956:8

**complaints** [3] - 6909:21, 6910:3, 6910:7

**completed** [3] - 6879:12, 6879:14, 6886:12

**completely** [1] - 6939:20

**complicated** [2] - 6808:22, 6817:23

**components** [2] - 6879:9, 6879:15

**Computer** [1] - 6772:25

**Computer-Assisted** [1] - 6772:25

**conceded** [3] - 6869:5, 6905:18, 6925:21

**concedes** [3] - 6785:2, 6900:12, 6924:8

**concentrated** [1] - 6947:22

**concentrating** [1] - 6947:23

**concept** [2] - 6826:17, 6828:22

**concern** [2] - 6821:25, 6863:22

**concerning** [2] - 6863:1, 6876:1

**concerns** [1] - 6803:24

**concession** [4] - 6925:14, 6936:21

**concessions** [2] - 6800:14, 6923:8

**conclude** [1] - 6875:12

**concluded** [2] - 6828:6, 6838:25

**concludes** [1] - 6801:21

**conclusion** [9] - 6821:25, 6828:25, 6844:3, 6844:16, 6863:25, 6877:9, 6878:4, 6944:1, 6944:4

**conclusions** [4] - 6872:12, 6882:3, 6882:9, 6966:8

**concrete** [2] - 6801:18, 6814:7

**condemned** [2] - 6873:16, 6951:20

**conditions** [4] - 6791:17, 6835:12, 6876:13, 6964:25

**conduct** [5] - 6874:4, 6888:7, 6907:11, 6930:10, 6951:18

**conference** [3] - 6883:11, 6883:15, 6929:18

**conferring** [1] - 6880:3

**confidence** [1] - 6887:9

**confidential** [3] - 6895:2, 6921:25, 6923:18

**confidentiality** [1] - 6777:3

**confirmed** [6] - 6785:7, 6785:9, 6785:20, 6801:2, 6801:5, 6936:17

**conflict** [1] - 6916:9

**confront** [1] - 6926:25

**confronted** [1] - 6876:12

**confronting** [1] - 6872:17

**confuse** [1] - 6916:10

**confusion** [1] - 6876:18

**Congress** [4] - 6810:24, 6961:16, 6961:17, 6961:24

**Congressional** [1] - 6961:11

**conjures** [2] - 6883:8, 6885:15

**CONNECTICUT** [1] - 6772:4

**connection** [5] - 6781:12, 6802:21, 6804:2, 6951:8, 6952:7

**CONRATH** [109] - 6773:4, 6774:7, 6776:1, 6776:8, 6776:16, 6776:19, 6776:25, 6778:6, 6778:8, 6778:10, 6778:11, 6778:23, 6779:2, 6779:10, 6779:15, 6780:2, 6780:5, 6788:10, 6789:7, 6790:8, 6790:16, 6791:11, 6796:16, 6796:20, 6796:22, 6796:25, 6797:10, 6797:12, 6797:16, 6797:20, 6802:7, 6802:10, 6802:12, 6802:19, 6803:1, 6808:7, 6809:4, 6809:8, 6809:10, 6809:12, 6809:17, 6809:21, 6809:23, 6813:2, 6813:24, 6814:2, 6814:5, 6814:7, 6814:10, 6814:14, 6816:3, 6816:5, 6818:4, 6818:14, 6818:19, 6818:22, 6818:25, 6822:13, 6822:17, 6822:22, 6823:8, 6823:9, 6823:20, 6827:1, 6831:19, 6833:17, 6833:20, 6833:24, 6834:7, 6834:9, 6839:24, 6840:2, 6840:9, 6840:14, 6841:16, 6841:22, 6847:1, 6847:6, 6847:24, 6848:4, 6856:1, 6865:4, 6865:11, 6865:13, 6949:5, 6949:7, 6949:11, 6949:17, 6949:19, 6949:24, 6953:1, 6953:3, 6954:18, 6954:20, 6955:11, 6955:17, 6956:1, 6956:4, 6956:7, 6957:1, 6958:1, 6961:7, 6961:9, 6961:16, 6961:24, 6962:4, 6966:23, 6968:7, 6968:11

**Conrath** [31] - 6774:8, 6778:5, 6822:20, 6866:6, 6868:14, 6871:2, 6871:4, 6871:13, 6872:18, 6878:21, 6879:5, 6879:24, 6881:24, 6889:1, 6889:23, 6894:22, 6896:13, 6907:22, 6912:6, 6913:21, 6916:21, 6918:23, 6924:9, 6931:25, 6937:12, 6937:14, 6938:3, 6938:12, 6940:16, 6949:4, 6949:16

**Conrath's** [1] - 6879:1

**consequence** [1] - 6860:5

**conservative** [2] - 6790:9, 6917:21

**consider** [5] - 6794:11, 6803:15, 6807:20, 6811:10, 6820:6

**consideration** [1] - 6815:13

**considered** [5] - 6795:9, 6803:13, 6811:19, 6838:12, 6922:6
**considering** [6] - 6803:16, 6811:11, 6815:16, 6865:21, 6906:19, 6961:22
**consistent** [4] - 6816:23, 6893:12, 6923:14, 6940:8
**consistently** [1] - 6870:16
**consortium** [1] - 6792:12
**constitute** [1] - 6896:17
**constraining** [1] - 6924:23
**construct** [1] - 6947:7
**constructed** [1] - 6923:3
**consumer** [31] - 6793:17, 6818:11, 6825:12, 6868:9, 6871:21, 6879:23, 6880:19, 6880:21, 6887:15, 6887:19, 6888:13, 6892:2, 6898:20, 6901:18, 6902:20, 6906:1, 6917:10, 6918:4, 6918:23, 6918:25, 6919:3, 6919:5, 6919:7, 6923:15, 6924:2, 6940:21, 6941:15, 6944:18, 6944:19, 6945:4, 6950:10
**consumers** [25] - 6781:21, 6794:1, 6806:23, 6812:18, 6819:16, 6862:9, 6863:3, 6863:14, 6878:24, 6880:5, 6880:18, 6880:25, 6883:24, 6887:17, 6887:25, 6899:5, 6902:22, 6902:24, 6904:2, 6905:1, 6919:12, 6919:21, 6919:24, 6950:15, 6960:23
**contagion** [2] - 6906:16, 6906:17
**contains** [1] - 6777:2
**contemporaneous** [7] - 6845:11, 6845:13, 6845:21, 6847:14, 6889:7, 6923:20, 6937:12
**contend** [1] - 6871:23
**contends** [1] - 6870:6
**context** [8] - 6807:18, 6818:25, 6823:22, 6841:15, 6874:8, 6874:17, 6927:1, 6930:16
**contiguous** [1] - 6777:12
**Continental** [26] - 6824:2, 6842:15, 6842:24, 6843:3, 6845:1, 6845:3, 6845:4, 6845:6, 6845:10, 6845:16, 6845:22, 6846:1, 6846:5, 6846:14, 6846:16, 6847:9, 6848:10, 6848:20, 6848:22, 6848:24, 6849:2, 6849:5, 6849:14, 6850:3, 6904:18, 6937:10
**continue** [9] - 6845:1, 6845:18, 6903:7, 6907:4, 6916:25, 6937:18, 6954:23, 6956:6, 6957:10
**Continued** [4] - 6802:24, 6826:20, 6864:12, 6943:6
**continued** [1] - 6812:22, 6840:19, 6840:24, 6841:5, 6855:12, 6895:14, 6911:21, 6922:20, 6927:7, 6940:3, 6957:18
**Continuing** [2] - 6823:8, 6856:1
**CONTINUING** [2] - 6813:1, 6923:1
**continuous** [1] - 6941:12
**contract** [2] - 6849:6, 6858:6
**contractual** [1] - 6849:22
**contradict** [1] - 6881:15

**contradicted** [1] - 6890:18
**contrary** [3] - 6845:2, 6880:2, 6930:2
**contribution** [2] - 6829:10, 6855:6
**contributions** [2] - 6828:23, 6829:3
**control** [4] - 6792:13, 6846:10, 6898:2, 6915:9
**controlled** [1] - 6932:7
**convenience** [1] - 6919:11
**convince** [1] - 6936:9
**copies** [1] - 6865:7
**copy** [1] - 6776:20
**copying** [1] - 6898:12
**Corbett** [3] - 6836:10, 6836:21, 6857:13
**core** [6] - 6783:19, 6803:1, 6826:13, 6826:16, 6827:15, 6963:19
**corporate** [16] - 6832:14, 6833:10, 6833:15, 6834:21, 6834:22, 6834:25, 6835:4, 6835:5, 6835:14, 6835:20, 6836:24, 6838:3, 6854:19, 6928:5, 6928:7, 6933:10
**corporation** [10] - 6818:7, 6822:3, 6833:14, 6834:21, 6835:1, 6835:7, 6836:3, 6836:24, 6836:25, 6938:19
**corporations** [7] - 6833:9, 6835:15, 6836:3, 6836:10, 6836:23, 6837:11, 6935:7
**correct** [14] - 6798:5, 6799:3, 6801:22, 6827:5, 6853:16, 6853:19, 6910:15, 6915:15, 6941:11, 6945:19, 6948:9
**correction** [2] - 6790:5, 6790:12
**cost** [24] - 6781:4, 6782:22, 6782:24, 6786:7, 6787:4, 6791:19, 6812:5, 6820:7, 6829:5, 6841:24, 6841:25, 6842:10, 6842:24, 6843:3, 6844:1, 6844:10, 6844:15, 6863:1, 6863:5, 6925:16, 6926:10, 6926:14, 6926:25
**costs** [13] - 6780:21, 6792:13, 6812:6, 6812:9, 6828:14, 6828:23, 6829:13, 6855:8, 6858:25, 6863:13, 6863:17, 6911:9, 6939:3
**Cotark** [1] - 6948:18
**Cote** [2] - 6948:13, 6948:24
**coterminous** [1] - 6965:23
**couches** [1] - 6885:11
**Counsel** [2] - 6774:6, 6779:19
**count** [1] - 6898:3
**counties** [1] - 6951:25
**counting** [1] - 6779:8
**country** [8] - 6819:20, 6852:9, 6853:7, 6893:21, 6914:14, 6940:24, 6955:2, 6964:18
**counts** [1] - 6852:17
**couple** [10] - 6809:4, 6809:5, 6820:16, 6823:12, 6839:24, 6840:9, 6841:12, 6850:15, 6949:6, 6949:7
**courage** [1] - 6890:6
**course** [14] - 6777:9, 6778:15, 6790:17, 6791:4, 6796:3, 6804:18, 6804:21, 6820:16, 6834:10, 6841:2, 6851:10, 6858:3, 6892:2, 6955:14
**COURT** [153] - 6772:1, 6774:4, 6774:9,

6774:21, 6775:15, 6775:18, 6776:2, 6776:5, 6776:11, 6776:14, 6776:17, 6776:20, 6776:24, 6777:4, 6777:9, 6777:16, 6777:22, 6778:3, 6778:7, 6778:22, 6778:24, 6779:3, 6779:14, 6779:17, 6780:4, 6788:3, 6789:5, 6790:1, 6790:9, 6791:9, 6796:10, 6796:19, 6796:21, 6796:24, 6797:8, 6797:11, 6797:13, 6797:19, 6801:23, 6802:9, 6802:11, 6802:15, 6808:6, 6808:25, 6809:6, 6809:9, 6809:11, 6809:13, 6809:18, 6809:22, 6813:21, 6814:1, 6814:3, 6814:6, 6814:9, 6814:13, 6816:2, 6816:4, 6818:2, 6818:5, 6818:18, 6818:21, 6818:24, 6821:23, 6822:15, 6822:20, 6822:23, 6823:4, 6823:19, 6831:7, 6833:8, 6833:19, 6833:22, 6834:1, 6834:8, 6839:19, 6840:8, 6840:13, 6841:14, 6841:21, 6846:5, 6847:3, 6847:22, 6847:25, 6862:16, 6864:7, 6865:3, 6865:9, 6865:12, 6865:15, 6865:21, 6866:2, 6866:4, 6875:9, 6885:16, 6885:25, 6886:17, 6886:23, 6890:25, 6891:2, 6891:4, 6891:7, 6891:12, 6898:25, 6909:16, 6914:21, 6915:1, 6915:2, 6915:5, 6915:15, 6925:4, 6938:14, 6938:17, 6938:24, 6946:15, 6946:18, 6946:22, 6946:24, 6947:12, 6947:15, 6947:25, 6948:13, 6948:16, 6948:19, 6948:23, 6949:3, 6949:6, 6949:9, 6949:12, 6949:15, 6949:18, 6949:23, 6952:25, 6953:2, 6954:2, 6954:19, 6955:5, 6955:9, 6955:15, 6955:18, 6956:3, 6956:6, 6956:25, 6961:5, 6961:8, 6961:10, 6961:19, 6962:3, 6966:17, 6966:21, 6966:24, 6967:1, 6967:4
**Court's** [1] - 6777:13
**courtesies** [2] - 6778:14, 6967:3
**Courthouse** [1] - 6772:9
**courtroom** [10] - 6774:2, 6806:17, 6809:16, 6820:25, 6823:2, 6880:5, 6890:4, 6890:10, 6910:15, 6923:4
**COURTROOM** [3] - 6774:3, 6774:5, 6823:3
**courts** [3] - 6803:15, 6810:3, 6918:20
**Courts** [1] - 6824:12
**cover** [3] - 6797:13, 6800:18, 6885:19
**coverage** [2] - 6799:20, 6854:16
**covered** [3] - 6895:4, 6912:13, 6949:21
**covering** [1] - 6957:6
**CRAIG** [1] - 6773:4
**Craig** [1] - 6774:8
**Crate** [1] - 6834:21
**CRAVATH** [1] - 6773:11
**cream** [2] - 6927:19, 6927:20
**create** [3] - 6846:8, 6871:3, 6892:5
**creation** [2] - 6961:23
**credibility** [1] - 6933:18
**credible** [2] - 6880:9, 6880:10

**credibly** [1] - 6880:6
**credit** [103] - 6780:12, 6781:6, 6782:1, 6782:20, 6782:21, 6782:22, 6782:24, 6783:1, 6783:3, 6785:12, 6786:2, 6790:4, 6790:23, 6793:14, 6798:6, 6798:21, 6799:20, 6800:19, 6804:9, 6804:17, 6804:23, 6805:9, 6806:7, 6807:3, 6807:14, 6807:24, 6808:15, 6812:7, 6812:9, 6812:19, 6813:9, 6816:10, 6824:15, 6824:20, 6825:12, 6826:6, 6826:10, 6826:13, 6826:14, 6826:15, 6826:16, 6827:3, 6827:6, 6827:8, 6827:13, 6827:16, 6827:17, 6827:22, 6831:4, 6832:1, 6832:10, 6833:9, 6834:23, 6835:13, 6836:16, 6857:19, 6862:24, 6863:5, 6863:7, 6863:9, 6863:11, 6863:17, 6880:12, 6880:14, 6914:5, 6914:9, 6914:12, 6914:23, 6915:23, 6916:14, 6916:25, 6917:5, 6918:4, 6918:14, 6919:10, 6919:13, 6919:23, 6920:6, 6921:4, 6921:14, 6921:20, 6922:5, 6923:23, 6924:3, 6924:20, 6957:7, 6962:1, 6962:13, 6962:22, 6963:3, 6963:5, 6963:12, 6963:17, 6963:20, 6963:24, 6964:1, 6964:3, 6964:8
**critical** [9] - 6781:14, 6794:11, 6863:7, 6867:7, 6867:23, 6881:24, 6882:2, 6919:4, 6919:10
**critically** [1] - 6956:19
**criticism** [4] - 6829:14, 6829:16, 6830:3, 6830:4
**criticisms** [1] - 6828:8
**criticize** [1] - 6800:22
**cropped** [2] - 6877:15, 6878:3
**cross** [1] - 6869:5
**cross-examination** [1] - 6869:5
**cumulative** [1] - 6840:4
**current** [9] - 6787:23, 6788:7, 6788:22, 6791:13, 6792:23, 6813:20, 6814:15, 6957:13, 6957:16
**customer** [28] - 6813:8, 6813:10, 6813:14, 6813:15, 6813:16, 6813:18, 6813:19, 6813:21, 6813:22, 6814:14, 6814:16, 6814:20, 6814:23, 6814:25, 6835:16, 6835:17, 6839:2, 6839:22, 6856:23, 6863:4, 6868:10, 6906:23, 6906:24, 6907:5, 6911:7, 6916:4, 6963:22
**customer's** [2] - 6907:2, 6916:3
**customers** [68] - 6781:10, 6784:13, 6784:16, 6784:25, 6785:1, 6786:14, 6786:17, 6795:2, 6795:3, 6807:25, 6808:1, 6812:7, 6812:8, 6813:4, 6813:6, 6814:11, 6814:16, 6815:24, 6826:13, 6826:16, 6827:15, 6828:1, 6831:24, 6832:4, 6836:14, 6836:19, 6837:6, 6837:14, 6837:25, 6839:4, 6839:23, 6846:17, 6854:23, 6856:22, 6857:2, 6857:14, 6858:2, 6858:11, 6863:3, 6863:6, 6863:16, 6875:14, 6881:8, 6902:7, 6909:24, 6910:4,

6910:7, 6910:10, 6910:16, 6911:1, 6911:2, 6911:6, 6911:22, 6916:7, 6918:7, 6920:18, 6935:16, 6937:25, 6940:18, 6941:17, 6945:15, 6962:19, 6962:20, 6962:21, 6963:12, 6963:19, 6963:23
**cut** [9] - 6785:13, 6788:25, 6795:11, 6795:22, 6837:13, 6861:21, 6889:21, 6906:4, 6952:6
**cuts** [1] - 6784:7
**cutting** [5] - 6785:14, 6785:16, 6800:6, 6951:9, 6952:8
**CVS** [1] - 6911:7
**cycle** [2] - 6901:14, 6901:18
**cynical** [1] - 6925:7

---

# D

**Dallas** [2] - 6830:18, 6830:20
**damage** [1] - 6938:6
**damages** [2] - 6896:11, 6896:12
**Dan** [1] - 6866:21
**danger** [5] - 6791:4, 6791:6, 6799:6, 6814:7
**dark** [1] - 6863:6
**darn** [1] - 6885:9
**dashed** [1] - 6853:15
**Data** [3] - 6881:23, 6882:1, 6932:19
**data** [8] - 6895:2, 6905:24, 6919:19, 6919:22, 6920:16, 6920:25, 6924:12, 6924:13
**database** [1] - 6920:18
**date** [1] - 6937:21
**daunting** [1] - 6929:23
**DC** [3] - 6773:4, 6948:9, 6948:10
**deal** [14] - 6795:20, 6809:25, 6836:18, 6837:1, 6837:13, 6845:23, 6845:24, 6846:5, 6847:13, 6852:21, 6853:4, 6858:3, 6867:18, 6904:21
**dealing** [2] - 6837:17, 6965:13
**deals** [5] - 6805:20, 6805:21, 6805:22, 6828:21, 6836:13
**death** [1] - 6890:1
**debit** [74] - 6812:10, 6824:1, 6824:20, 6824:21, 6825:24, 6825:25, 6826:6, 6827:16, 6868:11, 6880:14, 6882:1, 6884:7, 6884:11, 6893:7, 6912:7, 6912:8, 6912:24, 6912:25, 6913:7, 6914:8, 6915:5, 6915:21, 6915:23, 6917:5, 6917:6, 6917:20, 6918:5, 6918:7, 6918:14, 6918:17, 6918:18, 6919:10, 6919:13, 6919:23, 6920:2, 6920:5, 6920:15, 6921:3, 6921:6, 6921:7, 6921:9, 6921:14, 6921:20, 6922:5, 6922:12, 6922:13, 6922:14, 6922:18, 6923:7, 6923:10, 6923:13, 6923:16, 6923:22, 6923:25, 6924:3, 6924:21, 6931:16, 6961:6, 6961:13, 6961:25, 6962:13, 6962:17, 6962:19, 6962:20, 6962:22, 6963:4, 6963:12, 6963:17, 6964:4, 6964:5, 6964:7
**Debit** [1] - 6918:13

**debit's** [1] - 6824:21
**debits** [1] - 6827:7
**decade** [1] - 6939:15
**decades** [1] - 6902:16
**decide** [6] - 6806:8, 6859:16, 6927:23, 6953:12, 6953:13, 6953:14
**decided** [9] - 6789:6, 6795:12, 6798:6, 6803:8, 6870:4, 6870:10, 6873:12, 6885:18, 6887:12
**deciding** [2] - 6860:5, 6908:18
**decimal** [1] - 6910:8
**decision** [10] - 6779:6, 6779:21, 6779:23, 6849:14, 6849:18, 6877:8, 6909:20, 6916:8, 6966:10
**decisions** [3] - 6811:3, 6839:9, 6843:8
**deck** [2] - 6865:6, 6875:5
**decline** [4] - 6940:2, 6940:3, 6941:16
**declined** [1] - 6904:20
**declining** [1] - 6798:23
**decrease** [1] - 6884:16
**decreased** [1] - 6924:20
**decreasing** [2] - 6877:21, 6877:23
**decree** [2] - 6887:5, 6941:24
**deduct** [1] - 6926:24
**defeat** [3] - 6824:18, 6824:20, 6963:11
**defend** [2] - 6860:11, 6899:8
**Defendant** [1] - 6773:11
**defendant** [5] - 6811:15, 6858:23, 6858:24, 6860:2, 6913:3
**defendant's** [1] - 6899:23
**defendants** [4] - 6821:14, 6821:15, 6860:1, 6950:10
**Defendants** [1] - 6772:13
**defendants'** [1] - 6876:1
**defended** [2] - 6819:3, 6928:15
**defense** [8] - 6796:13, 6819:9, 6819:23, 6864:9, 6865:16, 6868:24, 6873:14, 6873:24
**Defense** [3] - 6776:12, 6776:21, 6966:19
**defense's** [1] - 6966:18
**defenses** [4] - 6782:8, 6782:10, 6782:12, 6838:9
**defensible** [1] - 6927:10
**deficit** [2] - 6903:12, 6933:9
**deficits** [1] - 6903:3
**defies** [1] - 6809:1
**define** [7] - 6804:5, 6807:5, 6825:3, 6828:3, 6858:14, 6925:21, 6926:7
**defined** [2] - 6805:3, 6825:9
**defining** [6] - 6829:17, 6838:7, 6859:5, 6916:20, 6925:13, 6964:2
**definitely** [1] - 6952:25
**definition** [26] - 6802:21, 6804:1, 6804:2, 6804:5, 6804:7, 6804:12, 6804:15, 6806:24, 6807:12, 6823:21, 6824:3, 6824:6, 6824:11, 6825:5, 6825:18, 6832:19, 6838:8, 6838:12, 6878:22, 6912:5, 6912:11, 6912:24, 6913:10, 6925:25, 6964:14, 6965:2
**definitive** [2] - 6821:24, 6822:9

**defused** [1] - 6794:10
**degree** [1] - 6872:22
**deliver** [3] - 6843:24, 6888:23, 6888:24
**delivered** [2] - 6887:8, 6889:7
**delivering** [3] - 6861:19, 6936:17, 6939:10
**Dell** [1] - 6936:20
**Delta** [19] - 6834:14, 6834:15, 6834:16, 6843:7, 6843:15, 6843:16, 6843:17, 6843:24, 6851:24, 6852:4, 6852:12, 6852:13, 6852:20, 6853:1, 6853:2, 6853:16, 6915:2
**Delta's** [1] - 6834:14
**demand** [12] - 6825:11, 6825:12, 6861:15, 6880:15, 6880:16, 6918:25, 6919:1, 6919:3, 6923:10, 6939:6
**demonstrate** [2] - 6892:8, 6896:7
**demonstrated** [4] - 6862:25, 6863:21, 6911:10, 6944:11
**demonstrates** [1] - 6905:11
**demonstration** [1] - 6876:1
**denied** [2] - 6813:19, 6813:21
**Dental** [1] - 6875:5
**dentist** [1] - 6874:11
**Dentists** [2] - 6800:24, 6801:1
**dentists** [1] - 6951:25
**denying** [3] - 6847:11, 6863:3, 6863:7
**departed** [1] - 6915:9
**Department** [6] - 6773:2, 6831:10, 6868:17, 6885:18, 6886:1, 6954:17
**department** [1] - 6946:19
**departs** [1] - 6915:13
**dependent** [3] - 6831:4, 6831:5, 6835:22
**deposed** [1] - 6866:22
**deposition** [1] - 6903:25
**Depot** [1] - 6782:22
**DEPUTY** [3] - 6774:3, 6774:5, 6823:3
**derived** [2] - 6825:12, 6918:25
**described** [3] - 6811:8, 6874:14, 6893:22
**describes** [3] - 6804:17, 6806:17, 6875:7
**describing** [1] - 6806:18
**description** [3] - 6903:18, 6903:19, 6918:24
**designed** [2] - 6783:16, 6904:11
**desired** [1] - 6960:23
**despite** [1] - 6933:24
**destroyed** [1] - 6889:5
**destroying** [1] - 6937:9
**detail** [1] - 6962:10
**determination** [1] - 6900:1
**detrimental** [3] - 6876:24, 6900:17, 6907:4
**developed** [2] - 6794:25, 6795:4
**developing** [2] - 6794:3, 6902:16
**developments** [1] - 6790:21
**device** [1] - 6792:4
**diagram** [1] - 6901:10
**dictate** [2] - 6810:16, 6861:11

**dictating** [1] - 6789:16
**die** [2] - 6894:6, 6894:7
**diesel** [1] - 6783:2
**differ** [1] - 6897:9
**difference** [6] - 6784:24, 6788:8, 6788:10, 6795:2, 6831:16, 6907:19
**different** [52] - 6784:19, 6784:20, 6784:21, 6788:4, 6790:4, 6791:3, 6807:3, 6807:5, 6808:23, 6810:5, 6810:13, 6828:12, 6828:13, 6830:4, 6830:12, 6830:17, 6830:22, 6833:5, 6833:9, 6834:23, 6836:6, 6861:13, 6866:12, 6891:24, 6894:3, 6897:5, 6904:15, 6907:1, 6920:10, 6920:22, 6922:15, 6924:16, 6925:19, 6925:20, 6925:23, 6925:25, 6926:7, 6926:8, 6926:11, 6926:12, 6926:21, 6926:22, 6926:23, 6931:22, 6931:25, 6932:25, 6964:19, 6964:24, 6965:10
**differential** [1] - 6799:25
**differentiate** [2] - 6790:22, 6792:21
**differentiated** [16] - 6812:12, 6822:19, 6859:10, 6860:8, 6860:17, 6860:19, 6860:20, 6860:22, 6860:23, 6860:24, 6861:2, 6862:1, 6867:8, 6867:19, 6897:9, 6897:12
**differentiating** [1] - 6898:16
**differentiation** [3] - 6870:1, 6935:15, 6944:8
**differently** [1] - 6859:8
**difficult** [4] - 6790:10, 6937:18, 6937:19, 6961:3
**diffuse** [1] - 6831:23
**digits** [1] - 6910:20
**diminish** [1] - 6843:9
**diminished** [1] - 6899:8
**diminution** [2] - 6842:18, 6843:14
**dinner** [1] - 6926:5
**dipped** [1] - 6946:19
**direct** [23] - 6786:5, 6787:6, 6787:7, 6787:8, 6787:12, 6793:9, 6794:20, 6795:24, 6800:7, 6801:2, 6807:22, 6808:9, 6808:10, 6813:6, 6871:18, 6951:17, 6952:5, 6952:12, 6952:17, 6953:5, 6953:6, 6959:14, 6964:13
**direction** [2] - 6870:18, 6954:14
**directly** [9] - 6793:15, 6794:1, 6805:22, 6823:5, 6826:2, 6834:17, 6837:18, 6861:9, 6940:13
**directors** [1] - 6804:22
**directory** [1] - 6865:24
**dirt** [1] - 6927:8
**disagree** [2] - 6878:13, 6878:15
**disappear** [1] - 6821:18
**disappearing** [1] - 6842:6
**disappears** [1] - 6954:8
**disappoint** [1] - 6909:23
**disappointed** [1] - 6818:23
**disbelief** [1] - 6821:3
**discipline** [1] - 6917:21
**disclosed** [1] - 6863:2

**discount** [23] - 6780:12, 6781:6, 6782:2, 6788:9, 6801:25, 6814:12, 6814:17, 6818:8, 6851:14, 6852:18, 6868:6, 6869:24, 6895:9, 6896:20, 6901:14, 6921:23, 6925:20, 6933:21, 6936:16, 6940:2, 6940:3, 6944:6, 6954:15
**discounts** [2] - 6857:17, 6866:25
**discover** [5] - 6786:7, 6793:5, 6907:25, 6909:9, 6946:5
**Discover** [38] - 6781:2, 6785:25, 6786:20, 6787:2, 6787:24, 6788:2, 6813:13, 6814:4, 6819:25, 6820:6, 6837:5, 6858:1, 6860:18, 6860:19, 6861:7, 6867:11, 6883:7, 6883:23, 6892:11, 6892:12, 6892:14, 6892:15, 6893:1, 6893:17, 6907:8, 6907:23, 6909:8, 6909:9, 6910:12, 6910:16, 6910:20, 6911:4, 6930:17, 6945:25, 6946:6, 6950:13
**discover's** [1] - 6860:24
**Discover's** [9] - 6786:4, 6787:10, 6787:16, 6787:18, 6800:8, 6800:9, 6860:23, 6892:18, 6952:15
**discovered** [1] - 6810:8
**discriminate** [1] - 6944:9
**discriminating** [1] - 6926:11
**discrimination** [10] - 6827:20, 6828:10, 6828:15, 6829:4, 6829:6, 6838:7, 6925:14, 6925:15, 6945:2, 6945:9
**discuss** [3] - 6783:5, 6783:11, 6841:14
**discussed** [4] - 6841:16, 6948:17, 6949:20, 6966:1
**discusses** [1] - 6937:15
**discussion** [4] - 6823:14, 6946:18, 6962:8, 6964:10
**discussions** [1] - 6779:25
**dismissed** [1] - 6900:22
**disparage** [1] - 6944:11
**disparaging** [1] - 6886:17
**disparity** [1] - 6917:1
**displayed** [1] - 6942:11
**displays** [1] - 6904:3
**dispositive** [1] - 6900:7
**disprove** [2] - 6815:22, 6815:25
**dispute** [7] - 6823:25, 6845:5, 6853:25, 6878:19, 6891:22, 6950:20, 6964:5
**disrupt** [6] - 6784:2, 6784:5, 6811:5, 6872:10, 6873:18, 6951:18
**disrupted** [3] - 6787:3, 6873:2, 6873:8
**disrupting** [1] - 6877:3
**disruption** [1] - 6951:8
**disruptive** [1] - 6794:14
**disrupts** [1] - 6873:11
**distinction** [2] - 6919:10, 6919:14
**distinguishing** [1] - 6965:19
**DISTRICT** [2] - 6772:1, 6772:1
**District** [4] - 6772:20, 6783:23, 6877:16, 6950:7
**divine** [1] - 6886:1
**DIVISION** [1] - 6773:2
**division** [2] - 6828:20, 6829:22

**document** [17] - 6804:21, 6828:18, 6828:19, 6829:20, 6829:22, 6829:23, 6840:8, 6845:15, 6845:21, 6847:14, 6889:9, 6898:11, 6905:9, 6937:12, 6937:14, 6937:15

**documents** [5] - 6845:14, 6847:8, 6909:5, 6923:20, 6946:1

**dog** [1] - 6935:17

**dollar** [1] - 6816:19

**dollars** [3] - 6926:5, 6931:5, 6935:5

**domestic** [5] - 6840:22, 6851:18, 6851:19, 6880:8, 6880:11

**dominant** [1] - 6867:18

**dominated** [2] - 6902:17, 6935:18

**DONALD** [1] - 6773:17

**Donald** [1] - 6775:5

**done** [17] - 6776:4, 6796:12, 6802:2, 6802:5, 6810:6, 6871:20, 6874:24, 6878:14, 6891:17, 6898:10, 6905:20, 6908:22, 6912:12, 6916:9, 6916:10, 6925:2, 6939:20

**donut** [1] - 6929:1

**Donuts** [1] - 6911:20

**door** [3] - 6837:6, 6944:22, 6944:24

**doubt** [2] - 6896:19, 6948:3

**Dow** [2] - 6934:20, 6934:21

**down** [52] - 6789:4, 6795:13, 6803:18, 6804:25, 6817:20, 6819:5, 6819:6, 6819:7, 6820:2, 6820:11, 6820:13, 6820:14, 6841:19, 6843:5, 6851:1, 6851:5, 6851:10, 6853:14, 6869:25, 6870:2, 6876:12, 6876:14, 6876:18, 6881:4, 6882:21, 6882:25, 6885:9, 6887:10, 6888:13, 6894:23, 6894:24, 6895:11, 6895:13, 6896:19, 6896:21, 6897:24, 6897:25, 6906:3, 6906:4, 6908:10, 6914:18, 6927:23, 6931:16, 6941:14, 6942:2, 6944:7, 6944:8, 6945:14, 6958:2, 6963:25

**dozen** [1] - 6894:15

**Dr** [27] - 6869:4, 6869:23, 6871:25, 6872:19, 6881:21, 6881:22, 6882:18, 6884:6, 6887:8, 6887:20, 6892:1, 6894:21, 6905:18, 6905:19, 6913:21, 6915:22, 6919:18, 6924:24, 6924:25, 6925:15, 6935:16, 6938:13, 6941:25, 6944:6, 6945:14, 6953:19

**dramatic** [3] - 6822:8, 6890:14, 6894:23

**dramatically** [6] - 6816:8, 6850:18, 6866:12, 6894:3, 6897:9, 6932:25

**draw** [4] - 6827:10, 6881:3, 6882:3, 6885:7

**drawers** [1] - 6929:2

**drawing** [2] - 6821:20, 6882:8

**drew** [2] - 6889:8, 6889:10

**drifting** [1] - 6894:24

**drive** [2] - 6902:6, 6958:24

**driven** [5] - 6849:15, 6898:9, 6925:8, 6940:20, 6940:22

**driving** [2] - 6849:18, 6939:6

**drop** [8] - 6827:3, 6827:15, 6849:6,

6941:17, 6942:20, 6942:22, 6962:13, 6963:17

**drop-off** [1] - 6941:17

**due** [2] - 6866:1, 6965:12

**dumb** [1] - 6940:7

**Dunkin'** [1] - 6911:20

**duopoly** [5] - 6796:3, 6893:5, 6954:7, 6954:9, 6954:10

**duplicating** [1] - 6903:16

**durability** [1] - 6944:2

**durable** [1] - 6944:3

**Durban** [1] - 6884:7

**Durbin** [2] - 6924:18, 6962:6

**during** [11] - 6777:10, 6813:8, 6820:21, 6851:5, 6853:21, 6858:2, 6866:16, 6903:23, 6917:20, 6919:18, 6920:9

**DX** [1] - 6905:10

**dynamic** [1] - 6788:23

**E**

**earliest** [1] - 6851:22

**early** [2] - 6777:19, 6794:24

**earn** [4] - 6819:2, 6819:8, 6832:15, 6915:17

**earned** [1] - 6926:18

**easily** [2] - 6955:19, 6956:11

**East** [1] - 6772:23

**EASTERN** [1] - 6772:1

**Eastman** [1] - 6785:16

**easy** [2] - 6796:17, 6956:12

**eat** [2] - 6848:1, 6848:2

**economic** [6] - 6816:23, 6905:21, 6934:12, 6934:14, 6934:16, 6965:21

**economically** [1] - 6852:15

**economics** [1] - 6875:12

**economist** [4] - 6825:2, 6825:7, 6882:11, 6888:4

**economists** [1] - 6881:1

**economy** [3] - 6784:12, 6798:22, 6960:14

**Ed** [1] - 6828:19

**effect** [86] - 6785:7, 6786:6, 6787:12, 6787:14, 6787:21, 6787:22, 6787:23, 6794:14, 6794:20, 6795:25, 6798:1, 6800:4, 6800:7, 6800:16, 6800:17, 6800:19, 6801:20, 6802:2, 6802:16, 6802:22, 6811:15, 6813:4, 6813:6, 6814:18, 6814:20, 6815:2, 6815:14, 6815:17, 6816:16, 6817:1, 6817:3, 6817:5, 6838:24, 6840:24, 6841:5, 6851:20, 6853:9, 6853:18, 6869:9, 6870:6, 6870:7, 6872:9, 6872:12, 6872:14, 6873:7, 6875:13, 6876:1, 6877:11, 6877:19, 6877:22, 6878:9, 6878:18, 6881:1, 6881:3, 6882:12, 6882:14, 6882:20, 6896:13, 6899:2, 6900:17, 6902:19, 6902:22, 6903:23, 6904:23, 6905:3, 6905:6, 6905:11, 6906:16, 6906:17, 6911:25, 6912:12, 6928:19, 6929:12, 6930:5, 6951:7, 6951:17, 6952:12, 6952:17, 6962:5,

6965:16

**effective** [1] - 6936:16

**effectively** [1] - 6836:11

**effects** [33] - 6783:12, 6783:22, 6785:3, 6794:15, 6801:2, 6801:16, 6801:17, 6804:3, 6807:19, 6811:16, 6811:18, 6869:2, 6869:3, 6874:19, 6876:24, 6899:15, 6899:18, 6900:2, 6903:4, 6903:7, 6911:11, 6911:13, 6911:16, 6929:12, 6930:1, 6930:3, 6930:10, 6936:24, 6951:13, 6965:11, 6965:14, 6965:19

**efficient** [3] - 6793:1, 6960:3, 6960:9

**efficiently** [2] - 6823:11, 6823:18

**effort** [1] - 6864:5

**efforts** [2] - 6933:24, 6935:23

**eggs** [1] - 6946:5

**eight** [4] - 6906:3, 6923:16, 6924:20, 6936:13

**eighteen** [1] - 6901:23

**Eighth** [1] - 6773:12

**eighty** [2] - 6898:3, 6911:2

**eighty-five** [1] - 6911:2

**either** [6] - 6812:10, 6893:6, 6902:24, 6921:7, 6947:22, 6954:11

**elaborate** [1] - 6951:16

**electronic** [2] - 6777:1, 6792:6

**electronically** [1] - 6865:5

**element** [2] - 6839:18, 6854:7

**elements** [1] - 6838:23

**elevator** [1] - 6927:18

**elicited** [1] - 6862:21

**eliminate** [3] - 6869:12, 6869:23, 6869:25

**eliminated** [2] - 6870:19, 6900:6

**elsewhere** [4] - 6854:17, 6907:8, 6924:15, 6932:21

**embarrassment** [2] - 6856:12, 6856:15

**embrace** [1] - 6871:7

**embraces** [2] - 6874:1, 6874:18

**emphasize** [1] - 6817:7

**emphasized** [1] - 6867:7

**empirical** [4] - 6787:13, 6801:9, 6875:25, 6905:7

**employees** [5] - 6782:25, 6833:14, 6834:22, 6834:25, 6835:8, 6957:3, 6957:4

**enables** [2] - 6816:12, 6818:16

**enactment** [1] - 6864:2

**encourage** [7] - 6786:17, 6788:21, 6792:16, 6795:2, 6795:3, 6836:19, 6901:18

**end** [6] - 6777:17, 6795:11, 6825:14, 6868:15, 6877:25, 6902:9, 6940:9, 6954:23

**ended** [2] - 6795:24, 6840:6

**endpoint** [1] - 6919:1

**enforce** [1] - 6863:22

**enforcement** [2] - 6808:3, 6864:2

**enforces** [1] - 6785:10

**enforcing** [1] - 6868:2

**engage** [3] - 6857:1, 6868:25, 6874:14
**Engineers** [1] - 6858:24
**English** [1] - 6889:20
**enormous** [1] - 6898:2
**enter** [1] - 6946:11
**entered** [1] - 6903:5
**entering** [1] - 6948:8
**enters** [2] - 6774:2, 6823:2
**entertainment** [6] - 6797:6, 6799:13, 6799:16, 6889:19, 6925:1, 6925:3
**Entertainment** [11] - 6827:19, 6828:21, 6829:2, 6829:6, 6829:22, 6829:25, 6831:3, 6832:3, 6851:8, 6854:14, 6964:10
**entire** [5] - 6866:16, 6869:10, 6889:22, 6905:5, 6967:3
**entirely** [2] - 6868:23, 6948:4
**entities** [2] - 6804:24, 6857:21
**entitled** [9] - 6808:1, 6808:2, 6808:19, 6819:10, 6820:14, 6896:11, 6939:23, 6957:15, 6957:15
**entity** [1] - 6819:25
**entrances** [1] - 6893:21
**entry** [1] - 6853:25
**environment** [2] - 6789:8, 6796:11
**equal** [1] - 6894:18
**ERIC** [1] - 6773:17
**Eric** [1] - 6775:7
**erroneous** [1] - 6882:9
**error** [2] - 6874:23, 6885:15
**errors** [1] - 6853:16
**especially** [2] - 6791:5, 6797:3
**essence** [4] - 6785:15, 6785:17, 6810:5, 6952:8
**essential** [5] - 6785:2, 6786:10, 6786:12, 6827:9, 6951:8
**essentially** [2] - 6903:6, 6933:15
**establish** [3] - 6811:16, 6816:21, 6842:5
**established** [9] - 6824:7, 6829:21, 6830:2, 6830:15, 6839:18, 6854:10, 6859:12, 6900:3, 6961:12
**establishes** [2] - 6816:21, 6855:10
**establishing** [1] - 6815:1
**estate** [1] - 6816:9
**estimate** [1] - 6908:13
**estimates** [1] - 6891:25
**et** [2] - 6867:22, 6880:14
**etcetera** [1] - 6903:11
**Ethan** [1] - 6774:20
**ETHAN** [1] - 6773:8
**evaluate** [1] - 6956:18
**evaluating** [2] - 6839:6, 6874:4
**Evan** [1] - 6775:1
**EVAN** [1] - 6773:13
**evaporates** [1] - 6935:16
**event** [2] - 6801:15, 6912:3
**eventually** [2] - 6800:12, 6816:25
**everyday** [7] - 6784:12, 6797:23, 6799:12, 6851:9, 6920:24, 6925:23
**Everyday** [1] - 6904:10
**Everywhere** [3] - 6905:21, 6905:22,

6906:3
**evidence** [147] - 6780:9, 6781:5, 6781:8, 6783:6, 6786:5, 6787:6, 6787:7, 6787:8, 6787:12, 6787:13, 6787:14, 6789:21, 6791:5, 6791:12, 6791:13, 6791:17, 6793:3, 6794:5, 6794:12, 6794:14, 6794:16, 6794:20, 6795:17, 6795:24, 6798:19, 6798:20, 6798:25, 6800:11, 6801:9, 6801:12, 6801:14, 6811:22, 6811:24, 6812:15, 6812:20, 6813:3, 6814:22, 6816:11, 6816:14, 6816:21, 6820:22, 6821:8, 6824:10, 6825:15, 6827:2, 6829:18, 6836:2, 6836:6, 6839:8, 6839:12, 6839:17, 6839:25, 6842:4, 6844:23, 6845:2, 6845:12, 6845:14, 6846:4, 6847:20, 6849:4, 6849:17, 6850:4, 6853:23, 6854:25, 6855:2, 6855:3, 6855:5, 6855:6, 6855:10, 6856:3, 6857:21, 6862:21, 6862:25, 6870:6, 6870:22, 6870:23, 6872:16, 6872:17, 6876:7, 6876:15, 6883:9, 6885:3, 6885:24, 6889:25, 6890:1, 6890:18, 6892:17, 6893:12, 6895:10, 6895:11, 6896:3, 6899:23, 6900:5, 6903:21, 6904:16, 6905:7, 6908:11, 6911:4, 6911:5, 6911:16, 6916:18, 6916:22, 6917:3, 6918:12, 6919:4, 6919:8, 6920:7, 6920:12, 6921:3, 6921:5, 6922:4, 6922:15, 6922:17, 6923:6, 6923:11, 6923:13, 6923:14, 6923:15, 6927:6, 6929:14, 6929:20, 6930:7, 6930:12, 6930:13, 6930:14, 6932:22, 6934:3, 6936:6, 6936:19, 6938:25, 6940:6, 6940:7, 6941:10, 6944:12, 6952:12, 6952:17, 6953:16, 6953:18, 6953:24, 6962:6, 6962:12
**evidence-qua-power** [1] - 6929:14
**evidentiary** [1] - 6948:12
**evolving** [1] - 6866:24
**EWALT** [2] - 6773:8, 6774:18
**Ewalt** [1] - 6774:19
**exact** [2] - 6829:8, 6837:20
**exactly** [24] - 6782:6, 6783:17, 6828:18, 6829:23, 6836:15, 6852:12, 6858:3, 6868:9, 6882:7, 6889:8, 6893:23, 6902:14, 6906:11, 6907:18, 6908:21, 6924:21, 6928:16, 6932:10, 6938:21, 6939:11, 6945:23, 6946:3, 6956:23, 6958:18
**examination** [2] - 6869:5, 6905:19
**examinations** [1] - 6913:21
**examine** [1] - 6783:21
**example** [23] - 6786:5, 6794:23, 6813:7, 6814:8, 6837:6, 6837:8, 6839:14, 6842:14, 6844:25, 6873:9, 6879:7, 6904:18, 6904:21, 6911:6, 6911:20, 6917:3, 6932:24, 6948:21, 6948:24, 6963:1, 6965:7, 6965:9
**examples** [6] - 6794:4, 6821:16, 6830:14, 6856:17, 6875:19, 6922:11, 6930:4, 6932:25, 6935:24

**exceed** [1] - 6863:12
**exception** [2] - 6886:3, 6887:9
**exceptions** [1] - 6851:24
**excerpt** [1] - 6786:13
**excerpts** [1] - 6913:20
**exchange** [3] - 6786:9, 6825:20, 6876:9
**excited** [1] - 6891:7
**exclude** [2] - 6846:13, 6859:21
**excluded** [1] - 6877:25
**exclusionary** [10] - 6867:5, 6877:8, 6877:17, 6887:11, 6887:13, 6887:20, 6887:23, 6903:4, 6903:5, 6950:11
**Exclusionary** [1] - 6901:25
**exclusive** [2] - 6849:11, 6873:17
**executive** [4] - 6821:17, 6821:19, 6862:4, 6866:22
**executives** [3] - 6890:24, 6901:3, 6933:21
**exercised** [1] - 6880:15
**Exhibit** [3] - 6865:10, 6927:24, 6966:19
**exhibits** [1] - 6878:23
**exist** [1] - 6887:4
**existed** [3] - 6796:11, 6800:10, 6801:19
**existence** [1] - 6892:20
**existing** [2] - 6793:9, 6899:17
**exists** [6] - 6824:5, 6871:5, 6878:17, 6878:19, 6880:3, 6951:2
**expect** [7] - 6780:14, 6785:13, 6884:6, 6884:15, 6884:16, 6924:22, 6941:15, 6941:17, 6958:5
**expected** [1] - 6930:9
**expenses** [2] - 6782:21, 6912:2
**expensive** [3] - 6789:11, 6851:7, 6954:15
**experience** [4] - 6786:4, 6879:5, 6906:23, 6906:25
**experienced** [1] - 6841:8
**experiences** [1] - 6905:13
**experiment** [5] - 6883:3, 6883:4, 6891:6, 6923:3, 6931:10
**expert** [14] - 6800:14, 6820:20, 6821:6, 6825:5, 6869:12, 6871:23, 6872:15, 6876:10, 6881:20, 6885:12, 6890:17, 6895:12, 6910:5, 6934:12
**experts** [5] - 6778:21, 6821:4, 6872:1, 6882:25, 6941:13
**explain** [9] - 6787:17, 6793:21, 6796:25, 6812:15, 6812:20, 6815:16, 6884:9, 6932:13, 6938:22
**explained** [18] - 6781:2, 6781:16, 6784:15, 6786:21, 6793:7, 6793:23, 6799:9, 6815:6, 6826:4, 6827:8, 6827:24, 6924:10, 6935:6, 6935:21, 6953:23, 6963:15, 6964:22, 6965:7
**explaining** [5] - 6800:13, 6800:14, 6835:22, 6839:10, 6953:9
**explains** [3] - 6786:13, 6962:11, 6963:15
**explanation** [4] - 6815:13, 6879:1, 6932:15, 6963:18
**explanations** [1] - 6907:11

**explicitly** [1] - 6872:11
**explore** [1] - 6793:6
**express** [1] - 6847:10
**EXPRESS** [3] - 6772:10, 6772:10, 6772:15
**Express** [195] - 6773:11, 6775:1, 6775:3, 6775:5, 6775:7, 6775:9, 6775:10, 6775:12, 6775:14, 6775:17, 6778:20, 6779:12, 6779:19, 6780:19, 6785:8, 6793:18, 6798:16, 6801:23, 6810:18, 6812:19, 6813:11, 6813:17, 6815:13, 6819:19, 6820:10, 6820:17, 6821:1, 6821:11, 6821:21, 6823:24, 6825:6, 6825:13, 6825:15, 6826:17, 6828:20, 6829:16, 6831:5, 6835:19, 6835:23, 6837:4, 6837:19, 6839:2, 6839:11, 6839:14, 6839:20, 6841:11, 6842:10, 6842:16, 6842:21, 6842:25, 6843:15, 6843:18, 6843:19, 6843:22, 6844:2, 6844:6, 6844:11, 6844:15, 6844:19, 6844:25, 6845:7, 6845:21, 6846:6, 6846:8, 6846:13, 6846:24, 6847:15, 6848:5, 6848:12, 6849:15, 6849:25, 6850:2, 6850:14, 6850:22, 6852:1, 6852:5, 6852:10, 6852:11, 6852:13, 6852:14, 6852:23, 6853:3, 6853:4, 6853:7, 6854:3, 6854:24, 6855:11, 6856:4, 6856:8, 6856:11, 6856:13, 6856:17, 6858:5, 6858:8, 6858:12, 6859:1, 6859:15, 6859:19, 6859:21, 6861:16, 6862:4, 6864:1, 6865:7, 6866:22, 6867:9, 6867:11, 6867:17, 6867:19, 6867:25, 6872:21, 6879:23, 6881:10, 6881:12, 6881:19, 6883:6, 6883:17, 6883:20, 6884:13, 6884:14, 6885:19, 6889:22, 6890:15, 6890:23, 6892:13, 6892:15, 6897:1, 6897:21, 6901:3, 6902:13, 6902:15, 6902:20, 6903:2, 6903:10, 6904:24, 6906:2, 6907:24, 6908:9, 6910:4, 6911:17, 6911:23, 6911:24, 6914:24, 6916:16, 6916:25, 6917:17, 6919:1, 6921:23, 6922:16, 6923:5, 6923:7, 6924:2, 6925:10, 6925:18, 6925:22, 6926:18, 6927:17, 6929:1, 6932:6, 6932:10, 6933:18, 6934:19, 6935:10, 6935:20, 6936:9, 6936:13, 6938:19, 6942:10, 6942:21, 6942:22, 6944:16, 6945:22, 6946:6, 6946:10, 6946:12, 6950:13, 6954:5, 6954:8, 6954:21, 6955:1, 6955:3, 6955:19, 6955:22, 6956:11, 6956:13, 6958:25, 6959:1, 6959:8, 6959:10, 6959:18, 6960:13, 6961:1, 6962:18
**Express'** [2] - 6785:6, 6901:14
**Express's** [18] - 6783:7, 6783:13, 6784:9, 6798:23, 6799:5, 6825:2, 6840:3, 6841:25, 6850:24, 6852:7, 6854:12, 6862:3, 6878:22, 6906:17, 6910:19, 6913:1, 6921:23, 6922:9
**expressed** [2] - 6780:19, 6783:25
**expressing** [1] - 6924:14

**extended** [1] - 6778:14
**extensive** [1] - 6955:18
**extensively** [2] - 6953:21, 6953:23
**extra** [1] - 6816:19
**extraneous** [1] - 6861:14
**extrapolate** [1] - 6930:4
**extreme** [6] - 6817:7, 6817:10, 6820:23, 6822:16, 6947:3, 6954:4
**extremely** [1] - 6963:16
**Exxon** [2] - 6801:5, 6876:4
**eye** [1] - 6775:22

## F

**face** [20] - 6784:22, 6793:9, 6799:11, 6799:22, 6807:2, 6819:15, 6821:13, 6835:23, 6858:20, 6859:16, 6859:17, 6906:11, 6917:13, 6936:25, 6957:12, 6958:6, 6958:23, 6959:16, 6960:15, 6961:3
**faced** [2] - 6855:1, 6856:3
**faceless** [1] - 6890:8
**facing** [2] - 6819:22, 6863:19
**fact** [72] - 6794:16, 6795:17, 6803:12, 6805:16, 6807:15, 6815:3, 6816:21, 6824:5, 6832:18, 6839:5, 6843:22, 6845:22, 6846:15, 6846:19, 6848:4, 6866:22, 6867:1, 6869:13, 6870:9, 6870:20, 6872:1, 6872:16, 6882:12, 6882:21, 6882:25, 6883:14, 6885:1, 6885:3, 6887:6, 6887:9, 6887:10, 6887:19, 6893:4, 6893:6, 6894:20, 6895:1, 6896:1, 6896:8, 6896:14, 6896:15, 6896:25, 6897:14, 6898:22, 6900:20, 6900:24, 6902:10, 6911:15, 6911:16, 6912:2, 6912:13, 6914:1, 6914:4, 6924:17, 6924:20, 6924:23, 6925:22, 6927:6, 6929:5, 6930:9, 6932:17, 6936:15, 6937:16, 6941:3, 6941:24, 6942:19, 6953:24, 6961:16, 6962:10, 6963:11, 6964:13
**factors** [1] - 6817:24
**facts** [23] - 6785:2, 6790:10, 6801:20, 6803:14, 6812:5, 6829:15, 6857:9, 6866:11, 6868:24, 6870:20, 6871:18, 6873:15, 6887:2, 6887:3, 6888:5, 6888:21, 6892:21, 6900:1, 6908:19, 6908:20, 6909:4
**factual** [8] - 6796:5, 6850:16, 6858:9, 6870:22, 6872:15, 6888:18, 6892:7, 6894:12
**factually** [1] - 6817:17
**failed** [3] - 6811:22, 6899:22, 6900:19
**fair** [5] - 6822:7, 6831:7, 6897:20, 6919:17, 6938:12
**fairness** [1] - 6942:8
**fall** [2] - 6876:11, 6883:1
**familiar** [2] - 6783:8, 6939:14
**family** [2] - 6944:13, 6944:14
**far** [4] - 6801:17, 6810:21, 6850:1, 6866:9
**Fargo** [3] - 6805:20, 6833:13, 6833:15

**fashioned** [1] - 6929:15
**fast** [3] - 6833:21, 6918:6, 6926:1
**fastest** [3] - 6921:6, 6921:8, 6921:9
**fat** [1] - 6889:11
**fatal** [2] - 6900:7, 6928:19
**favor** [5] - 6779:9, 6871:10, 6873:13, 6873:24, 6946:12
**favorable** [1] - 6955:13
**feature** [3] - 6805:14, 6904:14, 6965:19
**features** [1] - 6877:20
**Federal** [2] - 6875:6, 6919:8
**Federation** [7] - 6784:1, 6800:24, 6801:1, 6801:6, 6876:19, 6951:11, 6951:23
**fee** [1] - 6900:14
**fees** [16] - 6782:20, 6782:21, 6782:22, 6782:24, 6783:1, 6783:3, 6817:25, 6852:8, 6863:11, 6884:16, 6887:20, 6888:13, 6889:11, 6915:18, 6922:19, 6960:6
**fellow** [1] - 6902:20
**felt** [1] - 6797:25
**few** [16] - 6783:14, 6807:8, 6817:25, 6831:18, 6831:21, 6832:1, 6848:6, 6848:7, 6872:24, 6901:7, 6909:18, 6919:5, 6930:24, 6935:24, 6949:21, 6949:25
**fewer** [1] - 6933:6
**field** [2] - 6879:6, 6931:2
**fiercely** [1] - 6950:12
**fifteen** [3] - 6898:6, 6910:22, 6920:10
**fifth** [2] - 6889:22, 6905:5
**Fifth** [1] - 6773:3
**fight** [2] - 6782:6, 6782:7
**fighting** [3] - 6781:20, 6862:6, 6958:14
**figure** [4] - 6793:8, 6818:15, 6928:18, 6954:13
**figured** [1] - 6799:18
**figuring** [1] - 6835:7
**filings** [1] - 6934:18
**fill** [2] - 6911:7, 6933:23
**filled** [1] - 6909:8
**final** [3] - 6830:4, 6837:8, 6844:19
**finally** [3] - 6793:20, 6815:4, 6850:23
**finances** [1] - 6917:24
**financial** [4] - 6798:13, 6901:15, 6917:21, 6934:16
**financing** [1] - 6935:13
**findings** [3] - 6926:13, 6926:15, 6962:10
**fine** [9] - 6776:5, 6782:16, 6836:12, 6840:13, 6865:21, 6891:18, 6910:6, 6941:4, 6949:23
**finish** [1] - 6909:19
**firm** [7] - 6830:5, 6830:9, 6830:18, 6854:2, 6936:17, 6965:8, 6965:23
**firms** [2] - 6810:13, 6830:11
**first** [33] - 6775:24, 6775:25, 6776:1, 6783:11, 6783:14, 6786:5, 6803:20, 6804:1, 6811:8, 6811:14, 6816:6, 6820:16, 6828:9, 6829:14, 6831:8,

6866:6, 6870:15, 6871:12, 6899:4, 6912:9, 6912:19, 6917:16, 6919:7, 6920:22, 6925:6, 6929:16, 6930:15, 6950:1, 6951:12, 6954:20, 6956:5, 6956:9, 6959:6
**First** [2] - 6881:23, 6882:1
**fit** [3] - 6833:11, 6833:16, 6867:1
**fits** [1] - 6961:6
**five** [16] - 6804:24, 6839:15, 6840:6, 6877:10, 6892:14, 6892:18, 6893:16, 6905:12, 6906:2, 6908:3, 6909:1, 6911:2, 6927:20, 6931:21, 6936:8
**fix** [1] - 6882:23
**fixed** [1] - 6912:2
**fixing** [2] - 6874:8, 6874:9
**FLEXNER** [3] - 6773:15, 6773:17, 6775:4
**Flexner** [1] - 6775:5
**flight** [4] - 6843:10, 6843:11, 6965:15, 6965:17
**Flindon** [1] - 6897:18
**float** [1] - 6915:17
**floating** [1] - 6925:11
**flow** [1] - 6806:22
**flunked** [1] - 6936:2
**fly** [4] - 6832:7, 6927:11, 6928:22, 6928:23
**focus** [2] - 6805:25, 6827:18, 6963:20
**focused** [3] - 6947:8, 6948:4, 6960:8
**focuses** [1] - 6916:2
**focusing** [1] - 6882:3
**follow** [2] - 6783:10, 6807:23, 6953:19, 6961:18
**follow-up** [1] - 6953:19
**following** [6] - 6802:24, 6826:20, 6865:2, 6927:11, 6943:6, 6949:14
**follows** [1] - 6808:21
**food** [2] - 6926:1, 6935:17
**for-everyone-in-the-market** [1] - 6914:8
**force** [7] - 6810:10, 6867:20, 6902:15, 6903:12, 6930:20, 6931:7, 6932:9
**forces** [3] - 6790:2, 6863:20, 6903:7
**foreign** [1] - 6891:6
**foresee** [1] - 6901:3
**foresight** [1] - 6939:17
**forgetting** [2] - 6823:13, 6823:16
**form** [18] - 6795:21, 6800:10, 6812:19, 6816:18, 6820:16, 6820:23, 6837:16, 6837:17, 6838:8, 6838:12, 6846:20, 6863:15, 6873:4, 6874:15, 6952:5, 6953:25, 6966:4, 6966:5
**forms** [5] - 6790:23, 6791:7, 6820:16, 6880:12, 6920:18
**forth** [2] - 6871:11, 6920:1
**fortunate** [1] - 6966:10
**fortune** [1] - 6902:15
**forty** [2] - 6922:8, 6922:10
**forward** [3] - 6779:21, 6899:22, 6932:22
**foster** [2] - 6887:24, 6945:8
**four** [24] - 6775:19, 6778:19, 6778:21, 6795:17, 6797:20, 6832:11, 6836:1,

6875:19, 6883:8, 6884:5, 6884:10, 6889:23, 6890:19, 6890:23, 6897:17, 6905:5, 6906:14, 6918:12, 6925:5, 6931:2, 6935:3, 6940:4, 6946:4
**fourteen** [2] - 6867:3, 6906:9
**fourth** [1] - 6933:19
**frame** [2] - 6859:8, 6895:4
**framework** [2] - 6807:21, 6811:12
**France** [1] - 6889:8
**Francisco** [1] - 6933:14
**Francisco/Miami** [1] - 6831:16
**Frankly** [1] - 6909:5
**frankly** [11] - 6798:18, 6819:23, 6820:22, 6839:25, 6850:21, 6851:13, 6852:8, 6853:8, 6866:12, 6866:16, 6901:2
**free** [15] - 6781:10, 6784:17, 6811:2, 6819:17, 6819:21, 6836:18, 6861:25, 6907:25, 6908:1, 6911:13, 6911:14, 6911:23, 6912:1, 6912:3, 6944:9
**free-riding** [6] - 6911:13, 6911:14, 6912:1, 6912:3
**freedom** [2] - 6784:23, 6787:24, 6856:21
**frequently** [1] - 6815:6
**friendly** [1] - 6786:8
**frivolous** [1] - 6880:19
**front** [7] - 6877:25, 6901:9, 6902:9, 6904:6, 6904:9, 6917:16, 6944:24
**fruition** [1] - 6894:10
**frustration** [1] - 6847:10
**fuel** [2] - 6783:2, 6887:18
**full** [7] - 6777:2, 6871:25, 6873:14, 6914:16, 6915:14, 6931:9, 6965:18
**functioning** [3] - 6784:2, 6784:5, 6951:19
**fund** [1] - 6889:15
**Funda** [5] - 6780:18, 6781:16, 6785:7, 6815:11, 6862:4
**funda's** [1] - 6958:14
**fundamental** [2] - 6791:19, 6842:9
**fundamentally** [2] - 6817:17, 6878:13
**funding** [5] - 6887:18, 6889:14, 6889:21, 6905:1, 6945:13
**funds** [1] - 6945:13
**future** [9] - 6779:9, 6784:18, 6787:23, 6792:25, 6793:23, 6794:13, 6884:24, 6905:14, 6907:17

## G

**gain** [5] - 6788:13, 6788:14, 6788:21, 6789:9, 6937:8
**gained** [1] - 6779:4
**game** [1] - 6936:10
**gap** [2] - 6787:4, 6933:24
**GARAUFIS** [3] - 6772:20, 6774:2, 6823:2
**GEICO** [2] - 6936:11, 6936:18
**general** [1] - 6782:5, 6794:6, 6809:2, 6828:3, 6853:11, 6853:12, 6854:18,

6914:11, 6920:1, 6945:8
**General** [3] - 6867:6, 6883:18, 6886:18
**general-card** [1] - 6914:11
**general-purpose** [1] - 6914:11
**generally** [2] - 6798:22, 6855:10
**generate** [3] - 6812:2, 6815:23, 6887:18
**Gentile** [4] - 6774:23, 6775:23, 6862:17, 6862:18
**GENTILE** [6] - 6773:9, 6774:23, 6775:25, 6776:3, 6862:18, 6966:25
**genuinely** [1] - 6884:14
**George** [1] - 6942:18
**Gibson** [1] - 6793:11
**Gilbert** [1] - 6806:21
**Gilbert's** [2] - 6806:19, 6878:23
**Gilligan** [13] - 6804:22, 6820:24, 6828:19, 6890:25, 6897:18, 6917:15, 6917:25, 6918:22, 6933:7, 6937:6, 6937:22, 6938:4, 6939:17
**given** [7] - 6777:11, 6896:20, 6910:24, 6928:17, 6930:4, 6946:7, 6961:21
**glad** [1] - 6778:3
**GLASS** [3] - 6773:8, 6774:20, 6774:22
**Glass** [1] - 6774:20
**glass** [1] - 6774:21
**Glass's** [1] - 6857:23
**glass's** [1] - 6785:4
**Glenn** [1] - 6828:20
**global** [1] - 6840:4
**gloss** [1] - 6853:24
**goal** [4] - 6869:7, 6872:7, 6878:8, 6945:21
**gosh** [1] - 6787:18
**Government** [22] - 6777:11, 6924:5, 6925:9, 6928:1, 6929:9, 6929:25, 6930:16, 6930:21, 6930:22, 6931:18, 6931:23, 6931:24, 6932:1, 6932:5, 6932:13, 6933:4, 6934:7, 6935:22, 6938:8, 6941:22, 6942:6
**government** [81] - 6808:3, 6866:13, 6866:17, 6866:25, 6867:3, 6867:10, 6867:15, 6868:13, 6869:2, 6869:6, 6869:14, 6869:21, 6870:14, 6870:17, 6871:11, 6873:16, 6874:1, 6874:18, 6875:1, 6875:17, 6876:22, 6878:11, 6878:13, 6878:19, 6879:17, 6881:9, 6881:15, 6882:2, 6882:7, 6882:13, 6883:8, 6883:15, 6884:1, 6884:14, 6885:15, 6887:7, 6887:15, 6887:19, 6887:22, 6888:10, 6889:4, 6889:17, 6890:15, 6890:21, 6891:14, 6893:16, 6894:14, 6894:20, 6896:1, 6896:12, 6898:6, 6898:9, 6898:23, 6899:4, 6902:12, 6906:9, 6906:12, 6907:20, 6908:17, 6909:10, 6910:1, 6911:6, 6911:11, 6912:23, 6913:8, 6914:10, 6914:18, 6915:20, 6916:15, 6916:17, 6919:9, 6919:13, 6920:21, 6944:22, 6945:19, 6945:23, 6947:10, 6966:22
**government's** [19] - 6868:23, 6869:5, 6870:24, 6882:11, 6885:7, 6892:8,

6892:19, 6892:24, 6894:12, 6900:23, 6901:24, 6912:10, 6915:22, 6916:14, 6917:2, 6918:24, 6944:5, 6944:15, 6946:13

**Government's** [5] - 6777:17, 6926:12, 6935:19, 6941:1, 6942:12

**grand** [1] - 6954:7

**great** [9] - 6819:20, 6821:25, 6822:2, 6822:22, 6878:16, 6885:6, 6887:9, 6903:3, 6929:22

**greater** [1] - 6937:8

**green** [3] - 6840:21, 6840:23, 6841:4

**Grocery** [1] - 6913:5

**groom** [1] - 6783:2

**gross** [3] - 6880:8, 6880:10, 6926:19

**ground** [1] - 6793:8

**group** [5] - 6792:11, 6807:25, 6826:13, 6828:1, 6912:16, 6938:20, 6957:5

**groups** [2] - 6807:25, 6893:24

**grow** [1] - 6791:18

**growing** [9] - 6798:22, 6799:1, 6799:4, 6799:5, 6918:5, 6921:6, 6921:8, 6921:9

**grows** [1] - 6933:24

**growth** [2] - 6918:8, 6918:9

**guarantee** [5] - 6819:12, 6856:7, 6860:12, 6888:1, 6894:6

**guaranteed** [1] - 6958:20

**guess** [6] - 6796:1, 6838:6, 6850:6, 6858:2, 6890:2, 6961:14

**guesswork** [1] - 6868:23

**GUNTHER** [1] - 6773:20

**Gunther** [1] - 6775:17

**Gutierrez** [1] - 6942:17

**guy** [15] - 6780:21, 6780:23, 6788:13, 6788:14, 6788:19, 6789:9, 6789:13, 6791:19, 6791:23, 6791:24, 6885:12, 6890:6, 6959:21, 6959:23, 6959:25

**guys** [2] - 6885:10, 6937:19

## H

**half** [9] - 6872:4, 6881:5, 6881:16, 6888:11, 6899:14, 6906:4, 6908:21, 6938:3, 6959:5

**Hall** [1] - 6858:4

**HAMER** [2] - 6773:5, 6774:11

**Hamer** [1] - 6774:11

**hand** [2] - 6853:10, 6865:20

**handed** [1] - 6865:14

**handful** [1] - 6941:6

**hands** [1] - 6852:5

**hangs** [1] - 6875:1

**happily** [1] - 6933:19

**happy** [3] - 6784:25, 6856:22, 6886:19

**hard** [4] - 6789:13, 6801:20, 6909:7, 6960:21

**hardcopy** [1] - 6777:1

**harder** [4] - 6781:17, 6799:24, 6843:10, 6860:3

**harm** [28] - 6784:1, 6787:7, 6787:9,

**harm's** [1] - 6890:16

**harmed** [4] - 6783:24, 6828:5, 6828:7, 6830:25

**harsh** [1] - 6821:11, 6959:13, 6960:12, 6960:25

**Harvard** [2] - 6886:7, 6886:8

**hat** [1] - 6875:2

**Hawaii** [1] - 6936:1

**head** [1] - 6901:25

**Health** [1] - 6912:16

**healthcare** [1] - 6782:23

**hear** [4] - 6866:8, 6871:13, 6872:18, 6886:20

**heard** [38] - 6778:19, 6778:21, 6779:23, 6782:20, 6785:20, 6785:24, 6805:21, 6810:3, 6819:4, 6820:15, 6820:17, 6825:1, 6830:5, 6830:13, 6834:10, 6835:3, 6836:2, 6838:10, 6841:2, 6844:22, 6844:23, 6854:25, 6861:4, 6889:5, 6903:22, 6907:22, 6908:5, 6930:25, 6939:17, 6947:10, 6950:2, 6952:23, 6954:22, 6958:13, 6962:16, 6963:18, 6964:10, 6965:10

**hearing** [4] - 6780:7, 6845:25, 6942:8, 6966:21

**heavily** [1] - 6874:11

**held** [3] - 6871:18, 6883:11, 6931:22

**help** [5] - 6834:5, 6884:19, 6902:6, 6942:5, 6942:14

**helped** [1] - 6834:16

**helpful** [1] - 6834:7

**herring** [4] - 6830:7, 6931:24, 6932:1, 6932:2

**high** [21] - 6789:3, 6796:12, 6806:8, 6809:23, 6810:2, 6812:9, 6847:9, 6854:17, 6896:2, 6896:4, 6896:6, 6896:16, 6896:17, 6896:22, 6897:3, 6914:17, 6934:7, 6941:15, 6958:10

**high-price** [1] - 6958:10

**higher** [42] - 6786:14, 6789:23, 6801:10, 6803:3, 6807:2, 6812:1, 6812:8, 6812:17, 6812:19, 6816:16, 6816:17, 6816:24, 6817:3, 6819:17, 6820:8, 6828:5, 6829:5, 6829:14, 6839:11, 6844:15, 6851:8, 6854:16, 6854:21, 6863:15, 6863:17, 6876:8, 6876:16, 6887:25, 6896:24, 6897:4, 6897:6, 6897:14, 6897:16, 6900:20, 6900:24, 6900:25, 6916:17, 6934:9, 6934:10, 6951:20, 6951:21, 6953:15

**highest** [2] - 6788:15, 6829:2

**highlight** [1] - 6949:21

**highlighted** [1] - 6905:12

**highly** [1] - 6905:8

**Hilton** [3] - 6837:1, 6837:2

**Hilton's** [1] - 6837:2

**himself** [2] - 6890:4, 6910:9

**hindsight** [3] - 6796:15, 6796:18, 6939:16

**historically** [1] - 6797:7

**history** [8] - 6889:3, 6890:12, 6906:7, 6927:8, 6948:6, 6948:9, 6958:1, 6960:24

**Hochschild** [17] - 6781:1, 6785:24, 6786:13, 6786:19, 6786:21, 6787:23, 6789:12, 6790:25, 6793:7, 6820:4, 6861:5, 6883:22, 6884:25, 6897:19, 6908:5, 6908:14, 6952:19

**Hochschild's** [1] - 6906:21

**hold** [5] - 6809:5, 6829:15, 6850:22, 6927:2, 6948:7

**Holtey** [1] - 6782:25

**home** [3] - 6904:10, 6927:19, 6929:2

**Home** [1] - 6782:22

**honest** [1] - 6947:6

**honestly** [2] - 6928:6, 6948:3

**Honor** [153] - 6774:7, 6774:12, 6774:17, 6774:22, 6774:25, 6775:2, 6775:4, 6775:6, 6775:11, 6775:13, 6775:16, 6776:1, 6776:8, 6776:13, 6776:16, 6776:23, 6777:6, 6777:7, 6778:8, 6779:11, 6780:2, 6780:6, 6814:8, 6816:5, 6818:20, 6822:22, 6823:10, 6833:20, 6833:24, 6834:7, 6834:20, 6836:8, 6840:12, 6840:14, 6847:2, 6856:2, 6859:9, 6862:15, 6862:19, 6863:25, 6864:4, 6865:19, 6865:25, 6866:3, 6866:8, 6866:19, 6866:24, 6868:12, 6868:22, 6869:16, 6871:8, 6871:18, 6872:11, 6873:2, 6874:14, 6874:21, 6875:4, 6875:18, 6876:18, 6877:5, 6877:12, 6878:4, 6878:7, 6878:16, 6881:2, 6881:19, 6882:7, 6882:22, 6882:24, 6883:2, 6883:10, 6884:5, 6885:6, 6885:23, 6886:14, 6886:20, 6886:24, 6886:6, 6888:20, 6890:6, 6891:11, 6891:15, 6892:8, 6893:3, 6893:8, 6894:9, 6894:17, 6895:3, 6896:1, 6898:11, 6899:1, 6899:16, 6900:4, 6900:22, 6901:1, 6901:8, 6902:14, 6903:22, 6905:15, 6906:20, 6910:24, 6912:4, 6912:18, 6913:10, 6914:6, 6915:4, 6916:19, 6917:9, 6918:11, 6919:17, 6920:11, 6922:10, 6923:2, 6923:17, 6923:19, 6925:3, 6925:6, 6927:4, 6928:18, 6928:20, 6929:8, 6929:17, 6931:5, 6932:16, 6933:18, 6934:3, 6934:23, 6935:24, 6936:22, 6937:2, 6939:16, 6940:6, 6940:12, 6940:19, 6942:7, 6944:1, 6944:25, 6945:22, 6946:11, 6946:21, 6947:6, 6948:5, 6949:2, 6949:17, 6950:18, 6959:14, 6966:13, 6966:20, 6966:23, 6966:25, 6967:2

**Honor's** [2] - 6778:1, 6872:2

**HONORABLE** [1] - 6772:20

**hope** [12] - 6776:8, 6776:9, 6779:24, 6785:4, 6797:16, 6823:10, 6848:17, 6862:14, 6867:17, 6867:22, 6906:9, 6945:25
**hopefully** [1] - 6910:14
**hoping** [1] - 6822:11
**horizontal** [4] - 6874:6, 6874:8, 6874:9, 6875:17
**horrors** [3] - 6946:24, 6947:4, 6947:15
**hostile** [2] - 6937:20, 6944:20
**hostility** [2] - 6937:22, 6938:2
**hotel** [4] - 6835:18, 6836:4, 6927:16
**hour** [1] - 6869:1
**hours** [1] - 6775:19
**house** [3] - 6910:4, 6921:7, 6921:10
**Houston** [5] - 6830:17, 6830:20, 6832:1, 6832:7, 6842:22, 6965:15, 6965:17
**huge** [11] - 6782:6, 6845:20, 6850:12, 6853:1, 6853:17, 6922:9, 6933:9, 6936:5, 6962:7, 6962:13, 6965:16
**hundred** [3] - 6908:8, 6908:24, 6926:4
**hundreds** [1] - 6831:13
**hungry** [1] - 6927:23
**hurt** [2] - 6905:4, 6909:11
**hurts** [1] - 6808:10
**hypothetical** [8] - 6824:24, 6825:6, 6825:9, 6825:18, 6825:20, 6914:3, 6916:1, 6963:10
**hypotheticals** [1] - 6913:22

## I

**IBM** [1] - 6932:20
**idea** [20] - 6784:21, 6792:19, 6798:17, 6811:4, 6815:22, 6817:17, 6819:1, 6821:1, 6847:17, 6853:6, 6880:17, 6888:13, 6909:13, 6921:16, 6922:4, 6933:25, 6938:17, 6938:18, 6940:7, 6947:11
**ideas** [1] - 6795:10
**identifying** [1] - 6831:10
**ignore** [7] - 6807:15, 6840:23, 6879:19, 6881:5, 6881:16, 6963:20, 6963:23
**ignored** [3] - 6851:6, 6866:15, 6908:25
**ignores** [1] - 6866:13
**ignoring** [2] - 6881:17, 6895:10
**IHAN** [1] - 6773:6
**Ihan** [1] - 6774:14
**II** [1] - 6772:16
**III** [1] - 6773:2
**IKEA** [3] - 6856:24, 6885:11, 6885:12
**Ikea** [3] - 6784:15, 6909:15
**illegal** [2] - 6864:2, 6897:7
**illuminate** [1] - 6965:3
**illustrated** [2] - 6785:5, 6842:14
**illustrates** [1] - 6915:22
**illustration** [1] - 6918:11
**Image** [1] - 6785:16
**imagination** [1] - 6847:5
**imagine** [2] - 6808:3, 6808:4
**Imaging** [2] - 6801:14, 6900:10

**immediate** [6] - 6814:17, 6814:20, 6837:21, 6863:4, 6883:12
**immediately** [2] - 6842:23, 6883:21
**impact** [5] - 6878:1, 6883:10, 6905:20, 6907:2, 6922:18
**impeded** [2] - 6789:25, 6793:22, 6793:23, 6794:18, 6952:6
**impeding** [1] - 6792:24
**impending** [1] - 6790:3
**impermeable** [1] - 6881:3
**implement** [1] - 6908:18
**implemented** [3] - 6841:10, 6888:8, 6907:19
**implementing** [1] - 6824:23
**implication** [2] - 6852:16, 6940:14
**implications** [1] - 6831:11
**implicit** [1] - 6820:3
**implicitly** [2] - 6791:9, 6843:21
**importance** [1] - 6860:16
**important** [26] - 6780:22, 6783:15, 6785:19, 6791:1, 6791:4, 6796:4, 6796:16, 6809:24, 6818:25, 6823:23, 6827:9, 6849:13, 6852:19, 6857:4, 6863:23, 6866:15, 6867:2, 6905:15, 6908:15, 6919:3, 6929:10, 6929:15, 6929:17, 6929:25, 6955:14, 6956:17
**importantly** [3] - 6888:17, 6938:4, 6945:5
**impose** [4] - 6810:19, 6854:23, 6858:25, 6961:25
**imposed** [5] - 6812:17, 6828:5, 6840:15, 6863:11, 6946:25
**impossible** [2] - 6937:18, 6957:10
**impressive** [1] - 6960:19
**improving** [1] - 6903:17
**IN** [1] - 6772:15
**in-house** [1] - 6910:4
**inactive** [2] - 6933:13, 6933:14
**inappropriate** [1] - 6950:6
**inasmuch** [1] - 6833:11
**INC** [2] - 6772:11, 6772:12
**incentive** [5] - 6780:18, 6788:1, 6794:9, 6923:9, 6950:14
**incentives** [2] - 6781:21, 6848:22, 6862:8, 6958:15
**include** [1] - 6966:6
**included** [2] - 6795:11, 6966:7
**includes** [1] - 6845:14
**including** [8] - 6778:20, 6790:15, 6795:10, 6812:9, 6815:7, 6823:15, 6831:10, 6871:24
**income** [2] - 6817:25, 6850:14
**Income** [2] - 6840:17, 6850:11
**inconsistent** [5] - 6888:15, 6890:22, 6917:4, 6933:20, 6934:1
**inconvenience** [5] - 6846:17, 6909:23, 6909:24, 6910:10, 6911:1
**INCORPORATED** [1] - 6772:12
**incorrect** [2] - 6815:19, 6868:11
**incorrectly** [1] - 6817:2
**increase** [37] - 6781:21, 6785:13,

6785:14, 6785:17, 6786:16, 6801:10, 6812:5, 6815:9, 6820:7, 6824:18, 6824:20, 6825:22, 6828:3, 6842:1, 6844:5, 6844:9, 6844:10, 6844:13, 6844:17, 6845:3, 6845:4, 6845:13, 6846:3, 6847:11, 6850:4, 6850:25, 6851:20, 6855:3, 6862:8, 6862:9, 6899:9, 6937:24, 6950:25, 6952:8, 6953:16, 6963:10, 6963:11
**increased** [10] - 6785:22, 6787:3, 6787:8, 6789:1, 6840:16, 6894:21, 6911:21, 6924:21, 6952:17, 6953:25
**increases** [20] - 6793:16, 6826:1, 6835:24, 6839:13, 6840:16, 6840:18, 6840:20, 6840:21, 6840:23, 6841:3, 6841:5, 6841:8, 6841:10, 6844:7, 6844:23, 6854:23, 6855:1, 6880:14, 6939:1
**increasing** [4] - 6787:18, 6800:6, 6851:11, 6951:9
**incredible** [2] - 6852:9, 6853:8
**incredibly** [2] - 6871:12, 6912:10
**incremental** [1] - 6788:1
**incur** [1] - 6951:22
**incurred** [1] - 6863:13
**indeed** [5] - 6847:10, 6867:9, 6869:17, 6882:15, 6884:25
**independent** [3] - 6796:7, 6811:2, 6936:16
**Indiana** [10] - 6783:25, 6800:24, 6801:1, 6801:6, 6874:10, 6875:3, 6876:19, 6951:11, 6951:23, 6951:25
**indicated** [1] - 6856:14
**indication** [1] - 6955:21
**individual** [4] - 6836:25, 6916:4, 6929:21, 6938:20
**individuals** [1] - 6832:5
**industries** [8] - 6803:16, 6830:16, 6854:25, 6855:8, 6855:9, 6925:19, 6925:20, 6926:12
**Industries** [2] - 6828:21, 6829:6
**industry** [28] - 6784:20, 6804:18, 6804:23, 6808:15, 6810:20, 6816:10, 6828:22, 6828:24, 6829:2, 6831:1, 6831:2, 6831:18, 6831:22, 6847:5, 6847:7, 6854:4, 6855:4, 6897:20, 6906:10, 6925:24, 6925:25, 6926:8, 6964:12, 6965:13, 6965:14, 6965:18, 6965:20
**industry-specific** [1] - 6828:22
**industry-variable** [1] - 6829:2
**inexorable** [2] - 6817:18, 6820:2
**inexplicably** [1] - 6888:14
**inference** [1] - 6885:7
**inflated** [1] - 6863:20
**inflicted** [1] - 6933:7
**influence** [2] - 6904:2, 6904:11
**information** [4] - 6794:2, 6858:17, 6863:1, 6876:9
**inherently** [1] - 6858:10
**initial** [1] - 6777:18

**initiated** [1] - 6796:11
**initiative** [1] - 6961:11
**injunction** [2] - 6944:23, 6948:8
**injured** [4] - 6808:5, 6808:8, 6881:7
**injures** [1] - 6945:10
**inkling** [1] - 6901:25
**innovate** [2] - 6792:12, 6794:9
**innovating** [1] - 6794:7
**innovation** [13] - 6791:21, 6791:22, 6792:1, 6792:24, 6793:3, 6794:4, 6794:5, 6794:10, 6794:16, 6800:11, 6801:17, 6877:21
**innovative** [4] - 6791:24, 6793:15, 6860:25, 6861:2
**input** [1] - 6808:17
**inquired** [1] - 6778:4
**insight** [1] - 6799:12
**insights** [1] - 6779:4
**insistence** [18] - 6839:2, 6839:22, 6854:17, 6854:19, 6854:20, 6909:25, 6910:2, 6935:15, 6936:11, 6936:15, 6940:14, 6940:15, 6940:20, 6940:21, 6941:10, 6941:12, 6941:17, 6945:12
**insistent** [5] - 6832:16, 6835:17, 6839:4, 6940:18
**insisting** [4] - 6804:12, 6922:12, 6922:14, 6923:5
**instance** [2] - 6847:25, 6874:24
**instead** [10] - 6777:23, 6792:7, 6825:14, 6836:1, 6851:5, 6872:17, 6879:9, 6908:23, 6945:20, 6963:4
**insufficient** [1] - 6922:4
**insulate** [1] - 6902:13
**insulated** [2] - 6787:20, 6863:19
**insurance** [1] - 6952:1
**intention** [1] - 6778:3
**interaction** [1] - 6834:18
**interbrand** [2] - 6783:16, 6783:18
**interchangeability** [6] - 6804:14, 6824:7, 6824:9, 6824:24, 6825:18, 6916:3
**interchangeable** [10] - 6804:13, 6806:6, 6806:9, 6807:2, 6807:17, 6824:14, 6879:4, 6879:10, 6879:13, 6915:20
**interdependent** [1] - 6803:23
**interest** [12] - 6780:3, 6817:25, 6818:13, 6827:2, 6843:12, 6857:11, 6880:23, 6880:25, 6901:6, 6914:16, 6950:14, 6960:5
**interested** [3] - 6777:13, 6786:10, 6834:1
**interesting** [2] - 6836:5, 6860:18
**interfere** [1] - 6856:18
**interference** [1] - 6952:2
**intermediaries** [2] - 6933:23, 6945:3
**internal** [7] - 6787:2, 6828:18, 6835:4, 6905:9, 6921:21, 6923:20, 6946:1
**internally** [3] - 6795:15, 6839:3, 6918:13
**INTERNATIONAL** [1] - 6772:11
**international** [2] - 6840:22, 6926:3

**Internet** [1] - 6902:21
**interpretation** [2] - 6817:8, 6822:14
**interrupt** [1] - 6778:22
**interstate** [1] - 6926:2
**intervention** [3] - 6790:6, 6790:7, 6790:17
**intra** [1] - 6873:22
**introduce** [1] - 6798:6
**invest** [1] - 6898:20
**investing** [1] - 6940:20
**investment** [4] - 6911:24, 6935:8, 6935:12, 6941:13
**investments** [3] - 6902:5, 6902:9, 6902:10
**investors** [2] - 6935:7, 6935:12
**involve** [1] - 6808:22
**involved** [3] - 6818:6, 6818:20, 6931:4
**involves** [3] - 6899:12, 6951:7, 6953:15
**involving** [4] - 6792:13, 6899:5, 6922:2
**IOWA** [1] - 6772:4
**isolated** [1] - 6875:23
**issuance** [1] - 6807:10
**issue** [22] - 6794:18, 6797:9, 6801:12, 6806:13, 6806:20, 6807:18, 6809:9, 6809:25, 6834:16, 6869:4, 6886:11, 6899:3, 6903:9, 6903:10, 6922:12, 6922:14, 6926:13, 6932:11, 6940:12, 6942:9, 6950:3, 6961:5
**issuer** [10] - 6804:25, 6805:13, 6805:15, 6805:17, 6820:1, 6950:1, 6950:15, 6955:1, 6963:3
**issuers** [19] - 6805:8, 6805:9, 6805:20, 6805:25, 6806:2, 6806:4, 6806:11, 6806:12, 6807:13, 6808:16, 6815:7, 6815:15, 6819:14, 6833:10, 6834:24, 6950:3, 6950:12, 6950:19, 6950:24
**issues** [8] - 6782:17, 6804:1, 6804:7, 6823:6, 6823:13, 6912:7, 6912:20, 6949:20
**issuing** [11] - 6834:12, 6852:4, 6867:22, 6955:3, 6955:4, 6955:6, 6955:13, 6955:19, 6955:24, 6956:20, 6963:1
**issuing-side** [1] - 6852:4
**itself** [17] - 6783:24, 6805:17, 6805:18, 6807:8, 6830:6, 6830:9, 6830:19, 6843:7, 6857:10, 6858:3, 6877:11, 6907:10, 6916:15, 6952:18, 6960:15, 6961:1, 6963:14

**J**

**Jack** [1] - 6780:18
**jackets** [2] - 6879:9, 6879:16
**Jefferson** [1] - 6876:3
**jeopardy** [1] - 6905:2
**Jersey** [1] - 6904:19
**JESSE** [1] - 6773:19
**Jesse** [1] - 6775:10
**Jet** [1] - 6853:16
**JetBlue** [1] - 6851:24
**job** [5] - 6799:9, 6819:21, 6821:6,

6831:20, 6903:16
**JOHN** [1] - 6773:5
**John** [2] - 6784:14, 6856:24
**join** [1] - 6786:23
**joined** [1] - 6863:23
**joint** [2] - 6796:6, 6886:19
**jointly** [1] - 6932:3
**Jones** [1] - 6867:10
**Journal** [1] - 6883:14
**Judge** [11] - 6772:20, 6774:2, 6823:2, 6867:10, 6876:4, 6876:14, 6932:19, 6948:13, 6948:18, 6948:19, 6948:24
**judge** [4] - 6818:11, 6839:6, 6886:6, 6948:19
**judgment** [5] - 6872:2, 6912:18, 6929:19, 6935:10, 6946:12
**judgments** [1] - 6909:2
**jump** [1] - 6903:17
**Justice** [6] - 6773:2, 6831:10, 6868:17, 6885:17, 6886:1, 6964:17
**justification** [2] - 6859:4, 6860:6
**justifications** [1] - 6802:22
**justify** [1] - 6820:8

**K**

**Katz** [50] - 6787:16, 6803:13, 6816:22, 6824:25, 6825:9, 6826:4, 6827:21, 6827:24, 6828:6, 6842:3, 6843:6, 6844:12, 6852:15, 6853:15, 6869:4, 6869:23, 6881:21, 6881:22, 6882:18, 6884:6, 6887:8, 6887:20, 6892:1, 6905:18, 6913:2, 6914:2, 6915:25, 6924:6, 6924:17, 6925:15, 6925:21, 6926:9, 6926:16, 6930:8, 6935:16, 6938:13, 6941:25, 6944:6, 6945:14, 6952:23, 6952:24, 6953:5, 6953:19, 6962:9, 6963:15, 6963:19, 6964:13, 6964:15, 6964:24
**Katz's** [7] - 6844:4, 6871:25, 6872:19, 6894:21, 6905:19, 6924:24, 6962:12
**keep** [13] - 6775:21, 6783:15, 6784:25, 6799:24, 6819:20, 6863:6, 6890:7, 6891:12, 6901:19, 6912:24, 6913:14, 6936:21, 6965:1
**keeps** [1] - 6856:22
**KEVIN** [1] - 6773:13
**Kevin** [1] - 6775:3
**key** [1] - 6783:14
**kill** [5] - 6889:21, 6890:11, 6893:15, 6905:1, 6935:11
**killed** [2] - 6938:5, 6939:18
**KIM** [1] - 6773:6, 6774:14
**Kim** [1] - 6774:14
**Kimmet** [1] - 6782:22
**kind** [48] - 6790:6, 6791:7, 6792:24, 6797:23, 6799:19, 6801:13, 6803:17, 6805:15, 6808:23, 6809:20, 6810:9, 6810:11, 6810:13, 6811:12, 6812:12, 6817:16, 6817:18, 6834:17, 6834:19, 6834:25, 6835:21, 6837:9, 6837:22, 6837:23, 6838:2, 6838:21, 6839:20,

6849:25, 6850:1, 6859:19, 6859:24, 6902:13, 6904:5, 6907:10, 6918:19, 6923:2, 6924:21, 6925:11, 6935:13, 6936:6, 6941:10, 6944:20, 6945:2, 6945:9, 6952:5, 6963:4, 6965:20
**kinds** [2] - 6794:19, 6909:2
**King** [3] - 6927:25, 6928:6, 6928:8
**KMB** [7] - 6801:14, 6875:20, 6882:22, 6899:20, 6899:22, 6900:9, 6912:15
**known** [2] - 6830:10, 6939:19
**knows** [6] - 6779:11, 6786:4, 6791:15, 6796:3, 6961:17, 6966:3
**Kodak** [1] - 6785:16
**Korologos** [1] - 6775:9
**KOROLOGOS** [2] - 6773:18, 6775:8
**Kotelly** [2] - 6948:19

## L

**laboratory** [1] - 6923:3
**lack** [1] - 6932:18
**laid** [2] - 6838:19, 6889:20
**language** [3] - 6874:17, 6878:1, 6907:13
**lapped** [1] - 6898:21
**large** [2] - 6839:16, 6866:13
**largely** [2] - 6866:11, 6866:13
**largest** [5] - 6782:21, 6829:25, 6851:18, 6955:1, 6955:12
**last** [16] - 6853:24, 6870:4, 6872:22, 6873:13, 6878:3, 6883:8, 6890:19, 6908:20, 6911:13, 6917:14, 6923:15, 6930:20, 6931:2, 6946:20, 6966:1
**lastly** [1] - 6923:17
**late** [1] - 6865:23
**latest** [1] - 6851:23
**law** [35] - 6782:11, 6783:6, 6809:13, 6810:23, 6817:8, 6827:24, 6858:22, 6861:12, 6871:5, 6871:6, 6871:8, 6874:3, 6874:7, 6876:20, 6877:4, 6877:9, 6878:17, 6896:4, 6899:16, 6899:17, 6900:1, 6912:21, 6913:11, 6913:18, 6913:25, 6916:13, 6932:16, 6940:9, 6944:2, 6945:9, 6956:8, 6966:8
**laws** [32] - 6783:16, 6783:20, 6789:16, 6789:20, 6808:14, 6810:15, 6810:21, 6811:6, 6815:21, 6819:3, 6819:9, 6819:10, 6820:18, 6824:8, 6858:21, 6859:12, 6859:13, 6859:15, 6861:10, 6861:22, 6862:12, 6863:22, 6903:11, 6936:7, 6945:6, 6953:10, 6953:11, 6956:15, 6960:12, 6960:16, 6960:22, 6961:22
**lawsuit** [5] - 6867:11, 6867:25, 6868:13, 6884:18, 6942:13
**lead** [3] - 6800:12, 6812:1, 6959:9
**leads** [1] - 6853:14
**learn** [1] - 6778:18
**learned** [2] - 6780:6, 6879:6
**leased** [3] - 6846:7, 6848:5, 6848:7
**leasing** [1] - 6848:12

**least** [5] - 6801:8, 6826:1, 6881:13, 6920:4, 6925:10
**leave** [3] - 6868:10, 6927:15, 6935:8
**leaves** [1] - 6940:12
**leaving** [2] - 6818:2, 6866:23
**left** [10] - 6853:10, 6856:4, 6859:9, 6894:2, 6908:3, 6927:18, 6929:2, 6942:25, 6959:11, 6963:17
**left-hand** [1] - 6853:10
**legal** [11] - 6783:14, 6785:19, 6800:22, 6807:21, 6824:10, 6869:8, 6871:1, 6874:23, 6878:8, 6945:20, 6955:24
**legally** [2] - 6782:8, 6951:14
**legion** [1] - 6911:14
**legislative** [1] - 6961:23
**legitimate** [2] - 6838:12, 6859:4
**lens** [1] - 6924:15
**less** [18] - 6788:10, 6799:1, 6815:8, 6842:17, 6843:9, 6843:13, 6843:23, 6843:24, 6851:7, 6873:11, 6894:16, 6894:17, 6894:18, 6910:8, 6932:17, 6955:23, 6959:16
**lesser** [1] - 6939:23
**letters** [1] - 6936:12
**letting** [2] - 6810:22, 6845:9
**level** [11] - 6786:24, 6788:5, 6789:21, 6809:23, 6810:2, 6934:8, 6941:15, 6950:15, 6950:17, 6957:15, 6958:19
**levels** [2] - 6833:17, 6904:19
**leverage** [2] - 6942:9, 6942:11
**Lexington** [1] - 6773:16
**liability** [7] - 6886:20, 6947:17, 6947:21, 6947:23, 6948:4, 6948:16, 6966:10
**lid** [1] - 6888:11
**lies** [4] - 6917:9, 6917:10, 6917:12
**life** [1] - 6907:11
**life-threatening** [1] - 6907:11
**light** [3] - 6794:12, 6805:15, 6875:15
**likelihood** [4] - 6794:13, 6907:3, 6910:13
**likely** [5] - 6874:13, 6920:5, 6951:18, 6952:5, 6955:23
**limitation** [1] - 6944:10
**limitations** [1] - 6961:13
**limited** [1] - 6801:6
**limiting** [1] - 6862:23
**line** [7] - 6816:25, 6853:5, 6853:15, 6853:17, 6853:19, 6858:1, 6952:14
**lines** [1] - 6805:7
**linger** [1] - 6911:18
**lingering** [1] - 6903:4
**link** [1] - 6800:6
**linked** [1] - 6888:14
**lip** [1] - 6878:12
**list** [3] - 6792:1, 6795:10, 6961:7
**lists** [2] - 6829:23, 6829:25
**literally** [2] - 6871:25, 6922:9
**literature** [3] - 6905:21, 6934:14, 6965:21
**litigation** [4] - 6863:24, 6864:6, 6902:2, 6925:8

**LITIGATION** [2] - 6772:16, 6773:2
**litigation-driven** [1] - 6925:8
**litmus** [1] - 6804:14
**littered** [1] - 6960:24
**lived** [7] - 6842:21, 6889:3, 6890:12, 6901:22, 6906:7, 6906:20, 6945:18
**LLP** [2] - 6773:11, 6773:15
**loan** [2] - 6942:24, 6942:25
**lobby** [1] - 6858:7
**local** [1] - 6797:3
**location** [1] - 6903:11
**locations** [8] - 6872:21, 6883:5, 6884:23, 6892:10, 6908:12, 6931:7, 6933:6, 6941:2
**lodging** [1] - 6829:11
**logic** [6] - 6810:6, 6817:9, 6817:15, 6825:8, 6826:12, 6964:22
**logically** [1] - 6847:18
**logistics** [1] - 6777:7
**long-existing** [1] - 6899:17
**Look** [1] - 6850:25
**look** [98] - 6788:20, 6791:15, 6792:15, 6796:17, 6798:20, 6801:4, 6801:6, 6802:17, 6803:20, 6804:20, 6805:12, 6805:24, 6808:16, 6822:12, 6822:15, 6823:11, 6824:12, 6826:12, 6828:4, 6828:16, 6828:17, 6829:8, 6829:15, 6840:2, 6843:19, 6844:13, 6850:17, 6851:15, 6851:22, 6854:20, 6856:21, 6858:18, 6866:11, 6868:7, 6869:20, 6870:13, 6870:22, 6874:1, 6874:5, 6874:12, 6874:16, 6874:17, 6874:22, 6874:25, 6875:4, 6875:7, 6877:2, 6879:21, 6881:5, 6881:21, 6882:9, 6887:2, 6887:7, 6888:16, 6888:17, 6888:21, 6893:25, 6895:1, 6895:12, 6897:24, 6898:7, 6899:14, 6899:19, 6900:2, 6903:24, 6905:14, 6905:18, 6906:21, 6907:18, 6908:15, 6909:5, 6909:6, 6914:1, 6916:5, 6918:1, 6918:20, 6918:23, 6925:16, 6925:17, 6926:10, 6926:16, 6926:25, 6929:13, 6930:6, 6934:19, 6936:12, 6937:22, 6950:3, 6952:4, 6956:17, 6958:1, 6961:2, 6962:23, 6964:17, 6965:4
**looked** [12] - 6801:12, 6822:6, 6842:3, 6842:7, 6842:14, 6842:20, 6844:12, 6855:6, 6870:12, 6908:8, 6908:24, 6937:14
**looking** [22] - 6790:7, 6792:12, 6796:14, 6796:17, 6801:8, 6801:25, 6804:17, 6829:12, 6844:1, 6856:14, 6874:18, 6881:17, 6882:8, 6905:19, 6906:15, 6916:4, 6921:19, 6930:12, 6934:6, 6953:4, 6958:22, 6964:22
**looks** [5] - 6801:25, 6865:23, 6875:4, 6923:19, 6940:10
**loop** [2] - 6806:22, 6820:1
**lose** [7] - 6802:5, 6826:15, 6842:23, 6844:18, 6890:11, 6910:5, 6963:25
**loses** [1] - 6955:22

**losing** [4] - 6787:18, 6839:13, 6854:23, 6904:18

**loss** [1] - 6814:23

**lost** [9] - 6799:2, 6799:3, 6839:16, 6839:17, 6882:19, 6889:22, 6905:5, 6910:8, 6912:3

**Lounge** [1] - 6848:8

**lounge** [5] - 6846:2, 6846:7, 6846:9, 6848:8, 6904:19

**lounges** [5] - 6845:6, 6848:14, 6849:25, 6904:20, 6937:20

**love** [1] - 6961:17

**low** [24] - 6780:18, 6781:2, 6781:4, 6781:12, 6784:7, 6786:7, 6786:11, 6786:12, 6786:16, 6786:18, 6787:4, 6787:16, 6791:19, 6791:23, 6859:22, 6860:25, 6892:13, 6892:18, 6907:21, 6930:17, 6933:1, 6952:15, 6960:5, 6960:6

**lower** [25] - 6780:14, 6786:1, 6786:8, 6787:11, 6788:19, 6793:7, 6793:16, 6793:17, 6804:25, 6814:11, 6819:15, 6853:11, 6863:5, 6888:1, 6888:2, 6888:3, 6933:3, 6933:11, 6935:4, 6950:14, 6953:22, 6958:11, 6958:16, 6959:3, 6960:10

**lowered** [1] - 6936:15

**lowering** [1] - 6787:25

**loyal** [1] - 6956:21

**loyalty** [6] - 6919:18, 6920:16, 6920:25, 6935:15, 6941:14, 6945:15

**lumped** [2] - 6805:5, 6921:14

**lunch** [5] - 6777:15, 6777:17, 6777:18, 6777:19, 6864:8

**luncheon** [1] - 6864:11

**luxury** [1] - 6963:22

## M

**Mac** [1] - 6927:24

**made-for-litigation** [1] - 6902:2

**mailbox** [1] - 6955:21

**main** [3] - 6783:5, 6800:21, 6805:25

**maintain** [2] - 6957:15, 6958:12

**maintenance** [2] - 6873:9, 6873:12

**major** [4] - 6786:9, 6822:5, 6851:18, 6886:3

**majority** [3] - 6919:21, 6919:23, 6951:25

**man** [1] - 6866:21

**managed** [1] - 6830:1

**management** [1] - 6798:15

**Manhattan** [1] - 6865:24

**manner** [1] - 6950:14

**manufacturer** [1] - 6873:10

**map** [1] - 6940:17

**margin** [8] - 6829:5, 6855:5, 6925:16, 6926:19, 6926:20, 6926:25, 6927:1, 6927:2

**marginal** [1] - 6816:19

**margins** [5] - 6829:10, 6926:17, 6935:1,

6935:2

**MARK** [3] - 6773:5, 6773:7, 6773:19

**mark** [1] - 6774:11

**Mark** [2] - 6774:16, 6775:12

**marked** [1] - 6865:10

**market** [292] - 6780:7, 6780:11, 6780:15, 6780:17, 6780:25, 6782:7, 6782:18, 6783:4, 6784:3, 6784:20, 6786:2, 6788:7, 6789:14, 6789:21, 6790:2, 6790:21, 6792:22, 6791:17, 6792:25, 6794:10, 6794:17, 6796:7, 6796:12, 6798:23, 6799:14, 6800:2, 6800:16, 6800:20, 6801:24, 6802:1, 6802:3, 6802:5, 6802:16, 6802:21, 6803:11, 6803:12, 6803:14, 6803:15, 6803:21, 6803:25, 6804:2, 6804:4, 6804:5, 6804:7, 6804:10, 6804:12, 6804:13, 6804:15, 6805:5, 6805:8, 6805:10, 6806:3, 6806:7, 6806:10, 6806:15, 6806:17, 6807:7, 6807:11, 6810:10, 6810:22, 6811:1, 6811:18, 6814:18, 6816:8, 6817:12, 6818:5, 6818:6, 6819:13, 6819:18, 6819:25, 6820:9, 6820:12, 6823:16, 6823:21, 6824:3, 6824:6, 6824:11, 6824:13, 6824:19, 6824:21, 6824:22, 6825:1, 6825:5, 6825:9, 6825:17, 6826:7, 6827:20, 6827:22, 6827:23, 6828:3, 6829:17, 6830:8, 6830:25, 6832:19, 6832:22, 6832:25, 6833:2, 6833:7, 6838:6, 6838:7, 6838:8, 6838:12, 6838:14, 6838:20, 6839:1, 6839:6, 6841:6, 6841:10, 6844:18, 6848:5, 6848:16, 6853:24, 6854:2, 6854:6, 6854:10, 6854:13, 6854:14, 6854:15, 6854:18, 6855:10, 6855:11, 6859:19, 6860:10, 6860:17, 6861:20, 6863:10, 6866:7, 6866:17, 6866:25, 6868:9, 6868:11, 6869:10, 6869:14, 6869:18, 6870:13, 6871:15, 6871:22, 6871:24, 6872:2, 6872:3, 6872:5, 6876:13, 6876:24, 6878:10, 6878:12, 6878:18, 6878:20, 6879:3, 6879:7, 6879:10, 6879:11, 6879:20, 6880:3, 6881:4, 6881:16, 6882:4, 6885:11, 6887:15, 6887:16, 6888:15, 6889:18, 6893:7, 6893:8, 6894:2, 6897:6, 6897:22, 6898:2, 6898:4, 6898:23, 6899:8, 6899:10, 6899:12, 6899:14, 6899:18, 6899:24, 6899:25, 6900:2, 6902:17, 6902:19, 6903:19, 6903:20, 6904:14, 6908:4, 6909:2, 6910:1, 6910:2, 6912:5, 6912:6, 6912:11, 6912:14, 6912:19, 6912:22, 6912:23, 6912:25, 6913:4, 6913:7, 6913:8, 6913:10, 6913:14, 6913:18, 6914:5, 6914:8, 6914:10, 6914:11, 6914:19, 6915:21, 6915:24, 6916:14, 6916:20, 6916:24, 6917:6, 6917:8, 6917:10, 6917:11, 6918:20, 6925:2, 6925:10, 6925:11, 6925:13, 6925:22, 6925:24, 6926:1, 6926:3, 6926:5, 6927:3, 6927:4,

6927:10, 6928:3, 6928:5, 6928:6, 6928:13, 6928:16, 6928:18, 6928:19, 6929:6, 6929:8, 6929:11, 6929:24, 6930:9, 6930:10, 6930:23, 6931:16, 6934:22, 6935:18, 6940:8, 6941:10, 6941:18, 6941:19, 6945:25, 6951:16, 6951:19, 6952:16, 6953:13, 6954:1, 6955:3, 6955:4, 6955:6, 6955:13, 6955:19, 6955:24, 6956:20, 6958:2, 6960:2, 6960:8, 6960:10, 6961:5, 6961:6, 6961:14, 6962:13, 6962:15, 6963:8, 6964:2, 6964:12, 6964:14, 6964:20, 6964:23, 6965:2, 6965:4, 6965:8, 6965:22, 6965:24

**market-wide** [4] - 6780:25, 6800:16, 6899:24, 6900:2

**marketing** [1] - 6911:17

**marketplace** [18] - 6790:12, 6859:1, 6861:13, 6867:9, 6867:18, 6867:24, 6903:8, 6909:1, 6918:21, 6920:8, 6923:16, 6929:22, 6930:5, 6954:5, 6957:11, 6957:12, 6958:23, 6959:22

**marketplaces** [1] - 6800:18

**markets** [29] - 6785:25, 6797:3, 6803:23, 6803:24, 6805:2, 6805:4, 6805:5, 6806:6, 6807:5, 6807:9, 6825:3, 6830:12, 6830:15, 6830:20, 6830:22, 6831:23, 6832:24, 6833:5, 6848:9, 6853:11, 6853:12, 6875:14, 6899:5, 6904:15, 6926:8, 6926:22, 6926:23, 6961:18, 6964:16

**marking** [1] - 6966:18

**MARYLAND** [1] - 6772:5

**MasterCard** [61] - 6779:12, 6786:25, 6788:6, 6788:16, 6790:14, 6791:6, 6795:18, 6796:2, 6796:4, 6796:5, 6796:13, 6797:22, 6799:2, 6799:4, 6807:10, 6821:19, 6837:5, 6854:1, 6854:5, 6867:18, 6868:6, 6879:14, 6883:6, 6885:16, 6887:5, 6888:11, 6891:17, 6892:3, 6892:25, 6893:3, 6893:13, 6893:20, 6898:1, 6898:10, 6908:8, 6909:5, 6910:15, 6910:17, 6910:22, 6920:6, 6931:4, 6931:13, 6931:18, 6931:20, 6932:3, 6932:4, 6932:5, 6932:24, 6940:25, 6941:9, 6941:20, 6941:24, 6941:25, 6945:24, 6946:1, 6947:11, 6954:7, 6956:24, 6959:15, 6959:19

**MASTERCARD** [1] - 6772:11

**MasterCard's** [1] - 6877:17

**MasterCards** [1] - 6903:11

**matched** [1] - 6898:18

**material** [1] - 6777:2

**matter** [19] - 6783:3, 6796:5, 6845:20, 6848:3, 6850:16, 6858:9, 6896:4, 6901:8, 6902:5, 6902:11, 6903:3, 6904:5, 6932:13, 6943:2, 6948:25, 6952:11, 6955:16

**matters** [3] - 6783:4, 6902:8, 6930:17

**McDonald's** [2] - 6927:24, 6927:25

**McMahon** [1] - 6932:19

**MCX** [2] - 6792:11, 6793:10
**mean** [17] - 6779:11, 6781:1, 6782:7, 6785:12, 6817:10, 6848:21, 6858:13, 6858:14, 6858:15, 6860:12, 6871:12, 6886:5, 6947:12, 6948:23, 6956:14, 6957:3, 6958:25
**meaning** [1] - 6790:13
**meaningful** [1] - 6863:20
**meaningless** [1] - 6909:10
**means** [13] - 6781:2, 6781:12, 6781:20, 6806:22, 6862:7, 6863:15, 6878:13, 6884:15, 6904:5, 6910:22, 6916:8, 6920:23, 6926:22
**meant** [2] - 6799:5, 6822:9
**measure** [2] - 6934:13, 6934:15
**measured** [1] - 6844:9
**meat** [1] - 6937:3
**mechanical** [1] - 6772:24
**mechanism** [18] - 6780:13, 6781:14, 6784:3, 6784:6, 6787:3, 6796:13, 6808:10, 6872:11, 6873:1, 6873:7, 6873:11, 6873:18, 6874:18, 6877:3, 6878:6, 6900:18, 6951:19, 6952:3
**meet** [7] - 6801:21, 6811:22, 6815:1, 6815:4, 6815:16, 6834:2, 6952:20
**meets** [1] - 6838:9
**member** [2] - 6920:3, 6950:11
**members** [3] - 6845:7, 6846:14, 6905:13
**membership's** [1] - 6845:8
**membrane** [1] - 6881:4
**memo** [1] - 6938:3
**memory** [1] - 6948:10
**men's** [1] - 6879:7
**mention** [6] - 6796:1, 6817:25, 6818:21, 6869:2, 6933:2, 6940:13
**mentioned** [10] - 6818:18, 6818:19, 6866:19, 6872:19, 6872:20, 6881:21, 6888:6, 6888:9, 6901:10, 6940:14
**mentions** [1] - 6860:18
**merchant** [105] - 6780:12, 6781:6, 6781:9, 6781:16, 6782:2, 6782:4, 6784:9, 6784:19, 6785:20, 6786:8, 6786:11, 6786:15, 6786:17, 6788:21, 6791:1, 6791:2, 6793:6, 6805:1, 6805:21, 6812:1, 6813:5, 6813:10, 6813:23, 6813:24, 6816:15, 6816:24, 6817:19, 6817:20, 6820:8, 6824:16, 6824:17, 6825:11, 6826:3, 6826:14, 6827:14, 6827:15, 6827:16, 6832:9, 6832:12, 6832:25, 6834:18, 6835:13, 6835:17, 6837:3, 6837:24, 6852:7, 6853:6, 6857:6, 6857:25, 6861:15, 6863:4, 6863:9, 6868:2, 6868:6, 6869:21, 6869:24, 6872:21, 6878:20, 6880:20, 6880:22, 6881:6, 6881:7, 6881:9, 6883:5, 6884:16, 6884:23, 6887:20, 6889:11, 6892:10, 6895:9, 6897:1, 6901:14, 6904:16, 6906:25, 6908:6, 6908:12, 6916:8, 6917:11, 6918:24, 6919:5, 6919:18, 6921:2,

6921:5, 6921:8, 6921:23, 6922:5, 6922:12, 6923:9, 6923:11, 6923:14, 6932:8, 6940:23, 6942:7, 6944:6, 6944:17, 6957:6, 6963:9, 6963:14, 6963:21
**Merchant** [2] - 6829:3, 6829:12
**merchant's** [2] - 6814:10, 6862:23
**merchant-friendly** [1] - 6786:8
**merchant-owned** [1] - 6793:6
**merchants** [220] - 6778:19, 6781:3, 6781:10, 6781:11, 6781:18, 6781:22, 6782:19, 6782:20, 6784:12, 6784:17, 6785:11, 6786:3, 6787:24, 6788:1, 6788:24, 6791:2, 6791:25, 6792:12, 6792:20, 6793:6, 6794:1, 6794:8, 6794:24, 6795:2, 6795:14, 6797:6, 6799:22, 6800:13, 6803:2, 6803:3, 6804:10, 6805:13, 6805:22, 6805:25, 6806:5, 6806:14, 6806:23, 6807:2, 6807:16, 6808:4, 6808:11, 6808:19, 6810:10, 6811:2, 6812:6, 6812:18, 6815:5, 6815:22, 6815:25, 6816:1, 6816:20, 6817:3, 6817:13, 6819:13, 6819:16, 6820:5, 6824:16, 6824:19, 6825:17, 6825:21, 6826:5, 6826:9, 6826:11, 6827:1, 6827:3, 6827:4, 6827:15, 6827:19, 6827:22, 6827:23, 6828:12, 6828:13, 6830:1, 6831:3, 6831:5, 6831:13, 6831:14, 6831:17, 6832:3, 6832:14, 6835:10, 6835:11, 6835:22, 6836:17, 6836:18, 6838:3, 6838:9, 6839:4, 6839:10, 6839:13, 6839:15, 6839:16, 6839:17, 6842:2, 6844:18, 6844:21, 6844:22, 6847:11, 6851:8, 6854:14, 6854:18, 6854:21, 6856:7, 6856:20, 6856:24, 6857:15, 6859:23, 6860:25, 6861:18, 6861:19, 6862:9, 6863:2, 6863:7, 6863:12, 6863:14, 6872:20, 6878:24, 6879:22, 6880:4, 6880:16, 6880:17, 6880:23, 6880:24, 6883:19, 6884:4, 6884:12, 6884:13, 6884:17, 6884:18, 6884:21, 6885:2, 6885:8, 6885:14, 6885:21, 6887:4, 6887:17, 6890:19, 6891:15, 6891:16, 6892:16, 6893:14, 6893:15, 6894:13, 6894:15, 6895:7, 6897:15, 6899:5, 6902:23, 6904:9, 6904:10, 6904:17, 6906:2, 6906:18, 6907:14, 6909:13, 6911:18, 6916:15, 6916:24, 6919:22, 6920:24, 6921:1, 6921:12, 6921:16, 6921:18, 6922:3, 6923:4, 6923:5, 6925:23, 6925:24, 6928:1, 6931:1, 6931:7, 6931:9, 6933:13, 6933:15, 6933:23, 6933:25, 6935:5, 6935:23, 6936:22, 6937:5, 6937:9, 6938:6, 6939:2, 6939:7, 6939:9, 6939:10, 6939:13, 6941:1, 6941:7, 6941:22, 6942:1, 6942:3, 6942:10, 6942:16, 6943:2, 6944:9, 6950:5, 6952:6, 6958:9, 6958:10, 6958:11, 6958:16, 6959:4, 6960:3, 6963:9, 6963:10, 6963:11, 6963:18, 6964:6

**merchants'** [2] - 6786:14, 6897:16
**merely** [1] - 6873:6
**merger** [4] - 6833:2, 6833:3, 6882:1, 6882:2
**mergers** [3] - 6831:9, 6831:11, 6832:20
**merits** [5] - 6795:7, 6889:5, 6889:12, 6906:20, 6947:9
**message** [2] - 6888:23, 6891:8
**messenger** [1] - 6888:23
**met** [3] - 6816:13, 6854:8, 6944:19
**method** [1] - 6924:2
**metrics** [4] - 6930:19, 6932:10, 6932:12, 6933:2
**MICHIGAN** [1] - 6772:5
**microphone** [2] - 6823:6
**Microsoft** [1] - 6948:6
**middle** [7] - 6777:14, 6805:12, 6805:24, 6818:10, 6829:1, 6853:17, 6881:4
**Midland** [1] - 6965:18
**might** [40] - 6782:9, 6785:8, 6786:23, 6790:20, 6794:17, 6802:12, 6810:13, 6811:10, 6813:10, 6814:11, 6814:16, 6814:21, 6815:7, 6815:9, 6820:25, 6821:14, 6833:17, 6836:24, 6837:24, 6837:25, 6846:20, 6855:2, 6865:22, 6873:25, 6885:13, 6885:16, 6886:21, 6888:2, 6890:11, 6891:12, 6900:9, 6928:9, 6929:2, 6929:3, 6944:6, 6944:8, 6946:25, 6953:14, 6958:24
**migrating** [1] - 6924:2
**miles** [9] - 6842:21, 6842:22, 6842:25, 6843:1, 6843:11, 6843:16, 6843:22, 6852:18, 6852:21
**Miles** [5] - 6843:9, 6843:10, 6843:13, 6843:18, 6843:20
**million** [16] - 6872:20, 6881:14, 6883:5, 6883:19, 6884:22, 6884:23, 6885:13, 6887:3, 6890:19, 6892:9, 6908:12, 6930:24, 6935:5, 6937:23, 6940:25, 6941:2
**million-plus** [1] - 6908:12
**millions** [2] - 6914:14, 6943:3
**mind** [5] - 6783:15, 6901:5, 6938:18, 6948:21, 6965:2
**minds** [1] - 6918:7
**minus** [2] - 6828:23, 6926:10
**minute** [3] - 6805:4, 6822:23, 6949:9
**minutes** [7] - 6776:3, 6776:10, 6862:20, 6869:1, 6909:18, 6949:6, 6949:8
**mirror** [1] - 6939:5
**mischaracterization** [1] - 6880:1
**mischaracterize** [1] - 6877:5
**misleading** [1] - 6882:3
**missed** [1] - 6851:11
**MISSOURI** [1] - 6772:6
**misspoken** [1] - 6900:10
**misstate** [2] - 6910:17, 6942:16
**mistake** [2] - 6842:9, 6886:23
**mistakes** [1] - 6842:8
**Mitch** [2] - 6774:23, 6862:18
**MITCHELL** [1] - 6773:9

**Mitchell** [1] - 6793:20
**mix** [5] - 6851:6, 6851:12, 6853:19, 6868:7, 6897:19
**mix-adjusted** [1] - 6897:19
**mixed** [1] - 6934:10
**mobile** [4] - 6792:4, 6792:7, 6792:14, 6793:12
**model** [44] - 6790:4, 6790:14, 6790:15, 6809:1, 6810:19, 6812:12, 6815:17, 6817:22, 6819:11, 6822:1, 6822:4, 6822:19, 6859:11, 6860:9, 6860:10, 6860:16, 6860:17, 6860:19, 6860:21, 6860:22, 6860:23, 6860:24, 6861:2, 6861:16, 6861:21, 6862:1, 6867:1, 6867:8, 6867:20, 6868:17, 6881:18, 6889:10, 6894:6, 6905:2, 6906:8, 6916:11, 6924:14, 6935:14, 6954:6, 6960:14, 6960:17, 6960:23
**models** [1] - 6861:13
**modus** [1] - 6954:13
**moment** [16] - 6778:22, 6782:13, 6793:13, 6857:12, 6868:15, 6869:7, 6869:14, 6869:20, 6877:6, 6914:6, 6917:14, 6922:7, 6925:17, 6940:15, 6951:24, 6960:18
**moments** [3] - 6901:7, 6919:6, 6930:24
**Monday** [1] - 6920:13
**Monet** [1] - 6793:5
**money** [10] - 6788:21, 6841:11, 6849:20, 6880:15, 6915:6, 6915:9, 6915:13, 6915:17, 6939:7, 6939:22
**monopolist** [6] - 6824:25, 6825:6, 6825:10, 6825:19, 6825:20, 6963:10
**monopoly** [4] - 6832:25, 6833:2, 6833:4, 6934:22
**Montana** [1] - 6933:14
**months** [1] - 6936:13
**Moore** [1] - 6893:20
**MOORE** [1] - 6773:11
**morgan** [1] - 6796:8
**Morgan** [4] - 6795:1, 6889:7, 6901:11, 6903:24
**morning** [23] - 6774:7, 6774:9, 6774:12, 6774:18, 6774:21, 6774:22, 6774:25, 6775:2, 6775:4, 6775:6, 6775:8, 6775:11, 6775:13, 6775:16, 6775:18, 6775:19, 6778:11, 6866:20, 6871:2, 6871:14, 6879:25, 6894:22, 6931:25
**most** [17] - 6825:15, 6830:14, 6833:12, 6836:5, 6849:13, 6874:14, 6888:17, 6891:23, 6893:11, 6933:9, 6938:4, 6939:14, 6952:5, 6959:14, 6962:9
**motion** [1] - 6820:20
**motivated** [1] - 6819:19
**move** [9] - 6781:11, 6799:14, 6809:6, 6869:7, 6872:7, 6878:7, 6917:19, 6945:20, 6946:2
**moved** [3] - 6799:12, 6809:14, 6945:20
**moving** [10] - 6788:16, 6788:22, 6791:25, 6792:18, 6797:23, 6798:9, 6802:11, 6802:12, 6809:18, 6856:9

**multiple** [1] - 6932:9
**multiply** [1] - 6827:14
**Music** [1] - 6858:4
**must** [15] - 6846:18, 6869:6, 6869:9, 6869:16, 6878:17, 6894:9, 6899:17, 6900:2, 6913:12, 6913:13, 6940:24, 6941:4, 6942:2, 6945:1, 6953:9

# N

**N.Y** [1] - 6772:9
**name** [4] - 6866:21, 6939:12, 6956:22, 6961:11
**namely** [3] - 6872:16, 6874:15, 6880:12
**narrow** [2] - 6800:17, 6960:10
**narrower** [2] - 6828:3, 6963:7
**National** [2] - 6858:24, 6899:6
**natural** [2] - 6883:2, 6883:4
**naturally** [2] - 6797:24, 6857:6
**nature** [1] - 6866:25
**naught** [1] - 6902:6
**NDP** [1] - 6896:10
**NDP's** [3] - 6907:18, 6908:1, 6908:7
**NDPs** [12] - 6796:11, 6869:13, 6870:19, 6870:23, 6872:10, 6885:9, 6886:4, 6887:4, 6887:5, 6894:16, 6947:5, 6954:4
**near** [3] - 6890:1, 6904:22, 6942:18
**necessarily** [2] - 6817:11, 6836:25
**necessary** [4] - 6781:20, 6790:11, 6862:7, 6871:15
**necessity** [1] - 6940:22
**need** [34] - 6776:20, 6781:21, 6789:17, 6789:18, 6790:22, 6792:15, 6792:21, 6796:24, 6799:14, 6802:1, 6810:23, 6810:24, 6811:5, 6819:7, 6822:18, 6826:14, 6827:12, 6835:18, 6856:6, 6856:11, 6859:10, 6862:8, 6862:9, 6876:23, 6878:5, 6891:12, 6900:18, 6901:2, 6926:9, 6936:22, 6963:24, 6966:10
**needed** [1] - 6778:18
**needs** [1] - 6861:24
**negated** [1] - 6842:1
**negative** [3] - 6837:21, 6906:23, 6906:24
**negligible** [2] - 6839:16, 6839:17
**negotiate** [3] - 6781:25, 6921:22, 6942:10
**negotiated** [7] - 6846:5, 6847:19, 6847:21, 6848:20, 6849:16, 6849:17, 6849:23
**negotiating** [1] - 6922:3
**negotiation** [1] - 6852:21
**negotiations** [5] - 6922:11, 6923:4, 6923:6, 6923:12, 6936:8
**net** [12] - 6802:2, 6814:18, 6817:1, 6817:2, 6817:3, 6817:5, 6841:1, 6844:4, 6852:17, 6919:20, 6936:16
**network** [40] - 6785:13, 6786:8, 6786:15, 6788:18, 6789:15, 6791:3, 6793:6, 6795:16, 6805:1, 6805:12,

6805:16, 6805:19, 6805:24, 6806:4, 6806:8, 6807:9, 6807:24, 6808:16, 6808:18, 6820:2, 6862:24, 6863:12, 6877:23, 6878:20, 6878:22, 6878:23, 6879:13, 6879:15, 6881:1, 6881:3, 6882:1, 6902:19, 6902:22, 6905:8, 6950:16, 6951:1, 6951:2, 6955:4, 6957:6, 6963:9
**network-effect** [2] - 6902:19, 6902:22
**networks** [38] - 6778:20, 6780:12, 6781:6, 6782:2, 6787:15, 6787:17, 6788:12, 6788:24, 6789:6, 6790:24, 6795:17, 6796:6, 6806:1, 6806:12, 6806:14, 6807:16, 6811:2, 6811:25, 6816:15, 6816:16, 6824:15, 6824:20, 6832:2, 6834:24, 6835:13, 6838:4, 6863:8, 6863:9, 6867:19, 6902:17, 6917:12, 6918:13, 6923:17, 6923:20, 6924:3, 6935:18, 6950:24, 6960:1
**neutral** [1] - 6858:19
**never** [15] - 6810:3, 6830:5, 6867:10, 6871:3, 6872:19, 6874:23, 6878:14, 6881:20, 6889:9, 6890:5, 6903:2, 6903:12, 6908:3, 6920:7
**NEW** [1] - 6772:1
**New** [16] - 6772:23, 6773:12, 6773:16, 6830:16, 6830:20, 6831:15, 6832:1, 6832:7, 6904:19, 6912:16, 6928:23, 6928:24, 6928:25, 6965:15
**new** [15] - 6791:7, 6791:25, 6792:9, 6793:25, 6794:2, 6809:14, 6810:3, 6812:14, 6821:13, 6841:3, 6871:3, 6874:1, 6885:4, 6899:16, 6942:12
**Newark** [3] - 6846:8, 6846:9, 6848:6
**news** [1] - 6866:20
**newspaper** [3] - 6803:21, 6803:23, 6807:25
**newspapers** [1] - 6816:9
**newsstand** [1] - 6927:19
**next** [24] - 6780:20, 6782:17, 6787:1, 6804:20, 6806:15, 6806:16, 6812:22, 6819:24, 6829:20, 6840:24, 6851:15, 6853:10, 6855:12, 6864:12, 6895:14, 6901:13, 6920:4, 6920:5, 6921:24, 6922:20, 6942:24, 6957:18, 6961:7
**NGG)(RER** [2] - 6772:8, 6772:15
**niche** [5] - 6889:16, 6889:17, 6901:19, 6905:3, 6927:7
**NICHOLAS** [3] - 6772:20, 6774:2, 6823:2
**nickel** [1] - 6883:24
**night** [1] - 6909:20
**nine** [2] - 6906:5, 6940:25
**nine-point-some** [1] - 6940:25
**nineteen** [1] - 6958:3
**nobody** [4] - 6791:15, 6811:5, 6924:12, 6957:12
**nobody's** [1] - 6959:20
**non** [1] - 6926:19
**non-T&E** [1] - 6926:19
**noncharge** [1] - 6914:24

**noncompliance** [1] - 6785:11
**nondiscrimination** [3] - 6868:1, 6869:24, 6907:9
**none** [5] - 6801:10, 6827:3, 6827:5, 6902:8, 6939:1
**nonprofit** [1] - 6890:7
**nonrevolvers** [1] - 6914:19
**nonrevolving** [2] - 6914:4, 6914:12
**nontrivial** [1] - 6790:17
**normal** [2] - 6780:13, 6811:17
**normally** [2] - 6780:14, 6811:17
**not-for-profit** [1] - 6818:7
**note** [6] - 6780:22, 6796:1, 6804:23, 6819:25, 6838:18, 6877:12
**nothing** [12] - 6779:10, 6779:15, 6817:14, 6881:15, 6881:16, 6897:7, 6897:15, 6913:15, 6916:12, 6917:4, 6944:14, 6965:21
**nothing's** [2] - 6942:2, 6942:4
**notice** [1] - 6806:5
**noting** [1] - 6825:11
**notwithstanding** [2] - 6846:15, 6940:4
**number** [11] - 6796:2, 6843:22, 6854:2, 6854:4, 6854:17, 6854:25, 6875:19, 6877:9, 6913:14, 6921:2, 6931:5
**numbers** [5] - 6829:8, 6842:20, 6926:13, 6932:9, 6936:15
**nutshell** [2] - 6802:6, 6802:7
**NW** [1] - 6773:3
**NYU** [1] - 6886:21

## O

**oath** [3] - 6867:5, 6883:23, 6937:17
**objective** [2] - 6834:6, 6954:16
**obscure** [2] - 6824:4, 6965:3
**observation** [1] - 6906:7
**observe** [2] - 6941:11, 6961:24
**observed** [4] - 6917:19, 6953:3, 6953:4, 6962:2
**observer** [1] - 6875:11
**obstruct** [1] - 6783:18
**obtain** [1] - 6787:24
**obviate** [2] - 6876:23, 6900:17
**obvious** [2] - 6830:14, 6913:6
**obviously** [6] - 6783:8, 6865:25, 6873:11, 6873:18, 6912:24, 6934:23
**occurred** [2] - 6865:2, 6949:14
**October** [1] - 6772:17
**OF** [9] - 6772:1, 6772:3, 6772:4, 6772:4, 6772:5, 6772:5, 6772:6, 6772:6, 6772:7
**offending** [2] - 6857:2, 6857:14
**offer** [14] - 6780:18, 6785:22, 6813:24, 6814:22, 6819:11, 6861:9, 6861:23, 6886:25, 6950:14, 6958:11, 6958:25, 6959:1, 6959:3, 6959:16
**offered** [6] - 6786:8, 6812:15, 6812:20, 6825:5, 6834:14, 6953:12
**offering** [4] - 6788:17, 6814:12, 6898:17, 6898:18

**offers** [5] - 6832:8, 6832:10, 6833:14, 6834:15, 6858:15
**officer** [1] - 6845:16
**official** [2] - 6793:19, 6847:9
**Official** [1] - 6793:21
**officially** [1] - 6865:6
**offset** [6] - 6803:9, 6807:17, 6811:17, 6812:17, 6812:21, 6815:16
**offsets** [1] - 6815:13
**offsetting** [3] - 6815:23, 6817:4, 6844:7
**often** [3] - 6830:11, 6832:20, 6899:21
**often-repeated** [1] - 6899:21
**OHIO** [1] - 6772:6
**Ohio** [1] - 6773:9
**Oil** [2] - 6793:11, 6793:12
**old** [2] - 6908:2, 6929:15
**old-fashioned** [1] - 6929:15
**once** [5] - 6825:4, 6869:2, 6926:14, 6926:15, 6947:20
**one** [167] - 6777:12, 6780:6, 6781:4, 6782:9, 6782:12, 6782:21, 6784:14, 6791:9, 6792:3, 6801:22, 6801:25, 6802:16, 6803:9, 6803:15, 6803:24, 6805:10, 6805:14, 6806:14, 6806:25, 6807:16, 6808:23, 6810:15, 6814:11, 6815:7, 6815:9, 6820:11, 6827:10, 6828:9, 6830:4, 6830:13, 6830:19, 6832:24, 6832:25, 6835:1, 6835:20, 6836:21, 6838:25, 6841:17, 6841:18, 6841:19, 6844:25, 6845:14, 6847:4, 6847:9, 6848:7, 6850:9, 6850:10, 6850:23, 6851:6, 6852:23, 6853:7, 6853:11, 6853:24, 6855:2, 6856:5, 6856:24, 6857:24, 6860:18, 6865:4, 6865:5, 6865:11, 6865:13, 6866:19, 6869:20, 6870:11, 6871:9, 6871:16, 6871:19, 6871:20, 6873:4, 6873:15, 6875:20, 6875:23, 6876:20, 6877:6, 6878:22, 6879:2, 6879:9, 6879:10, 6879:20, 6879:21, 6880:9, 6881:18, 6882:4, 6882:8, 6882:10, 6885:11, 6886:3, 6886:25, 6888:6, 6888:14, 6888:22, 6889:13, 6889:22, 6891:19, 6891:21, 6891:24, 6891:25, 6893:19, 6897:10, 6897:11, 6897:25, 6898:5, 6899:5, 6899:8, 6899:13, 6902:21, 6909:13, 6909:14, 6912:7, 6912:8, 6912:18, 6913:5, 6913:6, 6913:12, 6913:13, 6913:16, 6913:23, 6913:24, 6914:24, 6915:3, 6916:22, 6917:12, 6917:14, 6919:20, 6919:22, 6920:1, 6921:5, 6921:15, 6924:1, 6924:18, 6924:23, 6929:4, 6930:6, 6930:11, 6931:1, 6933:8, 6935:11, 6936:11, 6937:2, 6940:12, 6940:18, 6944:6, 6948:5, 6948:16, 6948:21, 6948:25, 6951:16, 6951:17, 6954:20, 6959:19, 6960:8, 6960:10, 6961:7, 6961:13, 6962:4, 6962:5, 6964:19, 6964:23, 6965:8, 6965:25, 6966:15
**one's** [2] - 6804:18

**one-fifth** [1] - 6889:22
**one-sided** [1] - 6885:11
**one-third** [2] - 6891:24, 6891:25
**ones** [1] - 6812:7
**online** [1] - 6791:4
**oooooOooooooo** [1] - 6967:7
**open** [4] - 6774:1, 6823:1, 6865:2, 6949:14
**opening** [4] - 6820:21, 6868:22, 6894:17, 6940:19
**openings** [1] - 6777:11
**operandi** [1] - 6954:13
**operating** [2] - 6782:21, 6845:15
**operation** [2] - 6790:15, 6927:5
**operations** [1] - 6835:6
**opinion** [13] - 6825:5, 6869:17, 6872:2, 6875:23, 6876:19, 6876:25, 6877:1, 6912:19, 6950:8, 6953:20, 6953:21, 6962:12, 6966:7
**opportunity** [5] - 6778:17, 6779:20, 6791:18, 6811:15, 6819:10, 6863:3, 6908:20, 6946:3, 6946:4
**opposed** [5] - 6814:3, 6822:7, 6831:17, 6870:21, 6881:7
**opposing** [1] - 6882:2
**opposite** [4] - 6852:12, 6902:14, 6932:11, 6937:1
**Optima** [1] - 6798:7
**option** [2] - 6793:7, 6843:1
**options** [1] - 6785:22
**oral** [2] - 6774:5, 6775:20
**orange** [1] - 6853:19
**oranges** [2] - 6850:12, 6850:20
**order** [16] - 6819:2, 6828:15, 6848:14, 6848:24, 6856:6, 6856:19, 6896:5, 6907:9, 6913:14, 6914:9, 6914:17, 6923:6, 6937:3, 6944:3, 6958:11, 6960:16
**ordinary** [2] - 6804:18, 6804:21
**originally** [2] - 6779:11, 6874:7
**Orsini** [1] - 6775:3
**ORSINI** [2] - 6773:13, 6775:2
**otherwise** [5] - 6777:25, 6789:23, 6918:17
**ought** [8] - 6810:19, 6811:18, 6826:8, 6836:15, 6836:18, 6838:11, 6839:10, 6952:20
**outcome** [5] - 6789:18, 6789:19, 6810:23, 6811:3, 6871:9
**output** [4] - 6800:12, 6877:18, 6877:20, 6877:23
**outweigh** [1] - 6812:3
**overall** [7] - 6788:5, 6788:8, 6817:6, 6839:20, 6841:19, 6877:18, 6916:7
**overcome** [1] - 6932:22
**overlapping** [3] - 6796:6, 6893:25, 6915:19
**overstated** [1] - 6959:7
**overtake** [1] - 6956:11
**overwhelming** [1] - 6953:18
**own** [20] - 6809:22, 6829:22, 6836:23,

6843:12, 6846:8, 6846:17, 6848:8, 6848:14, 6857:10, 6861:25, 6881:20, 6885:12, 6888:22, 6890:17, 6907:9, 6923:22, 6937:23, 6941:13, 6946:2
**owned** [5] - 6793:6, 6890:8, 6893:24, 6932:3, 6932:7

## P

**p.m** [1] - 6864:9
**package** [3] - 6849:3, 6861:23, 6958:8
**page** [13] - 6802:10, 6802:24, 6812:22, 6826:20, 6853:10, 6855:12, 6864:12, 6895:14, 6905:24, 6922:20, 6943:6, 6950:9, 6957:18
**PAGE** [1] - 6968:3
**pages** [2] - 6802:13, 6937:15
**pain** [1] - 6937:8
**pair** [4] - 6831:2, 6831:8, 6928:20, 6928:23
**pairs** [3] - 6830:16, 6879:8, 6965:9
**pants** [2] - 6879:8, 6879:16
**paper** [2] - 6865:22, 6866:1
**papers** [12] - 6801:24, 6827:25, 6845:25, 6866:15, 6867:14, 6871:13, 6871:14, 6912:11, 6932:14, 6944:2, 6949:21, 6966:11
**parade** [3] - 6946:24, 6947:4, 6947:15
**paradigm** [1] - 6903:19
**parallel** [1] - 6950:8
**parameters** [1] - 6919:11
**Parish** [1] - 6876:3
**part** [34] - 6781:14, 6784:12, 6784:16, 6788:16, 6789:14, 6796:2, 6799:10, 6804:8, 6805:3, 6827:9, 6831:9, 6836:6, 6836:7, 6836:8, 6836:9, 6845:7, 6845:8, 6848:9, 6848:25, 6850:23, 6851:6, 6854:6, 6866:23, 6878:10, 6879:2, 6887:16, 6919:9, 6921:6, 6942:25, 6954:20, 6956:1, 6956:5, 6959:9
**participant** [1] - 6820:9
**participants** [1] - 6811:1
**participation** [1] - 6849:15
**particular** [17] - 6789:17, 6803:14, 6810:23, 6810:24, 6819:11, 6832:21, 6836:4, 6836:5, 6836:13, 6836:20, 6837:7, 6849:11, 6850:4, 6853:18, 6897:1, 6915:6, 6954:23
**particularized** [1] - 6831:14
**particularly** [1] - 6832:13
**parties** [8] - 6775:20, 6790:13, 6790:14, 6849:23, 6866:11, 6869:18, 6872:3, 6966:5
**partner** [2] - 6852:22, 6942:23
**parts** [5] - 6777:24, 6784:11, 6785:21, 6954:18, 6959:6
**party** [2] - 6805:20, 6819:14
**pass** [3] - 6816:17, 6819:21, 6883:25
**passed** [3] - 6816:20, 6863:14, 6883:24
**passing** [1] - 6818:7
**past** [7] - 6787:22, 6788:11, 6792:23,

6824:23, 6946:4, 6952:18, 6964:18
**Pause** [1] - 6898:24
**pause** [4] - 6877:6, 6877:17, 6914:6, 6917:13
**pay** [33] - 6782:19, 6782:24, 6803:3, 6812:7, 6812:8, 6812:9, 6825:21, 6826:1, 6826:16, 6827:12, 6828:13, 6837:7, 6837:15, 6839:10, 6843:10, 6845:19, 6849:19, 6849:20, 6863:16, 6894:16, 6894:18, 6914:15, 6914:16, 6914:17, 6915:13, 6917:22, 6936:5, 6936:10, 6937:25, 6938:1, 6939:8, 6950:4
**paying** [13] - 6828:12, 6836:15, 6841:9, 6843:20, 6843:23, 6852:10, 6852:13, 6853:5, 6853:6, 6853:7, 6863:17, 6881:7, 6885:14
**payment** [7] - 6790:23, 6791:7, 6792:4, 6852:18, 6858:4, 6918:25, 6924:2
**Payments** [2] - 6793:19, 6793:21
**payments** [3] - 6852:16, 6853:1, 6960:4
**PayPal** [6] - 6790:3, 6791:1, 6791:5, 6791:13, 6866:20, 6866:23
**pays** [2] - 6826:2, 6881:6
**pen** [2] - 6913:15, 6913:16
**penalties** [2] - 6845:20, 6849:21
**people** [28] - 6788:22, 6792:16, 6808:12, 6827:12, 6831:25, 6832:13, 6842:21, 6842:25, 6845:9, 6852:5, 6898:17, 6902:10, 6909:12, 6914:14, 6917:5, 6917:20, 6920:12, 6935:21, 6937:5, 6937:10, 6939:18, 6939:25, 6944:15, 6963:4, 6963:21, 6964:3, 6964:4
**per** [3] - 6874:4, 6874:7, 6875:15
**perceived** [1] - 6958:10
**percent** [65] - 6794:25, 6799:20, 6799:25, 6800:19, 6835:5, 6839:15, 6850:15, 6852:10, 6854:3, 6854:5, 6854:6, 6854:16, 6884:13, 6884:17, 6884:18, 6884:19, 6892:19, 6893:1, 6893:7, 6893:16, 6898:3, 6905:12, 6906:2, 6908:4, 6909:1, 6910:5, 6910:8, 6910:21, 6910:22, 6910:23, 6911:3, 6913:1, 6920:22, 6920:23, 6922:8, 6922:10, 6924:20, 6924:21, 6925:10, 6926:6, 6926:19, 6928:4, 6931:3, 6931:4, 6931:6, 6931:12, 6931:13, 6931:15, 6932:17, 6942:3, 6942:4, 6942:5, 6942:7, 6942:14, 6943:4, 6955:2, 6955:12, 6956:20, 6957:6, 6958:3
**percentage** [5] - 6800:17, 6891:24, 6923:13, 6931:13, 6931:22
**perceptions** [3] - 6906:1, 6907:2, 6907:3
**perfect** [12] - 6789:10, 6790:18, 6913:13, 6913:19, 6913:25, 6914:7, 6914:8, 6914:20, 6915:18, 6915:23, 6916:10
**perfectly** [3] - 6782:16, 6858:18,

6959:21
**perhaps** [8] - 6798:5, 6798:25, 6865:13, 6873:21, 6879:24, 6902:18, 6908:14, 6955:12
**period** [9] - 6777:12, 6787:4, 6787:5, 6789:12, 6798:17, 6842:15, 6851:6, 6853:21, 6895:6
**permit** [2] - 6796:14, 6802:14
**permits** [1] - 6814:4
**perpetrated** [1] - 6868:4
**perpetuated** [1] - 6903:6
**person** [2] - 6826:2, 6832:6, 6885:17
**person's** [1] - 6875:24
**personally** [2] - 6937:10, 6938:5
**perspective** [6] - 6830:24, 6835:17, 6837:2, 6916:3, 6916:6, 6959:12
**persuaded** [1] - 6936:14
**pesky** [1] - 6889:15
**PETER** [2] - 6773:14, 6773:20
**Peter** [1] - 6775:14
**phase** [1] - 6966:3
**Philadelphia** [1] - 6899:6
**PHILIP** [1] - 6773:18
**Philip** [1] - 6775:9
**phone** [1] - 6792:7
**phones** [1] - 6792:4
**phrase** [6] - 6837:20, 6849:20, 6877:24, 6879:25, 6910:15, 6931:24
**physician** [1] - 6900:14
**physicians'** [1] - 6900:13
**Picayune** [2] - 6803:20, 6808:22
**picture** [3] - 6797:5, 6802:17, 6951:24
**piece** [2] - 6876:20, 6927:6
**pieces** [4] - 6835:25, 6836:2, 6876:20, 6879:15, 6923:12
**pile** [1] - 6927:8
**place** [10] - 6828:17, 6832:4, 6856:18, 6902:1, 6905:11, 6933:19, 6945:13, 6950:16, 6959:18, 6961:12
**places** [5] - 6797:3, 6848:1, 6848:12, 6874:10, 6917:9
**Plaintiff** [2] - 6773:2, 6774:23
**plaintiff** [12] - 6811:14, 6815:24, 6862:19, 6864:4, 6870:6, 6876:6, 6876:12, 6876:14, 6882:19, 6896:5, 6900:14, 6928:16
**plaintiff's** [2] - 6900:5, 6900:8
**plaintiffs** [8] - 6775:23, 6808:5, 6815:20, 6816:11, 6816:12, 6817:2, 6817:8, 6896:9
**Plaintiffs** [1] - 6772:8
**plaintiffs'** [1] - 6804:8
**Plaintiffs'** [1] - 6865:10
**plan** [1] - 6821:3
**planning** [3] - 6838:18, 6888:23, 6901:12
**plastic** [5] - 6880:13, 6940:23, 6941:8, 6941:9, 6954:7
**platform** [6] - 6803:9, 6807:24, 6816:9, 6817:6, 6951:1, 6951:2
**platitudes** [1] - 6945:8

**plausible** [1] - 6893:11

**play** [1] - 6885:10

**playbook** [3] - 6889:13, 6898:13, 6903:17

**player** [1] - 6854:4

**players** [1] - 6918:20

**plays** [2] - 6838:4, 6867:8

**Plaza** [2] - 6772:23, 6773:11

**plenty** [2] - 6801:20, 6829:18

**plus** [10] - 6872:20, 6872:23, 6881:14, 6883:5, 6884:22, 6885:13, 6891:2, 6892:10, 6908:12, 6941:2

**pocket** [1] - 6929:3

**pockets** [1] - 6880:14

**point** [57] - 6777:23, 6784:10, 6785:10, 6786:10, 6792:5, 6794:11, 6795:18, 6797:7, 6800:5, 6807:5, 6816:6, 6818:10, 6819:24, 6820:11, 6825:13, 6829:19, 6841:2, 6850:6, 6850:9, 6850:10, 6858:16, 6858:17, 6879:25, 6886:9, 6887:1, 6888:7, 6889:14, 6890:13, 6890:15, 6890:20, 6904:1, 6904:25, 6906:23, 6906:25, 6910:8, 6911:13, 6914:22, 6915:8, 6915:16, 6919:2, 6919:15, 6919:17, 6927:9, 6928:24, 6929:24, 6934:18, 6940:25, 6942:15, 6947:19, 6956:9, 6960:10, 6961:4, 6962:16, 6966:11

**pointed** [5] - 6876:6, 6878:22, 6887:11, 6912:2, 6918:24

**pointing** [3] - 6866:14, 6890:7, 6896:25

**points** [13] - 6783:6, 6788:11, 6839:24, 6840:1, 6844:25, 6897:2, 6899:2, 6916:18, 6918:2, 6925:5, 6931:22, 6937:25

**Pojero** [2] - 6933:7, 6936:3

**politically** [1] - 6910:14

**poor** [1] - 6863:16

**portion** [3] - 6876:25, 6877:1, 6950:7

**portions** [1] - 6866:13

**posed** [2] - 6923:24, 6947:13

**posited** [1] - 6809:2

**position** [16] - 6778:25, 6817:15, 6835:4, 6843:8, 6843:17, 6843:24, 6868:16, 6891:15, 6892:4, 6902:2, 6918:6, 6947:18, 6955:13, 6957:16, 6958:12, 6958:17

**possibilities** [2] - 6792:3, 6807:21

**possibility** [4] - 6779:24, 6794:9, 6826:12, 6877:22

**possible** [10] - 6779:5, 6790:1, 6801:13, 6815:18, 6828:10, 6829:7, 6953:7, 6953:8, 6953:9, 6953:13

**possibly** [1] - 6953:17

**post** [7] - 6779:3, 6781:10, 6801:24, 6869:7, 6872:7, 6878:8, 6945:21

**post-trial** [3] - 6779:3, 6781:10, 6801:24

**posted** [1] - 6947:3

**poster** [1] - 6931:23

**posture** [1] - 6954:9

**potential** [2] - 6831:10, 6849:10

**power** [56] - 6838:14, 6838:20, 6839:1, 6839:6, 6844:18, 6854:2, 6854:6, 6854:10, 6854:13, 6855:10, 6855:11, 6871:17, 6876:24, 6898:2, 6906:8, 6910:1, 6910:2, 6913:4, 6913:8, 6916:18, 6925:2, 6928:3, 6928:5, 6928:7, 6929:8, 6929:11, 6929:13, 6929:14, 6929:25, 6930:7, 6930:9, 6930:13, 6930:14, 6931:19, 6931:21, 6932:18, 6933:1, 6933:2, 6934:4, 6934:16, 6934:21, 6934:22, 6936:6, 6936:23, 6936:25, 6937:4, 6940:8, 6940:10, 6940:13, 6940:18, 6941:10, 6941:18, 6941:19, 6944:3

**powerless** [1] - 6945:4

**powers** [1] - 6854:14

**practical** [2] - 6955:16, 6964:7

**practice** [2] - 6820:20, 6966:9

**pre** [1] - 6852:18

**Pre** [3] - 6820:21, 6840:17, 6850:11

**pre-payment** [1] - 6852:18

**Pre-Tax** [2] - 6840:17, 6850:11

**Pre-Trial** [1] - 6820:21

**precedent** [2] - 6944:25, 6945:1

**precisely** [3] - 6829:18, 6868:1, 6945:18

**predict** [1] - 6884:24

**predicted** [1] - 6887:21

**preempt** [1] - 6889:2

**prefer** [5] - 6778:1, 6795:4, 6799:23, 6814:16, 6859:18

**Prefer** [12] - 6868:3, 6894:11, 6901:8, 6904:2, 6904:3, 6904:8, 6904:11, 6905:10, 6905:22, 6905:23, 6906:4, 6945:18

**preference** [13] - 6777:13, 6794:22, 6795:13, 6795:15, 6795:16, 6795:20, 6798:18, 6800:10, 6836:23, 6836:24, 6857:20, 6875:24, 6901:19

**preferred** [4] - 6836:13, 6836:14, 6836:15, 6836:18

**prefers** [1] - 6837:1

**premise** [1] - 6959:7

**premised** [1] - 6868:23

**premium** [7] - 6788:6, 6868:6, 6896:25, 6897:21, 6901:18, 6934:11, 6953:15

**prepared** [1] - 6914:16

**prepurchase** [2] - 6852:21, 6853:2

**prescriptions** [1] - 6911:8

**present** [2] - 6788:4, 6884:23

**presentation** [16] - 6777:18, 6777:19, 6777:24, 6804:21, 6805:14, 6806:19, 6823:17, 6828:19, 6864:10, 6865:10, 6865:23, 6876:7, 6876:15, 6917:16, 6917:17, 6917:25

**presentations** [1] - 6889:10

**presenting** [1] - 6821:11

**preserved** [1] - 6903:6

**president** [2] - 6845:15, 6918:16

**press** [2] - 6883:11, 6883:15

**pressure** [2] - 6798:14, 6901:14

**pressures** [1] - 6818:3

**presumably** [2] - 6848:21, 6848:25

**presume** [1] - 6910:24

**presumption** [3] - 6932:18, 6932:19, 6932:23

**pretext** [1] - 6902:13

**pretty** [6] - 6780:9, 6851:23, 6876:21, 6912:21, 6927:6, 6946:7

**prevail** [2] - 6816:11, 6817:8

**prevailed** [1] - 6882:13

**prevent** [4] - 6856:11, 6863:1, 6911:15, 6944:23

**previous** [1] - 6829:21

**price** [181] - 6780:11, 6780:14, 6781:5, 6781:14, 6781:25, 6782:1, 6783:18, 6784:2, 6784:5, 6784:7, 6785:23, 6786:1, 6786:11, 6786:12, 6786:14, 6786:15, 6786:16, 6786:18, 6786:24, 6787:3, 6787:5, 6787:12, 6787:14, 6787:16, 6787:20, 6787:21, 6787:22, 6789:1, 6789:17, 6792:23, 6793:13, 6793:14, 6793:15, 6794:2, 6794:20, 6795:2, 6795:5, 6795:7, 6795:21, 6795:22, 6795:24, 6795:25, 6799:25, 6800:6, 6800:9, 6801:16, 6806:7, 6807:15, 6808:9, 6808:10, 6810:9, 6810:24, 6814:2, 6814:3, 6820:8, 6824:18, 6824:20, 6825:20, 6825:21, 6825:22, 6826:1, 6827:20, 6828:2, 6828:10, 6828:15, 6829:4, 6829:6, 6835:23, 6838:7, 6839:13, 6840:15, 6840:17, 6840:18, 6840:20, 6840:21, 6840:23, 6841:3, 6841:5, 6841:8, 6841:10, 6842:1, 6843:18, 6844:17, 6844:22, 6845:3, 6845:4, 6845:13, 6846:3, 6847:11, 6850:4, 6850:13, 6851:10, 6851:20, 6851:22, 6851:23, 6851:24, 6853:5, 6854:23, 6855:1, 6855:3, 6860:1, 6860:2, 6860:5, 6860:7, 6861:21, 6862:23, 6870:6, 6870:18, 6872:10, 6872:13, 6872:14, 6873:7, 6873:9, 6873:12, 6874:8, 6874:9, 6876:2, 6876:11, 6876:12, 6876:13, 6877:10, 6877:24, 6878:6, 6882:12, 6882:14, 6882:19, 6882:21, 6882:24, 6883:1, 6885:22, 6894:22, 6895:9, 6895:10, 6895:11, 6896:5, 6896:7, 6896:14, 6896:20, 6896:24, 6897:4, 6897:5, 6899:24, 6900:5, 6901:18, 6916:17, 6917:1, 6924:12, 6924:13, 6925:13, 6925:15, 6925:16, 6925:17, 6925:19, 6926:10, 6934:6, 6934:7, 6937:4, 6938:11, 6939:23, 6940:11, 6951:7, 6951:19, 6951:21, 6952:2, 6952:5, 6952:8, 6952:12, 6952:13, 6952:17, 6952:23, 6953:8, 6958:10, 6961:3, 6962:13, 6963:10, 6963:11

**price-related** [2] - 6924:12, 6924:13

**priced** [6] - 6786:8, 6788:19, 6791:23, 6793:7, 6814:11, 6960:10

**prices** [92] - 6780:18, 6781:2, 6781:13, 6784:7, 6785:9, 6785:13, 6785:14,

6785:17, 6786:9, 6787:9, 6787:10, 6787:12, 6787:25, 6789:3, 6789:4, 6789:22, 6793:16, 6795:11, 6800:7, 6800:8, 6800:9, 6801:9, 6803:3, 6807:2, 6812:1, 6812:8, 6812:17, 6812:19, 6816:16, 6816:17, 6816:24, 6817:3, 6817:19, 6817:20, 6820:5, 6824:16, 6828:5, 6828:12, 6828:13, 6828:14, 6829:14, 6835:12, 6839:11, 6839:15, 6841:19, 6842:5, 6844:6, 6850:25, 6851:5, 6851:10, 6851:18, 6853:14, 6853:20, 6854:24, 6859:23, 6860:25, 6863:15, 6876:16, 6884:22, 6894:20, 6894:24, 6895:9, 6896:2, 6896:4, 6896:19, 6896:22, 6896:23, 6897:8, 6897:20, 6897:24, 6900:20, 6925:19, 6926:22, 6951:9, 6951:20, 6952:14, 6952:15, 6952:17, 6953:11, 6953:15, 6953:22, 6954:1, 6958:1, 6958:16, 6959:3, 6959:16, 6959:18, 6959:19, 6962:7
**pricing** [12] - 6780:13, 6781:22, 6788:4, 6788:5, 6858:17, 6862:9, 6873:11, 6873:18, 6877:3, 6900:18, 6934:4, 6934:25
**Priebe** [2] - 6780:8, 6781:23, 6792:10
**primarily** [2] - 6783:16, 6854:19
**primary** [1] - 6846:11
**principal** [3] - 6867:4, 6867:13, 6869:3
**principle** [16] - 6779:13, 6783:25, 6785:19, 6794:6, 6810:22, 6810:24, 6882:21, 6899:16, 6899:17, 6926:6, 6926:7, 6950:18, 6953:10, 6953:12, 6965:20
**principles** [2] - 6783:14, 6824:10, 6951:11
**prisoners** [2] - 6880:18, 6938:8
**private** [1] - 6896:8
**privilege** [2] - 6852:10, 6852:13
**pro** [10] - 6795:10, 6798:10, 6811:11, 6811:16, 6811:18, 6815:2, 6859:4, 6860:4, 6868:18, 6883:13
**pro-competitive** [10] - 6795:10, 6798:10, 6811:11, 6811:16, 6811:18, 6815:2, 6859:4, 6860:4, 6868:18, 6883:13
**probable** [2] - 6953:20, 6953:22
**problem** [9] - 6790:19, 6845:11, 6878:10, 6878:11, 6900:23, 6913:8, 6928:2, 6929:10, 6933:12
**problems** [3] - 6798:16, 6827:7, 6933:16
**procedural** [1] - 6948:23
**procedurally** [2] - 6948:5, 6948:22
**proceed** [4] - 6778:7, 6823:7, 6865:16, 6898:25
**proceeding** [4] - 6920:7, 6948:1, 6966:5, 6966:11
**proceedings** [3] - 6888:7, 6948:7, 6948:12
**Proceedings** [1] - 6772:24

**process** [21] - 6779:22, 6783:9, 6783:10, 6783:24, 6784:13, 6787:8, 6788:23, 6789:2, 6789:19, 6789:24, 6800:5, 6801:3, 6801:8, 6859:14, 6866:1, 6886:12, 6907:15, 6945:12, 6951:8, 6951:17, 6952:10
**produced** [2] - 6772:25, 6811:23
**produces** [1] - 6852:8
**product** [30] - 6806:20, 6819:11, 6819:15, 6824:18, 6867:8, 6870:1, 6873:10, 6873:19, 6873:21, 6873:22, 6875:24, 6880:8, 6880:11, 6880:21, 6897:5, 6897:12, 6898:17, 6901:19, 6907:3, 6916:22, 6921:9, 6935:14, 6935:17, 6944:7, 6944:8, 6944:11, 6945:1, 6945:2
**products** [7] - 6863:15, 6863:18, 6881:8, 6923:23, 6939:14, 6953:11, 6962:15
**professional** [2] - 6953:20, 6953:21
**Professional** [1] - 6858:24
**Professor** [49] - 6787:16, 6806:19, 6806:21, 6816:22, 6824:25, 6825:9, 6826:4, 6827:21, 6827:24, 6828:5, 6841:23, 6842:3, 6842:17, 6843:19, 6843:6, 6843:19, 6843:25, 6844:4, 6844:12, 6851:1, 6851:4, 6851:16, 6852:2, 6852:15, 6853:14, 6853:18, 6878:23, 6895:4, 6913:2, 6914:2, 6915:25, 6924:6, 6924:9, 6924:10, 6924:17, 6925:21, 6926:9, 6926:16, 6930:8, 6952:23, 6952:24, 6953:5, 6962:9, 6962:12, 6963:15, 6963:19, 6964:13, 6964:15, 6964:21
**professor** [6] - 6803:13, 6806:24, 6825:4, 6844:8, 6853:13, 6853:15
**profile** [1] - 6921:6
**profit** [4] - 6795:4, 6818:7, 6819:19, 6881:10
**profitability** [2] - 6821:6, 6822:3
**profitable** [6] - 6842:6, 6844:17, 6844:20, 6881:11, 6934:22, 6965:17
**profits** [11] - 6819:2, 6819:8, 6819:15, 6819:17, 6843:13, 6934:12, 6934:13, 6934:16, 6934:19, 6958:19
**program** [22] - 6839:20, 6839:23, 6840:5, 6841:14, 6841:17, 6841:23, 6841:25, 6842:9, 6842:16, 6842:17, 6843:5, 6843:13, 6843:17, 6844:1, 6845:9, 6845:18, 6846:2, 6850:19, 6904:11, 6938:5
**programs** [1] - 6950:15
**prohibited** [1] - 6857:24
**prohibiting** [1] - 6865:22
**Project** [1] - 6793:5
**project** [1] - 6886:8
**projections** [1] - 6840:25
**prominent** [1] - 6956:22
**promises** [1] - 6848:25
**promising** [1] - 6848:23
**promote** [2] - 6954:16, 6954:17

**promoting** [1] - 6788:6
**promotion** [1] - 6795:8
**promotions** [1] - 6857:1
**prompting** [2] - 6813:22, 6857:15
**proof** [5] - 6801:18, 6838:18, 6854:7, 6897:15, 6951:20
**propensity** [1] - 6905:14
**proper** [6] - 6784:2, 6784:5, 6868:7, 6870:13, 6934:15, 6951:18
**property** [1] - 6942:24
**proportion** [1] - 6851:8
**proposal** [1] - 6933:22
**proposals** [1] - 6966:6
**propose** [2] - 6938:18, 6966:12
**proposed** [4] - 6831:11, 6872:12, 6926:12, 6944:23
**proposition** [23] - 6801:11, 6802:4, 6803:6, 6803:7, 6816:7, 6819:3, 6827:25, 6829:21, 6830:8, 6830:10, 6896:3, 6899:7, 6899:10, 6926:21, 6926:24, 6927:11, 6932:21, 6945:1, 6951:16, 6959:11, 6963:6, 6964:11, 6965:7
**propositions** [1] - 6782:6
**prosper** [1] - 6902:16
**protect** [16] - 6783:16, 6808:14, 6822:19, 6850:10, 6859:13, 6859:14, 6867:9, 6867:11, 6867:12, 6907:10, 6956:8, 6956:15, 6956:16, 6960:22
**protected** [2] - 6783:19, 6819:7
**protecting** [3] - 6843:12, 6946:9, 6946:10
**protection** [2] - 6808:2, 6820:15
**protectionism** [4] - 6811:7, 6859:11, 6907:24, 6907:25
**prove** [47] - 6782:10, 6802:2, 6811:23, 6811:24, 6812:4, 6815:21, 6815:25, 6817:2, 6838:18, 6853:24, 6867:13, 6869:6, 6869:9, 6871:15, 6871:17, 6871:21, 6872:4, 6872:6, 6872:8, 6872:12, 6873:6, 6876:23, 6878:5, 6882:19, 6882:20, 6882:24, 6882:25, 6894:14, 6896:5, 6896:9, 6896:12, 6896:13, 6896:14, 6896:21, 6897:3, 6899:17, 6910:1, 6910:3, 6912:11, 6912:12, 6912:13, 6912:19, 6912:22, 6934:15, 6940:17
**proved** [16] - 6800:4, 6800:13, 6801:16, 6812:2, 6838:23, 6853:23, 6871:16, 6871:17, 6872:13, 6872:14, 6881:15, 6900:25, 6913:17, 6934:7, 6951:7
**proven** [5] - 6911:11, 6928:12, 6929:15, 6930:2, 6936:24
**proves** [5] - 6811:14, 6870:24, 6897:4, 6897:6
**provide** [6] - 6805:10, 6811:12, 6834:24, 6848:15, 6859:22, 6887:18
**provided** [4] - 6779:5, 6858:17, 6865:7, 6881:18
**provides** [1] - 6859:20
**providing** [3] - 6939:13, 6939:22,

6941:14

**proving** [1] - 6876:24
**provision** [3] - 6849:6, 6858:5, 6885:20
**provisions** [5] - 6868:1, 6869:24, 6869:25, 6907:9, 6919:9
**provocative** [1] - 6906:16
**PTI** [1] - 6840:17
**public** [8] - 6777:1, 6829:9, 6840:8, 6890:4, 6890:9, 6890:10, 6893:24, 6935:7
**publication** [1] - 6923:21
**publicly** [1] - 6909:21
**publix** [1] - 6936:8
**Publix** [1] - 6936:9
**puffery** [1] - 6839:7
**pull** [3] - 6792:6, 6845:6, 6845:8
**pulled** [2] - 6875:23, 6877:14
**pulling** [4] - 6792:8, 6845:23, 6846:1, 6846:2
**pump** [1] - 6793:13
**punished** [1] - 6846:1
**purchase** [5] - 6814:3, 6880:20, 6911:3, 6917:23, 6920:4
**purchases** [1] - 6919:25
**pure** [1] - 6915:11
**purpose** [4] - 6914:11, 6920:1, 6945:9, 6965:2
**purposes** [5] - 6896:6, 6896:7, 6896:23, 6921:21, 6923:22
**pursue** [2] - 6787:25, 6908:17
**pursued** [2] - 6779:21, 6908:16
**pursuing** [1] - 6908:6
**push** [1] - 6811:6
**pushed** [1] - 6937:23
**pushes** [1] - 6807:18
**put** [43] - 6775:21, 6783:23, 6791:13, 6793:1, 6798:14, 6804:1, 6804:4, 6815:24, 6821:20, 6822:18, 6838:16, 6852:6, 6858:1, 6861:6, 6865:6, 6869:13, 6875:22, 6877:10, 6889:3, 6889:11, 6890:3, 6890:15, 6893:7, 6894:22, 6907:21, 6909:14, 6912:25, 6913:20, 6914:4, 6914:18, 6919:4, 6919:7, 6921:25, 6923:18, 6924:14, 6925:9, 6931:16, 6940:16, 6946:5, 6958:17, 6959:13, 6961:10, 6963:10
**puts** [1] - 6915:21
**putting** [11] - 6799:22, 6804:6, 6804:10, 6804:12, 6808:22, 6871:11, 6896:25, 6905:2, 6907:23, 6937:20, 6959:13

**Q**

**qua** [1] - 6929:14
**Quagliata** [2] - 6897:17, 6933:7
**qualify** [1] - 6863:17
**qualitative** [1] - 6924:15
**quality** [8] - 6800:12, 6801:10, 6801:16, 6870:1, 6876:2, 6899:24, 6944:7, 6959:17
**quantify** [1] - 6839:9

**quantitative** [3] - 6924:12, 6924:13, 6924:22
**quarter** [1] - 6888:12
**quarters** [3] - 6893:6, 6910:18, 6920:17
**questioning** [1] - 6905:17
**questions** [6] - 6798:4, 6823:15, 6915:22, 6937:2, 6952:22, 6963:13
**quick** [15] - 6801:4, 6801:6, 6801:13, 6874:1, 6874:5, 6874:16, 6874:17, 6874:22, 6874:25, 6875:4, 6875:7, 6877:2, 6960:3, 6960:5
**quick-look** [2] - 6801:4, 6801:6
**quicker** [1] - 6916:6
**quintessential** [2] - 6875:3, 6875:4
**quite** [7] - 6780:19, 6807:22, 6867:1, 6920:10, 6923:14, 6934:13, 6934:14, 6936:25
**quotation** [1] - 6803:21
**quote** [9] - 6872:10, 6875:5, 6875:22, 6877:1, 6877:15, 6878:3, 6899:20, 6930:24
**quoted** [1] - 6816:22
**quoting** [2] - 6876:2, 6930:22

**R**

**rachet** [1] - 6959:19
**Radio** [1] - 6858:4
**radiological** [1] - 6900:15
**raise** [6] - 6809:11, 6825:21, 6844:6, 6885:22, 6939:11, 6959:16
**raised** [8] - 6786:24, 6824:15, 6837:16, 6837:19, 6839:14, 6843:18, 6887:17, 6908:23
**raises** [3] - 6807:18, 6809:9, 6849:25
**raising** [4] - 6842:5, 6854:24, 6939:10, 6959:18
**ran** [1] - 6843:3
**range** [2] - 6831:13, 6831:17
**rarified** [1] - 6831:15
**rate** [13] - 6801:25, 6818:8, 6851:14, 6868:7, 6895:9, 6897:14, 6897:16, 6926:8, 6933:21, 6936:16, 6937:24, 6939:1, 6940:2
**rates** [52] - 6780:13, 6781:7, 6782:2, 6788:9, 6788:15, 6788:16, 6788:17, 6788:22, 6868:7, 6869:24, 6883:23, 6883:25, 6885:2, 6885:5, 6885:9, 6887:6, 6887:9, 6887:12, 6887:13, 6887:17, 6887:25, 6888:1, 6888:2, 6888:3, 6888:8, 6888:10, 6888:11, 6895:6, 6896:21, 6908:16, 6908:23, 6921:19, 6921:23, 6922:3, 6923:12, 6925:20, 6925:22, 6925:23, 6925:25, 6926:11, 6935:5, 6939:4, 6939:11, 6939:14, 6940:2, 6940:3, 6944:6, 6950:14, 6954:15, 6960:6
**rather** [5] - 6777:15, 6834:24, 6875:25, 6899:17, 6915:18
**rational** [2] - 6937:4, 6959:21
**rationale** [2] - 6868:20, 6925:13
**rays** [1] - 6952:1

**razor** [2] - 6927:19, 6927:20
**RE** [1] - 6772:15
**reach** [4] - 6801:16, 6828:25, 6955:18, 6964:18
**reaching** [1] - 6779:21, 6779:22
**react** [1] - 6799:8
**reaction** [1] - 6962:14
**reactions** [1] - 6962:8
**read** [5] - 6832:20, 6870:3, 6884:24, 6884:25, 6950:7
**reading** [1] - 6822:7
**real** [18] - 6816:9, 6817:23, 6890:18, 6894:7, 6894:10, 6903:7, 6906:20, 6913:8, 6918:11, 6918:19, 6920:12, 6921:3, 6922:5, 6923:4, 6929:5, 6931:14, 6965:4
**real-world** [4] - 6918:11, 6918:19, 6920:12, 6921:3
**realistic** [5] - 6826:12, 6893:11, 6910:24, 6956:19, 6964:23
**realistically** [2] - 6827:8, 6956:16
**realities** [1] - 6784:22
**reality** [6] - 6881:3, 6894:1, 6958:22, 6965:3, 6965:4
**realize** [1] - 6927:18
**really** [36] - 6788:8, 6789:13, 6796:13, 6798:8, 6802:1, 6802:20, 6803:18, 6817:5, 6819:16, 6820:14, 6821:11, 6826:7, 6828:15, 6829:20, 6831:7, 6832:15, 6843:4, 6844:13, 6850:25, 6858:11, 6859:11, 6862:3, 6871:11, 6875:3, 6886:13, 6907:12, 6907:14, 6927:9, 6937:3, 6940:13, 6941:15, 6942:22, 6952:11, 6955:15, 6960:13
**rearview** [1] - 6939:5
**reason** [41] - 6788:23, 6798:24, 6799:10, 6812:13, 6815:4, 6830:11, 6838:10, 6845:16, 6845:22, 6846:11, 6847:10, 6847:12, 6849:6, 6850:3, 6852:20, 6856:23, 6857:8, 6859:7, 6861:17, 6869:4, 6870:9, 6870:15, 6873:2, 6873:25, 6874:4, 6874:15, 6874:23, 6874:25, 6880:10, 6893:3, 6893:12, 6898:5, 6907:1, 6907:19, 6909:10, 6909:19, 6910:12, 6925:12, 6928:2, 6929:24, 6930:16
**Reason** [2] - 6783:9, 6783:22
**reasonable** [8] - 6804:14, 6822:13, 6824:6, 6824:8, 6824:24, 6825:18, 6873:14, 6916:2
**reasonably** [5] - 6804:13, 6824:13, 6879:3, 6879:13, 6915:20
**reasons** [5] - 6777:3, 6893:10, 6935:11, 6937:6, 6947:16
**reassess** [1] - 6790:14
**rebate** [1] - 6814:4
**rebuttal** [5] - 6776:7, 6777:22, 6872:19, 6884:20, 6932:18, 6949:5
**REBUTTAL** [1] - 6968:10
**recapture** [25] - 6796:9, 6839:14, 6839:19, 6840:4, 6840:5, 6842:16,

6842:17, 6844:6, 6844:17, 6846:3, 6850:11, 6850:19, 6851:5, 6851:20, 6853:21, 6854:22, 6855:2, 6937:2, 6937:3, 6937:11, 6937:24, 6938:5, 6938:11, 6938:15, 6940:4
**Recapture** [1] - 6939:12
**Reccoppa** [1] - 6865:9
**recede** [1] - 6945:15
**recedes** [1] - 6935:15
**receive** [2] - 6863:4, 6863:18
**received** [1] - 6891:8
**receiving** [1] - 6921:13
**recently** [3] - 6866:20, 6906:14, 6961:12
**reception** [1] - 6944:20
**recess** [2] - 6864:11, 6949:13
**Recess** [1] - 6822:25
**recession** [4] - 6917:18, 6917:20, 6918:5, 6918:19
**recites** [1] - 6877:2
**recognize** [1] - 6824:4
**recognized** [1] - 6825:2
**recognizes** [2] - 6803:22, 6826:17
**recollection** [1] - 6845:14
**record** [60] - 6776:18, 6776:20, 6789:22, 6791:5, 6791:12, 6791:16, 6793:3, 6794:4, 6794:12, 6794:14, 6798:19, 6798:25, 6812:5, 6813:3, 6816:12, 6816:14, 6817:18, 6821:1, 6829:18, 6830:3, 6839:8, 6842:4, 6846:4, 6847:3, 6847:7, 6847:20, 6849:4, 6867:15, 6870:5, 6870:21, 6887:3, 6888:5, 6888:15, 6888:21, 6891:22, 6892:7, 6892:17, 6893:10, 6895:8, 6896:3, 6898:12, 6904:16, 6908:11, 6910:18, 6911:4, 6912:2, 6921:1, 6921:18, 6922:8, 6925:18, 6929:6, 6934:2, 6938:23, 6939:21, 6942:16, 6956:25, 6957:1, 6957:2
**recorded** [1] - 6772:24
**recorder** [1] - 6909:6
**records** [1] - 6835:5
**recover** [1] - 6812:6
**recruiting** [1] - 6880:22
**red** [5] - 6830:7, 6840:21, 6931:24, 6932:1, 6932:2
**red-herring** [3] - 6931:24, 6932:1, 6932:2
**redacted** [1] - 6829:9
**redactions** [4] - 6777:3, 6840:10, 6840:12
**redeemed** [1] - 6939:8
**redefine** [1] - 6858:19
**redefined** [1] - 6858:13
**redemptions** [1] - 6939:3
**reduce** [5] - 6781:22, 6785:9, 6792:13, 6794:8, 6794:9
**reducing** [3] - 6877:18, 6877:20, 6877:21
**reduction** [1] - 6832:24
**refer** [3] - 6896:14, 6935:1, 6942:16
**reference** [1] - 6922:1

**references** [3] - 6909:7, 6909:9, 6922:2
**referred** [1] - 6791:12, 6868:15, 6901:9
**referring** [1] - 6881:25
**reflect** [2] - 6793:15, 6953:24
**reflected** [1] - 6840:16, 6904:1
**reflecting** [3] - 6784:21, 6805:16, 6812:8
**refrigerator** [2] - 6813:9, 6814:2
**refrigerators** [1] - 6827:11
**refuse** [1] - 6873:19
**regard** [5] - 6779:7, 6779:11, 6779:16, 6839:22, 6846:7
**regarding** [1] - 6833:8
**register** [2] - 6904:6, 6904:10
**regression** [5] - 6924:17, 6924:19, 6924:24, 6962:8, 6962:10
**regular** [1] - 6803:17
**regulated** [2] - 6888:10, 6961:24
**regulation** [1] - 6962:6
**regulators** [1] - 6831:9
**regulatory** [2] - 6961:13, 6962:1
**Rein** [1] - 6909:18, 6909:19
**reinstated** [1] - 6910:25
**RELATED** [1] - 6772:11
**related** [5] - 6834:17, 6852:4, 6924:12, 6924:13, 6961:25
**relates** [2] - 6834:11, 6962:4
**relationship** [12] - 6817:19, 6838:3, 6846:12, 6846:23, 6846:24, 6848:17, 6849:16, 6849:19, 6889:14, 6907:5, 6923:9, 6937:13
**relationships** [2] - 6790:5, 6937:9
**relative** [1] - 6889:18
**relatively** [1] - 6796:12
**relevant** [35] - 6793:1, 6807:6, 6824:19, 6825:1, 6825:3, 6827:23, 6827:24, 6830:8, 6830:15, 6830:19, 6830:24, 6832:7, 6838:9, 6853:21, 6871:15, 6878:10, 6878:18, 6878:20, 6879:7, 6912:14, 6912:19, 6912:22, 6914:5, 6927:6, 6931:1, 6932:4, 6951:12, 6960:25, 6961:5, 6961:6, 6961:14, 6962:25, 6963:8, 6965:22
**relief** [2] - 6788:24, 6906:11
**relies** [1] - 6916:15
**rely** [4] - 6801:7, 6826:6, 6874:11, 6963:17
**relying** [1] - 6800:24
**remain** [2] - 6900:6, 6900:15
**remainder** [1] - 6776:9
**remained** [1] - 6939:4
**remains** [1] - 6905:8
**remarkable** [5] - 6851:13, 6852:8, 6868:25, 6879:4, 6890:23
**remedies** [4] - 6947:8, 6947:20, 6947:22
**remedy** [13] - 6946:19, 6946:25, 6947:3, 6947:9, 6947:11, 6947:15, 6948:8, 6948:11, 6948:12, 6966:3, 6966:4, 6966:8
**remember** [32] - 6782:18, 6783:15, 6784:11, 6790:25, 6792:10, 6793:20,

6795:18, 6796:4, 6798:3, 6807:8, 6820:24, 6824:2, 6825:17, 6826:17, 6827:10, 6836:10, 6837:9, 6837:20, 6838:15, 6855:2, 6857:23, 6893:19, 6898:11, 6902:19, 6905:17, 6909:17, 6917:15, 6935:16, 6935:25, 6942:18, 6950:22, 6955:3
**remembering** [1] - 6848:17
**remembers** [3] - 6785:4, 6821:16, 6828:11
**remind** [1] - 6940:20
**reminded** [1] - 6824:2
**reminds** [1] - 6955:6
**remotely** [1] - 6803:8
**remove** [2] - 6789:20, 6953:13
**removed** [4] - 6820:18, 6950:23, 6953:7, 6958:6
**renew** [3] - 6848:11, 6936:18, 6936:21
**renewal** [1] - 6936:10
**rentals** [1] - 6829:10
**reopening** [1] - 6779:24
**repeat** [1] - 6783:10
**repeated** [2] - 6875:18, 6899:21
**repeatedly** [2] - 6869:11, 6870:19
**repeating** [3] - 6847:15, 6930:15, 6938:12
**replace** [1] - 6916:23
**replaced** [1] - 6791:7
**replacement** [1] - 6792:9
**report** [4] - 6820:20, 6851:16, 6871:25, 6889:7
**Reporter** [1] - 6772:22
**reports** [2] - 6845:22, 6924:18
**reposed** [1] - 6846:24
**representative** [1] - 6779:18
**representatives** [1] - 6894:1
**representing** [1] - 6839:15
**require** [5] - 6833:14, 6861:22, 6871:7, 6917:22, 6945:6
**required** [4] - 6801:18, 6840:11, 6876:5, 6947:9
**requirements** [1] - 6834:3
**requires** [2] - 6845:24, 6861:12
**resale** [2] - 6873:9, 6873:12
**reserve** [2] - 6776:6, 6776:9
**Reserve** [1] - 6919:8
**reserving** [1] - 6939:7
**resides** [1] - 6874:9
**resisted** [2] - 6922:16, 6922:17
**resisting** [1] - 6956:4
**resold** [1] - 6808:17
**resolution** [1] - 6779:5
**resolve** [1] - 6936:13
**resolved** [5] - 6790:2, 6832:20, 6850:1, 6883:17, 6885:22
**Resort** [1] - 6783:1
**resources** [1] - 6957:5
**respect** [33] - 6843:7, 6862:20, 6866:12, 6869:3, 6869:16, 6871:4, 6871:6, 6872:4, 6878:16, 6881:2, 6883:5, 6885:7, 6895:6, 6897:3, 6912:6,

6912:23, 6916:12, 6917:3, 6917:10, 6917:11, 6923:16, 6923:24, 6935:20, 6935:23, 6936:19, 6936:20, 6938:11, 6946:11, 6948:12, 6954:24, 6965:12, 6966:18

**Respectfully** [1] - 6919:2
**respectfully** [3] - 6847:1, 6874:21, 6878:15
**respects** [3] - 6866:10, 6898:21, 6903:15
**respond** [6] - 6787:16, 6795:9, 6799:11, 6800:9, 6819:13, 6923:23
**response** [9] - 6786:16, 6786:22, 6795:12, 6809:11, 6809:19, 6821:1, 6825:19, 6859:3, 6885:1
**responses** [2] - 6783:7, 6795:10
**responsible** [1] - 6884:2
**responsive** [1] - 6844:8
**rest** [4] - 6799:14, 6829:12, 6840:22, 6840:23
**restaurant** [1] - 6855:2
**restaurants** [1] - 6926:4
**rested** [1] - 6822:3
**restored** [1] - 6781:13
**restrain** [1] - 6863:8
**restrains** [1] - 6873:4
**restraint** [6] - 6870:12, 6873:5, 6896:8, 6900:6, 6951:15, 6954:24
**restraints** [10] - 6783:3, 6784:1, 6787:10, 6789:20, 6871:6, 6873:3, 6896:15, 6953:8, 6953:14
**restrict** [1] - 6862:22
**restricted** [1] - 6787:21
**restriction** [14] - 6803:3, 6806:2, 6808:8, 6808:10, 6859:7, 6860:1, 6860:2, 6860:6, 6950:21, 6950:23, 6950:25, 6951:2, 6960:17
**restrictions** [3] - 6856:6, 6861:14, 6863:6
**rests** [1] - 6880:11
**result** [15] - 6780:15, 6780:17, 6784:8, 6787:9, 6789:19, 6789:22, 6789:24, 6798:17, 6799:17, 6825:15, 6840:17, 6852:9, 6906:18, 6906:25, 6945:6
**resulted** [1] - 6951:20
**results** [3] - 6883:13, 6883:16, 6950:11
**resume** [2] - 6822:24, 6864:9
**retail** [1] - 6812:19
**retailer** [2] - 6873:10, 6904:10
**retailers** [1] - 6786:9
**retain** [2] - 6781:20, 6862:6
**retaliating** [1] - 6850:4
**retaliation** [2] - 6845:13, 6846:20
**retire** [1] - 6821:4
**return** [4] - 6818:16, 6926:12, 6935:8, 6935:11
**revealed** [1] - 6962:17
**revenue** [10] - 6816:17, 6816:20, 6851:14, 6852:3, 6852:6, 6852:7, 6852:17, 6852:18, 6855:8
**revenues** [1] - 6828:23

**reverse** [3] - 6817:21, 6844:16, 6940:1
**reversed** [2] - 6909:19, 6910:9
**revolutionary** [1] - 6803:18
**revolvers** [1] - 6914:18
**revolving** [3] - 6914:4, 6914:11, 6915:14
**reward** [15] - 6784:7, 6791:23, 6793:16, 6813:12, 6815:10, 6816:18, 6818:9, 6820:6, 6820:7, 6841:22, 6841:25, 6845:18, 6959:25
**rewarded** [2] - 6791:22, 6794:7
**rewards** [37] - 6810:12, 6812:10, 6812:11, 6812:16, 6813:17, 6814:19, 6832:16, 6841:14, 6841:16, 6841:17, 6842:6, 6842:9, 6843:17, 6844:1, 6844:7, 6845:9, 6846:1, 6860:25, 6861:9, 6863:19, 6880:20, 6888:21, 6888:13, 6889:15, 6898:17, 6939:3, 6939:8, 6941:13, 6945:13, 6945:14, 6945:15, 6953:17, 6959:1, 6960:5
**rid** [5] - 6862:2, 6862:10, 6885:9, 6951:1, 6959:24
**riding** [5] - 6911:13, 6911:14, 6911:23, 6912:1, 6912:3
**rise** [2] - 6774:3, 6823:3
**risk** [3] - 6894:7, 6894:10
**rivals** [7] - 6810:17, 6819:2, 6858:16, 6859:2, 6860:13, 6861:11, 6861:25
**road** [3] - 6876:18, 6893:15, 6940:17
**roadmap** [6] - 6838:19, 6838:20, 6838:22, 6839:12, 6839:18, 6853:22
**Robinson** [2] - 6784:15, 6856:24
**rocketing** [1] - 6954:14
**rocky** [1] - 6798:16
**role** [2] - 6836:12, 6867:7
**roll** [1] - 6793:13
**rolled** [1] - 6841:9
**roof** [1] - 6939:4
**room** [2] - 6789:4, 6806:18
**roulette** [1] - 6907:23
**round** [1] - 6774:10
**rounding** [1] - 6910:9
**route** [1] - 6930:1
**rudimentary** [1] - 6875:11
**Rule** [2] - 6783:9, 6783:22
**rule** [11] - 6793:24, 6810:25, 6811:17, 6814:15, 6870:9, 6870:15, 6873:25, 6874:4, 6874:15, 6874:23, 6874:24
**ruled** [1] - 6821:18
**Rules** [1] - 6901:25
**RULES** [1] - 6772:15
**rules** [64] - 6781:19, 6782:3, 6783:13, 6783:18, 6784:5, 6784:9, 6785:6, 6785:10, 6785:12, 6786:20, 6789:22, 6789:25, 6790:19, 6791:24, 6792:18, 6792:22, 6793:10, 6793:18, 6794:5, 6794:18, 6795:13, 6795:23, 6800:18, 6800:20, 6811:25, 6812:2, 6812:5, 6815:5, 6815:14, 6815:23, 6816:15, 6821:10, 6822:18, 6856:11, 6857:25, 6859:4, 6859:10, 6861:3, 6862:3,

6862:6, 6862:10, 6862:12, 6862:22, 6862:25, 6864:3, 6867:5, 6877:8, 6877:17, 6887:11, 6887:14, 6887:20, 6887:23, 6888:7, 6903:4, 6903:6, 6903:7, 6911:15, 6928:17, 6950:11, 6952:16, 6957:10, 6958:6, 6959:17
**ruling** [1] - 6801:11
**run** [7] - 6791:2, 6842:20, 6851:23, 6893:15, 6935:20, 6935:21, 6965:16
**run-up** [1] - 6851:23
**running** [2] - 6836:9, 6890:7
**runs** [1] - 6902:20
**rushed** [2] - 6842:25, 6843:3
**RYAN** [2] - 6773:7, 6774:16
**Ryan** [1] - 6774:16

## S

**Safeway** [5] - 6904:21, 6904:22, 6935:25, 6936:2, 6936:5
**sake** [1] - 6946:18
**salaries** [2] - 6876:8, 6876:16
**sale** [11] - 6781:4, 6784:10, 6786:10, 6858:16, 6858:17, 6889:14, 6904:25, 6906:23, 6906:25, 6915:8, 6961:4
**sales** [6] - 6780:15, 6781:12, 6781:13, 6784:8, 6827:14, 6911:21
**salesmanship** [1] - 6839:7
**San** [3] - 6831:16, 6933:14, 6965:17
**Sandwiches** [1] - 6928:11
**sandwiching** [1] - 6919:25
**sanity** [2] - 6930:6, 6930:11
**sat** [2] - 6890:9, 6937:7
**satisfied** [1] - 6945:19
**save** [1] - 6948:1
**saving** [2] - 6872:18, 6889:1
**savings** [2] - 6883:24, 6883:25
**saw** [14] - 6788:15, 6809:4, 6843:6, 6884:7, 6889:5, 6889:7, 6906:7, 6906:10, 6945:16, 6945:17, 6952:24, 6952:25, 6957:4
**scale** [1] - 6894:9
**scared** [1] - 6902:7
**scenario** [1] - 6888:18
**scenarios** [1] - 6894:12
**schedules** [2] - 6925:20
**SCHILLER** [1] - 6773:15
**School** [3] - 6886:7, 6886:9, 6886:21
**Schulman** [1] - 6866:21
**screen** [3] - 6895:2, 6921:25, 6923:18
**screwed** [1] - 6936:3
**se** [3] - 6874:4, 6874:7, 6875:15
**searching** [1] - 6874:14
**Sears** [3] - 6813:9, 6827:10, 6909:14
**seated** [2] - 6774:4, 6823:4, 6949:15
**SEC** [1] - 6934:18
**second** [15] - 6783:21, 6829:16, 6859:24, 6914:1, 6921:9, 6921:11, 6926:9, 6934:10, 6951:6, 6951:17, 6955:12, 6956:1, 6956:9, 6959:5, 6959:9

**Second** [15] - 6869:10, 6870:4, 6870:10, 6870:15, 6871:19, 6873:12, 6875:19, 6875:21, 6882:22, 6899:20, 6900:11, 6912:15, 6932:16, 6932:20, 6941:11
**secret** [1] - 6912:25
**section** [2] - 6866:1, 6966:15
**Section** [9] - 6783:9, 6811:12, 6862:13, 6864:1, 6868:18, 6870:3, 6870:8, 6870:9, 6947:2
**sections** [1] - 6876:19
**sector** [2] - 6831:3, 6855:11
**sectors** [1] - 6831:6
**security** [1] - 6919:10
**sedatives** [1] - 6891:10
**see** [53] - 6786:14, 6787:1, 6787:4, 6787:6, 6789:7, 6793:1, 6794:15, 6797:14, 6805:2, 6805:4, 6805:7, 6805:14, 6806:15, 6807:12, 6817:9, 6820:3, 6825:23, 6825:25, 6826:2, 6828:25, 6829:13, 6833:4, 6840:5, 6840:18, 6841:4, 6851:17, 6851:19, 6853:9, 6853:10, 6853:17, 6853:19, 6861:1, 6862:14, 6865:22, 6866:11, 6877:16, 6883:16, 6883:20, 6884:15, 6884:16, 6905:12, 6916:7, 6918:21, 6923:19, 6924:7, 6924:22, 6937:22, 6941:16, 6941:17, 6960:1, 6962:14, 6965:5
**seeing** [1] - 6869:15
**seem** [1] - 6869:18
**sees** [1] - 6786:15
**selection** [1] - 6863:5
**self** [2] - 6790:12, 6933:7
**self-correction** [1] - 6790:12
**self-inflicted** [1] - 6933:7
**sell** [8] - 6807:13, 6827:11, 6831:25, 6849:10, 6873:10, 6873:19, 6873:20, 6918:17
**seller** [1] - 6945:1
**sellers** [1] - 6831:22
**selling** [4] - 6805:13, 6805:25, 6806:1, 6885:11
**sells** [1] - 6807:25
**senators** [1] - 6908:2
**send** [1] - 6837:14
**senior** [2] - 6779:18, 6866:21
**sense** [15] - 6789:10, 6790:18, 6849:23, 6852:16, 6874:6, 6915:8, 6926:7, 6927:4, 6927:10, 6928:9, 6928:19, 6929:7, 6942:14, 6947:18, 6964:20
**sensitive** [1] - 6905:8
**sent** [2] - 6936:11, 6948:11
**sentence** [2] - 6866:7, 6877:25
**sentences** [2] - 6912:18, 6946:20
**separate** [19] - 6791:3, 6803:23, 6805:2, 6807:9, 6837:15, 6858:4, 6871:22, 6876:20, 6893:24, 6897:17, 6899:4, 6921:12, 6925:24, 6930:13, 6930:14, 6948:7, 6948:11, 6964:12, 6966:5
**series** [3] - 6842:8, 6860:14, 6913:22
**serious** [1] - 6909:8

**seriously** [1] - 6858:9
**Servers** [1] - 6932:19
**service** [3] - 6878:12, 6899:23, 6960:5
**services** [18] - 6798:7, 6805:13, 6805:25, 6806:2, 6806:4, 6806:5, 6806:8, 6807:9, 6808:16, 6808:18, 6827:22, 6863:18, 6877:23, 6878:20, 6900:15, 6951:21, 6958:8, 6963:9
**Services** [2] - 6829:3, 6829:12
**SERVICES** [1] - 6772:11
**serving** [1] - 6830:19
**SESSION** [1] - 6865:1
**session** [1] - 6793:25
**set** [12] - 6777:5, 6792:16, 6796:6, 6797:24, 6806:5, 6820:5, 6834:9, 6840:20, 6840:25, 6848:8, 6908:1, 6928:17
**Seth** [1] - 6774:13
**SETH** [1] - 6773:6
**setting** [9] - 6781:14, 6784:2, 6784:5, 6808:9, 6808:10, 6848:14, 6872:10, 6951:19, 6952:2
**settleable** [1] - 6779:13
**settled** [1] - 6779:13
**settlement** [5] - 6779:20, 6807:11, 6883:12, 6883:21, 6942:8
**settlements** [1] - 6891:18
**settling** [1] - 6790:13
**seven** [4] - 6899:19, 6903:9, 6910:21, 6936:8
**seventeen** [1] - 6864:4
**seventy** [2] - 6835:5, 6898:2
**several** [6] - 6852:10, 6862:20, 6875:22, 6877:7, 6886:20, 6922:15
**Several** [1] - 6899:2
**shape** [1] - 6810:21
**share** [39] - 6791:13, 6796:12, 6797:2, 6798:23, 6799:2, 6799:5, 6820:2, 6853:24, 6854:3, 6854:5, 6854:6, 6867:20, 6867:21, 6868:9, 6892:12, 6892:18, 6910:19, 6913:1, 6913:4, 6918:14, 6918:15, 6918:18, 6923:22, 6925:11, 6930:17, 6930:18, 6931:16, 6931:20, 6932:6, 6932:17, 6934:5, 6941:16, 6955:2, 6956:20, 6958:2
**shareholder** [2] - 6818:2, 6818:17
**shareholders** [1] - 6893:24
**shares** [2] - 6795:7, 6907:20, 6933:1
**shattered** [1] - 6821:20
**shaving** [2] - 6927:19, 6927:20
**sheet** [1] - 6865:13
**Sherman** [7] - 6808:2, 6810:4, 6864:2, 6868:18, 6871:5, 6947:2, 6966:16
**shift** [3] - 6781:3, 6797:2, 6824:19
**shifted** [1] - 6795:8
**Shoe** [1] - 6824:3
**shop** [1] - 6942:17
**shopping** [1] - 6919:24
**short** [6] - 6779:6, 6821:8, 6822:20, 6842:20, 6947:1, 6947:2
**shortcut** [1] - 6930:1

**show** [9] - 6872:9, 6873:1, 6882:10, 6900:19, 6901:8, 6905:7, 6922:5, 6927:1, 6936:1
**showed** [13] - 6820:21, 6835:21, 6900:5, 6903:21, 6907:12, 6919:21, 6919:24, 6920:3, 6920:16, 6921:5, 6921:11, 6923:6, 6927:25
**showing** [8] - 6837:6, 6878:23, 6882:13, 6900:17, 6918:3, 6936:23, 6936:25
**shown** [5] - 6801:2, 6862:22, 6900:21, 6900:23, 6961:1
**shows** [25] - 6780:10, 6787:2, 6791:18, 6793:4, 6795:17, 6804:22, 6808:15, 6811:24, 6813:3, 6816:14, 6817:23, 6839:8, 6853:20, 6855:7, 6905:25, 6906:14, 6911:16, 6921:1, 6921:18, 6922:8, 6931:1, 6938:23, 6938:25, 6939:21, 6945:25
**shred** [1] - 6885:24
**shrink** [1] - 6918:5
**shrinking** [2] - 6871:12, 6912:10
**shut** [1] - 6795:13
**side** [48] - 6796:1, 6801:25, 6802:16, 6803:5, 6803:9, 6803:10, 6804:1, 6808:25, 6812:3, 6814:18, 6815:3, 6817:6, 6834:12, 6838:10, 6852:4, 6863:9, 6869:21, 6871:21, 6871:22, 6879:20, 6881:5, 6881:18, 6881:23, 6882:4, 6882:8, 6882:10, 6887:15, 6887:19, 6884:9, 6894:9, 6897:25, 6898:20, 6902:20, 6917:10, 6917:11, 6918:23, 6919:5, 6919:7, 6921:2, 6922:5, 6923:11, 6923:14, 6923:15, 6932:11, 6951:1, 6951:2, 6963:1
**sided** [21] - 6801:24, 6803:9, 6803:11, 6803:16, 6803:22, 6804:7, 6807:24, 6816:9, 6817:12, 6861:1, 6869:13, 6869:15, 6869:18, 6871:24, 6872:1, 6872:3, 6878:12, 6882:4, 6885:11, 6887:15, 6895:10
**sidedly** [1] - 6844:5
**sidedness** [4] - 6802:20, 6807:20, 6820:13, 6823:22
**sides** [9] - 6779:7, 6779:23, 6802:3, 6802:4, 6817:6, 6888:14, 6897:25, 6919:4, 6966:7
**sign** [7] - 6836:13, 6836:18, 6858:1, 6858:22, 6890:17, 6898:8, 6933:23
**signage** [1] - 6904:3
**significant** [6] - 6782:18, 6916:17, 6917:1, 6917:19, 6918:14, 6961:14
**significantly** [1] - 6964:24
**signing** [3] - 6933:25, 6936:5, 6963:1
**signs** [5] - 6785:4, 6795:4, 6799:23, 6857:23, 6937:20
**Silverman** [3] - 6902:18, 6933:12, 6935:3
**similar** [3] - 6781:23, 6924:1, 6951:3
**similarly** [1] - 6820:9
**simple** [4] - 6786:8, 6817:19, 6858:16, 6889:20

**simple-priced** [1] - 6786:8

**simpler** [2] - 6861:12, 6887:1

**simply** [10] - 6871:4, 6871:8, 6878:7, 6887:2, 6888:15, 6922:6, 6929:10, 6933:17, 6934:1, 6941:21

**Sinclair** [2] - 6793:11, 6793:12

**single** [13] - 6788:21, 6805:5, 6833:7, 6870:5, 6870:9, 6870:11, 6871:23, 6893:21, 6910:20, 6913:3, 6942:6, 6944:19, 6952:14

**sit** [1] - 6945:4

**site** [1] - 6793:22

**sites** [1] - 6875:17

**sitting** [4] - 6908:25, 6928:24, 6933:19, 6934:1

**situated** [1] - 6820:9

**situation** [4] - 6777:14, 6788:7, 6831:12, 6846:7

**situations** [2] - 6894:13, 6922:2

**six** [13] - 6778:16, 6778:18, 6778:24, 6797:19, 6854:3, 6854:4, 6854:6, 6881:22, 6891:2, 6923:15, 6941:1, 6952:4, 6958:3

**six-week** [3] - 6778:16, 6778:24, 6952:4

**sixty** [1] - 6839:15

**sixty-five** [1] - 6839:15

**size** [4] - 6884:13, 6910:20, 6919:25, 6943:3

**Ski** [1] - 6783:1

**skip** [2] - 6827:2, 6854:9

**Sky** [5] - 6843:9, 6843:10, 6843:13, 6843:18, 6843:20

**skyrocketing** [1] - 6939:4

**slapped** [1] - 6888:11

**sleepless** [1] - 6909:20

**sleeves** [1] - 6891:18

**slide** [53] - 6787:1, 6787:2, 6787:6, 6793:2, 6794:21, 6800:3, 6804:20, 6806:15, 6806:16, 6806:19, 6806:24, 6823:20, 6828:17, 6829:9, 6837:12, 6838:15, 6838:16, 6840:2, 6851:3, 6851:15, 6851:16, 6854:12, 6855:6, 6856:14, 6856:15, 6865:5, 6865:10, 6875:5, 6875:19, 6877:10, 6881:22, 6895:1, 6899:19, 6900:11, 6901:10, 6903:24, 6905:9, 6905:18, 6906:13, 6906:22, 6912:15, 6914:1, 6918:1, 6918:3, 6919:15, 6923:19, 6924:1, 6930:20, 6931:3, 6931:7, 6931:12

**slides** [10] - 6776:16, 6776:25, 6777:1, 6804:17, 6854:10, 6865:20, 6913:20, 6919:21, 6921:24, 6966:18

**slightly** [1] - 6964:19

**slope** [2] - 6894:23, 6895:12

**slopes** [1] - 6783:2

**slowed** [1] - 6940:2

**slowly** [1] - 6799:1

**small** [13] - 6791:14, 6825:20, 6836:8, 6839:16, 6840:9, 6884:4, 6891:24, 6941:22, 6942:1, 6942:15, 6943:2, 6962:7, 6962:14

**smaller** [3] - 6884:12, 6933:5, 6933:6

**smallest** [1] - 6903:11

**smarter** [2] - 6885:17, 6918:6

**snack** [1] - 6927:23

**snowballiIng** [1] - 6905:6

**SNYDER** [1] - 6773:5

**soaring** [1] - 6923:13

**Society** [1] - 6858:24

**society** [1] - 6880:7

**softer** [1] - 6822:17

**software** [1] - 6816:9

**sold** [5] - 6806:4, 6806:5, 6808:16, 6808:18, 6873:22

**solely** [1] - 6882:4

**solicit** [1] - 6834:23

**Solitude** [1] - 6782:25

**solution** [3] - 6833:1, 6948:23, 6959:24

**solve** [3] - 6827:6, 6833:4, 6929:10

**someone** [4] - 6791:25, 6960:22, 6963:2, 6965:12

**sometime** [1] - 6965:13

**sometimes** [5] - 6775:21, 6805:22, 6813:5, 6964:14

**somewhat** [1] - 6958:11

**soon** [4] - 6884:4, 6884:5, 6884:10, 6884:11

**sophisticated** [1] - 6938:19

**sorry** [4] - 6808:11, 6833:19, 6840:8, 6910:25

**sort** [8] - 6782:9, 6790:10, 6797:22, 6814:22, 6910:3, 6946:19, 6947:3, 6947:13

**sorts** [1] - 6933:22

**Sotomayor** [1] - 6876:4

**Sotomayor's** [1] - 6876:14

**sought** [1] - 6867:13

**source** [1] - 6905:1

**Southwest** [3] - 6780:8, 6781:23, 6792:11

**space** [11] - 6792:14, 6832:1, 6832:3, 6832:9, 6832:12, 6836:16, 6846:7, 6846:9, 6848:6, 6848:7, 6848:12

**speaking** [3] - 6776:4, 6918:2, 6937:14

**special** [6] - 6810:8, 6810:19, 6837:13, 6854:24, 6858:7, 6965:5

**specific** [2] - 6828:22, 6922:2

**specifically** [4] - 6790:23, 6827:18, 6842:7, 6901:9

**specifics** [1] - 6842:14

**speculation** [5] - 6868:24, 6868:25, 6870:21, 6907:17, 6929:5

**speech** [5] - 6798:24, 6798:25, 6893:22, 6901:23, 6902:4

**spend** [36] - 6783:1, 6797:23, 6799:12, 6800:19, 6826:18, 6854:16, 6866:14, 6867:21, 6868:9, 6868:10, 6893:1, 6901:1, 6901:6, 6901:7, 6904:19, 6908:14, 6909:12, 6909:18, 6910:5, 6910:19, 6910:23, 6920:14, 6920:15, 6920:24, 6921:6, 6922:6, 6923:13, 6925:23, 6927:20, 6940:15, 6941:16,

6957:7, 6963:24, 6965:12

**Spend** [1] - 6904:10

**spending** [3] - 6799:21, 6851:9, 6904:22

**spent** [9] - 6835:5, 6864:5, 6869:21, 6880:16, 6902:15, 6919:17, 6929:12, 6938:12, 6947:7

**spill** [4] - 6965:11, 6965:14, 6965:16, 6965:18

**spill-over** [4] - 6965:11, 6965:14, 6965:16, 6965:18

**spilling** [1] - 6903:23

**spilling-over** [1] - 6903:23

**spillover** [9] - 6904:23, 6905:3, 6905:8, 6905:11, 6906:17, 6927:9, 6928:19, 6928:21, 6929:5

**spin** [1] - 6957:16

**spinning** [1] - 6832:21

**spins** [1] - 6833:3

**spiraling** [1] - 6905:6

**spite** [1] - 6839:21

**spread** [1] - 6818:1

**spun** [1] - 6796:7

**square** [1] - 6954:16

**squelched** [4] - 6801:19, 6861:2, 6861:3, 6861:4

**SSNIP** [7] - 6924:6, 6924:11, 6924:14, 6924:16, 6926:17, 6927:1

**staff** [2] - 6778:14, 6967:3

**stand** [11] - 6810:15, 6867:4, 6880:6, 6884:20, 6889:6, 6903:14, 6909:14, 6910:25, 6914:2, 6942:11, 6945:24

**standalone** [1] - 6889:18

**standard** [32] - 6800:23, 6801:21, 6807:22, 6811:12, 6811:24, 6824:6, 6824:23, 6869:11, 6870:13, 6870:14, 6871:1, 6871:3, 6872:25, 6873:8, 6873:16, 6874:1, 6874:2, 6874:22, 6874:25, 6875:8, 6875:17, 6875:18, 6876:5, 6877:2, 6878:2, 6914:7, 6916:20, 6934:23, 6945:20, 6945:21, 6952:21, 6965:1

**standards** [2] - 6869:8, 6874:3

**standing** [6] - 6890:4, 6890:8, 6904:6, 6904:9, 6944:17, 6959:24

**standpoint** [1] - 6955:25

**stands** [4] - 6803:6, 6803:7, 6899:7, 6951:11

**star** [1] - 6901:24

**start** [6] - 6778:13, 6825:11, 6913:19, 6916:13, 6918:9

**starting** [1] - 6919:2

**starts** [1] - 6906:2

**Starwood** [1] - 6915:2

**STATE** [7] - 6772:4, 6772:4, 6772:5, 6772:5, 6772:6, 6772:6, 6772:7

**State** [2] - 6773:9, 6904:19

**state** [1] - 6774:6

**statement** [12] - 6821:25, 6847:15, 6876:20, 6877:14, 6879:4, 6882:5, 6882:6, 6882:17, 6883:10, 6890:14,

6890:23, 6924:1

**statements** [4] - 6821:20, 6821:22, 6860:14, 6875:24

**states** [2] - 6899:21, 6966:24

**STATES** [2] - 6772:1, 6772:3

**States** [27] - 6772:20, 6774:8, 6774:11, 6774:13, 6774:14, 6774:15, 6774:16, 6774:19, 6774:20, 6774:24, 6782:19, 6799:21, 6821:18, 6860:15, 6862:19, 6863:13, 6863:23, 6864:5, 6867:6, 6868:16, 6872:20, 6880:8, 6883:19, 6888:17, 6889:23, 6892:17

**stay** [4] - 6913:7, 6935:7, 6936:10, 6944:21

**staying** [1] - 6851:11

**steer** [21] - 6781:10, 6781:24, 6784:13, 6784:18, 6784:19, 6784:25, 6787:24, 6788:1, 6794:8, 6814:10, 6815:6, 6836:14, 6836:22, 6837:13, 6856:21, 6862:23, 6885:21, 6891:15, 6891:16, 6891:19, 6892:1

**steered** [2] - 6792:20, 6911:22

**steering** [65] - 6781:9, 6781:17, 6781:19, 6782:2, 6782:4, 6783:13, 6783:18, 6784:9, 6784:10, 6784:11, 6785:3, 6785:5, 6785:8, 6786:10, 6786:11, 6786:20, 6790:19, 6791:24, 6792:18, 6792:22, 6793:10, 6793:18, 6793:24, 6795:13, 6811:25, 6812:2, 6812:5, 6813:5, 6813:10, 6815:5, 6815:9, 6815:14, 6815:21, 6815:23, 6816:14, 6820:18, 6821:10, 6836:12, 6837:9, 6837:17, 6837:22, 6856:17, 6856:20, 6856:22, 6857:25, 6858:10, 6861:3, 6862:3, 6862:5, 6862:10, 6862:12, 6862:22, 6864:3, 6884:7, 6884:11, 6885:20, 6891:20, 6892:4, 6896:18, 6910:16, 6912:1, 6912:3, 6945:13, 6952:16, 6957:10

**STEERING** [1] - 6772:15

**steers** [3] - 6784:15, 6857:10, 6857:12

**stenography** [1] - 6772:24

**step** [6] - 6783:8, 6783:11, 6912:19, 6948:16, 6948:25

**step-by-step** [1] - 6783:11

**stepping** [1] - 6951:23

**Stern** [1] - 6886:21

**stick** [3] - 6817:13, 6825:22, 6929:3

**sticking** [1] - 6892:21

**still** [10] - 6839:23, 6841:9, 6861:3, 6870:8, 6874:8, 6880:7, 6893:18, 6905:11, 6935:5, 6962:18

**stock** [3] - 6818:6, 6890:4, 6890:10

**stood** [2] - 6878:21, 6890:9

**stop** [18] - 6795:14, 6795:23, 6806:3, 6826:6, 6880:22, 6880:24, 6881:13, 6893:2, 6898:7, 6899:13, 6906:13, 6927:19, 6928:10, 6936:12, 6937:5, 6941:14, 6945:12

**stopped** [4] - 6800:10, 6826:10, 6937:6, 6940:4

**store** [7] - 6881:8, 6904:3, 6904:22, 6920:15, 6920:19, 6942:24, 6944:19

**stores** [4] - 6791:3, 6904:22, 6919:25, 6920:12

**stories** [1] - 6940:9

**story** [2] - 6909:25, 6940:8

**stoves** [1] - 6827:11

**straightforward** [1] - 6876:21

**strains** [1] - 6933:17

**strategy** [21] - 6780:20, 6780:23, 6781:2, 6786:11, 6786:12, 6786:19, 6787:25, 6789:6, 6795:1, 6797:4, 6802:3, 6802:4, 6889:6, 6889:20, 6906:18, 6908:6, 6908:16, 6917:18, 6925:8, 6959:21, 6963:16

**streamline** [1] - 6823:17

**street** [3] - 6911:7, 6927:24, 6963:25

**Street** [2] - 6773:3, 6883:14

**strengths** [1] - 6778:25

**strenuously** [1] - 6950:10

**Strictly** [1] - 6942:17

**strong** [4] - 6797:6, 6797:7, 6797:21, 6835:4

**stronger** [6] - 6797:22, 6854:18, 6855:4, 6855:11, 6891:9, 6952:9

**structure** [4] - 6788:4, 6796:8, 6797:14, 6797:16

**structured** [1] - 6936:4

**stuck** [1] - 6944:20

**studies** [1] - 6905:7

**Studios** [1] - 6857:18

**study** [2] - 6905:20, 6905:25

**stuff** [1] - 6889:24

**stunning** [1] - 6946:8

**Stunting** [1] - 6877:10

**stunting** [2] - 6877:13, 6877:24

**subject** [10] - 6779:25, 6782:3, 6825:16, 6868:4, 6872:22, 6883:7, 6886:22, 6887:4, 6955:6, 6966:8

**submarket** [6] - 6797:8, 6827:20, 6827:23, 6838:7, 6964:10, 6964:23

**submission** [1] - 6926:14

**submit** [16] - 6868:12, 6870:24, 6873:2, 6874:21, 6878:7, 6893:3, 6893:8, 6893:11, 6896:2, 6903:18, 6936:22, 6940:7, 6945:2, 6945:22, 6950:18, 6966:6

**subsequent** [1] - 6840:19

**substance** [1] - 6950:2

**substantial** [9] - 6807:11, 6826:15, 6835:23, 6841:8, 6851:23, 6876:7, 6876:15, 6932:22, 6936:23

**substantively** [1] - 6948:2

**substitute** [8] - 6806:8, 6807:3, 6827:16, 6879:2, 6913:24, 6914:9, 6915:8, 6964:7

**substitutes** [7] - 6826:8, 6913:13, 6914:12, 6914:20, 6915:19, 6915:20

**substitution** [1] - 6916:12

**subtracting** [1] - 6960:14

**Subway** [1] - 6928:11

**succeed** [8] - 6787:11, 6800:2, 6860:12, 6861:24, 6952:16, 6957:11, 6958:7, 6960:1

**succeeded** [1] - 6799:15

**success** [6] - 6860:13, 6901:13, 6901:18, 6905:15, 6957:14, 6960:20

**successful** [6] - 6798:8, 6799:19, 6839:23, 6841:10, 6841:12, 6844:20, 6867:23, 6960:19

**successfully** [1] - 6799:18

**sue** [3] - 6892:12, 6907:20, 6909:11

**sued** [9] - 6779:12, 6796:4, 6807:10, 6854:5, 6888:1, 6888:2, 6888:3, 6892:14, 6945:23

**suffering** [1] - 6880:18

**sufficient** [4] - 6875:25, 6951:14, 6952:18, 6953:24

**suggest** [7] - 6849:4, 6879:8, 6880:17, 6884:1, 6885:6, 6905:13, 6933:18

**suggested** [6] - 6869:14, 6882:16, 6896:2, 6914:10, 6934:24, 6939:12

**suggesting** [9] - 6811:3, 6859:6, 6878:3, 6880:2, 6886:16, 6886:24, 6896:21, 6896:24, 6966:6

**suggestion** [7] - 6820:17, 6852:25, 6885:8, 6888:19, 6895:8, 6935:2, 6935:19

**suggestions** [1] - 6909:7

**suggests** [6] - 6890:21, 6902:12, 6920:19, 6930:18, 6944:15, 6965:22

**suing** [1] - 6930:16

**Suite** [1] - 6773:3

**suits** [2] - 6879:7, 6879:16

**sum** [2] - 6800:3, 6840:3

**sum-up** [1] - 6840:3

**summarize** [2] - 6824:9, 6841:1

**summary** [4] - 6869:17, 6872:2, 6912:18, 6929:19

**SUMMATION** [3] - 6778:9, 6968:6, 6968:8

**sums** [2] - 6780:9, 6829:20

**super** [2] - 6934:8, 6953:15

**supermarket** [2] - 6798:13, 6889:25

**supplied** [1] - 6887:7

**supplier** [1] - 6905:3

**supply** [2] - 6965:9, 6965:23

**support** [10] - 6820:22, 6821:5, 6845:12, 6850:5, 6876:7, 6876:15, 6895:8, 6896:3, 6911:4, 6951:14

**supported** [6] - 6798:18, 6817:17, 6839:25, 6846:3, 6890:22, 6913:11

**supports** [1] - 6816:7

**suppose** [3] - 6847:4, 6879:7, 6913:22

**supposed** [3] - 6916:18, 6929:20, 6929:22

**suppressed** [1] - 6952:13

**suppression** [2] - 6839:17, 6950:4

**supra** [1] - 6896:23

**supra-competitive** [1] - 6896:23

**Supreme** [11] - 6783:25, 6785:15, 6801:1, 6824:2, 6858:23, 6874:10,

6875:7, 6875:16, 6876:3, 6951:10, 6952:7
**surely** [1] - 6884:1
**surmise** [2] - 6821:23, 6846:18
**surprise** [2] - 6856:20, 6964:12
**surprised** [2] - 6866:8, 6942:1
**surprising** [1] - 6859:17
**surprisingly** [1] - 6879:18
**survey** [2] - 6919:9, 6919:12
**survive** [4] - 6796:14, 6799:13, 6902:16, 6911:25
**survived** [3] - 6796:10, 6796:20, 6799:22
**surviving** [1] - 6799:7
**suspect** [2] - 6828:11, 6920:10
**sustain** [9] - 6830:6, 6830:9, 6830:11, 6830:18, 6830:19, 6833:6, 6925:24, 6960:15, 6960:17
**sustained** [2] - 6927:5, 6951:13
**sustaining** [1] - 6960:6
**SWAINE** [1] - 6773:11
**swath** [1] - 6939:2
**sweep** [1] - 6806:11
**swipe** [1] - 6863:11
**switch** [6] - 6825:24, 6825:25, 6851:3, 6916:5, 6962:21, 6963:15
**switched** [1] - 6920:3
**swore** [2] - 6937:7, 6938:4
**sworn** [1] - 6933:20
**system** [1] - 6813:20

---

## T

**T&E** [43] - 6797:21, 6827:23, 6829:10, 6829:14, 6829:17, 6829:21, 6830:2, 6830:6, 6832:9, 6832:12, 6832:14, 6833:16, 6835:22, 6838:6, 6838:9, 6853:11, 6854:9, 6854:11, 6854:16, 6854:18, 6854:20, 6854:24, 6855:4, 6855:8, 6855:11, 6904:8, 6905:3, 6912:8, 6920:21, 6920:22, 6921:1, 6925:22, 6926:19, 6926:24, 6927:2, 6927:13, 6927:17, 6927:21, 6928:1, 6928:3, 6929:6, 6965:6
**table** [3] - 6774:10, 6838:11, 6935:4
**talented** [2] - 6957:3, 6957:5
**talks** [3] - 6828:22, 6832:18, 6877:2
**tampered** [1] - 6900:19
**tampering** [1] - 6871:7
**Target** [1] - 6936:20
**target** [1] - 6856:10
**targeted** [1] - 6828:2
**task** [1] - 6929:23
**taught** [1] - 6955:5
**Tax** [2] - 6840:17, 6850:11
**teach** [1] - 6797:19
**team** [3] - 6881:24, 6937:23, 6967:3
**teased** [1] - 6921:15
**Tech** [1] - 6785:16
**technical** [1] - 6782:9
**techniques** [1] - 6933:22

---

**technology** [2] - 6794:1, 6794:2
**TEI** [2] - 6828:21, 6829:1
**telephone** [1] - 6938:2
**ten** [4] - 6821:3, 6822:23, 6938:25, 6949:9
**ten-minute** [2] - 6822:23, 6949:9
**tenants** [1] - 6847:22
**term** [4] - 6834:4, 6858:12, 6858:19, 6964:15
**terminal** [2] - 6846:9, 6847:23
**terminate** [2] - 6849:18, 6944:21
**terminating** [1] - 6785:11
**terms** [10] - 6782:8, 6788:7, 6788:8, 6818:9, 6831:8, 6848:20, 6905:25, 6916:6, 6916:8, 6916:19
**terrible** [2] - 6938:17, 6956:18
**territory** [2] - 6809:14, 6809:19
**test** [20] - 6801:3, 6804:14, 6824:25, 6825:6, 6825:10, 6825:19, 6899:21, 6913:14, 6913:15, 6924:6, 6924:11, 6924:16, 6926:17, 6935:25, 6936:1, 6936:2, 6936:4, 6953:2
**testified** [23] - 6780:21, 6784:17, 6786:22, 6787:23, 6795:1, 6803:13, 6815:11, 6821:17, 6821:19, 6825:4, 6836:11, 6856:20, 6856:25, 6857:13, 6867:5, 6867:16, 6871:24, 6882:11, 6916:2, 6917:15, 6917:16, 6941:13, 6953:21
**testify** [1] - 6883:23
**testifying** [1] - 6821:4
**testimony** [31] - 6793:25, 6795:19, 6800:15, 6803:14, 6805:21, 6818:18, 6820:4, 6826:18, 6828:11, 6830:13, 6833:8, 6852:20, 6861:4, 6867:16, 6881:23, 6882:1, 6897:17, 6897:18, 6901:2, 6901:13, 6906:21, 6907:8, 6911:9, 6916:15, 6919:16, 6919:18, 6922:17, 6930:25, 6933:20, 6934:11, 6958:14
**tests** [2] - 6838:9, 6913:18
**TEXAS** [1] - 6772:7
**text** [1] - 6931:25
**thanking** [1] - 6778:13
**THE** [155] - 6774:3, 6774:4, 6774:5, 6774:9, 6774:21, 6775:15, 6775:18, 6776:2, 6776:5, 6776:11, 6776:14, 6776:17, 6776:20, 6776:24, 6777:4, 6777:9, 6777:16, 6777:22, 6778:3, 6778:7, 6778:22, 6778:24, 6779:3, 6779:14, 6779:17, 6780:4, 6788:3, 6789:5, 6790:1, 6790:9, 6791:9, 6796:10, 6796:19, 6796:21, 6796:24, 6797:8, 6797:11, 6797:13, 6797:19, 6801:23, 6802:9, 6802:11, 6802:15, 6808:6, 6808:25, 6809:6, 6809:9, 6809:11, 6809:13, 6809:18, 6809:22, 6813:21, 6814:1, 6814:3, 6814:6, 6814:9, 6814:13, 6816:2, 6816:4, 6818:2, 6818:5, 6818:18, 6818:21, 6818:24, 6821:23, 6822:15, 6822:20,

---

6822:23, 6823:3, 6823:4, 6823:19, 6831:7, 6833:8, 6833:19, 6833:22, 6834:1, 6834:8, 6839:19, 6840:8, 6840:13, 6841:14, 6841:21, 6846:5, 6847:3, 6847:22, 6847:25, 6862:16, 6864:7, 6865:3, 6865:9, 6865:12, 6865:15, 6865:21, 6866:2, 6866:4, 6875:9, 6885:16, 6885:25, 6886:17, 6886:23, 6890:25, 6891:2, 6891:4, 6891:7, 6891:12, 6898:25, 6909:16, 6914:21, 6915:1, 6915:2, 6915:5, 6915:15, 6925:4, 6938:14, 6938:17, 6938:24, 6946:15, 6946:18, 6946:22, 6946:24, 6947:12, 6947:15, 6947:25, 6948:13, 6948:16, 6948:19, 6948:23, 6949:3, 6949:6, 6949:9, 6949:12, 6949:15, 6949:18, 6949:23, 6952:25, 6953:2, 6954:2, 6954:19, 6955:5, 6955:9, 6955:15, 6955:18, 6956:3, 6956:6, 6956:25, 6961:5, 6961:8, 6961:10, 6961:19, 6962:3, 6966:17, 6966:21, 6966:24, 6967:1, 6967:4
**theirs** [2] - 6871:24, 6895:12
**theme** [1] - 6823:23
**themselves** [8] - 6795:14, 6830:11, 6917:13, 6917:22, 6918:13, 6923:21, 6924:4, 6961:23
**theoretical** [1] - 6817:22
**theories** [7] - 6870:17, 6884:3, 6886:25, 6892:21, 6908:19, 6941:2
**theory** [21] - 6807:11, 6816:23, 6827:4, 6870:24, 6870:25, 6884:24, 6881:24, 6885:4, 6885:23, 6886:1, 6887:7, 6890:16, 6890:17, 6892:8, 6892:10, 6892:24, 6894:12, 6917:4, 6929:11, 6942:12, 6964:11
**Therefore** [1] - 6900:16
**therefore** [4] - 6807:15, 6897:2, 6902:8, 6946:11
**they've** [15] - 6788:15, 6819:20, 6870:18, 6872:25, 6877:13, 6877:25, 6884:3, 6928:11, 6928:17, 6929:14, 6930:4, 6932:8, 6933:21, 6933:22, 6940:9
**Thiel** [3] - 6782:23, 6837:9, 6837:17
**thinking** [9] - 6777:16, 6804:11, 6848:21, 6886:10, 6893:9, 6948:18, 6951:24, 6962:25, 6963:2
**thinks** [4] - 6804:23, 6849:2, 6908:17, 6919:1
**third** [11] - 6805:20, 6815:18, 6819:14, 6839:12, 6863:23, 6891:24, 6891:25, 6917:12, 6921:18, 6931:9, 6961:21
**third-party** [2] - 6805:20, 6819:14
**thirds** [2] - 6920:17, 6931:8
**thirty** [1] - 6920:22
**THOMAS** [1] - 6773:7
**Thomas** [1] - 6774:15
**thoughtful** [1] - 6958:13
**thousand** [1] - 6910:3
**thousands** [1] - 6831:13

**threat** [4] - 6892:25, 6909:8, 6923:24, 6936:14
**threatened** [1] - 6797:25
**threatening** [1] - 6907:11
**three** [35] - 6776:3, 6783:8, 6786:21, 6787:15, 6800:13, 6828:8, 6831:14, 6833:17, 6836:1, 6841:17, 6850:10, 6855:3, 6872:22, 6874:3, 6875:5, 6878:3, 6881:1, 6881:14, 6883:8, 6883:25, 6885:13, 6890:19, 6893:6, 6906:14, 6908:12, 6908:20, 6910:18, 6915:12, 6920:17, 6921:24, 6935:6, 6941:2, 6946:4, 6946:20
**three-plus** [1] - 6941:2
**three-quarters** [3] - 6893:6, 6910:18, 6920:17
**three-step** [1] - 6783:8
**thresholds** [1] - 6782:11
**thrilled** [1] - 6886:20
**throughout** [4] - 6778:15, 6794:10, 6800:20, 6803:13
**throw** [7] - 6842:19, 6913:15, 6913:16, 6916:22, 6916:24, 6917:5, 6917:6
**thrown** [1] - 6792:4
**Thursday** [2] - 6772:17, 6920:14
**thwarted** [1] - 6795:15
**tick** [1] - 6910:14
**ticket** [2] - 6850:14, 6927:12
**tickets** [3] - 6846:14, 6897:10
**tidbit** [1] - 6866:19
**tinkering** [1] - 6871:7
**tiny** [5] - 6866:19, 6867:20, 6867:21, 6910:8
**today** [39] - 6783:11, 6788:20, 6789:23, 6791:17, 6794:16, 6796:5, 6796:8, 6799:10, 6799:19, 6813:15, 6813:18, 6830:19, 6854:3, 6854:7, 6861:4, 6866:15, 6868:5, 6868:8, 6869:14, 6878:21, 6880:3, 6880:8, 6880:11, 6881:21, 6885:14, 6894:3, 6903:15, 6905:8, 6907:22, 6909:19, 6916:21, 6927:12, 6927:25, 6945:23, 6949:20, 6956:12, 6959:22, 6962:17, 6962:20
**today's** [1] - 6869:1
**Todd** [3] - 6801:5, 6801:14, 6876:4
**together** [12] - 6805:5, 6806:11, 6808:23, 6819:14, 6826:15, 6861:19, 6910:21, 6921:15, 6921:21, 6921:22, 6926:23, 6964:21
**tons** [2] - 6904:15, 6909:6
**took** [8] - 6821:23, 6823:10, 6852:2, 6852:6, 6935:12, 6936:8, 6936:13, 6961:12
**tool** [3] - 6779:5, 6924:11, 6965:1
**tools** [2] - 6803:17, 6863:7
**top** [4] - 6806:20, 6853:20, 6908:8, 6908:24
**Topco** [1] - 6899:7
**topic** [8] - 6783:11, 6792:1, 6798:4, 6837:8, 6859:9, 6950:1, 6965:25, 6966:1

**topics** [4] - 6841:17, 6856:2, 6949:25, 6951:6
**Tops** [1] - 6801:14
**TORRES** [1] - 6772:22
**total** [4] - 6814:19, 6816:18, 6846:10, 6849:3
**touch** [7] - 6783:14, 6802:13, 6823:22, 6841:13, 6841:19, 6949:24, 6965:25
**toward** [1] - 6917:19
**track** [2] - 6839:8, 6921:19
**tracking** [2] - 6905:25, 6921:21
**Trade** [1] - 6875:6
**transaction** [9] - 6806:21, 6863:2, 6863:13, 6879:12, 6879:14, 6879:15, 6927:13, 6927:17, 6927:21
**transactions** [12] - 6804:6, 6805:6, 6805:17, 6805:18, 6805:19, 6806:11, 6862:24, 6880:12, 6931:3, 6931:4, 6931:6, 6940:24
**transcript** [3] - 6772:24, 6905:25, 6962:11
**Transcript** [1] - 6772:25
**travel** [19] - 6797:6, 6799:13, 6799:16, 6831:24, 6832:5, 6833:10, 6833:15, 6834:23, 6835:16, 6836:7, 6836:9, 6836:17, 6837:12, 6838:3, 6839:16, 6857:13, 6889:18, 6925:1, 6925:3
**TRAVEL** [1] - 6772:10
**Travel** [11] - 6827:19, 6828:21, 6829:1, 6829:5, 6829:22, 6829:24, 6831:2, 6832:3, 6851:7, 6854:13, 6964:9
**traveler** [1] - 6836:25
**travelers** [2] - 6837:2, 6838:1
**Travelocity** [3] - 6795:20, 6795:21, 6795:23
**trend** [1] - 6918:3
**trial** [31] - 6778:16, 6778:17, 6778:24, 6779:3, 6781:5, 6781:10, 6801:24, 6804:19, 6811:23, 6813:8, 6815:6, 6820:16, 6820:22, 6821:7, 6835:21, 6838:16, 6851:17, 6856:10, 6856:14, 6856:15, 6856:16, 6858:3, 6862:21, 6866:16, 6869:22, 6901:11, 6929:18, 6944:12, 6948:7, 6952:4, 6962:11
**Trial** [1] - 6820:21
**tried** [9] - 6786:7, 6789:13, 6827:21, 6839:7, 6872:7, 6872:25, 6917:20, 6933:21, 6933:22
**tries** [5] - 6803:25, 6804:1, 6825:20, 6844:19, 6929:25
**trip** [2] - 6929:2, 6929:4
**troubles** [3] - 6798:2, 6798:7, 6798:11
**true** [20] - 6788:20, 6791:21, 6798:2, 6798:22, 6803:11, 6805:19, 6830:22, 6836:23, 6845:4, 6860:8, 6860:9, 6887:11, 6926:18, 6929:21, 6937:7, 6954:8, 6959:4, 6960:13, 6964:5
**trump** [1] - 6803:4
**truncate** [1] - 6865:22
**trust** [2] - 6810:25, 6811:1
**truth** [1] - 6846:19

**truthful** [2] - 6858:16, 6863:1
**try** [26] - 6804:4, 6810:20, 6812:20, 6815:15, 6819:11, 6823:5, 6823:17, 6833:24, 6834:7, 6850:18, 6856:12, 6860:10, 6860:11, 6860:20, 6860:22, 6861:8, 6861:9, 6866:14, 6868:20, 6884:9, 6932:14, 6934:6, 6949:21, 6959:22, 6963:22
**trying** [15] - 6798:13, 6804:8, 6809:6, 6814:10, 6819:21, 6834:4, 6869:8, 6889:24, 6933:23, 6934:15, 6947:7, 6947:18, 6960:11, 6962:24, 6965:4
**Tuesday** [1] - 6913:22
**turf** [2] - 6797:24, 6798:9
**turn** [10] - 6824:17, 6841:20, 6876:2, 6898:7, 6912:4, 6925:1, 6929:8, 6934:3, 6960:3, 6961:9
**turnaround** [1] - 6868:21
**turned** [1] - 6778:17
**turning** [1] - 6803:18
**turns** [2] - 6833:3, 6960:22
**tutorial** [1] - 6935:6
**TV** [1] - 6898:7
**Twenty** [1] - 6905:12
**twenty** [8] - 6854:3, 6854:4, 6854:6, 6897:2, 6906:2, 6908:3, 6958:3
**twenty-five** [3] - 6906:2, 6908:3
**Twenty-five** [1] - 6905:12
**twenty-six** [4] - 6854:3, 6854:4, 6854:6, 6958:3
**twice** [2] - 6782:24, 6796:4
**twins** [2] - 6893:18
**two** [91] - 6777:24, 6779:12, 6782:8, 6793:19, 6801:24, 6802:20, 6803:9, 6803:11, 6803:16, 6803:22, 6803:23, 6804:1, 6804:7, 6804:17, 6805:2, 6805:4, 6806:6, 6807:20, 6807:24, 6807:25, 6816:9, 6817:6, 6817:12, 6820:13, 6823:22, 6831:14, 6832:24, 6834:13, 6835:25, 6836:1, 6844:5, 6845:14, 6847:8, 6849:22, 6851:3, 6851:24, 6851:25, 6852:23, 6854:2, 6854:4, 6855:3, 6856:1, 6856:4, 6861:1, 6866:10, 6869:13, 6869:15, 6869:18, 6871:24, 6872:12, 6873:2, 6875:19, 6876:19, 6878:12, 6879:8, 6882:4, 6887:15, 6888:9, 6888:14, 6893:20, 6894:2, 6895:10, 6897:25, 6899:4, 6910:21, 6912:7, 6912:15, 6913:9, 6913:14, 6913:17, 6915:11, 6917:1, 6917:9, 6920:17, 6924:22, 6931:8, 6931:15, 6935:12, 6935:18, 6937:15, 6942:3, 6942:5, 6942:7, 6951:11, 6951:25, 6954:18, 6959:2, 6959:6, 6962:14
**two-sided** [20] - 6801:24, 6803:9, 6803:11, 6803:16, 6803:22, 6804:7, 6807:24, 6816:9, 6817:12, 6861:1, 6869:13, 6869:15, 6869:18, 6871:24, 6872:1, 6872:3, 6878:12, 6882:4, 6887:15, 6895:10

**two-sidedly** [1] - 6844:5
**two-sidedness** [4] - 6802:20, 6807:20, 6820:13, 6823:22
**two-thirds** [1] - 6920:17
**type** [1] - 6801:4
**types** [1] - 6785:5

# U

**U.S** [24] - 6772:9, 6773:2, 6783:23, 6805:3, 6805:11, 6806:1, 6821:17, 6829:3, 6829:12, 6838:19, 6838:25, 6853:22, 6854:1, 6854:15, 6876:13, 6877:7, 6877:12, 6878:2, 6892:10, 6920:9, 6931:19, 6948:6, 6950:8, 6950:22
**u.S.A** [1] - 6773:2
**ubiquitous** [1] - 6930:23
**ultimate** [3] - 6834:15, 6906:6, 6945:4
**ultimately** [1] - 6807:4
**unable** [1] - 6933:15
**uncertainties** [1] - 6822:5
**uncertainty** [2] - 6890:16, 6892:6
**under** [19] - 6783:9, 6783:22, 6811:24, 6813:19, 6816:10, 6817:7, 6819:9, 6819:10, 6824:7, 6845:19, 6853:1, 6858:21, 6867:5, 6870:13, 6871:5, 6873:14, 6873:16, 6883:23, 6937:7
**understood** [2] - 6822:8, 6904:24
**undifferentiated** [1] - 6935:17
**unfortunately** [1] - 6809:15
**unilaterally** [1] - 6863:21
**unique** [2] - 6802:3, 6809:1
**UNITED** [2] - 6772:1, 6772:3
**United** [23] - 6772:20, 6774:8, 6774:11, 6774:13, 6774:14, 6774:15, 6774:16, 6774:19, 6777:20, 6782:19, 6799:21, 6821:18, 6860:15, 6863:13, 6867:6, 6868:16, 6872:20, 6880:8, 6883:19, 6888:17, 6889:23, 6892:17
**Universal** [1] - 6857:18
**University** [1] - 6859:25
**unlawful** [2] - 6873:14, 6952:3
**unleashed** [1] - 6887:14
**unless** [4] - 6777:24, 6917:5, 6938:19, 6966:13
**unlike** [2] - 6888:10, 6939:14
**unlikely** [2] - 6954:25, 6963:16
**unmentioned** [1] - 6818:23
**unprecedented** [2] - 6812:14, 6945:11
**unprofitable** [1] - 6963:16
**unreasonable** [2] - 6873:5, 6951:15
**unreasonably** [1] - 6862:22
**unrebutted** [3] - 6897:16, 6897:18, 6934:11
**unremarkable** [1] - 6899:10
**unresolved** [1] - 6886:11
**unsuccessful** [1] - 6839:20
**untrue** [1] - 6871:4
**unwarranted** [2] - 6817:7, 6882:3
**unwelcome** [4] - 6857:16, 6857:19,

6857:22, 6858:11
**up** [107] - 6775:19, 6775:21, 6777:24, 6780:9, 6783:12, 6786:24, 6787:5, 6787:10, 6788:16, 6792:16, 6793:2, 6799:22, 6800:3, 6800:8, 6807:12, 6808:15, 6811:3, 6817:20, 6820:2, 6820:11, 6820:21, 6821:8, 6825:16, 6829:20, 6835:21, 6837:6, 6838:16, 6840:3, 6841:25, 6842:24, 6843:4, 6848:8, 6848:14, 6848:22, 6848:24, 6849:24, 6851:5, 6851:23, 6853:20, 6858:1, 6858:22, 6865:6, 6869:25, 6870:2, 6872:16, 6875:22, 6876:11, 6876:13, 6877:10, 6877:14, 6880:6, 6883:1, 6883:8, 6883:23, 6884:1, 6884:20, 6884:22, 6885:2, 6885:5, 6885:15, 6887:6, 6887:10, 6887:12, 6887:13, 6887:20, 6888:9, 6888:13, 6890:17, 6891:10, 6891:12, 6894:22, 6894:25, 6895:11, 6898:1, 6898:5, 6898:20, 6902:9, 6903:12, 6904:22, 6907:25, 6908:24, 6913:20, 6913:22, 6921:25, 6923:18, 6925:9, 6931:1, 6931:22, 6933:23, 6936:3, 6937:20, 6939:3, 6940:17, 6944:6, 6944:8, 6945:25, 6948:8, 6952:14, 6953:8, 6953:19, 6954:14, 6958:2, 6959:19, 6963:1
**upper** [1] - 6853:10
**upshot** [2] - 6785:12, 6834:16
**upside** [1] - 6803:18
**upward** [1] - 6894:24
**urge** [1] - 6863:25
**urging** [1] - 6907:24
**USA** [4] - 6806:3, 6839:5, 6839:18, 6877:17
**usage** [1] - 6905:14
**user** [1] - 6964:17
**uses** [1] - 6964:19
**utility** [1] - 6941:9
**utilized** [1] - 6948:24

# V

**vacated** [1] - 6948:10
**vacation** [1] - 6933:17
**valid** [1] - 6830:3
**valuable** [6] - 6842:17, 6924:11, 6942:23, 6956:22, 6956:23
**value** [43] - 6796:9, 6802:4, 6813:16, 6813:18, 6839:14, 6839:19, 6840:3, 6840:5, 6842:16, 6842:17, 6842:18, 6843:4, 6843:9, 6843:14, 6844:6, 6844:14, 6844:17, 6846:3, 6850:11, 6850:19, 6851:5, 6851:20, 6853:21, 6854:22, 6855:2, 6859:22, 6861:19, 6861:24, 6936:17, 6937:2, 6937:3, 6937:11, 6937:24, 6938:5, 6938:11, 6938:14, 6939:6, 6939:12, 6939:22, 6940:4, 6960:14
**variable** [4] - 6828:22, 6829:2, 6829:10, 6855:6

**variable-contribution** [2] - 6829:10, 6855:6
**variations** [1] - 6958:4
**variety** [2] - 6830:12, 6830:21
**various** [7] - 6785:5, 6795:11, 6834:14, 6843:11, 6856:17, 6857:20, 6901:3
**Varney** [1] - 6883:18
**VButlerRPR@aol.com** [1] - 6772:24
**vein** [2] - 6855:5, 6959:3
**vendor** [1] - 6908:9
**vendors** [2] - 6928:3, 6945:3
**ventures** [1] - 6796:6
**version** [3] - 6777:1, 6792:6, 6822:17
**versions** [1] - 6829:9
**Versus** [1] - 6785:16
**versus** [7] - 6860:15, 6879:16, 6930:25, 6932:4, 6932:20, 6933:13
**vertical** [8] - 6801:9, 6870:12, 6870:15, 6871:6, 6873:3, 6874:22, 6874:25, 6913:5
**viability** [1] - 6822:1
**viable** [4] - 6779:20, 6781:3, 6930:23, 6954:6
**victim** [1] - 6931:23
**VICTORIA** [1] - 6772:22
**view** [6] - 6817:16, 6820:2, 6820:7, 6820:11, 6913:10, 6919:12
**views** [1] - 6858:25
**vigilant** [1] - 6903:17
**violate** [2] - 6873:24, 6873:25
**violated** [1] - 6864:1
**violates** [2] - 6795:23, 6936:6
**violation** [12] - 6789:23, 6822:2, 6862:13, 6868:18, 6870:8, 6870:10, 6870:16, 6874:13, 6894:19, 6896:18, 6947:2, 6966:15
**violations** [1] - 6874:7
**virtually** [6] - 6851:19, 6869:22, 6932:8, 6934:20, 6939:1, 6941:8
**virtue** [3] - 6791:18, 6860:4, 6910:2
**virtues** [1] - 6951:21
**vis** [2] - 6948:8
**vis-a-vis** [1] - 6948:8
**visa** [1] - 6893:3
**Visa** [110] - 6779:12, 6783:23, 6786:24, 6788:6, 6788:16, 6790:14, 6791:6, 6794:24, 6794:25, 6795:3, 6795:5, 6795:8, 6795:16, 6796:3, 6796:5, 6796:13, 6797:21, 6798:17, 6799:1, 6799:4, 6799:23, 6805:4, 6805:11, 6806:1, 6806:4, 6807:10, 6817:12, 6821:16, 6821:17, 6821:18, 6833:13, 6833:15, 6837:5, 6838:19, 6838:25, 6839:5, 6839:18, 6853:22, 6854:1, 6854:15, 6860:15, 6867:18, 6868:3, 6868:6, 6877:8, 6877:12, 6877:14, 6877:17, 6878:2, 6879:14, 6883:6, 6885:16, 6887:5, 6888:11, 6889:9, 6890:6, 6891:17, 6892:2, 6892:25, 6893:12, 6893:20, 6897:2, 6897:5, 6897:25, 6898:10, 6901:8, 6901:19,

6903:10, 6903:21, 6903:22, 6904:2, 6904:24, 6906:14, 6908:7, 6909:5, 6910:15, 6910:17, 6910:22, 6916:17, 6917:3, 6917:7, 6920:6, 6920:9, 6921:13, 6921:14, 6921:19, 6921:20, 6927:7, 6930:21, 6931:3, 6931:19, 6932:3, 6932:7, 6940:16, 6940:18, 6940:24, 6941:9, 6941:20, 6941:24, 6941:25, 6945:23, 6946:1, 6947:10, 6950:8, 6950:22, 6954:6, 6956:23, 6959:10, 6959:15, 6959:18

**VISA** [1] - 6772:12

**Visa's** [2] - 6896:24, 6931:12

**Visa-MasterCard** [1] - 6941:24

**Visa/MasterCard** [1] - 6872:22

**visit** [1] - 6930:9

**visual** [2] - 6776:15, 6777:5

**volume** [18] - 6786:9, 6788:2, 6792:18, 6799:3, 6839:16, 6850:10, 6850:13, 6867:21, 6880:7, 6892:14, 6909:12, 6911:3, 6913:1, 6918:4, 6922:9, 6924:20, 6924:21, 6931:12

**volumes** [1] - 6922:19

**voluntarily** [1] - 6934:1

**Vons** [1] - 6913:4

**vulnerable** [3] - 6828:2, 6831:4, 6832:13

## W

**wait** [2] - 6883:16, 6884:6

**wake** [1] - 6868:3

**Walgreen's** [2] - 6910:19, 6910:23

**Walgreens** [3] - 6909:16, 6909:17, 6910:25

**walk** [3] - 6810:1, 6911:7, 6945:10

**walked** [2] - 6856:15, 6908:13

**walks** [1] - 6944:19

**Wall** [1] - 6883:14

**wall** [1] - 6898:8

**wallet** [4] - 6792:6, 6792:8, 6792:9, 6898:8

**wallets** [3] - 6792:5, 6891:20, 6920:13

**wants** [14] - 6784:6, 6801:7, 6806:10, 6807:14, 6813:9, 6814:25, 6817:13, 6832:6, 6837:17, 6908:18, 6933:19, 6940:23, 6963:20

**war** [1] - 6938:8

**Warehouse** [5] - 6875:20, 6882:23, 6899:20, 6900:9, 6912:16

**warped** [1] - 6810:21

**Washington** [3] - 6773:4, 6908:2, 6942:18

**watching** [1] - 6952:14

**water** [2] - 6829:15, 6850:22

**ways** [12] - 6784:19, 6790:7, 6795:11, 6814:11, 6819:5, 6820:10, 6835:20, 6838:2, 6838:25, 6843:11, 6866:12, 6915:17

**weaken** [1] - 6901:15

**weaknesses** [1] - 6778:25

**wear** [1] - 6879:8

**week** [3] - 6778:16, 6778:24, 6952:4

**weeks** [4] - 6778:18, 6891:2, 6915:12

**weight** [5] - 6820:22, 6894:8, 6953:18, 6961:10, 6961:21

**Weiss** [1] - 6775:10

**WEISS** [2] - 6773:19, 6775:10

**welcome** [9] - 6856:5, 6856:7, 6856:19, 6857:8, 6858:12, 6858:14, 6858:19, 6859:5

**Welcome** [2] - 6902:4, 6902:12

**welfare** [1] - 6944:12

**well-being** [1] - 6867:23

**well-established** [1] - 6824:7

**well-known** [1] - 6830:10

**Wells** [3] - 6805:20, 6833:13, 6833:15

**Wendy's** [3] - 6927:25, 6928:6, 6928:7

**wheel** [1] - 6795:4

**whereas** [1] - 6915:5

**whole** [14] - 6794:10, 6802:17, 6806:22, 6806:23, 6832:23, 6833:5, 6848:25, 6850:13, 6850:21, 6869:15, 6877:25, 6939:1, 6965:5, 6965:23

**wide** [8] - 6780:25, 6800:16, 6831:13, 6831:17, 6899:24, 6900:2, 6939:2, 6957:6

**widely** [2] - 6828:12, 6828:13

**willing** [3] - 6780:3, 6848:10, 6916:5

**win** [1] - 6811:21

**window** [3] - 6778:25, 6858:4, 6858:7

**winds** [1] - 6825:16

**wipe** [1] - 6794:15

**wiped** [1] - 6850:18

**wish** [2] - 6837:20, 6944:10

**withdrew** [1] - 6842:15

**WITNESS** [1] - 6968:3

**witness** [8] - 6867:4, 6869:3, 6871:23, 6897:19, 6901:24, 6942:6, 6942:7, 6942:11

**witnesses** [9] - 6778:19, 6778:20, 6780:7, 6856:17, 6893:19, 6897:17, 6916:15, 6922:15, 6929:21

**woke** [1] - 6913:22

**won** [3] - 6887:19, 6898:6, 6936:4

**wondering** [1] - 6947:25

**word** [7] - 6847:16, 6872:18, 6872:23, 6906:17, 6926:14, 6941:18, 6953:3

**words** [6] - 6777:20, 6862:10, 6872:24, 6876:14, 6878:3, 6951:10

**workaround** [1] - 6793:21

**works** [10] - 6781:9, 6786:13, 6791:20, 6819:18, 6832:19, 6835:14, 6840:15, 6849:12, 6881:12

**world** [21] - 6789:3, 6817:23, 6861:24, 6883:7, 6885:4, 6885:15, 6890:16, 6890:18, 6892:20, 6918:11, 6918:19, 6920:12, 6921:3, 6922:5, 6923:4, 6931:15, 6944:5, 6954:7, 6954:23, 6959:10

**Worldwide** [1] - 6773:11

**worried** [4] - 6792:17, 6793:23, 6833:20, 6907:21

**worry** [2] - 6808:13, 6827:6

**worse** [2] - 6870:7, 6894:4

**worth** [3] - 6842:10, 6849:2, 6849:3

**worthless** [1] - 6843:1

**worthy** [1] - 6936:1

**wound** [1] - 6933:7

**write** [2] - 6817:22, 6940:6

**writing** [1] - 6905:20

**written** [2] - 6871:8, 6894:6

## X

**x-rays** [1] - 6952:1

## Y

**yards** [1] - 6869:7

**year** [7] - 6851:22, 6851:23, 6884:8, 6884:9, 6884:10, 6908:14, 6913:2

**years** [42] - 6791:16, 6803:16, 6807:8, 6810:4, 6821:4, 6840:6, 6840:19, 6840:24, 6860:11, 6867:3, 6868:10, 6870:4, 6870:10, 6872:23, 6873:13, 6883:8, 6884:5, 6884:10, 6889:21, 6889:23, 6890:19, 6894:10, 6898:6, 6901:12, 6901:23, 6905:5, 6905:10, 6906:9, 6906:14, 6908:3, 6908:21, 6920:10, 6923:16, 6928:14, 6936:8, 6939:1, 6940:4, 6946:4, 6946:7, 6958:2, 6962:21

**yellow** [1] - 6829:12

**YORK** [1] - 6772:1

**York** [14] - 6772:23, 6773:12, 6773:16, 6830:16, 6830:20, 6832:1, 6832:7, 6912:16, 6928:23, 6928:24, 6928:25, 6965:15

**York/Chicago** [1] - 6831:15

**young** [1] - 6902:19

**yourself** [4] - 6796:17, 6833:6, 6859:3, 6960:7

**yourselves** [1] - 6775:22

**yup** [1] - 6940:10

## Z

**zero** [3] - 6852:17, 6914:18, 6933:21