
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------X
IN RE: AMERICAN EXPRESS ANTI-
STEERING RULES ANTITRUST LITIGATION

**MEMORANDUM & ORDER**
**REDACTED PUBLIC VERSION**

**11-MD-2221 (NGG) (RER)**

------------------------------------------------------------X

THE MARCUS CORPORATION, on behalf of
itself and all similarly situated persons,

                    Plaintiff,                            **13-CV-7355 (NGG) (RER)**

          -against-

AMERICAN EXPRESS COMPANY, et al.,

                    Defendants.
------------------------------------------------------------X
NICHOLAS G. GARAUFIS, United States District Judge.

      This court granted preliminary approval to a proposed class settlement (the "Class

Settlement Agreement," "Settlement," or "CSA") in In re American Express Anti-Steering Rules

Antitrust Litigation, No. 11-MD-2221 (NGG) (RER) (E.D.N.Y.) ("In re Amex ASR") on

February 11, 2014. (Class Settlement Prelim. Approval Order ("In re Amex ASR Prelim.

Approval Order") (Dkt. 333[1]).) The Honorable George B. Daniels of the Southern District of

New York had granted preliminary approval to the Class Settlement Agreement in The Marcus

Corp. v. American Express Co., et al., No. 13-CV-7355 (NGG) (RER) (E.D.N.Y.) (the "Marcus

Action") on December 23, 2013, before the Marcus Action was transferred to the Eastern District

of New York. (See Class Settlement Prelim. Approval Order ("Marcus Prelim. Approval

Order") (Dkt. 130 in Marcus Action).) On February 11, 2014, after the Marcus Action was

transferred to this district, this court issued a supplemental order adopting Judge Daniels's

---

[1] Unless otherwise noted, docket numbers of case filings cited in this Memorandum and Order refer to the docket
numbers in In re Amex ASR.

preliminary approval, inter alia. (Supplemental Class Settlement Prelim. Approval Order ("Supplemental Prelim. Approval Order") (Dkt. 143 in Marcus Action).) Now before the court are (1) the motion of Class Plaintiffs[2] for final approval of the Class Settlement Agreement (Not. of Class Pls.' Mot. for Final Approval of Class Action Settlement (Dkt. 361)), and (2) the motion of Class Counsel for attorneys' fees (Not. of Class Counsel's Mot. for an Award of Attorneys' Fees & Costs & for Leave To Distribute Service Awards (Dkt. 371)). Defendants American Express Company and American Express Travel Related Services Company, Inc. (collectively, "American Express," "Amex," or "Defendants") also seek final approval of the Class Settlement Agreement. (See Mem. of American Express in Resp. to Objections to the Class Settlement Agreement & in Supp. of Final Approval (Dkts. 507-1 (filed under seal), 508 (redacted public version)).) For the reasons discussed below, the motions are DENIED.

## I.   BACKGROUND

### A.   History of the Actions

On April 18, 2006, Performance Labs, Inc.; Joseph Lepkowski, DDS d/b/a Oak Park Dental Studio; Rookies, Inc.; and Jasa, Inc. filed a putative class action complaint in the Southern District of New York, Performance Labs, Inc., et al. v. American Express Co., et al., No. 06-CV-2974 (WHP) (S.D.N.Y.) (the "Performance Labs Action"). Animal Land, Inc. joined that action as plaintiff upon the filing of an amended class action complaint on May 10, 2006. On March 10, 2009, the Performance Labs Action was consolidated with other putative class actions pending in the Southern District, under the caption In re American Express Anti-Steering Rules Antitrust Litigation, No. 06-CV-2974 (WHP) (S.D.N.Y.) (the "S.D.N.Y. Consolidated

---

[2] Class Plaintiffs are The Marcus Corporation; Animal Land, Inc.; Firefly Air Solutions, LLC; Il Forno, Inc.; Italian Colors Restaurant; Jasa, Inc.; Lopez-Dejonge, Inc.; and Plymouth Oil Corp. (See Class Pls.' Mem. of Law in Supp. of Mot. for Final Approval of Class Action Settlement (Dkts. 363-1 (filed under seal), 362 (redacted public version)) at 1.)

Action"). The Honorable William H. Pauley appointed Gary B. Friedman, Esq. of Friedman Law Group LLP, Christopher W. Hellmich, Esq. of Patton Boggs LLP, and Mark Reinhardt, Esq. of Reinhardt, Wendorf & Blanchfield as interim co-lead counsel for the S.D.N.Y. Consolidated Action proposed class. (See S.D.N.Y. Consolidated Action Mar. 10, 2009, Order (Dkt. 26 in S.D.N.Y. Consolidated Action).)

In 2008, Rite Aid Corporation and Rite Aid HDQTRS. Corp. (together, "Rite Aid"); CVS Pharmacy, Inc.; Walgreen Co.; BI-LO, LLC; and H.E. Butt Grocery Co. (collectively, the "Original Individual Merchant Plaintiffs") filed independent actions against American Express in the Eastern District of New York, which were consolidated under Master File No. 08-CV-2315 (NGG) (RER) (E.D.N.Y.) (the "Original Individual Merchant Actions").[3] In 2010, two putative class actions were filed in the Eastern District, Firefly Air Solutions, LLC v. American Express Co., et al., No. 10-CV-5200 (NGG) (RER) (E.D.N.Y.), and Plymouth Oil Corp. v. American Express Co., et al., No. 10-CV-5369 (NGG) (RER) (E.D.N.Y.).

On February 7, 2011, the S.D.N.Y. Consolidated Action was transferred to this court pursuant to an order of the United States Judicial Panel on Multidistrict Litigation (the "MDL Panel") and further consolidated with the Original Individual Merchant Actions and additional putative class actions in In re Amex ASR. Additional individual plaintiffs filed suit in 2011, including The Kroger Co., Safeway Inc., Ahold U.S.A., Inc., Albertson's LLC, Hy-Vee, Inc., and The Great Atlantic & Pacific Tea Company, Inc.;[4] and Meijer, Inc., Publix Super Markets,

---

[3] See Rite Aid Corp., et al. v. American Express Travel Related Services Co., Inc., et al., No. 08-CV-2315 (NGG) (RER) (E.D.N.Y.); CVS Pharmacy, Inc. v. American Express Travel Related Services Co., Inc., et al., No. 08-CV-2316 (NGG) (RER) (E.D.N.Y.); Walgreen Co. v. American Express Travel Related Services Co., Inc., et al., No. 08-CV-2317 (NGG) (RER) (E.D.N.Y.); BI-LO, LLC v. American Express Travel Related Services Co., Inc., et al., No. 08-CV-2380 (NGG) (RER) (E.D.N.Y.); H.E. Butt Grocery Co. v. American Express Travel Related Services Co., Inc., et al., No. 08-CV-2406 (NGG) (RER) (E.D.N.Y.).

[4] See The Kroger Co., et al. v. American Express Travel Related Services Co., Inc., et al., No. 11-CV-337 (NGG) (RER) (E.D.N.Y.).

Inc., Raley's, and Supervalu Inc.[5] (collectively. and together with the Original Individual Merchant Plaintiffs, the "Individual Merchant Plaintiffs" or the "IMPs"). In February and March 2011, the MDL Panel transferred three additional putative class actions to the Eastern District of New York for inclusion in In re Amex ASR.[6]

On March 2, 2011, Magistrate Judge Ramon E. Reyes, Jr. appointed Gary B. Friedman, Esq. of Friedman Law Group LLP, Christopher W. Hellmich, Esq. of Patton Boggs LLP, and Mark Reinhardt, Esq. of Reinhardt, Wendorf & Blanchfield as interim lead counsel for the In re Amex ASR putative class. (Order Consolidating all Class Actions; Establishing Case Caption; & Appointing Interim Lead Class Counsel (Dkt. 14) at 4.) On March 23, 2011, Gary B. Friedman of Friedman Law Group LLP, Christopher W. Hellmich and Read K. McCaffrey of Patton Boggs LLP, and Mark Reinhardt and Mark A. Wendorf of Reinhardt, Wendorf & Blanchfield filed a Consolidated Class Action Complaint in In re Amex ASR. (Consolidated Class Action Compl. (Dkt. 27).)

Independently, in July 2004, The Marcus Corporation ("Marcus") filed a class action complaint in The Marcus Corp. v. American Express Co., et al., No. 04-CV-5432 (GBD) (S.D.N.Y.). The Marcus Action proceeded in the Southern District of New York; it was transferred to this district not by the MDL Panel but rather upon Judge Daniels's providing preliminary approval to the Class Settlement Agreement. (See Order of Transfer Under 28 U.S.C. § 1404(a) (Dkt. 129 in Marcus Action) (granting Class Plaintiffs' motion to transfer action in order to "facilitate a unified settlement approval process together with the class action cases in" In re Amex ASR).)

---

[5] See Meijer, Inc., et al. v. American Express Travel Related Services Co., Inc., et al., No. 11-CV-338 (NGG) (RER) (E.D.N.Y.).

[6] See Il Forno, Inc. v. American Express Co., et al., No. 11-CV-881 (NGG) (RER) (E.D.N.Y.); Treehouse, Inc. v. American Express Co., et al., No. 11-CV-882 (NGG) (RER) (E.D.N.Y.); Nat'l Supermarkets Ass'n, Inc. v. American Express Co., et al., No. 11-CV-1448 (NGG) (RER) (E.D.N.Y.).

In both In re Amex ASR and the Marcus Action (collectively, the "Amex Class Actions"), Class Plaintiffs and Defendants entered into the Class Settlement Agreement on December 19, 2013. (See CSA (Dkt. 306-2) at 1.) Upon preliminary approval of the Settlement, the court provisionally certified a Rule 23(b)(2) mandatory class, for settlement purposes only, consisting of "all Persons that as of the Settlement Preliminary Approval Date or in the future accept any American Express-Branded Cards at any location in the United States . . . , except that the Settlement Class shall not include the named Defendants, their directors, officers, or members of their families" (the "Settlement Class"). (In re Amex ASR Prelim. Approval Order ¶ 4; Marcus Prelim. Approval Order ¶ 4.) The court also approved a notice plan, appointed the law firms of Friedman Law Group LLP, Patton Boggs LLP, and Reinhardt, Wendorf & Blanchfield (collectively, "Co-Lead Class Counsel" or "Class Counsel") to serve as class counsel pursuant to Federal Rule of Civil Procedure 23(g), and scheduled a hearing for inquiry into the fairness, reasonableness, and adequacy of the Class Settlement Agreement and any objections thereto (the "Fairness Hearing"). (In re Amex ASR Prelim. Approval Order ¶¶ 14, 16-21; Marcus Prelim. Approval Order ¶ 8; Supplemental Prelim. Approval Order ¶¶ 8-13.) The Fairness Hearing was held on September 17, 2014. (See Sept. 24, 2014, Min. Entry.)

## B.    1720 MDL

In order to understand the issues currently before the court, some discussion is necessary of a second antitrust MDL concerning the credit and charge card industry, In re Payment Card Interchange Fee & Merchant Discount Antitrust Litigation, No. 05-MD-1720 (MKB) (JO) (E.D.N.Y.) ("In re Payment Card" or the "1720 MDL").[7] In the 1720 MDL, a putative class

---

[7] Any discussion of the 1720 MDL in this Memorandum and Order is included only for the purpose of assessing the proposed Class Settlement Agreement in the Amex Class Actions. Nothing said herein is intended to express any opinion whatsoever regarding the 1720 MDL class settlement or the Rule 60 motion currently being briefed in that action.

alleged that defendants in that case—Visa International Service Association and Visa U.S.A. Inc. (together, "Visa"), MasterCard Incorporated and MasterCard International Incorporated (together, "MasterCard"), and various issuing and acquiring banks—violated the antitrust laws through a conspiracy to fix interchange fees. See In re Payment Card, 986 F. Supp. 2d 207, 213 (E.D.N.Y. 2013). American Express was not a defendant in the 1720 MDL.

On December 13, 2013, the Honorable John Gleeson[8] approved a proposed class settlement in the 1720 MDL, which provided for, inter alia, "[t]he creation of two cash funds totaling up to an estimated $7.25 billion (before reductions for opt-outs)"; "Visa and MasterCard rule modifications to permit merchants to surcharge on Visa- or MasterCard-branded credit card transactions at both the brand and product levels"; "[a]n obligation on the part of Visa and MasterCard to negotiate interchange fees in good faith with merchant buying groups"; "[a]uthorization for merchants that operate multiple businesses under different 'trade names' or 'banners' to accept Visa and/or MasterCard at fewer than all of its businesses"; and "[t]he locking-in of the reforms in the Durbin Amendment and the DOJ consent decree with Visa and MasterCard, even if those reforms are repealed or otherwise undone." Id. at 217. Another important provision, referred to as the "level-playing-field" ("LPF") provision, "conditions a merchant's ability to surcharge a Visa or MasterCard credit card on the requirement that it also surcharge other payment products of equal or greater cost of acceptance." Id. at 233. As discussed in greater detail below, for any merchant that also accepts American Express, the LPF provision effectively ties that merchant's ability to make use of certain of the relief obtained in the 1720 MDL settlement agreement—the opportunity to surcharge Visa and MasterCard credit cards, on either a parity or differential basis—to Amex's own surcharging rules. See id.

---

[8]  In re Payment Card was subsequently reassigned to the Honorable Margo K. Brodie. (See Suggestion of Case Reassignment (Dkt. 6357 in 1720 MDL); MDL Panel Order Reassigning Litigation (Dkt. 6359 in 1720 MDL).)

MasterCard is represented in the 1720 MDL by the law firms of Willkie Farr & Gallagher LLP ("Willkie" or "WFG") and Paul, Weiss, Rifkind, Wharton & Garrison LLP. See id. at 211.

Friedman Law Group LLP, led by Gary B. Friedman, Esq., represented certain class plaintiffs in the 1720 MDL. It is not one of the three co-lead class counsel in that action; co-lead class counsel are Robbins Geller Rudman & Dowd LLP; Robins, Kaplan, Miller & Ciresi L.L.P.; and Berger & Montague, P.C. See id. (See also, e.g., June 10, 2015, Ltr. of Co-Lead Class Counsel in MDL 1720 (Dkts. 602-1 (filed under seal), 603 (redacted public version)).)

### C.    Class Settlement Agreement

In the Amex Class Actions, the Class Settlement Agreement would effectively modify American Express's Non-Discrimination Provisions (the "NDPs"), which—among other things—prohibit merchants that accept American Express credit and charge cards from imposing any surcharge on the use thereof, unless the merchant also imposes the same surcharge on the use of all other cards, including credit and charge cards of different brands, and including debit and proprietary store cards.[9] Under the Settlement, merchants will be permitted to impose a surcharge on the use of American Express credit and charge cards without also imposing a surcharge on the use of debit or proprietary store cards (or cash, check, or direct wire/ACH transfer). (CSA ¶ 8(b), (e).) This remains subject to the important limitation that the surcharge must not exceed any surcharge permitted to be imposed and in fact imposed on the use of other

---

[9]  A related enforcement action brought by the United States of America and the attorneys general of seventeen states challenged American Express's NDPs generally, but these plaintiffs expressly did not challenge the anti-surcharging rules that the Class Settlement Agreement would modify. See United States v. American Express Co., No. 10-CV-4496 (NGG) (RER), --- F. Supp. 3d ----, 2015 WL 728563, at *14 (E.D.N.Y. Feb. 19, 2015). After a seven-week bench trial, this court found in favor of the governmental plaintiffs in that action, id. at 2, 76; subsequently, the court entered a permanent injunction remedying the antitrust violation found in that case. See United States v. American Express Co., No. 10-CV-4496 (NGG) (RER), 2015 WL 1966362 (E.D.N.Y. Apr. 30, 2015). The liability and remedial decisions are currently on appeal to the Second Circuit. (See Not. of Appeal (Dkt. 664 in No. 10-CV-4496).) As the governmental plaintiffs did not challenge American Express's anti-surcharging rules, the injunction does not implicate those rules, and they remain in place. See Order Entering Permanent Injunction as to the American Express Defendants, United States v. American Express Co., No. 10-CV-4496 (NGG) (RER), slip op. ¶ VI.B (E.D.N.Y. Apr. 30, 2015) (Dkt. 638).

credit or charge cards.[10] (Id. ¶ 8(b)-(c).) Accordingly, under the Settlement, merchants would continue to be prohibited from imposing a surcharge on the use of American Express credit and charge cards if they do not also impose the same surcharge on the use of credit cards issued on the Visa, MasterCard, and/or Discover networks; and they would continue to be prohibited from surcharging only certain products (i.e., premium cards) and not others. The result would be a world in which a merchant could impose a consistent surcharge (e.g., 1% or 2% of the purchase price) on all transactions completed with a credit or charge card of any and all brands. This is referred to as "parity surcharging" (as opposed to "differential surcharging," which contemplates a merchant imposing a surcharge on transactions completed with a specific brand(s) and/or product type(s)).

The Settlement would also modify slightly American Express's Honor-All-Cards ("HAC") rule, which requires merchants that accept any American Express card product to accept all American Express card products. American Express does not currently offer a "Traditional Debit Card." (See id. ¶ (8)(h).) Under the Settlement, in the event that Amex in the future offers a Traditional Debit Card, merchants who accept other American Express products would not be required to accept the Amex Traditional Debit Card. (Id. ¶ (8)(f)-(h).) Prepaid and gift cards are excluded from the definition of Amex Traditional Debit Cards. (See id. ¶¶ 1(g).)

In exchange for these modifications of American Express's rules, the Class Settlement Agreement would release all class members' current and future claims for declaratory, injunctive, and equitable relief, and any future claims for damages or other monetary relief, that relate to American Express's NDPs or HAC rule, and that "fall within the identical factual predicate doctrine as applied to" the Amex Class Actions. (Id. ¶¶ 26-27; see also id. ¶ 41.) The

---

[10] The permitted surcharge is also subject to a cap at the amount of the discount rate charged by American Express to the merchant for the particular transaction. (Id. ¶ 8(c).)

Class Settlement Agreement purports to describe claims that the parties agree fall within the identical factual predicate doctrine (see id. ¶¶ 26-27), but also appears to acknowledge that the scope of the release would be guided by a court's interpretation of that doctrine (see id. ¶ 33). The Settlement would not release current damages claims; class members therefore would remain free to pursue backward-looking damages relief in individual litigation or arbitration, subject to their contractual rights. (See id. ¶ 40.) The release would terminate at minimum ten years after the changes to Amex's rules take effect, and potentially into perpetuity until either (1) Amex no longer "maintains its NDPs and HAC provisions in substantially the same form as they are in as a result of [the] Class Settlement Agreement except insofar as the changes to the NDPs or HAC provisions render such provisions less restrictive than they are following the changes required by [the] Class Settlement Agreement"; or (2) Visa and MasterCard no longer "maintain their [own] rules or provisions that govern surcharging, non-discrimination, or requirements to honor their cards in substantially the same form as they are in as a result of, or can become pursuant to, the settlement in [the 1720 MDL]." (Id. ¶ 1(vv).)[11]

On April 15, 2014, Class Plaintiffs filed their motion for final approval of the Class Settlement Agreement, along with numerous supporting papers. (E.g., Not. of Class Pls.' Mot. for Final Approval of Class Action Settlement.) Class Counsel also filed a motion for attorneys' fees of up to $75 million,[12] along with supporting materials. (E.g., Not. of Class Counsel's Mot. for an Award of Attorneys' Fees & Costs & for Leave To Distribute Service Awards.)

---

[11] If the releases Visa and MasterCard obtained in the MDL 1720 settlement become limited in duration on appeal or otherwise, American Express's release in the Class Settlement Agreement will terminate at the latest of (1) ten years after the changes to Amex's rules take effect, and (2) the duration of the Visa or MasterCard releases as so limited. (Id.)

[12] In the Class Settlement Agreement, American Express agrees not to object to Class Counsel's seeking attorneys' fees and costs and expenses not to exceed $75 million in aggregate, and to pay up to $75 million as awarded by the court. (See CSA ¶ 55.) If the court awards less than $75 million or the amount requested by Class Counsel, the class continues to be bound to pursue final approval of the Settlement and to carry out its terms. (Id. ¶ 56.)

A sizeable number of class members, constituting approximately 19-20% of the class in terms of charge volume,[13] filed objections to the Settlement. The IMPs object to the Settlement. (See IMPs' Obj. to the Proposed American Express Class Action Settlement (Dkt. 399-1 (filed under seal)).) Nonparty objectors include the National Retail Federation (Dkts. 436 (filed under seal), 385 (redacted public version)); Home Depot U.S.A., Inc. ("Home Depot") (Dkts. 409-1 (filed under seal), 408 (redacted public version)); the 7-Eleven Objector Group[14] (Dkt. 430); the Target Objector Group[15] (Dkts. 433 (filed under seal), 490 (redacted public version)); Buckeye Institute for Public Policy Solutions (Dkt. 414); Southwest Airlines, Co., Airtran Airways, Inc., Alaska Airlines, Inc., DSW Inc., and Newegg, Inc. (Dkt. 424); Spirit Airlines, Inc. (Dkt. 462); Blue Cross and Blue Shield Health Insurers[16] (Dkt. 417); and many other merchants, large and

---

[13] See Fairness Hr'g Tr. (Dkt. 543) at 179; Class Pls.' Reply Mem. of Law in Further Supp. of Mot. for Final Approval of Class Action Settlement at 41.

[14] The 7-Eleven Objector Group consists of 7-Eleven, Inc.; Academy, Ltd. d/b/a Academy Sports + Outdoors; Aldo US Inc. d/b/a Aldo and Call It Spring; Amazon.com, Inc.; American Eagle Outfitters, Inc.; Ashley Furniture Industries, Inc.; Barnes & Noble, Inc.; Barnes & Noble College Booksellers, LLC; Beall's, Inc.; Best Buy Stores, L.P.; Boscov's, Inc.; Brookshire Grocery Company; Buc-ee's Ltd.; The Buckle, Inc.; Costco Wholesale Corporation; Euromarket Designs, Inc. d/b/a Crate & Barrell and CB2; Meadowbrook, L.L.C. d/b/a The Land of Nod; Dillard's, Inc.; Drury Hotels Company, LLC; Express, LLC; Foot Locker, Inc.; The Gap Inc.; HMSHost Corporation; IKEA North America Services, LLC; Lowe's Companies, Inc.; Marathon Petroleum Company LP; Martin's Super Markets, Inc.; Michaels Stores, Inc.; Mills Motor, Inc.; Mills Auto Enterprises, Inc.; Willmar Motors, LLC; Mills Auto Center, Inc.; Fleet and Farm of Alexandria, Inc.; Fleet Wholesale Supply of Fergus Falls, Inc.; Fleet and Farm of Green Bay, Inc.; Fleet and Farm of Menomonie, Inc.; Mills Fleet Farm, Inc.; Fleet and Farm of Manitowoc, Inc.; Fleet and Farm of Plymouth, Inc.; Fleet and Farm Supply Company of West Bend, Inc.; Fleet and Farm of Waupaca, Inc.; Mills E-Commerce Enterprises, Inc.; Brainers Livery Auto, LLC; National Association of Convenience Stores (NACS); National Grocers Association (NGA); Panda Restaurant Group, Inc.; Panera, LLC; PetSmart, Inc.; RaceTrac Petroleum, Inc.; Recreational Equipment, Inc. (REI); Republic Services, Inc.; Retail Industry Leaders Association (RILA); Roundy's Supermarkets, Inc.; Sears Holding Corporation; Speedway LLC; Starbucks Corporation; Stein Mart, Inc.; Wal-Mart Stores, Inc.; The Wet Seal, Inc.; and YUM! Brands, Inc. (See Dkt. 430.)

[15] The Target Objector Group consists of Target Corporation; Macy's, Inc.; Kohl's Corporation; the TJX Companies, Inc.; Staples, Inc.; J.C. Penney Corporation, Inc.; Office Depot, Inc.; L Brands, Inc.; Big Lots Stores, Inc.; PNS Stores, Inc.; C.S. Ross Company; Closeout Distribution, Inc.; Ascena Retail Group, Inc.; Abercrombie & Fitch; OfficeMax Incorporated; Saks Incorporated; the Bon-Ton Stores, Inc.; Chico's FAS, Inc.; Luxottica U.S. Holdings Corp.; American Signature, Inc.; and Lord & Taylor Acquisitions, Inc. (See Dkts. 433, 490.)

[16] The individual entities referred to as the Blue Cross and Blue Shield Health Insurers are listed at Dkt. 417-1.

small.[17] The United States of America objected to the extent the Settlement did not exclude the United States from the defined settlement class and the release. (See Dkt. 412.)

Additionally, Class Plaintiffs,[18] the IMPs,[19] the Target Objector Group,[20] and the 7-Eleven Objector Group[21] filed expert materials in support of their positions. The court appointed Professor C. Scott Hemphill of Columbia Law School as the court's technical advisor with respect to economic issues involved in final approval of the agreement. (Feb. 27, 2014, Order (Dkt. 344).) Professor Hemphill filed his report as the court's technical advisor (Aug. 11, 2014, Report of Prof. C. Scott Hemphill ("Hemphill Report") (Dkts. 518 (filed under seal), 519 (redacted public version))); and Class Plaintiffs,[22] American Express,[23] and various objectors[24] filed responses thereto. American Express and Class Plaintiffs also filed responses to class members' objections.[25]

---

[17] See Dkts. 395, 398, 402, 432, 437-61, 463, 465-74, 476-84, 486, 488.

[18] Decl. of Alan S. Frankel, Ph.D. (Dkts. 367 (filed under seal), 370 (redacted public version)); Reply Decl. of Alan S. Frankel, Ph.D. (Dkts. 502-1 (filed under seal), 513 (redacted public version)); see also Decl. of Jude Olinger (Dkt. 368).

[19] Decl. of Prof. Joseph Stiglitz (Dkt. 400-1 (filed under seal)).

[20] Obj. to Admissibility or Consideration of Olinger Grp. "Market Study" & Expert Decl. of Jude Olinger (Dkt. 404); Report of Prof. H. Rao Unnava (Dkt. 404-2).

[21] Report of Scott Elder, Global Strategy Grp., re: Olinger Grp. Surcharging Survey (Dkt. 430-50); Report of Prof. Jerry Hausman (Dkt. 430-47).

[22] Class Pls.' Mem. in Resp. to Report of Prof. C. Scott Hemphill (Dkts. 525-1 (filed under seal), 529 (redacted public version)).

[23] Mem. of American Express in Resp. to Report of Prof. C. Scott Hemphill (Dkt. 523).

[24] See IMPs' Resp. to Report of Prof. C. Scott Hemphill (Dkt. 522-1 (filed under seal)); Resp. of the Target Objectors to the Aug. 11, 2014, Report of Prof. C. Scott Hemphill (Dkts. 521, 528); 7-Eleven Objectors' Resp. to the Report of Prof. C. Scott Hemphill (Dkt. 524); Resp. of Prof. Jerry Hausman to the Report of Prof. C. Scott Hemphill (Dkts. 524-1 (filed under seal), 527-1 (redacted public version)); Resp. of the Buckeye Institute for Public Policy Solutions to Report of Prof. C. Scott Hemphill (Dkt. 520).

[25] Class Pls.' Reply Mem. of Law in Further Supp. of Mot. for Final Approval of Class Action Settlement (Dkts. 500-1 (filed under seal), 511 (redacted public version)); Mem. of American Express in Resp. to Objections to the Class Settlement Agreement & in Supp. of Final Approval (Dkts. 507-1 (filed under seal), 508 (redacted public version)).

On September 17, 2014, the court held the Fairness Hearing. Counsel for Class Plaintiffs and American Express presented arguments in support of final approval of the Settlement; counsel for objectors presented arguments in opposition thereto; and the court received six exhibits into evidence. (Sep. 24, 2014, Min. Entry; see also Fairness Hr'g Tr. (Dkt. 543); Ltr. re: Corrected Set of Proposed Corrections to Fairness Hr'g Tr. (Dkt. 547); Nov. 10, 2014, Order.)

Subsequently, in February 2015, following a seven-week bench trial, this court issued an opinion finding American Express to have violated Section 1 of the Sherman Act in a related enforcement action brought by the United States of America and the attorneys general of seventeen states (the "Government Case"). See United States v. American Express Co., No. 10-CV-4496 (NGG) (RER), --- F. Supp. 3d ----, 2015 WL 728563 (E.D.N.Y. Feb. 19, 2015).

Around this time, and before the court finally ruled on the fairness of the Class Settlement Agreement, new developments, which are discussed below, came to light.

### D.    Friedman/Ravelo Communications

On December 22, 2014, attorney Keila Ravelo ("Ravelo"), formerly a partner at Willkie, and before that a partner at Hunton & Williams, LLP ("H&W"), was arrested on charges that she participated in a conspiracy to defraud two law firms and a client of several million dollars. (See WFG's Feb. 6, 2015, Ltr. (Dkt. 551-1) at 2; WFG's Mar. 13, 2015, Ltr. (Dkt. 557).) See also Criminal Compl., United States v. Keila Ravelo and Melvin Feliz, No. 14-MJ-6800 (JAD) (D.N.J. Dec. 19, 2014), ECF No. 1. Together with her husband and alleged co-conspirator, Melvin Feliz ("Feliz"), Ravelo is alleged to have defrauded Willkie, H&W, and MasterCard—which was Ravelo's client at both H&W and Willkie—over the course of her tenure at the two firms. See Criminal Compl., Ravelo, No. 14-MJ-6800 (JAD). (See also WFG's Feb. 6, 2015,

Ltr. at 2; WFG's Mar. 13, 2015, Ltr. at 2.) Ravelo and Feliz are alleged to have done this by creating and controlling two purported litigation support services companies that billed the law firms and MasterCard for purported services that did not in fact occur, and using the funds generated for their own personal expenses or investments. See Criminal Compl., Ravelo, No. 14-MJ-6800 (JAD).

On November 14, 2014, shortly after Willkie learned that Ravelo was under investigation, Ravelo resigned. (WFG's Feb. 6, 2015, Ltr. at 2; WFG's Mar. 13, 2015, Ltr. at 2.) Before her resignation, Ravelo represented MasterCard in connection with the 1720 MDL. (See Class Pls.' May 8, 2015, Ltr. (Dkts. 572-1 (filed under seal), 573 (redacted public version)) at 2; Defs.' Supplemental Mem. in Supp. of Final Approval ("Defs.' Supplemental Mem.") (Dkts. 582-1 (filed under seal), 587 (redacted public version)) at 6-7.)

In the course of an internal review of Ravelo's conduct, Willkie discovered certain documents in Ravelo's possession that Willkie perceived to be subject to the protective order entered in In re Amex ASR—to which MasterCard was not a party. (See WFG's Feb. 6, 2015, Ltr. at 2; WFG's Mar. 13, 2015, Ltr. at 2.) In February 2015, Willkie informed the parties to the Amex Class Actions and certain objectors about what it had found. (See generally WFG's Feb. 6, 2015, Ltr.) When informed of Willkie's discovery of these communications, the 7-Eleven and Target Objector Groups alerted the court and noted their "concern[] that the information provided . . . thus far . . . indicate[d] that the elements of procedural and substantive fairness required in relation to approval of the proposed settlement may have been compromised." (7-Eleven & Target Objs.' Feb. 12, 2015, Ltr. (Dkt. 551) at 2; see also Home Depot's Feb. 13, 2015, Ltr. (Dkt. 553).)

Nonparty Willkie, along with counsel for various parties and objectors to the 1720 MDL and to the Amex Class Actions, negotiated a protocol for sharing communications in Willkie's possession that fit into one of three categories: (1) documents that may have been subject to the In re Amex ASR protective order, dated July 8, 2009; (2) communications between Ravelo and Gary B. Friedman, Esq. ("Friedman")—who, as mentioned above, is a partner of Friedman Law Group LLP and Co-Lead Class Counsel in the Amex Class Actions—that appeared to relate to the 1720 MDL, the Amex Class Actions, or other litigations "involving certain parties or counsel in the [1720 MDL] and/or the [Amex Class Actions] (excluding communications that appear to have been made in the ordinary course of such litigations and that copied counsel from firms other than those at which Ms. Ravelo or Mr. Friedman worked)"; and (3) other communications between Ravelo and Friedman. (See WFG's Mar. 13, 2015, Ltr. at 2-4; Stipulation & Proposed Order Governing Disclosure by WFG (Dkt. 557) at 2.) Judge Reyes approved this protocol, which required these documents to be logged, and detailed a procedure for production of these documents, objections to production thereof, and disputing such objections. (See generally Stipulation & Order Governing Disclosure by WFG; Mar. 16, 2015, Order.) Subsequently, similar protocols were negotiated to facilitate the sharing of similar documents in the possession of three other Amex Class Actions nonparties, namely: H&W (see H&W's Mar. 30, 2015, Ltr. (Dkt. 561); Stipulation & Proposed Order Governing Disclosure by H&W (Dkt. 561); Mar. 31, 2015, Order); Friedman[26] (see Friedman's Mar. 31, 2015, Ltr. (Dkt. 562); Stipulation & Proposed Order Governing Disclosure of Gary B. Friedman's Documents (Dkt. 562); Mar. 31, 2015, Order); and MasterCard (see MasterCard's Apr. 28, 2015, Ltr. (Dkt. 565);

---

[26] Friedman is represented by counsel in connection with issues related to the production of these documents. (See Not. of Appearance (Dkt. 559); Not. of Appearance (Dkt. 560).)

Stipulation & Proposed Order Pursuant to Fed. R. Evid. 502(D) (Dkt. 565); Apr. 29, 2015, Order).

On April 30, 2015, the court directed American Express and Class Plaintiffs to submit supplemental briefing addressing, inter alia, how the communications disclosed pursuant to these four document-sharing protocols (collectively, the "Friedman/Ravelo Communications") affect the court's review of the Class Settlement Agreement. (Apr. 30, 2015, Order.) The court also invited briefing on this issue by the Individual Merchant Plaintiffs and/or other objectors to the Settlement. (Id.)

On June 1, 2015, the IMPs and American Express filed their respective briefs addressing this topic. (IMPs' Supplement in Opp'n to the Proposed Class Settlement ("IMPs' Supplemental Opp'n") (Dkts. 581-1 (filed under seal), 611 (redacted public version)); Defs.' Supplemental Mem.) The IMPs filed under seal redacted copies of several Friedman/Ravelo Communications as exhibits to its Supplemental Opposition (see Dkts. 581-9 to 581-21 (filed under seal)); unredacted versions of these exhibits were reviewed in camera by the court. (See June 9, 2015, Order; IMPs' Not. of Compliance (Dkt. 612).) On June 26, 2015, the IMPs submitted under seal two additional exhibits that had previously been unavailable to them. (IMPs' June 26, 2015, Ltr. Objecting to Class Settlement & Exs. A-B (Dkt. 621-1 (filed under seal)).)

Meanwhile, the Target and 7-Eleven Objector Groups and Home Depot (collectively, the "Nonparty Objectors") moved to compel the production of certain Friedman/Ravelo Communications to which they had not been granted access by the parties, so that they could more knowledgeably brief the same topic. (Objs.' Mot. to Compel (Dkts. 594-1 (filed under seal), 599 (redacted public version)).) Magistrate Judge Reyes granted in part and denied in part portions of the motion to compel at a hearing held June 29, 2015 (see June 29, 2015, Min.

15

Order), and disputes remaining after that hearing were resolved by the Nonparty Objectors and the IMPs through a meet-and-confer process. (See July 10, 2015, Joint Status Report (Dkt. 638).) The Nonparty Objectors received the final outstanding documents on July 14, 2015. (See Class Pls.' July 16, 2015, Ltr. (Dkt. 640); see also July 14, 2015, 1720 MDL Joint Case Status Report (Dkt. 6510 in 1720 MDL) at 11.)

Finally, on July 28, 2015, the Nonparty Objectors and Class Plaintiffs filed their supplemental briefing regarding the Friedman/Ravelo Communications. (Second Supplemental Brief of Home Depot U.S.A., Inc. Objecting to Proposed Class Settlement ("Home Depot's Second Supplemental Brief") (Dkt. 644-1 (filed under seal)); Mem. of the Target Objectors in Resp. to Court Order Dated April 30, 2015 ("Target's Supplemental Mem.") (Dkts. 645-2 (filed under seal), 653 (redacted public version)); 7-Eleven Objectors' Submission Regarding the Impact of Friedman-Ravelo Communications on Court's Review of Proposed Settlement ("7-Eleven's Supplemental Submission") (Dkts. 646-1 (filed under seal), 652 (redacted public version)); Class Pls.' Mem. in Resp. to Question Number Two Posed by the Court in its Order Dated April 30, 2015 ("Class Pls.' Second Supplemental Mem.") (Dkts. 656-1 (filed under seal), 649 (redacted public version)).) Each of these submissions attached various Friedman/Ravelo Communications as exhibits. (Home Depot's Second Supplemental Brief, Exs. A-B (Dkts. 644-2 to -3 (filed under seal)); Target's Supplemental Mem., Exs. A-J (Dkts. 645-3 to -12 (filed under seal)); 7-Eleven's Supplemental Submission, Exs. 2-37 (Dkts. 646-2 (filed under seal)); Class Pls.' Second Supplemental Mem., Exs. 1-30, 32-34, 36-39 (Dkts. 648-2 to -34, 648-36 to -39 (filed under seal)), Ex. 31 (Dkt. 651-1 (filed under seal)), Ex. 35 (Dkt. 654-2 (filed under seal)).) Additionally, the 7-Eleven Objector Group filed a declaration by Professor Roy D. Simon, Jr., providing a legal ethics opinion (Decl. of Professor

Roy D. Simon, Jr. (Dkts. 646-2 (filed under seal), 652-1 (redacted public version))); and Class

Plaintiffs filed a declaration by Friedman's counsel, Theresa Trzaskoma, discussing the

documents (Decl. of Theresa Trzaskoma (Dkts. 648-1 (filed under seal), 650 (redacted public

version))).[27]

## II.   LEGAL STANDARD

In order to finally approve a class action settlement, the court must be satisfied that

(1) the proposed class is properly certified under Federal Rule of Civil Procedure 23(a)

and 23(b); and (2) the proposed settlement is "fair, reasonable, and adequate." Fed. R. Civ.

P. 23(e)(2); see Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 619-22 (1997); In re Literary

Works in Elec. Databases Copyright Litig., 654 F.3d 242, 249 (2d Cir. 2011); Hernandez v.

Immortal Rise, Inc., 306 F.R.D. 91, 97, 99 (E.D.N.Y. 2015).

As an initial matter, Rule 23(a)'s four "prerequisites" require (1) numerosity ("the class is

so numerous that joinder of all members is impracticable"); (2) commonality ("there are

questions of law or fact common to the class"); (3) typicality ("the claims or defenses of the

representative parties are typical of the claims or defenses of the class"); and (4) adequacy of

representation ("the representative parties will fairly and adequately protect the interests of the

class"). Fed. R. Civ. P. 23(a); see also Fed. R. Civ. P. 23(g)(4) ("Class counsel must fairly and

adequately represent the interests of the class."). Adequacy of representation (whether

considered under subsection 23(a) alone or in combination with subsection 23(g)), involves two

discrete requirements: (1) the named plaintiffs' interests are not antagonistic to the interests of

---

[27] On July 21, 2015, objectors Unlimited Vacations and Cruises, Inc.; Lasko Enterprises, Inc.; and Anamarie Falvo, d/b/a The Silk House submitted briefing regarding the Friedman/Ravelo Communications. (Supp. Briefing on Friedman's Violations of Ethical & Fiduciary Duties (Dkt. 641).) As these objectors did not request, and were not given, any extension of time to file this submission past the original June 1, 2015, deadline, this filing was untimely. (See Apr. 30, 2015, Order; cf. 7-Eleven, Target, & Home Depot Objectors' May 6, 2015, Ltr. (Dkt. 568); May 14, 2015, Order; Class Pls.' May 29, 2015, Ltr. (Dkt. 575); May 26, 2015, Order.) Additionally, this submission cites only Ninth Circuit case law and none of the Friedman/Ravelo Communications. Accordingly, the court has not considered this submission in connection with its analysis of the Class Settlement Agreement.

absent class members; and (2) class counsel is adequate. See, e.g., Kulig v. Midland Funding, LLC, No. 13-CV-4715 (PKC), 2014 WL 5017817, at *2 (S.D.N.Y. Sept. 26, 2014) (citing In re Flag Telecom Holdings, Ltd. Sec. Litig., 574 F.3d 29, 35 (2d Cir. 2009)).

The class must also be properly certified under Rule 23(b)(1), (b)(2), or (b)(3); here, proponents of the Class Settlement Agreement seek certification pursuant to Rule 23(b)(2), which is appropriate when "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2); see also Wal-Mart Stores, Inc. v. Dukes, 131 S. Ct. 2541, 2557-58 (2011) ("The key to the (b)(2) class is 'the indivisible nature of the injunctive or declaratory remedy warranted—the notion that the conduct is such that it can be enjoined or declared unlawful only to all of the class members or as to none of them.'" (quoting Richard A. Nagareda, Class Certification in the Age of Aggregate Proof, 94 N.Y.U. L. Rev. 97, 132 (2009))).

Finally, the court must be persuaded that the settlement is both procedurally and substantively fair. See Fed. R. Civ. P. 23(e)(2); McReynolds v. Richards-Cantave, 588 F.3d 790, 803-04 (2d Cir. 2009). As to procedural fairness, the Second Circuit has directed the district court to "pay close attention to the negotiating process, to ensure that the settlement resulted from arm's-length negotiations and that plaintiffs' counsel . . . possessed the necessary experience and ability, and have engaged in the discovery, necessary to effective representation of the class's interests." McReynolds, 588 F.3d at 804 (alteration, citation, and internal quotation marks omitted); see also Malchman v. Davis, 706 F.2d 426, 433 (2d Cir. 1983) (the district court should consider "the negotiating process, examined in light of the experience of

counsel, the vigor with which the case was prosecuted, and the coercion or collusion that may have marred the negotiations themselves").

When assessing the substantive fairness of a class settlement, courts in the Second Circuit look to the "Grinnell factors." Wal-Mart Stores, Inc. v. Visa U.S.A., Inc., 396 F.3d 96, 117 (2d Cir. 2005); see City of Detroit v. Grinnell Corp., 495 F.2d 448, 463 (2d Cir. 1974), abrogated on other grounds by Goldberger v. Integrated Res., Inc., 209 F.3d 43 (2d Cir. 2000). These factors include: "(1) the complexity, expense and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through the trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in the light of the best possible recovery; and (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation." Grinnell, 495 F.2d at 463 (internal citations omitted).

The court evaluates the settlement's fairness in light of the "strong judicial policy in favor of settlement[]" of class actions. Visa U.S.A., 396 F.3d at 116 (internal quotation marks and citation omitted). The court must not simply "rubber stamp the settlement," but it should also refrain from "engag[ing] in 'the detailed and thorough investigation that it would undertake if it were actually trying the case.'" In re Visa Check/Mastermoney Antitrust Litig., 297 F. Supp. 2d 503, 509 (E.D.N.Y. 2003) (quoting Grinnell, 495 F.2d at 462), aff'd sub nom. Visa U.S.A., 396 F.3d 96. Where, as here, certification is sought for purposes of settlement only, the court must give additional scrutiny to both the fairness of the proposed settlement and the propriety of class certification. Ortiz v. Fibreboard Corp., 527 U.S. 815, 848-49 (1999);

Amchem, 521 U.S. at 620; D'Amato v. Deutsche Bank, 236 F.3d 78, 85 (2d Cir. 2001) (citing Weinberger v. Kendrick, 698 F.2d 61, 73 (2d Cir. 1982)); see also Manual for Complex Litigation (Fourth) § 21.612 (2004). Proponents bear the burden of establishing the propriety of certification and the procedural fairness of the settlement. See Amchem, 521 U.S. at 613-14; Int'l Union of Elec., Elec., Salaried, Mach., & Furniture Workers v. Unisys Corp., 858 F. Supp. 1243, 1264 (E.D.N.Y. 1994).

## III.   DISCUSSION

Even before the Friedman/Ravelo Communications came to light, objectors opposed final approval of the Class Settlement on numerous grounds. They contend, for example, that the cohesion necessary for Rule 23(b)(2) certification is lacking because the proposed relief potentially benefits only some class members and/or does not benefit all class members equally (notably, ten states currently prohibit surcharging, such that merchants in those states could not implement the relief); that an intra-class conflict exists between current and future class members; that damages claims, including future damages claims, cannot be released in a mandatory class settlement; and that arbitration clauses in Class Plaintiffs' card acceptance agreements with American Express render Class Plaintiffs unable to adequately represent absent class members in light of the Supreme Court's decision in American Express Co. v. Italian Colors Restaurant, 133 S. Ct. 2304 (2013).

Objectors also attack the substantive fairness of the Class Settlement Agreement. They propose that the ability to impose parity surcharges—the core of the relief—is of zero value to many, if not most, class members; and therefore class members would be worse off under the Settlement, which releases current and future injunctive claims, and future damages claims, than they are under the status quo. They argue that the Settlement would do nothing at all to increase

20

interbrand competition, and note that in the Government Case this court "recognize[ed] that 'the primary purpose of the antitrust law is to protect interbrand competition,'" and held that American Express's NDPs "impede a significant avenue of horizontal competition in the network services market," United States v. American Express Co., 2015 WL 728563, at *18, *50 (quoting State Oil Co. v. Khan, 522 U.S. 3, 15 (1997)). The court does have serious concerns about the Settlement's substantive fairness. The court's technical advisor, Professor Hemphill, who was tasked with "offer[ing] an independent assessment of 'conflicting economic models, the economic value and effect of the proposed rule changes,' the settlement's interaction with [the 1720 MDL settlement], and arguments about the effect of" the related Government Case (Hemphill Report at 1 (quoting Feb. 27, 2014, Order at 2)), concluded that "[t]here is a substantial probability that [the] effect [of the relief provided by the Agreement] will be small or zero" (id. at 42).

But the court need not, and does not, reach the merits of these aforementioned objections today, because it concludes that the improper and disappointing conduct of Co-Lead Class Counsel Gary B. Friedman has fatally tainted the settlement process. The procedural unfairness and failure of adequate representation (as this conduct bears on both inquiries) revealed by the Friedman/Ravelo Communications requires disapproval of the Settlement; the court cannot thoughtfully assess its substantive fairness without assurance that the class was properly represented in the negotiations thereof.

## A.    Adequacy of Class Counsel

A plaintiff seeking to represent a class must show that it will "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). "The purpose of this requirement is to protect the interests of absent class members, who will be bound by the results of the action

under res judicata." Kulig, 2014 WL 5017817, at *2. Establishing adequacy of representation requires the plaintiff to demonstrate that (1) the plaintiff's interests are not antagonistic to the interests of other class members; and (2) class counsel is adequate, i.e., qualified, experienced, and generally able to conduct the litigation. See In re Flag Telecom Holdings, 574 F.3d at 35; see also Gen. Tel. Co. v. Falcon, 457 U.S. 147, 158 (1982) ("The adequacy of representation requirement . . . also raises concerns about the competency of class counsel and conflicts of interest.").

Pursuant to the 2003 amendments to the Federal Rules of Civil Procedure, the issue of the adequacy of class counsel is guided by Rule 23(g). See Fed. R. Civ. P. 23(g)(1), (g)(2), (g)(4); see also Kulig, 2014 WL 5017817, at *1. Under Rule 23(g), when appointing class counsel, the court "must consider: (i) the work counsel has done in identifying or investigating potential claims in the action; (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action; (iii) counsel's knowledge of the applicable law; and (iv) the resources that counsel will commit to representing the class." Fed. R. Civ. P. 23(g)(1)(A). The court "may [also] consider any other matter pertinent to counsel's ability to fairly and adequately represent the interests of the class." Fed. R. Civ. P. 23(g)(1)(B); see also Fed. R. Civ. P. 23(g)(2) (the court may appoint an attorney as class counsel only if he or she is "adequate under Rule 23(g)(1) and (4)"); Fed. R. Civ. P. 23(g)(4) ("Class counsel must fairly and adequately represent the interests of the class.").

"The adequate representation requirement 'lies at the heart' of the rationale supporting class actions." Kingsepp v. Wesleyan Univ., 142 F.R.D. 597, 599 (S.D.N.Y. 1992) (quoting Johnson v. Shreveport Garment Co., 422 F. Supp. 526, 531 (W.D. La. 1976)). "Because class counsel seeks to determine the rights of absent putative class members, 'a court must carefully

scrutinize the adequacy of representation' when considering whether to certify a class." Id. (quoting Eisen v. Carlisle & Jacquelin, 391 F.2d 555, 562 (2d Cir. 1968)); see also Matsushita v. Epstein, 516 U.S. 367, 399 (1996) (Ginsburg, J., concurring) (stressing "the centrality of the procedural due process protection of adequate representation in class action lawsuits, emphatically including those resolved by settlement").

In determining whether proposed class counsel is adequate, "the Court may consider the honesty and integrity of the putative class counsels, as they will stand in a fiduciary relationship with the class." Friedman-Katz v. Lindt & Sprungli (USA), Inc., 270 F.R.D. 150, 160 (S.D.N.Y. 2010); see also In re Agent Orange Prod. Liab. Litig., 818 F.2d 216, 223 (2d Cir. 1987) (noting class counsel's fiduciary duty to class); Greenfield v. Villager Indus., Inc., 483 F.2d 824, 832 (3d Cir. 1973); Kingsepp, 142 F.R.D. at 599. "Misconduct by class counsel that creates a serious doubt that counsel will represent the class loyally requires denial of class certification." Kulig, 2014 WL 5017817, at *3 (citing Creative Montessori Learning Ctrs. v. Ashford Gear LLC, 662 F.3d 913, 918 (7th Cir. 2011) (Posner, J.)). Indeed, class counsel's integrity, loyalty, and adequacy generally are perhaps even more important than the adequacy of class plaintiffs, as "[e]xperience teaches that it is counsel for the class representative and not the named parties, who direct and manage these actions. Every experienced federal judge knows that any statement[] to the contrary is sheer sophistry." Greenfield, 483 F.2d at 832 n.9; see also Fed. R. Civ. P. 23(g) advisory committee's note to 2003 amendment (the 2003 amendment "responds to the reality that the selection and activity of class counsel are often critically important to the successful handling of a class action"); Samuel Issacharoff, Governance and Legitimacy in the Law of Class Actions, 1999 S. Ct. Rev. 337, 354 ("To the extent that the Rules direct courts to focus on the named class parties, they provide what is best a distraction from the

real source of legitimacy in class actions: the incentives for faithful representation by class counsel.").

## B.    Friedman's Representation of the Putative Class

The Friedman/Ravelo Communications that this court has reviewed reveal egregious conduct by Friedman. The court holds that in light of this conduct, Class Plaintiffs have not met their burden to prove that Co-Lead Class Counsel adequately represented the class during the negotiations resulting in the Class Settlement Agreement or that the settlement is procedurally fair. See McReynolds, 588 at 802 (a challenge to class counsel's adequacy to conduct settlement negotiations is effectively a challenge to the procedural fairness of the settlement agreement). Accordingly, the court denies the motion for final approval of the Settlement.

As an initial matter, there were blatant violations of the protective orders entered in the various actions brought against American Express.[28] (See, e.g., Protective Order (Dkt. 41 in No. 06-CV-2974 (WHP) (S.D.N.Y.)); Protective Order (Dkt. 42 in No. 08-CV-2315).) As a matter of course, Friedman improperly sent emails containing confidential and highly confidential information of American Express that was produced subject to a protective order that prohibited its further dissemination to Ravelo, counsel for MasterCard, American Express's major competitor and not a party to the protective order(s).[29] (See, e.g., IMPs' Supplemental Opp'n, Ex. 9 at LOG-A-00007730 to LOG-A-00007731;[30] id., Ex. 15;[31] id., Ex. 18; id., Ex. 20;

---

[28] To the extent that the court's discussion of the Friedman/Ravelo Communications herein includes privileged, confidential, or particularly sensitive information, this has been redacted from the public version of this Memorandum and Order. To the extent that any content of those communications that is not redacted may have been subject to a privilege (such as an attorney-work product privilege), the court finds that such privilege has been waived by disclosure to Ravelo and/or that there is a substantial need for such content to be made public.

[29] It appears that Friedman sent Ravelo at least approximately either 33 or 56 documents of this type. (See Defs.' June 9, 2015, Ltr. (Dkt. 600-1 (filed under seal)) at 2 n.3; July 14, 2015, 1720 MDL Joint Case Status Report at 21.)

[30] For the IMPs' characterization of these communications (Exhibits 9-21 to the IMPs' Supplemental Opposition), see Exhibit 7 to the IMPs' Supplemental Opposition, an appendix of the communications.

[31] See also Dkts. 189-1, 190 (filed under seal).

24

id., Ex. 21 (Hemphill Report); see also Defs.' Supplemental Mem. at 6-7 (Amex representing that Friedman violated the protective order by disseminating its confidential information).) The emails unequivocally reveal that this was not an inadvertent violation: In at least two of them, Friedman writes, "Burn after reading," and the content of others indicates his contemporaneous recognition of the confidential and highly confidential nature of the materials.[32] (See IMPs' Supplemental Opp'n, Ex. 18 ("Burn after reading"); LOG-A-00007732 to LOG-A-00007733 (". . . Burn after reading . . ." (reviewed in camera, and discussed at IMPs' Supplemental Opp'n, Ex. 7 ¶ 10)); IMPs' Supplemental Opp'n, Ex. 20 (acknowledging that brief contained IMPs' confidential information, and thirty minutes later forwarding brief to Ravelo with comment: "hahahahahaha"); see also, e.g., id., Ex. 21.) Indeed, neither Friedman, Class Plaintiffs, nor American Express contends otherwise.

American Express notes that it intends to seek sanctions against Friedman for this conduct, but it argues that the conduct—which harms the class's adversary—does not indicate collusion or render Friedman an inadequate class representative, and therefore does not provide grounds for rejection of the Settlement. (Defs.' Supplemental Mem. at 7; see also Class Pls.' May 8, 2015, Ltr. at 3 (taking similar position).) The court agrees that dissemination by plaintiffs' counsel of defendants' confidential information in violation of a protective order might not alone provide grounds for rejection of a class action settlement, see generally Reliable Money Order, Inc. v. McKnight Sales Co., 704 F.3d 489 (7th Cir. 2013) (holding that alleged breach by putative class counsel of promise of confidentiality to third party did not require denial of certification where misconduct was relatively minor, and did not prejudice the class, create a

---

[32] Additionally, many of the Friedman/Ravelo Communications were sent to Ravelo's personal Gmail address, rather than her Willkie or Hunton & Williams email address, suggesting an intention to keep the communications from being discovered.

conflict of interest, or compromise the integrity of the proceedings); here, however, the conduct

is by no means limited to disseminating American Express's confidential information.

Friedman also improperly disseminated to Ravelo the confidential information and

attorney work product of the IMPs (and the work product of Class Plaintiffs).[33] (See, e.g., IMPs'

Supplemental Opp'n, Ex. 9 at LOG-A-00007730 to LOG-A-00007731 (email chain containing

deposition preparation outline; the IMPs represent that their counsel performed some of the

"analysis, document review, and document preparation which resulted in the memo"); id., Ex. 18

(IMPs' expert report); id., Ex. 20.) By the terms of a joint prosecution and confidentiality

agreement entered into in connection with the 1720 MDL (id., Ex. 3), and a common interest

agreement entered into in connection with this litigation (id., Ex. 4), Friedman was bound to

keep confidential, and agreed not to disclose to third parties, any work product or confidential

information of the IMPs shared with Friedman. His emails to Ravelo violated those agreements.

The IMPs argue that these disclosures also violated the fiduciary duty that was owed by

Friedman as Class Counsel to the IMPs as class members, showing himself to be an inadequate

representative. (IMPs' Supplemental Opp'n at 7-9.) See Creative Montessori, 662 F.3d at 917

(noting class counsel's fiduciary obligations); Greenfield, 483 F.2d at 832 ("[C]lass action

counsel possess, in a very real sense, fiduciary obligations to those not before the court.");

Friedman-Katz, 270 F.R.D. at 160. This evident disloyalty to class members gives the court

more pause than does the dissemination of American Express's information; even if this were

where Friedman's misbehavior ended, the court might determine him to be an inadequate

representative. See Reliable Money Order, 704 F.3d at 498-99 ("No doubt, misconduct that

prejudices the class . . . requires [] denial [of class certification][,] . . . [and] even 'serious' or

---

[33] There appear to be approximately 22 documents revealing work product or confidential information of the IMPs. (See July 10, 2015, Joint Status Report (list of documents to which IMPs asserted work product privilege or confidentiality objections).)

'major' ethical violations—not prejudicial to the class—can require denial of class certification."); id. at 500 (suggesting that denial of certification would be appropriate if class counsel had breached a promise of confidentiality to class members or putative class members); Creative Montessori, 662 F.3d at 918 ("When class counsel have demonstrated a lack of integrity, a court can have no confidence that they will act as conscientious fiduciaries of the class. . . . Misconduct by class counsel that creates a serious doubt that counsel will represent the class loyally requires denial of class certification.").

But this is not where the misconduct ends, and it does not constitute the complete story of the inadequacy of representation in this case. Ravelo was not merely a third party who was unentitled to receive the materials that were sent to her by Friedman. She was counsel for MasterCard, a defendant in the 1720 MDL and an adversary to the merchant class in that case—a class to which nearly all members of the Amex Class Actions merchant class also belong. The documents indicate that Friedman and Ravelo were in frequent, possibly constant, communication regarding the negotiating process and status of both the 1720 MDL settlement and the Class Settlement Agreement. As Class Plaintiffs themselves describe it, "Mr. Friedman consulted [Ms. Ravelo] as a confidante and sounding board on strategic issues, drawing on her defense-side insights to help advance the interests of the merchant class." (Class Pls.' May 8, 2015, Ltr. at 2; see also Class Pls.' Second Supplemental Mem. at 8 ("The documents show, for example, that Ms. Ravelo helped Mr. Friedman at the outset of this litigation with framing the legal issues, and later was solicited for advice on discovery processes, damages approaches, settlement strategy, final approval briefing and Mr. Friedman's slide presentation at the final fairness hearing.").)

27

For example, before the 1720 MDL settlement was executed and announced in October 2012 (see Definitive Class Settlement Agreement (Dkt. 1651-1 in 1720 MDL)), Friedman forwarded to Ravelo email discussions and outlines regarding 1720 MDL settlement negotiations, status, strategy, and proposed provisions. (See IMPs' Supplemental Opp'n, Ex. 9 at LOG-A-00007727 to LOG-A-00007729 (discussion of hearing before Magistrate Judge James Orenstein); id., Ex. 11 (forwarded email chain discussing plaintiffs' meeting regarding mediators' proposals for 1720 MDL settlement, including memorandum discussing possibility of sunset provision for LPF provision); id., Ex. 12 & GBF00002146 to GBF00002418 ("apx & 1720 settlement strategy memo" discussing, inter alia, LPF provision); id., Ex. 13 (asking Ravelo for her "thoughts" on clause in draft 1720 MDL settlement); Target's Supplemental Mem., Ex. D (forwarding memorandum "roadmap to [Friedman's] basic thinking" about settling 1720 MDL); id., Ex. D (forwarding updated memorandum regarding same, and suggesting that he "draft a paragraph" for Ravelo to raise to MasterCard regarding the LPF).)

With respect to the settlement of the Amex Class Actions, Friedman consulted Ravelo at what appears to be every step along the way. In December 2011, he forwarded to Ravelo correspondence discussing conversations with the IMPs and a memorandum discussing possible consequences of a 1720 MDL settlement on the continued litigation of the Amex Class Actions, including settlement thereof. (GBF00002181 to GBF00002185 (reviewed in camera, and discussed at IMPs' Supplemental Opp'n, Ex. 7 ¶ 2).) In January 2012, Friedman forwarded to Ravelo another email chain, mentioning plans to "discuss negotiation objectives, strategies, and implications for" the Amex Class Actions with counsel for the IMPs, and containing another memorandum analyzing, inter alia, possible settlement of the Amex Class Actions in light of 1720 MDL negotiations. (IMPs' Supplemental Opp'n, Ex. 11 at GBF00002186 to

GBF00002187, GBF00002189.) On March 3, 2012, Friedman emailed Ravelo a memorandum regarding Friedman's updated thoughts regarding the settlement of the Amex Class Actions in light of "where we should and will end up" in the 1720 MDL settlement. (Id., Ex. 12 & GBF00002146 to GBF00002418.) On July 23, 2012, Friedman emailed Ravelo regarding settlement negotiations with American Express, including the negotiation of attorneys' fees. (Id., Ex. 14 (Friedman: "Btw, phil sounded receptive.[34] But on the issue of $ he said it was a 'huge f'ing number' that made him 'gag' and could impede his client from moving like they otherwise might. Then later he said, 'back to that # for a sec... does it include richard?'").)[35] Ravelo responded: "Not bad." (Id., Ex. 14.) In May 2013, Friedman forwarded to Ravelo Class Plaintiffs' privileged and confidential draft PowerPoint mediation presentation. (7-Eleven's Supplemental Submission, Ex. 11.) In September 2013, Friedman proposed possible explanations for American Express's reasons for rescheduling the mediation, and asked Ravelo for her "insights." (Id., Ex. 7 ("Fyi—keep under hat, but I'd like your insights. When are you free to talk?").)

On November 6, 2013, Friedman announced to Ravelo via text message that the case had settled, for $75 million in fees; Ravelo asked when the settlement would be public, and if the settlement terms permitted "Parity surcharging? That's it? B2 class no damages merchants can arbitrate individually"; Friedman confirmed that was correct. (IMPs' Supplemental Opp'n, Ex. 17 at GBF00001511 to GBF00001512.) On December 1, 2013, Friedman informed Ravelo, again via text message, that the "Amex negotiation has gotten crazy," and told her that he "Gmailed u the issue." Ravelo indicated that she would "check." (Id., Ex. 17 at GBF00001515.) On December 6, 2013, approximately two weeks before it was executed, Friedman sent Ravelo a

---

[34] "[P]hil" apparently refers to Philip Korologos, counsel for American Express.

[35] "[R]ichard" apparently refers to Richard Arnold, counsel for the IMPs.

summary of the material terms of the Class Settlement Agreement, with the note: ". . . Burn after reading . . . ." (LOG-A-00007732 to LOG-A-00007733 (reviewed in camera, and discussed at IMPs' Supplemental Opp'n, Ex. 7 ¶ 10); see also 7-Eleven's Supplemental Submission, Ex. 13.) The following day, Friedman told Ravelo about an American Express "about face" and asked if she had time to discuss. (IMPs' Supplemental Opp'n, Ex. 17 at GBF00001516 to GBF00001517.) Friedman also corresponded with Ravelo regarding the Class Settlement Agreement preliminary approval hearing and dynamics between the various parties to the Amex cases (LOG-A-00003790 (reviewed in camera, and discussed at IMPs' Supplemental Opp'n, Ex. 7 ¶ 11)), Class Plaintiffs' motion for final approval of the Settlement (IMPs' Supplemental Opp'n, Ex. 20), and Professor Hemphill's report on the proposed Settlement (id., Ex. 21 (Friedman commenting on the contents of the Hemphill Report: "Ugly")).[36] On June 10, 2014, after objections had been filed to the proposed Settlement, Friedman proposed "walk[ing] [Ravelo] thru" Class Plaintiffs' responses to those objections in order to "get [her] thoughts"; Ravelo responded that she was free to "talk later tonight." (7-Eleven Supplemental Submission, Ex. 8.)

Friedman also appears to have kept Ravelo apprised of the case more generally, including having consulted with her regarding the Amex Class Actions as early as 2005. (See, e.g., 7-Eleven's Supplemental Submission, Ex. 2 (providing Ravelo with Friedman's theory of the Marcus Action); id., Ex. 4 (asking Ravelo for any "thoughts" on draft motion for reconsideration in Marcus Action); id., Ex. 5 (forwarding interim co-lead class counsel's legal analysis of Supreme Court remand on S.D.N.Y. Consolidated Action); Class Pls.' Second Supplemental

---

[36] This email, with the highly confidential Hemphill Report attached, was sent not only to Ravelo but also to Friedman's wife, another person lacking the right to view the contents. (See IMPs' Supplemental Opp'n, Ex. 21 at LOG-A-00007877.)

Mem., Ex. 27 (asking Ravelo for input on portion of draft In re Amex ASR Consolidated Class Action Complaint); IMPs' Supplemental Opp'n, Ex. 15 (anticipated discovery motion); id., Ex. 18 (IMPs' expert report).)[37]

The reason these communications are so problematic is that the Settlement interacts with the settlement agreement approved in the 1720 MDL in a very important way.[38] Under the 1720 MDL settlement, and subject to the limitations contained in the LPF provision, merchants are permitted to impose surcharges on the use of MasterCard and Visa credit cards—either parity surcharges (charging the same surcharge for the use of all credit cards) or differential surcharges (imposing surcharges on particular brands or types of credit cards). The LPF provision limits that relief, however, by permitting a merchant to surcharge a Visa or MasterCard credit card only to the extent that it also "surcharge[s] other payment products of equal or greater cost of acceptance." In re Payment Card, 986 F. Supp. 2d at 233; see also id. at 233 n.19 (reciting language of LPF provision). As Judge Gleeson explained, "[s]ince many merchants accept American Express, which carries an even higher cost acceptance, and the American Express rules prohibit surcharging, most merchants will, as a practical matter, be precluded from surcharging Visa and MasterCard products." Id. at 233.[39] (See also Hemphill Report at 4

---

[37] Moreover, text messages and other communications generally show a constant flow of information between Friedman and Ravelo, regarding, in addition to personal and other topics, the Amex Class Actions, the Government Case, the cases brought by the IMPs against American Express, and potential future arbitrations against American Express, for which they even discussed acting as co-counsel. These communications also indicate that Friedman and Ravelo spoke about Amex-related matters over the telephone (discussions that are, accordingly, not available for the court's review). (See, e.g., IMPs' Supplemental Opp'n, Ex. 17 at GBF00001510, GBF00001511, GBF00001514, GBF00001524, GBF00001532 to GBF00001533, GBF00001537, GBF00001538, GBF00001563; 7-Eleven's Supplemental Submission, Ex. 12 at GBF00004129, GBF00004153; id., Ex. 28; id., Ex. 29.)

[38] As noted previously, this court expresses no opinion regarding the 1720 MDL settlement or the negotiating process that resulted in that settlement.

[39] As explained by this court in its liability opinion in the Government Case—although this is a generalization—the cost of a transaction made with an American Express credit card tends to be higher for the merchant than the cost of the same transaction made with a Visa or MasterCard credit card. United States v. American Express, 2015 WL 728563, at *1; see also id. at *43-46 & n.31 (discussing American Express's "express pricing strategy of charging merchants a premium over its competitors' rates," and noting that while American Express's mix-adjusted

(explaining that the LPF provision "permits, as to Amex acceptors, a surcharge for Visa and MasterCard only to whatever extent Amex allows it").) In other words, the LPF provision means that any merchant that accepts American Express may not impose differential surcharges on the use of any Visa, MasterCard, or American Express credit cards (either at a brand or product level) unless and until American Express permits such surcharges; and any merchant that accepts American Express may not impose parity surcharges on the use of all credit cards (as compared to debit, cash, and other payment methods), unless and until American Express permits such surcharges.

The resolution of the Amex Class Actions therefore effectively determines for the entire credit card industry whether parity, differential, or no surcharging will occur. As explained above, the Class Settlement Agreement permits parity surcharging only; pursuant to the LPF provision, Visa and MasterCard adopt the same rule with respect to all merchants who accept American Express. "The combined result of these two agreements is to permit only 'parity' surcharging of credit cards. Amex, Visa, and MasterCard credit cards can be surcharged all at the same level, or not at all. More targeted forms of steering are prohibited." (Hemphill Report at 4.) The combined result of the two settlement agreements, including the releases contained therein, would bind merchants and the three major credit card companies to this state of affairs for an indefinite period of time, and potentially into perpetuity. From a substantive point of view, the court is concerned that this combination might itself amount to an anticompetitive agreement. (See id. at 18-19 (noting that parity surcharging "lacks [the] tools" that would put pressure on the credit card networks to lower their fees, and "preserves the inability to reward . . . lower-priced networks"); see also 7-Eleven's Supplemental Submission, Ex. 35 at GBF00002417

---

premium has eroded over time, American's Express's premium over its competitors on a per-transaction basis, which is likely the relevant comparison from a merchant's perspective, appears to be "significantly larger" than the mix-adjusted premium).

(memorandum drafted by Friedman, noting the "perverse incentive that parity surcharging . . . gives Amex to raise rates. That is, if Amex can only be surcharged at the Visa [discount rate], then why not push the rate as high as possible and maximize the 'free kick.'").)

From a procedural point of view, which as previously explained is the focus of this Memorandum and Order, this interaction between the 1720 MDL settlement and the Class Settlement Agreement illustrates why Friedman's apparent collaboration with Ravelo is so troubling. Ravelo had a fiduciary duty to her contemporaneous client, MasterCard, which, along with the other credit card companies, had its own interests in connection with these antitrust litigations—interests that are implicated not only by the 1720 MDL settlement but also by the outcome of the Amex Class Actions. By involving MasterCard's counsel in the decisionmaking process with respect to the Amex Class Actions, Friedman created a conflict between himself (teamed up with Ravelo) and the merchant class: MasterCard may have had an interest in a settlement agreement pursuant to which American Express allows parity surcharging, and only parity surcharging, and merchants release their claims for any additional relief, as this would ensure that American Express would not be required, either through settlement or after trial, to permit differential surcharging. This in turn would limit the relief otherwise provided in the 1720 MDL settlement, and ultimately limit competition between the credit card brands on the merchant side of the market. Such limited competition may have been in MasterCard's interest (indeed, prior to the 1720 MDL settlement it, like Visa and American Express, had chosen to prohibit inter-brand competition through differential surcharging);[40] the merchants, on the other hand, had a clear interest in increased competition between credit card networks in order to

---

[40] The 7-Eleven Objector Group suggests that MasterCard, like American Express, may have had a particular "fear of differential surcharging" because MasterCard charges higher prices to merchants than does Visa. (7-Eleven's Supplemental Submission at 9 & n.24 (citing United States v. American Express Co., 2015 WL 728563, at *44 (noting that in 2013, American Express had an 8 basis point premium over Visa versus a 3 basis point premium over MasterCard, on a mix-adjusted basis)).)

reduce costs. Friedman's ability to be a zealous advocate for the class was compromised by his collaboration with counsel for MasterCard, an entity with interests divergent to those of the class; there is reason to be concerned that he was not acting solely in the class's interests when he, teamed with Ravelo, engaged in settlement negotiations and decisionmaking in connection with the Amex Class Actions.[41]

Indeed, the Friedman/Ravelo Communications themselves appear to reveal Friedman's own understanding that the two settlements were substantively linked, and that he believed the terms of the 1720 MDL settlement would impact the ability to settle the Amex Class Actions, and on what terms. (See GBF00002181 to GBF00002182, GBF00002184 (reviewed in camera, and discussed at IMPs' Supplemental Opp'n, Ex. 7 ¶ 2); IMPs' Supplemental Opp'n, Ex. 11 (Friedman stating that "it is becoming artificial to have 'Amex case' conversations and '1720 conversations,'" and suggesting a meeting with counsel for the IMPs to "discuss [1720 MDL] negotiation objectives, strategies and implications for the Amex ASR litigation"); id., Ex. 12 &

---

[41] Class Plaintiffs contend that "Ms. Ravelo never shared Mr. Friedman's communications relating to American Express with any of her clients or co-counsel. Among other things, this fact proves the Communications did not and were not designed to advantage MasterCard in any way." (Class Pls.' Second Supplemental Mem. at 8; see also id. at 4.) But certain documents included as exhibits to the objectors' briefing suggest that confidential American Express information in fact may have been used for MasterCard's benefit. Although not entirely clear, documents appear to indicate that in 2012, Alternative Litigation Solutions, a litigation support vendor, prepared reports for MasterCard, based on data from highly confidential American Express depositions and documents, regarding American Express's experience with surcharging in Australia. (See 7-Eleven's Supplemental Submission at 4 & n.15; id., Ex. 15 (slip sheets of vendor reports and bills); id., Ex. 14 at GBF00001488 (describing vendor work as "electronic and manual review of documents, deposition analysis, and written work product").)

GBF00002416 to GBF00002418 (forwarding to Ravelo a memorandum discussing possible terms of settlement of Amex Class Actions in light of 1720 MDL settlement negotiations, and characterizing this as the "big picture");[42] 7-Eleven Supplemental Submission, Ex. 35 (same).) In one noteworthy email from November 2011, Friedman wrote that "Amex would be thrilled" by a 1720 MDL settlement with an LPF provision, because "Amex's fantasy resolution of all this litigation is a world where merchants are free to surcharge Amex cards but only if (i) the merchant also surcharges [Visa/MasterCard] and (ii) surcharges [Visa/MasterCard] at the same level," and a 1720 MDL settlement with an LPF provision gets Amex "half-way home." (IMPs' June 26, 2015, Ltr. Obj. to Class Settlement, Ex. A; Home Depot's Second Supplemental Brief, Ex. A.) This "fantasy resolution" for Amex is, of course, the resolution that Friedman ultimately agreed to on behalf of all class members.[43]

The reason or reasons behind Friedman's conduct, and for his involving Ravelo in the Amex Class Actions, are unknown. It is undisputed that Friedman and Ravelo have a longstanding personal relationship. According to Friedman and Class Plaintiffs, Friedman and Ravelo are longtime, close friends, dating back to 1992, when they were associates together at a large law firm; they and their families "vacationed together, they socialized together and they discussed investment opportunities together."[44] (See Class Pls.' May 8, 2015, Ltr. at 2; Feb. 26, 2015, Hr'g Tr. (Dkt. 6424 in 1720 MDL) at 52-53; see also, e.g., Decl. of Theresa Trzaskoma ¶ 5(a); Class Pls.' Second Supplemental Mem., Exs. 3-13.) ██████████████

---

[42] Specifically, Friedman wrote: "Now we're into the truly big picture shit up in here." (IMPs' Supplemental Opp'n, Ex. 12.)

[43] Friedman also stated in this email that "Plaintiffs . . . will argue that any such limitation is itself anticompetitive—a way to protect each network from the competitive dilemma of whether to drop rates in order to prevent its card from being differentially surcharged." (IMPs' June 26, 2015, Ltr. Objecting to Class Settlement, Ex. A.)

[44] For example, in 2006, they apparently seriously considered the purchase of a Gulfstream II jet and the operation of an air charter business. (See Class Pls.' Second Supplemental Mem., Exs. 11-13.)



Whether Friedman exchanged confidential and/or privileged materials with Ravelo and consulted with her regarding these actions for financial reasons, out of personal loyalty, due to a misplaced sense that her advice would in fact benefit the merchant class and was not improper, and/or for some other reason(s), is something this court cannot currently, and need not, determine. Whatever his reason for doing so, Friedman's bringing MasterCard's counsel into the

---

negotiating process created a conflict between class members and Class Counsel, and specifically a risk that Friedman, with Ravelo in his ear, negotiated settlement terms that are worse for class members than the terms he might have negotiated absent that conflict. This risk requires the court to deny approval of the Settlement.[46] See Reliable Money Order, 704 F.3d at 499 n.8 (suggesting that with respect to even a potential conflict between putative class counsel and class members, "the mere appearance of impropriety warrants denial of class certification" (citing Susman v. Lincoln Am. Corp., 561 F.2d 86, 88 (7th Cir. 1977)); Kulig, 2014 WL 5017817, at *3 ("[A] serious doubt that counsel will represent the class loyally requires denial of class certification."). Cf. In re Agent Orange Prod. Liab. Litig., 818 F.2d 216, 222, 224 (2d Cir. 1987) (reversing district court's approval of fee-sharing agreement in connection with approval of class settlement and award of attorneys' fees due to potential conflict of interest between class counsel and class members, and holding that "the risk of . . . an adverse effect on the settlement process provides adequate grounds for invalidating the [fee] agreement as being inconsistent with the interests of the class"). This conclusion is further compelled by the fact that the Settlement involves a mandatory Rule 23(b)(2) class, rendering concerns about adequacy at their greatest. See Issacharoff, supra, 1999 S. Ct. Rev. at 341 ("The most extreme [virtual representation problem] arises in any mandatory class action setting, in which class members are denied the ability to opt out . . . .").

---

[46] Additionally, Friedman's misconduct requires the court to remove him as Co-Lead Class Counsel and interim class counsel. "[R]egardless of the qualifications of proposed class counsel[], in assessing [his] fitness to serve as class counsel[] the Court finds that [his] misconduct in this case far outweighs any of [his] positive attributes." Friedman-Katz, 270 F.R.D. at 160 n.15; see also, e.g., Kingsepp, 142 F.R.D. at 599 ("In assessing the adequacy of counsel, a court may examine class counsel's conduct in . . . the putative class action before the court."); Kaplan v. Pomerantz, 132 F.R.D. 504, 505, 501-11 (N.D. Ill. 1990) (decertifying class on grounds of inadequate representation when alerted to named plaintiff's false deposition testimony and class counsel's complicity); Cnty. of Suffolk v. Long Island Lighting Co., 710 F. Supp. 1407, 1419 (E.D.N.Y. 1989) ("To protect the interests of the class the court has the power to re-evaluate the adequacy of [class counsel]'s representation throughout the pendency of the action. The court may replace her as counsel for the class." (internal citations omitted)), aff'd, 907 F.2d 1295 (2d Cir. 1990).

## C.    Friedman's Co-Lead Class Counsel

Class Plaintiffs repeatedly argue, with no supporting citations to any case law, that because there are no allegations that Friedman's other Co-Lead Class Counsel engaged in any misconduct, there was no failure in representation. (See Class Pls.' Second Supplemental Mem. at 1-2, 4, 7.) This argument does not hold water.

First, the court has no way to know what happened behind the scenes while the Settlement was being negotiated—what Friedman may or may not have said to his Co-Lead Class Counsel, or to the mediator, and how that may or may not have affected the negotiation process and what Co-Lead Class Counsel was willing to accept. Moreover, by all accounts, and from the court's perspective, Friedman was the primary lawyer working on the Settlement, and driving these cases generally. A mere glance at the In re Amex ASR electronic docket sheet reveals that until the Friedman/Ravelo Communications came to light, Friedman signed and filed most of Class Plaintiffs' letters, briefs, and other submissions, including Class Plaintiffs' opposition to Defendants' motion to compel arbitration. (See Mem. of Law in Opp'n to Defs.' Mot. To Dismiss the Proceedings in Favor of Arbitration, or, Alternatively, Dismiss Count III & Compel the Remaining Claims to Arbitration (Dkt. 264) at 25.) It was Friedman who made appearances and spoke on behalf of Class Plaintiffs at court conferences. (See, e.g., Mar. 2, 2011, Status Conf. Tr. (Dkt. 17) at 4; Mar. 25, 2011, Conf. Tr. (Dkt. 35 (sealed)); Apr. 14, 2011, Conf. Tr. (Dkt. 71); July 26, 2011, Hr'g Tr. (Dkt. 74); Feb. 21, 2012, Hr'g Tr. (Dkt. 143); Mar. 27, 2012, Hr'g Tr. (Dkt. 153); July 12, 2012, Hr'g Tr. (Dkt. 169); July 18, 2012, Hr'g Tr. (Dkt. 187); Sept. 14, 2012, Hr'g Tr. (Dkt. 193); Oct. 16, 2012, Hr'g Tr. (Dkt. 203 (sealed)); Feb. 7, 2014, Conf. Tr. (Dkt. 331).) It was Friedman who stood up and spoke in support of final approval of the Settlement at the Fairness Hearing. (See generally Fairness

Hr'g Tr.) The court's observations have been consistent with Friedman's description of his role as "running the cases against American Express—including . . . assuming a primary role along with co-lead counsel in executing the litigation" (Decl. of Gary B. Friedman in Supp. of (1) Class Pls.' Mot. for Final Approval of Class Action Settlement and (2) Class Counsel's Mot. for an Award of Attorneys' Fees & Costs, & for Leave To Distribute Service Awards ("Friedman Decl.") (Dkt. 364) ¶¶ 4-6); and the court does not doubt that, as Amex states, Friedman "played a leading role in the settlement negotiations in this case" (Defs.' Supplemental Mem. at 7; see also Decl. of Kenneth R. Feinberg (Dkt. 369) ¶¶ 4, 8).

Second, the content of the most recent briefing presents additional concerns regarding the judgment and independence of the other Co-Lead Class Counsel. Shockingly, Co-Lead Class Counsel have not extricated Friedman from their ranks; instead, they submitted a brief regarding the Friedman/Ravelo Communications that was signed by Friedman (indeed, Friedman is listed first) as well as the other Class Counsel. (See Class Pls.' Second Supplemental Mem. at 11.) They even filed a declaration characterizing the documents at issue that was prepared by Friedman's personal attorney. (See generally Decl. of Theresa Trzaskoma.) Apparently, Co-Lead Class Counsel are willing to let Friedman describe or characterize the communications as he wishes; they have declined the opportunity to voice their own, independent view of the communications and put that before the court for an honest assessment of the representation that was provided, and its impact on the settlement negotiations. This gives the appearance that Friedman's co-counsel may be more interested in protecting Friedman, their settlement, and their attorneys' fees application, than they are in protecting the merchant class that they purport to represent.

Furthermore, Co-Lead Class Counsel raise arguments in that brief that illustrate a fundamental disconnect; they do not seem to understand the problem with Friedman's conduct. They continue to argue that Friedman was seeking Ravelo's defense-side expertise, and that Friedman did what he did "in an effort to benefit class members." (Class Pls.' Second Supplemental Mem. at 8.) Even if that is true, Class Counsel should understand why the way Friedman went about doing that was wrong. As the Target Objector Group puts it: "It is difficult to understand how class counsel could even suggest that such an arrangement might exist consistent with the adequacy of representation requirement and ethical standards." (Target's Supplemental Mem. at 7.) Given their apparent failure to grasp this important concept, and their continued association with Friedman, the court questions whether not only Friedman, but also the other Co-Lead Class Counsel, have the independence, judgment, and integrity necessary to serve as class counsel for a mandatory class.

This is all the more concerning where the proposed settlement would provide class members with only injunctive relief (of questionable value), while Defendants would pay Class Counsel a large attorneys' fee (up to $75 million). And Class Plaintiffs' mediation position PowerPoint presentation from June 2013, revealed with the Friedman/Ravelo Communications, makes the court even more skeptical of the representation that occurred in this matter. (See Target's Supplemental Mem., Ex. G.) ███████████████████████████

████████████████████████████████████████

█████████████████████████████████████

███████████████████████████████████

██████████████████████████████████ (Id.

at 2-4.) To the court, this smacks of blatant collusion—Class Counsel proposing to work together with Defendants to achieve a result that is contrary to the wishes of the putative class. Have Class Counsel lost sight of the fact that they purport to represent merchants? The court is concerned that none of the Co-Lead Class Counsel were, or are, acting in the class's best interests, as opposed to their own interests in effectuating this settlement agreement and collecting a fee.

Finally, there is an additional reason that the court is concerned that Co-Lead Class Counsel may be playing fast and loose with their representation of the merchant class. On June 6, 2014, after the Settlement was preliminarily approved and after Class Plaintiffs' motion for final approval was filed, the court received a letter by Christopher Hellmich, Esq. ("Hellmich"), formerly of Patton Boggs LLP. (Hellmich Ltr. (Dkt. 419).) Hellmich explained that although Judge Pauley and Judge Reyes's appointment orders had both appointed specific attorneys as interim co-lead class counsel for the In re Amex ASR putative class—Hellmich, Friedman, and Mark Reinhardt—the Class Settlement Agreement misrepresented these orders and instead stated that three law firms had been appointed as interim co-lead class counsel— Friedman Law Group, LLP, Patton Boggs LLP, and Reinhardt, Wendorf and Blanchfield. (Id. at 1-2.) Hellmich's statements regarding the appointment orders are accurate. (Compare S.D.N.Y. Consolidated Action Mar. 10, 2009, Order, and Order Consolidating all Class Actions; Establishing Case Caption; & Appointing Interim Lead Class Counsel at 4, with CSA at 2.) Hellmich further explained that Class Counsel "conducted all settlement negotiations" with American Express in the fall of 2013 "while intentionally concealing those negotiations from" Hellmich, and that they subsequently "refused [his] requests to review certain internal documents that they considered as being dispositive to the negotiations." (Id. at 1.) Therefore, he stated, he

was unable to aver that the Settlement was in the class's best interests; additionally, he suggested that the negotiating process may have been tainted through his intentional exclusion. (Id. at 1, 3.) In response, Class Plaintiffs contend that Hellmich was complaining of a mere technicality, and note that interim co-lead class counsel were named by both law firm name and attorney name (apparently suggesting that the law firm is the more important designation). (Class Pls.' Reply Mem. of Law in Further Supp. of Mot. for Final Approval of Class Action Settlement (Dkts. 500-1 (filed under seal), 511 (redacted public version)) at 38; see also Class Pls.' Second Supplemental Mem. at 1 (referring to "co-lead counsel firms").) They also argue that Hellmich was included in negotiations, and point to a declaration of the mediator Kenneth Feinberg, which stated that Hellmich was among the lawyers representing Class Plaintiffs at the June 2013 mediation. (Id. at 38-39 (citing Decl. of Kenneth R. Feinberg ¶ 4).) It appears, however, that Hellmich separated from Patton Boggs by July 2013 (see Not. of Change of Firm Affiliation (Dkt. 255)), and he was not in attendance at the November 2013 mediation, which purportedly resulted in the terms of the Settlement; he appears to have been replaced by Read McCaffrey, Esq. ("McCaffrey"), also (at that time) of Patton Boggs LLP. (See Decl. of Kenneth R. Feinberg ¶ 6.)

Making matters even stranger, as of January 2015, McCaffrey's affiliation with Patton Boggs also ended (see Not. of Firm Affiliation (Dkt. 549)); however, despite Class Plaintiffs' apparent position that it is the law firm, and not the attorney, that is the relevant entity for purposes of court appointment as interim class counsel and/or class counsel, McCaffrey has continued to purport to act on behalf of Class Plaintiffs, and he signed Class Plaintiffs' Second

Supplemental Memorandum in his new position at the Law Offices of Marc Rosen. (See id.; Class Pls.' Second Supplemental Mem. at 11.)[47]

The court does not have a full understanding of what exactly occurred between Hellmich, McCaffrey, Patton Boggs LLP (now Squire Patton Boggs), and the rest of Co-Lead Class Counsel, but they cannot simply decide for themselves who is representing the putative class and who is not. This is a troubling situation and the court will require an explanation.

\*       \*       \*

In sum, under the circumstances, Class Plaintiffs have failed to carry their burden to show that the settlement was procedurally fair, and that the requirements of Rule 23(a)(4) were met.[48] See Creative Montessori, 662 F.3d at 919 ("A serious or, equivalently, a 'major' ethical violation, should place on class counsel a heavy burden of showing that they are adequate representatives of the class." (citing Busby v. JRHBW Realty, Inc., 513 F.3d 1314, 1324 (11th Cir. 2008))). Accordingly, Class Plaintiffs' motion for final approval of the Settlement and Class Counsel's motion for an award of attorneys' fees are DENIED.[49]

---

[47] Class Plaintiffs continue to blur the lines with respect to whether they believe it is the firm, or the attorney, that is the relevant entity for purposes of class representation here. (See Class Pls.' Second Supplemental Mem. at 2 n.1 (discussing Reinhardt and his firm; discussing McCaffrey alone); id. at 7-8 (noting that McCaffrey and Patton Boggs LLP were "integrally involved in all decision-making throughout the litigation").)

[48] Contrary to Class Plaintiffs' and American Express's suggestion, the engagement of Kenneth Feinberg as a mediator in these actions does not overcome the failure in representation. See In re Literary Works, 654 F.3d at 245, 253 ("[T]he participation of impartial mediators . . . does not compensate for the absence of independent representation.").

[49] To reiterate, nothing stated herein is intended to express any opinion regarding the fairness, procedural or otherwise, of the 1720 MDL settlement agreement. Irrespective of Friedman's and Ravelo's degrees of participation or lack thereof in the negotiations of that agreement (see June 10, 2015, Ltr. of Co-Lead Class Counsel in MDL 1720 at 2-3 (representing that "[a]lthough Mr. Friedman had some participation in the negotiations relating to the [1720 MDL] written settlement agreement, he did not have a 'central' or 'key' role in negotiating the structural relief" and that "from [1720 MDL] Co-Lead Counsel's perspective, Ms. Ravelo was not a lead-negotiator or decision-maker on behalf of MasterCard with respect to reaching a settlement")), here, Friedman was, as stated, Co-Lead Class Counsel, and by all accounts, the driver of this litigation; for example, Friedman argued on behalf of Class Plaintiffs, in favor of final approval of the Class Settlement Agreement, at the Fairness Hearing (see generally Fairness Hr'g Tr.), and signed the briefs regarding the same (see Class Pls.' Mem. of Law in Supp. of Mot. for Final Approval of Class Action Settlement). (See also Friedman Decl. ¶¶ 4-6 (representing Friedman Law Group as having "run[] the cases against American Express"); Decl. of Kenneth R. Feinberg ¶¶ 4, 8 (Friedman represented

## IV. CONCLUSION

For the foregoing reasons, Class Plaintiffs' motion for final approval of the Class Settlement Agreement (Dkt. 361), and Class Counsel's motion for attorneys' fees (Dkt. 371), are both DENIED. Accordingly, the anti-suit injunction contained in paragraph 24 of the Class Settlement Agreement is VACATED. Additionally, Gary B. Friedman and the Friedman Law Group LLP are hereby REMOVED as Co-Lead Class Counsel and as interim class counsel in connection with the Amex Class Actions. Read McCaffrey, Christopher Hellmich, Mark Reinhardt, Squire Patton Boggs, and Reinhardt, Wendorf & Blanchfield are hereby ORDERED TO SHOW CAUSE in writing, by September 8, 2015, why any of them should continue in their capacities as interim class counsel, and, if they should so remain, to propose replacement interim class counsel in the place of Gary B. Friedman and Friedman Law Group LLP. Should Class Plaintiffs, with replacement interim class counsel, and American Express seek to return to mediation, they are DIRECTED to obtain a different mediator, who is experienced in antitrust law, and to seek court approval of that mediator. Finally, Class Plaintiffs and American Express are hereby DIRECTED to address, by September 8, 2015, whether the Marcus Action should remain in the Eastern District of New York or be transferred back to the Southern District of New York for further proceedings. A status conference shall be held at 10:00 a.m. on October 5, 2015.

SO ORDERED.

s/Nicholas G. Garaufis

Dated: Brooklyn, New York
August 4, 2015

NICHOLAS G. GARAUFIS
United States District Judge

---

Class Plaintiffs during settlement negotiations).) See also supra pages 38-39. Additionally, nothing stated herein is intended to express any viewpoint on American Express's anticipated motion for sanctions, or on the appropriate disciplinary consequences for Mr. Friedman, if any. This Memorandum and Order is addressed exclusively to the motions for approval of the Settlement and for attorneys' fees.