**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE AMERICAN EXPRESS ANTI-STEERING RULES ANTITRUST LITIGATION (II) | Master File No: 11-MD-02221 (NGG)(RER) |

This Document Relates to:

*Rite Aid Corporation, et al. v. American Express Travel Related Services Co., Inc.*, Case No: 08-cv-2315-NGG-RER

*CVS Pharmacy, Inc. v. American Express Travel Related Services Co., Inc.*, Case No: 08-cv-02316-NGG-RER

*Walgreen Co. v. American Express Travel Related Services Co., Inc.*, Case No: 08-cv-2317-NGG-RER

*BI-LO, LLC v. American Express Travel Related Services Co., Inc.*, Case No: 08-cv-02380-NGG-RER

*H.E. Butt Grocery Co. v. American Express Travel Related Services Co. Inc.*, Case No:   08-cv-02406-NGG-RER

*The Kroger Co., Safeway, Inc., Ahold USA, Inc., Albertson's LLC, Hy-Vee, Inc., The Great Atlantic & Pacific Tea Company, Inc. v. American Express Travel Related Services Co., Inc.*, Case No: 11-cv-0337-NGG-RER

*Meijer, Inc., Publix Super Markets, Inc., Raley's, and Supervalu v. American Express Travel Related Services Co., Inc.*, Case No:   11-cv-0338-NGG-RER

**PLAINTIFFS' FIRST AMENDED AND**
**CONSOLIDATED COMPLAINT**

Plaintiffs, Ahold U.S.A., Inc.; Albertson's, LLC; BI-LO, LLC; CVS Pharmacy, Inc.; The Great Atlantic & Pacific Tea Company, Inc.; H.E. Butt Grocery Co.; Hy-Vee, Inc.; The Kroger Co.; Meijer, Inc.; Publix Super Markets, Inc.; Raley's Inc.; Rite Aid Corporation and Rite Aid HDQTRS. Corp.; Safeway Inc.; Supervalu Inc.; and Walgreen Co. (collectively "Plaintiffs"), bring this Amended Complaint for treble damages and injunctive relief against Defendants American Express Company ("American Express") and its wholly-owned subsidiary American Express Travel Related Services Company, Inc. ("American Express Travel") (collectively referred to as "Amex") pursuant to the antitrust laws of the United States.   For its First Amended and Consolidated Complaint against Defendants, Plaintiffs state as follows:

## I.      NATURE OF THE ACTION

1.      This is a civil antitrust action challenging the legality under Sections 1 and 2 of the Sherman Act (15 U.S.C. §§ 1 and 2) of certain restraints that Amex, individually and in concert with certain bank issuers of Amex-branded credit cards, imposes on Plaintiffs and other U.S. merchants.   Specifically, Plaintiffs are retail merchants that have each entered into an American Express Card Acceptance Agreement with Amex (the "Agreement").   In those Agreements, and in virtually every other such Agreement that Amex has entered into with a merchant, Amex restrains the merchant from differentially pricing the use of payment cards, stating a preference for any form of payment, or allowing the retail customer to use different payment cards on differing terms or conditions established by the merchant.   These restraints are referred to herein as "the Amex restraints" or the "anti-steering rules."   Amex has agreed with bank issuers of Amex cards to enforce these restraints.   Those bank issuers also issue Visa and MasterCard credit cards.

2.      The Amex restraints: (a) require that Plaintiffs and other merchants accept all payment cards that bear the "American Express" name, trademark, servicemark or logo; and (b)

prohibit Plaintiffs and other merchants from (i) doing anything that would lead – or "steer" – a retail purchaser to use a lower-priced payment card product than the Amex credit card; (ii) suggesting to a retail customer who presented an Amex card that he or she use an alternative (less expensive) payment card product; (iii) providing retail customers with truthful procompetitive information about Amex's prices or the prices of other payment products; (iv) publishing or stating a preference for any other (less expensive) payment card product; or (v) promoting the use of any other (less expensive or higher quality) payment card over the use of Amex cards, including offering the retail customer any incentive, benefit, discount, advantage or reward for using an alternative payment card product or imposing a charge or price on the use of the Amex card that is not equally imposed on lower-cost payment cards.

3.      The purpose and effect of the Amex restraints are: (a) to prevent Plaintiffs and the other merchants with whom Amex has contracted from charging retail customers who use an Amex card for the higher cost to the merchant of the Amex card product; (b) to prevent the merchants from discounting the price of goods or services bought by retail customers who use payment products or methods that are or would be less costly to the merchant than Amex payment cards; (c) to prevent merchants from truthfully informing retail customers that their use of an Amex payment card imposes higher costs on the merchant than other payment card products or payment methods, or that those higher costs result in higher retail prices to consumers; (d) to prevent the merchants from offering benefits, incentives, services, advantages, rewards or the like to retail customers who use payment cards that are less expensive for the merchant to accept; and (3) to prevent merchants from even stating a preference for less costly payment cards.

4.      The Amex restraints are anticompetitive because they nullify the operation of the price mechanism, impede competition among credit card networks and suppress output.  The

Amex restraints prevent other credit card networks or credit card issuers from lowering merchant fees so as to incentivize merchants to steer retail customers to use that lower-cost competing credit card. Such conduct also would have the effect of lowering the net two-sided transaction price paid jointly by the merchant and the cardholder. More specifically, the Amex restraints suppress horizontal, interbrand price competition for credit card transactions and result in Amex and other credit card networks charging higher merchant fees and higher net two-sided transaction prices to merchants and cardholders that are both (1) in excess of the competitive level, and (2) higher than would be charged in the absence of the Amex restraints. If the Amex restraints did not exist, then the merchant fees charged by Amex, as well as the net two-sided transaction price paid by merchants and cardholders, would drop from their anticompetitively elevated levels to a lower rate established by competition. In addition, merchant fees and the net two-sided transaction price paid by merchants and cardholders for the credit card transactions of other credit card networks would also drop from their anticompetitively high levels that are sustained by the Amex restraints.

5.     The Amex restraints are also anticompetitive in that they suppress output by lowering the number of credit card transactions. If the Amex restraints did not exist, then the net two-sided transaction price for credit card transactions would drop, including a significant drop in the portion of the two-sided price paid by merchants. As a result, millions of merchants and other entities that receive recurring payments that do not currently accept credit cards – especially Amex credit cards – due to the unduly high merchant discount rate, would accept credit cards and the total number of credit card transactions would go up. In addition, if the Amex restraints were removed merchants would offer incentives, rewards and benefits to steer customers to use lower-cost credit cards. Some retail customers who would otherwise use a different payment form will

be motivated by these merchant-offered rewards, benefits and incentives to use the lower-cost credit card or use it more often and the number of credit card transactions will go up.

6.     The Amex restraints also stifle competition for credit card transactions by (1) erecting barriers to entry or expansion by new or aggressive credit card competitors that would have entered the market or expanded their share of the market by offering lower net two-sided transaction prices to merchants and cardholders, including lower merchant fees, which would incentivize merchants to steer retail customers to credit cards with lower net two-sided transaction prices; (2) reducing the quality of the available credit card transactions by preventing retail customers from being offered merchant discounts, benefits, incentives, services, or advantages that some retail customers would prefer to the Amex-offered rewards; (3) eliminating consumer choice by prohibiting the merchants from offering incentives, benefits, discounts, or advantages as alternatives to the Amex rewards; and (4) prohibiting merchants from imposing a differential price on the use of the high-cost Amex card so as to incentivize customers to use lower-cost cards and stimulate price competition, which would result in lower net two-sided transaction prices; and (5) keeping the prices paid by merchants (as well as the net two-sided transaction price paid by merchants and cardholders) higher than they would be if the price mechanism were allowed to function.  Those high merchant fees are passed on to the retail customers in the form of higher retail prices, which then suppress the output of the products and services sold at retail.

7.     The Amex restraints eliminate any economic incentive for credit card networks to lower their respective merchant fees, and thereby lower the net two-sided transaction price, as such price reductions will not lead to a greater number of credit card transactions for the network.  The result is that merchant fees and the net two-sided transaction price for Amex and other credit card networks are higher than the competitive level and higher than they otherwise would be in the

absence of Amex's anticompetitive restraints. In addition, the number of credit card transactions is lower than it otherwise would be in the absence of the Amex restraints. Thus, the anticompetitive restraints have raised price and lowered output.

8. The result of the Amex restraints is that: (a) the net two-sided transaction price of using an Amex card is hidden from the retail customer, who is the decision maker as to what payment method to use; (b) Amex is able to evade and nullify the operation of the price mechanism that, in the absence of the anticompetitive restraints, would lead to lower net two-sided credit card transaction prices for merchants and cardholders, lower merchant fees and lower retail prices. The Amex restraints allow Amex to impose supra-competitive net two-sided transaction prices on merchants and cardholders that are above the competitive level, and to obtain and maintain monopoly power, which is the power to profitably raise price substantially above the competitive level.

9. The Amex restraints have adverse consumer welfare effects on both sides of the credit card transaction platform as (1) retail consumers are deprived of the benefits, advantages, incentives, services, or discounts that would otherwise be offered by merchants and which retail customers would choose in preference to the Amex-offered rewards and (2) merchants are deprived of both the lower prices that they would be charged by Amex and other credit card networks and the added revenue they would receive by imposing a differential charge on the use of the high-cost Amex cards. Although such a charge would cause the cost of the transaction to some retail customer to go up, it would also cause the cost of the same transaction to the merchant to go down by at least an equal amount. Such differential pricing by merchants of Amex's high-cost credit cards would cause Amex cardholders to switch to lower-cost credit cards, thus causing Amex to lose transactions. In order to avoid that loss of transactions, Amex would lower its net

two-sided transaction price by lowering the merchant fees while leaving cardholder reward and annual fees at the same level.  In addition, because the Amex restraints have blocked entry or expansion into the credit card market, merchants and retail customers are deprived of credit card offerings that some merchants and retail customers would prefer over the historically available credit cards.

10.     The Amex restraints obstruct and eliminate horizontal interbrand price competition between credit card networks for credit card transactions and cause both Amex's net two-sided transaction price as well as the net two-sided transaction price of other credit card networks to be higher than they otherwise would be.  The Amex restraints also (a) block the flow of truthful, procompetitive information to retail customers, eliminate the consumer choice that, in the absence of the restraints, would be available in the form of incentives, benefits, rewards and discounts offered by merchants to encourage the retail customers to use lower-cost credit cards; and/or (b) result in supra-competitive pricing regardless of whether the price is calculated as the price paid by merchants (*i.e.*, the one-sided price) or the prices paid jointly by both merchants and cardholders (*i.e.*, the two-sided transaction price).

11.     Amex exploits its monopoly power in the two-sided credit card transaction market by charging merchants and cardholders supra-competitive net two-sided transaction prices for its credit card services.  Indeed, the Amex restraints are imposed and enforced by Amex for the specific anticompetitive purpose of insulating Amex from certain types of price competition from other credit card networks, eliminating or dampening cross-elasticity of demand between Amex's two-sided credit card transaction and the two-sided credit card transactions of other credit card networks and eliminating the cross-elasticity of demand for the sale of credit card services to merchants in the alternative one-sided relevant market alleged herein (*see* ¶¶ 575-62 below).  Thus,

Amex has monopolized or attempted to monopolize within the meaning of Section 2 of the Sherman act (a) the relevant market for the sale of two-sided credit card transactions; and/or (b) the relevant submarket for the sale of Amex-only two-sided credit card transactions.  In the alternative, Amex has monopolized or attempted to monopolize (a) the relevant one-sided market for the sale of credit card services to merchants; and/or (b) the relevant submarket for the sale of Amex-only one-sided credit card services sold to merchants.  Amex has also imposed anticompetitive contract terms on merchants.  Those terms have and continue to unreasonably restrain competition within the meaning of Section 1 of the Sherman Act in (1) the relevant two-sided credit card transaction market and/or (2) the relevant submarket for the sale of Amex-only two-sided credit card transactions.  In the alternative, Amex has and continues to unreasonably restrain competition with the meaning of Section 1 of the Sherman Act in (1) the relevant one-sided market for the sale of credit card services to merchants and/or (2) the relevant submarket for the sale of Amex-only one-sided credit card services sold to merchants.  Each Plaintiff seeks treble damages for the anticompetitive overcharges that it has suffered and will suffer as a result of Amex's unlawful conduct described in this First Amended and Consolidated Complaint, and injunctive relief to permanently enjoin the enforcement by Amex of its anticompetitive restraints.

## II.     PARTIES

12.     Plaintiff Ahold U.S.A., Inc. ("Ahold") is a Maryland corporation with its principal place of business in Quincy, Massachusetts.  Ahold owns and operates retail stores at which American Express cards are accepted as payment for goods and services.  Ahold purchases Amex payment card services pursuant to an agreement with Amex dated November 15, 2006.  Ahold has paid Amex supra-competitive, artificially inflated prices whether viewed as a one-sided price or part of a two-sided transaction price as a result of the anticompetitive restraints that Amex has

imposed and continues to impose on Ahold and other merchants.  The references in this First Amended and Consolidated Complaint to "merchant(s)" include Ahold.

13.     Plaintiff Albertson's LLC ("Albertson's") is a limited liability company with its principal place of business in Boise, Idaho.  Albertson's owns and operates retail stores at which American Express cards are accepted as payment for goods and services.  Albertson's purchases Amex payment card services pursuant to an agreement with Amex dated February 27, 2007. Albertson's has paid Amex supra-competitive, artificially inflated prices whether viewed as a one-sided price or part of a two-sided transaction price as a result of the anticompetitive restraints that Amex has imposed and continues to impose on Albertson's and other merchants.  The references in this First Amended and Consolidated Complaint to "merchant(s)" include Albertson's.

14.     Plaintiff BI-LO, LLC ("BI-LO") is a limited liability company organized and existing under the laws of the State of Delaware, with its principal place of business in Greenville, South Carolina.  BI-LO operates retail stores at which Amex payment cards are accepted as payment for goods and services.  BI-LO purchases Amex payment card services pursuant to written agreements since prior to 2003.  BI-LO has paid supra-competitive, artificially inflated prices whether viewed as a one-sided price or part of a two-sided transaction price as a result of the anticompetitive restraints that Amex has imposed and continues to impose on BI-LO and other merchants.  The references in this First Amended and Consolidated Complaint to "merchant(s)" include BI-LO.

15.     Plaintiff CVS Pharmacy, Inc. ("CVS") is a Rhode Island corporation with its principal place of business in Woonsocket, Rhode Island.  CVS and its affiliated companies own and operate over 9800 pharmacies and drug stores in most states throughout the United States, including in this District.  CVS and its affiliated companies have purchased credit card networks

services from Amex, pursuant to written agreements since at least prior to 2002.  CVS's affiliated companies have conveyed, assigned and transferred to CVS all rights, title and interest in and to all causes of action asserted herein and any resulting proceeds therefrom.  CVS and its affiliated companies have paid Amex supra-competitive, artificially inflated prices whether viewed as a one-sided price or part of a two-sided transaction price as a result of anticompetitive restraints that Amex has imposed on CVS, its affiliated companies and other merchants.  The references in this First Amended and Consolidated Complaint to "merchant(s)" include CVS.

16.     Plaintiff The Great Atlantic & Pacific Tea Company, Inc. ("A&P") is a Maryland corporation with its principal place of business in Montvale, New Jersey.  A&P owned and operated retail stores at which Amex payment cards were accepted as payment for goods and services.  A&P purchased Amex payment card services pursuant to an agreement with Amex dated September 13, 1995.  A&P has paid Amex supra-competitive, artificially inflated prices whether viewed as a one-sided price or part of a two-sided transaction price as a result of the anticompetitive restraints that Amex has imposed on A&P and other merchants.  The references in this First Amended and Consolidated Complaint to "merchant(s)" include A&P.

17.     Plaintiff H.E. Butt Grocery Co. ("HEB") is a Texas corporation with its principal place of business in San Antonio, Texas.  HEB owns and operates retail stores at which Amex payment cards are accepted as payment for goods and services.  HEB purchases Amex payment card services pursuant to an agreement with Amex dated November 1, 1999.  HEB has paid Amex supra-competitive, artificially inflated prices whether viewed as a one-sided price or part of a two-sided transaction price as a result of the anticompetitive restraints that Amex has imposed and continues to impose on HEB and other merchants.  The references in this First Amended and Consolidated Complaint to "merchant(s)" include HEB.

18.     Plaintiff Hy-Vee, Inc. ("Hy-Vee") is an Iowa corporation with is principal place of business in West Des Moines, Iowa.  Hy-Vee owns and operates retail stores at which American Express cards are accepted as payment for goods and services.  Hy-Vee purchases Amex payment card services pursuant to an agreement with Amex dated June 15, 2001.  Hy-Vee has paid Amex supra-competitive, artificially inflated prices whether viewed as a one-sided price or part of a two-sided transaction price as a result of the anticompetitive restraints that Amex has imposed and continues to impose on Hy-Vee and other merchants.  The references in this First Amended and Consolidated Complaint to "merchant(s)" include Hy-Vee.

19.     Plaintiff The Kroger Co. ("Kroger") is an Ohio corporation with its principal place of business in Cincinnati, Ohio.  Kroger owns and operates retail stores at which American Express cards are accepted as payment for goods and services.  Kroger purchases Amex payment card services pursuant to an agreement with Amex dated February 1, 2003.  Kroger has paid Amex supra-competitive, artificially inflated prices whether viewed as a one-sided price or part of a two-sided transaction price as a result of the anticompetitive restraints that Amex has imposed and continues to impose on Kroger and other merchants.  The references in this First Amended and Consolidated Complaint to "merchant(s)" include Kroger.

20.     Plaintiff Meijer, Inc. ("Meijer") is a Michigan corporation with its principal place of business in Grand Rapids, Michigan.  Meijer owns and operates retail stores at which Amex cards are accepted as payment for goods and services.  Meijer has purchased and purchases Amex payment card services pursuant to agreements with Amex, including the agreement dated June 9, 1998.  Meijer has paid Amex supra-competitive, artificially inflated prices whether viewed as a one-sided price or part of a two-sided transaction price as a result of the anticompetitive restraints

that Amex has imposed and continues to impose on Meijer and other merchants.  The references in this First Amended and Consolidated Complaint to "merchant(s)" include Meijer.

21.     Plaintiff Publix Super Markets, Inc. ("Publix") is a Florida corporation with its principal place of business in Lakeland, Florida.  Publix owns and operates retail stores at which Amex cards are accepted as payment for goods and services.  Publix has purchased and purchases Amex payment card services pursuant to agreements with Amex, including the agreement dated May 5, 1999.  Publix has paid Amex supra-competitive, artificially inflated prices whether viewed as a one-sided price or part of a two-sided transaction price as a result of the anticompetitive restraints that Amex has imposed and continues to impose on Publix and other merchants.  The references in this First Amended and Consolidated Complaint to "merchant(s)" include Publix.

22.     Plaintiff Raley's Inc. ("Raley's") is a California corporation with its principal place of business in West Sacramento, California.  Raley's owns and operates retail stores at which Amex cards are accepted as payment for goods and services.  Raley's has purchased and purchases Amex payment card services pursuant to agreements with Amex, including the agreement dated August 10, 1998.  Raley's has paid Amex supra-competitive, artificially inflated prices whether viewed as a one-sided price or part of a two-sided transaction price as a result of the anticompetitive restraints that Amex has imposed and continues to impose on Publix and other merchants.  The references in this First Amended and Consolidated Complaint to "merchant(s)" include Raley's.

23.     Plaintiffs Rite Aid Corporation and Rite Aid HDQTRS. Corp. ("Rite Aid") are corporations organized and existing under the laws of the State of Delaware, with their principal place of business in Camp Hill, Pennsylvania.  Rite Aid and their affiliates own and operate drugstores within the United States.  Rite Aid purchases Amex payment card services pursuant to

an agreement with Amex dated December 30, 1996.  Rite Aid has paid Amex supra-competitive, artificially inflated prices whether viewed as a one-sided price or part of a two-sided transaction price as a result of the anticompetitive restraints that Amex has imposed and continues to impose on Rite Aid and other merchants.  The references in this First Amended and Consolidated Complaint to "merchant(s)" include Rite Aid.

24.     Plaintiff Safeway Inc. ("Safeway") is a Delaware corporation with its principal place of business in Pleasanton, California.  Safeway owned and operated retail stores at which American Express cards were accepted as payment for goods and services.  Safeway purchased Amex payment card services pursuant to an agreement with Amex dated July 23, 2004.  Safeway is now owned by Albertsons.   Safeway paid Amex supra-competitive, artificially inflated prices whether viewed as a one-sided price or part of a two-sided transaction price as a result of the anticompetitive restraints that Amex has imposed on Safeway and other merchants.  The references in this First Amended and Consolidated Complaint to "merchant(s)" include Safeway.

25.     Plaintiff Supervalu Inc. ("Supervalu") is a Delaware corporation with its principal place of business in Eden Prairie, Minnesota.  Supervalu owns and operates retail stores at which Amex cards are accepted as payment for goods and services.  Supervalu has purchased and purchases Amex payment card services pursuant to agreements with Amex, including agreements dated October 29, 1999 and July 9, 1996.  Supervalu has paid Amex supra-competitive, artificially inflated prices whether viewed as a one-sided price or part of a two-sided transaction price as a result of the anticompetitive restraints that Amex has imposed and continues to impose on Supervalu and other merchants.  Supervalu brings this action individually, as the assignee of claims from Supervalu Holdings, Inc. and as the successor in interest to certain agreements between Albertson's, Inc. and Amex, including the agreement dated July 9, 1996.  The references in this

First Amended and Consolidated Complaint to Supervalu and "merchant(s)" include Supervalu, Supervalu Holdings, Inc. and Albertsons, Inc.

26.     Walgreen Co. ("Walgreen") is an Illinois corporation with its principal place of business in Deerfield, Illinois.  Walgreen brings this action on its own behalf and on behalf of its affiliated assignors, including Walgreens Health Initiatives, Inc. f/k/a WHP Health Initiatives, Inc., Walgreens Mail Service, Inc. f/k/a Walgreens Healthcare Plus, Inc. and Walgreens Home Care, Inc. f/k/a Walgreens Advance Care, Inc.  The reference in this First Amended and Consolidated Complaint to "Plaintiff" includes Walgreen and its assignors.  Walgreen owns and operates retail pharmacies in 49 states.  Walgreen purchases Amex payment card services pursuant to an agreement with Amex dated November 29, 1993.  Walgreen has paid Amex supra-competitive, artificially inflated prices whether viewed as a one-sided price or part of a two-sided transaction price as a result of the anticompetitive restraints that Amex has imposed and continues to impose on Walgreen and other merchants.  The references in this First Amended and Consolidated Complaint to "merchant(s)" include Walgreen.

27.     Each Plaintiff brings its claims individually in this First Amended and Consolidated Complaint.

28.     Defendant American Express Company ("American Express") is a New York corporation with its principal place of business in New York, New York.

29.     Defendant American Express Travel Related Services Company, Inc. ("American Express Travel") is a Delaware corporation with its principal place of business in New York, New York.  American Express Travel is a wholly-owned subsidiary of American Express and is actively managed and controlled by American Express.

30.     American Express actively directed and participated in the anticompetitive acts alleged in this Amended Complaint and determined that those acts be undertaken by itself and its wholly-owned subsidiary, American Express Travel.

### III.     JURISDICTION AND VENUE

31.     The claims set forth in this First Amended and Consolidated Complaint arise under Sections 1 and 2 of the Sherman Act (15 U.S.C. §§ 1 and 2) and seek treble damages pursuant to Section 4 of the Clayton Act (15 U.S.C. § 15(a)).  Plaintiffs also seek injunctive relief pursuant to Section 16 of the Clayton Act (15 U.S.C. § 26).  This Court has subject matter jurisdiction over these claims pursuant to 28 U.S.C. §§ 1331 and 1337(a).

32.     Venue is proper in this Court pursuant to Section 12 of the Clayton Act (15 U.S.C. § 22) and 28 U.S.C. § 1391 in that each Defendant is an inhabitant of this District or is found and transacts business in this District.

### IV.     NATURE OF TRADE AND COMMERCE

33.     Amex provides financial services in interstate commerce throughout the United States.  In particular, Amex provides credit card services to both retail consumers and to merchants. Amex also licenses approximately 10 major banks to issue Amex cards to consumers throughout the United States.

34.     A "credit card" is a wallet-sized plastic card or other electronic device that a retail customer can present to a merchant in order to effectuate payment for a purchase from the merchant.

35.     In order to provide credit card services, Amex issues credit cards to millions of individuals and businesses, who are sometimes referred to herein as "cardholders."  The vast majority of Amex cardholders typically pays Amex an annual fee and each cardholder agrees with

Amex that when the cardholder presents an Amex payment card to a merchant and the merchant accepts the card in payment for goods or services, Amex will advance payment to the merchant and bill the cardholder monthly in the amount of the cardholder's Amex transactions. The cardholder then pays Amex the billed amount pursuant to payment plans that are available for different types of Amex credit cards. If the cardholder does not pay the outstanding balance by the monthly due date, then Amex and the cardholder enter into a revolving credit agreement and Amex charges the cardholder interest on the unpaid balance. If the cardholder does not timely pay at least the minimum required amount, then the cardholder is assessed late fees and penalties.

36.     Amex also enters into card acceptance Agreements with merchants to sell them Amex credit card services. In these Agreements, the merchants agree to obtain electronic authorization from Amex to process an Amex payment card for a particular transaction and, if authorization is granted, to accept the Amex card in payment for the goods or services. Amex, in turn, agrees to pay the merchant the amount of the authorized transaction less a "merchant discount fee." The merchant discount fee, which is retained by Amex except the amount that Amex charges the merchant for providing credit card services.

37.     The majority of Amex's credit card services are delivered pursuant to the Three-Party System described above. In this system, the three parties are Amex, the cardholder, and the merchant.

38.     Amex also provides credit card services in the United States pursuant to a four-party system. In this system, an Amex trademarked or "logoed" credit card is issued to a cardholder by one of the approximately 10 banks that has entered into a license agreement with Amex to issue Amex credit cards. Each of the banks that issues Amex cards also issues Visa and MasterCard credit cards and is a horizontal competitor of Amex. The merchants who have entered

into card acceptance Agreements with Amex are required by those Agreements to permit the use of all cards bearing the Amex trademark or logo, including these bank-issued Amex credit cards.

39.     In this four-party system, Amex pays the merchant the transaction amount less the merchant discount fee.  The issuing bank bills the cardholder for the amount of the transaction and pays that amount less an "issuer discount" to Amex.  Because the merchant discount fee (*i.e.*, the fee charged to the merchant) is a higher percentage of the transaction than the issuer discount (*i.e.*, the fee retained by the issuing bank), the difference between the two generates a positive return for Amex.  In this four-party system, Amex does not incur an expense for the rewards received by the cardholder, which are paid for by the issuing bank.

40.     During the time period relevant to the allegations in this First Amended and Consolidated Complaint, improved technology led to substantial reductions in Amex's unit cost for providing credit card services to merchants and cardholders.  The other credit card networks also experienced these significant operating cost reductions.  In a competitive market these declining costs for all the credit card networks would have driven the credit card prices – both one-sided and two-sided – to lower competitive levels.  Despite these declining unit costs, however, Amex's price to Plaintiffs and other merchants and Amex's two-sided transaction price to merchants and cardholders rose during the relevant time period or remained at the same level.  In the absence of the Amex restraints, price competition would have prevented Amex prices – whether one-sided or two-sided – from remaining at their high level, or in some instances materially increasing, while industry-wide unit costs declined.  If horizontal price competition between Amex and the other credit card networks had not been suppressed by the Amex restraints, then the lower operating costs experienced by the credit card networks would have driven the competitive two-sided transaction price and the one-sided merchant price charged by Amex and

other credit card networks to significantly lower levels than what Amex and the other credit card networks actually charged.

## V.    THE RESTRAINTS AND THEIR ANTICOMPETITIVE EFFECTS

41.    It is a common procompetitive practice for merchants to influence or incentivize customers to purchase lower-cost items. This behavior incentivizes the suppliers who sell goods and services to the merchant to compete on price and thus lower the price they charge the merchants.  The resulting lower prices benefit both the merchants, who experience lower costs, and the retail customers, who pay lower prices for goods and services and/or receive merchant-provided incentives or benefits.  There are a number of techniques that a retailer can use to incentivize or "steer" retail customers to use lower-cost, more efficient and/or preferred credit cards.  The process of incentivizing retail cardholders to switch to lower-cost credit cards would result in horizontal price competition between Amex and the other credit card networks.  It would also result in cardholders and merchants paying lower competitive net two-sided transaction prices, and lower one-sided merchant prices, both of which will go down to the competitive level.  Such steering activity, if allowed, would not only lead to Amex charging lower merchant fees and lower net two-sided transaction prices, but also would lead to other credit card networks charging lower net two-sided credit card transaction prices and lower merchant discount fees.  Such steering would also result in an increase in the number of credit card transactions, greater retail consumer choice, credit card transactions that cardholders consider to be of better quality, and the elimination of barriers to entry or expansion.  These procompetitive steering devices include, but are not limited to:

    (a)    Offering the retail customer a discount at the point of sale ("POS") for using a less-expensive credit card product.  Such discounts would incentivize consumers to switch to the less-expensive form of payment and cause the more-expensive credit card network to lower its price to the merchant so that the merchant would not be

motivated to steer away from that credit card. The result would be that the net two-sided price of the transaction would drop towards the competitive level, consumer choice would be enhanced, the quality of the payment transaction would be enhanced, and the number of credit card transactions would increase;

(b)     Imposing on customers who use a high-cost credit card product, such as an Amex Card, a differentiated charge (*i.e.*, surcharge) no greater than the merchant's cost of accepting that credit card. Such a charge would invoke the price mechanism to dissuade many retail cardholders from using expensive payment products and incentivize them to switch to a less expensive payment form. Again, the resulting loss of business, or threat of loss, would – if not prevented by the Amex restraints – cause high-cost credit card service providers, such as Amex, to lower their net two-sided transaction price by lowering merchant fees or suffer the procompetitive consequence of losing transactions to lower-priced competing credit card platforms;

(c)     Verbally advising the retail cardholders at the check-out counter that the credit card they have presented, such as an Amex Card, is a high-cost product that charges the merchant high prices and results in higher retail prices and asking the retail cardholder to use a less-expensive payment product;

(d)     Posting signage in the retail stores identifying and stating a preference for less expensive credit card products and explaining that credit card networks, such as Amex, that charge the merchant higher fees cause higher retail prices for the goods or services that the merchant sells; and/or

(e)     Taking other action to influence retail cardholders not to use credit cards of networks, such as Amex, that charge merchants higher prices and instead steer customers towards credit card networks such as Discover that would offer merchants lower fees, while still offering competitive rewards, if it could result in more transactions. Such merchant activity includes: (i) giving the retail consumer merchant-sponsored loyalty points or rewards; (ii) providing the retail consumer with benefits or conveniences such as dedicated shorter checkout lines, free parking, free goods, or free delivery; or (iii) providing the retail customer with any other benefit, advantage, or convenience that the merchants would devise. Such activity would result in not only lower merchant discount fees but also lower net two-sided transaction prices. Such activity would also encourage and sustain new entrants and allow them to enter into and deconcentrate the highly concentrated credit card market by making it possible for them to gain market share by offering low merchant prices and incentivizing merchants to encourage or steer retail customers to use the competitive credit card offering of the new entrant. For the same reasons, steering would encourage competitors, such as Discover, that want to increase their market share to offer lower merchant fees and lower net two-sided transaction prices.

42.    All of the Agreements that Amex entered into with merchants, including Plaintiffs, prohibit the merchants from engaging in any of the efficiency-enhancing, pro-competitive practices, described above.  The restraints prevent the price mechanism or any of the above-referenced steering devices from being used to incentivize cardholders to use credit cards that would charge lower merchant fees and lower net two-sided transaction prices than the anticompetitively elevated merchant prices and net two-sided transaction prices that are and have for many years been charged by Amex and other credit card networks due to the Amex restraints.

43.    More specifically, the Amex card acceptance Agreement that each Plaintiff has entered into prohibits each Plaintiff from: (a) offering a retail customer a discount for using a less-expensive payment product or payment card; (b) imposing a surcharge on retail customers who use Amex's high-cost payment cards to effectuate purchase transactions that is not equally imposed on lower-cost payment cards; (c) truthfully informing customers that the Amex payment cards are high-cost products that increase the merchant's cost of doing business and result in higher retail prices being paid by retail customers; (d) trying in any way to persuade, influence or steer a retail customer to use an alternative payment card or method; (e) refusing to accept any payment card bearing Amex's trademark, servicemark or logo – regardless of its cost; (f) failing to mention, orally or in a sign, that the Amex card is a card the merchant accepts if the merchant mentions any card at all; (g) offering to effectuate a sales transaction with any other charge, credit or payment card when presented with an Amex card; (h) truthfully informing retail customers of  Amex's high merchant fees or payment card policies, and how those high costs force merchants to charge higher retail prices; (i) stating or publishing a preference for any other credit card; and/or (j) promoting any credit card service more actively than they promote Amex.

44.     Amex devotes significant resources to the aggressive enforcement of its anticompetitive restraints and cancels, or threatens to cancel, Agreements with merchants who violate the restraints.  Amex prefers to lose a merchant purchaser rather than permit an Amex cardholder to knowingly choose to use a less-expensive payment product with a lower two-sided transaction price than an Amex credit card.

45.     The intended purpose and actual effect of Amex's restraints is to insulate Amex from price and quality competition from other providers of credit card transactions to merchants and cardholders that would result from merchant steering.  Absent the Amex restraints, a competitor would offer high quality credit card transactions to merchants and cardholders that are priced significantly below the one-sided price and net two-sided price charged by Amex, MasterCard and Visa.  In the presence of the Amex restraints, however, this procompetitive price-cutting strategy does not allow the competitor to gain market share by incentivizing merchants to steer retail customers to the competitor's card and does not give the retail customer the opportunity to choose a payment option that is lower priced or provides preferred benefits, rewards or services.  This is because the Amex restraints prevent the merchant and the competing payment networks from using the price mechanism, benefits, incentives, rewards or services valued more highly by the retail customer than Amex rewards or truthful procompetitive market information, to encourage customers to choose the lower cost and/or higher quality payment card product that many retail customers would prefer.

46.     The Amex restraints ensure: (a) that the comparative cost to the merchant of the cardholder using a particular credit card is unknown to the cardholder at the point of sale; and (b) the cardholder is denied the ability to choose lower merchant prices or more highly-valued services, benefits or incentives by choosing a lower-cost credit card transaction.  Thus, the restraints allow

Amex to extinguish at the point of sale cross-elasticity of demand between an Amex credit card transaction and an alternative credit card transactions such as those offered by MasterCard, Visa, or Discover, and also allow Amex to charge supra-competitive prices to the merchants and supra-competitive net two-sided transaction prices to merchants and cardholders without fear of losing any significant amount of sales.

47.     Theoretically, each individual merchant could, of course, simply refuse to purchase Amex merchant services. As a practical matter, however, such a decision is not economically feasible or realistic because Amex enjoys substantial economic market power over merchants, and has the ability to force them to agree to terms to which the merchants would not agree in a competitive market and to raise the price paid by the merchants and the net two-sided transaction price paid by merchants and cardholders without suffering any significant market attrition.  In particular, there is significant economic pressure on the merchants to accept all major credit cards because they are likely to lose profitable incremental sales if they do not do so.  Because the gross margin on lost sales is for higher than the anticompetitive overcharge paid to Amex and other credit card networks, most merchants cannot realistically refuse to accept one of the major credit card brands or refuse to accept terms, such as the merchant restraints, to which they would not agree in a competitive market.

48.     In the absence of the Amex restraints: (a) the supra-competitive prices that Amex is able to charge Plaintiffs and other merchants for credit card services and (b) the supra-competitive net two-sided transaction price that Amex is able to charge merchants and cardholders would both be significantly diminished.  Merchants would incur lower fees and cardholders would benefit from merchant discounts, higher quality services, more highly valued point of sale benefits, and greater choice among credit card options.

49.     Because the two-sided price and one-sided merchant price would be lower in the absence of the Amex restraints, the number of credit card transactions would go up.  Merchants and non-merchants to whom recurring financial obligations are paid, who do not accept credit cards due to the high discount rate, would start to accept them if the discount rates came down.  As a result, the number of credit card transactions would go up.  In addition, entities that are allowed by Amex to impose "convenience fees" on the payor will either lower the convenience fee or cease charging a convenience fee altogether, both of which would result in more payment transactions being made with credit cards.  In the absence of the Amex restraints, the number of credit card transactions would also go up because merchants will offer point-of-sale incentives, rewards, discounts or benefits will motivate some retail customers who would not otherwise use a credit card to do so.  In addition, if the Amex restraints were removed, very low-cost/low-reward credit cards that are not now offered by the credit card networks would be offered.  For some retail customers, discounted low merchant prices or merchant-provided benefits, services and incentives at the point-of sale are a preferred option to credit card rewards.  If merchants could offer such discounts and incentives for the use of a very low-cost/low-reward card, there would be significant retail consumer demand for such a card and the credit card networks would move to satisfy that demand by supplying such a card.  Those cards would be preferred by some consumers who would use them more often than the cards they now have and the total number of credit card transactions would go up.

50.     The Amex restraints ensure that Plaintiffs and other merchants, who must recover their costs of doing business from the prices they charge, must raise prices to all customers, including cash customers, debit card users and those who would otherwise seek to avoid the high cost of Amex's merchant fees and the high cost of the Amex net two-sided transactions.

51.     The Amex restraints also result in market distortions that cause inefficient and anticompetitive subsidies running from the least affluent retail customers to the most affluent. Because merchants must increase the price of all goods to cover the cost of Amex's high merchant prices, the restraints effectively result in cash customers and users of low-cost payment forms paying higher retail prices to cover the cost of high-priced credit card transactions and rewards that accrue largely to other retail customers, including frequent flyer miles, car rental insurance, and free gifts and other rewards that are received by the Amex cardholders.

52.     The Amex restraints have had and continue to have a substantially adverse effect on competition within both the alleged relevant market and relevant submarket (*see* ¶¶ 55-56, 64-65) and the alleged alternative relevant market and submarket (*see* ¶¶ 55, 57-61, 66-67), and have and continue to result in, among other things, (a) higher net two-sided prices charged to merchants and cardholders for Amex and other credit card transactions; (b) higher fees paid by merchants for credit card services purchased from Amex and other credit card networks; and (c) a lower number of credit card transactions than would exist in the absence of the Amex restraints.  There are no procompetitive justifications for the Amex restraints, and even if there were, the anti-competitive effects of the Amex restraints significantly outweigh any purported procompetitive justifications and, in any event, there are less restrictive means for achieving any purported procompetitive justification.

53.     The Amex restraints have an actual adverse effect on competition as a whole in the relevant market and submarket, as well as the alternative relevant market and submarket alleged herein in that they have reduced output, quality and consumer choice and increased price and barriers to entry in each of the relevant markets and/or submarkets.  These adverse effects extend to both merchants and cardholders, on both sides of Amex's platform.  As a result, millions of retail

customers are deprived of the option of a card that better suits their preferences and would deliver to them discounts, services or benefits at the point of sale that they prefer to the rewards offered by Amex.  The unavailability of such preferred cards has not only reduced the output of credit card transactions, but also reduced the quality of the credit card transactions in the eyes of the retail customer while increasing the net two-sided transaction cost and the price paid by the merchants for credit card services.  The Amex restraints have also raised barriers to entry or expansion in the credit card market, causing a substantial reduction in innovation and consumer choice and, as noted above, have eliminated from the market credit cards and services or benefits that many retail customers would prefer to those that are offered. As a result, cardholder services are of a lower quality than they otherwise would be and the prices paid by the merchants are higher than they would be.  Competition on both sides of the two-sided transaction network is injured and the consumers on both sides of the credit card platform (*i.e.*, merchants and retail customers) are injured.  Finally, Amex's pricing is supra-competitive regardless of whether one analyzes just the merchant price (*i.e.*, one-sided price) or the price paid by both merchants and cardholders (*i.e.*, the net two-sided transaction price).

54.     There are significant barriers to entering into the business of providing credit card services to merchants and cardholders.  No company has successfully entered this line of business since 1985.  Entry is estimated to cost over $1 billion.  As explained above, the existence of the Amex restraints is itself a significant barrier to entry. Discover's ability to expand its market share in the two-sided transaction market (or the one-sided market for the sale of credit card services to merchants) by cutting merchant fees and the net two-sided transaction price was anticompetitively thwarted by the Amex restraints.

## VI.   MARKET DEFINITION AND MONOPOLY/MARKET POWER

### A.   Relevant Geographic Market

55.   The relevant geographic market is the United States.

### B.   Relevant Two-Sided Credit Card Product Market and Alternative One-Sided Credit Card Product Market

56.   There is a two-sided relevant product market for general purpose credit card transactions offered by credit card networks to both merchants and cardholders.  There are no reasonably close substitutes for credit card transactions and there is no cross-elasticity of demand between credit card transactions and other forms of payment.  Within this two-sided transaction market Amex enjoys both market and monopoly power as it (1) has the power (and has exercised the power) to raise its net two-sided transaction price substantially above the competitive level; and (2) has the power (and has exercised the power) to exclude competition from other credit card networks that would offer lower net two-sided transaction prices.

57.   In the alternative to the relevant product market alleged in paragraph 56, above, there is a relevant one-sided market for providing credit card network services to merchants.  This one-sided market can be properly asserted, notwithstanding the Supreme Court's decision in *Ohio v. American Express, et al.*, because the Plaintiffs will present evidence that was not presented in the Government Case against Amex and that satisfies the Supreme Court test for when a two-sided platform should be treated as a one-sided market.  More specifically, (1) the indirect network effects in the credit card market are weak or non-existent; (2) Amex, in fact, does not balance the price on both sides of its platform between merchants and cardholders as the prices on both sides are independently set and are not determined relative to each other; (3) with regard to the bank-issued Amex cards, Amex operates a four-party network in which the prices to cardholders (*i.e.*, the annual fees and rewards) are not set by Amex at all and, instead, are set by the bank that issues

the Amex branded credit card – thus invalidating the assertion of a two-sided price determined and balanced by Amex; (4) Amex can and has raised merchant discount fees without risking a negative network feedback loop in which fewer merchants accept the Amex card and, as a result, fewer cardholders want to obtain and use the card; and/or (5) the net Amex price for any particular transaction can be vastly different depending on the type of Amex card used and the merchant who makes the sale, thus rendering any purported "balancing" of price pairs illusory.

58.     The Amex platform is a mature payment system that has existed for over 60 years. When a payment platform is attempting to enter a market, there may be a "chicken and egg" problem in that cardholders have little interest in carrying a card that does not have wide acceptance among merchants, and merchants have little interest in accepting a card that does not have a significant number of card users.  This is because a merchant will not want to incur the fixed costs of installing a credit card acceptance system, including card readers at every checkout counter, for only a small number of card transactions, and because consumers will not want to apply for, and possibly pay an annual fee for, a credit card that can be used at only a few merchants. To the extent Amex ever experienced this problem, it overcame the problem decades before the time period relevant to the allegations in this complaint.  At all times pertinent to this lawsuit, Amex has been accepted by millions of merchants and has millions of cardholders.  The card-reading swipe systems and internet card acceptance systems used by merchants can all process the cards of all four major credit card networks.  Once there are enough card users to justify a merchant purchasing a card processing system, the "chicken and egg" problem is resolved.  Once the card-reading system is installed, it costs the merchant only an insignificant amount to program the system to accept another card – even if the card has few users.  The marginal cost of accepting the card is the percentage discount rate – regardless of how often that card is used at the merchant.  As

a result, once credit cards became common and a mature system, there was no beneficial indirect network effect or externality flowing to the merchant side of the Amex platform from the additional issuance or use of Amex credit cards.

59.     In a mature payment system like Amex, there are no significant externalities on either side of the platform.  Given Amex's extensive acceptance by major merchants, acceptance by an additional merchant will have little impact on cardholders' desire to acquire or use the card at merchants that already accept it.  Merchants that already accept Amex credit cards experience no beneficial indirect network effect from greater Amex card use.  In fact, once the merchant agrees to permit customers to use Amex-branded credit cards for transactions, the merchant hopes that no customers will actually use the Amex card as the cost to the merchant is higher than if a customer used a lower-cost credit card.  Any indirect network effects flowing from greater Amex cardholder use to the merchants is, at best, extremely weak, which, according to the Supreme Court, means that the market for the sale of credit card services in which Amex and its issuing banks participates is properly treated as one-sided because indirect network effects operate, at most, in only one direction.

60.     There is also no significant "symbiotic relationship" between the merchant side of the Amex platform and more card use.  There would be no such externality on the merchant side so long as there are no significant fixed costs associated with the merchant accepting a credit card. With an Amex fee that is a percentage of the transaction amount, increased card use by retail customers does not change the merchant acceptance decision.

61.     For the mature Amex platform, the high merchant fees combined with the Amex restraints are a major impediment to merchant acceptance of Amex cards.  If Amex wants to benefit cardholders by increasing the number of merchants that accept Amex cards, it should lower its

merchant fees.

62.     Amex possesses market and monopoly power within the alternative one-sided relevant market for the sale of credit card network services to merchants.  Amex has the power to exclude competition from lower-cost providers of credit card services to merchants that would offer (a) lower prices to merchants and cardholder benefits and rewards as good as or better than Amex's or (b) even lower-cost cards with low or no rewards.  Amex also has the power to profitably control and raise the price charged to merchants significantly above the competitive level without experiencing any significant merchant attrition and the power to force merchants to agree to terms to which they would not agree in a competitive market.

63.     Assuming the fact finder determines that there are significant two-sided indirect network effects and that merchants do materially benefit from greater Amex card use, then, in keeping with the decision in *Ohio v. American Express*, Plaintiffs allege that the relevant product market is the two-sided market in which the sale of services to both merchants and cardholders are considered.

### C.     The Relevant "Amex-Only" Submarkets

64.     Within the two-sided credit card transaction relevant market for the sale of credit card services to both merchants and cardholders there is a relevant submarket for the sale of Amex-only two-sided credit card transaction services to both cardholders and merchants.  In the alternative one-sided relevant market for the sale of credit card services to just merchants, there is also a relevant submarket for the sale of Amex-only one-sided credit card services sold to merchants.

29

65.     Amex enjoys market and monopoly power within the Amex-only two-sided credit card transaction submarket in that Amex can raise the net two-sided transaction price by increasing the merchant fees without losing transactions to other credit card networks.

66.     Amex also has market and monopoly power within the one-sided relevant submarket for the sale of Amex-only credit card services to merchants.  Amex has the power to raise the prices paid by merchants in this submarket without suffering any meaningful merchant attrition or loss of transactional volume.  Amex also has the power in this relevant submarket to force merchants to agree to anticompetitive restraints to which the merchants would not agree in a competitive market.  Likewise, Amex has the power to exclude competition from other lower-cost credit card service providers such as a card network that seeks to compete by offering merchants lower prices in order to incentivize the merchant to steer more transaction volume to that network.

67.     There is virtually no cross-elasticity of demand between the credit card services sold by Amex to merchants and the credit cards services sold to merchants by other credit card networks. Nor is there any significant cross-elasticity of demand between Amex credit card services and other methods of payment.  The Amex restraints eliminate any incentive by other card networks to charge lower merchant fees than Amex (and vice versa) because such lower merchant fees will not lead to increased sales.  Those restraints sever the connection that would exist in a properly functioning, competitive market or submarket between a decreasing price and increasing sales or an increasing price and decreasing sales.

## VII.   VIOLATIONS ALLEGED

### Count I
### Monopolization in Violation of § 2 of the Sherman Act

68.     Plaintiffs reallege paragraphs 1-67 as set forth above.

69.     Amex possesses monopoly power in (a) the relevant two-sided credit card transaction market; (b) the alternative one-sided relevant market for the sale of credit card network services to merchants; and (c) the "Amex-only" submarkets in both the relevant two-sided market and the relevant alternative one-sided market.  Amex has and continues to willfully exercise its monopoly power in each of those relevant markets and/or submarkets to set net two-sided transaction price or the one-sided merchant price at levels that are substantially above the competitive rate and substantially above the level that would prevail in the absence of its anticompetitive conduct.

70.     Amex has willfully maintained and/or increased its monopoly power in the relevant two-sided market or submarket and the alternative one-sided relevant market or submarket by imposing the anticompetitive Amex restraints on Plaintiffs and other merchants.  These restraints ensure that Amex will be immune from the operation of the price mechanism and competition in both the relevant two-sided market or submarket and the alternative one-sided relevant market or submarket.

71.     Amex's monopoly power in both the two-sided relevant market or submarket and the alternative one-sided relevant market or submarket has not been maintained by superior skill, business acumen or historic accident.

72.     As a direct and proximate result of Amex's anticompetitive conduct, each Plaintiff has been injured in its business or property by (a) being compelled to adhere to the Amex restraints; and (b) being charged supra-competitive, monopoly prices either as part of the two-

sided price or, in the alternative, as the one-sided price charged by Amex that, in either event, far exceeded the prices that would have obtained in an unfettered market in the absence of the Amex restraints.

73.     As a direct and proximate result of Amex's willful maintenance of its monopoly power in either the two-sided market or submarket or the alternative one-sided market or submarket, Plaintiffs are threatened with continuing loss or injury for which each of them has no adequate remedy at law.  Plaintiffs will continue to suffer irreparable injury unless Amex's anticompetitive conduct and its enforcement of its merchant restraints is enjoined by this Court.

**Count II**
**Attempt to Monopolize in Violation of § 2 of the Sherman Act**

74.     Plaintiffs reallege paragraphs 1-73 as set forth above.

75.     There is a dangerous probability that, if not enjoined by this Court, Amex will maintain monopoly power in the two-sided relevant market and submarket or the one-sided alternative relevant market and submarket that are alleged herein.

76.     As alleged above, Amex has imposed and enforced the merchant restraints on Plaintiffs and other merchants for the specifically anticompetitive purpose and with the anticompetitive effect of insulating itself from price and quality competition and obtaining and maintaining monopoly power in both the two-sided relevant market and submarket or the alternative one-sided relevant market and submarket.

77.     As a direct and proximate result of Amex's anticompetitive conduct, each Plaintiff has been injured in its business or property by: (a) being compelled to adhere to the Amex restraints; and (b) being charged supra-competitive, monopoly prices either as part of the two-sided price or, in the alternative, the one-sided price charged by Amex to merchants that, in either

event, far exceeded the prices that would have been charged in an unfettered market in the absence of the Amex restraints.

78.     As a direct and proximate result of Amex's willful maintenance of its monopoly power in either the two-sided relevant market or submarket or the alternative one-sided relevant market or submarket, Plaintiffs are threatened with continuing loss or injury for which each of them has no adequate remedy at law.  Plaintiffs will continue to suffer irreparable injury unless Amex's anticompetitive conduct and its enforcement of the anti-steering rules is enjoined by this Court.

**Count III**
**Unreasonable Restraint of Competition in Violation of § 1 of the Sherman Act**

79.     Plaintiffs reallege paragraphs 1-78 as set forth above.

80.     Amex possesses and exercises market power in the two-sided relevant market or submarket and the alternative one-sided relevant market or submarket that are alleged herein.

81.     The restraints that Amex imposes on Plaintiffs and other merchants constitute contracts that unreasonably restrain competition within the meaning of the rule of reason and violate Section 1 of the Sherman Act.  Among other things, the Amex restraints are imposed on Plaintiffs and other merchants through vertical agreements that are intended to and do (a) restrain and eliminate horizontal, *interbrand* price and quality competition from other providers of credit card services that would exist in the absence of the Amex restraints; (b) raise the prices paid by Plaintiffs and other merchants to Amex to supra-competitive levels regardless of whether the excessive price is a part of a two-sided price or is the one-sided price paid by merchants to Amex; (c) eliminate consumer choice; and (d) raise barriers to entry or expansion by competitors that offer lower two-sided net transaction prices and lower one-sided merchant prices.

33

82.     The Amex restraints are also anticompetitive because Plaintiffs and other merchants, in order to survive in the highly competitive retail markets in which they operate, must increase their own prices to consumers in order to recover the excessive costs imposed on them by Amex. Plaintiffs and the other merchants each unilaterally determine their own retail prices, but in doing so each must take into consideration the higher costs it incurs due to Amex's anticompetitive conduct.

83.     There are no procompetitive justifications for the Amex restraints and, even if such justification existed, any possible procompetitive benefits are substantially outweighed by the anticompetitive effects and, in any event, could be obtained by less restrictive alternative means.

84.     As a direct and proximate result of Amex's imposition and enforcement of its anticompetitive restraints, each Plaintiff has been injured in its business or property by: (a) being compelled to adhere to the Amex restraints; and (b) being charged supra-competitive prices either as part of the two-sided price or, in the alternative, the one-sided price charged by Amex that, in either event, far exceed the prices that would have been charged in the absence of Amex's anticompetitive merchant restraints.

85.     As a direct and proximate result of Amex's imposition and enforcement of the anti-steering rules, Plaintiffs are threatened with continuing loss or injury for which each of them has no adequate remedy at law. Plaintiffs will continue to suffer irreparable injury unless Amex's anticompetitive conduct and its enforcement of the anti-steering rules is enjoined by this Court.

## VIII.   **PRAYER FOR RELIEF**

WHEREFORE, each Plaintiff prays for judgment against the Defendants and for the following relief:

A.      A declaration that Defendants' merchant restraints are unlawful and that Amex has violated the antitrust laws in each of the ways alleged above;

B.      An order permanently enjoining the Defendants and their officers, directors, employees, agents and successors from (i) requiring each Plaintiff and other merchants to agree to the merchant restraints; or (ii) enforcing the Amex merchant restraints against any Plaintiff and any other merchant; and (iii) directing that all existing merchant obligations to adhere to the restraints be rescinded;

C.      An order awarding each Plaintiff treble the damages it has sustained on account of Defendants' unlawful conduct as provided in §4 of the Clayton Act (15 U.S.C. § 15);

D.      An order awarding each Plaintiff its reasonable attorneys' fees and costs of suit as provided in §§ 4 and 16 of the Clayton Act (15 U.S.C. §§ 15 and 26); and

E.      Such other and further relief as the Court deems just.

Dated:  July 27, 2018

Richard Alan Arnold, Esquire
William J. Blechman, Esquire
Kevin J. Murray, Esquire
Josh Gray, Esquire
KENNY NACHWALTER, P.A.
Four Seasons Tower
1441 Brickell Avenue
Suite 1100
Miami, Florida  33131
Tel:    (305) 373-1000
Fax:    (305) 372-1861
E-mail:  rarnold@knpa.com
         wblechman@knpa.com
         kmurray@knpa.com
         jgray@knpa.com


By:    _/s/ *Richard Alan Arnold*_____
         Richard Alan Arnold

*Counsel for the Kroger Plaintiffs*


Eric L. Bloom, Esquire
Maureen S. Lawrence, Esquire
HANGLEY ARONCHICK SEGAL PUDLIN &
  SCHILLER
2805 Old Post Road
Suite 100
Harrisburg, PA  17110
Tel:    (717) 364-1030
Fax:    (717) 364-1020
E-mail:  ebloom@hangley.com
         mlawrence@hangley.com


By:    _/s/ *Eric L. Bloom*_____
         Eric L. Bloom

*Counsel for the Rite Aid Plaintiffs*

Respectfully submitted,

David E. Everson, Esquire
STINSON LEONARD STREET LLP
7700 Forsyth Boulevard
Suite 1100
St. Louis, MO 63105-1821
Tel:    (816) 691-3108
Fax:    (816) 412-1131
E-mail:  david.everson@stinsonleonard.com

*Counsel for H.E. Butt Grocery Company*


Paul E. Slater, Esquire
Matthew T. Slater, Esquire
SPERLING & SLATER, P.C.
55 West Monroe Street
Suite 3200
Chicago, Illinois  60603
Tel:    (312) 641-3200
Fax:    (312) 641-6492
E-mail:  pes@sperling-law.com
         mslater@sperling-law.com


By:    _/s/ *Paul E. Slater*_____
         Paul E. Slater

Joseph M. Vanek, Esquire
David P. Germaine, Esquire
VANEK, VICKERS & MASINI, P.C.
55 West Monroe Street
Suite 3500
Chicago, Illinois  60603
Tel:    (312) 225-1500
Fax:    (312) 224-1510
E-mail:  jvanek@vaneklaw.com
         dgermaine@vaneklaw.com

*Counsel for the CVS Plaintiffs*