SPERLING & SLATER
PROFESSIONAL CORPORATION

TELEPHONE
(312) 641-3200
FACSIMILE
(312) 641-6492

September 7, 2018

55 WEST MONROE STREET
SUITE 3200
CHICAGO, IL 60603

**VIA ECF (FILED UNDER SEAL)**
The Honorable Nicholas Garaufis
United States Courthouse
225 Cadman Plaza East
Brooklyn, New York 11201

Re:    *In re: American Express Anti-Steering Rules Antitrust Litigation,*
         Case No: 11-MD-2221-NGG-RER

Dear Judge Garaufis:

Pursuant to Local Rule 7.1(d), the Merchant Plaintiffs ("MPs") in the above-captioned matter
move for an Order directing the Defendants to file an Answer and Defenses to the Merchant
Plaintiffs' First Amended and Consolidated Complaint ("Amended Complaint").

On July 10, 2018, this Court entered an Order directing the MPs to file their Amended Complaint
by July 27, 2018. This Court further ordered the American Express Defendants ("Amex") to
"answer or otherwise respond to the amended complaint by no later than 21 days after service
thereof." Fed. R. Civ. P. 12(a)(1)(A)(i). Doc. #811.

On July 27, 2018, the MPs filed their Amended Complaint. *See* Doc. #814. On August 17,
2018, Amex filed a document titled "Memorandum of Law in Support of Defendants' Motion to
Dismiss or in the Alternative for Summary Judgment with Respect to the Individual Plaintiffs'
One-Sided and Amex-Only Market Claims" ("Amex motion") (copy attached as Exhibit A).[1]
The Amex motion purports to be filed pursuant to Fed. R. Civ. P. 12(b)(6) and, alternatively,
pursuant to Fed. R. Civ. P. 56. *See* Notice of Motion to Dismiss or in the Alternative for
Summary Judgment (copy attached as Exhibit B). However, as explained below, the motion is
not a proper Rule 12(b)(6) motion to dismiss.

In the Amended Complaint, the MPs allege three claims: (i) monopolization in violation of § 2 of
the Sherman Act; (ii) attempt to monopolize in violation of § 2 of the Sherman Act; and (iii)
unreasonable restraint of competition in violation of § 1 of the Sherman Act. In support of these
three claims, the MPs allege four alternative relevant markets or submarkets. First, the MPs
alleged a two-sided credit card relevant market. Second, the MPs allege, in the alternative, a
one-sided credit card relevant market, based on evidence that was not before the Supreme Court

_____

[1]      We are filing the Amex motion papers with this letter motion because the Amex
pleadings have not yet been filed with the Court.

SPERLING & SLATER

The Honorable Nicholas G. Garaufis
September 7, 2018
Page 2

in the Government case. Third, the MPs allege, in the alternative, a two-sided Amex-only relevant submarket. Fourth, the MPs allege, in the alternative, a one-sided Amex-only relevant submarket.

The Amex motion does not seek the dismissal of any of the three claims brought by the MPs. Rather, the Amex motion attacks the MPs' allegation of a one-sided market and their allegation of the Amex-only submarkets. It does not attack the MPs' allegation of a two-sided credit card relevant market, which alone is sufficient to sustain each of the causes of action brought by the MPs.

The Amex motion is therefore not a Rule 12(b)(6) motion. Fed. R. Civ. P. 12(b)(6) is used to assert that there is a "failure to state a claim upon which relief can be granted." As noted in the comments to the 1946 amendment, a Rule 12(b)(6) motion "is substantially the same as the old demurrer for failure of a pleading to state a cause of action." Amex, however, merely attacks certain market allegations of the Amended Complaint—its papers do not challenge or seek dismissal of any claim, Count or cause of action asserted by the MPs.[2] Even if Amex's motion is granted, the MPs can still pursue each of their Counts or causes of action based on the unchallenged allegation of a two-sided credit card relevant market. As such, Amex's motion is not a proper Rule 12(b)(6) motion stating that the MPs have failed to state a claim.

Moreover, in challenging each of the three relevant market allegations, Amex's Memorandum of Law in support of its motion cites to factual material from outside the Complaint that is set forth in Amex's Rule 56.1 Statement of Undisputed Facts (attached as Ex. C) and to the Declaration of Peter Barbur that attaches excerpts from 9 expert reports, 20 depositions and 35 separate documents (attached as Ex. D). Amex's Rule 56.1 Statement of Facts and the Declaration of Mr. Barbur were filed with Amex's motion. The motion does not merely contain a bit of extraneous matter to a motion to dismiss an entire claim; it is on its face a partial motion for summary judgment pursuant to Rule 56(a).

Under Fed. R. Civ. P. 12(d), a motion that purports to be brought under Rule 12(b)(6), but presents "matters outside the pleadings … must be treated as one for summary judgment under Rule 56." Because each aspect of Amex's motion relies extensively on facts from outside the Amended Complaint,[3] it is a motion for partial summary judgment, not a motion to dismiss under Rule 12(b)(6).

---

[2]    Count I is for monopolization under §2 of the Sherman Act; Count II is for attempt to monopolize under §2; and Count III is for agreement in restraint of trade under §1 of the Sherman Act.

[3]    In seeking judgment on the MPs' allegation of a one-sided relevant market, Amex cites to:  the Vellturo Expert Report, the Stiglitz Expert Report, the Stiglitz deposition, and ¶¶ 1-9 of its Statement of Facts (Memo. p. 4); Exhibits 65 and 66 to the Barbur Declaration (Memo. p. 6);

SPERLING & SLATER

The Honorable Nicholas G. Garaufis
September 7, 2018
Page 3

If a defendant moves to dismiss a complaint under Rule 12(b), then Rule 12(a)(4) suspends the date by which the defendant must answer the complaint until 14 days after the motion to dismiss is decided. In this case, however, Amex has *not* moved to dismiss the complaint under Rule 12. Despite misnaming its motion, Amex has moved for partial summary judgment under Rule 56 – which does *not* suspend the necessity of answering the Amended Complaint, as no corollary rule to Rule 12(a)(4) exists in Rule 56. As such, pursuant to this Court's Order of July 10, 2018, Amex should have filed an Answer and Defenses to the Amended Complaint on August 21, 2018, when it filed its motion for partial summary judgment.

On August 27, 2018, the MPs wrote to Amex counsel and requested that Amex answer the Amended Complaint by September 4, 2018. (Letter of 8/27/18, attached as Ex. E). On August 29, 2018, Amex counsel responded and asserted (incorrectly) that their motion was a proper Rule 12(b)(6) motion to dismiss and that no answer was due. (Letter of 8/29/18, attached as Ex. F). On August 29, 2018, the MPs wrote to Amex and asked it to reconsider its position. (Letter of 8/29/18, attached as Ex. G). Among other things, the MPs pointed out that, under the briefing schedule set by Judge Reyes on Amex's motion, (1) Amex's reply brief in support of its motion is not due until October 12, 2018; (2) fact discovery closes five days later on October 17, 2018; and (3) the MPs' additional expert reports are due November 16, 2018. Thus, the MPs pointed out that Amex's contention – that it does not have to answer the complaint until 14 days after the disposition of its motion – is not only incorrect, but would also unreasonably require that the MPs complete discovery and file their updated or additional expert reports before Amex files its Answer and Defenses to the Amended Complaint, and before the MPs would learn what allegations Amex admits, what allegations it denies, and what defenses or affirmative defenses it intends to assert. The MPs advised Amex that we did not believe Amex's position to be reasonable.

On August 30, 2018, the parties held a telephone conference call. In that call, the MPs asked Amex if it would reconsider its position and file an Answer and Defenses to the Amended

---

¶¶ 10-11 of its Statement of Facts and Exhibits 15 and 60 to the Barbur Declaration (Memo. p. 7); Exhibits 13, 29, 61, and 62 to the Barbur Declaration and ¶¶ 11-15 of the Statement of Facts.

In seeking judgment on the MPs' Amex-only relevant submarket allegations, Amex cites to: the Statement of Facts ¶¶ 19-31 (Memo. p. 9); the Statement of Facts ¶44 and Exhibit 28 to the Barbur Declaration, the Vellturo Rebuttal and Sur-Rebuttal Reports, the Ariely Expert Report, the Statement of Facts ¶¶ 16-18, 40, and 42 (Memo. p. 11); the Vellturo Rebuttal and Sur-Rebuttal Reports, the Stiglitz Expert Report, and ¶¶ 32-36 of the Statement of Facts (Memo. p. 12); the Statement of Facts ¶¶ 5-9 (Memo. p. 13); and the Statement of Facts ¶¶ 37-44, the Vellturo Sur-Rebuttal Report, Exhibit 30 to the Barbur Declaration and the Vellturo deposition (Memo. p. 14).

SPERLING & SLATER

The Honorable Nicholas G. Garaufis
September 7, 2018
Page 4

Complaint. Amex responded that the MPs' request was just "make-work" and that Amex would not change its position.

On September 4, 2018, the MPs again wrote to Amex. (Letter of 9/4/18, attached as Ex. H). As a compromise, the MPs proposed that Amex answer only paragraphs 1-11, 38-40, 49, and 56-61 of the Amended Complaint and set forth its defenses and affirmative defenses. On September 5, 2018, Amex responded to the proposed compromise and refused to file what it called a "procedurally improper 'piecemeal answer' to select portions of [the] Amended Complaint." (Letter of 9/5/18, attached as Ex. I).

The MPs respectfully submit that, as explained above, Amex's motion is one for partial summary judgment, which does not suspend Amex's obligation to file an Answer and Defenses to the Amended Complaint. As such, Amex should have answered the Amended Complaint on August 17, 2018. Furthermore, even if Amex's motion was a Rule 12(b) motion to dismiss (which it is not), the Court in its discretion should order Amex to answer the Amended Complaint in order to avoid the obvious unfairness and prejudice to the MPs of having to complete discovery and prepare expert reports without knowing the alleged facts Amex admits or denies and the defenses it asserts. This is particularly important with respect to the MPs' allegation of a credit card two-sided relevant market – which Amex does not challenge in its motion. This market has not been previously litigated in this case, and the MPs need to know what Amex's position on this market is going to be in preparing their expert reports and preparing for and conducting fact and expert discovery.

Based on the foregoing analysis, the MPs respectfully request the entry of an Order compelling Amex to file its Answer and Defenses to the Amended Complaint within seven (7) days of the date of the Court's order ruling on this motion or, at the very least, to answer paragraphs 1-11, 38-40, 49, and 56-61 of the Amended Complaint and provide a statement of Amex's defenses and/or affirmative defenses as requested in the MPs September 5 compromise proposal.

Respectfully submitted,

Paul E. Slater
Counsel for the Merchant Plaintiffs

cc: Counsel of Record (via email)

# EXHIBIT A

HIGHLY CONFIDENTIAL / SUBJECT TO PROTECTIVE ORDER

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

IN RE AMERICAN EXPRESS ANTI-
STEERING RULES ANTITRUST
LITIGATION (II)

No. 11-MD-02221-NGG-RER
**FILED UNDER SEAL**

THIS DOCUMENT RELATES TO:

Individual Plaintiff Actions

No. 08-CV-2315
No. 08-CV-2316
No. 08-CV-2317
No. 08-CV-2380
No. 08-CV-2406
No. 11-CV-0337
No. 11-CV-0338

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'
MOTION TO DISMISS OR IN THE ALTERNATIVE FOR SUMMARY JUDGMENT
WITH RESPECT TO THE INDIVIDUAL PLAINTIFFS'
ONE-SIDED AND AMEX-ONLY MARKET CLAIMS**

Evan R. Chesler
Peter T. Barbur
Kevin J. Orsini
Rory A. Leraris
CRAVATH, SWAINE & MOORE LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019
(212) 474-1000

*Attorneys for Defendants American Express
Company and American Express Travel
Related Services Company, Inc.*

August 17, 2018

HIGHLY CONFIDENTIAL / SUBJECT TO PROTECTIVE ORDER

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................................ ii

PRELIMINARY STATEMENT .......................................................................................... 1

SUMMARY OF PLAINTIFFS' CLAIMS .......................................................................... 2

LEGAL STANDARDS ....................................................................................................... 3

ARGUMENT ....................................................................................................................... 4

    I.      PLAINTIFFS' ONE-SIDED MARKET ALLEGATIONS FAIL. ......................... 4

    II.     PLAINTIFFS' AMEX-ONLY MARKET ALLEGATIONS FAIL. ..................... 8

          A.     Plaintiffs' Amex-Only Market Theory Is Inconsistent with *Ohio v. Amex.* ................................................................................... 8

          B.     No Legal Theory Can Support an Amex-Only Market. ........................... 11

                  1.     Consumer Insistence Cannot Create a Single-Brand Market. ............................................................................................ 12

                  2.     Plaintiffs Cannot Use the NDPs To Define the Relevant Market. ........................................................................... 14

                  3.     The "Aftermarket" Exception Does Not Apply. ........................... 17

CONCLUSION .................................................................................................................. 18

HIGHLY CONFIDENTIAL / SUBJECT TO PROTECTIVE ORDER

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adidas Am., Inc. v. NCAA,*
    64 F. Supp. 2d 1097 (D. Kan. 1999) ........................................................................... 15

*Anderson v. Liberty Lobby, Inc.,*
    477 U.S. 242 (1986) ..................................................................................................... 3

*Apple, Inc. v. Psystar Corp.,*
    586 F. Supp. 2d 1190 (N.D. Cal. 2008) ...................................................................... 16

*Bel Canto Design, Ltd. v. MSS HiFi, Inc.,*
    No. 11-CV-6353, 2012 WL 2376466 (S.D.N.Y. June 20, 2012) ................................. 11

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007) ..................................................................................................... 3

*City of New York v. Grp. Health Inc.,*
    649 F.3d 151 (2d Cir. 2011) ......................................................................................... 9

*Disenos Artisticos E Industriales, S.A. v. Work,*
    714 F. Supp. 46 (E.D.N.Y. 1989) ............................................................................... 14

*Eastman Kodak Co. v. Image Technical Servs. Inc.,*
    504 U.S. 451 (1992) ................................................................................................... 17

*Global Discount Travel Services, LLC v. Trans World Airlines, Inc.,*
    960 F. Supp. 701 (S.D.N.Y. 1997) ............................................................................. 13

*Green Country Food Mkt., Inc., v. Bottling Grp., LLC,*
    371 F.3d 1275 (10th Cir. 2004) .................................................................................. 13

*Hack v. President & Fellows of Yale Coll.,*
    237 F.3d 81 (2d Cir. 2000) .................................................................................... 15, 18

*Hamilton Chapter of Alpha Delta Phi, Inc. v. Hamilton Coll.,*
    106 F. Supp. 2d 406 (N.D.N.Y. 2000) ....................................................................... 15

*Integrated Sys. & Power, Inc. v. Honeywell Int'l, Inc.,*
    713 F. Supp. 2d 286 (S.D.N.Y. 2010) ....................................................................... 11

*Ohio v. Am. Express Co.,*
    138 S. Ct. 2274 (2018) .......................................................................................... passim

HIGHLY CONFIDENTIAL / SUBJECT TO PROTECTIVE ORDER

*Papasan v. Allain*,
  478 U.S. 265 (1986) ...................................................................................3

*PepsiCo, Inc. v. Coca-Cola Co.*,
  315 F.3d 101 (2d Cir. 2002) ........................................................................3

*PSI Repair Servs., Inc. v. Honeywell, Inc.*,
  104 F.3d 811 (6th Cir. 1997) .....................................................................17

*PSKS, Inc. v. Leegin Creative Leather Prods., Inc.*,
  615 F.3d 412 (5th Cir. 2010) .....................................................................17

*Queen City Pizza, Inc. v. Domino's Pizza, Inc.*,
  124 F.3d 430 (3d Cir. 1997) ..........................................................15, 16, 18

*Smugglers Notch Homeowners' Ass'n v. Smugglers' Notch Mgmt. Co.*,
  414 F. App'x 372 (2d Cir. 2011) ...............................................................15

*Todd v. Exxon Corp.*,
  275 F.3d 191 (2d Cir. 2001) ........................................................................9

*Tops Mkts., Inc. v. Quality Mkts., Inc.*,
  142 F.3d 90 (2d Cir. 1998) ..........................................................................3

*Town Sound & Custom Tops, Inc. v. Chrysler Motors Corp.*,
  959 F.2d 468 (3d Cir. 1992) ......................................................................13

*United States v. Am. Express Co.*,
  838 F.3d 179 (2d Cir. 2016) ............................................................. passim

*United States v. Am. Express Co.*,
  88 F. Supp. 3d 143 (E.D.N.Y. 2015) .......................................................9, 13

*United States v. Waste Mgmt., Inc.*,
  743 F.2d 976 (2d Cir. 1984) ......................................................................13

**Statutes & Rules**

Fed. R. Civ. P. 12(b)(6) ........................................................................................2

Fed. R. Civ. P. 56(a) ...........................................................................................3

HIGHLY CONFIDENTIAL / SUBJECT TO PROTECTIVE ORDER

**Other Authorities**

Evans & Noel, *Defining Antitrust Markets When Firms Operate Two–Sided Platforms*, 2005 Colum. Bus. L. Rev. 667 ..........................................................5

Evans & Schmalensee, *Markets With Two–Sided Platforms*, 1 Issues in Competition L. & Pol'y 667 (2008)...................................................................5

Filistrucchi, Geradin, Van Damme & Affeldt, *Market Definition in Two–Sided Markets: Theory and Practice*, 10 J. Competition L. & Econ. 293 (2014) ............................5

Klein, Lerner, Murphy & Plache, *Competition in Two–Sided Markets: The Antitrust Economics of Payment Card Interchange Fees*, 73 Antitrust L.J. 571 (2006)...........................................................................................................5

HIGHLY CONFIDENTIAL / SUBJECT TO PROTECTIVE ORDER

## PRELIMINARY STATEMENT

Despite the Supreme Court's decision in *Ohio v. American Express Co.* ("*Ohio v. Amex*"), 138 S. Ct. 2274 (2018), affirming the Second Circuit's decision in *United States v. American Express Co.* ("*U.S. v. Amex*"), 838 F.3d 179 (2d Cir. 2016), Plaintiffs[1] continue to pursue claims based on two types of market definitions that directly contradict the Supreme Court's decision and the Second Circuit's precedents.

*First*, in claiming that the relevant market is one-sided, Plaintiffs seek to overrule the Supreme Court. *Ohio v. Amex* leaves no doubt that Amex[2] and other credit card networks are simultaneous two-sided transaction platforms to which a two-sided relevant market definition must apply. Plaintiffs attempt to distinguish the Supreme Court's decision on the facts, but their arguments are wrong, and they were presented to, but not accepted by, the Supreme Court. *Ohio v. Amex* was based on economic principles applied to the basic structure of credit card networks, which Plaintiffs' new allegations do not and cannot change. Plaintiffs' one-sided market claims cannot stand. *See infra* Section I.

*Second*, notwithstanding clear precedent establishing that the relevant market includes other credit card networks, Plaintiffs continue to allege that Amex is a monopolist in a single-brand, Amex-only market. Plaintiffs' theory is contradicted by the Supreme Court's analysis of two-sided markets: as the Supreme Court explained, card networks compete for

---

[1] Plaintiffs Ahold U.S.A., Inc., Albertson's LLC, The Great Atlantic & Pacific Tea Company, Inc., BI-LO, LLC, CVS Pharmacy Inc., H.E. Butt Grocery Co., Hy-Vee, Inc., The Kroger Co., Meijer, Inc., Publix Super Markets, Inc., Raley's Inc., Rite Aid Corp., Rite Aid Hdqtrs. Corp., Safeway Inc., Supervalu, Inc. and Walgreen Co.

[2] Defendants American Express Company and American Express Travel Related Services Company, Inc.

HIGHLY CONFIDENTIAL / SUBJECT TO PROTECTIVE ORDER

*transactions*, not for cardholders or merchants in isolation.  Plaintiffs concede that card networks compete for transactions by fighting for cardholders and their spending.  That undisputed fact disproves their claim that Amex exists in its own market, free from competition.  Plaintiffs rely only on allegations about demand elasticity for merchant services while ignoring cardholders, which is directly contrary to *Ohio v. Amex*.  Moreover, even setting the Supreme Court decision aside, Plaintiffs have no basis to avoid the general rule that single-brand markets are inherently implausible.  *See infra* Section II.

Plaintiffs' claims based on one-sided and Amex-only market definitions should be dismissed for failure to state a claim upon which relief can be granted.  Fed. R. Civ. P. 12(b)(6).  In the alternative, summary judgment on these claims is warranted because undisputed facts make clear that Amex is entitled to judgment as a matter of law.  *Id.*  R. 56.  In either case, Plaintiffs' one-sided and Amex-only market claims fail.

## SUMMARY OF PLAINTIFFS' CLAIMS

Based on non-discrimination provisions ("NDPs") in their merchant acceptance agreements with Amex, Plaintiffs claim that Amex violated Section 1 of the Sherman Act by unreasonably restraining trade and Section 2 through actual or attempted monopolization.  Until recently, Plaintiffs claimed that the relevant market was one-sided and Amex-only:  it included only Amex services to merchants, not Amex services to cardholders and not any services by another network.  Now, after the Second Circuit's ruling in *U.S. v. Amex* and the Supreme Court's decision in *Ohio v. Amex*, Plaintiffs have amended their complaint to bring claims based on four alternative markets:  (1) their original one-sided, Amex-only market; (2) a one-sided market that includes all general purpose credit and charge cards ("GPCC"); (3) a two-sided, Amex-only market that includes Amex services to merchants and cardholders; and (4) a two-

2

sided, all-GPCC market.  Pls.' First Am. & Consol. Compl. ("Am. Compl.") ¶¶ 56-57, 64 (July 27, 2018) (ECF No. 814).  This motion seeks dismissal or summary judgment for all claims based on the first three relevant markets—those with one-sided or Amex-only market definitions.[3]

## LEGAL STANDARDS

To survive a motion to dismiss, a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face".  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  The Court "must take all the factual allegations in the complaint as true, [but is] not bound to accept as true a legal conclusion couched as a factual allegation".  *Papasan v. Allain*, 478 U.S. 265, 286 (1986).

Summary judgment, which Amex seeks in the alternative, is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law".  Fed. R. Civ. P. 56(a).  "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.  If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986) (citations omitted).  Summary judgment "serves a vital function" in antitrust cases, *Tops Mkts., Inc. v. Quality Mkts., Inc.*, 142 F.3d 90, 95 (2d Cir. 1998), where it is "particularly favored", *PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 104-05 (2d Cir. 2002).

---

[3] Pursuant to the Court's August 9 and 17, 2018 Orders, Amex anticipates filing an additional summary judgment motion concerning claims based on a two-sided, all-GPCC market at a later date.

HIGHLY CONFIDENTIAL / SUBJECT TO PROTECTIVE ORDER

# ARGUMENT

## I.    PLAINTIFFS' ONE-SIDED MARKET ALLEGATIONS FAIL.

After nearly a decade of litigation, the Supreme Court has confirmed that the relevant market in this case is two-sided—the market must include the merchants and cardholders on both sides of Amex's two-sided platform.  Any attempt by Plaintiffs to avoid the Supreme Court's decision fails.

*Ohio v. Amex* sets a clear rule:  for a simultaneous two-sided transaction platform like Amex, "competition cannot be accurately assessed by looking at only one side of the platform in isolation".  138 S. Ct. at 2287.  Amex is a special type of two-sided platform—a two-sided *transaction* platform—that "cannot make a sale to one side of the platform without simultaneously making a sale to the other".  *Id.* at 2280.  "Because they cannot make a sale unless both sides of the platform simultaneously agree to use their services, two-sided transaction platforms exhibit more pronounced indirect network effects and interconnected pricing and demand."  *Id*. at 2286 (citation omitted).  Amex supplies one product—transactions—which are "jointly consumed by a cardholder, who uses the payment card to make a transaction, and a merchant, who accepts the payment card as a method of payment".  *Id.* at 2286.[4]

---

[4] Plaintiffs' experts agree about this fundamental, defining feature of the credit card market. *See, e.g.*, Vellturo I ¶ 23 (describing a credit card transaction); Stiglitz I ¶ 9 (similar); Dep. of Joseph Stiglitz (July 22, 2013) at 17:12-15 (testifying that Visa, MasterCard and Amex "link cardholders to merchants"); Facts ¶¶ 1-4; *see also id*. ¶¶ 5-9.

Excerpts from certain reports submitted by the parties in this case are attached to the Declaration of Peter T. Barbur ("Barbur Decl."), submitted herewith.  Reports by Drs. Vellturo, Stiglitz, Ariely and McCormack were submitted by Plaintiffs.  Reports by Drs. Bernheim and Hay were submitted by Amex.  The opening, rebuttal and sur-rebuttal reports are referred to by the convention [Expert] I, [Expert] II and [Expert] III, respectively.  For purposes of the present motion, Amex assumes that Plaintiffs' expert opinions are admissible.  Amex reserves the right to move against Plaintiffs' expert reports if trial is necessary.

HIGHLY CONFIDENTIAL / SUBJECT TO PROTECTIVE ORDER

"Accordingly", the Supreme Court concluded, a court must "analyze the two-sided market for credit-card transactions as a whole to determine whether the plaintiffs have shown that Amex's antisteering provisions have anticompetitive effects". *Id.* at 2287.

Seeking to avoid the Supreme Court's holding, Plaintiffs allege that they "will present evidence that was not presented in the Government Case against Amex and that satisfies the Supreme Court test for when a two-sided platform should be treated as a one-sided market". Am. Compl. ¶ 57. Plaintiffs misapprehend the Supreme Court's ruling. In requiring a two-sided market definition, the Supreme Court did not rely on any particular way the Government sought to prove the nature of the market or competition. Rather, the Supreme Court grounded its ruling in fundamental economic principles applied to basic, indisputable facts about the structure of the credit card market.[5] As Justice Breyer recognized in his dissent, the majority's rule requires a two-sided market definition when platforms have "four relevant features", which Amex indisputably does: "[T]hey (1) offer different products or services, (2) to different groups of customers, (3) whom the 'platform' connects, (4) in simultaneous transactions." *Ohio v. Amex*, 138 S. Ct. at 2298 (Breyer, J., dissenting). For these claims in this market, the Supreme Court has defined the relevant market. Plaintiffs' claims relate to the same market.

To make matters worse, Plaintiffs' argument relies on a theory that was actually presented to the Supreme Court, which declined to accept it. They claim that Amex is a "mature

---

[5] The Supreme Court cited, among others: Klein, Lerner, Murphy & Plache, *Competition in Two–Sided Markets: The Antitrust Economics of Payment Card Interchange Fees*, 73 Antitrust L.J. 571, 580, 583 (2006); Evans & Schmalensee, *Markets With Two–Sided Platforms*, 1 Issues in Competition L. & Pol'y 667 (2008); Evans & Noel, *Defining Antitrust Markets When Firms Operate Two–Sided Platforms*, 2005 Colum. Bus. L. Rev. 667, 668; and Filistrucchi, Geradin, Van Damme & Affeldt, *Market Definition in Two–Sided Markets: Theory and Practice*, 10 J. Competition L. & Econ. 293, 296 (2014).

HIGHLY CONFIDENTIAL / SUBJECT TO PROTECTIVE ORDER

payment system" because Amex is accepted at most major merchants.  Am. Compl. ¶¶ 58-59.

As a result, they say, acceptance by an additional merchant will not significantly increase

cardholders' desire to use the card, and merchants who already accept Amex receive no benefit

from greater Amex card use.  *Id.* ¶ 59.  This argument is irreconcilable with the Supreme Court's

decision.[6]  The test from *Ohio v. Amex* turns on whether a platform is a simultaneous two-sided

transaction platform, which leaves no room for any consideration of market "maturity" as a

condition of a two-sided analysis.  138 S. Ct. at 2280.  That rule is dictated by concepts that are

the same here:  "To optimize sales, the network must find the balance of pricing that encourages

the greatest number of matches between cardholders and merchants."  *Id.* at 2286.  And, because

"[o]nly other two-sided platforms can compete with a two-sided platform for transactions",

"[e]valuating both sides of a two-sided transaction platform is also necessary to accurately assess

competition".  *Id.* at 2287.

> In announcing the clear rule that a two-sided analysis applies to simultaneous
two-sided transaction platforms such as Amex, the Supreme Court found that, contrary to
supposed maturity, output in the market—transaction volume—has grown substantially in recent

---

[6] In two amicus briefs, Plaintiffs' expert, Dr. Stiglitz, argued that the credit card market in *Amex* was mature and that "[t]here is no evidence that significant two-sided externalities remain—that is, that merchant acceptance would increase if Amex increased its cardholding base, or vice versa".  Barbur Decl. Ex. 65 (Brief for Amici Curiae John M. Connor, *et al*. in Support of Petitioners at 7, *Ohio v. Amex* (July 6, 2017)); *see also* Barbur Decl. Ex. 66 (Brief for Amici Curiae John M. Connor *et al*. in Support of Petitioners at 4, n.4, *Ohio v. Amex* (Dec. 14, 2017)) ("Before reconfiguring the established and well-understood Rule of Reason analysis for a mature network like Amex, careful analysis should be conducted to ascertain the significance of any feed-back effects from pricing to each side from the other side (two-sided externalities).").

HIGHLY CONFIDENTIAL / SUBJECT TO PROTECTIVE ORDER

years, and continues to grow.[7]  Again, the transactions involved in this case are the same

transactions, in the same market, as the Supreme Court has addressed.

Plaintiffs have conceded the same unassailable market facts on which the

Supreme Court based its decision by describing the links between the merchant and consumer

sides of the Amex platform.  For example, undisputed evidence from Plaintiff H.E. Butt Grocery

Co.'s ("HEB") experience with its own co-brand credit card establishes that cardholder rewards

incentivize spending and are linked to merchant discount rates.  As one HEB official explained

about HEB's co-brand card, "our rates are competitive but our rewards are AWESOME" because

competitors' cards "have traded low rates for low rewards", which "really is something we have

to explain to others in terms of the whole picture".  Barbur Decl. Ex. 60.

(HEBAMXED03047232) at HEBAMXED03047232; Facts ¶ 10.  Further conceding the

interdependence between cardholder rewards and merchant fees, the HEB official continued:  "If

you just look at rates you are only getting half the picture.  I think our rewards . . . speak volumes

for our card." *Id.*  Another HEB official testified in this case that HEB offered a rewards credit

card because "the rewards component is the incentive to get the customer to use it" and "[t]here's

other cards in their wallet that would be competing for the H-E-B card".  Barbur Decl. Ex. 15

(Dep. of James Callahan (HEB), Nov. 6, 2012) at 38:16-25.  The same official explained that

rewards for its cobrand card were funded by merchant fees, *id.* at 122:7-123:21, and that "[t]he

---

[7] *See, e.g.*, *Ohio v. Amex*, 138 S. Ct. at 2289 ("There is no such evidence [of reduced output] in this case.  The output of credit-card transactions grew dramatically from 2008 to 2013, increasing 30%." (citing *U.S. v. Amex*, 838 F.3d at 206)); *id.* ("[W]hile these [NDP] agreements have been in place, the credit-card market experienced expanding output and improved quality. . . .  Indeed, between 1970 and 2001, the percentage of households with credit cards more than quadrupled, and the proportion of households in the bottom-income quintile with credit cards grew from just 2% to over 38%.").

HIGHLY CONFIDENTIAL / SUBJECT TO PROTECTIVE ORDER

level and rate of credit card rate increases is expected to keep increasing at a rapid rate, not only in terms of the rate itself, but also as a result of high fee rewards-type cards recently introduced by Visa and MasterCard in an attempt to compete with American Express and Discover". *Id.* at 59:15-60:7; Facts ¶ 11.[8]

Plaintiffs cannot avoid the Supreme Court's decision in *Ohio v. Amex*, which established that a two-sided relevant market definition applies for the analysis of *Amex*'s two-sided transaction platform. Amex respectfully requests that its motion for dismissal or summary judgment be granted for all claims based on a one-sided market.

## II. PLAINTIFFS' AMEX-ONLY MARKET ALLEGATIONS FAIL.

### A. Plaintiffs' Amex-Only Market Theory Is Inconsistent with *Ohio v. Amex*.

The Supreme Court decision in *Ohio v. Amex* also forecloses Plaintiffs' Amex-only market allegations. The Supreme Court made clear that two-sided platforms compete to produce *transactions*, not services to merchants or cardholders in isolation. The Supreme Court also made clear—and Plaintiffs repeatedly have conceded—that credit card networks compete fiercely for those transactions. Therefore, there *is* substitution among networks in the relevant

---

[8] Other Plaintiffs similarly acknowledge the link between cardholders and merchants across Amex's two-sided transaction platform. *See, e.g.*, Barbur Decl. Ex. 13 (Dep. of John Briggs (Hy-Vee), Dec. 13, 2012) at 141:5-22 (recognizing the benefit to the merchant of customers using credit cards with benefits); Barbur Decl. Ex. 29 (Dep. of Dennis Stokely (Safeway), Nov. 15, 2012) at 356:19-24 (recognizing the link between merchant fees and card rewards); Barbur Decl. Ex. 61 (KRGAMX00272018) at KRGAMX00272018 (Feb. 12, 2005 email from K. Hanna to senior officials of The Kroger Co. stating that MasterCard introduced a new high-fee, high-rewards card to "compete with American Express cards" and recognizing the financial impact this would have on Kroger); Barbur Decl. Ex. 62 (MEIJER-00264261) at MEIJER-00264279 (Meijer recognizing the benefits of rewards); *see also* Facts ¶¶ 12-15.

HIGHLY CONFIDENTIAL / SUBJECT TO PROTECTIVE ORDER

market, and an Amex-only market fails.  Plaintiffs' attempt to analyze substitutability only from the merchants' perspective is wrong under *Ohio v. Amex*.

Defining a relevant market for antitrust purposes requires an analysis of "the interchangeability of use or the cross-elasticity of demand" for the relevant product and any potential alternatives.  *Todd v. Exxon Corp.*, 275 F.3d 191, 200 (2d Cir. 2001) (citation omitted).  It is a "rule of reasonable interchangeability" that must account for all "substitute products".  *City of New York v. Grp. Health Inc.*, 649 F.3d 151, 155 (2d Cir. 2011) (citation omitted).

Each decision in the Government action scrutinized the relevant market.  None suggested that the relevant market could be limited to Amex alone; instead each included other credit card networks—Visa, MasterCard and Discover.  This Court first found that the relevant market was a "GPCC Card Network Services Market"—not limited to Amex.  *United States v. Am. Express Co.*, 88 F. Supp. 3d 143, 171 (E.D.N.Y. 2015).  The Second Circuit similarly defined the relevant market to include all GPCC networks.  *U.S. v. Amex*, 838 F.3d at 196-200.  And the Supreme Court left no doubt that the relevant market includes all GPCC networks: Amex, Visa, MasterCard and Discover.[9]  *Ohio v. Amex*, 138 S. Ct. at 2282.

Nevertheless, Plaintiffs continue to assert their single-brand, Amex-only market allegations on the ground that "[t]here is virtually no cross-elasticity of demand between the credit card services sold by Amex *to merchants* and the credit card[] services sold to merchants by other credit card networks" because the "Amex restraints eliminate any incentive by other card networks to charge lower merchant fees than Amex (and vice versa)".  Am. Compl. ¶ 67

---

[9] *See* Facts ¶¶ 19-31.

HIGHLY CONFIDENTIAL / SUBJECT TO PROTECTIVE ORDER

(emphasis added).  In other words, Plaintiffs say that there is no substitution between networks on the *merchant* side.

But Plaintiffs agree that there *is* demand elasticity and substitution on the cardholder side of the market.  As Plaintiffs recently told this Court, "[o]n the cardholder side of the market . . . there is cross-elasticity of demand between the services offered by Amex and the services offered by other credit card networks".  Merchant Pls.' Supp. Mem. in Support of Mot. to File Am. Compls. at 5-6 (May 12, 2017) (ECF No. 799).  That admission is fatal to Plaintiffs' Amex-only market.  As the Supreme Court explained, competition between two-sided transaction platforms does not exist just on one side of the platform or the other.  Instead, card networks compete with each other to create transactions that necessarily connect both sides:

> A credit-card company that processed transactions for merchants, but that had no cardholders willing to use its card, could not compete with Amex.  Only a company that had both cardholders and merchants willing to use its network could sell transactions and compete in the credit-card market.  Similarly, if a merchant accepts the four major credit cards, but a cardholder only uses Visa or Amex, only those two cards can compete for the particular transaction.  Thus, competition cannot be accurately assessed by looking at only one side of the platform in isolation.

*Ohio v. Amex*, 138 S. Ct. at 2287.  Because credit card networks compete for *transactions*, not for merchants or cardholders in isolation, Plaintiffs' attempt to segment the substitutability analysis is directly contrary to the Supreme Court's decision.  Plaintiffs do not and cannot question the strenuous competition in the market for transactions.

Plaintiffs' concessions and theories throughout this case underscore this same competitive reality.  Plaintiffs' experts have opined that Visa, MasterCard and Amex "compete with one another", Barbur Decl. Ex. 28 (Dep. of Joseph Stiglitz, July 22, 2013) at 17:7-17; Facts ¶ 44, and that substitutability "between AmEx and other third party payments cards (including at

10

HIGHLY CONFIDENTIAL / SUBJECT TO PROTECTIVE ORDER

least other credit cards and likely debit cards as well) is high because these cards offer merchants very similar functionality and value and are thus relatively undifferentiated". Vellturo III ¶ 18; *see also* Facts ¶¶ 16-18, 37-66; Vellturo II ¶ 61; Ariely I ¶ 50. Further, contrary to their market definition allegations, Plaintiffs' damages theory is premised on the idea that Amex and other payment cards are functional equivalents that should be priced similarly. Vellturo I ¶¶ 522-24; Facts ¶ 42. The relief requested by Plaintiffs in this litigation—the ability to steer Amex cardholders to other credit and debit card products—itself proves that Plaintiffs know that Amex cards are interchangeable with other forms of payment and therefore part of the same relevant product market.[10]

**B.     No Legal Theory Can Support an Amex-Only Market.**

While *Ohio v. Amex* alone precludes an Amex-only market, Plaintiffs' claims fail for other reasons, too, consistent with the prevailing rule against single-brand antitrust markets. Plaintiffs' Amex-only market allegations are based on a cardholder insistence theory that the Second Circuit rejected. Plaintiffs impermissibly rely on the challenged contract provisions to exclude otherwise interchangeable products from the relevant market. And Plaintiffs have no basis for an exception to the rule that "courts in the Second Circuit generally reject efforts to define a market as consisting of a single brand, and will dismiss a complaint that alleges only such a market". *Bel Canto Design, Ltd. v. MSS HiFi, Inc*., No. 11-CV-6353, 2012 WL 2376466, at *10 (S.D.N.Y. June 20, 2012); *see Integrated Sys. & Power, Inc. v. Honeywell Int'l, Inc.*, 713

---

[10] Plaintiffs argue that this substitutability addresses how the market would function absent the NDPs, *see, e.g.*, Vellturo III ¶ 18; Facts ¶ 40, but this only confirms that Plaintiffs are trying to (impermissibly) define a market by reference to the provisions they are challenging. *See infra* Section II.B.2. Absent the NDPs (which are irrelevant to defining the relevant market), Plaintiffs admit the relevant market would include all credit cards.

HIGHLY CONFIDENTIAL / SUBJECT TO PROTECTIVE ORDER

F. Supp. 2d 286, 298 (S.D.N.Y. 2010) (granting motion to dismiss and observing that courts

"have consistently held that a single brand name product cannot define a relevant market").

### 1.    Consumer Insistence Cannot Create a Single-Brand Market.

Plaintiffs' Amex-only market fails because it is based on the same type of

cardholder insistence theory that the Second Circuit directly rejected as a basis for market power

in *U.S. v. Amex*.  Plaintiffs allege that Amex faces no competition and operates in a single-brand

market because merchants are compelled to accept Amex based on cardholder preference:

cardholders prefer to use their Amex cards, and some will take their business elsewhere if the

Plaintiff does not accept Amex.  *See, e.g*., Vellturo I ¶ 116; Vellturo II ¶ 42; Vellturo III ¶ 65, 70;

Stiglitz I ¶ 21; Facts ¶¶ 32-36.  As a result, Plaintiffs assert, Amex can raise prices "without

suffering any meaningful merchant attrition or loss of transactional volume".  Am. Compl. ¶¶ 65-

66.  As Plaintiffs have conceded, their Amex-only market definition depends on their theory that

"[t]he source of Amex's market power is cardholder insistence".  Merchant Pls.' Opp. to Amex's

Mot. for Summary Judgment at 21 (Nov. 21, 2013) (ECF No. 715); *see id.* at 20 (arguing that

"Amex is insulated from competition for merchant acceptance of its cards by high insistence

levels and critical loss analysis").

This is the same theory of cardholder "insistence" that the Second Circuit

rejected.  Instead, the Second Circuit made clear, cardholder loyalty was a sign of healthy

competition because Amex was required to earn that loyalty by providing incentives to attract

consumers from competing networks.  *U.S. v. Amex*, 838 F.3d at 203.  Plaintiffs' argument that

Amex's insistent consumers insulate Amex from competition sufficiently to place Amex in its

own market directly contradicts the Second Circuit's findings:  "That Amex might not enjoy

market power without continuing investment in cardholder benefits indicates, if anything, a *lack*

12

HIGHLY CONFIDENTIAL / SUBJECT TO PROTECTIVE ORDER

of market power; evidence showing that Amex must compete on price in order to attract consumers does not show that Amex has the power to increase prices to supracompetitive levels." *Id.* at 203. This Court, too, found that Amex's cardholders would substitute away to other cards if Amex reduced its investment in benefits, which makes clear there is significant interchangeability between networks. *United States v. Am. Express Co.*, 88 F. Supp. 3d at 195 (finding that Amex's "current market share would dissipate if the company were to stop investing in those programs that make its product valuable to cardholders"). That Amex invests in benefits to attract and retain customers is further proof that Amex competes in a broader all-GPCC market. *See* Facts ¶¶ 5-9.

No other case, for any industry, recognizes the type of consumer insistence theory advanced by Plaintiffs as a basis for a single-brand market, with good reason. It would be perverse and improper to define an Amex-only market based on loyalty that is continually subject to such vigorous competitive challenge. *See United States v. Waste Mgmt., Inc.*, 743 F.2d 976, 984 (2d Cir. 1984) ("We fail to see how the existence of good will achieved through effective service is an impediment to, rather than the natural result of, competition."); *see also, e.g.*, *Green Country Food Mkt., Inc., v. Bottling Grp., LLC*, 371 F.3d 1275, 1282 (10th Cir. 2004) ("Even where brand loyalty is intense, courts reject the argument that a single branded product constitutes a relevant market."); *Town Sound & Custom Tops, Inc. v. Chrysler Motors Corp.*, 959 F.2d 468, 479-80 (3d Cir. 1992) (rejecting Chrysler-only market definition, notwithstanding consumer preferences because "a market also includes actual or potential competitors who may take business away from each other"); *Global Discount Travel Services, LLC v. Trans World Airlines, Inc.*, 960 F. Supp. 701, 705 (S.D.N.Y. 1997) (finding customer insistence for TWA flights between certain city pairs insufficient to define a market and analogizing this strong

13

HIGHLY CONFIDENTIAL / SUBJECT TO PROTECTIVE ORDER

preference to strictly preferring Pepsi over Coke:  "Pepsi is one of many sodas . . . . Likewise, tickets on TWA are like tickets on any other airline."); *Disenos Artisticos E Industriales, S.A. v. Work*, 714 F. Supp. 46, 48 (E.D.N.Y. 1989) (explaining that the "fact that some retailers echo the brand loyalties of their customers furnishes no basis for employing a single-product market definition").

As the Second Circuit concluded, "so long as Amex's market share is derived from cardholder satisfaction, there is no reason to intervene and disturb the present functioning of the payment-card industry".  *U.S. v. Amex*, 838 F.3d at 204.  Plaintiffs' Amex-only market fails for the same reason:  where Amex's consumer loyalty is constantly challenged by competition, Amex does not operate in a market by itself.

### 2.    Plaintiffs Cannot Use the NDPs To Define the Relevant Market.

Plaintiffs' Amex-only market theory fails for yet another reason:  Plaintiffs impermissibly define the market based on the contractual restraints at issue, claiming that competition on the merchant side of the Amex platform is restrained by the NDPs in merchants' contracts with Amex.  Plaintiffs argue that, without the NDPs, competition would flourish between all GPCCs.  Facts ¶¶ 37-44; *see generally* Vellturo III ¶¶ 17-18 ("[W]ith the Merchant Restraints in place, AmEx operates in a product market unto itself."); Am. Compl. ¶ 67 (alleging that there is no "significant cross-elasticity of demand between Amex credit card services and other methods of payment" because the "Amex restraints eliminate any incentive by other card networks to charge lower merchant fees than Amex (and vice versa) because such lower merchant fees will not lead to increased sales").  Therefore, according to Plaintiffs, the only thing keeping other card networks out of an Amex-only market is Amex's NDPs.  Barbur Decl. Ex. 30 (Dep. of Christopher Vellturo, Aug. 13, 2013) at 45:8-19 ("In a plausible economic world where

14

HIGHLY CONFIDENTIAL / SUBJECT TO PROTECTIVE ORDER

the merchant restraints don't exist the market would have expanded—or the relevant market expands."); Facts ¶ 41.

But "no court has defined a relevant product market with reference to the particular contractual restraints of the plaintiff". *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 438 (3d Cir. 1997); *see also Hack v. President & Fellows of Yale Coll.*, 237 F.3d 81, 85 (2d Cir. 2000) ("Economic power derived from contractual arrangements affecting a distinct class of consumers cannot serve as a basis for [an antitrust] claim."), *abrogated on other grounds by Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002).  Where the only barrier to substitution "stems not from the market but from plaintiffs' contractual agreement", "no claim will lie"; therefore, "a court making a relevant market determination looks not to the contractual restraints assumed by a particular plaintiff when determining whether a product is interchangeable, but to the uses to which the product is put by consumers in general".  *Smugglers Notch Homeowners' Ass'n v. Smugglers' Notch Mgmt. Co.*, 414 F. App'x 372, 376-77 (2d Cir. 2011) (summary order) (quoting *Queen City Pizza*, 124 F.3d at 443).  Indeed, "an antitrust plaintiff may not define a market so as to cover only the practice complained of" because "this would be circular or at least result-oriented reasoning".  *Adidas Am., Inc. v. NCAA*, 64 F. Supp. 2d 1097, 1102 (D. Kan. 1999) (internal quotations and citation omitted).  Using the contractual restraints to limit the market fails to take into account the existing cross-elasticity of demand between competitors in the broader market, and thus "create[s] an artificially narrow market which is defined essentially in terms of the practice of which they complain".  *Hamilton Chapter of Alpha Delta Phi, Inc. v. Hamilton Coll.*, 106 F. Supp. 2d 406, 409-13 (N.D.N.Y. 2000) (rejecting market based on contract because the "economic forces pertinent to the definition of a relevant market for antitrust purposes must flow from the market, not from private contract").

HIGHLY CONFIDENTIAL / SUBJECT TO PROTECTIVE ORDER

The Third Circuit's decision in *Queen City Pizza*—which the Second Circuit has followed—illustrates why Plaintiffs' single-brand market fails.  The plaintiffs, Domino's Pizza franchisees, sued franchisor Domino's Pizza, Inc., alleging antitrust claims in the alleged market for "ingredients, supplies, materials and distribution services used in the operation of Domino's stores" based on contracts that restricted their use of other suppliers for these products and services.  124 F.3d at 437.  Like Plaintiffs here, the *Queen City Pizza* plaintiffs could not dispute that substitutes existed for these products and services; instead, they argued that their contractual restrictions prevented them from using substitutes.  Indeed, as with Plaintiffs' claims here, it was "the availability of interchangeable" substitutes "from other suppliers, at lower cost, that motivate[d] [the] lawsuit".  *Id*. at 438.  The court rejected the proposed market definition because a "court making a relevant market determination looks not to the contractual restraints assumed by a particular plaintiff when determining whether a product is interchangeable, but to the uses to which the product is put by consumers in general".  *Id*.  ("[T]he only cases we have found involving similar claims" based on contract-derived market definitions "rejected plaintiffs' position as a matter of law".).  Because all contracts restrict competition in some sense, any other approach leads to nonsensical results:  If "contractual restraints render otherwise identical products non-interchangeable for purposes of relevant market definition, any exclusive dealing arrangement, output or requirement contract, or franchise tying agreement would support a claim for violation of antitrust laws".  *Id.*; *cf. Apple, Inc. v. Psystar Corp.*, 586 F. Supp. 2d 1190, 1200 (N.D. Cal. 2008) (noting the "circular nature" of counterclaimant's proposed single-brand Mac OS computer operating system market definition and rejecting claims based on that market definition).

HIGHLY CONFIDENTIAL / SUBJECT TO PROTECTIVE ORDER

Plaintiffs cannot rely on the NDPs in defining the relevant market.  They concede that, NDPs aside, GPCC networks compete with Amex.  Therefore, their attempt to define an Amex-only market fails.

### 3.    The "Aftermarket" Exception Does Not Apply.

Plaintiffs' single-brand market claims also fail because Plaintiffs cannot rely on the limited "aftermarket" exception to the general rule against single-brand markets.  "In rare circumstances, a single brand of a product or service can constitute a relevant market for antitrust purposes.  But that possibility is limited to situations in which consumers are 'locked in' to a specific brand by the nature of the product."  *PSKS, Inc. v. Leegin Creative Leather Prods., Inc.*, 615 F.3d 412, 418 (5th Cir. 2010) (internal citation omitted).  These lock-in cases all involve an aftermarket where further purchases of complementary goods for which there is no reasonable substitute are required *after* the initial purchase.  For example, in the leading case to recognize an aftermarket exception, the Supreme Court recognized that a person might be locked in to a single source for service of Kodak copy machines if, *after* the person invested to purchase a machine, Kodak stopped selling replacement parts to independent service organizations, and there were no reasonably interchangeable substitute replacement parts.  *See Eastman Kodak Co. v. Image Technical Servs. Inc.*, 504 U.S. 451, 457-58, 482 (1992).  Thus, aftermarket lock-in exists if a defendant concealed its policies when a customer made a purchase, or changed its policies after the fact.  *See PSI Repair Servs., Inc. v. Honeywell, Inc.*, 104 F.3d 811, 819-20 (6th Cir. 1997).  As the Court in *Kodak* found, for copier customers, information about aftermarket service costs was "difficult—some of it impossible—to acquire at the time of purchase".  504 U.S. at 474.

No such lock-in exists here.  Plaintiffs have not argued—nor could they—that Amex changed or concealed its policies about the NDPs.  A plaintiff cannot claim to be locked in

HIGHLY CONFIDENTIAL / SUBJECT TO PROTECTIVE ORDER

to an aftermarket by a contract that allows the plaintiff to "assess the potential costs and economic risks at the time they signed" the agreement at issue. *Queen City Pizza*, 124 F.3d at 440.  Here, the NDPs were contractual terms that were "fully disclosed" to Plaintiffs when they signed their acceptance agreements with Amex. *See Hack*, 237 F.3d at 87.

All claims based on Plaintiffs' improper single-brand market definition should be dismissed, or in the alternative, summary judgment should be granted.

## CONCLUSION

For the reasons set forth above, Amex respectfully requests that the Court grant Amex's motion for dismissal or, in the alternative, summary judgment with respect to all claims based on a one-sided market and all claims based on an Amex-only market.

HIGHLY CONFIDENTIAL / SUBJECT TO PROTECTIVE ORDER

August 17, 2018

CRAVATH, SWAINE & MOORE LLP,

by

/s/ Peter T. Barbur

Evan R. Chesler
Peter T. Barbur
Kevin J. Orsini
Rory A. Leraris
Members of the Firm
echelser@cravath.com
pbarbur@cravath.com
korsini@cravath.com
rleraris@cravath.com

Worldwide Plaza
825 Eighth Avenue
New York, NY 10019
(212) 474-1000

*Attorneys for Defendants American Express Company and American Express Travel Related Services Company, Inc.*

# EXHIBIT B

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE AMERICAN EXPRESS ANTI-STEERING RULES ANTITRUST LITIGATION (II) | 11-MD-02221-NGG-RER |
| THIS DOCUMENT RELATES TO:<br><br>Individual Plaintiff Actions<br><br>No. 08-CV-2315<br>No. 08-CV-2316<br>No. 08-CV-2317<br>No. 08-CV-2380<br>No. 08-CV-2406<br>No. 11-CV-0337<br>No. 11-CV-0338 | **NOTICE OF MOTION TO DISMISS OR IN THE ALTERNATIVE FOR SUMMARY JUDGMENT WITH RESPECT TO THE INDIVIDUAL PLAINTIFFS' ONE-SIDED AND AMEX-ONLY MARKET CLAIMS** |

PLEASE TAKE NOTICE that, upon Individual Plaintiffs' First Amended and

Consolidated Complaint (ECF No. 814), a copy of which is attached hereto; the declaration of

Peter T. Barbur, executed on August 17, 2018, with exhibits hereto; the local Civil Rule 56.1

Statement of Material Undisputed Facts; the Memorandum of Law in Support of Defendants'

Motion to Dismiss or in the Alternative for Summary Judgment with Respect to the Individual

Plaintiffs' One-Sided and Amex-Only Market Claims; and all prior pleadings and proceedings

herein, defendants American Express Company and American Express Travel Related Services

Company hereby move the Court before Hon. Nicholas G. Garaufis at the Courthouse, 225

Cadman Plaza East, Brooklyn, NY, for an order of dismissal pursuant to Fed. R. Civ. P. 12(b)(6),

or in the alternative granting summary judgment pursuant to Fed. R. Civ. P. 56(a), with respect

to the Individual Plaintiffs' one-sided and Amex-only market claims; and granting such other

and further relief as the Court deems just and proper.

August 17, 2018

CRAVATH, SWAINE & MOORE LLP,


by

_____
/s/ Peter T. Barbur

Evan R. Chesler
Peter T. Barbur
Kevin J. Orsini
Rory A. Leraris
Members of the Firm
echesler@cravath.com
pbarbur@cravath.com
korsini@cravath.com
rleraris@cravath.com


Worldwide Plaza
825 Eighth Avenue
New York, NY 10019
(212) 474-1000


*Attorneys for Defendants American Express
Company and American Express Travel
Related Services Company, Inc.*


TO:

Joseph M. Vanek, Esq.
David P. Germaine, Esq.
VANEK, VICKERS & MASINI, P.C.
55 W. Monroe, Suite 3500
Chicago, IL 60603
*jvanek@vaneklaw.com*
*dgermaine@vaneklaw.com*

Richard Alan Arnold, Esq.
William J. Blechman, Esq.
Kevin J. Murray, Esq.
Josh Gray, Esq.
Douglas H. Patton, Esq.
    KENNY NACHWALTER, P.A.
        Four Seasons Tower
            1441 Brickell Avenue, Suite 1100
                Miami, FL 33131-4327
                    *rarnold@knpa.com*
                    *wblechman@knpa.com*
                    *kmurray@knpa.com*
                    *jgray@knpa.com*
                    *dpatton@knpa.com*


Eric Bloom, Esq.
Maureen S. Lawrence, Esq.
    HANGLEY ARONCHICK SEGAL PUDLIN & SCHILLER
        2805 Old Post Road, Suite 100
            Harrisburg, PA 17110
                *ebloom@hangley.com*
                *mlawrence@hangley.com*


David E. Everson, Esq.
    STINSON LEONARD STREET LLP
        7700 Forsyth Boulevard, Suite 1100
            St. Louis, MO 63105-1821
                *david.everson@stinson.com*


Paul E. Slater, Esq.
Matthew T. Slater, Esq.
Mitchell H. Macknin
    SPERLING & SLATER, P.C.
        55 West Monroe Street, Suite 3200
            Chicago, IL 60603
                *pes@sperling-law.com*
                *mslater@sperling-law.com*
                *mhmacknin@sperling-law.com*


3

Steve D. Shadowen
   HILLIARD & SHADOWEN LLP
     2407 S. Congress Suite E 122
     Austin, TX 78704
      *steve@hilliardshadowenlaw.com*

Linda P. Nussbaum
   NUSSBAUM LAW GROUP, PC
     1211 Avenue of the Americas, 40th Floor
     New York, NY 10036
      *lnussbaum@nussbaumpc.com*

Robert N. Kaplan
   KAPLAN, KILSHEIMER & FOX, LLP
     805 Third Avenue
     New York, NY 10022
      *rkaplan@kaplanfox.com*

# EXHIBIT C

HIGHLY CONFIDENTIAL / SUBJECT TO PROTECTIVE ORDER

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE AMERICAN EXPRESS ANTI-STEERING RULES ANTITRUST LITIGATION (II) | 11-MD-02221-NGG-RER<br>**FILED UNDER SEAL** |
| THIS DOCUMENT RELATES TO:<br><br>Individual Plaintiff Actions<br><br>        No. 08-CV-2315<br>        No. 08-CV-2316<br>        No. 08-CV-2317<br>        No. 08-CV-2380<br>        No. 08-CV-2406<br>        No. 11-CV-0337<br>        No. 11-CV-0338 | REDACTED VERSION |

**RULE 56.1 STATEMENT OF MATERIAL UNDISPUTED FACTS
IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS OR IN THE ALTERNATIVE
FOR SUMMARY JUDGMENT WITH RESPECT TO THE INDIVIDUAL PLAINTIFFS'
ONE-SIDED AND AMEX-ONLY MARKET CLAIMS**

**FILED UNDER SEAL**

Evan R. Chesler
Peter T. Barbur
Kevin J. Orsini
Rory A. Leraris
CRAVATH, SWAINE & MOORE LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019
(212) 474-1000

*Attorneys for Defendants American Express
Company and American Express Travel
Related Services Company, Inc.*

August 17, 2018

HIGHLY CONFIDENTIAL / SUBJECT TO PROTECTIVE ORDER

Defendants American Express Company and American Express Travel Related Services

Company, Inc. (collectively, "American Express" or "Amex") respectfully submit this statement

of material facts, pursuant to Local Rule 56.1 of the United States District Court for the Eastern

District of New York, in support of Defendants' Motion to Dismiss or in the Alternative for

Summary Judgment with Respect to the Individual Plaintiffs' One-Sided and Amex-Only Market

Claims.  The material facts as to which there are no disputes are as follows:[1]

I.       **Undisputed Facts Regarding One-Sided Market Claims.**

1.       Amex, Visa, MasterCard and Discover operate two-sided transaction platforms

that connect merchants and cardholders for a simultaneous sale.  (Barbur Decl. Ex. 64

(Filistrucchi, Geradin, Van Damme & Affeldt, *Market Definition in Two–Sided Markets:  Theory*

*and Practice*, 10 J. Competition L. & Econ. 293, 301 (2014)); Barbur Decl. Ex. 63 (Klein,

Lerner, Murphy & Plache, *Competition in Two–Sided Markets:  The Antitrust Economics of*

*Payment Card Interchange Fees*, 73 Antitrust L.J. 571, 580, 583 (2006)); Barbur Decl. Ex. 28

(Dep. of Joseph Stiglitz, July 22, 2013) at 17:12-15; Barbur Decl. Ex. 4 (Expert Report of

Dr. Christopher A. Vellturo ("Vellturo I"), April 3, 2013), ¶ 23; Barbur Decl. Ex. 3 (Expert

Report of Professor Joseph Stiglitz ("Stiglitz I"), April 2, 2013), ¶ 9.)

2.       In his opening report, Plaintiffs' expert, Dr. Christopher Vellturo, described a

payment card transaction as one where "a shopper presents a . . . card to the merchant [and] . . .

the merchant submits the card information to a network which authorizes, clears and settles the

transaction".  (Barbur Decl. Ex. 4 (Vellturo I), ¶ 23.)

---

[1] All documents and testimony cited herein are exhibits to the August 17, 2018 Declaration
of Peter T. Barbur in Support of Defendants' Motion to Dismiss or in the Alternative for
Summary Judgment with Respect to the Individual Plaintiffs' One-Sided and Amex-Only Market
Claims.  All references to "Barbur Decl. Ex." refer to these exhibits.

HIGHLY CONFIDENTIAL / SUBJECT TO PROTECTIVE ORDER

3.       In his opening report, Plaintiffs' expert, Dr. Joseph Stiglitz, stated: "The use

of . . . credit cards involves payment to the merchant through a promise of a funds transfer to the

merchants' bank account . . . . By using a [credit card], an individual does not face the additional

transaction of going to the bank (or an ATM) to get cash, which he or she then turns over to the

merchant, who then normally takes that cash to its bank (involving another transaction).  Rather,

the funds go to the account of the merchant, from the account of the individual, mediated by the

credit or debit card company." (Barbur Decl. Ex. 3 (Stiglitz I), ¶ 9.)

4.       At his deposition, Dr. Stiglitz testified that Visa, MasterCard and Amex "link

cardholders to merchants". (Barbur Decl. Ex. 28 (Dep. of Joseph Stiglitz, July 22, 2013)

at 17:12-15.)

5.       Dr. Vellturo stated in his sur-rebuttal report that American Express "increases the

relative attractiveness of Amex to cardholders (through increased Amex rewards)".

(Barbur Decl. Ex. 7 (Sur-Rebuttal Expert Report of Dr. Christopher A. Vellturo ("Vellturo III"),

July 3, 2013), ¶ 29.)

6.       In Dr. Vellturo's opening report, he cited testimony from an Amex executive that

"AmEx encourages spend on its network . . . by offering richer rewards that AmEx pays for with

the premium it receives from merchants". (Barbur Decl. Ex. 4 (Vellturo I), ¶ 244 n.502 (citing

Dep. of Jack Funda (Amex), Nov. 20, 2012) at 521-23, 528-30.)

7.       Dr. Vellturo stated in his opening report that, if American Express decreased its

rewards and other benefits to customers, "credit transaction volumes" could decrease "due to, for

example, a decline in credit-based rewards". (Barbur Decl. Ex. 4 (Vellturo I), ¶ 398 n.725.)

8.       Dr. Vellturo testified at his deposition that, if American Express were to decrease

"the rewards and the benefits that AMEX card holders are receiving" its "customers would be

2

HIGHLY CONFIDENTIAL / SUBJECT TO PROTECTIVE ORDER

less inclined to use their AMEX cards, unless AMEX completely reset their model. And by being less inclined to use the AMEX cards that would have a negative impact potentially on insistence." (Barbur Decl. Ex. 30 (Dep. of Christopher Vellturo, Aug. 13-14, 2013) at 99:7-100:9.)

9.    Dr. Vellturo also testified that Amex's "rewards . . . are funded by revenues and those revenues are significantly related to merchant fees". (*Id.* at 362:6-14.)

10.    An HEB official explained in an email about HEB's co-brand credit card that "our rates are competitive but our rewards are AWESOME" because competitors' cards "have traded low rates for low rewards", which "really is something we have to explain to others in terms of the whole picture". (Barbur Decl. Ex. 60 (HEBAMXED03047232) at HEBAMXED03047232.) The HEB official continued: "If you just look at rates you are only getting half the picture. I think our rewards . . . speak volumes for our card." (*Id.*)

11.    James Callahan of HEB testified that HEB offered a rewards credit card because "the rewards component is the incentive to get the customer to use it" and "[t]here's other cards in their wallet that would be competing for the H-E-B card." (Barbur Decl. Ex. 15 (Dep. of James Callahan (HEB), Nov. 6, 2012) at 38:16-25.) Callahan further explained that rewards for its co-brand card were funded by merchant fees (*id.* at 122:7-123:21) and that "[t]he level and rate of credit card rate increases is expected to keep increasing at a rapid rate, not only in terms of the rate itself, but also as a result of high free rewards-type cards recently introduced by Visa and MasterCard in an attempt to compete with American Express and Discover."
(*Id.* at 59:15-60:7.)

12.    John Briggs of Hy-Vee testified that, while cardholders received certain benefits for using a particular program card, "Hy-Vee received the advantage of having the fleet coming

3

HIGHLY CONFIDENTIAL / SUBJECT TO PROTECTIVE ORDER

into our stores and into our gas stations and hopefully into our convenience stores and into our grocery stores". (Barbur Decl. Ex. 13 (Dep. of John Briggs (Hy-Vee), Dec. 13, 2012) at 141:5-22.)

13.     Dennis Stokely of Safeway testified that "the AMEX rewards program [was] driving the cost from Visa and MasterCard" and that Amex was "kind of the root of a lot of the cost increases we were incurring". (Barbur Decl. Ex. 29 (Dep. of Dennis Stokely (Safeway), Nov. 15, 2012) at 356:19-24.)

14.     On February 12, 2005, Kathy Hanna of Kroger wrote in an email to senior Kroger officials that MasterCard introduced a new high-fee, high-rewards card to "compete with American Express cards". (Barbur Decl. Ex. 61 (KRGAMX00272018) at KRGAMX00272018.) Hanna noted that, between MasterCard's new card and Visa's "Signature Rewards" card, "an estimated $1.5 billion of our sales will incur greater fees totaling approximately $10 million". (*Id.*)

15.     A Meijer presentation notes that Meijer "pays cardholders rewards for their purchases" made using the Meijer credit card and "offers incentives to both acquire new cardholders and to encourage usage". (Barbur Decl. Ex. 62 (MEIJER-00264261-379) at MEIJER-00264279.)

## II.     Undisputed Facts Regarding Amex-Only Market Claims.

### A.     American Express, Visa, MasterCard and Discover each provide the same core payment functions to merchants and to consumers.

16.     There are four major payment card networks in the United States today: Visa, MasterCard, American Express, and Discover. (Barbur Decl. Ex. 4 (Vellturo I), ¶¶ 25, 48-74; Barbur Decl. Ex. 5 (Vellturo I Errata)); Barbur Decl. Ex. 3 (Stiglitz I)), ¶ 29; *see also* Barbur Decl. Ex. 10 (Rebuttal Expert Report of B. Douglas Bernheim ("Bernheim II"),

4

HIGHLY CONFIDENTIAL / SUBJECT TO PROTECTIVE ORDER

May 20, 2013), Figure 9; Barbur Decl. Ex. 9 (Expert Report of B. Douglas Bernheim ("Bernheim I"), April 2, 2013), Figures 4-6.)

17.     All four networks have nationally recognized brands and perform the same core payment functions, enabling authorization, clearance and settlement of commercial transactions through the use of credit cards. (Barbur Decl. Ex. 4 (Vellturo I), ¶¶ 25, 50, 58, 62; Barbur Decl. Ex. 3 (Stiglitz I), ¶ 11 & n.20; Barbur Decl. Ex. 2 (Sur-Rebuttal Report of Mike McCormack, July 3, 2013), ¶ 22 & n.8.)

18.     American Express, Visa and MasterCard all "afford a convenient form of payment[,] one where customers are relieved of the burdens of carrying around cash and checks, and merchants are relieved of the manual costs associated with cash and check acceptance". (Barbur Decl. Ex. 4 (Vellturo I), ¶ 393.)

### 1.     American Express

19.     American Express began offering payment cards in 1958.  (Barbur Decl. Ex. 4 (Vellturo I), ¶ 48 & Barbur Decl. Ex. 5 (Vellturo I Errata), ¶ 48); Barbur Decl. Ex. 3 (Stiglitz I), ¶ 17; *see also* Barbur Decl. Ex. 10 (Bernheim II), ¶ 13.)

20.     American Express offers a suite of branded charge and credit cards, which are differentiated in various ways, such as levels of rewards and other benefits, but all with the same core payment functions.  (Barbur Decl. Ex. 54 (American Express, "View All Cards," http://www.americanexpress.com/getthecard); Barbur Decl. Ex. 4 (Vellturo I), ¶¶ 48, 50, Exhibit 7; Barbur Decl. Ex. 5 (Vellturo I Errata), ¶ 48, Exhibit 7; *see also* Barbur Decl. Ex. 11 (Rebuttal Expert Report of George A. Hay ("Hay"), May 20, 2013), ¶ 23 & Table 1, ¶ 24 & Table 2; Barbur Decl. Ex. 10 (Bernheim II), ¶¶ 13, 58-60.)

21.     In addition, through agreements with American Express, several banks in the United States offer cards with the American Express brand that are accepted on the American

5

HIGHLY CONFIDENTIAL / SUBJECT TO PROTECTIVE ORDER

Express network. (Barbur Decl. Ex. 4 (Velltuiro I), ¶ 49 & n.69; Barbur Decl. Ex. 5 (Velltuiro I

Errata), n.69; Barbur Decl. Ex. 10 (Bernheim II), ¶ 348 n.482.)

22.     A customer with an American Express card can generally use it at merchants that

have agreed to accept American Express. (Barbur Decl. Ex. 53 (AMEXNDR19345581-773) at

AMEXNDR19345610 ("3.1 Card Acceptance"); Barbur Decl. Ex. 52 (American Express

Merchant Regulations – U.S. October 2012) at 16 ("3.1 Card Acceptance").)

### 2.     Visa

23.     Visa (including its predecessor, BankAmericard) payment cards have been

available since 1958. (Barbur Decl. Ex. 4 (Velltuiro I), ¶ 55.)

24.     Issuers of Visa cards offer a variety of Visa credit cards, which are differentiated

in various ways, such as levels of rewards and other benefits, but all with the same core payment

functions. (Barbur Decl. Ex. 55 (Visa, "15 Visa Credit Cards,"

http://usa.visa.com/cardadvisor/CardAdvisor); Barbur Decl. Ex. 4 (Velltuiro I), ¶¶ 56, 58 & n.85;

*see also* Barbur Decl. Ex. 11 (Hay), ¶ 23 & Table 1.)

25.     A customer who has a Visa credit card can generally use it at merchants that have

agreed to accept Visa credit cards. (Barbur Decl. Ex. 58 (Visa International Operating

Regulations Core Principles, Effective 15 April 2013, http://usa.visa.com/download/merchants/

visa-core-principles.pdf) at 6.0 ("Payment Acceptance").)

### 3.     MasterCard

26.     MasterCard (including its predecessor, MasterCharge) payment cards have been

available since 1966. (Barbur Decl. Ex. 4 (Velltuiro I), ¶ 61.)

27.     Issuers of MasterCard cards offer a variety of MasterCard credit cards, which are

differentiated in various ways, such as levels of rewards and other benefits, but all with the same

core payment functions. (Barbur Decl. Ex. 56 (MasterCard, "Find The Card That's Right For

HIGHLY CONFIDENTIAL / SUBJECT TO PROTECTIVE ORDER

You," http://www.mastercard.us/personal-results.html?type=5&1=182&2=186); Barbur Decl.

Ex. 4 (Vellturo I), ¶¶ 61-62 & n.92; *see also* Barbur Decl. Ex. 11 (Hay), ¶ 23 & Table 1.)

28.    A customer who has a MasterCard credit card can generally use it at merchants

that have agreed to accept MasterCard credit cards. (Barbur Decl. Ex. 59 (MasterCard Rules,

June 14, 2013, http://www.mastercard.com/us/merchant/pdf/BM-Entire_Manual_public.pdf)

at 5.10.1 ("Honor All Cards").)

### 4.    Discover

29.    Discover payment cards have been available since 1985. (Barbur Decl. Ex. 4

(Vellturo I), ¶ 66.)

30.    Discover offers a suite of branded cards, which are differentiated in various ways,

such as levels of rewards and other benefits, but all with the same core payment functions.

(Barbur Decl. Ex. 57 (Discover, "Compare Credit Cards," https://www.discover.com/credit-

cards/?ICMPGN=TNV_CC_TXT); *see also* Barbur Decl. Ex. 4 (Vellturo I), ¶¶ 70-71;

Barbur Decl. Ex. 11 (Hay), ¶ 23 & Table 1.)

31.    A customer who has a Discover credit card can generally use it at merchants that

have agreed to accept Discover credit cards. (Barbur Decl. Ex. 51 (DFS0809209-363) at

DFS0809226 ("2.4 Equal Treatment of Cards Issued or Operating on the Discover Network . . .")

& DFS0809229 ("3.2 Card Acceptance Requirements").)

### B.    Amex Insistence and Substitutability.

32.    In his opening report, Dr. Vellturo stated that "AmEx has leveraged a concept . . .

known as 'insistence' to maintain high merchant discount rates" and that "attempts by merchants

similar . . . to Plaintiffs to test the limits of [insistence] have failed, as no comparable merchant

has successfully attempted to terminate AmEx acceptance; moreover, substantial merchants that

have actually ventured into cessation of AmEx acceptance have invariably returned."

7

HIGHLY CONFIDENTIAL / SUBJECT TO PROTECTIVE ORDER

(Barbur Decl. Ex. 4 (Vellturo I), ¶ 116.)

33.    In his rebuttal report, Dr. Vellturo stated that "a merchant's decision to accept (or to continue accepting) AmEx is not dependent on the number of AmEx cardholders, but rather on the degree of insistence (or use loyalty) among AmEx cardholders". (Barbur Decl. Ex. 6 (Rebuttal Expert Report of Dr. Christopher A. Vellturo ("Vellturo II"), May 20, 2013), ¶ 42.)

34.    In his sur-rebuttal report, Dr. Vellturo stated that "it does not take much cardholder insistence for AmEx to have power over merchants. Indeed, . . . insistence of less than four percent is sufficient to make non-acceptance of AmEx not a viable option for merchants". (Barbur Decl. Ex. 7 (Vellturo III), ¶ 65.) Amex's "insistence-based approach to its pricing interactions with Plaintiffs indicates that AmEx viewed its 'value added' to be primarily in the form of cardholder insistence as to AmEx card use. This perceived brand value created recognition among merchants that to cease acceptance once commenced was not a viable option". (*Id.* ¶ 70.)

35.    In his opening report, Dr. Stiglitz stated: "A Plaintiff would be willing to pay American Express a fee higher than the competitive level because of such loyalty (that results in part from the anticompetitive Restraints). . . . As long as the value of loyalty-based 'incremental sales' to the merchant exceeds American Express's cost of providing payment services, American Express has market power." (Barbur Decl. Ex. 3 (Stiglitz I), ¶ 21.)

36.    In his expert reports, Dr. Vellturo stated: "In the actual world with its Merchant Restraints in place, AmEx operates in a product market unto itself, where merchants attempting to substitute between AmEx and other payment options were (and continue to be) thwarted by the inability to steer transactions to less costly means." (Barbur Decl. Ex. 4 (Vellturo I), ¶ 104; Barbur Decl. Ex. 7 (Vellturo III), ¶ 17 (same).)

8

HIGHLY CONFIDENTIAL / SUBJECT TO PROTECTIVE ORDER

37. Dr. Vellturo stated in his sur-rebuttal report that "credit, charge and debit cards (and possibly other third-party payment mechanisms) should and would be largely interchangeable from the merchants' perspective; that is, they would all be in the relevant market if AmEx's Merchant Restraints did not exist." (Barbur Decl. Ex. 7 (Vellturo III), ¶ 19.)

38. Dr. Vellturo opined that "AmEx's Merchant Restraints prevent merchant substitution of AmEx credit cards for another network's payment cards (credit or debit)." (*Id.*)

39. At his deposition, Dr. Vellturo testified that "that there are insufficient cross elasticities of demand between American Express and other products at the merchant as a result of the merchant restraints that leave American Express's services to those merchants in a market by themselves". (Barbur Decl. Ex. 30 (Dep. of Christopher Vellturo, Aug. 13-14, 2013) at 32:6-33:4.) He also testifed that, "as a result of the restoration of cross elasticities of demand in the but-for world [absent the NDPs], the payment products . . . would be sufficiently close substitutes that they would reside in a common market". (*Id.* at 43:7-44:10.)

40. Dr. Vellturo stated in his sur-rebuttal report that, without the challenged restraints "the cross-elasticity between AmEx and other third party payments cards (including at least other credit cards and likely debit cards as well) is high because these cards offer merchants very similar functionality and value and are thus relatively undifferentiated. Considered this way, the relevant market as it would have operated absent the distortions generated by the AmEx Merchant Restraints for the Merchant Plaintiffs would have included at least all third-party credit cards, and may well have extended to all third-party payment mechanisms". (Barbur Decl. Ex. 7 (Vellturo III), ¶ 18.)

41. At his deposition, Dr. Vellturo testified: "In a plausible economic world where the merchant restraints don't exist the market would have expanded—or the relevant market

HIGHLY CONFIDENTIAL / SUBJECT TO PROTECTIVE ORDER

expands." (Barbur Decl. Ex. 30 (Dep. of Christopher Vellturo, August 13, 2013) at 45:8-19.)

42.   In his opening report, Dr. Vellturo stated that, absent the NDPs, "virtually no meaningful aspect of product differentiation among the various payment forms" exists. (Barbur Decl. Ex. 4 (Vellturo I), ¶¶ 522-24.)

43.   In his opening report, Dr. Vellturo noted the "limited differentiation in electronic payment mechanism". (*Id.* ¶ 398.)

44.   At his deposition, Dr. Stiglitz testified that Visa, MasterCard and Amex "compete with one another". (Barbur Decl. Ex. 28 (Dep. of Joseph Stiglitz, July, 2013) at 17:7-17.)

45.   Kathy Hanna of Kroger testified that "there's no difference between" American Express, Visa, and MasterCard "from the standpoint that the customer has – has an option to pay with something else at the time of the purchase". (Barbur Decl. Ex. 21 (Dep. of Kathy Hanna (Kroger), Oct. 2, 2012) at 39:13-16.)

46.   American Express has historically been accepted by fewer merchants than Visa, MasterCard and Discover. (Barbur Decl. Ex. 23 (Dep. of Bradford Morgan (Visa), Nov. 16, 2012) at 81:12-82:4; Barbur Decl. Ex. 3 (Stiglitz I), ¶ 40 n.86; Barbur Decl. Ex. 8 (Vellturo MDL 1720 Report, July 2, 2009 (MDL1720SJEX00000139-524)) at MDL1720SJEX00000171, ¶ 71.)

47.   Most consumers carry multiple cards in their wallets. (Barbur Decl. Ex. 14 (Dep. of Charles Butt (HEB), Dec. 11, 2012) at 107:4-10; Barbur Decl. Ex. 15 (Dep. of James Callahan (HEB), Nov. 6, 2012) at 88:19-89:7; Barbur Decl. Ex. 24 (Dep. of Peter Nash (CVS), Dec. 4, 2012) at 194:10-15; Barbur Decl. Ex. 26 (Dep. of Jacki Snyder (Supervalu), Nov. 15-16, 2012) at 23:10-26:25.)

HIGHLY CONFIDENTIAL / SUBJECT TO PROTECTIVE ORDER

48.     "Since Amex is not accepted at as many locations as MC & Visa, Amex customers are more likely to have a second card brand in their wallet."  (Barbur Decl. Ex. 46 (CVS_AMEX_0810320-330) at CVS_AMEX_0810327.)

49.     Virtually "all AmEx cardholders also have Visa and/or MasterCard payment cards" and "would be expected to choose at least among three options".  (Barbur Decl. Ex. 6 (Vellturo II), ¶ 61; *see also* Barbur Decl. Ex. 1 (Expert Report of Professor Dan Ariely ("Ariely I"), April 2, 2013), ¶ 50.)

50.     No more than approximately 2% of consumers carry only American Express cards.  (Barbur Decl. Ex. 36 (ALBAMX01845008-016) at ALBAMX01845009 ("Only 1% of the US population over 18 carries **only** an American Express Card.") (emphasis in original); Barbur Decl. Ex. 39 (WLGAMXED00611213-221) at WLGAMXED00611213 (same); Barbur Decl. Ex. 42 (HEBAMX00008262-267) at HEBAMX00008263 (slide deck from Visa for HEB showing only 1.6% of credit card holders carry only American Express); *see also* Barbur Decl. Ex. 10 (Bernheim II), ¶ 365 & Figure 49.)

51.     Plaintiffs recognize that consumers who use American Express cards frequently use other payment cards at their stores as well.  (Barbur Decl. Ex. 20 (Dep. of Bradley Fox (Safeway), Nov. 12, 2012) at 78:4-10; Barbur Decl. Ex. 27 (30(b)(6) Dep. of Marcia Steffler (Meijer), Nov. 7-8, 2012) at 279:20- 280:10; Barbur Decl. Ex. 16 (Dep. of David Ciancio (Kroger), Jan. 10, 2013) at 102:15-103:11 (data showed that customers used different types of tender); Barbur Decl. Ex. 13 (Dep. of John Briggs (Hy-Vee), Dec. 13, 2012) at 164:9-165:9 (customers carry multiple forms of payment).)

52.     CVS found that of its Extra Care loyalty customers, 80.681% of American Express customers "have also used a different credit/debit card" when shopping at CVS.

11

HIGHLY CONFIDENTIAL / SUBJECT TO PROTECTIVE ORDER

(Barbur Decl. Ex. 47 (CVS_AMEX_0198333-334) at CVS_AMEX_0198334.)

53.     Albertson's Inc. executives wrote: "Effective Sunday September 7th 2003 a group of 10 Acme stores will stop accepting American Express credit cards". (Barbur Decl. Ex. 35 (ALBAMX00067142-147) at ALBAMX00067142 (emphasis omitted).) In connection with the "Acme American Express test," Albertson's Inc. executives explained, "[a]s we looked at American Express users we find most also use other forms of credit/debit for the payment of groceries". (*Id.* at ALBAMX00067143.)

54.     In reviewing a twelve-week test of American Express acceptance at one Ahold banner, an analysis concluded that, "Amex households continue to use other forms of payment for most of their shopping". (Barbur Decl. Ex. 33 (AHDAMX00869135-157) at AHDAMX00869137.)

55.     In considering whether to "[s]uspend acceptance of American Express Cards", HEB assumed, "Cardholders currently using an AMEX card to make purchases will continue to use a credit card, of which 50% would go to Visa". (Barbur Decl. Ex. 38 (HEBAMXED03124978-981) at HEBAMXED03124980.)

56.     After running an acceptance test, Safeway found that households with an American Express card were using Amex for only 35.4% of their overall purchase volume at Safeway. (Barbur Decl. Ex. 34 (SFWAMX00000877-878) at SFWAMX00000877-878.)

57.     Meijer prepared a spreadsheet projecting the "Impact to Pretax Profit" of "Eliminating American Express Payment" that assumed 64% of American Express customers would switch to other credit cards and 34% would switch to a debit card. (Barbur Decl. Ex. 37 (MEI-018974-975) at MEI-018975; *see also* Barbur Decl. Ex. 27 (30(b)(6) Dep. of Marcia Steffler (Meijer), Nov. 7-8, 2012) at 249:15-251:8.)

12

HIGHLY CONFIDENTIAL / SUBJECT TO PROTECTIVE ORDER

58.     American Express compared its rates to Visa and MasterCard in preparation for a meeting with Ahold and Publix. (Barbur Decl. Ex. 48 (AMEXNDR18505277-279) at AMEXNDR18505278-279.)

59.     An internal American Express presentation also compared rates among Plaintiffs, showing ███████████████████████████████████████████ ███████████████████████████████████ (Barbur Decl. Ex. 43 (AMEXNDR06943055-060) at AMEXNDR06943057.)

60.     American Express has used price comparisons between itself and Visa/MasterCard in negotiations with merchants. (Barbur Decl. Ex. 45 (AMEXNDR13663676-718) at AMEXNDR13663712; Barbur Decl. Ex. 40 (WLGAMX00004366-368) at WLGAMX00004367.)

61.     When targeting merchants for a new point-of-sale initiative, American Express compared its rates to those of Visa and MasterCard. (Barbur Decl. Ex. 32 (AMEXNDR00736291-93) at AMEXNDR00736291, AMEXNDR00736293.)

62.     Internally, American Express compares its products to premium Visa and MasterCard products based on price and value to merchants. (Barbur Decl. Ex. 49 (AMEXNDR13731336-339) at AMEXNDR13731336-339.)

63.     Internally, American Express recognizes that its cards compete with cards issued on other networks. (Barbur Decl. Ex. 44 (AMEX-DOJ-10146480-657) at AMEX-DOJ-10146480-486, AMEX-DOJ-10146503-510; Barbur Decl. Ex. 50 (AMEXNDR15797107-140) at AMEXNDR15797132.)

64.     American Express recognizes that its cardmembers put a significant amount of their spending on cards issued on other networks. (Barbur Decl. Ex. 44 (AMEX-DOJ-10146480-

HIGHLY CONFIDENTIAL / SUBJECT TO PROTECTIVE ORDER

657) at AMEX-DOJ-101464506-508; Barbur Decl. Ex. 50 (AMEXNDR15797107-140) at AMEXNDR15797132.)

65.    Plaintiffs' expert, Dr. Stiglitz, stated in his opening expert report that American Express, Visa and MasterCard are "directly competing credit card networks". (Barbur Decl. Ex. 3 (Stiglitz I), ¶ 29; *see also* Barbur Decl. Ex. 12 (Dep. of Dan Ariely, Aug. 4, 2013) at 360:17-361:7 (testifying that American Express competes with Discover, PayPal, Visa, MasterCard and "lots of tiny new entrants"); Barbur Decl. Ex. 31 (Dep. of Christopher Vellturo MDL 1720, Sept. 30, 2010) at 568:7-22 (Visa and MasterCard compete with American Express).)

66.    Plaintiffs' executives acknowledge that American Express competes with the other networks, such as Visa and MasterCard, for consumer use:

i.     Maureen Elworthy of Ahold recognized that, "MasterCard and Visa compete with American Express", and that "Discover also competes with American Express". (Barbur Decl. Ex. 19 (Dep. of Maureen Elworthy (Ahold), Dec. 10-11, 2012) at 442:19-22, 447:8-12.)

ii.    James Callahan of HEB agreed that "American Express compete[s] with Visa and MasterCard". (Barbur Decl. Ex. 15 (Dep. of James Callahan (HEB), Nov. 6, 2012) at 140:11-13.)

iii.   Troy Dinin of Raley's testified that he "assume[s] [American Express] competes with Visa and MasterCard". (Barbur Decl. Ex. 18 (30(b)(6) Dep. of Troy Dinin (Raley's), Oct. 9, 2012) at 117:3-11.)

HIGHLY CONFIDENTIAL / SUBJECT TO PROTECTIVE ORDER

iv.     Matthew Schroeder of Rite Aid recognizes that "Visa and MasterCard compete with AmEx". (Barbur Decl. Ex. 25 (Dep. of Matthew Schroeder (Rite Aid), Oct. 10, 2012) at 109:4-6.)

v.      Samia Koudsi of Supervalu believes that "American Express competes with Visa and MasterCard to get cardholders to use the card". (Barbur Decl. Ex. 22 (Dep. of Samia Koudsi (Supervalu), Oct. 18, 2012) at 201:13-20.)

vi.     Susan DeVries of Walgreen sees "Visa, American Express, MasterCard and Discover as competitors". (Barbur Decl. Ex. 17 (Dep. of Susan DeVries (Walgreen), Oct. 25-26, 2012) at 86:23-87:2.)

vii.    Sandy Woods of Publix referred to MasterCard, Discover and American Express as "the 3 competitors" with Visa. (Barbur Decl. Ex. 41 (PUB_AMEX_0061617-618) at PUB_AMEX_0061618.)

HIGHLY CONFIDENTIAL / SUBJECT TO PROTECTIVE ORDER

CRAVATH, SWAINE & MOORE LLP,

by

/s/ Peter T. Barbur
_____
Evan R. Chesler
Peter T. Barbur
Kevin J. Orsini
Rory A. Leraris
Members of the Firm
echelser@cravath.com
pbarbur@cravath.com
korsini@cravath.com
rleraris@cravath.com

Worldwide Plaza
825 Eighth Avenue
New York, NY 10019
(212) 474-1000

*Attorneys for Defendants American
Express Company and American Express
Travel Related Services Company, Inc.*

# EXHIBIT D

HIGHLY CONFIDENTIAL / SUBJECT TO PROTECTIVE ORDER

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

In re American Express Anti-Steering Rules
Litigation (II)

This Document Relates to:

Individual Plaintiff Actions

No. 08-CV-2315
No. 08-CV-2316
No. 08-CV-2317
No. 08-CV-2380
No. 08-CV-2406
No. 11-CV-0337
No. 11-CV-0338

11-MD-02221-NGG-RER
**FILED UNDER SEAL**

---

**DECLARATION OF PETER T. BARBUR IN SUPPORT OF DEFENDANTS'
MOTION TO DISMISS OR IN THE ALTERNATIVE FOR SUMMARY JUDGMENT
WITH RESPECT TO THE INDIVIDUAL PLAINTIFFS'
ONE-SIDED AND AMEX-ONLY MARKET CLAIMS**

Peter T. Barbur hereby declares as follows:

1.      I am a member of the law firm of Cravath, Swaine & Moore LLP, 825 Eighth Avenue, New York, NY 10019, counsel for Defendants American Express Company and American Express Travel Related Services Company, Inc. (collectively, "Amex" or "Defendants") in the above-captioned matter.  I am a member in good standing of the bar of the State of New York and of this Court.

2.      I submit this declaration in support of Defendants' Motion to Dismiss or in the Alternative for Summary Judgment with Respect to the Individual Plaintiffs' One-Sided and Amex-Only Market Claims.

3.      Filed herewith is a true and correct copy of the expert report excerpts, deposition transcript excerpts and other documents cited in the (a) Memorandum of Law in

HIGHLY CONFIDENTIAL / SUBJECT TO PROTECTIVE ORDER

Support of Defendants' Motion to Dismiss or in the Alternative for Summary Judgment with Respect to the Individual Plaintiffs' One-Sided and Amex-Only Market Claims or (b) Rule 56.1 Statement of Material Undisputed Facts in Support of Defendants' Motion to Dismiss or in the Alternative for Summary Judgment with Respect to the Individual Plaintiffs' One-Sided and Amex-Only Market Claims.  These documents are labeled as Exhibits 1-66 as identified below.

**<u>Expert Reports</u>**

4.      Attached hereto as Exhibit 1 is a true and correct copy of excerpts from the Expert Report of Professor Dan Ariely, dated Apr. 2, 2013.

5.      Attached hereto as Exhibit 2 is a true and correct copy of excerpts from the Sur-Rebuttal Report of Mike McCormack, dated July 3, 2013.

6.      Attached hereto as Exhibit 3 is a true and correct copy of excerpts from the Expert Report of Professor Joseph Stiglitz, dated Apr. 2, 2013.

7.      Attached hereto as Exhibit 4 is a true and correct copy of excerpts from the Expert Report of Dr. Christopher A. Vellturo, dated Apr. 3, 2013.

8.      Attached hereto as Exhibit 5 is a true and correct copy of the Errata to Expert Report of Christopher Vellturo.

9.      Attached hereto as Exhibit 6 is a true and correct copy of excerpts from the Rebuttal Expert Report of Dr. Christopher A. Vellturo, dated May 20, 2013.

10.      Attached hereto as Exhibit 7 is a true and correct copy of excerpts from the Sur-Rebuttal Expert Report of Dr. Christopher A. Vellturo, dated July 3, 2013.

11.      Attached hereto as Exhibit 8 is a true and correct copy of excerpts from the Expert Report of Dr. Christopher A. Vellturo, dated July 2, 2009, submitted in *In re:*

2

HIGHLY CONFIDENTIAL / SUBJECT TO PROTECTIVE ORDER

*Payment Card Interchange Fee and Merchant Discount Antitrust Litigation*, 05-MD-1720,

bearing Bates numbers MDL1720SJEX00000139-524.

       12.     Attached hereto as Exhibit 9 is a true and correct copy of excerpts from

the Expert Report of B. Douglas Bernheim, dated Apr. 2, 2013.

       13.     Attached hereto as Exhibit 10 is a true and correct copy of excerpts from

the Rebuttal Expert Report of B. Douglas Bernheim, dated May 20, 2013.

       14.     Attached hereto as Exhibit 11 is a true and correct copy of excerpts from

the Rebuttal Expert Report of George A. Hay, dated May 20, 2013.

### **Transcripts**

       15.     Attached hereto as Exhibit 12 is a true and correct copy of excerpts from

the Deposition of Dan Ariely, dated Aug. 4, 2013.

       16.     Attached hereto as Exhibit 13 is a true and correct copy of excerpts from

the Deposition of John Briggs (Hy-Vee), dated Dec. 13, 2012.

       17.     Attached hereto as Exhibit 14 is a true and correct copy of excerpts from

the Deposition of Charles Butt (HEB), dated Dec. 11, 2012.

       18.     Attached hereto as Exhibit 15 is a true and correct copy of excerpts from

the Deposition of James Callahan (HEB), dated Nov. 6, 2012.

       19.     Attached hereto as Exhibit 16 is a true and correct copy of excerpts from

the Deposition of David Ciancio (Kroger), dated Jan. 10, 2013.

       20.     Attached hereto as Exhibit 17 is a true and correct copy of excerpts from

the Deposition of Susan DeVries (Walgreen), dated Oct. 25, 2012.

       21.     Attached hereto as Exhibit 18 is a true and correct copy of excerpts from

the 30(b)(6) Deposition of Troy Dinin (Raley's), dated Oct. 9, 2012.

HIGHLY CONFIDENTIAL / SUBJECT TO PROTECTIVE ORDER

22.     Attached hereto as Exhibit 19 is a true and correct copy of excerpts from the Deposition of Maureen Elworthy (Ahold), dated Dec. 11, 2012.

23.     Attached hereto as Exhibit 20 is a true and correct copy of excerpts from the Deposition of Bradley Fox (Safeway), dated Nov. 12, 2012.

24.     Attached hereto as Exhibit 21 is a true and correct copy of excerpts from the Deposition of Kathy Hanna (Kroger), dated Oct. 2, 2012.

25.     Attached hereto as Exhibit 22 is a true and correct copy of excerpts from the Deposition of Samia Koudsi (Supervalu), dated Oct. 18, 2012.

26.     Attached hereto as Exhibit 23 is a true and correct copy of excerpts from the Deposition of Bradford Morgan (Visa), dated Nov. 16, 2012.

27.     Attached hereto as Exhibit 24 is a true and correct copy of excerpts from the Deposition of Peter Nash (CVS), dated Dec. 4, 2012.

28.     Attached hereto as Exhibit 25 is a true and correct copy of excerpts from the Deposition of Matthew Schroeder (Rite Aid), dated Oct. 10, 2012.

29.     Attached hereto as Exhibit 26 is a true and correct copy of excerpts from the Deposition of Jacki Snyder (Supervalu), dated Nov. 15, 2012.

30.     Attached hereto as Exhibit 27 is a true and correct copy of excerpts from the 30(b)(6) Deposition of Marcia Steffler (Meijer), dated Nov. 7, 2012.

31.     Attached hereto as Exhibit 28 is a true and correct copy of excerpts from the Deposition of Joseph Stiglitz, dated July 22, 2013.

32.     Attached hereto as Exhibit 29 is a true and correct copy of excerpts from the Deposition of Dennis Stokely (Safeway), dated Nov. 15, 2012.

HIGHLY CONFIDENTIAL / SUBJECT TO PROTECTIVE ORDER

33.     Attached hereto as Exhibit 30 is a true and correct copy of excerpts from the Deposition of Christopher Vellturo, dated Aug. 13-14, 2013.

34.     Attached hereto as Exhibit 31 is a true and correct copy of excerpts from the Deposition of Christopher Vellturo in *In re: Payment Card Interchange Fee and Merchant Discount Antitrust Litigation*, 05-MD-1720, dated Sept. 30, 2010.

### Other Documents

35.     Attached hereto as Exhibit 32 is a true and correct copy of an email from Nancy Polk to Lauren Dardick re: Comparable Discount Rate, dated Nov. 21, 2002, bearing Bates numbers AMEXNDR00736291-293.

36.     Attached hereto as Exhibit 33 is a true and correct copy of an email from Judi Marcelonis to Barry Berman, *et al.* re: Final / Official Amex Incremental Sales Analysis, dated Mar. 5, 2003, and attachments, bearing Bates numbers AHDAMX00869135-157.

37.     Attached hereto as Exhibit 34 is a true and correct copy of a letter from Ken Shachmut to Gary Lloyd, dated Mar. 19, 2003, bearing Bates numbers SFWAMX00000877-878.

38.     Attached hereto as Exhibit 35 is a true and correct copy of a memorandum from Chris Mielke and Michele Koci to Felicia Thornton, *et al.* re: Acme American Express test, dated July 18, 2003, bearing Bates numbers  ALBAMX00067142-147.

39.     Attached hereto as Exhibit 36 is a true and correct copy of a document titled "American Express Acceptance Decision January 2004", bearing Bates numbers ALBAMX01845008-016.

HIGHLY CONFIDENTIAL / SUBJECT TO PROTECTIVE ORDER

40.     Attached hereto as Exhibit 37 is a true and correct copy of an email from Jeff Powers to Helen Billing and Jim Walsh re: Amex Analysis, dated Apr. 15, 2004, and attachment, bearing Bates numbers MEI-018974-975.

41.     Attached hereto as Exhibit 38 is a true and correct copy of a document titled "Visa Marketing Options", bearing Bates numbers HEBAMXED03124978-981.

42.     Attached hereto as Exhibit 39 is a true and correct copy of an email from Susan DeVries to Bill Rudolphsen and John Gleeson re: Bullish Report on American Express/MBNA Deal, dated June 28, 2004, with attachment, bearing Bates numbers WLGAMXED00611213-221.

43.     Attached hereto as Exhibit 40 is a true and correct copy of a letter from William Glenn to Jeffrey Rein, dated Dec. 13, 2004, bearing Bates numbers WLGAMX00004366-368.

44.     Attached hereto as Exhibit 41 is a true and correct copy of an email from Doug Hambry to Sandy Woods re: Publix-Visa, dated July 1, 2005, bearing Bates numbers PUB_AMEX_0061617-618.

45.     Attached hereto as Exhibit 42 is a true and correct copy of a document titled "Visa HEB Discussion Guide", dated Sept. 28, 2005, bearing Bates numbers HEBAMX00008262-267.

46.     Attached hereto as Exhibit 43 is a true and correct copy of a document titled "Supermarket Analysis GMS Pricing and Value Strategy Team April 2008", bearing Bates numbers AMEXNDR06943055-060.

HIGHLY CONFIDENTIAL / SUBJECT TO PROTECTIVE ORDER

47.     Attached hereto as Exhibit 44 is a true and correct copy of excerpts from a document titled "2007 U.S. Coverage Perceptions Final Report", dated July 21, 2008, bearing Bates numbers AMEX-DOJ-10146480-657.

48.     Attached hereto as Exhibit 45 is a true and correct copy of an email from John Aprile to Ben Alkin re: GMS Staff Meeting – 10/20, dated Oct. 19, 2009, with attachments, bearing Bates numbers AMEXNDR13663676-718.

49.     Attached hereto as Exhibit 46 is a true and correct copy of a file titled "Interchange Reform" containing emails and financial analyses, bearing Bates numbers CVS_AMEX_0810320-330.

50.     Attached hereto as Exhibit 47 is a true and correct copy of an email from Michelle Peloquin to Peter Nash re: Amex spreadsheet, dated June 14, 2010, with attachment, bearing Bates numbers CVS_AMEX_0198333-334.

51.     Attached hereto as Exhibit 48 is a true and correct copy of an email from Jeanique Riche to Leena Parikh re: Publix and Royal Ahold Competitive Rate Analysis, dated June 17, 2010, bearing Bates numbers AMEXNDR18505277-279.

52.     Attached hereto as Exhibit 49 is a true and correct copy of an email from Jack Funda to Dana Warren re: Pricing Communications Tools for Ken Meeting, dated Feb. 25, 2011, with attachment, bearing Bates numbers AMEXNDR13731336-339.

53.     Attached hereto as Exhibit 50 is a true and correct copy of a document titled "Competitive Update: Chase", bearing Bates numbers AMEXNDR15797107-140.

54.     Attached hereto as Exhibit 51 is a true and correct copy of excerpts from a document titled "Merchant Operating Regulations Release 11.2", dated Oct. 14, 2011, bearing Bates numbers DFS0809209-363.

HIGHLY CONFIDENTIAL / SUBJECT TO PROTECTIVE ORDER

55.     Attached hereto as Exhibit 52 is a true and correct copy of excerpts from a document titled "American Express Merchant Regulations – U.S. April 2012".

56.     Attached hereto as Exhibit 53 is a true and correct copy of excerpts from a document titled "American Express Merchant Regulations – U.S. October 2012", bearing Bates numbers AMEXNDR19345581-773.

57.     Attached hereto as Exhibit 54 is a true and correct copy of a printout from the American Express website titled "View All Cards".

58.     Attached hereto as Exhibit 55 is a true and correct copy of a printout from the Visa website titled "15 Visa Credit Cards".

59.     Attached hereto as Exhibit 56 is a true and correct copy of a printout from the MasterCard website titled "Find The Card That's Right For You".

60.     Attached hereto as Exhibit 57 is a true and correct copy of a printout from the Discover website titled "Compare Credit Cards".

61.     Attached hereto as Exhibit 58 is a true and correct copy of a document titled "Visa International Operating Regulations Core Principles", dated Apr. 15, 2013.

62.     Attached hereto as Exhibit 59 is a true and correct copy of excerpts from a document titled "MasterCard Rules", dated June 14, 2013.

63.     Attached hereto as Exhibit 60 is a true and correct copy of an email from Marina Hodges to Todd Piland and Will Hileman re: Credit Card comparison, dated Oct. 16, 2007, bearing Bates number HEBAMXED03047232.

64.     Attached hereto as Exhibit 61 is a true and correct copy of an email from Kathy Hanna to Dave Dillon, *et al.* re: Credit Card Interchange Rate Increases with "New" Cards, dated Feb. 12, 2005, bearing Bates number KRGAMX00272018.

8

HIGHLY CONFIDENTIAL / SUBJECT TO PROTECTIVE ORDER

65.     Attached hereto as Exhibit 62 is a true and correct copy of a document titled "Welcome Wegmans", bearing Bates numbers MEIJER-00264261-379.

66.     Attached hereto as Exhibit 63 is a true and correct copy of Klein, Lerner, Murphy & Plache, *Competition in Two–Sided Markets: The Antitrust Economics of Payment Card Interchange Fees*, 73 Antitrust L.J. 571 (2006).

67.     Attached hereto as Exhibit 64 is a true and correct copy of Filistrucchi, Geradin, Van Damme & Affeldt, *Market Definition in Two–Sided Markets: Theory and Practice*, 10 J. Competition L. & Econ. 293 (2014).

68.     Attached hereto as Exhibit 65 is a true and correct copy of a Brief for Amici Curiae John M. Connor, *et al*. in Support of Petitioners, *Ohio v. Amex* (July 6, 2017).

69.     Attached hereto as Exhibit 66 is a true and correct copy of a Brief for Amici Curiae John M. Connor, *et al*. in Support of Petitioners, *Ohio v. Amex* (Dec. 14, 2017).

70.     I declare under penalty of perjury that the foregoing is true and correct.


Executed on August 17, 2018.


                                          /s/ Peter T. Barbur
                                            Peter T. Barbur

# EXHIBIT E

SPERLING & SLATER
PROFESSIONAL CORPORATION

TELEPHONE
(312) 641-3200
FACSIMILE
(312) 641-6492

August 27, 2018

55 WEST MONROE STREET
SUITE 3200
CHICAGO, IL 60603

**Via Email**
Peter Barbur, Esq.
Cravath, Swaine & Moore LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019

      Re:     *In re: American Express Anti-Steering Rules Antitrust Litigation,*
              Case No: 11-MD-2221-NGG-RER

Dear Peter:

The Amex Motion to Dismiss or in the Alternative for Summary Judgment filed on August 17, 2018 does not actually seek dismissal under Rule 12(b)(6) of any of the causes of action set forth in the Plaintiffs' First Amended and Consolidated Complaint. Those causes of action are for (1) monopolization under §2 of the Sherman Act (Count I), (2) attempt to monopolize under §2 of the Sherman Act (Count II), and (3) agreement in unreasonable restraint of trade under §1 of the Sherman Act (Count III). Instead of seeking dismissal of any of these counts, Amex's motion requests that three of the four alternative relevant market allegations be struck.[1] All three of the Counts, however, are alleged and can be pursued under the fourth relevant market asserted in the First Amended Complaint – *i.e.*, the alleged two-sided credit card relevant market.

Because the Amex motion does not seek dismissal of any cause of action, we do not believe it falls within Rule 12(b)(6) and therefore does not provide Amex any additional time under Rule 12(a)(4) to file its Answer.[2] Accordingly, we believe Amex should have filed an Answer to the First Amended and Consolidated Complaint on August 17 in addition to its motion. Due to the shortened schedule that we are all operating under, it is particularly important for plaintiffs to know what allegations of the First Amended Complaint are admitted or denied and what defenses Amex is raising in response to the Complaint in time for plaintiffs to address those issues in discovery and in their expert reports. Thus, delaying an Answer until after the Court decides Amex's Motion to Dismiss or in the Alternative for Summary Judgment as to the remaining allegations of the First Amended Complaint will prejudice plaintiffs.

---

[1]      Amex asks that allegations of (1) a one-sided credit card relevant market, (2) a one-sided Amex-only relevant market, and (3) a two-sided Amex-only relevant market be struck.

[2]      We also do not believe the motion qualifies as a 12(b)(6) motion because it relies on facts asserted in Amex's Rule 56.1 Statement of Material Undisputed Facts with regard to each of the three challenged relevant market definitions.

SPERLING & SLATER

Peter Barbur, Esq.
August 27, 2018
Page 2


As a result, Plaintiffs respectfully request that Amex file an Answer to the First Amended and
Consolidated Complaint by September 4, 2018.  As noted above, this is especially important
given the Court's schedule so that the Plaintiffs will know what allegations of the Amended
Complaint Amex admits, what allegations it denies and what, if any, affirmative defenses Amex
asserts to Counts I, II and III in advance of discovery on those claims and the filing of expert
reports on those claims.

If you disagree with the above, we request that we promptly hold a meet and confer so that we
can expeditiously seek an Order from the Court.




                              Very truly yours,



                              Paul E. Slater

# EXHIBIT F

# CRAVATH, SWAINE & MOORE LLP

JOHN W. WHITE
EVAN R. CHESLER
RICHARD W. CLARY
STEPHEN L. GORDON
ROBERT H. BARON
DAVID MERCADO
CHRISTINE A. VARNEY
PETER T. BARBUR
THOMAS G. RAFFERTY
MICHAEL S. GOLDMAN
RICHARD HALL
JULIE A. NORTH
ANDREW W. NEEDHAM
STEPHEN L. BURNS
KEITH R. HUMMEL
DAVID J. KAPPOS
DANIEL SLIFKIN
ROBERT I. TOWNSEND, III
WILLIAM J. WHELAN, III
PHILIP J. BOECKMAN
WILLIAM V. FOGG
FAIZA J. SAEED
RICHARD J. STARK

THOMAS E. DUNN
MARK I. GREENE
DAVID R. MARRIOTT
MICHAEL A. PASKIN
ANDREW J. PITTS
MICHAEL T. REYNOLDS
ANTONY L. RYAN
GEORGE E. ZOBITZ
GEORGE A. STEPHANAKIS
DARIN P. MCATEE
GARY A. BORNSTEIN
TIMOTHY G. CAMERON
KARIN A. DEMASI
LIZABETHANN R. EISEN
DAVID S. FINKELSTEIN
DAVID GREENWALD
RACHEL G. SKAISTIS
PAUL H. ZUMBRO
ERIC W. HILFERS
GEORGE F. SCHOEN
ERIK R. TAVZEL
CRAIG F. ARCELLA
DAMIEN R. ZOUBEK

WORLDWIDE PLAZA
825 EIGHTH AVENUE
New York, NY 10019-7475

TELEPHONE: +1-212-474-1000
FACSIMILE: +1-212-474-3700
——
CITYPOINT
ONE ROPEMAKER STREET
LONDON EC2Y 9HR
TELEPHONE: +44-20-7453-1000
FACSIMILE: +44-20-7860-1150

WRITER'S DIRECT DIAL NUMBER
(212) 474-1058

WRITER'S EMAIL ADDRESS
pbarbur@cravath.com

LAUREN ANGELILLI
TATIANA LAPUSHCHIK
ALYSSA K. CAPLES
JENNIFER S. CONWAY
MINH VAN NGO
KEVIN J. ORSINI
MATTHEW MORREALE
JOHN D. BURETTA
J. WESLEY EARNHARDT
YONATAN EVEN
BENJAMIN GRUENSTEIN
JOSEPH D. ZAVAGLIA
STEPHEN M. KESSING
LAUREN A. MOSKOWITZ
DAVID J. PERKINS
JOHNNY G. SKUMPIJA
J. LEONARD TETI, II
D. SCOTT BENNETT
TING S. CHEN
CHRISTOPHER K. FARGO
KENNETH C. HALCOM
DAVID M. STUART
AARON M. GRUBER

O. KEITH HALLAM, III
OMID H. NASAB
DAMARIS HERNÁNDEZ
JONATHAN J. KATZ
MARGARET SEGALL D'AMICO
RORY A. LERARIS
KARA L. MUNGOVAN
NICHOLAS A. DORSEY
ANDREW C. ELKEN
JENNY HOCHENBERG
VANESSA A. LAVELY
G.J. LIGELIS JR.
MICHAEL E. MARIANI

SPECIAL COUNSEL
SAMUEL C. BUTLER

OF COUNSEL
MICHAEL L. SCHLER

August 29, 2018

In re American Express Anti-Steering Rules Antitrust Litig. (II), No. 11-MD-2221
(NGG)(RER) E.D.N.Y.

Dear Paul:

I write in response to your August 27, 2018 letter, which asks Amex to file an answer to Plaintiffs' amended complaint by September 4, even though Amex served Plaintiffs with its motion to dismiss on August 17.

"[A] partial motion to dismiss will suspend the time to answer those claims or counterclaims that are not subject to the motion." *Barbagallo v. Marcum LLP*, 820 F. Supp. 2d 429, 443 (E.D.N.Y. 2011). Settled law in this Circuit makes clear that this procedure is necessary to avoid "'a procedural thicket' of piecemeal answers that would poorly serve judicial economy". *Gortat v. Capala Bros.*, 257 F.R.D. 353, 366 (E.D.N.Y. 2009) (quoting *Ricciuti v. N.Y.C. Transit Auth.*, No. 90-cv-2823, 1991 WL 221110, at *2 (S.D.N.Y. Oct. 3, 1991)); *see also Finnegan v. Univ. of Rochester Med. Ctr.*, 180 F.R.D. 247, 250 (W.D.N.Y. 1998) (collecting cases). Amex has served a motion seeking partial dismissal of "Plaintiffs' claims based on one-sided and Amex-only market definitions . . . for failure to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6)." Amex Mem. at 2. It would be improper and inefficient for Amex to submit an answer limited to Plaintiffs' two-sided, all-GPCC market claims while the motion to dismiss is pending.

Citing no authority, your letter argues that a motion only qualifies under Rule 12(b)(6) if it seeks dismissal of individual counts in their entirety. There is no such rule. Rule 12(b)(6) motions may seek dismissal of claims and counts in a complaint, in whole or in part, and "*any* motion, particularly when the motion addresses a significant portion of the complaint . . . , will suspend the time to answer any claim." *Lombardo v. Dr. Seuss Enters., L.P.*, No. 16-cv-9974, 2017 WL 1378413, at *3 (S.D.N.Y. Apr. 7, 2017) (alterations in original) (quoting *Ricciuti*, 1991 WL 22110, at *2); *see also Dekom v. New York*, No. 12-cv-1318, 2013 WL 3095010, at *5 (E.D.N.Y. June 18, 2013) ("A party may file a motion to dismiss only certain

claims—*i.e.* a partial motion to dismiss—and the filing of any motion under Rule 12 postpones a defendant's time to answer."). Amex's motion targets the majority of the amended complaint, seeking dismissal of all claims based on three of the four alleged market definitions. Under Rule 12(a)(4), no further response is needed or appropriate.[1]

Very truly yours,

*Peter T. Barbur* /DHK

Peter T. Barbur

Paul E. Slater
   SPERLING & SLATER, P.C.
     55 West Monroe Street, Suite 3200
      Chicago, IL 60603

BY EMAIL

Copy to:

Joseph M. Vanek
David P. Germaine
   VANEK, VICKERS & MASINI, P.C.
     55 W. Monroe, Suite 3500
      Chicago, IL 60603

Richard Alan Arnold
William J. Blechman
Kevin J. Murray
Josh Gray
   KENNY NACHWALTER, P.A.
     Four Seasons Tower
      1441 Brickell Avenue, Suite 1100
      Miami, FL 33131-4327

---

[1] In a footnote, you further say that Amex's motion is not a Rule 12(b)(6) motion to dismiss because Amex's memorandum of law cites facts from the Rule 56.1 Statement of Material Undisputed Facts. As you know, Amex moved pursuant to Rules 12(b)(6) and 56 in the alternative. *See generally Zalivar v. Anna Bella's Café, LLC*, No. 11-cv-1198, 2012 WL 642828 (E.D.N.Y. Feb. 28, 2012) (addressing a motion by a defendant for dismissal under Rule 12(b)(6) or, in the alternative, summary judgment under Rule 56). Because Plaintiffs' claims fail on the face of the amended complaint, they may be dismissed without reference to any facts in the record. The Rule 56.1 statement and citations are included only with respect to summary judgment; they in no way affect the motion's status under Rule 12.

Eric Bloom
Maureen S. Lawrence
  HANGLEY ARONCHICK SEGAL PUDLIN & SCHILLER
    2805 Old Post Road, Suite 100
      Harrisburg, PA 17110

David E. Everson
  STINSON LEONARD STREET LLP
    7700 Forsyth Boulevard, Suite 1100
      St. Louis, MO 63105-1821

Matthew T. Slater
  SPERLING & SLATER, P.C.
    55 West Monroe Street, Suite 3200
      Chicago, IL 60603

BY EMAIL

# EXHIBIT G

SPERLING & SLATER

PROFESSIONAL CORPORATION

TELEPHONE
(312) 641-3200
FACSIMILE
(312) 641-6492

August 29, 2018

55 WEST MONROE STREET
SUITE 3200
CHICAGO, IL 60603

**Via Email**
Peter Barbur, Esq.
Cravath, Swaine & Moore LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019

Re:     *In re: American Express Anti-Steering Rules Antitrust Litigation*
        Case No: 11-MD-2221-NGG-RER

Dear Peter:

Thank you for your letter of August 29, 2018. As explained below, we disagree with your analysis and ask you to reconsider your position.

First, the pleading Amex filed on August 17, 2018, although denominated a "Motion to Dismiss or in the Alternative for Summary Judgment," is actually just a motion for summary judgment. Every part of the motion specifically relies on Amex's Rule 56.1 Statement of Material Undisputed Facts and the motion seeks a partial summary judgment as to certain relevant markets, but not judgment on any entire claim or count asserted by plaintiffs. That is a proper use of Rule 56, as the rule specifically permits moving against a "part of a claim or defense." Fed. R. Civ. P. 56(a)  Although under Rule 12(d) any supposed motion to dismiss that relies on "matters outside the pleadings … must be treated as one for summary judgment under Rule 56," Fed. R. Civ. P. 12(b)(6), refers only to moving against a claim, it does not permit a motion to dismiss against only part of a claim. The Amex motion simply does not seek to dismiss any "claim or counterclaim" as you suggest in your letter. The Amex motion merely seeks to eliminate three of the four relevant market factual allegations. All of the claims or causes of action could still be pursued under the fourth alleged relevant market (*i.e.*, a two-sided credit card relevant market), even if your motion is granted.[1]

---

[1]     The cases you cite in your letter do not support the proposition that a motion to dismiss only certain allegations while leaving the claim to go forward should be treated as a motion to dismiss, with a delay in answering the remaining counts. In *Dekom*, the movant sought and obtained dismissal of all claims in the complaint – which was dismissed in its entirety. In *Lombardo*, the movant sought the dismissal of entire counts. Amex has not sought the dismissal of any count or claim.

SPERLING & SLATER

Peter Barbur, Esq.
August 29, 2018
Page 2


Most troublesome, however, is your contention that Amex's failure to answer the complaint with
regard to the claims based on the relevant market allegation against which you have not moved
somehow serves the interest of judicial economy or efficiency. As you well know, the Amex
reply brief in support of your motion is not due until October 12, 2018. Fact discovery closes
five days later, on October 17, 2018, and Plaintiffs' additional expert reports are due November
16, 2018. It is highly likely that by November 16, 2018, the Amex motion will not yet be
decided. In other words, it is apparently your contention that Plaintiffs should have to complete
discovery and file their expert reports before they know which allegations Amex admits or
denies or affirmative defenses it asserts with regard to the claims based on a two-sided credit
card relevant market – against which Amex has not moved. In all candor, we do not believe that
your position -- that we should prepare our entire case before learning anything about Amex's
factual response or defenses to the allegations and claims against which Amex has not moved –
is even minimally reasonable. I explained our very real need for an answer to that part of the
Amended Complaint against which Amex has not moved in my letter of August 27, 2018. I note
that you have not responded to my explanation in any way.

Based on the above, I am asking that Amex reconsider its position and agree to file an answer to
that portion of the Complaint against which Amex has not moved in the very near term. We
have a call scheduled tomorrow and would be pleased to discuss the matter with you at that time.

Very truly yours,

Paul E. Slater

PES/jlg

# EXHIBIT H

SPERLING & SLATER
PROFESSIONAL CORPORATION

TELEPHONE
(312) 641-3200
FACSIMILE
(312) 641-6492

September 4, 2018

55 WEST MONROE STREET
SUITE 3200
CHICAGO, IL 60603

**Via Email**
Peter Barbur, Esq.
Cravath, Swaine & Moore LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019

    Re:    *In re: American Express Anti-Steering Rules Antitrust Litigation,*
           Case No: 11-MD-2221-NGG-RER

Dear Peter:

We would like to offer a compromise between our respective positions on whether Amex should file its Answer to the First Amended and Consolidated Complaint in advance of the decision on Amex's pending motion.  Although we continue to believe that the entirety of the Amended Complaint should have been answered on August 17, 2018, we are willing to accommodate Amex in the following respects.  Instead of answering all 85 paragraphs of the Amended Complaint, we request that Amex promptly answer just a handful of paragraphs: 1-11, 38-40, 49, and 56-61.  We also request that Amex submit any defenses or affirmative defenses and also indicate whether it will seek a trial by jury.

Please let me know if Amex is willing to agree with this compromise proposal at your earliest convenience so we can avoid the necessity of seeking relief from the Court.

                        Very truly yours,

                        Paul E. Slater

PES/jlg

# EXHIBIT I

# CRAVATH, SWAINE & MOORE LLP

JOHN W. WHITE
EVAN R. CHESLER
RICHARD W. CLARY
STEPHEN L. GORDON
ROBERT H. BARON
DAVID MERCADO
CHRISTINE A. VARNEY
PETER T. BARBUR
THOMAS G. RAFFERTY
MICHAEL S. GOLDMAN
RICHARD HALL
JULIE A. NORTH
ANDREW W. NEEDHAM
STEPHEN L. BURNS
KEITH R. HUMMEL
DAVID J. KAPPOS
DANIEL SLIFKIN
ROBERT I. TOWNSEND, III
WILLIAM J. WHELAN, III
PHILIP J. BOECKMAN
WILLIAM V. FOGG
FAIZA J. SAEED
RICHARD J. STARK

THOMAS E. DUNN
MARK I. GREENE
DAVID R. MARRIOTT
MICHAEL A. PASKIN
ANDREW J. PITTS
MICHAEL T. REYNOLDS
ANTONY L. RYAN
GEORGE E. ZOBITZ
GEORGE A. STEPHANAKIS
DARIN P. MCATEE
GARY A. BORNSTEIN
TIMOTHY G. CAMERON
KARIN A. DEMASI
LIZABETHANN R. EISEN
DAVID S. FINKELSTEIN
DAVID GREENWALD
RACHEL G. SKAISTIS
PAUL H. ZUMBRO
ERIC W. HILFERS
GEORGE F. SCHOEN
ERIK R. TAVZEL
CRAIG F. ARCELLA
DAMIEN R. ZOUBEK

WORLDWIDE PLAZA
825 EIGHTH AVENUE
NEW YORK, NY 10019-7475

TELEPHONE: +1-212-474-1000
FACSIMILE: +1-212-474-3700

———

CITYPOINT
ONE ROPEMAKER STREET
LONDON EC2Y 9HR
TELEPHONE: +44-20-7453-1000
FACSIMILE: +44-20-7860-1150

WRITER'S DIRECT DIAL NUMBER

(212) 474-1058

WRITER'S EMAIL ADDRESS
pbarbur@cravath.com

LAUREN ANGELILLI
TATIANA LAPUSHCHIK
ALYSSA K. CAPLES
JENNIFER S. CONWAY
MINH VAN NGO
KEVIN J. ORSINI
MATTHEW MORREALE
JOHN D. BURETTA
J. WESLEY EARNHARDT
YONATAN EVEN
BENJAMIN GRUENSTEIN
JOSEPH D. ZAVAGLIA
STEPHEN M. KESSING
LAUREN A. MOSKOWITZ
DAVID J. PERKINS
JOHNNY G. SKUMPIJA
J. LEONARD TETI, II
D. SCOTT BENNETT
TING S. CHEN
CHRISTOPHER K. FARGO
KENNETH C. HALCOM
DAVID M. STUART
AARON M. GRUBER

O. KEITH HALLAM, III
OMID H. NASAB
DAMARIS HERNÁNDEZ
JONATHAN J. KATZ
MARGARET SEGALL D'AMICO
RORY A. LERARIS
KARA L. MUNGOVAN
NICHOLAS A. DORSEY
ANDREW C. ELKEN
JENNY HOCHENBERG
VANESSA A. LAVELY
G.J. LIGELIS JR.
MICHAEL E. MARIANI

SPECIAL COUNSEL
SAMUEL C. BUTLER

———

OF COUNSEL
MICHAEL L. SCHLER

September 5, 2018

## In re American Express Anti-Steering Rules Antitrust Litigation (II), No. 11-MD-2221 (NGG)(RER) E.D.N.Y.

Dear Paul:

Your September 4, 2018 letter again asks Amex to answer portions of Plaintiffs' amended complaint. You surely know that, for the claims based on a two-sided, all-GPCC market definition, Amex denies that its nondiscrimination provisions caused anticompetitive harm with respect to price, output or quality. You also know that we previously requested a jury. We do not intend to withdraw that request. Amex will not file a procedurally improper "piecemeal answer[]" to select portions of your amended complaint while Amex's motion to dismiss is pending. *E.g.*, *Gortat v. Capala Bros.*, 257 F.R.D. 353, 366 (E.D.N.Y. 2009). You have our position.

Very truly yours,

*Peter T. Barbur* /DMR

Peter T. Barbur

Paul E. Slater
    SPERLING & SLATER, P.C.
        55 West Monroe Street, Suite 3200
            Chicago, IL 60603

BY EMAIL

2

Copy to:

Joseph M. Vanek
David P. Germaine
    VANEK, VICKERS & MASINI, P.C.
        55 W. Monroe, Suite 3500
            Chicago, IL 60603

Richard Alan Arnold
William J. Blechman
Kevin J. Murray
Josh Gray
    KENNY NACHWALTER, P.A.
        Four Seasons Tower
            1441 Brickell Avenue, Suite 1100
                Miami, FL 33131-4327

Eric Bloom
Maureen S. Lawrence
    HANGLEY ARONCHICK SEGAL PUDLIN & SCHILLER
        2805 Old Post Road, Suite 100
            Harrisburg, PA 17110

David E. Everson
    STINSON LEONARD STREET LLP
        7700 Forsyth Boulevard, Suite 1100
            St. Louis, MO 63105-1821

Matthew T. Slater
    SPERLING & SLATER, P.C.
        55 West Monroe Street, Suite 3200
            Chicago, IL 60603

BY EMAIL