**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

----------------------------------------------------------------x
                           :

IN RE: AMERICAN EXPRESS ANTI-STEERING    :
RULES ANTITRUST LITIGATION           :      No. 11-MD-2221 (NGG)(RER)
                           :

This Document Relates to:                :
                           :

**CONSOLIDATED CLASS ACTION**        :
                           :
----------------------------------------------------------------x

<u>**SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT**</u>

Plaintiffs Animal Land, Inc., Il Forno, Inc., Italian Colors Restaurant, Jasa Inc., Lopez-Dejonge, Inc., Plymouth Oil Corp. d/b/a Liberty Gas Station, Clam Lake Partners, LLC, Qwik Lube, LLC, and LaJolla Auto Tech, Inc., on behalf of themselves and all others similarly situated, hereby allege for their Consolidated Class Action Complaint against Defendants American Express Company and American Express Travel Related Services Company, Inc. (together, "American Express" or "Amex") the following:

**INTRODUCTION**

1.      This action challenges Amex's Non-Discrimination Provisions—referred to herein as "Anti-Steering Rules"—in its merchant agreements that unreasonably restrain interbrand price competition among credit and charge card (hereinafter "credit card") networks. The credit card industry is oligopolistic, divided among four competing networks.  In the relevant market, Amex's Anti-Steering Rules: (1) stifle competition among the networks; (2) impose supracompetitive merchant fees, without corresponding offsetting credit card user economic benefits; (3) increase the overall price of credit card transactions above competitive levels; and (4) raise consumer retail prices throughout the economy, thereby reducing output.

## JURISDICTION AND VENUE

2.      Plaintiffs bring this action to recover damages and obtain injunctive relief, including treble damages, costs of suit, and reasonable attorneys' fees arising from Defendants' violations of Section 1 of the Sherman Act, 15 U.S.C. § 1.

3.      This Court has subject matter jurisdiction over this action pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15, 26 and 28 U.S.C. §§ 1331 and 1337.

4.      Venue is proper in this District, pursuant to 28 U.S.C. § 1391 and Sections 12 and 16 of the Clayton Act, 15 U.S.C. §§ 22 and 26, because the Defendants may be found or transact business within this District. Further, venue is proper here because this District is the transferee District of an Order of the Judicial Panel on Multi-District Litigation, pursuant to 28 U.S.C. § 1407, dated February 7, 2011.

## THE PARTIES

### I.    PLAINTIFFS

5.      Plaintiff Animal Land, Inc. is a corporation organized under the laws of the State of Georgia, with its principal place of business in Atlanta, Georgia, where it operates Animal Land Pet Movers and accepts American Express credit cards.

6.      Plaintiff Il Forno, Inc. is a corporation organized under the laws of the State of California, with its principal place of business in Santa Monica, California, where it operates Il Forno Trattoria and accepts American Express credit cards.

7.      Plaintiff Italian Colors Restaurant is a business having its principal place of business in Oakland, California, where it accepts American Express credit cards.

8.      Plaintiff Jasa Inc. is a corporation organized under the laws of the State of Louisiana, with its principal place of business in Metairie, Louisiana, where it operates The Harbor

2

Bar & Grill and accepts American Express credit cards.

9.      Plaintiff Lopez-Dejonge, Inc. is a corporation organized under the laws of the State of Alabama, with its principal place of business in Birmingham, Alabama, where it operates Rojo restaurant and accepts American Express credit cards.

10.     Plaintiff Plymouth Oil Corp. d/b/a Liberty Gas Station is a corporation organized under the laws of the Commonwealth of Pennsylvania, with its principal place of business in Plymouth Meeting, Pennsylvania, where it operates Liberty Gas Station and accepts American Express credit cards.

11.     Plaintiff Clam Lake Partners, LLC (successor in interest to previous Class Representative Firefly Air Solutions, LLC) is a corporation organized under the laws of the State of Minnesota, with its principal place of business in St. Paul, Minnesota, where it operates Stewart's Café Bar (formerly, 128 Café) and accepts American Express credit cards.

12.     Plaintiff Qwik Lube, LLC is a corporation organized under the laws of the State of New York, with its principal place of business in Jamestown, New York, where it operates Qwik Lube Oil & Filter and does not accept Amex credit cards.

13.     Plaintiff LaJolla Auto Tech, Inc. is a corporation organized under the laws of the State of California, with its principal place of business in San Diego, California, where it operates La Jolla Autotech Porsche & Audi and does not accept Amex credit cards.

## II.   DEFENDANTS

14.     Defendant American Express Company is a New York corporation with its principal place of business in New York, New York.

15.     Defendant American Express Travel Related Services Company, Inc. is a Delaware corporation, with its principal place of business in New York, New York, and is a wholly owned

subsidiary of American Express Company. American Express Travel Related Services Company, Inc. is generally responsible for all aspects of the credit card business conducted under the American Express brand, including the operation of the American Express network. Depending on context, as used herein, the terms "American Express" or "Amex" may refer to Defendants or the American Express network or the American Express brand.

## FACTUAL ALLEGATIONS

### I.  THE CREDIT CARD INDUSTRY

#### A.  The Two-Sided Credit Card Platform

16.     Plastic credit cards represent a tangible form of payment that facilitates transactions in a two-sided platform connecting merchants and consumers. As of 2016, credit cards have surpassed cash as the most popular form of payment worldwide,[1] and in the United States, credit card payments have had the largest growth rate among non-cash forms of payment, reaching 33.8 billion transactions with a value of $3.16 trillion in 2015.[2]

17.     Credit cards facilitate cardholder purchases at participating merchants by providing the cardholders with a line of credit extended by the issuer of that card.[3] Cardholders typically receive an invoice for purchases made on their card once a month and have a grace period during which payment may be made. The time between the purchase and the cardholder's deadline to pay

---

[1] Sabrina Karl, *Infographic: Plastic Finally Overtakes Cash,* CreditCards.com (Jan. 31, 2017), http://www.creditcards.com/credit-card-news/infographic-plastic-finally-overtakes-cash.php.
[2] Federal Reserve Board, *The Federal Reserve Payments Study 2016,* A Federal Reserve System Publication (Dec. 22, 2016),
https://www.federalreserve.gov/newsevents/press/other/2016-payments-study-20161222.pdf.
[3] Charge cards similarly allow cardholders to make payments by accessing a line of credit extended by the card issuer, but typically do not offer a revolving credit facility like credit cards; rather, charge cards require that the cardholder pay the balance in full each month. As noted, credit and charge card networks generally are referred to herein as "credit card" networks, for ease of reference.

the invoice on which that purchase appears is known as the "float"—the period of time that permits cardholders to temporarily defer payment on their purchases without paying any additional costs.

18.     In order for a credit card transaction to occur, both the merchant and the cardholder simultaneously agree to use the same card network. A company in the credit card network industry thus needs both sides of the platform to agree to accept and use the network's card; merchants must agree to accept the card and consumers must agree to use that card.

19.     Many cardholders and merchants engage in "multihoming," meaning that cardholders own and use multiple cards from different networks and merchants accept multiple card brands. Cardholders owning two or more credit cards typically can and do choose which card to use for a particular transaction, weighing convenience and/or the rewards or other benefits accruing to them from their use of each card for that transaction. Some cardholders, by comparison, engage in "single homing," which means that they only carry or use one card.

20.     When a consumer uses a credit card, the merchant's point of sale terminal transmits a record of the transaction to the card's network, sometimes via intermediary processors. The money sent by the network to the merchant's bank account reflects the purchase price minus the "merchant discount fee" (hereinafter "merchant fee") that the network (or, in the case of Visa and Mastercard, its member bank) charges merchants. The merchant fee typically consists of an *ad valorem* element—*i.e.*, a percentage discount rate multiplied by the purchase price—but may include additional flat fees.

21.     On the consumer side, the cardholder may pay a fee and/or effectively receive a fee for holding or using the card. Many cardholders do not pay any startup or annual fees to hold their credit cards, including cards that offer "cash back" or other rewards. Some, mostly high-per-transaction-reward cards do charge annual fees, and to offset their annual fees these cards often

pay cardholders an incentive to open new card accounts, such as a lump sum of reward points, cash back, and/or waiving the annual fee for one or more years. Regarding fees for using their cards, cardholders typically either: (1) pay no per-transaction fee for using their cards, (2) receive direct, percentage-cash-back rewards for using their cards, which is economically identical to *being paid* a fee for card use, or (3) in the case of pre-loaded cards aimed at very low-value consumers, pay a small per-transaction or loading fee (even this type of fee is disappearing; for example, Amex's Bluebird card charges no activation or monthly/annual fee and is aimed at low-income Walmart customers). Cardholders may also pay finance charges for delayed payments, and various other fees.

### B. The Relevant Market

22.     The relevant geographic market for Counts One through Three herein is the United States, and for Counts Four and Five herein is California.

23.     The relevant product market consists of the two sides of simultaneous credit card transactions as a whole, including all transactions provided by one or more of the four networks in the card industry (American Express, Visa, MasterCard, and Discover).

24.     Credit card networks operate a two-sided simultaneous transaction platform that connects merchants, on the one side, and cardholders, on the other side. The market in which credit card networks operate incorporates consumer-related and merchant-related services.

### C. The Oligopolistic Card Network Industry

25.     As stated, Amex is one of four credit card networks that enable transactions between merchants and cardholders. Amex and Discover issue cards directly to cardholder

customers, while Visa and MasterCard rely on their member banks to issue cards and accept card transactions from merchants.

26.     The industry has been highly concentrated for decades, dominated by these four competing networks. There are high barriers to entry, evidenced by the fact that there has been only one successful entry—Discover—in more than thirty years, and that market shares have been stable for many years.

### D.  The Differences Among The Credit Card Networks

27.     The Visa and MasterCard networks are often referred to as "4-party" or "5-party" systems, an indication of the number of parties involved.  This is a result of the  "disaggregated" platforms that Visa and MasterCard operate, which involve: (1) the credit card network; (2) cardholders; (3) issuing banks, which issue credit cards to cardholders; (4) merchants; and (5) acquiring banks, which acquire merchants for the network and accept credit card transaction data from merchants for verification and processing.

28.     Unlike the Visa and MasterCard networks, Amex operates a "3-party" or "closed-loop" platform—meaning that it offers credit card transaction services directly to both merchants and consumers. This is because Amex acts as both the card issuer and the acquirer, directly facilitating the transaction between the cardholder and the merchant. Discover uses a hybrid model, similar to that used by Amex. Like Amex, Discover issues its own credit card products, but Discover relies on third-party acquirers to service the merchant—acquirer—side of the platform.

29.     Amex has historically attracted more wealthy consumers. Amex similarly attracts cardholders who perceive Amex cards as giving them social "status" based on the historical time period when only the wealthy carried Amex cards. Amex has also attracted cardholders through

its corporate card program. This program generates even greater cardholder loyalty when employers require the use of the Amex card by employees.

### E.  The Operation Of The Two-Sided Platform

#### i.  Merchant Fees

30.     Under the Visa and MasterCard networks, merchant fees are comprised of three elements: a percentage interchange fee, an acquirer fee, and a network fee. Under this structure, the acquirer fee is collected and kept by the acquiring bank for services the acquirer renders to the merchant, while the network fee is retained by Visa or MasterCard. The interchange component, which represents the largest portion of the merchant fee, is set by Visa or MasterCard and is retained by the issuing bank in the settlement process.

31.     The interchange rate charged to merchants, only applicable for Visa and MasterCard networks, varies depending on (1) the industry to which the merchant belongs, and (2) the actual credit card product used by the consumer. This results in a variety of different interchange rate categories (*i.e.*, MasterCard has over 240 interchange rate categories and Visa has more than 70 categories).

32.     As a result of its unique "closed-loop" structure, Amex's merchant pricing fee model is distinct from that of its other three competitors because, within each industry segment, Amex charges a single, typically higher merchant fee for all Amex credit cards. Amex's merchant fee does not vary regardless of card features, such as credit limits, rewards, etc.

33.     Amex sets a pricing table for each merchant industry segment—such as airlines, lodging, restaurants, gas stations—which contains a "headline" or "base" merchant fee charged across the entire industry, as opposed to a ceiling fee. While Amex claims to negotiate acceptance agreements with certain large merchants, such instances are extremely rare.

34.     Amex has claimed that it charges higher merchant fees to cover the high-end

8

rewards it offers its cardholders; but in fact, this is exactly the opposite of the actual economics. Amex does not set its merchant fees based on the cost of its rewards; it sets its merchant fees based on how much it can charge merchants without those merchants refusing to accept Amex credit cards. Amex's overall transaction fees (its merchant fees less its per-transaction rewards) are a huge profit center. Indeed, Amex's revenues are primarily dependent on its merchant fees.

35.     The Amex merchant fee is roughly 3% of the total transaction amount. Therefore, if a consumer uses an Amex-branded credit card to make a $100 purchase, the merchant will receive about $97 from Amex, and Amex will bill the consumer $100 (in addition to any future interest and penalties). The $3 difference is Amex's revenue from merchants (and is separate from its charges to cardholders).

### ii.     Cardholder Rewards For Card Usage

36.     In competing on the cardholder side of the platform, within this concentrated market, Amex promotes offering its cardholders certain membership benefits such as purchase protection, fraud protection, airport lounge access, concierge services, and/or rental car insurance, some of which are only provided to higher status cardholders.

37.     The vast majority of Amex rewards are based on card usage. For example, cardholders enrolled in American Express's Membership Rewards program receive Membership Rewards points for purchases made on their Amex cards, and may then redeem those points with Amex or one of its redemption partners for merchandise, gift cards, frequent flyer miles, statement credits, or other goods and services. These rewards and benefits offered by Amex and other networks through their issuing banks, however, attach to credit card *use* and not to mere possession of the credit card.

38.     Visa and MasterCard also have programs offering varying rewards or benefits for

card usage. Visa and MasterCard have been increasing their rewards through the adoption of higher-tiered cards. However, Visa and MasterCard cards that have significant rewards packages for card use also tend to carry higher interchange rates, meaning merchants are charged higher fees, explaining why it is more expensive for merchants to accept high-rewards Visa and MasterCard cards at the time of transaction when compared to more basic Visa and MasterCard cards on the same networks.

39.     Within Amex's model, cardholders include: (a) basic cardholders, who pay no or minimal annual fees, spend less, and receive no or minimal rewards; (b) intermediate cardholders, who pay annual fees and/or spend more, and in return, receive moderate rewards; and (c) premium or marquee cardholders who pay the highest annual fees, tend to spend more on both an annual and per transaction basis, and in return, receive access to what Amex claims to be valuable rewards. Amex's cardholder fees are higher than those charged by its competitors for cards with comparable benefits, and thus diminish to some extent the benefits of its cardholder rewards.

40.     Amex structures its rewards program based on the type of card being used. For example, the Amex Platinum card rewards cardholders five times Membership Rewards points for every dollar spent on all qualifying flights and hotels, and one Membership Rewards point for every dollar spent on other purchases, while the Amex Blue Card, Amex's lowest rewards card, only provides cardholders with one Membership Rewards point for every eligible dollar spent. Other Amex credit card products provide rewards for using Amex credit cards for specific purposes such as the Amex Everyday Preferred Card, which provides cardholders rewards for purchases made at U.S. gas stations (two Membership Rewards points per dollar spent) and at U.S. supermarkets (three Membership Rewards points per dollar spent), or the Amex Gold card (formerly the Premier Rewards Gold card), which rewards cardholders with four times

10

Membership Rewards points per dollar spent at U.S. restaurants and supermarkets and one Membership Rewards point back per dollar spent at U.S. gas stations. But, as previously noted, Amex's annual cardholder fees are generally higher than those charged by its competitors for cards with similar benefits, and are not offset by the corresponding value of cardholder rewards.

### F.  The Government's Anti-Steering Rule Suit and Partial Settlement

41.     For many years, Amex, Visa, and MasterCard all imposed restrictions on merchants, known as Anti-Steering Rules, which stifled price competition among credit card networks and effectively raised merchant fees and overall consumer card transaction costs above what otherwise would prevail in a competitive market.

42.     In 2010, the United States (the "government") brought suit against Amex, Visa, and MasterCard to enjoin all three networks' anticompetitive elimination of price competition through the imposition of anti-steering rules or "Merchant Restraints." As the government stated in its complaint against the three credit card networks:

> Each Defendant applies its Merchant Restraints through agreements with merchants or with merchants' acquiring banks. Each Defendant's set of vertically imposed restrictions independently restrains competition among networks. Each Defendant's Merchant Restraints violate Section 1 of the Sherman Act apart from the existence of the other two Defendants' Merchant Restraints.[4]

43.     The government entered into a settlement with Visa and MasterCard under which the two networks agreed to eliminate some of their Merchant Restraints.

44.     However, Amex continued to defend the practice, refusing to relinquish its Anti-Steering Rules. The government in turn noted that, so long as Amex continues to impose such

---

[4] Complaint at ¶ 23, *United States, et al. v. Am. Express Co., et al.*, No. 10-cv-04496-NGG-CLP (E.D.N.Y. October 4, 2010), ECF No. 1.

restrictions, the Visa/MasterCard settlement cannot restore competition in the market for credit and charge card transactions:

> Merchants that accept American Express cards [constituting 90% of all credit card transaction volume], including the vast majority of the major retailers in the United States, will be unable to influence customers' payment methods because the anticompetitive American Express Merchant Restraints will continue to constrain those merchants pending the outcome of this litigation. ***American Express stands as the last obstacle to achieving the full benefits of competition now suppressed by the challenged Merchant Restraints.***[5]

45.     Thus, although the government's intention for bringing its suit was to "level the playing field" among the card networks on a competitive basis, ironically, the playing field remains level on an anticompetitive basis.

### G. The Amex Anti-Steering Rules

46.     Amex's continued Anti-Steering Rules have unreasonably stifled and restrained price competition in the credit card transaction market by providing that merchants must not:

- indicate or imply that they prefer, directly or indirectly, any Other Payment Products over [Amex] Card[s];

- try to dissuade cardholders from using [their Amex] Card;

- criticize or mischaracterize [the Amex] Card or any of [Amex's] services or programs;

- try to persuade or prompt cardholders to use any Other Payment Products or any other method of payment (e.g., payment by check);

- impose any restriction, conditions, or disadvantages when the Card is accepted that are not imposed equally on all Other Payment Products, except for ACH funds transfer, cash, and checks;

- engage in activities that harm [Amex's] business or the American Express Brand (or both); or

---

[5] Competitive Impact Statement at 14, *United States, et al. v. Am. Express Co., et al.*, No. 10-cv-04496-NGG-CLP (E.D.N.Y. October 4, 2010), ECF No. 5 (emphasis added).

- promote any Other Payment Products (except the Merchant's own private label card that they issue for use solely at their Establishments) more actively than the Merchant promotes Amex.

47.     The above iteration of Amex's Anti-Steering Rules, taken from its Merchant Payment Guide, is substantially mirrored in Amex's card acceptance agreements with all U.S. merchants.

48.     Amex defines the term "Other Payment Products" as "any charge, credit, debit, stored value or smart cards, account access devices or other credit cards, services or products other than the [American Express] Card." By law, some aspects of this definition have been reformed. However, Amex still prohibits direct interbrand competition—*i.e.*, discounts for the use of alternative credit cards or specific debit cards; surcharges on Amex cards not assessed on other credit or debit cards; and/or suppression or preference strategies (*e.g.*, asking a customer to use a different card, such as stating: "we prefer Discover, which costs us far less so we can keep our prices low," etc.).

49.     Merchants wishing to steer customers towards using a specific network's card would be steering towards card payments with less expensive merchant fees. However, Amex's Anti-Steering Rules not only preclude merchants from steering cardholders towards using other network cards at the point of sale, but do so even when Amex is not mentioned. This causes the impact of the anticompetitive restraint to affect all the networks, allowing Visa, MasterCard, and Discover to avoid merchant steering as well. For instance, a merchant may not post a sign saying "Please Use Your Discover Card, Visa Is More Expensive To Accept" or offer a discount to MasterCard cardholders if they use a Visa card instead.

50.     Thus, Amex's Anti-Steering Rules stifle price competition, which would otherwise exist within this credit card network oligopoly, and increase overall transaction costs. Amex's

Anti-Steering Rules prevent merchants from steering cardholders away from using high cost Amex cards and towards cards that impose lower merchant fees at any cardholder category. As a result, Visa, MasterCard, and Discover have no economic incentive to compete by offering lower merchant fees, because merchants are powerless to generate increased usage of a lower cost card. Their incentive, instead, is to raise their merchant fees toward Amex's level. In other words, the absence of price competition created by Amex's Anti-Steering Rules is similar to the effects of a cartel: overall transaction prices in the industry remain high and each credit card network earns high per-transaction profits on its status quo market share, even if a network, acting unilaterally in the absence of the Anti-Steering Rules, would lower prices to expand its market share. This is evidenced by Discover's unsuccessful attempt to lower prices in the past.

## II. MARKET POWER IN THE TWO-SIDED CREDIT CARD TRANSACTION MARKET

### A. The Oligopolistic Two-Sided Credit Card Market

51.     The relevant product market is the provision of credit card transactions, which occur simultaneously on the two-sided platform between merchants and cardholders. This is a highly concentrated oligopolistic market. There are only four main suppliers: Visa, MasterCard, American Express, and Discover. The Supreme Court in 2018 described their market shares as Visa 45%, Amex 26.4%, MasterCard 23.3%, and Discover 5.3%. *See Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2282 (2018). Market shares have been relatively stable for many years.

52.     The market is characterized by substantial barriers to entry. New entrants would face elevated capital costs and other entry costs in connection with developing the infrastructure and branding necessary to compete. As the district court in *United States v. Am. Express Co.* found, and the Second Circuit reiterated, potential new entrants to the market face a "chicken and the egg" problem, as "a firm attempting entry into the [credit card] network market would struggle to

convince merchants to join a network without a significant population of cardholders and, in turn, would also struggle to convince cardholders to carry a card associated with a network that is accepted at few merchants." *United States v. Am. Express Co.*, 88 F. Supp. 3d 143, 190 (E.D.N.Y. 2015); *United States v. Am. Express Co.*, 838 F.3d 179, 190 (2d Cir. 2016). Moreover, the anticompetitive conduct by the three major competitors, including their Anti-Steering Rules, which Amex has continued, raises entry barriers into the market.

53.     The anticompetitive conduct by Visa and MasterCard that was the subject of *United States v. Visa U.S.A. Inc.*, and the Anti-Steering Rules of Visa, MasterCard, and Amex have also raised barriers to entry into the market. 163 F. Supp. 2d 322 (S.D.N.Y. 2001), *modified*, 183 F. Supp. 2d 613 (S.D.N.Y. 2001), *aff'd*, 344 F.3d 229 (2d Cir. 2003).

### B.   Amex Has Market Power In The Two-Sided Credit Card Transaction Market

54.     Amex has market power in the two-sided credit card transaction market. Amex is the second largest credit card network in a concentrated market with only four competitors. Many cardholders prefer Amex over other credit cards or are required by their employers to use their Amex card—which is not necessarily related to Amex's rewards offerings. Because there are barriers to entry, fear of entry does not constrain the networks' prices. In this oligopolistic market, Amex and its rivals are each able to maintain prices above the level of perfect competition. Rivals' competitive responses are made more accommodating by Amex's Anti-Steering Rules. Although Amex's 26% market share may not signify market power in a market where the remaining competitors all have minimal market shares, that is not true of the relevant market here. No responsible merchant can ignore a supplier (Amex) who is the second largest market player and controls one-fourth of a four-company market. All of these conditions endow Amex with market power, which is enhanced by Amex's Anti-Steering Rules.

15

### i.   Amex's Long-Standing Reputation

55.     Amex's market power is partly the result of its historical status as the card used by wealthy cardholders and its corporate card program. Those cardholders were attracted by Amex's status and its international card acceptance at a time when credit card transactions were still in their infancy. Amex remains a beneficiary of this historical status, even as credit became more ubiquitous. On the merchant side of the market, Amex's reputation of providing wealthy, "ready to spend" cardholders to merchants and the "single homing" or "insistence" behavior of many of its cardholders, include employees whose employers require the use of Amex cards for their business expenses, also contributes to its market power. This reputation and card insistence afford Amex the ability to profitably raise its merchant fees without losing significant business.  They also give Amex the ability to obtain and retain cardholders even while capturing a significant share of the higher merchant fees for itself.

### ii.   Cardholder Insistence

56.     Amex claims that 10–20% of Amex cardholders use only Amex cards.  These include cardholders who consolidate their credit card spending on their Amex cards.  They also include cardholders with Amex corporate cards. Amex's corporate card program significantly drives insistent spending. Amex has released a study suggesting that about 70% of corporate card cardholders are subject to some form of a "mandation" policy, whereby their employers force the employee-cardholders to use Amex cards for business expenses. In addition, Amex has promoted its rewards programs to its cardholders such that Amex persuades merchants that a significant percentage of its cardholders will favor patronizing a merchant that accepts the Amex cards.

57.     These Amex cardholders, accounting for charges in the hundreds of millions, have a strong preference for or insist on paying for transactions with their Amex cards. These

cardholders may take all of their business to a different merchant or spend less if they are unable to use their Amex card. This includes cardholders employed by businesses that mandate that their employees only use Amex cards for expenses. This preference for Amex cards means that Amex's market power is not dissipated by competition on the cardholder side of the platform. Only a portion of Amex's supracompetitive merchant fees are shared as enhanced rewards.

58.     This cardholder insistence by a share of Amex cardholders has the effect of deterring merchants from dropping acceptance of Amex despite its increasing merchant fees.

59.     As merchants have testified, Amex has recognized its market power is gained in part from cardholder insistence, and Amex has leveraged this loyalty to convince merchants of the need to accept and continue to accept Amex's cards.

### iii.    Amex's Merchant Fee Increases Without Significant Loss of Market Share

60.     As a result of the factors noted above, Amex has been able to increase merchant fees without significant merchant attrition.

61.     In the face of a declining premium over the all-in rates charged by Visa and MasterCard in the early 2000s, Amex executed a series of targeted price increases in certain industry segments between 2005 and 2010, with the stated purpose of better aligning its merchant fees with the value it perceived as being delivered to both cardholders and merchants (referred to as Amex's "Value Recapture Program"). Specifically, Amex raised its merchant fees on twenty separate occasions without losing any appreciable market share, or any large merchant's business. Amex also did not increase benefits to Amex cardholders to offset the merchant price increases, meaning that these increases were increases in Amex's overall transaction price.

62.     A prime example of Amex's market power involves the example of Walgreens. After terminating acceptance of Amex cards in 2004, Walgreens—which at the time was the ninth

largest retailer in the United States—was confronted by customers, including corporate employees and single homing Amex cardholders, who told Walgreens they would take their business to competitors if it did not reinstate its Amex acceptance policy. Under such pressure, Walgreens caved and agreed to a new acceptance agreement with Amex, which contained merchant fee terms that were substantially the same as those which had led the retailer to discontinue Amex acceptance.

63.    Amex's ability to impose significant price increases without any meaningful merchant attrition provides further evidence of its market power in the relevant market.

### C. Amex's Anti-Steering Rules Have Been A Contributing Factor To Its Market Power

#### i. Amex Exercises Market Power By Imposing Anti-Steering Rules On Merchants

64.    Amex has exercised and maintained its market power in part by successfully forcing merchants to accept its Anti-Steering Rules. These rules are a barrier to entry and deter rivals from reducing their merchant fees in order to gain substantial market share, and instead incentivize them to follow Amex's fee increases.  As a result, merchants have a problem: most merchants would strongly prefer not to agree to Amex' Anti-Steering Rules, but they cannot unilaterally give up Amex cardholder business without losing profits as long as other merchants continue to accept Amex. For this and the other reasons previously addressed, there have been no successful new entrants in the U.S. credit card network business for a third of a century—a staggering period of time in any industry.

65.    The experience of the most recent market entrant—Discover—illustrates the anticompetitive effects of the Anti-Steering Rules. In 1999, Discover attempted to compete with Amex, Visa, and MasterCard by offering a new model under which cardholders would receive a credit card with a rewards feature at no annual fee, while merchants were offered low merchant

fees. However, this campaign ultimately failed because the Anti-Steering Rules imposed by Amex (and other credit card networks at that time) prevented merchants from expressing a preference for Discover. In the face of these Anti-Steering Rules, Discover had little or no incentive to charge low fees to merchants because, unlike in a competitive market, doing so would not lead to significant additional market share.

66.     Amex's ongoing imposition of its Anti-Steering Rules continues to preclude Discover, other potential market entrants, and current market participants from engaging in price competition  in the relevant market. That is, by suppressing price competition to merchants in the form of lower priced payment options, and by extension, potential benefits of such competition to their customers, Amex's merchant restraints directly reduce interbrand competition. Because merchants are unable to steer consumers towards using lower priced payment options, merchant demand for network services is forced to be unresponsive to changes in price.

### ii.     Stifling Competition Allows Amex To Control Merchant Fees

67.     Amex has market power over credit card transactions within an oligopolistic industry, and its Anti-Steering Rules enhance this market power. In a competitively unrestrained market, Amex (which historically has typically charged the highest merchant fees) would risk losing transaction volume, revenue, and market share if it did not respond to market forces by reducing its merchant fees. In other words, Amex would face *price competition* on the merchant side of its two-sided transactional platform, which would lead to Amex and its rivals lowering their merchant fees. But Amex's Anti-Steering Rules insulate it and its competitor networks from such competition, resulting in increased merchant fees across all networks, and raising overall transaction prices throughout the relevant market above competitive levels.

68.     For example, in a competitive relevant market, credit card networks, including acquiring banks, would compete on price by offering merchants lower merchant fees in exchange for more favorable treatment, or "steering." Merchants can—and would—steer consumers to less costly payment products by a number of possible means:

- offering a discount for using a payment product that is cheaper to the merchant, such as Discover, Visa, and MasterCard credit cards, while not offering that discount for Amex cards;

- offering other benefits for using a cheaper payment product, such as rewards points or special offers on in-store products;

- informing customers that Amex transactions cost the merchants more, or asking customers if they would mind using a different payment option as opposed to Amex cards;

- posting signage indicating a preference for a cheaper payment product;

- posting the decals and signs of less expensive payment networks, but not posting the decal or sign of Amex;

- imposing a small charge (sometimes referred to as a "surcharge") for using all or any subset of Amex-branded credit cards but not for using less costly cards (when the merchant is located in one of the at least 43 states and the District of Columbia where such surcharges are legal); and

- taking any other actions that merchants may yet devise to advertise or promote the availability of a cheaper payment product if they were not constrained by the anticompetitive rules against steering.

### iii.     Amex Has Market Power On Both Sides Of The Platform

69.     Under Amex's "closed-loop" platform, Amex operates in three businesses: (1) as an issuer to cardholders, (2) as a merchant acquirer, and (3) as a network connecting cardholders and merchants. But for Amex's Anti-Steering Rules, Visa and MasterCard would be incentivized to reduce their interchange fees, and merchants would benefit from increased price competition.

70.     Amex's ability to exercise market power over merchants, and its power in the two-sided transaction market overall, significantly exceeds what might be suggested by its market

share. Merchants multi-home while cardholders have significant single-homing behavior. As previously noted, some only are willing to use Amex—particularly customers who are using cards provided by their employer and those customers who have strong preferences influenced by reward programs. Indeed, the other credit card networks also enjoy similar market power over merchants, for example, because of barriers to entry in the industry, the highly concentrated nature of the industry, and cardholder insistence. Amex's Anti-Steering Rules substantially exacerbate this market power.

### III.   EFFECTS OF AMEX'S ANTI-STEERING RULES

71.     As the Supreme Court explained in *Ohio v. Am. Express Co.*, a three-step burden-shifting approach applies in rule of reason cases under which: (1) the plaintiff bears an initial burden to show the defendant's challenged behavior had an actual adverse effect on competition as a whole in the relevant market by increasing prices, reducing output, or decreasing quality; if the plaintiff does so, (2) the burden shifts to the defendant to establish pro-competitive effects of the challenged agreement, and if the defendant does so, (3) the burden then shifts back to the plaintiff to prove that any legitimate competitive benefits offered by the defendant could have been achieved through significantly less restrictive means. 138 S. Ct. at 2284. The factfinder must then weigh the competitive effects of the agreement—both pro and con—to determine if the effects of the challenged restraint tended to promote or erode competition. *Id.*

72.     Amex's Anti-Steering Rules have increased the overall price of credit card transactions above a competitive level and otherwise have stifled price and non-price competition in the relevant market and raised retail prices to Amex cardholding and non-Amex cardholding consumers. The anticompetitive effect of the Anti-Steering Rules is not dissipated by competition on the cardholder side of the platform, since only a portion of Amex's supracompetitive merchant

fees results in enhanced rewards. That is, Amex's overall transaction prices (merchant fees minus cardholder rewards) are also supracompetitive. Output in the relevant market would have increased further but for Amex's Anti-Steering Rules. Additionally, Amex's Anti-Steering Rules have resulted in increased retail prices.

### A. Amex's Anti-Steering Rules Have Increased The Overall Two-Sided Transaction Price to Supracompetitive Levels

73.     Amex's Anti-Steering Rules have enabled all four market participants to raise their merchant fees, including fees charged by Amex's competitors to merchants that do not accept Amex, to levels that otherwise would not have resulted were merchants not stifled from influencing their customers' payment decisions. As a result, merchants pass on their increased costs in the form of higher retail prices, thereby increasing the overall two-sided credit card transaction price to supracompetitive levels. The government agreed, stressing that "retail prices are higher generally for consumers." Competitive Impact Statement at 9, *United States, et al. v. Am. Express Co., et al.*, No. 10-cv-04496 (E.D.N.Y. October 4, 2010), ECF No. 5. "Moreover, . . . less affluent purchasers using non-premium [credit cards], debit cards, cash, and checks effectively subsidize part of the cost of expensive premium card benefits and rewards enjoyed by those cardholders." *Id.*

74.     Because Amex is accepted by merchants accounting for the vast majority, in terms of dollar value, of all credit card transactions, its Anti-Steering Rules restrict the elements of the choice that both merchants and cardholders should have in completing their transactions by blocking essential communications between the two sides of the platform. In this way, Amex eliminates the economic incentive for all credit card networks to price compete on the merchant side of the market, which would otherwise obtain the "optimal balance" between the prices charged on each side of the platform, thereby suppressing price competition between Amex and its

competitors. As an example, when Discover attempted to compete with a business model that involved charging lower prices to merchants, it was unable to do so, because of entry barriers, including the Anti-Steering Rules imposed by Amex and the other networks at that time, which prevented merchants from steering customers to Discover in exchange for those lower fees. Indeed, Amex's continued imposition of the Anti-Steering Rules on merchants incentivizes rival networks to raise their fees up towards the level set by Amex, and enables each network to do so without losing market share.

75.     Moreover, as a result of Amex's Anti-Steering Rules, the acquiring banks of the two other dominant networks—Visa and MasterCard—continue to charge inflated merchant fees—just as though those networks had not terminated their own Anti-Steering Rules via settlement with the government. Amex's Anti-Steering Rules, therefore, have the effect of defeating the government's settlement with Visa and MasterCard, and causing each of the credit card networks to extract supracompetitive prices from merchants on their own platforms. Between 1997 and 2009 (prior to the 2011 settlement with the Department of Justice in which they agreed to change their own anti-steering provisions), Visa and MasterCard raised their fees by over 20%, without any fear that other networks could undercut their prices for competitive gain. Similarly, after Discover was compelled to discard its low-price strategy as a result of its competitors' Anti-Steering Rules, Discover was able to drastically increase its merchant pricing in a short period of time to close the gap with merchant fee rates imposed by its competitors. Those networks' prices have never returned to a competitive level. But for the Anti-Steering Rules' stifling of price competition, the networks would be compelled to, and would in fact, charge merchants substantially lower discount fees than presently charge. The Anti-Steering Rules, therefore, stifle price competition among all four networks at millions of merchants accounting for over 90% of

credit card transaction volume in the United States. And because merchant fees are not passed through directly to cardholders, as evidenced by Amex's ability to raise merchant fees without corresponding increases in cardholder rewards, and the ability of its rivals to rapidly increase merchant fees without losing share, this suppression of price competition has inflated the overall two-sided net price paid by merchants and consumers for transactions by all four networks at those merchants.

76.     Amex's Anti-Steering Rules also ensure that merchants seeking to recoup from consumers the artificially inflated fees paid to Amex, Visa, MasterCard, and Discover cannot attribute those fees to each network's specific transactions, and thus, have no margin-preserving option but to increase the prices they charge *all* consumers for goods and services—regardless of the method of payment at the point of sale.

77.     Indeed, the United Kingdom Competition Appeal Tribunal recently concluded that "since payment by credit card was seldom restricted to certain products, . . . insofar as there was pass-through by a merchant, the loss would be suffered not only by customers who paid by credit or debit card but by all its customers."[6]

78.     Amex's Anti-Steering Rules remove any bargaining power that market participants may have had absent such rules, and thus, prevent merchants and consumers from reaching a joint welfare-maximizing deal, or in other words, an equilibrium price. These rules deny to consumers and merchants the competitive ability to replace what otherwise would have been a lower price transaction to *both* parties in favor of a higher cost transaction, while also harming competitors, such as Discover, by, for example, increasing barriers to entry into the market and by stifling price elasticity of merchant fees.

---

[6] *Walter Hugh Merricks CBE v. MasterCard Inc., et al.*, [2017] CAT 16 [13].

79.     In fact, Amex's Anti-Steering Rules operate as a wealth transfer from whichever other network "lost" the transaction. The intended and actual result of Amex's Anti-Steering Rules is insulation from price competition in the relevant market. Competitor networks cannot gain market share by offering the same services at lower prices because the Anti-Steering Rules ensure that consumers will have no choice but to use a more expensive or less efficient payment medium—and yet, it is the consumer, after being fully informed and without artificial restraint, who should have the right to make the ultimate decision as to which payment option to use.

### B. Amex's Anti-Steering Rules Decrease Output

80.     As the U.S. Supreme Court recently enunciated, two-sided platforms often exhibit what economists call "indirect network effects," meaning that "the value of the two-sided platform to one group of participants depends on how many members of a different group participate. In other words, the value of the services that a two-sided platform provides increases as the number of participants on both sides of the platform increases." *Ohio v. American Express Co.,* 138 S. Ct. at 2280-81 (internal citation omitted). For example, a credit card "is more valuable to cardholders when more merchants accept it, and is more valuable to merchants when more cardholders use it." *Id.* at 2281. Thus, "[t]o ensure sufficient participation, two-sided platforms must be sensitive to the prices that they charge each side." *Id.* Amex's Anti-Steering Rules reduce the competition that would otherwise occur in a competitive two-sided market. Amex's Anti-Steering Rules distort the competitive determination of pricing in credit card platforms, prevent the optimal realization of benefits that otherwise would be provided to consumers and merchants together in a competitive two-sided market, and thus increase the overall transaction prices.

81.     The chilling effect of Amex's Anti-Steering Rules on interbrand competition reduces the volume of transactions. Amex's Anti-Steering Rules increase overall prices in the

relevant market thereby reducing the volume of transactions compared to the but-for world. Additionally, because Amex's Anti-Steering Rules are increasing overall credit card transaction prices to supracompetitive levels, they also suppress output by increasing retail prices to all consumers, which in turn results in reduced retail output. If Amex did not impose these restraints, competing credit card network acquiring banks would lower fees and offer other incentives for steering to merchants. Merchants would pass on their lower fees to consumers in the form of lower prices, rebates, and other benefits. These lower prices and other benefits would spur additional purchases, thereby increasing total transaction volume, including credit card volume, by more than has taken place in the presence of the restraints. Additionally, given that many businesses do not accept Amex in particular, if Amex's overall transaction prices were lower, then more businesses would accept Amex, and Amex cardholders would engage in additional transactions at those businesses.

## IV.   AMEX'S CARDHOLDER BENEFITS DO NOT OFFSET THE RESTRAINTS IMPOSED ON MERCHANTS BY ITS ANTI-STEERING RULES

82.     Amex's Anti-Steering Rules have caused the overall price per transaction, which includes the merchant fee minus the cardholder rewards, to increase. On the merchant side of the market, Amex's imposition of increased merchant fees, has, in turn, enabled Visa, MasterCard, and Discover to increase their respective merchants' fees, thereby stifling competition, and causing all credit card accepting merchants to pay supracompetitive merchant fees. This includes merchants who do not accept Amex cards but do accept other credit cards, because the remaining credit card networks do not lower their merchant fees for the generally small merchants that do not accept Amex.

83.     Further, on the consumer side, Amex's Anti-Steering Rules have caused merchants to increase retail prices, compelling all consumers to pay more at the point of sale, even those

consumers using check, debit, or cash. These anticompetitive effects are not offset by benefits to cardholders in the relevant market (either in the aggregate or for Amex cardholders as a whole).

84.     Amex Cardholders earn "rewards" only on actual card usage and not merely on card ownership. In fact, it is only a group of premium cardholders who are the recipients of the vast majority of Amex's rewards and benefits, whereas the majority of Amex cardholders receive substantially lesser benefits—not to mention non-Amex cardholders and non-credit card consumers at both Amex-accepting and non-Amex-accepting merchants, who pay higher product prices as a result of Amex's inflated merchant fees but receive no Amex "offsetting benefits" in return.  Moreover, annual fees on the higher reward cards partially offset the benefits provided to such cardholders. Only a portion of Amex's supracompetitive merchant fees are shared as enhanced rewards.

85.     The alleged "offsetting Amex benefits," such as rewards or other services available only to Amex cardholders do not offset higher transaction costs and higher retail prices to the cardholders of competing networks, who derive no benefit from such rewards, and cannot, in any way, offset higher transaction costs paid by those consumers who do not use credit cards, but rather use checks, debit cards or cash. Indeed, Amex cardholder rewards vary in value even among the different Amex cardholder categories. And even for those who might be expected to be beneficiaries of Amex's merchant fee revenues (Amex's premium cardholders), Amex still retains much of the increased merchant fees as profit, such that the inflated merchant fees reflect a supracompetitive overall price charged across Amex's transactional platform. Amex's Anti-Steering Rules, therefore, harm interbrand competition by causing all merchant acquirers, including merchants who do not accept Amex cards, to implement and maintain supracompetitive merchant fees for credit and charge card transactions, which merchants then pass on to all

27

cardholders and non-cardholders. This harm to merchants is not offset on the cardholder side of the platform, because the Anti-Steering Rules disrupt the balancing of the prices of all credit and charge entities between the two sides of the platform that would otherwise occur in a competitive market.

## V. ANTI-STEERING RULES ARE NOT ESSENTIAL TO AMEX'S BUSINESS

86.     Amex has claimed that the removal of its Anti-Steering Rules would "endanger the viability of its differentiated business model" because merchants would be able to steer cardholders away from using Amex cards, resulting in fewer customers using their Amex cards for transactions, thereby causing fewer merchants to accept Amex, and thus, "leading to [the] degradation of Amex's acceptance network." *United States v. Am. Express Co.*, 88 F. Supp. 3d at 226. Amex's merchant value proposition is founded on charging higher merchant fees mainly in exchange for transactions with one subset of its cardholders—the premium, or "marquee," cardholders. If isolating and packaging such a subset of cardholders is so valuable to merchants, then Amex would not have to insulate its network from competition through the Anti-Steering Rules.  Furthermore, there is no competitive justification for Amex imposing the same Anti-Steering Rules on all Amex-accepting merchants, including small businesses such as gas stations or grocery stores that obtain no benefit from Amex premium cardholder large purchases.

87.     Amex's claims that its Anti-Steering Rules are essential for Amex's business model are also contradicted by Amex's continued viability around the world, even where its Anti-Steering Rules have been eliminated. For example, in Australia, Amex signed an understanding with the Reserve Bank of Australia, agreeing that it would not prohibit surcharging.  Indeed, Australian merchants have, since 2003, been able to surcharge Amex transactions without surcharging other credit card transactions, or surcharge Amex transactions by more than the amount they surcharge

other credit card transactions. The result was not that Amex abandoned Australia, but rather that Amex adapted to a new competitive landscape and now runs a highly profitable business in Australia—with far lower merchant fees. *United States v. Am. Express Co.*, 88 F. Supp. 3d at 221 n.46.

88.     Additionally, since 2010 in Canada, merchants have had the ability to differentially discount by credit card network. Nonetheless, Amex continues to profitably operate its business model in Canada.

89.     Thus, Amex's network viability is not dependent on its Anti-Steering Rules and could similarly operate in the United States without its Anti-Steering Rules.

## AMEX'S ANTICOMPETITIVE COLLECTIVE ACTION BANS

## I.  AMEX'S COLLECTIVE ACTION BANS VIOLATE THE FEDERAL ANTITRUST LAWS

90.     In the same card acceptance agreements in which Amex imposes its Anti-Steering Rules on U.S. merchants, Amex purports to insulate itself from any legal challenge that might be brought, in any litigation or arbitral setting, by two or more merchants acting collectively (the "Collective Action Bans"). These Collective Action Bans, as applied under the facts of this case, violate the federal antitrust laws. The Collective Action Bans specifically state that, if Amex demands arbitration:

> The arbitrator's ability to resolve Claims is limited to Claims between you and us alone, and the arbitrator's authority to make awards is limited to awards to you and us alone.  No arbitration award or decision will have any preclusive effect as to issues or claims in any dispute with anyone who is not a named party to the arbitration.

91.     Under the Collective Action Bans (which are typically but not always accompanied by an arbitration agreement), a merchant generally forfeits the ability to: (i) have its claim consolidated or aggregated with any claim asserted by any other merchant against Amex; (ii) act

as a representative plaintiff in any class action; or (iii) participate even as a non-representative member of a class. The Collective Action Bans thus act as prospective waivers concerning antitrust violations with respect to any market-wide anticompetitive behavior that can only be redressed by collective action on the part of direct purchasers, whether as class members or groups of individual plaintiffs.

92.     Amex devised and implemented the Collective Action Bans with the specific intention of immunizing itself from liability under the antitrust laws in connection with the rules it imposes upon merchants, including the Anti-Steering Rules.

93.     Amex first began implementing Collective Action Bans in 1999, imposing them initially only on its smallest and least powerful merchants (those that transact less than $10 million per year on the Amex network). At that time, a merchant class action had been ongoing for several years in the Eastern District of New York challenging the "honor all cards" rule of the Visa and MasterCard networks—*i.e.*, the rule whereby any merchant accepting Visa or MasterCard credit cards was obligated to accept Visa and MasterCard's debit card products, at merchant discount rates that significantly exceeded those charged by other debit networks. *See In re Visa Check/Mastermoney Antitrust Litig.*, No. 96-CV-5238 (E.D.N.Y. 2002). Taking note, Amex executives grew concerned that their own anticompetitive merchant rules would come under antitrust scrutiny, as a result of similar merchant class litigation.

94.     Accordingly, in mid-1999, Amex devised the policy of forcing all small merchants to forfeit the ability to participate in a class or group action or arbitration, or to join their claims with those of other merchants, or to obtain remedies applicable to any other merchants. Amex instituted this policy by incorporating Collective Action Bans in its agreements for use with new small merchants, and by sending unilateral "envelope stuffer" mailers to existing small merchants,

who were, in effect, given the choice of discontinuing Amex acceptance altogether or waiving the right to participate in any antitrust challenge to Amex's merchant practices.

95.     By 2005, several merchants had filed or threatened to file actions challenging the Anti-Steering Rules. At the same time, a merchant class action challenging Visa's and MasterCard's Anti-Steering Rules was the subject of highly publicized proceedings. *See In re Credit Card Interchange Fee And Merchant Discount Antitrust Litig.*, No. 05-MD-1720 (E.D.N.Y. 2005). Further, in this same time frame, several competition authorities around the world had recently ruled that, or were considering whether, Anti-Steering Rules are anticompetitive and subject to forcible rescission or modification.

96.     In response to these developments, Amex devised a program to render itself impervious to any attempt by merchants to mount a broad challenge to Amex's Anti-Steering Rules. Under this program, Amex's merchant representatives, or "client managers," were directed to obtain collective action waivers from all merchants, even the largest and most powerful. Amex then set about exercising its considerable market power, demanding that, as a condition of being permitted to accept American Express cards, merchants execute waivers of the right to bring antitrust challenges on any collective basis.

97.     The resulting contractual provisions take several forms, depending upon the bargaining power of the merchant. But, in all or at least in the vast majority of cases, the merchant is required to waive the full panoply of rights to engage in collective action, or to seek market-wide relief, just as in the small merchant form agreements.

98.     The Collective Action Bans are intended to prevent challenges to American Express's anticompetitive conduct. Where a Collective Action Ban would not have the effect of precluding a merchant from challenging Amex's conduct—*e.g.*, where a merchant has sufficient

damages and other interests at stake to warrant actually proceeding in a one-on-one arbitration—Amex opts to waive arbitration and allow the claim to proceed in court jointly with the claims of any other merchants who are free of the Collective Action Ban. In other words, American Express has no interest in the Collective Action Ban except to the extent that it precludes challenges to Amex's conduct under the antitrust laws.

## II. THE AMEX COLLECTIVE ACTION BANS ARE UNENFORCEABLE BASED UPON THE VERY TERMS OF THE AMEX AGREEMENT

99.     The market-wide equitable relief plaintiffs seek - reforming the Anti-Steering Rules Amex enforces in the United States – lies squarely in the heartland of the equitable remedies authorized by § 16 of the Clayton Act.  A critical "end to be served" in equitable suits under the Clayton Act, the Supreme Court has long held, is that they effectively pry open to competition a market that has been closed by defendants' illegal restraints."[7]   At its core, the Clayton Act contemplates precisely the relief plaintiffs seek here.

100.     Granting a single merchant the right to surcharge and steer Amex cards would not make the cost of card acceptance transparent to consumers and thus give consumers an incentive to switch to cheaper cards, and would therefore not compel Amex or its rivals to engage in price competition.  Only market-wide injunctive relief would allow plaintiffs to "effectively pry open" competition in this market.

101.     But, as set forth herein, the very terms of the Amex Collective Action Bans prohibit plaintiffs from reforming Amex's anti-surcharging rules on a market-wide basis.  Under the terms of the Amex bans, once Amex compels arbitration, the plaintiff cannot consolidate or aggregate their claims with any other merchant, nor participate as a class representative or even a non-

---

[7] *Zenith Radio Corporation v. Hazeltine Research Co. Inc.*, 395 U.S. 100, 133 (1969), *quoting, International Salt Inc. v. United States*, 332 U.S. 392, 401 (1947).

representative member of the class, nor can the arbitrator grant an award that would affect any merchant other than the plaintiff.  The Amex Collective Action Bans would effectively prohibit plaintiffs' ability to vindicate their rights under the antitrust laws and therefore the bans cannot be enforced to prohibit the plaintiffs from obtaining a market-wide injunction.  As Justice Scalia recently made crystal clear, the vindication of rights doctrine "would certainly cover a provision in an arbitration agreement forbidding the assertion of certain statutory rights," and particularly "prospective waiver of a party's right to pursue statutory remedies."[8]

102.    Moreover, the Amex contract specifically states that "if any portion of this [class action waiver] is deemed invalid or unenforceable, then this entire [arbitration clause] shall not apply."  Since the class action waiver is invalid and unenforceable to preclude plaintiffs' market-wide equitable relief in this case, the entire arbitration clause in the Amex agreement is void and the plaintiffs are also entitled to seek both class-wide injunctive relief and damages in federal court.

## CLASS ACTION ALLEGATIONS

103.    Plaintiffs bring this action as a class action under Fed. R. Civ. P. 23(b)(3) for monetary damages, and under Fed. R. Civ. P. 23(b)(2) to restrain an unlawful practice under Section One of the Sherman Act. In addition, California merchants bring this action to restrain unlawful practices under California law.

104.    Plaintiffs seek certification of the following classes:

    a) The Amex Accepting Merchants ("**Amex Class**"), represented by Animal Land, Inc., Il Forno, Inc., Italian Colors Restaurant, Jasa Inc., Lopez-Dejonge, Inc., Plymouth Oil Corp. (d/b/a Liberty Gas Station), and Clam Lake Partners, LLC, includes (a) a damages class, and (b) an injunctive class of all merchants that have accepted American Express credit cards, during the longest period of

---

[8] *Am. Express Co. v. Italian Colors Rest.*, 570 U.S. 228, 235-36 (2013); *see also Parisi v. Goldman Sachs and Co.*, 710 F.3d 483, 487 (2d Cir. 2013) ("[L]anguage [in arbitration clause] insulating a [defendant] from damages and equitable relief renders the clause unenforceable") (quoting *Paladino v. Avnet Computer Techs, Inc.*, 134 F.3d 1054, 1062 (11th Cir. 1998)).

time permitted by the applicable statute of limitations (the "Statutory Period") within the United States. The Amex Class does not include: (i) Amex, its agents, subsidiaries or affiliates; (ii) any governmental entity; (iii) any bank issuer of American Express branded credit cards; or (iv) Amex's co-brand card issuer partners—namely, American Airlines, Delta Air Lines, Hilton Honors Worldwide, Starwood Hotels & Resorts Worldwide, Macy's, Bloomingdales, Lowe's and Mercedes-Benz.

b) The Visa/MasterCard/Discover Accepting Merchants ("**V/MC/D Class**"), who do not accept Amex cards, represented by Qwik Lube, LLC, and LaJolla Auto Tech, Inc., includes (a) a damages class, and (b) an injunctive class of all merchants that have accepted Visa, MasterCard, and Discover credit cards, during the longest period of time permitted by the applicable statute of limitations (the "Statutory Period") within the United States. The V/MC/D Class does not include: (i) Amex, its agents, subsidiaries or affiliates; (ii) any governmental entity; (iii) any bank issuer of American Express branded credit cards; or (iv) Amex's co-brand card issuer partners—namely, American Airlines, Delta Air Lines, Hilton Honors Worldwide, Starwood Hotels & Resorts Worldwide, Macy's, Bloomingdales, Lowe's and Mercedes-Benz.

c) The California subclasses also assert claims under California state law. The California Subclasses consist of: (1) a subclass of all merchants that have accepted Amex credit cards during the Statutory Period within California ("**California Amex Subclass**"), represented by Plaintiff Il Forno, Inc. and Italian Colors Restaurant, and (2) a subclass of all merchants that have accepted Visa, MasterCard, and/or Discover credit cards during the Statutory Period within California ("**California V/MC/D Subclass**"), but who do not accept Amex cards, represented by LaJolla Auto Tech, Inc. The California Subclasses do not include: (i) Amex, its agents, subsidiaries or affiliates; (ii) any governmental entity; (iii) any bank issuer of American Express branded credit cards; or (iv) Amex's co-brand card issuer partners—namely, American Airlines, Delta Air Lines, Hilton Honors Worldwide, Starwood Hotels & Resorts Worldwide, Macy's, Bloomingdales, Lowe's and Mercedes-Benz.

105.    The members of the Classes are so numerous that joinder of all members is impracticable.

106.    Questions of law or fact common to the members of the Classes predominate over any questions affecting only individual members, including:

a) Whether Amex uses substantial market power to impose the Anti-Steering Rules on merchants;

b) Whether Amex's Anti-Steering Rules have the anticompetitive effect of restraining interbrand competition among credit card networks;

c) Whether Amex's Anti-Steering Rules have the net anticompetitive effect of raising consumer prices for goods and services sold by all merchants that accept Amex, Visa, or MasterCard credit cards;

d) Whether Amex's Anti-Steering Rules have the net anticompetitive effect of raising overall transaction costs for goods and services purchased by all credit card consumers;

e) Whether the plaintiffs and class members are entitled to equitable and injunctive relief, and the nature of such relief; and

f) The appropriate measure of damages for the injury sustained by plaintiffs and other class members as a result of Amex's unlawful activities.

107. The claims of the plaintiffs identified above are typical of the claims of the respective Classes.

108. Plaintiffs and their counsel will fairly and adequately represent the interests of the Classes. Plaintiffs have retained counsel competent and experienced in complex antitrust and class action litigation.

109. Amex has acted and continues to act on grounds that are generally applicable to the Classes, such that final injunctive relief with respect to the Amex and V/MC Classes, and to the California Subclasses, as a whole is appropriate, within the meaning of Federal Rule of Civil Procedure 23(b)(2).

110.    This class action is superior to any other method for the fair and efficient adjudication of this dispute. There will be no significant difficulty in the management of this class action.

## CAUSES OF ACTION

### FIRST CLAIM FOR RELIEF

*On Behalf Of The Amex Class, For Violation Of Section One Of The Sherman Act,*
*Based On The Anti-Steering Rules*

111.    Plaintiffs repeat and reallege each of the foregoing allegations as though fully set forth herein.

112.    Section One of the Sherman Act prohibits contracts that unreasonably restrain trade. Among other things, it prohibits a defendant from imposing anticompetitive vertical restraints which injure competition in a relevant market by unreasonably restricting, stifling, or foreclosing interbrand price competition.

113.    Amex has caused such actual detrimental effects on interbrand competition by reason of the its Anti-Steering Rules, constituting the unlawful exercise of market power.

114.    Amex uses its substantial market power to impose the Anti-Steering Rules as a requirement to obtain Amex transactions—an unlawful contract in unreasonable restraint of trade.

115.    By imposing the Anti-Steering Rules, Amex is able to set and control supracompetitive overall prices in the relevant market.

116.    The Anti-Steering Rules are anticompetitive. Among the anticompetitive effects is the insulation of Amex against any competitive threat from a rival offering cheaper or more efficient credit card services.

117.    There exist no procompetitive justifications for the Anti-Steering Rules. On the merchant side of the transactional market, any such justification is outweighed by the substantial

anticompetitive effects of the practice in the market, including stifling of price competition between the credit card networks. On the consumer side of the market, any procompetitive benefits are enjoyed only by a limited group of Amex premium cardholders, while all consumers incur increased transaction costs and retail prices as a result of the anticompetitive restraints imposed by Amex's Anti-Steering Rules.

118.     Amex's cardholder rewards and benefits do not offset the anticompetitive effects of the Anti-Steering Rules.

119.     The Anti-Steering Rules are not necessary to accomplish any legitimate procompetitive benefit and there are less restrictive alternatives to achieving any such identified benefit. The absence of Anti-Steering Rules will not cause the collapse or materially jeopardize the viability of Amex.

120.     As a direct and foreseeable result of Defendants' imposition of the Anti-Steering Rules, the Amex Class has suffered damages in an amount to be determined at trial.

121.     As a direct and foreseeable result of Defendants' imposition of the Anti-Steering Rules, the Amex Class has suffered and will continue to suffer economic injury.

122.     Defendants' imposition and enforcement of the Anti-Steering Rules is likely to continue if not enjoined.

## SECOND CLAIM FOR RELIEF

*On Behalf Of The V/MC/D Class, For Violation Of Section One Of The Sherman Act, Based On The Anti-Steering Rules*

123.     Plaintiffs repeat and reallege each of the foregoing allegations as though fully set forth herein.

124.     As a direct and foreseeable result of Defendants' imposition of the Anti-Steering Rules, the V/MC/D Class has suffered damages in an amount to be determined at trial.

125.    As a direct and foreseeable result of Defendants' imposition of the Anti-Steering Rules, the V/MC/D Class has suffered and will continue to suffer economic injury.

126.    Defendants' imposition and enforcement of the Anti-Steering Rules is likely to continue if not enjoined.

### THIRD CLAIM FOR RELIEF

*On Behalf of the Amex Class,*
*For Violation of Section One of the Sherman Act,*
*Based on the Collective Action Bans*

127.    Plaintiffs repeat and reallege each of the foregoing allegations as though fully set forth herein.

128.    Amex uses its substantial market power to impose the Collective Action Bans on Plaintiffs and the Classes with the intent and effect of contractually immunizing itself from any challenge under Rule 23(b)(2) seeking to enjoin the anticompetitive effects of its Anti-Steering Rules.

129.    Because no singular enforcement can vitiate the market-wide competitive restraint imposed by Amex's Anti-Steering Rules, the Amex Class has suffered and continues to suffer economic injury as a result of Amex's anticompetitive Collective Action Bans.

### FOURTH CLAIM FOR RELIEF

*On Behalf of the California Subclasses,*
*For Violation of the California Antitrust Laws*

130.    The representatives of the California Subclasses repeat and reallege each of the foregoing allegations as though fully set forth herein.

131.    The Anti-Steering Rules, which Amex imposes on and enforces with respect to California merchants, represent an unlawful contract in unreasonable restraint of trade in violation of California's antitrust laws—the Cartwright Act, California Business and Professional Code §§

16700 *et seq.* These unlawful contracts were entered into and effectuated within the State of California.

132.    The Anti-Steering Rules have numerous additional anticompetitive effects, including the inflationary pressure they exert on consumer goods and services, the entrenchment of Amex's market position and the insulation of Amex against any competitive threat from a rival offering cheaper or more efficient credit card services.

133.    As a direct and foreseeable result of Defendants' imposition of the Anti-Steering Rules, the California Subclasses have suffered and continues to suffer irreparable injury for which there is no adequate remedy at law.

134.    As a direct and foreseeable result of Defendants' imposition of the Anti-Steering Rules, the California Subclasses have suffered damages in an amount to be determined at trial.

135.    Defendants' imposition and enforcement of the Anti-Steering Rules is likely to continue if not enjoined.

### FIFTH CLAIM FOR RELIEF

*On Behalf of the California Subclass,*
*For Violation of the California Unfair Competition Law*

136.    The representatives of the California Subclasses repeat and reallege each of the foregoing allegations as though fully set forth herein.

137.    As alleged above, Amex has engaged in and continues to engage in unlawful and unfair practices, including practices in violation of Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, all in violation of the Unfair Competition Law, California Business and Professional Code §§ 17200 *et seq.*, by entering into contracts in an unreasonable restraint of trade within the State of California in violation of the Sherman Act and the Cartwright Act, California Business and Professional Code §§ 16700 *et seq.*

39

138.     As a direct and foreseeable result of Defendants' imposition of the Anti-Steering Rules, the California Subclasses have suffered and continue to suffer irreparable injury for which there is no adequate remedy at law.

139.     As a direct and foreseeable result of Defendants' imposition of the Anti-Steering Rules, the California Subclasses have suffered damages in an amount to be determined at trial.

140.     Defendants' imposition and enforcement of the Anti-Steering Rules is likely to continue if not enjoined.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully seek an Order:

A. Directing that the instant separate claims for damages and injunctive relief may be prosecuted as a class action, on behalf of the classes defined above, under Fed. R. Civ. P. 23(b)(2);

B. Directing that the instant claims for damages may be prosecuted as a class action, on behalf of the classes defined above, under Fed. R. Civ. P. 23(b)(3);

C.     Declaring that Amex's Anti-Steering Rules are illegal;

D.     Enjoining Amex's Anti-Steering Rules;

E.     Declaring that the Collective Action Ban Provisions are unenforceable;

F.     Awarding damages in an amount to be determined at trial and then trebled;

G.     Awarding attorneys' fees and costs of suit; and

H.     Granting such other and further relief as this Court may deem just and proper.

PLAINTIFFS DEMAND A JURY TRIAL ON ALL ISSUES TRIABLE TO A JURY.

Dated: December 17, 2018                    Respectfully submitted,

                                            */s/ Michael D. Hausfeld*
                                            Michael D. Hausfeld
                                            HAUSFELD LLP
                                            1700 K Street, NW
                                            Suite 650
                                            Washington, DC 20006
                                            Phone: (202) 540-7200
                                            mhausfeld@hausfeld.com

                                            Irving Scher
                                            Scott A. Martin
                                            HAUSFELD LLP
                                            33 Whitehall Street
                                            14th Floor
                                            New York, NY 10004
                                            Phone: (646) 357-1100
                                            ischer@hausfeld.com
                                            smartin@hausfeld.com

                                            *Interim Lead Counsel for the*
                                            *Class Plaintiffs*

                                            Mark Reinhardt
                                            Mark A. Wendorf
                                            REINHARDT WENDORF &
                                            BLANCHFIELD
                                            1250 East First National Bank
                                            332 Minnesota Street
                                            St. Paul, MN 55101
                                            (651) 287-2100

                                            Vincent J. Esades
                                            HEINS MILLS & OLSON, P.L.C.
                                            310 Clifton Avenue
                                            Minneapolis, MN 55403
                                            (612) 338-4605

                                            *Counsel for the*
                                            *Class Plaintiffs*