UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

--------------------------------------------------------------------X

IN RE: AMERICAN EXPRESS ANTI-STEERING
RULES ANTITRUST LITIGATION

 

-----------------------------------------------------------------------       **MEMORANDUM & ORDER**

This Document Relates to:                          **11-MD-2221 (NGG) (RER)**

All Individual Merchant Plaintiff Actions

08-CV-2315 (NGG) (RER)
08-CV-2316 (NGG) (RER)
08-CV-2317 (NGG) (RER)
08-CV-2380 (NGG) (RER)
08-CV-2406 (NGG) (RER)
11-CV-0337 (NGG) (RER)
11-CV-0338 (NGG) (RER)

--------------------------------------------------------------------X

NICHOLAS G. GARAUFIS, United States District Judge.

In this set of consolidated antitrust actions (the "MP Actions"), the Merchant Plaintiffs

(the "MPs")[1] challenge under Sections 1 and 2 of the Sherman Antitrust Act, 15 U.S.C. §§ 1-2,

the contracts that they have entered into with Defendants American Express Travel Related

Services Company, Inc. and American Express Company (together, "Amex"). (See Am. Compl.

(Dkt. 814).) Specifically, the MPs challenge Amex's anti-steering rules, referred to as the Non-

Discrimination Provisions ("NDPs"), which are contained in merchant agreements entered into

between Amex and each MP. The MPs seek an order enjoining Amex from enforcing the NDPs,

as well as treble damages for the injuries the MPs allege they have sustained on account of the

NDPs. (See id. ¶ 11.)

---

[1] The MPs are Ahold U.S.A., Inc.; Albertson's LLC; BI–LO, LLC; CVS Pharmacy, Inc.; The Great Atlantic &
Pacific Tea Company, Inc.; H.E. Butt Grocery Co.; Hy-Vee, Inc.; The Kroger Co.; Meijer, Inc.; Publix Super
Markets, Inc.; Raley's Inc.; Rite Aid Corporation; Rite Aid HDQTRS Corp.; Safeway Inc.; Supervalu Inc.; and
Walgreen Co.

Pending before the court is Amex's motion seeking summary judgment as to the MPs' allegations of a one-sided market and the MPs' allegations of an Amex-only market. (See Notice of Mot. to Dismiss (Dkt. 835).) For the following reasons, Amex's motion is GRANTED.

## I.    BACKGROUND

The facts of this case—the procedural history, the restraints on competition, the workings of the credit-card market in general and Amex's platform in particular, etc.—have been discussed at great length in this court's previous opinions in this matter and in the related case brought by the federal government. See In re Am. Exp. Anti-Steering Rules Antitrust Litig. (In re Amex), No. 11-MD-2221 (NGG), 2016 WL 748089, at *1-4 (E.D.N.Y. Jan. 7, 2016); United States v. Am. Exp. Co. (U.S. v. Amex), 88 F. Supp. 3d 143, 149-67 (E.D.N.Y. 2015), rev'd, 838 F.3d 179 (2d Cir. 2016), aff'd sub nom. Ohio v. Am. Exp. Co. (Ohio), 138 S. Ct. 2274 (2018). The court repeats certain facts and aspects of the procedural history here as necessary to introduce and to decide the instant motion.

### A.    Factual Overview

The MPs are retail merchants that have each entered into an American Express Card Acceptance Agreement (the "Agreement") with Amex. (Am. Compl. ¶ 1.) In those Agreements, "and in virtually every other such Agreement that Amex has entered into with a merchant," Amex has included the NDPs, which prevent the merchant "from differentially pricing the use of payment cards, stating a preference for any form of payment, or allowing the retail customer to use different payment cards on differing terms or conditions established by the merchant." (Id.; see id. ¶¶ 2-3 (describing the NDPs).) The MPs claim that these restraints are anticompetitive "because they nullify the operation of the price mechanism, impede competition among credit card networks and suppress output." (Id. ¶ 4; see id. ¶¶ 4-6.) As a result, the MPs allege,

"merchant fees and the net two-sided transaction price for Amex and other credit card networks are higher than the competitive level and higher than they otherwise would be in the absence of Amex's anticompetitive restraints [and] the number of credit card transactions is lower than it otherwise would be in the absence of the Amex restraints." (Id. ¶ 7.)

The MPs allege that the NDPs "have had an actual adverse effect on competition as a whole . . . in that they have reduced output, quality and consumer choice and increased price and barriers to entry in each of the relevant markets and/or submarkets." (Id. ¶ 53.) The MPs seek to proceed to trial with respect to four formulations of the relevant market:

1. a one-sided, all-general purpose credit card ("GPCC") market;

2. a one-sided, Amex-only market;

3. a two-sided, all-GPCC market; and

4. a two-sided, Amex-only market.

(Id. ¶ 11, see id. ¶¶ 56-57, 64.) The MPs assert claims under each cause of action with respect to all four formulations of the relevant market and submarket. (See id. ¶¶ 68-85.)

**B.     Procedural History**

In 2008, certain of the MPs brought suit against Amex in this court. See In re Amex, 2016 WL 748089, at *2 & n.3. As stated above, the MPs allege that the anti-steering rules Amex imposes on merchants that participate in its network are an anticompetitive restraint on trade in violation of the Sherman Act. See Rite Aid Corp. v. Am. Exp. Travel Related Servs. Co., 708 F. Supp. 2d 257, 261-62 (E.D.N.Y. 2010). After answering each MP's complaint, Amex moved for judgment on the pleadings, arguing that all of the MPs' claims were barred by the Sherman Act's four-year statute of limitations. On March 3, 2010, the court denied the motion. Id. at 264; see In re Amex, 2016 WL 748089, at *2.

Meanwhile, in October 2010, the Department of Justice and the attorneys general of eighteen states filed suit against Amex, MasterCard, and Visa (the "Government Action").[2] The MP Actions and the Government Action proceeded to coordinated discovery. In late 2013, Amex moved for summary judgment in both the Government Action and the MP Actions, and moved to consolidate the actions for trial. The court denied Amex's motion for summary judgment in the Government Action in May 2014. See United States v. Am. Exp. Co., 21 F. Supp. 3d 187 (E.D.N.Y. 2014). Separately, the court denied Amex's motion to consolidate the actions for the purpose of trial (Feb. 11, 2014, Order (Dkt. 335)), and stayed the MP Actions during the pendency of a motion for final settlement approval in consolidated class actions that comprise part of the MDL and in which the MPs are putative class members (see Apr. 9, 2014, Order). The court reserved judgment on Amex's motion for summary judgment in the MP Actions.

The Government Action proceeded to a bench trial during the summer of 2014. On February 19, 2015, the court found by a preponderance of the evidence that the specific NDPs challenged by the Government violate Section 1 of the Sherman Act. After receiving additional briefing from the parties to the Government Action, as well as other interested parties including the MPs, the court issued a permanent injunction on April 30, 2015. United States. v. Am. Exp. Co., No. 10-CV-4496 (NGG), 2015 WL 1966352 (E.D.N.Y. Apr. 30, 2015), rev'd, 838 F.3d 179, aff'd sub nom. Ohio, 138 S. Ct. 2274. The court denied Amex's motion to stay the permanent injunction pending appeal. United States v. Am. Exp. Co., No. 10-CV-4496 (NGG), 2015 WL 13735045 (E.D.N.Y. May 19, 2015). Amex then filed a notice of appeal and sought a stay pending appeal from the Second Circuit. Although a three-judge panel of the Second Circuit

---

[2] Visa and MasterCard entered into consent decrees with the Government on the same day that the Government Action was initiated; only Amex remained as a defendant. See In re Amex, 2016 WL 748089, at *2 n.5.

initially denied Amex's motion to stay (Order of USCA (Dkt. 687 in No. 10-CV-4496)), the Second Circuit ultimately entered a temporary stay of the permanent injunction and a temporary stay of the Government Action in this court (Order of USCA (Dkt. 697 in No. 10-CV-4496)).

On September 26, 2016, the Second Circuit reversed this court's judgment in the Government Action, holding that the court erred in excluding the market for cardholders from its definition of the relevant market. See U.S. v. Amex, 838 F.3d at 197, 206-07. Because the Second Circuit found that the Government could not, on the facts of the case, prove net harm to both cardholders and merchants, it directed this court to enter judgment in favor of Amex. Id. at 207. Certain state plaintiffs then sought certiorari, which the Supreme Court granted.[3] Ohio v. Am. Exp. Co., 138 S. Ct. 355 (Mem) (2017). On June 25, 2018, the Supreme Court affirmed the Second Circuit, holding that this court should have included both sides of the Amex platform when defining the relevant market. Ohio, 138 S. Ct. at 2285-86.

Following the Supreme Court's affirmance of the dismissal of the Government Action, matters resumed in the MP Actions. The court granted the MPs leave to file an amended complaint—intended to address some of the deficiencies with the Government Action raised by the Court in Ohio—and set a briefing schedule on various anticipated motions for summary judgment by Amex. (July 10, 2018, Order (Dkt. 811).) The MPs filed the amended complaint on July 27, 2018. (Am. Compl.) Under the original briefing schedule set by the court, Amex was to serve its motions for summary judgment—one as to the allegations of one-sided and Amex-only markets, and one "additional" motion as to the allegation of a two-sided market that includes all GPCCs—on the Merchant Plaintiffs by no later than August 17, 2018. (See July 10,

---

[3] In response to the grant of certiorari, this court stayed all further proceedings in the MP Actions. (Oct. 24, 2017, Order.) The court directed the parties, by no later than 14 days after entry of a decision in Ohio, to "confer and submit a joint letter proposing a schedule for additional motions, if any, and setting forth the parties' availability for trial." (Id.)

2018, Order.) On August 6, 2018, Amex requested that it "be given leave to file a summary judgment motion directed to the Merchant Plaintiffs' allegations regarding competitive harm in a two-sided market after the new discovery is complete." (Aug. 6, 2018, Letter (Dkt. 815) at 2.) The court granted Amex's request and set the briefing schedule on the motion for summary judgment as to the Merchant Plaintiffs' claims on the two-sided, all-GPCC market to take place following the completion of additional fact discovery. (See Aug. 6, 2018, Min. Entry; Aug. 17, 2018, Order.)

On August 17, 2018, Amex served on the Merchant Plaintiffs a motion to dismiss or, in the alternative, for summary judgment. (Amex Mem. in Supp. of Mot. to Dismiss (Dkt. 828 at ECF p.6).) Amex did not answer the amended complaint. The MPs subsequently sought an order from this court compelling Amex to file its answer and defenses to the amended complaint. (Mot. to Compel (Dkt. 828 at ECF p.1).) On September 26, 2018, the court held that, because Amex did not "seek to dismiss any 'claims' in the amended complaint," its motion could not be considered a motion to dismiss, but rather one for summary judgment. In re Am. Exp. Anti-Steering Rules Antitrust Litig. (In re Amex), — F. Supp. —, 2018 WL 4623052, at *4-5, *7 (E.D.N.Y. Sept. 26, 2018). The court ordered Amex to answer the amended complaint, id. at *7, which Amex did on October 10, 2018 (Answer (Dkt. 834)). The court also provisionally terminated the pending briefing schedule on the motion for summary judgment, on the assumption that it would be more efficient to deal with Amex's anticipated summary-judgment motion in one fell swoop after the completion of additional fact discovery. See In re Amex, — F. Supp. 3d —, 2018 WL 4623052, at *7. On October 1, 2018, however, Amex informed the court that it had "decided that it [would] not file a motion for summary judgment directed to Plaintiffs' two-sided market allegations." (Oct. 1, 2018, Amex Letter (Dkt. 832).) Accordingly,

Amex's motion seeking summary judgment as to the MPs' one-sided and Amex-only relevant market allegations was fully briefed on October 12, 2018. (Notice of Mot.; Amex Mem. in Supp. of Mot. for Summ. J. ("Mem.") (Dkt. 836); MPs Opp'n to Mot. for Summ. J. ("Opp'n") (Dkt. 841-1); Amex Reply in Supp. of Mot. for Summ. J. ("Reply") (Dtk. 843-1).)

## II.    LEGAL STANDARD

A court must grant summary judgment when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A 'material' fact is one capable of influencing the case's outcome under governing substantive law, and a 'genuine' dispute is one as to which the evidence would permit a reasonable juror to find for the party opposing the motion." Figueroa v. Mazza, 825 F.3d 89, 98 (2d Cir. 2016) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). "The movant may discharge this burden by showing that the nonmoving party has 'fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" Lantheus Med. Imaging, Inc. v. Zurich Am. Ins. Co., 255 F. Supp. 3d 443, 451 (S.D.N.Y. 2015) (alteration in original) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986)). "'The mere existence of a scintilla of evidence' in support of the non-movant will be insufficient to defeat a summary judgment motion." Transflo Terminal Servs., Inc. v. Brooklyn Res. Recovery, Inc., 248 F. Supp. 3d 397, 399 (E.D.N.Y. 2017) (quoting Anderson, 477 U.S. at 252).

"In determining whether an issue is genuine, '[t]he inferences to be drawn from the underlying affidavits, exhibits, interrogatory answers, and depositions must be viewed in the light most favorable to the party opposing the motion.'" SCW W. LLC v. Westport Ins. Corp., 856 F. Supp. 2d 514, 521 (E.D.N.Y. 2012) (alteration in original) (quoting Cronin v. Aetna Life

Ins. Co., 46 F.3d 196, 202 (2d Cir. 1995)). "[T]he judge's function is not . . . to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Redd v. N.Y. Div. of Parole, 678 F.3d 166, 173-74 (2d Cir. 2012) (quoting Anderson, 477 U.S. at 249). However, "[a] party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment," and "[m]ere conclusory allegations or denials . . . cannot by themselves create a genuine issue of material fact where none would otherwise exist." Hicks v. Baines, 593 F.3d 159, 166 (2d Cir. 2010) (citation and internal quotation marks omitted).

Finally, it bears noting that "[s]ummary judgment is not an all-or nothing proposition." In re Methyl Tertiary Butyl Ether Prods. Liab. Litig., 824 F. Supp. 2d 524, 533 (S.D.N.Y. 2011). A party may move pursuant to Rule 56(a) for summary judgment as to an entire claim or defense, as well as "part of a claim or defense." Id. So, while the court has previously held that the MPs' alternative formulations of the relevant market (and submarket) are not, by themselves, independent claims subject to a Rule 12(b)(6) motion to dismiss, see In re Amex, — F. Supp. 3d —, 2018 WL 4623052, at *7, it is proper for the court to adjudicate the existence of a genuine issue for trial as to each relevant market on a motion for summary judgment.

## III.    DISCUSSION

In order for the MPs' antitrust claims against Amex to succeed, they must define a relevant market in which the allegedly uncompetitive behavior exhibited by Amex restrained trade. U.S. v. Amex, 88 F. Supp. 3d at 170 ("In order to determine whether Amex's NDPs violate the Sherman Act, the court must first determine the contours of the relevant market and thereby define an appropriate context for the remainder of its analysis."); see Ohio, 138 S. Ct. at 2285 & n.7 (holding that market definition is required when analyzing a vertical restraint); In re

8

Aluminum Warehousing Antitrust Litig., 95 F. Supp. 3d 419, 448 (S.D.N.Y. 2015); see also Geneva Pharm. Tech. Corp. v. Barr Labs. Inc., 386 F.3d 485, 506-07 (2d Cir. 2004) ("Under the rule of reason, the plaintiffs bear an initial burden to demonstrate the defendants' challenged behavior had an actual adverse effect on competition as a whole in the relevant market." (citation and internal quotation marks omitted)).

For antitrust purposes, a relevant market has two components: a "product market" and a "geographic market." See Concord Assocs. v. Entm't Props. Tr., 817 F.3d 46, 52 (2d Cir. 2016). Here, as in the Government Action, all "parties have agreed that the relevant geographic market is the Territorial United States," U.S. v. Amex, 88 F. Supp. 3d at 170, so only the relevant product market is at issue. "Under the federal antitrust laws, a product market is 'composed of products that have reasonable interchangeability' from the perspective of the relevant consumer with the product sold by the defendant firm." Id. (quoting United States v. E.I. du Pont de Nemours & Co., 351 U.S. 377, 404 (1956)); see Concord Assocs., 817 F.3d at 52 ("A relevant product market consists of products that have reasonable interchangeability for the purposes for which they are produced—price, use and qualities considered." (citation and internal quotation marks omitted)). If a product is "interchangeable," consumers retain the ability to "switch to a substitute," thus "restrain[ing] a firm's ability to raise prices above the competitive level." City of New York v. Grp. Health Inc., 649 F.3d 151, 155 (2d Cir. 2011) (quoting Geneva Pharm., 386 F.3d at 496).

"[M]arket definition is a deeply fact-intensive inquiry." Chapman v. N.Y. State Div. for Youth, 546 F.3d 230, 238 (2d Cir. 2008) (quoting Todd v. Exxon Corp., 275 F.3d 191, 199 (2d Cir. 2008)). Still, though, "a plaintiff whose proposed relevant market or allegation of market power is challenged by a motion for summary judgment must come forward with admissible

evidence sufficient to raise a genuine issue of fact for trial as to the market definition or the existence of market power." Emigra Grp. v. Fragomen, Del Rey, Bernsen & Loewy, 612 F. Supp. 2d 330, 347 (S.D.N.Y. 2009); Disenos Artisticos E Industriales, S.A. v. Work, 714 F. Supp. 46, 49 (E.D.N.Y. 1989) (stating that summary judgment should be granted where a plaintiff's definition of the relevant market "verges on legal insufficiency and is unsupported by any probative or credible evidence"); cf. City of New York v. Grp. Health Inc., No. 06-CV-13122 (RJS), 2010 WL 2132246, *5 (S.D.N.Y. May 11, 2010) (dismissing antitrust claim because the plaintiff's "market definition [was] inadequate as a matter of law"), aff'd, 649 F.3d 151.

Amex's motion for summary judgment requires the court to ask whether three of the MPs' four proposed market definitions can succeed as a matter of law. While Amex has not moved for summary judgment as to the MPs' two-sided, all-GPCC market definition, the other three definitions—one-sided, Amex-only; one-sided, all-GPCC; and two-sided, Amex-only—remain subject to this motion. The court agrees with Amex that these three market definitions cannot succeed as a matter of law, so the court GRANTS Amex's motion for summary judgment.

A.      **One-Sided Market Allegations**

1.      One- Versus Two-Sided Markets

Because Amex moves for summary judgment on the grounds that the MPs' one-sided market allegations are faulty as a matter of law, the court begins its analysis by defining "one-sided" and "two-sided" platforms and examining how the Supreme Court construed these terms in Ohio.

"[A] two-sided platform offers different products or services to two different groups who both depend on the platform to intermediate between them." <u>Ohio</u>, 138 S. Ct. at 2280; <u>see also</u> <u>id.</u> at 2298 (Breyer, J., dissenting) ("[T]here are four relevant features of [two-sided platforms] on the majority's account: they (1) offer different products or services, (2) to different groups of customers, (3) whom the 'platform' connects, (4) in simultaneous transactions."). As the Court has stated, a credit-card network is an example of a two-sided platform because of the simultaneous transactions it facilitates between cardholders and merchants:

> For cardholders, the network extends them credit, which allows them to make purchases without cash and to defer payment until later. . . . For merchants, the network allows them to avoid the cost of processing transactions and offers them quick, guaranteed payment.

<u>Id.</u> at 2280 (majority op.); <u>see</u> <u>U.S. v. Amex</u>, 838 F.3d at 185-86.

While "it is not always necessary to consider both sides of a two-sided platform" when defining the relevant market for antitrust purposes, courts must consider both sides of the platform when it exhibits two features typical of two-sided platforms. <u>See</u> <u>Ohio</u>, 138 S. Ct. at 2286. First, the court must ask if the platform exhibits "what economists call 'indirect network effects.'" <u>Id.</u> at 2280 (citation omitted). As this court has previously recognized, "[i]ndirect network effects exist when the number of agents or the quantity of services bought on one side of a two-sided platform affects the value that an agent on the other side of the platform can realize." <u>U.S. v. Amex</u>, 88 F. Supp. 3d at 155; <u>see</u> <u>Ohio</u>, 138 S. Ct. at 2280 ("Indirect network effects exist where the value of the two-sided platform to one group of participants depends on how many members of a different group participate."). Second, the court must ask if the platform exhibits "interconnected pricing and demand." <u>Ohio</u>, 138 S. Ct. at 2286. That is, in certain cases, the platform must "[s]trik[e] the optimal balance of the prices charged on each side of the

platform" so as to "maximize the value of [the platform's] services and to compete with their rivals." Id. at 2281.

In Ohio, the Supreme Court held that credit-card networks are two-sided platforms.[4] Id. at 2285. The court found that credit-card networks exhibit indirect network effects: the value of a credit card to cardholders increases when more merchants accept the card, and the card is more valuable to merchants when more cardholders use it. Id. at 2281. On the flip side, a credit-card network that raises the price on either cardholders or merchants risks entering "a feedback loop of declining demand" due to the likelihood that members of the affected side will leave the platform, thus decreasing the value to the other side and increasing the risk that members of that side will in turn leave the platform. See id. at 2281, 2285. As for interconnected pricing and demand, the Court noted that credit-card networks "often charge cardholders a lower fee than merchants because cardholders are more price sensitive." Id. at 2281. But even if the network is losing money on the cardholder side—usually because the network offers rewards, such as airline miles, as an incentive for cardholders to use the card—the network is able to remain viable "because increasing the number of cardholders increases the value of accepting the card to merchants and, thus, increases the number of merchants who accept it." Id.; see also id. at 2286 ("To optimize sales, the network must find the balance of pricing that encourages the greatest number of matches between cardholders and merchants."). The network "can then charge those merchants a fee for every transaction (typically a percentage of the purchase price)." Id. at

---

[4] The Court also noted that credit-card networks are a particular kind of two-sided platform: a transaction platform, which "suppl[ies] only one product—transactions." Ohio, 138 S. Ct. at 2286 (internal quotation marks omitted). "In the credit-card market, these transactions are jointly consumed by a cardholder, who uses the payment card to make a transaction, and a merchant, who accepts the payment card as a method of payment." Id. (internal quotation marks omitted).

2281.[5] Taken together, these features confirm that "courts must include both sides of the platform—merchants and cardholders—when defining the credit-card market." Id. at 2286.

## 2. Stare Decisis

The doctrine of stare decisis compels a district court to abide by the legal decisions of higher courts in the same jurisdiction.[6] See, e.g., Dobbs v. Anthem Blue Cross & Blue Shield, 600 F.3d 1275, 1279 (10th Cir. 2010) (setting forth "the general rule that a district court is bound by decisions made by its circuit court"); Dodge v. County of Orange, 282 F. Supp. 2d 41, 80 (S.D.N.Y. 2003) ("[V]ertical stare decisis provides little, if any, leeway for a district court judge to stray from Court of Appeals precedent."); Evan H. Caminker, Why Must Inferior Courts Obey Superior Court Precedents?, 46 Stan. L. Rev. 817, 818 (1994) ("[L]ongstanding doctrine dictates that a court is always bound to follow a precedent by a court 'superior' to it."); see also Hart v. Massanari, 266 F.3d 1155, 1170 (9th Cir. 2001) ("[C]aselaw on point is the law."). While courts and commentators may disagree as to whether vertical stare decisis is a constitutional command, see Winslow v. FERC, 587 F.3d 1133, 1135 (D.C. Cir. 2009) (quoting U.S. Const. art. III, § 1), or simply a "contingent" but "pragmatic" approach to decisionmaking, see Trammell, supra note 7, at 582-83 (citing Caminker, supra, at 867), the endurance of vertical stare decisis reflects a general and sensible belief that legal outcomes should be predictable and consistent, see Colonial Realty Corp. v. MacWilliams, 381 F. Supp. 26, 28 (S.D.N.Y. 1974) (noting "the interests of the legal system in consistency and uniformity" as "the central values" underlying the

---

[5] In a subsequent portion of the Ohio opinion, the Court found that the evidence does not support the Government's contention that Amex's antisteering provisions are the cause of any increases in merchant fees. 138 S. Ct. at 2288. Instead, the Court found that that the cause of increased merchant fees is "increased competition for cardholders and a corresponding marketwide adjustment in the relative price charged to merchants." Id.

[6] This form of stare decisis is commonly referred to as "vertical stare decisis," as distinguished from "horizontal stare decisis," which refers to a court's adherence to its own past decisions. See, e.g., Joseph W. Mead, Stare Decisis in the Inferior Courts of the United States, 12 Nev. L.J. 787, 788 (2012); Alan M. Trammell, Precedent and Preclusion, 93 Notre Dame L. Rev. 565, 581 (2017).

doctrine of vertical stare decisis); 18 James W. Moore, Moore's Federal Practice § 134.01[1], at 134-9 (3d ed. 2018).

Although stare decisis is, as a formal matter, concerned with fidelity to precedent, it often functions as a type of preclusion doctrine—similar to res judicata, or "law of the case." See 18B Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice and Procedure § 4478.5, at 814 (2d ed. 2002). Modern commentators have argued that there is little difference functionally between precedent and preclusion: both operate inflexibly to bind nonparties to prior decisions, and both can bind as to certain questions of law or fact. See Max Minzner, Saving Stare Decisis: Preclusion, Precedent, and Procedural Due Process, 2010 B.Y.U. L. Rev. 597, 608-11; Trammell, supra note 7, at 585-86; see also 18A Wright, Miller & Cooper, Federal Practice and Procedure § 4449, at 335 & n.30 (3d ed. 2017) ("[I]n some special settings [a judgment] may achieve a particularly potent force that approaches preclusion under the name of stare decisis . . . ."). At the same time, the argument for applying stare decisis inflexibly—that is, for a court to declare itself constrained by a higher court's prior judgment—is more persuasive where the question is one that has already been the subject of litigation "between the same parties." See 18 Wright, Miller & Cooper, Federal Practice and Procedure § 4425, at 701 (3d ed. 2016).

While it is not necessary at this juncture to define the full scope of the doctrine of stare decisis, it bears emphasizing that a decision can be given stare decisis effect even when the facts of the subsequent case are dissimilar. See Haith ex rel. Accretive Health, Inc. v. Bronfman, 928 F. Supp. 2d 964, 971 (N.D. Ill. 2013) ("The reach of Supreme Court decisions are not limited to the particular facts and circumstances presented in the case being decided; lower courts must apply the reasoning of those decisions even to cases that are factually dissimilar."). The

arguments for applying stare decisis as a form of preclusion may be heightened the more similar the facts, see Rodriguez v. City of Albuquerque, No. 07-CV-901, 2008 WL 5978925, at *2 (D.N.M. Dec. 22, 2008) (stating that vertical stare decisis "should effectively foreclose future litigation" as to cases that "all involve . . . the exact same set of facts"), but slight—or great— distinctions in factual circumstances between cases cannot save a party from being bound by a legal determination. It is thus incumbent upon a court construing a prior decision to give broad effect to the earlier case's legal principles and apply them as relevant. See Walker v. Georgia, 417 F.2d 5, 8 (5th Cir. 1969) (Tuttle, J.) ("[U]nless the Supreme Court expressly limits its opinion to the facts before it, it is the principle which controls and not the specific facts upon which the principle was decided.").

### 3. Whether the MPs May Proceed Under a One-Sided Market Theory

Ohio's holding is clearly stated: "[C]redit-card networks are two-sided platforms." 138 S. Ct. at 2285. Despite this seemingly ironclad language, the MPs contend that the holding in Ohio is irrelevant to the instant action because market definition is a question of fact. (Opp'n at 3; see id. at 6.) Further, they submit that it would be inappropriate to apply the Ohio holding to this case given that these are different "cases based on different facts." (Id. at 3.) In response, Amex states that the Supreme Court's holding in Ohio binds this court to reject the MPs' one-sided market allegations because the Supreme Court set forth a "conclusion[] of law" contrary to the MPs' legal formulation, and because "the economic activity and the basic facts are the same" between the Government Action and the MP Actions. (Reply at 3-4 & n.6.) The court agrees with Amex.

It strains credulity for the MPs to claim that this case is essentially dissimilar from the Government Action. (See Opp'n at 3-4.) As in the Government Action, the plaintiffs claim that

15

Amex is liable under the Sherman Act for restraining trade by including the NDPs in its merchant contracts. As in the Government Action, the plaintiffs' allegations are dependent on the economic realities of the credit-card market and the unique features of how Amex operates. And as in the Government Action, the plaintiffs seek to define the "relevant market" for Sherman Act purposes at least in part by reference to Amex's interactions with merchants alone, rather than by simultaneously scrutinizing Amex's interactions with merchants <u>and</u> cardholders.[7]

The MPs argue that this case is distinguishable from the one that both the Supreme Court and the Second Circuit decided in Amex's favor because the MPs "have come forward with different relevant market facts." (Opp'n at 4.) As far as the court can tell, the MPs do not argue that there is actually anything different about the facts at issue in this action. Rather, the MPs want the <u>chance</u> to make arguments that they claim were not properly presented in the Government Action and that would, in their estimation, result in a different legal outcome from that reached in <u>Ohio</u>. These arguments include: that Amex is a "mature" market, thus calling into question whether it exhibits indirect network effects (Opp'n at 9-12); and that "there is abundant evidence that Amex does not 'balance' the prices on the two sides of its platform and that those prices are not 'relative' to each other or 'interconnected'" (<u>id.</u> at 12-15). The MPs are first incorrect that the Supreme Court must have explicitly considered an argument in order for its opinion to be binding as to that argument.[8] While the <u>Ohio</u> opinion does not mention the arguments made by the Government and its <u>amici</u> as to market maturity (<u>see</u> Opp'n at 12), the

---

[7] Amex also points out that the MPs, in earlier filings in this action, admitted that "the basic facts and law in the Government [Action] and [the MP Actions] are identical." (Reply at 3.)

[8] This court's construction of the <u>Ohio</u> holding does not violate the general rule that courts should not read Supreme Court opinions as "contain[ing] holdings on matters the Court did not discuss and which, presumably, the parties did not argue," <u>Sweeney v. Westvaco Co.</u>, 926 F.2d 29, 40 (1st Cir. 1991) (Breyer, C.J.). (<u>See also</u> Opp'n at 12.) The relevant question in this instance is whether the Court discussed, and issued a holding on, whether Amex is a two-sided transaction platform and whether the "relevant market" for antitrust purposes contains both sides of the platform. Because the Court did so, <u>see Ohio</u>, 138 S. Ct. at 2286-87, the question of whether this holding incorporated the MPs' maturity theory is irrelevant.

Court still held that "two-sided transaction platforms exhibit more pronounced indirect network effects" and thus that both sides of the platform must be included in the relevant-market analysis, Ohio, 138 S. Ct. at 2286-87.[9] Similarly, while the Ohio opinion may not critically engage with the claim that "Amex brings merchants and cardholders together and that credit card transactions occur simultaneously on both sides of the platform" (Opp'n at 14), it is clear that the Supreme Court based its holding on this assumption, even if it was "unchallenged" (see id.). See Ohio, 138 S. Ct. at 2286 ("[T]wo-sided transaction platforms exhibit . . . interconnected pricing and demand. . . . In the credit-card market, these transactions are jointly consumed by a cardholder, who uses the payment card to make a transaction, and a merchant, who accepts the payment card as a method of payment." (internal quotation marks omitted)). The upshot of this analysis is that the MPs are wrong that Ohio "did not . . . hold that credit card platforms"—in particular, the Amex platform—"are two-sided markets as a matter of law." (Opp'n at 6.) While this rule is still subject to case-by-case application, cf. US Airways, 2017 WL 1064709, at *8 ("The relevant market for purposes of antitrust analysis may not be two-sided even though the defendant operates a two-sided platform."), this court may not deviate from the Court's clear application of this rule to the facts of this case.

Nor are the MPs owed an opportunity to upset the Supreme Court's holdings on this matter. As Amex properly identifies, the relevant question is not whether the MPs are precluded

---

[9] In support of their argument regarding market maturity, the MPs point to US Airways, Inc. v. Sabre Holdings Corp., No. 11-CV-2725 (LGS), 2017 WL 1064709 (S.D.N.Y. Mar. 21, 2017), appeal filed, No. 17-983 (2d Cir. Apr. 6, 2017). (See Opp'n at 11.) In US Airways, the district court held that the Second Circuit's opinion in U.S. v. Amex did not foreclose the US Airways jury's finding of a one-sided market based on market maturity, in part because U.S. v. Amex "[did] not address or appear to consider market maturity." 2017 WL 1064709, at *10. But US Airways noted that the finding of a two-sided market in U.S. v. Amex occurred "in a different industry and with very different facts," id., suggesting that the Second Circuit's decision was binding on the facts of the Amex platform, which continue to be present in this case. While U.S. v. Amex and Ohio may not foreclose future antitrust plaintiffs from arguing that a supposedly two-sided market is actually one-sided due to the presence of market maturity, US Airways makes it clear that such an argument cannot survive on the facts of the MP Actions.

as a matter of collateral estoppel and res judicata from making their arguments as to market maturity and the interconnectedness of the Amex platform; the question is whether Ohio held as a matter of law that the MPs' one-sided allegations cannot succeed.[10] (See Reply at 5-6 (citing Taylor v. Sturgell, 553 U.S. 880 (2008), and Allen v. McCurry, 449 U.S. 90 (1980)).) Ohio holds that Amex is a two-sided transaction platform that exhibits indirect network effects and interconnected pricing and demand, see 138 S. Ct. at 2286-87, a decision that is binding on this court as a matter of stare decisis. Cf. US Airways, 2017 WL 1064709, at *10. Any argument that the MPs, as nonparties to the Government Action, did not have a "full and fair opportunity to litigate the claims and issues settled in that suit," Taylor, 553 U.S. at 892 (internal quotation marks omitted), is unavailing.[11]

The court also rejects the MPs' argument that Ohio does not bind this court on the grounds that market definition is typically thought of as a question of fact. (See Opp'n at 3.) The MPs are correct that, as a general rule, the question of market definition "is a highly factual one best allocated to the trier of fact." Meredith Corp. v. SESAC LLC, 1 F. Supp. 3d 180, 219 (S.D.N.Y. 2014) (quoting Fineman v. Armstrong World Indus., Inc., 980 F.2d 171, 199 (3d Cir. 1992)); see Leegin Creative Leather Prods., Inc. v. PSKS, Inc., 551 U.S. 877, 899 (2007) (discussing "[t]he case-by-case adjudication contemplated by the rule of reason"). Just because the definition of a relevant market necessarily involves considerations that must be adjudicated on a case-by-case basis does not, however, it does mean that courts are unable to conclude at the

---

[10] Because vertical stare decisis is an absolute command, see Amy Coney Barrett, Precedent and Jurisprudential Disagreement, 91 Tex. L. Rev. 1711, 1713 (2013), this court is forbidden from revisiting a higher court's binding holding, no matter how little sense a bound party—or this court—may think the applicable rule of law makes.

[11] In Taylor, the Supreme Court specifically recognized the possibility that a nonparty against whom a decision would not necessarily have a preclusive effect could still be barred as a matter of law from litigating "repetitive suits" through application of stare decisis. See 553 U.S. at 893-95; see also Rodriguez, 2008 WL 5978925, at *2 (stating that litigation that involves "the exact same set of facts" as an earlier case would be "effectively foreclose[d]" as a matter of stare decisis).

summary-judgment stage whether a relevant market can exist. See Meredith Corp., 1 F. Supp. 3d at 219 (stating that, on a motion for summary judgment relating to the definition of a relevant market, the court must ask "whether there is sufficient evidence on which a trier of fact could adopt plaintiff's market definition"); cf. Minzner, supra, at 609 ("The distinction between fact and law, while once true, is no longer so clear."). As stated above, the facts in the MP Actions are identical to those in the Government Action. Because the Supreme Court has already answered the exact question presented to this court with respect to the same defendant, the court may not find for the MPs on the basis of their one-sided market allegations.[12] See Powers v. United States, 424 F.2d 593, 601-02 (Ct. Cl. 1970) (stating that stare decisis applies "where the parties, the law, and the controlling facts remain the same, but the facts are separable in the two causes of action"); cf. McCabe v. Lifetime Entm't Servs., LLC, No. 17-CV-908 (ERK) (SJB), 2018 WL 1521860, at *16 (E.D.N.Y. Jan. 4, 2018) (finding that stare decisis precludes certification of a class to which the Second Circuit previously denied certification in a separate action), R&R adopted, Order (E.D.N.Y. Mar. 26, 2018), appeal filed, No. 18-1149 (2d Cir. Apr. 19, 2018); Rodriguez, 2008 WL 5978925, at *2 (stating that courts should apply stare decisis to foreclose relitigation of cases involving "the exact same set of facts").

*    *    *

"[L]ike cases should be treated alike." 18 Moore, supra, § 134.01[1], at 134-9. Taking that command seriously, the court is compelled by the Supreme Court's decision in Ohio and the

---

[12] The cases that the MPs cite in support of their argument that the holding of Ohio cannot be given stare decisis effect are inapposite. (See Opp'n at 3.) In Complaint of Tug Helen B. Moran, Inc., 607 F.2d 1029 (2d Cir. 1979), the Second Circuit found that the apportionment of liability in one negligence case did not bind the district court's apportionment of liability in a subsequent case arising out of a different incident. The holding in Ohio is not a "determination[] of fact," and even if it were, the Second Circuit's consideration of stare decisis in Tug Helen B. Moran would not apply because this case is not one in which there are "different facts and a different record." See id. at 1031. And in United States v. Nolan, 136 F.3d 265 (2d Cir. 1998), the Second Circuit briefly mentioned stare decisis in dicta as a way of expressing the point that the same statute can be interpreted in a variety of ways depending on the factual situation. See id. at 269. That anodyne point is not relevant to the motion before the court.

Second Circuit's decision in U.S. v. Amex to reject the MPs' one-sided market arguments as a matter of law. Accordingly, for the reasons set forth above, the court grants Amex's motion for summary judgment as to the MPs' one-sided market allegations.

**B. Amex-Only Market Allegations**

The second part of Amex's motion for summary judgment requires the court to ask whether this case may proceed to trial under the theory that Amex restrained competition within an Amex-only market.

As stated above, the MPs bear the burden of defining a relevant market within which Amex allegedly restrained trade. There is no dispute as to the geographical market at issue in this case. There is, however, a dispute as to the product market: While both sides agree that the MPs may define the product market by reference to all GPCCs, Amex argues that the MPs may not define a relevant submarket limited to Amex-only credit-card transactions. The court agrees with Amex and grants its motion for summary judgment as to an Amex-only market.

1. Doctrinal Overview

a. *Defining a Relevant Market*

"Defining a relevant product market is 'a process of describing those groups of producers which, because of the similarity of their products, have the ability—actual or potential—to take significant amounts of business away from each other.'" Hamilton Chapter of Alpha Delta Phi, Inc. v. Hamilton Coll., 106 F. Supp. 2d 406, 411-12 (N.D.N.Y. 2000) (quoting Hayden Pub. Co. v. Cox Broad. Corp., 730 F.2d 64, 71 (2d Cir. 1984)). The "outer boundaries" of such a product market are determined by "the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it." Brown Shoe Co. v. United States, 370 U.S. 294, 325 (1962); accord Chapman, 546 F.3d at 237. A product is

reasonably interchangeable if it is "roughly equivalent to another for the use to which [the product] is put." Chapman, 546 F.3d at 238 (citation omitted). Reasonable interchangeability is indicated by the presence of "sufficient cross-elasticity of demand," which "exists if consumers would respond to a slight increase in the price of one product by switching to another product." Todd, 275 F.3d at 201-02; see also Intellective, Inc. v. Mass. Mut. Life Ins. Co., 190 F. Supp. 2d 600, 610 (S.D.N.Y. 2002) ("'Interchangeability' looks to the use or function of the given product as compared to other products. . . . 'Cross-elasticity' is related to interchangeability, and requires a consideration of the extent to which a change in the price of one product will alter demand for another product."). "[A]s a general rule, the process of defining the relevant market requires consideration of cross-elasticity of demand." Hayden Pub., 730 F.2d at 71.

"Reasonable interchangeability sketches the boundaries of a market, but there may also be cognizable submarkets which themselves constitute the appropriate market for antitrust analysis." Geneva Pharm., 386 F.3d at 496 (citing Brown Shoe, 370 U.S. at 325). The Supreme Court has articulated a number of "practical indicia" that may allow "well-defined submarkets" to "constitute product markets for antitrust purposes." Brown Shoe, 370 U.S. at 325. These factors include "industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors."[13] Brown Shoe, 370 U.S. at 325. As the Second Circuit has recognized, however, "[t]he term 'submarket' is somewhat of a misnomer, since the 'submarket' analysis simply clarifies whether two products are in fact 'reasonable' substitutes and are therefore part of the same market." Geneva Pharm., 386 F.3d at

---

[13] The Supreme Court's description of these factors as "practical indicia" indicates that this list is not intended to function as a "litmus test"—"submarkets can exist where only some of these factors are present." Bon-Ton Stores, Inc. v. May Dep't Stores Co., 881 F. Supp. 860, 868 (W.D.N.Y. 1994).

496. Therefore, an antitrust plaintiff seeking to define a relevant product submarket—like a plaintiff seeking to define a broader relevant market—must show that cross-elasticity of demand exists within the submarket. See PSKS, Inc. v. Leegin Creative Leather Prods., Inc., 615 F.3d 412, 418 (5th Cir. 2010) ("[T]he requirements for pleading a submarket are no different from those for pleading a relevant broader market."); Geneva Pharm., 386 F.3d at 496; U.S. Anchor Mfg., Inc. v. Rule Indus., Inc., 7 F.3d 986, 995 (11th Cir. 1993) ("[D]efining a 'submarket' is the equivalent of defining a relevant product market for antitrust purposes."); Pepsico, Inc. v. Coca-Cola Co., No. 98-CV-3282 (LAP), 1998 WL 547088, at *5 (S.D.N.Y. Aug. 27, 1998) ("Ultimately, a 'submarket' definition turns on the same inquiry as a 'market' definition—whether the products in a proposed submarket are reasonably interchangeable in use or production with products in the broader market." (citation and internal quotation marks omitted)). But see Geneva Pharm., 386 F.3d at 496 (analyzing the "competitive pressures" that create a submarket for generic warfarin sodium in spite of the "[f]unctional interchangeability" between the brand name drug and its chemically identical generic equivalent).

b.      *Single-Brand Markets*

It is an understatement to say that single-brand markets are disfavored. From nearly the inception of modern antitrust law, the Supreme Court has expressed skepticism of single-brand markets, stating that courts should not look at the power that certain manufacturers "have over their trademarked products" when asking whether monopolization exists, but rather that "[i]llegal [market] power must be appraised in terms of the competitive market for the product." E. I. du Pont, 351 U.S. at 393 (emphasis added). Accordingly, time and time again, courts in this circuit have rejected attempts by antitrust plaintiffs to limit the relevant market to a single brand or product. Mooney v. AXA Advisors, L.L.C., 19 F. Supp. 3d 486, 500 (S.D.N.Y. 2014); see, e.g.,

Planetarium Travel, Inc. v. Altour Int'l, Inc., 97 F. Supp. 3d 424, 429 (S.D.N.Y. 2015) (rejecting plaintiff's attempt to limit product market to one airline-ticket-purchasing network); Bookhouse of Stuyvesant Plaza, Inc. v. Amazon.com, Inc., 985 F. Supp. 2d 612, 620 (S.D.N.Y. 2013) (rejecting construction of complaint that would allege harm to the U.S. market for e-books that are readable on Amazon's Kindle devices and apps); Global Discount Travel Servs., LLC v. Trans World Airlines, Inc., 960 F. Supp. 701, 705-06 (S.D.N.Y. 1997) (Sotomayor, J.) (rejecting single-brand market allegations where customers were only "locked into" buying TWA tickets because of consumer preference); see also Todd, 275 F.3d at 200 ("Cases in which dismissal on the pleadings is appropriate frequently involve . . . failed attempts to limit a product market to a single brand, franchise, institution, or comparable entity that competes with potential substitutes . . . ."). In order to overcome this heavy presumption, the plaintiff must point to "exceptional market conditions" that have created a market for a single brand that would otherwise be just "one brand in a market of competing brands." Domed Stadium Hotel, Inc. v. Holiday Inns, Inc., 732 F.2d 480, 488 (5th Cir. 1984); see In re Fresh Del Monte Pineapples Antitrust Litig., No. 04-MD-1628 (RMB), 2009 WL 3241401, at *11 (S.D.N.Y. Sept. 30, 2009) (citing Domed Stadium Hotel, 732 F.2d at 488).

To illustrate the difficulties that plaintiffs seeking to define a single-brand market face, the court turns to the seminal case of Queen City Pizza, Inc. v. Domino's Pizza, Inc., 124 F.3d 430 (3d Cir. 1997). See Hack v. President & Fellows of Yale Coll., 237 F.3d 81, 85 (2d Cir. 2000) (citing Queen City Pizza, 124 F.3d at 438), abrogated on other grounds by Swierkiewicz v. Sorema N.A., 534 U.S. 506 (2002). In Queen City Pizza, the Third Circuit affirmed the dismissal of a claim that Domino's monopolized the market of "pizza supplies and ingredients for use in Domino's stores." 124 F.3d at 436. While the plaintiffs' franchise agreements with

Domino's limited their ability to purchase pizza supplies and ingredients that were not approved by Domino's, they could not argue that these other products were in any way distinguishable from the Domino's-approved products except in their designation by Domino's. It was unimportant whether the plaintiffs were <u>able</u>, under the terms of their contract with Domino's, to use non-Domino's-approved pizza supplies and ingredients; instead, the court asked whether "pizza makers in general might use such products"—that is, Domino's-approved and non-Domino's-approved products—"interchangeably." <u>Id.</u> at 438. Because the Domino's-approved and non-Domino's-approved products were interchangeable from the perspective of a general pizza maker, a single-brand market was not appropriate. The overarching question regarding single-brand markets is thus not whether the plaintiffs have articulated certain factors that distinguish a certain product from similar products, but whether the product does not have reasonable interchangeability of use with rival products. <u>See</u> <u>Global Discount Travel Servs.</u>, 960 F. Supp. at 705 ("A consumer might choose to purchase a certain product because the manufacturer has spent time and energy differentiating his or her creation from the panoply of products in the market, but at base, Pepsi is one of many sodas, and NBC is just another television network.").

There is one situation in which courts generally agree that single-brand markets can succeed: an "aftermarket," which is "a type of derivative market consisting of consumable goods or replacement components that must be used for the proper functioning of some primary good," IIA Phillip Areeda et al., <u>Antitrust Law: An Analysis of Antitrust Principles and Their Application</u> ¶ 564b, at 421 (4th ed. 2014). <u>See</u> <u>Xerox Corp. v. Media Scis., Inc.</u>, 660 F. Supp. 2d 535, 543-45 (S.D.N.Y. 2009) (discussing <u>Eastman Kodak Co. v. Image Tech. Servs., Inc.</u>, 504 U.S. 451 (1992)); <u>Mathias v. Daily News, L.P.</u>, 152 F. Supp. 2d 465, 483 (S.D.N.Y. 2001)

(same). For example, in <u>Eastman Kodak,</u> the Supreme Court permitted an aftermarket composed of companies that service Kodak machines because, from the perspective of owners of Kodak equipment, "service and parts for Kodak equipment are not interchangeable with other manufacturers' service and parts." <u>Eastman Kodak,</u> 504 U.S. at 481-82. District courts in this circuit have recognized single-brand aftermarkets in similar circumstances. <u>See</u> <u>Alt. Electrodes, LLC v. Empi, Inc.,</u> 597 F. Supp. 2d 322, 335 (E.D.N.Y. 2009); <u>Xerox Corp. v. Media Scis. Int'l, Inc.,</u> 511 F. Supp. 2d 372, 385 (S.D.N.Y. 2007).

It is important to make clear that single-brand market definitions are not formally limited to the aftermarket context. <u>See</u> <u>Mooney,</u> 19 F. Supp. 3d at 501. Single-brand market allegations are usually rejected because they "are consistently pled in a manner that lacks plausibility or is otherwise untethered to economic reality." <u>Id.</u> at 500-01. Accordingly, an antitrust plaintiff <u>may</u> succeed in defining a single-brand relevant market if it can establish that "a product's characteristics make it unique or circumstances prevent consumers from substituting alternatives for the same purposes." <u>In re Payment Card Interchange Fee & Merch. Discount Antitrust Litig.,</u> 562 F. Supp. 2d 392, 403 (E.D.N.Y. 2008) (citing IIA Areeda et al., <u>supra,</u> ¶ 563d); <u>see</u> <u>Mooney,</u> 19 F. Supp. 3d at 500-01. In most cases, though, the product at issue—even if distinguishable from other products due to its brand or certain features—will have possible substitutes such that a single-brand market definition is inappropriate. <u>See</u> IIA Areeda et al., <u>supra,</u> ¶ 563d, at 413-14 (listing examples).

2.    Application

The key question regarding the viability of MPs' Amex-only market allegations is whether the transactions[14] produced by Amex are reasonably interchangeable with the

---

[14] The product supplied by Amex is credit-card "transactions." <u>Ohio,</u> 138 S. Ct. at 2286-87. A transaction occurs when Amex facilitates a cardholder's use of her card to buy a good at the same time that it facilitates a merchant's

transactions produced by other GPCCs, such as Visa, MasterCard, and Discover.[15] All parties

agree that, from a cardholder's perspective, the transactions are interchangeable; that is, "if

Amex raises its net two-sided price by increasing the price on the cardholder side (i.e., by

reducing rewards), . . . [Amex] will lose cardholders and sales to MasterCard, Visa or Discover."

(Opp'n at 20; see Amex Mem. at 10.) In Amex's view, that is the end of the inquiry: because

"competition between two-sided transaction platforms does not exist just on one side of the

platform or the other," the admission that competition for transactions exists on the cardholder

side of the platform precludes the court from defining an Amex-only market. (Amex Mem. at

10.) Not so, argue the MPs: they submit that they will be able to present evidence at trial that

cross-elasticity of demand on the merchant side of the platform is "weak or non-existent"—in

other words, that "Amex can raise its net two-sided price by increasing merchant fees while

leaving rewards alone without losing sales to other credit cards"—thus making it inappropriate

for the court to grant summary judgment as to the single-brand submarket allegations. (Opp'n

at 20.)

      The court does not think it prudent to state, as a matter of law, that cross-elasticity of

demand on one side of a two-sided market forecloses the possibility that a single-brand market or

submarket may be appropriate. It is true that one group of participants in the two-sided market

before the court—the cardholders—treats Amex cards interchangeably with other credit cards.

But it is misguided to end the analysis there. If there is a disputed question of fact regarding

whether the merchants treat Amex as interchangeable, there remains an open question as to

---

acceptance of the card to receive payment for the good. See id.; Benjamin Klein et al., Competition in Two-Sided Markets: The Antitrust Economics of Payment Card Interchange Fees, 73 Antitrust L.J. 571, 580 (2006) ("[P]ayment card transactions . . . are jointly consumed by a cardholder, who uses the payment card to make a transaction, and a merchant, who accepts the payment card as a method of payment.").

[15] The practical differences between Amex, which operates a "closed-loop" payment card system, and Visa and MasterCard, which operate "open-loop" systems, have been extensively discussed in the context of the Government Action. See U.S. v. Amex, 838 F.3d at 188, 207-08; U.S. v. Amex, 88 F. Supp. 3d at 157-58.

whether the product at issue—the transactions—is actually interchangeable. This analysis is not, as Amex claims, an "attempt to segment the substitutability analysis." (Mem. at 10.) As the MPs point out, the Supreme Court has commanded that, in the case of a two-sided transaction market, courts "must look to 'both sides of the platform.'" (Opp'n at 22 (quoting Ohio, 138 S. Ct. at 2286); see id. at 21 (stating that there is "no rational basis" to look only at the cardholder side of the platform "where the anticompetitive restraint is directed only at the merchant side of the platform).)

But this is not the end of the inquiry. The "prevailing rule against single-brand markets" has multiple underpinnings which must be dealt with before the court may conclude that a single-brand market is appropriate. (See Mem. at 11.) Chief among these is the rule that a market of "otherwise identical products" cannot be rendered "non-interchangeable" simply by a plaintiff's assumption of contractual restraints. Queen City Pizza, 124 F.3d at 438; accord Smugglers Notch Homeowners' Ass'n v. Smugglers' Notch Mgmt. Co., 414 F. App'x 372, 377 (2d Cir. 2011) (summary order) (quoting Queen City Pizza, 124 F.3d at 443). Accordingly, where the defendant has "[e]conomic power" in a proposed market due exclusively to the "contractual arrangements" it has entered into with "a distinct class of consumers," an antitrust claim with respect to that market cannot lie. See Hack, 237 F.3d at 85. An antitrust claim based on a contractual term voluntarily assumed by the plaintiff can only succeed if "the defendant's power to force plaintiffs" to accept the allegedly anticompetitive provision "stems . . . from the market," not an agreement that the parties have entered into. Smugglers Notch, 414 F. App'x at 376-77 (internal quotation marks omitted) (quoting Queen City Pizza, 124 F.3d at 443).

The MPs assert that Amex is unlawfully restraining trade through its imposition of anti-steering rules in the cardholder acceptance agreements that it enters into with merchants. (See

27

Am. Compl. ¶ 1.) Amex argues that the MPs' claims as to an Amex-only market are barred because this market definition is "based on the contractual restraints at issue." (Mem. at 14.) In order to understand whether this defense is on-point, the court once again turns to Queen City Pizza. In Queen City Pizza, the franchisee plaintiffs alleged that Domino's was restraining trade in the market for Domino's-approved pizza ingredients and supplies because franchisees could not use non-Domino's-approved products without violating the franchise agreement. 124 F.3d at 438. The court concluded that the only reason Domino's had power to restrain the plaintiffs from purchasing other—interchangeable—pizza ingredients and supplies was due to the contracts that the plaintiffs had voluntarily entered into, and that that was insufficient to make out a showing that Domino's had power in the market. See id. at 438-41.

The same seems true here: the MPs would be permitted to steer customers away from using Amex cards but for the inclusion of the NDPs in the contracts which the MPs voluntarily entered into with Amex; the only thing allegedly restraining competition for "Amex" transactions—and thereby distinguishing those transactions from transactions using any other credit card—are the NDPs. As Amex points out, the MPs have admitted to the fact that their single-brand market theory is based solely on the NDPs. (See Amex Rule 56.1 Statement of Material Facts (Dkt. 837) ¶ 36 ("[W]ith its Merchant Restraints in place, AmEx operates in a product market unto itself . . . ." (quoting Expert Report of Dr. Christopher A. Vellturo ("Vellturo I") (Dkt. 840-5) (under seal) ¶ 104)).) Indeed, in their brief in opposition to Amex's motion for summary judgment, the MPs seemingly do not dispute the contention that their "allegation for an Amex-only submarket is 'based on the contractual restraints at issue.'" (Opp'n at 22 (quoting Mem. at 14).) Instead, the MPs state that Queen City Pizza does not preclude their Amex-only market definition because here, unlike in Queen City Pizza, Amex has "pre-

contract economic power that gives it the ability to compel merchants to accept its cards and agree to the anti-steering rules." (Id. at 24; see id. at 23.)

The MPs' Amex-only market allegations founder at this juncture, due to the fact that the MPs impermissibly seek to prove Amex's pre-contract market power by reference to "critical loss analysis." In general, a critical loss analysis "identifies the volume of business a supplier would have to lose (or correspondingly, the number of customers who would have to threaten to shift to another supplier) for a posited price increase to be rendered unprofitable." (Vellturo I ¶ 106; see id. ¶¶ 109-13.) In this case, the MPs argue that a critical loss analysis would show that they are unable to respond to increases in Amex's merchant fees by ceasing to accept Amex cards. (Opp'n at 23-24; see Vellturo I ¶ 114.) This is so because a merchant that stops accepting Amex would suffer a greater "loss of profits on purchases by customers who no longer shop at the merchants because AmEx is no longer accepted" than it would gain profits from "a reduction in its payment acceptance costs on customers that it retains who now use a lower cost card rather than AmEx." (Vellturo I ¶ 107; see Opp'n at 24 ("[A] small loss of sales causes the merchant a greater loss than does the Amex anticompetitive overcharge.").) In other words, the supposed pre-contract power that Amex possesses that allegedly compels merchants to accept the terms of their cardholder agreement—including the NDPs—comes from the fact that Amex cardholders would rather take their business to an Amex-accepting merchant than use a different card to shop at a merchant that has ceased accepting Amex.

As Amex correctly identifies, this is cardholder insistence by another name.[16] (See Amex Reply at 8.) In the Government Action, this court relied on cardholder insistence—which refers

---

[16] In their original opposition to Amex's motion for summary judgment as to an Amex-only submarket, the MPs treated the terms "critical loss analysis" and "insistence" as interchangeable. (See MPs Nov. 21, 2013, Mem. in Opp'n to Amex Mot. for Summ. J. (Dkt. 715) at 20, 22; see also Amex Reply at 9.)

to "the segment of Amex's cardholder base who insist on paying with their Amex cards and who would shop elsewhere or spend less if unable to use their cards of choice"—for its finding that Amex possessed sufficient market power to cause an adverse effect on competition. See U.S. v. Amex, 88 F. Supp. 3d at 191. The Second Circuit reversed, stating that cardholder insistence could not form the basis of a finding of market power. U.S. v. Amex, 838 F.3d at 203-04. As the Second Circuit saw it, "[c]ardholder insistence results not from market power, but instead from competitive benefits on the cardholder side of the platform and the concomitant competitive benefits to merchants who choose to accept Amex cards." Id. at 202. That statement compels the court's rejection of the MPs' Amex-only market allegations based on critical loss analysis.[17]

*    *    *

Because the MPs cannot define a single-brand market without reference to the contractual restraints at issue in this case, and because the MPs have not made a legally permissible allegation that Amex possessed pre-contract market power that compelled acceptance of the NDPs, the MPs' Amex-only market fails as a matter of law. Accordingly, the court grants Amex's motion for summary judgment as to the MPs' Amex-only market allegations.

---

[17] The MPs argue that the Second Circuit's discussion of cardholder insistence is irrelevant to the question of whether they can define an Amex-only relevant market because that court's opinion only discussed cardholder insistence in the context of market power. (Opp'n at 19 & n.6.) The MPs read the Second Circuit's opinion too narrowly. As discussed above, the question of whether the MPs may proceed as to an Amex-only market turns on the question of whether Amex's power to force the MPs to agree to the NDPs stems from the market or from the contract. See Smugglers Notch, 414 F. App'x at 376-77. Accordingly, the Second Circuit's findings as to insistence in the context of market power are applicable here, where the definition of the relevant market requires analysis of market power.

## IV. CONCLUSION

For the foregoing reasons, the court GRANTS Amex's motion for partial summary judgment (Dkt. 835). Counsel for both sides are DIRECTED, by no later than January 25, 2019, to provide the court with a joint update regarding the anticipated length of trial in light of this memorandum and order. Both sides are also DIRECTED to confer and contact the court's Deputy at 718-613-2545 to schedule a status conference to discuss pretrial issues.

SO ORDERED.

Dated: Brooklyn, New York
January /4, 2019

/s Nicholas G. Garaufis
NICHOLAS G. GARAUFIS
United States District Judge