## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------x
:
IN RE: AMERICAN EXPRESS ANTI-STEERING          :
RULES ANTITRUST LITIGATION                     :          No. 11-MD-2221 (NGG)(RER)
:
This Document Relates to:                      :          Date of Service: March 1, 2019
:
**CONSOLIDATED CLASS ACTION**                  :
:
-------------------------------------------------------------x

## PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION (1) TO STAY THE PROCEEDINGS AND COMPEL ARBITRATION AND (2) TO DISMISS THE SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................ 1

BACKGROUND ........................................................................................................ 1

    A.   Defendants' Actions Before this Court ................................................ 1

    B.   Amex's Arbitration Provisions ........................................................... 2

    C.   Plaintiffs' Second Amended Complaint .............................................. 2

ARGUMENT .............................................................................................................. 3

I.     THE AMEX CLASS CLAIMS PROPERLY SHOULD REMAIN IN THIS COURT .. 3

    A.   The "Effective Vindication" Exception to the Federal Arbitration Act Prohibits
Mandatory Arbitration in this Case ................................................... 3

    B.   The Seventh Amendment Bars the CAA .......................................... 8

    C.   The CAA Does Not Apply to the V/MC/D Class Members ............... 9

II.    THE V/MC/D CLASS HAS STANDING FOR ITS CLAIMS ....................... 9

    A.   The V/MC/D Class Has Article III Standing .................................... 10

    B.   The V/MC/D Class Has Antitrust Standing ...................................... 12

        1.   The V/MC/D Class Has Plausibly Alleged Antitrust Injury ............ 12

        2.   The V/MC/D Class Are Efficient Antitrust Enforcers ................... 14

        a. The V/MC/D Class' Injury Flows Directly from the Anticompetitive Harm Caused by
Amex's Behavior ............................................................................. 15

            i.   Plaintiffs' Injuries Are "Direct" Under Umbrella Liability ................. 16

            ii.   Regardless of Umbrella Liability, Plaintiffs' Injuries Are "Direct" .................... 19

        b. The Remaining *AGC* Factors Demonstrate that the V/MC/D Class Members Are
Efficient Enforcers of the Antitrust Laws ................................................... 20

    C.   The California Subclass Has Standing .............................................. 23

CONCLUSION ........................................................................................................ 25

# TABLE OF AUTHORITIES

**Cases**

*14 Penn Plaza LLC v. Pyett*,
  556 U.S. 247 (2009)..............................................................................................6

*In re Aluminum Warehousing Antitrust Litig.*,
  833 F.3d 151 (2d Cir. 2016)...............................................................................13

*In re Am. Express Merch. Litig.*,
  681 F.3d 139 (2d Cir. 2012)..................................................................................6

*Am. Express Co. v. Italian Colors Rest.*,
  570 U.S. 228 (2013)....................................................................................1, 5, 6, 7

*In re Ariz. Dairy Prods. Litig.*,
  627 F. Supp. 233 (D. Ariz. 1985) .......................................................................16

*Aryeh v. Canon Bus. Solutions, Inc.*,
  292 P.3d 871 (Cal. 2013) ....................................................................................24

*ASARCO Inc. v. Kadish*,
  490 U.S. 605 (1989)............................................................................................11

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)............................................................................................10

*Associated Gen. Contractors of Cal. v. Cal. State Council of Carpenters*,
  459 U.S. 519 (1983)..................................................................................... passim

*AT&T Techs., Inc. v. Commc'ns Workers of Am.*,
  475 U.S. 643 (1986)..............................................................................................9

*Atl. Richfield Co. v. USA Petroleum Co.*,
  495 U.S. 328 (1990)............................................................................................13

*In re Beef Indus. Antitrust Litig.*,
  600 F.2d 1148 (5th Cir. 1979) ............................................................................16

*Bell Atlantic Corp. v. Twombly*,
  550 U.S. 544 (2007)............................................................................................10

*Blue Shield of Va. v. McCready*,
  457 U.S. 465 (1982)......................................................................................14, 16

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
  429 U.S. 477 (1977)............................................................................................13

*In re Capacitors Antitrust Litig.*,
   106 F. Supp. 3d 1051 (N.D. Cal. 2015) ...................................................................24

*Capital Imaging Assocs., P.C. v. Mohawk Valley Med. Ass'n.*,
   996 F.2d 537 (2d Cir. 1993)....................................................................................13

*Cendella v. Metropolitan Museum of Art*,
   No. 18-cv-1029, 2018 WL 6629408 (S.D.N.Y. Dec. 19, 2018) ..............................11

*Cnty. of San Mateo v. CSL Ltd.*,
   No. 10-CV-05686-JSC, 2014 WL 4100602 (N.D. Cal. Aug. 20, 2014).................24

*In re Commodity Exchange, Inc.*,
   213 F. Supp. 3d 631 (S.D.N.Y. 2016).........................................10, 15, 16, 17, 20

*In re Conn. Mobilecom*,
   No. 02-12725, 2003 WL 23021959 (S.D.N.Y. Dec. 23, 2003) ..............................10

*Contant v. Bank of Am. Corp.*,
   No. 17-cv-3139, 2018 WL 5292126 (S.D.N.Y. Oct. 25, 2018)...............................11

*In re Copper Antitrust Litig.*
   98 F. Supp. 2d 1039 (W.D. Wis. 2000) ..................................................................17

*In re DDAVP Direct Purchaser Antitrust Litig.*,
   585 F.3d 677 (2d Cir. 2009)............................................................................ passim

*In re London Silver Fixing, Ltd., Antitrust Litig.*,
   213 F. Supp. 3d 530, 549 (S.D.N.Y. 2016).........................................12, 16, 17, 19

*Dennis v. JPMorgan Chase & Co.*,
   343 F. Supp. 3d 122 (S.D.N.Y. 2018)...............................................12, 19, 20, 21

*Dimick v. Schiedt*,
   293 U.S. 474 (1935).................................................................................................9

*District of Columbia v. Heller*,
   554 U.S. 570 (2008).................................................................................................8

*Dreyfuss v. eTelecare Glob. Sols.-US, Inc.*,
   No. 08-cv-1115 (RJS), 2008 WL 4974864 (S.D.N.Y. Nov. 19, 2008), *aff'd
   sub nom. Dreyfuss v. Etelecare Global Solutions-U.S. Inc.*, 349 F. *App'x* 551
   (2d Cir. 2009).........................................................................................................3

*In re Foreign Exch. Benchmark Rates Antitrust Litig.*,
   No. 13 CIV. 7789 (LGS), 2016 WL 5108131 (S.D.N.Y. Sept. 20, 2016)..............23

*FrontPoint Asian Event Driven Fund, L.P. v. Citibank, N.A.*,
No. 16-CIV-5263, 2018 WL 4830087 (S.D.N.Y. Oct. 4, 2018)............................................18

*Gatt Commc'ns, Inc. v. PMC Assocs. L.L.C.*,
711 F.3d 68 (2d Cir. 2013)..............................................................................................22

*Gelboim v. Bank of Am. Corp.*,
823 F.3d 759 (2d Cir. 2016)....................................................................................... passim

*Gilmer v. Interstate/Johnson Lane Corp.*,
500 U.S. 20 (1991)............................................................................................................6

*Green Tree Fin. Corp. ALA. v. Randolph*,
531 U.S. 79 (2000)............................................................................................................6

*Gross v. New Balance Athletic Shoe, Inc.*,
955 F. Supp. 242 (S.D.N.Y. 1997) .................................................................................18

*Grosser v. Commodity Exch., Inc.*,
639 F. Supp. 1293 (S.D.N.Y. 1986), *aff'd*, 859 F.2d 148 (2d Cir. 1988)..............................22

*Hanover Shoe, Inc. v. United Shoe Machinery Corp.*,
392 U.S. 481 (1968)........................................................................................................7, 8

*IBM Corp. v. Platform Solutions., Inc.*,
658 F. Supp. 2d 603 (S.D.N.Y. 2009)..............................................................................19

*Image Tech. Servs. Inc. v. Eastman Kodak Co.*,
125 F.3d 1195 (9th Cir. 1997) ..........................................................................................4

*Lexmark Int'l., Inc. v. Static Control Components, Inc.*,
572 U.S. 118 (2014)........................................................................................................13

*In re Libor-Based Fin. Instruments Antitrust Litig.*,
No. 11-MDL-2262, 2016 WL 7378980 (S.D.N.Y. Dec. 20, 2016)..................................19, 20

*In re Lower Lake Erie Iron Ore Antitrust Litig.*,
998 F.2d 1144 (3d Cir. 1993), *cert denied*, *Bessemer & Lake Erie R.R. Co. v.
Wheeling-Pittsburgh Steel Corp.*, 510 U.S. 1091 (1994) ........................................................16

*Mid-West Paper Prods. Co. v. Cont'l Grp.*,
596 F.2d 573 (3d Cir. 1979)............................................................................................18

*Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*,
473 U.S. 614 (1985)..........................................................................................................6

*In re Namenda Dir. Purchaser Antitrust Litig.*,
331 F. Supp. 3d 152 (S.D.N.Y. 2018)..................................................................15, 19, 20

*Nicosia v. Amazon.com, Inc.*,
  834 F.3d 220 (2d Cir. 2016).................................................................................3

*Ocean View Capital., Inc. v. Sumitomo Corp. of Am.*,
  No. 98-CIV-4067, 1999 WL 1201701 (S.D.N.Y. Dec. 15, 1999).........................................18

*Ohio v. Am. Express Co.*,
  138 S. Ct. 2274 (2018)..............................................................................3, 18

*Parisi v. Goldman Sachs and Co.*,
  710 F.3d 483 (2d Cir. 2013)...........................................................................5

*Pollock v. Citrus Assocs. of N.Y. Cotton Exch., Inc.*,
  512 F. Supp. 711 (S.D.N.Y. 1981) .............................................................17, 18, 21

*In re Processed Egg Prods. Antitrust Litig.*,
  881 F.3d 262 (3d Cir. 2018)...................................................................16, 21, 22

*Ross v. Bank of Am., N.A. (USA)*,
  524 F.3d 217 (2d Cir. 2008)..........................................................................10

*Samsung Elecs. Co. v. Panasonic Corp.*,
  747 F.3d 1199 (9th Cir. 2014) .......................................................................24

*Sonterra Capital Master Fund Ltd. v. Credit Suisse Grp. AG*,
  277 F. Supp. 3d 521 (S.D.N.Y. 2017)..................................................................22

*Spokeo, Inc. v. Robins*,
  136 S.Ct. 1540 (2016)................................................................................10

*Strax v. Commodity Exch., Inc.*,
  524 F. Supp. 936 (S.D.N.Y. 1981) ...............................................................17, 21

*Sullivan v. Barclays PLC*,
  No. 13-CV-2811, 2017 WL 685570 (S.D.N.Y. Feb. 21, 2017)..............................................18

*Tex. Indus., Inc. v. Radcliff Materials, Inc.*,
  451 U.S. 630 (1981)..................................................................................23

*U.S. Gypsum Co. v. Ind. Gas Co., Inc.*,
  350 F.3d 623 (7th Cir. 2003) ........................................................................16

*United States v. Am. Express Co.*,
  88 F. Supp. 3d 143 (E.D.N.Y. 2015) ...........................................................14, 17, 18

*In re Uranium Antitrust Litig.*,
  552 F. Supp. 518 (N.D. Ill. 1982) ..................................................................16

*Vynior's Case* (1609),
    77 E.R. 597, 599; 8 Coke Reports 80a, 81b ……………………………………………………… 9

*In re WellPoint Inc. Out-of-Network UCR Rates Litig.*,
    903 F. Supp. 2d 880 (C.D. Cal. 2012) ...................................................................23

*In re WellPoint, Inc. Out-of-Network UCR Rates Litig.*,
    865 F. Supp. 2d 1002 (C.D. Cal. 2011) ...............................................................24

*Wilk v. Am. Med. Ass'n*,
    895 F.2d 352 (7th Cir. 1990) ...................................................................................4

*Zenith Radio Corp. v. Hazeltine Research Inc.*,
    395 U.S. 100 (1969)..................................................................................................4

## Statutes

Cartwright Act, Cal. Bus. & Prof. Code § 16750(a) ...........................................23, 24

California Unfair Competition Law, Cal. Bus. & Prof. Code § 17200.........................24

Clayton Act § 4, 15 U.S.C. § 15 ...........................................................................7, 12

Clayton Act § 16, 15 U.S.C. § 26 ...........................................................................3, 4

Federal Arbitration Act, 9 U.S.C. § 2 ............................................................3, 5, 6, 7

Sherman Act, 15 U.S.C. § 1........................................................................................10, 11

## Rules

Fed. R. Civ. P. 12(b)(1)................................................................................................12

Fed. R. Civ. P. 12(b)(6)................................................................................................23

Fed. R. Civ. P. 23(b)(2).................................................................................................1

## Other Authorities

Phillip E. Areeda & Herbert Hovenkamp, ANTITRUST LAW: AN ANALYSIS OF ANTITRUST
    PRINCIPLES AND THEIR APPLICATION ¶ 347 (4th ed. 2018)……………………………..17,19

U.S. Const. amend. VII..............................................................................................8

U.S. Const. Art. III.................................................................................................. 10

## INTRODUCTION

Confronted with a pleading that responds to the "two-sided market" analysis required last year by the Supreme Court, Defendants American Express Company and American Express Travel Related Services Company, Inc. (collectively, "Amex") have moved that the claims of Amex-accepting merchants (the "Amex Class") challenging the Anti-Steering Rules ("ASRs") should not continue to be heard by this Court but, at this late date, should be sent to arbitration, and that the claims of non-Amex-accepting merchants (the "V/MC/D Class") should not be heard at all. However, application of the arbitration provision upon which Amex relies is inconsistent with its terms, and Amex's motion to dismiss the remaining claims misconstrues Plaintiffs' pleading and misapplies the law. Accordingly, Amex's Motion should be denied in its entirety.

## BACKGROUND

### A.  Defendants' Actions Before this Court

These actions were consolidated before the Court in March 2011. On June 28, 2013, Amex expressed its intent to file a motion to compel arbitration, which it then filed on August 5, 2013.[1] For years thereafter, Amex and the class representatives have sought to settle this litigation under the jurisdiction of this Court,[2] beginning December 19, 2013 (without a ruling on Amex's then pending Motion to Dismiss the Proceedings in Favor of Arbitration). At that time, the parties entered into a Class Settlement Agreement, *see* ECF No. 306-2, which the Court preliminarily approved, and as to which it provisionally certified a Rule 23(b)(2) mandatory class

---

[1] *See* Notice of Mot. to Compel Arbitration, ECF No. 262 (full briefing found at ECF Nos. 262–269). The parties stipulated to stays of the action during Amex's appeal of the *Italian Colors* case, discussed *infra*.
[2] *See In re: Am. Express Anti-Steering Rules Antitrust Litig.*, No. 11-md-2221, Order approving proposed briefing schedule for Amex's Mot. to Dismiss the Proceedings in Favor of Arbitration, June 28, 2013. Four days earlier, Amex had filed a Letter regarding briefing schedules for summary judgment and trial consolidation. Letter to Judge Garaufis, June 24, 2013, ECF No. 248; Transcript of Proceedings held on June 13, 2013, ECF. No. 247.

for settlement purposes in February 2014. *See* Class Settlement Preliminary Approval Order, ECF No. 333. And for more than a year, the parties worked to obtain final approval of the proposed settlement, although it was ultimately denied.[3] Thereafter, the Court appointed new lead plaintiffs' counsel.[4]

### B.  Amex's Arbitration Provisions

Amex asserts that "[t]he current, operative" Card Acceptance Agreement ("CAA") between Amex and the merchants at issue here is the October 2018 iteration. *See* Defendants' Memorandum of Law in Support of Defendants Motion to Stay and Compel Arbitration and to Dismiss the Second Amended Complaint ("Amex Mem."), at 5. But the CAA precludes a party's "right to a jury" as well as "participat[ion]" as a class representative or even "as a member of any class pertaining to any claim subject to arbitration." CAA (2018), at 4–5. And if a party elects to arbitrate, pursuant to the CAA "that claim will be arbitrated on an individual basis" with "no right or authority for any claims to be arbitrated on a class action basis" or "on behalf of the general public." *Id*. However, the CAA provides that the entire arbitration agreement fails "if any portion of these Limitations on Arbitration is deemed invalid or unenforceable."[5] *Id*.[6]

### C.  Plaintiffs' Second Amended Complaint

The SAC includes allegations responsive to the two-sided platform issues raised in *Ohio*

---

[3] This Court based its denial on the number of objectors, and also found that the conduct of then Co-Lead Class Counsel Gary Friedman tainted the settlement process. Mem. & Order Redacted Public Version, 9-10 (Aug. 4, 2015) ECF No. 658). At a hearing on September 17, 2014, counsel for Class Plaintiffs and Amex had presented arguments in support of final approval. *Id*. at 12.

[4] The Court should not infer that Class Plaintiffs in any way have abandoned or foreclosed continuing class-wide settlement discussions (or having Amex's motion held in abeyance to do so).

[5] The CAA provides that "[any issue regarding the] enforceability, or scope of [this Arbitration agreement] is not within the definition of a 'Claim' subject to determination by the Arbitrator." CAA (2018), at. 4–5.

[6] In the Second Amended Complaint ("SAC"), Plaintiffs assert that Amex arbitration agreements also state ". . . the arbitrator's authority to make awards is limited to awards to you and us alone." SAC ¶ 90. For years, this language was contained in the Amex arbitration agreement, but was removed by Amex in the 2018 edition of the agreement. Notwithstanding this change, the 2018 agreement continues to prohibit Plaintiffs from obtaining market-wide injunctive relief against Amex.

*v. Am. Express Co.*, 138 S. Ct. 2274 (2018), and adds claims on behalf of a V/MC/D Class (Visa, MasterCard, and Discover) of merchants. Plaintiffs allege in the SAC that Amex leveraged its market power in the relevant market to impose its ASRs.[7] As explained in the SAC, the ASRs: stifled competition among the card networks; imposed supracompetitive merchant fees without offsetting credit card user economic benefits; increased overall credit card transaction costs; and resulted in higher consumer retail prices, thereby reducing output.

## ARGUMENT

## I.   THE AMEX CLASS CLAIMS PROPERLY SHOULD REMAIN IN THIS COURT

In analyzing a motion to compel arbitration, courts must draw all reasonable inferences in favor of the non-moving party. *See Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 229 (2d Cir. 2016).[8] Defendants here thus bear "the burden of demonstrating by a preponderance of the evidence the existence of an agreement to arbitrate." *Dreyfuss v. eTelecare Glob. Sols.-US, Inc.*, No. 08-cv-1115 (RJS), 2008 WL 4974864, at *3 (S.D.N.Y. Nov. 19, 2008), *aff'd sub nom. Dreyfuss v. Etelecare Global Solutions-U.S. Inc.*, 349 F. App'x 551 (2d Cir. 2009).

### A.   The "Effective Vindication" Exception to the Federal Arbitration Act Prohibits Mandatory Arbitration in this Case

Both in the SAC and in briefing Amex's original motion to compel arbitration, Plaintiffs explicitly articulated both a right to obtain market-wide injunctive relief under the Clayton Act, and why the "effective vindication" exception to the Federal Arbitration Act ("FAA") prohibits mandatory arbitration in this case. SAC ¶¶ 99–100; Pls.' Mem. of Law in Opp'n to Defs.' Mot. to Compel, ECF No. 264, at 1, 1 n.1, 3–5, 11–12. Nonetheless, Amex's opening brief is

---

[7] Amex's contention that the Second Circuit "concluded" that Amex lacked power in the market considered in the Government's case, Amex Mem., at 3, is unavailing. Among other things, the market considered there was distinct from the *two-sided* market pleaded here, which is based on the Supreme Court's view that such a market should have been considered by this Court.

[8] Unless otherwise noted, internal quotations and citations have been omitted herein.

conspicuously silent on these issues.

Plaintiffs seek market-wide equitable relief to eliminate Amex's anticompetitive ASRs nationwide. This relief falls squarely within the equitable remedies authorized by Section 16 of the Clayton Act. The Supreme Court has long held that a critical "end to be served" in Clayton Act equitable relief suits is that they "effectively pry open to competition a market that has been closed by defendants' illegal restraints." *Zenith Radio Corp. v. Hazeltine Research Inc.,* 395 U.S. 100, 133 (1969) (quoting *Int'l Salt Co. v. United States*, 332 U.S. 392, 401 (1947)). At its core, the Clayton Act contemplates precisely the injunctive relief sought here. SAC ¶ 99.

Relief to a single merchant would not compel Amex or its rivals to engage in merchant fee competition. Likewise, relief to a single merchant would not incentivize a low-cost new entrant to enter the market. As alleged in the SAC, and established plainly in the accompanying Declaration of Padmanabhan Srinagesh, Ph.D ("Srinagesh Decl."), only market-wide injunctive relief would allow Plaintiffs to "effectively pry open" competition in this market. SAC ¶ 100. Additionally, courts routinely recognize that market-wide antitrust injunctions are appropriate, even in non-class cases, when such relief is necessary to redress antitrust injury.[9]

Despite this, the Amex arbitration provisions prohibit a single merchant from reforming Amex's ASRs on a market-wide basis. If arbitration is compelled under the CAA, a plaintiff cannot combine its claims with any other merchant, nor can it participate as a class representative. The arbitrator cannot grant an award that would affect any other merchant, nor can any other merchant rely upon the award to enforce its own claims.[10] CAA (2018), ¶ 7.c.ii.

---

[9] *See e.g., Wilk v. Am. Med. Ass'n*, 895 F.2d 352, 371 (7th Cir. 1990); *Image Tech. Servs. Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1226 (9th Cir. 1997); *see also infra* II.B.1 (discussing antitrust injury).

[10] This point also responds to Amex's argument in its initial reply brief that an individual plaintiff could always claim it needed market-wide injunctive relief. Amex Reply in Support of Motion to Dismiss, 5-7, ECF. No. 265 ("Amex Reply").

The ASRs eliminate any incentive for card networks to reduce their merchant fees, and no new network can enter the market with a low-cost provider strategy. *See* SAC ¶¶ 50, 65, 68, 74. By banning a broad injunction against Amex's ASRs, the arbitration agreement flatly bars any statutory remedy to the Amex Class redressing their antitrust injury.

Consequently, this case falls squarely within the "effective vindication" exception to requiring arbitration under the FAA. As Justice Scalia made clear in *Italian Colors*, the "effective vindication" exception "would certainly cover a provision in an arbitration agreement prohibiting the assertion of certain statutory rights," and particularly a "prospective waiver of a party's right to pursue statutory remedies." *Am. Express Co. v. Italian Colors Rest.*, 570 U.S. 228, 235-36 (2013); *see also Parisi v. Goldman Sachs and Co.,* 710 F.3d 483, 487 (2d Cir. 2013) ("language insulating a [defendant] from damages and equitable relief renders the clause unenforceable"). Here, the CAA is unenforceable because it prohibits Amex Class members' ability to vindicate their rights under the antitrust laws to obtain the necessary market-wide injunction.

Amex concedes that the issue of whether Plaintiffs' claims are subject to arbitration is a gateway dispute this Court must decide in this motion, but contends that the issue "has already been decided in *Italian Colors*." Amex Mem., at 11. Despite its inapposite facts, however, *Italian Colors* effectively requires that Amex's motion concerning arbitration should be *denied*.

In *Italian Colors*, a class of plaintiffs sought damages arising from Amex's alleged illegal "tying arrangement," under which Amex used its market power in the card market to impose 30% higher fees than competing cards on payment acceptance for merchants. 570 U.S. at 231. Amex moved to compel arbitration, relying on a provision in its arbitration agreement prohibiting arbitration on a class-wide basis. In response, plaintiffs established through expert

5

economic testimony that the cost for an individual plaintiff to pursue antitrust damages would exceed $1,000,000, while a maximum damages recovery for an individual would be less than $40,000. *Id*. Relying on the "effective vindication" exception, the plaintiffs claimed that, if compelled to arbitrate individually, they could not vindicate their rights under the antitrust statutes, and therefore the class action waiver was unenforceable. *Id*. at 232.

While the Supreme Court disagreed based on the facts in that case, it recognized the "effective vindication" exception to mandated arbitration under the FAA that had been applied in prior cases,[11] which was designed to prevent a "prospective waiver of a party's *right to pursue* statutory remedies." It ruled that the "effective vindication" exception "would certainly cover a provision in an arbitration agreement forbidding the assertion of certain statutory rights." *Italian Colors*, 570 U.S. at 235–36, 239. There, plaintiffs had simply claimed that the class action waivers left "no economic incentive to pursue their antitrust claims individually in arbitration." *Id.* at 235. The Court responded: "But the fact that it is not worth the expense involved in *proving* a statutory remedy does not constitute the elimination of the *right to pursue* that remedy." *Id.* at 236 (citing *In re Am. Express Merchants' Litig.*, 681 F.3d 139, 147 (2d Cir. 2012)) (Jacobs, C.J., dissenting from denial of rehearing en banc) (emphasis in original).

Unlike here, the plaintiffs in *Italian Colors* did not assert that market-wide injunctive relief was necessary to vindicate their statutory rights. The rights of each merchant would have been vindicated by simply prohibiting Amex from requiring *that* merchant to accept its low-value credit cards as a condition of accepting its higher-value cards.

Also unlike here, the plaintiffs' "effective vindication" argument in *Italian Colors* was

---

[11] *See 14 Penn Plaza LLC v. Pyett,* 556 U.S. 247, 273-74 (2009); *Green Tree Fin. Corp. ALA. v. Randolph*, 531 U.S. 79, 90 (2000); *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 28 (1991); *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 637 (1985).

founded on their professed entitlement to class proceedings. *Id.* at 234. As the Supreme Court observed, proving an entitlement to proceed as a class would require burdensome preliminary litigation hurdles that would destroy the very benefits of arbitration that the FAA was meant to secure. *Id.* at 238–39. Plaintiffs' argument here does not hinge on any claimed legal "right" to class proceedings, but rather challenges a provision that, if enforced, would foreclose market-wide relief under the applicable statutes.

In sum, the arbitration clause here does not simply make it too *expensive* for plaintiffs to *prove* their statutory remedies. *See id.* at 236. By prohibiting any market-wide injunctive relief, Amex's requirements "constitute the elimination of the right to pursue that remedy," and are thus prohibited by the "effective vindication" exception. *Id*.

When these arguments were raised in response to Amex's initial arbitration motion, Amex claimed that individual plaintiffs are not entitled to market-wide relief because a plaintiff in arbitration obtaining the right to surcharge and steer would no longer have the personal injury-in-fact necessary for antitrust standing. *See* Amex Reply, at 5-7, ECF. No. 265. Now, as then, the argument lacks merit.[12]

First, Amex posited that the merchant could "pass the cost of acceptance onto customers in the form of a surcharge, removing any personal harm." Amex Reply, at 7. But even if surcharging were economically feasible for an individual plaintiff merchant, which it is not, *see* Srinagesh Decl. ¶¶18-21, Amex's purported standing argument has long been foreclosed by the Supreme Court's decision in *Hanover Shoe, Inc. v. United Shoe Machinery Corp.*, 392 U.S. 481 (1968) (direct purchaser under Clayton Act § 4 is injured by the full amount of the overcharge

---

[12] The Amex Class Plaintiffs respond to these points here for the Court's convenience, but in no way concede that any arguments Amex may present concerning the Amex Class' long-articulated need for market-wide relief would be appropriate as "reply."

paid and antitrust defendant is barred from claiming this overcharge injury is passed on to indirect purchasers).

Alternatively, Amex asserted that an individual plaintiff could be made whole if that merchant convinced "customers to use less expensive cards through steering" Amex Reply, at 7. But it is clear that because of the ASRs, *all* card networks charge supracompetitive merchant fees. There is no economic incentive for a low-cost card network to enter the market, and so absent market-wide relief, an individual merchant would have no less expensive cards to steer towards. Srinagesh Decl. ¶ 17. Finally, Amex argued that an individual plaintiff merchant could be made whole by using the threat of steering or surcharging "to extract a lower rate from Amex." Amex Reply, at 7. Yet, the uncontroverted fact is that the vast majority of Amex-accepting merchants are unable to effectively negotiate prices with Amex, and have absolutely no power to affect Amex's market-wide merchant fees. Srinagesh Decl. ¶ 23.

The ASRs prevent any price competition between Amex and the other card networks. Absent market-wide relief from those ASRs, one of the fundamental purposes of the antitrust laws – preventing violators from retaining the fruits of their illegality – would be defeated. [13] *See Hanover Shoe*, 392 U.S. at 493.

## B.  The Seventh Amendment Bars the CAA

The Seventh Amendment "preserve[s]" the right to trial by jury. U.S. Const. amend. VII; *see also District of Columbia v. Heller*, 554 U.S. 570, 576 (2008) (the "words and phrases" of

---

[13] An additional point bears mention in this context. The Department of Justice ("DOJ") has generally taken the position that it does not pursue restitution, but rather provides private parties the opportunity to pursue treble damages under federal antitrust law. Compelling individual arbitration now, after the conclusion of the DOJ's case seeking only injunctive relief, would hobble such public/private enforcement here.  Moreover, sending the case to arbitration after this Court has devoted more than eight years to the applicable substantive antitrust claims would constitute a waste of the Court's limited resources.

the Constitution "were written to be understood by the voters" and to be "used in their normal and ordinary . . . meaning"). However, Amex's CAA fails to recognize this preservation, dictating that "[i]f arbitration is chosen by any party neither you nor we will have the right to . . . a jury trial on that claim." CAA (2018), at pp. 4-5.[14] Accordingly, enforcement of Amex's arbitration provision here would deprive the Amex Class of the right to a jury trial preserved by the Seventh Amendment and thus, it must be invalidated.

### C. The CAA Does Not Apply to the V/MC/D Class Members

For the avoidance of doubt, arbitration cannot be compelled as to the V/MC/D Class members in any event, as they have no agreement with Amex.[15] *See AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 648 (1986) (a court cannot force parties to arbitrate a dispute unless parties have entered into a valid agreement to do so). Those claims – which, as discussed *infra*, are on sound legal footing – involve many of the same factual issues and will remain before this Court.[16]

## II.   THE V/MC/D CLASS HAS STANDING FOR ITS CLAIMS

In evaluating both constitutional and antitrust standing, the Court must construe the complaint liberally, accept all factual allegations as true, and "draw[] all reasonable inferences in

---

[14] As the Supreme Court has recognized, the Seventh Amendment is understood to refer to the "common law" of England as it existed in 1791, *see, e.g.*, *Dimick v. Schiedt*, 293 U.S. 474, 477, 487 (1935), and thus under the original public meaning of the Seventh Amendment, arbitration agreements are revocable. Vynior's Case (1609), 77 E.R. 597, 599; 8 Coke Reports 80a, 81b ("[I]f I submit myself to arbitrament . . . yet I may revoke it for my act, or my words cannot alter the judgment of the law to make that irrevocable which is of its own nature revocable."). That the CAA permits Amex to unilaterally force a party to arbitrate with no mutuality or meeting of the minds is even more support for its revocability. *See Italian Colors*, 570 U.S. at 240 (Kagan, J. dissenting).

[15] As to one V/MC/D Class Plaintiff, Qwik Lube, Amex asserts that it accepted Amex cards from 1999 to 2007 pursuant to the terms of "an Amex CAA." *See* Amex Mem., at 4. Regardless, Qwik Lube stopped accepting Amex cards four years prior to consolidation of this case, and *eleven* years prior to the filing of the SAC—the pleading in which Qwik Lube is named, and the conduct that is at issue, which is not covered by any now-dusty CAA.

[16] Given that certain large individual merchant plaintiffs (the "IMPs") are scheduled for trial in less than four months on claims similar to some of those in this action, it stands to reason that many of the issues presented here will be addressed in that trial, perhaps before the instant motion is even decided. Accordingly, in addition to its legal infirmities, Amex's motion invites potential conflicting adjudications as between this Court and individual arbitrator(s).

plaintiff's favor." *Gelboim v. Bank of Am. Corp.*, 823 F.3d 759, 769-70 (2d Cir. 2016). The federal notice pleading standard "[does] not require heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 557, 570 (2007). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *In re Commodity Exchange, Inc.*, 213 F. Supp. 3d 631, 650 (S.D.N.Y. 2016). The claims of the V/MC/D Class readily meet these requirements.

## A. The V/MC/D Class Has Article III Standing

To assert Article III standing, a plaintiff merely needs to allege that it suffered a "concrete" and "particularized" injury-in-fact that is fairly traceable to the defendant's action, and that its injury is likely redressable by a favorable decision.[17]

Amex argues that the V/MC/D Class lacks Article III standing because the case is "built on a speculative causal chain," Amex Mem., at 19, contending that when injury is traceable not to the defendant but to the conduct of an independent third party, it cannot satisfy the causation and redressability requirements of standing. *See* Amex Mem., at 19. Amex relies for this proposition on *In re Conn. Mobilecom*, but fails to note the critical distinction that the "third party actor" in that case was the State of Connecticut, not an active market participant with a competitive stake.[18] By contrast, Visa, Mastercard, and Discover are active participants that need

---

[17] *See Spokeo, Inc. v. Robins,* 136 S.Ct. 1540, 1548 (2016); *Ross v. Bank of Am., N.A. (USA)*, 524 F.3d 217, 222 (2d Cir. 2008) ("Injury in fact is a low threshold[.]"); *see also* U.S. Const. Art. III (federal judicial power only extends to actual cases or controversies).

[18] Notably, in *Mobilecom*, even if the court had granted the requested relief, plaintiff's injury could not have been redressed because the claims focused on rates set by a state agency, to which the Sherman Act does not even apply. *In re Conn. Mobilecom*, No. 02-12725, 2003 WL 23021959, at *12 (S.D.N.Y. Dec. 23, 2003).

to compete in the market to maintain their customers. They are not "unfettered" parties like a

state, but rather are in the same market as Amex, and their actions are market responses directly

traceable to the challenged conduct of Amex.[19]

Additionally, Amex's reliance on *Cendella v. Metropolitan Museum of Art*, No. 18-cv-

1029, 2018 WL 6629408 (S.D.N.Y. Dec. 19, 2018), to support its contention that it is

"speculative" for the requested relief to address the V/MC/D Class claims is also misplaced.

Amex Mem., at 19. *Cendella* is hardly comparable to this case. In *Cendella*, a plaintiff, on behalf

of a putative class of non-favored artists, sued five New York City museums for allegedly

violating the Sherman Act by conspiring to fix the prices of art. 2018 WL 6629408, at *3. Unlike

here, the plaintiff in *Cendella* requested relief that rested solely on a "subjective boast,"

speculating that if the museums' alleged action was enjoined, the museums would purchase and

display the plaintiff's art at their museums. *Id.* at *4. Such speculation bears no relation to the

actual conduct of Visa and MasterCard alleged here.

Moreover, Plaintiffs' injunction directed to Amex's ASRs is far from a speculative

request. It would open up competitive opportunities to Visa, MasterCard, and Discover to lower

the rates they charge merchants, which will be supported by expert testimony in this case. *See*

SAC ¶¶ 49–50. It is to be expected that the elimination of Amex's ASRs would trigger

reductions by Visa, MasterCard, and Discover in their merchant fees. *Id.* at ¶¶ 80-81. The

V/MC/D Class' injuries are ongoing, and thus, injunctive relief is required to redress their

harm.[20] The Complaint adequately alleges that the V/MC/D Class suffers an injury-in-fact that is

---

[19] Amex also relies on *ASARCO*, a taxpayer standing case, in which the Supreme Court found that plaintiffs lacked standing because their economic injury claims depended on "the unfettered choices of independent actors." *ASARCO Inc. v. Kadish*, 490 U.S. 605, 615 (1989).

[20] Amex also relies on *Contant v. Bank of Am. Corp.*, No. 17-cv-3139, 2018 WL 5292126, at *4 (S.D.N.Y. Oct. 25, 2018), where the plaintiff did not allege an ongoing injury against which injunctive relief would have any effect.

traceable to Amex's conduct, and that is redressable by the relief requested. *Id*. ¶¶ 112-19; 123-26. Accordingly, drawing all reasonable inferences in favor of Plaintiffs, the V/MC/D Class has Article III standing, and Amex's Rule 12(b)(1) motion should be dismissed.

## B. The V/MC/D Class Has Antitrust Standing

Amex also challenges the V/MC/D Class' antitrust standing, but on a motion to dismiss, this inquiry turns on whether "plaintiffs have pled enough facts to make it plausible" that they suffered "the sort of injury that would entitle them to relief under Section 4 of the Clayton Act." *Dennis v. JPMorgan Chase & Co.*, 343 F. Supp. 3d 122, 162 (S.D.N.Y. 2018). The Second Circuit has held that to satisfy the Supreme Court's antitrust standing requirements, a plaintiff must plausibly allege that it (1) has "suffered a special kind of antitrust injury" and (2) is "a suitable plaintiff to pursue the alleged antitrust violations, and thus is an efficient enforcer of the antitrust laws." *In re London Silver Fixing, Ltd.*, *Antitrust Litig.*, 213 F. Supp. 3d 530, 549 (S.D.N.Y. 2016); *Gelboim*, 823 F.3d at 759; *see Associated Gen. Contractors of Cal. v. Cal. State Council of Carpenters*, 459 U.S. 519, 534 (1983) ("*AGC*")*.* As discussed below, the V/MC/D Class satisfies this burden.

### 1. The V/MC/D Class Has Plausibly Alleged Antitrust Injury

Plaintiffs have plausibly alleged an antitrust injury "of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *In re DDAVP Direct Purchaser Antitrust Litig.*, 585 F.3d 677, 688 (2d Cir. 2009). In assessing the antitrust injury requirement, courts look to identify (1) the defendant's anticompetitive conduct; (2) the plaintiff's "worse position" as a result of defendant's conduct; and (3) the anticompetitive effect of defendant's conduct as it compares to plaintiff's alleged injury. *See Dennis*, 343 F. Supp. 3d at 163. The antitrust injury inquiry does not focus on a segment of the market or simply

on individual competitors, as Amex improperly argues (Amex. Mem., at 15–16). Instead, the requirement centers on an "adverse effect on competition *as a whole* in the relevant market."[21]

In making its argument, Amex misstates Plaintiffs' claims by contending that the V/MC/D Class's antitrust injury is solely based on a "theory" that the cost of payment acceptance would fall if merchants were allowed to steer customers. Amex Mem., at 15. But this is part of the relief Plaintiffs seek: a market absent Amex's ASRs, which would decrease costs to both sides of the platform. SAC ¶¶ 126.

In fact, Plaintiffs have alleged that Amex's imposition of its ASRs stifles *interbrand* competition in the relevant market – a market encompassing all merchants (including the V/MC/D Class), cardholders, and networks (including Amex)[22] – thereby causing *all* merchants to pay higher fees, and raising overall transaction costs above competitive levels. SAC ¶¶ 1, 48, 66–67, 81. Both sides of the market are forced to pay higher prices, and therefore are in a worse position because of Amex's ASRs. *Id*. And when merchants and cardholders "must pay prices that no longer reflect ordinary market conditions," *Gelboim*, 823 F.3d at 772, as a result of Amex's "competition-*reducing*" conduct, they suffer antitrust injury. *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 344 (1990) (plaintiff may recover when injury "stems from a competition-*reducing* aspect or effect of the defendant's behavior"); *see also Lexmark Int'l., Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014) (such a showing places the plaintiff directly within "the zone of interests protected by" the antitrust laws).

Indeed, the actual injury alleged is not some far-flung consequence or hypothetical

---

[21] *Capital Imaging Assocs., P.C. v. Mohawk Valley Med. Ass'n.*, 996 F.2d 537, 543 (2d Cir. 1993) (emphasis added); *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 488 (1977) ("[T]he antitrust laws . . . were enacted for the protection of competition not competitors.").

[22] *Compare with In re Aluminum Warehousing Antitrust Litig.*, 833 F.3d 151, 161-62 (2d Cir. 2016) (plaintiffs "disavow[ed] participation in any of the markets in which the defendants operate[d]"; plaintiffs lacked antitrust standing).

"theory" of what would happen, *see* Amex Mem., at 15–16, but is reflective of *current* market conditions as this Court has previously found, and thus goes well beyond the "plausibility" requirement of a 12(b)(6) motion. *See United States v. Am. Express Co.*, 88 F. Supp. 3d 143, 216 (E.D.N.Y. 2015) ("[T]he court finds that prohibitions on merchant steering … have also enabled [Amex's] competitors to charge higher all-in fees…[W]ithout affording merchants the ability to influence their customers' credit and charge card decisions, there is little, if any, downward pressure on the price charged to merchants.").

The inability of the credit card networks to shift back to "ordinary" market conditions because of Amex's continued imposition of its ASRs is further evidenced by the fact that despite the Government's settlements with Visa and MasterCard and the subsequent removal of their similar anti-steering provisions, all merchants accepting credit cards continue to pay supracompetitive fees. SAC ¶¶ 41–45. Such an injury is "plainly" the type that the antitrust laws were designed to protect. *DDAVP*, 585 F.3d at 688 (plaintiffs "forced" to pay supra-competitive prices as a result of defendants' anticompetitive conduct suffered antitrust injury). Indeed, even if Amex's conduct may have targeted its competitors, the V/MC/D Class' resulting harm of having to pay supracompetitive merchant fees is so "inextricably intertwined" with the anticompetitive effects of Amex's ASRs that it thus "flow[s] from that which makes [D]efendants' acts unlawful." *Id*.; *see also Blue Shield of Va. v. McCready*, 457 U.S. 465, 484 (1982).

### 2. The V/MC/D Class Are Efficient Antitrust Enforcers

The V/MC/D Class are "efficient enforcers" of the antitrust laws. Applying the factors adopted by the Supreme Court in *AGC*, courts in the Second Circuit determine whether a party is a "proper plaintiff" (or efficient enforcer) to seek damages under the antitrust laws on the basis

of the: "(1) directness of the asserted injury, or causation; (2) self-interest of the class of persons to vindicate the public interest, or motivation; (3) speculativeness of the alleged injury; and (4) difficulty of identifying the apportioning damages so as to avoid duplicative recoveries." *In re Namenda Dir. Purchaser Antitrust Litig.*, 331 F. Supp. 3d 152, 213 (S.D.N.Y. 2018); *DDAVP*, 585 F.3d at 688; *see also AGC*, 459 U.S. at 540–45.[23] Each of these factors supports the V/MC/D Class' antitrust standing here.

### a. The V/MC/D Class' Injury Flows Directly from the Anticompetitive Harm Caused by Amex's Behavior

As a threshold matter, Amex focuses on whether the V/MC/D Class' injuries are adequately "direct," suggesting that Plaintiffs allege "general marketwide effects" that are "too remote." Amex Mem., at 12. Amex asserts that district court judges in the Second Circuit have dismissed umbrella-theory antitrust claims, but concedes that the Second Circuit has yet to address the standing issue. *See* Amex Mem., at 13; *see also Gelboim*, 823 F.3d at 778 (noting that the viability of umbrella liability has not been resolved in this Circuit);[24] *In re Commodity Exch.*, 213 F. Supp. 3d at 655 (same). Here, though, Amex attempts to transform the operative rule – that standing may exist despite a lack of "privity" (notwithstanding the viability of umbrella liability) – into a sweeping *de facto* rule that only parties in privity with one another can have antitrust standing. *See* Amex Mem., at 17. Amex's conjured, blanket proposition finds

---

[23] *Compare* Amex Mem., at 17 ("Courts do not hesitate to dismiss cases when one or more of these factors weighs against standing") with *In re Commodity Exch.*, 213 F. Supp. 3d at 653–54 ("[T]he third and fourth factors are problematic and the potential difficulty in ascertaining and apportioning damages is not … an *independent* basis for denying standing where it is adequately alleged that a defendant's conduct has proximately injured an interest of the plaintiff's that the statute protects and other relief might be available.").

[24] Amex relies upon *Gelboim* for the proposition that the Second Circuit has "expressed concern" with allowing umbrella claims to proceed, Amex Mem., at 13. However, the *Gelboim* court emphasized that it did not matter whether plaintiffs' transactions were conducted directly *or indirectly* with defendants, but expressed concern with damages "*if* the [defendants] control only a small percentage of the ultimate identified market." 823 F.3d at 779 (emphasis added). Here, of course, Amex enjoys a 26.4% market share, acting as the "second largest market player" in a four-player market. *See* SAC ¶¶ 51–54.

no support in the law. *See e.g., McCready*, 457 U.S. at 468-75 (a single antitrust conspiracy may result in different injuries; those with no direct relationship to defendants may have antitrust standing).

### i.   Plaintiffs' Injuries Are "Direct" Under Umbrella Liability

Under umbrella liability, a plaintiff's injuries arise from transactions with defendants' non-conspiring competitors who are able to charge supracompetitive prices because of defendants' conspiracy to create a pricing umbrella. *See In re Commodity Exch.*, 213 F. Supp. 3d at 656. Sister circuits recognize the viability of this theory.[25] *See e.g., U.S. Gypsum Co. v. Ind. Gas Co., Inc.*, 350 F.3d 623, 626–28 (7th Cir. 2003) (Easterbrook, J.) (finding dismissal of umbrella standing claims at pleading stage would be inappropriate, emphasizing that a purchaser who buys from a firm whose rivals have unlawfully raised market prices suffers antitrust injury).[26] Likewise, courts in the Second Circuit have recognized that plaintiffs suffer a direct injury when they purchase from non-conspiring rivals at elevated prices, regardless of a plaintiff's "privity" with defendants. *London Silver Fixing,* 213 F. Supp. 3d at 555 (upholding standing at pleading stage, noting that analyzing plaintiff's claims under umbrella liability "leads

---

[25] Amex contends that "most courts" outside this Circuit "reject umbrella theories." Amex Mem., at 13 n.4. *But see* n.26 (circuit court decisions), *infra; see also, e.g., In re Ariz. Dairy Prods. Litig.*, 627 F. Supp. 233 (D. Ariz. 1985) (granting standing for consumers purchasing from defendant conspirators, non-defendant co-conspirators, or non-conspiring competitors of conspirators); *In re Uranium Antitrust Litig.*, 552 F. Supp. 518 (N.D. Ill. 1982) (granting standing for direct purchaser of uranium from non-defendant non-conspirators). Put simply, opinions vary.

[26] *See also In re Processed Egg Prods. Antitrust Litig.*, 881 F.3d 262, 276 (3d Cir. 2018) ( purchasers of egg products form non-conspiring suppliers had antitrust standing to pursue a claim against suppliers that had conspired to reduce the supply of eggs, concluding that antitrust standing was not dependent on "whether it is the Suppliers, as opposed to someone else, who benefitted from the overcharges the Purchasers paid."); *In re Lower Lake Erie Iron Ore Antitrust Litig.*, 998 F.2d 1144, 1168 (3d Cir. 1993) (steel producers had antitrust standing despite making payments for ore movement services to "non-defendants" because "it was unquestionably the steel companies who bore the brunt of the increased costs attributed to the [conspiracy]"), *cert denied*, *Bessemer & Lake Erie R.R. Co. v. Wheeling-Pittsburgh Steel Corp.*, 510 U.S. 1091 (1994); *In re Beef Indus. Antitrust Litig.*, 600 F.2d 1148, 1166 n.24 (5th Cir. 1979) ("It is enough if, as alleged, the conspirators' activities caused a *general depression in wholesale prices*) (emphasis added)).

to no dispositive conclusions").[27]

In a typical umbrella liability case, conspirators seek to limit output, causing higher market prices. *See* Phillip E. Areeda & Herbert Hovenkamp, ANTITRUST LAW: AN ANALYSIS OF ANTITRUST PRINCIPLES AND THEIR APPLICATION ¶ 347 (4th ed. 2018) ("Areeda & Hovenkamp"). Although innocent suppliers are under no obligation to increase their output in return, unless the output reduction is "fully offset" (*i.e.*, output is increased by an amount that offsets the conspirators' cutback), innocent suppliers sell, and purchasers buy, under this "price umbrella" spread, giving rise to plaintiff's injury. *See London Silver Fixing*, 213 F. Supp. 3d at 555; Areeda & Hovenkamp ¶ 347. Because purchasers from innocent suppliers pay this overcharge "just as certainly as if they had bought from the conspirators, their injury can be compensated only by allowing them to sue the conspirators." Areeda & Hovenkamp ¶ 347; *In re Copper Antitrust Litig.* 98 F. Supp. 2d 1039, 1051 (W.D. Wis. 2000) (an umbrella plaintiff is injured every time it purchases the overcharged product in the same market, regardless of who the seller is).

Similarly, Amex's imposition of its ASRs chill interbrand competition, increasing overall transaction prices and reducing the volume of transactions in the relevant market. SAC ¶¶ 80–81. Thus, the reduced output effect of Amex's ASRs – higher overall prices – is not "fully offset" in output or benefits in the relevant market. *See* SAC ¶¶ 1, 40, 61, 80–85; *United States v. Am. Express Co.*, 88 F. Supp. 3d at 215 ("Amex's Value Recapture price increases were *not wholly offset* by additional rewards expenditures or otherwise passed through to cardholders, and resulted in a higher net price.") (emphasis added)).

---

[27] *See also Pollock v. Citrus Assocs. of N.Y. Cotton Exch., Inc.*, 512 F. Supp. 711, 719 (S.D.N.Y. 1981) (defendants restricted the supply of offsetting contracts, causing "the price throughout the market" to rise as a result of the defendants' activities); *Strax v. Commodity Exch., Inc.*, 524 F. Supp. 936, 939–40 (S.D.N.Y. 1981) (holding non-exchange defendants conspired to and caused the price of silver to rise; defendants actions had a "primary impact" on the market in which plaintiff traded "as a whole"); *Commodity Exch.*, 213 F. Supp. 3d at 655–56 (granting umbrella standing at pleading stage).

Notably, "umbrella standing concerns" arise when a cartel or monopolist controls "only part of a market," but a purchaser of a non-cartel member alleges a "sustained injury by virtue of the cartel's raising of prices in the market as a whole." *Gelboim*, 823 F.3d at 778; *see also Pollock*, 512 F. Supp. at 719 n.9 (distinguishing umbrella liability where "an oligopoly or price fixing arrangement *allows* a relatively small seller to raise its price[s]" as opposed to an arrangement where a seller in a "restricted market" is "*compelled*" to raise prices) (emphasis added). Here, Plaintiffs do not allege that Amex's anticompetitive conduct merely altered prices within a segment of the market; rather, Amex leveraged its market power as the second largest player in this four-player market to eliminate competition among all the credit card networks, which this Court has found had a direct effect on prices in the *entire* market. *See* SAC ¶¶ 71–81; *United States v. Am. Express Co.*, 88 F. Supp. 3d at 216.[28]

Amex further attempts to deny that it caused the V/MC/D Class' injuries under umbrella liability, claiming "[c]ountless factors" affect the rates that the other three market players charge. Amex Mem., at 14. Not only would this be a factual determination improper at the pleading stage, but this Court has already determined that Amex's ASRs have a direct impact on the entire market.[29] *See United States v. Am. Express Co.*, 88 F. Supp. 3d at 216. Even if it were true that

---

[28] Contrary to Amex's contention, *see* Amex. Mem., at 14, the Supreme Court merely "suggest[ed]" in dictum "that the cause of increased merchant fees is not Amex's antisteering provisions." *Ohio v. Am. Express Co.*, 138 S. Ct. at 2288. The Court did not reach a "conclu[sion]" on the issue.

[29] The cases on which Amex relies to discount "umbrella liability" are not to the contrary, and as distinguished from here, damages would be speculative or difficult to determine. *See Gross v. New Balance Athletic Shoe, Inc.*, 955 F. Supp. 242, 246-47 (S.D.N.Y. 1997) (denying umbrella liability and noting "the causal connection between the alleged injury and the conspiracy is attenuated by significant intervening causative factors"); *Mid-West Paper Prods. Co. v. Cont'l Grp.*, 596 F.2d 573, 584-86 (3d Cir. 1979) (applying *Illinois Brick*, a divided panel determined that the "causal link" between plaintiff's injuries and defendants conduct was "tenuous" because a small seller was merely permitted not compelled to raise prices). The other cases involve plaintiffs that transacted, unlike here, in a derivatives market rather than the market in which defendants allegedly carried out their anticompetitive scheme. *See FrontPoint Asian Event Driven Fund, L.P. v. Citibank, N.A.,* No. 16-CIV-5263, 2018 WL 4830087 (S.D.N.Y. Oct. 4, 2018); *Sullivan v. Barclays PLC*, No. 13-CV-2811, 2017 WL 685570, at *15 (S.D.N.Y. Feb. 21, 2017); *see also Ocean View Capital., Inc. v. Sumitomo Corp. of Am.*, No. 98-CIV-4067, 1999 WL 1201701, at *7 n.2 (S.D.N.Y. Dec. 15, 1999) (recognizing that "courts in this circuit have found standing for plaintiffs who trade in the same exchange market as defendants but who do not allege that they interacted directly with defendants").

Visa, MasterCard, and Discover had the ability to lower prices, this break in causation "does not excuse" defendants "from paying damages to umbrella plaintiffs." Areeda & Hovenkamp ¶ 347; *see London Silver Fixing*, 213 F. Supp. 3d at 555 (anticompetitive conduct that affects the entire market leads to "little room for any interfering price impact due to the actions of non-culpable entities or exogenous market forces"). Accordingly, the V/MC/D Class has plausibly alleged an actionable antitrust injury as if they had transacted directly with Amex.

### ii.   Regardless of Umbrella Liability, Plaintiffs' Injuries Are "Direct"

Separate and apart from the viability of "umbrella" liability, the V/MC/D Class has sufficiently alleged "direct" injury stemming from conduct that has had anticompetitive "market-wide effects" on pricing, which courts in this Circuit routinely recognize. *See e.g., Namenda*, 331 F. Supp. 3d at 213; *Dennis*, 343 F. Supp. 3d at 162; *DDAVP*, 585 F.3d at 688. Under this theory, injuries do not present concerns about whether innocent retailers would have acted differently but for a defendant's anticompetitive behavior. Rather, courts focus on whether the defendant's conduct necessarily impacted the entire market, forcing purchasers to pay supracompetitive prices. *See DDAVP*, 585 F.3d at 688.

Amex challenges the V/MC/D Class' antitrust standing by stating the obvious—that V/MC/D Class merchants "are not Amex consumers or competitors." Amex Mem., at 17. But as explained above, antitrust standing does not hinge on such a "privity-only" rule. *See DDAVP*, 585 F.3d at 688 (harming competitors "was simply a means for the defendants to charge the plaintiffs higher prices").[30] Instead, when a defendant "intentionally restrict[s]" and

---

[30] *Compare with In re Libor-Based Fin. Instruments Antitrust Litig.*, No. 11-MDL-2262, 2016 WL 7378980, at *15-16 (S.D.N.Y. Dec. 20, 2016) (denying antitrust standing only to " Bondholder" plaintiffs because those plaintiffs had a *choice* of incorporating LIBOR (the price-fixed component) into their transactions, but acknowledging "the antitrust laws do not require a plaintiff to have purchased directly from a defendant in order to have antitrust standing"); *IBM Corp. v. Platform Solutions., Inc.*, 658 F. Supp. 2d 603, 609 (S.D.N.Y. 2009) (rejecting plaintiff's "antitrust injury" based on IBM's refusal to license its *software* to third parties which caused plaintiff's *hardware* sales to cease).

"manipulate[s]" competition in the market to increase prices, even a plaintiff purchasing from a defendant's competitor has suffered a direct injury from the defendant. *See generally Namenda*, 331 F. Supp. 3d at 213 (holding that injuries suffered by class of "Non-Forest Generic Purchasers" were "the direct result of the asserted antitrust violation," despite not having purchased from defendants); *Dennis*, 343 F. Supp. 3d at 162 (holding that plaintiffs who engaged in derivative transactions at prices impacted by defendants' alleged manipulation of short-term interest rate were efficient enforcers, even though they did not transact directly with defendants).

As the SAC alleges, Amex sought to *eliminate* price competition on the merchant side of the market by *manipulating* the interaction between merchants and cardholders via its ASRs. *See* SAC ¶ 74 (Amex's "[ASRs] restrict the elements of the choice that both merchants and cardholders should have in completing their transactions," eliminating "the economic incentive for all credit card networks to price compete…"). Merchant fees rose to supracompetitive levels as a result of this restriction, which in turn increased overall retail transaction prices. SAC ¶¶ 1, 73–79. And while V/MC/D Class merchants may not be competitors or customers of Amex, harming them "was simply a means" for Amex to eliminate price competition and increase transaction costs. *DDAVP*, 585 F.3d at 688. Thus, the V/MC/D Class' injuries flow directly from Amex's anticompetitive scheme.[31]

### b. The Remaining *AGC* Factors Demonstrate that the V/MC/D Class Members Are Efficient Enforcers of the Antitrust Laws

The remainder of the "efficient enforcement" *AGC* factors all support a conclusion that the V/MC/D Class constitutes proper plaintiffs.

As to the second factor, a plaintiff's "motivation" to bring a claim, Amex asserts that

---

[31] Where the record is not sufficiently developed, causation and standing concerns "must be deferred to the class certification stage." *In re Commodity Exchange, Inc.*, 213 F. Supp. 3d at 656.

Amex-accepting merchants are more "directly" positioned than the V/MC/D Class. Amex Mem., at 18. But this is simply a reiteration of Amex's argument that lack of privity is dispositive of antitrust standing. As shown above, this is not so. Moreover, this second factor looks for "*an* entity most motivated by self-interest, not *the* entity most motivated by self-interest." *DDAVP*, 585 F.3d at 688–89. Thus, even if the Amex-accepting merchants might be the "most motivated", the V/MC/D Class are also motivated due to their "natural economic self-interest in paying the lowest price possible." *Id*. ("'Inferiority' to other potential plaintiffs . . . is not dispositive.").[32]

As to the third factor, the "speculativeness" of plaintiff's injuries, Amex contends that the V/MC/D Class' injuries are "highly speculative," Amex Mem., at 18, failing to note that the proper inquiry is whether plaintiff's injury would *necessarily* be highly speculative." *Dennis*, 343 F. Supp. 3d at 166–67 (emphasis added). This argument again is derivative of Amex's unsound "privity only" view of the law. Plaintiffs' injuries are not speculative even absent "transactions" with Amex. *See* SAC ¶¶ 74–76; *Processed Egg Prods.*, 881 F.3d at 276. Allegations of injury in the *same* market in which a defendant is alleged to have carried out its anticompetitive conduct provides proof of the impact of the defendant's conduct and would not require speculation.[33] Further, Amex's contention that damages here are speculative is improper at this point in the litigation. Still, damages here may be readily measured by the overcharge paid

---

[32] Most members of the V/MC/D Class have lower profit margins than most Amex-accepting merchants, which tend to be larger retailers; thus, increased merchant fees harm the V/MC/D Class merchants to a greater degree. *See* SAC ¶¶ 55, 82, 86.

[33] *See e.g., Strax*, 524 F. Supp. at 939 (allegations of trading "in the very market which the defendants are alleged to have manipulated" removed speculation that defendants' conduct impacted plaintiff); *Pollock*, 512 F. Supp. at 719 (allegations of paying higher prices "due to defendants' restriction on the supply" was sufficient; plaintiffs "were well within the 'target area' of the defendants' alleged anticompetitive behavior").

by all merchants[34]—*i.e.*, the difference between the actual "price" of merchant fees and the presumed competitive "price" of merchant fees. *See Processed Egg Prods.*, 881 F.3d at 276. Plaintiffs have pleaded such allegations here, and the overcharge will be supported by the evidence that is put forward. SAC ¶¶ 22–24; 60–64; 79.

Even if, as Amex claims, exogenous factors existed, that fact alone is not dispositive of antitrust standing. *See e.g., In re London Silver Fixing*, 213 F. Supp. 3d at 557 (in "most antitrust cases" "exogenous factors affect price movements," but the "speculative nature of [p]laintiffs' injuries and damages can be best resolved at a later stage"); *Grosser v. Commodity Exch., Inc.*, 639 F. Supp. 1293, 1319–20 (S.D.N.Y. 1986), *aff'd*, 859 F.2d 148 (2d Cir. 1988) (rejecting existence of extraneous factors affecting price movement as grounds to deny standing).

Finally, contrary to Amex's contention, the presence of the V/MC/D Class does not present a danger of complex damage apportionment or "duplicative recovery." Amex's concern that *some* plaintiffs in a *separate* case have settled with Visa and MasterCard is erroneous. *See* Amex Mem., at 19. Plaintiffs here base their allegations on *Amex's* ASRs and not on the anti-steering provisions that Visa and MasterCard imposed through 2010. These are *distinct* claims seeking recovery from a *different* defendant.

Even so, that V/MC/D Class merchants did not pay fees to Amex does not pose any risk of damages exceeding the "aggregate harm" (Amex Mem., at 18–19) because antitrust liability is joint and several under § 1 of the Sherman Act, where damages "may be had from either or both defendants without regard to their relative responsibility for originating the combination or their

---

[34] Amex relies on *Gatt Communications, Inc.* and *Sonterra Capital Master Fund,* but in those actions, it was impossible to determine damages in the "but-for" world based on multiple attenuating factors. *Gatt Commc'ns, Inc. v. PMC Assocs. L.L.C.*, 711 F.3d 68, 79 (2d Cir. 2013); *Sonterra Capital Master Fund Ltd. v. Credit Suisse Grp. AG*, 277 F. Supp. 3d 521, 564 (S.D.N.Y. 2017).

different roles in effectuating its end." *In re Foreign Exch. Benchmark Rates Antitrust Litig.*, No. 13 CIV. 7789 (LGS), 2016 WL 5108131, at *7 (S.D.N.Y. Sept. 20, 2016) ("*FOREX*").[35] As the *FOREX* court observed in an antitrust standing challenge brought by non-settling banks, the fact that some wrongdoers have already agreed to settlements "has nothing to do with the efficient enforcer analysis, particularly *Gelboim*'s concern with disproportionate damages." *Id.* Like the non-settling banks in *FOREX*, Amex here essentially asserts that "the antitrust laws' imposition of treble damages and the provision for joint and several liability are themselves 'disproportionate.'" *Id.* (underscoring that defendants do not and could not cite any authority for this line of reasoning). Here, there is no concern for duplicative recoveries, nor could there be, because Amex, like any wrongdoer, will only be responsible for the effects in the relevant market of its own anticompetitive conduct. *See id.*

Viewing the allegations in the light most favorable to Plaintiffs as required at the Rule 12 (b)(6) stage, there can be no question that the V/MC/D Class has antitrust standing.

### C. The California Subclass Has Standing

Amex's argument that the California V/MC/D Subclass claims must be dismissed fails for the same reasons that its federal antitrust standing argument fails. *See* Amex Mem., at 2. Amex cites a string of cases to support its application of the *AGC* factors to a Cartwright Act claim, as well as to support its contention that any harm the California V/MC/D Subclass suffered is necessarily derivative of harm allegedly inflicted on a third party.[36] But those cases do not reflect the best authority on this issue.

---

[35] *See also Tex. Indus., Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630 (1981) (no right of contribution in federal antitrust case; each conspirator is jointly and severally liable for the entire reward).

[36] *See* Amex Mem., at 20 (citing *In re Libor-Based Fin. Instruments*, 2016 WL 7378980, at *24; *In re WellPoint Inc. Out-of-Network UCR Rates Litig.*, 903 F. Supp. 2d 880 (C.D. Cal. 2012); *Kwikset Corp. v. Superior Court*, 246 P.3d 877 (Cal. 2011)).

First, the application of the *AGC* factors to Cartwright Act claims is "murky," with the California Supreme Court stating that "[i]nterpretations of federal antitrust law are at most instructive, not conclusive[.]" *Aryeh v. Canon Bus. Solutions, Inc.,* 292 P.3d 871, 877 (Cal. 2013); *In re Capacitors Antitrust Litig.*, 106 F. Supp. 3d 1051, 1073 (N.D. Cal. 2015).

Moreover, the California V/MC/D Subclass' allegations stand regardless of whether the *AGC* factors are applied. Like the V/MC/D Class, the California V/MC/D Subclass's injuries are of the type that the antitrust laws were intended to forestall. The Cartwright Act and applicable decisions hold that plaintiffs lacking "privity" with defendants may still recover: the measure of harm is not speculative; recovery cannot be duplicative when injunctive relief is granted; and damages will not be difficult or complex to apportion. *See* Cal. Bus. & Prof. Code § 16750(a) (allowing suit by any injured person "regardless of whether such injured person dealt directly or indirectly with the defendant"); *Cnty. of San Mateo v. CSL Ltd.*, No. 10-CV-05686-JSC, 2014 WL 4100602, at *3 (N.D. Cal. Aug. 20, 2014).[37]

Finally, the disposition of Sherman Act claims is independent of California antitrust claims here. *See e.g., Samsung Elecs. Co. v. Panasonic Corp.*, 747 F.3d 1199, 1205, 1205 n.4 (9th Cir. 2014) (reversing dismissal of Cartwright Act claims; district court incorrectly determined claims were controlled by dismissal of federal antitrust claims); *San Mateo*, 2014 WL 4100602, at *4 (umbrella damages are recoverable under the Cartwright Act, even if they are not recoverable under the Sherman Act).

---

[37] Amex concedes that if the V/MC/D Class has standing under the Sherman and Cartwright Acts they also have standing under the California Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200. Amex Mem., at 21. Because the V/MC/D Class merchants have standing under the Sherman and Cartwright Acts, they therefore have standing under the UCL. *See In re WellPoint, Inc. Out-of-Network UCR Rates Litig.*, 865 F. Supp. 2d 1002, 1049 (C.D. Cal. 2011) ("Because Plaintiffs have adequately stated a claim under the Sherman Act, Plaintiffs have also stated a claim under the UCL's unfair and unlawful prongs.").

## CONCLUSION

For the foregoing reasons, the Court should deny Amex's Motion in its entirety.

Dated: March 1, 2019

Respectfully submitted,

*/s/ Michael D. Hausfeld*
Michael D. Hausfeld
HAUSFELD LLP
1700 K Street, NW
Suite 650
Washington, DC 20006
Phone: (202) 540-7200
mhausfeld@hausfeld.com

Irving Scher
Scott A. Martin
HAUSFELD LLP
33 Whitehall Street
14th Floor
New York, NY 10004
Phone: (646) 357-1100
ischer@hausfeld.com
smartin@hausfeld.com

*Interim Lead Counsel for the*
*Class Plaintiffs*

Mark Reinhardt
Mark A. Wendorf
REINHARDT WENDORF &
BLANCHFIELD
1250 East First National Bank
332 Minnesota Street
St. Paul, MN 55101
(651) 287-2100

Vincent J. Esades
HEINS MILLS & OLSON, P.L.C.
310 Clifton Avenue
Minneapolis, MN 55403
(612) 338-4605

*Counsel for the*
*Class Plaintiffs*

25