

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------X

IN RE AMERICAN EXPRESS ANTI-STEERING
RULES ANTITRUST LITIGATION

---------------------------------------------------------------

This Document Relates to:

The Consolidated Class Action

---------------------------------------------------------------

ANIMAL LAW, INC., IL FORNO, INC., ITALIAN
COLORS RESTAURANT, JASA INC., LOPEZ-
DEJONGE, INC., PLYMOUTH OIL CORP. d/b/a
LIBERTY GAS STATION, CLAM LAKE
PARTNERS, LLC, QWIK LUBE, LLC, and
LAJOLLA AUTO TECH, INC., on behalf of
themselves and all others similarly situated,

                                    Plaintiffs,

            -against-

AMERICAN EXPRESS COMPANY and
AMERICAN EXPRESS TRAVEL RELATED
SERVICES COMPANY, INC.,

                                    Defendants.

---------------------------------------------------------------X

**MEMORANDUM & ORDER**

**11-MD-2221 (NGG) (RER)**

NICHOLAS G. GARAUFIS, United States District Judge.

Plaintiffs bring claims against Defendants American Express Company and American

Express Travel Related Services Company, Inc. (together, "Amex") on behalf of two putative

classes: (1) a class of merchants who accept Amex cards pursuant to a Card Acceptance

Agreement ("CAA") with Amex (the "Amex Class"); and (2) a class of merchants who do not

accept Amex cards and who have no contract with Amex (the "Non-Amex Class").  (See Second

Amended Consolidated Class Action Complaint ("SAC") (Dkt. 864).)  Currently pending before

the court are two motions: (1) Amex's motion to stay proceedings and compel arbitration of all the Amex Class's claims; and (2) Amex's motion to dismiss all of the Non-Amex Class's claims under Federal Rules of Procedure 12(b)(1) and 12(b)(6).  (See Mot. to Compel & Mot. to Dismiss ("Mot.") (Dkt. 875).)

For the following reasons, Amex's motion to compel arbitration is GRANTED and its motion to dismiss is GRANTED as to the Non-Amex Class.

## I.     BACKGROUND

This action challenges non-discrimination provisions (the "Anti-Steering Rules") contained in the CAAs.  (SAC ¶ 1.)  Plaintiffs allege that the Anti-Steering Rules unreasonably restrain interbrand price competition among general purpose credit and charge card networks ("credit card networks") because they: "(1) stifle competition among the networks; (2) impose supracompetitive merchant fees, with corresponding offsetting credit card user economic benefits; (3) increase the overall price of credit card transactions above competitive levels; and (4) raise consumer retail prices throughout the country, thereby reducing output."  (Id.)

The background of this case—including the procedural history, the restraints on competition, the workings of the credit-card market in general, and Amex's platform in particular, etc.—have been discussed at great length in this court's previous opinions in this matter and in the related case brought by the federal government.  See In re Am. Exp. Anti-Steering Rules Antitrust Litig., 361 F. Supp. 3d 324, 331-34 (E.D.N.Y. 2019); In re Am. Exp. Anti-Steering Rules Antitrust Litig., No. 11-MD-2221 (NGG), 2016 WL 748089, at *1-4 (E.D.N.Y. Jan. 7, 2016); United States v. Am. Exp. Co. ("U.S. v. Amex"), 88 F. Supp. 3d 143, 149-67 (E.D.N.Y. 2015), rev'd, 838 F.3d 179 (2d Cir. 2016), aff'd sub nom. Ohio v. Am. Exp.

Co. ("Ohio"), 138 S. Ct. 2274 (2017).  The court facts and aspects of the procedural history
necessary to introduce and to decide the instant motion are laid out below.

### A.     The Parties

The class representatives fall into two groups.  The representatives of the Amex Class,
which accept Amex cards, are: (1) Animal Land, Inc., a Georgia corporation; (2) Il Forno, Inc., a
California corporation; (3) Italian Colors Restaurant, a California business; (3) Jasa Inc., a
Louisiana corporation; (4) Lopez-Dejonge, Inc., an Alabama corporation; (5) Plymouth Oil
Corp. d/b/a Liberty Gas Station, a Pennsylvania corporation, and (6) Clam Lake Partners, LLC
(successor in interest to previous class representative Firefly Air Solutions, LLC), a Minnesota
corporation.  (Id. ¶¶ 5-11).  The representatives of the Non-Amex Class, which do not accept
Amex cards, are: (1) Qwik Lube, LCC, a New York corporation and (2) LaJolla Auto Tech, Inc.,
a California corporation.  (Id. ¶¶ 12-13.)  Plaintiffs also assert the existence of two California
Subclasses: A California Amex Subclass and a California Non-Amex Subclass.  (Id. ¶ 104(c).)
The California Amex Subclass is represented by Il Forno, Inc. and Italian Colors Restaurant, and
the California Non-Amex Subclass is represented by LaJolla Auto Tech., Inc.  (Id.)  All Plaintiffs
are merchants.  (Id. ¶ 104.)

Defendant American Express Company is a New York corporation.  (Id. ¶ 14.)
Defendant American Express Travel Related Services Company, Inc. is a Delaware corporation
with its principal place of business in New York, New York.  (Id. ¶ 15.)  It is a wholly owned
subsidiary of American Express Company.  (Id.)

### B.     The Relevant Market

Plaintiffs lay out two geographic markets: (1) the United States for Counts One, Two, and
Three; and (2) California for Counts Four and Five.  (SAC ¶ 22.)  The relevant product market is

the two-sided credit card market, including all transactions provided by Amex and its competitors, MasterCard, Discover, and Visa.  (Id. ¶ 23.)

### C.   The Credit Card Industry

Amex is one of four significant competitors in the nationwide credit card market.  (SAC ¶ 25.)  The others are Visa, MasterCard, and Discover; in 2018, the Supreme Court described their market shares as Visa 45%, Amex 26.4%, MasterCard 23.3%, and Discover 5.3%.  (Id. ¶ 51 (citing Ohio, 138 S. Ct. at 2282).)  According to Plaintiffs, these market shares have not meaningfully changed in many years.  (Id.)

Credit card companies provide services both to cardholders, who use the cards to purchase goods and services, and to merchants, who accept those cards as payment in exchange for goods and services.  These credit card companies thus operate a two-sided platform, offering services to two, distinct groups (merchants and consumers) and facilitating transactions between them.  See Ohio, 138 S. Ct. at 2280.  Credit card companies need to make a sale to both sides of the market to succeed; after all, "no credit-card transaction can occur unless both the merchant and the cardholder agree to use the same credit-card network."  Id.  (See also SAC ¶ 18.)  Amex offers services directly to both merchants and consumers.  (SAC ¶ 27.)

As Plaintiffs allege, "[w]hen a consumer uses a credit card, the merchant's point of sale terminal transmits a record of the transaction to the card's network."  (Id. ¶ 20.)  The network then pays, or facilitates the payment of, money for that transaction to the merchant, consisting of the purchase price charged to the customer minus the fee that network or bank charges merchants.  (Id.)  Consumers may also pay fees to use their credit cards and get rewards for making purchases with a particular card.  (Id. ¶ 21.)  Unlike its competitors, who charge variable merchant fees depending on the particular card the individual consumer is using, "Amex charges

a single, typically higher merchant fee for all Amex credit cards." (Id. ¶ 32.) Plaintiffs further

allege that, unlike its competitors, "Amex's revenues are primarily dependent on its merchant

fees." (Id. ¶ 34.)

### D. The CAA

#### 1. Relevant Version of the Agreement

According to Amex, the "current, operative" form of the CAA between Amex and the

merchants in the Amex Class has been in effect since October 2018. (Mot. at 5.) Plaintiffs do

not state whether they disagree or disagree with this assertion, but do note:

> In the [SAC], Plaintiffs assert that Amex arbitration agreements also
> state ". . . the arbitrator's authority to make awards is limited to
> awards to you and us alone." SAC ¶ 90. For years, this language
> was contained in the Amex arbitration agreement, but was removed
> by Amex in the 2018 edition of the agreement. Notwithstanding this
> change, the 2018 agreement continues to prohibit Plaintiffs from
> obtaining market-wide injunctive relief against Amex.

(Pls. Resp. Mem. in Opp'n to Mot. ("Opp'n") (Dkt. 879) at 2 n.6.) Amex does not dispute this

characterization of the changes made in 2018, and agrees with Plaintiffs that the agreement

prohibits Plaintiffs from obtaining market-wide injunctive relief (see Amex May 24, 2019 Letter

(Dkt. 894)). The court will therefore cite to the 2018 version of the CAA Amex has provided.

All members of the Amex Class are bound by this agreement. (See SAC ¶¶ 47, 90.)

#### 2. Arbitration Provisions

The CAA provides, inter alia:

> You or we may elect to resolve any Claim by individual, binding
> arbitration.
>
> . . .
>
> If arbitration is chosen by either party, neither you nor we will have
> the right to litigate that Claim in court or have a jury trial on that
> Claim. Further, you and we will not have the right to participate in
> a representative capacity or as a member of any class pertaining to

5

any Claim subject to arbitration. . . . The arbitrator's decisions are as enforceable as any court order and are subject to very limited review by a court.  Except as set forth below, the arbitrator's decision will be final and binding.

(2018 CAA (Dkt. 877-3) § 7.c.)  The provision defines "Claim" as:

[A]ny claim (including initial claims, counterclaims, cross-claims, and third-party claims), dispute, or controversy between you and us arising from or relating to the Agreement or prior Card acceptance agreements, or the relationship resulting therefrom, whether based in contract, tort (including negligence, strict liability, fraud, or otherwise), statutes, regulations, or any other theory, including any question relating to the existence, validity, performance, construction, interpretation, enforcement, or termination of the Agreement or prior Card acceptance agreements, or the relationship resulting therefrom, except for the validity, enforceability, or scope of section 7.c of the General Provisions.

(Id. § 1.c.)

3.    Anti-Steering Rules

Amex's Anti-Steering Rules provide that merchants may not:

- indicate or imply that they prefer, directly or indirectly, any Other Payment Products over [Amex] Card[s];

- try to dissuade cardholders from using [their Amex] Card;

- criticize or mischaracterize [the Amex] Card or any of [Amex's] services or programs;

- try to persuade or prompt cardholders to use any Other Payment Products or any other method of payment (e.g., payment by check);

- impose any restriction, conditions, or disadvantages when the Card is accepted that are not imposed equally on all Other Payment Products, except for ACH funds transfer, cash, and checks;

- engage in activities that harm [Amex's] business or the American Express Brand (or both);

- or promote any Other Payment Products (except the Merchant's own private label card that they issue for use

6

> solely at their Establishments) more actively than the
> Merchant promotes Amex.

(SAC ¶ 46.)

### E.   Related Actions

In 2008, some merchants first brought suit against Amex in this court (initiating the "MP

Actions"). See In re Amex, 2016 WL 748089, at *2 & n.3.  Then, in October 2010, the

Department of Justice and the attorneys general of eighteen states filed suit against Amex,

MasterCard, and Visa (the "Government Action").[1]  The Government Action proceeded to a

bench trial during the summer of 2014.  On February 19, 2015, the court found by a

preponderance of the evidence that the specific NDPs challenged by the Government violate

Section 1 of the Sherman Act.  After receiving additional briefing from the parties to the

Government Action, as well as other interested parties, the court issued a permanent injunction

on April 30, 2015.  United States. v. Am. Exp. Co., No. 10-CV-4496 (NGG), 2015 WL 1966352

(E.D.N.Y. Apr. 30, 2015), rev'd, 838 F.3d 179, aff'd sub nom. Ohio, 138 S. Ct. 2274.  The court

denied Amex's motion to stay the permanent injunction pending appeal.  United States v. Am.

Exp. Co., No. 10-CV-4496 (NGG), 2015 WL 13735045 (E.D.N.Y. May 19, 2015).  Amex then

filed a notice of appeal and sought a stay pending appeal from the Second Circuit.  Although a

three-judge panel of the Second Circuit initially denied Amex's motion to stay (Order of USCA

(Dkt. 687 in No. 10-CV-4496)), the Second Circuit ultimately entered a temporary stay of the

permanent injunction and a temporary stay of the Government Action in this court (Order of

USCA (Dkt. 697 in No. 10-CV-4496)).

---

[1] Visa and MasterCard entered into consent decrees with the Government on the same day that the Government
Action was initiated; only Amex remained as a defendant.  See In re Amex, 2016 WL 748089, at *2 n.5.

On September 26, 2016, the Second Circuit reversed this court's judgment in the Government Action, holding that the court erred in excluding the market for cardholders from its definition of the relevant market.  See U.S. v. Amex, 838 F.3d at 197, 206-07.  Because the Second Circuit found that the Government could not, on the facts of the case, prove net harm to both cardholders and merchants, it directed this court to enter judgment in favor of Amex.  Id. at 207.  Certain state plaintiffs then sought certiorari, which the Supreme Court granted.  Ohio v. Am. Exp. Co., 138 S. Ct. 355 (Mem) (2017).  On June 25, 2018, the Supreme Court affirmed the Second Circuit, holding that this court should have included both sides of the Amex platform when defining the relevant market.  Ohio, 138 S. Ct. at 2285-86.

Following the Supreme Court's affirmance of the dismissal of the Government Action, matters resumed in the MP Actions.  The court granted Amex's motion for partial summary judgment in January of 2019, see In re Amex, 361 F. Supp. 3d at 347, and the MP Actions were voluntarily dismissed with prejudice on April 12, 2019.  (See Stip. & Order of Dismissal (Dkt. 213 in Case No. 08-CV-2315).)

**F.     The Consolidated Class Actions**

The procedural history of the consolidated class actions is complex and need not be repeated in full here.  For a detailed accounting of the development of the class action component of the litigation, see the court's 2015 Memorandum and Order denying approval of the Class Settlement Agreement.  (Aug. 4, 2015 Mem. & Order (Dkt. 657).)  After a variety of stays and other proceedings, most notably the Supreme Court's decision in Ohio, 138 S. Ct. 2274, Plaintiffs filed their Second Amended Consolidated Class Action Complaint (the "Second Amended Complaint") on December 17, 2018.  (SAC.)  The Second Amended Complaint asserts the following claims for relief: on behalf of the Amex Class for violation of § 1 of the Sherman

Act, based on the Anti-Steering Rules (SAC ¶¶ 111-22); on behalf of the Non-Amex class for violation of § 1 of the Sherman Act, based on the Anti-Steering Rules (SAC ¶¶ 123-26); on behalf of the Amex class for violation of § 1 of the Sherman Act, based on the aspect of the CAA's arbitration provisions disallowing collective action (SAC ¶¶ 127-29); and on behalf of the California subclasses for violation of California Antitrust Laws and the California Unfair Competition Law (SAC ¶¶ 130-40).

On March 15, 2019, Amex filed its fully briefed motion to compel arbitration of the Amex Class's claims and motion to dismiss the Second Amended Complaint. (Mot.; Opp'n; Defs. Reply in Further Supp. of Mot. ("Reply") (Dkt. 882).) On May 22, 2019, Plaintiffs filed a supplemental letter notifying the court of the Supreme Court's decision in Lamps Plus, Inc. v. Varela, 139 S. Ct. 1407 (2019). (Pls. May 22, 2019 Letter (Dkt. 893).) Amex responded shortly thereafter. (Amex May 24, 2019 Letter.)

## II.    MOTION TO COMPEL ARBITRATION

### A.    Legal Standard

The Federal Arbitration Act ("FAA") provides that written agreements to arbitrate are "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. The FAA "is a congressional declaration of a liberal federal policy favoring arbitration agreements, notwithstanding any state substantive or procedural policies to the contrary." Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24 (1983). "This policy is founded upon 'a desire to preserve parties' ability to agree to arbitrate, rather than litigate, their disputes.'" Starke v. SquareTrade, Inc., 913 F.3d 279, 288 (2d Cir. 2019) (alteration adopted) (quoting Schnabel v. Trilegiant Corp., 697 F.3d 110, 118 (2d Cir. 2012)). Under Section 4 of the FAA, a party "aggrieved by the alleged failure, neglect, or

9

refusal of another to arbitrate under a written agreement for arbitration" may file a motion to compel, which a court must grant "upon being satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue." 9 U.S.C. § 4; see also AT&T Mobility LLC v. Concepcion, 563 U.S. 333, 354-55 (2011). Despite the FAA's "liberal federal policy favoring arbitration agreements," CompuCredit Corp. v. Greenwood, 565 U.S. 95, 98 (2012) (citation omitted), "arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit," In re Am. Express Fin. Advisors Sec. Litig., 672 F.3d 113, 127 (2d Cir. 2011) (quoting Howsam v. Dean Witter Reynolds, Inc., 537 U.S. 79, 83 (2002)). "[C]ourts must rigorously enforce arbitration agreements according to their terms," even in cases involving "claims that allege a violation of a federal statute, unless the FAA's mandate has been overridden by a contrary congressional command." Am. Express Co. v. Italian Colors Rest., 570 U.S. 228, 233 (2013) (quotation marks and citations omitted)).

In deciding a motion to compel arbitration, "the court applies a standard similar to that applicable to a motion for summary judgment." Bensadoun v. Jobe-Riat, 316 F.3d 171, 175 (2d Cir. 2003); see also Wachovia Bank, Nat'l Ass'n v. VCG Special Opportunities Master Fund, Ltd., 661 F.3d 164, 172 (2d Cir. 2011).

**B.    Discussion**

The Supreme Court's decision in Italian Colors controls. In that case, the Supreme Court considered the enforceability of the same arbitration provision as that at issue here. 570 U.S. at 231. The plaintiffs were merchants who accepted Amex cards and brought an antitrust suit against Amex, arguing that Amex impermissibly used its market power to force merchants to accept its credit cards while assessing fees approximately 30% higher than those for competing

credit cards. Id. Amex moved to compel arbitration based on the arbitration provision in their contract with the merchants—the same as that at issue here—that required all disputes between the parties to be resolved by arbitration and provided that "[t]here shall be no right or authority for any Claims to be arbitrated on a class action basis." Id. The Court found that the arbitration provision was enforceable under the FAA.

Plaintiffs argue that this case is different from Italian Colors because, "[u]nlike here, the plaintiffs in Italian Colors did not assert that market-wide injunctive relief was necessary to vindicate their statutory rights." (Opp'n at 6.) In so arguing, Plaintiffs rely on the "effective vindication" exception to the FAA, which allows courts to "invalidate, on public policy grounds, arbitration agreements that operate as a prospective waiver of a party's right to pursue statutory remedies." Id. at 235 (alterations adopted) (quotation marks, emphasis, and citations omitted). But Italian Colors is clear that Rule 23 does not establish an entitlement to class proceedings for the vindication of preexisting statutory rights. 570 U.S. at 234. As the Court observed, a class-action waiver "no more eliminates [ ] parties' rights to pursue their statutory remedy than did federal law before its adoption of the class action for legal relief in 1938." Id. at 236. The Court continued: "to put it differently, the individual suit that was considered adequate to assure 'effective vindication' of a federal right before adoption of class-action procedures did not suddenly become 'ineffective vindication' upon their adoption." Id. at 236-37.

Plaintiffs are correct that, under Italian Colors, the effective vindication exception "would certainly cover a provision in an arbitration agreement prohibiting the assertion of certain statutory remedies." Id. at 236. But the text of the CAA does not prohibit the assertion of any statutory remedies. Plaintiffs' primary argument seems to be that market-wide equitable relief is necessary for effective vindication of their rights under the Clayton Act, and that foreclosing

their ability to access that relief effectively prohibits their assertion of those rights.  (Opp'n at 3-4.)  This cannot be true.  As the Supreme Court observed in <u>Italian Colors</u>:

> The antitrust laws do not evince an intention to preclude a waiver of class-action procedure. . . . The Sherman and Clayton Acts make no mention of class actions.  In fact, they were enacted decades before the advent of Federal Rule of Civil Procedure 23, which was designed to allow an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only.

570 U.S. at 234 (alteration adopted) (quotation marks and citations omitted).  The parties there had "agreed to arbitrate pursuant to that usual rule," and, the Court held, "it would be remarkable for a court to erase that expectation."  <u>Id.</u> (quotation marks omitted).  This case is no different. Plaintiffs' claims that class action is necessary to vindicate their rights are nonsensical because, as the <u>Italian Colors</u> Court noted, class wide injunctive relief was not available at the time the Clayton Act was enacted.  <u>Id.</u> at 234.  Plaintiffs have provided no reason for this court to assume that the Clayton Act, at the time of its enactment, provided statutory rights that had no effective means of vindication.

Plaintiffs also submitted a supplemental letter arguing that the Supreme Court's recent decision in <u>Lamps Plus</u> further supports their position that the court should not compel arbitration.  (Pls. May 22, 2019 Letter at 1.)  It does not.  As Amex noted in response (Amex May 24, 2019 Letter), all parties agree that class arbitration is not permitted under the CAA. (<u>See id.</u>; Opp'n at 4.)  The <u>Lamps Plus</u> holding—that class arbitration may be compelled under the FAA only when it is affirmatively specified in the parties' agreement—is therefore irrelevant. <u>See Lamps Plus</u>, 139 S. Ct. at 1412.

Finally, Plaintiffs argue that the Seventh Amendment prohibits irrevocable arbitration agreements.  (<u>See</u> Opp'n at 8-9.)  This argument is unavailing.  It is true that the Seventh Amendment "preserve[s]" the right to trial by jury, U.S. Const. amend. VII, but the Constitution

permits waivers of this right via arbitration agreements between two private parties, see, e.g., Desiderio v. Nat'l Ass'n of Sec. Dealers, Inc., 191 F.3d 198, 206 (2d Cir. 1999); In re Currency Conversion Fee Antitrust Litig., 265 F. Supp. 2d 385, 414 (S.D.N.Y. 2003)). Plaintiffs cite no caselaw to the contrary.

The court therefore grants Amex's motion to compel arbitration of the Amex Class's claims.

## III.   MOTION TO DISMISS

The court will now address Amex's motion to dismiss the Non-Amex Class's claims under both federal and California law.[2]

### A.   Federal Claims

Section 4 of the Clayton Act establishes a private right of action to enforce Section 1 of the Sherman Act. 15 U.S.C. § 15. At the pleading stage, "[a]n antitrust plaintiff must show both constitutional standing and antitrust standing." Gelboim v. Bank of Am. Corp., 823 F.3d 759, 770 (2d Cir. 2016). Amex claims that Plaintiffs here have not met either burden. (Mot. at 11-20.) Because the court determines that Plaintiffs have not established Antitrust Standing for the Non-Amex class, it does not address constitutional standing.

At the motion to dismiss stage, "a private antitrust plaintiff must plausibly allege (a) that it suffered a special kind of antitrust injury, and (b) that it is a suitable plaintiff to pursue the alleged antitrust violations and thus is an efficient enforcer of the antitrust laws." In re London Silver Fixing, Ltd., Antitrust Litig., 213 F. Supp. 3d 530, 549 (S.D.N.Y. 2016) (quoting Gatt Commc'ns, Inc. v. PMC Assocs., L.L.C., 711 F.3d 68, 76 (2d Cir. 2013) (alterations adopted)

---

[2] The California law claims are asserted only by the California Non-Amex Subclass.

(quotation marks omitted)).  Because the court finds that Plaintiffs are not efficient enforcers of the antitrust law, it will not address whether they have plausibly alleged antitrust injury.

As the Second Circuit has described:

> The efficient enforcer inquiry turns on: (1) whether the violation was a direct or remote cause of the injury; (2) whether there is an identifiable class of other persons whose self-interest would normally lead them to sue for the violation; (3) whether the injury was speculative; and (4) whether there is a risk that other plaintiffs would be entitled to recover duplicative damages or that damages would be difficult to apportion among possible victims of the antitrust injury.

Gelboim, 823 F.3d at 772.  "[These] factors reflect a concern about whether the putative plaintiff is a proper party to perform the office of a private attorney general and thereby vindicate the public interest in antitrust enforcement." Id. at 780 (quotation marks and citation omitted). Moreover, "[t]hese four factors need not be given equal weight," and "the relevant significance of each factor will depend on the circumstances of the particular case." IQ Dental Supply, Inc. v. Henry Schein, Inc., 924 F.3d 57, 65 (2d Cir. 2019).

### 1.   Directness

This factor cuts against Plaintiffs.  "Directness in the antitrust context means close in the chain of causation." Gatt, 711 F.3d at 78 (citations omitted).  "The overall inquiry is akin to proximate cause in tort law—plaintiffs may not be 'too remote' so as to avoid 'duplicative recovery' and 'limitless[] increase [in] the universe of potential plaintiffs.'" Harry v. Total Gas & Power N. Am., Inc., 889 F.3d 104, 116 (2d Cir. 2018) (citing In re Aluminum Warehousing Antitrust Litig., 833 F.3d 151, 159, 162 (2d Cir. 2016)).  Amex argues that the Non-Amex Class "cannot be directly harmed by Amex's [Anti-Steering Rules] because they have no interaction with Amex or Amex's [Anti-Steering Rules]" and "are not Amex consumers or competitors." (Mot. at 17.)  Amex is correct that, as a general matter, those entities most directly injured by

anticompetitive conduct are customers or competitors of the defendant. Aluminum
Warehousing, 833 F.3d at 159. And, of course, the Non-Amex Class members are by definition
not direct customers or competitors of Amex.

Nonetheless, a plaintiff who is not a customer or competitor may suffer a direct injury if
it is "a participant in 'the very market directly distorted by the antitrust violation'" and its injury
is "inextricably intertwined with the injury the [defendants] sought to inflict." Id. at 159, 160
(quoting Blue Shield of Va. v. McCready, 457 U.S. 465, 484 (1982); SAS of PR, Inc. v. PR
Telephone Co., 48 F.3d 39, 46 (1st Cir. 1995)). And "to assess the plausibility of a putative
plaintiff's claim to antitrust injury as being inextricably intertwined with the injury the
defendants ultimately sought to inflict," this court must "ask whether the plaintiff was
manipulated or utilized by defendant as a fulcrum, conduit[,] or market force to injure
competitors or participants in the relevant product and geographical markets." Id. at 161.
Plaintiffs are indisputably participants in the two-sided credit card market—the very market
allegedly distorted by Amex's actions. The question for the court is thus whether their supposed
injury is inextricably intertwined with the injury Amex sought to inflict. It is not.

Amex first argues that Plaintiffs have not alleged a direct injury and instead present only
a so-called "umbrella" theory of liability. (Mot. at 12-14.) Although the Second Circuit has not
directly addressed the question,[3] district courts in this circuit to have considered such a theory of
liability—under which "a consumer who deals with non-defendants . . . alleges injury by virtue
of the defendants' conspiracy"—have determined that it cannot create antitrust standing.
FrontPoint Asian Event Driven Fund, L.P. v. Citibank, N.A., 16-CV-5263 (AKH), 2018 WL

---

[3] The Second Circuit has not yet explicitly addressed the viability of antitrust claims that rely on an umbrella theory of liability, but it has expressed concerns about allowing such claims to proceed. See Gelboim, 823 F.3d at 778-79 (noting that allowing claims under an umbrella theory of liability could "vastly extend the potential scope of antitrust liability" and could allow recovery for "damages disproportionate to wrongdoing").

4830087, at *6 (S.D.N.Y. Oct. 4, 2018) (citing Gelboim, 823 F.3d at 778); In re Platinum &

Palladium Antitrust Litig., 14-CV-9391 (GHW), 2017 WL 1169626, at *22 (S.D.N.Y. Mar. 28,

2017); Sullivan v. Barclays PLC, No. 13-CV-2811 (PKC), 2017 WL 685570, at *15-16

(S.D.N.Y. Feb. 21, 2017); In re LIBOR-Based Financial Instruments Antitrust Litig. ("LIBOR"),

No. 11-MDL-2262 (NRB), 2016 WL 7378980, at *16 (S.D.N.Y. Dec. 20, 2016)). "The concern

with so-called umbrella purchasers is that 'significant intervening causative factors, most

notably, the independent pricing decisions of non-conspiring retailers, attenuate the causal

connection between the violation and the injury.'" Sonterra Capital Master Fund, Ltc. v.

Barclays Bank PLC, 366 F. Supp. 3d 516, 545 (S.D.N.Y. 2018) (quoting LIBOR, 2016 WL

7378980, at *15).

"Umbrella standing concerns are most often evident when a cartel controls only part of a

market, but a consumer who dealt with a non-cartel member alleges that he sustained injury by

virtue of the cartel's raising of prices in the market as a whole." Gelboim, 823 F.3d at 778. That

is precisely the situation Plaintiffs allege here. As Amex notes, Plaintiffs "allege[] that Amex's

[Anti-Steering Rules] raise the prices charged by all credit card networks—even for merchants

who do not take Amex cards—because [the Anti-Steering Rules] purportedly restrain

competition between credit card networks at merchants who accept Amex." (Mot. at 12 (citing

SAC ¶¶ 73-75, 82).) The court need not—and will not—rule on whether an umbrella theory of

liability may ever create antitrust standing. It is enough to observe those general concerns and

note that they are particularly present here, where adopting Plaintiffs' proposed theory of liability

would expose Amex to damages for every merchant fee charged by every credit card network in

the United States.

Arguments about the umbrella theory of liability aside, Plaintiffs' alleged injuries are indirect. In Gatt, the Second Circuit considered an alleged "bid-rigging" or "bid rotation" scheme regarding the sale of radios to New York City and State government agencies. See 711 F.3d at 72. Plaintiff, a radio merchant, alleged that Defendants determined which radio merchant would submit the lowest bid and what the price would be. Id. The remaining dealers would then either "refrain from bidding or submit artificially inflated 'dummy quotations' for the contract." Id. Any merchant who refused to cooperate with the process would lose their license to deal the Vertex radios used by both the City and State governments. Id. The plaintiff refused to comply and, as a result, was no longer permitted to sell Vertex-brand radios. Id. The Second Circuit determined that this was an indirect injury because the plaintiff "was only incidentally harmed by the conspiracy" and "[i]t did not pay higher prices by virtue of the conspiracy; it merely lost the right to sell to one brand of radio." Id. at 78-79. Here, unlike in Gatt, Plaintiffs do allege that the Non-Amex Class actually paid higher prices because of Amex's conduct. Nonetheless, as in Gatt, their alleged injury is only incidental—Amex was not, according to the allegations in the complaint, using its market power to force its competitors to charge higher merchant fees across the board. Nor did it enter into a horizontal price-fixing agreement with those competitors. What it allegedly did, rather, was force those merchants who did accept its cards to refrain from steering customers towards other cards and, in so doing, insulated its ability to charge those merchants ultracompetitive fees. Plaintiffs may be right that this had an effect on the fees other credit card networks charged to the Non-Amex Class, but any such effect was incidental to Amex's alleged anticompetitive behavior.

In arguing to the contrary, Plaintiffs rely on three cases: In re DDAVP Direct Purchaser Antitrust Litigation, 585 F.3d 677 (2d Cir. 2009); Dennis v. JPMorgan Chase and Company, 343

F. Supp. 3d 122 (S.D.N.Y. 2018); and In re Namenda Direct Purchaser Antitrust Litigation, 331 F. Supp. 3d 152 (S.D.N.Y. 2018). (See Opp'n at 19-20.)  In DDAVP, the Second Circuit held that "even though the plaintiffs' injuries were derivative of the direct harm experienced by the defendants' competitors, harming competitors was simply a means for the defendants to charge the plaintiffs higher prices." 585 F.3d at 688.  Plaintiffs have not argued—nor could they—that Amex imposing the Anti-Steering Rules on the Amex Class was "simply a means" to increase the fees its competitors charged to the Non-Amex Class. DDAVP is therefore inapposite.

Dennis and Namenda provide somewhat more analogous situations.  The relevant plaintiffs in Namenda purchased the generic version of a drug and sued the manufacturer and seller of the name brand version of the drug, alleging that "they paid higher prices for generic memantine because Defendants intentionally restricted and manipulated generic competition" by entering into settlements seeking to delay market entry for some generic versions.  Id. at 190-94, 213.  This is a more direct injury than that alleged by Plaintiffs here: the defendants there directly conspired with one competitor to keep some other competitors out of the relevant market.  See id.  Amex's Anti-Steering Rules, by contrast, are not a direct agreement with any other party to manipulate or limit entry into the credit network market.  At best, Plaintiffs allegations involve Amex's competitors reacting—perhaps in predictable ways—to a contractual provision entered into between Amex and the Amex Class.

In Dennis, the plaintiffs alleged that the defendants conspired to manipulate the Bank Bill Swap Reference Rate (the "BBSW"), a benchmark interest rate used to set the price for some financial derivatives. 343 F. Supp. 3d at 142.  The plaintiffs had all "engaged in U.S.-based transactions for BBSW-based derivatives."  Id.  Presumably, Plaintiffs here could argue that they engaged in transactions that charged fees based on Amex's merchant fees—but the situations are

entirely different.  Amex set the price for its merchant fees, which then influenced the fees charged by its competitors, as all price setting does.  It did not, however, fraudulently manipulate a benchmark explicitly used by its competitors to set their rates.  Instead, the relationship between its rates and those of Visa, Mastercard, and Discover is indirect, and the chain of causation is attenuated by the intervening decisions of those entities that, presumably, consider a great number of factors.

The Second Circuit's most recent decision on the issue, IQ Dental, 924 F.3d 57, underscores the difference between the circumstances in Dennis and Namenda and those the court considers here.  There, the plaintiff—a small seller of dental supplies—distributed its supplies using an online portal hosted by a third party.  IQ Dental, 924 F.3d at 61.  The plaintiff alleged that larger dental-supply distributors conspired to drive that online portal out of business and that it was harmed as a result.  Id.  This injury was insufficiently direct, said the Second Circuit, because the plaintiff "was not the target of annihilation; it was simply collateral damage."  Id. at 65-66.  So, too, here: the Non-Amex Class may have been "damaged" by the Anti-Steering Rules, but they, quite obviously, were "not the target of annihilation."

### 2.    Identifiable Class of Other More Direct Victims

"This consideration seems to bear chiefly on whether the plaintiff is a consumer or a competitor."  Gelboim, 823 F.3d at 779.  "Implicit in the inquiry is recognition that not every victim of an antitrust violation needs to be compensated under the antitrust laws in order for the antitrust laws to be efficiently enforced."  Id.  As previously noted, the Non-Amex Class members and representatives are definitionally not Amex's customers or competitors, but are, rather, consumers participating in the affected market.  And while such participants may occasionally be the most well positioned enforcers of the antitrust laws, that is not the case here

19

because there is an obvious class of more direct victims—the Amex Class, who are actually bound by Amex's Anti-Steering Rules.

The court is aware this factor merely requires "an entity most motivated by self-interest, not the entity most motivated by self-interest" and, therefore, that "[i]nferiority to other potential plaintiffs can be relevant, but it is not dispositive." DDAVP, 585 F.3d at 688-89 (emphasis in original) (quotation marks and citations omitted). And, of course, even the Non-Amex class members here are "significantly motivated due to their 'natural economic self-interest' in paying the lowest price possible," id. at 689. This is not enough to sway this factor in Plaintiffs' favor, however, because "denying [them] a remedy on the basis of [their] allegations in this case is not likely to leave a significant antitrust violation undetected or unremedied." IQ Dental, 924 F.3d at 66 (citation omitted). Obviously, the Amex Class has litigated the same issue, and remains free to do so pursuant to the arbitration process laid out in their agreement with Amex. Moreover, as previously discussed, these provisions have also been the subject of several other lawsuits in front of this court, from the Government, other, larger, merchants, and, now, consumers who shop at stores bound by the Anti-Steering Rules. And at least some of these other litigants are more directly harmed than the Non-Amex Class members. See IQ Dental, 924 F.3d at 66 ("Given that [the plaintiff] is further removed from the harm caused by the Defendants than the parties directly affected by the boycott that have already sued the Defendants, the second efficient-enforcer factor weighs against [the plaintiff's] antitrust standing.")

3.    Speculative Nature of Injury

The existence of only "highly speculative damages is a sign that a given plaintiff is an inefficient engine of enforcement." Gelboim, 823 F.3d at 779. "At the same time, some degree of uncertainty stems from the nature of antitrust law." Id. "Impediments to reaching a reliable

damages estimate often flow from the nature and complexity of the alleged antitrust violation." Id. at 780.

In IQ Dental, the Second Circuit determined that the nature of the plaintiff's injuries "render[ed] its potential recovery highly speculative" because its "damages calculation rests on multiple layers of speculation" and "essentially would require the creation of an 'alternative universe.'" 924 F.3d at 67. Here, too, Plaintiffs' damages calculation would necessarily rest on multiple layers of speculation. Plaintiffs claim that "damages here may be readily measured by the overage paid by all merchants—i.e., the difference between the actual 'price' of merchant fees and the presumed competitive 'price' of merchant fees." (Opp'n at 22 (emphasis in original) (footnote call number omitted).) But that is precisely the problem—calculating the "presumed competitive price" would involve assessing the pricing decision on Amex's non-party competitors, all of whom are competing against one another as well as against Amex on both sides of the two-sided market. As such, the calculation involves several stages of speculation: how much steering would occur if merchants accepting Amex cards were permitted to engage in it? What effect would this have on Amex's merchant fees? What effect would any change in Amex's merchant fees have on the decisions of its competitors regarding their own merchant fees? And, perhaps most important in terms of the speculative nature of this claim, how would those decisions trickle over into the parallel situation of the Non-Amex Class members? Such exogenous factors are, to be sure, insufficient by themselves to defeat antitrust standing; nonetheless, their presence is relevant to the efficient enforcer analysis. See London Silver Fixing, 213 F. Supp. 3d at 557.

4.   Duplicative Recovery and Complex Apportionment

In IQ Dental, the Second Circuit reiterated the importance of this consideration, noting

that "[t]he existence of other plaintiffs who could lay claim to precisely the same damages,

whether in theory or in actuality, indicates that the would-be antitrust plaintiff might not be well

positioned to vindicate the antitrust laws for the benefit of the public." 924 F.3d at 67. While

that is not obviously the case here, the court does note its concerns about the complex nature of

apportionment and the broad nature of the class suggested by Plaintiffs, which presents an

"obvious risk of disproportionate damages." In re London Silver Fixing, Ltd., Antitrust Litig.,

332 F. Supp. 3d 885, 906 (2d Cir. 2018).

Amex argues that the court should be concerned because at least some of Plaintiffs have

already recovered damages for the alleged lack of competition between the credit card networks.

(Mot. at 19; Reply at 8-9.) However, as Plaintiffs respond and Amex does not dispute, these

settlements resolved disputes regarding similar provisions Visa and Mastercard allegedly

imposed on merchants, not Amex's Anti-Steering Rules at issue here. (See Opp'n at 22.) The

fact that some wrongdoers have already agreed to settlements, moreover, "has nothing to do

with the efficient enforcer analysis, particularly Gelboim's concern with disproportionate

damages." In re Foreign Exch. Benchmark Rates Antitrust Litig., No. 13-CV-7789 (LGS), 2016

WL 5108131, at *7) S.D.N.Y. Sept. 20, 2016). The court is thus unpersuaded by Amex's

argument on this point.

The court does note, however, that Gelboim "strongly suggested" that "other enforcement

mechanisms were relevant" to this factor when it "stat[ed] that the fact that the defendants'

alleged manipulation was 'under scrutiny by government organs, bank regulators[,] and financial

regulators bears upon the need for the plaintiffs as instruments for vindicating the Sherman

Act.'" Sonterra, 277 F. Supp. 3d at 565 (alterations adopted) (quoting Gelboim, 823 F.3d at 778). And, as the court has previously discussed, there are certainly other available enforcement mechanisms here. While this would not eliminate antitrust standing by itself, it "does reinforce the conclusion that the remaining plaintiffs are not efficient enforcers of the antitrust laws." Id.

* * *

Because all four of the efficient-enforcer factors cut against Plaintiffs, the court finds that the Non-Amex Class has not established federal antitrust standing.

### B.    California Claims

Amex argues that the California Non-Amex Subclass lacks standing to sue under California law for essentially the same reasons it lacks standing under federal law. (Mot. at 20-21.) Plaintiffs contend that standing under California law must be analyzed independent of federal antitrust standing, and argue that the California Non-Amex Subclass does have standing to pursue their antitrust claims under California law. (Opp'n at 23-24.) As an initial matter, Plaintiffs are correct that dismissal of the Non-Amex Class's Sherman Act claims does not necessarily mandate the dismissal of their claims under the California Unfair Competition Law (the "UCL") and California state antitrust law, known as the Cartwright Act. Samsung Elecs. Co. v. Panasonic Corp., 747 F.3d 1199, 1205 n.4 (9th Cir. 2014). However, dismissal is independently appropriate on these claims for substantially the same reasons as it is appropriate on their federal claims.

### 1.    The Cartwright Act

The California Supreme Court has not addressed whether antitrust standing under California state law is properly analyzed under the same framework as that used to determine federal antitrust standing. See Salveson v. JP Morgan Chase & Co., 166 F. Supp. 3d 242, 257

(E.D.N.Y. 2016); In re Capacitors Antritrust Litig., 106 F. Supp. 3d 1051, 1072-73 (N.D. Cal.

2015).  While courts have disagreed on the issue—and authority is sparse in either direction—the

court is persuaded by those that have found that the same or substantially similar factors apply.

See Salveson, 166 F. Supp. 3d at 258; In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig.,

No. 09-CV-3690, 2015 WL 3988488, at *8 (N.D. Ill. June 29, 2015); In re Flash Memory

Antitrust Litig., 643 F. Supp. 2d 1133, 1151 (N.D. Cal. 2009).  But see Capacitors, 106 F. Supp.

3d at 1073.

This determination is in accordance with the analysis of at least one of California's

intermediate appellate courts.  See Vinci v. Waste Mgmt., Inc., 43 Cal. Rptr. 2d 337, 338-39

(Cal. Ct. App. 1995).  It is unclear the extent to which Vinci's holding was altered by the

California Supreme Court's observation that "[i]nterpretations of federal antitrust law are at most

instructive, not conclusive, when construing the Cartwright Act," Aryeh v. Canon Bus. Sols.,

Inc., 292 P.3d 871, 877 (Cal. 2013), but that statement, without more, is insufficient to convince

this court that the California Supreme Court would decide the issue contrary to Vinci.  See New

York v. Nat'l Serv. Indus., Inc., 460 F.3d 201, 210 (2d Cir. 2006); see also Comm'r of Internal

Revenue v. Bosch's Estate, 387 U.S. 456, 465 (1967) ("[A]n intermediate appellate state court is

a datum for ascertaining state law which is not to be disregarded by a federal court unless it is

convinced by other persuasive data that the highest court of the state would decide otherwise."

(quotation marks and citation omitted)).

Lacking more direct guidance from the California courts, and in light of Vinci, the court

will thus apply the federal factors to analyze antitrust standing under California law.  As laid out

by the Supreme Court, then, the relevant factors are: "(1) the nature of the plaintiff's alleged

injury, (2) the directness of the injury, (3) the speculative nature of the harm, (4) the risk of

duplicative recovery and (5) the complexity in apportioning damages." Salveson, 166 F. Supp. 3d at 259; see also Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters ("AGC"), 459 U.S. 519, 535-37 (1983). The court also observes, however, that California law considers these factors somewhat more liberally than its federal analog. See Salveson, 166 F. Supp. 3d at 259.

As to the nature of the alleged injury, the court must consider "whether the nature of the injury asserted by a plaintiff is 'the type the antitrust laws were intended to forestall.'" Salveson, 166 F. Supp. 3d at 259 (quoting Knevelbaard Dairies v. Kraft Foods, Inc., 232 F.3d 979, 987 (9th Cir. 2000)). In assessing this requirement, courts look to: (1) the defendant's anticompetitive conduct; (2) the plaintiff's "worse position" as a result of defendant's conduct; and (3) a comparison of the anticompetitive effect of defendant's conduct and plaintiff's alleged injury. See Harry v. Total Gas & Power N. Am., Inc., 889 F.3d 104, 115 (2d Cir. 2018). Here, Amex allegedly used its market power to pressure the merchants who accepted its cards to agree to its Anti-Steering Rules. Because this prevented merchants from charging more to consumers using Amex cards and from offering incentives to those who used other credit cards, merchants have no way to increase use of a card that charges less. Amex and its competitors, then, have no incentive to keep prices down. (SAC ¶ 50.) In other words, Plaintiffs "have alleged that Amex's imposition of its [Anti-Steering Rules] stifles interbrand competition in the relevant market . . . [,] thereby causing all merchants to pay higher fees, and raising overall transaction costs above competitive levels." (Opp'n at 13 (emphasis in original).) This is sufficient to have plausibly alleged that Amex engaged in unlawful anticompetitive conduct, at least to meet the "low bar" of the inquiry at the standing stage. See IQ Dental, 924 F.3d at 63.

Next, the court must "isolate and identify [Plaintiffs'] 'actual injury' or 'the ways in which the plaintiff claims it is in a 'worse position' as a consequence of the defendant's conduct." Id. at 63 (quoting Gatt, 711 F.3d at 76). "Assuming that [Plaintiffs are] operating in a market affected by anticompetitive conduct, the question of actual injury becomes whether [Plaintiffs are] worse off than [they] would be if the market were free of anticompetitive forces." Id. at 64. Taking the allegations in the complaint as true, Plaintiffs have alleged sufficient facts to show that they are in a worse position as a result of Amex's alleged conduct. They allege the following:

> On the merchant side of the market, Amex's imposition of increased merchant fees, has, in turn, enabled Visa, MasterCard, and Discover to increase their respective merchants' fees, thereby stifling competition, and causing all credit card accepting merchants to pay supracompetitive merchant fees. This includes merchants who do not accept Amex cards but do accept other credit cards, because the remaining credit card networks do not lower their merchant fees for the generally small merchants that do not accept Amex.

(SAC ¶ 82.) Plaintiffs thus allege that they are charged higher merchant fees and are, as a result, worse off than they would be in a genuinely competitive market.

Finally, Plaintiffs "must demonstrate that the Defendants' anticompetitive behavior caused its actual injury." IQ Dental, 924 F.3d at 65; see also Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 489 (1977) (the plaintiff must show that its injury "flows from that which makes defendants' acts unlawful"). This is the least certain of the relevant considerations in this inquiry. It is plausible that the imposition of higher merchant fees, in combination with the Anti-Steering Rules, could stifle competition and allow Amex's competitors to raise their rates across all merchants, rather than just across those merchants who are bound by the Anti-Steering Rules themselves. This is particularly true given that most large merchants, according to Plaintiffs, do accept Amex, meaning that the credit card companies would have little incentive

26

to tailor contracts for relatively insignificant individual merchants who do not.  Despite this logical connection, the court cannot ignore the intervening decisions of third parties that weaken the chain of causation from Amex's Anti-Steering Rules to the merchant fees charged by other networks to the Non-Amex Class members.

Even assuming that antitrust injury has been established, however, that does not outweigh the other factors relevant to the antitrust standing analysis, all four of which cut against Plaintiffs.  The court has discussed these factors above—as a part of its "efficient enforcer" analysis—but will address directness again because "'the extent to which antitrust injury is recognized under the Cartwright Act is enlarged, by statute, in comparison to federal law' because an action 'may be brought by a person who is injured . . . by reason of anything declared unlawful by [the Cartwright Act], regardless of whether such injured person dealt directly or indirectly with the defendant." Salveson, 166 F. Supp. 3d at 263 (emphasis omitted) (quoting Knevelbaard, 232 F.3d at 991); see also Dairy Farmers, 2015 WL 3988488, at *8 ("California's antitrust-standing provision is broader in some respects than federal antitrust-standing law."); Cal. Bus. & Prof. Code § 16750(a)).

Courts applying California law find antitrust standing where, for example, "indirect purchasers of components had satisfied their burden of pleading directness of injury by alleging that the cost of the component was traceable through the product distribution chain." Flash Memory, 643 F. Supp. 2d at 1155 (collecting cases).  In fact, California's statute allowing the expansion of its antitrust standing as compared to federal law was passed in response to Illinois Brick Company v. Illinois, 431 U.S. 720 (1977), which held that indirect purchasers lacked antitrust standing where their only alleged damages were the overcharges passed on from direct purchasers, id. at 730-31; see also McCready, 457 U.S. at 474 (describing the Illinois Brick

decision as finding "unacceptable the risk of duplicative recovery engendered by allowing both direct and indirect purchasers to claim damages resulting from a single overcharge by the antitrust defendant"). See Dairy Farmers, 2015 WL 3988488, at *7 ("The California legislature took action within months . . . (i.e., prior to the AGC decision) . . . to prevent Illinois Brick from having any effect on judicial interpretation of the Cartwright Act." (alterations adopted) (citations and quotation marks omitted)). The California legislature did not undertake a similar response to AGC just six years later, and has not done so since, despite some state and numerous federal courts applying the AGC factors to California antitrust standing. And, as "Illinois Brick and AGC are separate inquiries," Dairy Farmers, 2015 WL 3988488, at *8 (citing In re Refrigerant Compressors Antitrust Litig., No. 09-MD-2042, 2013 WL 1431756, at *10 (E.D. Mich. Apr. 9, 2013)), the impact of the statute outside the context of indirect purchasers is unclear.

In any event, California law does not allow recovery for an antitrust injury that is a "secondary, consequential, or remote" result of the allegedly unlawful conduct. In re WellPoint, Inc. Out-of-Network UCR Rates Litig., No. 09-MD-2074, 2013 WL 12130034, at *10 (C.D. Cal. July 19, 2013) (quoting Cellular Plus, Inc. v. Superior Court, 18 Cal. Rptr. 2d 303, 312 (Cal. Ct. App. 1993)). Instead, the injury alleged must be "the direct result" of that conduct. Id. (quoting Cellular Plus, 18 Cal. Rptr. 2d at 312); see also Meyer v. Qualcomm Inc., No. 08-CV-655, 2009 WL 539902, at *8 (S.D. Cal. Mar. 3, 2009 ("The California courts have held that a plaintiff whose injuries were not secondary, consequential, or remote, but the direct result of the unlawful conduct and were the kind of injuries the antitrust laws seek to prevent has antitrust standing." (quotation marks and citations omitted)). And, as discussed above, the Non-Amex Class's injury is—definitionally—secondary. Plaintiffs have alleged that they were charged higher merchant

fees because of reactions to Amex's rate-setting by independent actors, Amex's competitors. They do not allege that Amex conspired to increase merchant fees across the market, but instead only that Amex's Non-Steering Provisions had that effect. Such allegations, without more, do not sufficiently tie Amex's alleged anti-competitive conduct to the merchant fees of the California Non-Amex Subclass, who did not interact with Amex directly (and, moreover, did not directly interact with any other party that, at any point in the chain of causation, entered into any agreement or transaction with Amex at all).

Even under this more liberal approach to the directness inquiry, therefore, the Non-Amex Class's injuries are simply too remote. This determination, in combination with the factors discussed previously, brings the court to conclude that the California Non-Amex Subclass has failed to allege standing under the Cartwright Act.

   2.   The UCL

Finally, the California Non-Amex Subclass asserts claims under the UCL (SAC ¶¶ 136-40), alleging that Amex violated the UCL "by entering into contracts in an unreasonable restraint of trade within the State of California in violation of the Sherman Act and the Cartwright Act" (id. ¶ 137). The UCL does allow a plaintiff to bring a claim based on conduct that violates other laws, Cal. Bus. & Prof. Code § 17200, but dismissal of an underlying antitrust claim mandates dismissal of the UCL claim as well, see Dairy Farmers, 2015 WL 3988488, at *18; In re Wellpoint, Inc. Out-of-Network UCR Rates Litig., 903 F. Supp. 2d 880, 927-28 (C.D. Cal. 2012).

Because the court has dismissed all of the Non-Amex Class's other claims and Plaintiffs have provided no reason that the California Non-Amex Subclass's UCL claims survive independently, the court also dismisses their claims under the UCL.

IV.    **CONCLUSION**

For the foregoing reasons, Amex's (Dkt. 875) motions to compel arbitration and to dismiss are both GRANTED.  The court retains limited jurisdiction to enforce any award resulting from any arbitration between Amex and members of the Amex class.

All claims asserted by the Non-Amex Class are DISMISSED.  The Clerk of Court is respectfully DIRECTED to terminate Qwik Lube, LCC and LaJolla Auto Tech, Inc. and to remove them from the caption.

SO ORDERED.

s/Nicholas G. Garaufis

Dated: Brooklyn, New York
       January 14 , 2020

NICHOLAS G. GARAUFIS
United States District Judge