**MANDATE**

# UNITED STATES COURT OF APPEALS
## FOR THE
## SECOND CIRCUIT

At a Stated Term of the United States Court of Appeals for the Second Circuit, held at the Thurgood Marshall United States Courthouse, 40 Foley Square, in the City of New York, on the 22nd day of November, two thousand twenty-one.

Before:   Denny Chin,
              Joseph F. Bianco,
              Steven J. Menashi,
                  *Circuit Judges.*

_____

In Re: American Express Anti-Steering Rules Antitrust Litigation,
****************************************************

LaJolla Auto Tech, Inc., Qwik Lube LLC,

       Plaintiffs - Appellants,

Rite Aid Corporation, Walgreen Co, Firefly Air Solutions, LLC, Plymouth Oil Corporation, Rite Aid Headquarters Corp, Jasa, Inc., on behalf of themselves and all similarly situated persons, Animal Land, Inc., Rookies, Inc., Italian Colors Restaurant, Cohen Rese Gallery, Inc., Lopez-Dejonge, Inc., Bar Hama LLC, Meijer, Inc., Publix Super Markert, Inc., Raley's, Supervalu Inc., CVS Pharmacy, Inc., Bi-Lo, LLC, H.E.B Grocery Company, The Kroger Co., Safeway Inc., Ahold U.S.A. Inc., Albertson's LLC, Hy-Vee, Inc., The Great Atlantic and Pacific Tea Company Inc., Treehouse, Inc., IL Forno, Inc., National Supermarkets Association, Inc., on behalf of its membership, and all other similarly situated persons, Plaintiffs, All Class Plaintiffs, The Marcus Corporation, Bill McCauley, Read McCaffrey, Hillary Jaynes, Anthony Oliver, Bernadette Martin, Bryan Huey, James Eaton, Paul Kashishian, Gianna Valdes, Chad Tintrow, Matthew Moriarty, Andrew Amend, Igor Gelman, Zachary Draper, Shawn O'Keefe, Francisco Robleto, Jr., Michael Thomas Reid, Plymouth Oil Corp., Clam Lake Partners LLC,

       Plaintiffs,

v.

American Express Travel Related Services Company, Inc., American Express Company,

**JUDGMENT**

Docket No. 20-1766

**MANDATE ISSUED ON 01/18/2022**

Defendants - Appellees,

Susan Burdette,

Defendant,

Circuit City Liquidating Trust, The RSH Liquidating Trust, Holiday
Companies, Gander Mountain Company, Commonwealth Hotels,
Inc., Keila Ravelo,

Intervenors.

_____

The appeal in the above captioned case from a judgment of the United States District
Court for the Eastern District of New York was argued on the district court's record and the
parties' briefs. Upon consideration thereof,

IT IS HEREBY ORDERED, ADJUDGED and DECREED that the judgment of the
district court is AFFIRMED.

For the Court:
Catherine O'Hagan Wolfe,
Clerk of Court

A True Copy
Catherine O'Hagan Wolfe, Clerk
United States Court of Appeals, Second Circuit

20–1766
*In re American Express Anti-Steering Rules Antitrust Litigation*

# In the
# United States Court of Appeals
## FOR THE SECOND CIRCUIT

───────────────

AUGUST TERM 2020
No. 20-1766

IN RE AMERICAN EXPRESS ANTI-STEERING RULES ANTITRUST
LITIGATION,

LAJOLLA AUTO TECH, INC., QWIK LUBE LLC,
*Plaintiffs-Appellants,*

RITE AID CORPORATION, WALGREEN CO., FIREFLY AIR SOLUTIONS,
LLC, PLYMOUTH OIL CORPORATION, RITE AID HEADQUARTERS
CORP., JASA, INC., ON BEHALF OF THEMSELVES AND ALL SIMILARLY
SITUATED PERSONS, ANIMAL LAND, INC., ROOKIES, INC., ITALIAN
COLORS RESTAURANT, COHEN RESE GALLERY, INC., LOPEZ-DEJONGE,
INC., BAR HAMA LLC, MEIJER, INC., PUBLIX SUPER MARKET, INC.,
RALEY'S, SUPERVALU INC., CVS PHARMACY, INC., BI-LO, LLC, H.E.B.
GROCERY COMPANY, THE KROGER CO., SAFEWAY INC., AHOLD
U.S.A. INC., ALBERTSON'S LLC, HY-VEE, INC., THE GREAT ATLANTIC
& PACIFIC TEA COMPANY INC., TREEHOUSE, INC., IL FORNO, INC.,
NATIONAL SUPERMARKETS ASSOCIATION, INC., ON BEHALF OF ITS
MEMBERSHIP, AND ALL OTHER SIMILARLY SITUATED PERSONS,
PLAINTIFFS, ALL CLASS PLAINTIFFS, THE MARCUS CORPORATION,
BILL MCCAULEY, READ MCCAFFREY, HILLARY JAYNES, ANTHONY
OLIVER, BERNADETTE MARTIN, BRYAN HUEY, JAMES EATON, PAUL
KASHISHIAN, GIANNA VALDES, CHAD TINTROW, MATTHEW
MORIARTY, ANDREW AMEND, IGOR GELMAN, ZACHARY DRAPER,
SHAWN O'KEEFE, FRANCISCO ROBLETO, JR., MICHAEL THOMAS REID,

**PLYMOUTH OIL CORP., CLAM LAKE PARTNERS LLC,**
*Plaintiffs,*

v.

**AMERICAN EXPRESS TRAVEL RELATED SERVICES COMPANY, INC.,**
**AMERICAN EXPRESS COMPANY,**
*Defendants-Appellees,*

**SUSAN BURDETTE,**
*Defendant,*

**CIRCUIT CITY LIQUIDATING TRUST, THE RSH LIQUIDATING TRUST,**
**HOLIDAY COMPANIES, GANDER MOUNTAIN COMPANY,**
**COMMONWEALTH HOTELS, INC., KEILA RAVELO,**
*Intervenors.*[*]

———————————

On Appeal from the United States District Court
for the Eastern District of New York

———————————

ARGUED: DECEMBER 16, 2020
DECIDED: NOVEMBER 22, 2021

———————————

Before:       CHIN, BIANCO, and MENASHI, *Circuit Judges.*

The plaintiffs-appellants are commercial merchants that sought monetary and injunctive relief under both federal and California antitrust laws against the defendants-appellees—American Express

———————————

[*] The Clerk of Court is directed to amend the caption as set forth above.

2

Travel Related Services Co., Inc., and American Express Co.—alleging that the appellees' anti-steering rules caused merchant fees to rise across the market. The appellants do not accept American Express cards and therefore proceeded under an "umbrella" theory of liability. The district court considered the four "efficient enforcer" factors, concluded that the appellants lacked antitrust standing, and dismissed the claims. The appellants challenge that holding, arguing that the four efficient-enforcer factors support antitrust standing for the "umbrella" plaintiffs in this case.

We disagree. The efficient-enforcer factors structure a proximate cause analysis according to which there must be a sufficiently close relationship between the alleged injury and the alleged antitrust violation to establish antitrust standing. Here, that relationship is lacking. After considering the efficient-enforcer factors and the relevant state laws, we **AFFIRM**.

————

SCOTT MARTIN, Hausfeld LLP, New York, NY (Michael D. Hausfeld, Hausfeld LLP, Washington, DC, and Irving Scher, Jeanette Bayoumi, and Kimberly Fetsick, Hausfeld LLP, New York, NY, *on the brief*), *for Plaintiffs-Appellants*.

EVAN R. CHESLER (Peter T. Barbur, Kevin J. Orsini, and Rory A. Leraris, *on the brief*), Cravath, Swaine & Moore LLP, New York, NY, *for Defendants-Appellees.*

Eric F. Citron, Goldstein & Russell, P.C., Bethesda, MD, *for Amici Curiae Eighteen Professors of Antitrust Law.*

————

3

20–1766

*In re American Express Anti-Steering Rules Antitrust Litigation*

MENASHI, *Circuit Judge*:

The appellants, on behalf of a class of commercial merchants, allege that the Anti-Steering Rules promulgated by the appellees, the American Express Company and American Express Travel Related Services Company, Inc. (together, "Amex"), violate the antitrust laws.

The appellants do not accept American Express cards but claim to be harmed by Amex's policies nevertheless. These merchants "seek monetary and injunctive relief for overcharges paid to Visa, MasterCard, and Discover," not to Amex, "caused by Amex's imposition of 'Anti-Steering Rules' in its agreements with merchants who accept Amex cards." Appellants' Br. 1-2. The appellants claim that "Amex's Anti-Steering Rules have stifled interbrand competition throughout the relevant market, causing the credit card transaction fees charged to Appellants by Visa, MasterCard, and Discover to prevail at supracompetitive levels under Amex's pricing umbrella." *Id.* at 2.

The U.S. District Court for the Eastern District of New York (Garaufis, J.) dismissed the appellants' claims under Federal Rule of Civil Procedure 12(b)(6) and ruled that the class lacked antitrust standing because it did not include "efficient enforcers" of the antitrust laws relative to Amex's challenged anticompetitive conduct. *In re Am. Express Anti-Steering Rules Antitrust Litig.*, 433 F. Supp. 3d 395, 407-13 (E.D.N.Y. 2020). The appellants "seek reversal of the district court's dismissal of their claims because Amex's anticompetitive conduct has directly injured them, and recognizing their standing would ensure efficient enforcement of the antitrust laws." Appellants' Br. 2. Amex contends that the district court was correct that the appellants "lack antitrust standing because they are

not efficient enforcers" of the antitrust laws and the alleged damages are "too indirect" and "speculative." Appellees' Br. 3-4.

We affirm the district court's judgment. To determine whether a party can sue under the antitrust laws—whether the party has "antitrust standing"—we apply the "efficient enforcer" test. The efficient-enforcer test is an elaboration on the proximate cause requirement of *Associated General Contractors of California, Inc. v. California State Council of Carpenters* (*AGC*), 459 U.S. 519, 535-36 (1983). In cases of economic harm, proximate cause is demarcated by the "first step" rule, which limits liability to parties injured at the first step of the causal chain of the defendants' actions. *See id.* at 534. Here, at the first step, Amex restrained trade to raise its own prices; only later did its competitors follow suit. Because the appellants were harmed at that later step, the claims here fail the first-step test. After considering the four *AGC* factors, we conclude that—taking the allegations of the complaint as true—the appellants are not efficient enforcers of the antitrust laws and therefore lack antitrust standing.

## BACKGROUND[1]

The appellants challenge Amex's Anti-Steering Rules, or what Amex calls its non-discrimination provisions, contained in its Card Acceptance Agreement with merchants. The appellants allege that "Amex's Anti-Steering Rules unreasonably restrain interbrand price competition with the other major [credit card] networks because the Rules: (1) stifle interbrand competition among the networks; (2) impose supracompetitive merchant fees, without corresponding

---

[1] For purposes of this appeal, we accept as true all facts alleged in the second amended complaint ("SAC"). *Henry v. County of Nassau*, 6 F.4th 324, 328 (2d Cir. 2021).

offsetting credit card user economic benefits; (3) cause the overall price of credit card transactions to rise above competitive levels marketwide, because the other credit card networks would not benefit competitively by reducing their merchant fees; and (4) raise consumer retail prices throughout the economy, thereby reducing output." Appellants' Br. 4; *see also Am. Express Anti-Steering*, 433 F. Supp. 3d at 401.

# I

The credit card industry is divided among four competing networks: Amex, Visa, MasterCard, and Discover. *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2282 (2018). The market is characterized by high barriers to entry. New entrants face a "chicken-and-egg" problem because "merchants value a payment system only if a sufficient number of cardholders use it and cardholders value a payment card only if a sufficient number of merchants accept it."[2]

Credit card networks such as Amex "operate what economists call a 'two-sided platform,'" which "offers different products or services to two different groups who both depend on the platform to intermediate between them." *Ohio*, 138 S. Ct. at 2280.[3] Amex provides credit-card services to both "merchants," who accept Amex as payment, "and cardholders," who use Amex to make payments. *Ohio*, 138 S. Ct. at 2279-80. Both parties are necessary; "no credit-card

---

[2] Benjamin Klein, Andres V. Lerner, Kevin M. Murphy & Lacey L. Plache, *Competition in Two-Sided Markets: The Antitrust Economics of Payment Card Interchange Fees*, 73 ANTITRUST L.J. 571, 584 (2006).

[3] *See also* D. Daniel Sokol, *Rethinking the Efficiency of the Common Law*, 95 NOTRE DAME L. REV. 795, 803 (2019) ("The value of the two-sided market (or platform) is the ability to make matches across both sides of the market.").

transaction can occur unless both the merchant and the cardholder simultaneously agree to use the same credit-card network." *Id.* at 2280.

While credit card companies often charge cardholders an annual fee, all credit card companies charge merchants a fee for every transaction processed.[4] According to the appellants, Amex charges higher merchant fees than its competitors. To avoid the higher fees, merchants—in the absence of any restraint prohibiting the practice—might "steer" their customers toward using another form of payment. "Steering" could be done in different ways, such as simply by asking, offering benefits for using other payment methods, or imposing a surcharge on the use of Amex cards.[5]

Steering allows for price signals between merchant and customer. Without steering, "consumers do not internalize the full costs of their choice of payment system."[6] Steering also may prevent Amex from charging higher fees because merchants will steer customers toward cards with lower fees. In sum, "American Express dislikes steering; the merchants like it; and the shoppers may benefit from it, whether because merchants will offer them incentives to use

---

[4] *See* Timothy J. Muris, *Payment Card Regulation and the (Mis)application of the Economics of Two-Sided Markets*, 2005 COLUM. BUS. L. REV. 515, 522 (2005).

[5] *See* Klein et al., *supra* note 2, at 586-87.

[6] Adam J. Levitin, *Priceless? The Social Costs of Credit Card Merchant Restraints*, 45 HARV. J. ON LEGIS. 1, 11 (2008); *see also id.* at 3 ("[S]ome consumers end up paying higher or lower prices for the transaction than they would have if the merchant charged prices that varied with the cost of accepting payment.").

less expensive cards or in the form of lower retail prices overall." *Ohio*, 138 S. Ct. at 2292 (Breyer, J., dissenting).

Amex has discouraged steering by inserting anti-steering provisions into its contracts with merchants. Pursuant to Amex's Anti-Steering Rules, merchants may not:

- indicate or imply that they prefer, directly or indirectly, any Other Payment Products over Amex Cards;

- try to dissuade cardholders from using their Amex Card;

- criticize or mischaracterize the Amex Card or any of Amex's services or programs;

- try to persuade or prompt cardholders to use any Other Payment Products or any other method of payment (e.g., payment by check);

- impose any restriction, conditions, or disadvantages when the Card is accepted that are not imposed equally on all Other Payment Products, except for ACH funds transfer, cash, and checks;

- engage in activities that harm Amex's business or the American Express Brand (or both);

- or promote any Other Payment Products (except the Merchant's own private label card that they issue for use solely at their Establishments) more actively than the Merchant promotes Amex.

*Am. Express Anti-Steering*, 433 F. Supp. 3d at 404 (alterations omitted).

8

The appellants allege that these Anti-Steering Rules, when combined with Amex's higher merchant fees, have raised fees throughout the industry. Competing networks "have no economic incentive to compete in the market by offering lower merchant fees [because] merchants cannot educate cardholders and [steer] transactions to the cards with lower fees." Appellants' Br. 7. Because "lower-fee competitor[s] cannot gain market share" by competing on price, all competing networks raise prices. *Id*. This effect is widespread because "most large merchants, according to Plaintiffs, do accept Amex, meaning that the credit card companies would have little incentive to tailor contracts for relatively insignificant individual merchants who do not." *Am. Express Anti-Steering*, 433 F. Supp. 3d at 415.

## II

The Anti-Steering Rules have been litigated for over a decade. Merchants have been filing suits since the 2000s. *See generally Rite-Aid Corp. v. Am. Express Travel Related Servs. Co.*, 708 F. Supp. 2d 257, 260 (E.D.N.Y. 2010). "In October 2010, the Department of Justice and the attorneys general of eighteen states filed the Government Action against Amex, MasterCard, and Visa" challenging each company's version of the Anti-Steering Rules. *In re Am. Express Anti-Steering Rules Antitrust Litig.*, No. 08-CV-2315, 2016 WL 748089, at *2 (E.D.N.Y. Jan. 7, 2016). "Visa and MasterCard entered into consent decrees with the Government on the same day that the Government Action was initiated. Only Amex remained as a defendant." *Id.* at *2 n.5. After a bench trial, the district court ruled for the government, concluding that it had shown by a preponderance of the evidence that the Anti-Steering Rules violated § 1 of the Sherman Act. *United States v. Am. Express Co.*, 88 F. Supp. 3d 143, 238 (E.D.N.Y. 2015). Our court

reversed that judgment, holding that the district court erred in not requiring the government to show harm to consumers "accounting for consumers on both sides of the platform." *United States v. Am. Express Co.*, 838 F.3d 179, 206-07 (2d Cir. 2016). The Supreme Court then affirmed. *Ohio*, 138 S. Ct. at 2290.

"Following the Supreme Court's affirmance of the dismissal of the Government Action, matters resumed in the [Merchant Plaintiff] Actions." *Am. Express Anti-Steering*, 433 F. Supp. 3d at 405. The merchant plaintiffs—including the appellants here—filed the SAC on December 17, 2018. The SAC sought monetary and equitable relief "on behalf of two putative classes: (1) a class of merchants who accept Amex cards … (the 'Amex Class'); and (2) a class of merchants who do not accept Amex cards and who have no contract with Amex (the 'Non-Amex Class')." *Id.* at 401. Within both classes, subclasses of plaintiffs sought relief under California law. *Id.* at 402, 405.

On January 15, 2020, the district court ruled in Amex's favor. *Id.* at 417. It first granted Amex's motion to compel arbitration of the Amex Class's claims. *See id.* at 405-07. It then granted Amex's motion to dismiss the Non-Amex Class's claims. *See id.* at 407-16. Specifically, the district court held that "the Non-Amex Class has not established federal antitrust standing." *Id.* at 413. Applying the "efficient enforcer" test, *id.* at 408; *see Balaklaw v. Lovell*, 14 F.3d 793, 797 n.9 (2d Cir. 1994) (endorsing the efficient-enforcer test), the district court concluded that all four efficient-enforcer factors indicated that the appellants lacked antitrust standing. *Am. Express Anti-Steering*, 433 F. Supp. 3d at 407-13. For similar reasons, the district court concluded that the appellants lacked antitrust standing under California's Cartwright Act and Unfair Competition Law as well. *Id.* at 413-16. On May 14, 2020, the district court entered an order of partial final

10

judgment pursuant to Federal Rule of Civil Procedure 54(b). On June 8, 2020, the appellants timely appealed.

## DISCUSSION

"We review a district court's grant of a motion to dismiss *de novo*, accepting as true all factual claims in the complaint and drawing all reasonable inferences in the plaintiff's favor." *Henry*, 6 F.4th at 328 (internal quotation marks omitted). The appellants argue that the district court erred when it dismissed their claims under the Clayton Act and under California antitrust law. We address each claim in turn.

## I

The appellants contend that the district court erred in dismissing their federal antitrust claim. The appellants brought that claim under the Clayton Act, which provides a private right of action for injuries "by reason of anything forbidden in the antitrust laws." 15 U.S.C. § 15(a). The district court dismissed the claim on the ground that the appellants lacked antitrust standing. *See Am. Express Anti-Steering*, 433 F. Supp. 3d at 407-08. We agree with the district court's conclusion.

"It is a well-established principle that, while the United States is authorized to sue anyone violating the federal antitrust laws, a private plaintiff must demonstrate 'standing.'" *Daniel v. Am. Bd. of Emergency Med.*, 428 F.3d 408, 436 (2d Cir. 2005). We have explained that "[a]ntitrust standing is a threshold, pleading-stage inquiry" and that "when a complaint by its terms fails to establish this requirement we must dismiss it as a matter of law." *Gatt Commc'ns, Inc. v. PMC Assocs., L.L.C.*, 711 F.3d 68, 75 (2d Cir. 2013) (quoting *NicSand, Inc. v. 3M Co.*, 507 F.3d 442, 450 (6th Cir. 2007) (en banc)). This requirement

"prevents private plaintiffs from recovering damages under" the Clayton Act "merely by showing injury causally linked to an illegal presence in the market." *Id.* at 76 (internal quotation marks and alteration omitted).

To demonstrate antitrust standing, a private plaintiff must show both that (1) "it suffered a special kind of antitrust injury" and that (2) "it is a suitable plaintiff to pursue the alleged antitrust violations and thus is an efficient enforcer of the antitrust laws." *Id.* (internal quotation marks omitted). Whether a plaintiff is an "efficient enforcer" depends on the four factors the Supreme Court identified in *AGC*. 459 U.S. at 540-45. Those factors are (1) "the directness or indirectness of the asserted injury"; (2) "the existence of more direct victims" or the "existence of an identifiable class of persons whose self-interest would normally motivate them to vindicate the public interest in antitrust enforcement"; (3) the extent to which the claim is "highly speculative"; and (4) "the importance of avoiding either the risk of duplicate recoveries on the one hand, or the danger of complex apportionment of damages on the other." *Id.*; *see also Gelboim v. Bank of Am. Corp.*, 823 F.3d 759, 772 (2d Cir. 2016). "[T]he weight to be given the various factors will necessarily vary with the circumstances of particular cases." *Daniel*, 428 F.3d at 443.

In this case, the appellants claim to have antitrust standing under a so-called "umbrella" theory. The classic "umbrella" scenario occurs when "[a] cartel cuts output, which elevates price throughout the market." *U.S. Gypsum Co. v. Ind. Gas Co.*, 350 F.3d 623, 627 (7th Cir. 2003). Because of that price umbrella, "customers of fringe firms (sellers that have not joined the cartel) pay this higher price, and thus suffer antitrust injury, just like customers of the cartel's members." *Id.* In other words, the umbrella theory "seeks to hold price-fixers liable

12

for harm allegedly flowing from the illegal conduct even though the price-fixing defendants received none of the illegal gains and were uninvolved in their competitors' pricing decisions." *In re Coordinated Pretrial Proceedings in Petroleum Prods. Antitrust Litig.*, 691 F.2d 1335, 1339 (9th Cir. 1982). The appellant merchants in this case do not have a contractual relationship with Amex such that the Anti-Steering Rules apply to the appellants directly. Rather, the appellants argue that—as in a classic umbrella scenario—Amex's practices provide an umbrella under which the other credit card companies that do have a relationship with the appellants also raise prices.

The district court declined to determine whether the appellants had established an antitrust injury because it concluded that the appellants were not efficient enforcers of the antitrust laws and for that reason lacked antitrust standing. We likewise need not address antitrust injury. Because the four efficient-enforcer factors do not establish antitrust standing, we affirm the district court's judgment.

## A

The first efficient-enforcer factor asks whether "the violation was a direct or remote cause of the injury." *Gelboim*, 823 F.3d at 772. This factor turns on "familiar principles of proximate causation." *Lotes Co. v. Hon Hai Precision Indus. Co.*, 753 F.3d 395, 412 (2d Cir. 2014).

Proximate cause stands for the proposition that "the judicial remedy cannot encompass every conceivable harm that can be traced to alleged wrongdoing." *AGC*, 459 U.S. at 536. It encompasses "the judicial tools used to limit a person's responsibility for the consequences of that person's own acts" and "reflects ideas of what justice demands, or of what is administratively possible and convenient." *Holmes v. Sec. Inv. Prot. Corp.*, 503 U.S. 258, 268 (1992)

13

(internal quotation marks omitted). This principle limits antitrust liability beyond a certain point. Given the "ripples of harm" that antitrust violations may have in the economy, the Supreme Court has said that "[i]t is reasonable to assume that Congress did not intend to allow every person tangentially affected by an antitrust violation to maintain an action to recover threefold damages for the injury to his business or property." *Blue Shield of Va. v. McCready*, 457 U.S. 465, 476-77 (1982). Therefore, "despite the broad wording of § 4 [of the Clayton Act] there is a point beyond which the wrongdoer should not be held liable." *Id.* at 477 (quoting *Ill. Brick Co. v. Illinois*, 431 U.S. 720, 760 (1977) (Brennan, J., dissenting)).

In the context of antitrust standing, proximate cause generally follows the first-step rule. When the Clayton Act was enacted, the Supreme Court has explained, Congress understood "the judicial gloss" expressed by Justice Holmes: "The general tendency of the law, in regard to damages at least, is not to go beyond the first step." *AGC*, 459 U.S. at 534 (quoting *S. Pac. Co. v. Darnell-Taenzer Lumber Co.*, 245 U.S. 531, 533 (1918) (Holmes, J.)).[7] The first-step rule requires "some

---

[7] In other words, the law "does not attribute remote consequences to a defendant," even if those consequences are foreseeable. *Darnell-Taenzer*, 245 U.S. at 533. Barring liability for foreseeable harms is not unusual. Such limits on liability can be found, for example, in the economic loss rule, *see Akron Corp. v. M/T Cantigny*, 706 F.2d 151, 153 (5th Cir. 1983) (noting that "a party may not recover for economic losses not associated with physical damages" so as "to prevent limitless liability for negligence and the filing of law suits of a highly speculative nature"); *see also* RESTATEMENT (THIRD) OF TORTS: LIAB. FOR ECON. HARM § 1 cmt. c(1) (Am. L. Inst. 2020) (noting that one of the rationales for limiting tort liability for economic loss is that "[e]conomic losses proliferate more easily than losses of other kinds" even though such losses "may be at least generally foreseeable to the person who commits the negligent act"), and other limitations on liability for

direct relation between the injury asserted and the injurious conduct alleged." *Bank of Am. Corp. v. City of Miami*, 137 S. Ct. 1296, 1306 (2017) (quoting *Holmes*, 503 U.S. at 268). Under the rule, injuries that happen at the first step following the harmful behavior are considered proximately caused by that behavior. Accordingly, "[d]irectness in the antitrust context means close in the chain of causation." *Gatt Commc'ns*, 711 F.3d at 78 (quoting *IBM Corp. v. Platform Sols., Inc.*, 658 F. Supp. 2d 603, 611 (S.D.N.Y. 2009)). As Justice Stevens, the author of *AGC*, observed, the Supreme Court's "interpretation of § 4 has … adhered to Justice Holmes' observation that the 'general tendency of the law, in regard to damages at least, is not to go beyond the first step.'" *Verizon Commc'ns Inc. v. Law Offs. of Curtis V. Trinko, LLP*, 540 U.S. 398, 417 (2004) (Stevens, J., concurring in the judgment) (quoting *S. Pac. Co.*, 245 U.S. at 533).

Our court has repeatedly followed the first-step rule in the antitrust context. In *Paycom Billing Services. v. MasterCard International, Inc.*, we held that a merchant, Paycom, did not suffer a direct injury

---

negligence, *see 532 Madison Ave. Gourmet Foods, Inc. v. Finlandia Ctr., Inc.*, 96 N.Y.2d 280, 289 (2001) ("Absent a duty running directly to the injured person there can be no liability in damages, however careless the conduct or foreseeable the harm."), and for negligent misrepresentation, *see* RESTATEMENT (THIRD) OF TORTS: LIAB. FOR ECON. HARM § 5 cmt. b ("Liabilities that expand as easily as words travel would … become indeterminate and unduly widespread in many cases."). Even when the law extends a right to recover for derivative injury—such as emotional distress from witnessing another's accident—that right is often confined to close relations and excludes others in ways unrelated to foreseeability. Robert L. Rabin, *Tort Recovery for Negligently Inflicted Economic Loss: A Reassessment*, 37 STAN. L. REV. 1513, 1522 (1985). The "specter of collateral claims, virtually unlimited in number, as a result of any given accident"—not foreseeability—informs these limitations. *Id.* at 1525.

from MasterCard's practice of forbidding its member banks from dealing with other card companies. 467 F.3d 283, 293 (2d Cir. 2006). Paycom's theory was that, absent that practice, MasterCard would have faced more competition from Discover and American Express, and it would have then adopted more favorable policies toward Paycom. *Id.* That was not enough to establish antitrust standing; we concluded that "any injury suffered by Paycom was indirect and flowed from the injuries suffered by Discover and American Express." *Id.* We similarly held that the injury suffered in *Gatt Communications* was indirect. 711 F.3d at 78-79. In that case, Gatt Communications alleged that PMC Associates had formed a price-fixing conspiracy for the sale of Vertex radio equipment to government agencies, and when Gatt sought to defect, its "Dealer Agreement"—through which it was able to sell that brand of radio equipment in the first place—was terminated. *Id.* at 71-73. Gatt argued that it was entitled to damages for the commissions it would have received absent the anticompetitive conduct. *Id.* at 74. We held that Gatt was harmed "only incidentally" and that "[i]f there are direct victims of the alleged conspiracy, they are the state agencies, not Gatt." *Id.* at 78-79. Most recently, in *IQ Dental Supply, Inc. v. Henry Schein, Inc.*, we determined that IQ Dental Supply, though injured by a boycott of the third-party online portal through which IQ sold its goods, lacked antitrust standing to challenge that boycott. 924 F.3d 57, 65 (2d Cir. 2019). Because the harm to IQ "resulted from injury" to the third-party portal, the antitrust claims were "derivative and indirect." *Id.*

In this case, the appellants did not suffer a direct injury from the alleged antitrust violation. At the first step, Amex raised the price for Amex-accepting merchants through the Anti-Steering Rules.

16

Amex did not raise the appellants' fees. Nor could it have: the appellants do not accept American Express cards. Similar to the holdings in *Gatt Communications* and *IQ Dental Supply*, if there are "direct victims," those victims are the merchants to which Amex's Anti-Steering Rules applied. *Gatt Commc'ns*, 711 F.3d at 78-79; *IQ Dental Supply*, 924 F.3d at 65. The appellants were allegedly injured when Amex's competitors, covered by Amex's price umbrella, raised their own prices. In the appellants' words, Amex's imposition of increased merchant fees "enabled" the competitor companies "to increase their own merchant fees." Appellants' Br. 10. Yet Amex "enabl[ing]" other credit card companies to raise the appellants' fees does not establish the "direct relation" between injury and antitrust violation that the first-step rule requires. *Bank of Am. Corp.*, 137 S. Ct. at 1306.

Given the allegations in the SAC, we hold that the appellants' injuries did not occur at the first step following Amex's conduct. The injuries, therefore, were not proximately caused by Amex; the alleged antitrust violation was instead a "remote" cause of the injuries.

**B**

The second efficient-enforcer factor considers the "existence of an identifiable class of persons whose self-interest would normally motivate them to vindicate the public interest in antitrust enforcement." *IQ Dental Supply*, 924 F.3d at 65 (quoting *Daniel*, 428 F.3d at 443). For this factor, we ask whether "[d]enying the [plaintiff] a remedy on the basis of its allegations" is "likely to leave a significant antitrust violation undetected or unremedied." *AGC*, 459 U.S. at 542; *see also Paycom*, 467 F.3d at 294. "[T]he presence of plaintiffs who are better situated to vindicate the antitrust laws," though not

17

dispositive, "is relevant to this second factor." *IQ Dental Supply*, 924 F.3d at 66. The existence of such plaintiffs "diminishes the justification for allowing a more remote party … to perform the office of a private attorney general." *AGC*, 459 U.S. at 542.

This factor also counsels against antitrust standing here. In *IQ Dental Supply*, we concluded that antitrust standing based on the second factor was unlikely because "IQ [was] further removed from the harm caused by the Defendants than the parties directly affected by the boycott that have already sued the Defendants." *IQ Dental Supply*, 924 F.3d at 66. The same argument applies here. As noted, the merchants who have a relationship with Amex *were* harmed at the first step by Amex's Anti-Steering Rules. And those merchants have already sued Amex. *Am. Express Anti-Steering*, 433 F. Supp. 3d at 401-02. We follow our precedent in holding that "the second efficient-enforcer factor weighs against … antitrust standing" in this case. *IQ Dental Supply*, 924 F.3d at 66.

## C

The third efficient-enforcer factor concerns the extent to which the claim is "highly speculative." *AGC*, 459 U.S. at 542. "[H]ighly speculative damages is a sign that a given plaintiff is an inefficient engine of enforcement." *Gelboim*, 823 F.3d at 779. Under this factor, we ask whether there would be "a high degree of speculation in a damages calculation." *IQ Dental Supply*, 924 F.3d at 66-67. When an injury is "derivative" rather than direct, the potential recovery is often "highly speculative." *Id.* at 67. We also consider whether the "alleged effects on the [plaintiff] may have been produced by independent factors." *AGC*, 459 U.S. at 542.

Whether this factor weighs in favor of antitrust standing is a close question. The SAC presents a compelling prima facie case of foreseeable damages, given the allegation that Amex exercises market power and the district court's finding in the Government Action that the "prohibitions on merchant steering" have "enabled … higher all-in fees." *Am. Express Co.*, 88 F. Supp. 3d at 216.[8] Yet the fact that the appellants have suffered an "indirect" injury, and the accompanying uncertainty of how eliminating Amex's Anti-Steering Rules would affect its competitors' merchant fees, suggest that a damages calculation would rely on some speculation. *See AGC*, 459 U.S. at 542.

In any event, the third factor does not confer antitrust standing on the appellants. The four efficient-enforcer factors "need not be given equal weight," and "the relative significance of each factor will depend on the circumstances of the particular case." *IQ Dental Supply*, 924 F.3d at 65. In particular, the Supreme Court has noted that the "potential difficulty in ascertaining and apportioning damages is not … an *independent* basis for denying standing where it is adequately

---

[8] In making this finding, the district court in the Government Action explained that from 1997 to 2009, "prohibitions on merchant steering" enabled Visa and MasterCard to "increase their average all-in merchant rates … by more than 20% … without fear of other networks undercutting their prices in order to gain [market] share." 88 F. Supp. 3d at 216. Discover was "forced to abandon its low-price strategy as a result of" prohibitions on merchant steering and "was able to raise its rates with virtual impunity, relying on the restraining effect of anti-steering rules to ensure that it would not be undercut by a competitor offering a lower price to merchants." *Id*. "These examples provide further support for the [district] court's finding that without affording merchants the ability to influence their customers' credit and charge card decisions" through steering, "there is little, if any, downward pressure on the price charged to merchants." *Id*. *Ohio* did not question this finding.

alleged that a defendant's conduct has proximately injured an interest of the plaintiff's that the statute protects" because this factor is a touchstone for "the proximate-cause requirement." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 135 (2014).

Even if the injury is not speculative here, it does not establish proximate cause. The appellants' injury may have been foreseeable, predictable, and even calculable, but proximate cause—especially in the economic harm context—requires more than foreseeability. *See McCready*, 457 U.S. at 476-77. In light of the other efficient-enforcer factors, the third factor does not confer antitrust standing.

## D

The fourth efficient-enforcer factor stresses the importance of "avoiding either the risk of duplicate recoveries on the one hand, or the danger of complex apportionment of damages on the other." *AGC*, 459 U.S. at 543-44. This factor reflects an administrative concern: "massive and complex damages litigation not only burdens the courts, but also undermines the effectiveness of treble-damages suits." *Id.* at 545. The concern arises when "[t]he damages to which [the plaintiff] lays claim" are "exactly the same damages [other parties] could have claimed." *IQ Dental Supply*, 924 F.3d at 67.

There is no risk of duplicate recoveries or complex reapportionment of damages here. The damages that the Amex and Non-Amex Classes seek do not overlap; each class alleges that the respective card companies charged separately. This case does not involve pass-on theories that would require a court to divide damages from the same violation among multiple plaintiffs. *See Ill. Brick Co.*, 431 U.S. at 737-38; *Hanover Shoe, Inc. v. United Shoe Mach. Corp.*, 392 U.S. 481, 493 (1968). Apportionment of damages here would neither

"burden[] the courts" nor "undermine[] the effectiveness of treble-damages suits." *AGC*, 459 U.S. at 545.[9]

But the appellants' success on this factor does not establish antitrust standing. In *AGC* itself, the fourth factor was non-dispositive. *AGC*, 459 U.S. at 545 n.52. Even though the Court recognized that the "policy against duplicative recoveries may not apply" to a harm the plaintiffs allegedly suffered, "the remote and obviously speculative character of that harm [was] plainly sufficient to place it beyond the reach of § 4." *Id.* While the fourth factor addresses a "strong interest … in keeping the scope of complex antitrust trials within judicially manageable limits," *id.* at 543, the efficient-enforcer inquiry remains, fundamentally, one into proximate cause, *Lotes*, 753 F.3d at 412; *McCready*, 457 U.S. at 476-77. Here, as in *AGC*, that the line between the Amex plaintiffs' and non-Amex plaintiffs' damages presents no additional difficulties does not pull back the appellants' injury from "beyond the reach of § 4." 459 U.S. at 545 n.52. We therefore conclude that, given the allegations of the SAC, the four efficient-enforcer factors do not establish antitrust standing.[10]

---

[9] The district court held that this fourth factor counseled against antitrust standing, and in its discussion of the factor expressed concern over the "obvious risk of disproportionate damages." *Am. Express Anti-Steering*, 433 F. Supp. 3d at 412 (quoting *In re London Silver Fixing, Ltd., Antitrust Litig.*, 332 F. Supp. 3d 885, 906 (S.D.N.Y. 2018)). Yet the fourth efficient-enforcer factor concerns not the size of the damages awarded but the difficulty courts might face in dividing an award. We do not see such difficulty here.

[10] The appellants also seek injunctive relief under § 16 of the Clayton Act, 15 U.S.C. § 26. The appellants must demonstrate antitrust standing for that requested relief. *Eastman Kodak Co. v. Henry Bath LLC*, 936 F.3d 86, 94 (2d Cir. 2019). The Supreme Court has said that "the difference in the remedy each section provides means that certain considerations relevant to a

In short, it is not the appellants' status as umbrella plaintiffs or otherwise that resolves the antitrust standing question but "the relationship between the defendant's alleged unlawful conduct and the resulting harm to the plaintiff." *Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of Cal.*, 190 F.3d 1051, 1058 (9th Cir. 1999). We employ the efficient-enforcer test to evaluate the relevant relationship. The key principle underlying that test is proximate cause, and here the appellants fail to show the required direct connection between the harm and the alleged antitrust violation. The appellants are not efficient enforcers of the antitrust laws and therefore lack antitrust standing.[11]

## II

Dismissal of the appellants' federal antitrust claims does not necessarily require the dismissal of their claims under the California Unfair Competition Law ("UCL") and California antitrust law, known as the Cartwright Act. *See Aryeh v. Canon Bus. Sols., Inc.*, 292

---

determination of standing under § 4 are not relevant under § 16." *Cargill, Inc. v. Monfort of Colo., Inc.*, 479 U.S. 104, 111 n.6 (1986). In particular, "standing under § 16 raises no threat of multiple lawsuits or duplicative recoveries." *Id.* Given that no damages are awarded under § 16, the third factor's inquiry into whether there is a "high degree of speculation in a damages calculation" is inapplicable. *IQ Dental Supply*, 924 F.3d at 66. Because the difference in remedies does not affect the proximate clause analysis, we hold that the appellants lack antitrust standing for the request for injunctive relief.

[11] This result does not mean that Amex could never be liable for allegedly raising prices throughout the market. As the district court noted, the Amex Class members can still litigate the Anti-Steering Rules through the arbitration process. *Am. Express Anti-Steering*, 433 F. Supp. 3d at 411. In addition, at least one circuit court has held that an antitrust defendant may be held liable for umbrella effects on prices. *See In re Processed Egg Prods. Antitrust Litig.*, 881 F.3d 262, 276 (3d Cir. 2018).

22

P.3d 871, 877 (Cal. 2013) ("Interpretations of federal antitrust law are at most instructive, not conclusive, when construing the Cartwright Act."). Still, we conclude that the appellants' California law claims fail for similar reasons as the federal claims.

"[W]e consider the language of the state intermediate appellate courts to be helpful indicators of how the state's highest court would rule." *DiBella v. Hopkins*, 403 F.3d 102, 112 (2d Cir. 2005). The California district courts of appeals have discussed antitrust standing under the Cartwright Act at length. In *Kolling v. Dow Jones & Co.*, the California court noted that "[t]he plaintiff in a Cartwright Act proceeding must show that an antitrust violation was the proximate cause of his injuries." 187 Cal. Rptr. 797, 807 (Cal. Ct. App. 1982). In the same opinion, that court described the "standing to sue" requirement as preventing suits from parties only "incidentally injured" by an antitrust violation. *Id.* More recently, a California court observed that "[o]ne of the elements of standing to seek antitrust damages … is a sufficient showing of injury with respect to," among other things, "the directness of the injury," "the speculative measure of the harm," and "the risk of duplicative recovery." *Wholesale Electricity Antitrust Cases I & II*, 55 Cal. Rptr. 3d 253, 265 (Cal. Ct. App. 2007).

These decisions indicate that the California legislature, like Congress, was "familiar with the common-law rule" of proximate cause, and California courts will not assume that the legislature intended "to displace it *sub silentio*." *Lexmark*, 572 U.S. at 132.

Accordingly, the lack of proximate cause in this case means that the appellants cannot state a claim under the Cartwright Act.[12]

\* \* \*

For these reasons, we **AFFIRM** the judgment of the district court.

---

[12] The district court properly concluded that "dismissal of an underlying antitrust claim mandates dismissal of the UCL claim as well." *Am. Express Anti-Steering*, 433 F. Supp. 3d at 416. "The UCL permits any person acting for the interests of itself, its members or the general public to initiate an action … against a person or business entity who has engaged in any unlawful, unfair, or fraudulent business act or practice." *Quelimane Co. v. Stewart Title Guar. Co.*, 960 P.2d 513, 521-22 (Cal. 1998) (internal quotation marks and citations omitted). Because the UCL claim is predicated on violations of the Sherman and Cartwright Acts, we affirm the dismissal of that claim as well.